# KING & SPALDING

1185 Avenue of the Americas
New York, New York  10036-4003
Fax:  212/556-2222
www.kslaw.com

Edward G. Kehoe
Direct Dial: 212/556-2246
EKehoe@kslaw.com

December 29, 2010

**VIA OVERNIGHT DELIVERY**

Dirección General de Asuntos de Economía
Internacional
Competencia e Inversión Privada
Ministerio de Economía y Finanzas
Jirón Lampa 277, piso 5
Lima
Peru

> **Re:**  ***Claimant's Notice of Intent to Commence Arbitration Under United States -
> Peru Trade Promotion Agreement***

Dear Sir:

Enclosed please find Claimant's Notice of Intent to Commence Arbitration pursuant to
the United States - Peru Trade Promotion Agreement.

Sincerely,

Edward G. Kehoe

Encl.

cc.: Minister Pedro Sánchez Gamarra
Minster of Energy and Mines
Minsistry of Energy and Mines
Av. Las Artes Sur 260 San Borja
Lima, Peru

Ing. Victor Carlos Estrella
General Manger's Office
Activos Mineros S.A.C.
Prolongación Pedro Miotta No. 421
San Juan de Miraflores
Lima, Peru

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**THE RENCO GROUP, INC.,**
**CLAIMANT,**

**V.**

**THE REPUBLIC OF PERU,**
**RESPONDENT.**

**Claimant's Notice of Intent to Commence Arbitration**
**Under United States - Peru Trade Promotion Agreement**

## TABLE OF CONTENTS

Page

I.   Parties ...................................................................................................................2

II.  Preliminary Statement ...........................................................................................2

III. The Treaty.............................................................................................................5

IV.  Factual Background ..............................................................................................6

   A.   The Republic of Peru Mandated Environmental Remediation in La Oroya ...................6

   B.   DRP Purchased the Complex in 1997, but Respondents Retained
        Sole Liability for Several Environmental Projects and Third-Party Claims ...................6

   C.   DRP Complied With and Exceeded Its Obligations Under the Stock Transfer
        Agreement...................................................................................................8

        1.   DRP Complied with its Investment Obligations ............................................8

        2.   DRP is in Compliance with its PAMA Obligations .........................................8

        3.   DRP Exceeded its Contractual Obligations and Made Significant
             Additional Investments to Improve Conditions in the La Oroya
             Community.................................................................................................9

V.   Peru Breached its Treaty Obligations ....................................................................10

   A.   Activos Mineros and Peru Breached the Investment Agreements ...............................10

        1.   Activos Mineros' and Peru's  Refusal to Assume Liability for
             Third-Party Lawsuits Brought Against Claimants, their Affiliates,
             and Executives Constitutes a Breach of the Investment Agreements................10

        2.   Activos Mineros' and Peru's Failure to Remediate the Soil in and
             Around the town of  La Oroya is a Breach of the Investment Agreements........11

        3.   Peru's Failure to Grant DRP Adequate Extensions of Time to Complete
             its PAMA Obligations is a Breach of the Investment Agreements ...................12

   B.   Activos Mineros' and Peru's Conduct Violates Peru's Obligations under the
        Treaty.........................................................................................................12

        1.   Peru's Pattern of Unfair Treatment of DRP Violates Article 10.5
             of the Treaty.............................................................................................12

        2.   Peru's Pattern of Treating DRP Less Favorably than it Treats
             Centromin/Activos Mineros Violates Article 10.3 of the Treaty. .....................13

        3.   Peru's Unfair Treatment of DRP Continues and Has the Potential
             to Culminate in an Expropriation of Renco's Investment, in Violation
             of Article 10.7 of the Treaty. ....................................................................14

        4.   Peru's Breach of its Obligations under the Investment Agreements
             Also Violates the Treaty through Article 10.4.............................................14

VI.  Intent to Arbitrate ................................................................................................15

i

**EXHIBIT "A" TO NOTICE OF REMOVAL**

Pursuant to Article 10.16(2) of the United States-Peru Trade Promotion Agreement that was signed on April 12, 2006 and entered into force on February 1, 2009 (the "Treaty"), The Renco Group, Inc. ("Renco" or "Claimant"), on its own behalf and on behalf of its affiliate Doe Run Peru S.R.LTDA ("DRP"), hereby provides this Notice of Intent to submit to arbitration against the Republic of Peru ("Peru," or the "State") ("Respondent") claims arising out of Renco's investment in the La Oroya Metallurgical Complex (the "Complex"), including the Contract of Stock Transfer between Empresa Minera del Centro del Peru S.A. ("Centromin") and DRP, The Doe Run Resources Corporation ("Doe Run Resources"), and Renco, dated October 23, 1997 (the "Stock Transfer Agreement")[1] and the Guaranty Agreement between Peru and DRP, dated November 21, 1997 (the "Guaranty")[2], and related agreements (collectively, the "Investment Agreements").

## I.    Parties

Renco has its principal place of business at One Rockefeller Plaza, 29th Floor, New York, NY 10020.  Its telephone number is 212-541-6000, and its facsimile number is 212-541-6197.  Renco is a legal entity organized under the laws of New York, United States of America.

DRP has its principal place of business at Av. Victor Andres Belaunde 147, Centro Empresarial Real, Torre Real 3, Piso 9, Lima Peru 27.  Its telephone number is +511-215-1200, and its facsimile number is +511-215-1235.  DRP is a legal entity organized under the laws of Peru and a wholly-owned, indirect subsidiary of Renco.

The Republic of Peru is the constituted *de jure* government of the people and territory of Peru, and it is represented by the Minister of Justice, whose address is Scipión Llona 350 Miraflores, Lima Peru 18.  The telephone and facsimile numbers of the office of the Minister of Justice are +511-222-4660 and +511-222-4660 respectively.

## II.    Preliminary Statement

1.    On October 23, 1997, DRP acquired substantially all of the outstanding shares of Empresa Metalurgica La Oroya S.A. ("Metaloroya" or the "Company") from Centromin, pursuant to the Stock Transfer Agreement, which established ongoing commitments by both parties.  Peru also provided a written guarantee of Centromin's obligations under the Stock Transfer Agreement.  At the time of the stock sale, the Company owned the Complex, a metallurgical smeltering and refining complex located in the central Andes region of Peru, in the town of La Oroya.  This investment dispute arises from (1) Respondent's violations of the Treaty and international law, including Peru's (a) pattern of unfair treatment of DRP in violation of Article 10.5 of the Treaty, (b) pattern of treating DRP less favorably than it treats Centromin and its successor in interest Activos Mineros, SAC ("Activos Mineros")[3] in violation of Article 10.3 of the Treaty, (c) continuing unfair treatment of DRP that has

---

[1]  **Exhibit C-1**, Contract of Stock Transfer between Empresa Minera del Centro del Peru S.A., Doe Run Peru S.R.LTDA, The Doe Run Resources Corporation, and The Renco Group, Inc., dated October 23, 1997 (English).

[2]  **Exhibit C-2**, Guaranty Agreement between the Republic of Peru and Doe Run Peru S.R.LTDA, dated November 21, 1997 (English).

[3]  Activos Mineros is a legal entity organized under the laws of Peru, wholly-owned by the Republic of Peru.  It is the successor-in-interest to Centromin, which is an entity wholly-owned by the Republic of Peru that was substantially dissolved in 2007.  The terms "Centromin" and "Activos Mineros" are used interchangeably herein.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

the potential to culminate in an expropriation of Renco's investment in violation of Article 10.7 of the Treaty, and (d) failure to observe the obligations into which it entered pursuant to the Investment Agreements; and (2) Respondent's breaches of the Investment Agreements, including (a) the failure and refusal of Activos Mineros and the Republic of Peru to honor their contractual obligations to assume and accept liability and responsibility for pending third-party claims, (b) the failure by Activos Mineros and Peru to comply with their environmental obligations, including remediating the soil in and around the town of La Oroya, and (c) the failure by Peru to grant DRP adequate extensions of time to complete environmental projects.

2.      During the three-year period prior to DRP's acquisition of the Complex, Peru had passed a law and related regulations requiring Centromin to improve the Complex to reduce its environmental impact going forward and to perform environmental remediation projects in and around the Complex arising from Centromin's decades-long ownership and operations of the Complex.  This legal process culminated in the Programa de Adecuación y Manejo Ambiental of January 13, 1997 (the "PAMA"), by which Centromin became obligated to meet certain environmental goals and complete certain projects on an established investment schedule, over an initial period of ten years (through January 2007).

3.      As part of the October 1997 sales transaction, DRP agreed to complete significant environmental projects pursuant to the PAMA relating to the Complex, while Centromin retained some PAMA obligations, in particular those relating to remediating the area in and around the town of La Oroya.  Seventy-five years of gaseous and particle emissions from the operations of the Complex by Centromin and its predecessors impacted the soil in and around the town of La Oroya with heavy metals, including lead.  In light of these substantial pre-existing environmental impact issues, Centromin and the Republic of Peru accepted and assumed liability for any and all claims that third parties might bring after DRP acquired the Company shares and the Complex, except in extremely narrow circumstances that are not present here.  In other words, DRP was to improve the Complex so that its *future* environmental impact was reduced, while Centromin and Peru agreed to remediate much of the *pre-existing* environmental impact for which Centromin and its predecessors were solely responsible and to accept liability for potential third-party claims going forward—for the period during which DRP would be implementing the PAMA environmental projects, and subsequent thereto.

4.      Specifically, the Stock Transfer Agreement provides that during the period of time approved for performance of the environmental PAMA obligations (initially ten years, extended to 15 years), *Centromin (and Peru through its Guaranty) assumes liability for any damages and claims by third parties attributable to the activities of DRP, Centromin or its predecessors, except only* in cases in which third-party claims: (i) arise directly from acts exclusively attributable to DRP that are *not* related to the PAMA, and even then, only insofar as such acts were the result of DRP's use of standards and practices less protective of the environment or public health than those pursued by Centromin during its period of ownership, or (ii) arise from a default by DRP in its PAMA obligations or environmental obligations established by the Stock Transfer Agreement.  The Stock Transfer Agreement provides further that after the approved term of the PAMA expires, Centromin and Peru continue to assume and accept liability for third-party claims except only to the extent that they result directly from (i) acts that are *solely attributable* to DRP's operations after the PAMA expires, or (ii) a default by DRP in its PAMA obligations or environmental obligations established by the Stock Transfer Agreement.

3

**EXHIBIT "A" TO NOTICE OF REMOVAL**

5.     Renco relied on the contractual commitment of Centromin and Peru to assume and accept liability for third-party claims when it agreed to purchase the Company.  The sale transaction would not have occurred without this critically important commitment by Centromin and Peru.

6.     Other relevant provisions of the Stock Transfer Agreement are set forth in more detail below, including provisions by which Centromin agreed to release DRP from any obligations arising from lawsuits actually filed by third parties, including the obligation to defend against third-party claims for which Centromin and Peru have assumed liability and responsibility.

7.     At the time the Stock Transfer Agreement was executed, Peru estimated that DRP's PAMA obligations would cost approximately $107 million.  Not only did the actual project costs vastly exceed these initial estimates, but in order to achieve the agreed-upon environmental goals of the PAMA, DRP was required to complete many additional, time-consuming, and costly projects.  In addition, Peru imposed additional projects upon DRP.  When DRP reasonably sought extensions of time to complete its PAMA obligations in light of these changes, after extensive extension request processes, Peru failed to grant adequate extensions and instead granted limited extensions and imposed upon DRP more obligations.  At one point, Peru's failure to grant DRP an adequate extension to complete its PAMA caused DRP's lending institutions to refuse to renew DRP's operational financing, forcing DRP to shutdown operations of the Complex in June 2009.  Indeed, Peru arbitrarily and capriciously attempted at such time to extract unreasonable concessions from DRP as a pre-condition to holding substantive discussions to restart the Complex.  Peru's conduct prevented DRP from obtaining the financing necessary to timely reopen the facility.  This pattern of unfair and inequitable treatment of DRP by Peru eventually led to one of DRP's suppliers placing DRP in an involuntary bankruptcy proceeding in February 2010, of which DRP was notified in April 2010, and which officially started in August 2010.  This proceeding currently is ongoing.

8.     Moreover, Centromin, and Peru through its Guaranty, failed to comply with their PAMA obligations under the Stock Transfer Agreement, including the obligation to remediate the soil in and around the town of La Oroya.

9.     In 2007 and 2008, Peruvian citizens living in and near the town of La Oroya filed lawsuits against Renco, Doe Run Resources, and affiliated entities and individuals in the state court of Missouri, U.S.A., alleging various injuries and damages as a result of alleged lead exposure and environmental contamination from the Complex (the "Lawsuits").  In public statements and in correspondence between the parties, the Republic of Peru and Activos Mineros have affirmatively denied liability for these third-party damage claims, for which they are exclusively liable under the terms of the Stock Transfer Agreement and the Guaranty.  They also have failed and refused to release the defendants in the Lawsuits from liability, and to assume the obligation of taking the lead in defending against the Lawsuits.

10.     As described more fully below, Renco intends to pursue arbitration to seek damages for violations of the Treaty and international law and breach of the Investment Agreements in an amount to be established, but not less than approximately (U.S.) $800 million.  In addition, Renco intends to seek an award declaring Peru (to which Centromin's successor Activos Mineros' actions and omissions are attributable) exclusively liable for any judgment and damages that may be rendered in connection with the Lawsuits.  Renco also intends to seek an order and award requiring Peru to release and indemnify the defendants from all liability associated with the Lawsuits and to take on the defense of the Lawsuits.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## III.   <u>The Treaty</u>

11.     The Treaty is a bilateral free trade agreement that was designed to eliminate obstacles to trade, consolidate access to goods and services, and foster private investment in and between the United States and Peru.  Chapter 10 of the Treaty provides for the protection of private investment in both countries, and for arbitration of investment disputes between investors from one State and the government of the other State.

12.     Section A of Chapter 10 of the Treaty sets out various substantive protections that Peru is obligated to afford to U.S. investments.[4]  The Treaty provides, *inter alia*, that Peru must (i) accord U.S. investments fair and equitable treatment and full protection and security,[5] (ii) treat U.S. investors and investments no less favorably than it treats its own investors and investments,[6] and (iii) not expropriate or nationalize U.S. investments, either directly or indirectly, through measures equivalent to expropriation or nationalization, except for a public purpose, in a non-discriminatory manner, on payment of prompt, adequate, and effective compensation, and in accordance with due process of law.[7] The Treaty also requires Peru to treat U.S. investors and investments no less favorably than it treats investors and investments from countries other than the United States.[8]  In bilateral investment treaties with other countries, Peru has agreed to observe any obligation into which it has entered with regard to investments of nationals from these other countries.  This commitment by Peru extends to the present case.

13.     Section B of Chapter 10 of the Treaty grants a U.S. investor the right to submit to arbitration any investment dispute between the investor (either on its own behalf or on behalf of a Peruvian subsidiary that it owns or controls directly or indirectly) and Peru for breach of the Treaty obligations contained in Section A,[9] or of any "investment agreement" between the U.S. investor and a Peruvian national authority.[10]

14.     The Stock Transfer Agreement (defined and described below), together with the Guaranty and related agreements, qualifies as an "investment agreement" under the Treaty.[11]

---

[4] The Treaty defines investment broadly as "every asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, including . . . shares, stock, and other forms of equity participation in an enterprise[.]" Treaty Article 10.28 at 10-24 and 10-25.  This language means that the U.S. investor need not directly own the covered investment—here, the Complex—in order to qualify for protection under the Treaty.  Indirect ownership through a shareholding interest is sufficient.

[5] Treaty Article 10.5(1).

[6] Treaty Article 10.3.

[7] Treaty Article 10.7(1).

[8] Treaty Article 10.4.

[9] Treaty Articles 10.16(1)(a)(i)(A) and 10.16(1)(b)(i)(A).

[10] Treaty Articles 10.16(1)(a)(i)(C), 10.16(1)(b)(i)(C), and 10.28 (definition of "investment agreement").

[11] An "investment agreement" is any written agreement between a national authority and a foreign investor, on which the investor relies in establishing or acquiring an investment other than the written agreement itself, that grants certain rights to the investor.  Treaty Article 10.28 at 10-25.

5

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## IV.   Factual Background

### A.   The Republic of Peru Mandated Environmental Remediation in La Oroya

15.    The Complex was founded in 1922 by the Cerro de Pasco Corporation, a private company, and it is comprised of smelters and refineries that process the poly-metallic minerals mined in the central Andes region, into copper, lead, zinc and other metals including but not limited to silver and gold.  In 1974, Peru expropriated the Complex and transferred its ownership and operations to Centromin, a corporation wholly-owned by the Republic of Peru.

16.    In 1993, Peru passed Supreme Decree No. 016-93-EM, mandating the remediation and environmental improvements of various industrial sites around the country, including in La Oroya. With an eye towards privatizing the Complex, Centromin created the Company, in which it vested ownership of the Complex.  Centromin also conducted a preliminary environmental evaluation with respect to the Complex, and prepared a list of environmental projects and estimated costs necessary to bring the Complex within the environmental standards prescribed by the law.  On January 13, 1997, the Peruvian Ministry of Energy and Mines adopted Centromin's environmental proposals, in the form of the PAMA, which contained a list of environmental projects and required that Centromin meet certain environmental goals over an initial period of ten years (later extended twice until March 2012).

### B.   DRP Purchased the Complex in 1997, but Respondent Retained Sole Liability for Several Environmental Projects and Third-Party Claims

17.    By Supreme Resolution No. 018-97-PCM dated January 23, 1997, Peru called for an increase of private investment in the Company, and in accordance with this Resolution, the Special Committee on Privatization of Centromin called for Public International Bidding No. PRI-16-97 "to promote private investment in the Company, through a stock transfer and the increase of its stock capital in virtue of new contributions from a corporation or consortium that would fulfill the pre-qualification requirements established by [the law]."[12]

18.    Public International Bidding No. PRI-16-97 was implemented, and by letter dated July 10, 1997, the bid was awarded to a consortium comprised of Doe Run Resources and Renco.  In accordance with the Bidding Conditions, the consortium assigned its rights to its Peruvian subsidiary, DRP, as authorized and approved by the relevant Peruvian authorities by agreement dated September 11, 1997.

19.    On October 23, 1997, DRP, Doe Run Resources, Renco, and Centromin executed the Stock Transfer Agreement, pursuant to which DRP acquired the majority shares of the Company for a purchase price of $121.4 million, and as part of that transaction, Peru issued the Guaranty, which guaranteed the "representations, assurances, guaranties and obligations assumed by" Centromin under the Stock Transfer Agreement.

---

[12] **Exhibit C-1**, Stock Transfer Agreement at VII.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

20.    The Stock Transfer Agreement contained various ongoing commitments by both parties.[13]  DRP agreed to invest $120 million in improving and operating the Complex within five years.[14]

21.    The parties also agreed to allocate the PAMA projects among themselves, which the Ministry of Energy and Mines approved.  Among other projects, Centromin, and Peru through its Guaranty, agreed to remediate the areas affected by gaseous and particle emissions from the smeltering and refining operations.[15]  Gaseous and particle emissions from the operations of the Complex by Cerro de Pasco (for over 50 years) and Centromin (for over 20 years) impacted the soil in and around the town of La Oroya with numerous heavy metals, including lead.

22.    DRP agreed to construct new sulfuric acid plants, a water treatment plant for the copper refinery, an industrial liquids treatment plant, a wall to retain the drainage of lead mud from the Zileret plant, sewage water treatment plants and a garbage disposal facility at the Complex.  DRP also agreed to create a closed circuit for the speiss granulation waters, install equipment to improve anode cleaning in the zinc plant, and develop a system for copper and lead slag management and disposal.

23.    During the period approved for performance of the PAMA projects, Centromin—and Peru through its Guaranty—agreed to assume liability for any and all damages and third-party claims attributable to the activities of DRP, Centromin, and its predecessors, except in narrow and limited circumstances that are not present here.[16]  This obligation and commitment by Peru and Centromin to take responsibility for third-party claims extends to, and benefits, affiliates and owners of DRP.

24.    The Stock Transfer Agreement further clarifies that DRP would not be liable for damages or third-party claims attributable to Centromin that result from Centromin's or its predecessors' operations, or that are due to Centromin's default of its environmental obligations specified in Clause 6.1.[17]

25.    Centromin also undertook to protect and hold DRP harmless against third-party claims and to "indemnify it for any damages, liabilities, or obligations that may arise for which it has assumed liability and obligation,"[18] and to immediately assume any obligations relating to "any demand or judicial, administrative notice or notice of any kind" arising out of events for which Centromin assumed responsibility, releasing DRP from such claims, and to lead the defense with respect to such lawsuits.[19]  These obligations and commitments by Centromin and Peru extend to claims brought

---

[13] By merger agreement dated December 30, 1997 (two months after the parties executed the Stock Transfer Agreement), the Company merged completely into DRP, which assumed all of the Company's contractual rights and obligations, per the Tenth Clause of the Stock Transfer Agreement.

[14] Stock Transfer Agreement at Fourth Clause.

[15] *Id*. at Clause 6.1(c).

[16] *Id*. at Clause 6.2. The narrow circumstances in which Centromin and Peru are not liable for third party claims are when the claims arise:  (1) directly due to acts *unrelated* to the PAMA, which are *exclusively attributable to DRP*, and only *insofar* as they are the result of DRP's "use of standards and practices that were less protective of the environment or of public health than those that were pursued by Centromin until the date of execution of this contract"; or (2) directly from a default of DRP's PAMA obligations or of its environmental obligations set forth in Clauses 5.1 and 5.2 of the Stock Transfer Agreement.  Neither of these events has occurred.

[17] *Id*. at Clause 5.5.

[18] *Id*. at Clause 6.5.

[19] *Id*. at Clause 8.14.

7

**EXHIBIT "A" TO NOTICE OF REMOVAL**

against DRP's owners and affiliates, including individual directors and officers of such affiliates, as is the case in the Lawsuits.

26.     Each party also agreed to work with the other party in the event the other party had difficulty fulfilling its obligations under the Stock Transfer Agreement if such difficulty was the result of causes that arise that are not imputable to the obliged party and that were not foreseen at the time that the contract was signed, such as extraordinary economic alterations and governmental interference.[20]

27.     Finally, pursuant to the Guaranty, Peru guaranteed "the representations, assurances, guaranties and obligations assumed by" Centromin under the Stock Transfer Agreement.[21]   Peru's Guaranty extends for as long as Centromin "has pending obligations" under the Stock Transfer Agreement.[22]   Peru's Guaranty also "survive[s] the transfer of any of the rights and obligations of Centromin [under the Stock Transfer Agreement] and any liquidation of Centromin."[23]

## C.     DRP Complied With and Exceeded Its Obligations Under the Stock Transfer Agreement

### 1.     DRP Complied with its Investment Obligations

28.     DRP satisfied its obligation to invest $120 million in the first five years.  From 1997 to 2002, DRP invested approximately $120.2 million in the Complex, as confirmed by Centromin in an official certification, dated February 13, 2003.

### 2.     DRP is in Compliance with its PAMA Obligations

29.     DRP is in compliance with the PAMA obligations and actually has exceeded initial expectations in this regard.

30.     The PAMA projects initially proposed by Centromin, and approved by the Ministry of Energy and Mines, underestimated the amount of work required to meet the environmental goals contained in the PAMA.  The Ministry of Energy and Mines acknowledged that the engineering work at the time was prepared with limited technical detail and a very basic level of engineering that did not contemplate the remediation of some environmental problems, which in some cases were significant.  DRP thus proposed, and the Ministry of Energy and Mines approved, additional investments that DRP would make at its own cost.  Moreover, the Ministry of Energy and Mines required DRP to complete additional, so-called "complementary projects" to the PAMA.

31.     In light of these circumstances, as well as the 2002 financial crisis in the metals market which constituted an "extraordinary economic alteration" under the terms of the Stock Transfer Agreement, in year 2004 DRP requested a five-year extension to complete the PAMA and, in this respect, took part in a thorough and extensive process in support of its request.  However, Peru did not grant DRP the five years that it requested.  Instead, in 2006 Peru extended the deadline by only two years and ten months, until October 31, 2009, while simultaneously imposing on DRP various new and

---

[20]  *Id*. at Fifteenth Clause.

[21]  **Exhibit C-2**, Guaranty at 2.1.

[22]  *Id*. at 4.

[23]  **Exhibit C-1**, Stock Transfer Agreement at Tenth Clause.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

onerous obligations, including "complementary projects," more stringent environmental standards, and continuous and daily inspections. One of the projects that Peru required DRP to complete was a copper modernization project that increased DRP's costs by over $100 million. DRP worked to comply with these new obligations, as well as to fulfill its other obligations imposed by the PAMA and the Ministry of Energy and Mines.

32.    By 2007, DRP had substantially completed all but one of the PAMA projects, and it had partially completed the final project. As a result of the global financial crisis, DRP experienced some financial difficulties as world metal prices dropped, and in 2009, at the request of its lender, it made several requests to the Ministry of Energy and Mines for an extension of time to complete the remaining PAMA environmental work, as the Stock Transfer Agreement contemplates in times of "extraordinary economic alterations," and as the law requires in light of Peru constantly changing its requirements. The Ministry of Energy and Mines refused to honor the parties' shared understanding and commitment, and refused to grant an extension. When DRP was unable to secure an extension of its PAMA obligations, DRP's lending institutions refused to renew the revolving loan that DRP was using to finance its day-to-day operations, forcing DRP to partially close the Complex in March 2009.

33.    On September 26, 2009, the Peruvian Congress finally passed a law granting DRP an extension of 30 months to complete the last remaining project, the sulfuric acid plant. Although initially adequate, this extension soon became insufficient when the Ministry of Energy and Mines passed new and targeted regulations that were so onerous that DRP was unable to resume operations and take advantage of the extension. For example, the regulations required DRP, *inter alia*, to pay 100% of its gross proceeds into a trust that would only release funds after securing three months' worth of PAMA schedule obligations, thus making it difficult for DRP to pay its workers or suppliers, or generally to operate the Complex. Because of these prohibitive regulations, DRP was unable to obtain the necessary financing or to restart the facility.

34.    DRP has spent over $300 million on PAMA projects to date, and in complying with its commitments and obligations, DRP adopted standards and practices that are more protective of the environment and public health than those adopted and implemented by Centromin in the years leading up to the sale of the Company and its Complex. These standards and practices are evidenced by DRP's significant and documented improvements with respect to air and water quality in La Oroya. Moreover, DRP voluntarily put in place safety standards and practices focused on prevention and control actions—such as continuous medical examinations—and also implemented health-related standards and practices that Centromin never established, including the creation of hygiene and health programs benefiting all local residents and the institution of programs to clean the streets, refurbish houses of at-risk children, and install washrooms in local schools.

3.    DRP Exceeded its Contractual Obligations and Made Significant Additional Investments to Improve Conditions in the La Oroya Community

35.    In addition to performing its contractual obligations, DRP voluntarily spent additional sums on social programs for the citizens of the La Oroya area, such as:

- Offering special programs for the women from the communities: training programs focused on budget planning, child rearing, nutrition, and social responsibility, training a team of health promoters to educate the communities

9

**EXHIBIT "A" TO NOTICE OF REMOVAL**

about health risks and orient pregnant women on pre-natal care, and extensive small business training;

- Instituting the Human and Social Ecology Program, which monitors the health of at risk children and provides daily nutritional lunches;

- Sponsoring training programs in animal husbandry targeted to the farming communities around La Oroya. In the Forestation and Andean Gardening program, DRP and community participants planted more than 121,000 seedlings and 132,000 square meters of gardens by 2006; and,

- Improving infrastructure at 17 schools, three playgrounds, a medical post, a laundry area, and a public dining room. Infrastructure improvements consisted of works like installing computer labs, installing washrooms and running water, refurbishing existing structures, and constructing additions.

## V.   **Peru Breached its Treaty Obligations**

### A.   **Activos Mineros and Peru Breached the Investment Agreements**

36.   Renco intends to submit claims to arbitration under Article 10.16 of the Treaty because Activos Mineros and Peru breached their contractual obligations under the Investment Agreements.

1.   Activos Mineros' and Peru's Refusal to Assume Liability for Third-Party Lawsuits Brought Against Claimants, their Affiliates, and Executives Constitutes a Breach of the Investment Agreements

37.   In early August 2007, DRP learned that fliers soliciting plaintiffs for future litigation were being distributed in La Oroya. The fliers, prepared by the law firm SimmonsCooper LLC of East Alton, Illinois, U.S.A., stated, among other things, that "with the lawyers' help, you can ask the courts of law of the United States and make Doe Run pay for the medical treatment of your children and for their injuries."

38.   On October 4, 2007, a group of plaintiffs filed lawsuits in the United States alleging various personal injury damages as a result of alleged lead exposure and environmental contamination from the Complex. The plaintiffs voluntarily withdrew the lawsuits and then refiled the Lawuits in 2008, which are comprised of 11 cases on behalf of 35 minor plaintiffs—all of whom are citizens and residents of La Oroya, the Republic of Peru—in the Circuit Court of the State of Missouri, Twenty-Second Judicial Circuit, City of St. Louis, Missouri, U.S.A. The allegations in each lawsuit are virtually identical, stating "[t]his is an action to seek recovery from Defendants for injuries, damages and losses suffered by each and every minor plaintiff named herein, who were minors at the time of their initial exposures and injuries as a result of exposure to the release of lead and other toxic substances . . . in the region of La Oroya, Peru."

39.   In addition to seeking damages for alleged personal injuries, the plaintiffs seek punitive damages, and name as defendants Renco and Doe Run Resources, as well as their affiliated companies DR Acquisition Corp. and Renco Holdings, Inc., and directors and officers Marvin K. Kaiser, Albert Bruce Neil, Jeffrey L. Zelms, Theodore P. Fox III, Daniel L. Vornberg, and Ira L. Rennert (the "Renco Defendants"). The plaintiffs did not bring claims against Activos Mineros, the Republic of Peru, or

**EXHIBIT "A" TO NOTICE OF REMOVAL**

DRP, choosing instead to sue DRP's U.S.-based affiliates in the courts of the United States. The Lawsuits seek to hold DRP's U.S.-based owners and corporate affiliates, as well as directors and officers of these U.S.-based affiliated companies, liable for the alleged actions of DRP. Pursuant to applicable law and governing corporate documents, DRP is obligated to indemnify the Renco Defendants against any judgment that may be entered against them in the Lawsuits.

40.     On October 31, 2007, the then-President of Peru's Council of Ministers, Jorge del Castillo Galvez, wrote a letter to the United States Ambassador to Peru Michael McKinley, expressing the Republic of Peru's "deepest concerns" about the Lawsuits that had just been filed.[24] As the party that will be liable for any ultimate damages award under the Stock Transfer Agreement, the Republic of Peru does not wish for the cases to proceed in the United States where, for example, punitive damages are possible.   In his letter, Mr. del Castillo Galvez explained that, under principles of international law, the courts in the United States should "refuse to review the case" because the owner and operator of the Complex is DRP, a Peruvian company, the plaintiffs are Peruvian, the facts that are the basis of the Lawsuits have taken place in Peru, and any such claims should be brought in Peru.

41.     The Lawsuits have proceeded slowly to date and pending motions, some of which move to dismiss the Lawsuits, have not yet been heard. Specifically, on September 14, 2010, the Missouri state court ruled that the proper venue for the Lawsuits is the Circuit Court of the City of St. Louis, Missouri, U.S.A. The Renco Defendants submitted a petition challenging that ruling. However, on December 21, 2010, the Supreme Court of the State of Missouri effectively affirmed that venue is proper in the Circuit Court of the City of St. Louis. Therefore, while no recent proceedings have been held in the Lawsuits following an order that stayed discovery in the Lawsuits pending the disposition of the petition challenging venue, proceedings will now resume in the Lawsuits, including proceedings to be held on the defendants' motion to dismiss on various grounds including *forum non conveniens*. Once those motions have been fully briefed, a hearing on the motions could be held as early as in the spring of 2011.

42.     On October 12, 2010, counsel for Renco and its affiliates wrote to Activos Mineros, the Ministry of Energy and Mines, and the Ministry of Economics and Finance of Peru to request that they honor their contractual obligations by (1) appearing in the Lawsuits; (2) assuming liability and responsibility for any damages that the plaintiffs may recover in the Lawsuits; and (3) releasing and holding Renco and its affiliates harmless from those third-party claims. Renco and its affiliates reiterated their requests in letters dated November 12, 2010 and December 14, 2010. By letters dated November 5 and 26, 2010, Activos Mineros responded, refusing to accept or assume any liability or responsibility. The Republic of Peru has not responded to date.

2.     <u>Activos Mineros' and Peru's Failure to Remediate the Soil in and Around the town of La Oroya is a Breach of the Investment Agreements</u>

43.     In both the PAMA and the Stock Transfer Agreement, Activos Mineros and Peru agreed to remediate the soil in and around the town of La Oroya, but they have utterly failed and refused to do so. Moreover, in 2000, Peru improperly passed a resolution purporting to change the timing of its project to remediate the soil in and around the town of La Oroya, stating that it could begin the projects in 2007 and finish in 2010. To date, Peru has taken no meaningful actions whatsoever to comply with its obligation to remediate the soil.

---

[24] **Exhibit C-3**, Letter from Mr. Jorge del Castillo Galvez to Ambassador Michael McKinley, dated October 31, 2007.

11

**EXHIBIT "A" TO NOTICE OF REMOVAL**

44.     Activos Mineros' and Peru's failure to honor their commitment to remediate the soil continues to harm the citizens of La Oroya and has given rise to the Lawsuits, for which Activos Mineros and Peru are liable, not only because they assumed all liability for third-party claims in the Investment Agreements, but, for the separate reason that they failed to remediate the soil as they promised to do.

### 3.     Peru's Failure to Grant DRP Adequate Extensions of Time to Complete its PAMA Obligations is a Breach of the Investment Agreements

45.     Activos Mineros and Peru also breached their contractual obligations under Clause 15 of the Stock Transfer Agreement and Article 2.1 of the Guaranty by failing to grant DRP adequate extensions of time to complete its PAMA obligations in light of certain circumstances of *force majeure*, including extraordinary economic alterations in 2002 and 2008, and the imposition upon DRP by Peru of additional and onerous environmental and operational obligations as a condition to granting the first extension in 2006.

46.     In 2009, DRP requested an extension of time to complete the final PAMA project due to (1) financial difficulties that it faced during the global economic crisis and (2) the State's unilateral imposition upon DRP of additional and onerous environmental and operational obligations.  When Peru failed to provide DRP with an adequate extension of its environmental obligations, DRP lost its financing for day-to-day operations and was forced to reduce the operations of the Complex substantially in March 2009, ultimately ceasing operations altogether on June 3, 2009.

## B.     Activos Mineros' and Peru's Conduct Violates Peru's Obligations under the Treaty

47.     Peru's and Activos Mineros' misconduct not only breaches the Investment Agreements, but also violate international law and the Treaty.  Their actions and omissions continue to harm and impair Renco's substantial investment in the La Oroya Complex, and risk depriving Renco of its investment without fair compensation.  Because this misconduct violates at least three Articles of the Treaty and threatens to violate a fourth, Renco intends to submit claims to arbitration under Articles 10.16(1)(a)(i)(A) and 10.16(1)(b)(i)(A) of the Treaty.

### 1.     Peru's Pattern of Unfair Treatment of DRP Violates Article 10.5 of the Treaty

48.     Peru has engaged in a pattern of conduct of unfair treatment in violation of Article 10.5 of the Treaty by, *inter alia*, repeatedly imposing on DRP additional environmental projects and requirements, which increased the amount of time and money that DRP was required to spend, while simultaneously and improperly refusing to timely grant DRP the needed additional time to fulfill these new obligations.

49.     Moreover, not only did the actual project costs vastly exceed Peru's initial estimates in 1997, but the actual environmental conditions that existed at La Oroya at the time of the transfer caused DRP to spend additional sums and do additional projects that were not originally anticipated, which became mandated by the government through resolutions. When DRP reasonably sought an extension of time in light of the changes required by Peru, Peru granted only a limited extension and imposed additional and onerous obligations upon DRP.

50.     When DRP reasonably sought a second extension in light of several factors including the additional obligations imposed by Peru and world economic conditions, the Ministry of Energy and

**EXHIBIT "A" TO NOTICE OF REMOVAL**

Mines denied the request. The Congress of the Republic of Peru through the Law 29410, finally extended DRP's time to complete its PAMA, but the Ministry of Energy and Mines, through an inferior range rule, passed such onerous financial regulations that DRP was unable to take advantage of the extension. It is a classic case of unfair and inequitable treatment for one Peruvian State organ (Congress) to grant a necessary and required extension that another State organ (the Ministry of Energy and Mines) effectively cancels out.

51. Moreover, during all of this time, Peru engaged in a smear campaign in the press against DRP. Peru's statements to the press—including the Peruvian President's public statement that DRP was no longer welcome in Peru— were intended to create an erroneous public opinion that DRP was responsible for the contamination of La Oroya and remiss in its remediation obligations.

52. In addition, and as discussed more fully above, Peru and Activos Mineros refused to honor their commitment to assume liability for the Missouri Lawsuits. Renco relied on this contractual commitment when it agreed to purchase the Company. The sale transaction would not have occurred without this critically important commitment by Centromin and Peru. The refusal by Peru and Activos Mineros to honor this commitment is a breach of Renco's and DRP's legitimate expectations when they made their substantial investment in Peru and constitutes yet another example of the unfair and inequitable treatment that Renco has experienced at the hand of Peru.

53. Peru's unfair refusal to timely grant reasonable PAMA extensions, its unreasonable refusal to honor its commitment to assist DRP in overcoming fallout from the global financial crisis, and its disparaging public campaign against Renco and DRP have created a hostile investment environment and have prevented DRP from securing new financing necessary to resume operations of the Complex.

### 2. Peru's Pattern of Treating DRP Less Favorably than it Treats Centromin/Activos Mineros Violates Article 10.3 of the Treaty.

54. Peru's unfair treatment of DRP is in direct contrast to its treatment of Centromin, a company owned by Peru, in violation of Article 10.3 of the Treaty. As described above, DRP went through an extensive request process for each of the PAMA extensions that it received. This process included conducting detailed studies, submitting the reports of the studies to the Ministry of Energy and Mines, providing the public with notice and conducting public hearings. With respect to the first of the extensions that Peru begrudgingly granted, Peru imposed upon DRP obligations to complete more projects and to satisfy additional environmental standards. Peru also subjected DRP to continuous daily inspections by an inspector living in La Oroya. With respect to the second extension that Peru granted, Peru subjected DRP to financial conditions so onerous that DRP could not possibly complete its last remaining PAMA project.

55. Meanwhile, Centromin requested a PAMA modification in 2000 that included an extension of its time to complete its PAMA projects. Centromin did not even notify DRP. DRP had no opportunity to object or participate in the process. Peru did not require Centromin to conduct any studies or submit any reports or notify the public or conduct public hearings. Peru granted Centromin's request for a PAMA modification without imposing any additional obligations or more stringent environmental standards on Centromin.

56. Moreover, while Peru subjected DRP to rigorous inspections, Peru seemingly imposed little quality control over Centromin. For example, one of Centromin's PAMA projects was the

13

**EXHIBIT "A" TO NOTICE OF REMOVAL**

abandonment of the arsenic trioxide deposit that Centromin used during its operations of the Complex. While Centromin claims to have completed this project and Peru seems to be satisfied that this project is complete, studies completed by DRP indicate that the deposit still leaks substantial amounts of arsenic into the river. In addition, even though its PAMA was modified to extend its deadline to remediate the soil in and around La Oroya until 2010, Centromin has yet to make any substantial progress toward completing this project.

> 3. Peru's Unfair Treatment of DRP Continues and Has the Potential to Culminate in an Expropriation of Renco's Investment, in Violation of Article 10.7 of the Treaty.

57. Peru's unfair treatment of DRP continues and has the potential to culminate in an expropriation of the Complex, in violation of Article 10.7 of the Treaty. Because DRP was unable to obtain financing, DRP was unable to pay its suppliers. In February 2010, one supplier placed DRP into involuntary bankruptcy. DRP had been working with its creditors to reach a repayment deal, but on October 1, 2010, the Peruvian bankruptcy agency published a list of outstanding creditors. DRP was surprised to learn that the government of Peru has filed several claims in an attempt to become the largest creditor, and thus control the fate of the company. Peru's largest (and patently bogus) claim against DRP is for payment of the cost of completion of the remaining PAMA project. But the time for completion of the PAMA has not yet passed, and in any event DRP never agreed to pay Peru the remaining cost in case of non-completion of a PAMA project. Peru's attempt to take over the company through bogus bankruptcy claims is as improper as it is unfair, and violates the Treaty.

> 4. Peru's Breach of its Obligations under the Investment Agreements Also Violates the Treaty through Article 10.4

58. In bilateral investment treaties with other countries, Peru agreed to observe any obligation into which it has entered with regard to investments of nationals from these other countries. This commitment, known as an "Umbrella Clause," by Peru extends to the present case through Article 10.4, which requires Peru to treat U.S. investors and investments no less favorably than it treats investors and investments from countries other than the United States.[25] Because Peru has failed to observe its obligations under the Investment Agreements, Peru has violated the Umbrella Clause.

---

[25] Treaty Article 10.4.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## VI.    Intent to Arbitrate

59.    The Treaty provides that, in the event that a disputing party considers that an investment dispute cannot be settled by consultation and negotiation, that party may submit the claim to arbitration pursuant to Article 10.16.

60.    Claimant attempted to resolve the present dispute with Peru and Activos Mineros. Claimant's representatives met with various government officials on numerous occasions for this purpose.  Claimant also delivered letters requesting that Peru and Activos Mineros honor certain of their obligations, and notifying them that Claimant would resort to any and all available legal remedies if the matter could not be resolved.

61.    Because Peru and Activos Mineros rejected all of Claimant's attempts to resolve the present dispute, Claimant submits this Notice of Intent at this time to notify Peru of Claimant's intention to submit the claims described herein to arbitration in accordance with Section B of the Treaty.

62.    Claimant reserves its right to amend or supplement this requested relief at the time that it may institute formal arbitration proceedings against Peru.

Dated:  December **29**, 2010.

Respectfully submitted,

Edward G. Kehoe
Caline Mouawad
Lisa Albert
Kana Ellis
Alejandro Cremades
KING & SPALDING
1185 Avenue of the Americas
New York, NY 10036-4003
(212) 556-2100
(212) 556-2222 (Facsimile)

15

1220139

**EXHIBIT "A" TO NOTICE OF REMOVAL**

THE RENCO GROUP, INC.,
DEMANDANTE,


C.


THE REPUBLIC OF PERU,
DEMANDADO.


Notificación de Intención del Demandante para iniciar un arbitraje
en virtud del Tratado de Libre Comercio Perú-Estados Unidos


**EXHIBIT "A" TO NOTICE OF REMOVAL**

## ÍNDICE

Página

I.  Partes..................................................................................................................2

II.  Declaración preliminar ....................................................................................2

III.  El Tratado .........................................................................................................5

IV.  Antecedentes de hecho .....................................................................................6

    A.  La República del Perú ordenó remediación ambiental en La Oroya ...............6

    B.  DRP compró el Complejo en 1997, pero el Demandado conservó responsabilidad exclusiva por varios proyectos medioambientales y por los reclamos de terceros .........................................................................................6

    C.  DRP cumplió y excedió sus obligaciones en virtud del Acuerdo de Transferencia de Acciones...........................................................................................................8

        1.  DRP cumplió sus obligaciones de inversión .......................................8

        2.  DRP cumplió sus obligaciones del PAMA............................................8

        3.  DRP excedió sus obligaciones contractuales y realizó significativas inversiones para mejorar las condiciones de la comunidad de La Oroya ................................9

V.  Perú incumplió sus obligaciones conforme a tratados.................................10

    A.  Activos Mineros y Perú violaron los Contratos de Inversión.........................10

        1.  La negativa de Activos Mineros y Perú para asumir responsabilidad por tercerías iniciadas contra los Demandantes, sus afiliadas y ejecutivos constituye una violación de los Contratos de Inversión....................................................10

        2.  El hecho de que Activos Mineros y Perú no hayan remediado el suelo de la ciudad de La Oroya y sus cercanías constituye una violación de los Contratos de Inversión ...........................................................................................................11

        3.  El hecho de que Perú no le haya concedido a DRP prórrogas suficientes para completar sus obligaciones conforme al PAMA es una violación de los Contratos de Inversión ...........................................................................................................12

    B.  La conducta de Activos Mineros y Perú viola las obligaciones de este último conforme al Tratado........................................................................................12

        1.  El patrón de trato injusto de Perú a DRP viola el Artículo 10.5 del Tratado .....12

        2.  El patrón de Perú de tratar a DRP menos favorablemente que como trata a Centromin/Activos Mineros viola el Artículo 10.3 del Tratado.........................13

        3.  El tratamiento injusto de Perú de DRP continúa y tiene el potencial para culminar en una expropiación de la inversión de Renco, en violación del Artículo 10.7 del Tratado...................................................................................14

        4.  La violación de Perú de sus obligaciones conforme a los Contratos de Inversión también viola el Tratado en su Artículo 10.4 ....................................................14

VI.  Intención de someter a arbitraje.....................................................................15

i

**EXHIBIT "A" TO NOTICE OF REMOVAL**

De conformidad con el Artículo 10.16(2) del Tratado de Libre Comercio Perú-Estados Unidos, firmado el 12 de abril de 2006, que entró en vigencia el 1 de febrero de 2009 (en adelante, el "Tratado"), The Renco Group, Inc. (en adelante, "Renco" o el "Demandante"), por cuenta propia y en representación de su afiliada Doe Run Peru S.R.LTDA. (en adelante, "DRP"), presenta esta Notificación de Intención de someter a arbitraje contra la República del Perú (en adelante, "Perú" o el "Estado") (el "Demandado") los reclamos derivados de la inversión de Renco en el Complejo Metalúrgico La Oroya (en adelante, el "Complejo"), incluido el Contrato de Transferencia de Acciones entre Empresa Minera del Centro del Perú S.A. (en adelante, "Centromin") y DRP, The Doe Run Resources Corporation (en adelante, "Doe Run Resources"), y Renco, del 23 de octubre de 1997 (en adelante, el "Contrato de Transferencia de Acciones")[1] y el Contrato de Garantía entre Perú y DRP, del 21 de noviembre de 1997 (en adelante, la "Garantía")[2], y los contratos relacionados (en adelante, en conjunto, los "Contratos de Inversión").

## I.    Partes

Renco tiene su sede social en One Rockefeller Plaza, 29th Floor, Nueva York, NY 10020. Su número telefónico es 212-541-6000 y su número de facsímil, 212-541-6197. Renco es una persona jurídica constituida de conformidad con la legislación de Nueva York (Estados Unidos de América).

DRP tiene su sede social en Av. Víctor Andrés Belaunde 147, Centro Empresarial Real, Torre Real 3, piso 9, Lima (Perú), 27. Su número telefónico es +511-215-1200 y su número de facsímil, +511-215-1235. DRP es una persona jurídica constituida de conformidad con la legislación de Perú y es una subsidiaria indirecta de propiedad absoluta de Renco.

La República del Perú es el gobierno *de jure* del pueblo y del territorio de Perú; está representado por el Ministro de Justicia, cuya dirección es Scipión Llona 350, Miraflores, Lima (Perú), 18. El número telefónico y de facsímil del Ministerio de Justicia son +511-222-4660 y +511-222-4660, respectivamente.

## II.    Declaración preliminar

1.    El 23 de octubre de 1997, DRP adquirió sustancialmente todas las acciones en circulación de Empresa Metalúrgica La Oroya S.A. (en adelante, "Metaloroya" o la "Compañía") de Centromin, de conformidad con el Contrato de Transferencia de Acciones, que estableció compromisos vigentes entre ambas partes. Perú aportó una garantía escrita por las obligaciones de Centromin en virtud del Contrato de Transferencia de Acciones. Al momento de la venta de las acciones, la Compañía era la propietaria del Complejo, un complejo metalúrgico de fundición y refinado, ubicado en la región central de los Andes de Perú, en la ciudad de La Oroya. La controversia por la inversión resulta de 1) las violaciones, por parte del Demandado, del Tratado y del derecho internacional, incluidos, por parte de Perú, a) el patrón de trato injusto a DRP, en violación del Artículo 10.5 del Tratado, b) el patrón de trato menos favorable a DRP que a Centromin y a su sucesor Activos Mineros, SAC (en adelante, "Activos Mineros"),[3] en violación del Artículo 10.3 del Tratado, c) el trato injusto continuado a DRP que puede

---

[1] **Anexo C-1**, Contrato de Transferencia de Acciones entre Empresa Minera del Centro del Perú S.A., Doe Run Peru S.R.LTDA., The Doe Run Resources Corporation y The Renco Group, Inc., del 23 de octubre de 1997 (en inglés).

[2] **Anexo C-2**, Contrato de Garantía entre la República del Perú y Doe Run Peru S.R.LTDA., del 21 de noviembre de 1997 (en inglés).

[3] Activos Mineros es una persona jurídica constituida de conformidad con la legislación de Perú, de propiedad absoluta de la República del Perú. Es la sucesora de Centromin, persona jurídica de propiedad absoluta de la República del Perú, que se disolvió sustancialmente en 2008. Los términos "Centromin" y "Activos Mineros" se utilizan indistintamente en el presente.

2

**EXHIBIT "A" TO NOTICE OF REMOVAL**

culminar en la expropiación de la inversión de Renco, en violación del Artículo 10.7 del Tratado, y d) el incumplimiento de las obligaciones que le corresponden de conformidad con los Contratos de Inversión; y 2) los incumplimientos de los Contratos de Inversión por parte del Demandado, incluidos a) el incumplimiento y la denegación de Activos Mineros y de la República del Perú de sus obligaciones contractuales de asumir y aceptar la responsabilidad por los reclamos de terceros que se encuentran pendientes, b) el incumplimiento por parte de Activos Mineros y de Perú de sus obligaciones medioambientales, incluidas las de remediar el suelo en la ciudad de La Oroya y sus alrededores, y c) la negativa de Perú a conceder las prórrogas adecuadas para completar los proyectos medioambientales.

2.      Durante el período de tres años previo a que DRP adquiriera el Complejo, Perú aprobó una ley y normas relacionadas que requerían que Centromin mejorara el Complejo para reducir su impacto medioambiental en lo sucesivo y que realizara proyectos de remediación medioambiental en el Complejo y en sus alrededores, como resultado de la propiedad durante décadas y de las operaciones de Centromin en el Complejo. Dicho proceso legal resultó en el Programa de Adecuación y Manejo Ambiental, del 13 de enero de 1997 (en adelante, el "PAMA"), por el cual Centromin quedó obligado a cumplir ciertas metas medioambientales y a completar ciertos proyectos según un cronograma de inversiones establecido, a lo largo de un período inicial de diez años (hasta enero de 2007).

3.      Como parte de la transacción de ventas de octubre de 1997, DRP acordó completar proyectos medioambientales significativos, de conformidad con el PAMA, relacionados con el Complejo, mientras que Centromin mantuvo algunas de las obligaciones del PAMA, en particular las relacionadas con el área de remediación en la ciudad de La Oroya y sus alrededores. Setenta y cinco años de emisiones de gases y partículas por las operaciones del Complejo, por parte de Centromin y sus predecesores, impactaron en el suelo de la ciudad de La Oroya y sus alrededores, con metales pesados, incluido el plomo. En vista de estos sustanciales asuntos de impacto medioambiental preexistentes, Centromin y la República del Perú aceptaron y asumieron la responsabilidad por cualquier reclamo que pudieran presentar terceros luego de que DRP adquiriera las acciones de la Compañía y el Complejo, salvo en casos muy limitados que no se incluyen en el presente. En otros términos, DRP mejoraría el Complejo de manera tal que se redujera el impacto medioambiental *futuro*, por el cual Centromin y Perú acordaron remediar gran parte de impacto medioambiental *preexistente*, por el cual Centromin y sus predecesores eran los únicos responsables, y aceptar la responsabilidad por los potenciales futuros reclamos de terceros, por el período durante el cual DRP implementaría los proyectos medioambientales del PAMA, y los sucesivos.

4.      Específicamente, el Contrato de Transferencia de Acciones establece que durante el período aprobado para el cumplimiento de las obligaciones medioambientales del PAMA (inicialmente diez años, extendido a quince años), *Centromin (y Perú mediante su Garantía) asume la responsabilidad por todos los daños y perjuicios y reclamos provenientes de terceros atribuibles a las actividades de DRP, Centromin o sus predecesores, salvo, únicamente,* en los casos en que los reclamos de terceros: i) provengan directamente de actos exclusivamente atribuibles a DRP que *no* estén relacionados con el PAMA, e incluso en esos casos, solo en la medida en que dichos casos fueran el resultado del uso por parte de DRP de estándares y prácticas menos preservadores del medioambiente o de la salud pública que los seguidos por Centromin durante su período de propiedad; o ii) provengan de un incumplimiento por parte de DRP de sus obligaciones del PAMA u obligaciones medioambientales establecidas en el Contrato de Transferencia de Acciones. El Contrato de Transferencia de Acciones establece, asimismo, que luego del vencimiento del plazo aprobado del PAMA, Centromin y Perú continuarán asumiendo y aceptando la responsabilidad por los reclamos de terceros, con la única excepción de los casos en que resulten directamente de i) actos que son *únicamente atribuibles* a las operaciones de DRP luego del vencimiento del PAMA; o ii) un incumplimiento por parte de DRP de sus obligaciones del PAMA u obligaciones medioambientales establecidas por el Contrato de Transferencia de Acciones.

3

**EXHIBIT "A" TO NOTICE OF REMOVAL**

5.    Renco confió en el compromiso contractual de Centromin y Perú de asumir y aceptar la responsabilidad por los reclamos de terceros cuando acordó comprar la Compañía. La transacción de venta no había tenido lugar sin este compromiso sumamente importante por parte de Centromin y Perú.

6.    Más abajo se incluyen con más detalle otras disposiciones relevantes del Contrato de Transferencia de Acciones, incluidas las disposiciones por las cuales Centromin acordó liberar a DRP de todas las obligaciones que surgieran de juicios efectivamente iniciados por terceros, incluida la obligación de defender contra los reclamos de terceras partes por los que Centromin y Perú asumieron responsabilidad.

7.    Al momento de la celebración del Contrato de Transferencia de Acciones, Perú estimó que las obligaciones de DRP en virtud del PAMA costarían aproximadamente USD 107 millones. Los costos reales del proyecto no solo excedieron esa estimación inicial, sino que a fin de alcanzar las metas medioambientales acordadas en virtud del PAMA, DRP se vio forzado a completar muchos proyectos adicionales, demandantes de tiempo y costosos. Además, Perú impuso proyectos adicionales a DRP. Cuando DRP razonablemente solicitó prórrogas para completar sus obligaciones del PAMA, en vista de dichos cambios, luego de extensos procesos de solicitud de prórroga, Perú denegó las prórrogas adecuadas y, en cambio, otorgó prórrogas limitadas e impuso más obligaciones a DRP. En un punto, la negativa de Perú a otorgar a DRP una prórroga adecuada para completar sus obligaciones del PAMA generó que las entidades crediticias de DRP se negaran a renovar el financiamiento de las operaciones de DRP, forzando a DRP al cierre de las operaciones del Complejo en junio de 2009. De hecho, Perú, arbitraria y caprichosamente, intentó en su momento obtener concesiones irrazonables de DRP como condición previa al mantenimiento de conversaciones cruciales para reiniciar el Complejo. La conducta de Perú impidió a DRP obtener el financiamiento necesario para reabrir la instalación oportunamente. Este patrón de trato injusto e inequitativo por parte de Perú hacia DRP generó que uno de los proveedores de DRP llevara a DRP a un proceso de quiebra involuntaria en febrero de 2010, del cual DRP fue notificado en abril de 2010, y que oficialmente se inició en agosto de 2010. Este proceso se encuentra actualmente en curso.

8.    Además, Centromin, y Perú a través de su Garantía, incumplieron sus obligaciones del PAMA en virtud del Contrato de Transferencia de Acciones, incluida la obligación de remediar el suelo en de la ciudad de La Oroya y sus alrededores.

9.    En 2007 y 2008, los ciudadanos peruanos que viven en la ciudad de La Oroya y sus alrededores iniciaron juicios contra Renco, Doe Run Resources, y personas físicas y jurídicas afiliadas en el tribunal estadual de Misuri (Estados Unidos), alegando diversas lesiones y daños como resultado de la supuesta exposición al plomo y contaminación ambiental del Complejo (en adelante, los "Juicios"). En declaraciones públicas y en correspondencia entre las partes, la República del Perú y Activos Mineros rechazaron positivamente su responsabilidad por dichos reclamos de terceros por daños, por los cuales son exclusivamente responsables de conformidad con los términos del Contrato de Transferencia de Acciones y la Garantía. Asimismo, se negaron a exonerar de responsabilidad a los demandados en los Juicios, y a asumir la obligación de tomar la iniciativa de la defensa en los Juicios.

10.    Como se describe más detalladamente abajo, Renco tiene la intención de solicitar un arbitraje para reclamar daños y perjuicios por violaciones del Tratado y del derecho internacional, y por incumplimiento de los Contratos de Inversión, por una cifra a ser establecida, pero no inferior a aproximadamente USD 800 millones. Además, Renco pretende obtener un laudo en el que se declare a Perú (al que son atribuibles las acciones y omisiones del sucesor de Centromin, Activos Mineros) exclusivamente responsable por cualquier fallo que se dicte y daños y perjuicios que se ordenen con relación a los Juicios. Asimismo, Renco pretende obtener una resolución y un laudo que ordene a Perú exonerar y mantener indemne a los demandados de toda responsabilidad asociada con los Juicios y hacerse cargo de la defensa en los Juicios.

4

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## III.   El Tratado

11.    El Tratado es un acuerdo de libre comercio bilateral celebrado con el fin de eliminar los obstáculos al comercio, consolidar el acceso a los bienes y servicios y promover las inversiones privadas en y entre Estados Unidos y Perú. El Capítulo 10 del Tratado prevé la protección de las inversiones privadas en ambos países y el arbitraje en los casos de controversias por inversiones entre inversionistas de un Estado y el gobierno del otro Estado.

12.    La Sección A del Capítulo 10 del Tratado establece diversas protecciones sustantivas que Perú se encuentra obligado a otorgar a las inversiones de Estados Unidos.[4] El Tratado prevé, entre otras cuestiones, que Perú debe i) conceder a las inversiones de Estados Unidos un trato justo y equitativo, así como protección y seguridad plenas;[5] ii) no tratar a los inversionistas e inversiones de Estados Unidos menos favorablemente que a sus propios inversionistas e inversiones;[6] y iii) no expropiar ni nacionalizar inversiones de Estados Unidos, ni directa ni indirectamente, a través de medidas equivalentes a la expropiación o nacionalización, salvo que sea con fines públicos, de modo no discriminatorio, con el pago de una indemnización pronta, adecuada y efectiva, y de conformidad con el debido proceso legal.[7] Además, el Tratado requiere que Perú dé a los inversionistas e inversiones de Estados Unidos un trato no menos favorable que el que da a los inversionistas e inversiones de países distintos a Estados Unidos.[8] En tratados de inversión bilaterales con otros países, Perú acordó respetar cualquier obligación que hubiere asumido con respecto a inversiones de nacionales de esos países. Dicho compromiso por parte de Perú se extiende al presente caso.

13.    La Sección B del Capítulo 10 del Tratado otorga a los inversionistas de Estados Unidos el derecho a someter a arbitraje cualquier controversia por inversiones entre el inversionista (ya sea por cuenta propia o en representación de una subsidiaria peruana que posea o controle directa o indirectamente) y Perú por incumplimiento de las obligaciones del Tratado contenidas en la Sección A,[9] o de cualquier "acuerdo de inversión" entre el inversionista de Estados Unidos y una autoridad nacional peruana.[10]

14.    El Acuerdo de Transferencia de Acciones (definido y descripto más abajo), junto con la Garantía y los acuerdos relacionados, califica como un "acuerdo de inversión", en virtud del Tratado.[11]

---

[4] El Tratado define 'inversión' como "todo activo de propiedad de un inversionista o controlado por el mismo, directa o indirectamente, que tenga las características de una inversión, incluyendo [...] . . acciones, capital y otras formas de participación en el patrimonio de una empresa [...]". Artículos 10.28 en 10-24 y 10-25. Este texto significa que los inversionistas de Estados Unidos no necesitan ser directamente titulares de la inversión cubierta —en este caso, el Complejo— para tener derecho a la protección del Tratado. La titularidad indirecta a través de participación accionaria es suficiente.

[5] Artículo 10.5(1) del Tratado.

[6] Artículo 10.3 del Tratado.

[7] Artículo 10.7(1) del Tratado.

[8] Artículo 10.4 del Tratado.

[9] Artículos 10.16(1)(a)(i)(A) y 10.16(1)(b)(i)(A) del Tratado.

[10] Artículos 10.16(1)(a)(i)(C), 10.16(1)(b)(i)(C) y 10.28 (definición de "acuerdo de inversión").

[11] Un "acuerdo de inversión" es un acuerdo escrito entre una autoridad nacional y un inversionista, en el que el inversionista se basa para establecer o adquirir una inversión diferente al acuerdo escrito en sí mismo, que otorga derechos al inversionista. Artículo 10.28 en 10-25 del Tratado.

5

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## IV.    Antecedentes de hecho

### A.    La República del Perú ordenó remediación ambiental en La Oroya

15.    El Complejo fue fundado en 1922 por Cerro de Pasco Corporation, una compañía privada, y está formada por fundidoras y refinerías que procesan los minerales polimetálicos extraídos en la región central de los Andes, a cobre, plomo, zinc y otros metales, incluidos, entre otros, la plata y el oro. En 1974, Perú expropió el Complejo y transfirió su titularidad y operaciones a Centromin, una empresa de propiedad absoluta de la República del Perú.

16.    En 1993, Perú aprobó el Decreto Supremo n.° 016-93-EM, ordenando la remediación y mejora medioambiental de varios complejos industriales a lo largo del país, incluida La Oroya. Con miras a privatizar el Complejo, Centromin creó la Compañía, a la que confirió la titularidad del Complejo. Centromin también realizó una evaluación medioambiental preliminar con respecto al Complejo así como una lista de proyectos medioambientales y costos estimados necesarios para colocar al Complejo dentro de los estándares prescriptos por la legislación. El 13 de enero de 1997, el Ministerio de Energía y Minas de Perú adoptó las propuestas medioambientales del Centromin, en la forma del PAMA, que contenía una lista de proyectos medioambientales y solicitó que Centromin cumpliera ciertas metas medioambientales durante un período inicial de diez años (que luego se extendió dos veces hasta marzo de 2012).

### B.    DRP compró el Complejo en 1997, pero el Demandado conservó responsabilidad exclusiva por varios proyectos medioambientales y por los reclamos de terceros

17.    Mediante Resolución Suprema n.° 018-97-PCM, del 23 de enero de 1997, Perú requirió un aumento de las inversiones privadas en la Compañía, y de conformidad con dicha Resolución, el Comité Especial de Privatización de Centromin llamó a Licitación Pública Internacional n.° PRI-16-97 "para promover la inversión pública en la Compañía, a través de transferencia de acciones y el aumento de su capital social en virtud de nuevas contribuciones de una empresa o consorcio que cumpliera los requisitos de precalificación establecidos por [la legislación]".[12]

18.    Se implementó la Licitación Pública Internacional n.° PRI-16-97, y por carta del 10 de julio de 1997, se otorgó la licitación a un consorcio compuesto por Doe Run Resources y Renco. De conformidad con las Condiciones de Licitación, el consorcio cedió sus derechos de su subsidiaria peruana, DRP, según lo autorizado y aprobado por la autoridad peruana pertinente, mediante acuerdo del 11 de septiembre de 1997.

19.    El 23 de octubre de 1997, DRP, Doe Run Resources, Renco y Centromin celebraron el Contrato de Transferencia de Acciones, según el cual DRP adquirió la mayoría de las acciones de la Compañía por un precio de compra de USD 121,4 millones, y como parte de la transacción, Perú emitió la Garantía, que garantizaba las "declaraciones, garantías y obligaciones asumidas por" Centromin en virtud del Acuerdo de Transferencia de Acciones.

---

[12] **Anexo C-1**, Acuerdo de Transferencia de Acciones, en VII.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

20.     El Acuerdo de Transferencia de Acciones contenía diversos compromisos vigentes de ambas partes.[13] DRP acordó invertir USD 120 millones en mejoras y en la operación del Complejo, en un plazo de cinco años.[14]

21.     Las partes también acordaron distribuir los proyectos del PAMA entre ellos, lo cual fue aprobado por el Ministerio de Energía y Minas. Entre otros proyectos, Centromin, y Perú a través de su Garantía, acordaron remediar las zonas afectadas por emisiones de gases y partículas provenientes de las operaciones de fundición y refinado.[15] Las emisiones de gases y partículas provenientes de las operaciones del Complejo por parte de Cerro de Pasco (durante más de cincuenta años) y Centromin (por más de veinte años) impactaron en el suelo de la ciudad de La Oroya y en los alrededores, con numerosos metales pesados, incluido el plomo.

22.     DRP acordó construir nuevas plantes de ácido sulfúrico, una planta de tratamiento de agua para la refinería de cobre, una planta de tratamiento de líquidos industriales, una pared para retener el drenaje de lodo de plomo proveniente de la planta Zileret, una planta de tratamiento de aguas residuales y una instalación de eliminación de desechos en el Complejo. DRP también acordó crear un circuito cerrado para aguas de granulación speiss, instalar equipos para mejorar el ánodo de limpieza en la planta de zinc, y desarrollar un sistema para el manejo y la eliminación de escoria de cobre y de plomo.

23.     Durante el período aprobada para la realización de los proyectos del PAMA, Centromin —y Perú a través de su Garantía— acordaron asumir la responsabilidad por todos los daños perjuicios y reclamos provenientes de terceros atribuibles a las actividades de DRP, Centromin y sus predecesores, excepto en circunstancias limitadas que no se incluyen en el presente.[16] Esta obligación y compromiso por parte de Perú y Centromin de asumir la responsabilidad por los reclamos de terceros se extiende, y beneficia, a las afiliadas y propietarios de DRP.

24.     El Acuerdo de Transferencia de Acciones, además, deja en claro que DRP no sería responsable por daños y perjuicios o reclamos de terceros atribuibles a Centromin resultantes de las operaciones de Centromin o de sus predecesores, o debidas al incumplimiento de Centromin de sus obligaciones medioambientales especificadas en la Cláusula 6.1.[17]

25.     Centromin también se comprometió a proteger y mantener indemne a DRP frente a reclamos de terceros y a "indemnizarlo por los daños y perjuicios, responsabilidades u obligaciones que pudieran surgir por los que asumió responsabilidad y obligación",[18] y a asumir inmediatamente cualquier obligación relacionada con "cualquier demanda o notificación judicial, administrativa o de cualquier tipo" originada en los hechos por los que Centromin asumió responsabilidad, eximiendo a DRP de dichos reclamos, y a hacerse cargo de la defensa con respecto a dichos juicios.[19] Dichas obligaciones y compromisos a cargo de Centromin y Perú se extienden a los reclamos presentados

---

[13] Mediante acuerdo de fusión del 30 de diciembre de 1997 (dos meses después de que las partes celebraran el Acuerdo de Transferencia de Acciones), la Compañía se fusionó completamente con DRP, que asumió la totalidad de los derechos y obligaciones contractuales de la Compañía, según la Cláusula Décima del Acuerdo de Transferencia de Acciones.

[14] Acuerdo de transferencia de Acciones en Cláusula Cuarta.

[15] *Id.* en Cláusula 6.1(c).

[16] *Id.* en Cláusula 6.2. Las circunstancias limitadas en las que Centromin y Perú no son responsables por reclamos de terceros son aquellas en las que los reclamos surgen: 1) directamente debido a actos *no relacionados* con el PAMA, que son *exclusivamente atribuibles a DRP*, y solo *en la medida en que* sean el resultado del "uso de estándares y prácticas menos preservadores del medioambiente o de la salud pública que los seguidos por Centromin hasta la fecha de la celebración de este contrato", por parte de DRP; 2) directamente del incumplimiento de las obligaciones del PAMA o de las obligaciones medioambientales establecidas en las Cláusulas 5.1 y 5.2 del Acuerdo de Transferencia de Acciones, por parte de DRP. No se dio ninguno de dichos casos.

[17] *Id.* en Cláusula 5.5.

[18] *Id.* en Cláusula 6.5.

[19] *Id.* en Cláusula 8.14.

7

**EXHIBIT "A" TO NOTICE OF REMOVAL**

en contra de los propietarios y las afiliadas de DRP, incluidos los directores y funcionarios individuales de dichas afiliadas, como es el caso en los Juicios.

26.     Cada parte también acordó trabajar con la otra en el caso de que la otra parte tuviera dificultades para cumplir sus obligaciones en virtud del Acuerdo de Transferencia de Acciones, si dichas dificultades fueran el resultado de causas no imputables a la parte obligada y que no fueron previstas al momento de firmarse el contrato, tales como cambios económicos extraordinarios e interferencias gubernamentales.[20]

27.     Finalmente, de conformidad con la Garantía, Perú garantizó "las declaraciones, garantías y obligaciones asumidas por" Centromin en virtud del Acuerdo de Transferencia de Acciones.[21] La Garantía de Perú se extiende mientras Centromin "tenga obligaciones pendientes" en virtud del Acuerdo de Transferencia de Acciones.[22] La Garantía de Perú también "sobrevive la transferencia de cualquier derecho y obligación de Centromin [en virtud del Acuerdo de Transferencia de Acciones] y cualquier liquidación de Centromin".[23]

### C.     DRP cumplió y excedió sus obligaciones en virtud del Acuerdo de Transferencia de Acciones

#### 1.     DRP cumplió sus obligaciones de inversión

28.     DRP satisfizo su obligación de invertir USD 120 millones en los primeros cinco años. Desde 1997 hasta 2002, DRP invirtió aproximadamente USD 120,2 millones en el Complejo, tal como lo confirmó Centromin en una certificación oficial, del 13 de febrero de 2003.

#### 2.     DRP cumplió sus obligaciones del PAMA

29.     DRP cumplió sus obligaciones del PAMA e incluso excedió las expectativas iniciales a ese respecto.

30.     Los proyectos del PAMA inicialmente propuestos por Centromin, y aprobados por el Ministerio de Energía y Minas, subestimaron la cantidad de trabajo requerido para cumplir las metas medioambientales contenidas en el PAMA. El Ministerio de Energía y Minas reconoció que el trabajo de ingeniería en ese momento se realizó con detalles técnicos limitados y un nivel muy básico de ingeniería que no contempló la remediación de algunos problemas medioambientales, que en algunos casos eran significativos. Así es que DRP propuso, y el Ministerio de Energía y Minas aprobó, inversiones adicionales que DRP haría a su costa. Todavía más, el Ministerio de Energía y Minas requirió a DRP que completara unos denominados "proyectos complementarios" adicionales al PAMA.

31.     A la luz de estas circunstancias, así como de la crisis financiera de 2002 en el mercado de los metales que constituyó una "alteración económica extraordinaria" conforme a los términos de la STA, en el año 2004, DRP solicitó una prórroga de cinco años para completar el PAMA y, a este respecto, tomó parte en un proceso riguroso y extenso en apoyo de su solicitud. Sin embargo, Perú no le concedió a DRP los cinco años que había solicitado. En vez, en 2006 Perú amplió la fecha límite en solo dos años y diez meses, hasta el 31 de octubre de 2009, a la vez que le impuso a DRP varias obligaciones nuevas y

---

[20] *Id.* en la Decimoquinta Cláusula.

[21] **Anexo C-2**, Garantía en 2.1.

[22] *Id.* en 4.

[23] **Anexo C-1**, Acuerdo de Transferencia de Acciones, en Cláusula Décima.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

onerosas, entre ellas, "proyectos complementarios", normas ambientales más estrictas e inspecciones continuas y diarias. Uno de los proyectos que Perú le solicitó completar a DRP fue un proyecto de modernización de cobre que aumentó los costos en más de USD 100 millones. DRP trabajó para cumplir con estas nuevas obligaciones, así como para ejecutar las otras obligaciones impuestas por el PAMA y el Ministerio de Energía y Minas.

32.      Para 2007, DRP había completado sustancialmente todos los proyectos del PAMA excepto uno, y ha completado parcialmente el proyecto final. Como resultado de la crisis financiera global, DRP experimentó algunas dificultades económicas luego de la baja en los precios mundiales de los metales, y, en 2009, a pedido de su entidad crediticia, realizó varias solicitudes al Ministerio de Energía y Minas para lograr una prórroga a fin de completar el trabajo ambiental del PAMA restante, tal como el Contrato de Transferencia de Acciones contempla en tiempos de "alteraciones económicas extraordinarias" y tal como la ley requiere a la luz de que Perú cambia constantemente sus requisitos. El Ministerio de Energía y Minas se negó a cumplir el acuerdo de las partes y denegó la concesión de una prórroga. Cuando DRP no pudo asegurar la prórroga de sus obligaciones conforme al PAMA, las instituciones crediticias se negaron a renovarle el préstamo renovable que DRP usaba para financiar sus operaciones cotidianas, lo que la forzó a cerrar parcialmente el Complejo en marzo de 2009.

33.      El 26 de septiembre de 2009, el Congreso peruano finalmente aprobó una ley mediante la que se le otorgaba una prórroga de 30 meses a DRP para completar el último proyecto restante: la planta de ácido sulfúrico. Si bien inicialmente esta prórroga resultó suficiente, pronto dejó de serlo cuando el Ministerio de Energía y Minas aprobó disposiciones nuevas y dirigidas que fueron tan onerosas que DRP no pudo reanudar las operaciones y aprovechar la prórroga. Por ejemplo, las disposiciones le exigían a DRP, entre otras cuestiones, pagar la totalidad del producido bruto en un fideicomiso que solo liberaría los fondos luego de haber asegurado un valor de tres meses de las obligaciones programadas del PAMA, dificultando así el pago de DRP a sus trabajadores o proveedores, o, en general, la operación del Complejo. Debido a estas disposiciones prohibitivas, DRP no pudo obtener el financiamiento necesario ni reiniciar el establecimiento.

34.      DRP ha gastado más de USD 300 millones en proyectos del PAMA a la fecha y, al cumplir con sus compromisos y obligaciones, adoptó estándares y prácticas que protegen más el medioambiente y la salud pública que aquellos adoptados e implementados por Centromin en los años que llevaron a la venta de la Compañía y su Complejo. Estos estándares y prácticas están evidenciados por las significativas y documentadas mejoras de DRP con respecto a la calidad del aire y del agua en La Oroya. Además, DRP orquestó voluntariamente estándares y prácticas de seguridad centrados en la prevención y acciones de control —tales como continuos exámenes médicos— y también implementó estándares y prácticas relacionadas con la salud que Centromin nunca estableció, incluida la creación de programas de higiene y salud para beneficio de todos los residentes locales y la institución de programas para limpiar las calles, remodelar casas en peligro de niños e instalar cuartos de baño en escuelas locales.

3.      DRP excedió sus obligaciones contractuales y realizó significativas inversiones para mejorar las condiciones de la comunidad de La Oroya

35.      Además de cumplir con sus obligaciones contractuales, DRP gastó voluntariamente sumas adicionales en programas sociales para los ciudadanos del área de La Oroya, tales como los siguientes:

- Ofrecimiento de programas especiales para las mujeres de las comunidades: programas de capacitación centrados en el planeamiento presupuestario, la crianza de niños, la nutrición y la responsabilidad social, capacitación de un equipo de promotores de la salud para educar a las comunidades

**EXHIBIT "A" TO NOTICE OF REMOVAL**

acerca de los riesgos de salud y orientar a las embarazadas sobre el cuidado prenatal, y amplia capacitación en pequeñas empresas.

- Institución del Programa de Ecología Social y Humana, que controla la salud de los niños en riesgo y ofrece almuerzos nutricionales diarios.

- Auspicio de programas de capacitación en cría de animales orientada a las comunidades agrícolas alrededor de La Oroya. En el programa de Forestación y Jardinería Andina, DRP y los participantes comunitarios plantaron más de 121.000 semillas y 132.000 metros cuadrados de jardines en 2006.

- Mejora de la infraestructura en 17 escuelas, tres lugares de juegos, un puesto médico, un área de lavandería y un comedor público. Las mejoras de infraestructura consistieron en trabajos como instalar laboratorios de computación, cuartos de baño y agua corriente, remodelar las estructuras existentes y construir adiciones.

## V.   Perú incumplió sus obligaciones conforme a tratados

### A.   Activos Mineros y Perú violaron los Contratos de Inversión

36.   Renco pretende presentar reclamos para arbitraje conforme al Artículo 10.16 del Tratado porque Activos Mineros y Perú incumplieron sus obligaciones contractuales conforme a los Contratos de Inversión.

1.   La negativa de Activos Mineros y Perú para asumir responsabilidad por tercerías iniciadas contra los Demandantes, sus afiliadas y ejecutivos constituye una violación de los Contratos de Inversión

37.   A comienzos de agosto de 2007, DRP se enteró de que se estaban distribuyendo folletos en La Oroya en los que se solicitaban demandantes para un litigio futuro. Los folletos, preparados por el estudio jurídico SimmonsCooper LLC de East Alton, Illinois (Estados Unidos), indicaban, entre otras cosas, que "con la ayuda de los abogados, usted puede pedirles a los tribunales de justicia de los Estados Unidos y hacer que Doe Run pague por el tratamiento médico de sus hijos y por sus lesiones".

38.   El 4 de octubre de 2007, un grupo de demandantes presentó demandas en los Estados Unidos alegando diferentes daños personales como resultado de la exposición al plomo y de la contaminación medioambiental del Complejo. Los demandantes retiraron voluntariamente las demandas y luego volvieron a presentar 11 casos en 2008 en nombre de 35 demandantes menores —todos los cuales son residentes y ciudadanos de La Oroya, República del Perú— en el Tribunal de Distrito del Estado de Misuri, Circuito Judicial Vigésimo Segundo, ciudad de San Luis, Misuri, Estados Unidos (los "Juicios"). Las alegaciones realizadas en cada juicio son virtualmente idénticas: "[e]sta es una acción para obtener daños y perjuicios de los demandados sufridos por cada uno de los demandantes menores nombrados aquí, que eran menores al tiempo de sus exposiciones y heridas iniciales como resultado de una exposición a la liberación de plomo y otras sustancias tóxicas… en la región de La Oroya, Perú".

39.   Además de reclamar por daños y perjuicios a raíz de daños personales, los demandantes pretenden daños y perjuicios punitivos, y designan como demandadas a Renco y a Doe Run Resources, así como a sus afiliadas DR Acquisition Corp. y Renco Holdings, Inc., y los directores y funcionarios Marvin K. Kaiser, Albert Bruce Neil, Jeffrey L. Zelms, Theodore P. Fox III, Daniel L. Vornberg y Ira L. Rennert (los "Acusados de Renco"). Los demandantes no iniciaron acciones contra Activos Mineros, la República de Perú, o

**EXHIBIT "A" TO NOTICE OF REMOVAL**

DRP, eligiendo, en cambio, demandar a las afiliadas estadounidenses de DRP en los tribunales de los Estados Unidos. Las Demandas buscan responsabilizar a los propietarios y afiliadas societarias estadounidenses de DRP, así como a los directores y funcionarios de estas compañías afiliadas con sede en los Estados Unidos por las acciones alegadas de DRP. Conforme al derecho aplicable y a los documentos societarios en vigor, DRP está obligada a mantener indemne a los Demandados de Renco frente a toda sentencia que se pueda dictar en su contra en las Demandas.

40.     El 31 de octubre de 2007, el entonces presidente del Consejo de Ministros de Perú, Jorge del Castillo Gálvez, le escribió una carta al embajador de los Estados Unidos en Perú Michael McKinley en la que expresó las "más profundas preocupaciones" de su país acerca de las Demandas que habían sido recientemente interpuestas.[24] Como la parte que será responsable por un otorgamiento final de daños y perjuicios conforme al Contrato de Transferencia de Acciones, la República del Perú no desea que los casos prosigan en los Estados Unidos, donde, por ejemplo, los daños y perjuicios punitivos son una posibilidad. En su carta, el Sr. del Castillo Gálvez explicó que, conforme a los principios del derecho internacional, los tribunales de los Estados Unidos deberían "negarse a revisar el caso" porque el dueño y operador del Complejo es DRP, una compañía peruana, los demandantes son peruanos, los hechos que forman el fundamento de las Demandas han tenido lugar en Perú y esos reclamos deberían articularse en Perú.

41.     Las Demandas han procedido lentamente hasta la fecha, y las mociones pendientes, algunas de las cuales intentan desestimar la Causa, no han sido escuchadas aún. Específicamente, el 14 de septiembre de 2010, el tribunal estadual de Misuri decidió que la sede apropiada para las Demandas es el Tribunal de Distrito de la Ciudad de San Luis, Misuri, Estados Unidos. Los Demandados de Renco presentaron una petición para oponerse a esa decisión. Sin embargo, el 21 de diciembre de 2010, la Suprema Corte del estado de Misuri afirmó que la sede correspondiente es la del Tribunal de Circuito de la ciudad de San Luis. Por lo tanto, mientras no se han dado procedimientos recientes en los Juicios luego de una orden que suspendió la exhibición de pruebas pendiente la disposición de la petición que objetaba la sede, los procedimientos se reiniciarán en los Juicios, incluidos aquellos respecto de la moción para desestimar con varios fundamentos incluidos el de *forum non conveniens*. Una vez que las mociones hayan sido completamente interpuestas, se podría celebrar una audiencia para ellas en la primavera de 2011.

42.     El 12 de octubre de 2010, los abogados de Renco y sus afiliadas escribieron a Activos Mineros, el Ministerio de Energía y Minas y el Ministerio de Economía y Finanzas de Perú para solicitar que cumplieran con sus obligaciones contractuales 1) compareciendo en los Juicios; 2) asumiendo responsabilidad por los daños y perjuicios que los demandantes pudieran obtener en los Juicios; y 3) liberando y manteniendo indemnes a Renco y sus afiliadas de aquellas tercerías. Renco y sus afiliadas reiteraron sus pedidos en cartas fechadas el 12 de noviembre de 2010 y el 14 de diciembre de 2010. Mediante cartas fechadas el 5 y el 26 de noviembre de 2010, Activos Mineros respondió negándose a aceptar o asumir responsabilidad. La República del Perú no ha respondido a la fecha.

2.     El hecho de que Activos Mineros y Perú no hayan remediado el suelo de la ciudad de La Oroya y sus cercanías constituye una violación de los Contratos de Inversión

43.     Tanto en el PAMA como en el Contrato de Transferencia de Acciones, Activos Mineros y Perú acordaron remediar el suelo de la ciudad de La Oroya y sus cercanías, pero se han negado completamente a hacerlo. Asimismo, en 2000, Perú aprobó impropiamente una resolución mediante la que se intentaban cambiar los tiempos de este proyecto a fin de remediar el suelo en la ciudad de La Oroya y sus cercanías, estableciendo que podría comenzar los proyectos en 2007 y terminarlos en 2010. A la fecha, Perú no ha tomado medida significativa alguna para cumplir con la obligación de remediar el suelo.

---

[24] **Anexo C-3**, carta del Sr. Jorge del Castillo Gálvez al embajador Michael McKinley, fechada el 31 de octubre de 2007.

11

**EXHIBIT "A" TO NOTICE OF REMOVAL**

44.    El hecho de que Activos Mineros y Perú no hayan cumplido con su compromiso de remediar el suelo continúa dañando a los ciudadanos de La Oroya y ha dado lugar a los Juicios, por los que Activos Mineros y Perú son responsables, no solo porque asumieron toda la responsabilidad por tercerías en los Contratos de Inversión, sino por la razón aparte de que no han remediado el suelo como habían prometido.

3.    El hecho de que Perú no le haya concedido a DRP prórrogas suficientes para completar sus obligaciones conforme al PAMA es una violación de los Contratos de Inversión

45.    Activos Mineros y Perú también incumplieron sus obligaciones contractuales conforme a la Cláusula 15 del Contrato de Transferencia de Acciones y el Artículo 2.1 de la Garantía al no otorgarle a DRP prórrogas suficientes para completar sus obligaciones conforme al PAMA debido a ciertos casos de fuerza mayor, entre ellos, alteraciones económicas extraordinarias en 2002 y 2008, y la imposición sobre DRP por parte de Perú de obligaciones medioambientales y operacionales adicionales y onerosas como condición para conceder la primera prórroga en 2006.

46.    En 2009, DRP solicitó una prórroga para completar el proyecto PAMA final debido a 1) dificultades financieras que enfrentó durante la crisis económica global, y 2) la imposición unilateral del Estado sobre DRP de obligaciones medioambientales y operacionales adicionales y onerosas. Cuando Perú no le dio una prórroga suficiente de sus obligaciones medioambientales, DRP perdió su financiamiento por operaciones diarias y fue forzada a reducir las operaciones del Complejo sustancialmente en marzo de marzo de 2009, cesando las operaciones completamente el 3 de junio de 2009.

**B.    La conducta de Activos Mineros y Perú viola las obligaciones de este último conforme al Tratado**

47.    La inconducta de Perú y Activos Mineros no solo viola los Contratos de Inversión, sino también el derecho internacional y el Tratado. Sus acciones y omisiones continúan dañando y afectando la inversión sustancial de Renco en el Complejo La Oroya, y representan un riesgo de privar a Renco de su inversión sin indemnización justa. Debido a que esta inconducta viola al menos tres artículos del Tratado y amenaza con violar un cuarto, Renco pretende someter los reclamos a arbitraje conforme a los artículos 10.16(1)(a)(i)(A) y 10.16(1)(b)(i)(A) del Tratado.

1.    El patrón de trato injusto de Perú a DRP viola el Artículo 10.5 del Tratado

48.    Perú se ha involucrado en un patrón de conducta de tratamiento injusto en violación del Artículo 10.5 del Tratado al imponer en repetidas oportunidades, entre otras cosas, sobre DRP proyectos y requisitos medioambientales adicionales, lo que incrementó la cantidad de tiempo y dinero que DRP debió gastar, a la vez que se negó simultánea e impropiamente a otorgarle en tiempo a DRP el tiempo adicional necesario para cumplir con estas obligaciones.

49.    Asimismo, los costos del proyecto actual no solo excedieron vastamente las estimaciones iniciales de Perú de 1997, sino que también las condiciones medioambientales que existían en La Oroya al tiempo de la transferencia llevaron a DRP a gastar sumas adicionales y realizar más proyectos que no estaban previstos originalmente, que fueron exigidos por el gobierno mediante resoluciones. Cuando DRP pretendió razonablemente una prórroga en consideración de los cambios requeridos por Perú, este país solo concedió una extensión limitada e impuso obligaciones adicionales y onerosas sobre DRP.

50.    Cuando DRP solicitó una segunda prórroga a la luz de diversos factores, incluidas las obligaciones adicionales impuestas por Perú y las condiciones económicas mundiales, el Ministerio de Energía y

12

**EXHIBIT "A" TO NOTICE OF REMOVAL**

Minas denegó la solicitud. El Congreso de la República de Perú, mediante la ley n.º 29410, finalmente prorrogó el plazo de DRP para completar su PAMA, pero el Ministerio de Energía y Minas, mediante una norma de rango inferior, aprobó unas disposiciones financieras onerosas que le impidieron DRP aprovechar la prórroga. Este es un caso clásico de tratamiento injusto e inequitativo para un órgano estatal peruano (el Congreso) de conceder una prórroga necesitada y requerida que otro órgano estatal (el Ministerio de Energía y Minas) cancela efectivamente.

51.    Además, durante todo este tiempo, Perú comenzó una campaña difamatoria contra DRP en la prensa. Las declaraciones de Perú a la prensa —incluida aquella pronunciada por el presidente peruano de que DRP no era más bienvenida en Perú— tenían por objetivo crear una opinión pública errónea de que DRP era responsable por la contaminación de La Oroya y negligente en sus obligaciones de remediación.

52.    Además, y tal como se trató más arriba, Perú y Activos Mineros se negaron a cumplir con su compromiso de asumir la responsabilidad por los Juicios de Misuri. Renco confiaba en este compromiso contractual cuando acordó adquirir la Compañía. La venta no se hubiera concretado sin este crítico compromiso de Centromin y Perú. La negativa de Perú y Activos Mineros de cumplir este compromiso es una violación de las expectativas legítimas de Renco y DRP cuando realizaron sus inversiones sustanciales en Perú y ello constituye otro ejemplo más del trato injusto e inequitativo que Renco ha experimentado en manos de Perú.

53.    La negativa injusta de Perú de conceder en tiempo prórrogas razonables conforme al PAMA, su irrazonable negativa de asistir a DRP en superar las secuelas de la crisis financiera mundial y su campaña pública contra Renco y DPR han creado un ambiente de inversión hostil y han evitado que DRP asegure nuevos financiamientos necesarios para retomar las operaciones del Complejo.

2.    El patrón de Perú de tratar a DRP menos favorablemente que como trata a Centromin/Activos Mineros viola el Artículo 10.3 del Tratado.

54.    El tratamiento injusto de Perú de DRP se encuentra en directo contraste con el modo en que trata a Centromin, compañía propiedad de Perú, en violación del Artículo 10.3 del Tratado. Como se indicó anteriormente, DRP pasó por un proceso de solicitud extenso para cada una de las prórrogas de PAMA que recibió. Este proceso incluyó la realización de estudios detallados, la presentación de informes de los estudios del Ministerio de Energía y Minas, notificando al público y realizando audiencias públicas. Con respecto a la primera de las prórrogas que Perú seductoramente otorgó, este país impuso sobre DRP obligaciones para completar más proyectos y para satisfacer estándares medioambientales adicionales. Perú también sujetó a DRP a continuas inspecciones diarias por un inspector que vivía en La Oroya. Con respecto a la segunda prórroga que Perú otorgó, Perú sujetó a DRP a condiciones financieras tan onerosas que DRP no puedo completar el proyecto PAMA restante.

55.    Mientras tanto, Centromin solicitó una modificación de PAMA en 2000 que incluyó una prórroga del plazo para completar sus proyectos PAMA. Centromin ni siquiera notificó a DRP. DRP no tuvo oportunidad de objetar o participar en el proceso. Perú no le solicitó a Centromin realizar estudios o presentar informes o notificar al público o realizar audiencias públicas. Perú otorgó el pedido de Centromin de una modificación de PAMA sin imponer obligaciones adicionales o estándares medioambientales más exigentes a Centromin.

56.    Asimismo, mientras Perú sujetó a DRP a rigurosas inspecciones, aparentemente impuso poco control de calidad sobre Centromin. Por ejemplo, uno de los proyectos de PAMA de Centromin fue

13

**EXHIBIT "A" TO NOTICE OF REMOVAL**

el abandono del depósito de trióxido arsénico que Centromin utilizó durante sus operaciones del Complejo. Si bien Centromin alega haber completado este proyecto y Perú parece satisfecho con que el proyecto esté terminado, los estudios realizados por DRP indican que el depósito aún filtra importantes cantidades de arsénico en el río. Además, a pesar de que su PAMA fue modificado para extender la fecha límite a fin de remediar el suelo en La Oroya y sus cercanías hasta 2010, Centromin aún tiene que realizar algún progreso sustancial tendiente a completar este proyecto.

3.    El tratamiento injusto de Perú de DRP continúa y tiene el potencial para culminar en una expropiación de la inversión de Renco, en violación del Artículo 10.7 del Tratado.

57.    El tratamiento injusto de Perú de DRP continúa y tiene el potencial para culminar en una expropiación del Complejo, en violación del Artículo 10.7 del Tratado. Dado que DRP no pudo obtener financiamiento, DRP no puedo pagarles a sus proveedores. En febrero de 2010, un proveedor colocó a DRP en quiebra involuntaria. DRP había trabajado con sus acreedores para lograr un acuerdo de reintegro, pero el 1 de octubre de 2010, el organismo de quiebras peruano publicó una lista de acreedores destacados. DRP se sorprendió al enterarse de que el gobierno de Perú ha presentado varios reclamos en un intento de convertirse en el acreedor más grande y así controlar el destino de la compañía. El reclamo más grande (y patentemente falaz) de Perú contra DRP es para el pago del costo de completar el proyecto de PAMA restante. Pero el plazo para completar el PAMA no ha vencido, y en todo caso DRP nunca acordó pagarle a Perú el costo restante en caso de que no se completara el proyecto PAMA. El intento de Perú de acaparar la empresa por medio de reclamos de quiebra es tan impropio como injusto y resulta violatorio del Tratado.

4.    La Violación de Perú de sus Obligaciones conforme a los Contratos de Inversión también viola el Tratado en su Artículo 10.4

58.    En tratados de inversión bilaterales con otros países, Perú acordó respetar toda obligación en la que hubiera entrado con respecto a las inversiones de ciudadanos de estos otros países. Este compromiso, conocido como la "Cláusula Paraguas" por Perú se extiende hasta el presente caso mediante el Artículo 10.4, que requiere que Perú trate a los inversores y a las inversiones estadounidenses no menos favorablemente que como trata a los inversores y a las inversiones de países diferentes de los Estados Unidos.[25] Debido a que Perú ha omitido observar sus obligaciones conforme a los Contratos de Inversión, ha violado la Cláusula Paraguas.

---

[25] Artículo 10.4 del Tratado.

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## VI.   Intención de someter a arbitraje

59.    El Tratado establece que, en caso de que una parte en disputa considere que una disputa de inversión no pueda resolverse mediante consultas y negociaciones, dicha parte puede presentar el reclamo de arbitraje conforme al Artículo 10.16.

60.    El demandante intentó resolver la presente disputa con Perú y Activos Mineros. Los representantes del demandante se encontraron con varios funcionarios estatales en numerosas oportunidades para este propósito. El demandante también envió cartas en las que requería que Perú y Activos Mineros cumplieran con sus obligaciones, y los notificaba de que recurriría a todos los recursos jurídicos a su disposición si el asunto no se pudiera resolver.

61.    Debido a que Perú y Activos Mineros rechazaron todos los intentos del demandante para resolver la presente disputa, el demandante presenta esta Notificación de Intención en esta oportunidad para notificar a Perú de la intención del demandante de someter los reclamos aquí descritos a arbitraje de acuerdo con la Sección B del Tratado.

62.    El demandante se reserva el derecho de modificar o complementar este recurso solicitado al tiempo que puede instituir un proceso formal de arbitraje contra Perú.

Fechado: **29** de diciembre de 2010.

Presentado respetuosamente.

Edward G. Kehoe
Caline Mouawad
Lisa Albert
Kana Ellis
Alejandro Cremades
KING & SPALDING
1185 Avenue of the Americas
New York, NY 10036-4003
(212) 556-2100
(212) 556-2222 (Facsímil)

15

**EXHIBIT "A" TO NOTICE OF REMOVAL**

# EXHIBIT 1

*Anibal Corvetto Romero*
*Notary - Attorney-at-law*
*Plaza 27 de Noviembre 250*
*(Av. Central) San Isidro*
*Tel. 422-9564 - 442-9369*
*Tel. 422-9564 - 442-9369 - 440-7299*


*Testimony*


**From the Instrument of**     CONTRACT OF STOCK TRANSFER, CAPITAL STOCK
INCREASE AND STOCK SUBSCRIPTION OF EMPRESA
METALURGICA LA OROYA S.A., "METALOROYA S.A.'

**Granted by**     EMPRESA MINERA DEL CENTRO DEL PERU S.A.
(CENTROMIN PERU S.A.)

**In favor of**     DOE RUN PERU S.R.LTDA WITH INTERVENTION          OF
EMPRESA METALURGICA LA OROYA S.A.,
"METALOROYA S.A.," THE DOE RUN RESOURCES
CORPORATION AND THE RENCO GROUP, INC.


*Lima, OCTOBER 23, 1997*


Page __21,215_____     No. _____

Kx __28,469_____


**EXHIBIT "A" TO NOTICE OF REMOVAL**

*Anibal Corvetto Romero*
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

KARDEX: 28469                    PAGE: 21,215

CONTRACT OF STOCK TRANSFER, CAPITAL STOCK INCREASE AND
STOCK SUBSCRIPTION OF EMPRESA METALURGICA LA OROYA S.A.,
"METALOROYA S.A."

GRANTED BY:

EMPRESA MINERA DEL CENTRO DEL PERU S.A.
(CENTROMIN PERU S.A.)
AND PARTY OF THE OTHER PART:
DOE RUN PERU S.R.LTDA.

WITH THE INTERVENTION OF:
EMPRESA METALURGICA LA OROYA S.A., "METALOROYA S.A.," THE
DOE RUN RESOURCES CORPORATION AND THE RENCO GROUP, INC.

[in right the margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

-------------------------------------------------------------------------------------------

IN THE CITY OF LIMA, ON THE TWENTY-THIRD DAY OF THE MONTH OF OCTOBER,

NINETEEN HUNDRED NINETY-SEVEN, BEFORE ME, **ANIBAL**

1

**CORVETTO ROMERO**, ATTORNEY-AT-LAW AND NOTARY PUBLIC OF THIS CAPITAL

CITY.- ===============================================

THE FOLLOWING PERSONS **PERSONALLY APPEAR**: =====================

**CESAR POLO ROBILLIARD**, A PERUVIAN NATIONAL, WHO STATES BEING MARRIED, AN

ENGINEER, DULY IDENTIFIED WITH VOTER REGISTRATION CARD NUMBER 10540500 AND

MILITARY CARD NUMBER 22388545, WHO ACTS ON BEHALF AND IN REPRESENTATION OF

**EMPRESA MINERA DEL CENTRO DEL PERU SOCIEDAD ANONIMA (CENTROMIN PERU**

**S.A.)**, WITH TAXPAYER'S SINGLE REGISTRATION NUMBER 10017653, DULY EMPOWERED

PURSUANT TO VOUCHER INSERTED IN THE TEXT OF THIS PUBLIC INSTRUMENT.

====================

**JEFFREY L. ZELMS**, A UNITED STATES NATIONAL, DULY IDENTIFIED WITH U.S.

PASSPORT NUMBER 153205339, MARRIED, AN ENGINEER, WHO ACTS ON BEHALF AND IN

REPRESENTATION OF **DOE RUN PERU SOCIEDAD DE RESPONSABILIDAD LIMITADA**

AND **THE DOES RUN RESOURCES CORPORATION**, DULY EMPOWERED PURSUANT TO

THE POWERS OF ATTORNEY THAT ARE RECORDED IN FILING CARD NUMBERS 143658 OF

THE REGISTRY OF CORPORATIONS OF LIMA AND 6864 OF THE REGISTRY OF SPECIAL

POWERS OF ATTORNEY OF LIMA, RESPECTIVELY.-

=================================================

**JORGE MERINO TAFUR**, A PERUVIAN NATIONAL, WHO STATED BEING SINGLE, AN

ELECTRICAL MECHANICAL ENGINEER, DULY IDENTIFIED WITH VOTER

[in right the margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

2

**EXHIBIT "A" TO NOTICE OF REMOVAL**

*Anibal Corvetto Romero*
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

REGISTRATION CARD NUMBER 07341351 AND MILITARY CARD NUMBER:

214030551, WHO ACTS ON BEHALF AND IN REPRESENTATION OF **EMPRESA**

**METALURGICA LA OROYA S.A., "METALOROYA S.A.",** WITH TAXPAYER'S

SINGLE REGISTRATION NUMBER 33526610, DULY EMPOWERED PURSUANT TO THE

POWER OF ATTORNEY THAT IS RECORDED IN ENTRY 1 OF FILING CARD NUMBER

040367 OF THE REGISTRY OF CORPORATIONS OF THE MINING PUBLIC REGISTRY.-

**MARVIN M. KOENIG**, A UNITED STATES NATIONAL, WHO STATED BEING

MARRIED, A BUSINESS ACCOUNTANT, DULY IDENTIFIED WITH U.S. PASSPORT

NUMBER 156205648, WHO ACTS ON BEHALF AND IN REPRESENTATION OF **THE**

**RENCO GROUP, INC.**, DULY EMPOWERED PURSUANT TO THE POWER OF

ATTORNEY THAT IS RECORDED IN FILING CARD NUMBER 6863 OF THE BOOK OF

SPECIAL POWERS OF ATTORNEY OF THE PUBLIC RECORDS OF LIMA.- ======

**THE APPEARING PARTIES** ARE OF LEGAL AGE, ABLE TO ENTER INTO

CONTRACTS AND WITH KNOWLEDGE OF THE SPANISH LANGUAGE, AND WHOM I

HAVE IDENTIFIED, TO WHICH I ATTEST, AS BEING COMPETENT, FREE AND WITH

KNOWLEDGE TO ASSUME OBLIGATIONS, TO WHICH I LIKEWISE ATTEST, AND

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

3

**EXHIBIT "A" TO NOTICE OF REMOVAL**

THEY DELIVER TO ME A SET OF MINUTES DULY SIGNED AND

AUTHORIZED, SO THAT ITS CONTENT BE RECORDED IN A PUBLIC

INSTRUMENT, WHICH IS RECORDED IN ITS RESPECTIVE MINUTES

DOCUMENTS AND WITH THE PERTINENT CONSECUTIVE NUMBER, TO

WHICH I LIKEWISE ATTEST, ACCORDING TO THE FOLLOWING LITERAL

TENOR :

MEMORANDUM: MR. NOTARY DOCTOR ANIBAL CORVETTO ROMERO:
KINDLY ENTER INTO YOUR REGISTRY OF PUBLIC DEEDS, THE CONTRACT
OF STOCK TRANSFER, CAPITAL INCREASE AND STOCK SUBSCRIPTION IN
THE EMPRESA METALURGICA LA OROYA S.A., "METALOROYA S.A.",
ENTERED INTO ON THE ONE PART BY EMPRESA MINERA DEL CENTRO DEL
PERU S.A. (CENTROMIN PERU S.A.), WITH TAXPAYER'S SINGLE
REGISTRATION NO. 10017653, DOMICILED AT AV. JAVIER PRADO ESTE NO.
2155, SAN BORJA, LIMA 41, REPRESENTED BY ITS FINANCIAL AND
COMMERCIAL CENTRAL MANAGER, ENG. CESAR POLO ROBILLIARD, WITH
VOTER'S REGISTER CARD NO. 10540500, AUTHORIZED BY RESOLUTION OF
THE BOARD OF DIRECTORS OF CENTROMIN, DATED AUGUST 28, 1997,
HEREINAFTER CENTROMIN; AND ON THE OTHER PART DOE RUN PERU S.R.
LTDA., WHICH IS AN INDIRECT WHOLLY OWNED SUBSIDIARY OF THE DOE
RUN RESOURCES CORPORATION, REPRESENTED BY JEFFREY L. ZELMS, US
CITIZEN, PASSPORT NO. 153205339 AUTHORIZED AS PER POWER OF
ATTORNEY REGISTERED ON FILING CARD NO. 143658 OF THE REGISTRY OF

4

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

BUSINESS CORPORATIONS OF LIMA TO EXECUTE THIS CONTRACT, HEREINAFTER THE INVESTOR. INTERVENES IN THIS CONTRACT THE EMPRESA METALURGICA LA OROYA, S.A. (METALOROYA S.A.) WITH TAXPAYER'S SINGLE REGISTRATION NO. 33526610, DOMICILED AT AV. JAVIER PRADO ESTE NO. 2175, SAN BORJA, LIMA 41, REPRESENTED BY ITS GENERAL MANAGER, ENG. JORGE MERINO TAFUR, WITH VOTER'S REGISTER CARD NO. 07341351, BY VIRTUE OF POWER-OF-ATTORNEY REGISTERED IN ENTRY 1 UNDER FILING CARD NO. 040367 OF THE REGISTER OF BUSINESS CORPORATIONS OF THE PUBLIC MINING REGISTRY, HEREINAFTER THE COMPANY.

BACKGROUND

I.    LEGISLATIVE DECREE NO. 674 DATED SEPTEMBER 25, 1991 STATES IT IS OF NATIONAL INTEREST TO PROMOTE PRIVATE INVESTMENT IN ENTERPRISES COMPRISING THE STATE'S ENTREPRENEURIAL ACTIVITY.

II.    SUPREME RESOLUTION NO. 102-92-PCM RATIFIES THE AGREEMENT ADOPTED BY THE COMMISSION FOR THE PROMOTION OF PRIVATE INVESTMENT (COPRI), WHICH INCLUDES CENTROMIN IN THE PRIVATE INVESTMENT PROCESS REFERRED TO IN LEGISLATIVE DECREE NO. 674.

III.    SUPREME RESOLUTION NO. 016-96-PCM RATIFIES THE AGREEMENT …

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

5

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...ADOPTED BY COPRI, APPROVING THE NEW PLAN FOR THE PROMOTION OF PRIVATE INVESTMENT IN CONNECTION WITH **CENTROMIN**.

IV. **COPRI** BY DECISION OF APRIL 17, 1996, AUTHORIZED THE ORGANIZATION OF COMPANIES BASED ON **CENTROMIN**'S OPERATIVE UNITS, IN ACCORDANCE WITH ARTICLE NO. 10 OF LEGISLATIVE DECREE NO. 674.

V.  **EMPRESA METALURGICA LA OROYA SOCIEDAD ANONIMA "METALOROYA S.A."** IS A CORPORATION ORGANIZED UNDER THE BASIS OF THE LA OROYA METALLURGICAL COMPLEX OF **CENTROMIN** (HEREINAFTER "LA OROYA METALLURGICAL COMPLEX"), WHOSE STOCK IS WHOLLY OWNED BY **CENTROMIN** AND WHOSE CORPORATE OBJECTIVE IS MAINLY TO ENGAGE IN ACTIVITIES PROPER TO THE METALLURGICAL AND MINING INDUSTRY, SUCH AS SMELTING, REFINING, INDUSTRIALIZATION, MINING AND MARKETING OF ITS PRODUCTS.

VI.  SUPREME RESOLUTION NO. 018-97-PCM RATIFIES **COPRI**'S AGREEMENT APPROVING THE MODALITY FOR PROMOTING THE INCREASE OF PRIVATE INVESTMENT IN THE **EMPRESA MINERA METALURGICA LA OROYA SOCIEDAD ANONIMA**, HEREINAFTER THE COMPANY.

VII. IN ACCORDANCE WITH THE PRECEDING BACKGROUND, THE SPECIAL ...

6

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

COMMITTEE ON PRIVATIZATION OF THE EMPRESA MINERA DEL CENTRO DEL PERU, SOCIEDAD ANÓNIMA (**CEPRI-CENTROMIN**) CALLED AND CARRIED OUT PUBLIC INTERNATIONAL BIDDING NO. PRI-16-97 TO PROMOTE PRIVATE INVESTMENT IN THE **COMPANY**, THROUGH THE STOCK TRANSFER AND THE INCREASE OF ITS STOCK CAPITAL PURSUANT TO THE NEW CONTRIBUTIONS FROM A CORPORATION OR CONSORTIUM THAT WOULD FULFILL THE PRE-QUALIFICATION REQUIREMENTS ESTABLISHED BY **CEPRI**.

VIII.    PUBLIC INTERNATIONAL BIDDING NO. **PRI-16-97** WAS CARRIED OUT, AND IN ACCORDANCE WITH THE LETTER DATED JULY 10, 1997 THE WINNER WAS ANNOUNCED AND THEREFORE THE AWARD WAS GIVEN TO THE CONSORTIUM COMPOSED BY THE DOE RUN RESOURCES CORPORATION AND THE RENCO GROUP, INC. IN ACCORDANCE WITH THE BIDDING CONDITIONS, THE AFOREMENTIONED CONSORTIUM HAS ASSIGNED ITS RIGHTS TO THE **INVESTOR** AND THIS ASSIGNMENT HAS BEEN AUTHORIZED BY THE **CEPRI-CENTROMIN AGREEMENT** DATED SEPTEMBER 11, 1997. IN ACCORDANCE WITH THE PROVISIONS THAT APPEAR ON THE BIDDING CONDITIONS, **CENTROMIN** HAS CONTRIBUTED TO THE COMPANY THE ASSETS WHICH REFER TO THE LA OROYA METALLURGICAL COMPLEX. IT HAS ALSO TRANSFERRED THE LIABILITIES THAT ARE REFLECTED IN THE PROJECTED BALANCE SHEET, FOR THE AMOUNTS THAT ARE RECORDED ON THE ACCOUNTING BOOKS OF **METALOROYA S.A.**

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

7

**EXHIBIT "A" TO NOTICE OF REMOVAL**

THE AFOREMENTIONED ASSETS (HEREINAFTER, THE "ASSETS") SHALL BE TRANSFERRED BY MEANS OF A CERTIFICATE OF DELIVERY, RECEPTION AND VALUATION OF PROPERTIES. **CENTROMIN** GUARANTEES THAT ALL THESE ASSETS ARE THOSE THAT ARE NEEDED FOR THE NORMAL OPERATION OF THE **COMPANY**, EXCEPT FOR THE CASH, ACCOUNTS RECEIVABLE AND FINISHED PRODUCTS. BY VIRTUE OF THE ABOVE BACKGROUND, THE CORPORATIONS APPEARING IN THE CAPTION ENTER INTO THIS CONTRACT UNDER THE FOLLOWING TERMS AND CONDITIONS:

**FIRST CLAUSE**                  **TRANSFER**

1.1 **CENTROMIN** REPRESENTS, GUARANTEES AND AGREES THAT: **(A)** IT HAS RECEIVED TEN THOUSAND (10,000) SHARES FROM THE INITIAL CAPITALIZATION OF THE **COMPANY**; **(B)** IT HAS FULLY TRANSFERRED THE LA OROYA METALLURGICAL COMPLEX TO THE **COMPANY** FOR WHICH IT HAS RECEIVED 160,614,467 **(ONE HUNDRED SIXTY MILLION SIX HUNDRED AND FOURTEEN THOUSAND FOUR HUNDRED AND SIXTY-SEVEN)** SHARES WITH A PAR VALUE OF ONE NUEVO SOL (S./1.00); (C) THE TOTAL NUMBER OF SHARES OF THE **COMPANY**, EACH WITH A PAR VALUE OF ONE NUEVO SOL (S/. 1.00), IS **160,614,467 (ONE HUNDRED SIXTY MILLION SIX HUNDRED AND FOURTEEN THOUSAND FOUR HUNDRED AND SIXTY-SEVEN)** SHARES; (D) **CENTROMIN** IS THE OWNER OF 160, 604,467 SHARES OF A PAR VALUE OF ONE NUEVO SOL (S/. 1.00) WHOLLY SUBSCRIBED AND…

8

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

PAID FOR, WHICH CONSTITUTE ONE HUNDRED PER CENT (100%) OF THE **COMPANY**'S REPRESENTATIVE STOCK CAPITAL; (E) **CENTROMIN** WILL TRANSFER TO **CENTROMIN**'S WORKERS, ACCORDING TO THE BIDDING CONDITIONS, 106,688 (ONE HUNDRED AND SIX THOUSAND SIX HUNDRED EIGHTY-EIGHT) SHARES, WHICH CONSTITUTE 0.0664249% OF THE **COMPANY**'S REPRESENTATIVE STOCK CAPITAL, (F) **CENTROMIN** STATES THAT THE SHARES INDICATED IN NUMERAL (D) ARE THE ONLY SHARES ISSUED; AND, **(G)** ALL TRANSFERS TO THE WORKERS WILL BE LAWFULLY MADE AND THERE ARE NO OBLIGATIONS ON THE PART OF THE COMPANY FOR SUCH SHARES NOR WILL THERE BE ANY SUCH OBLIGATION FOR ANY ISSUANCE. **CENTROMIN** SHALL RETAIN ANY LIABILITIES AND RESPONSIBILITIES WHATSOEVER RELATING TO THE SHARES TRANSFERRED TO THE WORKERS, INCLUDING ANY CLAIMS BY SUCH WORKERS. THE **INVESTOR** ASSUMES THE COMMITMENT OF ACQUIRING THE SHARES THAT THE WORKERS MAY NOT ACQUIRE IN EXERCISING ITS PREFERENTIAL RIGHT AT THE SAME PRICE.

1.2 PURSUANT TO THIS CONTRACT **CENTROMIN** TRANSFERS TO THE **INVESTOR** THE OWNERSHIP OF 160,507,779 (ONE HUNDRED SIXTY MILLION, FIVE HUNDRED AND SEVEN THOUSAND, SEVEN HUNDRED SEVENTY-NINE)

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

9

**EXHIBIT "A" TO NOTICE OF REMOVAL**

SHARES THAT REPRESENT THE 99.9335751% OF THE **COMPANY**'S STOCK CAPITAL.

1.3   ON THE DATE OF EXECUTION OF THIS CONTRACT, IT HAS BEEN COMMUNICATED TO THE **COMPANY** THE TRANSFER OF THE SHARES DESCRIBED IN NUMERAL 1.2 TO BE RECORDED ON THE RESPECTIVE BOOK OF STOCK TRANSFER OF THE **COMPANY**.

**SECOND CLAUSE**========================= **CONSIDERATION**

IN CONSIDERATION FOR THE TRANSFER DESCRIBED IN 1.2, THE **INVESTOR** COMMITS ITSELF TO PAY TO **CENTROMIN** THE AMOUNT OF US$ 121,440,608 (ONE HUNDRED TWENTY-ONE MILLION, FOUR HUNDRED FORTY THOUSAND, SIX HUNDRED AND EIGHT DOLLARS OF THE UNITED STATES OF NORTH AMERICA) IN CASH ON THE SIGNING OF THIS CONTRACT.

PAYMENT WILL BE MADE IN DOLLARS OF THE UNITED STATES OF NORTH AMERICA.

THIRD CLAUSE========================= INCREASE OF THE **COMPANY**'S =========================STOCK CAPITAL=========================

3.1   ON THE DATE OF SIGNING THIS CONTRACT, THE **COMPANY** HAS A STOCK CAPITAL OF S/.160,614,467 (ONE HUNDRED SIXTY MILLION SIX HUNDRED FOURTEEN THOUSAND FOUR HUNDRED AND SIXTY-SEVEN NUEVOS SOLES) REPRESENTED BY 160,614,467 SHARES OF A NOMINAL VALUE OF S/. 1.00 (ONE NUEVO SOL).

10

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

**CENTRONIM** IS THE OWNER OF 160,614,467 (ONE HUNDRED SIXTY MILLION, SIX HUNDRED FOURTEEN THOUSAND, FOUR HUNDRED AND SIXTY SEVEN) SHARES OF A NOMINAL VALUE OF S/. 1.00 (ONE NUEVO SOL) WHOLLY SUBSCRIBED AND PAID FOR, WHICH CONSTITUTE 100 PER CENT OF THE **COMPANY'**S REPRESENTATIVE STOCK CAPITAL.

3.2  THE **INVESTOR** MAKES A MONETARY CONTRIBUTION OF US$ 126,481,383.24 (ONE HUNDRED TWENTY-SIX MILLION FOUR HUNDRED EIGHTY-ONE THOUSAND THREE HUNDRED EIGHTY-THREE UNITED SATES DOLLARS AND TWENTY FOUR CENTS) FOR THE PURPOSE OF INCREASING THE COMPANY'S STOCK CAPITAL. WITH THIS CONTRIBUTION. THE **INVESTOR** REPRESENTS FIFTY ONE PERCENT (51%) OF THE **COMPANY'**S STOCK CAPITAL.

PAYMENT OF THE CONTRIBUTION WILL BE MADE IN DOLLARS OF THE UNITED STATES OF NORTH AMERICA, TO BE CREDITED WITH THE EVIDENCE OF A BANK DEPOSIT RECEIPT IN THE **COMPANY'**S NAME.

3.3  THE CONTRIBUTION REFERRED TO IN NUMERAL 3.2 COMPRISES THE MONETARY CONTRIBUTION DESTINED TO INCREASE THE STOCK CAPITAL OF THE **COMPANY** AND THE PREMIUM FOR THE ISSUE OF SHARES.

FOR ACCOUNTING PURPOSES, THE MONETARY CONTRIBUTION WILL BE RECORDED IN NUEVOS SOLES, AT THE SALE EXCHANGE RATE OF THE DAY AND PLACE OF THE SIGNING OF THIS CONTRACT. OUT OF THE RESULTING AMOUNT,

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

11

S/. 167,170,160 (ONE HUNDRED SIXTY-SEVEN MILLION, ONE HUNDRED SEVENTY THOUSAND, ONE HUNDRED SIXTY NUEVOS SOLES) WILL BE RECORDED IN THE STOCK CAPITAL ACCOUNT. THE DIFFERENCE WILL BE RECORDED AS ISSUE PREMIUM.

IT IS HEREBY UNDERSTOOD THAT THE **COMPANY** WILL NOT BE OBLIGED TO MAINTAIN IN CASH THE AMOUNTS CONTRIBUTED TO INCREASE THE STOCK CAPITAL OF THE **COMPANY**, PURSUANT TO NUMERALS 3.2 AND 3.3, BUT SUCH FUNDS MAY BE USED FOR OTHER PURPOSES, COMMERCIAL OPERATIONS OR OTHERS.

3.4 AS A CONSEQUENCE OF THE STOCK CAPITAL REFERRED TO IN NUMERAL 3.3, THE **COMPANY** WILL ISSUE 167,170,160 SHARES OF A NOMINAL VALUE OF ONE NUEVO SOL (S/. 1.00).

THE **INVESTOR** WILL SUBSCRIBE AND PAY THE TOTALITY OF THE ISSUED SHARES WHEN THIS CONTRACT IS EXECUTED.

3.5 WITH REGARD TO THIS CONTRACT, **CENTROMIN** WAIVES ITS RIGHT TO PREFERENTIAL SUBSCRIPTION.

3.6 LIKEWISE, ON THE DATE OF THE SIGNING OF THIS CONTRACT, THE **INVESTOR** AND **CENTROMIN** COMMIT THEMSELVES TO HOLD A SPECIAL GENERAL MEETING OF SHAREHOLDERS OF THE **COMPANY** FOR THE PURPOSE OF ADOPTING THE NECESSARY AGREEMENTS FOR THE EXECUTION OF THIS CONTRACT.

FOURTH CLAUSE========================= INVESTMENT COMMITMENT

12

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

4.1   WITHIN A PERIOD OF FIVE (5) YEARS FROM THE DATE OF THE SIGNING OF THIS CONTRACT, THE **COMPANY** COMMITS TO INVEST THE AMOUNT OF US$120,000,000.00 (ONE HUNDRED TWENTY MILLION AND 00/100 DOLLARS OF THE UNITED STATES OF NORTH AMERICA) FOR USES DESCRIBED IN NUMERAL **4.5** OF THIS CONTRACT IN ITS LA OROYA METALLURGICAL COMPLEX, AS IT IS DESCRIBED IN THE BACKGROUND ABOVE.

IT IS UNDERSTOOD THAT THE COMPANY WILL HAVE A MAXIMUM PERIOD OF FIVE (5) YEARS TO MAKE SUCH INVESTMENT AND THAT THERE ARE NO ANNUAL REQUIREMENTS.

4.2   TO VERIFY THE AMOUNT OF THE INVESTMENT MADE, THE **COMPANY** WILL PRESENT A SWORN STATEMENT SIGNED BY A FIRM OF INDEPENDENT AUDITORS OF ACKNOWLEDGED INTERNATIONAL PRESTIGE ELECTED BY **CENTROMIN** FROM AMONG A MINIMUM OF THREE FIRMS PROPOSED BY THE **INVESTOR**.

THE **INVESTOR'S** PROPOSAL WILL BE SUBMITTED TO **CENTROMIN** THIRTY (30) DAYS PRIOR TO THE EXPIRATION OF THE TERM SPECIFIED IN NUMERAL 4.1, OTHERWISE **CENTROMIN** WILL DESIGNATE THE FIRM OF AUDITORS WITHOUT TAKING INTO ACCOUNT THOSE PROPOSED BY THE **INVESTOR**.

THE SWORN STATEMENT WILL BE SUBMITTED TO **CENTROMIN** WITHIN SIXTY (60) DAYS FROM THE EXPIRATION OF THE PERIOD SPECIFIED IN NUMERAL 4.1 OR

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

13

FROM THE DAY ON WHICH **CENTROMIN** COMMUNICATES TO THE **COMPANY** THE APPOINTMENT OF THE INDEPENDENT AUDITOR, WHICHEVER OCCURS LATER.

ANNUALLY, THE **COMPANY** WILL SUBMIT TO **CENTROMIN** A REPORT ON THE INVESTMENT MADE UP TO THAT MOMENT WITHIN A TERM OF SIXTY (60) DAYS FROM THE DAY AND MONTH OF THE CORRESPONDING YEAR THAT COINCIDES WITH THE DAY AND MONTH OF THE DATE THE CONTRACT WAS SIGNED. THEIR REPORTS WILL BE COUNTERSIGNED BY A FIRM OF INDEPENDENT AUDITORS ACCORDING TO THE PROCEDURE INDICATED IN THIS NUMERAL.

THE AUDITOR'S FEES WILL BE **CENTROMIN**'S RESPONSIBILITY.

4.3   THE PERIOD FORESEEN IN NUMERAL 4.1 WILL BE SUSPENDED IF, IN THE COURSE OF EXECUTING THE INVESTMENT COMMITMENT, AN ACT OF GOD OR FORCE MAJEURE SHOULD OCCUR, ACCORDING TO ARTICLE 1315 OF THE CIVIL CODE; OR AS PROVIDED IN THE FIFTEENTH CLAUSE BELOW OR IF MATTERS NON-ATTRIBUTABLE TO THE **COMPANY**'S NEGLIGENCE OCCUR. THE SUSPENSION WILL REMAIN WHILE SUCH EVENTS CONTINUE AND PREVENT THE **COMPANY** FROM EXERCISING THE OBLIGATIONS STIPULATED IN THE INVESTMENT COMMITMENT.

14

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

4.4   SHOULD EVENTS AS THOSE POINTED OUT IN NUMERAL **4.3** TAKE PLACE, AFFECTING THE COMPLIANCE OF THE INVESTMENT COMMITMENT, THE **COMPANY** WILL MAKE THE SITUATION KNOWN TO **CENTROMIN**, IN WRITING, WITHIN FIFTEEN (15) DAYS AFTER THE EFFECTS OF THE EVENT HAVE BECOME KNOWN. THE **COMPANY** WILL STATE EXACTLY IN THE SAME COMMUNICATION THE RELATIONSHIP OF CAUSALITY BETWEEN THE EVENT AND THE IMPEDIMENT TO FULFILL THE INVESTMENT COMMITMENT, AS WELL AS THE ASPECT OF THE SAME INVESTMENT COMMITMENT WHICH WILL AFFECTED AND RENDERED IMPOSSIBLE BY SUCH EVENTS.

4.5   TO THE EFFECTS OF THIS CLAUSE, THE AMOUNTS ACTUALLY DISBURSED FOR THE ITEMS THAT FOLLOW, WILL BE CONSIDERED AS INVESTMENTS:

A)   FEASIBILITY STUDIES, TECHNICAL AND/OR FINANCIAL, INCLUDING ENVIRONMENTAL STUDIES AND DISBURSEMENTS NECESSARY FOR THE COMPLIANCE WITH THE OBLIGATIONS OF THE **COMPANY** FOR THE ENVIRONMENTAL ADJUSTMENT AND MANAGEMENT PROGRAM (**METALOROYA'S PAMA**) DESCRIBED IN THE CLAUSE 5 BELOW, AND ANY OTHER ENVIRONMENTAL REQUIREMENTS REQUIRED BY THE LAW.

B)   DEVELOPMENT, IMPROVEMENTS, MODERNIZATION, AMPLIFICATION AND EXPANSION IN THE PRODUCTION CAPACITY OF THE **COMPANY**, AS WELL AS

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

15

INVESTMENTS FOR ROADS AND FOR PROVIDING ELECTRICITY AND WATER, WHICH ENABLE TO COVER ITS NEEDS, AS WELL AS SAFETY, HEALTH, SOCIAL PROGRAMS AND INVESTMENTS, AS WELL AS PUBLIC UTILITIES INFRASTRUCTURE RELATED TO ITS PURPOSES.

C)   THE PURCHASE, INSTALLATION OR CONSTRUCTION OF PLANTS AND EQUIPMENT. IN ADDITION, ALL OTHER CAPITAL EXPENDITURES, AS WELL AS EXTRAORDINARY MAINTENANCE AND REPAIRS WHICH IMPLY INCREASES IN THE PRODUCTION CAPACITY AND/OR EFFICIENCY, AS WELL AS EXTENSION OF THE USEFUL LIFE OF PLANTS AND EQUIPMENT.

D)   INSURANCE, FREIGHT, IMPORT DUTIES AND OTHER TAXES RELATED WITH THE PRECEDING ITEMS.

E) ADMINISTRATIVE EXPENSES RELATED TO THE PRECEDING ITEMS.

F) WORKING CAPITAL RESULTING FROM THE CONTRIBUTIONS TO THE EQUITY.

THE INVESTMENT MUST BE MADE NECESSARILY WITH THE CONTRIBUTION STATED IN NUMERAL 3.2 AND THE ISSUE PREMIUM INDICATED IN NUMERAL 3.3, WITHOUT PREJUDICE TO WHAT IS ESTABLISHED IN THE LAST PARAGRAPH OF NUMERAL 3.3.

**FIFTH CLAUSE**====================== **THE COMPANY'S RESPONSIBILITY** ======================**IN ENVIRONMENTAL MATTERS**=================

16

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

**CENTROMIN** AND THE **COMPANY** ACKNOWLEDGE THAT THE ENVIRONMENTAL ADJUSTMENT AND MANAGEMENT PROGRAM (PAMA) OF THE "LA OROYA" PRODUCTION UNIT OF CENTROMIN-PERU, THAT WAS APPROVED BY DIRECTORIAL RESOLUTION NO. 017-97-EM/DGM, DATED JANUARY 13, 1997, AND MODIFIED BY DIRECTORIAL RESOLUTION NO. 325-97-EM/DGM DATED OCTOBER 6, 1997, HAS BEEN DIVIDED UP INTO THE ENVIRONMENTAL ADJUSTMENT AND MANAGEMENT PROGRAM (PAMA) OF THE LA OROYA METALLURGICAL COMPLEX OF **METALOROYA S.A.** (HEREINAFTER "**METALOROYA'S PAMA**") THAT WAS APPROVED BY DIRECTORIAL RESOLUTION NO. 334-97-EM/DGM DATED OCTOBER 16, 1997, AND THE ENVIRONMENTAL ADJUSTMENT AND MANAGEMENT PROGRAM (PAMA) OF LA OROYA OF **CENTROMIN** PERU S.A. (HEREINAFTER "**CENTROMIN'S PAMA**") THAT WAS APPROVED BY DIRECTORIAL RESOLUTION NO. 334-97-EM/DGM DATED OCTOBER 16, 1997.

THE **COMPANY** ASSUMES THE RESPONSIBILITY ONLY FOR THE FOLLOWING ENVIRONMENTAL MATTERS:

5.1   COMPLIANCE WITH THE OBLIGATIONS CONTAINED IN METALOROYA'S PAMA, AND ITS EVENTUAL AMENDMENTS APPROVED PURSUANT TO THE LEGAL PROVISIONS, WHICH HAVE BEEN OR MAY BE ISSUED BY THE RELEVANT AUTHORITY WITH REGARD TO THE EFFLUENTS, EMISSIONS AND WASTE

17

**EXHIBIT "A" TO NOTICE OF REMOVAL**

GENERATED BY:

A)     THE SMELTING AND REFINING FACILITIES OF THE **COMPANY**.

B)     THE SERVICE FACILITIES AND HOUSING OF THE **COMPANY**.

C)     THE ZINC FERRITE DEPOSITS THAT EXIST ON THE DATE OF THE SIGNING OF THIS CONTRACT, INCLUDING THE ZINC FERRITES THAT MAY BE ADDED BY THE **COMPANY**, SHOULD THE **COMPANY** NOT RETURN THE SAME WITHIN THREE (3) YEARS COUNTED FROM THE DATE OF THE SIGNING OF THIS CONTRACT OR NOT PAY THE AMOUNT ESTABLISHED IN NUMERAL **5.6**.

DURING A THREE (3) YEAR PERIOD FROM THE DATE OF THE SIGNING OF THIS CONTRACT, THE **COMPANY** MAY USE, AT NO COST, THE AREAS THAT THE PARTIES HAVE AGREED TO SIGN TO THE **COMPANY** IN THE DEPOSITS THAT **CENTROMIN** AND ITS PREDECESSORS WERE USING, UNTIL THE **COMPANY** SETS UP NEW AREAS TO DEPOSIT THE SLAG, THE ARSENIC TRIOXIDE AND THE ZINC FERRITES. THIS TERM WILL EXPIRE ON OCTOBER 24, 2000, WHEN THE **COMPANY** AND **CENTROMIN** SHALL SIGN THE RESPECTIVE CERTIFICATE OF RETURN. NOTWITHSTANDING THE AFOREMENTIONED, THE **COMPANY** MAY RETURN THE DEPOSITS THAT IT WAS GIVEN TO USE AT ANY TIME BEFORE THE EXPIRATION OF THE AFOREMENTIONED TERM AND SHALL THEN BE FREED FROM THE...

18

**ANIBAL CORVETTO ROMERO**

NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...RESPECTIVE OBLIGATIONS. **CENTROMIN** AND THE **COMPANY** SHALL THEN SIGN THE CERTIFICATE OF DELIVERY.

THE **COMPANY** SHALL ONLY BE RESPONSIBLE FOR THE ROUTINE OPERATION MAINTENANCE OF THE DEPOSIT AREAS THAT WERE ASSIGNED TO THE **COMPANY** FOR ITS USE DURING THE THREE (3) YEAR PERIOD.

**CENTROMIN** WILL BE RESPONSIBLE FOR THE MAINTENANCE OF THE OTHER AREAS OF THE DEPOSITS THAT WERE NOT ASSIGNED FOR USE BY THE **COMPANY**. SAID MAINTENANCE RESPONSIBILITIES ASSIGNED TO THE **COMPANY** WILL NOT RELEASE **CENTROMIN** FROM THE FULFILLMENT OF THE OBLIGATIONS CONTAINED IN **CENTROMIN**'S PAMA, WHICH ARE RELATED WITH THOSE DEPOSITS DURING THE PERIOD DURING WHICH THEY WILL BE USED BY THE **COMPANY**, THAT IS THREE (3) YEARS. THE TECHNICAL ABANDONMENT OF THE SAME WILL BE GOVERNED BY THE PROVISIONS OF NUMERAL **6.1** AND BY **CENTROMIN**'S PAMA. AT THE END OF THE THREE (3) YEAR PERIOD, THE SLAG AND ARSENIC TRIOXIDE DEPOSITS INCLUDING THE ADDITIONAL WASTE DEPOSITED IN THEM BY THE **COMPANY** DURING THE THREE (3) YEAR PERIOD WILL AFTERWARDS BECOME THE SOLE RESPONSIBILITY OF **CENTROMIN** UNDER ALL CIRCUMSTANCES. **CENTROMIN** WILL RETAIN TITLE OVER THE LANDS IN WHICH THE EXISTING SLAG AND ARSENIC TRIOXIDE DEPOSITS ARE ON THE...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU
                                        19

**EXHIBIT "A" TO NOTICE OF REMOVAL**

DATE OF THE SIGNING OF THIS CONTRACT AND WHICH WILL BE TEMPORARILY USED BY THE **COMPANY**.

**CENTROMIN** AND THE **COMPANY** DECLARE THAT THEY KNOW THAT THE SLAG, ARSENIC TRIOXIDE AND ZINC FERRITE DEPOSITS WERE SEPARATED AND DETACHED FROM THE SMELTING CONCESSIONS THAT WERE TRANSFERRED BY **CENTROMIN** TO THE **COMPANY** AND THAT **CENTROMIN** KEPT OWNERSHIP OVER THEM AND OVER THE OBLIGATIONS THAT MAY ARISE FROM THEM. ADDITIONALLY, TAKING INTO CONSIDERATION THE INCLUSION WITHIN METALOROYA'S PAMA OF **CENTROMIN**'S OBLIGATION TO INVEST IN 1997 THE SUM OF US$ 1,145,668.00 (ONE MILLION ONE HUNDRED FORTY-FIVE THOUSAND, SIX HUNDRED SIXTY-EIGHT AND 00/100 US DOLLARS) IN PROJECTS FOR THE TREATMENT OF INDUSTRIAL LIQUID EFFLUENTS AND THE NEW SYSTEM FOR THE GRANULATION OF SLAG, **CENTROMIN** MUST PAY THIS SUM IN CASH TO THE **INVESTOR** ON THE DATE OF EXECUTION OF THIS CONTRACT.

D) ANY NEW WASTE DEPOSIT THAT THE **COMPANY** MAY ESTABLISH OR PROVIDE.

5.2   THE FUTURE CLOSING AND DISMANTLING AT THE END OF THE OPERATIONAL LIFE OF:

A)    THE SMELTING AND REFINING FACILITIES OF THE **COMPANY**.

20

## ANIBAL CORVETTO ROMERO

NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

B)   ANY NEW DEPOSIT OF SLAG, ZINC FERRITE OR ARSENIC TRIOXIDE AND OTHERS THAT THE **COMPANY** MAY ESTABLISH.

C)   THE EXISTING ZINC FERRITE DEPOSITS SHOULD THE **COMPANY** NOT RETURN THE SAME TO **CENTROMIN** WITHIN THREE (3) YEARS FROM THE DATE OF THE SIGNING OF THIS CONTRACT OR SHOULD NOT PAY THE AMOUNT THAT WAS STIPULATED IN NUMERAL **5.6**.

5.3   DURING THE PERIOD APPROVED FOR THE EXECUTION OF METALOROYA'S PAMA, THE **COMPANY** WILL ASSUME LIABILITY FOR DAMAGES AND CLAIMS BY THIRD PARTIES ATTRIBUTABLE TO IT FROM THE DATE OF THE SIGNING OF THIS CONTRACT, ONLY IN THE FOLLOWING CASES:

A)   THOSE THAT ARISE DIRECTLY DUE TO ACTS THAT ARE NOT RELATED TO **METALOROYA**'S PAMA WHICH ARE EXCLUSIVELY ATTRIBUTABLE TO THE **COMPANY** BUT ONLY INSOFAR AS SAID ACTS WERE THE RESULT OF THE **COMPANY**'S USE OF STANDARDS AND PRACTICES THAT WERE LESS PROTECTIVE OF THE ENVIRONMENT OR OF PUBLIC HEALTH THAN THOSE THAT WERE PURSUED BY **CENTROMIN** UNTIL THE DATE OF EXECUTION OF THIS CONTRACT.

SHOULD THERE BE ANY CONTROVERSY ON THE DETERMINATION OF WHETHER...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

21

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...THE STANDARDS OR PRACTICES USED BY THE **COMPANY** WERE OR WERE NOT LESS PROTECTIVE OF THE ENVIRONMENT OR OF THE PUBLIC HEALTH THAN THOSE THAT WERE APPLIED BY **CENTROMIN** AND SHOULD NO AGREEMENT BE REACHED WITH REGARD TO THIS WITHIN THIRTY (30) CALENDAR DAYS FROM THE DATE ON WHICH THE CLAIM WAS MADE, THE **CENTROMIN** AND THE **COMPANY** SHALL SUBMIT THIS DETERMINATION TO THE OPINION OF AN EXPERT AND SHALL APPLY FOR THIS PURPOSE THE PROCEDURE THAT IS DESCRIBED IN NUMERAL 5.4(C).

B) THOSE THAT RESULT DIRECTLY FROM A DEFAULT ON THE **METALOROYA**'S PAMA OBLIGATIONS ON THE PART OF THE **COMPANY** OR OF THE OBLIGATIONS ESTABLISHED BY MEANS OF THIS CONTRACT IN NUMERALS **5.1 AND 5.2**.

5.4 AFTER THE EXPIRATION OF THE LEGAL TERM OF **METLAOROYA**'S PAMA, THE **COMPANY** WILL ASSUME LIABILITY FOR DAMAGES AND THIRD PARTY CLAIMS IN THE FOLLOWING MANNER:

A) THOSE THAT RESULT DIRECTLY FROM ACTS THAT ARE SOLELY ATTRIBUTABLE TO ITS OPERATIONS AFTER THAT PERIOD.

B) THOSE THAT RESULT DIRECTLY FROM A DEFAULT ON THE **METALOROYA**'S PAMA OBLIGATIONS ON THE PART OF THE **COMPANY** OR OF THE OBLIGATIONS ESTABLISHED BY MEANS OF THIS CONTRACT IN NUMERALS 5.1 AND 5.2.

22

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**

NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

C) SHOULD THE DAMAGES BE ATTRIBUTABLE TO **CENTROMIN** AND TO THE **COMPANY**, THE **COMPANY** WILL ASSUME LIABILITY PROPORTIONATELY TO ITS CONTRIBUTION TO THE DAMAGE.

IN THOSE CASES IN WHICH NO CONSENSUS WAS REACHED BETWEEN **CENTROMIN** AND THE **COMPANY** WITH REGARD TO THE CAUSES OF THE PRESUMED DAMAGE THAT IS THE SUBJECT OF THE CLAIM OR WITH REGARD TO THE MANNER IN WHICH THE LIABILITY WILL BE SHARED AMONGST THEM, SHOULD NO AGREEMENT BE REACHED WITHIN THE TERM OF THIRTY (30) DAYS COUNTED FROM THE RECEPTION OF THE CLAIM, THE MATTER WILL BE SUBMITTED TO THE DECISION OF AN EXPERT ON THIS MATTER THAT WILL BE DESIGNATED BY MUTUAL AGREEMENT. THIS EXPERT MUST RENDER A DECISION AS SOON AS POSSIBLE.

IF THE AMOUNT OF THE CLAIM WERE FOR LESS THAN US$50,000.00, **CENTROMIN** AND THE **COMPANY** WILL BE BOUND BY THE DECISION OF THE EXPERT. IF THE AMOUNT OF THE CLAIM WERE HIGHER THAN US$50,000.00, **CENTROMIN** AND THE **COMPANY** MAY SUBMIT THE MATTER TO ARBITRATION, IN ACCORDANCE WITH CLAUSE 12 OF THIS CONTRACT, SHOULD ONE OR BOTH PARTIES NOT BE IN AGREEMENT WITH THE DECISION OF THE EXPERT.

5.5   FROM THE SIGNING OF THIS CONTRACT, THE **COMPANY** WILL NOT HAVE NOR WILL IT ASSUME ANY LIABILITY FOR DAMAGES OR FOR THIRD PARTY CLAIMS ATTRIBUTABLE TO **CENTROMIN** INSOFAR AS THE SAME WERE THE ...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

23

RESULT OF **CENTROMIN**'S OPERATIONS OR THOSE OF ITS PREDECESSORS UP TO THE EXECUTION OF THIS CONTRACT OR ARE DUE TO A DEFAULT ON THE PART OF **CENTROMIN** WITH REGARDS TO ITS OBLIGATIONS THAT ARE SPECIFIED IN NUMERAL **6.1**.

5.6    SHOULD THE **COMPANY** RETURN TO **CENTROMIN** THE ZINC FERRITE DEPOSITS REFERRED TO IN NUMERAL 5.1 C), IT MUST PAY THE LATTER US$7,200,000 (SEVEN MILLION TWO HUNDRED THOUSAND UNITED STATES OF AMERICA DOLLARS) FOR REMEDIATION COSTS REGARDING THE SAME AND **CENTROMIN** WILL AFTERWARDS ASSUME THE SOLE RESPONSIBILITY FOR THE SAME AND WILL INDEMNIFY AND HOLD THE **COMPANY** HARMLESS AGAINST ANY CLAIM, COST, DEMAND OR OTHER OBLIGATION ARISING FROM THE SAME. THE PARTIES SHALL SIGN THE CERTIFICATE OF RETURN THAT IS REFERRED TO IN NUMERAL 5.1.C), AND THE **COMPANY** MUST MAKE THE AFOREMENTIONED PAYMENT WITHIN TEN (10) WORKING DAYS AFTER THE SIGNING OF THIS CERTIFICATE.

SHOULD THE **COMPANY** NOT RETURN THE ZINC FERRITE DEPOSITS WITHIN THREE (3) YEARS FROM THE SIGNING OF THIS CONTRACT, **CENTROMIN** WILL TRANSFER TO THE **COMPANY** THE TITLE OVER THE LANDS AND THE SMELTING CONCESSION THAT REFER TO THE ZINC FERRITE DEPOSITS…

24

## ANIBAL CORVETTO ROMERO

NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...EXISTING AT THE EXECUTION OF THIS CONTRACT.

5.7 **CENTROMIN** RESERVES FOR ITSELF THE RIGHT TO CARRY OUT THE INSPECTIONS THAT MAY BE NECESSARY TO VERIFY THE FULFILLMENT OF THE PROVISIONS SET FORTH IN NUMERAL 5.1.C).

THE **COMPANY** WILL PERIODICALLY PROVIDE **CENTROMIN** WITH COPIES OF THE MONITORING REPORTS, METALLURGICAL REPORTS AND THE FULFILLMENT OF **METALOROYA**'S PAMA SUBMITTED TO THE COMPETENT AUTHORITY.

5.8 THE **COMPANY** SHALL PROTECT AND HOLD **CENTROMIN** HARMLESS AGAINST THIRD PARTY CLAIMS AND INDEMNIFY IT FOR ANY DAMAGE, LIABILITY OR OBLIGATION THAT MAY COME FOR WHICH IT HAS ASSUMED LIABILITY AND OBLIGATION.

5.9 ALL OTHER LIABILITIES SHALL CORRESPOND TO **CENTROMIN** IN ACCORDANCE WITH THE SIXTH CLAUSE.

SIXTH CLAUSE================= **CENTROMIN**'S RESPONSIBILITY IN ====================ENVIRONMENTAL MATTERS==================

6.1 **CENTROMIN** ASSUMES RESPONSIBILITY IN THE FOLLOWING ENVIRONMENTAL MATTERS:

A) COMPLIANCE WITH THE OBLIGATIONS CONTAINED IN **CENTROMIN**'S PAMA ACCORDING TO ITS EVENTUAL AMENDMENTS APPROVED BY THE RELEVANT AUTHORITY AND THE LEGAL APPLICABLE REQUIREMENTS IN FORCE...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

25

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...THAT HAVE BEEN ISSUED OR WHICH MAY BE ISSUED BY THE RELEVANT LEGAL AUTHORITY.

B)   TECHNICAL ABANDONMENT OF THE SLAG AND ARSENIC TRIOXIDE DEPOSITS THAT EXIST ON THE DATE OF THE SIGNING OF THIS CONTRACT, AND THE OBLIGATIONS RELATED THERETO, INCLUDING THE ADDITIONAL WASTE DEPOSITED BY THE **COMPANY** IN THOSE AREAS WHICH ARE PERMITTED IN ACCORDANCE WITH CLAUSE FIFTH.

C)   REMEDIATION OF THE AREAS AFFECTED BY GASEOUS AND PARTICLES EMISSIONS FROM THE SMELTING AND REFINING OPERATIONS THAT HAVE PRODUCED UP UNTIL THE DATE OF THE EXECUTION OF THIS CONTRACT AND OF ADDITIONAL EMISSIONS DURING THE PERIOD THAT IS PROVIDED FOR IN THE LAW FOR **METALOROYA**'S PAMA EXCEPT FOR THOSE AREAS WHICH ARE THE RESPONSIBILITY OF THE **COMPANY** IN ACCORDANCE WITH THE FIFTH CLAUSE.

D)   TECHNICAL ABANDONMENT OF THE ZINC FERRITE DEPOSITS AND THE OBLIGATIONS RELATED THERETO, SHOULD THE **COMPANY** RETURN THEM TO **CENTROMIN** WITHIN A THREE (3) YEAR PERIOD FROM THE DATE OF THE SIGNING OF THIS CONTRACT AND PAY THE AMOUNT SPECIFIED IN NUMERAL 5.6.

E) REMEDIES AND TECHNICAL ABANDONMENT OF ANY WASTE DEPOSIT...

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**

NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...GENERATED BY **CENTROMIN** OR ITS PREDECESSORS BEFORE THE DATE OF THE TRANSFER OF THE LA OROYA METALLURGICAL COMPLEX WHICH WAS NOT IDENTIFIED OR WHOSE EXISTENCE WAS NOT DECLARED BEFORE THE DATE OF THE TRANSFER.

6.2    DURING THE PERIOD APPROVED FOR THE EXECUTION OF **METALOROYA**'S PAMA, **CENTROMIN** WILL ASSUME LIABILITY FOR ANY DAMAGES AND CLAIMS BY THIRD PARTIES THAT ARE ATTRIBUTABLE TO THE ACTIVITIES OF THE **COMPANY**, OF **CENTROMIN** AND/OR ITS PREDECESSORS, EXCEPT FOR THE DAMAGES AND THIRD PARTY CLAIMS THAT ARE THE **COMPANY**'S RESPONSIBILITY IN ACCORDANCE WITH NUMERAL 5.3.

6.3    AFTER THE EXPIRATION OF THE LEGAL TERM OF **METALOROYA**'S PAMA, **CENTROMIN** WILL ASSUME LIABILITY FOR ANY DAMAGES AND THIRD PARTY CLAIMS ATTRIBUTABLE TO **CENTROMIN**'S AND/OR ITS PREDECESSORS' ACTIVITIES EXCEPT FOR THE DAMAGES AND THIRD PARTY CLAIMS FOR WHICH THE **COMPANY** IS LIABLE IN ACCORDANCE WITH NUMERAL **5.4**.

IN THE CASE THAT DAMAGES MAY BE ATTRIBUTABLE TO **CENTROMIN** AND THE **COMPANY**, THE PROVISIONS SET FORTH IN NUMERAL 5.4.C SHALL APPLY.

6.4    THE **COMPANY** RESERVES THE RIGHT TO CARRY OUT...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

27

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...THE INSPECTIONS REQUIRED TO VERIFY THE EXECUTION OF **CENTROMIN**'S PAMA.

**CENTROMIN** WILL PERIODICALLY PROVIDE THE **COMPANY** WITH COPIES OF THE MONITORING REPORTS, STUDIES AND REPORTS ON COMPLIANCE WITH **CENTROMIN**'S PAMA THAT ARE SUBMITTED TO THE COMPETENT AUTHORITY.

6.5 **CENTROMIN** WILL PROTECT AND HOLD THE **COMPANY** HARMLESS AGAINST THIRD PARTY CLAIMS AND WILL INDEMNIFY IT FOR ANY DAMAGES, LIABILITIES OR OBLIGATIONS THAT MAY ARISE FOR WHICH IT HAS ASSUMED LIABILITY AND OBLIGATION.

**SEVENTH CLAUSE**=============== **REPRESENTATIONS AND GUARANTEES** ========================**OF THE INVESTOR**========================

7.1 THE **INVESTOR** REPRESENTS THAT IT HAS CARRIED OUT ITS OWN INVESTIGATION, EXAMINATION, INFORMATION AND EVALUATION DURING THE "DUE DILIGENCE" PROCESS, DIRECTLY OR THROUGH THIRD PARTIES, ON THE BASIS OF INFORMATION ACCESSIBLE, AVAILABLE AND PROVIDED BY **CENTROMIN**.

TO THE INVESTOR'S KNOWLEDGE, THE INFORMATION CONCERNING THE **COMPANY** HAS BEEN PROVIDED THROUGH AN "INFORMATION MEMORANDUM," THE DOCUMENTATION INCLUDED IN THE "DATA ROOM" AND THE INFORMATION REQUESTED BY THE **INVESTOR**, DIRECTLY OR THROUGH THIRD PARTIES

28

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

…AUTHORIZED THERETO. TO THE **INVESTOR**'S KNOWLEDGE, THE INFORMATION CONCERNING THE **COMPANY** HAS BEEN ENTIRELY AVAILABLE TO THE **INVESTOR** THROUGH THE "DUE DILIGENCE" PROCESS. WITHIN THIS CONTEXT, THE **INVESTOR** ASSUMES THE RESPONSIBILITY OF THE DUE DILIGENCE ON THE BASIS OF INFORMATION ACCESSIBLE AND PROVIDED BY **CENTROMIN**. CONSEQUENTLY, THE **INVESTOR** CANNOT CLAIM ANY RESPONSIBILITY FROM **COPRI**, ITS MEMBERS, FROM CEPRI-**CENTROMIN**, ITS MEMBERS OR ADVISERS, FROM **CENTROMIN**, OR THE PERUVIAN STATE FOR THE INFORMATION THAT THE **INVESTOR** HAS FAILED TO REVIEW CONCERNING THE **COMPANY** OR THE LA OROYA METALLURGICAL COMPLEX, WHICH HAS BEEN PROVIDED TO THE **INVESTOR** THROUGH THE DUE DILIGENCE PROCESS.

THE INFORMATION CONTAINED IN THE PREVIOUS PARAGRAPH IS WITHOUT PREJUDICE OF THE REPRESENTATIONS AND GUARANTEES MADE BY **CENTROMIN** MENTIONED IN CLAUSE EIGHT.

7.2   THE **INVESTOR** ACKNOWLEDGES THAT THE AWARDING OF THE BIDDING INCLUDES THE COMPLIANCE WITH THE PRE-QUALIFICATION REQUIREMENTS ESTABLISHED BY CEPRI-**CENTROMIN**. IN THAT SENSE, THE **INVESTOR** AGREES TO MAINTAIN THE OWNERSHIP OF A NUMBER OF SHARES…

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

29

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...THAT REPRESENTS NO LESS THAN 25% OF THE FULLY PAID CAPITAL, UP TO THE FULFILLMENT OF THE INVESTMENT COMMITMENT. THE **INVESTOR**'S FULFILLMENT OF THAT OBLIGATION WILL ALSO BE MADE IF AT LEAST 25% OF THE **COMPANY** OR ANY SUCCESSOR **COMPANY** IS OWNED DIRECTLY OR INDIRECTLY BY EITHER MEMBER OF THE CONSORTIUM, OR ANY SUBSIDIARY MEMBER OF THE GROUP OF COMPANIES OWNED DIRECTLY OR INDIRECTLY BY THEM.

THE REQUIREMENT OF OWNERSHIP OF THE 25% WILL NOT PRECLUDE THE PLEDGE OF ALL OF THE SHARES OF THE **COMPANY** TO BANKS OR OTHER ENTITIES PROVIDING LOANS TO THE **COMPANY**.

7.3   **CENTROMIN** AGREES THAT IT HAS GRANTED AND THE **INVESTOR** AGREES THAT IT HAS RECEIVED FROM **CENTROMIN** AT THE SIGNING OF THIS CONTRACT, THE FOLLOWING DOCUMENTS:

A)   A COPY OF THE MINUTES OF THE STOCKHOLDERS GENERAL MEETING OF **CENTROMIN** DATED MAY 30, 1996, IN ACCORDANCE WITH WHICH THE BOARD OF DIRECTORS OF **CENTROMIN** WAS AUTHORIZED TO TRANSFER ASSETS AND LIABILITIES TO THE **COMPANY**. A COPY OF THE MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS OF **CENTROMIN**, WHICH HAS BEEN AUTHENTICATED BY A NOTARY PUBLIC, IN WHICH IT WAS RESOLVED AND PLEDGES TO (I) CONTRIBUTE ALL THE ASSETS RELATED TO THE LA OROYA METALLURGICAL COMPLEX, THAT WILL BE TRANSFERRED BY MEANS OF A CERTIFICATE OF DELIVERY, RECEPTION AND VALUATION OF PROPERTIES (II)...

30

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...TRANSFER THE CURRENT LIABILITIES FOR THE AMOUNT THAT IS RECORDED IN THE ACCOUNTING BOOKS OF THE **COMPANY** WITHOUT CHANGES IN THE DEFERRED LIABILITIES THAT APPEAR IN THE PROJECTED BALANCE SHEET OF THE **COMPANY**. ALL THESE TRANSFERS WILL HAVE BEEN MADE AT THE TIME OF THE EXECUTION OF THIS CONTRACT OR PRIOR TO THAT TIME.

B)   A COPY OF THE MINUTES OF THE STOCKHOLDERS' GENERAL MEETING OF THE **COMPANY** IN WHICH IT WAS AGREED TO INCREASE THE STOCK CAPITAL TO S/. 160,614,467 (ONE HUNDRED SIXTY MILLION SIX HUNDRED FOURTEEN FOUR HUNDRED SIXTY-SEVEN NUEVOS SOLES) AS A RESULT OF THE AFOREMENTIONED CONTRIBUTION OF ASSETS MADE BY **CENTROMIN** AND OF THE CONTRACT FOR CAPITAL INCREASE WHICH WAS DULY SIGNED BY THE LEGAL REPRESENTATIVE OF THE **COMPANY**.

C)   A COPY AUTHENTICATED BY A NOTARY PUBLIC OF THE MINUTES OF THE SESSION OF THE BOARD OF DIRECTORS OF THE **COMPANY** IN WHICH THE VALUATION OF THE CONTRIBUTIONS MADE BY **CENTROMIN** WAS APPROVED IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 98 OF THE SINGLE REVISES TEXT OF THE BUSINESS CORPORATIONS LAW, APPROVED BY SUPREME DECREE NO.003-85-JUS.

D)   A CERTIFIED COPY OF THE PUBLIC DEED OF THE ARTICLES OF INCORPORATION OF THE **COMPANY**.

E) THE CERTIFICATES THAT REPRESENT THE SHARES OF THE **COMPANY**...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

31

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...THAT HAVE BEEN LEGALLY TRANSFERRED BY **CENTROMIN** TO THE **INVESTOR** SO THAT THE LATTER MAY CANCEL THEM AND OPPORTUNELY ISSUE THE CERTIFICATES UNDER THE NAME OF THE **INVESTOR**.

F) A CERTIFICATE OF DELIVERY AND RECEPTION OF PROPERTIES THAT CONSTITUTE THE ASSETS AND INVENTORY OF THE **COMPANY**.

G)   A COPY OF THE MINUTES OF THE BOARD OF DIRECTORS OF **CENTROMIN**, AUTHENTICATED BY A NOTARY PUBLIC IN WHICH THE SALE TO THE **INVESTOR** OF ALL THE SHARES OF THE **COMPANY** IS AUTHORIZED EXCEPT FOR THE WORKER SHARES THAT WERE TRANSFERRED UNDER THE FIRST CLAUSE OF THIS CONTRACT.

H)   A COPY OF THE MINUTES OF THE STOCKHOLDERS GENERAL MEETING OF THE **COMPANY**, WHICH WAS AUTHENTICATED BY A NOTARY PUBLIC IN WHICH THE INCREASE OF STOCK CAPITAL OF THE **COMPANY** THAT WAS DESCRIBED IN THE THIRD CLAUSE OF THIS CONTRACT.

IV.   **EIGHT CLAUSE**==============**REPRESENTATIONS AND GUARANTEES**
============================**OF CENTROMIN AND THE COMPANY**

8.1.   **CENTROMIN** REPRESENTS AND GUARANTEES THAT IT IS THE SOLE AND EXCLUSIVE OWNER OF THE SHARES WHICH ARE THE SUBJECT MATTER OF THIS CONTRACT, THAT THE SHARES AND ALL ASSETS OF **THE COMPANY**, ALL OF WHICH HAVE BEEN TRANSFERRED TO **THE COMPANY** BY **CENTROMIN** ARE FREE FROM ALL LIENS, PLEDGES, TAXES, CLAIMS, OPTIONS OR RESTRICTIONS...

32

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

…AND REPRESENTS THAT NO OTHER PERSON HAS ANY RIGHT, REAL OR CONTINGENT OVER THEM. SUCH ASSETS CONSTITUTE ALL THE ASSETS OWNED BY **CENTROMIN** ON THE DATE OF EXECUTION OF THE CONTRACT FOR THE LA OROYA METALLURGICAL COMPLEX, AND WHICH ARE MENTIONED IN NUMERAL 7.3(A) ABOVE.

CENTROMIN REPRESENTS AND GUARANTEES THAT ALL THE ASSETS NECESSARY FOR THE OPERATIONS OF THE ACTIVITIES HAVE BEEN TRANSFERRED TO **THE COMPANY**, EXCEPT FOR, CASH, ACCOUNTS RECEIVABLE AND FINISHED PRODUCTS.

8.2   **CENTROMIN** HAS DELIVERED TO **THE INVESTOR** THE BALANCE SHEET OF **THE COMPANY** PROJECTED TO JUNE 30, 1997 (THE SAME WHICH WILL BE REFERRED TO HEREINAFTER AS **THE PROJECTED BALANCE SHEET**). SUCH PROJECTED BALANCE SHEET HAS BEEN ELABORATED ACCORDING TO THE PERUVIAN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

8.3   LIKEWISE, **CENTROMIN** REPRESENTS THAT IT DOES NOT KNOW THE EXISTENCE OF OTHER LIABILITIES OR ANY CONTINGENCIES DERIVED FROM TAX, LABOR OR LEGAL RESPONSIBILITIES, OR OF ANY OTHER NATURE DIFFERENT FROM THOSE RECORDED ON THE BOOKS OF **THE COMPANY** THAT ARE REFLECTED IN THE **PROJECTED BALANCE SHEET** AS OF JUNE 30, 1997, AS WELL AS THAT ADJUSTED BY **THE VERIFICATION BALANCE SHEET**. IN CASE…

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

33

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**COMPANY**'S DISCOVERY OF EITHER LIABILITIES OR NON-RECORDED CONTINGENCIES DERIVED FROM EVENTS PRIOR TO THE DATE OF EXECUTION OF THIS CONTRACT, THEY WILL BE ASSUMED BY **CENTROMIN** TO THE EXTENT THAT THEY HAVE EFFECTIVELY ORIGINATED PRIOR TO THE DATE OF THIS CONTRACT AND THAT THE CLAIMS ARISE WITHIN TWO (2) YEARS FROM THE DATE OF EXECUTION OF THIS CONTRACT EXCEPT TAX CONTINGENCIES THAT ARE GOVERNED AS STIPULATED IN NUMERAL **8.15** OF THIS CONTRACT WHICH SHALL BE THE RESPONSIBILITY OF **CENTROMIN** FOR THE ENTIRE PERIOD ON WHICH SUCH TAX CONTINGENCIES MAY BE ASSERTED IN ACCORDANCE WITH LAW AND EXCEPT FOR SUCH CLAIMS AND LIABILITIES AS ARE NOT EXPRESSLY ASSUMED BY **THE COMPANY** UNDER THIS CONTRACT. IT IS UNDERSTOOD THAT UNDER THIS CLAUSE, ALL CLAIMS AND LIABILITIES ARISING FROM MATTERS PRIOR TO THE DATE OF THIS CONTRACT RELATING IN ANY WAY TO THE LA OROYA METALLURGICAL COMPLEX SHALL REMAIN THE SOLE RESPONSIBILITY OF **CENTROMIN**, EXCEPT AS SPECIFICALLY ALLOCATED TO **THE COMPANY** UNDER THIS CONTRACT. SUCH CLAIMS AND LIABILITIES OF **CENTROMIN** EXPRESSLY INCLUDE THOSE THAT ARISE AFTER THE DATE OF EXECUTION OF

34

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

THIS CONTRACT THAT PERTAIN TO MATTERS PRIOR TO THE DATE OF EXECUTION OF THIS CONTRACT.

THE REIMBURSEMENTS REFERRED TO IN THE PREVIOUS PARAGRAPH WILL ONLY BE EFFECTED STARTING WITH INDIVIDUAL OR ACCUMULATED SUMS, EQUAL OR HIGHER THAN TWO HUNDRED FIFTY THOUSAND UNITED STATES DOLLARS (US$250,000.00) AND SUBJECT TO **THE COMPANY**, WITHIN A TERM OF TEN (10) CALENDAR DAYS OF LEARNING OF THE CONTINGENCY, MAKES IT KNOWN TO **CENTROMIN**. IN ANY CASE, **THE COMPANY** WILL HAVE TO ACTIVELY DEFEND THE INTERESTS OF **CENTROMIN** IN THE POSSIBLE ADMINISTRATIVE OR JUDICIAL CLAIMS THAT COULD ARISE UNTIL THE ASSUMPTION BY **CENTROMIN**, ACCORDING TO NUMERAL **8.14** AND **CENTROMIN** WILL REIMBURSE **THE COMPANY** FOR THE COSTS OF SUCH DEFENSE, UPON DEMAND.

EACH REIMBURSEMENT WILL BE PAID BY **CENTROMIN** TO **THE COMPANY** WITHIN THE THIRTY (30) DAYS FOLLOWING THE DEMAND OF PAYMENT BY **THE COMPANY**.

AT THE EXPIRATION OF THE PERIOD OF TWO (2) YEARS **CENTROMIN** WILL REIMBURSE THE AMOUNT PENDING ON THAT DATE, EVEN IF IT WERE LOWER THAN TWO HUNDRED FIFTY THOUSAND DOLLARS OF THE UNITED STATES OF AMERICA (US$250,000.00).

WITHIN 180 DAYS FOLLOWING THE EXECUTION OF THIS CONTRACT,…

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

35

**EXHIBIT "A" TO NOTICE OF REMOVAL**

IF **THE COMPANY** RECEIVES ANY SUM WHICH CORRESPONDS TO **CENTROMIN**, **THE COMPANY** WILL REIMBURSE TO **CENTROMIN** WITHIN THIRTY (30) DAYS FOLLOWING THE DEMAND OF PAYMENT BY **CENTROMIN**.

IN THE CASE OF ACCOUNTS PAYABLE, ORIGINATING IN THE ORDINARY COURSE OF BUSINESS FOR CONTRACTS FOR THE PURCHASE OF MATERIALS, WHICH HAVE NOT BEEN DELIVERED TO **THE COMPANY** AT THE DATE OF EXECUTION OF THIS CONTRACT, THEY SHALL BE ASSUMED BY **THE COMPANY**.

IF FOR HONORING SUCH ACQUISITION, **CENTROMIN** SHOULD HAVE TO ISSUE LETTERS OF CREDIT FOR AMOUNTS PREVIOUSLY AGREED UPON AND OTHER SIMILAR, **THE COMPANY** SHALL MAKE THE CORRESPONDING REIMBURSEMENT TO **CENTROMIN**.

8.4   ANNEX   8.4   CONTAINS   COMPLETE   INFORMATION   ON   EMPLOYMENT CONTRACTS AND COLLECTIVE AGREEMENTS OF WORKERS (IT IS UNDERSTOOD THAT EMPLOYEES ARE INCLUDED) OF **THE COMPANY**, INDICATING THEIR SALARIES, TIME OF SERVICE AND DISTRIBUTION BY CATEGORY. **CENTROMIN** AGREES THAT ANY LEGAL OR CONVENTIONAL OBLIGATION RESULTING FROM THE LABOR RELATIONSHIP WITH THE MENTIONED WORKERS UNTIL THE DATE OF EXECUTION OF THIS CONTRACT SHALL BE THE SOLE RESPONSIBILITY OF **CENTROMIN**, INCLUDING SALARIES, BENEFITS, PENSIONS AND SOCIAL

36

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

CONTRIBUTIONS IN THE TERMS INDICATED IN THE **PROJECTED BALANCE SHEET**.

**CENTROMIN** HAS SIGNED THE COLLECTIVE AGREEMENT WITH THE WORKERS ON SEPTEMBER 20, 1997, AND HAS TRANSFERRED TO THE WORKERS COVERED BY SUCH AGREEMENT TO **THE COMPANY**, HOWEVER PROVIDING THAT **CENTROMIN** SHALL BE RESPONSIBLE FOR ANY WAGES OR BENEFITS (INCLUDING WITHOUT LIMITATION ANY SOCIAL BENEFITS) DUE OR ACCRUED BEFORE THE DATE OF EXECUTION OF THIS CONTRACT, INCLUDING WITHOUT LIMITATION ANY WAGES OR SOCIAL BENEFITS DUE OR ACCRUED OR WHICH MAY BE RETROACTIVE AS OF JULY 25, 1997 REGARDING ANY NEW AGREEMENT WITH THE WORKERS AND ANY ONE DUE OR ACCRUED OR RETROACTIVE AS OF MAY 1, 1997 FOR ANY PROFESSIONALS OR MANAGERS AND THE PORTION OF ANY SEVERANCE ACCRUED ON THE DATE OF EXECUTION OF THIS CONTRACT. **CENTROMIN** WILL INDEMNIFY, DEFEND AND HOLD **THE COMPANY** HARMLESS FROM THE SAME.

**THE COMPANY** AND **THE INVESTOR** DECLARE THAT THEY KNOW THAT THE SALARIES, BENEFITS AND LABOR CONDITIONS OF WORKERS WHO HAVE BEEN TRANSFERRED ARE THOSE APPEARING ON THE COLLECTIVE AGREEMENTS IN

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

37

**EXHIBIT "A" TO NOTICE OF REMOVAL**

FORCE ON THE DATE OF EXECUTION OF THIS CONTRACT.

IN CASE OF ADMINISTRATIVE AND JUDICIAL CLAIMS OR ACTIONS FILED AGAINST **THE COMPANY** FOR SALARIES, BENEFITS OR OTHER LABOR MATTERS RESULTING FROM FACTS PRECEDING THE EXECUTION OF THIS CONTRACT, IT IS AGREED UPON THAT **THE COMPANY** WILL INFORM TO **CENTROMIN** THE REFERRED ACTIONS WITHIN A REASONABLE TERM SINCE THE SERVICE OF NOTICE WHICH ALLOWS **CENTROMIN** TO EXERCISE ITS DEFENSE, WITHOUT PREJUDICE OF INITIATING IMMEDIATE ACTIONS REQUIRED FOR ITS DEFENSE.

**CENTROMIN** SHALL BE RESPONSIBLE FOR DEFENDING THE REFERRED ACTIONS AND FOR ASSUMING THE PAYMENT OF THE ECONOMIC OBLIGATIONS RESULTING THEREFROM. LIKEWISE, **CENTROMIN** IS BOUND TO REGULARLY INFORM TO **THE COMPANY** ABOUT THE INDICATED ACTIONS.

8.5   ANNEX 8.5 CONTAINS A COMPLETE LIST OF ALL THE SURFACE LANDS, CONCESSIONS AND MINING RIGHTS AND LICENSES FOR WATER USE WHICH REFER TO THE LA OROYA METALLURGICAL COMPLEX. ALL THE TITLES OF REAL ESTATE, CONCESSIONS AND MINING RIGHTS AND WATER USE LICENSES (I) HAVE BEEN DULY TRANSFERRED AND REGISTERED BY **CENTROMIN** TO **THE**

38

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

COMPANY; (II) ARE FREE FROM FAULTS, VALID, IN A CORRECT LEGAL SITUATION AND DISPLAY ALL THEIR EFFECTS, AND (III) ARE FREE FROM ANY BURDEN, LIEN, ATTACHMENT, MORTGAGE, USUFRUCT, AND EASEMENT, HEREINAFTER LIENS, EXCEPT FOR THOSE EASEMENTS WHICH CORRESPOND TO **CENTROMIN**'S ELECTRICAL SYSTEM.

**THE COMPANY** IS THE OWNER OF ALL THE PERSONAL PROPERTIES, APPEARING ON **THE PROJECTED BALANCE SHEET**, WHICH ARE FREE FROM CHARGES, LIENS, GUARANTIES OR ANY OTHER RESTRICTIONS.

IF THE TITLES HAVE NOT BEEN OBTAINED BY **CENTROMIN** AND TRANSFERRED TO **THE COMPANY** OR ALL THE LIENS HAVE NOT BEEN RELEASED BEFORE THE EXECUTION OF THIS CONTRACT, **CENTROMIN** BINDS ITSELF TO FINISH THE PROCEEDINGS NECESSARY WITHIN A TERM NO LONGER THAN SIXTY (60) DAYS FROM THE DEMAND OF **THE COMPANY**. IF SUCH TERM EXPIRES WITHOUT THE ACQUISITION AND TRANSFER OF THE TITLES TO **THE COMPANY** OR WITHOUT THE RELEASE OF THE LIENS, **CENTROMIN** WILL GRANT AN IRREVOCABLE POWER-OF ATTORNEY FOR SUCH PURPOSE. **CENTROMIN** WILL REFUND THE EXPENSES TO **THE COMPANY** WITHIN THE REASONABLE PRICE RANGE OF THE LOCAL MARKET FOR SAID TYPE OF SERVICE.

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

39

**EXHIBIT "A" TO NOTICE OF REMOVAL**

8.6   ANNEX 8.6 CONTAINS A COMPLETE LIST OF ALL THE FIXED ASSETS WHICH REFER TO THE LA OROYA METALLURGICAL COMPLEX. ALL THE TITLES, ALL THE PROPERTY RIGHTS AND RIGHTS OF USE OF FIXED ASSETS LISTED IN SAID ANNEX (I) HAVE BEEN DULY TRANSFERRED BY **CENTROMIN** TO **THE COMPANY** (II) ARE FREE FROM FAULTS, VALID IN A CORRECT LEGAL SITUATION AND DISPLAY ALL THEIR EFFECTS AND (III) ARE FREE FROM ANY LIEN, OR OTHER RIGHTS OR CLAIMS OF ANY THIRD PARTY. IF THE TITLES AND OTHER PROPERTY AND USE RIGHTS WERE NOT OBTAINED PRIOR TO THE EXECUTION OF THIS CONTRACT, **CENTROMIN** PLEDGES TO CONCLUDE THE PROCEEDINGS THAT MAY BE NECESSARY WITHIN A TERM OF NOT MORE THAN SIXTY (60) DAYS COUNTED FROM THE DEMAND MADE BY **THE COMPANY**. ONCE THIS TERM HAS EXPIRED WITHOUT HAVING COMPLIED WITH OBTAINING THE TITLES AND TRANSFERRING THEM TO **THE COMPANY** OR WITHOUT HAVING RELEASED THE LIENS, **CENTROMIN** GRANTS AN IRREVOCABLE POWER OF ATTORNEY FOR THIS PURPOSE. **CENTROMIN** WILL REIMBURSE **THE COMPANY** FOR ITS EXPENSES WHICH SHALL BE PAID WITHIN THE THIRTY (30) DAYS AFTER **THE COMPANY** HAS DEMANDED THEM, WITHIN THE REASONABLE PRICE RANGE OF THE LOCAL MARKET FOR SAID TYPE OF SERVICE.

40

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

**8.7 THE COMPANY** HAS COMPLIED WITH ALL MINING OBLIGATIONS CORRESPONDING TO THEIR MINING RIGHTS, FORMAL AS WELL AS SUBSTANTIVE.

ALL MINING RIGHTS ARE IN FORCE AND HAVE NOT INCURRED IN ANY CAUSE FOR LAPSING AND ALL OBLIGATIONS ARISING UNDER THE GENERAL MINING LAW HAVE BEEN SATISFIED BY **CENTROMIN** THROUGH 1997.

MINING GOOD STANDING RIGHTS OF CONCESSIONS BELONGING TO **THE COMPANY** HAVE BEEN PAID FOR 1997.

8.8   ANNEX 8.8 CONTAINS A LIST OF JUDICIAL, ARBITRATION, ADMINISTRATIVE SUITS OR OTHER OUTSTANDING PROCEDURES, ALL OF WHICH SHALL BE **CENTROMIN**'S RESPONSIBILITY AND NOT THAT OF **THE COMPANY**. **CENTROMIN** REPRESENTS AND GUARANTEES THAT THERE IS NO DEMAND, PROCEDURES (JUDICIAL, ARBITRATION OR OF ANY OTHER KIND) THAT IS PENDING OR IS THREATENED WITH REGARD TO (1) **THE COMPANY**; (2) THE ASSETS OR LIABILITIES OF **THE COMPANY**; (3) ANY ENVIRONMENTAL MATTER THAT HAS OCCURRED BEFORE THE DATE OF THIS CONTRACT; (4) OR ON THE BASIS OF TRANSACTIONS CONTEMPLATED UNDER THIS CONTRACT, INCLUDING WITHOUT LIMITATION, ANY DEMANDS BY ANY PRIOR BIDDER.

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

41

**EXHIBIT "A" TO NOTICE OF REMOVAL**

8.9 ALL THOSE CONTRACTS AND AGREEMENTS, LEASES AND OTHER CONTRACTS AND GUARANTEES THAT ARE RELATED TO THEM WITH REGARD TO THE LA OROYA METALLURGICAL COMPLEX ARE LISTED IN ANNEX 8.9. ALL OF THESE HAVE BEEN DULY AND LEGALLY ASSIGNED TO **THE COMPANY**, ALL OF WHICH ARE FULLY IN FORCE AND IN EFFECT AND NO DELAY HAS BEEN NOTIFIED NOR ACCORDING TO **CENTROMIN**'S BEST KNOWLEDGE DOES THERE EXIST ANY REASON TO ASSERT ANY CASES OF DELAY OR NONCOMPLIANCE.

**CENTROMIN** ASSUMES RESPONSIBILITY FOR ANY MATTERS THAT MAY ARISE FROM ANY OF THOSE CONTRACTS PRIOR TO THE DATE OF THIS CONTRACT AND SHALL INDEMNIFY AND HOLD **THE COMPANY** HARMLESS OF THE SAME, INCLUDING WITHOUT LIMITATION, ALL DEMANDS (INCLUDING DEMANDS FOR PRODUCTS OUTSIDE OF THOSE SPECIFIED), INFRINGEMENT OF CONTRACTS, RETURNS AND SIMILAR MEASURES INSOFAR AS THEY ARE NOT REFLECTED IN THE VERIFICATION **BALANCE SHEET**.

NUMERAL **8.16** LISTS ALL INFORMATION, DATA, INTELLECTUAL PROPERTY RIGHTS, INTANGIBLE RIGHTS, AND TECHNOLOGY THAT ARE RELEVANT FOR THE LA OROYA METALLURGICAL COMPLEX AND ALL THE PROCESSES AND OTHER INTELLECTUAL PROPERTY RIGHT THAT ARE REQUIRED FOR THE SAME. ALL OF THEM WILL BE TRANSFERRED TO **THE COMPANY** WITHOUT ROYALTIES AND…

42

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...ARE FREE FROM LIENS, OBLIGATIONS AND LAWSUITS OR OTHER DEMANDS WHATEVER THEY MAY BE AND **CENTROMIN** SHALL INDEMNIFY AND HOLD **THE COMPANY** HARMLESS FROM ANY DEMANDS RELATED TO THE SAME.

**CENTROMIN** HAS INFORMED **THE COMPANY** THAT "MATERIAL DAMAGES AND LOSS OF PROFITS INSURANCE POLICY" SHALL REMAIN IN FORCE UNTIL DECEMBER 16, 1997. **THE COMPANY** SHALL HAVE THE OPTION OF CONTINUING TO ENJOY THE COVERAGE OF THE POLICY UNTIL ITS CONCLUSION AT NO COST WHATSOEVER. FOR THAT PURPOSE, **THE COMPANY** MUST COMMUNICATE ITS WISH TO MAINTAIN OR NOT THIS POLICY WITHIN A TERM OF FIFTEEN (15) DAYS COUNTED FROM THE EXECUTION OF THIS CONTRACT. ONCE THIS TERM HAS EXPIRED WITHOUT THE RECEPTION OF ANY COMMUNICATION, IT SHALL BE UNDERSTOOD THAT THERE IS NO INTENTION TO CONTINUE WITH THE POLICY.

8.10 ANNEX 8.10 CONTAINS A LIST OF ALL LICENSES, PERMITS, RIGHTS, CERTIFICATIONS, FRANCHISES, AUTHORIZATIONS, APPROVALS AND CONSENTS RELATED TO THE LA OROYA METALLURGICAL COMPLEX (HEREINAFTER THE "LICENSES"). ALL THE "LICENSES" (I) HAVE BEEN DULY TRANSFERRED BY **CENTROMIN** TO **THE COMPANY**; (II) ARE FREE FROM FAULTS, VALID, IN A CORRECT LEGAL SITUATION AND DISPLAY ALL THEIR EFFECTS, AND (III) ARE

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

43

**EXHIBIT "A" TO NOTICE OF REMOVAL**

FREE FROM ANY LIEN, RIGHTS OR CLAIMS BY ANY THIRD PARTY; (IV) CONSTITUTE ALL THE "LICENSES" REQUIRED BY **THE COMPANY** TO COMPLY WITH ALL THE LAWS, RULES AND REGULATIONS. **CENTROMIN** AGREES TO INDEMNIFY, DEFEND AND PROTECT FROM DAMAGES **THE COMPANY** AND ITS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND INDEPENDENT CONTRACTORS FROM CLAIMS, DEMANDS, SUITS, ACTIONS, PROCEDURES AND HARM CAUSED BY OR AS A RESULT OF ANY INACCURACY IN THE AFOREMENTIONED DECLARATION.

8.11 ALL RAW MATERIALS, WORK IN PROCESS, SPARE PARTS AND SUPPLIES, INVENTORIES AND SAMPLES THAT ARE FOUND, WHICH ARE RELATED TO THE LA OROYA METALLURGICAL COMPLEX; (I) HAVE BEEN CONVEYED BY **CENTROMIN** TO **THE COMPANY**, (II) ARE MARKETABLE AND SUITABLE FOR THE RESPECTIVE PURPOSE.

8.12 ALL BOOKS, DOCUMENTS, RECORDS, ACCOUNTING BOOKS, FILES, GENERAL CORRESPONDENCE AND CORRESPONDENCE WITH REGARD TO THE ENVIRONMENT, LISTS, TOPOGRAPHICAL MAPS, INFORMATION ON SOIL MECHANICS, CREATIVE MATERIAL, INFORMATION ON SALES, PUBLICITY AND PROMOTION, PERSONNEL AND FINANCIAL RECORDS AND RELATED DOCUMENTS, STUDIES, REPORTS AND ANY OTHER…

44

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...WRITTEN OR PRINTED DOCUMENT RELATED TO THE LA OROYA METALLURGICAL COMPLEX HAS BEEN TRANSFERRED BY **CENTROMIN** TO **THE COMPANY**.

8.13  ON THE DATE OF THE EXECUTION OF THIS CONTRACT, ALL THE FACILITIES, LANDS, PERSONAL PROPERTY AND INTANGIBLE PROPERTY AND OTHER ASSETS WHICH ARE WITHIN THE BOUNDARIES OF THE DIFFERENT PLANTS, BUILDINGS AND GENERALLY, PROPERTIES OF THE LA OROYA METALLURGICAL COMPLEX HAVE BEEN TRANSFERRED BY **CENTROMIN** TO **THE COMPANY** AND ARE SOLELY OWNED BY **THE COMPANY**.

8.14  SHOULD **THE COMPANY** OR **THE INVESTOR** RECEIVE ANY DEMAND OR JUDICIAL, ADMINISTRATIVE NOTICE OR NOTICE OF ANY KIND, RELATED TO ANY ACT OR FACT INCLUDED WITHIN THE RESPONSIBILITIES, DECLARATION AND GUARANTEES OFFERED BY **CENTROMIN**, THEY PLEDGE TO REPORT IT TO **CENTROMIN** WITHIN A REASONABLE TERM WHICH WILL ALLOW **CENTROMIN** TO EXERCISE ITS RIGHT TO A DEFENSE, RELEASING **THE COMPANY** OR **THE INVESTOR** FROM ANY OBLIGATION WITH REGARD TO THE SAME AND **CENTROMIN** SHALL BE OBLIGED TO IMMEDIATELY ASSUME THOSE OBLIGATIONS AS SOON AS IT IS NOTIFIED. **THE COMPANY** SHALL ALSO BE ENTITLED TO BE REPRESENTED IN THOSE PROCEDURES BY LAWYERS IT HAS CHOSEN AND WHOSE FEES SHALL BE SOLELY ASSUMED BY IT. **CENTROMIN**

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

45

**EXHIBIT "A" TO NOTICE OF REMOVAL**

SHALL KEEP **THE COMPANY** FULLY INFORMED ON ALL THE ASPECTS AND ACTIVITIES RELATED TO THAT DEFENSE, INCLUDING THE SUPPLYING OF COPIES OF ALL THE LEGAL PAPERS, PLEADING AND OTHER MATTERS.

8.15 **CENTROMIN** HAS COMPLIED WITH THE PRESENTATION OF ALL TAX RETURNS OF NATIONAL, REGIONAL AND MUNICIPAL TAXES WHICH WERE THEIR OBLIGATION REGARDING LA OROYA METALLURGICAL COMPLEX AND HAS PAID ALL THE TAXES CORRESPONDING TO THEM, WHETHER THEY APPEAR OR NOT IN THOSE TAX RETURNS, OR HAS ESTABLISHED THE CORRESPONDING RESERVE IN **THE PROJECTED BALANCE SHEET**.

**CENTROMIN** THEREFORE STATES THAT IT WILL ASSUME THE PAYMENT OF THE TAX CONTINGENCIES ORIGINATED BY TAXES COMPRISED WITHIN THE NATIONAL TAX SYSTEM OR OF ANY OTHER PUBLIC ENTITY AFTER THE DATE OF EXECUTION OF THIS CONTRACT AND THAT CORRESPOND TO OBLIGATIONS DERIVED FROM TAXABLE FACTS, OR PAYMENTS ACCRUED PRIOR TO THAT DATE, PROVIDED THAT THEY ARE NOT REFLECTED IN **THE PROJECTED BALANCE SHEET**. **CENTROMIN** WILL ASSUME THE PAYMENT FOR SUCH TAXES, AS WELL AS FOR INTEREST, PENALTIES AND LATE FEES THAT THERE MAY BE, AND ANY ADJUSTMENT TO THE TAX DEBT.

46

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

8.16 ON THE DATE OF EXECUTION OF THIS CONTRACT, **CENTROMIN** HAS TRANSFERRED TO **THE COMPANY** ALL OF ITS RIGHTS, TITLES AND INTERESTS AND ALL INTANGIBLE RIGHTS TO THE INFORMATION AND DATA OF BUSINESS, FINANCIAL, ACCOUNTING, TECHNICAL, ENVIRONMENTAL AND LEGAL ACTIVITIES RELATING TO THE LA OROYA METALLURGICAL COMPLEX, WHETHER OR NOT LOCATED AT THE OFFICES OF **CENTROMIN**, OR AT THE LA OROYA METALLURGICAL COMPLEX, INCLUDING THOSE THAT RELATE TO THE INFORMATION CONCERNING THE LA OROYA METALLURGICAL COMPLEX PRIOR TO THE DATE OF EXECUTION OF THIS CONTRACT, OTHER THAN THOSE ABSOLUTELY NECESSARY FOR **CENTROMIN** TO COMPLY WITH ITS OBLIGATIONS UNDER THIS CONTRACT (AND WHEN THOSE OBLIGATIONS ARE PERFORMED), SUCH RECORDS WILL BE TRANSFERRED TO **THE COMPANY** AND **THE COMPANY** AND ITS REPRESENTATIVES WILL HAVE COPIES AND FULL, FREE AND COMPLETE ACCESS TO THE INFORMATION. SUCH INFORMATION TRANSFERRED TO **THE COMPANY** INCLUDES, WITHOUT LIMITATION, ALL OF THE FOLLOWING:

A)    ALL DATA AND INFORMATION IN THE DATA ROOM;

B)    ALL LISTS OF CUSTOMERS, CONTRACTS, AND OTHER BUSINESS INFORMATION OF THE LA OROYA METALLURGICAL COMPLEX;

C)    ALL ACCOUNTING RECORDS OF THE LA OROYA METALLURGICAL COMPLEX;

    [Stamp in the right margin:]
    ANIBAL CORVETTO ROMERO
    NOTARY - ATTORNEY-AT-LAW
    LIMA - PERU

47

D)   ALL INFORMATION CONCERNING PRODUCTION, EQUIPMENT, MAPS, ENGINEERING DRAWINGS, BUILDINGS, PROCESS SPECIFICATIONS, ASSAYS, METALLURGICAL INFORMATION, PROCESS INFORMATION AND ALL PROCESSES AND OTHER INTELLECTUAL PROPERTIES, AS WELL AS SIMILAR OR DISSIMILAR INFORMATION CONCERNING THE OPERATIONS OF THE LA OROYA METALLURGICAL COMPLEX;

E) ALL RECORDS RELATING TO WATER AND AIR, AND ALL CORRESPONDENCE CONCERNING THE ENVIRONMENTAL OBLIGATION OF THE LA OROYA METALLURGICAL COMPLEX;

F) ALL PATENTS, INTELLECTUAL PROPERTY RIGHTS, TRADEMARKS, (INCLUDING THOSE FROM "LONDON METAL EXCHANGE"), TRADE SECRETS AND OTHER INTELLECTUAL PROPERTY AND INTANGIBLE, RELATING TO THE LA OROYA METALLURGICAL COMPLEX;

G)   ALL OTHER BUSINESS, LEGAL, AND TECHNICAL INFORMATION RELATING TO THE LA OROYA METALLURGICAL COMPLEX;

H)   ALL GEOLOGICAL INFORMATION CONCERNING MINING ACTIVITIES FOR THE LA OROYA METALLURGICAL COMPLEX, INCLUDING WITHOUT LIMITATION, LIMESTONE, CLAY AND AGGREGATE QUARRIES, THE AMOUNT AND QUALITY OF THE RESERVES, AND ANY ALTERNATE SOURCES OF SUPPLY.

48

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

I)  ALL INTANGIBLE RIGHTS WITH REGARD TO CLAIMS AGAINST THIRD PARTIES WITH REGARD TO ANY OF THE ASSETS.

J)  THE INSURANCE POLICY FOR MATERIAL DAMAGES AND LOSS OF PROFITS UNDER THE TERMS STIPULATED IN THE LAST PARAGRAPH OF NUMERAL 8.9;

K)     ALL THE OPERATION PERMITS AND LICENSES AND ANY OTHER NECESSARY GOVERNMENTAL AUTHORIZATION FOR THE OPERATION OF THE LA OROYA METALLURGICAL COMPLEX.

**CENTROMIN** REPRESENTS AND GUARANTEES THAT, IMMEDIATELY PRIOR TO THE TRANSFER OF THE SAME TO **THE COMPANY**, IT HAD THE SOLE RIGHT, TITLE AND INTERESTS ON ALL OF THE ASSETS REFERRED TO IN THIS CONTRACT, INCLUDING WITHOUT LIMITATION THOSE IDENTIFIED IN LETTERS (A) TO (K) ABOVE. ALL OF SUCH ASSETS, INCLUDING WITHOUT LIMITATION THOSE DESCRIBED IN LETTERS (A) TO (K) ABOVE, ARE FREE OF ALL LIENS, CLAIMS, OBLIGATIONS AND INTERESTS ON ANY THIRD PARTY WHATSOEVER.

**CENTROMIN** SHALL INDEMNIFY, DEFEND AND HOLD **THE COMPANY** HARMLESS FROM AND AGAINST ANY AND ALL DEMANDS, CLAIMS, ACTIONS AND PROCEEDINGS ASSERTING ANY RIGHTS, TITLES, INTERESTS OF LIENS RELATING TO THE SAME AND WILL SECURE SUCH RIGHTS, TITLES AND INTERESTS ON

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

49

**EXHIBIT "A" TO NOTICE OF REMOVAL**

BEHALF OF **THE COMPANY** TO THE EXTENT THAT IT IS NOT FULLY
TRANSFERRED TO **THE COMPANY** ON OR PRIOR TO THE DATE OF EXECUTION OF
THIS CONTRACT TO ENABLE **THE COMPANY** TO HAVE THE BENEFIT OF THE USE
OF THE SAME. **CENTROMIN** SHALL HAVE THE RESPONSIBILITY TO CARRY OUT
SUCH TRANSFERS WITHIN NO MORE THAN SIXTY (60) DAYS. IF SAID PERIOD
EXPIRES WITHOUT HAVING COMPLIED WITH SUCH TRANSFERS, **CENTROMIN**
WILL GRANT AN IRREVOCABLE POWER-OF-ATTORNEY TO **THE COMPANY** FOR
SUCH PURPOSE. **CENTROMIN** SHALL REIMBURSE THE COSTS AND EXPENSES OF
SUCH TRANSFERS, INCLUDING ANY ACTIONS OR LITIGATIONS NECESSARY TO
CARRY OUT SUCH TRANSFERS, TO **THE COMPANY**, THE SAME WHICH SHALL BE
PAID WITHIN THIRTY (30) DAYS FOLLOWING THE DEMAND BY **THE COMPANY**.
SAID COSTS AND EXPENSES SHALL NOT EXCEED THE REASONABLE LOCAL
MARKET PRICES.

8.17 **CENTROMIN** REPRESENTS AND GUARANTEES THAT IT HAS MADE
AVAILABLE TO **THE INVESTOR** ALL THE INFORMATION AND DATA IN ITS
POSSESSION OR CONTROL TO ENABLE **THE INVESTOR** TO CONDUCT ITS "DUE
DILIGENCE". **CENTROMIN** FURTHER REPRESENTS AND GUARANTEES THAT SUCH
INFORMATION REMAINS CORRECT.

**CENTROMIN** ALSO GUARANTEES THAT SINCE APRIL 11, 1997 THERE HAVE BEEN
NO ADVERSE CHANGES TO THE BUSINESS AND OPERATIONS OF THE LA
OROYA...

50

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...METALLURGICAL COMPLEX, HAVING OPERATED IT ONLY IN THE ORDINARY COURSE OF BUSINESS, AND IT HAS MADE NO ADVERSE CHANGES IN THE OPERATION METHODS OR IN THE REPLACEMENT PRACTICES OF EQUIPMENT OR MAINTENANCE AND THAT ON THE DATE OF EXECUTION OF THIS CONTRACT THERE IS SUFFICIENT INVENTORY OF PRODUCTS IN PROCESS AND MATERIALS AND SPARE PARTS FOR THE NORMAL OPERATION OF THE LA OROYA METALLURGICAL COMPLEX AT EFFICIENCY LEVELS NOT LESS THAN THOSE ACHIEVED THROUGH 1996.

**CENTROMIN** REPRESENTS AND GUARANTEES THAT THE CHANGES THAT HAVE OCCURRED FROM APRIL 11, 1997 OF ASSETS OR LIABILITIES OF THE LA OROYA METALLURGICAL COMPLEX ARE THOSE THAT CORRESPOND TO NORMAL BUSINESS OPERATION.

8.18 IF AFTER HAVING COMPLIED WITH THE CERTIFICATE OF DELIVERY, RECEPTION AND VALUATION, ASSETS SHOULD BE FOUND THAT SHOULD HAVE BEEN TRANSFERRED AND WERE NOT, THESE MUST BE TRANSFERRED BY **CENTROMIN** TO **THE COMPANY** WHENEVER THIS SHOULD BE DEMANDED BY **CENTROMIN** AND **THE COMPANY**. IN CASE OF ANY DISAGREEMENT REGARDING THE TRANSFER OF THESE ASSETS, THE PARTIES MUST SEEK A DECISION MADE BY AN EXPERT TO BE APPOINTED BY MUTUAL AGREEMENT AND WHICH WILL BE EXECUTED BY AN ACKNOWLEDGED AUDITING FIRM. IF **CENTROMIN**

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

51

**EXHIBIT "A" TO NOTICE OF REMOVAL**

OR **THE COMPANY** SHOULD DO REACH AN AGREEMENT REGARDING THE APPOINTMENT OF THE EXPERT, HE WILL BE SELECTED BY **THE COMPANY** FROM THE AUDITING FIRMS STIPULATED IN NUMERAL 4.2. IF THE VALUE OF THE ASSETS SHOULD EXCEED US$50,000, THE PARTIES SHALL BE GOVERNED BY THE PROVISIONS OF THE TWELFTH CLAUSE.

8.19 **CENTROMIN** SHALL GRANT **THE INVESTOR** A PREFERENTIAL RIGHT IN THE PURCHASE OF UP TO 30% OF THE SHARES OF THE EMPRESA MINERA PARAGSHA S.A. OR THE EMPRESA DE ELECTRICIDAD DE LOS ANDES S.A.

**THE INVESTOR** MUST EXPRESS HIS INTEREST IN MAINTAINING ONE OR THE OTHER OPTION, AT THE LATEST BY THE LIMIT DATE TO SUBMIT CONSULTATIONS IN THE TENDER TO SELL THE SHARES OF THE COMPANY THAT CORRESPONDS TO HIS INTEREST AND AFTERWARDS CONFIRM HIS INTENTION OF EXERCISING THE OPTION WITHIN 10 CALENDAR DAYS IMMEDIATELY AFTER THE DATE OF THE RESPECTIVE GRANTING OF AN AWARD TO A BIDDER.

8.20 AFTER THE DATE OF THE EXECUTION OF THIS CONTRACT, **CENTROMIN** SHALL EXECUTE AND DELIVER ALL THE DOCUMENTS OF TRANSFER, ASSIGNMENT AND DELIVERY AND SHALL TAKE THE MEASURES THAT **THE COMPANY** MAY REQUEST TO EXECUTE THE TRANSFER, ASSIGNMENT AND DELIVERY TO **THE COMPANY** AND TO PLACE **THE COMPANY** IN POSSESSION AND CONTROL OF ALL THE ASSETS.

52

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

**NINTH CLAUSE=====================BALANCE SHEET ADJUSTMENT**

9.1 WITHIN NINETY (90) DAYS FOLLOWING THE EXECUTION OF THIS CONTRACT, A BALANCE SHEET WILL BE PREPARED SHOWING THE CONDITION OF **THE COMPANY** TO THE DATE ON WHICH THIS CONTRACT IS SIGNED (HEREINAFTER **THE VERIFICATION BALANCE SHEET**). IN PREPARING THIS BALANCE SHEET, THE SAME CRITERIA, PRINCIPLES AND CONSIDERATION ASSUMED IN THE ELABORATION OF THE **PROJECTED BALANCE SHEET** SHALL BE USED.

SUCH **VERIFICATION BALANCE SHEET** WILL BE PREPARED IN ACCORDANCE WITH PERUVIAN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES APPLIED ON A CONSISTENT BASIS AND IN ACCORDANCE WITH THE SAME PRACTICES USED FOR THE PREPARATION OF THE **PROJECTED BALANCE SHEET**.

9.2 **THE VERIFICATION BALANCE SHEET** WILL BE PREPARED BY **THE COMPANY** AND REPORTED BY A FIRM OF INDEPENDENT AUDITORS OF INTERNATIONAL PRESTIGE ELECTED BY **CENTROMIN** AMONG A MINIMUM OF THREE FIRMS PROPOSED BY **THE INVESTOR**.

THE AUDITOR'S FEES WILL BE PAID BY **CENTROMIN**.

9.3 **THE PROJECTED BALANCE SHEET** WILL BE COMPARED WITH THE

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

53

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**VERIFICATION BALANCE SHEET**. IF THE DIFFERENCE BETWEEN THE NET CURRENT ASSETS AND THE CURRENT LIABILITIES PRESENTED IN THE **PROJECTED BALANCE SHEET** EXCEEDS BY MORE THAN 5% THE DIFFERENCE BETWEEN THE NET CURRENT ASSETS AND THE CURRENT LIABILITIES PRESENTED IN THE **VERIFICATION BALANCE SHEET**, **CENTROMIN** WILL PAY **THE COMPANY** AN AMOUNT EQUIVALENT TO THE EXCESS ABOVE SAID 5%.

IF, ON THE CONTRARY, THE DIFFERENCE BETWEEN THE NET CURRENT ASSETS AND THE CURRENT LIABILITIES PRESENTED IN THE **VERIFICATION BALANCE SHEET**, EXCEEDS BY MORE THAN 5% OF THIS SAME DIFFERENCE, THE DIFFERENCE BETWEEN THE NET CURRENT ASSETS AND THE CURRENT LIABILITIES PRESENTED IN THE **PROJECTED BALANCE SHEET**, **THE COMPANY** WILL PAY **CENTROMIN** AN AMOUNT EQUIVALENT TO THE EXCESS ABOVE THIS 5%.

9.4   THE DIFFERENCE TO BE REIMBURSED BY **CENTROMIN** TO **THE COMPANY**, OR VICE VERSA, REFERS EXCLUSIVELY TO THE DIFFERENCE BETWEEN THE CURRENT ASSETS AND CURRENT LIABILITIES AND NO CONSIDERATION OF ANY NATURE WILL BE GIVEN TO FIXED ASSETS, INTANGIBLE ASSETS, OTHER ASSETS OR OTHER LIABILITIES, WHICH WILL BE ASSUMED IN WHAT IS INDICATED IN THE **VERIFICATION BALANCE SHEET** AND IN THE CONDITION AND PHYSICAL SITUATION IN WHICH THEY ARE, AND THAT SUCH EQUIPMENT AND FACILITIES…

54

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...ARE OPERATING IN THE SAME WAY AS THEY WERE ON APRIL 11, 1997.

THE VALUATION CRITERIA OF CURRENT ASSETS AND LIABILITIES WHICH WERE USED TO PREPARE THE **PROJECTED BALANCE SHEET**, WILL ALSO BE USED IN THE SAME MANNER TO PREPARE THE **VERIFICATION BALANCE SHEET**, **CENTROMIN** HAS PREVIOUSLY FURNISHED TO THE **INVESTOR** THE PRACTICES AND STANDARDS BY WHICH THE **PROJECTED BALANCE SHEET** WAS PREPARED.

9.5   THE DIFFERENCE WILL BE PAID BY THE PARTY THAT HAS BENEFITED, WITHIN THIRTY (30) DAYS AFTER THE PRESENTATION OF THE **VERIFICATION BALANCE SHEET**, INCLUDING INTEREST AT THE THREE-MONTH ACTIVE LIBOR RATE, PUBLISHED BY REUTERS AND APPLICABLE FROM THE DATE OF EXECUTION OF THIS CONTRACT.

PAYMENT WILL BE MADE IN DOLLARS OF THE UNITED STATES OF AMERICA.

9.6   AS A GUARANTEE OF THE POSSIBLE RESTITUTION THAT MAY BE ORIGINATED IN FAVOR OF **THE COMPANY**, THE 5% OF THE SUM OF THE CURRENT ASSETS PLUS THE CURRENT LIABILITIES OF THE **PROJECTED BALANCE SHEET** WILL BE KEPT AS A RESERVE IN A JOINT SAVINGS ACCOUNT THAT BANCO **SANTANDER** WILL OPEN IN **THE COMPANY**'S AND IN **CENTROMIN**'S NAME, UNTIL THE DEFINITION FORESEEN IN NUMERAL...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

55

**EXHIBIT "A" TO NOTICE OF REMOVAL**

…9.3.

9.7 AS GUARANTEE OF THE POSSIBLE RESTITUTION WHICH MAY BE ORIGINATED IN FAVOR OF **CENTROMIN**, **THE INVESTOR** WILL DELIVER AN IRREVOCABLE, UNCONDITIONAL BANKING LETTER OF GUARANTY ISSUED BY A LOCAL BANK, WITHOUT THE BENEFIT OF EXCUSSION AND JOINT AND SEVERAL, OR AN IRREVOCABLE LETTER OF CREDIT IN THE FORM OF "STAND BY LETTER OF CREDIT" ISSUED BY ANY OF THE BANKS MENTIONED IN CIRCULAR LETTER NO.018-97-EF/90 OF THE CENTRAL RESERVE BANK OF PERU, OF IRREVOCABLE NATURE, NOTIFIED AND CONFIRMED BY A LOCAL BANK. BOTH OF THEM WILL BE OF AUTOMATIC EXECUTION, VALID FOR A PERIOD OF NO LESS THAN ONE HUNDRED AND FIFTY (150) DAYS FROM THE EXECUTION OF THIS CONTRACT, ISSUED IN FAVOR OF **CENTROMIN** FOR A SUM EQUIVALENT TO 5% OF THE SUM OF THE CURRENT ASSETS PLUS THE CURRENT LIABILITIES OF THE **PROJECTED BALANCE SHEET**.

THE REPORT THAT WILL BE ISSUED BY THE FIRM OF AUDITORS REGARDING THE COMPARISON OF **THE PROJECTED BALANCE SHEET** AND **THE VERIFICATION BALANCE SHEET** WILL BE FINAL.

IF ON APPLYING WHAT IS POINTED OUT IN NUMERALS 9.3 AND 9.4, A PAYMENT IN FAVOR OF **CENTROMIN** WILL EXIST, **THE COMPANY** WILL COMPLY WITH IT AS STIPULATED IN THE NUMERAL 9.5. IN CASE OF NON-COMPLIANCE **CENTROMIN** WILL PROCEED TO COLLECT THE CORRESPONDING SUM WITH…

56

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...INTEREST AGAINST THE BANKING LETTER OF GUARANTY OR THE LETTER OR CREDIT UNDER THE FORM "STAND BY LETTER OF CREDIT", MENTIONED IN NUMERAL 9.7, LEAVING A BALANCE OF FREE DISPOSAL AND RELEASING, THE DEPOSIT STIPULATED IN NUMERAL 9.6 BEING OF FREE DISPOSAL THE RETAINED SUM.

IF ON APPLYING THE PROVISION OF NUMERALS 9.3 AND 9.4 A PAYMENT IN FAVOR OF **THE COMPANY** WILL EXIST, **CENTROMIN** WILL COMPLY WITH IT, AS STIPULATED IN THE NUMERAL 9.5. IN CASE OF NON-COMPLIANCE, **THE COMPANY** MAY COLLECT THE CORRESPONDING SUM WITH INTEREST FROM BANCO **SANTANDER** AGAINST THE DEPOSIT POINTED OUT IN NUMERAL 9.6 WITH THE BALANCE REMAINING AT **CENTROMIN**'S FREE DISPOSAL AND RELEASING, LIKEWISE, THE BANKING LETTER OF GUARANTY OR THE LETTER OF CREDIT UNDER THE FORM "STAND BY LETTER OF CREDIT" MENTIONED IN NUMERAL 9.7.

**TENTH CLAUSE**===========**ASSIGNMENT OF RIGHTS AND/OR OBLIGATIONS**
**THE INVESTOR** AND **THE COMPANY** GRANT THEIR APPROVAL, IN ADVANCE, TO THE SUBSTITUTION OF THE CONTRACTUAL POSITION DERIVED FROM THIS CONTRACT OR THE ASSIGNMENT OF THE RIGHTS AND/OR OBLIGATIONS THAT MIGHT ORIGINATE FROM IT THAT **CENTROMIN** MIGHT FULFILL AND...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

57

**EXHIBIT "A" TO NOTICE OF REMOVAL**

CENTROMIN GRANTS THE CORRESPONDING RIGHTS AND APPROVALS TO **THE INVESTOR** AND **THE COMPANY**, SUBJECT TO APPLICABLE LAW AND THIS CONTRACT IN NUMERAL 7.2 ABOVE. THE SUBSTITUTION WILL BE COMMUNICATED TO **THE INVESTOR** AND **THE COMPANY** IN THE CASE OF **CENTROMIN**, AND TO **CENTROMIN** IN THE CASE OF **THE INVESTOR** AND **THE COMPANY** THROUGH NOTARIAL LETTER. FROM THE DATE OF SUCH COMMUNICATION, THE RIGHTS AND OBLIGATIONS ORIGINATING IN THIS CONTRACT WILL BE ASSUMED BY THE SUCCESSOR.

BY REASON OF SUPREME DECREE NO.042-97-PCM APPROVED ON SEPTEMBER 19, 1997 IN ACCORDANCE WITH DECREE LAW NO.25570 AND ACT NO.26438, AND THE CORRESPONDING GUARANTY CONTRACT ENTERED INTO UNDER THAT DECREE, THE GOVERNMENT OF PERU IS OBLIGED TO GUARANTEE ALL OF THE OBLIGATIONS OF **CENTROMIN** UNDER THIS CONTRACT, AND SAID GUARANTY SHALL SURVIVE THE TRANSFER OF ANY OF THE RIGHTS AND OBLIGATIONS OF **CENTROMIN** AND ANY LIQUIDATION OF **CENTROMIN**.

**ELEVENTH CLAUSE**===========================**GOVERNING LEGISLATION** THIS CONTRACT WILL BE GOVERNED AND EXECUTED IN ACCORDANCE WITH THE LAWS OF THE REPUBLIC OF PERU. THE PARTIES HAVE ALSO PREPARED, SIGNED AND ACCEPTED AN OFFICIAL ENGLISH TRANSLATION OF THIS

58

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...CONTRACT, BUT IT IS UNDERSTOOD THAT THE SPANISH VERSION OF THIS CONTRACT IS THE LEGAL PREVAILING VERSION.

**TWELFTH CLAUSE**===================================**ARBITRATION** ANY LITIGATION, CONTROVERSY, DISAGREEMENT, DIFFERENCE OR CLAIM THAT MAY ARISE BETWEEN THE PARTIES WITH REGARD TO THE INTERPRETATION, EXECUTION OR VALIDITY DERIVED OR IN RELATION TO THIS CONTRACT THAT CANNOT BE RESOLVED BY MUTUAL AGREEMENT BETWEEN THEM, WILL BE SUBMITTED TO LEGAL ARBITRATION OF INTERNATIONAL CHARACTER UNDER THE RULES AND PROCEDURES AS ESTABLISHED BY UNCITRAL. THE PLACE OF SUCH ARBITRATION SHALL BE IN LONDON, ENGLAND, OR SUCH OTHER LOCATION AS THE PARTIES MAY AGREE. EACH PARTY SHALL HAVE THE RIGHT TO CALL AND CROSS EXAMINE WITNESSES AND TO UNDERTAKE DISCOVERY. THE ARBITRATORS WILL BE THREE (3) OF WHICH EACH OF THE PARTIES WILL DESIGNATE ONE OF THEM, AND THE TWO ARBITRATORS SO DESIGNATED WILL APPOINT THE THIRD, WHO WILL PRESIDE THE ARBITRAL COURT. IF ONE OF THE PARTIES DOES NOT NAME ITS CORRESPONDING ARBITRATOR WITHIN FIFTEEN (15) CALENDAR DAYS OF RECEIVING THE WRITTEN REQUEST FROM THE PARTY ASKING FOR THE ARBITRATION OR IF WITHIN AN EQUAL TERM OF FIFTEEN (15)...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

59

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...CALENDAR DAYS STARTING FROM THE APPOINTMENT OF THE SECOND ARBITRATOR, THE TWO ARBITRATORS DO NOT REACH AN AGREEMENT ABOUT THE DESIGNATION OF THE THIRD ARBITRATOR, THE DESIGNATION OF ANY OF THE THREE ARBITRATORS WILL BE DONE, UPON THE REQUEST OF ANY OF THE PARTIES, BY THE INSTITUTE OF MINING AND PETROLEUM LAW.

IN THE CASE IN WHICH, FOR ANY CIRCUMSTANCES A SUBSTITUTE ARBITRATOR HAS TO BE DESIGNATED, HE WILL BE DESIGNATED FOLLOWING THE SAME PROCEDURE AS INDICATED BEFORE FOR THE DESIGNATION OF THE ARBITRATOR THAT IS SUBSTITUTED.

THE PARTIES WAIVE THE RIGHT TO APPEAL THE ARBITRAL AWARD, EXCEPT IN THE CASE THAT SUCH DECISION MAY BE A CONSEQUENCE OF FRAUD, FAILURE OR THE NON-COMPLIANCE WITH THE PROCEDURES REQUIRED OR OTHER FAILURES ACCORDING TO INTERNATIONAL STANDARDS.

**THIRTEENTH CLAUSE**================================**DOMICILE**

13.1 FOR THE PURPOSE OF THE EXECUTION OF THIS CONTRACT, THE PARTIES ESTABLISH AS THEIR DOMICILES IN PERU THOSE ADDRESSES INDICATED IN THE CAPTION OF THIS CONTRACT.

13.2 THE CHANGE OF DOMICILE OF ANY OF THE PARTIES CANNOT OPPOSE THE OTHER IF IT HAS NOT BEEN MADE KNOWN TO HIM THROUGH NOTARIAL LETTER.

60

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

13.3 FOR THE PURPOSE OF THIS CONTRACT, IT IS UNDERSTOOD THAT COMMUNICATIONS, REQUIREMENTS OR NOTICES MENTIONED THEREIN, ARE CONSIDERED TO BE KNOWN AT THE MOMENT THEY ARRIVE AT THE ADDRESSEE'S DOMICILE.

**FOURTEENTH CLAUSE**============================**EXPENSES AND TAXES**

14.1 EXPENSES INCURRED BY CONVERTING THIS PRELIMINARY DEED INTO A PUBLIC DEED WILL BE PAID BY **THE INVESTOR**.

14.2 EACH OF THE PARTIES OF THIS CONTRACT ASSUMES THE CORRESPONDING TAXES IN ACCORDANCE TO THE LAWS IN FORCE. EACH PARTY WILL PAY FOR ITS OWN LEGAL FEES, COSTS AND EXPENSES IN THE CONDUCTING OF "DUE DILIGENCE" AND THE NEGOTIATING AND EXECUTION OF THIS CONTRACT AND OF THE TRANSFERS OF THE ASSETS AND LIABILITIES OF **THE COMPANY**.

**FIFTEENTH CLAUSE**==============================**FORCE MAJEURE**

NEITHER OF THE CONTRACTING PARTIES MAY DEMAND FROM THE OTHER THE FULFILLMENT OF THE OBLIGATIONS ASSUMED IN THIS CONTRACT, WHEN THE FULFILLMENT IS DELAYED, HINDERED OR OBSTRUCTED BY CAUSES THAT ARISE THAT ARE NOT IMPUTABLE TO THE OBLIGED PARTY AND THIS OBLIGATION HAS NOT BEEN FORESEEN AT THE TIME OF THE EXECUTION OF THIS CONTRACT. ALL THOSE CAUSES ARE CONSTITUTED, BUT NOT IN A RESTRICTIVE MANNER, BY...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

61

…FORCE OR ACT OF GOD SUCH AS EARTHQUAKES, FLOODS, FIRES, AND STRIKES WHETHER DECLARED LEGAL OR ILLEGAL, CIVIL DISTURBANCES, EXTRAORDINARY ECONOMIC ALTERATIONS, FACTORS THAT AFFECT TRANSPORT GENERALLY, GOVERNMENTAL PROHIBITIONS AND CATASTROPHES IN GENERAL, IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 1135 OF THE CIVIL CODE. IT IS EXPRESSLY AGREED, NEVERTHELESS, THAT THE FACT THAT THE GOVERNMENT OF PERU DOES NOT SUPPLY FINANCING FOR **CENTROMIN'S** OBLIGATIONS SHALL NOT CONSTITUTE A CASE OF FORCE MAJEURE UNDER THIS CLAUSE.

**SIXTEENTH CLAUSE**========================**NOTICES AND REMEDIES**
EXCEPT WHERE THERE IS A SPECIFIC PROVISION FOR NOTICE AND REMEDY ELSEWHERE UNDER THIS CONTRACT, A PARTY TO THIS CONTRACT SHALL NOT BE DECLARED TO BE IN DEFAULT OF ANY OF ITS OBLIGATIONS UNDER THIS CONTRACT UNLESS PRIOR WRITTEN NOTICE OF SUCH DEFAULT HAS BEEN GIVEN TO SUCH PARTY, WHICH SPECIFIES IN DETAIL THE NATURE OF SUCH DEFAULT AND (I) IN THE CASE OF ANY REQUIREMENT FOR THE PAYMENT OF MONEY, THE PARTY HAS FAILED TO REMEDY SUCH DEFAULT WITHIN 30 DAYS; AND (II) IN…

: 62 :

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

...THE CASE OF ANY OTHER DEFAULT, THE PARTY DOES NOT COMPLETE THE REMEDY WITHIN 90 DAYS UNLESS (A) AN EARLIER PERIOD OF TIME IS REQUIRED BY THE APPLICABLE LAW, SUCH AS IN THE CASE OF THE OBLIGATIONS DESTINED TO THE PARTIES UNDER THE PAMA; OR (B) IF THE NATURE OF THE MATTER IS SUCH THAT IT CANNOT REASONABLY BE REMEDIED WITHIN SUCH 90 DAYS PERIOD, BUT THE PARTY SHALL IMMEDIATELY COMMENCE TO REMEDY THE SAME AND SHALL COMPLETE THE REMEDY AS SOON AS POSSIBLE.

**SEVENTEENTH CLAUSE**=====================**CONFIDENTIALITY**

FOLLOWING THE CLOSING AND IN THE MAXIMUM EXTENT ALLOWED BY LAW, **CENTROMIN** AGREES TO MAINTAIN AND TO REQUIRE ITS OTHER COMMERCIAL UNITS TO MAINTAIN, THE CONFIDENTIALITY OF ALL DATA, FINANCIAL INFORMATION, BUSINESS INFORMATION, CUSTOMER LISTS, PROCESS AND TECHNOLOGY INFORMATION AND ALL OTHER INFORMATION CONCERNING THE LA OROYA METALLURGICAL COMPLEX, AND OF THE CONSORTIUM AND **THE INVESTOR** AND **THE COMPANY**. SUCH OBLIGATION SHALL NOT APPLY TO:

(I) INFORMATION THAT **CENTROMIN** CAN SHOW HAS ALREADY DISCLOSED TO THE PUBLIC IN GENERAL;

(II) INFORMATION THAT **CENTROMIN** DISCLOSES TO ITS ADVISORS,...

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

63

**EXHIBIT "A" TO NOTICE OF REMOVAL**

...ACCOUNTANTS AND OTHER ADVISORS, WHO ARE PLACED UNDER A DUTY OF CONFIDENTIALITY;

(III) INFORMATION NECESSARY CON **CENTROMIN** TO PROTECT ITS RIGHT IN ANY ARBITRATION UNDER THIS CONTRACT.

(IV) INFORMATION THAT IS REQUIRED TO BE DISCLOSES AS A MATTER OF LAW

**EIGHTEENTH CLAUSE================CONTRACT INTERPRETATION**

18.1 IN THE INTERPRETATION OF THIS CONTRACT AND IN WHAT IS NOT EXPRESSLY STIPULATED THEREIN, THE PARTIES WILL ACKNOWLEDGE SUPPLEMENTAL VALIDITY TO THE FOLLOWING DOCUMENTS:

(A) THE ANSWERS TO CONSULTATIONS WITH OFFICIAL CHARACTER, CIRCULATED BY **CEPRI-CENTROMIN** AMONG THOSE PRE-QUALIFIED BIDDERS; AND

(B) THE BIDDING CONDITIONS OF THE INTERNATIONAL PUBLIC BIDDING NO.PRI-16-97 FOR THE PROMOTION OF PRIVATE INVESTMENT IN **THE COMPANY**.

(C) IF THERE WERE A CONTROVERSY BETWEEN THE BIDDING CONDITIONS AND THE CONTRACT, THE LATTER SHALL PREVAIL.

18.2 TITLES OF THE CLAUSES USED IN THIS CONTRACT ARE ILLUSTRATIVE AND FOR REFERENCE AND WILL HAVE NO EFFECT IN THE INTERPRETATION OF THIS CONTRACT.

18.3 ALL REFERENCES IN THE CONTRACT TO A CLAUSE OR NUMERAL REFER TO THE CORRESPONDING CLAUSE AND NUMERAL IN THIS CONTRACT.

64

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

REFERENCES IN THE CONTRACT TO A CLAUSE INCLUDE ALL THE NUMERALS WITHIN SUCH CLAUSE AND REFERENCES TO A NUMERAL INCLUDE ALL THE PARAGRAPHS OF THE SAME.

18.4 ALL THE ANNEXES MENTIONED IN THIS CONTRACT ARE INCORPORATED INTO AND FORM AN INTEGRAL PART OF THIS CONTRACT.

18.5 AS A MATTER OF CLARIFICATION, THE OBLIGATIONS OF **THE INVESTOR** ARE STRICTLY LIMITED TO THE OBLIGATIONS SPECIFICALLY ASSIGNED TO **THE INVESTOR**. **THE INVESTOR** HAS NO OBLIGATIONS THAT ARE ASSIGNED TO **THE COMPANY** INCLUDING WITHOUT LIMITATION, THE OBLIGATION OF **THE COMPANY** IN NUMERAL 4.5 IN FIFTH AND SIXTH CLAUSES.

**NINETEENTH CLAUSE**==========================**NO COMPETITION**

**CENTROMIN** AGREES THAT, FOR A PERIOD OF TEN (10) YEARS FROM THE EXECUTION OF THIS CONTRACT, IT WILL NOT BE THE OWNER, NOR WILL FUND, OPERATE, DIRECTLY OR INDIRECTLY, SMELTERS AND/OR REFINERIES SIMILAR TO THE LA OROYA METALLURGICAL COMPLEX.

**ADDITIONAL CLAUSE**

THE CONSORTIUM COMPOSED BY **THE DOE RUN RESOURCES CORPORATION AND THE RENCO GROUP, INC.**, WARRANTS THE COMPLIANCE WITH THE

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

65

**EXHIBIT "A" TO NOTICE OF REMOVAL**

OBLIGATIONS CONTRACTED BY **THE INVESTOR, DOE RUN PERU S.R.LTDA.**, THEREFORE THIS CONTRACT IS SUBSCRIBED BY **THE DOE RUN RESOURCES CORPORATION**, DULY REPRESENTED BY **JEFFREY L. ZELMS**, IDENTIFIED BY PASSPORT NO.153205339 OF THE UNITED STATES OF AMERICA, TRANSITORILY DOMICILED AT HOTEL "LOS DELFINES", LOS EUCALIPTOS 555, SAN ISIDRO, WHO PROCEEDS DULY AUTHORIZED UNDER POWER-OF-ATTORNEY REGISTERED ON FILING CARD NO.6864 OF THE REGISTRY OF SPECIAL POWERS OF ATTORNEY OF LIMA; AND **THE RENCO GROUP, INC.**, DULY REPRESENTED BY **MARVIN M. KOENIG**, IDENTIFIED BY PASSPORT NO.156205648 OF THE UNITED STATES OF AMERICA, TRANSITORILY DOMICILED AT HOTEL "LOS DELFINES", LOS EUCALIPTOS 555, SAN ISIDRO, WHO PROCEEDS DULY AUTHORIZED UNDER POWER-OF-ATTORNEY REGISTERED ON FILING CARD NO.6863 OF THE REGISTRY OF SPECIAL POWERS OF ATTORNEY OF LIMA.

IN ACCORDANCE WITH THE BIDDING CONDITIONS, **CENTROMIN** MAY RELEASE ANY OF THE MEMBERS OF THE CONSORTIUM FROM THIS GUARANTY, FOR WHICH EFFECT A WRITTEN COMMUNICATION IS SUFFICIENT.

KINDLY INSERT, MR. NOTARY, ALL THE OTHER CLAUSES REQUIRED BY LAW. LIMA, TWENTY-THIRD DAY OF THE MONTH OF OCTOBER, NINETEEN HUNDRED NINETY-SEVEN, REPRESENTING EMPRESA MINERA DEL CENTRO DEL PERU SOCIEDAD ANONIMA, (CENTROMIN PERU...

66

**EXHIBIT "A" TO NOTICE OF REMOVAL**

## ANIBAL CORVETTO ROMERO
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

... S.A.).- ===============================================================

SIGNED: JEFFREY L. ZELMS, REPRESENTING **DOE RUN PERU SOCIEDAD DE**

**RESPONSABILIDAD LIMITADA** AND **THE DOE RUN RESOURCES CORPORATION**.

SIGNED: JORGE MERINO TAFUR, REPRESENTING **EMPRESA METALURGICA LA OROYA**

**S.A. "METALOROYA S.A."** ===================================

SIGNED: MARVIN M. KOENIG, REPRESENTING **RENCO GROUP, INC.** =======

AUTHORIZING THESE MINUTES IS DR. LUCIANO BARCHI VELAOCHAGA, ATTORNEY-AT-

LAW REGISTERED UNDER NUMBER 15455 OF THE BAR ASSOCIATION OF LIMA.-

=========================================

**INSERT:** <u>VOUCHER</u>.- ==================================================

I, **ANIBAL CORVETTO ROMERO**, ATTORNEY-AT-LAW AND NOTARY PUBLIC OF THIS

CAPITAL CITY, **CERTIFY** THAT I HAVE HAD BEFORE ME THE BOOK ENTITLED: **MINUTES**

**OF THE BOARD OF DIRECTORS**, BELONGING TO THE COMPANY BY THE NAME OF

**EMPRESA MINERA DEL CENTRO DEL PERU S.A. "CENTROMIN PERU S.A.,"** DULY

LEGALIZED ON DECEMBER TWELVE, NINE HUNDRED NINETY-FIVE, BEFORE THE

NOTARY OFFICE OF DR. ALBERTO FLOREZ BARRON, AND RECORDED UNDER NUMBER

SIXTEEN THOUSAND ONE HUNDRED THIRTY-FIVE; AND I HAVE VERIFIED THAT FROM

PAGE THREE HUNDRED EIGHT-NINE AND FOLLOWING ONES ARE THE MINUTES OF THE

BOARD OF DIRECTORS

[Stamp in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU                    67

**EXHIBIT "A" TO NOTICE OF REMOVAL**

MEETING DATED AUGUST TWENTY-EIGHT, NINETEEN HUNDRED NINETY-SEVEN, WHICH

IN ITS PERTINENT PART READS LITERALLY AS FOLLOWS: ===========

**EMPRESA MINERA DEL CENTRO DEL PERU S.A.- CENTROMIN PERU S.A.**

**MINUTES OF BOARD OF DIRECTORS MEETING.-** =========================

MEETING No. -------------- 16-97.- ================================

DATE ------------------------ LIMA, AUGUST 29, 1997.- ====================

BEGINNING TIME --------- 01:00 A.M.- =============================

CLOSING TIME ------------ 05:30 P.M.- ============================

QUORUM -------------------- AS PER REGULATIONS.-=========================

**ATTENDING.-** ====================================================

CHAIRMAN --------------- ENG. JUAN CARLOS BARCELLOS MILLA.- =======

MEMBERS ------------------ ENG. ALFONSO ZUZUNAGA GUTIERREZ.- =======

-------------------------------- ENG. GERMER CAMPERO ELIAS.- =============

-------------------------------- ENG. LUIS HIROTA TANAKA.- ================

-------------------------------- DR. HERNAN ÑOPO ODAR.- ================

OFFICERS ------------------ ENG. CESAR POLO.- =========================

-------------------------------- GENERAL MANAGER (E).- ====================

-------------------------------- ENG. ANGEL ALVAREZ.- ====================

-------------------------------- MINING OPERATIONS MANAGER.- ============

-------------------------------- ENG. ANTONIO CORNEJO.- ================

-------------------------------- METALLURGICAL OPERATIONS MANAGER.- =====

68

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 422-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

-------------------------------- ENG. LUIS PEREZ PIÑA. ===================

-------------------------------- TECHNICAL SERVICES MANAGER.- =========

-------------------------------- MR. JUAN BEGAZO.- ===================

-------------------------------- HEAD OF THE ACCOUNTING OFFICE.- =======

-------------------------------- DR. ROBERTO ROTTA.- ================

-------------------------------- LEGAL MANAGER. ==================

-------------------------------- ENG. HERBERT GUTIERREZ.- =============

-------------------------------- PRIVATIZATION COORDINATOR.- ==========

-------------------------------- ENG. PEDRO ANDIA.- ==================

-------------------------------- PRIVATIZATION COORDINATOR.- ===========

-------------------------------- DR. LUIS GUTIERREZ ADRIANZEN.- ========

-------------------------------- GENERAL SECRETARY.- ================

**A. MINUTES.-** ==================================================

MEETING 15-97 APPROVED WITHOUT ANY OBSERVATIONS.- ==========

**... 5. TRANSFER OF METALOROYA S.A. - AUTHORIZATION FOR SUBSCRIPTION OF**

**CONTRACT.-** ================================================

AGREEMENT No. 77-97.- ==========================================

WHEREAS: ===============================================

THE BID HAVING BEEN FORMALLY AWARDED IN INTERNATIONAL PUBLIC

[in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

69

**EXHIBIT "A" TO NOTICE OF REMOVAL**

BIDDING No. PRI-16-97, FOR THE PROMOTION OF PRIVATE INVESTMENT IN

EMPRESA METALURGICA DE LA OROYA S.A. (METALOROYA S.A.), IT IS

NECESSARY TO FORMALIZE THE TRANSFER OF STOCK OF SAID COMPANY,

PURSUANT TO SECTION "M" OF ARTICLE 40 OF THE STATUTES OF CENTROMIN PERU S.A.,

APPROVED BY SUPREME DECREE No. 019-82-EM/VM.- ==========

IT IS UNANIMOUSLY AGREED: ====================================

1. TO AUTHORIZE ENGINEERS CESAR POLO ROBILLIARD AND ANGEL ALVAREZ ANGULO

SO THAT, ONE OR THE OTHER, MAY SUBSCRIBE THE CONTRACT OF CAPITAL STOCK

INCREASE AND STOCK TRANSFER OF METALOROYA S.A., WITH THE COMPANY DOE RUN

PERU S.R.LTDA.- ==============================

2. TO AUTHORIZE THE ABOVE MENTIONED ENGINEERS SO THAT, ONE OR THE OTHER,

MAY SUBSCRIBE SUCH DOCUMENTATION AS MAY BE NECESSARY FOR THE TRANSFER

UPON COMPLIANCE WITH THE ADMINISTRATIVE AND LEGAL PROVISIONS APPLICABLE

TO THAT REGARD.- ==========================

... WITH NO FURTHER BUSINESS TO CONDUCT, THE MEETING WAS CONCLUDED.-

SIX ILLEGIBLE SIGNATURES FOLLOW BELOW.- =======================

**CONCLUSION**.- THE INSTRUMENT HAVING BEEN FORMALIZED, I ADVISED THE

GRANTORS OF ITS PURPOSE AND RESULTS, AND THE SAME WAS READ BY THE

GRANTORS ACCORDING TO THE LAW, TO WHICH I ATTEST, AND AFTER WHICH THE

CONTENTS THEREOF WERE AFFIRMED AND RATIFIED, AND THEY PROCEEDED TO SIGN

IT BEFORE ME, TO WHICH I ATTEST. A RECORD OF THIS INSTRUMENT BEGINS

70

**EXHIBIT "A" TO NOTICE OF REMOVAL**

**ANIBAL CORVETTO ROMERO**
NOTARY OF LIMA
PLAZA 27 DE NOVIEMBRE No. 250
(AV. CENTRAL) - SAN ISIDRO
FAX: 421-8778 TEL.: 442-9564 - 442-9369
e-mail: ancoro@amauta.rcp.net.pe

ON SERIES PAGE NUMBER 0523315 AND ENDS ON SERIES PAGE NUMBER 0523385, TO

WHICH I ATTEST.- ==================================================

SIGNED: CESAR POLO ROBILLIARD, REPRESENTING **EMPRESA MINERA DEL CENTRO**

**DEL PERU SOCIEDAD ANONIMA (CENTROMIN PERU S.A.).-** =======

SIGNED: JEFFREY L. ZELMS, REPRESENTING **DOE RUN PERU SOCIEDAD DE**

**RESPONSABILIDAD LIMITADA** AND **THE DOE RUN RESOURCES CORPORATION.-**

==================================================

SIGNED: JORGE MERINO TAFUR, REPRESENTING **EMPRESA METALURGICA LA OROYA**

**S.A. "METALOROYA S.A."** ==================================

SIGNED: MARVIN M. KOENIG, REPRESENTING **THE RENCO GROUP, INC.** ====

THIS CONCLUDES THE SUBSCRIPTION OF THIS INSTRUMENT ON OCTOBER TWENTY-

THREE, NINE HUNDRED NINETY-SEVEN.- =======================

BEFORE ME: ANIBAL CORVETTO ROMERO, ATTORNEY-AT-LAW AND NOTARY OF THIS

CAPITAL CITY. ==================================================

THIS TESTIMONY **AGREES** WITH THE ORIGINAL INSTRUMENT REFERENCED ON PAGE

TWENTY-ONE THOUSAND TWO HUNDRED FIFTEEN OF MY REGISTRY OF PUBLIC

INSTRUMENTS FOR THE CURRENT BIENNIAL, AND AT THE REQUEST OF THE INTERESTED

PARTY, THIS TESTIMONY IS ISSUED ON THIRTY-EIGHT PAGES OF TEXT, WHICH I MARK,

SEAL, FLOURISH AND SIGN IN THE CITY OF LIMA, ON

[in the right margin:]
ANIBAL CORVETTO ROMERO
NOTARY - ATTORNEY-AT-LAW
LIMA - PERU

71

**EXHIBIT "A" TO NOTICE OF REMOVAL**

THE TWENTY-THIRD DAY OF THE MONTH OF OCTOBER, NINETEEN HUNDRED NINETY-

SEVEN. ===============================================

                    [illegible signature]

                    [Stamp:] ANIBAL CORVETTO ROMERO
                    NOTARY - ATTORNEY-AT-LAW
                    LIMA - PERU
[illegible seal]   [notary seal]

72

**EXHIBIT "A" TO NOTICE OF REMOVAL**