UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,                                )
                                               )        Case No. 4:11-cv-00044-CDP
                    Plaintiffs,                )        (CONSOLIDATED)
                                               )
v.                                             )
                                               )
DOE RUN RESOURCES CORPORATION,                 )
et al.,                                        )
                                               )
                    Defendants.                )

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR A DETERMINATION OF FOREIGN LAW**

## **Table of Contents**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 1

I.    Plaintiffs' Claims. ................................................................................... 2

II.    Defendants' Period of Ownership and Control of the La Oroya Complex..................... 2

    A.    The Period of October 23, 1997 Through February 8, 2007. ..................... 3

    B.    The Period of February 8, 2007 Through the Present................................. 5

ARGUMENT ............................................................................................................ 6

I.    Missouri Law Governs the Statute of Limitations Determination................................. 7

    A.    Statute of Limitations Determinations Cannot Be Made in the Abstract. ................... 7

    B.    The Borrowing Statute Is Not Applicable Because Plaintiffs' Claims Are Not Fully Barred by Peru's Statute of Limitations................................... 8

    C.    The Peruvian Statute of Limitations and Accrual Rules............................. 9

    D.    The Borrowing Statute Does Not Apply the Limitations Period of a Forum in Which the Defendants Are Not Subject to Jurisdiction........................ 12

    E.    The Cause of Action "Originated" In Missouri or New York. .................. 16

II.    Choice of Law Analysis. ....................................................................... 20

    A.    Discovery Is Needed to Engage in a Choice of Law Analysis. ................. 21

    B.    Choice of Law Standard......................................................................... 23

    C.    Peru Has No Policy Interest in Applying Its Laws to Any Issue In this Case........... 25

III.    The Substantive Law of This Case Should Be Governed By Missouri and/or New York Law. ....................................................................... 27

    A.    There is No Substantial Conflict Between the Laws of Peru and Missouri................ 27

    B.    Choice of Law Analysis Related to Direct Liability................................. 29

    C.    Peruvian Law Governing Direct Liability. .............................................. 36

IV.    Missouri and New York Law Govern Issues of Secondary Liability........................... 42

    A.    Choice of Law Analysis on Vicarious Liability and Principal-Agent Liability. ........ 42

    B.    Choice of Law Analysis on Veil Piercing and Alter Ego Theories. ........... 46

    C.    Peruvian Law Related to Issues of Secondary Liability. .......................... 48

V.    Missouri and/or New York Law Govern Questions of Immunity from Suit................ 51

    A.    Choice of Law Analysis. ....................................................................... 51

    B.    Article 1971 ........................................................................................ 53

VI.    Damages............................................................................................... 54

    A.    There is No Substantial Conflict Between the Laws of Peru and Missouri................ 54

i

B.      Choice of Law Analysis as to Compensatory Damages ............................................... 55

C.      Choice of Law Analysis as to Punitive Damages ....................................................... 57

D.      Peruvian Law on Damages ........................................................................................ 60

VII.    Federal Procedural Law Governs Questions of Capacity. ..................................................... 60

VIII.   Federal Procedural Law Governs Questions of Necessary Parties. ............................... 64

CONCLUSION .......................................................................................................................... 65

# Table of Authorities

**Cases**

*Acapalon Corp. v. Ralston Purina Co.*,
827 S.W.2d 189 (Mo. 1992) ...................................................................................... 20

*August v. Boyd Gaming Corp.*,
135 Fed. Appx. 731 (5th Cir. 2005)............................................................................ 41

*Balderas v. Howe*,
891 S.W.2d 871 (Mo. Ct. App. 1995)......................................................................... 46

*Birdsell v. Holiday Inns*,
852 F.2d 1078 (8th Cir. 1988) .................................................................................... 64

*Blum v. Salyer*,
299 F. Supp. 1074 (W.D. Mo. 1969) .......................................................................... 64

*Boland v. St. Luke's Health Sys.*,
-- S.W.3d --, 2013 Mo. App. LEXIS 1419 (Mo. Ct. App. Nov. 26, 2013)............................. 19

*Bonnell v. Cabo Azul Resort*,
No. 08-910, 2010 U.S. Dist. LEXIS 89155 (D. Nev. Aug. 27, 2010) ...................................... 47

*Burke v. Smith*,
252 F.3d 1260 (11th Cir. 2001) .................................................................................. 63

*Bus. Men's Assur. Co. of Am. v. Graham*,
984 S.W.2d 501 (Mo. 1999) .................................................................................. 13, 14

*Carijano v. Occidental Petro. Corp.*,
643 F.3d 1216 (9th Cir. 2011) ......................................................................... 39, 54, 60

*Cates v. Creamer*,
431 F.3d 456 (5th Cir. 2005) ................................................................ 42, 43, 44, 45

*Central States, S.E. & S.W. Areas Pension Fund v. Aalco Express Co.*,
592 F. Supp. 664 (E.D. Mo. 1984).............................................................................. 8

*Chandler v. Multidata Systems International Corp.*,
163 S.W.3d 537 (Mo. Ct. App. 2005)......................................................................... 20

*Chappel v. City of Springfield*,
423 S.W.2d 810 (Mo. 1968) ..................................................................................... 57

*Clean Harbors, Inc. v. CBS Corp.*,
875 F. Supp. 2d 1311 (D. Kan. 2012) ........................................................................ 41

*Combs v. Int'l Ins. Co.*,
354 F.3d 568 (6th Cir. 2004) ..................................................................................... 17

*Consorcio Minero S.A. v. Doe Run Res. Corp.*,
No. 11-583, 2011 U.S. Dist. LEXIS 112414 (E.D. Mo. Sept. 30, 2011)................................. 50

*Consorcio Minero, S.A. v. Renco Group, Inc.*,
No. 11-354, 2012 U.S. Dist. LEXIS 44317 (S.D.N.Y. March 29, 2012) ................................ 50

*Constantine v. S.W. La. Inst.*,
120 F. Supp. 417 (D. La. 1954) ................................................................................. 63

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
581 N.Y.S.2d 669 (App. Div. 1992)........................................................................... 51

*Davis v. Laclede Gas Co.*,
603 S.W.2d 554 (Mo. banc 1980)........................................................................ 13, 14

*De Paul Hospital School of Nursing, Inc. v. Southwestern Bell Telephone Co.*,
539 S.W.2d 542 (Mo. Ct. App. 1976).......................................................................... 14

*Developmental Disabilities Advocacy Ctr., Inc. v. Melton*,
   689 F.2d 281 (1st Cir. 1982) ................................................................. 61
*Devlin v. City of N.Y.*,
   678 N.Y.S.2d 102 (App. Div. 1998) ....................................................... 46
*Doe Run Peru S.R.L. v. Handy & Harman Refining Group*,
   295 B.R. 179 (D. Conn. Bankr. 2003) ............................................... 1, 50
*Doe v. Saravia*,
   348 F. Supp. 2d 1112 (E.D. Cal. 2004) ............................................. 55, 60
*Donnelly v. Parker*,
   486 F.2d 402 (D.C. Cir. 1973) ............................................................... 62
*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ............................................................................... 46
*Elam v. Alcolac, Inc.*,
   765 S.W.2d 42 (Mo. Ct. App. 1988) ....................................................... 51
*Elmore v. Owens-Illinois, Inc.*,
   673 S.W.2d 434 (Mo. 1984) .................................................................... 16
*Erickson v. U-Haul Int'l*,
   767 N.W.2d 765 (Neb. 2009) ........................................................... 43, 44
*Feszczyszyn v. GM Corp.*,
   669 N.Y.S.2d 1010 (App. Div. 1998) ..................................................... 46
*Finnegan v. Squire Publishers, Inc.*,
   765 S.W.2d 703 (Mo. Ct. App. 1989) ................................................ 17, 18
*Forsythe v. Clark USA, Inc.*,
   864 N.E.2d 227 (Ill. 2007) ..................................................................... 41
*Gardner v. Parson*,
   874 F.2d 131 (3d Cir. 1989) ................................................................... 62
*Genesco, Inc. v. Cone Mills Corp.*,
   604 F.2d 281 (4th Cir. 1979) .................................................................. 61
*Gibbs v. Carnival Cruise Lines*,
   314 F.3d 125 (3d Cir. 2002) .............................................................. 62, 63
*Goede v. Aerojet Gen. Corp.*,
   143 S.W.3d 14 (Mo. Ct. App. 2004) ......................................... 23, 25, 55
*Graboff v. Collern Firm*,
   No. 10-1710, 2010 U.S. Dist. LEXIS 118732 (E.D. Pa. Nov. 8, 2010) ................ 22
*Great Plains Trust Co. v. Union Pac. R.R. Co.*,
   492 F.3d 986 (8th Cir. 2007) .................................................................. 13
*Great Rivers Coop. v. Farmland Indus.*,
   934 F. Supp. 302 (S.D. Iowa 1996) .......................................................... 9
*Green v. Kensinger*,
   429 P.2d 95 (Kan. 1967) ................................................................... 13, 16
*Gwartz v. Jefferson Mem'l Hosp. Assn.*,
   23 F.3d 1426 (8th Cir. 1994) .................................................................. 65
*Hagensicker v. Boston Scientific Corp.*,
   No. 12-5018, 2012 U.S. Dist. LEXIS 32715 (W.D. Mo. Mar. 12, 2012) ................ 65
*Henke v. Arco Midcon, LLC*,
   No. 10-086, 2014 U.S. Dist. LEXIS 31810 (E.D. Mo. Mar. 12, 2014) ..................... 8

iv

*Hicks v. Graves Truck Lines, Inc.*,
   707 S.W.2d 439 (Mo. Ct. App. 1986)...................................................................... 30
*Huff v. La Sieur*,
   571 S.W.2d 654 (Mo. Ct. App. 1978) ...................................................................... 63
*In re Agent Orange Prod. Liab. Litig.*,
   580 F. Supp. 690 (E.D.N.Y. 1984) .......................................................................... 57
*In re Air Crash Disaster Near Chicago*,
   644 F.2d 594 (7th Cir. 1981) ............................................................. 52, 56, 57, 58
*In re Air Disaster at Ramstein Air Base*,
   81 F.3d 570 (5th Cir. 1996) ..................................................................................... 30
*In re Disaster at Detroit Metro. Airport*,
   750 F. Supp. 793 (E.D. Mich. 1989)........................................................................ 30
*In re Duque*,
   154 B.R. 93 (S.D. Fla. Bankr. 1993)........................................................................ 10
*In re Managed Care Litig.*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) .................................................................... 41
*In re Nuvaring Products Liability Litigation*,
   957 F. Supp. 2d 1110 (E.D. Mo. 2013) .................................................................... 59
*In re Tetracycline Cases*,
   729 F. Supp. 662 (W.D. Mo. 1989) .......................................................................... 20
*In re: Master Mortgage Investment Fund*,
   151 B.R. 513 (Bankr. W.D. Mo. 1993)..................................................................... 20
*Inghram v. Mut. of Omaha Ins. Co.*,
   170 F. Supp. 2d 907 (W.D. Mo. 2001) ..................................................................... 30
*J.M. v. Shell Oil Co.*,
   922 S.W.2d 759 (Mo. 1996) ..................................................................................... 46
*Jenkins v. Westinghouse Elec. Co.*,
   18 F.R.D. 267 (W.D. Mo. 1955)............................................................................... 65
*Johnson v. Avco Corp.*,
   No. 07-1695, 2009 U.S. Dist. LEXIS 108600 (E.D. Mo. Nov. 20, 2009)........................ passim
*Johnson v. Precision Airmotive, LLC* ,
   No. 07-1695, 2008 U.S. Dist. LEXIS 48778 (E.D. Mo. June 26, 2008) ............................ 2, 21
*Kampe v. Colom*,
   906 S.W.2d 796 (Mo. Ct. App. 1995)........................................................................ 9
*Kansas Pub. Employees Ret. Sys. v. Reimer & Koger Assocs.*,
   61 F.3d 608 (8th Cir. 1995) ....................................................................................... 8
*Keene Corp. v. Ins. Co. of N. Am.*,
   597 F. Supp. 934 (D.D.C. 1984)............................................................................... 57
*Kennedy v. Dixon*,
   439 S.W.2d 173 (Mo. 1969) ............................................................................... 23, 24
*Krause v. U.S. Truck Co.*,
   787 S.W.2d 708 (Mo. banc 1990)............................................................................. 28
*Linn Reorganized Sch. Dist. v. Butler Mfg. Co.*,
   672 S.W.2d 340 (Mo. banc 1984)............................................................................. 15
*Lizarbe v. Hurtado*,
   No. 07-21783, 2008 U.S. Dist. LEXIS 109517 (S.D. Fla. March 4, 2008)........................ 54, 60

*M.S. v. Wermers,*
  557 F.2d 170 (8th Cir. 1977) ........................................................................... 61, 63
*Matter of Dohring,*
  537 N.Y.S.2d 767 (Sup. Ct. 1989) ........................................................................ 47
*McLennan v. Am. Eurocopter Corp.,*
  245 F.3d 403 (5th Cir. 2001) ................................................................................ 31
*Mikron Indus. v. Hurd Windows & Doors, Inc.,*
  No. 07-532, 2007 U.S. Dist. LEXIS 80982 (W.D. Wash. Oct. 12, 2007) ................... 2
*Minebea Co. v. Papst,*
  444 F. Supp. 2d 68 (D.D.C. 2006) .................................................................. 27, 38
*Mitchell v. Lone Star Ammunition, Inc.,*
  913 F.2d 242 (5th Cir. 1990) ................................................................................ 30
*Natalini v. Little,*
  185 S.W.3d 239 (Mo. Ct. App. 2006) ........................................................ 20, 55, 56
*Neilson v. Colgate-Palmolive Co.,*
  993 F. Supp. 225 (S.D.N.Y. 1998) ........................................................................ 63
*Nettles v. AT&T Co.,*
  55 F.3d 1358 (8th Cir. 1995) ................................................................................ 19
*Old Dominion Freight Line, Inc. v. Dally,*
  369 S.W.3d 773 (Mo. Ct. App. 2012) .................................................................... 19
*Patch v. Playboy Enterprises,*
  652 F.2d 754 (8th Cir. 1981) ............................................................ 12, 17, 18, 19
*Pearson v. Component Tech. Corp.,*
  247 F.3d 471 (3d Cir. 2001) ................................................................................. 41
*Phillips v. Marist Soc'y,*
  80 F.3d 274 (8th Cir. 1996) ...................................................................... 23, 29, 55
*Renfroe v. Eli Lilly & Co.,*
  686 F.2d 642 (8th Cir. 1982) ................................................................................ 20
*Ritter v. BJC Barnes Jewish Christian Health Sys.,*
  987 S.W.2d 377 (Mo. Ct. App. 1999) .............................................................. 43, 46
*Safety-Kleen, Inc. v. Wyche,*
  274 F.3d 846 (4th Cir. 2001) ................................................................................ 33
*Sam M. v. Carcieri,*
  608 F.3d 77 (1st Cir. 2010) .................................................................................. 62
*Scenic Holding, LLC v. New Bd. of Trs. of Tabernacle Missionary Baptist Church,*
  506 F.3d 656 (8th Cir. 2007) ................................................................................ 65
*Schreiber Foods Int'l v. Intercargo Napoli S.R.L.,*
  No. 98-5954, 1999 U.S. Dist. LEXIS 4692 (S.D.N.Y. Apr. 5, 1999) ...................... 22
*Seide v. Prevost,*
  536 F. Supp. 1121 (S.D.N.Y. 1982) ...................................................................... 63
*Skewes v. Masterchem Industries, Inc.,*
  164 S.W.3d 92 (Mo. Ct. App. 2005) ...................................................................... 20
*Speedmark Transp., Inc. v. Mui,*
  778 F. Supp. 2d 439 (S.D.N.Y. 2011) ................................................................... 22
*Strong v. Lewis,*
  68 N.E. 556 (Ill. 1903) ................................................................................... 13, 16

*Technicon Elecs. Corp. v. Am. Home Assurance Co.*,
    533 N.Y.S.2d 91 (App. Div. 1988) ................................................................. 33
*Thornton v. T & W Tire, L.P.*,
    410 F. Supp. 2d 1098 (W.D. Okla. 2006) ....................................................... 15
*Torres v. Bayer Corp.*,
    616 F.3d 778 (8th Cir. 2010) ........................................................................ 61
*Torres v. Southern Peru Copper Corp.*,
    965 F. Supp. 899 (S.D. Tex. 1996) ............................................... 7, 39, 40, 41
*Travelers Indem. Co. v. Bengtson*,
    231 F.2d 263 (5th Cir. 1956) ........................................................................ 63
*UBS Sec. LLC v. Highland Cap. Mgmt.*,
    924 N.Y.S.2d 312 (Sup. Ct. 2011) ............................................................... 46
*United States v. Bestfoods*,
    524 U.S. 51 (1998) ................................................................................ 40, 41
*Veasley v. CRST Int'l, Inc.*,
    553 N.W.2d 896 (Iowa 1996) ....................................................................... 34
*Vorhes v. Mittal Steel USA, Inc.*,
    No. 06-1130, 2008 U.S. Dist. LEXIS 22968 (W.D. Pa. Mar. 24, 2008) ................. 41
*W. Natural Gas Co. v. Cities Serv. Gas Co.*,
    507 P.2d 1236, 1243 (Okla.) .................................................................. 13, 15
*Walker v. Sheldon*,
    179 N.E.2d 497 (NY 1961) ........................................................................... 57
*Wolfley v. Solectron USA, Inc.*,
    541 F.3d 819 (8th Cir. 2008) ........................................................................ 23
*Yates v. Bridge Trading Co.*,
    844 S.W.2d 56 (Mo. Ct. App. 1992) .............................................................. 47

**Statutes**
Mo. Rev. Stat. § 1.010 .................................................................................... 13
Mo. Rev. Stat. § 507.020 .......................................................................... 63, 64
Mo. Rev. Stat. § 507.110 ............................................................................... 64
Mo. Rev. Stat. § 516.030 ................................................................................. 8
Mo. Rev. Stat. § 516.100 ............................................................................... 13
Mo. Rev. Stat. § 516.120 ................................................................................. 8
Mo. Rev. Stat. § 516.190 ................................................................................. 9
Peru Civil Code Art. 1969 ........................................................................ 36, 37
Peru Civil Code Art. 1970 ........................................................................ 37, 38
Peru Civil Code Art. 1971 ................................................................ 51, 53, 54
Peru Civil Code Art. 1981 ............................................................................. 48
Peru Civil Code Art. 1994 ............................................................................. 11
Peru Civil Code Art. 1996 ............................................................................. 11
Peru Civil Code Art. 2097 ............................................................................. 25
Peru Const. Art. 2, § 22 ................................................................................ 53
Peru Const. Art. 7 ......................................................................................... 53
Peru Gen'l Law on the Env't Art. 142 ...................................................... 38, 53
Peru Gen'l Law on the Env't Art. 143 ............................................................ 38

**Rules**

Fed. R. Civ. P. 17 ................................................................................ 60, 61, 62, 63, 64
Fed. R. Civ. P. 19 ...................................................................................................... 65
Mo. Sup. Ct. R. 52.02 ............................................................................................... 64
Mo. Sup. Ct. R. 52.03 ............................................................................................... 64

**Other Authorities**

15 *Mo. Prac. & Proc.* § 52.03:1 ............................................................................. 63
15A C.J.S. *Conflict of Laws* § 16 ........................................................................... 51
4-17 *Moore's Fed. Prac. – Civil* § 17.25 ................................................................ 61
4-17 *Moore's Fed. Prac. – Civil* § 17.21 ................................................................ 61
54 C.J.S. *Limitations of Actions* § 109 .................................................................. 14
68 A.L.R. 752 ............................................................................................................ 61
9-44.1 *Moore's Fed. Prac. – Civil* § 44.1.04 ................................................... 28, 38
Allan Ingelson, *Mine Operator Liability for the Spill of an Independent Contractor in Peru*, 24 J.
   ENERGY NAT. RESOURCES L. 53 (2006) .......................................................... 48
Dante Figueroa, *Comparative Aspects of Piercing the Corporate Veil in the United States and
   Latin America*, 50 DUQ. L. REV. 683 (2012) .................................................. 48
RESTATEMENT (SECOND) OF CONFLICT OF LAWS ............................................... passim

## INTRODUCTION

The Court should deny Defendants' Motion For a Determination of Foreign Law for several reasons. Significantly, the Motion is premature due to an incomplete and undeveloped factual record, which is needed to analyze the issues relevant to a determination of whether foreign law applies. As such, Defendants' Motion is procedurally improper. Nonetheless, based on the limited information available, Plaintiffs have shown that Peruvian law does not govern Plaintiffs' claims. Alternatively, if the Court finds otherwise, then the Court should find that the laws of Peru do not bar Plaintiffs' claims. To the contrary, Peruvian law recognizes Plaintiffs' claims, finds them to be timely, and does not immunize Defendants from liability.

## STATEMENT OF FACTS[1]

Discovery is far from complete. There reportedly are millions of pages of responsive documents that Defendants have not produced. Defendants still have not produced a single custodian file or any electronically stored documents. Nor have they produced any Doe Run Peru documents, whether in their possession or Doe Run Peru's possession. Overall, Defendants have produced a minimal amount of documents regarding the basic facts of this litigation. Vital information, including communications among Defendants regarding the operation of the La Oroya Complex, has yet to be produced. Thus, Plaintiffs are unable to provide supporting details on crucial issues, such as Defendants' control and operation of the La Oroya Complex, where certain acts or conduct occurred, or the *mens rea* of those acts. These are just a few of the facts that are necessary prerequisites to any choice of law analysis and only can be obtained through discovery. *See, e.g.*, *Johnson v. Precision Airmotive, LLC ("Johnson I")*, No. 07-1695, 2008

---

[1] Plaintiffs respectfully submit that the Court should view Defendants' factual summary critically. *Compare* Def.'s Mem. at 7 ("Doe Run Peru has not been sued in the United States nor brought suit in this country") *with Doe Run Peru S.R.L. v. Handy & Harman Refining Group*, 295 B.R. 179, 181 (D. Conn. Bankr. 2003) (discussing Doe Run Peru's complaint against Handy & Harman Refining Group); *see also infra* at 50 (discussing false statement in notarized affidavit submitted to in federal court by Doe Run Peru President Juan Carlos Huyhua).

1

U.S. Dist. LEXIS 48778, at 10–11 (E.D. Mo. June 26, 2008); *Mikron Indus. v. Hurd Windows & Doors, Inc.*, No. 07-532, 2007 U.S. Dist. LEXIS 80982, at 7–8 (W.D. Wash. Oct. 12, 2007). Instead, Plaintiffs must rely on the limited discovery produced, reasonable inferences therefrom, and publicly available information. Additionally, no depositions have taken place on the issues of liability, nor have any Rule 30(b)(6) witnesses been deposed. This has left Plaintiffs with an incomplete record of facts to provide to this Court. Thus, if the Court chooses to address the merits of Defendants' motion, Plaintiffs respectfully request leave to re-address these issues after Defendants produce responsive discovery.[2]

## I.   Plaintiffs' Claims.

Plaintiffs' claims are based on tortious acts Defendants committed in Missouri and/or New York. Specifically, Defendants engaged in the negligent, reckless, and/or intentional operation of Doe Run's lead smelter, known as the La Oroya Complex, causing permanent injuries to Plaintiffs, who are minor children residing near the Complex. Plaintiffs allege state law theories of negligence, civil conspiracy, strict liability, and contribution based on Defendants' concerted tortious conduct. Plaintiffs do not allege claims, either directly or indirectly, against Doe Run Peru (Defendants' subsidiary), Centromin (the former state-owned operator of the La Oroya Complex), or the Republic of Peru (which owned the Complex before Defendants). (*See* Complaint at ¶¶ 26, 32.)

## II.   Defendants' Period of Ownership and Control of the La Oroya Complex.

Defendants continuously owned and controlled the La Oroya Complex since October 23, 1997, when they purchased it from Centromin. *Ex. 1*, Letter from Def.'s counsel of 1/31/08; *Ex. 2*, Stock Transfer Contract. Defendants' ownership interests have shifted over the years, such as

---

[2] Plaintiffs previously set forth this position in more detail in the briefing on Plaintiffs' Motion to Strike, or in the Alternative to Stay, Defendants ' Motion for a Determination of Foreign Law. (See Docs. 160, 179.) Plaintiffs' arguments are incorporated herein by reference.

with the creation of a Cayman Islands corporation, precluding a "direct" ownership link to Doe Run Resources. However, at all times, Ira Rennert, as owner of the Renco and Doe Run companies, has been at the top of the ownership chain of the La Oroya Complex.

**A.     The Period of October 23, 1997 Through February 8, 2007.**

Defendants Doe Run Resources, Inc., DR Acquisition, The Renco Group, and Ira Rennert owned the Complex from the date of purchase, October 23, 1997, through February 8, 2007. The paper trail evidencing their ownership of the Complex is somewhat involved.[3] In short, Doe Run Peru is a "subsidiary" that has no independent corporate will separate from the Defendants' control and decision making power.

Defendants' purchase of the La Oroya Complex was evidenced by a Stock Transfer Contract between Centromin and Doe Run Peru, as the principal party. The contract was signed by Defendant Jeffery Zelms on behalf of both Doe Run Peru and Doe Run Resources, and also by The Renco Group, Inc. *Ex. 2*, Stock Transfer Contract, at 1, 44. This contract recognized that Doe Run Peru was controlled by the U.S. Defendants.

Doe Run Resources' control of the La Oroya Complex has been evident for years. Upon information and belief, when Defendant Bruce Neil served as President of Doe Run Peru, his office and residence were in St. Louis, Missouri. He also occupied overlapping positions as CEO

---

[3] In 1997, Defendant Doe Run Resources created three companies for the sole purpose of purchasing the Complex from Centromin: (1) Doe Run Cayman, Ltd., a subsidiary of Doe Run Resources, Inc.; (2) Doe Run Mining S.R.L., a subsidiary of Doe Run Cayman; and (3) Doe Run Peru, S.R.L., a subsidiary of Doe Run Mining. *See Ex. 3*, Documents regarding ownership interest in Doe Run Peru provided by Defendants pursuant to Court Order (hereinafter "Ownership Documents"); *Ex. 1*, Letter from Def.'s counsel of 1/31/08, at 2. Doe Run Peru was a subsidiary of Doe Run Mining until June 1, 2001, when the two corporations merged. After the merger, Doe Run Cayman directly owned Doe Run Peru.

The merger of Doe Run Mining into Doe Run Peru had the practical effect of making Doe Run Resources the direct owner of Doe Run Peru. On paper, however, Defendants kept in place the sham Cayman Islands corporation. According to Doe Run Resources' filings with the SEC, Doe Run Cayman had no operations separate from those of Doe Run Peru, and Doe Run Peru was under Defendant Ira Rennert's control. *Ex. 4*, Excerpt of Doe Run Resources Corp. Form 10-Q, Quarterly Report at 18 (Aug. 7, 2006); *Ex. 5*, Excerpt of Doe Run Resources Corp. Form 10-K, at 4 (Mar. 21, 2006). In any event, from October 23, 1997 through February 8, 2007, Defendant Doe Run Resources (and in turn, Defendants DR Acquisition, The Renco Group, and Ira Rennert) owned and controlled Doe Run Peru.

of Doe Run Resources and President of Doe Run Peru for a period of time. *See Ex. 6*, Press Release, Doe Run Resources, *Doe Run names management successors* (Dec. 21, 2005); *Ex. 7*, The Doe Run Company, *News & Views* (Jan. 2006). Months after Mr. Neil reportedly resigned from Doe Run Peru, his control of the company remained evident. For instance, Mr. Neil made a presentation at a 2006 conference on Peru investment and development in which he spoke on behalf of Doe Run Peru and described its future financial plans. *See Ex. 8*, Bruce Neil Presentation at 2 (stating Doe Run Peru originally agreed to invest $107 million, but "[w]e now expect to spend double the original amount").

According to Defendants, Barb Shepard, who is the Vice President of Human Resources and Community Relations for Doe Run Resources, is not affiliated with Doe Run Peru or the La Oroya Complex. But in her response to an article criticizing Doe Run for its role in polluting La Oroya, she made no distinction between Doe Run Resources and Doe Run Peru. Instead, she announced, "The Doe Run Company remains committed to meeting *our* environmental obligations and minimizing the impact of *our* operations," and thanked the readers for their interest in Doe Rue Peru "as *we* continue *our* progress there." *Ex. 9*, *Doe Run response to our "La Oroya" article*, PERU THIS WEEK, Oct. 24, 2006 (emphasis added).[4] In response to recommendations made by La Oroya's Center for Disease Control, Ms. Shepard said, "*We* believe that the findings of the CDC's report validates *our* efforts to reduce emissions and address the concerns of *our* neighbors." *Ex. 10*, Press Release, The Doe Run Company, *Doe Run Supports CDC Recommendations for La Oroya* (Aug. 11, 2005) (emphasis added).[5] These comments provide evidence that Doe Run Resources, acting from Missouri, determined and controlled the environmental policies that affected La Oroya.

---

[4] *Available at* http://archive.peruthisweek.com/news-2634-doe-run-response-to-our-la-oroya-article.
[5] *Available at* http://www.prweb.com/releases/2005/08/prweb272173.htm.

Public records show Doe Run Resources also controlled Doe Run Peru's sales and
marketing efforts from Missouri. In April 2005, Doe Run Resources announced that Doe Run
Peru's sales and marketing departments would maintain existing sales operations "under the
direction of the St. Louis headquarters," that Doe Run's metal sales teams in Peru would report
to the Director of Global Metal Sales in St. Louis, and that the Director of Raw Materials and
Concentrates in Peru would report to the Vice President for Sales and Marketing for Doe Run in
St. Louis. *See Ex. 11*, Press Release, Doe Run Resources, *Doe Run Reorganizes Sales and
Marketing Departments* (Apr. 1, 2005).

Thus, Doe Run Peru's president, and its marketing, sales, and community relations
departments all operated from Missouri. Further, Agustin Mamani Mayta, a former manager of
Doe Run Peru who worked at the Complex from November 27, 1972 through September 14,
2003, has stated by affidavit that Doe Run Resources controlled the operations in La Oroya. *Ex.
12*, Affidavit of Agustin Mamani Mayta. Specifically, Doe Run Resources determined "the
business practices and goals and objectives related to the control of emissions and production"
for Doe Run Peru, controlled Doe Run Peru's budget, and dictated its practices through the
dissemination of manuals, memoranda, and other written policies. *Id.* at 2. As shown, Doe Run
Resources, operating out of Missouri, controlled Doe Run Peru. The tortious actions of Doe Run
Resources in Missouri therefore were the direct cause of Plaintiffs' injuries.

**B.     The Period of February 8, 2007 Through the Present.**

Effective February 8, 2007, Defendants entered into a string of corporate transactions that
resulted in DR Acquisition and Renco Group owning the Complex.[6] In a separate lawsuit related

---

[6] Doe Run Resources transferred its ownership interest in the La Oroya Complex by assigning all of its shares in
Doe Run Cayman to its parent, Defendant DR Acquisition. *Ex. 3*, Ownership Documents, Doc. 68. Subsequently,
DR Acquisition transferred its ownership interest in the La Oroya Complex through Doe Run Cayman to Renco
Group. *Id.*, Docs. 16, 17. With this transaction, Defendant Doe Run Resources and Doe Run Peru became affiliated

to the Doe Run Peru bankruptcy, Peruvian entities allege that these corporate reorganizations were unlawful and left Doe Run Peru undercapitalized and wrongly saddled with Defendants' debts. *Ex. 15*, MIS Mot. to Compel at 2–3, *In re Application of Consorcio Minero*, No. 11-583, Doc. 24 (E.D. Mo.). Renco Group directly owned the Complex since February 8, 2007. Despite these ownership changes, Defendants continuously operated Doe Run Peru from the U.S.

## ARGUMENT

Defendants' Motion for a Determination of Foreign Law ("Motion for Determination") asks the Court to: (1) decide whether Missouri's borrowing statute would apply Peru's statute of limitations, (2) determine the time period and effect of Peru's statute of limitations, (3) conduct a choice of law analysis to determine which law will govern substantive legal issues; and (4) determine the meaning and effect of Peru's laws on these issues. Defendants' motion is premature, procedurally improper, and cannot be briefed, argued, or decided until discovery has progressed. The consideration of this motion at this stage is unduly prejudicial to Plaintiffs.

Nonetheless, under the existing record, neither Peru's statute of limitations nor its substantive laws apply in these cases. In support of this Opposition, Plaintiffs submit the reports of two Peruvian law experts. The first, Dr. Juan Espinoza Espinoza, is a distinguished law professor in civil law at San Marcos National University and the Pontifical Catholic University of Peru (Pontificia Universidad Católica del Perú), an arbitrator, and a member of multiple government commissions. *See Ex. 16*, Report of Dr. Juan Espinoza Espinoza ("Espinoza Report") at ¶¶ 1.3–1.5, 1.8. Dr. Espinoza has written many books and articles on legal topics, including a book titled *The Law of Civil Liability*, now in its seventh edition. *Id.* at ¶ 1.7.

---

sister corporations, with Renco Group owning both companies. *See Ex. 13*, Doe Run Website Excerpt, http://www.doerun.com/about/company.aspx; *Ex. 14*, Renco Companies: The Doe Run Company, http://www.rencogroup.net/companies/doerun.html.

Plaintiffs' second expert, Dr. Gaston Fernandez Cruz, is a distinguished law professor at the Pontifical Catholic University of Peru, where he teaches civil liability and is the General Coordinator of the Area of Patrimonial Civil Law. *See Ex. 17*, Report of Dr. Gaston Fernandez Cruz ("Fernandez Report") at ¶¶ 4–6. Dr. Fernandez previously taught law at the University of Lima and in the masters program at Pontifical Catholic University of Peru's law school. *Id.* at ¶¶ 7, 10. In addition, Dr. Fernandez served as a legal advisor to the commission working on reforms to Peru's civil code, served on several other government commissions, given conferences in Peru, Spain, and Italy, published several articles on civil law, and co-authored a book on civil law. *Id.* at ¶¶ 13–15, 17. Dr. Fernandez is also an arbitrator and has served on commissions concerning civil law for the bar of Lima, Peru. *Id.* at ¶¶ 9, 18.

In addition, Plaintiffs rely on a Declaration submitted by Luz Aurea Saenz Arana in the case, *Torres v. Southern Peru Copper Corp.*, 965 F. Supp. 899 (S.D. Tex. 1996). Dr. Saenz is the former Comptroller General of Peru and an expert in Peruvian law. *Ex. 18*, Saenz Decl. Further, Plaintiffs rely on "Tomos" (volumes) 1 and 2 of *La Responsabilidad Extracontracual* (*Extra-Contractual Responsibility*), a book published by Defendants' expert, Fernando de Trazegnies Granda. *Ex. 19*, Excerpts of Trazegnies Tomo I; *Ex. 20*, Excerpts of Trazegnies Tomo II. Lastly, Plaintiffs rely on an article published by Dr. Trazegnies, titled *Piercing the Corporate Veil in Determining Jurisdiction in Arbitration*. *Ex. 21*, Excerpts of Trazegnies Article. Notably, Dr. Trazegnies' conclusions in his book and article differ significantly from those offered here. As set forth in the reports of Drs. Espinoza and Fernandez and the other sources cited herein, even if Peru law were to apply, Plaintiffs state viable, timely claims against all Defendants.

**I.  Missouri Law Governs the Statute of Limitations Determination.**

    **A.  Statute of Limitations Determinations Cannot Be Made in the Abstract.**

Defendants argue that Plaintiffs' claims originated in Peru, and therefore the statute of

limitations applicable to these claims is governed by the law of Peru. Defendants then argue that,
because Plaintiffs' claims are barred under Peru's statute of limitations (which they construe as
two years from the date of injury), Plaintiffs' claims also are barred under Missouri's borrowing
statute. This argument is fundamentally flawed, as it is based on an undeveloped and incomplete
factual record. In fact, Defendants acknowledge the factual record is lacking. (Def.'s Mem. at 19,
asking the Court to conduct a choice of law analysis based on "the facts that Plaintiffs plead".)

It is well settled that a statute of limitations analysis is a fact-specific inquiry. In fact,
courts often deny requests to certify classes on this basis, finding "[d]efenses such as the statute
of limitations … will require an individualized determination for each class member". *Henke v.
Arco Midcon, LLC*, No. 10-086, 2014 U.S. Dist. LEXIS 31810, at 53 (E.D. Mo. Mar. 12, 2014).
Not surprisingly, Defendants have not cited a single case in which a statute of limitations
determination was made in the abstract. Given the variety of factual scenarios that will affect the
limitations period, it is impossible to make a statute of limitations determination in the abstract
that would be applicable to these multiple plaintiffs.

### B. The Borrowing Statute Is Not Applicable Because Plaintiffs' Claims Are Not Fully Barred by Peru's Statute of Limitations.

Precedent provides that a federal court presiding over a case removed from state court
shall apply the law of the forum when ruling on statute of limitations issues. *Kan. Pub.
Employees Ret. Sys. v. Reimer & Koger Assocs.*, 61 F.3d 608, 611–12 (8th Cir. 1995). Missouri
considers statutes of limitations to be procedural in nature, and therefore governed by Missouri
law. *Central States, S.E. & S.W. Areas Pension Fund v. Aalco Express Co.*, 592 F. Supp. 664,
666–67 (E.D. Mo. 1984). For personal injury actions, Missouri prescribes a five year statute of
limitations. Mo. Rev. Stat. § 516.120(4). In addition, Missouri law tolls the running of the statute
of limitations during a plaintiff's minority. Mo. Rev. Stat. § 516.030.

However, Defendants argue that Plaintiffs' claims originated in Peru and therefore, under Missouri's borrowing statute, Peru's limitations period applies to Plaintiffs' claims. The borrowing statute provides that the limitations period of another forum should apply in the following circumstances:

> Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state.

Mo. Rev. Stat. § 516.190. However, the borrowing statute only is implicated when a claim would be "fully barred" under the laws of the state or country in which it originated. If a claim is not so barred, then Missouri's statute of limitations applies. *Id.*; *Kampe v. Colom*, 906 S.W.2d 796, 807 (Mo. Ct. App. 1995).

Contrary to Defendants' arguments, Peru's statute of limitations does not fully bar Plaintiffs' causes of action. Therefore, because Plaintiffs' claims are timely under the laws of both Missouri and Peru, it is irrelevant where their causes of action originated for purposes of the borrowing statute. *Great Rivers Coop. v. Farmland Indus.*, 934 F. Supp. 302, 305 (S.D. Iowa 1996) (finding it unnecessary to determine whether cause of action originated in Nebraska, when such law "would not 'fully bar' the claim for purposes of the Missouri borrowing statute").

**C.    The Peruvian Statute of Limitations and Accrual Rules.**

1.    Peruvian Statute of Limitations.

While the parties agree the relevant statute of limitations under Peruvian law is two years, they disagree on the application of Peru's accrual and tolling rules.[7] Notably, despite retaining two Peruvian law experts to opine on Peru's statute of limitations, Defendants' Motion ignores the opinions given by both of these experts regarding the onset of the limitations period.

---

[7] Defendants acknowledge that Missouri's borrowing statute "incorporates the foreign jurisdiction's tolling and accrual rules." (*See* Def.'s Mem. at 18.)

Defendants' experts state that Peru's statute of limitations is triggered by Plaintiffs' awareness of their injury, yet Defendants claim the limitations period begins to run "the day on which the injury is received." *Compare* Def.'s Mem. at 18, *with* Report of Fernando de Trazegnies Granda[8] ("Trazegnies Report") at ¶ 12.12 (claim is time-barred if not brought "within two years as of the date on which the damage became known"), Report of Keith Rosenn[9] ("Rosenn Report"), Ex. D at 63 (opinion by Defendants' prior expert, Professor Alfredo Bullard, stating the statute of limitations starts on "the date on which the person becomes aware of the damage"), *and with* Rosenn Report at ¶ 28 (discussing victims who are "unaware of the damage"). The opinion of Defendants' experts on this issue corresponds with that of Plaintiffs' experts. *See* Fernandez Report at ¶¶ 58-62 (stating general rule that limitations period begins when damages become known by victim); Espinoza Report at ¶¶ 5.8–5.10 (same).

All experts agree that, at the earliest, Peru's statute of limitations does not begin until a person knows of her injury. Moreover, if a plaintiff suffers multiple harms, the limitations period for each such harm would begin running at different times if she became aware of them on different dates. Fernandez Report at ¶ 62. Thus, determining when the limitations period begins running is a fact-intensive inquiry, turning on the circumstances of each case of toxic exposure and manifested injury. No standard date exists (or could exist) for when Plaintiffs' injuries became known. However, as explained next, awareness of the injury will not start the statute of

---

[8] Dr. Trazegnies highlights the fact that he was the Minister of Foreign Affairs of Peru and Chancellor of the Republic from 1998 to 2000. Trazegnies Report at ¶ 1.8. Dr. Trazegnies fails to mention, however, that he served under and for President Alberto Fujimori, who was convicted of gross human rights violations and is now serving a lengthy prison term. *See* Simon Romero, *Peru's Ex-President Convicted of Rights Abuses*, N.Y. Times, Apr. 8, 2009, at A6, *available at* http://www.nytimes.com/2009/04/08/world/americas/08fujimori.html?_r=0.

[9] Professor Rosenn is not a Peruvian lawyer. Rather, he is a Florida lawyer who claims to regularly submit affidavits on Latin American law. Rosenn Report at ¶¶ 1, 5. At least one court has found that Professor Rosenn submitted a poorly-reasoned declaration on foreign law. *See In re Duque*, 154 B.R. 93, 96 (S.D. Fla. Bankr. 1993) ("This Court is not persuaded by Keith S. Rosenn's affidavit as to the unavailability of discovery in the Colombian action").

limitations in cases involving prolonged toxic exposures. In such cases, the limitations period does not run while the plaintiff's exposure to the toxic substances or symptoms persists.

### 2.   Continuing Harm.

The delayed accrual of a claim due to a continuing harm is well-established under Peruvian law. Fernandez Report at ¶¶ 63–77; Espinoza Report at ¶¶ 5.6–5.7. Peru's accrual rules are akin to the continuing violation doctrine recognized under U.S. law.

Under Peru's continuing harm doctrine, the statute of limitations does not begin to run on a claim for toxic exposures while exposure or symptoms still persist. Fernandez Report at ¶¶ 63–77; Espinoza Report at ¶¶ 5.6–5.7. "[T]he statute of limitations for continuing damage does not begin until the final result is produced." Fernandez Report at ¶ 66. As such, Plaintiffs' claims are timely "to the extent to which they continue to suffer the effects of the damage." *Id.* at ¶ 69; *see also id.* at ¶ 72. Moreover, with respect to toxic exposures, the statute of limitations does not accrue so long as the plaintiff continues to be exposed to the pollutants. Espinoza Report at ¶ 5.7. This hold true even if the defendant ceased operations in the interim. *Id.*[10]

### 3.   Conclusions on the Statute of Limitations.

Determining when a claim for personal injury accrues under Peruvian law begins with recognizing the two-year limitations period. Then, consideration is given to Peru's general standard for claim accrual (injury awareness) and its more specialized standard for prolonged toxic exposure cases (continuing harm doctrine). In light of the fact-intensive, individualized showing required to accurately determine the timeliness of claims under Peruvian law,

---

[10] Several tolling provisions also may apply. For instance, Peru's statute of limitations is tolled "[f]or as long as it is impossible to claim the right before a Peruvian court." Espinoza Report at ¶ 5.5 (quoting Civil Code Art. 1994 (8)). Here, the courts of Peru lacked the ability to exercise personal jurisdiction over Defendants, making it impossible to bring them before a Peruvian tribunal. *Id.* at ¶ 5.3. In addition, the statute of limitations is tolled during the pendency of an action, and during minority if a minor plaintiff is not in the custody of parents or legal representatives. *Id.* at ¶¶ 5.5–5.6 (quoting Civil Code Arts. 1994(1), 1996(3)). However, given the effect of Peru's accrual rules and continuing harm doctrine, Plaintiffs' claim are timely without reliance on these tolling rules.

Defendants cannot possibly show at this stage that any Plaintiff's claim is barred by the statute of limitations. As discussed in Section I.B, this prevents the application of Missouri's borrowing statute. Instead, Missouri's five-year statute of limitations and tolling rules apply.

> **D.    The Borrowing Statute Does Not Apply the Limitations Period of a Forum in Which the Defendants Are Not Subject to Jurisdiction.**

As set forth in *Patch v. Playboy Enterprises*, 652 F.2d 754 (8th Cir. 1981) (per curiam), one of Defendants' principle cases, the purpose of Missouri's borrowing statute is to prevent forum shopping. *Id.* at 756. Thus, the borrowing statute would not apply the limitations period of an alleged originating state if the defendant could not be hauled into court there.

Peruvian courts have limited jurisdiction over parties domiciled abroad. Espinoza Report at ¶¶ 5.1–5.3. Specifically, they do not have jurisdiction over non-domiciliary defendants who, acting from abroad, cause damage in Peru. *Id.* at ¶ 5.3. "[I]f what takes place in [Peru] are the effects or consequences of an action, but the action that caused them took place outside of the country … there would be no Peruvian legal jurisdiction against a non-domiciled person or entity." *Id.* (internal quotations omitted). Thus, because "the defendants' relevant conduct, e.g., their decisions regarding the handling of the La Oroya complex," occurred in the U.S., Peruvian courts lack jurisdiction over them. *Id. See also*, *Ex. 18*, Saenz Decl. at ¶¶ 5.4, 8.2 ("defendants who do not have a domicile in Peru are not subject to the jurisdiction of Peruvian Courts").

Defendants are not residents of Peru, nor have they ever indicated they would submit to jurisdiction in Peru. Therefore, Defendants are not subject to jurisdiction in Peru and Plaintiffs could not seek redress in that forum. Instead, Plaintiffs filed suit in Missouri, where most Defendants reside or have their principal place of business.[11] Defendants cannot now seek the protection of a limitations period from a forum in which they are not even subject to jurisdiction.

---

[11] While no Defendant is a Peruvian resident, some, like Renco Group and Ira Rennert, are New York residents.

This would thwart the purpose of the borrowing statute, and allow Defendants to effectively engage in *post hoc* forum shopping for a shorter limitations period. For this reason, borrowing statutes only apply the limitations period of a foreign state if a defendant would be subject to the jurisdiction of that state's courts. *See W. Natural Gas Co. v. Cities Serv. Gas Co.*, 507 P.2d 1236, 1243 (Okla.), *cert. denied*, 409 U.S. 1052 (1972); *Green v. Kensinger*, 429 P.2d 95, 99 (Kan. 1967); *Strong v. Lewis*, 68 N.E. 556, 556 (Ill. 1903). While Missouri courts have yet to address the issue, this premise is in keeping with Missouri jurisprudence.

1.    Purpose of Missouri's Accrual Rules.

In determining where a cause of action originated for the purposes of the borrowing statute, Courts ask where the action "accrued," as that term is defined by Missouri Revised Statute § 516.100. *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007). Thus, Section 516.100 determines both when and where a cause of action accrues for statute of limitation purposes. *Id.* The statute provides:

> the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Mo. Rev. Stat. § 516.100. The term "accrue" is to be given a liberal interpretation so as to give proper effect to the accrual and borrowing statutes. Mo. Rev. Stat. § 1.010 ("laws shall be liberally construed, so as to effectuate the true intent and meaning thereof").

The accrual rules serve two purposes. First, they prevent the assertion of stale claims. *Bus. Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. 1999). Second, they ensure the limitations period does not expire before a plaintiff has "a practical remedy" and can pursue an actionable injury. *Davis v. Laclede Gas Co.*, 603 S.W.2d 554, 556 (Mo. banc 1980). This is

13

why "in Missouri the statute of limitations is triggered not by the discovery of damage, but by the commencement of the right to sue." *Bus. Men's Assur. Co. of Am.*, 984 S.W.2d at 507. Thus, a cause of action accrues both when and where a plaintiff obtains the right to sue.

2.     The Limitations Period Does Not Accrue Unless Plaintiff Has a Practical Remedy.

Although the issue of a "practical remedy" has not been addressed in reference to *where* a cause of action accrues, it is often discussed in relation to *when* an action accrues to determine when the limitations period begins to run. Such was the case in *De Paul Hospital School of Nursing, Inc. v. Southwestern Bell Telephone Co.*, 539 S.W.2d 542 (Mo. Ct. App. 1976), in which the court stated:

> [T]he cause of action arises when, and only when, the aggrieved person has the right to apply to the proper tribunal for relief. The statute does not attach to a claim for which there is no right of action, and does not run against a right for which there is no corresponding remedy or for which judgment cannot be obtained. The true test, therefore, to determine when a cause of action has accrued is to ascertain the time when *plaintiff could first have maintained his action to a successful result, regardless of the time when the actual damage results ….*

*Id.* at 546 (quoting 54 C.J.S. *Limitations of Actions* § 109, at 11–14) (emphasis in original). Admittedly, *De Paul Hospital* involved a slightly different factual circumstance, in that it addressed a condition precedent to filing suit rather than a jurisdictional issue. However, the rationale is the same, as both circumstances effectively prevent a plaintiff from seeking relief. Thus, a "plaintiff's cause of action cannot be said to have accrued until it is within his power to prosecute a suit to a successful judgment." *Id.* at 547.

This premise has often been repeated throughout Missouri jurisprudence in determining when damages were capable of ascertainment for accrual purposes. For instance, in *Davis*, 603 S.W.2d 554, the Missouri Supreme Court interpreted the accrual rules in the context of a

14

continuing tort, finding "that the 'cause of action' which commences the limitations period should not refer to the 'technical' breach of duty which determines whether the plaintiff has any legal right, but to the existence of a practical remedy." *Id.* at 556 (internal quotations omitted). Several years later, the Missouri Supreme Court reiterated this holding, finding that a cause of action accrues "*when it is within the claimant's power to prosecute a suit to successful judgment.*" *Linn Reorganized Sch. Dist. v. Butler Mfg. Co.*, 672 S.W.2d 340, 343 (Mo. banc. 1984) (emphasis in original; internal quotations omitted).

### 3.   A Cause of Action Cannot Accrue or Originate in a Forum Where a Plaintiff Has No Practical Remedy.

The definition of "accrue" recognizes the statute of limitations should not start unless the plaintiff has an available remedy and can obtain relief. Thus, a cause of action accrues when, and for the purposes of the borrowing statute where, it is within a plaintiff's power to prosecute a suit to a successful judgment. A cause of action cannot be deemed to accrue where relief cannot be obtained. Instead, a plaintiff must have the ability to file suit against the defendant—meaning the courts of a state must have jurisdiction over him—for a cause of action to accrue in that state. Because Defendants are not subject to jurisdiction in Peru, Plaintiffs' cause of action did not accrue or originate there, and Peru's limitations period is not borrowed.

Several other states to have addressed this issue have made similar findings with respect to their borrowing statutes. For instance, the Oklahoma Supreme Court held that its borrowing statute was not "intended to borrow the limitation law of a jurisdiction in which the defendant cannot be summoned." *W. Natural Gas Co.*, 507 P.2d at 1243. *See also*, *Thornton v. T & W Tire, L.P.*, 410 F. Supp. 2d 1098, 1103 (W.D. Okla. 2006) (applying rationale of *Western Natural Gas* to current version of the State's borrowing statute). Kansas courts have reached similar conclusions, finding that their borrowing statute applies "when the cause of action has accrued in

a foreign state, or, in other words, when the plaintiff has the right to sue the defendant in the courts of such foreign state." *Green*, 429 P.2d at 99 (emphasis removed) (finding cause of action accrued in California because party had ability to bring suit there). This also is the rule of law in Illinois. As held by that state's Supreme Court at the turn of the century:

> The words, 'when a cause of action has arisen,' as they occur in the [borrowing statute], should be construed as meaning, when jurisdiction exists in the courts of a State to adjudicate between the parties upon the particular cause of action, if properly invoked, or, in other words, when the plaintiff has the right to sue the defendant in the courts of the State upon the particular cause of action, without regard to the place where the cause of action had its origin.

*Strong v. Lewis*, 68 N.E. 556, 556 (Ill. 1903) (internal quotations omitted).

As these states have recognized, a court must have jurisdiction over a defendant for there to be any relationship between the forum's statute of limitations and the litigation. Moreover, the purpose of the borrowing statute—the prevention of forum shopping—is not furthered by applying the limitations period of a forum where the suit could not be brought. Missouri courts, like those in Kansas, Oklahoma, and Illinois, would hold that a cause of action cannot accrue where such action cannot be brought. Peru's statute of limitations does not apply.

**E.    The Cause of Action "Originated" In Missouri or New York.**

Setting aside the issue of jurisdiction, Plaintiffs' causes of action originated in Missouri or New York, where Defendants' conduct occurred.[12] Although the usual rule in tort is that "[a] cause of action accrues when and originates where damages are sustained and are capable of ascertainment," can sometimes lead to finding that a cause of action originated where the injury occurred, *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 436 (Mo. 1984) (finding cause of action accrued on date of diagnosis), this is not always the case. Missouri courts do not

---

[12] As set forth above, and in Plaintiffs' Motion to Stay or Strike, Plaintiffs lack the necessary discovery to determine whether Defendants' tortious conduct occurred in New York or Missouri. Plaintiffs respectfully request leave to re-brief these issues when Defendants produce responsive discovery.

universally look to the place of injury to determine where an action originated. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 584 (6th Cir. 2004) ("Viewed overall, Missouri jurisprudence does not necessarily focus on the place of injury" in interpreting its borrowing statute).

      1.   <u>Courts Define Accrual so as to Further the Anti-Forum Shopping Purposes of the Borrowing Statute.</u>

When determining where a cause of action accrued, courts do not universally find that the cause of action accrued at the place of injury. Instead, they consider the purpose of the borrowing statute when making this determination. For instance, in *Patch v. Playboy Enterprises*, 652 F.2d 754, a case that Defendants agree is instructive, the Eighth Circuit held that a cause of action originated, not where the damages occurred, but where the tortious conduct occurred. *Patch* involved a libel action stemming from information published in Playboy magazine and distributed in multiple states. *Id.* at 755. The Eighth Circuit rejected the theory that the cause of action accrued in the place of injury, because under the circumstances of the case, this interpretation would not further the anti-forum shopping purpose of the borrowing statute. *Id.* at 757. Instead, the Court found that the cause of action originated at the publisher's principal place of business—where the tortious actions were centered—as that would ensure the consistent application of the anti-forum shopping purpose of the borrowing statute. *Id.* at 758.

The case *Finnegan v. Squire Publishers, Inc.*, 765 S.W.2d 703 (Mo. Ct. App. 1989), had a similar holding. In *Finnegan*, an attorney licensed in Missouri brought suit for libel. *Id.* The Court held that the cause of action did not accrue in Missouri, where the plaintiff suffered damage to his professional reputation. *Id.* at 704. Instead, the cause of action originated where the defendants' bad conduct occurred, because such a holding would further the "anti-forum shopping policy of Missouri's borrowing statute". *Id.*

Here, like in *Patch* and *Finnegan*, situating the place of injury as the place of accrual would hinder the anti-forum shopping purpose of the borrowing statute. Defendants committed the acts alleged by Plaintiffs in either Missouri or New York. Defendants were not subject to jurisdiction in Peru, so Plaintiffs filed suit in Defendants' home forum where jurisdiction could be obtained. Thus, Plaintiffs' choice to file in Missouri was not one of forum shopping, but of necessity. In such circumstances, it cannot be said that applying Peru's statute of limitations furthers the purposes of the borrowing statute.

2.     <u>Non-Accrual of the Statute of Limitations.</u>

Plaintiffs and their families have been subjected to numerous threats, causing them to fear for their safety and lives. (*See* Doc. 24 at 3–4.) Specifically, Plaintiffs received death threats, as well as threats of being burned, stabbed, stoned, and driven out of the city. (*See* Doc. 24-7.) Further, misinformation was spread to La Oroya's populace, informing them that the Doe Run smelter closed because of Plaintiffs' lawsuits, and that any resulting financial difficulties were Plaintiffs' fault. This, in turn, caused individuals in La Oroya to threaten Plaintiffs and their attorneys. (*See* Docs. 24-7, 24-8.) In addition, radio broadcasts aired indicating that Plaintiffs' counsel was deceiving and lying to the people of La Oroya. (*See* Doc. 24-11.)

These intimidation tactics caused many individuals to delay or forgo bringing their claims. (*See* Doc. 24 at 10.) It also made it difficult, and sometimes impossible, for Plaintiffs' counsel to meet with and obtain information from clients. (*See* Docs. 24-1, 24-8.) Plaintiffs sought discovery as to Defendants' involvement with these threats, but Defendants have not produced responsive documents, nor has other discovery been conducted on these issues.[13]

---

[13] These issues were addressed in Plaintiffs' Emergency *Ex Parte* Application for Temporary Restraining Order, which is incorporated herein by reference. (*See* Docs. 23, 24, and attachments thereto.) As the Court recognized in its Order of January 11, 2011, the Plaintiffs have been unable to obtain evidence linking the bad acts to Defendants. These matters are the subject of numerous outstanding discovery requests. As such, if the Court deems Plaintiffs'

Under these circumstances, Defendants cannot look to the statute of limitations for a defense.

Such actions, if proven to be attributable to Defendants, present justification for equitable tolling,

and may even prevent the accrual of the statute of limitations altogether. *See Boland v. St. Luke's*

*Health Sys.*, -- S.W.3d --, 2013 Mo. App. LEXIS 1419, at 25–31 (Mo. Ct. App. Nov. 26, 2013).

### 3.   The Cases Relied on by Defendants are Distinguishable.

Defendants argue that Plaintiffs' causes of action arose in Peru, where Plaintiffs came in

contact with the toxic substances. However, the facts here are distinguishable from the cases on

which Defendants rely, and preclude a finding that Plaintiffs' causes of action arose in Peru.

Initially, and importantly, Defendants rely on the aforementioned case, *Patch v. Playboy*,

for the proposition that a cause of action cannot accrue at the place of wrongful conduct and

instead must accrue at the place of injury. However, *Patch* came to the opposite conclusion,

holding that if it furthers the purposes of the borrowing statute, then the cause of action should be

found to accrue at the place of conduct. *Patch*, 652 F.2d at 758.

The issue of accrual can sometimes be clear. *Old Dominion Freight Line, Inc. v. Dally*,

369 S.W.3d 773 (Mo. Ct. App. 2012), which involved a car accident where the tortious conduct

and injury occurred in a single state, presents one such example. *Id.* at 778. However, this case is

different. Here, Missouri and New York residents, who are not subject to jurisdiction in Peru,

allegedly controlled the operation of the La Oroya smelter from their offices in the U.S., where

they committed tortious actions that directly injured the residents of La Oroya. None of the cases

on which Defendants rely present facts such as these.

For instance, *Nettles v. AT&T Co.*, 55 F.3d 1358 (8th Cir. 1995), involved a cause of

action for fraudulent misrepresentation in the context of a job offer, in which the tortious action

arguments to be insufficient due to the lack of factual evidence, Plaintiffs respectfully request leave to re-brief this
issue after Defendants have produced responsive discovery.

19

and initial injury all occurred in California. *Id.* at 1361. The plaintiff's injuries later worsened after she moved to Missouri. *Id.* In ruling that the cause of action accrued in California, the Court held that the aggravation and worsening of an existing injury does not delay the accrual of an action. *Id.* at 1363. In the case *In re: Master Mortgage Investment Fund*, 151 B.R. 513 (Bankr. W.D. Mo. 1993), Missouri had no contacts to the cause of action whatsoever. Thus, in *Nettles* and *Master Mortgage*, there were no allegations of tortious conduct in Missouri, and no allegations that the defendants were not subject to jurisdiction in the alleged state of accrual.

Additionally, the cases *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642 (8th Cir. 1982) and *In re Tetracycline Cases*, 729 F. Supp. 662 (W.D. Mo. 1989) were pharmaceutical product liability cases in which none of the tortious actions, such as the design or manufacture of the products, were alleged to occur in Missouri. Instead, the products simply were sold and ingested in the state. *Natalini v. Little*, 185 S.W.3d 239 (Mo. Ct. App. 2006), was a wrongful death action in which the decedent lived and was also treated by the defendant in Kansas. The cases of *Acapalon Corp. v. Ralston Purina Co.*, 827 S.W.2d 189 (Mo. 1992), *Chandler v. Multidata Systems International Corp.*, 163 S.W.3d 537 (Mo. Ct. App. 2005), and *Skewes v. Masterchem Industries*, 164 S.W.3d 92 (Mo. Ct. App. 2005), all involved motions to dismiss for forum non conveniens, and thus only tangentially discussed the issue of accrual and never addressed the borrowing statute or its policy considerations.

The facts here distinguish this case from those cited by Defendants. Plaintiffs' claims did not accrue in Peru, and are not barred by its statute of limitations.

## II.    Choice of Law Analysis.

Next, Defendants ask this Court to find that Peruvian law should govern all theories of liability and defenses in this litigation, as well as federal procedural issues such as capacity and joinder. Further, Defendants ask the Court to interpret Peruvian law. Before the Court is able to

20

decide which law governs these cases, additional discovery is warranted. But in either case, it is apparent that Peruvian law is not applicable to this dispute.

**A.  Discovery Is Needed to Engage in a Choice of Law Analysis.**

Defendants' arguments rely heavily on this Court's decision in *Johnson v. Avco Corp.* (*"Johnson II"*), No. 07-1695, 2009 U.S. Dist. LEXIS 108600 (E.D. Mo. Nov. 20, 2009). The decision is distinguishable, as set forth in Sections III.B.5 and VI below. Importantly, however, this Court's decision in *Johnson II* was rendered post-discovery.

At an earlier, pre-discovery stage, this Court recognized the importance of discovery in a choice of law examination, opining that "discovery will be necessary" to decide certain issues and thus "it would be premature to make a choice of law determination at this time." *Johnson I*, 2008 U.S. Dist. LEXIS 48778, at 10–11. Plaintiffs respectfully submit that the issues raised here, like in *Johnson I*, require discovery prior to a choice of law determination and, therefore, such a critical decision at this early juncture would be "premature." *Id.* at 11.

In *Johnson II*, the Court was afforded the confidence of knowing that a factual record had been fully developed from which an accurate choice of law analysis could be conducted. In stark contrast, Defendants have frustrated Plaintiffs' attempts to obtain comprehensive discovery throughout this litigation. To date, Plaintiffs have received little of Defendants' responsive discovery and no witnesses have been produced for deposition.

The facts developed through discovery will further illuminate Defendants' misconduct in Missouri and/or New York. For example, discovery may reflect that Defendants, acting from Missouri and/or New York, concocted a plan in which they could reap profits domestically while evading environmental laws domestically and abroad, developing a complex corporate structure in an attempt to insulate themselves from tort liability. Discovery may show that Defendants were well aware of the harm they were causing to Plaintiffs, and nevertheless continued with

their tortious conduct. Discovery also could show that, despite being one of the richest men on the planet,[14] Defendant Ira Rennert decided that his domestic profit margins were more important than the health and safety of the children of La Oroya, and purposely chose not to incur the costs associated with safety controls. There may be numerous "smoking gun" discovery documents that could shift the course of this choice of law analysis and this litigation. This is the type of information that Plaintiffs are entitled to investigate and discover prior to a determination of which law applies to these cases.

As this stage, given the significant amount of discovery that remains outstanding in this litigation, it is premature for the Court to engage in this choice of law determination. Defendants' non-production of the bulk of their responsive documents, including all electronically stored documents, prevents Plaintiffs' counsel from setting forth the complete record of relevant facts in support of their argument. This has left Plaintiffs unable to fully craft, support, and present their arguments in opposition to this premature choice of law determination. *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011) (noting that "a choice-of-law determination is premature … since the record lacks facts necessary to conduct the context-specific 'center of gravity' or 'grouping of contacts' analysis required by New York's choice-of-law principles"); *Graboff v. Collern Firm*, No. 10-1710, 2010 U.S. Dist. LEXIS 118732, at 21 (E.D. Pa. Nov. 8, 2010) (emphasizing that "a choice of law analysis is premature because the record lacks necessary facts for the Court to conduct the fact-intensive, context-specific analysis required by … law"); *Schreiber Foods Int'l v. Intercargo Napoli S.R.L.*, No. 98-5954, 1999 U.S. Dist. LEXIS 4692, at 7 (S.D.N.Y. Apr. 5, 1999) ("Absent a substantive motion, no choice of law determination need be made").

---

[14] *See The World's Billionaires*, Forbes, *available at* http://www.forbes.com/profile/ira-rennert/. At the time of drafting, Defendant Ira Rennert came in at number 243. *Id.*

Plaintiffs respectfully submit that Defendants' Motion for Determination should be denied as premature.[15] However, if the Court decides to address Defendants' motion on the merits, then all potential factual scenarios should be inferred in Plaintiffs' favor.

**B.      Choice of Law Standard.**

The first question in any conflict of law analysis is whether the laws actually conflict. If there is no conflict, then the laws of the forum apply. *Phillips v. Marist Soc'y*, 80 F.3d 274, 276 (8th Cir. 1996). However, if the laws at issue substantially differ, a district court applies the choice of law rules of the state in which it sits to determine which state's law should apply. *Wolfley v. Solectron USA, Inc.*, 541 F.3d 819, 823 (8th Cir. 2008). Missouri courts resolve a choice of law inquiry via the "most significant relationship" test. *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. 1969) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT") § 145). Notwithstanding Defendants' arguments to the contrary, this Court should apply the substantive law of Missouri and/or New York in the case at bar.[16]

With respect to personal injury liability, the law of the state in which the injury occurs only applies if no other state has a more significant interest in applying its laws. RESTATEMENT §§ 145, 146.[17] Indeed, Missouri abandoned the traditional *lex loci delicti* rule and adopted the balancing approach set forth in the Restatement, explicitly directing courts to look beyond the place of the injury when conducting a choice of law inquiry. *See Kennedy*, 439 S.W.2d at 180–81 ("the *lex loci delicti* rule is too harsh and inflexible and is an unsatisfactory rule").

---

[15] Plaintiffs addressed this issue extensively in their briefing on the Motion to Strike (Docs. 160 and 179), and incorporate such arguments by reference.

[16] As set forth above and in the Motion to Strike, Plaintiffs have not received sufficient discovery to determine whether Defendants' relevant contacts were centered in Missouri or New York. Accordingly, Plaintiffs' arguments regarding such contacts necessarily must take an "and/or" form. To the extent the Court finds Plaintiffs' arguments to be insufficient due to the lack of specificity, Plaintiffs respectfully request leave to re-brief the choice of law issues when Defendants produce responsive discovery.

[17] Under the choice-of-law doctrine of *depecage*, different issues in a single case may be decided under the laws of different states. *See Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 11–12; *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 25 (Mo. Ct. App. 2004).

23

As this Court noted in *Johnson II*, Missouri courts apply the general principle set forth in Restatement § 145 to determine whether a state has a more significant interest than the state of injury. *Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 7. Section 145 states that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." RESTATEMENT § 145(1). In conducting this analysis, courts examine the relationship each of the following contacts bear to the issue:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and
>     place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is
>     centered.

*Id.* at § 145(2). The relative weight given to each of these contacts varies depending on its importance to the particular issue being evaluated. *Id.* Further, the analysis centers on the examination of seven overarching factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative
>     interests of those states in the determination of the particular
>     issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be
>     applied.

*Id.* at § 6(2).

A court focuses, not merely on the quantity of the contacts, but instead on their quality and relative importance to the issue. *See Kennedy*, 439 S.W.2d at 184 (stating that a court should "not engage in the mere counting of the number of contacts but must evaluate them in order to

determine what state has the most significant contacts"); *Goede*, 143 S.W.3d at 31 (holding

same). While all of the § 6 factors are relevant to the analysis, when dealing in tort, sub-sections

b, c, and e—the policies of the forum, other interested states, and those underlying the field of

law—are accorded the most weight. *Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 9.

It is under these principled tenets that Plaintiffs will demonstrate that the laws of

Missouri and/or New York, rather than those of Peru, govern the issues raised in this case.

### C.      Peru Has No Policy Interest in Applying Its Laws to Any Issue In this Case.

A separate choice of law analysis should be conducted for each individual legal issue to

determine which law governs that particular facet of a cause action. However, there is one over-

riding principle that must be addressed at the outset of the analysis: *Peru has no interest in*

*applying its law to any issue in this matter*.

Article 2097 of the Civil Code, Peru's choice of law statute, dictates that "[t]ort liability

is regulated by the law of the country where the main activity that generates the harm is

performed." Espinoza Report at ¶ 5.44 (quoting Civil Code Art. 2097). However, "[i]f the law of

the place where the damage was produced deems the agent to be liable, but not so the law of the

place where the activity or omission that provoked the damage took place, the applicable law is

the former". *Id.*

As Dr. Espinoza explains, "the main activity that gives rise to the damage focuses on the

decisions made regarding the management of the La Oroya complex, which took place in the

United States". *Id.* at ¶ 5.45. Accordingly, Peruvian law dictates that the law of Missouri or New

York—as the place of Defendants' conduct—should govern unless the law of such states would

not consider Defendants liable. *Id.* Here, Defendants make no attempt to deny that the laws of

Missouri and New York recognize liability in these circumstances. Therefore, "the law of the

United States applies." *Id.*

By its choice of law statue, Peru has stated that it has no interest in applying its laws to this action. *See id.* at ¶ 5.44 (quoting Civil Code Art. 2097). Thus, Peru has no policy interest in seeing its laws applied. *See* RESTATEMENT § 6, cmt. f ("The content of the relevant local law rule of a state may be significant in determining whether this state is the state with the dominant interest"). The Restatement addressed this issue at length, stating:

> [T]here will ordinarily be little justification for applying the local law of a state which has little or no interest in the matter at hand. An indication of the existence of a state interest in a given matter, and of the intensity of that interest, can sometimes be obtained from an examination of that state's choice-of-law decisions. For example, the fact that a state's choice-of-law decisions provide for application of the local law of another state to determine a certain issue may afford some indication that the state has little or no interest in the application of its relevant local law rule in the resolution of that issue.

*Id.* at § 8, cmt. k. *See also, id.* at § 8, Ill. 3. This issue was further addressed in the comments to § 145, which state "in judging a state's interest in the application of one of its local laws, the forum should concern itself with the question [of] whether the courts of that state would have applied this rule in the decision of the case." *Id.* at § 145, cmt. h. "[T]he fact that these courts would not have applied this rule may indicate *that no important interest of that state would be infringed if the rule were not applied by the forum.*" *Id.* (emphasis added).

Indeed, during a January 10, 2008 hearing before the Commission of Andean, Amazonic and Afro-Peruvian towns, for the Environment and Ecology—which was presided over by the Congresswoman for the province in which La Oroya is situated—several members of Congress opined on the respective interests of Peru and the U.S. in regard to the La Oroya contamination. *See generally*, *Ex. 22*. In the hearing, Congresswoman Gloria Ramos commented that:

> You have questioned some actions being done in Peru and why many Peruvian people have to turn to the United States looking for justice. Or of their headquarters. Because there is no answer here. … Tell me one emblematic case where the government was strong

26

> by sanctioning the company. In none. Doe Run has had fines
> charged. They never pay. They turn to a series of defenses, so they
> won't have to pay. Doe Run also has companies in the United
> States, for example in St. Louis, however they don't allow that
> there. The rules are clear there. There, they do abide by the rules.
> On the other hand, they don't abide by the rules, here in Peru.

*Id.* at 10. Clearly, Peru has no interest in having its laws applied to this cause of action. Instead,

Peru's interest is best served by the application of U.S. law.

Had this cause of action been filed in Peru, a Peruvian court would have applied the law

of Missouri or New York. Espinoza Report at ¶¶ 5.44–5.46. It makes little sense for a court

sitting in Missouri to apply Peruvian law when a Peruvian court would not do so. As Peru has no

interest in applying its laws to this case, Missouri and/or New York have the greater interest.

### III.   The Substantive Law of This Case Should Be Governed By Missouri and/or New York Law.

#### A.   There is No Substantial Conflict Between the Laws of Peru and Missouri.

Plaintiffs' direct liability claims against Defendants sound in two theories of tort: fault-

based and strict liability. Despite Defendants' statements to the contrary, Peruvian law does not

differ substantially from that of Missouri on these issues.

Fault-based claims under Missouri law are akin to Peruvian law governing extra-

contractual liability. Espinoza Report at ¶¶ 5.15–16. Defendants argue that extra-contractual

liability differs from Missouri law in four main respects: (1) whether causation is determined by

the judge or jury, (2) which party has the burden of proof as to misconduct, (3) whether Doe Run

Peru is a necessary party, and (4) whether the laws recognize direct liability against Defendants

in these circumstances. (Def.'s Mem. at 22– 23.)[18] Defendants' arguments are incorrect.

---

[18] Defendants also claim that there are different affirmative defenses available under Peru law. However, Defendants give only a cursory statement on this issue, failing to provide any sort of detail or explanation. Based on Defendants' failure to provide any sort of proof, the Court is free to apply the law of the forum. *See Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 185–86 (D.D.C. 2006) (applying forum law where parties failed to prove German law);

Defendants first two points raise issues of trial administration. Accordingly, the laws of the forum determine whether causation is decided by the judge or jury, and which party bears the burden of proof on the issue of misconduct. RESTATEMENT §§ 129, 133.[19] Further, the causation standards of Missouri and Peru are indistinguishable. *Compare Krause v. U.S. Truck Co.*, 787 S.W.2d 708, 710 (Mo. banc 1990) (test for causation is whether the injury "was the natural and probable consequence" of the defendant's act), *with Ex. 19*, Trazegnies, Tomo I at 195–96 (explaining "normal" consequences of actions are sufficient for causation). *Accord* Espinoza Report at ¶¶ 5.37-39. As set forth in Section VIII below, whether Peru is a necessary party is a procedural question and therefore governed by federal law. Lastly, Plaintiffs' experts dispose with Defendants' fourth argument, showing that Defendants can be held directly liable under Peruvian law. *See* Section III.C.2*, infra* (citing Espinoza Report at ¶¶ 5.16–5.17). Accordingly, there is no conflict between Missouri and Peruvian law as to Plaintiffs' fault based claims.

Defendants concede that strict liability is recognized under Peru law. (Def.'s Mem. at 23.) However, they posit that the laws differ because Peru might not consider mining and smelting to be a hazardous activity for strict liability purposes. (*Id.*) This, however, is wholly inaccurate. Peru does consider mining and smelting to be hazardous activities. *See* Section III.C.1*, infra* (citing Espinoza Report at ¶¶ 5.11–5.13; Fernandez Report at ¶¶ 78, 80, 86–88 90–93; *Ex. 20*, Trazegnies Tomo II at 254–55). Thus, there is no conflict between Missouri and Peruvian law as to Plaintiffs' strict liability claims.

Lastly, Defendants argue that the laws differ because Peruvian law would immunize them from suit. (Def.'s Mem. at 23–25.) As set forth in Section V below, Peruvian law, like that of

---

9-44.1 *Moore's Fed. Prac. – Civil* § 44.1.04 ("when parties have failed to prove foreign law, the court may apply the local law of the forum").

[19] There is an exception to this general rule if the primary purpose of the burden of proof standard "is to affect decision of the issue rather than to regulate the conduct of the trial." RESTATEMENT § 133.

Missouri, provides no immunity for Defendants. Moreover, immunity is a separate issue that raises distinct policy considerations, and therefore is subject to a separate choice of law determination analysis under the theory of *depecage*. RESTATEMENT §145, cmt. d; § 146, cmt. e.

Because there is no conflict of laws, no conflict analysis is necessary. Instead, the laws of the forum govern issues related to Defendants' direct liability. *Phillips*, 80 F.3d at 276.

### B.    Choice of Law Analysis Related to Direct Liability.

Defendants make several unavailing arguments throughout their motion regarding the nature of the Court's choice of law analysis. First, they misconstrue the policy interests of the respective states, asking this Court to assign undue weight to the alleged interests of Peru over those of Missouri and New York. (*See* Def.'s Mem. at 26–28.) As readily set forth above, Peru's interest in this matter falls well short of the interests of Missouri and/or New York. Additionally, Defendants make much of the place of Plaintiffs' injuries, arguing that this factor holds what is tantamount to determinative weight. (*Id.*) In doing so, Defendants attempt to direct this Court's attention away from a paramount consideration under Restatement § 6: the place of conduct. Defendants frame these arguments, among others, through the lens of this Court's discussion and rationale in *Johnson II*, 2009 U.S. Dist. LEXIS 108600. As set forth below, the facts and circumstances of the instant matter differ greatly from those of *Johnson II*.

### 1.    Relevant Policies and Interests of the Place of Injury and Place of Misconduct.

From the outset, Defendants overestimate the value of the place of injury in the choice of law analysis. Indeed, the comments to Restatement § 6 recognize there is no *de facto* rule, and that the place of the injury does not always govern a choice of law in tort:

> the difficulties and complexities involved have as yet prevented the courts from formulating a precise rule, or series of rules, which provide a satisfactory accommodation of the underlying factors in all of the situations which may arise. All that can presently be done

> in these areas is to state a general principle, such as application of
> the local law of the state of most significant relationship, which
> provides some clue to the correct approach but does not furnish
> precise answers. In these areas, the courts must look in each case to
> the underlying factors themselves in order to arrive at a decision
> which will best accommodate them.

RESTATEMENT § 6, cmt. c. When the defendant's conduct and the plaintiff's injury occur in separate states, the choice of law becomes even more complex. *Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 13. Thus, through a fact-specific analysis of the factors enumerated in Restatement §§ 6 and 145, a court may properly determine that a forum other than the state of injury has a more significant relationship to the parties and occurrences. *See Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 8–9; *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 445 (Mo. Ct. App. 1986) (applying Missouri comparative fault law to injury occurring in Kansas); *Inghram v. Mut. of Omaha Ins. Co.*, 170 F. Supp. 2d 907, 910 (W.D. Mo. 2001) (applying Missouri law to breach of fiduciary duty claim with injury occurring in Kansas).

When conducting a § 145 analysis, courts have repeatedly recognized the importance of the situs of the principal activity and misconduct, often finding that such location has the most significant interest in having its laws applied to the dispute. *See, e.g., In re Air Disaster at Ramstein Air Base*, 81 F.3d 570, 577 (5th Cir. 1996) (finding place of misconduct was determinative factor and applying that state's law). Courts apply the law of the state where the tortious acts or omissions took place due to the state's strong interest in regulating wrongful activity within its borders. *See, e.g., Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 249 (5th Cir. 1990) (applying Texas where serviceman was injured in North Carolina by defective mortar shell manufactured in Texas by Texan defendants due to Texas's substantial interest in regulating conduct of manufacturers doing business in its state); *In re Disaster at Detroit Metro. Airport*, 750 F. Supp. 793, 803 (E.D. Mich. 1989) (applying California law to product liability

30

claims by plaintiff injured in Michigan by aircraft manufactured in California by Californian defendant, due to California's interest in regulating wrongful conduct within its borders).

For example, in a case analogous to the instant litigation, the Fifth Circuit conducted a choice of law analysis in a suit brought by a Canadian plaintiff who was injured in Canada by a helicopter manufactured by a Texan defendant. *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403 (5th Cir. 2001). In finding that Texas law should apply, the court reasoned that, while the plaintiff was injured in Canada, the relevant conduct that gave rise to the plaintiff's injuries took place in Texas, at the defendant's principal place of business. *Id.* at 426. The defendant did business in Texas, and therefore there was "no evidence that the application of Texas law poses any great burden on [defendant]'s ability to defend the suit." *Id.* Because "Texas has a strong interest in enforcing its products liability laws against the manufacturers operating in the State", its laws applied. *Id.* Here, while Plaintiffs' injuries occurred in a foreign country in which they reside, Defendants' principal place of business and misconduct was situated in Missouri and/or New York. In this regard, like *McLennan*, Missouri and/or New York have a strong interest in enforcing their states' laws prohibiting the wrongful conduct of persons and entities operating within their borders.[20] And, also like *McLennan*, there is no evidence to suggest that the application of Missouri and/or New York law would pose any burden on Defendants.

Contrary to Defendants' assertions, the contacts to Missouri and New York are in no way incidental. Instead, under the circumstances here at issue, the place of Defendants' wrongful conduct is the central and most significant factor for the choice of law analysis. Defendants, acting from Missouri and/or New York, ran Doe Run Peru. They controlled Doe Run Peru's

---

[20] In regard to any misconduct occurring in both New York and Missouri, it is worthwhile to note the Restatement principle that "[w]hen certain contacts involving a tort are located in two or more states with identical local rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state." RESTATEMENT § 145, cmt. i.

finances, policies, and business practices. And, while located in Missouri and/or New York, Defendants engaged in tortious actions causing severe and permanent damage to the children of La Oroya. According to Defendants' public statements, Doe Run Peru's marketing, sales, and community relations departments were managed in Missouri, and its environmental policies were set in Missouri.[21] At times, Doe Run Peru's President even lived in and worked from Missouri.

As set forth above, Peru has stated by statute that it has no interest in having its laws applied to this litigation, and Peru's lawmakers are actively looking to the U.S. to provide a remedy for the damages caused by these U.S. Defendants. Therefore, the interests of Missouri and/or New York in regulating and controlling Defendants' actions clearly outweigh the interests of Peru. Restatement factor § 6(c)—the relevant policies of the interested states—weighs in favor of the application of Missouri or New York law.

2.      Relevant Policies of the Forum.

Another important contact is the relevant policies of the forum state. *See* RESTATEMENT § 6(b). The interests of the forum state are two-fold. First, as the place where the conduct occurred, it has an interest in controlling and regulating that conduct. Second, as the forum, Missouri has interests related to general and efficient trial administration. *See* RESTATEMENT § 6, cmt. e.

The first issue is discussed at length above, and as shown, Missouri has a great interest in having its laws applied. The second issue—general trial administration—dovetails with Restatement factor 6(g), the ease in the determination and application of the law to be applied. Determination and application of Missouri or New York law, as opposed to Peruvian law, would of course be much less costly and burdensome for the Court. No foreign law experts would be

---

[21] Plaintiffs respectfully remind this Court that their repeated requests for Defendants to produce long-overdue discovery have been categorically ignored. As such, the only evidence available to Plaintiffs on these issues comes from Defendants' press releases and public statements. Of course, Defendants have made no public declarations or admissions describing their misconduct. This information can only be obtained through discovery. Plaintiffs respectfully request leave to re-brief these issues when Defendants produce responsive discovery.

required, no translations would be needed.[22] Thus, application of Restatement factors 6(b) and

(g) both weigh in favor of the application of Missouri or New York law.

### 3.    The Basic Policies Underlying the Field of Law.

The next factor—the basic policies underlying the field of law—also weighs in favor of

the application of Missouri or New York law. RESTATEMENT § 6(e). There are two main policies

that underlie the tort field: (1) "to deter or punish tortious conduct" and (2) "to compensate the

victim for his injuries." *Id.* at § 145, cmt. c. When the primary purpose of the law relates to the

deterrence of conduct, the state of such conduct has the dominant interest. *Id.*

Toxic torts, such as those alleged here, are committed on a mass scale. A single tortious

act or omission can cause immeasurable and permanent injuries, both to people and the

environment. Thus, the primary purpose of the law sounds in deterrence. *See Safety-Kleen, Inc.*

*v. Wyche*, 274 F.3d 846, 866 (4th Cir. 2001) (discussing primary purpose of environmental laws

in the context of CERCLA); *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 533 N.Y.S.2d

91, 103 (App. Div. 1988) (discussing "the importance of deterring deliberate polluters").

Deterrence also is implicated when a defendant's conduct exceeds the bounds of simple

negligence, which likely is the case here. RESTATEMENT § 145, cmt. d. As such, the primary

purpose of the laws here at issue sound in deterrence. Missouri and/or New York, as the state of

Defendants' conduct, has the greatest interest in seeing its laws applied.

### 4.    Other Factors to be Considered.

*Restatement Factors 6(a) and (d).* As set forth in Section II.C above, had this suit been

brought in Peru, the law of Missouri or New York would have applied. In such circumstances, it

cannot reasonably be argued that applying Missouri or New York law would negatively impact

---

[22] Admittedly, the policies underlying the ease in determining and applying the law are not sufficient to outweigh the interests of a state that otherwise would have a more significant interest. RESTATEMENT § 6, cmt. j. "The policy does, however, provide a goal for which to strive." *Id.*

the interstate and international system considerations of Restatement § 6(a). *See Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 899 (Iowa 1996) ("Respect for interstate and international systems is maintained when the forum state, when choosing to apply its own law, has a 'substantial connection' with the issue"). Nor can it be argued that the application of Missouri or New York law would negatively impact the justified expectation factor of § 6(d). To the contrary, because the application of Peruvian substantive law to this dispute would be in contravention of Peruvian law, Defendants could have no reasonable expectation that Peru's laws would apply. Moreover, Defendants should expect to be subject to the laws of Missouri or New York—their domiciles. *Id.* at 898–99 (establishing that the defendant "could reasonably have foreseen that Iowa law would apply" when it chose to make its principal place of business there). There is little basis for Defendants' conclusory statement that "[t]he justified expectation of the parties was that Peruvian law would govern." (Def.'s Mem. at 29.) Thus, both the protection of justified interests and the needs of the interstate and international systems are served by the application of Missouri or New York law. *See* RESTATEMENT § 6(a), (d).

    *Interests of the Domiciles of the Parties.* The domiciles of the parties do not play a determinative role in this choice of law analysis. RESTATEMENT § 145(c). Plaintiffs are residents of Peru, whereas Defendants are residents of Missouri and New York.[23] Accordingly, there is no centralized or common residence that would afford significant weight to this consideration. *Cf. Id.* at § 145, cmt. e ("the fact that the domicil and place of business of all parties are grouped in a single state is an important factor to be considered in determining the state of the applicable

---

[23] Doe Run Resources is incorporated in New York with its principal place of business in Missouri. DR Acquisition is incorporated and has its principal place of business in Missouri. Renco Group and Renco Holdings both are incorporated and have their principal places of business in New York. Ira Rennert is a New York resident. All other individual Defendants are Missouri residents.

law"). Thus, "the importance of these contacts depends largely upon the extent to which they are grouped with other contacts," such as the place of misconduct. *Id.*

     *Interests of the Place Where the Parties' Relationship Is Centered.* Similarly, there is no direct relationship between Plaintiffs and Defendants so as to implicate this factor in a choice of law examination. *Id.* at § 145(d). Defendants orchestrated their plans from Missouri and/or New York, and did not have a direct relationship with Plaintiffs in Peru. As such, this factor is not applicable. *See Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 11 (because the "relationship among the parties is not centered in any state …, I do not find the place where the parties' relationship was centered determinative").

     5.    Missouri or New York Law Applies on the Issue of Direct Liability.

     Based on the above analysis, it is clear that either Missouri or New York has the greatest interest in having its State's laws apply to the issue of Defendants' direct liability. Plaintiffs are aware that in *Johnson II*, this Court ruled that the law of the place of injury should govern with respect to the issue of liability. *Johnson II*, 2009 U.S. Dist. LEXIS 108600, at 16. However, the facts and circumstances of the instant matter differ greatly from those in *Johnson II*.

     First, when the Court was confronted with the choice of law question in *Johnson II*, the Missouri defendants had settled with the plaintiffs and were about to be dismissed from the case. *Id.* at 6. However, Defendants' motion is not dispositive in nature, and there has been no settlement with any of the Defendants. Accordingly, the Missouri Defendants here will remain in this matter for the foreseeable future, and facts attributable to them will need to be assessed in connection with choice of law questions.

     *Johnson II* did not involve circumstances in which the Defendants' tortious actions were potentially reckless, thereby increasing the interests of the state where the conduct occurred. Nor did it involve a toxic tort, in which the issue of conduct regulation furthers the interests of the

state of misconduct. Moreover, there was no allegation that the state of injury would not have applied its laws had the suit been brought there. Because the facts and procedural posture at issue differ greatly from those informing this Court's decision in *Johnson II*, the conclusions drawn in *Johnson II* cannot summarily be applied to this litigation. Instead, this Court should apply Missouri and/or New York law, rather than Peruvian law, to the legal issues governing liability.

### C.      Peruvian Law Governing Direct Liability.

In the event the Court determines that Peru's laws should apply to liability issues, Plaintiffs respectfully submit that Defendants' interpretation is a gross mischaracterization thereof. An accurate interpretation of Peruvian law is set forth herein.[24]

#### 1.      Available Causes of Action Under Peruvian Law.

There are at least three types of causes of action under Peruvian law applicable to claims of toxic exposure: extra-contractual liability, strict liability, and statutory environmental claims.

*Extra-Contractual Liability.* Article 1969 of the Peruvian Civil Code is the basis for extra-contractual (fault-based tort) liability. Espinoza Report at ¶ 5.15. It broadly states "[a]nyone who, through malice or negligence, causes damage to another person, is required to compensate that person." *Id.* (quoting Civil Code Art. 1969).

Article 1969 contains no heightened causation requirement. Rather, Peruvian law is clear that the concept of adequate cause applies to tort claims. Espinoza Report at ¶¶ 5.36–5.40. Adequate cause is less demanding than the proximate cause standard applicable to contract actions. *Ex. 19*, Trazegnies, Tomo I at 192; *see also id.* at 195–96 (explaining "normal" consequences of actions are sufficient for causation). Adequate cause is satisfied when the

---

[24] The laws of Peru, just like those of the U.S., are complex. It is difficult, if not impossible, to address every potentially applicable facet of the law without a dispositive motion to narrow the issues. Accordingly, Plaintiffs do not attempt to recite the entirety of Peru's laws here, but instead provide a basic outline of the applicable tort law. Plaintiffs will provide further evidence as to the nature of Peruvian law, if ever necessary, when the issues are narrowed, and the law is actually being applied.

"activity will increase the chances that the damage will also occur." Espinoza Report at ¶ 5.37. Defendants' conduct in the United States is sufficient to demonstrate causation. Espinoza Report at ¶¶ 5.37, 5.40; *see also* Trazegnies Report at ¶ 7.2.4 ("Peruvian law looks to whether the injury is the normal or probable effect of an act in order to determine if there is a causal relationship").

*Strict Liability.* Article 1970 is the basis for strict liability in Peru. It states "[a]nyone who … through the exercise of a risky or dangerous activity, causes a damage to another person, is required to redress said damage." Espinoza Report at ¶ 5.11 (quoting Civil Code Art. 1970).

Peru's strict liability statute applies to Plaintiffs' claims. Espinoza Report at ¶¶ 5.11–5.13; Fernandez Report at ¶¶ 78, 80, 86–88, 90–93. Even Defendants' own expert has argued strict liability should apply in this context:

> But we have seen that the possibility also exists for damages due to contamination even when no regulations have been infringed upon: despite adopting the precautions established by the corresponding regulations, the fumes from a chemical plant pollute the river and cause the destruction of neighboring farmers' crops. If this situation is governed by Article 1969, the corporate owner of the plant could demonstrate that it adopted all reasonable precautions and that, therefore, being without fault, it has no liability. However, we believe that said plant should have strict liability— even if it has not demonstrated negligence—because, in many cases, the damages from contamination are socially intolerable per se, due to the seriousness and extent of risk they create; in this way, these damages must also be included within the area of applicability of Article 1970.

*Ex. 20*, Trazegnies Tomo II at 254–55. Peru's strict liability laws have been widely applied, including to traffic accidents, hazardous waste, and insecticide application, such that its application here is wholly uncontroversial. Rosenn Report at ¶ 52 (traffic accidents and hazardous wastes); *Ex. 19*, Trazegnies, Tomo I at 109 (insecticides).

Bolstering this conclusion, Dr. Trazegnies has stated that the strict liability statute should be broadly interpreted, and that the phrase "risky and dangerous" reflects "the legislator's desire

for no doubt to remain regarding the fact that whatever may cause proximity to harm is subject to strict liability." *Ex. 19*, Trazegnies, Tomo I at 99. To the extent this issue is unsettled under Peruvian law, "judges [ ] determine whether or not a risky activity exists on a case-by-case basis," so this Court could easily find strict liability applies here. *Id.* at 102. In doing so, the Court should keep in mind that Peru has a lower standard for strict liability than the U.S. *Id.* at 100 (noting Peru does not require the activity to be abnormally dangerous; strict liability applies to activities that "are risky in any way").

Not only does Peruvian strict liability law apply to mining and pollution cases, Dr. Trazegnies has argued it should apply *generally* to business activities. *Id.* at 107–109. Indeed, that point is not in dispute. *See, e.g.,* Fernandez Report at ¶¶ 78, 90–93. Strict liability is particularly appropriate for businesses, like the one at issue here, involving large numbers of people and production machinery. *Ex. 19*, Trazegnies, Tomo I at 108. Strict liability therefore applies both because of this case's mining origins and because it involves business activities.

Against all of this authority, Defendants assert a different interpretation of Article 1970, claiming it is "unresolved but probably doubtful" mining and smelting activities give rise to strict liability. (Def.'s Mem. at 23.) Defendants' interpretation is inconsistent with Peruvian law.[25]

*Environmental Statute.* Peru's environmental statute provides a cause of action based on environmental harm, such as from toxins. Espinoza Report at ¶¶ 5.14, 5.43 (quoting Articles 142 and 143 of the General Law on the Environment). Indeed, Defendants previously acknowledged Peru's General Law on the Environment provides a cause of action for anyone damaged by toxic emissions. (*See* Def.'s MIS Mot. to Dismiss, Doc. 50-18 at 13 (11/24/08), relying on declaration by Professor Alfredo Bullard.)

---

[25] Even if the Court did find the application of strict liability in these circumstances to be unsettled under Peruvian law, it should then apply the law of the forum. *See Minebea Co.*, 444 F. Supp. 2d at 185–86; 9-44.1 *Moore's Fed. Prac. – Civil* § 44.1.04.

*Defendants' Arguments.* As demonstrated above, Plaintiffs could assert various causes of action under Peruvian law. Defendants argue, however, that companies affiliated with a Peruvian mining company can never be held liable under Peruvian law. Not only does Defendants' position lack support, it is directly contrary to statements Defendants made when seeking dismissal on *forum non conveniens* grounds. At that time, Defendants unambiguously asserted "Plaintiffs' claims for damages can be brought in, and will be recognized by, a Peruvian court, subject to whatever defenses might be available to Defendants under Peruvian law." (*Id.* at 27.)

Although asserting Plaintiffs could state claims under Peruvian law against Doe Run Peru's affiliates when it served their purposes, Defendants now take the opposite position. They were right the first time. Plaintiffs have actionable claims under Peruvian law. *See Carijano v. Occidental Petro. Corp.*, 643 F.3d 1216, 1225 (9th Cir. 2011) (in action by Peruvians against U.S. defendant for environmental contamination, the court relied on expert's conclusion that "'Peruvian law has analogies for all the substantive legal theories on which the lawsuit filed in the Los Angeles jurisdiction is based,' while also offering analogous remedies").[26]

## 2.   Direct Liability of Defendants.

Plaintiffs have stated claims for direct liability under Peruvian law. *See, e.g.*, Espinoza Report at ¶¶ 5.11–5.21. Defendants could be held liable as joint tortfeasors or for inciting or assisting in the harm. *Id.* at ¶¶ 5.17–5.21. Indeed, consistent with Plaintiffs' experts' opinions, the only U.S. court to squarely confront this issue held that plaintiffs may state claims under Peruvian law against the affiliates of a company operating in Peru for damage caused by mining-related activities. *Torres v. S. Peru Copper Corp.*, 965 F. Supp. 899, 904 (S.D. Tex. 1996). In finding Peruvian law provided an actionable claim in such cases, the court relied on an affidavit from the former Comptroller General of Peru, Luz Aurea Saenz Arana, who stated:

---

[26] In *Carijano*, the plaintiffs' claims included allegations of negligence and strict liability. 643 F.3d at 1223.

> [T]he SPCC shareholders and lenders, as well as its senior
> management representatives, are fully and absolutely liable for
> damages caused to inhabitants of the Ilo and to the natural
> resources, and are subject, under the law, to being sued for joint
> liability for compensation for the damages caused, as there is no
> exemption for their being liable.

*Id.*; *see also Ex. 18*, Saenz Decl. at ¶ 7.

Although Plaintiffs clearly allege Defendants are liable for their own acts (direct liability)

and the acts of their alter ego, agent, and co-conspirator Doe Run Peru (secondary liability),

Defendants try to combine the separate liability theories by characterizing the direct liability

claims as a "form of derivative liability." (Def.'s Mem. at 40; *see also id.* at 31.) Characterizing

direct liability claims as "derivative" just because a subsidiary also is involved is wrong under

U.S. and Peruvian law. *See United States v. Bestfoods*, 524 U.S. 51, 64–73 (1998) (U.S. federal

law); *Torres*, 965 F. Supp. at 904 (Peruvian law); *see also* Espinoza Report at ¶ 5.17 (explaining

corporations may be joint tortfeasors "if the participation of both legal entities (through their

representatives) has been decisive in the production of the environmental damage").

*Bestfoods* sets out important principles of parent company direct liability, which are

misunderstood by Defendants and their expert, Professor Rosenn. There, the Supreme Court held

a parent corporation may be directly liable "for its own actions in operating a facility owned by

its subsidiary." 524 U.S. at 64. The opinion repeatedly stresses this type of liability is *direct*, not

secondary. *Id.* at 64–65, 67–68, 70. Indeed, where the "act of operating a corporate subsidiary's

facility is done on behalf of a parent corporation, the existence of the parent-subsidiary

relationship under state corporate law is simply irrelevant to the issue of direct liability." *Id.* at

65. Interpreting CERCLA, the Court explained the term "operation" includes "the exercise of

direction over the facility's activities", which goes beyond the "mere mechanical activation of

pumps and valves." *Id.* at 71.[27] The Court found evidence of the parent company's direction over the facility in the form of an employee who "played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant." *Id.* at 72. Nonetheless, the Court remanded the case so that the district court could consider evidence of the parent company's operation of the facility, including "any additional evidence … that would tend to establish that [the subsidiary's] decisionmakers acted on specific orders from [the parent]." *Id.* at 73, n.14. *Bestfoods* illustrates the way in which Plaintiffs seek to hold Defendants directly liable. Peruvian law, like that in the U.S., recognizes such liability. *Torres*, 965 F. Supp. at 904; Espinoza Report at ¶ 5.17.

The existence of joint tortfeasor liability in Peru is not in dispute. Espinoza Report at ¶ 5.17. As Dr. Trazegnies has recognized, when one party causes harm through the direct acts of another, both parties are jointly liable. *Ex. 19*, Trazegnies, Tomo I at 192. Further, Dr. Trazegnies found this type of liability to be particularly apt for pollution-based cases. *Ex. 20*, Trazegnies, Tomo II at 259. Thus, whether Defendants directly harmed Plaintiffs or caused Doe Run Peru to harm them, Defendants can be liable as joint tortfeasors.

Although Defendants recognize joint tortfeasor liability exists under Peruvian law, they again conflate direct and secondary liability by claiming joint tortfeasor liability cannot be used

---

[27] The definition of operation from *Bestfoods* has been applied in other contexts. *See Clean Harbors, Inc. v. CBS Corp.*, 875 F. Supp. 2d 1311, 1327 (D. Kan. 2012) (RCRA case where parties agreed *Bestfoods* "governs whether CBS, as a parent company, can be held directly liable as an operator of a facility owned by a subsidiary").

Parent company direct liability, of course, is not limited to actions under federal environmental statutes. *See, e.g.*, *August v. Boyd Gaming Corp.*, 135 Fed. Appx. 731, 733 (5th Cir. 2005) (holding evidence that parent company "assumed a duty to operate and manage the casino" owned by subsidiary "support[ed] a theory of direct liability" in wrongful death action against the parent); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001) ("in the labor context, 'direct' liability may attach if the parent has overridden the subsidiary's ordinary decision-making process and ordered it to institute an unfair labor practice"); *Vorhes v. Mittal Steel USA, Inc.*, No. 06-1130, 2008 U.S. Dist. LEXIS 22968, at 18 (W.D. Pa. Mar. 24, 2008) (acknowledging theory of direct liability for parent company and denying motion for summary judgment in case involving accident at abandoned mine where there was evidence of parent companies' control of mine); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1309 (S.D. Fla. 2003) (finding plaintiffs sufficiently alleged direct liability of parent companies in case involving untimely payments of insurance claims); *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 237 (Ill. 2007) (collecting cases, and stating "[i]f a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries.").

41

to pierce the corporate veil. (Def.'s Mem. at 41; Rosenn Report at ¶ 64.) On their direct liability

joint tortfeasor claims, Plaintiffs are suing Defendants for their own tortious actions. No veil

piercing is required to prevail on such claims. Defendants and their experts plainly are mixing

liability theories; only Plaintiffs' *secondary* liability theories (alter ego, agency, and conspiracy)

seek to hold Defendants' liable, in part, for Doe Run Peru's conduct.

Incitement or assistance is another theory of direct liability recognized by Peruvian law.

Espinoza Report at ¶¶ 5.18–5.21. Notably, the defendant liable for incitement need not have the

purpose of causing harm; the defendant is liable if it "promotes conduct that would almost

inevitably result" in harm. *Ex. 19*, Trazegnies, Tomo I at 368.

In summary, Peruvian law recognizes multiple direct liability theories available to

Plaintiffs.[28] Defendants' position on tort liability for parent companies, by contrast, would lead to

absurd results. In essence, any corporation seeking to avoid liability in Peru for their own

conduct would need only to form a subsidiary. Once done, no matter how egregious the parent's

own conduct, the parent would be immune as long as there was a local subsidiary in the picture.

Defendants cite no Peruvian authority demonstrating such a perverse rule exists.

**IV.    Missouri and New York Law Govern Issues of Secondary Liability.**

**A.    Choice of Law Analysis on Vicarious Liability and Principal-Agent Liability.**

With regard to the choice of law examination on the issue of vicarious liability,

Restatement § 174 provides guidance. *See Cates v. Creamer*, 431 F.3d 456, 463 (5th Cir. 2005)

(engaging in a detailed analysis under § 174 to determine which state's law applied to issue of

vicarious liability). This section also applies to determinations of principal-agent liability.

RESTATEMENT § 174, cmt. f.

---

[28] In addition, according to Dr. Trazegnies' published works, strict liability as applied to corporations is a form
of direct liability. *Ex. 19*, Trazegnies, Tomo I at 109.

The first step in a § 174 analysis is to determine whether the relationship between the defendant and the other entity makes the imposition of vicarious liability reasonable. *Id.* at cmt. a; *Cates*, 431 F.3d at 464. Here, there is an adequate relationship to support the imposition of vicarious liability. As Defendants admit, Doe Run Peru is a "nearly wholly-owned subsidiary" of Renco, and previously was a nearly wholly owned subsidiary of Doe Run Resources. (Def.'s Mem. at 13.)  Plaintiffs allege Defendants abused these relationships, allowing Renco and Doe Run Resources to completely dominate and control Doe Run Peru from Missouri and/or New York. Thus, the imposition of vicarious liability certainly is reasonable. *See, e.g., Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 385 (Mo. Ct. App. 1999) (parent corporation can be liable for acts of its subsidiary where subsidiary is subject to parent's control).

Next, § 174 directs a court to determine whether there is a reasonable relationship between the defendants and the state whose local law is to be applied. *See* RESTATEMENT § 174, cmt. a. Defendants are incorporated in and have their principle places of business in Missouri and New York. Thus, there is a significant relationship between Defendants and both states.

After completing the reasonableness determination, the Restatement directs the court to engage in a § 145 analysis, focusing on the particular issue of vicarious liability. *See Cates*, 431 F.3d at 464. In conducting this analysis, the local law of the state with the most significant relationship to the occurrence and the parties on the issue of vicarious liability should be applied. *See* RESTATEMENT § 174, cmt. a; *Cates*, 431 F.3d at 462; *Erickson v. U-Haul Int'l*, 767 N.W.2d 765, 773 (Neb. 2009). Further, vicarious liability may properly be imposed under the local law of a state other than that of the injury. RESTATEMENT § 174, cmt. c.

When examining the § 145 considerations, the place where the relationship between the entity sought to be held liable and the direct tortfeasor is centered is the most important factor in

43

determining which state has the most significant relationship. *See Cates*, 431 F.3d at 465 (finding interests of state in which relationship of tortfeasor and defendant was centered outweighed interests of state of injury); *Erickson*, 767 N.W.2d at 773 (finding, despite injury occurring in Iowa, Nebraska law governed issue of vicarious liability as it had "a significantly greater relationship" to the parties).

For the reasons set forth *supra* in Section III.B.1, the application of § 145 to the facts at bar yields the inextricable conclusion that Missouri and/or New York have the most significant relationship to the parties and occurrences herein. First, Defendants exercised complete control over the operations and misconduct at Doe Run Peru, including the generation, storage, handling, disposal, and release of the toxic and harmful substances that led to the Plaintiffs' injuries. This control emanated from Missouri and/or New York in the form of decisions, orders, policies, and requirements communicated to Defendants' agents in La Oroya Peru. (*See* Complaint ¶ 27.)

Second, the relationship between Defendants and Doe Run Peru is centered in Missouri and/or New York, not Peru. Plaintiffs believe discovery will show that Doe Run Peru was conceived of and created in Missouri and/or New York. As set forth above, the President of Doe Run Peru lived and worked in St. Louis, Doe Run Peru's marketing, sales, and community relations departments were managed in Missouri, and its environmental policies were set in Missouri. Discovery likely will show that these were not isolated incidents.

Defendants exercised complete control and domination of the finances, policies, and business practices of Doe Run Peru from the states of Missouri and/or New York. As a result of this complete domination, Defendants controlled essentially all of Doe Run Peru's actions and conduct from Missouri and/or New York. Since the majority of Defendants' interactions and

contacts with Doe Run Peru occurred in Missouri and/or New York, it is clear that the relationship between them was centered there.[29]

Next, the Court is to consider these contacts in relation to the § 6 principles. *See Cates*, 431 F.3d at 465. Peru has little interest in whether U.S. Defendants are held liable for Doe Run Peru's misconduct. And to the extent Peru does have an interest, it would be best served by ensuring that the foreigners who bankrupted Doe Run Peru, leaving it unable to pay its debts or compensate Peruvian Plaintiffs for their injuries, are held accountable. Based on Defendants' interpretation of Peruvian law (which Plaintiffs contest), this would favor the application of Missouri and/or New York law. *See* RESTATEMENT § 6, cmt. f ("application of a state's statute or common law rule which would absolve the defendant from liability could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff"); *Cates*, 431 F.3d at 465 (discounting the interest of the place of injury, when it offered less protection to the plaintiff than other relevant contacts). This, in addition to Peru's statutory statement of non-interest discussed in Section II.C above, shows that Peru does not have a significant interest in having its laws applied here.

In contrast, Missouri and New York clearly have a strong interest in determining whether their local corporations should be held liable for controlling, directing, and dominating the activities of a foreign corporation that engaged in reprehensible conduct, causing severe and permanent injury. As discussed *supra* in Section III.B.1, states have a strong interest in regulating wrongful activity that occurs within their borders. Since Doe Run Resources and Renco Group are incorporated in and have their principal places of business in Missouri and

---

[29] Plaintiffs have alleged, and believe discovery will show, that Defendants completely dominated and controlled the actions taken by Doe Run Peru. However, without discovery, Plaintiffs cannot definitely state where that control emanated from, nor can they state which forum—New York or Missouri—has the most significant relationship to the occurrences and the parties with respect to the issue of vicarious liability. *See* RESTATEMENT § 174, cmt. b.

New York, and the majority of the misconduct occurred in Missouri and/or New York, those states have the greater interest in seeing their laws applied.

Finally, the Restatement recognizes that vicarious liability should be imposed if it would be fair to do so. *See* RESTATEMENT § 174, cmt. b. Given the extent of Defendants' control over Doe Run Peru and the nature of the harm caused, the imposition of vicarious liability certainly is not unfair. Missouri[30] and/or New York[31] law should apply to the issue of vicarious liability.

### B.      Choice of Law Analysis on Veil Piercing and Alter Ego Theories.

Defendants assert that, according to the internal affairs doctrine, the law of Doe Run Peru's state of incorporation governs Plaintiffs' veil piercing claim. (Def.'s Mem. at 42.) While Missouri courts have applied the internal affairs doctrine to disputes involving the administration or governance of a corporation, it has no bearing on alter ego and veil piercing determinations.

The internal affairs doctrine "recognizes that only one State should have the authority to regulate a corporation's internal affairs -- matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders -- because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982). "In contrast, alter ego liability and the related doctrine of piercing the corporate veil involve the abuse of the corporate form to the detriment of third parties and do not implicate the corporation's internal affairs." *See UBS Sec. LLC v. Highland Cap. Mgmt.*, 924 N.Y.S.2d 312, at 3 (Sup. Ct. 2011) (Table) (applying significant relationship analysis to alter ego and veil piercing

---

[30] Under Missouri law, for vicarious liability to apply, the party sought to be held liable must have control or the right to control the conduct of another in the performance of an act. *J.M. v. Shell Oil Co.*, 922 S.W.2d 759, 764 (Mo. 1996); *Balderas v. Howe*, 891 S.W.2d 871, 873–74 (Mo. Ct. App. 1995). The same analysis applies to determine whether a parent corporation is vicariously liable for the actions of its subsidiary. *See Ritter*, 987 S.W.2d at 385.

[31] Under New York law, the most crucial factor in determining vicarious liability is control over the results produced or the means used to achieve the results. *Devlin v. City of N.Y.*, 678 N.Y.S.2d 102, 103 (App. Div. 1998). In addition, a parent will be held vicariously liable for the actions of a subsidiary if the parent corporation exercises complete dominion and control over the subsidiary's daily operations. *Feszczyszyn v. GM Corp.*, 669 N.Y.S.2d 1010, 1012 (App. Div. 1998).

claims) (internal citations omitted). Plaintiffs' claims do not involve the internal affairs of the corporate Defendants or Doe Run Peru, but instead seek to hold Defendants liable for the tortious actions of their alter ego—Doe Run Peru. Thus, the internal affairs doctrine is inapplicable.

Instead, Missouri applies the Restatement's most significant relationship test to determine which law should govern. *See Yates v. Bridge Trading Co.*, 844 S.W.2d 56, 62 (Mo. Ct. App. 1992) (applying Missouri law to a Delaware corporation where court determined the internal affairs doctrine did not apply). The state with the most significant contacts, not the subsidiary's state of incorporation, has the greatest interest in having its law applied to these issues. *Id. See also*, *Matter of Dohring*, 537 N.Y.S.2d 767, 769 (Sup. Ct. 1989).

Applying these principles, it is clear that Missouri or New York law should control Plaintiffs' veil piercing claims. While it is true that Doe Run Peru is incorporated in Peru and Plaintiffs' injuries occurred in Peru, there are numerous contacts that favor application of Missouri and New York law. As discussed *supra* in Sections III.B.1 and IV.A, Defendants' control emanated from Missouri and/or New York and the relevant misconduct giving rise to Plaintiffs' injuries occurred in Missouri and/or New York. Defendants are incorporated and have their principal places of business in Missouri and New York. Further, acting from Missouri and/or New York, Defendants sent Doe Run Peru into bankruptcy, leaving it undercapitalized and unable to maintain its operations or pay its debts, thus ensuring that Plaintiffs could never seek redress from Doe Run Peru.[32] Thus, Missouri and/or New York have the greatest interest in applying their law to the alter ego and veil piercing issues.

---

[32] Ultimately, Plaintiffs contend discovery will reveal even more evidence that Doe Run Peru is merely the alter ego of one or more of the Defendants, and will confirm that the majority of the relevant contacts were either in Missouri or New York—not Peru. *See Bonnell v. Cabo Azul Resort*, No. 08-910, 2010 U.S. Dist. LEXIS 89155, at 10 (D. Nev. Aug. 27, 2010) (finding that additional discovery as to the relationship between the parties was necessary, and it was "premature to fully determine the choice-of-law questions posed").

### C.    Peruvian Law Related to Issues of Secondary Liability.

#### 1.    Principal-Agency Liability.

Under Peruvian law, one company can be held liable for another company's actions where there is a principal-agent relationship. Fernandez Report at ¶¶ 23–36, 104–135; Espinoza Report at ¶¶ 5.15–5.17, 5.33–5.35. In Peru, agency liability extends well beyond the labor context. Fernandez Report at ¶ 30. Article 1981 allows parent companies to be held liable for the torts of other corporations acting as their agents. *Id.* at ¶ 26 (quoting Civil Code Art. 1981); *id.* at ¶¶ 23–36, 104–135 (discussing agency liability at length). What matters in proving agency liability is not the formal relationship between the principal and agent, but rather whether the agent acts on behalf of the principal. *Id. at ¶* 30 (while direct orders or complete domination by the principal may show the control needed for agency liability, it also can be demonstrated simply by tacit authorization); *see also id.* at ¶¶ 114–124 (discussing requisite control for agency liability, particularly in the parent-subsidiary context).

#### 2.    Piercing the Corporate Veil.

Piercing the corporate veil is recognized under Peruvian law as a means to hold parent corporations liable for the acts of their subsidiaries. Espinoza Report at ¶¶ 5.22–5.32. *See also* Dante Figueroa, *Comparative Aspects of Piercing the Corporate Veil in the United States and Latin America*, 50 DUQ. L. REV. 683, 775–76 (2012) ("In Peru, the veil has been judicially pierced with frequency in cases involving economic groups, principally in labor matters, even if judicial decisions do not explicitly mention the veil piercing doctrine."); *cf.* Allan Ingelson, *Mine Operator Liability for the Spill of an Independent Contractor in Peru*, 24 J. ENERGY NAT. RESOURCES L. 53, 54–55, 61 (2006) (discussing administrative action where Peruvian ministry rejected multinational enterprise's arguments that it was not responsible for mercury spill because it had hired another company to transport the mercury).

48

Dr. Espinoza's opinion on veil piercing is based on ample Peruvian legal authority.[33] For example, he relies on a Peruvian Supreme Court case, Espinoza Report at ¶ 5.23, labor and tax cases, *id.* at ¶¶ 5.25–5.26, statutory foundations for the doctrine, *id.* at ¶¶ 5.28, 5.32, and scholarly writings, *id.* at ¶ 5.29 (citing Defendants' expert, Alfredo Bullard, among others). Piercing the corporate veil, therefore, is an alternative to agency liability for holding a corporate parent liable for the acts of its subsidiary. Fernandez Report at ¶ 135.

Defendants' experts grudgingly recognize that alter ego liability exists in Peru under some circumstances. For example, Dr. Trazegnies states "Peruvian judges and arbitrators are quite conscious that the theory of piercing the corporate veil might well be necessary in some extreme case." Trazegnies Report at ¶ 10.5; *see also id.* at ¶ 10.1 ("from time to time certain case law has adopted some principles of that doctrine"). Similarly, Professor Rosenn merely concludes "[p]iercing the corporate veil or other approaches to entity disregard have gained little acceptance in Peruvian law." Rosenn Report at p.32, conclusion (f); *see also id.* at *¶* 40.

Dr. Trazegnies' current lack of enthusiasm for veil piercing cannot be reconciled with his prior published opinions on this issue. In a 2005 article titled *Piercing the Corporate Veil in Determining Jurisdiction in Arbitration* ("*El rasgado del velo societario dentro del arbitraje*"), Dr. Trazegnies asserted veil piercing had been adopted by Peruvian judges and arbitrators. *Ex. 21* Trazegnies Article. He further stated veil piercing was "strictly supported in the law," and concluded that "judges may ignore the existence of a legal personality in order to go beyond legal entities, until finding the real decision-making centers for economic interests, and, as a result, discover those who are ultimately responsible for the consequences of the operation." *Id.* Contrary to the opinion he now provides at Defendants' behest, Dr. Trazegnies went so far as to

---

[33] Dr. Espinoza is a recognized jurist in the area of piercing the corporate veil. Peru's Supreme Court has cited his works on the this issue with favor. *See* Espinoza Report at ¶ 5.23 (quoting *Cassation Appeal No. 4624-2010* (Peru Dec. 19, 2011)).

state that "[n]owadays, there is practically no academic objection whatsoever to accepting the legal merits of the theory of piercing the corporate veil". *Id.*

While any showing is premature at this stage, publicly available information provides ample support for piercing the corporate veil to hold Defendants liable for Doe Run Peru's conduct. For example, Defendants have been sued in civil and criminal actions in Peru concerning the undercapitalization of Doe Run Peru. *Consorcio Minero S.A. v. Doe Run Res. Corp.*, No. 11-583, 2011 U.S. Dist. LEXIS 112414, at 3 (E.D. Mo. Sept. 30, 2011)  ("Cormin asserts against the Doe Run entities claims of criminal fraud upon the Peruvian Government; fraudulent insolvency; [and] fraudulent management of Doe Run Peru"); *see also Consorcio Minero, S.A. v. Renco Group, Inc.*, No. 11-354, 2012 U.S. Dist. LEXIS 44317 (S.D.N.Y. March 29, 2012). Filings in related U.S. litigation describe Defendants' "corporate and financial machinations," which ultimately left Doe Run Peru "undercapitalized and saddled with its own acquisition debt." *Ex. 15*, MIS Mot. to Compel at 2–3, *Consorcio Minero, S.A. v. Doe Run Res. Corp.*, No. 11-583, Doc. 24 (E.D. Mo.). Notably, Defendants' defense to the Peruvian actions rests on the demonstrably false assertion that Doe Run Peru's financial difficulties only began in 2009. *Compare Ex. 23*, Affidavit of Doe Run Peru President Juan Carlos Huyhua at ¶ 11 (stating it "was not until 2009 … that [Doe Run Peru] experienced financial difficulties") *with Doe Run Peru S.R.L. v. Handy & Harman Ref. Group, Inc.*, 295 B.R. 179, 182 (D. Conn. Bankr. 2003) (2003 case in which "Doe Run submitted an affidavit of its vice president, averring that Doe Run is in financial difficulties with significant liquidity problems").

While Plaintiffs expect that discovery will fully support their veil piercing theory, for purposes of this brief it only matters that this theory is recognized under Peruvian law.

V.      **Missouri and/or New York Law Govern Questions of Immunity from Suit.**

Defendants' argument as to immunity under Article 1971 of Peru's Civil Code requires a separate choice of law analysis, as it involves separate policy issues from those discussed above.

A.      **Choice of Law Analysis.**

Defendants argue that immunity was bestowed upon them through the execution of the "Programa de Adecuación y Manejo Ambiental" ("PAMA") and the attendant "right" to operate the La Oroya facility. However, it "is thoroughly established as a broad general rule that foreign law or rights based on such law will not be given effect or enforced if opposed to the settled public policy of the forum." 15A C.J.S. *Conflict of Laws* § 16 (2014). A grant of blanket immunity to poison and injure children clearly violates the public policies of both Missouri and New York. *See, e.g., Cont'l Cas. Co. v. Rapid-Am. Corp.*, 581 N.Y.S.2d 669, 673 (App. Div. 1992) (discussing New York's policy interest in "assur[ing] that corporate polluters bear the full burden of their own actions spoiling the environment"); *Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 176 (Mo. Ct. App. 1988) (discussing Missouri's policy interest in ensuring "that the costs of the pervasive injury which result from mass exposure to toxic chemicals shall be borne by those who can control the danger … rather than those who are powerless to protect themselves").

The fact that the vast majority—if not all—of the misconduct at issue occurred outside of Peru, and in one or more of Defendants' domiciles likely provides a basis for finding that any cognizable immunity provision does not extend to actions taken by them. *See* RESTATEMENT § 146, cmt. e (when defendants' conduct occurs in a state other than the state extending immunity, that conduct "might be thought not to come within the purpose of the rule of the state of injury").

Conversely, Missouri has a strong interest in regulating Defendants' activity within its borders. This interest is bolstered by the fact that Defendants have engaged in similar wrongful conduct in the State of Missouri, resulting in litigation against Doe Run Resources in this very

city. *See* Leah Thorsen, *Lawsuits over Doe Run lead smelter could continue for years*, ST. LOUIS POST DISPATCH (June 4, 2012).[34] The facts and circumstances giving rise to those actions were eerily similar. The plaintiffs were families with children who lived near the Doe Run facilities in Herculaneum, Missouri and were exposed to excessive lead levels. *Id.* One such case resulted in a $358 million jury verdict against the Doe Run Defendants, while another resulted in a $55 million settlement. *Id.*

In contrast to the cases relied on by Defendants, it is clear that Missouri's interest goes far beyond the general interest each state has in regulating activity within its borders. Rather, Missouri has an interest in preventing a domestic corporation from operating a hazardous facility on foreign soil for the purpose of avoiding stringent environmental regulations. *See In re Air Crash Disaster Near Chicago*, 644 F.2d 594, 613 (7th Cir. 1981) (finding, where company headquarters was in Missouri and injury occurred in Illinois, "Missouri has an obvious interest in deterring wrongful conduct . . . even if the actual [misconduct] was performed in California. To find otherwise would be to gut the very concept of corporate accountability.").

Lead is a very noxious poison. When ingested, lead can remain in the body permanently and interfere with a variety of body processes and systems. (*See* Complaint at ¶ 22.) Lead interferes with the development of the nervous systems, and thus is particularly toxic to children due to a heightened risk of developing behavioral disorders, pain, anemia, seizures, coma and death. (*Id.*) Missouri surely has a substantial interest in preventing its domestic corporations from repeatedly poisoning children with lead. *See In re Air Crash*, 644 F.2d at 613.[35]

---

[34] *Available at* http://www.stltoday.com/news/local/metro/lawsuits-over-doe-run-lead-smelter-could-continue-for-years/article_415c0f78-03ee-5ed1-b533-75c1921ea038.html.

[35] As set forth above, Plaintiffs are precluded from further expounding upon the heightened interests of Missouri and New York due to Defendants' failure to abide by their discovery obligations.

## B.      Article 1971

Since the choice of law rules indisputably preclude Article 1971 from applying here, no extended discussion of the provision is necessary. Nonetheless, Peruvian law also precludes its application, because Article 142 of the General Law of the Environment makes Article 1971 of the Civil Code inapplicable to toxic exposure actions. Espinoza Report at ¶ 5.14.

Defendants' own expert, Dr. Trazegnies, agreed with Plaintiffs' interpretation of Article 1971 in his previously published works, explaining that "any use of a right that does not respect the public interest" falls outside of Article 1971's protections. *Ex. 19*, Trazegnies, Tomo I at 122. Peru's paramount interest in its citizens' health is enshrined in its Constitution, which states "[e]veryone has the right to protection of his health". Peru Const. Art. 7; *see also*, *id.* at Art. 2, § 22.[36] Defendants' harm to that public interest means Article 1971 does not apply.[37]

Article 1971 has other limitations as well. While Professor Rosenn cynically equates poisoning poor children with business complaints about Walmart's low prices (Rosenn Report at ¶ 53), permission to engage in a certain type of activity does not amount to blanket immunity for any resulting harms. Dr. Trazegnies explained this premise with an apt analogy: while a license gives someone the right to drive, it does not give that person the right to harm others while driving. *Ex. 19*, Trazegnies, Tomo I at 123. Along the same lines, Doe Run Peru's permission to produce lead does not give it the right to harm others by way of toxic exposures.

An extended discussion by Dr. Trazegnies further demonstrates the inapplicability of Article 1971 to toxic tort cases. For example, he argues pollution often is an "intolerable" harm even when unintentional. *Ex. 20*, Trazegnies, Tomo II at 238. Accordingly, pollution can give

---

[36] *Available at* http://www.congreso.gob.pe/_ingles/CONSTITUTION_27_11_2012.pdf.

[37] An expert retained by Plaintiffs in 2008 came to a different conclusion, stating PAMA would provide Doe Run Peru with immunity. *Ex. 24* Excerpt of Expert Report of Carlos J. Chipoco. However, the expert engaged in only a generalized analysis of Article 1971, failing to consider it in the context of toxic exposure cases. As stated by Drs. Espinoza and Trazegnies, Article 1971 immunity is not applicable in such instances.

rise to tort liability even when not strictly illegal or in violation of any regulation. *Id.* at 241, 254–55. Presciently, Dr. Trazegnies even uses a "lead smelting plant without the proper facilities that directly releases its emissions into the atmosphere" as an example of an intolerable harm. *Id.* at 248. Dr. Trazegnies' analysis leaves little doubt that pollution cases generally, and cases involving lead emissions specifically, are not protected by Article 1971.

Even if Article 1971 was potentially applicable, despite the strong legal arguments espoused by Defendants' own expert to the contrary, its impact would turn on facts not yet available to Plaintiffs. Defendants acknowledge the statute's protections are not absolute; Professor Rosenn observed it applies if Doe Run Peru complied with environmental obligations. Rosenn Report at ¶ 57. Conducting an Article 1971 inquiry is unnecessary now. Plaintiffs raise this point merely to show Defendants would face factual hurdles even if they somehow could surmount the legal impediments to the statute's application.[38]

## VI.  Damages

### A.    There is No Substantial Conflict Between the Laws of Peru and Missouri.

 Peruvian law does not differ substantially from Missouri and New York on the issue of damages, and therefore there is no conflict. (*See* Def.'s Mem. at 41, "Peruvian law compensates claimants for personal injury under headings roughly the same as common law nations.") Federal courts that have addressed this issue found damages under Peruvian law to be equivalent to damages under U.S. law. *See Lizarbe v. Hurtado*, No. 07-21783, 2008 U.S. Dist. LEXIS 109517, at 8 & n.4 (S.D. Fla. March 4, 2008) (awarding punitive damages under federal common law and noting the "awards of damages would remain the same even if Peruvian law applied"); *Carijano*,

---

[38] While Defendants seek to invoke Article 1971 based on Doe Run Peru's purported right to pollute, it certainly cannot be invoked for Defendants' conduct forming the basis for their direct liability, as Defendants' U.S.-based conduct was never authorized by the Government of Peru. Defendants' expert's conclusions on this issue simply have no relevance to Plaintiffs' direct liability claims. *Cf.* Rosenn Report ¶ 57 (claiming *Doe Run Peru's* compliance "would mean that *Doe Run Perú* would have no liability") (emphasis added).

643 F.3d at 1225 (finding district court appropriately "disregarded" expert declaration claiming "damages fulfill a purely compensatory—not punitive—function in Peru"); *cf. Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158, n.4 (E.D. Cal. 2004) (holding moral damages under Salvadoran law "are tantamount to punitive damages under U.S. law"). Because there is no conflict, there should be no conflict analysis. Instead, the rule of the forum applies. *Phillips*, 80 F.3d at 276.

### B.      Choice of Law Analysis as to Compensatory Damages

Even if there was a conflict, the laws of Missouri and/or New York should apply. Restatement § 171, which governs choice of law issues with respect to damages, refers the Court to the analysis set forth in § 145. The comments caution that "[t]he state of conduct and injury will not, by reason of these contacts alone, be the state that is primarily concerned with the measure of damages in a tort action." RESTATEMENT § 171, cmt. b.

With respect to compensatory damages, Defendants rely almost entirely on *Johnson II*, in which this Court found that "the state of the injured plaintiff's residence has the greatest interest in applying its law to ensure the plaintiff is compensated for his injuries." 2009 U.S. Dist. LEXIS 108600, at 16. However, Defendants' reliance is misplaced. The finding in *Johnson II* was largely based on *Goede v. Aerojet General Corp.*, 143 S.W.3d 14 (Mo. Ct. App. 2004) and *Natalini v. Little*, 185 S.W.3d 239 (Mo. Ct. App. 2006). When the analysis from those cases is applied here, it is clear that Missouri and New York—not Peru—have the most significant interest in the determination of compensatory damages.

Contrary to Defendants' assertion, *Goede* does not stand for the proposition that the state of the injured plaintiff's residence, by default, has the greatest interest in applying its law to ensure the plaintiff is compensated for her injuries. Rather, the *Goede* court expressly affirmed the principle of *depecage*, and found different laws could apply to liability and damage issues. 143 S.W.3d at 25. On the issue of damages, the Court held that "Missouri's policy favors the

recovery of certain damages" for its citizens, namely unlimited damage for pain and suffering, whereas California limited those damages. *Id.* at 27. As Missouri's policy interest was served by allowing its citizens to receive unlimited damages, the interest of the state of conduct (California) did not outweigh that of the state of injury and death (Missouri). *Id.*

In *Natalini*, the Missouri Court of Appeals found that the victim's home state, Kansas, had a policy interest in providing compensation to the victim. 185 S.W.3d at 252. However, the court did not find in favor of Kansas law simply because it was the state of the victim's residence. Instead, it focused heavily on the fact that the defendant's wrongful conduct also occurred in Kansas. *Id.* Specifically, the court noted that, "if the majority of Defendant's wrongful conduct occurred in Missouri," this fact would support Missouri's "policy interest of providing compensation to a victim from a party whose conduct has injured them … and the application of Missouri law." *Id.* Here, the majority of Defendants' misconduct took place in Missouri and/or New York, not Peru. As held in *Natalini*, this supports the application of Missouri or New York law on the issue of compensatory damages.

A plaintiff's state of domicile has an interest in protecting its citizens, and deterring others from injuring its citizens. However, according to Defendants' arguments, Peruvian law would provide less protection than that of Missouri. *See* RESTATEMENT § 6, cmt. f. (where forum's rule protects defendant at the expense of plaintiff, the application of such law "could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff"). Further, as set forth in Section II.C above, Peru has stated by statute that its laws should not apply to this cause of action. In such circumstances, Peru has no substantial interest. Contrarily, Missouri and New York both have a policy interest in deterring bad conduct, and providing compensation to those injured by their citizens. *See In re Air Crash Disaster Near Chicago*, 644

F.2d at 613. Missouri and/or New York are the only states with an interest in having their laws applied, and these are the laws that should control.

### C.      Choice of Law Analysis as to Punitive Damages

Under Missouri law, punitive damages "are awarded for the purpose of inflicting punishment for wrongdoing, and as an example and deterrent to similar conduct." *Chappel v. City of Springfield*, 423 S.W.2d 810, 814 (Mo. 1968). New York takes a similar approach awarding punitive damages "not only to punish the defendant but deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future." *Walker v. Sheldon*, 179 N.E.2d 497, 498 (NY 1961).[39] Because the purpose of punitive damages is to punish and deter bad acts, not to compensate the victim, the state of a plaintiff's domicile does "not have an interest in whether or not punitive damages are imposed on the defendants." *In re Agent Orange Prod. Liab. Litig.*, 580 F. Supp. 690, 705 (E.D.N.Y. 1984). *Accord Keene Corp. v. Ins. Co. of N. Am.*, 597 F. Supp. 934, 939 (D.D.C. 1984) ("the place where the injury occurred and where the parties' relationship is centered do not claim as great an interest in the punitive damages issue"); RESTATEMENT § 145, cmt. c ("If the primary purpose of the tort rule involved is to deter or punish misconduct, … the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship").

In *Johnson II*, the Court looked to the Seventh Circuit decision in *In re Air Crash Disaster Near Chicago*, 644 F.2d 594, when conducting a choice of law analysis on the issue of punitive damages. *In re Air Crash* held that the only states with contacts to be taken into account were the state of injury, the state of defendant's misconduct, and the defendant's principal place of business. *Id.* at 612. Furthermore, this Court in *Johnson II* noted that the Seventh Circuit:

---

[39] Missouri and New York's tort rules on punitive damages are essentially identical. Therefore, they should "be treated for choice-of-law purposes as if these contacts were grouped in a single state." RESTATEMENT § 145, cmt. i.

> disregarded the plaintiffs' states of residence first because those
> states do not have an interest in disallowing punitive damages
> because the decision to allow such damages is obviously designed
> to protect the interest of resident defendants, not to effectuate the
> interest of domiciliary states in the welfare of plaintiffs. Second,
> those states had no interest in imposing punitive damages on the
> defendants because domiciliary states only have an interest in
> compensating their residents, and once they are made whole by
> recovery of the full measure of compensatory damages, those
> states's interests are satisfied.

2009 U.S. Dist. LEXIS 108600, at 19 (internal citations and quotations omitted).

Defendants acknowledge that a state has "an interest in deterring misconduct by its own residents." (Def.'s Mem. at 44.) Defendants, however, are mistaken in their assertion that the places of injury and misconduct are one in the same. Instead, Defendants' misconduct, which caused a smelting plant to pollute the environment and resulted in injuries to the people of La Oroya, occurred in Missouri and/or New York, not Peru. Further, Defendants' principal places of business are Missouri and New York, both of which permit punitive damages. Thus, it is the place of misconduct and the Defendants' principal place of business that are one in the same.

The case at bar does not present the same issues that were addressed in *In re Air Crash* or *Johnson II*. In *In re Air Crash*, the court recognized that both the place of misconduct and the defendant's place of business usually have a greater interest in the imposition of punitive damages than the place of injury. 644 F.2d at 616. However, the laws of those two states were in absolute conflict—one allowed punitive damages, while the other prohibited them—which "indicates that neither state has an interest greater than the other's." *Id.* Therefore, as a fallback position, the law of the place of injury governed. *Id.*

A similar situation arose in *Johnson II*. There were several defendants, each of which had their principal places of business in different states, and therefore the misconduct of each defendant occurred in different states. 2009 U.S. Dist. LEXIS 108600, at 21. The laws of these

states had conflicting policies with respect to punitive damages, and therefore "no state has a greater interest than the other in applying its laws." *Id.* at 22. Here, however, the opposite is true. Both Missouri and New York permit punitive damages. There is no conflict. Refusing to apply the punitive damages laws of Missouri and/or New York would undermine the interests of both Missouri and New York in punishing and deterring misconduct within their borders.

Defendants' reliance on *In re Nuvaring Products Liability Litigation*, 957 F. Supp. 2d 1110 (E.D. Mo. 2013), also is unpersuasive because this case is readily distinguishable. In *Nuvaring*, both states concerned—New Jersey and Missouri—had punitive damages statutes in place. *See id.* at 1116. Therefore, the Court determined that "both New Jersey and Missouri have interests that would be furthered by applying their respective statutes to [plaintiff's] claim." *Id.* However, the defendant's home state limited the amount of liability, a protection the defendant lost by engaging in misconduct in Missouri and injuring a resident there. *Id.* at 1117. Accordingly, the interests of Missouri outweighed those of New Jersey. *Id.*

That is not the case here. Defendants argue (though Plaintiffs contest) that Peru does not recognize the concept of punitive damages. Assuming *arguendo* that Defendants' position is accurate, even setting aside Peru's statutory choice of law provision discussed above, Peru has no interest in applying its laws. The Peruvian citizens at issue—Plaintiffs—would receive no protection from Peru's law, and the foreign actors—Defendants—would not be deterred or punished. Peru has no interest in insulating foreign defendants from the possibility of punitive damages. Meanwhile, Missouri and New York have a significant interest in regulating the conduct of their corporate citizens. Based on the foregoing, this Court should apply the laws of Missouri and New York with respect to punitive damages.

### D.     Peruvian Law on Damages

Plaintiffs will address damages under Peruvian law in detail, if necessary, at the appropriate time. Even Defendants recognize certain damages issues "cannot be determined at this time and should be reserved for later." (Def.'s Mem. at 42.) Suffice it to say, under Peruvian law, Plaintiffs will be entitled to a wide range of damages, including punitive damages or their equivalent. *Id.* at 41; *Lizarbe*, 2008 U.S. Dist. LEXIS 109517, at 8 & n.4; *Carijano*, 643 F.3d at 1225; *cf. Saravia*, 348 F. Supp. 2d at 1158, n.4.

Defendants characteristically ignore Dr. Trazegnies' prior recognition that punitive damages or their equivalent are available under Peruvian law. While acknowledging there is no express provision for punitive damages in the Civil Code, Dr. Trazegnies observes that Peru's moral damages can fulfill a punitive role. *Ex. 20*, Trazegnies, Tomo II at 32, 37. Notably, he devotes much discussion to intentional and intolerable harms, frequently using pollution as an example. *Id.* at 35 (arguing punitive damages make sense in cases of "intentional environmental pollution"); *see also id.* at 153, 238.

## VII.   <u>Federal Procedural Law Governs Questions of Capacity.</u>

Defendants next claim that Peruvian law negates the capacity of the Next Friends to act on Plaintiffs' behalves. However, the capacity of the Next Friends is governed by federal procedural law, not the law of Peru.

The parties are in agreement that, under Federal Rule of Civil Procedure 17(b)(1), Peruvian law controls whether plaintiffs who have reached the age of majority and are acting on their own behalves have the capacity to sue. However, as to the approximately 800 minor Plaintiffs, the parties differ with respect to which law governs the capacity of next friends to sue on the minor Plaintiffs' behalves. Defendants incorrectly claim Peruvian law applies when in fact federal law applies.

Capacity to sue is a procedural question . Federal courts apply federal rules on procedural matters, even if the court also is applying state or foreign substantive law. *Torres v. Bayer Corp.*, 616 F.3d 778, 785 (8th Cir. 2010). The applicable procedural rule, set forth in Federal Rule of Civil Procedure 17(c), permits a next friend to sue on behalf of a minor:

> (1) The following representatives may sue or defend on behalf of a minor or an incompetent person: (A) a general guardian; (B) a committee; (C) a conservator; or (D) a like fiduciary.
> (2) *A minor or incompetent person who does not have a duly appointed representative may sue by next friend* or by a guardian ad litem. The court must appoint a guardian ad litem-- or issue another appropriate order--to protect a minor or incompetent person who is unrepresented in an action.

Fed. R. Civ. P. 17(c) (emphasis added). In this case, the minor Plaintiffs do not have guardians, conservators, or other such duly appointed representatives. Therefore, they are authorized under Rule 17(c) to bring this action through next friends.[40] This clear rule should end the analysis.

Instead, Defendants' argument appears to misconstrue the relationship between Rules 17(b)(3) and 17(c). Rule 17(b)(3) determines whether a general guardian, conservator, or similar fiduciary has the capacity to file suit on behalf of another. 4-17 *Moore's Fed. Prac. – Civil* § 17.25(1). Rule 17(c) states, unequivocally, that a minor who has no representative appointed by law may sue by next friend. 4-17 *Moore's Fed. Prac. – Civil* § 17.25(2). The capacity of a next friend to sue on behalf of a minor is determined by federal law, and is not subject to the constraints of state law. *Id. See also*, *id.* at § 17.21(3)(a). This issue is one of black letter law. 68 A.L.R. 752(2). The laws of Missouri and Peru have no role in determining the capacity of a next friend in federal court. *Id.* "[S]uch state rules are procedural rather than substantive and hence need not be applied in federal courts." *M.S. v. Wermers*, 557 F.2d 170, 174 n.4 (8th Cir. 1977).

---

[40] A parent is not a duly appointed representative for Rule 17 purposes. *Developmental Disabilities Advocacy Ctr., Inc. v. Melton*, 689 F.2d 281, 285 (1st Cir. 1982). Further, the capacity of a next friend is not affected by whether she was appointed by the district court. A next friend need not be officially appointed to have capacity. *See Genesco, Inc. v. Cone Mills Corp.*, 604 F.2d 281, 285 (4th Cir. 1979); 4-17 *Moore's Fed. Prac. – Civil* § 17.25(2)

The interplay between Rules 17(b)(3) and 17(c) was demonstrated by the First Circuit in *Sam M. v. Carcieri*, 608 F.3d 77 (1st Cir. 2010). *Sam M.* was a class action brought by next friends on behalf of children who suffered injury at the hands of the state foster care program. *Id.* at 81. The children had been represented by CASA attorneys in family court.[41] The district court found the CASA attorneys were the children's "duly appointed representatives" and therefore the next friends did not have capacity to act on the children's behalves. *Id.* at 83. On appeal, the Circuit Court first looked to state law, pursuant to Rule 17(b)(3), to determine whether the CASA attorneys were duly appointed representatives. *Id.* at 86–87. They were not. *Id.* at 87. Relying on Rule 17(c), and noting that the children otherwise would be unrepresented, the Court held that the children could proceed by next friend. *Id.* at 88–89. The Court then determined whether the next friends had capacity to proceed—based solely on federal law. *Id.* at 89–93.[42] *See also*, *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 134–36 (3d Cir. 2002).

Other courts have rejected arguments similar to the one made by Defendants here, which amounts to a misinterpretation of Rule 17 in an apparent attempt to dismiss a minor's suit on technical grounds. This argument is contrary to the purpose of Rule 17(c), which "is to further the child's interest in prosecuting or defending a lawsuit". *Gardner v. Parson*, 874 F.2d 131, 140 (3d Cir. 1989). The rule "was not intended to be a vehicle for dismissing claims on a summary judgment motion." *Id.* Thus, courts consistently hold that state law does not and cannot constrain the choice of next friend. *See, e.g.*, *Donnelly v. Parker*, 486 F.2d 402, 406–07 (D.C. Cir. 1973) ("state law may confer but not deny capacity to sue or defend federally"); *Travelers Indem. Co.*

---

[41] CASA attorneys, or Court Appointed Special Advocates, are attorneys who serve as court-appointed guardians ad litem to assist otherwise unrepresented minors in family court proceedings. *Sam M.*, 608 F.3d at 86 n.7.

[42] *Sam M.* also disposed with Defendants' apparent belief that the capacity of a next friend raises an issue of standing. 608 F.3d at 83, n.5. Questions of standing relate to whether the true party in interest (here, the children of La Oroya) suffered an injury within the context of an Article III case or controversy. *Id.* The criteria for serving as a representative party relate to capacity, not standing. *Id. See also*, *Gardner v. Parson*, 874 F.2d 131, 137 n.9 (3d Cir. 1989) (finding the use of the term standing in reference to a next friend's capacity to be "inapt").

*v. Bengtson*, 231 F.2d 263, 265 (5th Cir. 1956) (the right to sue by next friend "is unconditional, in no way dependent upon the capacity, under the law of the domicile for a party, or under the law of the state in which the district court is held for parties acting in a representative capacity as is expressed in FRCP 17(b)"); *Neilson v. Colgate-Palmolive Co.*, 993 F. Supp. 225, 227 (S.D.N.Y. 1998) (deference to state law on the capacity of a guardian ad litem "would in many cases render Rule 17 a virtual nullity"); *Seide v. Prevost*, 536 F. Supp. 1121, 1132 (S.D.N.Y. 1982) (next friend "status is not conferred as a matter of State law but rather is a matter of the court's discretion pursuant to Rule 17(c)"); *Constantine v. S.W. La. Inst.*, 120 F. Supp. 417, 418 (D. La. 1954) (a minor's right to sue by next friend "cannot be abridged by a State statute").

The issue is clear cut. Federal courts apply federal procedural law, and Rule 17 is a procedural rule. *See M.S.*, 557 F.2d at 174 n.4; *Burke v. Smith*, 252 F.3d 1260, 1264 (11th Cir. 2001); *Travelers Indem. Co.*, 231 F.2d at 266; *Gibbs*, 314 F.3d at 135. Federal law determines whether the next friends have capacity to sue on the children's behalves in federal court. And under Rule 17(c), a minor without a duly appointed representative can file suit by next friend.

Finally, Defendants' attempt to argue, *without support,* that Missouri Revised Statute § 507.020 somehow supplants federal procedural law and limits the ability of a minor to proceed by and through a next friend, is a misstatement of the law.

As an initial matter, the purpose of Section 507.020 "is to give a right of action in Missouri courts upon a foreign cause of action where formerly such action could be maintained only upon principles of comity and in the discretion of the court." 15 *Mo. Prac. & Proc.* § 52.03:1. *Accord*, *Huff v. La Sieur*, 571 S.W.2d 654, 656–57 (Mo. Ct. App. 1978). Thus, the statute is the equivalent of Federal Rule of Civil Procedure 17(b), in that it "gives the executor, administrator, guardian, guardian ad litem or other person empowered by the laws of another

63

state power to sue in a representative capacity whenever a claim exists for the incapacitated person under the law of said other state." *Blum v. Salyer*, 299 F. Supp. 1074, 1076 (W.D. Mo. 1969).[43] And like Rule 17(b), Section 507.020 determines whether a general guardian or similar fiduciary has the power to instigate a suit, not whether a court-appointed next friend has the capacity to act on behalf of an unrepresented minor. Accordingly, even if Missouri law could affect a next friend's capacity to sue on behalf of a minor in federal court, Missouri would not look to the laws of Peru. Instead, Missouri would apply its own procedural rules.

Here, Missouri law is substantively identical to federal law, stating:

> Suits by infants may only be commenced and prosecuted, either:
> First, by a duly appointed guardian or conservator of such infant;
> or, second, by a next friend appointed for him in such suit; or,
> third, if asserted by counterclaim, by a guardian ad litem.

Mo. Rev. Stat. § 507.110. *Accord*, Mo. Sup. Ct. R. 52.02(a) ("Civil actions by minors may be commenced and prosecuted only by a duly appointed guardian of such minor or, if there is no such guardian, by a next friend appointed in such civil action"). Missouri's procedural law recognizes the capacity of next friends to act on behalf of minors. Peruvian law does not apply. *See Birdsell v. Holiday Inns*, 852 F.2d 1078, 1079 (8th Cir. 1988) (Missouri adheres "to the well settled doctrine that a forum state applies its own law as to procedural matters").[44]

## VIII.   Federal Procedural Law Governs Questions of Necessary Parties.

Defendants raise a second procedural issue, arguing the failure to join Doe Run Peru is fatal to Plaintiffs' claims under Peruvian law. (Def.'s Mem. at 22.) However, like the issue of capacity, the substantive laws of other states (or countries) are not implicated.

---

[43] The language of Missouri Revised Statute Section 507.020 is nearly identical to that of Missouri Supreme Court Rule 52.03. Rule 52.03 is related to Federal Rule of Civil Procedure 17(b). Mo. Sup. Ct. R. 52.02, cmt.

[44] Moreover, even if the Next Friends were not properly appointed, Missouri law states that this procedural defect "shall not invalidate the proceedings if the court finds that the interests of the minor … were adequately protected." Mo. Sup. Ct. R. 52.02(m). Finally, even if Peruvian law could somehow apply to the issue of capacity, the Next Friends were properly appointed under Peruvian law, and any defect in the appointment could be easily remedied. Espinoza Report at ¶¶ 5.41–5.42; Fernandez Report at ¶ 52.

Joinder is a procedural issue, governed by federal procedural law. *See Scenic Holding, LLC v. New Bd. of Trs. of Tabernacle Missionary Baptist Church,* 506 F.3d 656, 665 (8th Cir. 2007); *Hagensicker v. Boston Scientific Corp.*, No. 12-5018, 2012 U.S. Dist. LEXIS 32715, at 5 (W.D. Mo. Mar. 12, 2012). Likewise, the question of whether a party constitutes a necessary or proper party to a federal action is one of procedural law, governed by Federal Rule of Civil Procedure 19. *Jenkins v. Westinghouse Elec. Co.*, 18 F.R.D. 267, 269 (W.D. Mo. 1955). *See also Gwartz v. Jefferson Mem'l Hosp. Assn.*, 23 F.3d 1426, 1428 (8th Cir. 1994) (applying Rule 19 in diversity action to determine whether party is "necessary" or required). Therefore, whether Doe Run Peru is or is not a necessary party, and thus should be joined in this litigation, will be governed by Rule 19 of the Federal Rules of Civil Procedure rather than Peruvian law.[45]

## <u>CONCLUSION</u>

This Court should deny Defendants' Motion for Determination on the grounds that it is premature due to the lack of discovery and also procedurally improper. That being said, based on the limited information available to Plaintiffs, Peruvian law does not apply to any legal issue, including the statute of limitations, general liability theories, damages, or otherwise. If the Court determines that Peruvian law applies to any extent, Plaintiffs respectfully request that the Court discount the opinions of Defendants' expert, Fernando de Trazegnies Granda, whose current "interpretation" of Peruvian law differs substantially from his prior published works. Instead, this Court would be warranted in accepting the opinions of Plaintiffs' experts that the laws of Peru do not bar Plaintiffs claims, an opinion consistent with Dr. Trazegnies' prior stated beliefs before he was retained by Defendants in this case.

---

[45] In any event, Doe Run Peru is not a necessary party under Peruvian law. *See*, *e.g.*, Espinoza Report at ¶ 5.19 (a plaintiff can sue one or more joint tortfeasors but need not sue all of them).

Respectfully submitted,

SCHLICHTER, BOGARD & DENTON


By:  ___/s/ Kristine K. Kraft_____
JEROME J. SCHLICHTER #32225
ROGER C. DENTON #30292
KRISTINE K. KRAFT #37971
ELIZABETH M. WILKINS #61284
TARA A. ROCQUE #59246
100 South 4th Street, Suite 900
St. Louis, MO 63102
(314) 621-6115
(314) 621-7151 (fax)
jschlichter@uselaws.com
rdenton@uselaws.com
kkraft@uselaws.com
bwilkins@uselaws.com
trocque@uselaws.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 10th day of June, 2014 a copy of the foregoing document was filed with the Clerk of the Court to be served upon counsel of record via the Court's ECF system.


       /s/ Kristine K. Kraft