# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GERARDO ARIAS TORRES and | § | |
| CARMEN MAMANI YANEZ, | § | |
| individually and as next | § | |
| friend for CLAUDIO ARIAS | § | |
| MAMANI and HELANAR ARIAS | § | |
| MAMANI, Minors, et al.; | § | |
| | § | |
| Plaintiffs | § | |
| | § | CIVIL ACTION NO. C-95-495 |
| vs. | § | |
| | § | JURY |
| SOUTHERN PERU COPPER | § | |
| CORPORATION, et al., | § | |
| | § | |
| Defendants. | | |

## SWORN AFFIDAVIT OF LUZ AUREA SAENZ ARANA

# EXHIBIT B

01033

DEC-06-1995  11:50    ZUMMO & SCHIRRMEISTER          713 781 0776   P.02
                                                     Inlingua translation # 26362

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

### CORPUS CHRISTI DIVISION

**GERARDO ARIAS TORRES** and
**CARMEN MAMANI YAÑEZ**
Individually and as Next
Friend for Claudio Arias
Mamani and Helanora Arias Mamani
Minors, et al.

                                                    CIVIL ACTION NO. C-95-495

v.

**SOUTHERN PERU COPPER**
**CORPORATION**, et al.

### SWORN AFFIDAVIT

DOCTOR LUZ AUREA SAENZ ARANA, having been duly sworn, stated under oath the
following:

1.   **NAME AND QUALIFICATIONS**

1.1 · My name is LUZ AUREA SAENZ ARANA. I am 49 years old, I have been licensed to
     practice law in Peru for 25 years and I have been practicing law in Peru for 25 years.

1.2  I am currently working as a full-time Associate Professor of Civil Law and Registry Law
     at the College of Law and Political Science of the Federico Villareal National University.

Case: 4:11-cv-00044-CDP   Doc. #: 214-18   Filed: 06/10/14   Page: 4 of 24 PageID #: 8609

### 1.3   DEGREES OBTAINED

- Bachelor's Degree in Philosophy and Social Sciences in 1968 obtained from the College of Education of the National University of San Marcos.

- Law Degree in 1970, obtained from the College of Law and Social and Political Science of the University of San Marcos.

- Postgraduate study in Education at the College of Education of the National University of San Marcos, in 1968.

- Studies for Masters in Taxation at the College of Accounting of the University of San Marcos, in the years 1972-1977.

### 1.4   PUBLICATIONS

- Various articles on legal subjects in magazines and newspapers in circulation nationally.

### 1.5   LECTURES

### A)   AS REPRESENTATIVE OF THE DEPARTMENT OF JUSTICE:

- "COMMENTARY ON THE ORGANIZATIONAL LAW OF THE DEPARTMENT OF JUSTICE", at the invitation of the Association of Judges of Peru, as representative of the District Attorneys for the Judicial District of Lima in 1981, given at the Superior Court of Lima.

01035

Case: 4:11-cv-00044-CDP  Doc. #: 214-18  Filed: 06/10/14  Page: 5 of 24 PageID #: 8610
DEC-06-1995  11:51        ZUMMO & SCHIRRMEISTER            713 781 0776   P.04

- 3 -

- "HUMAN RIGHTS UNDER THE CONSTITUTION OF 1979", at the invitation of the College of Law and Political Science of the Federico Villareal National University, given in the auditorium at the College of Law.

- "ACTIONS RELATING TO CONSTITUTIONAL GUARANTEES", at the invitation of the Employees' Union Center of the Peruvian Social Security Institute, given in the auditorium of the Enrique Rebagliatti Hospital.

- "THE CRIME OF SMUGGLING AND CUSTOMS REFORM IN PERU", by designation of the National Attorney General, given in the border cities of the Republic.

- "RELATIONS AMONG THE POLICE, PROSECUTORS AND THE JUDICIARY", at the invitation of the General Directorate of the Investigative Police of Peru (now the Peruvian National Police).

- "MUNICIPAL ELECTION LAW", (as a result of having been Chairperson of the Provincial Electoral Board of Lima), at the invitation of the College of Law of he Federico Villareal National University.

- "CRIMINAL POLICY:  JUVENILE CRIME AND REFORMATORIES IN PERU", at the invitation of the Ministry of Education, given in the Lima Metropolitan Area and districts in the Province of Lima.

- Lectures given at various governmental institutions on assignment by the National Attorney General are not mentioned.

01036

**B)**   **AS REPRESENTATIVE OF THE COMPTROLLER GENERAL OF THE REPUBLIC OF PERU:**

- "FOREIGN DEBT AND SUB-DEVELOPMENT IN LATIN AMERICA". In the capacity of Chairperson of the OLACEFS, given in the cities of Miami (USA), Madrid (Spain) and Brasilia (Brazil).

- "FRAUD AND CORRUPTION IN GOVERNMENT". In the capacity as the Comptroller General of the Republic in 1991, broadcast by satellite to all countries on the continent, organized by the North American Association for the Fight Against Governmental Fraud and Corruption.

- "THE OPERATIONAL AUDIT", as speaker and Chairperson of OLACEFS, given in the city of Berlin, Germany, in 1989.

- "SUPERVISION OF PUBLIC WORKS CONTRACTS", in the city of Quito, Ecuador in 1990, in the capacity as President of OLACEFS, at the Annual Congress of this organization.

- "FRAUD IN PUBLIC CONTRACTING". In the city of Berlin, Germany, in 1991, at the invitation of the DSI or FADI (Foundation for Development in Germany).

- Innumerable lectures have been given at the national level, in municipalities, regions and other public and private institutions, which would be tiresome to list.

**C)**   **OTHER LECTURES:**

- "EDUCATIONAL REFORM IN PERU", at the invitation of the USE in San Juan de Lurigancho in 1994.

01037

Case: 4:11-cv-00044-CDP Doc. #: 214-18 Filed: 06/10/14 Page: 7 of 24 PageID #: 8612
DEC-06-1995 11:51 ZUMMD & SCHIRRMEISTER 713 781 0776 P.06

- 5 -

- "INSPECTIONS AND AUDITS IN THE GOVERNMENTAL APPARATUS". At the invitation of the College of Education of the Private Inca Garcilazo de la Vega University.

- "WOMEN AND POLITICS", at the invitation of the glass of milk (sic) in 1993.

- "VIOLATION OF POLITICAL AND SOCIAL RIGHTS IN THE LAST FOUR YEARS". At the invitation of representatives of the State of Apurimac, given in the city of Andahuaylas in 1994.

- "THE POLITICS OF PRIVATIZATION AND PUBLIC MORALITY". At the invitation of, and given at, the Employees' Union of the Peruvian Social Security Institute in 1994.

- "THE SOCIOLOGY OF PERUVIAN EDUCATION", at the invitation of the College of Education of Garcilazo de la Vega University, in the auditorium of the College.

- Appearances on radio and television.

1.6 **CONTINUING PROFESSIONAL EDUCATION CONFERENCES AND SEMINARS:**

- FOREIGN TRADE - ADEX and the Ministry of the Economy and Finance.

- INTERNATIONAL CIVIL CONTRACTING: College of Law of San Marcos National University.

- INSURANCE AND INTERNATIONAL TRANSPORTATION: College of Law of San Marcos National University.

Case: 4:11-cv-00044-CDP   Doc. #: 214-18   Filed: 06/10/14   Page: 8 of 24 PageID #: 8613
DEC-06-1995 11:52   ZUMMO & SCHIRMEISTER   713 781 0776   P.07

- 6 -

- BANKRUPTCY LAW: College of Law of San Marcos National University.

- DRUG TRAFFIC AND TERRORISM: Ministry of Domestic Policy

- ENGLISH: Catholic University of Peru.

- FRENCH: Alliance Francaise

- CIVIL CODE: Seminar sponsored by the Catholic University of Peru.

- Participation in the conference "TOWARD A NATIONAL PLAN FOR PERU FOR THE XXI CENTURY". Invitation extended by the Peruvian Association for Technological Development - APEDET 1994.

- FORUM: GAS FROM CAMISEA, NATIONAL CHALLENGE AND DEVELOP-MENT, Society of Engineers of Peru, 1994.

- PRIVATIZATION OF STATE ENTERPRISES, held at the ESAN, 1991.

- THE PROCESS OF PRIVATIZATION OF ENTERPRISES IN MEXICO AND BRAZIL, held at the Research Center at the Office of the Comptroller General in 1992.

- FORUM: PRIVATIZATION OF STATE-OWNED ENTERPRISES, held at the Society of Engineers of Peru in 1994.

- PARTICIPATION BY WOMEN IN THE POLITICAL LIFE OF THE COUNTRY, invitation extended by the Lima Bar Association in 1990.

## 2. GOVERNMENTAL SERVICE:

### 2.1 OFFICE OF THE COMPTROLLER GENERAL:

-- Office of the Comptroller General, from November 1987 to April 5, 1992, appointed pursuant to the Constitution of 1979, by vote of the Senate, my functions being the supervision of the proper use of public funds.

### 2.2 JUDICIAL BRANCH:

-- Prosecutor for the Province of Lima, elected by Public Election before the National Council of Magistrates on the recommendation of the Lima Bar Association and appointed by Presidential Order in March of 1978.

-- Scope of authority: Civil, criminal and administrative matters from 1978 to 1981, and from 1982, exclusively in criminal matters.

### 2.3 DEPARTMENT OF JUSTICE:

-- With the establishment of a constitutional system with the Political Charter of 1979, the Attorney General of the Nation was appointed in 1980, the state's attorneys for the three judicial departments being separated to form the Justice Department as an Autonomous Agency of the State; CONFIRMED after the process of confirmation to which all Officers of the nascent Department of Justice were submitted.

-- Ad Hoc Provincial District Attorney: By designation of the National Attorney General, from June 1982 to March 1985.

01040

– Scope of authority: a) Quality and price control for medications in Peru (1982); and (b) Tax Crime and Fraud Against the State (from August 1982 to March 1985).

– Senior Provincial District Attorney in Lima, from July 1985 to February 1986.

– Senior District Attorney for Criminal Matters in Lima, in Division One of the Superior Court of Lima, from February 1985 to July 1985.

Senior District Attorney in Civil Matters in Division One of the Superior Court of Lima, from November 1986 to November 1987.

## 2.4    OTHER POSITIONS HELD:

- Chairperson of the Lima Provincial Electoral Commission: Municipal Elections (non-paid position, being the Senior District Attorney for Lima), from August to November 1986.

- Advisor to the Health Benefits Department No. 1 (Currently the Peruvian Social Security Institute) 1975-1977. Appointment: by Public Competition.

- President of the ILACIF, currently the OLACEFS (Latin American and Caribbean Organization of Senior Auditing Agencies), which brings together the titled officials carrying out the functions of Comptroller, Government Accounting Offices and the Office of Accounting of the Department of the Treasury and Public Finance in Mexico, from 24 Latin American and Caribbean countries, such agencies being independent audit and inspection agencies, established by the respective constitutions.

From 1988 to December 1991, chosen by election by all members of OLACEFS under the applicable bylaws.

3.    <u>UNIVERSITY-LEVEL TEACHING EXPERIENCE:</u>

3.1    **GARCILAZO DE LA VEGA UNIVERSITY:**

College of Economics (1975-1976), full-time.
Course: Introduction to Political Science

3.2    **FEDERICO VILLAREAL NATIONAL UNIVERSITY:**

College of Law and Political Science (1980-1988), full-time.
Courses:    Criminal Procedure, Criminal Procedural Practice, Evolution of political ideas.

3.3    **UNIVERSITY OF LIMA:**

College of Law and Political Science (1986-1987), full-time.
Course: Criminal Law.

3.4    **TRAINING SCHOOL FOR OFFICERS OF THE REPUBLICAN GUARD**
(Now the Peruvian National Police):

Basic Course and Advanced Course for Lieutenants and Captains (19980-1985).
Course: Criminal Procedure

3.5    **INSTRUCTION CENTER OF THE INVESTIGATORY POLICE OF PERU**
(now the Peruvian National Police):

Course: Constitutional Law.

3.6    **SAN MARTIN DE PORRES UNIVERSITY:**

College of Law and Political Science (1993)

Course: Human Rights, Environmental Law and Integration Law.

\*        University teaching was interrupted during the course of holding the
         position as Comptroller General of the Republic, due to the exceptional
         complexity of the job.

4.    **SPECIFIC    KNOWLEDGE    ABOUT    SOUTHERN    PERU    COPPER
CORPORATION:**

-        I remember that I had just assumed the duties of Comptroller General of the
         Republic of Peru in 1987, by appointment made by the Senate for a term of seven
         years, when I received written complaints from farmers in the Ilo valley regarding
         destruction caused by Southern Peru Copper Corporation, which is a private
         company.  This matter could not be investigated directly by the Comptroller's
         Office, which had jurisdiction only over public companies and institutions, so
         authorities at the Department of Energy and Mines, the Department of Health, the
         Department of Agriculture and the Department of Industry were questioned as to
         why they had not adopted corrective measures in this matter, despite the fact that
         this outrage had been going on for decades, since it was within the jurisdiction of
         these agencies of the State.  After approximately 3 years of investigation, we at
         the Comptroller's Office demanded that the Department of Energy and Mines,
         being the agency most directly responsible, force SPCC to invest in environmental
         controls.  As a consequence, the Department of Energy and Mines proceeded to
         enter into a contract with SPCC, which company agreed to invest 300 million
         dollars over the course of 5 years, beginning in January of 1992.  The contract
         was sent to the Comptroller's Office for review, and the document was subjected
         to a technical legal study, with the conclusion being that this contractual
         commitment made by SPCC was a sham.  The language of the contract disguised

- 11 -

the affirmation that the investment would be devoted to improving their facilities.
The Comptroller's Office raised the question to the Congress as to why the
Ministry of Mines and Energy had entered into a contract which was so
prejudicial to the interests of the country, but in the course of doing so, I,
unfortunately, was removed, by unilateral action, from the position of
Comptroller General on April 5, 1992.

Everything described above is reflected in documents which were prepared during my
term of office and are now on file at the office of the Comptroller General and,
principally, in the Ministry of Energy and Mines, and are public proceedings which are
required to be kept on file at such state agencies, to which documents one should refer to
corroborate the declarations set out above.

5. **PURPOSE OF THE AFFIDAVIT**:

5.1  The Plaintiffs have requested me to determine if the courts or laws of Peru permit
a party to bring suit for personal injury resulting from the exposure to toxic
emissions from Southern Peru Copper Corporation.

To begin with, in order to respond, it is necessary to cite the provisions of Article
2, Section 22 of the Constitution of Peru:  "All persons have the right to peace,
and to be remain unmolested in the enjoyment of their free time and rest, and to
enjoy a balanced and suitable environment in which to conduct their lives."

Art. 1969 of the Civil Code of Peru, in turn, provides that:  "Anyone who, by
fraud or negligence, causes injury to another person shall be obligated to
compensate him..."

These articles establish the right of the inhabitants of Peru to compensatory
damages for damage to their person, property and moral interests.  Unfortunately,
however, Peruvian courts have maintained the approach of awarding absurdly low

- 12 -

judgments for the compensation for any injury, which approach is deeply
ingrained in Peruvian courts. Furthermore, I feel that, because of evidentiary and
procedural restrictions, and other material and legal reasons which we will
describe below, it would be impossible for the plaintiffs to obtain a favorable
judgement against SPCC.

5.2   They have asked me to describe, in general terms, the influence and control which
Southern Peru Copper Corporation exercises in Peru, specifically bribes, pay-offs
and other corrupt practices in which SPCC participates on a regular basis, the
control which SPCC exercises over the courts and the effect which the control,
influence and corrupt practices which might have on the plaintiffs' ability to
pursue a lawsuit in the Courts of Peru.

If one is familiar with the background, it can be easily assumed that SPCC could
exercise its economic and political influence to destroy the impartiality of the
Judiciary.   We know that Southern Peru Cooper (sic) Corporation makes
donations to the institutions which could benefit it in any way.  It should be
pointed out that in 1994, a training seminar was held for prosecutors from all
levels of the Department of Justice.  SPCC, looking to make friends, agreed to
pay the bills for such seminar, in September 1995.  Madame Attorney General
expressed her appreciation on television.  This irregularity has caused a scandal in
the country, in which the Department of Justice has been seriously compromised.
This situation confirms the assumption of partiality toward SPCC, since the
supervisory institutions have been compromised morally.

As if that were not enough, I would like to mention one event in particular.  I
remember that I was conducting the investigation regarding the various damages
caused by this company, which, incidentally, was during the general election
season in April 1990, when, to my surprise, there appeared in my office a
candidate for the Senate who was running as part of a group of independents,
whose symbol was a rooster, a person whom I knew and with whom I had dealt

previously. It turned out that, taking advantage of the confidence which I had
afforded him, he proposed to me that I temporarily cease the investigatory
operations affecting said company until the elections were over, in return for
which Southern Peru Copper Corporation would provide him with a contribution
of approximately US$ 180,000 (One Hundred Eighty Thousand Dollars), I do not
remember the amount exactly, which money said company was offering him for
his political campaign and, with this money, he would be as good as elected, and,
once in the Senate, he would help in any way necessary with the agency of which
I was the director. My attitude toward this brazen insinuation was rejection and I
expressed to this individual that he did not merit the least consideration and that
from that moment on he should never speak another word to me. This individual
is alive and well but was not elected to the Senate. SPCC, in defiance of my
determined investigation of environmental damage and other matters, used politics
and the press to discredit the person and office of the Comptroller General.

Likewise, the farmers from Ilo have informed me of the manner in which SPCC
used the practices of bribery and pay-offs. Each year during the Christmas and
New Year's celebrations, SPCC delivered fabulously generous gifts (called
"CHRISTMAS BASKETS") to the residence of each of the Judges and
Prosecutors from the Department of Justice in Ilo, Moquegua and Tacna.
Similarly, on the occasion of the celebration of Judges' Day, or Judicial System
Employees' Day, SPCC offers up lavish hospitality at well-known restaurants in
each of these cities. Examples like this are numerous.

5.3     The plaintiffs have requested me to render an opinion as to whether it is possible
to file suit in the Courts of the United States for environmental damages.

In the Peruvian procedural system, the right of the plaintiff to file his suit at the
domicile of the defendant, either inside or outside of the country, is guaranteed,
subject to the provisions of Art. 15 of the Code of Civil Procedure and related

- 14 -

rules; so it is my opinion that it is possible to file a suit outside of the country for environmental damage.

5.4     The plaintiffs have asked me to determine if SPCC shareholders and lenders are subject to the jurisdiction of the courts of Peru and if they would be allowed to sue for personal injuries resulting from toxic emissions from the facilities in Ilo.

From the interpretation of the law observed over 25 years of professional experience, it is my opinion that defendants who do not have a domicile in Peru are not subject to the jurisdiction of Peruvian Courts. We are aware that the companies sued directly do not have a fixed residence and/or domicile in Peru.

...

5.5     The plaintiffs have requested me to determine if they will be treated fairly by the courts in Peru, if they file this suit against SPCC in Peru.

It is evident that the Judiciary in Peru has given signs of absolute partiality whenever one of the parties has economic power. In particular, with regard to SPCC, its ruling would be, if not a slap on the wrist, then totally exculpatory, after an unjustified and tortuous delay, with the goal of trying to get the numerous injured plaintiffs, who do not have the same resources as SPCC, to abandon the case out of fatigue, for which reason I feel that it would be impossible for the plaintiffs to compete with SPCC, because of its undeniable economic power and because of the biased judiciary.

6.     **PERUVIAN LAW RECOGNIZES THE PLAINTIFFS' RIGHT TO CHOOSE THE COMPETENT JURISDICTION AND TO REJECT THE THEORY OF _FORUM NON CONVENIENS_.**

6.1     To support my opinion, it is necessary to cite the provisions of the Peruvian Constitution relating to basic personal rights and procedural rules.

- 15 -

With regard to freedom, Section 24 of Article 2, Para. a) of the Peruvian Constitution provides: "NO ONE IS OBLIGATED TO DO WHAT THE LAW DOES NOT REQUIRE AND NOR IS HE PREVENTED FROM DOING FROM DOING WHAT IT DOES NOT PROHIBIT".

It can be taken from the foregoing provision that as long as a law does not provide for a limitation on the freedom or right of an individual, all actions are permitted.

6.2   In Peru, the plaintiff's freedom to file his suit in the place where the domicile of the defendant is guaranteed, and if there are several defendants before the court, the domicile of any of them, either within the country or abroad, as provided in Art. 15 of the Code of Civil Procedure and related rules. This is an acquired right established in a rule of public order, and, therefore, mandatory. It should be added that Article 137 of the Environmental and Natural Resources Code expressly provides: "Actions filed in defense of the environment, or whose main issue is such, shall be filed in the court when the right is affected or where the Plaintiff or the DEFENDANT is domiciled".

6.3   With regard to the theory of *FORUM NON CONVENIENS*, our Peruvian legal system does not recognize or accept the theory of *Forum Non Conveniens*, since it is a theory unknown to Peruvian law. In addition to the foregoing, such theory violates the principle in our law which gives the plaintiff the ability to file the suit in the courts where the defendant, or any of them, is domiciled, as stipulated in Art. 30 of our Code of Civil Procedure, which states: Effects of the Preliminary Hearing: "the preliminary hearing makes the jurisdiction of the Court exclusive in those cases where, under the law, several judges could hear the same matter". That is, it prohibits another court from taking over the case.

These provisions are in complete accord with the provisions of Art. 13 of the Environmental and Natural Resources Code, which states:  "...A plea to the

DEC-06-1995  11:55      ZUMMO & SCHIRRMEISTER          713 781 0776   P.17

- 16 -

jurisdiction CANNOT BE FILED if it is expressly stated in the petition that the action is filed in defense of the environment and natural resources or that the main issue is such".

6.4    Consequently, in view of the right of the plaintiff to choose the most convenient venue and, after the plaintiffs have chosen, the right to file the suit where the defendants are domiciled, whether this is in the country or abroad, it would be illegal for a Peruvian judge to ignore and overturn this decision made by the plaintiff to select the venue as that where the defendant is domiciled.

## 7.  DOES PERUVIAN LAW RECOGNIZE JOINT LIABILITY, UNDER WHICH THE SOUTHERN PERU COPPER CORPORATION SHAREHOLDERS AND LENDERS CAN BE SUED?

With regard to this question, the Civil Code provides the following, in the articles cited below:

Art. 1183- "Joint liability is not assumed, only the law and the document evidencing the obligation may expressly provide for it".

Art. 1981, in its final section, provides that "The direct perpetrator or the indirect perpetrator shall be subject to joint liability".

Art. 1978:  "Also liable for damage is the party who incites it or contributes to it.  The degree of liability shall be determined by the Judge, based on the circumstances".

Article 1983:  "If several parties are liable, they shall be liable jointly".

Article 1986:  "Agreements which exclude or limit liability for fraud or unmitigated negligence shall be null and void."

- 17 -

Based on the concepts set out in the aforesaid Peruvian legal rules, which constitute provisions related to the public order, and, taking into consideration the abundant uniform body of law relating to this matter, it is my opinion that the SPCC shareholders and lenders, as well as its senior management representatives, are fully and absolutely liable for damages caused to the inhabitants of the Ilo and to the natural resources, and are subject, under the law, to being sued for joint liability for compensation for the damages caused, as there is no exemption for their being liable.

For the reasons set out above, I utterly reject the arguments regarding this matter put forth by Dr. Roberto G. Maclean in Item 14 of his AFFIDAVIT.

8.  **THERE IS NO POSSIBILITY OF A FAVORABLE JUDGMENT AGAINST SOUTHERN PERU COPPER CORPORATION'S SHAREHOLDERS AND LENDERS BECAUSE THESE AMERICAN COMPANIES ARE NOT SUBJECT TO THE JURISDICTION OF THE COURTS OF PERU**

8.1  I have examined the Plaintiffs' First Amended Complaint and I understand that they have filed suit in the United States District Court against the Southern Peru Copper Corporation's shareholders and lenders.

8.2  None of the Southern Peru Copper Corporation shareholders or lenders, which are defendants in the United States District Courts, are subject to the jurisdiction of the Judicial System of Peru. To the best of my understanding and knowledge, none of these entities have a fixed domicile and/or residence in Peru. Based on the foregoing, the plaintiffs cannot bring suit in Peru for damages against ASARCO, INC., Cerro Trading Co. Inc., Cerro Sales Corporation, The Marmon Corporation, The Marmon Group, Inc., Marmon Holdings Inc., GL Corporation, Phelps Dodge Oversea (sic) Capital Corporation, Phelps Corporation, Phelps Dodge Corporation, Phelps Dodge Refining Corporation, Phelps Dodge Industries, Inc., New Mont (sic) Mining Corporation, Inc., Billiton B.V. or Misui (sic) & Co., Ltd.

01050

- 18 -

8.3   Although these companies might have been prepared to voluntarily submit to the jurisdiction of the courts of Peru, Peruvian law:

   a)   Does not allow a non-resident company to be sued even if the defendant requests to become subject to the general jurisdiction of the Peruvian courts; and/or

   b)   There would be an absolute lack of territorial jurisdiction to judge the shareholders and lenders named in Section 7.2 in Peru.  In addition, since jurisdiction is a matter of public order and therefore mandatory, the Peruvian judge would apply it *ex officio*, without regard stipulations to the contrary by the defendants and without regard to the shareholders and lenders having expressly subjected themselves to Peruvian jurisdiction, subject to the provisions of Article 30 of the Code of Civil Procedure and related rules.

9.   **THE PLAINTIFFS HAVE NO CHANCE OF WINNING AGAINST SPCC IN PERU.**

9.1   SPCC, because of the economic importance it has in Peru, will not be treated the same as the plaintiffs, who have scarce economic resources and are humble people.  There are many ways for SPCC to curry favor with the authorities in an impoverished country, since for the 35 years it has been in the southern part of the country, exploiting natural resources without paying any attention whatsoever to the environment and the ecology, despite the poor health conditions of the people, the reduction in the quantity and quality of their crops and the deterioration of marine resources in the Bay of Ite and the beaches near the smelter, the people there being the most severely affected by the baneful influence of SPCC, no action can be initiated nor have the authorities bothered with enforcing compliance with laws dating back more than 35 years to obligate SPCC to invest some of its copious earnings in reducing or controlling pollution of the environment by applying the appropriate technological mechanisms which are already available.

DEC-06-1995  11:57      ZUMMO & SCHIRR/REISTER           713 781 0776   P.20

- 19 -

9.2   SPCC offers lavish hospitality and special gifts to the Judges and judiciary
employees in the areas where it has interests, because of their authority.

9.3   Justice in Peru does not come free, in light of the fact that Directive No. 015-95
establishes a schedule of court fees and taxes, the amounts for which vary between
20 and 400 new sols.  Payment of these fees is mandatory for anyone wishing to
litigate.  As an exception, a judge may grant Judicial Assistance (previously called
the Pauper's Oath) to any litigating party.  However, despite this exception to the
general rule, litigants in Peru have to make certain payments for the handling of
any judicial procedures (Visual Inspection, Expert appraisals, etc.), for
transportation, for "tips" for employees in the judicial system for "speeding up"
the handling of any procedures, payment for giving notices, etc., and, if they do
not, the proceeding simply does not advance and ends up being abandoned.

9.4   In addition, speaking of the courts in Ilo, the situation is even worse because,
under the principle of dual authority, the party affected by a decision by the first
authority has the right of appeal and the case is raised to the Superior Court,
which is the Civil Division of the Superior Court of Tacna and Moquegua, the
seat of which is precisely in the city of Tacna, which is 2 hours away, which
means transportation expenses, overnight stays, travel expenses, etc.

9.5   The Judiciary does not have complete autonomy since the decisions of the
Judiciary are conditioned on the political decisions of the Government and groups
with economic power, such as SPCC.

9.6   Another reason why the Judiciary in Peru does not guarantee that the plaintiffs
could possibly win against SPCC is that the Judges in the Judiciary and the
Department of Justice are not appointed officeholders, having only the status of
provisional officers; consequently, these Judges believe that the fact of becoming a
Provisional Judge is a panacea, in which they can do what do what they see fit,

- 20 -

without any responsibility, issuing their decisions with marked economic bias, because they know their stay in such position is temporary.

9.7    Salaries for the Judges and Administrative Personnel in the Judiciary and the Department of Justice range from 600.00 to 1200.00 new sols monthly, equivalent to US$ 280 to 650, which obviously does not allow them to meet their basic needs, so they are susceptible to corruption and bribery.

Consequently, for all of these reasons, I feel that there could not be any significant and exemplary judgment against SPCC in Peru, purely and simply because this company has the economic power to corrupt.

## 10.    THE JUDICIAL SYSTEM IN PERU:

10.1    In the hypothetical case that these suits would be tried in Peru, none of the plaintiffs, nor their relatives, could testify about their case, since in our procedural system, one cannot testify in his own case.  Art. 229, Sec. 3 and 4 of the Code of Civil Procedure.

10.2    The "DEPOSITIONS" under American law are not contemplated by our Peruvian procedural law, in view of the fact that, Arts. II and V of the Preliminary Title of the Code of Civil Procedure provide that:  "It is the responsibility of the Judge to control the trial proceedings and all procedural actions, hearings and the offering, admission and use of evidence shall take place in the presence of the Judge, being non-delegable, subject to being nullified."  Consequently, in the Peruvian legal (judicial) system, testimonial evidence, such as DEPOSITIONS under the American system, does not exist, because it is inconsistent with the principle of control and administration by the Judge and with the requirement that litigants appear before the Judge at all times during the conduct of the trial, both aspects being characteristic of Peruvian civil procedure.

01053

Case: 4:11-cv-00044-CDP  Doc. #: 214-18  Filed: 06/10/14  Page: 23 of 24 PageID #:
8629
DEC-06-1995  11:57      ZUMMO & SCHIRRMEYSTER                    713 781 0776   P.22

- 21 -

10.3    The Peruvian procedural system does not accept the jury system as found in the American system.

10.4    Documentary evidence is restricted, in the sense that in order to obtain it from the adverse party, it is necessary to indicate precisely what document is being sought and where it is located.   Our law does not permit an abstract demand for documents or a demand for generic categories of documents, as I understand is permitted under American law by the REQUEST FOR PRODUCTION OF DOCUMENTS.

10.5    Expert witnesses are appointed by the Judge, as provided in Art. 263 of the Code of Civil Procedure, with the parties being able to offer their own expert opinions. This procedure is also dilatory and burdensome because of the many obstacles which can be imposed and which can significantly delay the opinion of the experts for physical and time-related reasons.   To obtain a definitive position, depending on the technical capacity available, the number of cases and expert opinions requested, including appellate proceedings, the opinion of the experts can be delayed, on the average, for up to 8 months on a single matter.   It should be pointed out that under Art. 271 of the Code of Civil Procedure: "The Judge sets the fees for expert witnesses.  The party offering the evidence is obligated to pay such fees.  If ordered ex *officio*, the fee shall be paid proportionately by the parties".  It can be deduced from the foregoing that the situation in question presents almost insurmountable procedural and quantitative barriers, which would obviously be complicated by the filing of suits by approximately 700 plaintiffs in the Peruvian courts.  Added to this is the fact that for the specific case involved here, there are no specialized experts in the southern part of Peru who could give an opinion with the proper degree of professionalism and professional ethics.

10.6    Another of the inconveniences presented is that in the city of Ilo, the place where all of the plaintiffs are domiciled, the Judiciary has only one judge and a clerk for

DEC-06-1995  11:58    ZUMMO & SCHIRMEISTER                     713 781 0776   P.23
- 22 -

civil matters, who are already insufficiently equipped to handle the existing case
load. Added to this are the physical limitations under which they operate, since
they have not kept up with advances in information technology, still using manual
typewriters. This other reason, of a material nature, would invalidate the
constitutional principle of prompt justice and in any case is inappropriate for the
adequate administration of justice.

10.7  Our Peruvian justice is slow and the resolution of a case granting compensatory
damages to the plaintiff would take years. In addition, there exists a series of
procedural mechanisms which the parties could use and which would likewise
entail a delay in any stage of the proceedings, for example, exceptions,
interlocutory proceedings and extraordinary remedies (appeal, clarification,
nullification, review) and the parties, in addition, will have had, during the course
of the proceedings, significant restrictions on the admissibility and use of their
evidence, aggravated by the practice of appealing interlocutory orders and the use
of extraordinary remedies which significantly lengthen the proceedings. Under
Peruvian civil procedure, orders and rulings made by the trial court are
appealable.

10.8  The Peruvian attorney fee system requires that the client pay all litigation
expenses. In addition, the attorneys usually collect 50% of their fees upon filing
the case, another 25% midway through the trial and the other 25% upon
concluding the trial. In other cases, attorneys tend to charge for each document
filed.

Signed in Lima, Peru, November 7, 1995, my signature being legalized by a Notary Public.

/s/    *LUZ AUREA SAENZ ARANA*
       "L.E." 08771565