**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **A.O.A.,** *et al.*, | ) | |
| | ) | |
| | ) | **Case No. 4:11-cv-00044-CDP** |
| **Plaintiffs,** | ) | **(consolidated cases)** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE DOE RUN RESOURCES** | ) | **ORAL ARGUMENT** |
| **CORPORATION,** *et al.*, | ) | **REQUESTED** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DETERMINE THE APPLICATION OF FOREIGN LAW**

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ............................................................... 1

II.    BACKGROUND ................................................................................ 6

     A.    The La Oroya Complex and the Establishment of the PAMA ............. 6

     B.    The Acquisition of the La Oroya Complex ........................................ 9

     C.    The Present Lawsuits ....................................................................... 11

     D.    Peru's Formal Protest to the Exercise of United States Jurisdiction ................... 12

III.   PROCEDURAL POSTURE ................................................................ 13

IV.    ARGUMENT ................................................................................... 14

     A.    The Law of Peru Applies to Plaintiffs' Vicarious Liability Theories ................. 15

     B.    Missouri's Most Significant Relationship Test Confirms That Peruvian Law Applies to All Claims and Issues in This Consolidated Action ................... 17

          1.    Peruvian Law and Missouri Law are in Conflict With Respect to Every Claim Plaintiffs Assert ................................ 19

               a.    Peruvian and Missouri Law are in Conflict With  Respect to All of Plaintiffs' Theories of Vicarious Liability ................... 20

                    (1)    Alter Ego and Veil Piercing Theories of Liability ........... 20

                    (2)    Agency Liability ............................................................. 21

                    (3)    Direct Participation Liability ............................................ 23

               b.    Peruvian Law and Missouri Law  are in Conflict With Respect to Both Joint  Tortfeasor and Contribution Liability ....... 23

               c.    Peruvian Law and Missouri Law are in Conflict  With Respect to Both Negligence and Strict Liability ........................... 24

               d.    Peruvian Law and Missouri Law are  in Conflict Concerning Civil Conspiracy ........................................ 25

               e.    Peruvian Law and Missouri Law are in Conflict  With Respect to Plaintiffs' Claims for Breach of  Assumed Duties Pertaining to Foreseeable Harms and Negligent Performance of a Contract or Undertaking ................... 26

f.      Peruvian Law and Missouri Law  are in Conflict
        Concerning Punitive Damages ...................................................... 27

2.      Peruvian Law Presumptively Applies  Because Peru is the
        Undisputed Place of Injury ....................................................... 28

        a.      The Factors in Section 145 of the Restatement  Confirm
                That Peruvian Law Should Apply .................................................. 30

                (1)      Place of Injury ................................................................. 30

                (2)      Place of Misconduct ........................................................ 31

                (3)      Domicile, Residence, Nationality, Place of
                         Incorporation and Business of the Parties ........................ 37

                (4)      Place Where the Relationship  Between the Parties
                         is Centered ....................................................................... 38

        b.      The Principles Set Forth in Section 6 of the Restatement
                Similarly Confirm That Peruvian Law Should Apply ................. 40

                (1)      Needs of the International System (Principle A) ............. 42

                (2)      Relevant Policies of the Forum  and Interested
                         States (Principles B and C) ............................................. 43

(a)      Vicarious Liability Theories .................................................................. 45

(b)      Substantive Liability Claims ................................................................. 46

(c)      Punitive Damages .................................................................................. 49

                (3)      The Protection of Justified Expectations (Principle
                         D) .................................................................................... 50

                (4)      The Basic Policies Underlying the Particular Field
                         of Law (Principle E) ......................................................... 55

                (5)      Certainty, Predictability and Uniformity of Result
                         (Principle F) ..................................................................... 57

                (6)      Ease in Determining and Applying the Law
                         (Principle G) ..................................................................... 58

C.      This Court Should Apply Peruvian Law for the Independent Reason That
        Application of U.S. Law Would be Unconstitutional ........................................... 59

ii

Defendants[1] submit this memorandum of law in support of their renewed motion,[2] pursuant to Federal Rule of Civil Procedure 44.1, to apply Peruvian law to this consolidated action.[3]

## I.   **PRELIMINARY STATEMENT**

Over three years ago, this Court declined to rule on Defendants' earlier motion to determine the application of foreign law (Dkt. # 148), on the ground that, in light of "the relative dearth of discovery and the considerable number of factual questions, there is no way yet to thoughtfully determine whether Peru, Missouri, or New York has the most significant relationship to this action." *Reid v. Doe Run Res. Corp.*, 74 F. Supp. 3d 1015, 1024 (E.D. Mo. 2015) (the "2015 Order").  In the 2015 Order, the Court held that "Plaintiffs' claims originated in Peru because that is where the damage resulting therefrom was sustained and was capable of ascertainment," *id.* at 1019, and noted that, in order to decide which law applied, it needed to

---

[1]     Defendants refers to (i) Ira L. Rennert, Marvin K. Kaiser, Albert Bruce Neil, Jeffrey L. Zelms, Theodore P. Fox III, DR Acquisition Corporation, Doe Run Cayman Holdings, LLC, Doe Run Resources Corporation ("Doe Run Resources"), The Renco Group, Inc. ("Renco"), Roger L. Fay, Marvin M. Koenig, John A. Siegel, Dennis A. Sadlowski, John A. Binko, Michael C. Ryan; and (ii) The Ira Leon Rennert Revocable Trust, The Trusts F/B/O S. Tamara Rennert under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2, and 3, The Trusts F/B/O Yonina Nechama Rennert under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2, and 3, Trusts F/B/O Ari E.Y.M. Rennert under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2, and 3, The Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 4, 5, 9, 10, 2002A, and 2002B, The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Sarah Tamara Rennert Winn, The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Yonina Nechama Rennert Davidson, and The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Ari E.Y.M. Rennert (collectively, the "Trusts").

[2]     Submitted herewith in support of the motion is the declaration of James E. Crowe, III, sworn to March 16, 2018 (the "Crowe Decl.").  Citations to exhibits herein ("Ex." or "Exs.") refer to exhibits defined in and attached to the Crowe Decl.  Also submitted herewith is the expert declaration of Keith S. Rosenn, Defendants' expert witness on Peruvian law, sworn to March 16, 2018 (the "Rosenn Decl.").

[3]     On May 12, 2017, Defendants Roger L. Fay, Marvin M. Koenig, John A. Siegel, Jr., Dennis A. Sadlowski, John A. Binko, Michael C. Ryan, Ira L. Rennert, Renco, and the Trusts (collectively, the "Non-Missouri Defendants") moved to dismiss the Amended Complaint on the grounds that, among other things, this Court lacks personal jurisdiction over them.  (*See* Dkt. # 545, at 40-45.)  The Non-Missouri Defendants maintain a continuing objection to this Court's exercise of personal jurisdiction over them, and neither waive, nor intend to waive, their continuing objection to this Court's exercise of personal jurisdiction by joining in the instant motion while their personal jurisdiction objection is *sub judice*.  This continuing objection is appropriate in light of the fact that the Non-Missouri Defendants were required to participate in this motion by the Court's scheduling order.  (*See* Dkt. # 836, at 1.)

better understand the facts related to, among other things, "the location of the injury-causing conduct," "where the relationship, if any, between plaintiffs and defendants was centered," and "the relevant policies of the forum and other interested states, the relative interests of those states in the determination of the particular issue and the protection of justified expectations," *id*. at 1024.

In this action, Peruvian citizens and residents sue for purported injuries they allege were suffered in Peru, and claim were caused by the operation of a metallurgical complex in La Oroya, Peru (the "La Oroya Complex").  The La Orya Complex was owned and operated by Doe Run Peru S.R.L. ("Doe Run Peru"), a Peruvian company headquartered in, and organized under the laws of, Peru—which Plaintiffs have not sued.  Plaintiffs' claims against Defendants—all of which were based in the United States at all relevant times—almost exclusively rely on veil piercing and alter ego theories based on Defendants' status as corporate affiliates or indirect parents of Doe Run Peru, or officers and shareholders of such entities.

Peruvian law applies to Plaintiffs' efforts to ignore the corporate form of Doe Run Peru in order to impose liability on Defendants.  Under Missouri's well-settled internal affairs doctrine, any claim to pierce the corporate veil of an entity is decided according to the law of the place of that entity's incorporation.  It is not disputed that Doe Run Peru was incorporated in Peru, and, therefore, only the law of Peru is applicable to determine Plaintiffs' alter ego and veil piercing theories, and whether liability could be imposed on Doe Run Peru's parents, corporate affiliates, and certain past and present officers, directors, employees, and shareholders of the corporate Defendants.

In any event, the application of the choice of law principles of the Restatement (Second) of Conflict of Laws (the "Restatement"), which the Court held to govern here in the 2015 Order,

2

*Reid*, 74 F. Supp. 3d at 1023, also conclusively confirms that Peruvian law applies *to all aspects of Plaintiffs' claims*.  The Restatement sets forth a three-part "most significant relationship" test to determine which jurisdiction's laws apply.  Each of the three parts of the Restatement test leads to the inevitable and unsurprising conclusion that Peru has the most significant relationship to this action, and, therefore, this Court should apply Peruvian law to all of Plaintiffs' claims.

The fact that Peru has the most significant relationship is confirmed not only by the substantial discovery conducted since the 2015 Order was issued, but also by the allegations in Plaintiffs' Amended Complaint, which was filed over two years after the 2015 Order with the benefit of huge volumes of discovery.  Based on these allegations, the location of the injury-causing conduct is unquestionably Peru, and thus Peruvian law should apply to Plaintiffs' claims.  Moreover, no facts have been adduced in the substantial discovery the parties conducted after the 2015 Order that should alter the Court's conclusion that Plaintiffs' alleged injuries were sustained in Peru.

In addition, the government of Peru has affirmatively asserted—through formal diplomatic channels—its substantial sovereign interests over the matters in dispute in this action, which directly concern its sovereign rights and national interest.  Specifically, Peru officially protested this Court's continuing jurisdiction over this action by advising the United States Department of State that it "has long emphasized and maintains the importance of its sovereign rights with respect to the issues [raised in this action], including as reflected in" the Peru-United States Trade Promotion Agreement, (Ex. 1, 2017 Peru Statement, at 2), and that "[a]ny claim and/or lawsuit with respect to those [facts that form the basis of the current action] must be the exclusive jurisdiction of the administrative and/or jurisdictional authorities of Peru," (*id.* at 5).  In contrast to Peru's substantial interest, Plaintiffs remain unable to articulate any governmental

3

interest that Missouri (or any other U.S. state) has over this matter, and certainly none that would come close to overriding the substantial interest of Peru.

In short, there is no legitimate dispute that Peru has the most significant interest in the application of its law to these claims, and, therefore, Peruvian law should govern this action. Even if Plaintiffs could articulate some interest of Missouri in having its laws applied to the claims of Peruvian citizens who claim to have been injured in Peru by a Peruvian company, it is inconceivable that any such interest would outweigh Peru's interest.  Analyzing the factors under the Restatement's "most significant relationship" test confirms that Peruvian law governs here.

Under the first part of the Restatement's most significant relationship test, the Court assesses whether a conflict exists between the laws of the jurisdictions at issue, *i.e.*, Peru and Missouri.  As discussed in detail below, Peruvian law is not only materially different from Missouri law, but is in direct conflict with the specific Missouri law on which Plaintiffs' claims are based.

Under the second part of the Restatement test, it is presumed that the law of the jurisdiction where the plaintiff claims to have been injured governs the plaintiff's claims.  Here, as Plaintiffs concede in their Amended Complaint and in depositions, *all* of their alleged injuries occurred entirely in Peru, thus establishing a presumption that Peruvian law applies to all of their claims.

Under the third and final part of the Restatement test, the Court assesses whether Plaintiffs have overcome the presumptive application of the law of the place of injury, here, Peru.  The Restatement sets forth a multi-factored analysis to determine whether the forum (*i.e.*, Missouri) has a "more significant" interest than the location of injury (*i.e.*, Peru).  The multi-factored analysis includes assessing, among other things, the contacts that the parties and claims

4

have with each jurisdiction, as well as the respective interests of the different jurisdictions.  The presumption in favor of applying the law of the place of injury can be overcome only if the Restatement's multi-factored analysis establishes that a jurisdiction *other than* that in which the injury occurred has a more significant interest in the application of its law.

Here, that presumption is insurmountable.  Missouri has no interest in the application of its law to these claims, and Plaintiffs' allegations that Missouri has such an interest are legally and factually wrong.  Plaintiffs' claims stem from their relationship with Doe Run Peru, which was indisputably located in La Oroya, Peru.  Even if Plaintiffs could identify such an interest, it would pale in comparison to the interest of Peru in having its law apply to the claims of Peruvian citizens who claim to have been injured in Peru by the operations of a Peruvian company.

Indeed, at least one Eighth Circuit Judge has already acknowledged that substantial Peruvian contacts are at the core of this case.  During oral argument in an interlocutory appeal in this case, Circuit Judge Duane Benton observed that Peru's interest and contacts were "bigger than life," and recognized that Peruvian law should govern based on Missouri's "most significant relationship" test.  (Ex. 2, Sept. 19, 2012 8th Cir. Oral Hr'g Tr., at 20:22-25, 21:4-6 ("And wouldn't Missouri say most significant contacts, Peru law governs everything here?").)

Finally, applying Missouri law here would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  The Constitution independently prohibits a state from applying its laws to conduct with which it has little or no contact. Applying Missouri's (or any state's) law to Plaintiffs' claims based on torts committed in Peru, by a Peruvian company, against Peruvian citizens would therefore be unconstitutional.

Accordingly, and as shown more fully below, Defendants' motion that Peruvian law applies to this action should be granted.

## II.      BACKGROUND

### A.      The La Oroya Complex and the Establishment of the PAMA

The mining and metallurgical industry has been critically important to Peru's economy for more than a century.  The La Oroya Complex has been in nearly continuous operation since approximately 1922, and is a key part of Peru's substantial mining industry.  In 1974, Peru nationalized the La Oroya Complex and continued operations through a governmental body known as Empresa Minera del Centro del Peru S.A. ("Centromin").  (Ex. 3, Peruvian Presidential Decree; Ex. 4, PAMA, § 1.1.)

In September 1990, Peru enacted the Environmental and Natural Resources Code ("ENRC"), which imposed—for the first time—general requirements on mining and metallurgical companies, including requiring companies to utilize emissions control equipment. (*See* Ex. 5, Legislative Decree No. 613.)  Pursuant to the ENRC, it is Peru's "duty to prevent and control environmental pollution . . . that may interfere with the normal conduct of life of any kinds and of society" and, to that end, the law sets out various rules and general principles for the protection of the environment.  (*Id.* at 2.)

The Peruvian government supplemented the ENRC in April 1993 through Supreme Decree No. 016-93-EM (the "April 1993 Decree"), which was specifically designed to regulate Peru's mining and metallurgical industry.  (*See* Ex. 6, Supreme Decree No. 016-93-EM.)  Article 3 of the April 1993 Decree states that its purposes were to: (a) "[e]stablish the prevention and control actions that must be performed in order to harmonize the development of mining and metallurgical activities with environmental protection; (b) [p]rotect the environment from hazards resulting from harmful agents that could be generated by the mining and metallurgical activity. . . ; [and] (c) [p]romote the use of new techniques and processes related to the improvement of the environment."  (*Id.* Art. 3.)

The April 1993 Decree introduced two important concepts that were centerpieces of Peru's environmental regulatory scheme for the mining and metallurgical industry.  First, Peru introduced the Environmental Remediation and Management Plan, known by its Spanish-language acronym, "PAMA."  (*See id*. Art. 2.)  Second, Peru introduced "Maximum Permissible Limits" for emissions from metallurgical complexes.  (*Id.* Art. 3.)  The April 1993 Decree also required the parties responsible for any mining or metallurgical operation in Peru to submit a PAMA to the Ministry of Energy and Mines.  (*Id.* Arts. 7, 9.)  The purpose of a PAMA was for "operators of the mining activity to reduce their levels of environmental pollution to the maximum permissible levels."  (*Id.* Art. 9.)  The PAMA had to "establish the implementation, investment, monitoring and control procedures for effluents" and "contain a timetable for implementation of the same."  (*Id.*)  Peru tasked its Ministry of Energy and Mines with the responsibility for enforcing the law.  (*Id.* Arts. 2, 4.)  It designated that Ministry as the sole government agency responsible for "[e]stablish[ing] policies for the protection of the environment for mining and metallurgical activities and mak[ing] the corresponding regulations," and "[a]pprov[ing] the [PAMA] and authoriz[ing] the implementation of the same."  (*Id.* Art. 4; *accord* Ex. 7, Environmental Administrative Stability Contract, at 1.)

The PAMA for the La Oroya Complex was formally approved by the Peruvian government on January 13, 1997.  (Ex. 4, PAMA, at 2.)  Significantly, the PAMA for the La Oroya Complex was designed to ensure that operations would continue at the facility, and, as approved by the government, recognized the crucial importance of a functioning metallurgical complex to the economy of the region.  As required by law, it contained a "Closing Plan" to address steps to be taken to protect the environment should the facility be closed, but stated, "the importance of the Metallurgical Complex for the social and economic development of the region

makes it unlikely that its operations will cease in the long or medium term." (Ex. 4, PAMA, at 20.) Thus, the whole purpose of the PAMA was to ensure that the La Oroya Complex and other Centromin facilities would continue to operate, but in a manner consistent with the Peruvian environmental standards that were only then under development. (*See id.* at 21.) Indeed, Peru consistently sought to ensure the continued operation of the La Oroya Complex, including during the efforts to sell and "privatize" the facility that were ongoing when Centromin's PAMA for it was approved (*see infra* at 9):

> The fundamental objective of the promotion of investments in Centromin is modernization, *expansion of operations and development of the potential of the projects in order to maintain its continuity, especially of La Oroya.*

(*See* Ex. 8, Government of Peru 1999 White Paper, at 36 (emphasis added).)

The La Oroya Complex's emissions levels and modernization projects were extensively regulated by the Peruvian Ministry of Energy and Mines and other Peruvian government agencies, including Peru's analogue to the United States Environmental Protection Agency. In 2001, Peru enacted a law setting national environmental air quality standards. (*See* Ex. 9, Supreme Decree No. 074-2001-PCM.) Supreme Decree No. 074-2001-PCM's objective was "[t]o protect health . . . [through the] establish[ment] [of] national environmental air quality standards and the strategy guidelines to achieve them progressively." (*Id.* Art. 1.) The law's text stated that it resulted from two years of discussions with "the private sector and civil society . . . in order to achieve a consensus among the fishing, mining, and industrial business sectors, including nongovernmental organizations specializing in the environment, *thus achieving an equilibrium between the objectives of protecting health and having clear rules for private investment.*" (*Id.* at 2 (emphasis added).) In 2003, pursuant to Supreme Decree No. 074-2001-PCM, Peru issued specific air quality standards for concentrations of lead—the primary cause for

complaint in this action—and for additional substances, including sulfur dioxide ($SO_2$).  (*See* Ex. 10, Supreme Decree No. 069-2003-PCM, at 1-2.)

In 2005, Peru enacted the General Environmental Law.  (Ex. 11, General Environment Act – Law No. 28611.)  The law's stated objective was to "govern[] the normative legal framework for environmental management in Peru."  (*Id.* Art. 1.)  It was intended to "regulate[] the actions undertaken to protect the environment which must be included in the conduct of all human activities."  (*Id.* Art. 2.2.)  Among other things, the General Environmental Law reiterated Peru's commitment to the PAMA process as a means to regulate the operation of mining and metallurgical facilities in Peru in a manner that was designed to balance the need for the development of the country's natural resources: "[t]he competent environmental authority may establish and approve Environmental Improvement and Management Programs [PAMA], to facilitate the adaptation of an economic activity so as to comply with new environmental obligations" and that authority "must ensure due compliance therewith in the time frames prescribed by the respective provisions, through explicit environmental performance objectives."[4]  (*Id.* Art. 26.1.)

**B.     The Acquisition of the La Oroya Complex**

As it refined the contours of its environmental regulations, the Peruvian government recognized a substantial need to revitalize its previously nationalized industries through private investment and the influx of foreign capital.  (*See* Ex. 8, Government of Peru 1999 White Paper, at 7-8.)  Because the Peruvian government designated its mining industry as a key component of this revitalization campaign, Peru began soliciting bids from private investors for Centromin in

---

[4]      Peru continues to extensively regulate environmental standards in connection with its critical mining industry and related activities.  (*See, e.g.*, Ex. 12, Supreme Decree No. 040-2014-EM.)

1994.  (*See* Ex. 4, PAMA, § 1.2.)  However, given the conditions at Centromin's numerous

facilities, including the La Oroya Complex, and the potential liabilities posed by assuming

control of Centromin's operations, Peru's initial attempts to privatize Centromin failed to attract

any private investors.  (*Id.* at 40-41.)  Peru subsequently created Empresa Metalúrgica La Oroya

S.A. ("Metaloroya") and transferred ownership of the La Oroya Complex from Centromin to

Metaloroya, thereby separating the La Oroya Complex from Centromin's other facilities and

liabilities.  (Ex. 13, Stock Transfer Agreement, at 1.)  During its second attempt to sell the La

Oroya Complex, Peru modified the terms of the investment so that, in return for buying and

improving the facilities, *Peru would retain liability for*, and indemnify the buyer for the

remediation of, both preexisting and post-acquisition environmental contamination, as well as

assume the liability for any third-party claims arising therefrom.  (*Id.* §§ 6.2, 6.5.)

Peru's strategy for privatizing the La Oroya Complex worked.  In July 1997, a

consortium of Renco and The Doe Run Resources Corporation ("Doe Run Resources") were the

high bidders for the La Oroya Complex based on the modified terms of Peru's second attempt to

sell the La Oroya Complex.  (Ex. 13, Stock Transfer Agreement, at 1.)  The sale was

memorialized in two separate agreements entered at the same time: (i) the Contract for Stock

Transfer, Capital Increase, and Stock Subscription (the "Stock Transfer Agreement") between

Centromin and Doe Run Peru, on the one hand, and The Doe Run Resources Corporation and

Renco (collectively, the "Renco Consortium") on the other hand (*see* Ex. 13, Stock Transfer

Agreement); and (ii) the Guaranty Agreement between Peru and Doe Run Peru (the "Peru

Guaranty") (*see* Ex. 14, Peru Guaranty).  These agreements were structured to mitigate the

environmental and regulatory challenges that previously stymied Peru's efforts to privatize the

Complex.  (*Id.* § 2.1.)  Specifically, pursuant to the Stock Transfer Agreement, Centromin

retained the obligation to defend against third-party claims.  (Ex. 13, Stock Transfer Agreement, § 6.5.)  Further, the Peruvian government guaranteed all of Centromin's obligations concerning the La Oroya Complex pursuant to the contemporaneously executed Peru Guaranty.  (*Id.* Cl. 10; Ex. 14, Peru Guaranty.)

While the Renco Consortium provided the investment capital, the *sole* owner and operator of the La Oroya Complex was the Peruvian limited liability company, Doe Run Peru. In fact, the government of Peru specifically conditioned the sale of the La Oroya Complex on the formation of a Peruvian company to own and operate the facility.  (Ex. 14, Peru Guaranty, Introductory cmt.)  Thus, after the sale of the La Oroya Complex in 1997, *all* operations at the La Oroya Complex were carried out *not* by Defendants, but by Doe Run Peru and its employees in Peru.

### C.   The Present Lawsuits

The instant lawsuits seek to hold Defendants liable for Doe Run Peru's operations at the La Oroya Complex and were filed in the Circuit Court for the City of St. Louis starting in 2007. Parallel actions were filed by a different group of plaintiffs' counsel starting in 2015.  Those other cases were ultimately removed and consolidated before District Judge Sippel.  *See Collins v. Doe Run Res. Corp.*, No. 4:15-cv-01704-RWS (E.D. Mo.) (collectively, the "Collins Litigation").  The instant cases were ultimately removed to federal court, and now include the claims of 1,171 individuals.  Despite naming a large number of individuals and entities as Defendants, none of the Plaintiffs sued Doe Run Peru or its immediate parent corporation, Doe Run Cayman Ltd.  Instead, Plaintiffs sued numerous other upstream corporate entities and individual officers of Doe Run Resources and Renco in the United States.  (*See* Dkt. # 474, Am. Compl. ¶¶ 10-28.)

Plaintiffs allege that they are Peruvian citizens who, at all times, resided in Peru.  (Am. Compl. ¶ 2; *see also Reid*, 74 F. Supp. 3d at 1017 ("The plaintiffs . . . allege that they live near La Oroya.").)  As alleged by Plaintiffs, the domicile, residence, nationality, place of incorporation, and place of business of the Defendants are in Missouri or New York.  (Am. Compl. ¶¶ 4-14.)  Indeed, Plaintiffs allege that they suffered injuries in Peru from toxic substances present in the environment due to emissions from the La Oroya Complex during the time it was owned and operated by the Peruvian company, Doe Run Peru.  (*See, e.g.*, Am. Compl. ¶¶ 2, 70, 72, 96;  *see also Reid*, 74 F. Supp. 3d at 1017 ("The plaintiffs . . . allege that they . . . have been harmed by exposure to high levels of lead, cadmium, sulfur dioxide, and other toxic substances emitted from the smelter.").)  No Plaintiff alleges, and discovery has not revealed, any contact between any Plaintiff and either the United States or Missouri.  Plaintiffs nevertheless attempt to plead claims based on Missouri law.[5]

### D.    Peru's Formal Protest to the Exercise of United States Jurisdiction

On April 3, 2017, the government of Peru filed a statement of protest with the United States Department of State, formally objecting to the continued exercise of United States jurisdiction over this action and the Collins Litigation (the "2017 Peru Statement").  (Ex. 1, 2017 Peru Statement, at 3.)  Among other things, the 2017 Peru Statement makes clear that:

- "States have . . . the sovereign right to exploit their own resources pursuant to their own environmental and developmental policies" and are themselves responsible for establishing and enforcing such policies, "which includes enabling relevant judicial and administrative proceedings, as well as adjudicating liability for victims of pollution."  (*Id.* at 4 (citing the Rio Declaration on Environment and Development (the "Rio Declaration"), which was adopted by the United Nations in 1992).)

- With respect to the La Oroya Complex, Peru has "articulated its position on the environmental situation in La Oroya and exercised its sovereignty and control over its

---

[5]      In their Opposition to Defendants' Motion to Dismiss the Amended Complaint (the "MTD Opp."), Plaintiffs repeatedly assert that Missouri law applies to their claims. (*See, e.g.*, Dkt. # 640, MTD Opp., at 129 n.34 ("There is no basis for applying any law other than Missouri law to this case.").)

natural resources and mining and metallurgical activities conducted within its
jurisdiction, including, with respect to air pollution and environmental damage from" the
La Oroya Complex.  (*Id.* at 4.)

- Peru is concerned that the current actions "might require a court of the United States to
pass judgment on the official acts and policies of the Peruvian State, rule on arguments
relating to compliance with the laws and regulations of Peru, or interpret specific
regulatory statements, policies, decisions and actions of Peru in connection with La
Oroya" and that "[s]uch steps could affect the availability of appropriate and effective
remedies for environmental contamination under applicable law, and could be considered
to be inconsistent with the text and spirit of the Treaty and the Rio Declaration."
(*Id.* at 5.)

The 2017 Peru Statement is expressly based on Peru's sovereign rights under

international law and emanates from the United States-Peru Trade Promotion Agreement (the

"Treaty"), which was the result of Peru's earlier efforts to attract foreign investment in its

economy, specifically from the United States.  (Ex. 1, 2017 Peru Statement, at 2.)

### III.   PROCEDURAL POSTURE

On January 26, 2014, Defendants filed their initial Motion for a Determination of Foreign

Law pursuant to Rule 44.1 of the Federal Rules of Civil Procedure.  (*See* Dkt. # 148.)  On

February 11, 2015, the Court issued the 2015 Order, which, among other things, declined to

make such a determination of foreign law because the Court noted that it needed to await the

completion of additional discovery before it could rule on the motion.  *Reid*, 74 F. Supp. 3d at

1026.

Specifically, in the 2015 Order, the Court identified several issues in the Restatement's

choice of law analysis that would benefit from additional factual development, including: (i) "the

place where the injury occurred;" (ii) "the place where the conduct causing the injury occurred;"

(iii) "the domicile, residence, nationality, place of incorporation and place of business of the

parties;" (iv) "where the relationship, if any, between plaintiffs and defendants was centered,"

and whether "it exists;" (v) "the relevant policies of the forum and other interested states;" (vi)

"the relative interests of those states in the determination of the particular issue;" and (vii) "the protection of justified expectations." *Reid*, 74 F. Supp. 3d at 1024.

Accordingly, as the Court is aware, for the last three years, the parties have been engaged in substantial discovery in anticipation of the renewal of the prior choice of law motion, including over 90 depositions (including 24 Defendant depositions), and Defendants' production of over 3.7 million documents.  All of the areas identified by the Court in the 2015 Order have been the subject of extensive discovery (to the extent that they were ever in dispute), and, as detailed below, all of the discovery (and other developments) point to the conclusion that Peruvian law should apply to Plaintiffs' claims.

## IV.   ARGUMENT

As a federal court sitting in Missouri, this Court applies Missouri choice of law principles in diversity cases pursuant to 28 U.S.C. §1332.  *See, e.g.*, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007).  Even in non-diversity cases such as this, where there is no compelling federal interest in how choice of law issues are resolved, the forum state's choice of law principles apply.[6]  *United States v. Aid Ins. Co.*, 642 F. Supp. 535, 537 (E.D. Mo. 1986) (applying Missouri choice of law principles "in [a] non-diversity case[]" due to "the absence of a compelling federal interest"); *see also In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000) (holding that a federal bankruptcy court deciding state-law claims must apply the choice of law principles of the state in which it sits); *S.E.C. v. Elmas Trading Corp.*, 683 F. Supp. 743, 747-750 (D. Nev. 1987) (holding that courts should apply "the rule of *Klaxon* to cases founded upon federal question

---

[6]      In the 2015 Order, the Court held that there was no need to decide whether Missouri or federal common law governs the choice of law analysis in this action because both require the use of the Restatement analysis to determine which forum's law should apply here.  *See Reid*, 74 F. Supp. 3d at 1023-24.

jurisdiction where state law controls the issue to be decided").  Thus, as Plaintiffs' claims do not invoke or depend on any federal interest, the Court must apply Missouri conflict of law principles.

Here, under Missouri's well-settled choice of law principles embodied in the Restatement (and elsewhere), Peru's overwhelming relationship with and interest in the claims, facts, and issues in this lawsuit dictate that its law should apply to all aspects of Plaintiffs' claims, whether as a result of Missouri's internal affairs doctrine or through the application of the Restatement's broader choice of law principles.

### A.      The Law of Peru Applies to Plaintiffs' Vicarious Liability Theories

Plaintiffs' efforts to hold Defendants liable for the alleged wrongdoing of Doe Run Peru rest on various theories through which Plaintiffs ask the Court to pierce the corporate veil of Doe Run Peru.  Therefore, even before the Court reaches any of the factors in the Restatement test referenced in the 2015 Order, the Court should independently hold that, as a matter of law, Peruvian law applies to Plaintiffs' veil piercing and alter ego theories pursuant to Missouri's internal affairs doctrine.

Under Missouri's internal affairs doctrine, courts apply the law of the state or country in which an entity is incorporated to adjudicate disputes regarding the structure or administration of a corporation.[7]  *See Yates v. Bridge Trading Co.*, 844 S.W.2d 56, 61 (Mo. Ct. App. 1992) (the

---

[7]      The Court should apply Missouri's internal affairs doctrine prior to analyzing the Restatement's "most significant relationship" test.  Nevertheless, if the Court analyzes the Restatement first (and it should not), Peruvian law still applies to Plaintiffs' alter ego and veil piercing claims.  As discussed *infra* at Section IV.B, application of the Restatement test mandates that Peruvian law applies to Plaintiffs' claims, including their theories of vicarious liability, because that test dictates that Peru has the most significant relationship to the claims and conduct at issue in this case.  However, even if the Court were to apply the Restatement test and determine that Missouri law applies to Plaintiffs' alter ego and veil piercing theories (and it should not), it would not alter the result that Missouri's internal affairs doctrine dictates that Peruvian law governs Plaintiffs' alter ego and veil piercing theories.  *See In re Bridge Info. Sys., Inc.*, 325 B.R. 824, 830-831 (Bankr. E.D. Mo. 2005) (applying the internal affairs doctrine after determining, pursuant to Restatement § 145, that Missouri had the most significant relationship to plaintiff's tort claims), *aff'd*, 344 B.R. 587 (E.D. Mo. 2006).

internal affairs doctrine clearly "provides that the law of the state of incorporation should be applied to settle disputes affecting the organic structure or internal administration of a corporation").  Because veil piercing and alter ego claims require a court to examine the internal structure and administration of a corporation and its parents or affiliates, Missouri applies the internal affairs doctrine to evaluate such claims.  Under that doctrine, this Court is required to apply the law of the state or country in which the corporate entity whose veil is being pierced is incorporated.  Mo. Rev. Stat. § 351.582(3) ("This chapter does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."); *In re Bridge Info. Sys., Inc.*, 325 B.R. 824, 831 (Bankr. E.D. Mo. 2005) ("[U]nder the internal affairs doctrine, the applicable law in . . . adjudicating a veil piercing claim is [that of] the state . . . under which the corporation exists."), *aff'd*, 344 B.R. 587 (E.D. Mo. 2006); *see also Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp.*, No. 1:15-cv-00077-SNLJ, 2017 WL 2377509, at *5 (E.D. Mo. June 1, 2017) ("Accordingly, because both defendants are Delaware corporations, Delaware's state law applies to plaintiff's veil-piercing claim."); *Guidry v. Seven Trails W., LLC*, No. 4:12-cv-01652-NCC, 2014 WL 4386744, at *9 (E.D. Mo. Sept. 5, 2014) (applying law of the state of incorporation of the entity whose corporate form is being challenged to hold another entity liable); *Montgomery Bank, N.A. v. First Horizon Home Loan Corp.*, No. 4:09-cv-01334-ERW, 2010 WL 1712848, at *1 (E.D. Mo. Apr. 26, 2010) (applying the internal affairs doctrine to apply Kansas law to determine whether a "creditor [can] . . . maintain a suit to recover assets from the shareholders of a dissolved Kansas corporation").

Plaintiffs' claims stand or fall on their attempt to have the Court ignore the corporate form of Doe Run Peru and impose liability for its conduct on its parents and affiliates and their officers and shareholders.  (*See* Am. Compl. ¶¶ 97-253.)  However, because Doe Run Peru is a

Peruvian corporate entity that was organized, and existed, under the laws of Peru (Ex. 15, 2007 Peru Statement, at 5), this Court must apply Peruvian law to any claims that concern or challenge its corporate form. *See, e.g.*, *In re Bridge Info. Sys., Inc.*, 325 B.R. at 831.

It makes no difference for this purpose that Doe Run Peru received its charter from the government of a foreign state rather than one of the United States.[8]  *See Acapolon Corp. v. Ralston Purina Co.*, 827 S.W.2d 189, 193 (Mo. banc 1992) (holding that whether a Missouri parent corporation could be held liable for the actions of its Guatemalan subsidiary through a veil piercing claim was a "pristine question of Guatemala law").

Accordingly, under the internal affairs doctrine, Peruvian law unquestionably controls Plaintiffs' alter ego and veil piercing theories of liability.

### B.     Missouri's Most Significant Relationship Test Confirms That Peruvian Law Applies to All Claims and Issues in This Consolidated Action

Even if the internal affairs doctrine were not applicable to Plaintiffs' claims, application of Missouri's general choice of law principles also mandates that Peruvian law applies here, because Peru has the "most significant relationship" to the claims, facts, and issues in dispute. As the Court held in the 2015 Order, the "most significant relationship" test in the Restatement is applicable in this action. *See Reid*, 74 F. Supp. 3d at 1024 ("I will use the Restatement approach

---

[8]     Other federal courts have reached the same conclusion when addressing veil piercing and alter ego claims brought against foreign defendants.  *See Panam Mgmt. Grp., Inc. v. Pena*, No. 2:08-cv-02258-JFB-ARL, 2011 WL 3423338, at *4 (E.D.N.Y. Aug. 4, 2011) (granting dismissal for failure to adequately allege veil piercing under Panamanian law, because "Panama's veil-piercing doctrine is controlling" where the corporation whose veil plaintiff sought to pierce was "incorporated in the Republic of Panama"); *see also Symington v. Guillen*, No. 2:15-cv-09809-JAK-PJW, 2016 WL 7486603, at *7-9 (C.D. Cal. June 30, 2016) (applying Mexican law to shareholder derivative claims pursuant to internal affairs doctrine); *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (observing that "[s]ince [defendant] was incorporated in the Republic of Panama, this Court will apply Panama's veil-piercing doctrine to plaintiffs' alter ego allegations); *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 577 F. Supp. 2d 124, 128-29 (D.D.C. 2008) (applying law of the United Kingdom to shareholder derivative claims pursuant to internal affairs doctrine and observing, "[t]he internal affairs doctrine is not limited to the application of the laws of the States of the United States"), *aff'd*, 589 F.3d 1292 (D.C. Cir. 2009).

here . . . .  Following the Restatement requires a determination of which forum has the most

significant relationship to the action.").

Specifically, Section 146 of the Restatement sets forth a three-part "most significant

relationship" test for determining which jurisdiction's law should apply.  *See, e.g.*, *Winter v.*

*Novartis Pharms. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014); *Wolfley v. Solectron USA, Inc.*, 541

F.3d 819, 823 (8th Cir. 2008); *In re NuvaRing Prods. Liab. Litig.*, 957 F. Supp. 2d 1110, 1113-

14 (E.D. Mo. 2013).

In the first part of the most significant relationship test, the Court must assess whether a

conflict exists between the foreign law and the law of the forum (here, Peru and Missouri,

respectively).  *Prudential Ins. Co. of Am.*, 475 F.3d at 924.  In the second part, the Court must

identify the place of injury, because the law of the place of injury (referred to as the *lex loci*

*delicti*) presumptively governs.  *Winter*, 739 F.3d at 410 ("[F]or personal injury actions, Missouri

applies the law of the place of injury, unless some other [jurisdiction] has *a more significant*

*relationship.*") (emphasis added); *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir.

1994); *Taylor v. Cottrell, Inc.*, No. 4:09-cv-00536-HEA, 2015 WL 8021729, at *2 (E.D. Mo.

Dec. 7, 2015) (applying the place of injury presumption).  Finally, that presumption controls

unless the Court finds that another jurisdiction has a *more* significant interest based on an

analysis of the factors outlined in Restatement Section 145,[9] and the principles and interests of

the respective jurisdictions outlined in Restatement Section 6.[10]  *See Winter*, 739 F.3d at 410;

---

[9]     The factors are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury
occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4)
the place where the relationship, if any, between the parties is centered.  *See* Restatement § 145.

[10]     The principles are: (a) the needs of the interstate and international systems; (b) the relevant policies of the
forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination
of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular
field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of
the law to be applied.  *See* Restatement § 6.

*Dorman*, 23 F.3d at 1358; *Hefferan v. Ethicon Endo-Surgery, Inc.*, No. 1:14-cv-00911-TSB, 2015 WL 2169689, at *6 (S.D. Ohio May 8, 2015) (holding that, after a court applies the place of injury presumption, the "presumptive choice is then 'tested against the contacts detailed in section 145 and the general principles outlined in section 6'" and, unless another state has a more significant relationship, "the presumption governs").

Critically, the Restatement mandates that the law of the place where the alleged injuries occurred (or *lex loci delicti*) must apply, *unless* the Restatement factors definitively prove that the forum has a "more significant interest."  Thus, to overcome the presumption that the law of the place of injury applies, it is not sufficient to establish that the forum has *an* interest in the application of its law.  Rather, the interest of the forum must be definitively more significant than that of the place of injury.  The presumption favoring the application of the law of the place of injury is so strong that the law of the place of injury must be applied even where the interest of the forum appears to be equal to that of the place of injury.  Indeed, under Missouri law, even if "it is difficult to see clearly that a particular state has the most significant relationship to an issue" after addressing the Restatement factors, "the trial court should apply . . . the substantive law of the place where the injury occurred."  *Taylor*, 2015 WL 8021729, at *2.

### 1.      Peruvian Law and Missouri Law are in Conflict With Respect to Every Claim Plaintiffs Assert

Peruvian and Missouri law are in conflict with respect to material aspects of each of Plaintiffs' claims: (1) claims and theories of vicarious liability,[11] including, but not limited to, corporate veil piercing and alter ego liability, agency liability, and direct participation liability;

---

[11]     As discussed above, Missouri's internal affairs doctrine dictates that Peruvian law should apply to Plaintiffs' vicarious liability theories regardless of the Restatement's broader choice of law analysis.  However, assuming *arguendo*, that Missouri's well-established internal affairs doctrine should be ignored, and that Missouri law should apply to Plaintiffs' veil piercing claims, the conflicts between Peruvian and Missouri law with respect to vicarious liability are addressed herein.

(2) claims and theories of joint tortfeasor and/or contribution liability; (3) negligence and strict

liability claims; (4) claims for conspiracy; (5) claims for direct liability for breach of assumed

duties pertaining to foreseeable harms, and for negligent performance of a contract or

undertaking; and (6) Plaintiffs' theory of punitive damages.

**a.      Peruvian and Missouri Law are in Conflict With
Respect to All of Plaintiffs' Theories of Vicarious Liability**

As shown below, Missouri and Peruvian law are in fundamental conflict with respect to

every theory of vicarious liability advanced by Plaintiffs.

**(1)      Alter Ego and Veil Piercing Theories of Liability**

The legal doctrine on which nearly all of Plaintiffs' claims are founded—*i.e.*, derivative

liability based on disregarding Doe Run Peru's corporate form (including theories of alter ego

and corporate veil piercing)—is not recognized under Peruvian law in *any* form.  (Ex. 16,

Rosenn Decl., ¶¶ 21, 25, 27-28.)  Article 78 of Peru's Civil Code provides that the owners of a

corporation are not subject to the corporation's liabilities based on deference to the corporate

form, (*id.* ¶¶ 18-21), and the concept of limited liability for Peruvian "quotaholders"—the

equivalent of shareholders in a U.S. corporation—is specifically set forth in Article 283 of Peru's

General Company Law.   Thus, both Peru's General Company Law and Peru's Civil Code make

clear that under Peruvian law owners or shareholders are not personally liable for the obligations

of limited liability companies such as Doe Run Peru.  (*Id.* ¶¶ 17-21.)

Unlike Missouri law (or U.S. law generally), however, Peru's Civil Code contains no

statutory provisions that authorize liability for shareholders based on disregarding the corporate

form in any way, and concepts of veil piercing and alter ego liability are entirely foreign to

Peruvian law.  (Ex. 16, Rosenn Decl., ¶¶ 21, 28.)  Indeed, several Peruvian scholars have

concluded that "veil-piercing is not possible in Peru without adoption of positive legislation

20

specifically authorizing it." (*Id.* ¶ 21; *accord id.* 8 n.4.)  To date, Peru has adopted no such

legislation.  Notably, an attempt to amend Peru's Civil Code in the late 1990s to include

veil piercing under certain circumstances failed.  (*Id.* ¶¶ 22-23.)  Thus, the doctrines of

veil piercing and alter ego liability remain unrecognized by Peruvian law.[12]  (*Id.*)

In contrast, Missouri law recognizes the doctrines of veil piercing and alter ego liability

to disregard the corporate form in certain limited situations.  *See, e.g.*, *Dunne v. Res. Converting,*

*LLC*, No. 4:16-cv-01351-DDN, 2017 WL 564485, at *8 (E.D. Mo. Feb. 13, 2017) ("Under

Missouri law, piercing the corporate veil on the alter ego theory may be pleaded as a separate

and distinct cause of action.").  The fact that Missouri law recognizes a legal doctrine that

Peruvian law does not (to say nothing of the fact that the Peruvian legislature has definitively

refrained from codifying such a doctrine into the country's civil law system) presents a textbook

example of a conflict of law between the two jurisdictions.

### (2)   Agency Liability

Although Peru does recognize a species of vicarious liability through agency under

Article 1981 of Peru's Civil Code—which imposes vicarious liability on employers and

principals for torts committed by their employees or agents within the scope of their employment

or service—this form of vicarious liability conflicts with Missouri law in, at least, two significant

respects.  (Ex. 16, Rosenn Decl., ¶¶ 34, 36.)

*First*, Peruvian courts "do not use the principle of vicarious liability enshrined in Article

1981 of the Civil Code as a means to impose liability upon parent corporations for the torts of

their subsidiaries."  (Ex. 16, Rosenn Decl., ¶ 37.)  Indeed, *no* Peruvian court has *ever* held that a

---

[12]     Attempts at circumventing this limitation have also failed, as the doctrines of abuse of right and fraud on the law have been rejected by Peruvian courts as a means to pierce the corporate veil in Peru.  (Ex. 16, Rosenn Decl., ¶¶ 28-30.)

downstream subsidiary is the agent of a corporate parent so as to create a principal-agent relationship under Article 1981.  (*Id.* ¶ 38.)  By contrast, Missouri courts have held that a parent corporation may be vicariously liable for the misconduct of its subsidiary based on an agency theory.  *See, e.g.*, *Rehabcare Grp. E., Inc., v. Stratford Health Care Props., LLC*, No. 4:14-cv-00886-FJG, 2017 WL 4390276, at *14 (W.D. Mo. Sept. 29, 2017) (recognizing that under certain circumstances a parent corporation may be found vicariously liable for the alleged conduct of its subsidiary-agent).

*Second*, under Peruvian law a principal cannot be vicariously liable *unless* and *until* there is a "judicial determination that the subsidiary is liable" as a separate party either prior to or contemporaneously with the court's determination of the principal's vicarious liability.  (Ex. 16, Rosenn Decl., ¶ 39 ("[E]ven if a Peruvian court did decide to impose liability under Article 1981 upon parent corporations for the torts of their subsidiaries, vicarious liability could not be applied without a prior judicial determination that the subsidiary is liable for the plaintiffs' damages.").)  Plaintiffs' previous Peruvian law expert agreed with Defendants' expert, Professor Rosenn, and concluded that, under Peruvian law, the subsidiary-agent must be found to be liable before the principal can be held liable.  (Ex. 17, Expert Report of Professor Gastón Fernández Cruz, ¶ 107) ("As noted, for the principal to be indirectly liable for the damages committed by the agent, they must first be directly responsible for the damages done personally.  The principal cannot be indirectly responsible if the direct responsibility of the agent-cause *is not proved beforehand*." (emphasis added).)  Accordingly, even if Doe Run Peru was an agent of Defendants (and it was not), such a relationship would not provide a route to bypass the absence of corporate veil piercing under Peruvian law.  Here, Doe Run Peru is not a party and has not already been held liable.  By contrast, Missouri courts have held principals vicariously liable for the acts of their

agents in the absence of any judicial determination of liability against the agent.  *See, e.g.*,

*Collins v. Westlake Hardware Co. of Macon, Inc.*, 783 S.W.2d 172, 173 (Mo. Ct. App. 1990).

(3)      <u>Direct Participation Liability</u>

Plaintiffs also attempt to circumvent the legal protections afforded to quotaholders of

Peruvian limited liability companies under Peruvian law through a strained theory of "direct

participation liability," whereby Plaintiffs allege that Defendants, who indirectly owned Doe Run

Peru, are liable for directly "operat[ing] . . . the La Oroya Complex."  (Am. Compl. ¶¶ 248-49.)

However, there is no analogous Peruvian legal doctrine that permits a court to hold a

parent corporation, let alone an officer or shareholder of that parent corporation, liable for direct

participation in the tortious conduct of its subsidiary.  (Ex. 16, Rosenn Decl., ¶ 41.)  Peruvian

law does not recognize U.S.-style direct participation liability, and there has been no receptivity

to such a theory by Peruvian courts.  (*Id.*)

By contrast, certain courts in the United States have recognized and applied the direct

participation liability doctrine (albeit in limited circumstances that are not applicable here).  *See,*

*e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 53 (1998); *Forsythe v. Clark USA, Inc.*, 864 N.E.

2d 227, 238-39 (Ill. 2007).

b.      <b>Peruvian Law and Missouri Law<br>are in Conflict With Respect to Both Joint<br><u>Tortfeasor and Contribution Liability</u></b>

Plaintiffs seek to hold Defendants liable alternatively as joint tortfeasors or contributors

to the liability of each other and/or Doe Run Peru.  (Am. Compl. ¶¶ 77-86.)  Although Peruvian

law recognizes the concept of joint tortfeasor/contributor liability, it is only found in limited

circumstances that are inapplicable here.  Article 1981 of Peru's Civil Code makes principals

vicariously liable for torts committed by their agents, and this liability is joint and several

between the agent and principal.  However, as discussed above (*supra* at 21-22), this agency

23

theory does not permit Peruvian courts to pierce the corporate veil.  Moreover, agency theories
cannot impose liability upon the principal unless the putative agent—here, Doe Run Peru (which
is not even a party to this action)—is itself first found liable.  (*See* Ex. 16, Rosenn Decl., ¶¶ 39-
40.)  Similarly, although Article 1981 of Peru's Civil Code imposes joint and several liability on
joint tortfeasors, that theory is not utilized by Peruvian courts to impose joint liability on
managers or quotaholders of limited liability companies for the acts of the company.  (*Id*. ¶ 34.)

Moreover, Peruvian courts do not impose joint tortfeasor or contributor liability based on
a parent company's ownership of a subsidiary.  (*See id*. ¶ 36.)  Indeed, joint liability of
tortfeasors is not available in Peru as a device to pierce the corporate veil.  (*Id.* ¶¶ 37-38.)  By
contrast, Missouri courts have, when appropriate, held corporate parents and subsidiaries liable
as joint tortfeasors.[13]  *See, e.g.*, *Favazza v. Path Media Holdings, LLC*, No. 4:12-cv-01561-TCM,
2014 WL 1846109, at *9 (E.D. Mo. May 8, 2014) (holding parent corporation, its subsidiaries,
and its affiliates to be alter egos and entering a judgment of joint and several liability).

**c.      Peruvian Law and Missouri Law are in Conflict
With Respect to Both Negligence and Strict Liability**

Missouri law also conflicts with Peruvian law with respect to negligence and strict
liability.  Under Peruvian law both negligence and objective liability (Peru's analogue to strict
liability) are subject to an important limitation that is both particularly relevant here and is
without an equivalent under Missouri law.  (Ex. 16, Rosenn Decl., ¶ 50.)

Article 1971 of Peru's Civil Code provides complete immunity from liability for damages
based on objective liability and negligence that occur in the course of an actor's exercise of a
right conferred upon him by law.  (*Id.* ¶ 50.)   No provision affording such immunity exists under

---

[13]     Notably, Plaintiffs have conceded that their contribution claim is not viable.  (*See* Dkt. # 640, MTD Opp.,
at 174-75.)  Nevertheless, for purposes of this motion only, Defendants treat Plaintiffs' claim for "contribution" as
tantamount to a claim for joint tortfeasor liability.  (*See* Am. Compl. ¶¶ 156-65.)

24

Missouri law.  This conflict is material because Doe Run Peru operated the La Oroya Complex

pursuant to a right that was granted subject to and in accordance with the PAMA, which in turn

was required and approved by the Peruvian government pursuant to the April 1993 Decree.

Accordingly, because the La Oroya Complex was operated pursuant to rights conferred on Doe

Run Peru by Peruvian law, Article 1971 would immunize Defendants' conduct, regardless of

whether it was tortious (which it was not).  (*Id.* ¶¶ 45-50.)  Indeed, Dr. Carlos J. Chipoco, an

expert in foreign law previously retained and relied on by Plaintiffs, agreed when he testified

that:

> [T]he Civil Code itself exempts the responsible party from the obligation to
> compensate in the case where the harm originates "in the regular exercise of a
> right" (Article 1971: There is no responsibility in the following cases: 1. – In the
> regular exercise of a right.)  In the case of Doe Run in Perú, their harmful activity
> has been permanently legitimized and validated by the Peruvian State through it's
> [sic] continuous modifications and expansions of the PAMA . . . for which the
> above referenced business can be defended as operating "in the regular exercise of
> a right" granted by the State of Peru.

(*Id.* ¶ 48.)

By contrast, Missouri law does not recognize a similar safe harbor for tort liability based

on compliance with an environmental statute or regulation.  *See, e.g.*, *Kersey v. Harbin*, 591

S.W.2d 745, 750 (Mo. Ct. App. 1979) (citing to Restatement (Second) of Torts § 288C and

stating "compliance with a legislative enactment . . . does not preclude a finding of negligence").

### d. Peruvian Law and Missouri Law are in Conflict Concerning Civil Conspiracy

Missouri law directly conflicts with Peruvian law with respect to Plaintiffs' claims for

civil conspiracy, (Am. Compl. ¶¶ 127-142), for two specific reasons.  *First*, Peru does not

recognize a cause of action for civil conspiracy to commit a tort.  (Ex. 16, Rosenn Decl., ¶ 44.)

Under Peru's Penal Code, entering into a conspiracy is a *criminal*, not civil, violation and does

not give rise to civil liability, unless the conspiracy concerns drug trafficking, rebellion, or

sedition.  (*Id.*)  None of those exceptions apply here.  *Second*, even if conspiracy were a recognized civil theory under Peruvian law, the predicate act on which Plaintiffs base their civil conspiracy claim is Doe Run Peru's purportedly negligent operation of the La Oroya Complex.  However, as discussed above (*supra* at 24-25), Article 1971 provides immunity from such negligence in connection with the exercise of a right under operation of law.  Accordingly, the predicate act on which Plaintiffs base their conspiracy claim is not recognized under Peruvian law either.

By contrast, under Missouri law, a civil conspiracy to commit a tort has legal consequences; Missouri law recognizes that each conspirator is liable for the underlying tort.  *See, e.g.*, *Gibson v. Brewer*, 952 S.W.2d 239, 245 (Mo. 1997) ("A civil conspiracy is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act.").

> **e.    Peruvian Law and Missouri Law are in Conflict
> With Respect to Plaintiffs' Claims for Breach of
> Assumed Duties Pertaining to Foreseeable Harms and
> Negligent Performance of a Contract or Undertaking**

Missouri law also conflicts with Peruvian law with respect to Plaintiffs' claims for breach of assumed duties (Counts VIII and IX) and negligent performance of a contract (Counts X and XI).  As Plaintiffs concede in their opposition to Defendants' motion to dismiss, Counts VIII–XI arise solely under the Restatement (Second) of Torts § 324A (1965)—Liability to a Third Person for Negligent Performance of an Undertaking—which Missouri has adopted.[14]  However, under

---

[14]    Plaintiffs asserted Counts X and XI against Defendants for "Negligent Performance of a Contract or Undertaking," and those claims thus plainly arise under Restatement (Second) of Torts § 324A (1965).  In addition, Plaintiffs repeatedly cite cases in their Opposition to Defendant's Motion to Dismiss that apply Section 324A.  (Dkt. # 640, MTD Opp., at 175-181.)  Further, although they nominally framed Counts VIII and IX as claims for "Direct Liability For Breach Of Assumed Duties Pertaining To Foreseeable Harms," Plaintiffs explicitly rely on Section 324A throughout their Opposition, and thereby concede that those claims also arise under that section.  (*Id.* at 171-174.)  Thus, regardless of Plaintiffs' assertions otherwise, Counts VIII-XI all assert claims under Section 324A.

Peruvian law, no such Restatement-based claims exist.  Peru neither codified these claims, nor is there any analogous law in Peru providing for such claims.  (Ex. 16, Rosenn Decl., ¶¶ 56, 64.) Accordingly, because Peru does not recognize causes of action based on these theories, Counts VIII–XI directly conflict with Peruvian law.

Moreover, to the extent that Plaintiffs seek to assert that Counts VIII–XI are simply seeking to hold Defendants liable for breaching some unspecified duty of care to Plaintiffs, these claims would be duplicative of Plaintiffs' claims for negligence and are still in direct conflict with Peruvian law.  As discussed above, Article 1971 of Peru's Civil Code provides complete immunity from tort claims arising from an actor's exercise of a right conferred upon him by law. (*Id.*, ¶¶ 47-50.)

### f.   Peruvian Law and Missouri Law are in Conflict Concerning Punitive Damages

Peruvian Civil Law does not provide for punitive damages.  (*See, e.g.*, Ex. 16, Rosenn Decl., ¶ 67); *see also Flores v. S. Peru Copper Corp.*, 253 F. Supp. 2d 510, 534 n. 26 (S.D.N.Y. 2002) (punitive damages are "unavailable under Peruvian law"), *aff'd*, 414 F.3d 233 (2d Cir. 2003).  By contrast, Missouri law does permit punitive damages under certain circumstances not applicable here.  *See, e.g.*, *NuvaRing*, 957 F. Supp. 2d at 1116-1117 (applying punitive damages under Missouri law).

Based on the foregoing, this consolidated action presents true conflicts between Peruvian law and Missouri law concerning each of Plaintiffs' asserted claims.  The first requirement for a determination of foreign law under Missouri's conflicts of law principles—the existence of a conflict between the substantive laws of the competing jurisdictions—is therefore, satisfied in this case.

## 2.      Peruvian Law Presumptively Applies
## Because Peru is the Undisputed Place of Injury

Although the Court cited a need for additional factual development concerning the place of Plaintiffs' injuries in the 2015 Order, *Reid*, 74 F. Supp. 3d at 1024, application of the second part of the "most significant relationship" analysis under the Restatement test—determining the place of injury—is not disputed here.

First, Plaintiffs themselves allege that they were injured in Peru.  (*See* Am. Compl. ¶ 1 ("This is an action to seek recovery . . . for injuries, damages, and losses . . . caused by exposures to lead and other toxic substances as a result of Defendants' ownership, use, management, supervision, storage, maintenance, disposal, and release of materials from a metallurgical complex *in the region of La Oroya, Peru*"); *id.* ¶ 2 ("At critical times during gestation and/or their developmental years and to the present, Plaintiffs were exposed to damaging levels of lead and other toxic substances . . . as a result of Defendants' acts and/or omissions *related to their ownership and/or operation of the La Oroya Complex.*" (emphasis added).)[15]

Second, this Court confirmed this point in the 2015 Order, stating that Peru "is where the damage . . .  was sustained," and noting that Plaintiffs "do not allege that they have ever left Peru, so the damage they have allegedly suffered could not have been sustained . . . anywhere else."  *Reid*, 74 F. Supp. 3d at 1019.  In their Amended Complaint, Plaintiffs still do not allege that they were injured anywhere other than in Peru.

---

[15]       *See also* Am. Compl. ¶ 70 ("At all relevant times hereto, Defendants created, emitted or caused . . . the lead and other hazardous substances *in the La Oroya region* . . . ."); *id.* ¶ 72 ("Defendants' actions and omissions causing the release of these toxic substances *into the surrounding environment*, and/or allowing the accumulation of these toxic substances and resultant contamination *of the surrounding environment*, and/or failing to remediate *the surrounding environment* . . . has resulted in plaintiffs' exposure to these toxic and harmful substances."); *id.* ¶ 96 ("As a direct and proximate result *of the releases of toxic and harmful substances from the La Oroya Complex* caused by the acts and omissions of these Defendants, plaintiffs have suffered injuries, and currently suffer and will continue to suffer damages and losses . . . .") (emphasis added).

Third, although Plaintiffs' allegations are dispositive in their own right regarding whether Peru is the place of their injuries, discovery from Plaintiffs since the 2015 Order similarly confirms their allegations that their injuries occurred in Peru.  Multiple Plaintiffs, and their parents, have admitted that Plaintiffs' injuries were sustained exclusively in Peru.  (*See, e.g.*, Ex. 18, Oct. 5, 2017 Dep. Tr. of J. Rojas Barona, at 113:12-14, 114:8-10 (conceding, among other things, that "all the contamination that you complain about is in Peru," and "all the relevant events for this case occurred in Peru"); Ex. 19, Oct. 11, 2017 Dep. Tr. of T. Medina Salcedo (Mother of S.R.A.M.), at 78:5-80:19 (conceding that, among other things, "every time that [her] daughter was injured or suffered any pain from the contamination in La Oroya, she was in Peru," that "[t]he alleged contamination that you complain about occurred in Peru," and that "[a]ll the facts about this case occurred in Peru"); Ex. 20, Jan. 23, 2018 Dep. Tr. of R. Espinoza Sovero (Father of J. Espinoza), at 49:8-10 (conceding that, among other things, "all the contamination . . . occur[red] in Peru"); Ex. 21, Jun. 16, 2017 Dep. Tr. of W. Toribio Palomino, at 60:18-61:2 (confirming that all the injuries stemming from exposure to substances were "sustained in La Oroya"); Ex. 22, Jun. 23. 2017 Dep. Tr. of G.S.A.Y., at 80:5-10 (confirming that "all of the things that [plaintiff] believe were caused by lead [] happened in La Oroya").)

Plaintiffs' repeated concessions that Peru is where they were injured gives rise to a presumption that Peruvian law governs all claims in this case.  *Winter*, 739 F.3d at 409-10 (holding that Missouri's choice of law rules establish "a presumption that the state with the most significant relationship [to the issues] *is the state where the injury occurred*" and that "Missouri applies the law of the place of injury, unless some other state has a more significant relationship" (emphasis added)).  The law of Peru is therefore presumptively applicable here.

A different result is possible only if consideration of the factors identified in Restatement

Section 145 and the principles contained in Restatement Section 6 establish that a jurisdiction

*other than* that in which the injury occurred (*i.e.*, Peru) has a more significant interest in the

application of its law.  In fact, applying Section 145 and Section 6 here only reinforces the

presumptive conclusion reached after application of the first two steps of the conflicts analysis;

the law of Peru governs Plaintiffs' claims.

**a.      The Factors in Section 145 of the Restatement<br>Confirm That Peruvian Law Should Apply**

Each of the factors identified in Section 145 of the Restatement confirms that (i) Peru has

the most significant relationship to the facts, claims, parties, and injuries alleged in this litigation

such that the law of Peru should be applied, and (ii) Missouri does not have a more significant

interest in having its law applied.

**(1)      Place of Injury**

Although the Court in the 2015 Order listed the "place where the injury occurred" as one

of the fact-intensive Restatement factors that necessitated further discovery (*Reid*, 74 F. Supp. 3d

at 1024), as noted above, there is no dispute that Peru is the place of Plaintiffs' injuries.  That is

where Plaintiffs lived, were exposed to the alleged contaminants, and allegedly were damaged.

No discovery on this subject was necessary, but the depositions taken of Plaintiffs (and their

subsequent amended pleadings) have confirmed that they were injured in Peru.  None had ever

been to the United States, or claimed an injury occurring anywhere other than in the La Oroya

region.

Accordingly, this Section 145 factor indicates that Peru has the most significant interest

in having its law applied.

30

**(2)**   **Place of Misconduct**

The Court also stated in the 2015 Order that additional factual development was necessary concerning the place of the alleged misconduct. *Id.* at 1024. Plaintiffs' own allegations, however, establish that Peru is the place of the alleged misconduct, and negate the need for any additional factual development on this issue. Specifically, Plaintiffs allege that Defendants conducted operations at the La Oroya Complex in a manner that negligently or recklessly "created, emitted or caused, and/or allowed to be emitted, allowed to accumulate, stored, failed to remove, and/or failed to remediate the lead and other hazardous substances in the La Oroya region" in Peru, allegedly causing injury to Plaintiffs in Peru, and purportedly failed to sufficiently warn Plaintiffs about these risks in Peru. (Am. Compl. ¶¶ 70, 82.) Indeed, Plaintiffs repeatedly assert in the Amended Complaint that their claims are based on Defendants' purported *direct* operation of the La Oroya Complex, *in Peru*, in a manner that caused pollution and injured Plaintiffs:

- Plaintiffs seek recovery from Defendants for "injuries, damages and losses suffered by each and every plaintiff named herein caused by exposures to lead and other toxic substances as a result of … [the] release of materials from a metallurgical complex in the region of La Oroya, Peru." (*Id.* ¶ 1.)

- "Defendants . . . owned, *operated, maintained, managed and/or used the La Oroya metallurgical complex and related operations and facilities* . . . in a way that negligently, carelessly, and recklessly generated, handled, stored, released, disposed of, allowed to accumulate, failed to control or contain, and/or failed to remediate the heavy metals and other toxic substances used, emitted, and/or generated by the complex, resulting in the release of toxic metals and gases and other hazardous substances *onto and around the properties on which plaintiffs, at relevant times in the past and/or currently have resided, used, visited, and/or attended school*; as such, these Defendants' actions and omissions resulted in the contamination of the locations where plaintiffs were thereby exposed." (*Id.* ¶ 81 (emphasis added).)

*See Winter*, 739 F.3d at 410 (place of misconduct causing injury was where sales representatives failed to issue warning).

31

Even if the Court were to ignore Plaintiffs' concessions in their Amended Complaint (and it should not), Plaintiffs similarly conceded in their depositions that all of the misconduct at issue in this case occurred exclusively in Peru.  (*See, e.g.*, Ex. 18, Oct. 5, 2017 Dep. Tr. of J. Rojas Barona, at 113:15-17 (conceding that "all the wrongdoing or illegal acts that you complain about occurred in Peru"); Ex. 23, Oct. 3, 2017 Dep. Tr. of. N. Barona Caparachin (Mother of J. Barona), at 82:8-13 (conceding that "all the contamination you are complaining of occurred in Peru"); Ex. 19, Oct. 11, 2017 Dep. Tr. of T. Medina Salcedo (Mother of S.R.A.M.), at 79:5-7 (conceding that "all the illegal acts that you allege in this lawsuit occurred in Peru"); Ex. 20, Jan. 23, 2018 Dep. Tr. of R. Espinoza Sovero (Father of J. Espinoza), at 49:11-13 (same.); Ex. 24, Jan. 22, 2018 Dep. Tr. of J. Espiritu Carhuancho, at 36:3-16 (same); Ex. 25, Oct. 13, 2017 Dep. Tr. of. M. Palomino Oscanoa (Mother of W. Toribio Palomino), at 88:8-10 (same); Ex. 26, Oct. 17, 2017 Dep. Tr. of. M. Escandon Huaynate (Mother of Y.Y.H.E), at 58:8-10 (same).)

Moreover, Plaintiffs' contention that certain corporate "decisions" were made in Missouri by Doe Run Peru's corporate parents or affiliates (Am. Compl. ¶ 71) does not make Missouri the place of misconduct.  In the context of a choice of law analysis under the Restatement, the place of upstream corporate decisions is not considered.  *See de Melo v. Lederle Labs.*, 801 F.2d 1058, 1059, 1064 (8th Cir. 1986) (rejecting plaintiff's assertion that the U.S. defendant "had complete control over the manufacture, packaging, and labeling of Myambutol produced and distributed by [Brazilian Corporation]" in Brazil where the "crux of this suit concerns the safety of drugs distributed in Brazil" and noting that it "would seem that Brazil has a paramount interest in regulating the quality and distribution of drugs through Brazilian products liability law") (citing *Harrison v. Wyeth Labs.*, 510 F. Supp. 1, 4-5 (E.D. Pa. 1980) (foreign law applied to tort claims concerning drugs marketed in foreign country, even if all production and marketing decisions

32

were made in defendant's headquarters in United States), *aff'd*, 676 F.2d 685 (3rd Cir. 1982)); *In re Genetically Modified Rice Litig.*, No. 4:06-md-01811-CDP, 2010 WL 2326036, at *9 (E.D. Mo. June 7, 2010) (holding that in tort cases "the site of the physical conduct causing the injury is more important than the site where decisions, or non-decisions, were made"); *see also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 70 (D.C. Cir. 2011) ("Other than decision-making . . . all conduct causing injury occurred in Indonesia according to the complaint [and] [t]he plaintiffs are citizens of and reside in Indonesia," and thus Indonesian law applied to the plaintiffs' non-federal tort claims), *aff'd and vacated on other grounds*, 527 Fed. App'x 7 (D.C. Cir. 2013); *In re NuvaRing*, 957 F. Supp. 2d at 1115 (rejecting defendants' arguments that the location of corporate decision-making was the place of misconduct under Restatement and finding that where acts causing injury happened was place of misconduct).[16]

Further, even assuming that Plaintiffs' allegations of "decisions" made in the United States were accurate—and they are not—Plaintiffs concede that any such "decisions" did not concern corporate conduct in the United States but rather were directly related to the operation and management of the La Oroya Complex in Peru, where Plaintiffs were allegedly injured. (Am. Compl. ¶¶ 71, 80, 99-103.)  Therefore, Plaintiffs' admissions in their Amended Complaint subsequent to the 2015 Order further support the application of Peruvian law and alleviate any need for additional factual development on this issue.

In any event, the fact is that Defendants made no such "decisions" regarding the operation of the La Oroya Complex.  Assuming *arguendo* that there is legal relevance to Plaintiffs' contention that Missouri (or New York) is the place of misconduct for Restatement

---

[16]     *See also Ogburn-Sisneros v. Fresenius Med. Care Holdings, Inc.*, No. 2013-05050, 2015 WL 6437773, at *4 (Mass. Super. Oct. 19, 2015) (applying law of place of injury and rejecting plaintiff's argument that place of misconduct was where defendants "made its decisions," and instead concluding that place of misconduct was where "the injured party . . . ingested the drug").

purposes simply because vague and unspecified corporate "decisions" were made there by Doe Run Peru's corporate parents or affiliates (and there is not), discovery since the 2015 Order confirms that *none* of the Defendants made *any* decisions concerning Doe Run Peru's operations. In fact, discovery demonstrates that Doe Run Peru operated independently of any direct oversight, decision making, or control by any of the Defendants.

For example, two former Presidents and General Managers of Doe Run Peru have confirmed at deposition that the management personnel at Doe Run Peru in Peru were in charge of day-to-day operational decisions concerning the La Oroya Complex.  Bruce Neil, President and General Manager of Doe Run Peru from 2003-2006, testified that "Doe Run Peru was operating the plant, had—all the plant, was responsible for the plant's operation.  Doe Run Peru was responsible for all of this.  And Doe Run Peru was responsible for the production, was responsible for the emissions, was responsible for the employees, all of that.  Was responsible for that and that was—part of that responsibility was accompanied by the requirements of the—of the PAMA and requirements of the—the laws and rules and regulations in the country of Peru." (Ex. 27, Sept. 20, 2017 Dep. Tr. of B. Neil, at 122:19-123:4.)  Similarly, Kenneth Buckley, President and General Manager of Doe Run Peru from 1997 to 2003, was asked whether it was "Ira Rennert who ultimately *had to make the decisions* with respect to the continued operation or just matters affecting the operation of Doe Run Peru," he testified that "I never felt Ira would be the one to make those decisions, ever."  (Ex. 28, Jun. 9, 2017 Dep. Tr. of K. Buckley, at 193:24-194:10 (emphasis added).)

Eric Peitz, Doe Run Peru's Treasurer from 1998 to 2005, and Vice President of Finance Administration from 2005-2006, also repeatedly confirmed that Doe Run Peru operated independently of any controlling "decisions" made by any of the Defendants.  When asked

34

whether "executives from Doe Run Resources would make the decisions related to the operation

of the finance department at Doe Run Peru," Mr. Peitz testified that "[t]he day-to-day operations

were left to the financial people at Doe Run Peru."  (Ex. 29, July 27, 2017 Dep. Tr. of E. Peitz, at

33:4-8.)  Similarly, when asked about Ira Rennert's role in decisions concerning the operation of

Doe Run Peru, Mr. Peitz testified that "Mr. Rennert allowed Doe Run Peru to fully operate La

Oroya and Cobriza.  He put a lot of faith and trust in the mining—Peruvian mining management

team and employees."  (*Id*. at 38:12-39:5.)  When later asked whether Mr. Rennert "ultimately

made decisions with respect to just general operations of the complex," Mr. Peitz testified that

"he did not provide a lot of guidance as far as the operations of the metallurgical facility . . . .  He

left the operations of the facilities principally to the operators that were hired to do that."  (*Id*. at

242:10-21.)

Other Defendants have further confirmed that none of the Defendants made "decisions"

impacting operations at La Oroya.  Jeff Zelms, President and Chief Executive Officer of Doe

Run Resources from 1984 to 2006, testified that "Ken Buckley was in charge [of Doe Run Peru].

He was president of Doe Run Peru.  Now, when anyone was in Peru from Doe Run Resources,

Doe—Ken Buckley was el jefe grande.  So Dan Vornberg or anybody else was never in charge

of whatever specific area they were looking at . . . Ken Buckley was in charge and Ken reported

to me.  Ken ran Doe Run Peru."  (Ex. 30, Jun. 21, 2017 Dep. Tr. of J. Zelms, at 115:15-24.)

Similarly, when asked "[w]hat kind of day-to-day work did you do in your position for

Doe Run Peru with regard to administration," Marvin Kaiser, who served as Vice President and

Chief Financial Officer of Doe Run Resources from 1998 to 2001, Executive Vice President and

Chief Financial and Administrative Officer from 2001 to 2004, and Executive Vice President and

Chief Administrative Officer from 2004 to 2006, responded "I don't think there was really any day-to-day work."  (Ex. 31, July 7, 2017 Dep. Tr. of M. Kaiser, at 72:11-15.)

Mike Ryan, Vice Chairman of Renco from 2013 to present, in his capacity as a Rule 30(b)(6) corporate witness for both Renco and Doe Run Resources, also repeatedly testified that "Doe Run Peru was operating the facility, not Doe Run or Renco," (Ex. 32, Jan. 30, 2018 Dep. Tr. of M. Ryan, at 125:21-23), and that "Doe Run Peru was managing Doe Run Peru.  Doe Run [Resources] was not," (Ex. 33, Jan. 31, 2018 Dep. Tr. of M. Ryan, at 399:14-15).

Likewise, Dennis Sadlowski, Vice President of Law at Renco, and Secretary and Director for Doe Run Resources from 2002 to 2006, testified that "the Renco Group and Mr. Rennert or anyone else there exercised no control as such over the operations of Doe Run Peru."  (Ex. 34, July 13, 2017 Dep. Tr. of D. Sadlowski, at 196:21-24.)  Mr. Sadlowski also confirmed that "Doe Run Peru was an independent entity.  It had officers and directors.  It ran its operations. Obviously I went down there to be informed of what they were doing [but] [t]hey made their own decisions.  They had the compatibility and expertise of doing that with some assistance from Doe Run Resources Corporation, but it was a standalone subsidiary operation just as most of our activity companies are in the Renco Group."  (Ex. 35, July 12, 2017 Dep. Tr. of D. Sadlowski, at 136:22-137:8.)

Ira Rennert, Chairman of the Board of both Renco and Doe Run Resources, similarly testified that he had no involvement in the daily operations of Doe Run Peru.  (Ex. 36, Sept. 13, 2017 Dep. Tr. of I. Rennert, at 78:22-25 (testifying that he was not asked to approve any decisions relating to the operation of the La Oroya Complex).)

Tellingly, Plaintiffs have deliberately declined to notice depositions of key Doe Run Peru employees that did make "decisions" for Doe Run Peru, and did operate the La Oroya Complex

(such as Juan Carlos Huyhua,[17] Jose Mogrovejo Castillio,[18] or a single other key Doe Run Peru manager or employee), presumably to avoid testimony that would reiterate and confirm the testimony from the others (noted above), and directly undermine Plaintiffs' theories of alter ego and veil piercing liability by confirming that Doe Run Peru operated independently of control exerted by any of the Defendants.

Accordingly, as a matter of both law and fact, Plaintiffs cannot escape the fact that, for Restatement purposes, the place of misconduct is Peru.

### (3)   Domicile, Residence, Nationality, Place of Incorporation and Business of the Parties

Although the Court, in the 2015 Order, also referenced the domicile, residence, nationality, place of incorporation and place of business of the parties as one of the fact-intensive Restatement factors that necessitated further discovery (*Reid*, 74 F. Supp. 3d at 1024), no further discovery was or is needed on this issue because these points are not disputed.  As alleged by Plaintiffs, the domicile, residence, nationality, place of incorporation, and place of business of the parties are in Peru, Missouri, and New York.[19]  Defendants do not dispute these facts.

However, for this Restatement factor, courts give great weight to the location of *plaintiffs'* residence (here, Peru) when, as here, it is also the place of injury.  *See In re E.I. Du Pont De Nemours & Co.*, No. 2:13-md-2433, 2015 WL 10910489, at *10 (S.D. Ohio May 20,

---

[17]     Mr. Huyhua served as Central Manager of Operations for Centromin from 1995-1997, Vice-President and Manager of Operations for Doe Run Peru October from 1997 to April 2006, and President and General Manager from April 2006 to June 2012.

[18]     Mr. Mogrovejo began working as Doe Run Peru's Director of Environmental Affairs beginning in 2000, and later served as Vice President of Environmental Affairs.

[19]     The Plaintiffs are residents of Peru (Am. Compl. ¶ 2.)  Defendants are Missouri and/or New York corporations, and officers or agents of those corporations, all of whom have their principal place of business and/or residence in New York and/or Missouri.  (*Id*. ¶¶ 10-28.)  Doe Run Peru, the entity that operates the facility that allegedly caused Plaintiffs' injuries, is incorporated under the laws of Peru and has its principal place of business in Peru.  (Ex. 15, 2007 Peru Statement, at 1.)

2015) ("[T]he law of the plaintiff's place of injury applies, particularly where the place of injury is the same as the plaintiff's domicile.").  Conversely, courts give little weight to the place of defendants' incorporation when, as here, it is the only connection with the forum state.  *See Lee ex rel. Lee v. Choice Hotels Int'l Inc.*, No. 02-10-280(CHT), 2006 WL 1148737, at \*2 (Del. Super. Ct. Mar. 21, 2006) (presumption that law of the place of injury applies "should not be disturbed where [the] place of incorporation is the only factor favoring the forum").  Accordingly, this factor also weighs in favor of applying Peruvian law.

### (4)    Place Where the Relationship Between the Parties is Centered

As the Court recognized as a possibility in the 2015 Order,[20] Plaintiffs have no relationship with Defendants at all, and have not even alleged any such relationship.  Rather, Plaintiffs' claims arise solely because they live in La Oroya, Peru, where Doe Run Peru, a company incorporated under the laws of Peru, operated the La Oroya Complex from 1997 to 2009.  (Ex. 15, 2007 Peru Statement, at 1.)  Accordingly, insofar as their legal claims are concerned, Plaintiffs have—at best—a relationship with Doe Run Peru, for the purposes of the Restatement analysis.  The only reason Defendants are in this case is because they happen to be affiliates of Doe Run Peru, or officers or employees of the corporate Defendants.

Plaintiffs allege no contact with Missouri (or the United States) or with Defendants in Missouri (or the United States) prior to the initiation of this lawsuit, other than through the Peruvian entity, Doe Run Peru.  (*See, e.g.*, Ex. 18, Oct. 5, 2017 Dep. Tr. of J. Rojas Barona, at 7:2-4, 106:24-107:1 (conceding that the trip for his deposition was the first he had been "outside the nation of Peru," and further that he had "never traveled to the United States before [the trip

---

[20]        *See Reid*, 74 F. Supp. 3d at 1024 (noting that "[t]he court cannot know where the relationship, *if any*, between plaintiffs and defendants was centered when it does not know anything about that relationship—*or even whether it exists*" (emphasis added)).

for his deposition]"); Ex. 19, Oct. 11, 2017 Dep. Tr. of T. Medina Salcedo (Mother of S.R.A.M.),
at 78:9-11 (conceding that "her daughter has only been injured in Peru"); Ex. 20, Jan. 23, 2018
Dep. Tr. of R. Espinoza Sovero (Father of J. Espinoza), at 51:5-6, 53:11-13 (conceding that his
"son has never lived outside Peru," and that the "only time that [his] son has been outside Peru
was for his deposition").)

Therefore, to the extent there is any relationship, it is centered entirely on Doe Run Peru
in Peru.  In fact, sworn testimony from Plaintiffs and their parents confirms as much.  (*See, e.g.*,
Ex. 18, Oct. 5, 2017 Dep. Tr. of J. Rojas Barona, at 114:5-7 (conceding that his "relationship
with Doe Run Peru or with any Doe Run company centered in Peru"); Ex. 37, Oct. 4, 2017 Dep.
Tr. of E. Rojas Huaman (Father of J. Rojas Barona), at 97:6-17 (agreeing that any relationship
with Doe Run Peru is based on the parents' employment by the smelter and the services provided
to the children, and that "that relationship occurred solely in Peru"); Ex. 19, Oct. 11, 2017 Dep.
Tr. of T. Medina Salcedo (Mother of S.R.A.M.), at 79:13-24 (conceding that all plaintiff's
contacts with any Doe Run company occurred in Peru); Ex. 20, Jan. 23, 2018 Dep. Tr. of R.
Espinoza Sovero (Father of J. Espinoza), at 50:17-20 (conceding that "relationship between your
son and Doe Run or any Doe Run company was centered in Peru"); Ex. 38, Oct. 10, 2017 Dep.
Tr. of L. Carhuancho Yaringano (Mother of J. Espiritu Carhuancho), at 83:14-84:8 (confirming
that plaintiff's "relationship with Doe Run Peru or any other Doe Run company was centered in
Peru," and that "the illegal activities [plaintiff] complain[s] about in this lawsuit . . . occurred in
Peru . . . everything about this case occurred in Peru"); Ex. 24, Jan. 22, 2018 Dep. Tr. of J.
Espiritu Carhuancho, at 36:16-37:7 (confirming that "all contacts that [he] had with Doe Run
company occurred in Peru," and that plaintiff's "relationship with Doe Run Peru or with any Doe
Run company was centered in Peru.").)

In any event, when, as here, the plaintiffs lack any connection to the forum state, courts routinely hold that the place of injury is also the place in which the parties' relationship is centered.  *See Gilliland v. Novartis Pharm. Corp.*, 33 F. Supp. 3d 1060, 1065-66 (S.D. Iowa 2014) (finding locus of parties' relationship was where plaintiff was injured, not state where defendant issued warnings); *Cornett v. Johnson & Johnson*, 998 A.2d 543, 552 (N.J. Super. Ct. App. Div. 2010) ("Kentucky was also the locus of the parties' relationship, because while [defendant] issued its warnings and warranties from Florida, [plaintiff] and his healthcare providers received them or suffered from their omission in Kentucky."), *aff'd as modified*, 48 A.3d 1041 (N.J. 2012).  Even assuming, *arguendo*, that Plaintiffs could show that the relationship between Plaintiffs and Defendants was centered in Missouri or elsewhere in the United States—which they cannot—this Restatement factor would still be vastly outweighed by all of the others, as well as the presumption in favor of the place of injury, all of which make clear that Peruvian law should apply here.

### b.  The Principles Set Forth in Section 6 of the Restatement Similarly Confirm That Peruvian Law Should Apply

The Section 145 factors overwhelmingly confirm that Peru has the most significant interest to the claims and parties here and that no additional inquiry is necessary.  Yet, even if the Court were to continue the Restatement analysis by assessing the principles enumerated in Section 6 of the Restatement—and the Court in the 2015 Order cited certain of the Section 6 principles as items that necessitated further factual development—such an inquiry serves only to further demonstrate that Peru has the most significant interest in Plaintiffs' claims.

Section 6 of the Restatement sets forth six additional relevant principles to be considered by courts assessing the relative interests of each jurisdiction in a proceeding.  These principles include (a) the needs of the interstate and international systems; (b) the relevant policies of the

forum (*i.e.*, Missouri); (c) relevant policies of other interested states (*i.e.*, Peru); (d) the protection of justified expectations of the parties; (e) the basic policies underlying the particular field of law at issue; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.  *See* Restatement § 6(2).

The Restatement makes clear that because "[t]he factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field," in the context of tort claims, "protection of the justified expectations of the parties [*i.e.*, Factor D] is of lesser importance," as are "the values of certainty, predictability and uniformity of result [*i.e.*, Factor F]."  *Id.* § 145, cmt. b; *accord Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1359 (8th Cir. 1994) ("The Restatement commentary explains that paragraphs (d) and (f), which deal with protection of justified expectations and certainty, predictability, and uniformity of result, are implicated only minimally [in the context of tort actions].").

Conversely, "[b]ecause of the relative insignificance of the above-mentioned factors in the tort area of choice of law, the remaining factors listed in § 6 assume greater importance." Restatement § 145, cmt. b.  These remaining factors include "the needs of the interstate and international systems [*i.e.*, Factor A], the relevant policies of the forum [and] the relevant policies of other interested states and particularly of the state with the dominant interest in the determination of the particular issue [*i.e.*, Factors B & C], and ease in the determination and application of the law to be applied [*i.e.*, Factor G]."  *Id.*; *accord Johnson v. Avco Corp.*, No. 4:07-cv-01695-CDP, 2009 WL 4042747, at *3 (E.D. Mo. Nov. 20, 2009) ("In tort actions . . . the only relevant Section 6 factors are . . . the 'policies and interests of the jurisdictions involved and the field of law to be applied.'")(quoting *Dorman,* 23 F.3d at 1359); *Flynn v. Mazda Motors of*

*Am.*, No. 4:09-cv-02069-HEA, 2010 WL 2775632, at *3 (E.D. Mo. July 14, 2010) (recognizing

that Factors D & F are "implicated only minimally" in tort cases).

### (1)      Needs of the International System (Principle A)

Principle A considers the "needs of the international system," and assumes greater

importance in choice of law analyses conducted in tort cases.  Restatement § 145, cmt. b.  Here,

Principle A favors the application of Peruvian law.  The international system needs certainty,

predictability and respect for sovereignty.  *See, e.g.*, *Mayo v. Hartford Life Ins. Co.*, 220 F. Supp.

2d 714, 744 (S.D. Tex. 2002) ("Interstate or international systems are advanced by each

jurisdiction having easily ascertainable, certain, uniform, and predictable law governing disputes

in that jurisdiction."), *aff'd and remanded*, 354 F.3d 400 (5th Cir. 2004).

Application of Missouri law to tort claims of Peruvian citizens based on alleged injuries

that occurred in Peru would inject uncertainty into the international system, infringe on Peru's

sovereignty, and restrict its ability to regulate its mining industry.  *See, e.g.*, *Fallhowe v. Hilton

Worldwide, Inc.*, No. 1:14-cv-02870-PAB-KLM, 2015 WL 5081690, at *7 (D. Colo. Aug. 28,

2015) (where U.S. residents sued U.S. corporation for injuries sustained while on vacation in

Mexico, holding that "[a]pplying Colorado law to tort claims that arose and occurred in Mexico

undermines Mexico's sovereignty and its ability to regulate its resort industry").  This is not

conjecture.  The 2017 Peru Statement—which was issued subsequent to the 2015 Order—asserts

that the application of Missouri law would interfere with the "cooperative relationship that [Peru]

has shared for many years with the United States in matters relating to trade, investment,

development, and environmental protection."  (Ex. 1, 2017 Peru Statement, at 5.)  Similarly,

Peru believes that the resolution of this action may "require a court of the United States to pass

judgment on the official acts and policies of the Peruvian State, rule on arguments relating to

compliance with the laws and regulations of Peru, or interpret specific regulatory statements, policies, decisions and actions of Peru in connection with La Oroya."  (*Id.*)

Moreover, application of Missouri law to Plaintiffs' claims would encroach upon Peru's right under the Treaty to regulate and oversee its own environment and its own mining sector. (Ex. 1, 2017 Peru Statement, at 2-3 (citing Article 18.3 of the Treaty) (The United States is not empowered "to undertake environmental law enforcement activities in the territory of [Peru]").) "Likewise, the Rio Declaration, which was adopted by the United Nations Conference on Environment and Development in 1992, declares that each sovereign is itself responsible for implementing its own environmental laws and policies."  (*Id.* at 4.)  Permitting Missouri law to govern such issues would interfere with the network of treaties and other agreements that facilitate international relations.  *See, e.g.*, *Asakura v. City of Seattle*, 265 U.S. 332, 341, *amended*, 44 S. Ct. 634 (1924) ("The treaty is binding within the state of Washington.  The rule of equity established by it cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws . . .  and it will be applied and given authoritative effect by the courts.").

In these circumstances, the needs of the international system are best served by the application of Peruvian law.

### (2)   Relevant Policies of the Forum and Interested States (Principles B and C)

Principles B and C require the Court to compare the relevant policies and interests of Missouri to the relevant policies and interests of Peru as to the legal issues that are in conflict. As discussed, Principles B and C assume greater importance to a choice of law analysis in the tort context.  Restatement § 145, cmt. b.

In the 2015 Order, this Court identified Principles B and C as specific areas in need of factual development.  *Reid*, 74 F. Supp. 3d at 1024.  Indeed, in the 2017 Peru Statement, issued subsequent to the 2015 Order, Peru made clear that the application of Missouri law would interfere with the "cooperative relationship that [Peru] has shared for many years with the United States in matters relating to trade, investment, development, and environmental protection," and that the resolution of this action may "require a court of the United States to pass judgment on the official acts and policies of the Peruvian State, rule on arguments relating to compliance with the laws and regulations of Peru, or interpret specific regulatory statements, policies, decisions and actions of Peru in connection with La Oroya."  (Ex. 1, 2017 Peru Statement, at 5.)

By contrast, notwithstanding that this case has been ongoing for over a decade, neither Missouri nor any other domestic entity has expressed a countervailing policy interest in this matter, much less one that exceeds the express interest Peru has asserted.  In any event, as discussed (*supra* at 31-37), any alleged misconduct—including the "decision making" to which Plaintiffs vaguely allude in their allegation—occurred exclusively in Peru, only Peru has a policy interest in this matter.  Nor are Plaintiffs able to articulate any facts suggesting that Missouri holds any cognizable interest in this matter or the claims asserted.  Even if they could point to a policy interest held by Missouri with respect to their claims, Plaintiffs cannot reasonably assert that any such interest overrides the interest of Peru, which has been repeatedly and expressly asserted by Peru itself.  *See, e.g.*, *Dorman*, 23 F.3d at 1359 (holding that none of the Section 6 principles significantly overcame the presumption that the law of the place of injury should apply); *Crowe v. Booker Transp. Servs., Inc.*, No. 4:11-cv-00690-FJG, 2012 WL 4468757, at *3 (W.D. Mo. Sept. 27, 2012) (same).  Accordingly, in light of the Peru statement, and in light of Plaintiffs' inability to point to any countervailing Missouri policies, Restatement Principles B

44

and C weigh in favor of applying Peruvian law to all of Plaintiffs' theories and claims.  As

shown below, analyzing Plaintiffs' specific vicarious liability theories, substantive liability

claims, and punitive damage theories confirms that Peru has the greater interest.

**(a)**     **Vicarious Liability Theories**

By far, Peru has the greater interest in determining whether and to what extent the

corporate form of Peruvian incorporated and regulated corporations may be breached, pierced, or

ignored.  *See, e.g.*, *Polanco v. H.B. Fuller Co.*, 941 F. Supp. 1512, 1528-29 (D. Minn. 1996)

(applying foreign law to reject direct participation liability and concluding that decision-making

in Minnesota provided the state with only a minimal interest in setting the standards of conduct

in other countries); *Martinez v. E.I. DuPont De Nemours & Co.*, 82 A.3d 1, 33 (Del. Super. Ct.

2012) (dismissing claims of asbestos exposure brought by Argentinian employees of U.S.

subsidiary, holding that the parent corporation's "state of incorporation—has no rational

connection to the cause of action in this case and is clearly being used as a subterfuge").

The vicarious liability theories asserted by Plaintiffs all turn on the scope of legal

protections afforded to a *Peruvian* corporate entity and the circumstances in which foreign

shareholders and affiliates of a *Peruvian* company will not be protected by the corporate form

created and regulated by the *Peruvian* government.  Indeed, Plaintiffs' claims depend on legal

doctrines and theories that expressly contravene or impede Peruvian law and policy, because

Peru has *expressly rejected* vicarious or derivative liability of the kind asserted here, which

disregards or challenges the corporate form.  (Ex. 16, Rosenn Decl., ¶¶ 21, 33, 40.)  Moreover,

Peru has asserted its significant interest in regulating the activities within its borders particularly

with respect to its environmental policies as they relate to the La Oroya Complex.  (*See* Ex. 1,

2017 Peru Statement, at 5) ("The situation in La Oroya relates to [Peru's] national concerns and

45

policies. . . . Peru maintains a sovereign interest in addressing matters relating to its applicable [environmental] laws.").)

In contrast, Missouri has little to no interest in regulating the conduct of corporate entities operating thousands of miles away in Peru, especially where no Missouri citizens have been injured, and where Plaintiffs have not alleged that Doe Run Peru engaged in any allegedly tortious conduct in Missouri.  *See, e.g.*, *Dorman*, 23 F.3d at 1360 ("Missouri's interest in ensuring that *its citizens* are compensated for loss is not implicated in this case where a Canadian citizen brings suit for an injury that occurred in Canada.") (emphasis added); *de Melo*, 801 F.2d at 1062-64 (holding that Brazil's interest in controlling U.S. defendant's wholly owned Brazilian subsidiary was far greater than forum state's interest in controlling conduct of defendant-parent in the United States); *Johnson*, 2009 WL 4042747, at *6 (applying Indiana law to claim for compensatory damages because Indiana had the greatest interest in seeing its law applied where the injury occurred within its borders).

Accordingly, Peru has a far greater interest than Missouri in determining the circumstances under which shareholders and other affiliates of a *Peruvian* corporation will be denied the protections of the corporate form.  Peruvian law must be applied to Plaintiffs' vicarious liability theories of liability.

### (b)      Substantive Liability Claims

With respect to Plaintiffs' negligence and strict liability claims, Peru has the strongest interest in determining both the appropriate standard of care applicable to conduct within its borders, and whether such conduct constitutes ultra-hazardous or abnormally dangerous activity—particularly in connection with a sector as vital to Peru's economy as mining and

metals processing.[21]  Notably, no Peruvian court has ever held that mining and smelting is an

abnormally dangerous or ultra-hazardous activity under Peruvian law.  (Ex. 16, Rosenn Decl.,

¶ 51, 54-55).

Here, Plaintiffs' claims are expressly based on the theory that the U.S. Defendants:

> owed a duty to plaintiffs . . . to control and contain the heavy metals
> and other toxic substances generated, handled, stored, emitted and
> disposed of at the La Oroya Complex and related operations and
> facilities; to ensure that any such emissions or releases of hazardous
> substances are within safe and non-toxic levels; to warn and
> continue to warn plaintiffs of the release of these toxic and harmful
> substances; to remediate and clean up any existing contamination;
> to prevent any further contamination and release of toxic and
> harmful substances; and thus to prevent these plaintiffs from being
> harmed and injured and ensure these plaintiffs' health and safety.

(Am. Compl. ¶ 101.)  By premising their claims on the existence of these alleged "duties,"

however, Plaintiffs ask this Court to determine whether and to what extent duties are owed to

Peruvian citizens by the operator of a Peruvian metallurgical complex; that is, to decide the

appropriate standard of care applicable to the mining and metallurgical industry in *Peru*.

Determining that standard and the scope of any such duties associated with it necessarily requires

the Court to make a policy determination for Peru.[22]  It would also require the Court to regulate

---

[21]     As established *supra* at 26-27, Peru does not recognize Plaintiffs' claims for breach of assumed duties
(Counts VIII and IX) and negligent performance of a contract or undertaking (Counts X and XI).  Nevertheless, as
with Plaintiffs' other claims sounding in tort, because Counts VIII-XI would require this Court to determine, among
other things, whether and what duties are owed to Peruvian citizens by the operator of a Peruvian metallurgical
complex, and what Peruvian emissions standards are applicable, Peru has a greater interest in deciding such matters.

[22]     "A duty is a requirement to conform to a standard of conduct for the protection of others against
unreasonable risks."  *Pierce v. Platte-Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 771 (Mo. banc 1989).  "When
considering if a duty exists in a particular case, [courts] look at several policy factors, including the following: (1)
whether society finds the interest is worthy of protection; (2) the foreseeability of harm and degree of certainty that
the protected person suffered injury; (3) the moral blame society places on the conduct; (4) the prevention of future
harm; (5) the costs and the ability to spread the risk of loss; and (6) the economic burden on the actor and
community."  *Bowan v. Express Med. Transporters, Inc.*, 135 S.W.3d 452, 457 (Mo. Ct. App. 2004).  If a duty is
found to exist, a court must determine the scope of that duty.  "Deciding the scope of a duty of care is 'essentially a
policy determination.'"  *Norris v. Corr. Corp. of Am.*, 521 F. Supp. 2d 586, 591 (W.D. Ky. 2007) (quoting *Mullins
v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992)).

Peru's metallurgical and mining industry, regarding, among other things, what emissions levels

of each particular substance alleged to have harmed Plaintiffs (such as lead, arsenic, cadmium,

etc.) are acceptable in Peru, and the extent to which a Peruvian operator is required to invest in

and install pollution control technologies.  Similarly, the Court would have to decide the extent

to which the operator of a metallurgical facility in Peru must "warn" citizens about emissions.

(Am. Compl. ¶ 101.)

Peru has already made decisions about these issues.  Peru has determined whether and to

what extent the operator of a metallurgical facility may be held liable for emissions.  Peru

enacted specific environmental regulations for the mining and metallurgical industry and set

specific emissions limits, called "Maximum Permissible Limits."  Peru also determined that

operators who were unable to meet these MPLs should be afforded a specific period of time to

make improvements designed to meet those limits, and that during such period, there would be

no liability.  (*See supra* at 7-10.)

By contrast, Missouri has no interest in the regulation of emissions from the operation of

a metallurgical facility in Peru.  Indeed, even if it did have such an interest, Missouri courts

recognize that the interests of the jurisdiction in which purported tortious conduct *occurs* exceeds

their own.  "[I]n determining whether acts or omissions in another state are tortious," Missouri

courts apply "the standards of conduct of the state where the alleged tort occurs."  *Olson v.*

*Empire Dist. Elec. Co.*, 14 S.W.3d 218, 222 (Mo. Ct. App. 2000); *accord Acapolon*, 827 S.W.2d

at 194 ("Missouri's interest in assuring that its corporations comply with adequate design

standards when designing products for manufacture and use abroad is less substantial than the

foreign nation's interest in protecting citizens from injury and setting standards for the

manufacture and distribution of products within its borders.").

48

Moreover, Missouri courts recognize that the state "has a policy interest in protecting its residents from an out-of-state plaintiff shopping for a forum within which to assert a claim accruing in plaintiff's state of residence that is otherwise barred by the laws of the state." *Natalini v. Little*, 185 S.W.3d 239, 251-52 (Mo. Ct. App. 2006).  This policy would be undermined by the application of Missouri law to Plaintiffs' claims, which would not be viable under Peruvian law as alleged.

Accordingly, Peru has a far greater interest than Missouri in determining the legal standards appropriate to assess liability for the operations of the La Oroya Complex, and, therefore, Peruvian law must be applied to Plaintiffs' claims of substantive liability.

(c)      <b>Punitive Damages</b>

Peru also has the most significant relationship to Plaintiffs' claims for punitive damages in connection with the La Oroya Complex.  Notably, Peruvian law does not recognize punitive damages in the civil law context.  *Flores*, 253 F. Supp. 2d at 534 n.26.  By seeking punitive damages, Plaintiffs are asking this Court to bypass Peru's asserted public policy against punitive damages and instead impose Missouri legal standards to alleged conduct by a Peruvian mining operation that purportedly harmed Peruvian citizens in Peru.  Peru's prohibition against punitive damages is based on policy judgments made by Peruvian jurists and its legislature, and those judgments should be respected by U.S. courts.[23]

As District Judge Sippel held in *NuvaRing*, under Missouri's choice of law analysis, the place where the injury occurs is the most significant factor in the determination of which

---

[23]      As the court in *Polanco* expressed, "this Court owes [the respect] to sovereign nations which as such are endowed, as surely as this Nation is, with the right to determine the standards of compensatory justice which comport with their particular and social requirements. . . . This Court entertains no illusions that justice in Guatemala is the same as justice in America, but it recognizes that 'sometimes different laws are neither better or worse in an objective way, just different."  941 F. Supp. at 1527 (quoting *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W. 2d 467, 473 (Minn. 1994)).

punitive damage law, if any, applies.  957 F. Supp. 2d at 1115 (citing Restatement § 145 cmt. c). In *NuvaRing*, the Court rejected the simplistic argument that New Jersey, where the defendant was headquartered, served as the locus of misconduct for purposes of determining which punitive damages law applied.  *Id.*  Instead, the Court held that Missouri's punitive damages law applied, because Missouri is where the defendant's representatives interfaced with the prescribing physicians, and where the drug was prescribed and ingested.  *Id.*  Similarly, the Eighth Circuit in *Winter* determined that the place of injury and where the conduct "at least in part" caused harm determined the law applicable to punitive damages. [24]  739 F.3d at 410.

Accordingly, because the alleged misconduct and injury occurred in La Oroya, Peru has the greater interest in determining the availability of punitive damages in this action.

### (3)    The Protection of Justified Expectations (Principle D)

Although the Court noted the need for additional factual development concerning "the protection of justified expectations," *Reid*, 74 F. Supp. 3d at 1024, both this Court and the Eighth Circuit have expressly recognized that this principle is "implicated only minimally" in the context of tort actions.  *Dorman*, 23 F.3d at 1359; *see also Johnson*, 2009 WL 4042747, at *3 (same).  In fact, comment g to Restatement Section 6 makes clear that "particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied . . . the parties have no justifiable expectations to protect, *and this factor can play no part in the decision of a choice-of-law question.*" Restatement § 6 (emphasis added).  Accordingly, as a matter of law, Plaintiffs cannot reasonably

---

[24]    The Eighth Circuit held that Missouri had the most significant relationship to the punitive damages claim because: (i) Missouri was the place where the injury occurred, "making it presumptively the state with the most significant relationship;" and (ii) "Missouri is where [defendant's] sales representatives failed to warn [plaintiff's] doctor, making it also, *at least in part*, the state of the conduct causing the injury."  *Winter*, 739 F.3d at 410 (emphasis added).

argue that this principle militates against, much less overcomes, the presumption that as the place of injury, Peru's law applies.

Even if the Court does decide to consider this principle, however, it is clear that Peru and Defendants reasonably expected that Peruvian law would apply to any disputes or litigation arising from the La Oroya Complex.  Further, Plaintiffs could not have had any other expectation, let alone any other justified expectation.

The Peruvian government permitted Doe Run Peru's acquisition and operation of the La Oroya Complex only after Doe Run Peru committed to complying with certain obligations and environmental parameters mandated by the Peruvian government *under Peruvian law.*  (Ex. 13, Stock Transfer Agreement, §§ 4.1, 4.5.)  Through the Stock Transfer Agreement and the PAMA, Defendants and Peru bound themselves to a detailed structure of obligations governing investment rules, liability allocation, and environmental improvement obligations at the La Oroya Complex, among other things, all of which were subject to Peruvian law.  (*Id.* §§ 5.1-6.1.) Indeed, the timeline for implementing PAMA projects was set by the government of Peru.  Thus, at all times, both Peru and Defendants understood and expected their arrangement to be controlled by Peruvian law.  *See NuvaRing*, 957 F. Supp. 2d at 1116 ("[Defendant] sold and marketed NuvaRing in Missouri.  In doing so, [defendant] should have expected to be subject to Missouri law regulating such conduct.").

Similarly, and also pursuant to the terms of the La Oroya acquisition, the government of Peru, through its corporate entity Centromin and an express Guaranty, agreed to assume any third party liability arising from operations at La Oroya prior to Doe Run Peru's acquisition of the facility, and any such liability after the acquisition while Doe Run Peru remained in compliance with the PAMA.  (Ex. 13, Stock Transfer Agreement, at §§ 6.2, 6.5)  Under these

circumstances, Defendants obviously expected that claims arising out of such liability would be asserted against Centromin or the Peruvian government *in Peru*.

Moreover, ample testimony obtained in discovery in the nearly three years since the 2015 Order makes clear that Defendants believed that Peruvian law would apply to the operation of the La Oroya Complex, including any claim arising therefrom.  For example, Defendants rightfully believed that Peruvian law concerning emission and environmental standards controlled operations at the La Oroya Complex.  When asked whether Doe Run Resources had "less concern for the environmental effects, including potential adverse health effects on the population, with respect to its role in the Peruvian operation than it did here in the United States," Louis Marucheau, Vice President of Law for Doe Run Resources from 2001 to 2011, and Special Counsel from 2011 to 2015, testified in his capacity as a Rule 30(b)(6) corporate witness for Doe Run Resources that "[w]ell, first of all, it would be the Peruvian company that was responsible.  But in fact, the Peruvian environmental requirements were actually more stringent than the U.S. requirements, so . . . they realized that they would have to meet those more stringent requirements if they took over the—you know, if the subsidiary [*i.e.*, Doe Run Peru] took over the complex."  (Ex. 39, Dec. 14, 2017 Dep. Tr. of L. Marucheau, at 48:9-20.)

Likewise, when asked whether "Doe Run Resources ever emphasize[d] its environmental philosophy and the goal to get La Oroya to U.S. environmental standards," Mr. Marucheau testified that "[a]s far as the ambient levels, ambient numbers, those were, in fact, issued by the Government of Peru based on World Health Organization and other such numbers.  I'm not— I'm certainly, even though it's more stringent, I'm not aware of anyone saying we shouldn't have to meet the Peruvian number, we should meet the U.S. number.  I think that they knew that they needed to comply, and that was part of the agreement with the Peruvian, both their emission

52

limits, that would be the [Peruvian] MPLs both for air and for water, and for dealing with the ambient level that were necessary ultimately to be made—to be made in—at the various monitoring sites." (*Id.* at 242:8-243:5.)

Defendants also repeatedly testified as to their expectation that Peruvian law controlled the corporate structure of Doe Run Peru.  For instance, John Binko, Chief Financial Officer for the Renco Group from 2013 to present, testified in his capacity as a Rule 30(b)(6) corporate witness for both Renco and Doe Run Resources that "given Peruvian law, the Peruvian companies were set up as limitadas [limited liability companies]."  (Ex. 40, Feb. 2, 2018 Dep. Tr. of John Binko, at 43:3-5.)  Similarly, Dennis Sadlowski testified "that under Peruvian law—now I recall under Peruvian law that there is a required annual meeting to be held by Doe Run Peru." (Ex. 35, July 12, 2017 Dep. Tr. of D. Sadlowski, at 176:15-18.)  Mr. Sadlowski also testified that "[t]he law of Peru required that the consortium form a subsidiary. We named it Doe Run Peru, and they were the ones that bought the facility and began operating on [day one]."  (Ex. 34, July 13, 2017 Dep. Tr. of D. Sadlowski, at 285:25-286:5.)

Nor could Plaintiffs have had a different expectation.  As Peruvian minors, Plaintiffs lacked legal training or experience sufficient to provide them with a reasonable expectation that the law of Missouri would apply to their claims for injuries suffered in Peru.  Any argument to the contrary is patently absurd, and Plaintiffs undoubtedly did expect Peruvian law would govern such claims.  In fact, many Plaintiffs and their parents expressly testified that they affirmatively believed Peruvian law would apply to Plaintiffs' claims.  (*See, e.g.*, Ex. 18, Oct. 5, 2017 Dep. Tr. of J. Barona Rojas, at 115:3-7 ("Q. You told me earlier that you're bringing a lawsuit for events that only happened in Peru; right?  A. Yes. Q. So Peruvian law should apply; right?  A. Of course."); Ex. 19, Oct. 11, 2017 Dep. Tr. of T. Medina Salcedo (Mother of S.R.A.M.), at 78:5-

53

80:19 ("Q. Absolutely everything about this case occurred in Peru, right?  A. Yes, in Peru.  Q. So this case should be decided by the law of Peru, right?  A. Yes."); Ex. 41, July 18, 2017 Dep. Tr. of M.X.O.R., at 38:23-39:8 ("Q. And it's your expectation that the law of Peru will govern the events and activities around you, isn't that correct?  A. Yes."); Ex. 42, Oct. 3, 2017 Dep. Of H. Yurivilca Payta (Mother of R. Astudillo Yurivilca), at 73:17-73:20 ("Q. I'm talking about when you're in Peru the laws of the United States aren't going to protect you; right?  A. No, not over there."); Ex. 43, Jul. 13, 2017 Dep. Tr. of E. Solano Ramos (Mother of D.D.P.S.), at 94:1-10 ("Q. Do you agree that the law of Peru governed the operation of the smelter after 1997?  A. Yes.).)

        Any attempt by Plaintiffs' counsel to use Plaintiffs' responses to Doe Run Resources' Second Set of Interrogatories to support their argument that Plaintiffs had an expectation that U.S. law would apply to their claims should not be countenanced.  These responses appear to be heavily coordinated by Plaintiffs' counsel, given that every single Plaintiff in the discovery cohort provided identical responses to Interrogatory No. 3, which began with the statement:  "I do not recall consciously thinking about legal issues, such as which law applies to the claims that could be made in a lawsuit on my behalf."  (*See, e.g.*, Ex. 44, J. Rojas Barona's Responses and Objections to Doe Run Resources' Second Set of Interrogatories, at 4; Ex. 45, S.R.A.M.'s Responses and Objections to Doe Run Resources' Second Set of Interrogatories, at 4; Ex. 46, J. Espinoza Laureano's Responses and Objections to Doe Run Resources' Second Set of Interrogatories, at 4.)  Moreover, as this coordinated response concedes, Plaintiffs had *no* expectation concerning what law would apply, unlike Defendants, which, as discussed, clearly expected Peruvian law to apply.  Further, in their coordinated objection to Interrogatory No. 3, all Plaintiffs assert that their expectations, if any, are legally irrelevant.  (*Id.* at 3 ("To the extent

54

that this interrogatory is inquiring as to Plaintiff's beliefs about which law governed his/her relationship to the smelter, Plaintiff objects that such is irrelevant and is not likely to lead to the discovery of relevant information.").)  Additionally, as is evident from the foregoing excerpts, these coordinated interrogatory responses directly conflict with testimony provided by the same Plaintiffs during subsequent depositions.

Accordingly, there is no plausible argument that any party to this action had a justifiable expectation that U.S. law would apply to the claims in this action before the Court, and in fact, all parties had an expectation that Peruvian law would apply.

### (4)     The Basic Policies Underlying the
### Particular Field of Law (Principle E)

As discussed, Principle E assumes a greater importance to a choice of law analysis in the tort context.  Restatement § 145, cmt. b; *see also Dorman*, 23 F.3d at 1359.  Principle E calls for an assessment of the basic policies underlying this consolidated group of personal injury actions, namely: (i) to deter other wrongdoers; and (ii) to compensate the injured person.  Restatement § 146, cmt. e.  Peru is clearly best situated to compensate its *own* citizens who were allegedly injured *in Peru* for purported misconduct originating there.  *See Taylor*, 2015 WL 8021729, at *2 (holding that "with respect to compensatory damages, courts applying the Second Restatement recognize that the state of the injured plaintiff's residence has the greatest interest in applying its laws to ensure the plaintiff is compensated for his injuries" and applying Oklahoma law to claims by an Oklahoma domiciliary that was injured in Oklahoma).  Similarly, as discussed (*supra* at 28-30), Peru is also the place where Plaintiffs' injuries were incurred, and where any alleged environmental contamination or emissions that caused such injuries occurred.

Moreover, as discussed (*supra* at 6-9), Peru's metallurgical and mining industry is subject to significant regulatory oversight, including the imposition of fines and even criminal liability

for violations of applicable regulations.  The compensatory and punitive mechanisms built into

Peru's metallurgical and mining regulations illustrate its interest in deterring misconduct in this

industry.  Thus, Peru is best positioned to deter putative wrongdoers from harming its citizens

within its territory.  *See, e.g.*, *Clark v. Prudential Ins. Co. of Am.*, No. 2:08-cv-06197-DRD-

MCA, 2009 WL 2959801, at *14 (D.N.J. Sept. 15, 2009) (while the state in which defendant was

incorporated "undoubtedly has an interest in deterring corporations operating within its borders

from committing wrongdoing," the states where the conduct occurred and was regulated held the

greater interest in "having their laws applied to disputes involving the heavily regulated area,"

even assuming that the tort "emanated from [Defendant's] headquarters").  At a bare minimum,

Peru's interest in deterring alleged environmental contamination or emissions within its own

borders—conduct that is subject to its internal regulatory scheme—unquestionably exceeds any

of Missouri's interests in deterring such conduct.

Accordingly, because none of its own citizens were purportedly injured, and all the

alleged harm occurred abroad, Missouri has no equivalent interest in this matter and is not in a

better situation to "best achieve" the policies underlying tort law than is Peru.  *See Dorman*, 23

F.3d at 1360 ("Missouri's interest in ensuring that its citizens are compensated for loss is not

implicated in this case where a Canadian citizen brings suit for an injury that occurred in

Canada."); *Estate of Marin-Torres v. Gamo Outdoor USA, Inc.*, No. 1:14-cv-22122-JAL, 2015

WL 11233089, at *6 (S.D. Fla. Mar. 30, 2015) (holding that Florida's interest in compensating

tort victims would not be advanced because "none of the claimants [were] Florida

domiciliaries"); *Livingston v. Baxter Healthcare Corp.*, 313 S.W.3d 717, 723-24 (Mo. Ct. App.

2010).

56

(5)     **Certainty, Predictability and Uniformity**
        **of Result (Principle F)**

As set forth in *Dorman*, Principle F is "implicated only minimally" in the case of tort

actions arising out of personal injury.  23 F.3d at 1359; *accord Johnson*, 2009 WL 4042747, at

*3 (same).  Accordingly, as a matter of law, Plaintiffs cannot reasonably argue that this principle

militates against, much less overcomes the presumption that as the place of injury, Peru's law

applies.  Even when this principle is considered, courts emphasize the place of injury to promote

certainty, predictability, and uniformity of result.  *See, e.g.*, *Estate of Marin-Torres*, 2015 WL

11233089, at *8 ("[A]pplying the law of the state where the injury occurred would promote

predictability and uniformity of result.").

Here, Peru affirmatively encouraged foreign investment in the La Oroya Complex by

stipulating to the application of Peruvian law and environmental standards in the Stock Transfer

Agreement.  (Ex. 13, Stock Transfer Agreement, §§ 4.1-6.1; *see generally* Ex. 4, PAMA.)  Thus,

Defendants anticipated that Peruvian law would apply to operations at the Complex.  To apply

any other law would have a chilling effect on foreign investment and negatively impact the

global economy.  (Ex. 1, 2017 Peru Statement, at 5 ("Peru continues to maintain a

macroeconomic policy and legal framework that facilitates opportunities for investment, while

reasonably expecting that investors comply with applicable and legal obligations, including

environmental laws, regulations, and standards.  Peru maintains a sovereign interest in

addressing matters relating to its applicable laws.").)  Further, the application of Missouri law to

Peruvian transactions and activities would deter non-Peruvians from subsidizing environmental

cleanup efforts and, thereby, contravene Peru's sovereign efforts to complete Centromin's

PAMA through private investment.  In fact, it is undisputed and has been widely reported in the

Peruvian press that numerous attempts to attract foreign investors to purchase the assets of the La

57

Oroya Complex out of bankruptcy and restart operations have failed precisely because of this litigation and the threat of regulation through litigation by U.S. courts.[25]

**(6)     Ease in Determining and Applying
the Law (Principle G)**

Because Peru is the undisputed place of the alleged injury for all Plaintiffs, Peruvian law should apply because "consideration of the ease in determining and applying the law . . . points in favor of applying the state of injury's law to all . . . issues because of the ease in applying only one state's laws." *Johnson*, 2009 WL 4042747, at *3. Here, there is no discernible advantage to applying any law other than the laws of Peru. *See Dorman*, 23 F.3d at 1359. There is no magic to applying Peruvian law to the operations of a Peruvian mining company or to the purported harm allegedly done in La Oroya to Peruvian citizens. Both sides have experts available to them to address and opine on the application of Peruvian law to the facts here, and Defendants' expert, Professor Keith Rosenn, a preeminent expert on Peruvian law, can address any and all issues and inquiries raised concerning Peruvian law. Restatement § 6, cmt. j. This Court also has the means available to it to properly apply the law of Peru to this case. As such, this principle also militates in favor of the application of Peruvian law.

---

[25]     *See, e.g.*, Ex. 47, Marco Aqunio,  *In Peru, A Smelter's Future Stirs Fears Of Its Toxic Past*, Reuters (Jan. 12, 2017), https://www.reuters.com/article/us-peru-smelter/in-peru-a-smelters-future-stirs-fears-of-its-toxic-past-idUSKBN14W2L9 ("A 2015 auction failed to draw any bidders [for the La Oroya Complex] as potential buyers fretted over liability for lingering pollution."); Ex. 48, Teresa Cespedes & Mitra Taj, *Peru To Extend Liquidation Deadline For La Oroya Smelter Again*, Reuters (July 27, 2017), https://www.reuters.com/article/us-peru-smelter/peru-to-extend-liquidation-deadline-for-la-oroya-smelter-again-idUSKBN1AC31P ("[N]o one made any offers on the [La Oroya Complex] on Wednesday or in five previous auctions this year aimed at preventing its liquidation," and even though the government relaxed emissions standards to make it more attractive, "investors remain worried about potential liability for pollution in soils surrounding the smelter."); Ex. 49, *¿Quién invierte en Doe Run?* [*Who Invests in Doe Run?*], El Montonero (12 Noviembre 2017) (Peru), http://elmontonero.pe/economia/quien-invierte-en-doe-run ("Today the major concern is no longer the environmental requirement, but rather the 3,000 cases filed at a court in Missouri (United States) against the ex-owner Doe Run, which are scaring bidders away.").

C.     **This Court Should Apply Peruvian Law for the Independent Reason That Application of U.S. Law Would be Unconstitutional**

In addition to the fact that the Restatement analysis dictates that Peru has the most significant interest in having its law apply to Plaintiffs' claims, Peruvian law should also apply to Plaintiffs' claims because application of Missouri law in this instance would violate constitutional limitations mandated by the Due Process Clause of the Fourteenth Amendment.

The United States Constitution independently "limits the power of a forum state to apply its substantive law to factual and legal situations with which it has little or no contact." *McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578 (8th Cir.), *aff'd*, 454 U.S. 1071 (1981). To that end, the Supreme Court requires federal courts to scrutinize whether the forum state maintains "a significant contact or significant aggregation of contacts to the claims asserted . . . in order to ensure that the choice of [that state's] law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (quotation omitted); *accord Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310-11 (1981); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-10 (1930). "Without sufficient contacts, the state has no legitimate interest in the outcome of the litigation," and its law cannot govern consistent with due process. *McCluney*, 649 F.2d at 581.

Here, these constitutional limitations prohibit the application of Missouri law to Plaintiffs' claims, as illustrated by a long and unbroken line of Supreme Court authority.  In *Phillips Petroleum*, for example, the Supreme Court held that a Kansas court could not apply Kansas law to a nationwide class action seeking to recover royalty payments with respect to leased lands, when 97% of the class resided out-of-state and 99% of the lands were leased outside Kansas.  472 U.S. at 821-22.  The Court explained that an "important element" to its constitutional inquiry "is the expectation of the parties," and noted that there was "no indication . . . the parties had any idea that Kansas law would control" when "the leases

involving land and royalty owners outside of Kansas were executed."  *Id*. at 822 (citing *Dick*, 281 U.S. at 410 (forum state "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them")).

Similarly, in *Phillips Petroleum*, the Supreme Court echoed its prior holding in *Dick,* 281 U.S. at 410, which established that a defendant's "residence is not enough" to pass constitutional muster for the application of a forum state's laws to the defendants' foreign conduct.  472 U.S. at 823.  In *Dick*, the Supreme Court held that a Texas statute could not be applied in a Texas-based litigation because the claims asserted therein arose out of a subject matter that bore no connection to Texas, the forum state.  281 U.S. at 410.  The case involved a disagreement over the terms of an insurance policy issued in Mexico, by a Mexican insurer, to a Mexican citizen, covering Mexican risk.  *Id.* at 402-03, 407-08.  The plaintiff, who was domiciled in Mexico but had his permanent residence in Texas, brought suit in Texas against a New York reinsurer.  *Id.* at 403-04.  The Texas courts applied a Texas statute to void a limitation clause in the policy, but the Supreme Court reversed, holding that the statute as applied violated due process.  *Id.* at 405, 410.

The Eighth Circuit, at the Supreme Court's direction, has enforced these constitutional limitations with equal vigor.  *See, e.g.*, *In re St. Jude, Inc.*, 425 F.3d 1116, 1120-21 (8th Cir. 2005) (holding that a constitutional choice-of-law analysis was required even though the defendant was headquartered in forum state, and the alleged conduct occurred there as well).  In *McCluney*, for example, the Eighth Circuit held that Missouri law could not constitutionally govern where "there [wa]s only one relevant contact between . . . Missouri . . . and [the challenged] transaction: [the plaintiff's] post-termination change of residence to that state."  649 F.2d at 583.  "Standing alone," the Eighth Circuit explained, "that [wa]s not sufficient to permit Missouri law to affect a Wisconsin contract entered into between two Wisconsin residents and

which [wa]s to be performed in Wisconsin." *Id.* at 583-84 (holding that "the application of Missouri law to [the] employment arrangement . . . constitute[d] an infringement of the interest Wisconsin ha[d] in overseeing contractual arrangements entered into and performed within its territorial boundaries").

Similarly, in *Wickenhauser v. Edward D. Jones & Co.*, this Court held that Missouri did not have sufficient constitutional contacts with the plaintiff's employment discrimination claims *even though the plaintiff's employment contract contained a provision stating that Missouri law governed the contract.* 953 F. Supp. 286, 289 (E.D. Mo. 1996). Notwithstanding the existence of a choice-of-law provision, the *Wickenhauser* court held that due process required the application of Illinois law because the plaintiff had only "very limited contact with Missouri," and "all of the alleged discriminatory acts occurred in Illinois." *Id.*

The reasoning of these cases applies with equal force here. As in those other cases, here, Missouri is at most "casually or slightly related to the litigation." *Wickenhauser*, 953 F. Supp. at 289 (citing *Phillips Petroleum*, 472 U.S. at 819). Plaintiffs are Peruvian citizens who, at all times, resided in Peru. (Am. Compl. ¶ 2; *supra* at 37-38.) They allege that they suffered injuries only in Peru. (Am. Compl. ¶¶ 1, 2; *supra* at 28-30.) And, the conduct allegedly causing those injuries occurred in Peru. (Am. Compl. ¶¶ 1, 2; *supra* at 31-36.)

Indeed, there is no allegation or evidence of any meaningful contact between Plaintiffs' claims and the state of Missouri—vague, unspecified allegations of "decision-making" do not suffice. (*See supra* at 31-37.) Nor is there any "indication that . . . the parties [in particular, Plaintiffs] had any idea that [Missouri] law would control" prior to their preparation for this lawsuit. *Phillips Petroleum*, 472 U.S. at 822 (holding that an "important element" in this constitutional analysis "is the expectation of the parties") (citing *Allstate*, 449 U.S. at 333

(Powell, J, dissenting.)).  In fact, the opposite is true.  Defendants uniformly expected that

Peruvian law would govern Doe Run Peru's operation of a metallurgical complex in Peru.  (*See*

*supra* at 52-53.)  Notably, Doe Run Peru was not even permitted to acquire the La Oroya

Complex until after it committed to and did comply with requirements mandated by the Peruvian

government under Peruvian law.  (*See supra* at 11, 51.)  To the extent that the Plaintiffs had any

expectations at all regarding what law would apply to their claims, they either conceded it was

Peruvian law (*supra* at 53-55), or their suggestion that United States law would apply does not

withstand scrutiny.  Indeed, it is not reasonably plausible that Plaintiffs anticipated Missouri law

would control *prior* to their decision to commence these legal proceedings.  (*See supra* at 54-55.)

*See also Phillips Petroleum*, 472 U.S. at 822 (due process not satisfied where there was "no

indication . . . the parties had any idea that Kansas law would control" when "*the leases . . . were*

*executed*") (emphasis added).

    That fewer than a handful of the Defendants are Missouri corporations headquartered in

Missouri does not alter the analysis and certainly not the conclusion.  A defendant "solely being

headquartered in a forum state is not sufficient to establish significant contact or significant

aggregation of contacts to the claims asserted" to satisfy the Due Process Clause.  *Andren v.*

*Alere, Inc.*, 2017 WL 6509550, at *16 (S.D. Cal. Dec. 20, 2017); *accord In re Ford Motor Co.*

*Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 371 (E.D. La. 1997) (Michigan law could not

constitutionally be applied to nationwide class even though defendant was a Michigan resident);

*Endo v. Albertine*, 1995 WL 170030, at *5 (N.D. Ill. Apr. 7, 1995) (holding that Illinois law

could not govern claims by out-of-state shareholders against a corporation headquartered in

Illinois because, "[a]side from the fact that [that defendant's] primary place of business is located

in Illinois, there is no indication that when the non-Illinois class members . . . purchased their

securities in various states across the country, they had any idea that Illinois law would control in any later suit"); *Sanders v. Robinson Humphrey/Am. Express, Inc.*, 1986 WL 10096, at *9 (N.D. Ga. July 8, 1986) (holding that Georgia law could not be applied to claims against multiple corporate defendants, only one of which was headquartered in Georgia, because "there is no indication that when the investors purchased the limited partnership interests outside of Georgia they had any idea that Georgia law would control").

Aside from bare allegations of Defendants' corporate citizenship, Plaintiffs also fail to allege any meaningful connection between the state of Missouri and the conduct Plaintiffs purport gave rise to this litigation.  *See, e.g.*, *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001) (the court must "inquire not only into the contacts between the regulated party and the state, but also into the contacts between the regulated subject matter and the state") (quotation omitted).[26]  Here, the "regulated subject matter" is the operation of a metallurgical complex in Peru and its emissions, and there is no relationship whatsoever between that subject matter and the state of Missouri.  (*See supra* at 38-40.)  To the contrary, the government of Peru specifically conditioned the sale of the La Oroya Complex to Defendants on the formation of a Peruvian company to own and operate the facility, in compliance with Peruvian rules and regulations.

The application of Missouri law would also unconstitutionally deprive Defendants of the rights to which they are entitled under Peruvian law, including the legal protections provided in Article 1971 of Peru's Civil Code for an actor's exercise of a right conferred by law.  (*See supra* at 24-25.)  There is no dispute that the La Oroya Complex was operated pursuant to rights

---

[26]     Although *Gerling* dealt with the issue of legislative jurisdiction, that inquiry is "similar to that explored in determining . . . whether a court can apply a state's own law under choice-of-law analysis to a case consistent with due process."  *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 221 F.3d 1211, 1216 (11th Cir. 2000).

conferred on Doe Run Peru directly by the Peruvian government pursuant to the PAMA, and various mining concessions and licenses.  (*See supra* at 11, 51.)  Likewise, Peruvian law is clear that in situations like those alleged here, owners or shareholders, like Defendants, are never personally liable for the obligations of limited liability companies such as Doe Run Peru.  As explained, however, Missouri law does not recognize such protections from liability.  (*See supra* at 24-25.)  Thus, applying Missouri law in an "attempt to impose a greater obligation than that agreed upon . . . [would thus] violate[] the guaranty against deprivation of property without due process of law."  *Dick*, 281 U.S. at 408.

Simply put, Missouri has no cognizable interest in this matter.  Under any measure of objective constitutional analysis, this forum is at best "casually or slightly related to the litigation."  *Wickenhauser*, 953 F. Supp. at 289 (citing *Phillips Petroleum*, 472 U.S. at 819).  "Missouri, [therefore,] does not have sufficient contacts with the plaintiff[s'] claim[s] to satisfy the Due Process Clause," *id.*, and its laws "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them."[27]  *Dick*, 281 U.S. at 410.  Consequently, application of Missouri law here is impermissible not only as a matter of the

---

[27]    Additionally, it is well established that a state simply "cannot punish a defendant for conduct that may have been lawful where it occurred."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003).  Here, the conduct for which Plaintiffs seek to punish Defendants took place in Peru, where it was affirmatively permitted by Peruvian law.  Plaintiffs' theory is that by operating the La Oroya Complex in the manner not only permitted, but affirmatively mandated by Peruvian law (by virtue of the the PAMA and the Stock Transfer Agreement), Doe Run Peru violated Missouri law and thereby harmed Plaintiffs.  This theory is plainly contrary to law.  *See, e.g.*, *State Farm*, 538 U.S. at 421; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572-73 (1996) ("Alabama does not have the power . . . to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents.  Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions."); *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("[t]o punish a person because he does know what the law plainly allows him to do is a due process violation of the most basic sort.");  *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends.").

Restatement's most significant relationship analysis, but also because it would violate the United States Constitution.

## <u>CONCLUSION</u>

For the foregoing reasons, pursuant to Rule 44.1, Defendants respectfully submit that the laws of Peru should apply to Plaintiffs' claims, and move the Court to determine the following main propiostions of Peruvian law and corollary propositions following from them:

(a)     All issues of vicarious liability in these cases, including, without limitation, corporate veil piercing or alter ego liability, agency liability, direct participation liability, or otherwise, will be governed by the law of Peru;

(b)     All issues of liability in these cases will be governed by the law of Peru; and

(c)     All issues of damages, including punitive damages, will be governed by the law of Peru.

Dated: March 16, 2018

Respectfully submitted,


**DOWD BENNETT LLP**

By: /s/   Edward L. Dowd, Jr.
    Edward L. Dowd, Jr.  #28785MO
    edowd@dowdbennett.com
    James E. Crowe, III,  #50031MO
    jcrowe@dowdbennett.com
    7733 Forsyth Blvd., Suite 1900
    St. Louis, Missouri 63105
    Telephone: (314) 889-7300
    Facsimile: (314) 863-2111

**KASOWITZ BENSON TORRES LLP**

By: /s/   Marc E. Kasowitz (w/ permission)
    Marc E. Kasowitz (*pro hac vice*)
    mkasowitz@kasowitz.com
    Kenneth R. David (*pro hac vice*)
    kdavid@kasowitz.com
    Matthew A. Kraus (*pro hac vice*)
    mkraus@kasowitz.com
    1633 Broadway
    New York, New York 10019
    Tel: (212) 506-1700
    Facsimile: (212) 506-1800

*Attorneys for Defendants The Renco Group, Inc., DR Acquisition Corp., Ira L. Rennert, and Doe Run Cayman Holdings, LLC*


**LEWIS RICE LLC**

By: /s/ Andrew Rothschild (w/ permission)
    Andrew Rothschild, #23145MO
    arothschild@lewisrice.com
    Richard A. Ahrens, #24757MO
    rahrens@lewisrice.com
    Thomas P. Berra, Jr., #43399MO
    tberra@lewisrice.com
    Michael J. Hickey, #47136MO
    mhickey@lewisrice.com
    600 Washington Avenue, Suite 2500
    St. Louis, Missouri 63101-1311
    Telephone:  (314) 444-7600
    Facsimile:  (314) 241-6056

*Attorneys for Defendants The Doe Run Resources Corporation, Marvin K. Kaiser, Jerry Pyatt, Jeffrey L. Zelms, and Theodore P. Fox III*

**CARMODY MacDONALD P.C.**

By: /s/ Gerard T. Carmody (w/ permission)
    Gerard T. Carmody, #24769
    gtc@carmodymacdonald.com
    Kevin M. Cushing, #27930
    kmc@carmodymacdonald.com
    120 South Central Avenue, Suite 1800
    St. Louis, Missouri 63105
    (314) 854 8600 (Telephone)
    (314) 854 8660 (Facsimile)

*Attorneys for Defendants The Ira Leon Rennert Revocable Trust, The Trusts F/B/O S. Tamara Rennert Under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2 and 3, The Trusts F/B/O Yonina Nechama Rennert Under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2 and 3, The*

66

*Trusts F/B/O Ari E.Y.M. Rennert Under the Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 1, 2 and 3, The Ira Leon Rennert Grantor Retained Annuity Trusts Nos. 4, 5, 9, 10, 11, 2002A and 2002B, The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Sarah Tamara Rennert Winn, The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Yonina Nechama Rennert Davidson, The Ira Leon Rennert 2010 Irrevocable Sub Trust F/B/O Ari E.Y.M. Rennert, Roger L. Fay, Marvin M. Koenig, John A. Siegel, Jr., Dennis A. Sadlowski, John A. Binko and Michael C. Ryan*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 16th day of March, 2018, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

_____ /s/ Edward L. Dowd, Jr. _____