UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:11 CV 44 CDP |
| | ) | |
| IRA L. RENNERT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This Order considers defendants' motion to dismiss plaintiffs' first amended complaint and defendants' motion for determination of foreign law, along with certain other procedural motions.

In their motion to dismiss, defendants assert that dismissal is required for several reasons.  They argue that principles of international comity require abstention, that the Court lacks personal jurisdiction over the non-Missouri defendants, and that the complaint fails to state a claim upon which relief can be granted.  In their motion for determination of foreign law, defendants ask me to rule that the law of Peru applies to all aspects of this case.  Plaintiffs respond by arguing for the application of Missouri law.  Additionally pending are a motion to substitute parties to replace the defendant Trusts with the trustees and beneficiaries

of each Trust, and a motion to consolidate three additional cases with these consolidated cases.

For the reasons that follow, I conclude that the Court lacks personal jurisdiction over the newly-added individual and Trust defendants, although the Court continues to have jurisdiction over previously-named defendants Ira Rennert and Renco.  I conclude that plaintiffs' negligence-based claims survive the motion to dismiss, whether considered under Missouri, New York, or Peruvian law, but their claims of strict liability and civil conspiracy fail to state a claim on which relief may be granted.  I conclude that the law of Missouri should apply to this case.  Finally, I conclude that abstention based on international comity is not appropriate.

Plaintiffs are hundreds of Peruvian children (many of whom have attained majority in the many years these cases have been pending) who live near the La Oroya Complex, a metallurgical smelting and refining complex owned and operated by the defendant companies and their Peruvian subsidiary.  The individual defendants are directors and/or officers of the defendant companies. The defendant Trusts were established by defendant Ira Rennert for the benefit of himself and his family and together own the defendant companies.  Plaintiffs allege that defendants, acting from Missouri and New York, ran the operations of the La

Oroya Complex in a manner that resulted in plaintiffs' exposure to lead and other toxic substances, which caused plaintiffs' serious medical and developmental injuries.  They bring a variety of state-law tort claims against the defendants.

## Operative Complaint

Plaintiffs originally brought their seven-count complaint in this action against four corporate defendants:  Doe Run Resources Corporation ("Doe Run Resources"), DR Acquisition Corp. ("DR Acquisition"), The Renco Group, Inc. ("Renco"), and Renco Holdings, Inc.; and six individual defendants:  Marvin K. Kaiser, Albert Bruce Neil, Jeffery L. Zelms, Theodore P. Fox III, Daniel L. Vornberg, and Ira L. Rennert.  With leave of Court, and upon stipulation of the parties, plaintiffs filed an amended complaint in February 2017, naming fifteen additional defendants, specifically, Doe Run Cayman Holdings LLC ("Cayman Holdings"); individual defendants Roger L. Fay, Marvin M. Koenig,[1] John A. Siegel Jr., Dennis A. Sadlowski, John A. Binko, and Michael C. Ryan; and several Ira Rennert Trusts ("the Trusts").  Originally-named defendants Renco Holdings and Daniel L. Vornberg are not named in the amended complaint.

The amended complaint is brought in twelve counts:

---

[1] Koenig died on April 12, 2017.  ECF 753.  With leave of Court, plaintiffs substituted Alice Koenig, as Executor of the Estate of Marvin M. Koenig, for defendant Marvin M. Koenig in this action.  ECF 833, 851.

- Count I – <u>Negligence</u> against Renco, Doe Run Resources, DR Acquisition, Cayman Holdings, the Trusts, Rennert, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count II – <u>Negligence</u> against Rennert, Kaiser, Neil, Zelms, Fox, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count III – <u>Civil Conspiracy</u> against Renco, Doe Run Resources, DR Acquisition, Cayman Holdings, the Trusts, Rennert, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count IV – <u>Civil Conspiracy</u> against Rennert, Kaiser, Neil, Zelms, Fox, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count V – <u>Absolute or Strict Liability</u> against Renco, Doe Run Resources, DR Acquisition, Cayman Holdings, the Trusts, Rennert, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count VI – <u>Absolute or Strict Liability</u> against Rennert, Kaiser, Neil, Zelms, Fox, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count VII – <u>Contribution Based on Tortious Conduct of Entities Acting in Concert</u> against all defendants;

- Count VIII – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox;

- Count IX – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against Renco, DR Acquisition, Rennert, Fay, Koenig, Siegel, Sadlowski, Binko, and Ryan;

- Count X – <u>Negligent Performance of a Contract or Undertaking</u> against Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox;

- Count XI – <u>Negligent Performance of a Contract or Undertaking</u> against Renco, DR Acquisition, Rennert, Fay, Koenig, Siegel, Sadlowski, Binko,

and Ryan;

- Count XII – <u>Direct Participation Liability</u> against Renco, Rennert, and the Trusts.

All defendants seek to dismiss the amended complaint in its entirety.

<b><u>Motion to Dismiss</u></b>

## I.    Personal Jurisdiction

As noted above, the amended complaint added as defendants eight trusts established by Ira Rennert for the benefit of himself and his family; six individuals who are described as officers and directors of various of the originally-named company defendants; and one additional company, Doe Run Cayman Holdings LLC. Originally-named defendants Ira Rennert and Renco challenge personal jurisdiction, as do all newly-added defendants other than Cayman Holdings, which is a Missouri limited liability company. I conclude that this Court cannot assert personal jurisdiction over the Trusts and the newly-added individual defendants, and so I will dismiss the case against them without prejudice. I conclude that Rennert and Renco are properly subject to personal jurisdiction in this district.

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff is only required to make a prima facie showing of personal jurisdiction, that is, plaintiff must allege facts sufficient to support a "reasonable inference that the

- 5 -

defendants can be subjected to jurisdiction within the state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011); *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). If the district court relies on pleadings and affidavits, the court must look at the facts in the light most favorable to the party invoking personal jurisdiction, and resolve all factual conflicts in favor of that party. *Dakota Indus., Inc. v. Dakota Sportswear, Inc*., 946 F.2d 1384, 1387 (8th Cir. 1991) (citing *Watlow Elec. Mfg. Co. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir. 1988)).

There are two types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). General, or "all-purpose," jurisdiction exists over a corporation when the forum state is its place of incorporation or the location of its principal place of business. *Id*. at 121, 127; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). In an exceptional case, an additional state could have general jurisdiction if the corporation's activities in that state are "so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19.

Specific, or "conduct-linked," jurisdiction involves suits "arising out of or related to the defendant's contacts with the forum[.]" *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *see also Daimler*, 571 U.S.

at 122.  The defendant's activities within the forum state must give rise to, or relate to, the cause of action.  *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004).  For a Missouri court to exercise specific jurisdiction over an out-of-state defendant, two requirements must be met:  1) jurisdiction must be allowed by the Missouri long-arm statute; and 2) the reach of the long-arm statute must comport with due process.  *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 593-94 (8th Cir. 2011).  Missouri's long-arm statute authorizes, *inter alia*, personal jurisdiction over defendants who transact business or commit a tort within the state.  Mo. Rev. Stat. § 506.500.1(1), (3).  Due process requires that a defendant have certain minimum contacts with the state, such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).  The individual categories in the long-arm statute, such as transacting business or making a contract, are construed broadly "to provide for jurisdiction, within the specific categories enumerated in the statute, to the full extent permitted by the Due Process Clause."  *State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. banc 1984).

When assessing the sufficiency of a defendant's contacts, the court should examine five factors:  (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the

contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). Physical entry into a "is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

### A. The Trusts and the Newly-Added Individual Defendants

The Trusts were established under New York law and are alleged to together own 100% of Renco stock. Renco lost its corporate status from December 31, 2003 to August 10, 2004. The amended complaint alleges that the Trusts, along with other shareholders, officers, and directors of Renco are personally liable for the torts committed by Renco during the time of the dissolution. ECF 474 ¶ 110. It also alleges that certain of the officers and directors participated in the tortious activity, including acts that caused the delay of necessary environmental improvements at the La Oroya Complex. *See, e.g.,* ECF 474 ¶ 123, 124, 138-140.

Plaintiffs argue that under New York law they may look to the owners and officers of the dissolved corporation for damages attributable to the dissolved corporate defendant's acts during that time. But in *L-Tec Elec. Corp. v. Cougar Elec. Org., Inc.,* the court held that once a corporation has been reinstated, "its corporate status is restored *nunc pro tunc*," and the individual defendants are relieved of any personal liability. 198 F.3d 85, 87 (2nd Cir. 1999); *see* N.Y. Tax §

203-a(7).  Plaintiffs' argument based on this theory fails.

Plaintiffs' amended complaint makes very few allegations about the Trusts. It names them in the paragraphs introducing the defendants.  ECF 474 ¶ 12, 13, 14. It adds them to a few paragraphs that make allegations about Rennert (ECF 474 ¶ 78, 83, 84, 235) but provides no specific allegations about their actions.  The amended complaint makes numerous allegations against "defendants" generally, and plaintiffs' brief opposing the motion to dismiss does the same.  To the extent those allegations can be construed to include the Trusts, they are too vague to establish personal jurisdiction in Missouri.  Merely alleging that a party is a shareholder, even a 100% shareholder, without more does not establish personal jurisdiction over the shareholder.  *Cf. Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.,* 519 F.2d 634, 638 (8th Cir. 1975).  Plaintiffs have not shown that this Court can exercise personal jurisdiction over these New York Trusts,[2] and I will grant the motion to dismiss as to the Trusts.

The newly-added individual defendants worked for Renco and various of the other corporate defendants, including some of those with their principal places of

_____

[2] In response to defendants' argument that the Trusts themselves cannot be sued, plaintiffs move to substitute the trustees and unnamed trust beneficiaries as defendants.  ECF 637.  The personal jurisdiction analysis is the same whether the Trusts or the trustees and beneficiaries are the named defendants:  with the exception of Rennert, none of the trustees, Trusts, or beneficiaries have been shown to have sufficient contacts with Missouri to be brought into court here.  I will therefore deny the motion to substitute parties.

business in Missouri.[3]  In addition to being Renco officers, several of them are alleged to have held special powers of attorney to act in Peru for Renco and the other corporate defendants, including some of the Missouri corporate defendants. Unlike most of the individual defendants named in the original complaint, none of these defendants ever worked in Missouri or entered into any contracts in Missouri. Although none dispute being officers of Renco, some were never directors of Renco or the other corporations, and the two who were directors (Fay and Sadlowski) attested that they were never "dominant or controlling" directors.  ECF 757-1.  Plaintiffs have not presented any evidence that these defendants have had sufficient contacts with Missouri to allow the exercise of personal jurisdiction here.

Plaintiffs also argue that the Trusts and the newly-added individual defendants waived any objection to personal jurisdiction in Missouri.  Between the date the amended complaint was deemed filed, February 21, 2017, and the filing of the motion to dismiss on May 12, 2017, attorneys entered their appearances for all

---

[3] Renco is a New York corporation with its principal place of business in New York.  Rennert is a New York resident, as are newly-added individual defendants Fay, Koenig, Siegel, Binko and Ryan.  Newly-added defendant Sadlowski is a resident of Connecticut.  The originally-named individual defendants other than Rennert (that is, Kaiser, Neil, Zelms, and Fox) are or were during relevant times residents of Missouri or worked for the corporate defendants in Missouri; they do not challenge personal jurisdiction.

the newly-added defendants.[4]  Those lawyers participated in a status conference,

joined in filing a status report, and agreed to certain requested extensions of time.

In the time the motion has been pending, the newly-added defendants have

participated in discovery and in the regular scheduling conferences with the Court.

I do not agree with plaintiffs that those actions constituted a waiver of the new

defendants' right to challenge personal jurisdiction.  Indeed, given all the other

things going on in this case, it was entirely reasonable for the new lawyers to take

the actions that they did before filing the anticipated motion to dismiss.  And their

actions taken after the motion was filed are consistent with my directives that

discovery proceed without delay and without regard to any pending motions.

These newly-added defendants did not waive their right to challenge personal

jurisdiction.  I will grant the motion to dismiss for lack of personal jurisdiction as

to defendants Roger L. Fay, Marvin M. Koenig, John A. Siegel Jr., Dennis A.

Sadlowski, John A. Binko, and Michael C. Ryan.

### B.  Rennert and Renco

Unlike the newly-added defendants, Rennert and Renco have waived their

---

[4] The relevant procedural history is somewhat complicated.  Plaintiffs filed their motion for leave to amend, ECF 455, on January 19, 2017, and the parties proposed a briefing schedule, ECF 470, which I approved, ECF 461.  After that deadline was extended several times, the parties filed a stipulation that the amended complaint could be filed, but defendants expressly "reserve[d] all rights in regard of the proposed Amended Complaint."  ECF 471.  That stipulation included a proposed briefing schedule for the anticipated motion to dismiss.  The amended complaint was deemed filed on February 21, 2017.  ECF 473, 474.

right to object to personal jurisdiction, and I will deny the motion to dismiss as to them.

Personal jurisdiction is an individual right that may be waived. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). A person may submit to the jurisdiction of the court by appearance, by not timely raising the defense in an answer or responsive pleading, or by conduct that amounts to a "legal submission to the jurisdiction of the court, whether voluntary or not." *Id.* A "bald assertion" of lack of personal jurisdiction does not preserve the defense in perpetuity, as the defense may be lost by later conduct such as not timely seeking a ruling. *Yeldell v. Tutt*, 913 F.2d 533, 539 (8th Cir. 1990) (citing *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168 (1939)). Moreover, waiver of personal jurisdiction may occur when a defendant fails to object repeatedly "to the power of the court to act over the defendant's person." *Alger v. Hayes*, 452 F.2d 841, 844 (8th Cir. 1972).

Over the lengthy course of this litigation, Rennert and Renco never before asserted lack of personal jurisdiction. Their past actions are inconsistent with their present argument. For example, in opposing remand to state court the last time, defendants argued that jurisdiction would only be proper in this Court. ECF 38. They participated in motion practice in state court (including writs of prohibition

and mandamus) and removed the case three times.  *See* ECF 45.  They filed an

interlocutory appeal when I denied their request to stay these cases pending the

arbitration with Peru, but successfully obtained a stay of the case while their appeal

was pending.  ECF 62, 71, 72.  In their answers to the original petition, Rennert

and Renco admitted that subject-matter jurisdiction and venue were proper in this

Court, and never mentioned personal jurisdiction.  ECF 81, 83.  They participated

in motion practice, numerous hearings, and very extensive discovery over a period

of many years before ever raising this objection to personal jurisdiction.  Their

waiver of a personal-jurisdiction challenge could not be more unequivocal.

To the extent that defendants argue that the *Bristol-Myers Squibb* decision

changed the law of personal jurisdiction and gave them a new chance to object to

personal jurisdiction, they are wrong.  In that case, more than 600 plaintiffs from

34 states brought suit in a California state court against a pharmaceutical company,

alleging damage to their health from the drug Plavix.  *Bristol-Myers Squibb Co. v.

Super. Ct. of Cal.*, *San Francisco Cty.*, 137 S. Ct. 1773, 1777 (2017).  The

Supreme Court reversed a decision by the California Supreme Court, which had

held that Bristol-Meyers was subject to personal jurisdiction in California for the

claims of the non-California plaintiffs.  Although personal jurisdiction existed over

Bristol-Meyers for the claims of the California plaintiffs, there were insufficient

California contacts between the defendant and the non-California plaintiffs as to
those plaintiffs' claims.  *Id*. at 1782-1783.  The Supreme Court described this as a
"straightforward application . . . of settled principles of personal jurisdiction[.]"  *Id*.
at 1783.  In other words, it was not a new rule.  Bristol-Myers certainly knew to
make the argument, as did many other defendants who had unsuccessfully raised it
in lower courts in similar mass tort cases involving out-of-forum plaintiffs.  *See,
e.g., State ex rel. Bayer Corp. v. Moriarty,* 536 S.W.3d 227 (Mo. banc 2017).
Rennert and Renco could have raised the same argument, but they did not, and
they have waived the right to challenge personal jurisdiction in Missouri.

In any event, *Bristol-Myers* does not change the fact that Rennert and Renco
are subject to specific personal jurisdiction here, even aside from the waiver.  The
essence of plaintiffs' claims against Rennert and Renco is that they took actions in
Missouri that caused injuries to the plaintiffs in Peru.  Rennert and Renco had
extensive contacts with Missouri.  Rennert used Renco to structure the acquisition
and financing of the La Oroya operation, he attended numerous meetings in
Missouri to discuss the environmental cleanup in Peru, and he approved (and failed
to approve) the funding and scheduling of that cleanup.  Rennert's and Renco's
alleged conduct constitutes transacting business in Missouri within the meaning of
Missouri's long-arm statute.  Mo. Rev. Stat. § 506.500.3.  Rennert's and Renco's

activities within and contacts with the state are sufficient to meet the state long-arm requirements and the due process requirements of the Fourteenth Amendment.

## II.      Failure to State a Claim

Defendants move to dismiss all of the plaintiffs' claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  In their response to the motion to dismiss, plaintiffs conceded that their Count VII, for contribution, fails even under Missouri law.  I conclude that Counts V and VI fail to state a claim for strict liability. Counts III and IV fail to state a claim for civil conspiracy because only negligence claims remain and one cannot conspire to be negligent.[5]  Because these five claims fail even under Missouri law, I will dismiss them and need not consider the issues of piercing the corporate veil, comity, and determination of foreign law as to them.

When reviewing a Rule 12(b)(6) motion to dismiss, I must assume the allegations in the complaint to be true and construe the complaint in favor of the plaintiff.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010); *Anzaldua v. Northeast Ambulance & Fire Prot. Dist.*, 978 F. Supp. 2d 1016, 1021 (E.D. Mo. 2013).  To survive a motion to dismiss, the complaint need not contain "detailed factual allegations," but it must contain facts with enough specificity "to raise a

_____

[5] To the extent Counts X and XI attempt to state a claim for breach of contract, the contract claims are dismissed.  The claims, however, survive as to negligence.

right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

Specifically, to survive a motion to dismiss, a complaint must contain enough

factual allegations, accepted as true, to state a claim for relief "that is plausible on

its face." *Twombly*, 550 U.S. at 570.  The issue in determining a Rule 12(b)(6)

motion is not whether the plaintiff will ultimately prevail, but whether it is entitled

to present evidence in support of its claim.  *See Skinner v. Switzer*, 562 U.S. 521,

529-30 (2011) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

     I must accept the plaintiffs' factual allegations as true and construe them in

plaintiffs' favor, but I am not required to accept the legal conclusions the plaintiffs

draw from the facts alleged.  *Twombly,* 550 U.S. at 555; *Retro Television Network,*

*Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768-69 (8th Cir. 2012).  Drawing on

my "judicial experience and common sense," I must consider the plausibility of

each claim as a whole, not the plausibility of each individual allegation.  *Zoltek*

*Corp. v. Structural Polymer Grp*., 592 F.3d 893, 896 n. 4 (8th Cir. 2010).  In

*Twombly*, the Supreme Court clarified that Rule 8(a)(2) requires complaints to

contain "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action." *Twombly*, 550 U.S. at 555; accord *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678-79 (2009).

### A. Veil Piercing, Alter-Ego Liability, Internal Affairs Doctrine, and Agency

Defendants argue generally that all counts must be dismissed under the law of Peru.  They argue that Peruvian law does not recognize theories of veil piercing, alter-ego liability, or agency liability.[6]  For the reasons that follow, I conclude that plaintiffs have adequately alleged a claim under the veil-piercing, alter-ego, and agency theories they assert.

The defendants remaining in Count I, which alleges negligence, are Rennert and the corporate defendants Renco, Doe Run Resources, DR Acquisition, and Cayman Holdings.  Count II alleges negligence against remaining defendants Rennert, Kaiser, Neil, Zelms, and Fox.  Count X alleges negligent performance of a contract or undertaking by defendants Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox.  Count XI asserts negligent performance of an undertaking by defendants Renco, DR Acquisition, and Rennert.  All of these counts seek to impose some sort of derivative or veil-piercing liability.  Defendants seek to dismiss these counts for failure to adequately plead piercing the corporate veil, alter-ego liability, and agency.  Defendants also urge that none of these concepts are recognized by Peruvian law.

---

[6] This argument applies only to Counts I, II, X, and XI, because Counts VIII, IX, and XII do not allege any theory of derivative liability such as piercing the corporate veil.

Defendants first argue that under the "internal affairs doctrine" recognized by Missouri and New York, the Court must apply Peruvian law to these theories because non-party Doe Run Peru was incorporated in Peru.

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands.

*Edgar v. MITE Corp.,* 457 U.S. 624, 645 (1982).  Some courts have interpreted this doctrine to mean that any consideration of whether the corporate veil could be pierced must be determined using the law of the state of incorporation.  Defendants urge that under this doctrine the Court must use the law of Peru.  Non-parties Doe Run Peru and Doe Run Mining are Peruvian companies, but under the facts of this case the Court would have to look at the law of Missouri and New York as well, because Cayman Holdings and DR Acquisition were established under Missouri law and Doe Run Resources and Renco were incorporated under New York law.

Defendants cite to cases supporting their premise that veil piercing requires "a court to examine the internal structure and administration of a corporation and its parents or affiliates[.]"  ECF 843 at p. 16.  Even so, this does not necessarily mean that veil piercing itself requires application of the internal affairs doctrine. The internal affairs doctrine provides that the law of the state of incorporation

should be applied when internal corporate governance matters are at issue, to
ensure uniform applications of law.  Defendants' cases illustrate this.  In *In Re
Bridge Info. Sys., Inc.*, the court noted that the internal affairs doctrine generally
applies to disputes involving the administration or governance of a corporation.
325 B.R. 824, 830 (Bankr. E.D. Mo. 2005).   That court determined that the veil-
piercing claim, which involved a creditor's fraud claim against a controlling
shareholder of the bankrupt corporation that resulted in direct injury to the
corporation, would be governed by the law of the state of incorporation.  *Id.* at
830-31.

     *Yates v. Bridge Trading Co.*, 844 S.W.2d 56 (Mo. Ct. App. 1992), another
case relied on by defendants, was an action brought by a stockholder against a
Delaware corporation based on a stock purchase agreement that contained a
Missouri choice-of-law provision.  Discussing the internal affairs doctrine, the
court recognized that the issuance of stock is part of the internal affairs of a
corporation, which would "require[] the application of the laws of the state of
incorporation."  *Id.* at 61.  The court, however, nevertheless noted the flexibility of
the internal affairs doctrine as applied to pseudo-foreign corporations as well as the
most-significant-relationship test used by other courts to apply local law to a
foreign corporation's internal affairs, and determined that the internal affairs

doctrine did not require application of Delaware law to the agreement in the circumstances of that case.  *Id.* at 61-62.  I also note that in other cases, courts have applied Missouri's veil-piercing law to out-of-state corporations without discussing the internal affairs doctrine.  *See, e.g., Weitz Co. v. MH Washington,* 631 F.3d 510, 520-22 (8th Cir. 2011).

Comment e of the Restatement (Second) of Conflict of Laws § 302 explains that matters regarding a corporation's internal administration, such as the election or appointment of directors, the adoption of bylaws, the issuance of corporate shares, or cumulative voting requirements should be governed by a single law.  Restatement (Second) of Conflict of Laws § 302 cmt. e (1971).  This is because it would be impractical to have these sorts of internal matters, "which involve a corporation's organic structure or internal administration, governed by different laws."  *Id.*

The purpose of the internal affairs doctrine would not be served by applying it to the veil-piercing claims here.  This is not a case involving a fight among shareholders or over the election of corporate officers.  Rather, the veil-piercing issue in this case relates to the way the various entities were operated in relation to one another and to Doe Run Peru.  As the case does not involve any disputes about the internal affairs of the various defendants, Missouri law applies to the veil-

piercing issues.

When one corporation dominates and controls another to the point where formal corporate separateness is no longer followed, the subordinate corporation becomes the "alter ego" of the parent. *Weitz Co.*, 631 F.3d at 520. The veil of the parent may be pierced and the separate formal corporate structures may be ignored when the "formal corporate separateness is used to accomplish a fraud, injustice, or some unlawful purpose." *Id.* To state a valid claim for veil piercing under Missouri law, one must show three elements: (1) control – meaning domination of finances, policy, and business practice so that the corporate entity had no will or existence of its own; and (2) such control perpetuated fraud or a wrong, a violation of a statutory or other positive duty, or an unjust act in breach of plaintiffs' rights; and (3) the control and subsequent breach of duty proximately caused the injury. *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. Ct. App. 1986). *Collet* employs eleven factors that indicate the degree of control held by the parent corporation.[7]  *Id.*  Any combination of the eleven factors could support the

---

[7] The eleven factors are: (1) The parent corporation owns all or most of the capital stock of the subsidiary; (2) The parent and subsidiary corporation have common directors or officers; (3) The parent corporation finances the subsidiary; (4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation; (5) The subsidiary has grossly inadequate capital; (6) The parent corporation pays the salaries and other expenses or losses of the subsidiary; (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) In the papers of the parent corporation or the statements of its officers, the subsidiary is described as a

conclusion that a parent corporation controls a subsidiary corporation. *Paglin v. Saztec Int'l, Inc.*, 834 F. Supp. 1184, 1191 (W.D. Mo. 1993).

Similarly, under New York law, veil piercing is possible where "the owner exercised complete domination over the corporation with respect to the transaction at issue and such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2nd Cir. 1997). Determinations of veil piercing are fact specific and courts may consider several factors, including the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors, and personnel; and payment or guarantee of the corporation's debts by the dominating entity. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2nd Cir. 1997).

The amended complaint alleges that Doe Run Cayman Ltd., Doe Run Mining, and Doe Run Peru were formed in 1997 for the purpose of acquiring the La Oroya Complex. Plaintiffs allege that defendants controlled these entities, including Doe Run Peru, through a series of intermediary companies, with

department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own; (9) The parent corporation uses the property of the subsidiary as its own; (10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation and the latter's interest; and (11) The formal legal requirements of the subsidiary are not observed. *Collet,* 708 S.W.2d at 284.

defendants Renco and Rennert directly and indirectly owning all subsidiaries since
1997.  ECF 474 ¶ 14.  Renco owned DR Acquisition, which then owned Doe Run
Resources.  *Id.* at ¶ 15 and 16.  From 1997 to 2001, Doe Run Peru was owned by a
Peruvian subsidiary – Doe Run Mining.  *Id.* at ¶ 33.  Doe Run Mining was owned
by Doe Run Cayman Ltd., which was wholly owned by Doe Run Resources.  In
June 2001, Doe Run Mining was dissolved, and Doe Run Cayman Ltd. directly
held ownership of Doe Run Peru until 2007.  *Id.* at ¶ 34.  During this time before
2007, Doe Run Cayman Ltd. was directly owned by Doe Run Resources, which in
turn was held by DR Acquisition, which was directly owned by Renco.  *Id.* at ¶ 35.
In February 2007, Doe Run Resources, through its parent DR Acquisition,
transferred Doe Run Cayman Ltd. to a new Missouri holding company, Doe Run
Cayman Holdings, LLC (referred to as "Cayman Holdings" in this Memorandum
and Order).  *Id.* at ¶ 17, 36-37.   Later in March 2007, DR Acquisition transferred
its interests in Cayman Holdings to Renco.  *Id.*  From 1997 to 2007, Renco and
Rennert maintained ownership of these subsidiaries, including Doe Run Peru,
through capital stock.  *Id.* at ¶ 32.  Moreover, plaintiffs have demonstrated control
via the overlap of officers and directors serving on boards of subsidiaries
simultaneously, with Rennert serving as chairman of Renco, Doe Run Resources,
and DR Acquisition.  ECF 474 ¶ 10, 18-22.

Plaintiffs allege that defendants controlled the policy and decision-making processes of Doe Run Peru through various agreements for professional, technical, and managerial services. ECF 474 ¶ 39-68. Plaintiffs specifically allege that defendant Doe Run Resources provided staff and equipment to, and managed the employees and operations of, the La Oroya Complex, which included: performing all human resources operations such as payroll, employee incentives programs, and training; managing metallurgical production and materials handling, smelting and refining, shipping, purchasing, sales, and transportation; managing external operations such as public relations and community relations, handling political issues, and coordinating with governmental entities; managing environmental controls, monitoring, and remediation; and training the personnel who handled environmental management, among many other things. ECF 474 ¶ 49. They allege that Renco provided operational services to Doe Run Resources that included management of production, operation, personnel, and finances; obtained insurance; filed taxes; and claimed the right to any benefit of business losses. ECF 474 ¶ 52-59. Plaintiffs allege that defendant Rennert personally approved all capital expenditures, financing for operations and maintenance, budgeting and forecasting, business organization and management, and intercompany agreements (including those for managment and consulting services). Rennert is also alleged

to have required daily reporting from Peru on certain issues, and to have controlled all corporate meetings, voting rights, and bylaws.  ECF 474 ¶ 60-63.

These activities go far beyond the routine corporate "parental involvement" that normally includes such things as "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures.'"  *Masterson Pers., Inc. v. The McClatchy Co.*, No. Civ. 05-1274RHKJJG, 2005 WL 3132349, at *5 (D. Minn. Nov. 22, 2005) (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)). Instead, plaintiffs here allege that, through these agreements and in other ways, defendants controlled the day-to-day affairs of Doe Run Peru's business.  ECF 474 ¶ 49, 59.  These allegations include a majority of the *Collet* factors.  If defendants were performing this level of management of Doe Run Peru and the La Oroya Complex, then a factual basis for the "control prong" is satisfied.  *See Kleweis v. Transp. Support, Inc.*, 972 F. Supp. 494, 496 (E.D. Mo. 1997) (control prong satisfied when plaintiffs provided evidence of policy promulgation, approval of budgets, and controlling "strategic direction" of the subsidiary).

The second element required to pierce the corporate veil is whether control was used to "commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's

legal rights." *Collet*, 708 S.W.2d at 284.  Plaintiffs allege that defendants, for their

own financial benefit, caused significant environmental damages at La Oroya.

ECF 474 ¶ 70, 77-83, 92.  Undercapitalizing a subsidiary by creating it and then

operating it without a sufficient supply of money can serve as a proxy for this

element.  *Radaszewski by Radaszewski v. Telecom Corp.,* 981 F.2d 305, 308 (8th

Cir. 1992).  Plaintiffs allege that the undercapitalization of Doe Run Peru left the

company unable to implement environmental protection measures.  ECF 474 ¶ 94-

96.  These allegations suggest an "improper purpose," which may exist when a

corporation operates "without sufficient funds to meet obligations to those who

must deal with it[.]"  *May Dep't Stores Co. v. Union Elec. Light & Power Co.*, 107

S.W.2d 41, 55 (Mo. 1937).  Plaintiffs' allegations satisfy the second element

required by *Collet*.

Finally, plaintiffs must allege that the control and breach of duty

proximately caused their injury.  *Collet*, 708 S.W.2d at 284.  Plaintiffs have alleged

that it was foreseeable that the lack of pollution-control technology could result in

harm because of the danger from un-remediated toxic emissions.  Generally,

causation is a question of fact.  *Schaub v. VonWald*, 638 F.3d 905, 921 (8th Cir.

2011).  Here plaintiffs sufficiently alleged this element.  Plaintiffs have satisfied all

three elements under *Collet*; therefore their theories of veil piercing are adequately

pled under Missouri and New York law because of the overlap of factors that support the basis for a claim.

I also conclude that, contrary to defendants' arguments, Peruvian law could allow veil piercing under these allegations.  Instead of having an expressed doctrine as recognized by common law courts, Peruvian law has a form of indirect liability derived from misfeasance.  As explained by plaintiffs' expert, a Peruvian lawyer and law professor, the lack of a codified positive legal rule does not preclude derived liability from fraudulent misfeasance under Article 96 of the Civil Code because entities that are organized via "legal fraud" violate the public order, thereby allowing for dissolution of the entity similar to veil piercing.  ECF 871-121, Espinoza Report at ¶ 5.12.[8]  It may be possible to disregard the purpose of limited liability when members of the corporate entity do not act in good faith and the corporate entity frustrates economic expectations associated with the makeup of the legal entity.  *Id.* at ¶ 5.16 n.4.  An example of this can occur when fraudulent (unlawful) conduct materializes by harming creditors' economic expectations.  *Id*.  When applied in the context of Doe Run, this is the sort of activity at the heart of

---

[8] In discussing Peruvian law in this memorandum, I do not specifically cite to all the evidence submitted by the parties.  However, I have considered all the expert witness reports and exhibits submitted by all parties in support of their respective positions on the motion to dismiss (exhibits attached to ECF 545, 640, 756), the 2014 motion for determination of foreign law (exhibits attached to ECF 150, 214, 244), and the renewed motion for determination of foreign law (exhibits attached to ECF 843, 871, 909).

plaintiffs' claims – the La Oroya Complex was an undercapitalized corporate entity directly controlled by defendants, and the undercapitalization resulted in plaintiffs' harm.

Plaintiffs also plead theories of agency as a basis for liability.  A principal-agent relationship between two corporate entities is established when there is such domination and control "that the controlled corporation has no separate mind, will or existence of its own and is but a business conduit for its principal."  *Blackwell Printing Co. v. Blackwell-Wielandy Co.*, 440 S.W.2d 433, 437 (Mo. 1969).  The following elements show an agency relationship:  the agent has the power to alter legal relations, the agent is a fiduciary within the scope of matters entrusted to it, and a principal has a right to control the conduct of the agent.  *Banks v. Fluor Corp.*, 450 S.W.3d 308, 382-383 (Mo. Ct. App. 2014) (quoting *State ex rel. Ford Motor Co. v. Bacon,* 63 S.W.3d 641, 642 (Mo. banc 2002)).  New York law is similar; three elements are necessary to show an agency relationship:  a manifestation the agent shall act, an acceptance of the undertaking, and an understanding that the principal controls the undertaking.  *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 422 (Bankr. S.D.N.Y. 1990).  An agency relationship cannot be established where the alleged principal lacks control over the alleged agent.  *In Re Shulman Transp. Enter., Inc.*, 744 F.2d 293, 295 (2nd Cir.

- 28 -

1984).

As noted above, the overlap of common directors, control of business operations, and total ownership of the chain of subsidiaries demonstrate a factual allegation of control by defendants to establish an agency relationship over Doe Run Peru.  *Sedalia Mercantile Bank & Trust Co. v. Loges Farms, Inc.*, 740 S.W.2d 188, 202-03 (Mo. Ct. App. 1987) (concluding an agency relationship did not exist because the parent only required its subsidiary to follow guidelines and the parent did not direct operations, thus the relationship was not total, actual, and participatory).  An agent is a fiduciary for matters within the scope of the agency, and once the agency relationship is established, a fiduciary relationship arises as a matter of law.  *Int'l Envtl. Mgmt., Inc. v. United Corp. Servs., Inc.*, 858 F.3d 1121, 1125 (8th Cir. 2017).  "To adequately allege an actual agency relationship, a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority."  *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012).  Plaintiffs have pled facts to establish an inference of authority; therefore, defendants' argument for a lack of agency relationship fails.

Plaintiffs' allegations also state a basis for liability under Article 1981 of the Peruvian Civil Code.  When a subordinate relationship exists – meaning when the subordinate acts on behalf of the parent – and results in damage, then the parent

may be liable for the acts of the subordinate.  ECF 871-121, Espinoza Report at ¶ 5.24.  This type of relationship is a low bar, only requiring a "causal relationship" between the parties.  *Id.* at ¶ 5.25.  Thus, if it is possible to exercise power over a party, then a subordinate relationship is present because of the mere existence of the relationship and the exercise of control.  The relationship between defendants and Doe Run Peru qualifies as a "subordinate" relationship because Doe Run Peru acted on behalf of its owners.  Liability is established when there is the mere existence of a relationship between the principal and agent.  *Id.* at ¶ 5.26.  When a party directs another to act, and the latter causes damages while performing those duties, then the "direct principal and the vicarious principal are subject to joint liability."  *Id.* at ¶ 5.27.  Peruvian law recognizes liability arising under agency principles.

For the reasons stated above, plaintiffs have adequately pled theories of liability premised on alter-ego/piercing the corporate veil and agency sufficient to withstand dismissal under Rule 12(b)(6), whether considered under Missouri, New York, or Peruvian law.

## B. Negligence (Counts I and II)

Counts I and II allege that defendants owed a duty to the plaintiffs to control the toxic substances generated by the La Oroya Complex, to ensure that all were

within safe levels, and to remediate and warn plaintiffs to prevent their being

harmed.  These counts allege that the defendants negligently and recklessly

handled the wastes, resulting in damage to the plaintiffs.

To state a claim for negligence under Missouri law, the plaintiff must allege

that the defendant had a duty of care to protect the plaintiff from injury, the

defendant failed in performing the duty, and the defendant's failure proximately

caused harm to the plaintiff.  *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d

151, 155 (Mo. banc 2000).  A duty of care to a plaintiff may hinge upon whether

the defendant should have foreseen a risk in a given set of circumstances.  *Taylor*

*v. Dale-Freeman Corp.*, 389 S.W. 2d 57, 61 (Mo. 1965).  That being said,

"foreseeability alone is not enough to establish a duty."  *Stitt by Stitt v. Raytown*

*Sports Ass'n*, 961 S.W.2d 927, 930 (Mo. Ct. App. 1998).  There must be "some

right or obligation to control the activity which presents the danger of injury."  *Id.*;

*see also Pippin v. Hill-Rom Co*., 615 F.3d 886, 890 (8th Cir. 2010).  A company

owes a duty of care to the population of a given area to guard against the careless

release of toxic pollutants and other residues of their production process.  *Elam v.*

*Alcolac, Inc*., 765 S.W.2d 42, 175 (Mo. Ct. App. 1988).  New York law is

essentially the same:  "Negligence is the absence of care, according to the

circumstances."  *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 99 (N.Y. 1928)

(internal quotation marks and citation omitted).

Count I specifically alleges that Renco, Doe Run Resources, DR Acquisition, Cayman Holdings, and Rennert exerted complete control over the Peruvian subsidiaries and the La Oroya Complex and negligently and recklessly generated, stored, and failed to control toxic wastes from the mine, resulting in injury to the plaintiffs.  It also alleges that these defendants failed to warn the plaintiffs of the foreseeability of damage from defendants' handling of the toxic wastes.

Count II alleges that defendants Rennert, Kaiser, Neil, Zelms and Fox knew of and personally participated in the tortious acts of the defendant corporations.  It specifically alleges that these defendants were involved in the budgeting processes for the Complex, including setting environmental goals and the pollution-control budget; knew of available technologies that would have remediated the damage but failed to use them; knew of the toxic releases but failed to notify plaintiffs or others in the surrounding community; delayed implementation of proper pollution controls; and withheld information regarding the dangers of the toxic emissions.

Plaintiffs' allegations are sufficient to state plausible claims of negligence against these defendants under either Missouri or New York law.

Plaintiffs' allegations also plausibly state a claim of negligence under

Articles 1985 and 1981 of the Civil Code of Peru.  Article 1981 creates a broad duty of care for those engaged in "the exercise of their duties" when "another person under his command is responsible for said damage" of a person.  ECF 871-121, Espinoza Report at ¶ 5.52.  Defendants were directly or indirectly responsible for the La Oroya Complex and the alleged discharge of pollutants.  Article 1985 is analogous to both direct cause and proximate cause, two essential elements for a claim of negligence.  To establish a claim under Article 1985, the harm must be directly attributed to the defendants' conduct and "probability judgment."  This judgment is measured by what a person of normal mentality (similar to a reasonable person) could have foreseen because of his or her actions when assessed in the abstract.  *Id.* at ¶ 5.60.  Plaintiffs allege that their harm was a foreseeable consequence when defendants allegedly failed to implement measures to reduce environmental harm.  *Id*. at ¶ 5.62.  Article 1985 assesses damages for any consequences derived from the action or omission that generated the harm.  *Id.* at ¶ 5.61.  Additionally, Articles 142.1 and 142.2 of the General Environmental Law create a right of action against anyone that causes damage to the environment or human health, specifically defining environmental damage as "any material impairment suffered by the environment . . . that may be caused through the breach of legal provisions and which results in actual or negative potential effects."  ECF

871-121, Espinoza Report at ¶ 5.46.  The reference to breach of legal provisions is similar to the breach of duty required under American negligence law.  Read together these Articles indicate that Peru recognizes claims analogous to negligence.

Counts I and II of the amended complaint thus allege plausible claims under Missouri, New York, and Peruvian law, and survive dismissal under Rule 12(b)(6).

### C. Strict Liability (Counts V and VI)

Counts V and VI of the amended complaint allege absolute or strict liability. Plaintiffs argue that defendants' activities, which included the smelting, refining, and processing of heavy metals, are analogous to blasting operations or the release of radioactive emissions, and thus constitute an abnormally dangerous activity.

Missouri courts have applied the tort of strict liability for ultrahazardous or abnormally dangerous activities "very narrowly."  *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 868 (Mo. Ct. App. 1985).  In fact, the only "abnormally dangerous" activities that Missouri courts have found sufficient to state a claim for strict liability are activities involving nuclear materials, such as in *Bennett*, and blasting, such as in *Clay v. Mo. Highway & Transp. Comm'n,* 951 S.W.2d 617 (Mo. Ct. App. 1997).  For other activities, claims must be based on other torts such as negligence, nuisance, or trespass.  *Bennett,* 698 S.W.2d at 868.  *See, e.g.,*

*Rychnovsky v. Cole,* 119 S.W.3d 204 (Mo. Ct. App. 2003) (failure to maintain

gravity flow sewer line must be brought as negligence, nuisance, trespass, or

ejectment action); *Scott v. Dyno Nobel, Inc.*, No. 3:13-cv-5032-DGK, 2017 WL

395298 (W.D. Mo. Mar. 9, 2016) (claim for injury from toxic emissions from ball

bearing plant is really a negligence claim that plant was not operated properly);

*Wilson Road Dev. Corp. v. Fronabarger Concreters, Inc.,* 971 F. Supp. 2d 896,

916-17 (E.D. Mo. 2013) (claims about land-moving activities were really

complaints about the manner in which the activities were conducted, which is a

claim of negligence, not strict liability).

A review of the factors listed in the Restatement (Second) of Torts (1977),

on which Missouri courts have relied, shows why this tort is so difficult to

plausibly allege.  Those factors are:  (a) existence of a high degree of risk of some

harm to the person, land, or chattels of others; (b) likelihood that the harm that

results from it will be great; (c) inability to eliminate the risk by the exercise of

reasonable care; (d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and (f)

extent to which its value to the community is outweighed by its dangerous

attributes.  Restatement (Second) of Torts § 520 (1977).

Plaintiffs simply allege that the "ownership, operation, maintenance,

management, handling, processing and use of metals and gases and other toxic

substances" at the La Oroya Complex "constitute an abnormally dangerous activity

or ultra-hazardous activity, because such activities create a high risk of significant

harm." ECF 474 ¶ 144, 151. They have thus alleged only one of the factors listed

under the Restatement – the high risk of harm. They do not attempt to allege that

the risk cannot be eliminated through the exercise of reasonable care or that lead

mining is not a common activity, or any of the other Restatement factors. In their

brief they argue that "routine maintenance" would not have eliminated the risk

(ECF 640 at p. 169), but this is not the test. Even if "routine" maintenance would

not eliminate the risk, this cannot be a strict liability claim if "reasonable care"

would have done so. Indeed, in the same paragraph of their brief, plaintiffs go on

to argue that defendants *could* have lessened the risk had they "implement[ed]

suitable technologies and processes to prevent the pollution and contamination."

*Id.* This is a negligence allegation, not an allegation that the activity is so unusual

and so unreasonably dangerous that its hazards cannot be eliminated through the

exercise of reasonable care. Counts V and VI fail to state claims under Missouri

law.

Plaintiffs make no attempt to argue that their allegations are sufficient to

state a claim under New York law, and my review of New York law shows that the

allegations here are not sufficient to proceed.  New York also considers the

Restatement factors; and while New York courts do not always require factual

allegations showing that all six factors support the claim, more than a bald

assertion of danger is required.  *See, e.g., Town of New Windsor v. Avery Dennison*

*Corp.,* No. 10-CV-8611(CS), 2012 WL 677971 (S.D.N.Y. Mar. 1, 2012) (denying

motion to dismiss where complaint plausibly alleged facts supporting all but one

Restatement factor).

Because the strict liability counts fail to state a claim even under Missouri or

New York law, I need not consider whether a similar claim could survive under

Peruvian law.

### D. Direct Participation Liability, Breach of Assumed Duties, Negligent Performance of a Contract or Undertaking (Counts VIII, IX, X, XI, and XII)

Count VIII (brought against defendants Doe Run Resources, Cayman

Holdings, Kaiser, Neil, Zelms, and Fox) and Count IX (brought against defendants

Renco, DR Acquisition, and Rennert) are both titled "Direct Liability for Breach of

Assumed Duties Pertaining to Foreseeable Harms."  Count X (against defendants

Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox) and Count

XI (against defendants Renco, DR Acquisition, and Rennert) are both titled

"Negligent Performance of a Contract or Undertaking."  Count XII is brought

against defendants Renco and Rennert and is titled "Direct Participation Liability."

All five counts allege in some manner that the named defendants assumed the operation of the La Oroya Complex and in doing so assumed duties of care to plaintiffs.  These counts allege that the defendants' breach of these duties of care caused the plaintiffs' injuries from toxic emissions.  Counts VIII, IX, and XII allege that defendants are directly liable for their actions and those of their agents.  Counts X and XI appear to allege derivative liability arising from various express contractual undertakings (Count X) or from financial agreements among the corporate entities (Count XI).  All counts list various environmental, financial and management activities that they allege defendants negligently performed or failed to perform, and all counts make allegations related to underfunding the Complex or avoiding costs of environmental improvements.  All counts allege that these actions were taken to financially benefit the parent corporations and the individual defendants to the detriment of Doe Run Peru and the Complex.

Despite the titles to Counts X and XI referring to negligent breach of contract, plaintiffs urge that all five of these counts are based only on negligence, not on contract.  In general, neither Missouri nor New York law recognizes claims brought by non-parties to a contract for negligent breach of a contract.  *See, e.g., Fleischer v. Hellmuth, Obata & Kassabaum, Inc.,* 870 S.W.2d 832, 834 (Mo. Ct.

App. 1993); *see also Hardcore Concrete, LLC v. Fortner Ins. Servs., Inc.,* 220

S.W.3d 350 (Mo. Ct. App. 2007); *532 Madison Ave. Gourmet Foods, Inc. v.*

*Finlandia Ctr., Inc.,* 750 N.E.2d 1097 (N.Y. 2001).  Of course, third-party

beneficiaries can sue for breach of contract when "the terms of the contract . . .

express directly and clearly an intent to benefit an identifiable person or class."

*L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 260

(Mo. banc 2002) (internal quotation marks and citation omitted).  But that is not

the same as a claim of negligent breach of contract that could be brought by an

"unlimited number, or indeterminate class, of potential claimants[.]"  *Fleischer*,

870 S.W.2d at 835 (citing *Westerhold v. Carroll,* 419 S.W.2d 73, 79 (Mo. 1967)).

    Both Missouri and New York law have, however, recognized that a party

may, through contract or otherwise, assume a duty toward a person who is not

party to the underlying transaction; and if a duty is so assumed, a defendant must

exercise reasonable care.  *Kraus v. Hy-Vee, Inc.,* 147 S.W.3d 907, 924 (Mo. Ct.

App. 2004) (company that conducted traffic study that failed to recommend traffic

light assumed duty to person killed at unsignaled intersection); *Espinal v. Melville*

*Snow Contractors, Inc.,* 773 N.E.2d 485, 487-88 (N.Y. 2002) (describing situations

where New York law provides tort liability to third persons not in privity of

contract).  Both states have recognized that Section 324A of the Restatement

(Second) of Torts provides the analytical framework for whether a defendant has assumed a duty toward a third person.  *Berliner v. Milwaukee Electric Tool Corp.*, 501 S.W.3d 59, 67 (Mo. Ct. App. 2016) (company providing safety services at power plant assumed duty to workers); *Espinal,* 773 N.E.2d at 488.  Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a)  his failure to exercise reasonable care increases the risk of such harm, or
>
> (b)  he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)  the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).  When a defendant undertakes an activity that the defendant knows can affect the safety of third persons, the defendant has a duty of care to those third persons "to act in such a way that they will not be injured."  *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18, 22 (Mo. 1953).  A contractual obligation can be relevant in a negligence action to determine what duties defendant has undertaken, *see id.* at 21, but that does not necessarily translate into a claim for breach of the contract, whether negligently or

- 40 -

intentionally.  *See L.A.C.,* 75 S.W.3d 247.

It appears that Peruvian law recognizes somewhat similar types of claims.

Under Articles 1314 and 1327, there exists a similar cause of action to breach of

assumed duties.  Article 1314 states:  "Anyone who acts with the required ordinary

diligence is not liable for a failure to meet an obligation, or its partial, late or

defective completion."  ECF 871-121, Espinoza Report ¶ 5.82.  Article 1327

provides that there will be no compensation available if an alleged tortfeasor used

"ordinary diligence."  *Id.* at ¶ 5.83.  Ordinary diligence is analogous to a

reasonable care standard because in assuming the duty to act, a party must do so

"with the act of protecting an obligation," which requires an assessment of

attention and caution to a set of characteristics.  *Id.* at ¶ 5.84-5.85.  Assuming the

duty requires acting with reasonable care under the circumstances.  Articles 1969,

1981, and 1983 impose extra-contractual liability on individuals and corporations,

and when combined with Article 1314, the same liability can apply to third parties

when individuals or corporations assume a duty via contract.  ECF 871-121,

Espinoza Report at ¶ 5.86.  Moreover, Article 1457 allows for extra-contractual

liability claims to proceed in conjunction with Articles 1969, 1981 or 1983 because

Article 1457 provides an action for negligence in fulfilling the duty if a task for the

benefit of a third person occurs in a contract.  *Id.* at ¶ 5.88-5.90.  Peruvian law

recognizes an analogous claim to breach of assumed duties because both Missouri and Peru consider the harm done to third parties with respect to an acquired obligation.

All five counts here adequately allege that defendants undertook certain activities, and then were negligent in performing them.  Although they are overlapping and somewhat difficult to distinguish from one another, they are each sufficient to state a claim on which relief can be granted.

As noted above in the section discussing piercing the corporate veil, Counts VIII, IX, and XII allege that the defendants named in those counts are directly liable to plaintiffs.  Direct liability of this sort is supported by *United States v. Bestfoods*, 524 U.S. 51 (1998), which recognized that a parent corporation could be directly liable for a CERCLA violation as an "operator" as that term is used in 42 U.S.C. § 9601(20)(A)(ii).  The Court in *Bestfoods* distinguished this type of liability from derivative or veil-piercing liability, 524 U.S. at 67-68, and held that CERCLA did not change the existing common law of direct liability that can apply when "'the alleged wrong can seemingly be traced to the parent through the conduct of its own personnel and management' and 'the parent is direct a participant in the wrong complained of.'"  *Id.* at 64 (quoting Douglas & Shanks, *Insulation from Liability through Subsidiary Corporations*, 39 Yale L. J. 193, 207-

08 (1929)).  As the Supreme Court noted, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."  *Id.* at 69 (internal quotation marks and citation omitted).  It is presumed that directors are wearing their "subsidiary hats," instead of their "parent hats" when acting on behalf of the subsidiary.  *Id*.  This presumption is strongest when an officer is acting consistently with corporate norms, but "wanes as the distance from those accepted norms approaches the point of action by a dual officer *plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent*."  *Id.* at 70 n.13 (emphasis added).

The notion of direct participation liability is transaction specific and limited to situations where parental or shareholder meddling is directly tied to the harmful or tortious conduct of the subsidiary; therefore, this form of liability rests on the parent's or owner's own conduct.  *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 234 (Ill. 2007) (citing *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2nd Cir. 1929) (such liability "normally must depend upon the parent's direct intervention in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers.")); *see also Esmark, Inc. v. N.L.R.B.,* 887 F.2d 739, 757 (7th Cir. 1989) (parent can be held liable where the

parent "directs the actions of its subsidiary, using its ownership interest to command rather than merely cajole").

Peruvian law also recognizes the possibility of direct participation liability, albeit through multiple Articles of the Code taken together. First, Article 142 of the General Environment Act, which creates liability for harm to the environment, along with Article 1983, which establishes joint liability, can allow for direct liability. ECF 871-121, Espinoza Report at ¶ 5.79. *See also Torres v. Southern Peru Copper Corp.,* 965 F. Supp. 899, 904 (S.D. Tex. 1996), *aff'd*, 113 F.3d 540 (5th Cir. 1997). Second, an individual acting as the "primary party" directing the subordinate corporation can be liable under Article 1981, which also establishes joint liability. ECF 871-121 at ¶ 5.79. The key to both causes of action is the degree of control the primary individual exercises, with control defined "as the dominant and continuing influence in decision making." *Id.* at ¶ 5.75. Control may be exercised over corporate entities when one person administers decision-making authority and all entities share risk, meaning the financial circumstances of one entity has repercussions for the others. *Id.* at ¶ 5.73-5.74. The burden is on the plaintiff to show the requisite degree of control exercised by an individual or abuse of corporate form. *Id.* at ¶ 5.80.

Here, plaintiffs have presented sufficient facts to support the allegation of

direct participation liability.  The allegations in Counts VIII, IX, and XII are sufficient to allege that those defendants were not wearing their "subsidiary hats" when they operated the La Oroya Complex and took actions that left Doe Run Peru undercapitalized and financially unable to implement pollution-mitigation measures.

I conclude that Counts VIII, IX, X, XI and XII all make sufficient allegations to withstand the motion to dismiss.  All counts sufficiently allege that defendants had duties to plaintiffs and breached those duties by failing to use reasonable care, resulting in damage to the plaintiffs.  Because of the confusing and overlapping nature of these counts, I am somewhat skeptical that plaintiffs will be able to sort them out to present them to a jury in any reasonable manner when the cases go to trial.  Nevertheless, applying the Rule 12(b)(6) standard, I will deny the motion to dismiss as to these counts.[9]

### E.  Civil Conspiracy (Counts III and IV)

Counts III and IV allege civil conspiracy amongst the individual and corporate defendants.  Plaintiffs acknowledge that civil conspiracy is not a separate tort in itself but instead is a means to hold conspirators liable for an underlying wrong.  *See Higgins v. Ferrari,* 474 S.W.3d 630, 642 (Mo. Ct. App. 2015).  In

---

[9] To the extent Counts X and XI purport to be breach of contract claims, they fail; but they survive as negligence claims.

these counts, plaintiffs allege that defendants "have acted jointly and in conspiracy . . . to commit the torts alleged[.]"  ECF 474 ¶ 128.  Plaintiffs also allege that the objects of the conspiracy included "allow[ing] toxic substances to be released . . . in order to avoid the cost" of performing the environmental cleanup.  ECF 474 ¶ 131.

It is common sense that "one cannot conspire to commit a negligent or unintentional act."  *United States v. Sdoulam*, 398 F.3d 981, 987 (8th Cir. 2005); *see also Bader Farms, Inc. v. Monsanto Co.,* Case No. 1:16CV299SNLJ, 2018 WL 1784394, at *5-6 (E. D. Mo. Apr. 13, 2018); *Wright v. Brooke Grp. Ltd.,* 114 F. Supp. 2d 797, 837 (N.D. Iowa 2000).  As the only claims remaining in this case are all based on negligence, the civil conspiracy counts must be dismissed.

### F.  Punitive Damages

All counts of the Amended Complaint seek punitive damages.  Plaintiffs have alleged enough factual support for their claims for punitive damages to go forward at this time under either Missouri or New York law.  To obtain punitive damages for negligence, a plaintiff must show a form of egregious conduct or a "conscious disregard for the safety of others."  Mo. Approved Jury Instr. (Civil) 10.02 (7th ed.); *see also Litchfiled By & Through Litchfield v. May Dep't Stores Co.*, 845 S.W.2d 596, 599 (Mo. Ct. App. 1992);  *Hartford Accident & Indem. Co.*

*v. Village of Hempstead*, 397 N.E.2d 737, 743 (N.Y. 1979); N.Y. Pattern Jury Instr. – Civil  2:278.

Defendants argue that punitive damages are not available under Peruvian law.  Although punitive damages do not appear to be applied in the same manner in Peru as they are applied in the United States (*i.e*., as a separate submission of damages), Peru does recognize that damages can be imposed as a "form of private punishment."  ECF 871-121, Espinoza Report at ¶ 5.93.  In assessing non-pecuniary damages (pain and suffering or personal damages), the behavior of the party that caused the harm is to be considered.  *Id.* at ¶ 5.91.  Thus, damages are not solely based on compensation.  Although Peru does not have the same "conscious disregard for others" standard as Missouri or New York, Peru does require an "extensive application of damages" and damages can be increased to punish the wrongdoer and to deter others.  *Id.* at ¶ 5.93.  Defendants are incorrect in stating that Peru flatly does not recognize punitive damages.  Plaintiffs' claims for punitive damages survive under Missouri, New York, and Peruvian law.

## III.    Choice of Law

The defendants request that I make a determination, pursuant to Federal Rule of Civil Procedure 44.1 and Missouri choice-of-law principles, that the law of Peru governs this case.  Under Rule 44.1, the determination of foreign law is a

question of law that can be based on any relevant source, "whether or not submitted by a party and whether or not admissible under the Federal Rules of Evidence." *United States v. Matya*, 541 F.2d 741, 746 n.10 (8th Cir. 1976) (citing Fed. R. Civ. P. 44.1).  As shown in the discussion above, I have considered the expert reports and other materials relating to Peruvian law that the parties have submitted.

Although a court making a Rule 44.1 determination may examine any relevant material, "it is under no obligation to do so if the party whose burden it is fails to produce sufficient evidence that foreign law applies." *In re Vivendi Universal, S.A. Sec. Litig.*, 618 F. Supp. 2d 335, 340 (S.D.N.Y. 2009).  Where the parties do not adequately prove foreign law so as to "'enable the court to apply it in a particular case,'" the law of the forum applies.  *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 469 (E.D. Pa. 2010) (quoting *Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3rd Cir. 1999)).  A court has no duty to make further inquiries of a party who fails to prove the content of the applicable foreign law.  *See Vivendi*, 618 F. Supp. 2d at 340.

With regard to choice-of-law principles, both federal common law and Missouri law follow the approach outlined in the Restatement (Second) of Conflict of Laws.  *See Eli Lilly Do Brasil, Ltd. v. Fed. Express Corp.*, 502 F.3d 78, 81 (2nd

Cir. 2007); *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969); *see also*

*Blake v. Comm'r*, 697 F.2d 473, 477 n.4 (2nd Cir. 1982) (declining to decide

whether federal or forum state choice-of-law principles applied because the result

was the same either way).  Both Missouri and the federal common law

determinations begin with an investigation of whether the laws conflict in the first

place.  *See Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir.

2007); *In re Aircrash Disaster Near Roselawn, Ind.*, 926 F. Supp. 736, 740 (N.D.

Ill. 1996).

     As discussed more fully above, I conclude that the laws of Peru do not

actually conflict in any significant, substantive way with Missouri and New York

law.  When the legal principles are the same in both jurisdictions, there is no need

to employ a choice-of-law analysis.  *Phillips v. Marist Soc'y of Washington*

*Province*, 80 F.3d 274, 276 (8th Cir. 1996).  With the lack of a true conflict of law,

the law of the forum where the action is brought controls.  *Forsyth v. Cessna*

*Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975).  For each of the claims that are

plausible under Missouri law, a comparable form of relief exists under Peruvian

law.  Although Peruvian law may not identify the claims at issue by the same

doctrinal name and litigation procedure is obviously different, this does not mean

that the same substantive relief cannot exist under analogous legal provisions of

both countries' laws.  Given the similarity, making a further choice-of-law analysis is unnecessary.

Defendants have failed to prove a true conflict exists between Missouri and Peruvian law.  If the movant fails to prove foreign law with reasonable certainty, a district court should apply the law of the forum.  *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006-07 (5th Cir. 1990).  The parties offer conflicting experts on Peruvian law, who reach opposite conclusions regarding the same provisions of Peruvian law.  This indicates a lack of reasonable certainty regarding which controlling law to apply, either Missouri or Peru.  Missouri law will control the outcome of this case because of the lack of conflict between Peruvian law and that of Missouri.

Even if a conflict were present, under the principles of the most-significant-relationship test, Missouri law would still control.  There is no doubt that the injuries occurred in Peru, but that does not mean that defendants are correct in arguing that the *conduct* giving rise to injury occurred in Peru.  Missouri has a substantial connection with this case because Missouri is the principal place of business of several defendants and most of the individual defendants resided or worked here during the relevant times.  *See In Re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 594, 613 (7th Cir. 1981) (noting an interest because of

principal place of business).  Missouri certainly has an interest in deterring

malfeasance by its domestic corporations and providing a place of redress for harm

caused by its citizens.  *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir.

1991).  Missouri has an interest in applying its tort law because – as the state where

defendants are incorporated and the misconduct occurred – Missouri has a greater

ability to control corporate behavior by deterrence or punishment than Peru, the

place where the injury occurred.  *In re Air Crash Disaster Near Chicago, Ill.*, 644

F.2d at 615.  The policies that underlie toxic tort law include punishing and

deterring wrongdoing, not just compensating the victims, something Missouri has

an interest in doing.  *See Singh v. Edwards Lifescience Corp.,* 210 P.3d 337, 342

(Wash. Ct. App. 2009) (noting a state has an interest in deterring wrongdoing by its

corporations).

   Defendants have failed to meet their burden of showing that Peruvian law

should apply.  As discussed in detail above, there is no substantial conflict between

Missouri and Peruvian law with regard to the claims in this case.  Even if a conflict

existed, Missouri law would have a more significant relationship because of the

allegations of wrongdoing in Missouri by Missouri corporations and citizens.

Therefore, defendants' motion to determine foreign law, wherein they ask that I

apply Peruvian law to the claims in this case, is denied.

## IV.    International Comity

Defendants ask this Court to abstain from deciding the case on the basis of international comity.  They argue this Court's deciding the action would interfere with Peru's sovereign interests and would improperly impose United States' standards to regulate the environment and mining operations in Peru.  Among other legal authorities, defendants point to *Torres v. Southern Peru Copper Corp.,* 965 F. Supp. 899 (S.D. Tex. 1996), *aff'd* ,113 F.3d 540 (5th Cir. 1997), a case they relied on earlier in this litigation to argue that federal subject-matter jurisdiction should be based on the federal common law of foreign relations.  I rejected that argument and remanded the earlier case to state court.  *A.A.Z.A. v. Doe Run Resources Corp.,* Case No. 4:07CV1874 CDP (E.D. Mo. Mar. 18, 2008) (Memorandum and Order, ECF 61).  The comity argument raised now presents a different issue from the one I considered before.[10]

Applications of international comity are context specific, but in general, comity is deference provided by one government to foreign government actors. William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev.

---

[10] As an initial matter, I reject plaintiffs' argument that defendants have waived this argument or that it is governed by the law of the case.  "[Q]uestions of comity can be raised on the court's own initiative," *Thomas v. State of Ind.*, 910 F.2d 1413, 1415 (7th Cir. 1990), and issues relating to international comity can be raised on appeal even if the issue was not raised in the district court, *Fortino v. Quasar Co., a Div. of Matsushita Elec. Corp. of Am.*, 950 F.2d 389, 391 (7th Cir. 1991).

2071, 2078 (2015).  Comity is not required by international law but is incorporated into domestic law.  *Id.*  Although the rationales of various international comity doctrines may vary, according respect for the sovereign interest of other nations and the interest of the United States remains paramount.  *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

There are several ways of analyzing whether a court should abstain from deciding a case based on international comity.  Defendants advocate for dismissal based on the factors set out in the Restatement (Third) of Foreign Relations Law § 403 (1987).  Plaintiffs discuss the concept of prospective adjudicative comity.  Under any of the tests, I conclude that abstention on international comity grounds is not required or appropriate here, for the reasons that follow.

Section 403 of the Restatement (Third) of Foreign Relations Law cites eight factors that a court should consider in determining whether exercising jurisdiction is reasonable:

(a)   the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b)   the connections, such as nationality, residence, or economic activity between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c)      the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d)      the existence of justified expectations that might be protected or hurt by the regulation;

(e)      the importance of the regulation to the international political, legal, or economic system;

(f)      the extent to which the regulation is consistent with the traditions of the international system;

(g)      the extent to which another state may have an interest in regulating the activity; and

(h)      the likelihood of conflict with regulation by another state.

"Prospective adjudicative comity" is the phrase used to describe a doctrine of abstention similar to forum non conveniens.[11]  *See Ungaro-Benages,* 379 F.3d at 1238-39.  Three interests inform this analysis:  "the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum."  *Id.* at 1238.  The most important interests are the sovereign interest of both the United States and the foreign government.  *See Perforaciones*

---

[11] The related concept of retrospective adjudicative comity has no application here, because it considers whether to respect the judgment of a foreign tribunal or to defer to foreign proceedings, *Ungaro-Benages,* 379 F.3d at 1238, and here there is no Peruvian judgment or proceeding. *Cf. Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft,* 491 F.3d 355, 365-66 (8th Cir. 2007) (once foreign judgment is final the doctrine of res judicata should apply).

*Exploracion y Produccion v. Maritimas Mexicanas, S.A. de C.V.*, 356 F. App'x

675, 681 (5th Cir. 2009) (Mexico's silence is dispositive basis to reject abstention);

*Mujica v. Airscan*, 771 F.3d 580, 609-12 (9th Cir. 2014) (abstention warranted

because both United States and Columbian governments requested dismissal upon

international comity).

Under both the "prospective adjudicative" test and factor (g) of the

Restatement, the most important aspect of a comity analysis is to determine the

sovereign interests.  Restatement (Third) of Foreign Relations Law § 403, reporter

note 6 (1987) ("it may be necessary to identify and weigh the respective interests

of the concerned states in regulating (or refraining from regulating) a given activity

or transaction.").  Comity requires a particularized analysis "of the respective

interests of the foreign nation[.]"  *Societe Nationale Industrielle Aerospatiale v.*

*U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543-44 (1987).

For the United States' interest, if the State Department expresses a specific

opinion on the implications of "exercising jurisdiction over particular petitioners in

connection with their alleged conduct, that opinion might well be entitled to

deference as the considered judgment of the Executive on a particular question of

foreign policy."  *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004).

Dismissal of a case may be warranted when the State Department files a statement

of interest noting that the litigation impedes an important foreign policy initiative or would result in "serious implications for stability in the region." *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005); *see also Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 63 (2nd Cir. 2005). The State Department has not expressed any position on this litigation.

The parties have submitted competing letters purporting to reflect the views of the Peruvian government. Defendants provided a 2007 letter from the Peruvian Minister of Economy and Finance, ECF 545-13, and a 2017 letter from the same office, ECF 545-3. Plaintiffs have submitted two letters from Peruvian Congressmen, both dated August 2017. ECF 640-85, 640-86. Defendants' letters are addressed to United States officials. The 2007 letter specifically asked the Department of State to notify this Court that this litigation should be handled by the courts of Peru. The 2017 letter is addressed to the Chief of Investment Arbitration, Office of the Legal Adviser, Department of State and says it is being sent pursuant to the United States-Peru Trade Promotion Agreement. Included in its lengthy recitation about Peru's environmental actions and the arbitration between Renco and Peru is a reference back to the prior 2007 letter's statements that Peruvian courts should hear these cases.

The letters plaintiffs have submitted are from Peruvian Congressmen who

represent the La Oroya area; these letters are directed to Peru's Ministry of Finance.  The first of these letters says that the cases should be allowed to proceed in this Missouri court, and expresses concern that "an official from your sector has been interfering in a judicial process where the Peruvian State is not a party."  ECF 640-85.  The second letter speaks favorably about the cases proceeding in Missouri and asks for information "regarding the legal basis, justification and motivation for" the 2017 letter submitted by defendants.  ECF 640-86.

Courts may consider "any relevant material" when weighing a foreign state's views about the meaning of its own laws.  *Animal Sci. Prods. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1870 (2018).  When considering foreign statements, a court is "neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials."  *Id.* at 1873.  Instead, courts should look to the context and purpose of the statement, role and authority of who is offering the statement, and consistency with past positions.  *Id.* at 1868.  The Supreme Court also pointed out that "[w]hen a foreign government makes conflicting statements or . . . offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission."  *Id.* at 1873 (internal citation omitted).

I conclude that the letters presented here are not persuasive either way

regarding Peru's interest in this case.  The letters not only contradict one another, but they were obtained by each side for the purpose of supporting their positions in this litigation.[12]  It appears to me that different Peruvian officials have taken different sides in this dispute, and none fully represents the position of the Peruvian government.  Moreover, even aside from the contradictory positions demonstrated by the letters, the 2017 letter submitted by defendants does not expressly advocate for dismissal on grounds of comity, but merely states that Peru's sovereignty *might* be affected by this litigation.  In other cases foreign governments have expressly declared such interests, even at the district court level. *See Mujica,* 771 F.3d at 586 (Columbian government sent two statements of interest advocating for dismissal).  The lack of an express position is a significant factor in deciding where the litigation should proceed.  *Pacheco de Perez v. AT&T Co.,* 139 F.3d 1368, 1378 (11th Cir. 1998).

The sovereign interests of the United States and Peru do not advocate for dismissal on the grounds of international comity.  The lack of an express sovereign

---

[12] I am also concerned that defendants initially denied soliciting the 2017 letter, *see* ECF 556, pp. 45-47 (5/23/2017 Telephonic Status Conf.), and that they only later corrected that statement and admitted, as seemed obvious to me from the beginning, that defendants had been involved in obtaining it or, at the very least, had "believe[d], though without any assurance" that Peru would provide another letter.  ECF 583, p. 7 (6/6/17 Telephonic Status Conf.).  I accept counsel's word that he was not fully informed by his clients when he made his initial misrepresentation to the Court.

interest weighs heavily against dismissal, and three of the remaining Restatement

factors support this conclusion.  Restatement factors (b), (c), and (d) consider

nationality of the parties and residence, the activity at issue, and the expectations of

the parties.  Although the plaintiffs are Peruvian, the defendants are American.

The wrongful activity is alleged to be the decisions made and actions implemented

by defendants acting in the United States.  A United States District Court may

exercise jurisdiction over a domestic corporation even when the alleged injury

occurred entirely abroad.  *Jota v. Texaco, Inc.,* 157 F.3d 153, 155 (2nd Cir. 1998).

A state has a "significant interest in providing a forum for those harmed by the

actions of its corporate citizens."  *Carijano v. Occidental Petroleum Corp.*, 643

F.3d 1216, 1232 (9th Cir. 2011).  And of course, Peru has an interest in seeing that

its Peruvian citizens receive appropriate compensation if they have been harmed by

wrongful actions of Americans.

As the home forum state, Missouri has a cognizable state interest in

regulating the conduct of its citizens who are subject to the reach of applicable

state law.  *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 709 F. Supp. 472, 481

(S.D.N.Y 1989) (a cognizable state interest exists when a United States corporation

executed securities fraud abroad).  No conflict occurs "where a person subject to

regulation by two states can comply with the laws of both."  *Hartford Fire Ins. Co.*

*v. California*, 509 U.S. 764, 799 (1993) (internal quotation marks and citation omitted).  Since the remaining tort law claims do not conflict, defendants are capable of complying with both Peruvian and relevant state laws.  The regulated activity is of importance to Missouri and Missouri has an interest in ensuring a proper forum exists for those harmed by its corporate citizens.  *Carijano*, 643 F.3d at 1232.  Finally, defendants should expect litigation where they are at home because a "defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens."  *Reid-Walen*, 933 F.2d at 1400.

Of the remaining Restatement factors, only factor (a) favors abstention.  Factor (a) concerns the forum where the injury took place.  Plaintiffs are Peruvian citizens who were injured entirely in Peru.  *See Torres,* 965 F. Supp. at 909 (dismissal warranted when activity and harm occurred in Peru and plaintiffs are all Peruvian nationals).  Restatement factors (e) and (f) are neutral because the claims at issue in this case do not implicate the "international legal systems."  Peru's sovereignty is not at issue and the adjudication of these claims will not upset the traditions of the international system.  To the extent that defendants argue that the United States-Peru Trade Promotion Agreement shows that Peruvian sovereignty would be affected by this case going forward, they are wrong.  Chapter 18.4,

paragraph four of that agreement recognizes that suits like this could go forward in the United States, as it provides that each party (*i.e.*, the United States and Peru) must provide remedies "for violations of a legal duty under that *Party's law* relating to the environment or environmental conditions affecting human health, which may include rights such as: to sue another person under *that Party's jurisdiction* for damages under *that Party's laws*." ECF 545-10 at p. 4 (emphasis added). "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008).

Finally, Restatement factor (h) is neutral because there are no statutes that conflict with the remaining tort claims; therefore, there is no likelihood of conflicting regulations by another state because defendants can comply with the laws of both. *Hartford Fire*, 509 U.S. at 799.

When the interests of Peru and the United States are considered, the interest of Missouri in regulating the conduct of its own citizens, both at home and abroad, outweighs the interest of Peru. After all, citizens of Peru have come to this Court seeking recompense for what they allege are improper actions taken in America by American defendants. Although there is no doubt that plaintiffs suffered the consequences in Peru, an American court is in the best position to consider the American conduct of American defendants. While defendants have consistently

argued that this case is not about their conduct in the United States, plaintiffs have alleged that it is, and, as set out above, they have stated valid claims under Missouri and New York law, based on defendants' alleged actions here in the United States.  The lack of any parallel proceeding in Peru, and the Peruvian courts' likely inability to hold these same defendants responsible for their conduct, is also significant in maintaining the case in Missouri.[13]

Having considered the sovereign interests and balanced the applicable Restatement factors, I conclude that abstention on the basis of international comity is not supported in this case.  Missouri and New York have cognizable state interests in regulating the affairs of their corporate citizens.  Peru and the United States lack an express position advocating for dismissal.  It is only fair to permit this litigation to proceed and allow plaintiffs a chance to hold defendants liable for their actions where defendants are at home.

## V.    Conclusion

To summarize:  all counts are dismissed without prejudice against all the newly-added defendants, all claims against the Trusts, Roger L. Fay, Marvin M.

---

[13] Defendants argue that the Court could condition dismissal on defendants' agreement to submit to the jurisdiction of Peruvian courts, but then in a footnote they argue that not all defendants are potentially liable and therefore not all defendants should be required to consent.  ECF 756 at p. 71 n.31.  In other words, the suggestion that defendants would consent to jurisdiction in Peru is illusory.

Koenig, John A. Siegel Jr., Dennis A. Sadlowski, John A. Binko, and Michael C. Ryan for lack of personal jurisdiction.  Counts III, IV, V, VI, and VII are dismissed in their entirety for failure to state a claim.  The motion to dismiss is denied in all other respects.

The counts that remain are:

- Count I – <u>Negligence</u> against defendants Renco, Doe Run Resources, DR Acquisition, and Cayman Holdings;

- Count II – <u>Negligence</u> against defendants Rennert, Kaiser, Neil,. Zelms, and Fox;

- Count VIII – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against defendants Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox;

- Count IX – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against defendants Renco, DR Acquisition, and Rennert;

- Count X – <u>Negligent Performance of an Undertaking</u> against Doe Run Resources, Cayman Holdings, Kaiser, Neil, Zelms, and Fox;

- Count XI –<u>Negligent Performance of an Undertaking</u> against Renco, DR Acquisition, and Rennert; and

- Count XII – <u>Direct Participation Liability</u> against defendants Renco and Rennert.

<b><u>Other Motions</u></b>

**I.     <u>Motion to Substitute Parties</u>**

Plaintiffs move to substitute all the trustees and beneficiaries for the Trusts.

As I have dismissed all claims against the defendant Trusts and the same result would be required against the individuals, I will deny this motion.

## II.   **Motion to Consolidate Cases**

Plaintiffs move to consolidate three additional cases with these cases. Defendants oppose the motion, arguing that the parties are different and the claims are different.  The difference in parties is that the trustees and beneficiaries of the Trust defendants are named as individual defendants.  No new jurisdictional allegations are set out that would change my decision that this Court lacks personal jurisdiction over these defendants.  The claims appear substantially the same.  I will grant the motion to consolidate, but all rulings from this Memorandum and Order will apply to those cases.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss [543] is granted in part and denied in part.

**IT IS FURTHER ORDERED** that plaintiffs' claims against Roger L. Fay, Marvin M. Koenig, John A. Siegel Jr., Dennis A. Sadlowski, John A. Binko, Michael C. Ryan, and all the Trust defendants are dismissed without prejudice for lack of personal jurisdiction.

**IT IS FURTHER ORDERED** that Counts III, IV, V, VI, and VII are

- 64 -

dismissed for failure to state a claim.

**IT IS FURTHER ORDERED** that defendants' motion for determination of foreign law [841] is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion to substitute parties [637] is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion to consolidate cases [891] is granted.  The rulings set forth herein shall apply to the complaints in those cases.  The following cases are consolidated with this case, but, as with the other member cases, all filings must be made in this master case.  After I rule on any procedural matters that may be pending, the cases will be administratively closed, subject to being reopened if and when appropriate.

Case No. 4:18CV575 RLW, *Katerin Carrera Espinoza, et al. v. Ira L. Rennert, et al.*;

Case No. 4:18CV585 RLW, *Eliana Arias Amaro, et al. v. Ira L. Rennert, et al.*; and

Case No. 4:18CV594 HEA, *Shirley Rosario Baldeon Leiva, et al. v. Ira L. Rennert, et al.*

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 16th day of October, 2018.

- 65 -