## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,

Plaintiffs,

vs.   No. 4:11-cv-00044-CDP

DOE RUN RESOURCES
CORPORATION, et al.,

Defendants.

Volume 1
VIDEOTAPED Deposition of WILLIAM BANNER, M.D., Ph.D.
Taken on March 2nd, 2020

## Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,

Plaintiffs,

vs.   No. 4:11-cv-00044-CDP

DOE RUN RESOURCES
CORPORATION, et al.,

Defendants.

   VIDEOTAPED DEPOSITION OF WILLIAM
BANNER, M.D., Ph.D., taken on behalf of the
Plaintiffs, at the offices of Lewis Rice LLC,
600 Washington Avenue, Suite 2500, St. Louis,
Missouri, on the 2nd day of March, 2020, before
Gretta G. Cairatti, RPR, CRR, MO-CCR #790, IL-CSR
#084-003418.

## Page 3

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:
    KRISTINE K. KRAFT, ESQ.
    ELIZABETH M. WILKINS, ESQ.
    Schlichter, Bogard & Denton, LLP
    100 South Fourth Street, Suite 1200
    St. Louis, MO 63102
    314/621-6115
    kkraft@uselaws.com
    bwilkins@uselaws.com

FOR THE DEFENDANTS THE RENCO GROUP, INC., et al.:
    GEOFFREY M. DRAKE, ESQ.
    MARK SENTENAC, ESQ.
    King & Spalding
    1180 Peachtree Street, N.E.
    Atlanta, GA 30309-3521
    404/572-4726
    gdrake@kslaw.com
    msentenac@kslaw.com

## Page 4

APPEARANCES (CONTINUED):

FOR THE DEFENDANTS THE DOE RUN RESOURCES
CORPORATION, et al.:
    THOMAS P. BERRA, JR., ESQ.
    Lewis, Rice & Fingersh, L.C.
    600 Washington, Suite 2500
    St. Louis, MO 63101
    314/444-7600
    tberra@lewisrice.com
        AND
    CRYSTAL A. SALING, ESQ.
    Associate General Counsel
    The Doe Run Company
    1801 Park 270 Drive, Suite 300
    St. Louis, MO 63146
    314/453-7681
    csaling@doerun.com

1 (Pages 1 to 4)

Page 37

1  call that. It was a grilled Ceasar salad and
2  conversation but perhaps more detail than you
3  wished.
4      Q  I'm just interested in your discussions
5  regarding preparing for the case.
6      A  We -- we --
7          MR. DRAKE:  Not what you ate.
8          THE WITNESS:  Not what I ate?  Okay.  Sorry.
9      The -- yeah, we -- we talked a little bit
10 but it was nothing -- it was mostly conversation.
11 QUESTIONS BY MS. KRAFT:
12     Q  And did you also have conversations over the
13 telephone with the attorneys in preparation for your
14 deposition?
15     A  We had a few short conversations about, you
16 know, Send me this article, send me that article;
17 kind of thing but -- a follow-up on some of our
18 in-person meetings.
19     Q  And what is your billable rate for meeting
20 with the attorneys for preparing for your
21 deposition?
22     A  I charge $500 an hour for all the activities
23 that I do.
24     Q  All right.  Just to be clear, the $500 an
25 hour applies to any work that you do in this case,

Page 38

1  whether it's meeting with attorneys, or giving
2  depositions, or the IMEs; is that correct?
3      A  Correct.
4      Q  Okay.  There's no variance to that billable
5  rate in any respect?
6      A  Unless I'm working on the case, I don't
7  charge for travel time, if that's what you mean.  I
8  don't ...
9      Q  Okay.
10     A  But actual working time.
11     Q  I'm going to ask you a few questions now
12 about your CV.  And if you need to look at your CV,
13 it is contained in Exhibit 1 towards the end.
14 There's a tab that says CV; okay?
15     A  Sure.
16     Q  So first of all you indicated that you're
17 retired from Baptist INTEGRIS Medical Center in
18 Oklahoma City.  Correct so far?
19     A  I'm part-time.
20     Q  Okay.  Could you just explain that
21 generally, like --
22     A  Well, you know, nowadays there's no
23 retirement, per se, you know.  And so I just
24 switched my contract from full-time to part-time
25 and that allows me -- these guys are friends of

Page 39

1  mine, both of them have a day planned on something,
2  I can go down and still do it.  I'll do two days in
3  March, for example, that I will -- will work in the
4  intensive care unit on kind of a per diem basis.
5      Q  Okay.  And how long have you had that
6  arrangement, this part-time arrangement?
7      A  Since July 1st.
8      Q  July 1st of 2019?
9      A  Yes, ma'am.  Sorry.
10     Q  And since July 1st of 2019, please describe,
11 generally, the time -- the amount of time you spend
12 on a part-time basis there.
13     A  I did a couple of days over fall break,
14 like, a long weekend at fall break.  And then there
15 was a family, a death in the family of one of them,
16 and I went down and covered for a day.  And then
17 two -- I think there may have been a day in January,
18 and then two days in March.  So it's -- it's fairly
19 infrequent.  I don't -- don't wish to do too much.
20     Q  So are you more so on, like, an on-call or
21 as needed basis as opposed to a regular set of
22 reduced hours?
23     A  Yes.  Yes.  It's called occasional
24 part-time.  It's OPT.
25     Q  Okay.  And you began at the Medical Center

Page 40

1  in 2009; is that correct?
2      A  That's correct.  We went from St. Francis in
3  Tulsa to INTEGRIS Baptist.
4      Q  And would you provide us with an overview of
5  the nature of your role at Baptist INTEGRIS Medical
6  Center since 2009?
7      A  I was an attending physician.  I had some
8  administrative responsibilities for, like, a
9  hospitalist service, but mostly I was in the
10 intensive care unit and also on the general
11 pediatric floor for part of that time when they
12 needed help.  But primarily an attending physician,
13 there were two, and we covered 24/7 for all ICU
14 admissions and critical care for children.
15     Q  Did you also have a follow-up clinical
16 practice for any of the patients you saw at the
17 hospital?
18     A  Not generally speaking, no.  They come in
19 with a primary care provider and we would -- would
20 give them follow-up instructions.
21         There were a few patients that I saw, for
22 example, with lead poisoning, and -- and saw them as
23 outpatients in follow-up just because there was
24 nobody, really -- nobody else to do it, so ...
25     Q  And so those few patients -- let's see, the