# Exhibit B

# Rebuttal: Dr. Libicki, Dr. Rouhani, and Mr. Hoffnagle Expert Reports

Prepared by:

David A. Sullivan
Certified Consulting Meteorologist
Sullivan Environmental Consulting, Inc.
1900 Elkin Street, Suite 200
Alexandria, VA 22308



David A. Sullivan

June 22, 2020

Contents

**Executive Summary** ....................4

Figure E-1: Example of Air Quality as Function of Time at the Hotel Inca Monitoring Site ...6

Figure E-2: Imaginary Building in the Modeling that Defendants' Experts Rely On...............9

**1.0 Rebuttal of Dr. Libicki** ....................11

Table 1-1: Lead Emissions from Mr. Dan Vornberg Modeled by Dr. McVehil ....................12

Table 1-2: Comparison of $PM_{10}$ Lead Emission Rates ....................14

Figure 1-1: Source-By-Source Comparison of the Ratio of Emission Rates Computed by Mr. Vornberg Over Those Computed by Mr. McVehil ....................15

Figure 1-2: Photograph of the Sindicato Site Extracted from Mr. Hoffnagle's Expert Report ....................17

Figure 1-3: Location of Closest Air Quality Monitoring Sites Relative to Key Source Areas at the Smelter ....................19

Figure 1-4: Example of Upwind Trajectory from Smelter to Sindicato ....................21

Table 1-3: Comparison of McVehil and Sullivan Modeling of Annual Average PM10 Lead for 2007....................23

Figure 1-6: Comparison of 2007 Lead Concentrations Between Dr. McVehil's Modeling and David Sullivan....................23

Table 1-4: Modeled Data Extracted from MMA Modeling Report 113:21 ....................24

Figure 1-6: Comparison of Dr. McVehil's Modeling of Annual Average PM10 Lead for 2007 ....................26

**2.0 Rebuttal of Report by Mr. Hoffnagle** ....................29

Figure 2-1: Buildings with the World's Largest Volume (Plus DRP Imaginary Building) .....36

3.0 **Review of Dr. Rouhani's Expert Report**....................43

Table 3-1: Model Performance for $SO_2$ for the 2.5H Scenario Model Run ....................47

Table 3-2: Model Performance for Lead Based on 2.5H Modeling Scenario ....................48

Table 3-3: Model Performance for Arsenic Based on 2.5H Modeling Scenario ....................49

**Appendix A: Comparative Model Runs to Demonstrate Significance of Points Raised by Defendants Experts** ....................52

**Appendix B: Mischaracterization of Surface Roughness Term in Computational Fluid Dynamics Modeling**....................63

**Appendix C: Further Technical Discussion of Short-Term Stack Fumigation Versus 5-6 Hour Peak Measured Concentrations in La Oroya** ....................69

**Appendix D: Dustfall Measurements** ....................77

Figure D-1: Dustfall Sampling Site Locations Within the La Oroya City Area .......................79

Figure D-2: Regression analysis of Modeled Annual Arsenic Deposition and Measured Dustfall Concentrations (Including the Sindicato Measured Dustfall Value) ..........................80

Figure D-3: Regression analysis of Modeled Annual Arsenic Deposition and Measured Dustfall Concentrations Without Sindicato Data ....................................................................81

Figure D-4: Isolines of Modeled Arsenic Community Dust Concentrations (ppm) for 2008 (Scenarios 2.5H) Inserted Into Regression Equation Compared with Measured Dust (ppm) in Yellow...........................................................................................................................82

Figure D-5: Isolines of Modeled Lead Community Dust Concentrations (ppm) for 2008 (Scenarios 2.5H) Inserted Into Regression Equation Compared with Measured Dust (ppm) in Yellow...........................................................................................................................83

Appendix E: Differences in Buildings in The Vicinity of The Sindicato Monitoring Site 2006 To 2020 ........................................................................................................................84

## **<u>Executive Summary</u>**

The Defendants' experts have made multiple claims that my modeling is grossly overstating impacts from the La Oroya Complex due to meteorological input data, emissions data, and other factors.

Mr. Hoffnagle, for example, asserts that the fact that I did not include the Sindicato meteorological site was a "*fundamental flaw that renders his related modeling efforts defective and unreliable.*" The omission of Sindicato does not cause my modeling results to be unreliable. Mr. Hoffnagle's opinion on this point lacks support. A side-by-side comparison of the plots demonstrate only minor differences (e.g. < 5 percent in the core areas of La Oroya). The differences between Mr. Hoffnagle's opinions and my opinions have been exaggerated by Mr. Hoffnagle, as shown point-by-point in Appendix A. In Appendix A, I show how the modeling results would have changed in the event I had modeled the exposures according to the process proposed by Mr. Hoffnagle.

When comparing common sources of airborne emissions, the emission rates I ran were approximately 55 percent higher for lead, for example, than the 2002 emission rates used by MMA in the modeling that the Defendants' experts support. I show the differences in Appendix A in terms of air quality in Run 2 where I modeled all the MMA emissions and source specifications for full grid analysis. I will defer to Dr. Cheremisinoff regarding the reasons for the differences in emission rates,[1] but in this circumstance, even if the severe modeled impacts were reduced by 55 percent, this would not affect the conclusion that the air quality in La Oroya when Defendants' operated the facility was extremely high for $SO_2$, lead, and arsenic.

The Defendants' experts opine that the results of my modeling are much too high. Instead, Defendants' conclude that the modeling results commissioned by Doe Run Peru and produced by McVehil & Monet Associated (MMA) are reliable. Significantly, the Defendants' experts have omitted three critically important points:

[1] In summary, the differences are primarily related to the treatments of fugitive emissions (i.e. emissions not emitted from a stack or vent) for two sources (the copper converter and copper roaster). On behalf of the Defendants Mr. Vornberg used mass balance methods and Dr. Cheremisinoff used emission factors.

(1) The MMA modeling has an obvious problem involving an imaginary building added into their input file to alter model performance (not only a really large building but a building that would be 35 times larger in volume than any building on the planet),

(2) Although MMA only produced modeling results for 10 monitoring sites, at these locations the MMA results are similar to mine (but generally higher), and

(3) The voluminous directly measured air quality data collected by DRP show extreme air quality degradation with or without a model-based analysis.

It is obvious that the smelter was causing extremely high air quality degradation with or without the review of modeling to estimate concentrations throughout the affected areas. Refer to Figure E-1 as an example, and there is full site-by-site coverage of this in my expert report. High measured concentrations occurred until the facility closed and then it was like "*flipping a switch*" - - the concentrations flat lined. There really is no basis to refute the fact that air quality in La Oroya was extremely for degraded lead, arsenic, and $SO_2$ when DRP operated the smelter.

Figure E-1: Example of Air Quality as Function of Time at the Hotel Inca Monitoring Site




The Defendants' experts state that air quality improved under Defendants' ownership of the LA Oroya Complex. They are correct. By mid-2007 there were improvements for lead and arsenic (refer to Figures 5-11 of my expert report) but the levels remained high relative to acceptable levels for lead. Arsenic concentrations also still showed highly elevated concentrations relative to what was known even at the time about acceptable ambient limits in the U.S. to manage cancer risks from arsenic. $SO_2$ measured concentrations stayed about the same concentrations until closure and were still hundreds of times higher than standards that would be considered acceptable in the U.S.

As an example, many states in the U.S. had ambient air quality limits by the 1980s on annual average airborne arsenic concentrations, with the level set at 0.00024 µg/$m^3$ (based on the arsenic cancer risk factor), which were in place in the U.S. before operations began by Defendants in La Oroya. It was well established at that time that airborne arsenic was extremely

toxic. Annual average concentrations of arsenic at populated locations such as Hotel Inca and Sindicato were directly measured 1-3 $\mu g/m^3$, which is up to 12,500 times higher than levels considered acceptable in the U.S. These facts were not mentioned in any of the Defendants' reports, but rather their focus was on the fine points of modeling.

Neither MMA nor the Defendants' experts showed the complete coverage of the La Oroya modeling domain when modeled based on the MMA approach that included the massive imaginary building. Refer to Appendix A (Figures A-3 and A-4) to see the complete picture that is shown when the display is broadened to include the full modeling domain, i.e. including the effects of the artificial building. The impacts increase and show that the maximum impact areas in La Oroya were not included in the monitoring network.

The measured air quality data directly tells the story of air quality impacts that occurred in La Oroya, at least at the fringes of the community at locations further removed from the La Oroya complex than the most impacted areas. The modeling is useful in estimating concentrations more broadly throughout the community, including locations closer to the smelter that had higher impacts than the monitoring sites for the La Oroya Complex.

The Defendants' experts focused on critiques of my modeling methodology, which I address in detail in this rebuttal report. What is remarkable is that none of the Defendants' experts addressed the "*elephant in the room*," i.e. the extremely elevated, directly measured air quality data that Doe Run Peru was required to collect. Based on many years of data, measured air quality at the fringes of La Oroya (and further removed from peak areas closer to the smelter) measured concentrations for heavy metals (e.g. lead and arsenic) and sulfur dioxide ($SO_2$) that are extremely high (hundreds of times higher than established standards), and among the highest levels on the planet.

I have 45 years of experience in air quality modeling throughout the U.S., and internationally in Russia, the Czech Republic, Poland, and Indonesia. I have studied highly polluted urban areas. The directly measured air quality degradation in La Oroya Antigua, Peru is hundreds of times worse than anything I have ever seen in my career.

A review of the Defendants' modeling approach (Ref 113; MMA's final modeling report) can be summarized as follows: (1) rely on an imaginary building two miles wide by one mile long

by over 430 feet high that would basically fill much of the valley near the smelter and half of La Oroya, and (2) calibrate the modeling for each monitoring site so that the results exactly match the long-term average measured concentrations at each site.

Figure E-2 presents a depiction of such an object within the valley. The "*building*," which has the footprint of a small town, occupies the Western half of La Oroya and extends a mile further north of La Oroya. The Sindicato monitoring site and some of the smelter sources would be inside the imaginary building. This imaginary building was only modeled for the main stack, which is 167 m (548 feet) tall. The Defendants' consultants MMA's approach artificially reduced the stack height relatively to the surface from 548 feet to 118 feet. Any modeling approach that requires the insertion of a large imaginary building to alter the results is not credible or reliable.

Figure E-2: Imaginary Building in the Modeling that Defendants' Experts Rely On






There are two obvious distinctions between my report and the focus of the Defendant's rebuttal report: (1) the directly measured concentrations were extremely high relative to acceptable levels even at locations on the fringes of La Oroya, which is a point that was ignored in the Defendant's reports, and (2) the modeling I have produced is reasonably consistent with the measured data at the monitoring sites and more generally shows expected airborne concentrations throughout La Oroya and nearby communities, while the Defendant's experts allege without factual support and in conflict with the measured data that my modeling is too high.

This rebuttal report is presented in three sections:

1.0 Rebuttal of Dr. Libicki

2.0 Rebuttal of Mr. Hoffnagle

3.0 Rebuttal of Dr. Rouhani

Since some of their points are addressed through common modeling analysis, Appendix A presents analysis that in some cases is referred to in multiple rebuttal sections of this report.

## 1.0 Rebuttal of Dr. Libicki

### Meteorological Monitoring Site Selection for CALMET

Dr. Libicki opined that I should have included the Sindicato meteorological tower in the CALMET modeling despite this site having multiple violations of standard meteorological siting guidance (Ref 114:40)[2]. I personally inspected this site and in my professional judgment this site would not be suitable for the CALMET / CALPUFF modeling because it was poorly sited relative to standard meteorological siting guidance. First, this is a meteorological decision for which it does not appear that Dr. Libicki has the expertise to make. Second, she apparently did not realize that this site would only represent flow within the surface layer of 0 to 20 m while the effective heights of plumes that had the dominant effect on the most affected areas were well above this layer and unaffected by this selection. The transport and dispersion in CALPUFF of significant sources was based on the higher level gridded meteorological data above this level.

Refer to Appendix A (Figure A-1 and Figure A-2 )where I have comparative runs of CALMET / CALPUFF with and without the inclusion of the Sindicato site. As would be expected, the inclusion of the Sindicato site made no significant difference in the results. Comparative isopleth maps with and without Sindicato look nearly identical and performance at the monitoring sites was within five percent. In other words, whether this site was included made no significant difference on the results or conclusions drawn from the modeling results. It should have been obvious to Dr. Libicki (and Mr. Hoffnagle) that the surface meteorological sites would make little difference on the modeling results based on the effective heights of the key plumes. Appendix A proves this fact.

### Emissions

Dr. Libicki argues that Mr. Vornberg's emissions were not $PM_{10}$ but total suspended particulates. Mr. Vornberg's emission table clearly documents "*$PM_{10}$ emissions*." Dr. McVehil then takes the $PM_{10}$ emission data from Mr. Vornberg and models lead $PM_{10}$ and then calibrates his results based on measured $PM_{10}$ data. As shown in Dr. McVehil's CALPUFF model file that

[2] In this report Ref 114:40 refers to reference file 114, electronic page 40. Similarly, when referring to Defendants' expert reports I am referring to electronic page numbers.

provides the names he was using for the pollutants; $PM_{10}$, and not TSP, is listed in the file set up (Ref 151:40).[3]

As an example, Dr. McVehil (MMA) relied on the following emission rates based on Mr. Vornberg's analysis as shown in Table 1-1 (Ref 129):

Table 1-1: Lead Emissions from Mr. Dan Vornberg Modeled by Dr. McVehil

| Source | 2002 MT/yr | 2005 MT/yr | 2007 MT/yr | 2011 MT/yr | Notes |
|---|---|---|---|---|---|
| Main Stack | 656 | 450 | 395 | 375 | |
| Sinter Scrubber | 116 | 116 | 4 | 4 | |
| Sinter Fugitives | 30 | 30 | 5 | 5 | |
| Blast Furnace | 60 | 40 | 10 | 10 | Building Enclosure 2005 |
| Dross Plant | 40 | 40 | 10 | 10 | Building Enclosure 2006 |
| Casting Anodes | 4 | 4 | 0 | 0 | With ventilation of dross plant 2006 |
| Slimes Plant | 10 | 10 | 10 | 1 | Ag circuit modernization |
| Lead Electrolytic | 4 | 4 | 4 | 1 | Ventilate casting equipment |
| Copper Converter | 40 | 40 | 40 | 10 | Partial enclosure |
| Copper Roaster | 60 | 60 | 60 | 15 | Enclosure 2 close 2 roasters |
| NJ Zinc Roaster | 10 | 0 | 0 | 0 | Closed 12/31/04 |
| Total Fugitives | 374 | 344 | 143 | 56 | |
| Grand Total | 1030 | 794 | 538 | 431 | |

Using 2002 as an example, the total stack emissions were 656 and fugitives were 374 metric MT/yr with a total of 1,030 tons lead emission. The main stack did not significantly affect the nearby monitors in the network. There is a great deal of discussion in Dr. Libicki's report and Mr. Hoffnagle's report asserting that Dr. Cheremisinoff's emission data are far too high relative

[3] This particular example file Dr. McVehil provided in his report was for $SO_2$ modeling but when particulates were run, as this set up shows, it would have been for the $PM_{10}$ fraction.

to Mr. Vornberg's data. Their statements are not correct as shown below in Table 1-2. A comparison of the $PM_{10}$ lead emission data from Mr. Vornberg generally agree within a small percentage difference from those of Dr. Cheremisinoff. Figure 1-1 shows the same information graphically. In many cases, the two inventories are within 1-2 percent, with the most noticeable difference shown for the copper converter and copper roaster. Dr. Cheremisinoff's emissions based on EPA emission factors are 2.5 times higher than those based on mass balance by Mr. Vornberg for these two sources. Absent any documentation for Mr. Vornberg's analysis, which were not produced by the Defendants, there is no basis to assess the assumptions he has made. Dr. Cheremisinoff, on the other hand, has provided references to authoritative sources.

Table 1-2: Comparison of $PM_{10}$ Lead Emission Rates

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Slimes Plant Fugitives | 10 | 403 | 0.08 | 32 | 3.22 | 0.36 | 11 | 0.87 |
| Lead Electrolytic Fugitives | 4 | 17 | 0.57 | 10 | 2.42 | 0.42 | 4 | 0.99 |
| Copper Converter Fugitives | 40 | 3659 | 0.08 | 293 | 7.32 | 0.37 | 107 | 0.37 |
| Copper Roaster Fugitives | 60 | 5488 | 0.08 | 439 | 7.32 | 0.37 | 161 | 0.37 |
| Zinc Roaster Fugitives | 10 | 3287 | 0.02 | 66 | 6.57 | 0.22 | 14 | 0.69 |
| Lead Reverb | | 193 | 0.59 | 114 | | 0.21 | 24 | |
| Reverb smelting furnace fugitives | | 284 | 0.08 | 23 | | 0.21 | 5 | |
| Ore mixing / pelletizing | | 26 | 0.03 | 1 | | 0.85 | 1 | |
| Congregate handling | | 12 | 0.02 | 0 | | | | |
| Arsenic kitchen | | 76 | 0.00 | 0 | | | | |
| Total Main Stack | | | | | | | | |
| Total Fugitives | 374 | 14650 | | 1457 | 3.90 | | 581 | |
| | | | | | ratio PM10 mcv/pm10 Dr c | | | 0.643275613 |

Figure 1-1: Source-By-Source Comparison of the Ratio of Emission Rates Computed by Mr. Vornberg Over Those Computed by Mr. McVehil




The differences between Mr. Vornberg's $PM_{10}$ analysis and Dr. Cheremisinoff are primarily associated with the differences between mass balance calculations (Mr. Vornberg) and the use of standard EPA emission factors (Dr. Cheremisinoff). I defer to Dr. Cheremisinoff regarding statements regarding the significance of the double counting that the Defendants experts refer to.

Setting aside the copper converter and copper roaster[4], where there obviously is a difference of opinion, for the remaining nine fugitive sources Mr. McVehil estimated 277 MT $PM_{10}$ lead compared to Dr. Cheremisinoff's 313 MT $PM_{10}$ lead. In other words, there is a difference of 13 percent across these common sources. Across the full set of sources Dr. Cheremisinoff's estimates for fugitive lead $PM_{10}$ emissions are 581 mt/year compared to 374 MT/year for Mr. McVehil's modeling, i.e. a difference of 55 percent. Considering the magnitude of the modeled and measured air quality concentrations, changing the metals exposures by 55 percent would not alter the conclusion that air quality levels in the vicinity of the La Oroya smelter were extreme by any definition. It also is important to note that Mr. Vornberg's emissions inventory also

[4] I defer to Dr. Cheremisinoff for the reconciliation of these two sources.

implicitly assumed that there were zero lead emissions, from the following fugitive sources at the smelter:

- The lead reverb (23.7 MT/yr)
- Reverb Smelting furnace (4.7 MT/yr)
- Ore mixing / pelletizing (0.7 MT/yr)

  Total =29.1 MT/yr

DRP did not provide any emissions data for the refinery operations, nor was there sufficient documentation to estimate the refinery emissions. These emissions, if quantified, would have increased modeled impacts especially at Cushurampama and Marcavalle.

**Sindicato Measured Air Quality Data**

Ms. Libicki's opinion is that Sindicato is a well-sited air quality monitoring site. I disagree based on support from standard siting guidance as referenced in my expert report. Model performance was good at Sindicato for gas-phase $SO_2$; average measured versus modeled concentrations are within 10 percent at Sindicato over the three years with comparative data based on Scenario 2.5H. The $SO_2$ model performance (a gas) is generally similar to the performance at the other sites. The positive model bias at this site was limited to particulate matter.

Dr. Libicki has mistakenly assumed I was referring to a dilution issue and engaged in computation fluid dynamics to try to address that issue. This is not the case. I was referring to the higher potential for surface sinks and potential reduction in particulate collection efficiency associated with the complex recirculation zones at this site.

Figure 1-2 shows a photograph of the Sindicato site , which was extracted from Mr. Hoffnagle's expert report. Note the "*PM Samplers*", two rooftop penthouses on the flat root and an adjacent building with a jagged roofline. I will not repeat here the multiple ways that this site fails to meet established siting criteria; please refer to my expert report.

Figure 1-2: Photograph of the Sindicato Site Extracted from Mr. Hoffnagle's Expert Report




Contrary to a statement made by Mr. Hoffnagle, the obstacles to flow at the Sindicato site when the Defendants operated the facility are similar to those observed at this time. Refer to Appendix E for comparative aerial photographs for 2006 and 2020.

It is unknown why Defendants did not install monitors at locations closer to the smelter's major sources and higher into the terrain in La Oroya Antigua which would have better aligned the monitoring network with the areas in La Oroya most affected by the key sources at the La Oroya complex. The modeling I conducted, as well as the modeling conducted by the Defendants' consultant, Dr. McVehil (MMA), show that the largest impacts in La Oroya occurred in the Eastern portion of the town and closer to the smelter than any of the monitoring sites in the DRP network. The Defendants added and relocated stations but never monitored in the core of La Oroya Antigua where air quality experts should have expected the highest impacts. Certainly, if the goal was to measure at the highest impact locations in La Oroya, Defendants would not have monitored at Sindicato, Hotel Inca or Huanchan as the closest monitors to the most significant sources. Refer to Figure 1-3. which shows the location of the smelter, and the three closest monitoring sites. The closest monitoring site is Sindicato, but this is further away and at lower elevation than the closer and more affected residential areas in La Oroya that are more aligned vertically and closer horizontally to the dominant plumes from the smelter. The major sources at the smelter are at the opposite side of the town from Sindicato, i.e. near the Eastern boundary of the facility across the Montero River. Figure 1-4 shows the locations of the major sources at the facility, which are well East of the Sindicato site compared to closer locations in La Oroya Antigua. Sindicato obviously did not measure the peak concentrations in La Oroya. A model is needed for that at this time based on the limitations of the available measured data, but the directly measured data alone show unacceptable air quality at the less affected locations where the monitors were placed. My expert report and the MMA modeling (see Appendix A) show that the peak modeled concentrations for heavy metals and $SO_2$ are in the Eastern portion of La Oroya, while the Sindicato site and Hotel Inca are at the western extreme of La Oroya and beyond. Mr. Hoffnagle was incorrect when he asserted that the maximum impacts occurred in the vicinity of the Sindicato monitoring site. The facts of this case do not support this assertion.

Figure 1-3: Location of Closest Air Quality Monitoring Sites Relative to Key Source Areas at the Smelter



It is unknown whether a site such as Sindicato, which is in a complex recirculation zone affected by multiple structures and the high potential for losses / sinks, is representative of typical air quality, and especially monitor collection efficiency. However, standard siting guidance provides justification for avoiding locations such as Sindicato.

I can agree that locating a monitoring site in La Oroya Antigua would be difficult, but when the Defendants expanded the monitoring network and relocated sites, they could have established a suitable monitoring site in La Oroya, rather than only rely on Sindicato since it was located in a complex environment that grossly conflicts with reliable siting guidance. It would have been prudent to site monitors in more open areas at locations closer to the effective heights of the plumes that had the biggest impact on La Oroya Antigua. Instead DRP retained the Sindicato site which was located at the fringes of La Oroya Antigua and much further from the dominant smelter sources, as opposed to monitoring other location in La Oroya Antigua that would be expected to have higher impacts based on review of the terrain, proximity, and location of the most significant sources. MMA's modeling and mine both showed this to be the case.

**<u>Computational Fluid Dynamics</u>**

The Defendants' experts had flaws in their analysis based on scale of analysis. In the matter of the CALPUFF modeling, Mr. Hoffnagle based his opinions on modeling by MMA that inserted a massive imaginary building much larger than any on earth, while in the CFD modeling the atmospheric physics of the upwind air affecting the specific structures was simulated in a manner that would be consistent with flow over clipped grass (or in terms of obstacle heights, ~1 inch obstacles, which obviously does not match conditions at Sindicato and locations upwind). Dr. Libicki's CFD modeling is clearly erroneous.

She stated in her deposition of May 19, 2020 (Page 132 lines 20-25): "*Because again, what we want to do is wind field development at the source. So, we look up-wind a kilometer and we say, what does that look like? And upwind from the facility is basically bare rocks and hills. And that's a very low surface roughness, and that is what we used.*" Dr. Libicki used the wrong surface roughness value by at least 10-20 fold. <u>See</u> Figure 1-4. The surfaces upwind of the smelter within a kilometer are not "*basically bare rocks and hills*" but large smelter buildings followed by the buildings of the town, which depending on the trajectory included many buildings in La Oroya that were not considered by the CFD inputs shown in her report as Figures

4-4 and 4-5. It does not require an advanced degree in atmospheric science to see that bare rocks and hills does not match what is shown in Figure 1-4.

Figure 1-4: Example of Upwind Trajectory from Smelter to Sindicato
*(upwind kilometer is not characterized by rocks and hills as Dr. Libicki testified May 19, 2020 Page 132 lines 20-25))*



CFD as used by Dr. Libicki simulates the wind flow in the vicinity of a structure, which in this case involves multiple buildings and penthouses. To accurately use CFD, it is necessary to simulate wind flow in the atmosphere of the approaching air that is input to the CFD modeling. One input required to do this, is surface roughness. The wind conditions and associated atmospheric turbulence are very different between a smooth land surface (such as a golf green) as compared to a rough surface, e.g. as a city environment.

The term "*surface roughness*" is an uncommon term to lay individuals but is a fundamental term when modeling wind profiles in atmospheric science. It is abbreviated as $z_0$ in meteorological textbooks and technical papers. Experts in atmospheric science / turbulence theory are very familiar with this term. Surface roughness is measured in length, with the larger values indicating a rougher surface. As an example, surface roughness ranges from a small fraction of an inch over smooth snow and up to five or more feet for urban centers. For a town city environment where Sindicato is located, surface roughness is typically in the range of 2-3 feet or higher (e.g. Ref 165:4). Dr. Libicki's CFD assumed ~ 1 inch (0.03 m). This input would be applicable to short grass or moss; there is little grass or moss in the vicinity of the Sindicato site.

Dr. Libicki presented CFD results with a blatant error. The literature, including the reference she relied on, i.e. (Ref 165:4) that shows that this value is at least 20 times too low for this type of setting (Ref 165:4; Ref 166:68-70). Failure to recognize such a mismatch demonstrates that Dr. Libicki, or whomever ran the CFD modeling that she is relying on, did not have sufficient expertise in applied atmospheric science to recognize the mismatch in surface conditions. Refer to Appendix B for further details regarding this issue.

**Modeling Approach**

Defendants opined that the Defendants emissions data and contractor modeling by MMA was reliable and that the emissions data I relied on was not. However, a comparison of the results for the limited number of locations where the Defendant's modeling data are available, shows the results are remarkably similar to mine; and to the point that comparable conclusions would be drawn. The Defendants' modeling, however, only provides modeled concentrations for locations where monitoring sites were located, while my modeling showed results at these locations and also throughout the La Oroya area. Refer to Table 1-3 for an example of the differences between Dr. McVehil's modeling of the six monitoring sites compared to mine.

Figure 1-5 present the results graphically. The differences are minor even though the two analyses were done quite differently (Dr. McVehil optimized the modeling for the six monitoring sites using an artificial building and non-standard use of meteorological data while I followed standard modeling practice).

Table 1-3: Comparison of McVehil and Sullivan Modeling of Annual Average PM10 Lead for 2007 (μg/m3)

| Site | McVehil | Sullivan | Measured NP |
|---|---|---|---|
| Hotel Inca | 1.16 | 0.76 | 0.93 |
| Sindicato | 2.19 | 3.07 | 1.19 |
| Huanchan | 1.96 | 1.45 | 5.46 |
| Casaracra | 0.03 | 0.05 | 0.2 |
| Marcavalle | 0.53 | 0.15 | 0.59 |
| | | | |
| Average | 1.17 | 1.10 | 1.67 |

Figure 1-6: Comparison of 2007 Lead Concentrations Between Dr. McVehil's Modeling and David Sullivan



As shown, McVehil's modeling is usually higher than the model estimates I have made, which is a point that is not mentioned in Defendants' reports. In addition, the measured data typically are higher than either modeling analyses. It also is useful to note that prior to calibration, where the MMA modeling forced the model results to match the long term averaged measured data at each site, that MMA showed $SO_2$ (gas-phase) to be well characterized as well at the Sindicato site while for particulates (lead in this case) the MMA modeling also was high. Refer to Table 1-4 that was extracted from Reference 113:21. As observed, MMA's modeling also was high for Sindicato relative to the measured lead (particulate) data. The MMA modeled lead concentration also is high relative to the measured data at Sindicato, i.e. by a factor of 2.11-fold, while mine is high by a factor of 2.58-fold. Both modeling approaches show the Sindicato site to be the only monitoring site with model concentrations substantially higher than background that is substantially overstated relative to measured particulate data. This is consistent with my modeling results and my concerns for the potential localized sinks and reduced collection efficiency for particulates at this site associated with complex wind flow.

Table 1-4: Modeled Data Extracted from MMA Modeling Report 113:21

Based on Average Modeled and Measured Concentrations for March 2007 through February 2008

| Location | $SO_2$ | | Pb | |
|---|---|---|---|---|
| | Predicted | Observed | Predicted | Observed |
| Hotel Inca | 477 | 444 | 1.16 | 0.83 |
| Sindicato | 756 | 749 | 2.19 | 1.04 |
| Huanchan | 766 | 2109 | 1.96 | 4.87 |
| Marcavalle | 290 | 374 | 0.53 | 0.59 |
| Hauri | 26 | 321 | 0.04 | No Data |
| Huaynacancha | 85 | 153 | 0.14 | No Data |

Dr. Libicki statements about the modeling I performed, demonstrate that she did not fully understand what I have done. Examples include:

- Dr. Libicki thought we only modeled $PM_{10}$ but did not understand that we modeled $PM_{10}$ (for model performance and health risk assessment) and TSP (for health risk assessment). There are 44 tables in Appendix D of my expert report for TSP-based analysis.

- Dr. Libicki indicated that we did not directly use Dr. Cheremisinoff's metal/TSP ratios, but concluded we modified them. The files show that we used his ratios directly.

- Dr. Libicki stated that we did not vary emissions monthly, which is not correct. There were emission scalars in the model input files to show variability by month.

In the final step (which I have not presented here), Mr. McVehil calibrated on a site-by-site basis his modeling results to force the modeling to more exactly match the measured data. Any model can match observed results if mathematically forced to do so. Model calibration is not allowed in U.S. because optimizing for select locations is more likely than not to adversely affect the modeling at other locations (Ref 143:28). Figure 1-6 includes the imaginary building and forced model calibration (calibrated on a site-by-site basis[5]). As would be expected when a model is forced on a site-by-site basis to match measured data, it does, as shown in Figure 1-6.

[5] In U.S. modeling the USEPA does not accept calibration on the composite measured data set, let along calibrating (forcing conformance to measured data on a site-by-site basis). There is no point in modeling if in the end the model values are forced to match the measurements.

Figure 1-6: Comparison of Dr. McVehil's Modeling of Annual Average PM10 Lead for 2007

Based on Site by Site Model Calibration to Exactly Match Measured Annual Average Concentrations (model is not needed if just forced to match measured data)




A modeling approach that is forced to be perfect on a site-by-site basis is not credible beyond the sites evaluated on this basis. The reason that model calibration is not allowed in the U.S. is that optimization for a small subset of receptors has a high potential for adversely biasing the results at other locations.

The modeling in my report (Table E-12) for $SO_2$ shows excellent model performance without the use of artificial buildings or calibration procedures to optimize the results as was used in Mr. McVehil's modeling. Fourteen of the 20 points of comparison for $SO_2$ showed average results within a factor of two, and the modeling of $SO_2$ at Sindicato for the three years with comparative measured and modeled data showed differences relative to the measured data of +8 percent (2006), -10 percent (2007), and +2 percent (2008). The claims about problems modeling Sindicato because of various issues raised by Dr. Libicki and Mr. Hoffnagle clearly are not evident in the modeling results for gas-phase $SO_2$.

**<u>Photos of Fugitive Plume Lift</u>**

Dr. Libicki has asserted without evidence that the photos showing high lift of the hot fugitive emissions through the open roofs of the smelter operations are associated with upset conditions.

First, the photographs available for my review were not labelled as being taken during upset conditions. Rather, the photos were labelled as "*fugitive emissions*" when specifically labelled at all.

Dr. Libicki's statement implies that unless there are upset conditions that visible particulate emissions would not occur. I will defer to Dr. Cheremisinoff on the details. My experience, however, conducting a site visit of the Doe Run Herculaneum, Missouri facility, for example, is that high levels of visible particulate matter (smoky conditions) were present within the smelter operations at this U.S. facility in the mid to late 1990s that was required to be controlled to U.S. standards. It is unrealistic to assume:

(a) The fugitive emissions from the DRP operations would not have substantial lift (as shown in many photos) due to the heat of the operations,

(b) To assume that visual emissions only would occur if there were upset conditions, and

(c) To assume that the open roof posed any impediment to the substantial rise of the clearly visible plumes.

The photographs consistently show, as would be expected with no effective fugitive controls and an open rooves, visible plumes from these smoky operations. The photos show substantial lift which was modeled to realistically represent these fugitive sources in a manner that is consistent with the objectives of the EPA Guideline on Air Quality Models.

**Extreme Measured $SO_2$ Concentrations**

Dr. Libicki stated that $SO_2$ concentrations higher than 6,000 µg/m$^3$ did not happen very often: "*a maximum of 2.4 % of the ($SO_2$) values in one year (after the limit was raised) exceeded the instrument threshold of 6000 µg/m$^3$*." That is fortunate because, for example, the $SO_2$ standard in the U.S. is 196 µg/m$^3$ ( based on the 99th percentile of the daily 1-hour maximum $SO_2$ concentrations). $SO_2$ concentrations of 20,000 µg/m$^3$ or more were recorded in the network after the monitors were modified to increase the upper scale beyond the normal range because the standard monitors could not measure concentrations as high as the concentrations that occurred in La Oroya. On a typical day, the maximum 1-hour $SO_2$ concentrations at Sindicato, for example, exceeded the U.S. standard of 196 µg/m$^3$ by more than five-fold, i.e. concentrations on

the order of ~1,000 $\mu g/m^3$ were common. Monthly lead and arsenic concentrations at the fringes of La Oroya, and well removed from the smelter compared to more affected locations in La Oroya, also measured concentrations far above levels considered acceptable by any reasonable standard.

## **2.0 Rebuttal of Report by Mr. Hoffnagle**

### **Overview**

It is not unexpected that there would be some differences of opinions on the scientific issues associated with modeling this complex facility. Issues such as identifying emission rates to the atmosphere, meteorological stations to include or exclude from the modeling, and so forth can have a range of approaches. The modeling experts disagree on these points. For example, I chose not to include the Sindicato meteorological site because of my concerns about data quality, while Mr. Hoffnagle would include this site. Mr. Hoffnagle expressed differences of opinion on a few model options, the use of the Sindicato meteorological site, the tightness of the grid, and noted that he preferred the MMA modeling. Appendix A shows the significance of all these points. In short, we ran the model isolating his suggestions and the differences are relatively minor or nonexistent, i.e. none of these suggestions would lead to a risk assessor to altering their conclusions. In other words, the differences in opinion do not affect the conclusion that the DRP smelter / refinery complex created extremely elevated air quality levels in La Oroya and the surrounding area. The approaches he recommended also demonstrated, contrary to his assertion, that the location of the Sindicato site clearly was not in an area where the expected highest air quality impacts occurred in La Oroya Antigua.

There are some topics, however, that are simply hard facts where there should be no disagreement at all. Some matters are beyond a matter of opinion and are simply facts, e.g. generally speaking, the sun does rise in the East and sets in the West. An excellent example of "*debating a fact*" is the attempt by Mr. Hoffnagle to defend an obvious and blatant fundamental error in the modeling analysis of MMA. MMA erroneously assumed that the high concentrations at the Sindicato and Hotel Inca monitoring sites that occur typically from 9:00 A.M.to 3:00 P.M. were associated with the main stack plume quickly coming down to ground level due to a condition commonly referred to as stack fumigation. The next paragraph explains this term. Understanding this issue is very important for lay readers to grasp the difference between the MMA modeling and the modeling I have conducted. A key point to keep in mind is that Mr. Hoffnagle's opinions are based on the MMA modeling, for which the fundamental premise can be readily disproven based on the broad scientific literature, and even a technical

paper authored by Mr. Hoffnagle. There should be no disagreement or even discussion about the fact that stack fumigation conditions at specific downwind locations such as Sindicato or Hotel Inca do not persist for 5-6 hours but rather occur on the order of an hour or less in an inland setting such as this. It is physically impossible that the MMA hypothesis that stack fumigation of the main stack was the reason for the high concentrations from 9:00 AM to 3:00 PM. As shown in more detail in Appendix C, this issue is well beyond debate. The short-term nature of stack fumigation is not a debatable issue, rather it is a well-established fact that stack fumigation does not persist for 5-6 hours.[6]

There are other factors as well that disprove the MMA hypothesis:

(1) Locations such as Sindicato and Hotel Inca (monitoring sites with the high impacts 9:00 A.M. to 3:00 P.M.) are much too close for a fumigating plume from the effective height of the main stack plume to touch down in a concentrated manner, and

(2) Even with a very light 1 m/sec wind speed, it would require only 15 minutes to clear out the concentrated plume (900 seconds) before reaching Sindicato. Emissions from the stack after this first 15 minutes would be well mixed in the vigorously mixed layer starting right from the point of release at stack top.

In short, the premise of morning breakup downwashing the main stack was flawed, and obviously so. This required the use of an implausible, imaginary building to force the model to match the flawed hypothesis, albeit in an artificial manner that is obviously inconsistent with acceptable modeling practice and common sense. There is no justification for this approach in the peer-reviewed literature or authoritative sources. If modelers could arbitrarily change reality, such as the use of massive imaginary buildings to alter model performance to match their expectations, modelers could alter standard model treatments to show whatever result they wanted to show. Obviously, authoritative sources do not accept such modeling methods, nor is it any more appropriate for legal proceedings.

Incorrectly identifying the reason for the high concentrations mid-day was not the only problem with the MMA modeling that Mr. Hoffnagle's opinion is based on. Beyond the preceding points,

---

[6] There is a special case condition that does not apply here where stack fumigation can continue for hours when a stack is in close proximity to a shoreline. With an elevation of over 12,000 feet in La Oroya, this condition obviously does not apply here.

the Defendants hired in 2012 the developers of the CALPUFF model (Exponent had purchased the firm that developed CALPUFF by 2012) (Ref 102) to evaluate the adequacy of the modeling conducted by Dr. McVehil (MMA) that Mr. Hoffnagle has relied on. Exponent provided a long list of major deficiencies that rendered the modeling unreliable (Ref 102):

- Upper air data, which would be transporting most of the emission points, was based on a "*pseudo*" sounding from another location, i.e. it did not represent conditions in La Oroya. The meteorological data used to model the transport and dispersion of emissions from the main stack was not even from the La Oroya area but from an undisclosed location with a similar elevation above sea level.
- The modeling domain was too small to capture plumes that recirculate back into areas of concern.
- Only ten monitoring site receptors were modeled, i.e. there were no isopleth analyses showing concentrations throughout the modeling domain of interest (e.g. La Oroya and surrounding locations). (I have shown this, however, in Appendix A).
- MMA relied on the unconventional use of an artificial building: "*It is likely the use of assumed large and high structures in the valley will introduce improper non-physical behavior in the modeling.*"
- Model calibration was done (which is not standard in air quality modeling).
- The MMA modeling was forced to match the measured data based on calibrating one monitoring site at a time. This means altering standard model output so that on average the modeled concentrations and the measured concentrations are forced to exactly match at each site on a long-term average basis.

The MMA modeling results were only displayed for 10 monitoring sites for which the model was artificially optimized to match the measured data.[7] Refer to Figures A-3 and A-4 where a

---

[7] At his deposition, Mr. Hoffnagle testified that the imaginary building was used to optimize model performance for the Huanchan monitoring site. This statement is not consistent with the data. The model performance was optimized performance for Sindicato and Hotel Inca, the closest locations to La Oroya Antigua (albeit Sindicato was on the western extreme fringes of La Oroya Antigua and further from the smelter's major sources than other areas in La Oroya Antigua). Also, there is not any population near Huanchan. There would not have been an incentive to optimize model performance for a location that had no population to assess in terms of risk assessment.

full display of the results based on the imaginary building are shown (full grid) based on Dr. McVehil's sources treatments. Especially for $SO_2$ as shown in Figure A-4, the McVehil treatment resulted in higher modeled concentrations and with peak impacts for La Oroya also shown in the Eastern portion of the town, which is the opposite side of La Oroya from the Sindicato. The artificial building substantially increased concentrations in La Oroya and created broad areas of artificially high concentrations at the higher elevations in La Oroya. This full view was not provided in the MMA modeling, nor was it presented in Mr. Hoffnagle's report. It should have been.

After using a hypothetical building to better match the measured data at Sindicato and Hotel Inca (the closest monitoring sites to the smelter), it is interesting to note that the Defendants modeling results and mine are quite similar at the monitoring sites (the only locations the Defendants modeled) in spite of the differences in emission rates and assumptions. In other words, when reviewing the comments in the Defendants' expert reports alleging major flaws in my modeling, keep in mind that the bottom line results of the Defendants' modeling at the locations they modeled are quite similar to mine and generally show higher results when fully displayed, which is the opposite of Mr. Hoffnagle's statements in his report and deposition testimony. The difference is that my modeling is appropriate for more than just 10 monitoring sites where performance was artificially optimized as in the MMA modeling. I show tested modeling results for the entire La Oroya area, which is the purpose for the modeling for this case. The measured concentrations at the monitoring sites were already available.

In summary, we show in side-by-side model comparisons how much difference it would make to accept Mr. Hoofnagle's points where he disagreed with us. As shown below, the issues presented by the Defendants as major problems are not significant when directly compared:

- Mr. Hoffnagle stated the following in regarding the fact that I did not include the Sindicato meteorological site in the modeling (because of siting deficiencies): "*His* (referring to David Sullivan*) refusal to use the available data from the Sindicato monitoring station is a fundamental flaw that renders his related modeling efforts defective and unreliable*." In response to this claim, I added in this site, remodeled including Sindicato, and compared the results as shown in Appendix A. It made less than a five percent difference in the results - - at most locations it made no

discernable difference at all. Mr. Hoffnagle is obviously exaggerating the significance of this difference of opinion: a modeling difference of a several percent or less is not a "*fundamental flaw*." but a minor difference of opinion that obviously was overstated by Mr. Hoffnagle.

- Tightening the grid used in the model grid as Mr. Hoffnagle suggested increased modeled concentrations at the closest sites to La Oroya (Sindicato and Hotel Inca) by 13 to 75 percent for lead and 29-31 percent for $SO_2$.

- Following the MMA treatment of emission and source specifications, i.e. Mr. Hoffnagle's preferred modeling approach, resulted in the following changes at the Sindicato and Hotel Inca sites: lead decreased by 15 to 81 percent, while $SO_2$ increased by 6 to 77 percent. The differences were generally less than a factor of two, and in the composite sense when displayed across the full modeling domain, the MMA treatment generally increased modeled concentrations for $SO_2$ and showed similar concentrations generally for lead throughout most of La Oroya but ~25-30 percent lower.

- Differences in model options cited by Mr. Hoffnagle (which are non-default, i.e. not typically recommended) made no difference in the results

In short, Mr. Hoffnagle raised points that were represented differences of opinion in how he would have run the model versus what I have done - - none of which alters the conclusion that air quality impacts throughout La Oroya Antigua and beyond were extremely high. In my judgment, some of these issues are reasonable areas of debate, but they make no material difference in the conclusions drawn. The lack of credibility of the Defendants' modeling that required a massive imaginary building to try to support a flawed premise and is based on meteorological data from an undisclosed locations (that was not in the La Oroya area) is beyond debate and clearly does not provide a reliable basis for Mr. Hoffnagle's opinions. The MMA modeling, and the opinions of Mr. Hoffnagle that are based on this modeling, are associated with untested, novel modeling methods that are not justified in the peer-reviewed literature nor by authoritative sources.

**Response to specific points made by Mr. Hoffnagle, which lack support**:

- Mr. Hoffnagle states that Dr. McVehil's work continues to be the best available modeled data. *"the air modeling conducted by MMA for the 2008 Integral risk assessment was then and continues to be the best available*." This is an extraordinary statement. First, the MMA modeling forced the model to better match the data by adding a massive imaginary building (that did not exist) to create enough downwash of the main stack plume (referred to as stack fumigation) to better match the measured data, followed by site-by-site calibration to force the model to match long-term measured concentrations on a site-by-site basis (Ref 113:26-28. There is no modeling guidance that supports modelers using imaginary buildings (in this case , a building that is 2 miles long by 1 mile wide and over 400 feet tall) to artificially improve model performance. Such guidance obviously is not needed. Common sense dictates that if an imaginary building with a volume of 637 million cubic meters is needed to improve model performance that there is something seriously wrong in the Defendants' modeling approach. As a point of reference, the current largest volume building on earth is 13 million cubic meters. The model Mr. Hoffnagle testified was the best available basically filled the valley with a building (bigger than the valley) and nearly as tall as the valley walls, but this imaginary building only existing for one source, i.e. the main stack. The building disappeared when modeling the other sources. In fact, much of the smelter and most of La Oroya would be contained within the massive imaginary structure. Refer to Figure E-1 for perspective on the size of this imaginary building added to the modeling to alter standard model performance. Figure E-2 (Exhibit 5 from Mr. Hoffnagle's deposition) shows the footprint of the imaginary building filling in the valley at La Oroya and occupying much of the city of La Oroya and beyond, including extending through the valley walls in multiple directions. Mr. Hoffnagle based his opinions on this case on a modeling analysis that required an imaginary building many times larger in terms of volume than any building on earth to produce reasonable results at selected monitoring sites. Based on his response at deposition, however, he was not aware of the actual size of this building:

**Question**: "*I want to represent to you that, based on the BPIP modeling, the width and length of the building is about .8 - - 0.8 miles wide and about 1.8 miles long; okay? Does that sound reasonable to you with respect to dimension - - dimensions of this building that was used in this modeling report*?"

**Response**: "*No, I have no idea what the number are.*"

In my judgment, any experienced and objective air quality modeler that was aware that an imaginary building nearly 1 mile by 2 miles by over 400 feet tall was inserted into a model to improve model performance, would not rely on results from such a model. Mr. Hoffnagle's opinions on modeled concentrations, therefore, are based on untested and novel modeling methods. Figure 2-1 provides further perspective on the size of the building included in the modeling analysis that Mr. Hoffnagle relied on.

Figure 2-1: Buildings with the World's Largest Volume (Plus DRP Imaginary Building)

https://en.wikipedia.org/wiki/List_of_largest_buildings




| Building | Volume (m3) |
|---|---|
| MMA Imaginary Building | 637.5 |
| Boeing Everett WA | 13.3 |
| Great Mosque of Mecca | 8 |
| Jean-Lac Lagardere | 5.6 |
| Aerium | 5.2 |
| Meyer Wert | 4.72 |

- The Defendants' modeling listed as '*best available*" by Mr. Hoffnagle also was based on model calibration. As stated in Ref 143:28 EPA's position on model calibration is quite clear: "*Because of the uncertainty in paired modeled and observed concentrations, any attempts at calibration of models based on these comparisons is of questionable benefit and shall not be done."* The Defendants' modeling is not only based on model calibration, but calibration of one site at a time, which is forcing the model to match the long-term average measurements specifically at each site. Mr. Hoffnagle was not aware of this based on his deposition testimony. When asked if MMA calibrated one site at a site he answered: " *MMA did not do it one site at a time*." Ref 113:26-28 clearly shows a separate calibration equation for each site, as well as a separate background value for each site. Not only is model calibration not accepted in U.S. modeling, but calibrating one site at a time essentially eliminates the need for a model. In this case, the "*model*" is just a match to the measured data at each site. At any other location than these monitoring sites, the modeling is not valid, which would include any other location in La Oroya than Sindicato.

  For this case, the closest residential area to the smelter is La Oroya where the only monitor (Sindicato) was on the far Western fringe of the town. Models need to estimate concentrations at places beyond the monitors, i.e. the reason to run a model. We know what the concentrations are at the monitors - - they were directly measured. In other words, the MMA modeling was based on circular reasoning. Mr. Hoffnagle accepted the MMA modeling and based his opinions on it: (a) without understanding the extent of the imaginary building dimensions, (b) without understanding that MMA calibrated one site at a time to match each monitoring site, and (c) based on meteorological data that transported the main stack emissions based on a monitoring site from an unknown location that it was not in the La Oroya modeling area. The problem with inserting imaginary structures and forcing models to match long-term averages at specific sites is that it is much more likely than not that model performance elsewhere will be seriously degraded, i.e. at locations in La Oroya beyond the few locations the where the Defendants' optimized the model. The MMA modeling approach is analogous to saying the modeling approach is whatever exactly matches the measured data at each of monitoring sites. A model obviously is not needed if this is the objective. Refer to

Appendix A to view model performance when the full set of receptors are shown (rather than just the five optimized receptors). The modeling that Mr. Hoffnagle has relied on is an extreme example of the application of non-standard modeling methods. No regulatory agency in the U.S., or likely anywhere in the world, would accept modeling based on the flawed and non-standard methods that are being relied on by Mr. Hoffnagle.

- Mr. Hoffnagle stated: "*The WRF domain chosen by Sullivan for 2006-2008 was 50 kilometers by 50 kilometers with a grid point at every kilometer. This is not consistent with WRF guidance (Citation 29, WRF Model Guidance)*." The use of 1 km resolution in the initial wind field is standard practice. The WRF regional gridded data provides a starting point with 1 km resolution, which is then refined using CALMET which is based on 200 m resolution in our modeling, the MMA modeling, and the recommendations made by Exponent (Ref 102).

- Mr. Hoffnagle has made a series of assertions that are addressed in Appendix A. The overriding statement, however, is obviously inconsistent with the facts: "*As a result of these errors (errors in his opinion), Mr. Sullivan's model has produced ambient air quality results that are vastly different than the measured air data, which shows that his model is not working and is unreliable*." I have relied on Scenario 2.5H, which empirically accounts for the observed plume rise of the hot fugitive sources at the smelter as explained in my expert report. These results are shown to reliably replicate the measured concentrations. A model in complicated terrain and with complex sources such as this will not be extremely accurate for each monitoring site and each year, but on balance across the full data set, I have demonstrated the modeling to be reliable relative to measured data. This provides greater assurance that the more general modeling of concentration fields throughout La Oroya and surrounding areas is generally reliable as well. Even a brief review of the model performance results in Appendix E for Scenario 2.5 H of my expert report directly refute Mr. Hoffnagle's assertions.

- "*As with Mr. Sullivan's ambient air model results, his claim on Page 77 of his report that his modeled metals deposition results more accurately reflect levels of lead and other metals in La Oroya Antigua than actual sampling is also not supportable*." The problem

with Mr. Hoffnagle's statement is that I never testified to this point, nor is it contained anywhere in my expert report, including Page 77.

- "*Mr. Sullivan's assertion that the deposition of metals at the ground surface only includes metals concentrations attributable to current operations at Doe Run Peru is unsupported by the data."* I do not make such as assertion and Mr. Hoffnagle has misconstrued my statements. On Page 77 of my report, I stated the following, which is much different than Mr. Hoffnagle's assertion: "*legacy dust prior to the defendants' operations would be effectively removed early in the Defendants' operation of the smelter and refinery and would not be a significant soured of exposure to the community*." This statement is fully supported by peer-reviewed literature and the fact that over 200 inches of precipitation would have fallen on a climatological basis between the time DRP assumed operations and the dust samples were taken. Mr. Hoffnagle has not visited the site. If he had, he would have been aware that in La Oroya where these samples were taken nearly all surfaces are hard surfaces with minimal soil / grass to support long-term retention of settled dust.

- Mr. Hoffnagle testified at deposition on January 29, 2020: "*That is, the deposition of dust was modeled by MMA for the risk assessment prior -- prior to 2006, and so therefore there is an estimate of the deposition of dust at various locations in La Oroya Antigua and outside of La Oroya Antigua in -- in the MMA modeling*." Dust deposition is not mentioned anywhere in the exhibits associated with Mr. Hoffnagle's deposition, nor in any materials in my reference list. The results of the MMA modeling are for airborne concentration only and are limited to ten monitoring sites.

- The timeline for setting standards, etc. is irrelevant to this exposure assessment. In terms of standards, I am showing modeled concentrations for risk assessors to evaluate. It is up to the risk assessors to interpret the exposure data as they see fit and is not a topic for the exposure assessment that I have produced.

- "*Mr. Sullivan's discussion of ambient concentrations ignores concentrations preceding Doe Run Peru's operations, because as he admitted in his deposition (page 177), he has never seen ambient air quality results from before Doe Run Peru's ownership*."

Notably, Mr. Hoffnagle omitted the reason I did not rely on these earlier results, which is because (as he says later) a reliable air monitoring network was not in place.

- "*No real action was taken by Centromin following enactment of these standards to reduce emissions prior to Doe Run Peru acquiring the facility in October 1997. Therefore, I would expect that air quality around the facility would exceed the newly enacted standards during the approximately 10 years that DRP operated the facility as it worked to transition and modernize the complex and reduce its emissions*." The focus of my exposure work and Mr. Hoffnagle's opinions, should be on exposure assessment. As described above, the issue of applicable standards, is a different issue that will be addressed by others. It should be stated, however, that as a U.S. company, DRP would be aware of acceptable air quality levels for lead, arsenic, and $SO_2$. For example, based on U.S. Environmental Protection Agency standard setting process in place and under development at the time DRP took over operations of the La Oroya complex, measured concentrations for lead, arsenic and $SO_2$ were far above U.S. standards. It would have been clear to DRP that they were operating the facility at levels orders of magnitude higher than acceptable levels in the U.S., which based on objective review would lead to the logical conclusion that the operations had a high probability of causing adverse health effects.

- Mr. Hoffnagle takes issue with my opinion: "*None of the locations of Defendants' air quality monitoring sites are representative of the areas where residents were exposed to the highest concentrations of contamination*. " The primary reason for his disagreement is that in his judgment the Sindicato site "*is an acceptable site*." There are two problems with the Sindicato site: (1) as shown in Appendix I of my expert report this site has multiple violations of EPA siting criteria, and (2) the site is located at lower terrain at the extreme fringes of La Oroya. Regardless of preliminary decisions on siting prior to DRP ownership in 1997, after DPR added additional monitoring sites, the DRP network that it established and operated for many years did not address the higher elevation and closer areas to the smelter in southeastern La Oroya Antigua, i.e. the locations where air quality experts would expect to see higher impacts in La Oroya. This also was clearly shown by my model and the modeling produced by MMA (Dr. McVehil) when displayed full grid.

Mr. Hoffnagle, on the other hand, did not mention the fact that the MMA modeling when extended to full grid conflicted with his assertion that the highest air quality impacts in La Oroya were at the Sindicato site.

Mr. Hoffnagle makes an extraordinary statement: "*The dust concentrations taken from the town and MMA's (Dr. McVehil) prior air modeling further disprove Mr. Sullivan's hypothesis* (that higher concentrations occur at locations in La Oroya closer and more in line with the major sources at the smelter)." First, the MMA modeling only had 10 receptors that matched the monitoring sites. The MMA modeling report did not even address the closer locations in La Oroya. Second, my opinion is not based on a hypothesis but direct modeling results based on sound modeling methods. Third, Mr. Hoffnagle should have evaluated Dr. McVehil's results when receptors are provided throughout the modeling domain rather than at just 10 receptors to optimize model performance for locations that were all well removed from the core of La Oroya. As shown in Appendix A Figures A-3 and A-4, the full display of Dr. McVehil's modeling throughout La Oroya shows the largest impacts occur on the eastern side of La Oroya while the closest and only monitoring site in La Oroya is at the far western extreme of La Oroya.

Mr. Hoffnagle based his opinion that Sindicato had the highest measured airborne concentrations on the dustfall measured concentration at a location near (to the north) of the Sindicato site showed the highest measured concentrations. As he stated at his deposition on January 28, 2020 (Volume 1, Page 156, Lines 19-24:

> Q. Any other dust samples that you're relying on for your opinion that Sindicato is properly sited?
>
> A. No.
>
> Q. Only that one?
>
> A. I think that's correct.

Refer to Appendix D of this report. I have made the adjustment in coordinates that he suggested at his deposition and have displayed the degree that the Sindicato site is an outlier compared to all other samples, including a sample that was in close proximity to the one value that Mr. Hoffnagle is solely relying on. The "*Sindicato*" site sample stands out as an obvious anomaly. In spite of this fact, Mr. Hoffnagle is relying on this one outlier sample to support his opinion even though the MMA (Dr. McVehil) modeling that he also is relying on and my modeling conflicts with this opinion. Refer to Appendix A. When the MMA modeling is run for the full grid, rather than just the monitoring sites, it is clearly shown that the maximum impacts occur well East of the Sindicato site and closer to the primary sources at the La Oroya complex for metals and also $SO_2$.

**Point of Agreement**

- I agree with Mr. Hoffnagle's comment that the cadmium modeled values are substantially higher than the measured concentrations. I did not conduct model performance or emphasize cadmium because it is my understanding that the pollutant is of lesser importance than arsenic, lead, and $SO_2$, which I have emphasized in my report.

3.0 **Review of Dr. Rouhani's Expert Report**

Mr. Rouhani incorrectly opines that there is a requirement in applied modeling to conduct a detailed statistical assessment of model performance. This clearly is not standard practice. Model performance can be done based on the judgment of the modeler in the rare case (like this) when there are available measured air quality data to do so, but clearly model performance is not required and is very rarely done.

The scope of the model performance in applied modeling is up to the modeler. When models are developed and need to be validated, then there will be detailed statistical tests required. That is not the case here. Models like AERMOD or CALPUFF are validated based on detailed statistical assessment when the emissions data are well known from either continuous emission monitoring of a stack (such as a power plant stack typically) or based on the use of a tracer where the specific emission rate is calibrated and also well known. In those cases, there is only one variable that is isolated, i.e. the performance of the dispersion model.

Model validation is comprised of multiple model performance evaluations relying on known emissions data. In a matter like this where emission rates are estimated based on the best available information for a wide range of fugitive and stack sources, and not released as a tracer or measured by continuous monitoring associated with an isolated source, there is no basis from which to conduct a detailed model performance. A more appropriate way to use measured data in applied modeling is to "*learn*" from the measured data how to best run the model to replicate reality. I made such comparisons to seek model treatments that most realistically represented reality based on the objective of minimizing model bias relative to the available measured concentrations. Dr. Rouhani is confusing model validation with methods used for much more limited empirical review of modeled versus available measured data, such as for this case.

"*Mr. Sullivan's air model is an unreliable model that according to EPA's cited guidance should be disregarded*." First, Dr. Rouhani has no basis in terms of expertise to make this claim. He is not an expert air quality modeler. It appears he is referring to the fact that CALPUFF is no longer recommended by EPA as a generally preferred (Appendix A) model. However, Dr. Rouhani's statement conflicts with the EPA's actual guidance. EPA's actual position on CALPUFF at this time is as follows:

> "*It is also important to note that the use of CALPUFF in the near-field as an alternative model for situations involving complex terrain and complex winds is not changed by removal of CALPUFF as a preferred model in Appendix A. The EPA recognizes that AERMOD, as a Gaussian plume dispersion model, may be limited in its ability to appropriately address such situations, and that CALPUFF or other Lagrangian model may be more suitable." (Ref 143:15).*

The Defendants modeler, Mr. Hoffnagle, did not question the use of the CALPUFF model. The MMA modeling conducted for Doe Run Peru used CALPUFF. Exponent who reviewed the MMA modeling in 2012, also recommended that CALPUFF be run, although much differently than the way MMA ran the model. Our model runs were consistent with the recommendations of Exponent and EPA standard guidance.

The overriding objective of air quality modeling is to seek the most accurate answer (based on the EPA Guideline on Air Quality Models). EPA's position on modeling is summarized as follows*: (*Ref 143:24):

> "*The model that most accurately estimates concentrations in the area of interest is always sought. However, it is clear from the needs expressed by the EPA Regional Offices, by state, local, and tribal agencies, by many industries and trade associations, and also by the deliberations of Congress, that consistency in the selection and application of models and data bases should also be sought, even in case-by-case analyses. Consistency ensures that air quality control agencies and the general public have a common basis for estimating pollutant concentrations, assessing control strategies, and specifying emissions limits. Such consistency is not, however, promoted at the expense of model and database accuracy."*

I followed these objectives and guidelines in making my assessment. As an expert in air quality modeling and based on inspection of the various geographic areas in the study area, it is my opinion that CALPUFF, as I have run it, is an appropriate model to represent air quality in this setting.

Dr. Rouhani also takes out of context my application of a "*factor of two*" in assessing the modeling results. At page 23 of his Report, Dr. Rouhani states: "*The majority of his model*

*results for various locations and years do not meet a "factor of two" agreement with their corresponding observed values, and thus, cannot be considered as acceptable under EPA guidance recommendations cited by Mr. Sullivan."*

In my report, I said: "*Note that a standard rule of thumb for expected model performance is ~ +/- a factor of two (Ref. 152:17).*" This statement obviously does always not apply to every location and every period modeled . Nowhere in my report or in EPA model guidance does it state that a factor of two relative to measured data is the criteria to determine whether an applied modeling analysis is reliable. Nevertheless, based on the modeling scenario that considered the observed lift of the hot fugitive sources (Scenario 2.5H) out of 20 points of comparison with measured data (lead, arsenic, and $SO_2$ for the years available), a total of 14 of these comparisons were within a factor of two, including the Sindicato site that is addressed below.

Dr. Rouhani's conclusion that omitting the Sindicato Station meteorological measurements lacks support and impacts my modeling results, is based on flawed reasoning. In his report, Dr. Rouhani stated at page 25: "*The Sindicato Station is the nearest air monitoring station to the CMLO facility. Mr. Sullivan's arguments seem to be motivated by the fact that his model results consistently **overestimate** air concentrations when compared to those measured at this station. As listed in Table 5, Mr. Sullivan's own reported model results consistently indicate large overestimations Sindicato Station measurements. Mr. Sullivan ignores the fact that by rejecting the Sindicato Station data, he is further reducing the reliability of his model results within the most investigated area of La Oroya."*

This statement is incorrect. My motivation was to select sites that best met the EPA siting criteria. I noted the problems with Sindicato well before having any modeled data and rejected Sindicato for meteorological input because of multiple violations of standard siting guidance prior to running the model. First, the modeling did not consistently overestimate air concentrations. For $SO_2$ the model performance, for example, was good at Sindicato. It was for particulate matter that the poor siting and violation of numerous EPA site monitoring requirements resulted in the apparent poor collection efficiency and source sinks for particulate matter in this complex recirculation environment for my modeling and the modeling conducted by MMA that did include Sindicato.

I did not ignore Sindicato. I put the measured data from Sindicato in context in terms of including a footnote for each table I prepared for metals to specifically note that there were siting problems at Sindicato that should be considered when reviewing the modeled versus measured data. It does provide a low range estimate of particulate impacts.

In terms of meteorological data at Sindicato, my decision (prior to modeling) to not include this site had no bearing on model performance as shown in Appendix A Figures A-1 and A-2 and the associated model performance comparisons with and without the inclusion of the Sindicato meteorological data. As with the other Defendants' experts, Dr. Rouhani also erroneously stated the following: "*Mr. Sullivan ignores the fact that by rejecting the Sindicato Station data, he is further reducing the reliability of his model results within the most investigated area of La Oroya.*" Whether or not Sindicato was input to the model effectively made no difference in the results, which is a point missed by each of the Defendants' expert.

Dr. Rouhani has no idea of my "*motivation*" regarding this site or any other aspect of my report. My motivation was to estimate air quality impacts as accurately as possible (it was not to overstate model impacts as his assertion implies). Dr. Rouhani did not personally inspect the various monitoring sites to evaluate the suitability of the sites for meteorological input data or for the representativeness of the measured air quality data. Refer to Section 1.0 (Dr. Libicki rebuttal) for more details on siting issues. Review of the Defendants' comments would lead to the conclusion that the modeling I have conducted would be high relative to the Defendants' modeling. As documented in my expert report in terms of model performance for Scenario 2.5,H this clearly is not the case. In fact, comparison of my modeling with the MMA modeling (prior to the final step where they forced the modeling to match long-term averages on a site-by-site basis), the MMA modeling is generally higher than my model estimates, i.e. the opposite of the assertions they have made.

Dr. Rouhani stated that the modeling consistently overestimates concentration at Sindicato. As an example, refer to $SO_2$ results in my expert Report in Table E-12 that is presented at Table 3-1. Dr. Rouhani's statement is incorrect.

Table 3-1: Model Performance for $SO_2$ for the 2.5H Scenario Model Run

Table E-12: Adjusted Height (2.5H) Run $SO_2$ Model Performance

| SITE | 2001 | | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 10,173 | - | 9,600 | 14,231 | 9,295 | 11,552 | 7,416 | 14,743 |
| CUSH | 4,276 | - | 4,307 | 5,541 | 1,872 | 3,153 | - | - |
| HUAN | 10,748 | - | 10,265 | 23,182 | 8,810 | 27,246 | 8,557 | 23,951 |
| CASA | 1,050 | - | 881 | 1,380 | 803 | 1,577 | 1,215 | 3,938 |
| MARC | - | - | - | - | 2,651 | 5,184 | 2,726 | 4,428 |
| HUAR | - | - | - | - | 1,107 | 5,513 | 985 | 5,053 |
| SIND | 16,403 | - | 15,186 | 16,450 | 18,167 | 16,539 | 17,818 | 17,540 |
| HUAY | - | - | - | - | 1,238 | 1,926 | 1,986 | 2,853 |

**Note: 2006 is based on July through December after increase in span of monitors**

As shown above, 18 of the 20 points of comparison show that the modeling is **lower** than measured concentrations and 14 of the 20 are within a factor of two. Sindicato is understated or overstated within 10 percent for each of the three years. In addition, 3 of the 6 times when the model is understating by more than a factor of two, the comparisons were associated with the Huanchan site that is down-valley of the smelter in a location where there are not any residential exposures and the modeling was too low. This is excellent model performance in such a complex terrain setting and for such a complex facility. If the modeling were unreliable on the basis asserted by Dr. Rouhani and the other defense experts, model performance such as shown above would not occur. Unlike the only Defendants' modeling, the modeling I conducted does not rely on the creation of an unprecedented imaginary building and site-by-site calibration, but rather follows standard EPA modeling procedures.

The comparisons for lead and arsenic are similar, except that at the Sindicato site for particulate matter, deviations from standard siting guidance appear to be biasing the measured data low because of local sinks (loss of mass) and the potential for reduced collection efficiency is associated with the complex recirculation zones in which this site is location. The MMA modeling produced by Dr. McVehil on behalf of the Defendants and relied on by Mr. Hoffnagle shows similar overstatement for metals at Sindicato and minimal bias for $SO_2$. I present the comparisons of measured and modeled concentrations at the Sindicato site in my expert report, and note the adverse siting issues in a footnote to the tables.

For lead, the more distant sites have values in some cases approaching background. At low concentrations, there can be substantial differences between modeled and measured concentrations in terms of percent as background levels of air quality are approached. Refer to Table 3-2. Focusing for example on sites with particulate matter greater than 1 ug/m$^3$ the comparisons are reasonable between the measured and modeled concentrations. For 5 of the 6 pairs with annual average lead concentrations higher than 1.0 ug/m$^3$ the modeling is lower than the measured data. Only at Sindicato does the model overstate (by an average factor of ~3). I note that for the Defendants' MMA modeling also overstates Sindicato (by about a factor of 2), which like my modeling this is the only site with emissions substantially higher than background where the models are overstating.

Table 3-2: Model Performance for Lead Based on 2.5H Modeling Scenario

Established 1988

Table E-6: Adjusted Height (2.5H) Run Model Performance Annual Average for Lead: $PM_{10}$ Based

| SITE | 2001 | | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 0.85 | 1.63 | 1.50 | 2.40 | 0.76 | 0.93 | 1.17 | 0.96 |
| CUSH | 0.34 | 0.93 | 0.40 | 1.59 | - | - | - | - |
| HUAN | 4.11 | 7.21 | 3.63 | 7.64 | 1.45 | 5.46 | 2.26 | 5.74 |
| CASA | 0.07 | 0.39 | 0.07 | 0.65 | 0.05 | 0.20 | 0.08 | 0.16 |
| MARC | - | - | - | - | 0.15 | 0.59 | 0.23 | 0.60 |
| HUAR | - | - | - | - | 0.07 | 0.61 | 0.08 | 0.70 |
| SIND | 8.11 | 2.67 | 9.93 | 3.62 | 3.07 | 1.19 | 5.33 | 1.36 |
| HUAY | - | - | - | - | 0.07 | 0.33 | 0.10 | 0.41 |

**Note that Sindicato site has multiple obstructions and is poorly sited in terms of EPA siting criteria**

The fact that one site (Sindicato) has a factor of three difference for metals instead of a factor of 2 does not invalidate the use of a model.

The following repeats this exercise for Arsenic as shown in Table 3-3:

Table 3-3: Model Performance for Arsenic Based on 2.5H Modeling Scenario

Table E-9: Adjusted Height (2.5H) Run Model Performance Arsenic Annual Average: $PM_{10}$ Based

| SITE | 2001 | | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.36 | 1.84 | 2.34 | 2.05 | 0.78 | 0.83 | 0.94 | 0.90 |
| CUSH | 0.32 | 1.13 | 0.65 | 1.43 | - | - | - | - |
| HUAN | 3.11 | 7.19 | 3.64 | 5.53 | 2.30 | 4.01 | 2.01 | 4.43 |
| CASA | 0.05 | 0.43 | 0.05 | 0.94 | 0.04 | 0.17 | 0.06 | 0.11 |
| MARC | - | - | - | - | 0.14 | 0.42 | 0.17 | 0.40 |
| HUAR | - | - | - | - | 0.05 | 0.39 | 0.05 | 0.52 |
| SIND | 9.62 | 3.38 | 10.43 | 3.48 | 3.65 | 1.01 | 4.92 | 1.42 |
| HUAY | - | - | - | - | 0.05 | 0.18 | 0.07 | 0.28 |

All these differences are trivial when considering that at the time of DRP operations, it was acceptable air limits in the U.S. for arsenic were typically set at 0.0024 µg/m$^3$.

The bottom line is that when reviewed in context, most of the modeling results for locations substantially above background are within a factor of two, and when the differences are outside this range, in nearly all cases the modeling is lower than the measurements. Of the 64 pairs of measured and modeled data including $SO_2$, lead, and arsenic, the model is understating for 57 of the 64 comparisons. This means that risk assessment based on these results will generally tend to provide a lower bound estimate.

Dr. Rouhani is also incorrect in reaching the following conclusion: Page 24: "*Instead of a quantitative evaluation of his air models in accordance with EPA guidance recommends, Mr. Sullivan presents a series of linear regressions of his modeled versus measured results (Sullivan 2019, Tables E-13 through E-15). In each of these regressions, Mr. Sullivan uses a different time basis to pair his modeled results to the measured values. In Table E-14 he compares annual averages, while in Table E-15, He compares the 99th percentiles of daily maximum 1-hour concentrations. In Table E-13, maximum three-month averages are compared . . .* "

Arsenic is a carcinogen that is typically evaluated on an annual average basis. Lead is evaluated on a quarterly or three month folling average. $SO_2$ is evaluated in the U.S. based on the 99th percentile of the daily 1 hour maximum. The reason that different averaging times were used is because the health criteria are based on different averaging times. On page 27: Point # 68 of his report, Dr. Rouhani takes issue with the Dr. MacIntosh's opinions and states: "*Dr. MacIntosh's statements are quite puzzling when considering that Mr. Sullivan's modeling results are predicated on the rejection of the Sindicato Station data*…" This is not an issue. My modeling does not eliminate any site in terms of displaying air quality measurements in comparison to modeled concentrations (only meteorological inputs to CALMET), but we do caveat Sindicato. Rather, when I reviewed modeled performance, I noted that for the particulates (lead and arsenic) that the Sindicato site was significantly affected by the multiple violations of the EPA monitoring siting guidance. Reliance on these directly measured data would produce a lower estimate of exposures. My point was that all indications were that the poor siting of Sindicato,

especially for metals and meteorology, resulted in understatements of measured concentrations for the heavy metals. Dr. MacIntosh's use of directly measured heavy metals air quality data to conservatively (understate) exposures is appropriate in that context.

**Appendix A: Comparative Model Runs to Demonstrate Significance of Points Raised by Defendants Experts**

| Run # | Year | Sindicato Met. Data | McVehil Emissions / Source Treatments | Hoffnagle Terrain options | Hoffnagle CALMET 100 m Grid |
|---|---|---|---|---|---|
| 1 | 2008 | * | | | |
| 2 | 2007 | | * | | |
| 3 | 2008 | | | * | |
| 4 | 2008 | | | | * |

For each run, Scenario 2.5H was used and results provided for lead and $SO_2$ as examples. Comparative isopleth plots are provided to compare modeling in my expert report with results based on methods the Defendant's experts claimed I should have used.

Figure A-1: Run 1 - Inclusion of the Sindicato Site for Lead $PM_{10}$

Original: Lead $PM_{10}$: Without Sindicato site




Lead $PM_{10}$: Including Sindicato Site



Figure A-2: Run 1 - Inclusion of the Sindicato Site for $SO_2$

$SO_2$: without Sindicato




$SO_2$: Including Sindicato



Table A-1: Run 1- Comparative Model Performance Table

| | **ORIG $SO_2$ RESULTS** | | **NEW $SO_2$ RESULTS** | |
|---|---|---|---|---|
| SITE | 2008 | | 2008 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 7,416 | 14,743 | 7,508 | 14,743 |
| CUSH | - | - | - | - |
| HUAN | 8,557 | 23,951 | 8,451 | 23,951 |
| CASA | 1,215 | 3,938 | 1,145 | 3,938 |
| MARC | 2,726 | 4,428 | 2,935 | 4,428 |
| HUAR | 985 | 5,053 | 991 | 5,053 |
| SIND | 17,818 | 17,540 | 17,859 | 17,540 |
| HUAY | 1,986 | 2,853 | 1,948 | 2,853 |

| | **ORIG LEAD RESULTS** | | **NEW LEAD RESULTS** | |
|---|---|---|---|---|
| SITE | 2008 | | 2008 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.45 | 1.14 | 1.52 | 1.14 |
| CUSH | - | - | - | - |
| HUAN | 3.17 | 9.51 | 3.33 | 9.51 |
| CASA | 0.10 | 0.26 | 0.10 | 0.26 |
| MARC | 0.30 | 0.73 | 0.31 | 0.73 |
| HUAR | 0.10 | 1.00 | 0.10 | 1.00 |
| SIND | 6.80 | 1.61 | 6.55 | 1.61 |
| HUAY | 0.13 | 0.51 | 0.13 | 0.51 |

Figure A-3: Run 2 - Modeling with McVehil Emissions, Source Treatment Lead Modeling $PM_{10}$ Fraction

Original Lead ($PM_{10}$)




McVehil Emissions and Source Treatments Lead ($PM_{10}$)



Figure A-4 - Run 2 McVehil Emissions and Sources $SO_2$

Original $SO_2$




McVehil $SO_2$



Table A-2: Run 2 - McVehil Emissions, and Sources

| | ORIG $SO_2$ RESULTS | | NEW $SO_2$ RESULTS | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 9,295 | 11,552 | 16,476 | 11,552 |
| CUSH | 1,872 | 3,153 | 1,788 | 3,153 |
| HUAN | 8,810 | 27,246 | 14,468 | 27,246 |
| CASA | 803 | 1,577 | 1,715 | 1,577 |
| MARC | 2,651 | 5,184 | 5,249 | 5,184 |
| HUAR | 1,107 | 5,513 | 1,037 | 5,513 |
| SIND | 18,167 | 16,539 | 19,276 | 16,539 |
| HUAY | 1,238 | 1,926 | 1,699 | 1,926 |

| | ORIG LEAD RESULTS | | NEW LEAD RESULTS | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.02 | 1.27 | 0.87 | 1.27 |
| CUSH | - | - | - | - |
| HUAN | 1.92 | 6.47 | 0.16 | 6.47 |
| CASA | 0.08 | 0.42 | 0.21 | 0.42 |
| MARC | 0.21 | 1.03 | 0.23 | 1.03 |
| HUAR | 0.08 | 0.77 | 0.09 | 0.77 |
| SIND | 5.11 | 2.09 | 2.93 | 2.09 |
| HUAY | 0.10 | 0.45 | 0.25 | 0.45 |

Table A-3: Run 3 - Terrain Options

No differences observed in making changes in terrain treatments as recommended by Mr. Hoffnagle:

| SITE | ORIG LEAD RESULTS 2008 MODELED | ORIG LEAD RESULTS 2008 MEASURED | NEW LEAD RESULTS 2008 MODELED | NEW LEAD RESULTS 2008 MEASURED |
|---|---|---|---|---|
| INCA | 1.45 | 1.14 | 1.55 | 1.14 |
| CUSH | - | - | - | - |
| HUAN | 3.17 | 9.51 | 3.17 | 9.51 |
| CASA | 0.10 | 0.26 | 0.10 | 0.26 |
| MARC | 0.30 | 0.73 | 0.30 | 0.73 |
| HUAR | 0.10 | 1.00 | 0.10 | 1.00 |
| SIND | 6.80 | 1.61 | 6.80 | 1.61 |
| HUAY | 0.13 | 0.51 | 0.13 | 0.51 |

| SITE | ORIG $SO_2$ RESULTS 2008 MODELED | ORIG $SO_2$ RESULTS 2008 MEASURED | NEW $SO_2$ RESULTS 2008 MODELED | NEW $SO_2$ RESULTS 2008 MEASURED |
|---|---|---|---|---|
| INCA | 7,416 | 14,743 | 7,416 | 14,743 |
| CUSH | - | - | - | - |
| HUAN | 8,557 | 23,951 | 8,557 | 23,951 |
| CASA | 1,215 | 3,938 | 1,215 | 3,938 |
| MARC | 2,726 | 4,428 | 2,726 | 4,428 |
| HUAR | 985 | 5,053 | 985 | 5,053 |
| SIND | 17,818 | 17,540 | 18,474 | 17,540 |
| HUAY | 1,986 | 2,853 | 2,380 | 2,853 |

Figure A-5: Run 4 - Finer Grid Treatment

Original Lead $PM_{10n}$ (Annual)




Refined Grid Lead $PM_{10}$ (Annual)



Figure A-6: Run 4 - Finer Grid Treatment

Original $SO_2$




Refined Grid Treatment $SO_2$



Table A-4: Finer Grid Resolution

| | **ORIG LEAD RESULTS** | | **NEW LEAD RESULTS** | |
|---|---|---|---|---|
| SITE | 2008 | | 2008 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.45 | 1.14 | 1.64 | 1.14 |
| CUSH | - | - | - | - |
| HUAN | 3.17 | 9.51 | 2.21 | 9.51 |
| CASA | 0.10 | 0.26 | 0.10 | 0.26 |
| MARC | 0.30 | 0.73 | 0.23 | 0.73 |
| HUAR | 0.10 | 1.00 | 0.05 | 1.00 |
| SIND | 6.80 | 1.61 | 11.88 | 1.61 |
| HUAY | 0.13 | 0.51 | 0.11 | 0.51 |

| | **ORIG $SO_2$ RESULTS** | | **NEW $SO_2$ RESULTS** | |
|---|---|---|---|---|
| SITE | 2008 | | 2008 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 7,416 | 14,743 | 9,617 | 14,743 |
| CUSH | - | - | - | - |
| HUAN | 8,557 | 23,951 | 6,865 | 23,951 |
| CASA | 1,215 | 3,938 | 1,069 | 3,938 |
| MARC | 2,726 | 4,428 | 4,282 | 4,428 |
| HUAR | 985 | 5,053 | 418 | 5,053 |
| SIND | 17,818 | 17,540 | 22,915 | 17,540 |
| HUAY | 1,986 | 2,853 | 1,646 | 2,853 |

**Appendix B: Mischaracterization of Surface Roughness Term in Computational Fluid Dynamics Modeling**

Consider Figures B-1 and B-2, which show an aerial a photo of the area around Sindicato and the view towards the smelter, respectively. Figure B-3 present an aerial view showing a range of trajectories from the smelter towards the Sindicato site. Rather than being more like an open fairway as assumed, it is consistent with a city environment with many buildings, and an industrial complex with many obstacles to flows. Refer to Figure B-4 for an example of ~ 0.03 m roughness length.

Figure B-1: Location of Sindicato Relative to a Town Environmental with Many Buildings



Figure B-2: View of DRP Smelter



The airflow from the smelter towards Sindicato is not flowing over smooth natural surfaces as Dr. Libicki has assumed but past an aerodynamically complex smelter with numerous large buildings and then with flow over the structures in La Oroya.

Figure B-3: Aerial View of Trajectories from the Smelter Towards Sindicato




Flow especially from the major sources of the smelter travelled past the large buildings /aerodynamically rough surface of the smelter then over many more structures in the city than simulated in the CFD modeling.

Figure B-4: Example of ~ 0.03 m Surface Roughness Length



The selection of 0.03 meters by Dr. Libicki would apply to "*short grass and moss*." This is obviously incorrect. La Oroya, including the Sindicato site, is best characterized as a city with many buildings. As stated in Ref 165:4, suburbs are listed as 0.40 to 0.70 and a large town as 0.7 to 1.5 m. Other references show similar ranges of roughness lengths as a function of the surface conditions, such as Ref 166:70, that show small towns to large towns to be in the range of 0.6 to 0.9 m. Even if it is assumed that the lower end of the range (0.6 m) is used, the atmospheric inputs to the computation fluid dynamics representation of the wind were erroneous by at least a factor of 20-fold or more. A 0.03 m roughness length would be consistent with surface conditions like cut grass with a height of about an inch. With surface heights as high as present near Sindicato, however, there is a second problem with the CFD analysis, i.e. the "*d*" (displacement term) in the logarithmic wind speed equation: [8]

$$u = \frac{u_*}{0.4} ln\left(\frac{z-d}{z_0}\right)$$

Where:

u = wind speed (m/sec)

z = height about ground level (m)

d = displacement length (m)

$z_0$ = surface roughness length (m)

As shown in Ref 165:9 (the listed basis for Dr. Libicki's computational fluid dynamics analysis) this displacement term becomes important when the obstacle heights (buildings in this case) are relatively high. With 10 m wind monitoring and a nearby buildings heights on the order of at least 20 feet (~ 6 m) the "*d*" term would be on order of at least 6 m * (2/3) = 4 m. While the "*d*" term could be ignored, and usually is, as negligible when over clipped grass (0.03 m), it is significant in this case, and based on Dr. Libicki's documentation there is no evidence that it was considered.

[8] The displacement term (d) is needed because the logarithmic wind profile will not approach zero wind speed at the ground surface, but rather at a height typically about two-thirds of the representative obstacle height.

In short, the atmospheric basis for the computational fluid dynamics analysis is flawed and unrealistic. In addition, the CFD analysis evaluated differences in dilution rates, rather than surface sinks (loss of particulate mass), which was my point for stating the measured particulate data (such and lead and arsenic) as measured at Sindicato were low. This is shown in my modeling and is further supported by the modeling that the Defendants have embraced as reliable, i.e. the MMA modeling, which also shows the measured particulate data at the Sindicato site to be low relatively low for modeling of lead.

In summary, the computational fluid dynamics mischaracterized atmospheric conditions and evaluated differences in dilution, which was not relevant to the matter at hand. The error in representing atmospheric conditions is not a matter of opinion but fact. The surface roughness length that was used in the CFD modeling was incorrect and substantially so.

**Appendix C: Further Technical Discussion of Short-Term Stack Fumigation Versus 5-6 Hour Peak Measured Concentrations in La Oroya**

As Mr. Hoffnagle explained at his deposition, Dr. McVehil was trying to downwash the main stack plume to try to replicate the high measured concentrations near La Oroya between 9:00 AM and 3:00 PM: In layman's terms, the physics can be simplified as follows. During nights with clear skies and light wind speed, the valley would have minimal dilution (inversion / stable atmospheric conditions). If the main stack plume were visible at night, it would look like a thin pencil line with minimal spread vertically or horizontally. When the sun rises the next morning and the ground surface begins to heat (and the walls of the valley) the layer with minimal dilution potential "*burns off*" from the ground and works its way up to the top of the stable layer, which could fill the entire valley and above (e.g. 300-400 m or more). Envision this progression as a vertically moving front, e.g. moving upwards as the morning progresses. The air below this front will have more vigorously mixing conditions. When this layer of vigorous mixing reaches the pencil line main stack plume, these high concentrations will be mixed towards the surface causing short-term, transient peak concentration. This upward progression of a vigorously mixed layer continues until the entire layer of stable (poorly diluting) air is eliminated. Once the modified layer continues to grow above the extent of the plume, this transient condition will cease, and the main stack plume will then be diluted starting at the point of based on the vigorously diluting atmosphere.

In La Oroya, the immediate valley depth is approximately 300 m. Based on Ref 162:9 "*the range of ratios of stable-layer depth to the valley depth is 0.53 to 1.10*." Although the stable layer in La Oroya may have extended above the immediate valley walls, based on this range of ratios, the depth of the stable layer would be on the order of 150 to 330. In other words, in less than 3 to 5 hours after sunrise the surface-based stable layer and any potential for even limited duration stack fumigation would have been eliminated. In other words, sometime prior to 11:00 A..M (and potentially much earlier) the potential for even limited duration fumigation would have been eliminated, but high air quality concentrations continued until 2:00 PM to 3:00 PM on typical afternoons.

Ref 169 is a technical paper authored by Mr. Hoffnagle in 1973. The subject of this paper is inversion breakup, which addresses fumigation issues as discussed above. In fact, Mr. Hoffnagle

referenced this paper during his deposition: *"So I've been dealing - - in 1972 I wrote a paper for a conference at Texas A & M on inversion break-ups. I know what I'm talking about, thank you."* This paper conflicts with Mr. Hoffnagle's acceptance of the MMA modeling with the imaginary building to attempt to create a 5-6 hour fumigation event. As an example, consider Figure C-1 which was extracted from Ref 169:24. As shown, the inversion has been eliminated by 9:45 A.M., which eliminates the potential for subsequent stack fumigation. This figure also is fully consistent with the literature described above but conflicts with the peak concentrations in La Oroya that persist on many days from ~ 9:00 A.M. to ~ 2:00 to 3:00 P.M. These high values are unrelated to fumigation.

Figure C-1: Mr. Hoffnagle's Depiction of Typical Timing of Inversion Breakup

FIGURE 1 - STAGES IN INVERSION BREAKUP




In addition, review of actual field data as shown in Mr. Hoffnagle's paper shows the transient nature of fumigation, which is much shorter than the time required to break-up the full ground-based inversion layer. Refer to Figure C-2.

Figure C-2 Example of Timing and Duration of Stack Fumigation




In valleys and in complicated terrain such as La Oroya there is a much more plausible explanation for the repeatable peak concentrations in La Oroya between 9:00 A.M. and 3:00 P.M. While every valley / terrain situation will respond differently to heating and cooling during the daily cycle, the conditions are very repeatable during periods where local circulation dominates. Such conditions occur when there are not strong regional winds that can overwhelm localized heating/cooling induced flows in mountainous terrain. Mountain meteorology / valley flows have been known since the 1930s-1940s, as demonstrated in the classical work of

Frederich Defant (Ref 164:107-129). As shown in Ref 164:109, upslope winds become strong ~ 9:00 AM and then decrease by late afternoon. All mountain / valley flows are not the same in terms of timing and strength (Ref 167:5), but this type of localized recirculation system adjacent to a major smelter provides a plausible explanation for the empirically observed peak concentrations 9:00 AM to 3:00 PM. The hypothesis of stack fumigation does not.

When the mountain/valley terrain is left to its own devices (when strong regional flow does not exist) it sets up a repeatable cycle. During the nighttime, cooled air along the slopes slide down the mountain / valley walls and creates drainage much like water would do, i.e. the cold air slides down the mountain / valley side wall and then flows downvalley much like a river. In the morning when the sun comes up, the valley walls and valley floor are heated by the sun and the air adjacent to these surfaces begins to heat and rise. This gives way to upslope flows (up the valley walls or up the mountainside) and eventually upvalley flow (the opposite of what occurs at night).

During Mr. Hoffnagle's deposition on January 28, 2020 he testified as follows:

> *"Q Okay. And so your conclusions are that inversion break-up most commonly occurs for a period*
>
> *of about 5 to 6 hours from 8:00 or 9:00 in the morning to 2:00 in the afternoon; right?*
>
> *A Yes, depending upon the terrain, and how hot things get, and how fast the -- how tall the stack is, that's the timing of when it occurs and how long it occurs."*

A total of 5-6 hours of fumigation (associated inversion breakup) at a specific location (such as Sindicato) does not happen in non-coastal settings. It is a transitory event at specific locations. In the morning when the sun heats the valley floor and valley walls, this heating eliminates the poor dilution layer starting from the ground surface initially and then the adjusted (more vigorously diluting air) works its way up to higher elevations above the surface. After the "*front*" passes a vertical level, such as the height where the plume is location, the more vigorous mixing brings the plume more quickly to the surface, thereby creating transitory high concentrations at sufficient distances downwind and for a relatively short period of time. It can be envisioned as a "*front*" that moves up rather quickly until at some point the entire stable layer with poor dilution is eliminated.

According to a technical paper authored by Mr. Hoffnagle (Ref 169:6) and mentioned by him at this deposition, this front moves upward at a rate of 70 to 140 m / hour (i.e. ~ 230 to 460 feet / hour. As an example, the effective stack height of the main stack during nighttime stable conditions is ~ 225 m (based on SCREEN3). At 900 m downwind (the approximate distance to the Sindicato site) the vertical extent of the plume (2 sigma z) would be approximately less than 25-30 m during stable conditions (poor mixing). Using 250 m as an example, and assuming a typical sunrise at 6:00 A.M. for La Oroya, this would mean that the potential for fumigation would be over within the range of 8:00 A.M. to 9:30 A.M. The peak modeled concentrations, however, at Sindicato and Hotel Inca, on the other hand, occur from ~ 9:00 A.M. through 2:00 P.M.to 3:00 P.M. During the peak of sunny days such as 12 noon to 2:00 P.M. the effective plume height based on SCREEN3 during stable conditions could be 500 m or more such that the transport and dispersion of the main stack would be in the regional flow and not channeled towards the Sindicato or Hotel Inca sites by terrain. As shown in Mr. Hoffnagle's rebuttal report (Page 61)[9], the Mount Somi site located at the top of the valley walls has minimal flow towards either Sindicato or Hotel Inca, in fact the flow is dominated by flow towards the East.

For a brief period when the "*front*" reaches the concentrated elevated plume it is relatively quickly dispersed horizontally and vertically including downward towards the ground. When this relatively concentrated plume reaches the ground, it will for a short period of time produced high concentrations. The "*new*" pollution emitted from the tall stack into the more vigorously diluting environment will no longer have the highly concentrated initial plume and concentrations will quickly decrease. As an example, consider the distance from the main stack to Sindicato, which is about 900 m. Even assuming a very low wind speed of 1 m/sec the time it would take to clear out the remnants of the concentrated plume would be 900 seconds, i.e. 15 minutes. It is not physically possible for this transitory condition to persist for 5-6 hours in La Oroya.[10]

---

[9] Although Mr. Hoffnagle is only showing wind rose data representative of the month of April, Ref 102:14 shows a similar result for Mt. Somi.

[10] There is a special case situation for a tall stack near a shoreline where this condition known as stack fumigation can persist for multiple hours, but obviously this special case does not apply in La Oroya that is more than 12,000 feet above sea level.

The peer reviewed literature and authoritative sources conflict with Mr. Hoffnagle's assertion that stack fumigation caused the high concentrations for 5-6 hours in La Oroya:

- *" For the inversion break-up case, the concentration can be expected to persist for about 30 to 90 minutes*" (Ref 160:58; U.S. EPA *guidance document*).
- "*The peak of the surface concentration occurred at 0720 LST, about 6 km from the stack, followed by only a slight reduction with distance. The duration of the fumigation peak was about 600s* (10 minutes) (Ref 161:5; peer-reviewed technical paper on inversion breakup fumigation).
- After sunrise, the typical duration of a stable layer is approximately 3.5 to 5 hours (Ref 162:11), with stack fumigation at any particular height (including the main stack at the DRP facility) being a small fraction of this time, e.g. ≤ 1 hour. Sunrise in La Oroya typically occurs approximately 6:00 AM. This means by 11:00 AM the entire stable layer would be expected to be eliminated and there would be no potential for any fumigation. The high values at Sindicato and Hotel Inca, on the other hand, typically persistent until 2:00 PM to 3:00 PM.

In addition to his statements being in conflict with timing considerations, the high concentrations observed at Sindicato and Hotel Inca during the mid-day period of 9:00 AM to 3:00 PM occur much closer to the sources at the smelter than the expected maximum touchdown distance for a stack with a 167 m height of release plus rise that produces effective heights of 225 m or higher above the surface. For example, Sindicato is about 900 m from the main stack at the smelter. The distance to maximum touchdown of the plume during fumigation would be much further (Ref 160:57). Neither the extended duration of the peak values nor the distances involve support the theory that fumigation of the main stack is causing the extreme air quality degradation measured at the Sindicato and Hotel Inca monitoring sites.

MMA's inclusion of a massive building to attempt to replicate an incorrect hypothesis (assuming that the fumigation of the main stack was causing the high concentrations 9:00 A.M. to 3:00 P.M.) was then fully accepted and endorsed by Mr. Hoffnagle. His opinions on air concentration and deposition in La Oroya are flawed because the foundation for his opinions are based on modeling that can be conclusively demonstrated to be based on a flawed premise,

followed by novel modeling methods that cannot be supported based on the peer-reviewed literature or by any authoritative source.

Mr. Hoffnagle stated at his deposition: "*this phenomenon also occurred at all the other monitors*." If the phenomenon is plume fumigation from the smelter's main stack, it would not be possible to explain the high concentrations simultaneously occurring at numerous monitors in differing directions from the smelter. Fumigation occurs in the direction the wind is blowing at any given time, i.e. it could not affect Hotel Inca, Sindicato, Huanchan, Cushurampampa and Marcavalle all at the same time.

I have set up long-term meteorological towers and interpreted the data in valleys in the U.S., including setting up and operating a four-tower meteorological monitoring network in the Kanawha Valley of West Virginia (Charleston) and meteorological monitors in the Pittsburgh area near the coke oven operations in Clairton, Pennsylvania. When regional wind flow is light, repeatable patterns are the norm, not the exception. In La Oroya, the norm is that when there is upslope flow mid-morning until midafternoon, there are high concentrations associated with the La Oroya complex. This is not surprising. Upslope flows can create a recirculation flow where after rising, the air then flows back towards the lower terrain and sinks. Such an upslope, recirculation involving wind flow from the smelter towards the upslope terrain in La Oroya occurs during the typical time of the day when peak impacts were routinely observed. Similar flow would be expected near the refinery as well and stations upslope from the refinery emissions, but the refinery emissions are unknown because DRP did not inventory the refinery. The refinery impacts, however, would be expected to be less than from the smelter.

**Appendix D: Dustfall Measurements**

Mr. Hoffnagle is placing a great deal of emphasis on one dustfall measurement that was labelled as "*Sindicato*." As mentioned in greater detail in the text of this rebuttal report, deposition-related measurements, such as soil sampling or the related dustfall measurements in this matter, generally show a decreasing trend with distance from sources but with a great deal of variability.

Figure D-1 shows the portion of the dustfall monitoring network that was in La Oroya Antigua. As a case in point, there are two dustfall samples in the vicinity of Sindicato as shown in Figures D-1 and D-2: 12,513 ppm (see OAPS-06) and 1,730 ppm (see AJPS-03) for lead. These two locations are in close proximity. As shown in Figure D-2, there is approximately a 7-fold difference between these two nearby points. Review of Figure D-2 shows that the 12,513 ppm value that is labelled as "*Sindicato*" is an outlier for lead relative to all other data points, including those closer and further away from the smelter sources. Figure D-3 shows a similar result for arsenic.

In the correlation analysis in my report I averaged the two dustfall samples taken near Sindicato to help smooth the differences in the results. In this rebuttal report I have shown correlation between modeled deposition and measured dustfall with and without the outlier data points for lead and arsenic at the Sindicato site. Mr. Hoffnagle focused exclusively on one outlier data point to attempt to justify his assertion that the highest air quality impacts occurred at the western extreme of La Oroya even though the large sources were located at the opposite side of La Oroya Antigua. Any objective review of Figures D-2 and D-3 leads to the conclusion that reliance on the outlier sample taken at the Sindicato site is not appropriate. It is not standard practice to focus on one outlier sample as the basis for an opinion, rather than to interpret a full data set.

The modeling is showing deposition extending well into the higher terrain in La Oroya as is shown in Figures D-4 and D-5. Absent the one value that is nearly 10 times larger than all the others, the modeled deposition and the measured dustfall are generally consistent with the typical

scatter that is expected. In addition, it is necessary to consider the full set of dustfall measurements including those in the more outlying areas to perform a complete analysis.

Mr. Hoffnagle brought up this issue during his deposition to make the point that the highest air quality impacts would be expected near Sindicato, and, therefore, at locations more removed from the smelter than the residential and commercial areas in La Oroya that are much closer and more aligned with the core plumes from the smelter.

The modeling that Mr. Hoffnagle identified as the most reliable (the MMA modeling) also conflicts with his statement, in fact, more so than the modeling I have conducted. Refer to Appendix A (Run 2: McVehil Emissions and Sources) where I have provided full grid coverage for the McVehil modeling approach. The highest impacts are, as expected and like my modeling, closer to the smelter and substantially further to the East than the Sindicato monitoring site. The McVehil modeling was available to the Defendants when they were refining the monitoring network even though the results provided for my review did not include any locations other than the monitoring sites. The full grid McVehil modeling, on the other hand, shows the same result as my modeling, i.e. when the Defendants added and relocated monitoring they did not place monitors in the areas of La Oroya where the highest impacts would be expected based on the modeling they commissioned.

Figure D-1: Dustfall Sampling Site Locations Within the La Oroya City Area



Figure D-2: Regression analysis of Modeled Annual Arsenic Deposition and Measured Dustfall Concentrations (Including the Sindicato Measured Dustfall Value)




**Regression analysis of Modeled Annual Lead Deposition and Measured Dustfall Concentrations**



Figure D-3: Regression analysis of Modeled Annual Arsenic Deposition and Measured Dustfall Concentrations Without Sindicato Data




**Regression analysis of Modeled Annual Lead Deposition and Measured Dustfall Concentrations Without Sindicato Data**



Figure D-4: Isolines of Modeled Arsenic Community Dust Concentrations (ppm) for 2008 (Scenarios 2.5H) Inserted Into Regression Equation Compared with Measured Dust (ppm) in Yellow



Figure D-5: Isolines of Modeled Lead Community Dust Concentrations (ppm) for 2008 (Scenarios 2.5H) Inserted Into Regression Equation Compared with Measured Dust (ppm) in Yellow



Appendix E: Differences in Buildings in The Vicinity of The Sindicato Monitoring Site 2006 To 2020

5/17/2006




April 11, 2020



# Appendix – Prior Testimony and Fees

Over the past four years my testimony history is as follows:

| Case Name | Year | Location | Trial | Deposition |
|---|---|---|---|---|
| Raymond v. Hostetler, Case No. 2014CV30062, Delta Co. District Court, CO | 2017 | Hotchkiss, CO | y | y |
| Brown et. al., v St. Gobain Performnce Plastics Corp.& Gwenael Busnel 1:16-CV-00242-JL | 2018, 2019 | Merrimack, NH | | y |
| Hermens v. Textile Coated Incorporated No. 216-2017 CV 00524 & 00525 (N.H. Super Ct.) | 2018 | Manchester, NH | | y |
| Bell et. al. v WestRock and West Point Chips Case No. 3:17-cv-00829 (E.D. Va) | 2018 | West Point, VA | | y |
| A.O.A et. al v. Doe Run Resources Corp., Case No. 4:11-CV-44-CDP (E.D. Mo.) | 2019 | La Oroya, Peru | | y |
| U.S. Metals v multiple defendants case No. 2:17-cv-01624-ES-SCM (D.N.J) | 2019 | Carteret, NJ | | y |
| Dole et. al., vs Patrickson et. al., case No. 07-1-0047-01 (GWBC) | 2020 | Rio Frio, Cost Rica | | y |

My hourly rate for litigation matters in 2020 is $222.45 / hour for all work on cases including testimony.