# Exhibit D

# Rebuttal Report to Defendant Reports of March 19, 2021

Prepared by:

David A. Sullivan
Certified Consulting Meteorologist
Sullivan Environmental Consulting, Inc.
1900 Elkin Street, Suite 200
Alexandria, VA 22308



David A. Sullivan

May 28, 2021

# Table of Contents

## Contents


Resume, Rates, and Reliance Materials ........ 5

**1.0 Overview** ........ 5

**2.0 Mr. Hoffnagle** ........ 9

Table 2-1: Report vs. Reliance Arsenic, Lead, and $SO_2$ Monitoring Site Results ........ 15

Table 2-2: Comparison of Lead Concentrations for 2007 ........ 23

Table 2-3: Dr. McVehil's Modeling Results for Lead Before and After Calibration ........ 23

Figure 2-1: McVehil Modeling Before and After Site-By-Site Adjustment (Calibration) To Better Match the Measured Data ........ 24

Table 2-4: Lead Results Comparing New Composite Run to McVehil 0.48 GMMD to 4.0 GMMD ........ 28

Table 2-5: Comparison of Total Emission Rates Between Sullivan and Cheremisinoff ........ 32

**3.0 Dr. Libicki** ........ 35

Table 3-1: Percent Represented by Six Additional Sources Added to the Vornberg (Defendants') Emissions Inventory ........ 38

Table 3-2: Lead to Dust Ratios ........ 39

Figure 3-1: Lead Ore Concentrate Uncontrolled Fugitive Emissions ........ 41

**Figure 3-2: Basis for Dr. Libicki's Arsenic Kitchen Assessment** ........ 46

Figure 3-3: Arsenic Trioxide Production Increases (Ref 93) ........ 47

Table 3-3: Bag House Stack Measurements Based on Ref 199:146 ........ 48

Table 3-4: March 2008 Arsenic Bag House Stack Measurements and Emissions Calculations based on Ref 205 ........ 48

Table 3-5: Comparison of Libicki's Emissions to Sullivan's Emissions for the Arsenic Kitchen's Stack Alone ........ 48

Figure 3-4: Documentation of Fugitive Emissions from the Arsenic Kitchens during 2007 ........ 49

Table 3-6: Summary of Fugitive Source Particle Size Data from AP-42 Background Document (Ref 178:56) ........ 51

Table 3-7: Summary of Fugitive Source Particle Size Data from AP-42 Background Document from East Helena Lead Smelter (Ref 178:61) ........ 51

Table 3-8: 2002 $PM_{10}$ Vornberg to Sullivan Emission Rate Comparison ........ 53

4.0 Dr. Rouhani ........ 54

Table 4-1: Correlation Analysis With and Without Huanchan Site ........ 64

Table 4-2: Lead, Arsenic, and $SO_2$ Measured to Modeled Concentrations ........ 66

Figure 4-1: $SO_2$ Measured to Modeled Comparison for 2007 for All Monitoring Stations ........ 68

Figure 4-2: $SO_2$ Measured to Modeled Comparison for 2007 Excluding the Huanchan Monitoring Station ........ 68

Figure 4-3: Measured vs. Predicted 2007 Daily Lead ........ 69

Figure 4-4: Measured vs. Predicted 2007 Hourly $SO_2$ ........ 70

Figure 4-5: Original to New Lead Results from Dr. Rouhani ........ 71

**5.0 Mr. Connor** ........ 74

Figure 5-1: Expansion of Mr. Conner's Exhibit J Lead Regression Plot Using a Partial Dataset ........ 74

Figure 5-2: Site Map for Dust Fall Samples ........ 77

Table 5-1: Actual Dust Fall Lead Concentrations (mg/kg) for Closest Sites ........ 77

Table 5-2: Measured Arsenic in Outdoor Dust 2007 from All 14 Arsenic Dust Wipe Samples ........ 82

Table 5-3: Modeled to Measurements of the Dust Fall Samples in 2007 ........ 83

Figure 5-3: Conner's Exhibit J Lead Regression Plot Using Incomplete Dataset ........ 84

**Figure 5-4: Lead Regression Plot Using the Full Dust Fall Dataset** ........ 84

Figure 5-5: Conner's Exhibit K Arsenic Regression Plot Using Incomplete Dataset ........ 85

**Figure 5-6: Arsenic Regression Plot Using the Full Dust Fall Dataset** ........ 85

Appendix A: Modeling Results Based on Inputting only the Vornberg Emissions Data to the CALPUFF modeling ........ 86

Table A-1: Comparisons of $PM_{10}$ Model Performance for the Maximum Three-Month Rolling Average for Lead Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 87

Table A-2: Comparisons of $PM_{10}$ Model Performance for Annual Average Arsenic Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 88

Table A-3: Comparisons of Model Performance for the 99th percentile One-Hour Daily Maximum $SO_2$ Concentration Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 89

Figure A-1: Comparisons of $PM_{10}$ Contour Mapping of the Maximum Three-Month Rolling Average for Lead Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 90

Figure A-2: Comparisons of $PM_{10}$ Contour Mapping Annual Average Arsenic Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 91

Figure A-3: Comparisons of the Maximum One-Hour $SO_2$ Concentrations Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007 ........ 91

Appendix B: Comparison of McVehil Results Versus Sullivan December 2020 Results ........ 93

Table B-1: Correction to Table A-2 from Sullivan Rebuttal Report July 2020 ........ 93

Appendix C: Particle Size Distributions ........ 94

Figure C-1: Example of Fugitive Emissions (Ex. 40) Versus Stack Emissions (Ex. 53) ........ 97

Table C-1: AP-42 $PM_{10}$ Example Fugitive Emissions Percentages for Lead and Copper Smelter Sources ........ 99

Table C-2: East Helena Smelter Study $PM_{10}$ Fugitive Emissions Percentages for Lead Smelter Sources ........ 100

Table C-3: Summary of Fugitive Sources Particle Size Distributions ........ 103

Table C-4: Summary of Process versus Fugitives Data and Method of Collection of Particle Size Distribution Data ........ 104

Figure C-1: Comparison of Particle Size Distribution for the East Helena Blast Furnace Building Based on Direct Measurement (microscopy) Versus Indirect Measurement Based on a Cascade Impactor .. 106

Appendix D: Modeled Concentrations (µg/$m^3$) for Plaintiff's Homes and Schools Based on 2007 Modeling of the $PM_{10}$ Lead and Arsenic and $SO_2$ ........ 110

Appendix E: Model Sensitivity to Particle Size Distributions for $PM_{10}$ ........ 112

Figure E-1: Annual Arsenic Concentrations (µg/$m^3$) for Base New Composite Run ........ 113

Figure E-2: Annual Arsenic Concentrations (µg/$m^3$) for New Composite Run with 0.48 GMMD ........ 113

Figure E-3: Annual Arsenic Concentrations (µg/$m^3$) for New Composite Run with 4.0 GMMD ........ 113

Figure E-4: Three-Month Lead Concentrations (µg/$m^3$) for Base New Composite Run ........ 114

Figure E-5: Three-Month Lead Concentrations (µg/$m^3$) for New Composite Run with 0.48 GMMD ... 114

Figure E-6: Three-Month Lead Concentrations (µg/$m^3$) for New Composite Run with 4.0 GMMD ..... 114

Appendix F: Resume of David A. Sullivan, Certified Consulting Meteorologist ........ 115

**Resume, Rates, and Reliance Materials**

My resume is presented in Appendix F. My rate for all work on this matter in 2021 is $250 per hour. My full set of reliance materials for this case are available in electronic format (full files) and will be transferred on this basis.

## 1.0 Overview

The differences of opinion regarding the modeling analysis can be grouped into two categories: (1) model set up issues, and (2) emissions.

In my rebuttal report of July 2020, I showed that although there are differences of opinion between myself and Mr. Hoffnagle on model set-up issues[1], these differences of opinion involve fine points of air quality modeling that do not significantly affect the results.

Dr. Cheremisinoff and I are of the opinion that six additional sources of emissions should be added to the Defendants' emissions data prepared by Mr. Vornberg (Refs 112 and 129) because the Vornberg emissions inventory did not include all of the sources associated with the Defendants' operations. Although the addition of these six sources still does not produce a complete inventory, they do slightly expand the emission coverage.

Dr. Cheremisinoff and I hold the opinion that the Defendants' emissions data should be expanded to show the full range of particle size (i.e., for total suspended particulates (TSP)), as opposed to only addressing the $PM_{10}$ fraction as presented in the Vornberg emissions inventory. TSP includes particles up to 30 µm, which are considered to be sufficiently light to remain suspended in the air to travel well beyond the point of release. $PM_{10}$, on the other hand, is the subset of TSP that is comprised of particulate matter ≤ 10 µm. Actual human exposure to heavy metals include the full range of TSP. If $PM_{10}$ exposures are high, then TSP exposures from smelter operations would be expected to be substantially higher.

---

[1] Such as grid spacing, whether or not the Sindicato meteorological site is included, and specific model options for kinematic effects and similar features in the CALPUFF model.

The Defendants' experts disagree with the foregoing opinions. Mr. Hoffnagle testified that in his opinion, TSP did not apply:

"*Okay. Let me ask this, then: Would you expect lead concentrations from the La Oroya complex for TSP to exceed* $PM_{10}$*? MR. WILL: Object to form. A. No. I don't believe the particles coming out of the fugitive emission sources, except for perhaps the concentrate of fugitive emission. I don't expect them to be greater than 10 microns in size.*" (Hoffnagle Deposition dated 4/19/2021, p. 26)

There is a great deal of published data that conflicts with the above statement (refer to Appendix C). Additionally, Mr. Hoffnagle incorrectly asserted in his Supplemental Report dated 3/19/2021 that there is no basis for my inclusion of six additional sources to Mr. Vornberg's emissions data when performing my modeling analysis. Mr. Hoffnagle claims that I assumed Mr. Vornberg had understated the emissions. See Hoffnagle Supplemental Report dated 3/19/2021, p. 39: "*[Sullivan] starts with the assumption that Mr. Vornberg was understating emissions and thus other sources of fugitive emissions had to be added to the inventory.*"). However, Mr. Hoffnagle misconstrued my consideration of Mr. Vornberg's emissions data as well as the reasoning for my conclusion that it was appropriate to include six additional sources of fugitive emissions. First, I have not taken the position that Mr. Vornberg understated the fugitive emission for the sources he specifically addressed. I accept his inventoried data as the best available. Rather, it is my position that Mr. Vornberg prepared an incomplete inventory of fugitive emission sources. Obvious examples of omitted sources include airborne emissions from haul roads, refinery emissions, and the fact that only 5 of the 33 combustion gas stacks (Ref 96:83) were modeled with emissions at the facility. As a result, both Dr. Cheremisinoff and I determined based on our respective expertise that six additional sources of fugitive emissions should be added to provide more complete coverage. There are many other sources, however, where there are insufficient data to estimate emissions at this time.

Dr. Libicki claims in her rebuttal report: "*Mr. Sullivan failed to correct several of the original errors in Dr. Cheremisinoff's work, even though these errors were identified in my November 2019 report and in my May 2020 deposition. For example, Mr. Sullivan continues to rely on*

*obscure and unvalidated EPA emission factors and uses emission factors for incorrect processes or processes that did not exist at the La Oroya smelter*" (Supplemental Report of Shari Libicki dated 3/19/2021, p. 10). The EPA emission factors that Dr. Cheremisinoff and I used for the various processes are not obscure and are supported with site maps and flow charts. Dr. Libicki's has a difference of opinion regarding the extent of the Vornberg emissions inventory (Refs 129 and 173), but there is no documentation to identify the basis for Mr. Vornberg's inventory other than what is written in the short emails that he produced. Dr. Libicki is speculating on what he may or may not have done. Absent documentation to support the Vornberg emissions inventory, Dr. Libicki is speculating that Mr. Vornberg included sources that he does not list in his inventory. In contrast, Dr. Cheremisinoff and I accepted the Vornberg emissions inventory as written as the best available information for the specific sources identified by Mr. Vornberg. We make no assumptions beyond what Mr. Vornberg has written. There are specific sources that were present at La Oroya that were not addressed by Mr. Vornberg. It is not possible to address all of them, but the following small additional subset was added by Dr. Cheremisinoff and confirmed or modified by me to supplement the work of Mr. Vornberg:

- The Ore Concentrate Handling Sources
- The Copper Reverberatory Furnace
- The Arsenic Plant that includes the Arsenic Kitchens, and the
- Lead Reverberatory Furnace

There are two important considerations that must be taken into account regarding the Defendants' incomplete documentation of emission rates that have lead to differing opinions between myself and the Defendants' experts regarding the emissions inventory: (1) regarding what sources the Vornberg fugitive emissions inventory represents, and (2) what particle size does the Vornberg emissions inventory represent ($PM_{10}$ or TSP). These differences of opinion exist because the Defendants did not produce a complete emissions inventory for the time period

they operated the facility, nor did the Defendants produce documentation describing how Mr. Vornberg computed mass balance[2].

The emissions data produced by Mr. Vornberg appears to have captured the majority of the $PM_{10}$ fugitive emissions. Dr. Cheremisinoff and I only added a small percentage increase to these emissions. This results in relatively small differences in the modeled $PM_{10}$ and $SO_2$ concentrations between my modeling analysis and modeling based directly on the Vornberg emissions data, which I present in Appendix A in response to the Defendants' latest rebuttal comments. The average differences between the 2007 modeling based on my emissions data compared to modeling only the Vornberg emissions data was 16 percent increase for lead, and a 12 percent increase for arsenic. The lead and arsenic concentrations grossly exceed known acceptable levels during the time the Defendants' operated the facility. The average difference between modeling my set of emissions data and the Vornberg inventory for $SO_2$ is 6 percent. For example, the $SO_2$ concentrations (99th percentile of the 1-hour daily maximum), for example, grossly exceeded the U.S. standard of 75 ppb (196 $\mu g/m^3$) by about 100 fold. The lead and arsenic concentrations similarly grossly exceed established standards and guidance. Small differences on the order of 6 to 16 percent should not be the focus of review. Rather the extreme nature of the measured and modeled concentrations should be the subject of concern rather than the ongoing paper trail regarding differences of opinion on issues that have only a minor influence on the final modeled results.

In other words, a lot of documentation and testimony is focused on issues that make little difference to the bottom line exposure assessment. The modeling and emissions issue that have been debated for the past several years are of minor consequence, especially relative to the extreme nature of the concentrations that have been modeled.

The rebuttal reports of Mr. Hoffnagle, Dr. Libicki, Dr. Rouhani, and Mr. Connor dated March 19, 2021 missed the point of my December 1, 2020 emissions and modeling report. In that

---

[2] If documentation were available and provided by the Defendants that describe the basis for the Vornberg emissions inventory, it is likely that there would be agreement on the scope of the Vornberg emissions data. It is the lack of documentation that has led to differences of opinion on the more minor sources we added. In terms of the dominant sources of $PM_{10}$ emissions, however, there is agreement.

report, I simplified the analysis and focused on areas where there was general agreement. This is why I modeled $PM_{10}$ only and selected a later year (2007) when emissions were much lower than the earlier periods. In other words, I gave the Defendants the benefit of the doubt. While I show in this report that I can support the extension of the Defendant's $PM_{10}$ emissions data (up to 10 µm particles) to total suspended particulates TSP (up to 30 µm particles), I modeled $PM_{10}$ data in my December 2020 emissions report that included emissions data that consisted of approximately 90 percent of the $PM_{10}$ emissions sources from the Defendants' emissions data.

In Appendix A, I provide modeling results that are based on the Vornberg $PM_{10}$ data, without any modification (i.e., without adding any additional sources and without expansion to TSP). As discussed in this report, my findings from running the modeled $PM_{10}$ concentrations are quite similar to the results using the Vornberg emission inventory alone. See Tables A-1 through A-3 and Figures A-1 through A-3 in Appendix A.

It is not disputed that during the earlier years of the Defendants' operation of the smelter, there were higher airborne concentrations than reported in the modeling of 2007. Mr. Vornberg in Ref 112:1-2 shows that during the period of 2002 through 2007, emissions of lead were reduced by a factor of two. If I had modeled total suspended particulates for years prior to 2007, the airborne concentrations would have been much higher for metals. Here, modeling the $PM_{10}$ fraction in 2007, one of the lowest projected impacts prior to the closure of the plant, I am showing extremely high airborne concentrations. My modeling analysis is appropriate, based on the best available meteorological data, and EPA regulatory recommended model options. The results of my modeling based on the foregoing factors are reasonably consistent with and usually lower than the measured data. In other words, I focused on areas where there is agreement among the experts and still concluded that there was extreme air quality degradation during the period of, Defendants' operation of the complex.

## 2.0 <u>Mr. Hoffnagle</u>

My rebuttal comments to Mr. Hoffnagle's opinions set forth in his March 19, 2021 report and during his April 19, 2021 deposition are presented in the following material. Mr. Hoffnagle's

opinions are largely based on his misinterpretation or lack of understanding of the facts I relied upon and my conclusions. In addition, Mr. Hoffnagle's opinions are inherently flawed because he relies on novel modeling methodology that he acknowledged would not be accepted in the U.S. by regulatory agencies e.g., "*Model calibration is not accepted by the EPA for the limited purposes of writing a SIP for writing a permit. And "calibration" in that sense means just multiplying or dividing the number in my model by the -- by the size of the measured data. That -- that's not accepted*." (Hoffnagle Deposition dated 4/19/2021, p. 78). Although this quote is not fully correct (EPA does not allow model calibration as clearly stated in its guidance), he is correct in stating that adjusting modeled concentrations to better match measured data is not allowed by the EPA or state regulatory agencies.

Mr. Hoffnagle also considered Dr. McVehil's modeling as reliable even though it included an imaginary building with a volume much larger than any on the planet:

> Q I want to represent to you that, based on
> the BPIP modeling, the width and length of the
> building is about .8 -- .8 miles wide and about
> 1.8 miles long; okay? Does that sound reasonable to
> you with respect to the dimension -- dimensions of
> this building that was used in this modeling rework?
> MR. WILL: Object to form.
> THE WITNESS: No, I have no idea what the
> numbers are. (Deposition January 28, 2020 pages 85-86)

Modelers obviously cannot insert imaginary structures to try to reach a predetermined result, especially a structure of this magnitude.

1. Hoffnagle's Opinion: "*Sullivan has chosen to minimize the differences between his and Dr. Cheremisinoff's emissions and model results by choosing to use 2007 as the modeling comparison year when the differences are the smallest."(Hoffnagle Report March 19, 2021, p. 1)*

**<u>Response</u>**:

**Mr. Hoffnagle's speculation about why I choose 2007 as the modeling year is wrong.** The objective of my December 2020 report was to confirm or refine the emissions and source specifications data produced by Dr. Cheremisinoff. I did not undertake the analysis with the intent to minimize the differences. Instead, I selected 2007 as the modeling year to demonstrate that even near the end of the Defendants' operation of the facility, the air quality impacts remained at extremely elevated levels. The calendar year 2007 also was the latest year inventoried by Mr. Vornberg prior to plant shut down.

2. Hoffnagle's Opinion: "*Sullivan has chosen to minimize the differences during 2007 by limiting the model results provided to the ambient monitor locations. This differs from his original February 17, 2019 report (2019 Original Report), where he used the year 2006 for his presentations of model isopleth maps. This also differs from his June 22, 2020 rebuttal report (2020 Rebuttal Report), where he used the year 2008 for his isopleth maps. Sullivan never explains why he changes the years of comparison in this confusing manner."(Hoffnagle Report March 19, 2021, p. 1)*

**<u>Response</u>**:

**Mr. Hoffnagle misrepresents the findings in my December 2020 and June 22, 2002 reports. I do show contour mapping as well as comparisons of modeled and measured data at the monitoring sites.** In my December 2020 report, I presented model performance at ambient monitor locations, and also presented isopleth analyses for the modeling domain for lead, arsenic, and $SO_2$ in Figures E-6 through E-8.

3. Hoffnagle's Opinion: "*In his most recent modeling, Sullivan has chosen to try and limit the differences in his and Cheremisinoff's fugitive air emission estimates by looking only at the particles smaller than 10 microns (commonly referred to as $PM_{10}$). Dr. Cheremisinoff in his prior reports provided air emissions estimates not only for particles smaller than 10 microns but*

*for all particulates (commonly referred to as total suspended particulates or TSP). Sullivan, in his 2019 Original Report, utilized Dr. Cheremisinoff's emissions estimate when conducting air modeling, focusing on particles up to 30 microns in size."(Hoffnagle Report March 19, 2021, pp. 1-2)*

**Response**:

**Mr. Hoffnagle's assertion that I attempted to limit the differences between my fugitive air emission estimates and Dr. Cheremisinoff's by focusing on $PM_{10}$, lacks merit. I modeled $PM_{10}$ because the Vornberg emissions data were specific to $PM_{10}$ and therefore, I accepted Defendants' emission data - - not because I tried to minimize differences with Dr. Cheremisinoff.** As explained at the outset of this report, I have focused on $PM_{10}$ to show that even if I limit the analysis to $PM_{10}$, and do not account for total suspended particulates, that the airborne concentrations are still extremely high. I did not make any attempt to minimize the differences between my emissions assessment and that of Dr. Cheremisinoff. It should be noted that the Defendants measured and modeled $PM_{10}$ because the Peruvian ambient air quality standard they were trying to meet was based on $PM_{10}$. The U.S. standard for lead is based more broadly on total suspended particulates (TSP).

4. Hoffnagle's Opinion: "*Sullivan has not provided complete updated model results for the new emission inventories he has created in his 2020 Supplemental Report. The new modeling, he has done is limited to $PM_{10}$ only rather than his full emission inventory (or even the $PM_{30}$ inventory he modeled in his prior reports). Sullivan's new modeling is also only for the year 2007, and only at the ambient air monitoring locations. He has not provided any updated modeling results of any sort for 2001, 2006, or 2008. Also, he has not presented updated modeling results for any locations other than the ambient air monitor locations for 2007 for $SO_2$, lead, and arsenic. He does also present files for isopleth maps in his reliance materials."(Hoffnagle Report March 19, 2021, p. 2)*

**Response**:

**Mr. Hoffnagle is correct that I have not modeled every year with the updated data, and I have only modeled $PM_{10}$ for the metals in the latest analysis. He incorrectly states that I have only modeled the monitoring locations. The isopleth analyses I have produced address all locations in the modeling domain.** The reasons for my decision to model $PM_{10}$ for the year 2007 are fully described above. Had I modeled the earlier years and had I included total suspended particulates, the modeled concentrations for the metals would have been substantially higher than my findings described in my December 20, 2020 report and this report. This is demonstrated based on the measured air quality data, the Vornberg emissions data (Ref 112), and Mr. Hoffnagle's emission compilation shown in Table 1 in his March 2021 supplemental report showing much higher emission rates for the heavy metals in years prior to 2007.

5. Hoffnagle's Opinions: "*Sullivan has not provided revised emissions or model results for cadmium". (Hoffnagle Report March 19, 2021, p. 2)*

**Response**:

Mr. Hoffnagle is correct that I have not provided modeling results for cadmium but incorrect in stating that I have not provided emissions data for cadmium. The emission rates for cadmium are presented in the "*DRP-Fugitives Spreadsheet*" that was available for his review. I did not evaluate model performance based on cadmium. However, a marked improvement in cadmium model performance is shown based on the updated emissions report of December 1, 2020 as described by Mr. Hoffnagle in his rebuttal report of December 2019. Additional reasons for the improvement in cadmium modeling were explained in my previous rebuttal report (June 22, 2020).

6. Hoffnagle's Opinions: "*Sullivan has not provided the input and output files for the model run to support the results in his tables. The modeling file CALPUFF-NEW-COMPOSITE.INP, which is a CALPUFF model input file, was provided as part of his reliance material for his 2020 Supplemental Report. I have run this file and do not obtain the same results as Sullivan presents in his 2020 Supplemental Report (examples are provided in section 4.2 of this report). Stated*

*differently, the modeling results stated in Sullivan's 2020 Supplemental Report are not supported by the underlying modeling files which he provided."(Hoffnagle Report March 19, 2021, p. 2)*

**<u>Response</u>**:

**Mr. Hoffnagle is incorrect. He had all the files he needed to replicate my analysis. He did not correctly process the results in a manner that would exactly match mine.** Mr. Hoffnagle ran the model input files I provided and attempted to compare my results as shown in the December 2020 emissions report with his. Therefore, he ran the files,, which allowed him to make these comparisons. He testified that the only reason he thought he did not have all of the model input files was that he could not exactly match my final modeling results:

> "*Q. What input files are -- do you claim you're missing? A. The input file that led to the concentrations that Mr. Sullivan reports in his report. Because when I ran CALPUFF-NEW-COMPOSITE, it didn't give me the same answers as Mr. Sullivan presents in his report. So I don't have the input file that he used to develop the concentrations reported in his report.*" (Hoffnagle Deposition dated 4/19/2021, p. 46)

In fact, Mr. Hoffnagle was provided the correct model input files. If he had processed the results to show paired measured and modeled concentrations (i.e., if he compared directly only when there are both measured and modeled concentrations) he could have exactly matched my results. He also did not document in his report the fact that the differences in nearly every case were trivial, e.g., 1 percent or less.

His points of comparison are shown below based on the results shown in my December 2020 report (i.e., referred to as "*report*" below) compared to Mr. Hoffnagle's data processing (i.e., referred to as "*reliance*" below.) Notably, Table 2-1 was extracted from Mr. Hoffnagle's reliance files, but not discussed in his Report, which shows the differences to be minor except for Cushurampampa, where he improperly compared 12 days of measured data with 365 days of modeled concentrations and obviously showed a substantial difference.

**Table 2-1: Report vs. Reliance Arsenic, Lead, and $SO_2$ Monitoring Site Results**

| | Arsenic Annual | | Lead 3 Month Rolling | | $SO_2$ 99th% | |
|---|---|---|---|---|---|---|
| **Monitor** | **Report** | **Reliance** | **Report** | **Reliance** | **Report** | **Reliance** |
| Inca | 0.49 | 0.48 | 1.23 | 1.18 | 9,295 | 9,129 |
| Cushurumpampa | NA | 0.21 | NA | 0.12 | 1,871 | 3,650 |
| Huanchan | 0.67 | 0.70 | 2.44 | 2.51 | 8,810 | 8,670 |
| Casaraca | 0.05 | 0.05 | 0.13 | 0.11 | 764 | 754 |
| Marcavalle | 0.14 | 0.14 | 0.37 | 0.32 | 2,651 | 2,643 |
| Huari | 0.08 | 0.07 | 0.18 | 0.18 | 1,109 | 1,108 |
| Sindicato | 1.42 | 1.49 | 4.48 | 4.10 | 18,167 | 18,127 |
| Huay | 0.07 | 0.07 | 0.18 | 0.17 | 1,274 | 1,665 |

There are two primary reasons why Mr. Hoffnagle shows minor differences from my results. The differences are not related to the modeling files, but inconsistencies in Mr. Hoffnagle's processing of these files to produce final results. First, he is comparing the average of all the modeled days with the subset of every third-day metals monitoring. Although every third day of sampling produces approximately 120 samples per year and generally is a reasonable approximation of the days with measured data, he is not comparing the same days. In my analysis, I only used matched data, i.e., I compared the averages of the modeled and measured data limited to the days when both had values, which is what Mr. Hoffnagle needed to do to replicate my values.

The second reason for the differences is that Mr. Hoffnagle used the fourth highest day to represent the 99th percentile of the 1-hour daily maximum for $SO_2$. Given there are 365 days per year, the 99th percentile can be approximated by the 4th highest day, but more precisely is the 3.65th day statistically. I represented the 3.65th day by using the Excel percentile feature that does the extrapolation. The differences between the 4th high and the actual 99th percentile are small, and I agree that using the 4th high is a reasonable approximation, but it will not produce identical results with the 99th percentile..

Similarly, Mr. Hoffnagle incorrectly claims on page 15 of his rebuttal report that there are substantial differences between my latest model runs and my previous modeling results in June 2020. He apparently was referring to sites with minimal impacts from the smelter, e.g., where a difference of ~ 0.1 µg/m$^3$ produced a large percentage difference because the concentrations

were approaching background. In fact, a difference of 1/10th of a microgram / $m^3$ is not a large difference - - just a relatively large percentage difference among relatively small numbers. Mr. Hoffnagle stated that my position was that the new modeling results were within 10 percent of the previous results, but my statements were addressing the differences in emission rates - - not concentrations.

7. Hoffnagle's Opinions: "*Dr. Ryer-Powder has not revised for her analysis of arsenic health effects to plaintiffs based on the new air emission estimates or related modeling from Sullivan. Tables similar to Appendix D of Sullivan's 2019 Original Report which Dr. Ryer-Powder used were not found in the reliance material provided. As was true originally, Dr. MacIntosh does not use Sullivan's lead modeling results (old or new) in his analysis. In his December 2020 Supplemental Report, Sullivan does not present modeled concentrations for any constituent based on his emissions inventory to which the plaintiffs were exposed and thus cannot testify to their exposure."(Hoffnagle Report March 19, 2021, p. 3)*

**Response**:

**Mr. Hoffnagle incorrectly stated that I did not present modeled concentrations based on the updated emissions data.** I provided isopleth maps in my December 2020 emissions report that can be used by other experts to identify the modeled $PM_{10}$ concentration for the plaintiff homes and schools for 2007 and any other location within the modeling domain. Earlier years would be higher, and if TSP were to be modeled, the concentrations would be even higher. On this basis, there are sufficient data to describe exposures anywhere within the modeling domain. In response to this point, however, in Appendix D of this report, I provided the $PM_{10}$ 2007 results and $SO_2$ modeled concentrations at plaintiffs' homes and schools specific to the 2.5 H scenario.

8. Hoffnagle's Opinions: "*Sullivan has provided further analysis of building fugitive emission conditions and yet he still chooses not to use the temperature release data to change his conclusions about release height and continues to model them incorrectly as he did before." (Hoffnagle Report March 19, 2021, p. 3)*

**Response:**

**Mr. Hoffnagle has stated that I have not changed my approach to account for the plume rise from the fugitive sources.** There is no basis or need to change my approach. As Mr. Hoffnagle is aware, I have empirically shown that buoyant lift is needed for the hot fugitive sources. This is shown in my original expert report and again it is shown in my December 2020 report that the same buoyant lift produced modeling results that are reasonably consistent with the measured data. The model performance review demonstrates this approach is producing results that are appropriate relative to directly measured data collected by the Defendants.

**Rebuttal to additional assertions made by Mr. Hoffnagle:**:

- **Mr. Hoffnagle continues to base his opinions on modeling conducted by Dr. McVehil that is novel and inconsistent with sound modeling practice.** Mr. Hoffnagle reiterated his opinion on Page 65-66 at his April 19, 2021 deposition that the modeling performed by Dr. McVehil best represents modeled concentrations in La Oroya:

  > "*Q. So what is your basis for stating that Dr. McVehil's modeling or measuring $SO_2$ with the building showed improved performance over Mr. Sullivan's December 2020 modeling results? A. That's a -- that's a long stretch. Q. That's your opinion, isn't it, that's stated on page 5 A. That's -- that's my opinion, yes.*"

  Dr. McVehil's modeling is novel, untested, and in violation of standard modeling methodology because: (1) it relied on a massive imaginary building two miles long by one mile wide by over 400 feet tall, and (2) it used calibration factors to adjust modeled results on a site-by-site basis to closely match the measured concentrations at each site. This process results in forcing the modeled data at each site to match the measured data more closely. On this basis, Dr. McVehil's modeling provides no meaningful evidence for this case. Mr. Hoffnagle acknowledged that calibration factors are not allowed in the U.S (refer to Pages 82-83 of his April 19, 2021 deposition):

> "*Q. So it would be okay to utilize model calibration in this case to force a better fit with the measured data? That would be an acceptable practice, in your opinion? A. No, it wouldn't be.*"

He is correct. Calibration factors are not allowed by EPA or state regulatory agencies in the U.S. because they introduce bias at locations beyond the monitoring sites for which the adjustment factors are based on. Mr. Hoffnagle then attempts unconvincingly to separate Dr. McVehil's modeling from the term "*calibration*". He testified as follows on pages 66 and 68 of his April 19, 2021 deposition):

> "*Okay. And in Table 10, is it correct that you're reflecting Mr. McVehil's final report to be after calibration? A. After -- after he made revisions to his model to make it more physically correct – and that's not calibration, but as to make it more physically correct -- he ran the model again, and these are the results compared to measured data that he provided in his final expert -- in his final report, his final modeling.*"

> "*Do you agree with that representation; is that -- is described as Exhibit 4? A. That's the document that I was referring to. Q. Yes. Okay. And these are results after -- well, okay. So these are adjusted results, which is after calibration? A. It's not calibration, but these are adjusted results, yes.*"

The above statements are untrue; Dr. McVehil did indeed calibrate the model results one site at a time. First, calibrating an instrument or a model means that the objective is to match a reference by the use of calibration factors. In this case, the point of reference is the measured data at each monitoring site. Adjusting the model results mathematically, as Dr. McVehil has done, clearly is model calibration. In fact, in Dr. McVehil's report he directly uses the terminology, "*calibration factors*:" (Ref 113:50): "*Calibration factors were developed to adjust the concentration frequency distributions predicted by the model in order to more closely match observations*." It is established that Dr. McVehil calibrated his modeling, which directly conflicts with standard modeling methodology,

and calibration is not allowed in the U.S. Unreliable methodology such as this also should not be relied on in legal matters.

- **Mr. Hoffnagle misstates my report.** On page 19 of Hoffnagle's Supplemental Report dated 3/19/2021, Mr. Hoffnagle states that I did not replicate the McVehil modeling. As stated in my report: "*Note that Appendix A of my original July 2020 rebuttal report shows full-scale modeling results for lead (annual average for 2007) and $SO_2$ (2006) based on inputting Dr. McVehil's source treatments into the modeling.*" (Sullivan Review of Emissions, p. 9). I never stated that I exactly ran Dr. McVehil's modeling files, which as Mr. Hoffnagle is aware, was not possible because the full set of files (including all the required meteorological data) are not available. Rather, I exactly extracted Dr. McVehil's emission rates, release specifications, and building downwash (except in these runs I did not include the imaginary building, which should not have been used in the first place). I did not use Dr. McVehil's upper air meteorological data because: (1) it is unavailable, (2) the source of the data is unknown and not from the La Oroya area, and (3) superior meteorological data including WRF-generated data are available at this time that were not available to Dr. McVehil. Mr. Hoffnagle acknowledged that WRF data that were available for my modeling of upper air input data are superior to what was available to Dr. McVehil in 2008:

  > "*Q. So do you agree that Mr. Sullivan's use of WRF meteorological data was superior to the available meteorological data used by Dr. McVehil? MR. WILL: Object to form. A. Only in the sense that the upper air data -- that is, where the winds are blowing and how fast they're blowing at the height above -- 2000 feet above the ground in La Oroya -- that that data is superior in terms of using WRF than in terms of the upper air data that Dr. McVehil found and used.*" (Hoffnagle Deposition, 4/21/2021, p. 62).

- **Mr. Hoffnagle correctly pointed out a column of data in one of the tables in my June 22, 2020 rebuttal report was inconsistent with the current results.** On Pages 20-21 of Hoffnagle's Supplemental Report dated 3/19/2021, Mr. Hoffnagle correctly pointed out that the model performance tables in the December 2020 emissions report do not match

those in my July 2020 rebuttal report. The most recent values (December 2020) are correct. I have noted that Table A-2 in the July 2020 rebuttal report extracted incorrect modeled values from the processing spreadsheet. Appendix B, which is attached, corrects this discrepancy.

- **Mr. Hoffnagle is misstating expected model accuracy.** n Table 6 of Mr. Hoffnagle's Supplement Report dated 3/19/2021, Mr. Hoffnagle shows differences between modeled and measured concentrations within typically 50-60 percent. These are within the typical approximate factor of two accuracy objective for long-term model estimates. Ref 268:19 shows that typical relative mean bias is approximately ± 40% and the amount of random scatter is about a factor of two of the mean. In Ref 268, for example, the emissions were isolated to a single source in Salt Lake City at a single (known) emission rate of 2 g/s of the tracer sulfur hexafluoride ($SF_6$ )(Ref 268:20) making the study as simple as possible, which is obviously unlike a lead smelter that has many different sources. Even with this simple application with highly accurate measurements of the tracer $SF_6$ showed 50 percent of the modeled results across all monitors were within a factor of two: "*The fraction of predictions within a factor of two, or FAC2, is slightly less for Model B than for Model A, and is about 0.8 for the arc maximum values and about 0.5 for all monitors* (Ref 268:24)."

- **Mr. Hoffnagle notes that there are some (small) differences in model performance in my December 1, 2020 emissions report.** On Page 18, of his rebuttal report Mr. Hoffnagle notes that in some cases (mostly Sindicato) where the performance has improved more than expected based on the emission changes. This was explained in my December 1, 2020 report in Appendix A.

- **Mr. Hoffnagle is basing his opinions on novel modeling methodology.** Mr. Hoffnagle incorrectly states that when I model using Dr. McVehil's emission treatment the modeling results are better: "*Despite Sullivan's criticism of McVehil's incorporation of the artificial building into his modeling, the run with the artificial building gives better*

*results, i.e., closer to the measured concentrations." (Hoffnagle Supplemental Report March 19, 2021, p. 19)*

Mr. Hoffnagle again states that the imaginary building was used to improve model performance:

> "*So the point that Dr. McVehil was making was that he could reproduce the $SO_2$ concentrations at Huanchán -- Huanchán by -- Huanchán, I'm sorry -- better with the building. And that's what we see happens. The concentrations at Huanchán double because of the influence of the building.*" (Hoffnagle Deposition April 19, 2021, p. 94)

It is not accepted practice that modelers can introduce imaginary structures, especially those of such massive proportions, to try to make a model perform a certain way. See Ref 102:25 where one of Doe Run's contractors in 2012 documented the following in a report to Doe Run Peru: "*Only actual building downwash should be included. The use of the fictitious larger "building" structures should be terminated.*" Mr. Hoffnagle confirmed at his deposition on April 19, 2021 that he was referring to Dr. McVehil's modeling results based on both the imaginary building and the calibrated modeling forced on a site-by-site basis to better match the measured data at each site:

> "*QUESTIONS BY MS. KRAFT: Q. Mr. Hoffnagle, what we're showing on the screen here is Table 6-2 from Mr. McVehil's 2008 report. Is that the table that you used to reflect the information contained in Table 10 of your report for the McVehil final report? A. Yes. Q. And are the predicted concentrations shown in Table 6-2 of Mr. McVehil's 2008 report reliable results? MR. WILL: Object to form. A. Are they reliable? Yes.*" (April 19, 2021 Hoffnagle Deposition, p. 69)

Mr. Hoffnagle believes it is appropriate to insert a massive imaginary building into a modeling analysis and then calibrate the results on a site-by-site basis to closely match measured results. This opinion is not shared or recognized by authoritative sources.

In addition, Dr. McVehil's emission treatments do not produce superior results. Whether I rely on Dr. McVehil's emissions or the emission sources I used (the Vornberg inventory plus six additional emission sources), the results actually are quite similar (without the imaginary building or calibration adjustment factors) and would lead to the same conclusion regarding the severity of the air quality impacts.

My opinion is that three sets of emission treatments lead to the same conclusion (mine, Vornberg only, or the McVehil treatments based on the Vornberg inventory). As shown in Table 2-2 below, however, when I insert Dr. McVehil's source treatments into CALPUFF, in every case the performance was degraded relative to the modeling I have done. In that table, the only difference between the McVehil results and mine are the source treatments. In Table 2-3, on the other hand, I am directly showing the results from Dr. McVehil's report (Ref 113:21) as he modeled (see Column 3) and after he applied a calibration factor to better match each monitoring site (see Column 4). As shown, the only way superior performance is shown was by adjusting (calibrating) the modeling at each site to force a better match with the measured data for each site. There is no need for a model, if the "*model*" is only valid at the sites where the concentrations were directly measured and therefore already known. In effect, the model is forced to approximate the measured data at each site, which is useless for any other location.

**Table 2-2: Comparison of Lead Concentrations for 2007**

| Site | McVehil Ref 113:21 3/07-2/08 | Sullivan 2007 Dec 2020 | Sullivan Modeling of McVehil Source Treatments 2007 Dec 2020 | Measured 2007 |
|---|---|---|---|---|
| Hotel Inca | 1.16 | 1.23 | 0.64 | 1.27 |
| Sindicato | 2.19 | 4.48 | 5.92 | 2.09 |
| Huanchan | 1.96 | 2.44 | 0.96 | 6.47 |
| Marcavalle | 0.53 | 0.37 | 0.17 | 1.03 |
| Hauri | 0.04 | 0.18 | 0.08 | 0.77 |
| Huaynacancha | 0.14 | 0.18 | 0.10 | 0.45 |

The actual comparison for modeling March 2007 through February 2008 is shown in Table 2-3 and Figure 2-1, which are based on Dr. McVehil's report for lead, i.e., with and without the final calibration step that forced the modeled data to match the measured concentrations more closely at each site.

**Table 2-3: Dr. McVehil's Modeling Results for Lead Before and After Calibration**

| Site | Modeled Concentrations Before Calibration (Ref 113:21) | Modeled Concentrations After Calibration (Ref 113:32-34) | Measured 3/2007 – 2/2008 (Ref 113:32-34) |
|---|---|---|---|
| INCA | 1.16 | 0.86 | 0.83 |
| HUAN | 1.96 | 5.71 | 4.84 |
| MARC | 0.53 | 0.56 | 0.52 |
| SIND | 2.19 | 1.25 | 1.04 |

**Figure 2-1: McVehil Modeling Before and After Site-By-Site Adjustment (Calibration) To Better Match the Measured Data**




Mr. Hoffnagle's reliance on Dr. McVehil's modeling directly connects his opinions to two egregious violations of accepted modeling methodology: (1) forcing the model prediction for each monitoring site to approximate the measured concentration at that site (essentially eliminating the need for a model), and (2) relying on a massive building to try to make the modeling more closely match the measured concentrations. As stated in the US EPA Guideline on Air Quality Models (Ref 143:28): "*Model evaluations and inter-comparisons should take these aspects of uncertainty into account. For a regulatory application of a model, the emphasis of model evaluations is generally placed on the highest modeled impacts. Thus, the Cox-Tikvart model evaluation approach, which compares the highest modeled impacts on several timescales, is recommended for comparisons of models and measurements and model inter-comparisons. The approach includes bootstrap techniques to determine the significance of various modeled predictions and increases the robustness of such comparisons when the number of available*

*measurements are limited.* ***Because of the uncertainty in paired modeled and observed concentrations, any attempts at calibration of models based on these comparisons is of questionable benefit and shall not be done*** **(emphasis added)."**

The calibration procedures relied on by Mr. Hoffnagle remove any useful basis for a model if in the end, the modeling is just factored to closely match the measured data at each specific location. Here, there is not a monitoring site located near the homes of the plaintiffs or schools they attend or formerly attended. Rather, modeling is needed to estimate those exposures. Mr. Hoffnagle referred to forcing of the model to match measured data one site at a time as a "*physical adjustment*." Whether it is referred to as a physical adjustment, calibration, or a "*fudge factor*," it does not require expertise in air quality modeling to conclude that such an approach offers no value beyond simply relying on the directly measured concentrations where airborne concentrations are already known.

Furthermore, Mr. Hoffnagle agreed that model calibration is not allowed in the U.S.

> "*Model calibration is not accepted by the EPA for the limited purposes of writing a SIP for writing a permit. And "calibration" in that sense means just multiplying or dividing the number in my model by the -- by the size of the measured data. That -- that's not accepted*." (Hoffnagle Deposition dated 4/19/2021, p. 78)

He is correct. This methodology is not acceptable to the EPA or state regulatory agencies when conducting modeling to show expected concentration fields for supporting a permit, state implementation plans, or other applications. EPA's prohibition against model calibration is when a network of monitoring sites is used for a single calibration procedure. Significantly, Mr. Hoffnagle utilizes an approach that extends a step much further outside the bounds of accepted EPA modeling practice because the predicted (adjusted) model concentrations are adjusted to match each monitoring site separately. This convoluted process in the McVehil adjustment procedure that Mr. Hoffnagle's opinions are based on is novel, not supported by the peer-reviewed literature, and provides misleading information to the court. Mr. Hoffnagle was unable

to point to any authority or recognized industry standard to support his methodology. He testified in his deposition of April 19, 2021 (see Page 93):

> "*Q. You can't point me to any reference or standard that supports inserting an imaginary building into a model to force it to achieve better results? A. We're not forcing it to achieve better results. But, no, I can't point to any regulatory decision.*"

Consequently, Mr. Hoffnagle's methodology is flawed.

- **Mr. Hoffnagle is inappropriately and inaccurately speculating on my motives.** On page 21 of Mr. Hoffnagle's Supplement Report dated 3/19/2021, he states: "*In other words, he is hiding his gross over exaggerations at Sindicato with significant underestimations virtually everywhere else*." However, Mr. Hoffnagle is wrong. There is nothing to hide. Model performance is well within reasonable expectations. It is appropriate to review the results from two perspectives: (1) from the closest sites to the smelter, and (2) from the perspective of the more distant sites.

  There were three monitoring sites in closest proximity to the smelter operations, i.e., Sindicato, Hotel Inca, and Huanchan. At these three closest monitoring sites to La Oroya, the following is found. At Sindicato the model is high by a factor of 2.14, which is not a gross exaggeration. At Huanchan the model is low by a factor of 2.7, and at Hotel Inca, the model is nearly the same as the measured concentrations (modeled as 1.23 $\mu g/m^3$ and the measured as 1.27 $\mu g/m^3$). For the closest sites, therefore, the average model bias is within 20 percent of the measured concentrations. With the exception of heavy metals at Sindicato, the modeling is conservatively representing exposures (understating - - not overstating). At the more distant sites, which involve more complex wind flow through complicated terrain, the modeling results tend to understate the actual measured concentrations. None of the above has anything to do with hiding anything or exaggerating concentrations.

- **Mr. Hoffnagle is misrepresenting my report and incorrectly stating that there are significant changes to the particle size distributions used for the new modeling.** On Page 30 of Mr. Hoffnagle's Supplement Report dated 3/19/2021, he stated: "*Sullivan makes significant changes to the particle size distributions in the emissions inventory he prepared and used in his new modeling compared with those in the Cheremisinoff inventory he used originally*." Mr. Hoffnagle misconstrues the work I performed. First, he appears to be comparing distributions of $PM_{10}$ with TSP ($PM_{30}$), which is not relevant. Second, the differences in results between using a geometric mass mean diameter of 0.48 (shown in Dr. McVehil's modeling files), 1.6 (used for my $PM_{10}$ modeling in my December 2020 report) or 4 µm (value referenced by Mr. Hoffnagle below) is trivial in terms of model performance. Notably, Mr. Hoffnagle testified that he agreed that the differences were so minor for the $PM_{10}$ modeling that he did not include the results in his rebuttal report:

> "*Q. And Dr. McVehil did use a median mass of 4 microns for his PM10 modeling; is that right? A. That's correct. Q. In your opinion, is there a substantial difference between 4 microns and 1.62 microns for fugitive emissions? MR. WILL: Object to form. Vague. A. The only way you can figure that out is to run the models with two different particle size distributions. Run the model with the two different particle size distributions. I did that, and there's not much difference. So, in fact, I didn't even report it. But there's not much difference between McVehil's 4 microns modeling and Sullivan's 2020 modeling with two particle sizes less than 4.*" (Hoffnagle Deposition dated 4/19/2021 at p. 104)

See Appendix E of this report for examples of modeling based on the $PM_{10}$ geometric mass mean diameter compared within the range 0.48 µm and 4 µm used geometric mass mean diameter values used by Dr. McVehil. Whether 0.48 µm, 4 µm, or values in between, the differences for $PM_{10}$ modeling are trivial. These small differences in the geometric mass mean diameter within the $PM_{10}$ range makes little difference in the modeling results. Table 2-4 below shows the comparison for lead. Refer to Appendix E

of this report for the details that show the differences in modeled results based on these differences in particle sizes are slight.

**Table 2-4: Lead Results Comparing New Composite Run to McVehil 0.48 GMMD to 4.0 GMMD**

| UTM-X | UTM-Y | NEW COMPOSITE | MCVEHILL- 0.48 GMMD | MCVEHILL- 4.0 GMMD | |
|---|---|---|---|---|---|
| 400.687 | 8726.178 | 1.19 | 1.23 | 1.09 | INCA |
| 399.778 | 8724.919 | 0.51 | 0.55 | 0.45 | CUSH |
| 403.240 | 8724.176 | 2.57 | 2.66 | 2.41 | HUAN |
| 395.830 | 8733.212 | 0.11 | 0.12 | 0.10 | CASA |
| 398.578 | 8723.916 | 0.32 | 0.36 | 0.27 | MARC |
| 408.880 | 8712.696 | 0.18 | 0.21 | 0.13 | HUAR |
| 401.312 | 8725.800 | 3.53 | 3.60 | 3.36 | SOMI |
| 401.816 | 8726.147 | 4.59 | 4.62 | 4.49 | FUND |
| 396.078 | 8730.359 | 0.14 | 0.15 | 0.12 | VADO |
| 401.628 | 8726.322 | 4.11 | 4.14 | 4.02 | SIND |
| 395.472 | 8719.722 | 0.17 | 0.18 | 0.14 | HUAY |

- **Mr. Hoffnagle correctly states that I did not model deposition in my latest modeling analysis.** (See Hoffnagle March 19, 2021 report at pp. 34-35). However, the model runs were not applicable to deposition since I ran $PM_{10}$ in these examples. I ran deposition in my expert report dated February 17, 2019. The differences in emission rates and particle size between my expert report (based on Dr. Cheremisinoff) and my December 1, 2020 report (based on my emission treatments) are relatively minor such that the original results provide reasonable documentation that higher deposition occurred in La Oroya than in the more distant locations.

- **Mr. Hoffnagle's deposition testimony regarding $PM_{10}$ emissions versus TSP impacts is incorrect and lacks support.** Mr. Hoffnagle testified during his April 19, 2021 deposition at p. 26:

*"Q. Okay. Let me ask this, then: Would you expect lead concentrations from the La Oroya complex for TSP to exceed $PM_{10}$? MR. WILL: Object to form. A. No. I don't believe the particles coming out of the fugitive emission sources, except for perhaps the*

*concentrate of fugitive emissions, I don't expect them to be greater than 10 microns in size."*

He misstated the nature of fugitive emissions from smelter operations by stating that they were all $PM_{10}$. See Appendix C of this report for extensive EPA literature on particle size distributions for fugitive emissions that shows the distributions are generally dominated by particles greater than 10 µm for fugitive emissions.

Mr. Hoffnagle testified that in some cases accounting for $PM_{10}$ fraction only could produce higher concentrations than the full distribution:

*"Q. Would modeling $PM_{10}$ emissions produce lower-modeled concentrations than TSP? A. Sometimes yes and sometimes no. Q. Okay. Could you explain that? A. It depends upon the height of the release and the distance to the receptor or the monitor whether the concentrations go up and down when you change from total suspended particulate to $PM_{10}$. If the emission rates are different, you have different emission rates for $PM_{10}$ and TSP. And the changes can be different depending upon the distance and the height of the release. Q. So in what types of situations would $PM_{10}$ emissions produce higher concentrations than TSP? A. At -- if there were more $PM_{10}$ emissions than TSP, then the $PM_{10}$ emissions would create higher concentrations at further distances from the -- from the source."*(Hoffnagle Deposition dated 4/19/2021, pp. 28-29).

The above testimony is obviously incorrect. For any given source there is a distribution of particles ranging from small particles less than 10 µm to particles up to 30 µm and beyond. Particles less than 10 µm are a subset of the total particles less than 30 µm. It is not mathematically possible for modeled concentrations from the $PM_{10}$ fraction to be greater than the total up to 30 µm. For controlled stack sources at smelters, it is common that $PM_{10}$ approximately equals to TSP (particles up to 30 µm), but under no circumstances can a part be greater than the whole.

- **Mr. Hoffnagle misread or misrepresented my report of December 2020.** Mr. Hoffnagle testified on pages 29-30 in his deposition of April 19, 2021 that my $PM_{10}$ modeled concentrations were higher than the TSP concentrations I previously modeled:

> "*A.-- of my supplemental report, it shows that at Inca, Huanchán, Casaracra, Marcavalle, Huari and Huay, the concentrations go up for Sullivan's new emission inventory, as compared to the original report.· So at all stations except Sindicato, the concentrations go up when he changed from TSP to $PM_{10}$.*"

Mr. Hoffnagle is incorrect. The only modeled TSP concentrations I have produced were in my expert report: Air Quality & Meteorological Analysis of the Doe Run Peru Smelter and Refinery Operations in the Vicinity of La Oroya, Peru dated February 17, 2019. In my rebuttal report dated June 22, 2020 and my subsequent report dated December 1, 2020, I modeled $PM_{10}$. Comparing concentrations with the current results show that the TSP modeling for lead and arsenic was substantially higher than for the $PM_{10}$ fraction, e.g., for example typically about two times higher. The latest $PM_{10}$ modeling and original $PM_{10}$ modeling, however, have generally similar results.

- **Mr. Hoffnagle misrepresented my testimony below.** Mr. Hoffnagle is incorrect in claiming that I stated that the modeled concentrations in my December 2020 report were within 10 percent of the modeled concentrations in my earlier report (presumably he was referring to my July 2020 rebuttal report). See Mr. Hoffnagle Deposition dated 4/19/ 2021 at pp. 37-38) that:

> "*Q. But again, you're doing a comparison based on air concentration, and what he describes in his report is based on emission rates, which is two different things, right? MR. WILL: Object to form. Mischaracterizes his report. A. His report and his deposition say that the concentration differences are less than 10 percent, as well as the emissions differences are less than 10 percent, neither of which are true.*"

In contrast to Mr. Hoffnagle's claim, I clearly testified during my January 19, 2021 deposition, that I was referring to emission rates.

> *"So in both cases we showed in about 90 percent or so of the impacts were directly based upon the Defendant's data, the Vornberg dataset, the stack data that was based upon the Defendant's data, and the additional sources that Dr. Cheremisinoff added, and we ultimately refined as well, added about 10 percent. A very small difference.*" (David Sullivan's Deposition 1/19/21, p. 13)

> "*So it's pretty much Defendants' data with minor 10 percent tweaks that myself and Dr. Cheremisinoff have added".* (David Sullivan's Deposition 1/19/21, p. 72)

The emission rates that I developed are not generally much different from those computed by Dr. Cheremisinoff. See Sullivan Expert Report dated December 1, 2020 Tables E-1 through E-4, which reflect that the differences in the emission rates are generally less than 10 percent. Table 2-5 shows the differences between my results as documented in my December 1, 2020 emission report and those of Dr. Cheremisinoff by year and pollutant.

**Table 2-5: Comparison of Total Emission Rates Between Sullivan and Cheremisinoff**

| Pollutant | 2001 | | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| | Cheremisinoff | Sullivan | Cheremisinoff | Sullivan | Cheremisinoff | Sullivan | Cheremisinoff | Sullivan |
| Lead | 409.0 | 433.9 | 331.0 | 383.0 | 145.5 | 154.6 | 137.4 | 146.6 |
| Arsenic | 181.3 | 135.7 | 239.1 | 111.2 | 77.9 | 77.0 | 72.6 | 72.1 |
| $SO_2$ | 36,197 | 72,984 | 34,028 | 34,028 | 32,122 | 32,122 | 29,637 | 29,637 |

When considering the terms of the severity of the air quality exposures impacts such differences are minor.in terms of the overall emissions.

- **Mr. Hoffnagle misrepresented EPA's position on expected model accuracy**. Mr. Hoffnagle repeats the incorrect statement in his testimony on page 40 of his April 19, 2021 deposition that for seasonal and annual averaging times, the modeled concentrations should be within 10 to 40 percent:

> "*Q. And is the basis for your conclusion that for annual averages and for 3-month average concentrations, the model results should be within 10 to 40 percent of the measured values? A. Well, that was a conclusion that EPA came to in the -- in the early 2000s and put in the 2005 guideline, but it's a -- it's a conclusion that says that long-term average – the model is better at doing long-term averages than short-term averages.*"

This statement mischaracterizes EPA's position, which is clearly stated in the EPA Guideline on Air Quality Models (Ref 143:28): "*Errors of 5 to 10 degrees in the measured wind direction can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location. Such uncertainties do not indicate that an estimated concentration does not occur, only that the precise time and locations are in doubt. Composite errors in highest estimated concentrations of 10 to 40 percent are found to be typical. However, estimates of concentrations paired in time and space with observed concentrations are less certain*."

First, EPA is referring to tracer studies where the emission rates for an isolated source are known (measured). The EPA is acknowledging that because of uncertainties in wind direction and other factors that the model cannot estimate with great accuracy concentration at a specific time and at a specific place. The EPA concluded that the modeling somewhere and at some time would be expected to show peak concentrations within 10 to 40 percent, but this does not refer to specific locations or monitoring sites.

In my experience, long-term averages with well-characterized emission rates are often within +/- 50 percent on average of the measured concentrations (not all sites in a monitoring network). Here, it is unrealistic to expect modeled concentrations to be within 10-40 percent for the La Oroya metallurgical complex that has estimated (not measured) emissions and impacts dominated by numerous fugitive sources and many stacks in complex terrain.

- **Mr. Hoffnagle misrepresented the differences between my December 2020 report and my expert report of February 2019.** Mr. Hoffnagle inappropriately compared PM10 modeling in my December 2020 report with TSP modeling in my February 2019 report. Mr. Hoffnagle misrepresented the results of the modeling in my December 1, 2020 report as compared to my expert report of February 17, 2019 when he stated the following at his 4/19/21 deposition on page 50):

> "*Q. And what were your conclusions? A. That the concentrations in La Oroya Antigua at the locations of the plaintiffs' residences and at the locations of the*

> *deposition are much, much, much smaller than the concentrations in -- air concentrations and depositions from the original report."*

Mr. Hoffnagle may be comparing modeling of TSP from my expert report dated February 17, 2019 with $PM_{10}$ modeling in the more recent report from December 1, 2020. It would be expected that the TSP modeling would be higher. Refer to my expert report from February 17, 2019 Tables D-41, for example, and compare the 2.5 H modeling scenario for $PM_{10}$ with the current $PM_{10}$ results for the plaintiffs homes and schools as shown in Appendix D. Lead and SO2 show similar results. The results for lead and SO2 are similar. Arsenic is lower as explained in Appendix A of my December 1, 2020 emissions report. The results generally are not "*much, much, much smaller.*"

- **Mr. Hoffnagle stated that in his opinion that Mr. Vornberg's emissions data were the most appropriate for modeling purposes** (Hoffnagle Deposition of 4/19/21, p. 83):

> "*Q. Okay. So is it your opinion that the modeling results in this case should be based only on Dan Vornberg's emission rates, without any modification? A. Yes.*"

Similarly, he testified:

> "*Q. Mr. Hoffnagle, I understand that it's your opinion that Dr. McVehil's emission rates, as provided by Dan Vornberg, without any modification, is the appropriate emissions data to use in performing modeling of the La Oroya complex. Is that a correct statement? A. It's correct for the years that they did the evaluation, yes."* (Hoffnagle Deposition dated 4/19/2021 at p. 106).

As I show in Appendix A of this Report, modeling results based only on the Vornberg emissions (without any additional emission sources and without extending the distributions up to TSP) produced modeled impacts similar to the $PM_{10}$ modeling based on my emissions assessment. This appears to be a point that both the Plaintiffs and Defendants should be able to agree on.

**3.0 <u>Dr. Libicki</u>**

Dr. Libicki has glossed over the most critical point for context, i.e., the Defendant and Plaintiffs' experts agree that the Vornberg emission rates account for a substantial majority of the emissions and constitute the best available data for $PM_{10}$-based metals and $SO_2$. It is essential for the finders of fact to understand the "*big picture*" before getting into the details regarding the minor details that are in dispute between the parties with regard to the emissions inventory. Dr. Libicki's discussion of "*mistakes*," which actually are differences of opinion, are limited to: (1) the emissions from the minor sources that Dr. Cheremisinoff and I added that comprise a small fraction of the total emissions, and (2) the extrapolation of Mr. Vornberg's $PM_{10}$ emissions data to total suspended particulates.

As will be noted in her report of March 19, 2021 and the rebuttal that follows, Dr. Libicki and I have differences of opinion regarding emission rates and particle size data. Prior to addressing these differences in detail, some important context is needed.

Actually, we agree on the important and fundamental issues as noted below:

1. Mr. Vornberg's emissions inventory represent the best available data.

2. The Vornberg emissions inventory addressed a large fraction of the emissions.

3. The additional six fugitive sources Dr. Cheremisinoff and I have added are small in magnitude in comparison to the total fugitive emissions in the Vornberg emissions inventory.

One point of clarification is needed regarding the above points. Dr. Libicki's opinion is that the Vornberg emissions data were for total suspended particulates; my opinion based on contemporaneous records is that the Vornberg emissions inventory was for $PM_{10}$. When I model the Vornberg emission rates as written and without modification for $PM_{10}$ modeling, it should be noted that I am modeling the mass emissions directly compiled by Mr. Vornberg. I agree that the Vornberg sources generally comprises about 85 to 90 percent of my total emissions inventory. These are the Defendants' data that both Dr. Libicki and Mr. Hoffnagle agree is the best available dataset.

Dr. Libicki does not agree that the extra sources are needed. Her opinion is that they are already included in the Vornberg emissions inventory (her opinion in her expert report) or are very small (based on her deposition of May 5, 2021). She also does not agree that any scale-up to total suspended particulates is needed. Let's put these issues to the side for the moment and focus on the direct use of the Vornberg data without any additional sources and without any scale-up to TSP, i.e., how would the modeling look if I only modeled based on the points of agreement. Refer to Appendix A where I show the results based directly on the mass emissions data we agree on in comparison to my modeling of all sources for $PM_{10}$. These results are for 2007 when all can agree with the emissions for the metals was much smaller than the earlier years of operation by the Defendants. What is shown is that the modeled concentrations increased a little bit for lead and arsenic and are more similar for $SO_2$ when I include the additional six sources where we disagree. But, even without any scale-up and even if I just directly use the Vornberg emissions data, the results for the $PM_{10}$ fraction alone are extremely high in 2007 and based on the Vornberg emissions inventory, would be about two times higher in 2001, for example. If I were to scale-up to TSP, it is evident based on my expert report of 2019 that the concentrations in La Oroya would approximately double.[3]

It is clear based on the above that this section involving the differences of opinion in interpreting the Vornberg emissions inventory is only addressing the minor points, e.g., 10 percent or so of the emissions. We agree on the rest. This 10 percent, even if zeroed out as I have demonstrated in Appendix A, does not change the conclusions at all, i.e., the air quality degradation in a year (2007) with much lower emissions for heavy metals and just for the $PM_{10}$ fraction shows extreme air quality degradation.

The core reason for the differences of opinion on the minor sources Dr. Cheremisinoff and I have added can all be related to the fact that Mr. Vornberg's emissions inventory has no available documentation. Dr. Libicki is speculating that in spite of the fact that Mr. Vornberg referred to the inventory as $PM_{10}$, and Dr. McVehil then modeled as $PM_{10}$, her opinion is the emissions really are for TSP. As she testified at her deposition of May 5, 2021, she does not know how Mr. Vornberg produced the inventory. There is no documentation. In her opinion, Mr. Vornberg

[3] The differences in the emission rates and particle size distributions between Dr. Cheremisinoff's assessment and mine is sufficiently small that the previous deposition data provides a reasonable approximation.

covered all of the significant sources at this large metallurgical complex. Dr. Cheremisinoff and I have taken the position that we will rely directly on what Mr. Vornberg has stated. He shows emissions for specific sources. I do not assume anything beyond what he has specifically documented these sources to represent. When he provides emissions data for the copper converter, for example, I accept these as emissions should be applied to the copper converter. This is the same as Dr. McVehil did on a contemporaneous basis when the Vornberg emissions data were produced. I do not assume, for example, that the ore concentrate handling emissions are somehow embedded into one of the specific sources in the Vornberg emissions inventory. There is no basis in fact to do this. If Mr. Vornberg did not list the source, I assumed it was not included in the inventory. I added only six relatively small sources on this basis, i.e., those where there was deemed sufficient documentation for a default estimate. It is evident that all sources were not included. There are no emissions data for the refinery, for example, nor are the emission rates from haul roads and many other such sources. This is a reason why the modeling is generally understating exposures. For example, the monitoring sites in the general vicinity of the Defendants' refinery (Marcavalle and Cushurampampa) would be expected to have lower modeled concentrations, and they do, because this key source, the refinery, was never inventoried by the Defendants nor was there sufficient documentation to allow for estimates to be made.

Finally, prior to review of the details for these six minor sources where we disagree, consider Table 3-1, which shows what fraction of the total fugitive emissions comprise the six sources Dr. Cheremisinoff and I have added. The fractions for each year are relatively small, and especially so for the example year 2007 that I have modeled in this report.

**Table 3-1: Percent Represented by Six Additional Sources Added to the Vornberg (Defendants') Emissions Inventory**

| Year | Lead | Arsenic | $SO_2$ |
|---|---|---|---|
| 2001 | 1.8% | 25.8% | 5.0% |
| 2006 | 9.7% | 25.6% | 10.0% |
| 2007 | 12.9% | 5.4% | 10.0% |
| 2008 | 13.3% | 6.4% | 10.0% |

Table 3-1 provides the needed perspective when reviewing the remainder of this section.

**Specific comments follow**:

- **Dr. Libicki noted that there are differences in the metal to total $PM_{10}$ ratios between the handwritten notes from Mr. Vornberg (applicable to ducted emissions) and the default estimate I used for the lead reverb source.** On Page 8, Dr. Libicki refers to Mr. Vornberg's handwritten notes contain metal to TSP ratios for a list of sources (Ref 173:3). Dr. Libicki notes that the lead reverberatory furnace ratio that I used was higher than what is shown in the Vornberg notes (see Table 3-2). That is true; however, this issue affects a very minor portion of the emission rates. The lead reverb furnace, for example, accounts for 2.6 percent of the lead fugitive emissions for 2007. On the other hand, the ratio I used for the copper converter (based on Mr. Vornberg's lead (Ref 129) and $PM_{10}$ (Ref 173) emission rates specific to fugitive emissions was lower than the ratio shown by Mr. Vornberg. This means I calculated lower fugitive emission rates from the copper converter than Vornberg shows in his handwritten notes for ducted emissions. For most of the sources, I used a lead to dust ratios that was identical or nearly identical to Vornberg's handwritten note. For the two sources that deviate, only the lead reverb furnace results in a higher estimation than what Vornberg estimated, and it is notable that this is a small source did not greatly contribute to fugitive lead emissions. For the copper converter, I am relying direction on Mr. Vornberg's lead and $PM_{10}$ emissions for fugitive sources.

**Table 3-2: Lead to Dust Ratios**




| Fugitive Source | Sullivan Vornberg Fugitives | Vornberg Memos Fugitive Pb to $PM_{10}$ Ratios | Vornberg Notes Ducts |
|---|---|---|---|
| | Pb to Dust Ratios | | |
| Sinter Plant | 0.405 | 0.405 | 0.408 |
| Blast Furnace | 0.588 | 0.588 | 0.589 |
| Dross Plant | 0.261 | 0.261 | - |
| Lead Reverberatory Furnace | 0.679 | - | 0.262 |
| Copper Converter | 0.076 | 0.076 | 0.352 |
| Copper Reverberatory Furnace | 0.076 | - | 0.114 |
| Zinc Roaster | 0.020 | 0.020 | 0.020 |

The "*Sullivan*" column is based on Refs 129 and 173 created by Mr. Vornberg for the fugitive emissions except for the Lead and Copper Reverberatory Furnaces. The lead reverb furnace source is a small source that for example in 2007 accounts for 2.6 percent of the total lead emissions. Other years it is in the range of 2.7 to 7.0 percent. There is uncertainty in this source. The Copper Reverberatory Furnace is listed in Vornberg's handwritten notes above as the Oxy Fuel Furnace (confirmed by Refs 191:1, 192:1, and 193:336) is for ducted sources but as

a fugitive source in Refs 129 and 173, which lead to a difference of expert opinions on this source. It is of minor significance in terms of modeled concentrations.

- **Dr. Libick's opinion is that ore handling emissions are small and covered by the Vornberg inventory.** Refer to Page 12: Ore handling vs. ore concentrate handling. While there is a difference of opinion between Dr. Libicki and I regarding these emission rates, the difference in opinion is not significant because these are very small sources. I have made corrections to the emission rate originally used by Dr. Cheremisinoff. For perspective, in 2002 (the example Dr. Libicki is referring to), the total contribution from ore and concentrate handling is 0.64 percent for lead. There is insufficient documentation to support that controls were used for the ore concentrate handling locations because the location called "*Molienda*" in the site maps show that grinding occurred *prior* to transfer to the preparation plant (Refs 191:1 and 192:1). I have relied on Ref 235b:51 for this grinding emissions factor as well as the site maps showing that the location is prior to the conveyers to the Preparation Plant. This emission factor was 0.15 kg/Mg.

  Fugitive emissions from rail car unloading of a typical lead ore concentrate is within the range of 0.015 – 0.2 kg/Mg (Ref 225:426) as shown in Figure 3-1. Using this reference alone, the average emission rate factor would be 0.1075 kg/Mg. To ensure I did not overstate these emissions I relied on the 0.15 kg/Mg as a conservative (tends to understate) composite emission factor. Note that I am not including conveyer or preparation plant emissions and are setting those to zero.

  Dr. Libicki believes that no crushing operations took place at the smelter, but rather was done at the mine: "*The first two sources listed by Dr. Cheremisinoff involve activities that do not take place at the Facility. The process flowcharts for the copper and lead circuits in PAMA report, for example, reflect that the preparation plant at the Facility does not receive ores, only concentrates. In other words, there was no lead and copper "ore mixing and palatalization (crushing)" taking place at the Facility itself. This instead would have taken place at the mine. Dr. Cheremisinoff points to no evidence*

*demonstrating otherwise."* (Libicki Original Rebuttal Report November 26, 2019, p. 45) In fact, documentation at the smelter indicates otherwise (Refs 191 and 192) .

**Figure 3-1: Lead Ore Concentrate Uncontrolled Fugitive Emissions**

| Source of IPFPE | Uncontrolled fugitive emission factor | Emission factor reliability rating | Model plant fugitive emission inventory: Operating parameter, metric tons/year (tons/year) | Model plant fugitive emission inventory: Uncontrolled emissions metric tons/yr (tons/yr) |
|---|---|---|---|---|
| 1. Railroad car and truck unloading | | | | |
| Limestone | 0.015-0.2 kg/Mg unloaded[a] (0.03-0.4 lb/ton unloaded) | E | Limestone unloaded 79,445 (87,390) | 8 (9) |
| Silica sand | 0.015-0.2 kg/Mg unloaded[a] (0.03-0.4 lb/ton unloaded) | E | Silica unloaded 3,500 (3,850) | 0.38 (0.41) |
| Lead ore concentrate | 0.015-0.2 kg/Mg unloaded[a] (0.03-0.4 lb/ton unloaded) | E | Lead ore unloaded 317,782 (349,560) | 34 (37) |
| Iron ore | 0.015-0.2 kg/Mg unloaded[a] (0.03-0.4 lb/ton unloaded) | E | Iron ore unloaded 45,000 (49,500) | 5 (6) |
| Coke | 0.2 kg/Mg unloaded[a] (0.4 lb/ton unloaded) | E | Coke unloaded 94,494 (103,943) | 19 (21) |
| 2. Blast furnace flue dust | | | | |
| 2a. Storage | Negligible[b] | E | - | b |
| 2b. Handling and transfer | Negligible[b] | E | - | b |
| 3. Limestone | | | | |
| 3a. Storage Loading onto pile | $\frac{(0.02)(K_1)(S/1.5)}{(PE/100)^2}$ kg/Mg material loaded onto pile[c] $\left(\frac{(0.04)(K_1)(S/1.5)}{(PE/100)^2}\right.$ lb/ton material loaded onto pile$\left.\right)$ | D | Limestone loaded 79,445 (87,390) | 2 (2) |

Mr. Vornberg did not provide fugitive emission estimates for ore concentrate handling. Dr. Cheremisinoff and I have relied on EPA emission factors as default estimates of at least a portion of these emissions. Dr. Libicki has stated that Mr. Vornberg covered all emissions, but clearly he did not specify the emissions from these sources. At her deposition on 5/5/2021, Dr. Libicki testified that ore/concentrate handling would result in fugitive lead emissions. On pages 83-84 of her deposition transcript, she testified as follows:

> "*Q. Okay. Would you expect that some fugitive lead emissions would occur from the movement of that concentrate from one place in the facility to another? A. I would expect that there would be a potentially very minor amount of fugitive lead emissions, but it's certainly possible.*"

In her initial rebuttal report in 2019 on p. 45, however, Dr. Libicki stated that there was not any processing of the ore concentrate occurring at the plant: "*there was no lead and copper "ore mixing and palatalization (crushing)" taking place at the Facility itself."*

The Lead Ore Concentrate and the Copper Ore Concentrate Sources involved activities such as grinding of the ore concentrate mixed in with silicates that occurred at the smelter as shown in Ref 191:1 and 192:1. "*Molienda*" is the literal translation of grinding. The 1970 report (Ref 123) indicates there are five different processes in the Preparation Plant including two silicate processes but doesn't explain the molienda process from outside of the Preparation Plant near the rail cars transfer locations for the ore concentrates as well as silicates.

The emission rates based on my assessment indeed are minor compared to the other sources, i.e., the fraction of lead emissions for example, from ore handling is ~ eight percent of the total fugitive emissions during 2007. In this sense, I agree it is a relatively minor contributor, but is clearly not zero. Further, Dr. Libicki's testimony above is in conflict with her written testimony that states Mr. Vornberg's inventory addressed all sources at the metallurgical complex as in her second rebuttal report on p. 13:

> Q. "*So it's your opinion that his mass balance inventory successfully captured 100 percent of the lead emissions from the facility? A. Again, it's my opinion that it captured the lead emissions from the facility, 100 percent of them, all of them that were relevant, because it's a mass balance inventory*." (Dr. Libicki's Deposition, p. 82).

Dr. Libicki speculates without evidence that Mr. Vornberg incorporated ore/concentrate handling emissions into the inventory. Where would this be shown? In the copper converter? Slimes plant? There is no basis for this speculation. The fact is that neither Dr. Libicki, Mr. Hoffnagle, Dr. Cheremisinoff nor I have seen any documentation on how the Vornberg inventory was produced. Dr. Libicki's lack of any documentation to support her assertions is shown in the deposition testimony of 5/5/2021 (pages 70-71):

"*Q. Is it reasonable that it would take 6 or 7 years to collect that information? MR. WILL: Object to form. A. Again, I don't know what went into his mass balance. It is possible that data existed earlier; it is possible it didn't. I just don't know. Q. Okay. My question is different than what you're answering, though. In your experience and expertise in creating a mass balance inventory, is it reasonable to think that a facility like La Oroya would take 6 to 7 years to collect the information needed to do that? MR. WILL: Object to form. A. So, again, I reiterate, I don't have full details on how Mr. Vornberg did his estimation. I don't have full insight into the information that went into it. I don't know the answer to what kind of information he needed and whether it was collected.*"

I agree with Dr. Libicki that the basis for the mass balance conducted by Mr. Vornberg to estimate fugitive emissions is unknown and undocumented. There are no details to support assertions of what Mr. Vornberg did. He does not say that his mass balance was circuit wide, for example, such as to cover all fugitive emissions from the lead, copper, or zinc circuits. He certainly does not state that it included all operations at the smelter. It clearly did not include sources such as the refinery or haul roads, i.e., it was not a complete inventory for lead or any other pollutant. Rather, Mr. Vornberg provided estimates for a subset of the sources in these circuits. Any statements that go beyond the

limited, contemporaneous documentation produced by Mr. Vornberg are simply speculation.

- **Dr. Libicki has stated that the ore concentrate handling has controls**. "*More significantly, Mr. Sullivan appears to lack a basic understanding of the operations involved in handling concentrate and where they occur at the site. Had Mr. Sullivan considered that the operations included unloading (from railcars), conveying, mixing, etc., he would have recognized that many of these processes have some type of capture (e.g., conveyor cover and building enclosures), which would result in a certain level of control of fugitive emissions, a fact that Mr. Sullivan ignored*." (Dr. Libicki 2021, p. 9).

  Dr. Libicki provided no details to support further refinement of these emission rates. PAMA tells us, for example, that the emissions were virtually uncontrolled for dust with only a gas washer and not any bag filters in the Preparation Plant for the "*unaltered sulfides*" (Ref 96:123). Certainly not all operations associated with handling of ore concentrates were in controlled operations, e.g., ore unloading.

- **Dr. Libicki's opinion is that the lead reverb and copper reverb emissions were included within other sources in the Vornberg emissions inventory**. Page 7: Section 5.3. Dr. Libicki speculates that the lead reverb and copper reverb process areas were included in the Vornberg emissions inventory and from her original rebuttal report in 2019 on p. 45.

> *"The fourth and fifth sources added by Dr. Cheremisinoff—the lead reverberatory furnace and the copper reverberatory smelting furnace—were already accounted for in the DRP inventory."*

As previously described, there is no documentation to support this position. It is just speculation. Just because two operation areas are located in the same building or in nearby buildings does not mean that the fugitive emissions based on mass balance review were addressed in a composite fashion. Mr. Vornberg did not provide documentation regarding how he specifically conducted the mass balance documented in Refs 112 and 129. He listed emission rates by process area rather than building. I am directly

accepting this information as documented and as the best available. I do not agree with Dr. Libicki's opinion, but as with the other more minor sources I have added to the Vornberg inventory, the contributions are minor relative to the Vornberg emissions. For example, the total contribution to total fugitive emissions from lead from the lead reverb and copper reverb sources combined is only 4.1 percent for 2007.

- **Dr. Libicki disagrees with $SO_2$ Emission Estimates for 2001.** Section 6.3 Starting on Page 9 of Dr. Libicki's Rebuttal report. The $SO_2$ emissions I reference were directly from the PAMA report published in 1997 (Ref 96:84-85). I list these values for completeness but do not have a basis to carry them forward beyond 2001 because the record is incomplete regarding upgrades past 1997. These data suggest that the earlier periods including 1997 may have had substantially higher emission rates and airborne concentrations of $SO_2$ than were measured or modeled for this case. I have not stated that these emissions apply beyond 2001 and only applied the PAMA data from 1998 to the 2001 emission estimates. I acknowledge there is uncertainty in the data between PAMA's 1997 emissions report and 2002 emission estimates; however, Ref 58 shows that the Copper Reverberatory Furnace had documented $SO_2$ emissions during 2002-2007 and the Copper Reverberatory Furnace was not a source Vornberg had considered in Refs 129 and 173 for $SO_2$.

**Dr. Libicki has computed lower emission rates for the arsenic kitchen.** Section 6.4. Starting on Page 11. : Mr. Vornberg did not estimate the emissions of arsenic or lead from the arsenic kitchen operations. Based on the limited available information, I estimated default lead and arsenic emission rates from this source area by using the throughput in the Arsenic Plant based on several sources (Ref 96:100 for 1998 and 2001 emissions, Ref 199:145 for 2004-2008 emissions) which account for changes in the amount of dust going through the Arsenic Plant and for 2007 and 2008 the addition of a bag house at the Arsenic Kitchens location that further reduced emissions. Fugitive emissions more likely than not occurred in the Arsenic Plant. Dr. Libicki discounted those fugitive emissions, but admitted that some of the Arsenic dust did not go to the Main Stack and was emitted as fugitive emissions, but she did not quantify those

emissions. She only quantified emissions from the baghouse stack at the arsenic kitchen based on a stack test in March 2008. The Defendants obviously saw a need to reduce the arsenic and lead emissions from this area based on the fact that they added a baghouse stack in 2007. In addition, the Arsenic Trioxide dust increased dramatically after Doe Run Peru purchased the plant and necessitated the placement of a bag house to contain the fugitive emissions in 2007 (Figures 3-2 and 3-3).

> "*While there may be some minor fugitive emissions as the exhaust from the Arsenic Cottrell is ducted to the Main Stack, the diagram shows that most exhaust emissions from the Arsenic Cottrell are ducted to the Main Stack.*" (Libicki 2021 Supplemental Report, p. 12).

**Figure 3-2: Basis for Dr. Libicki's Arsenic Kitchen Assessment**

PHOTO No. 2.25: Dust collectors (bag house) of Arsenic kitchens



## Figure 3-3: Arsenic Trioxide Production Increases (Ref 93)

| | FY 98 NOV97-OCT98 | FY 99 NOV98-OCT99 | FY 2000 NOV99-OCT00 | FY 2001 NOV00-OCT01 | FY 2002 NOV01-OCT02 | FY 2003 NOV02-OCT03 |
|---|---|---|---|---|---|---|
| kg Arsenic Trioxide (2) | 1,929,010 | 1,635,240 | 2,883,360 | 2,161,632 | 3,161,578 | 4,400,186 |

18-May-21

**(2) Total production of Arsenic Trioxide (Sales +Vado Stock).**

The Arsenic Kitchens source is nevertheless not a major source accounting for 0.7% of the lead and 3.8% of the arsenic produced at the plant in 2007. Arsenic was a more significant source prior to the installation of the bag house. For example, in 2006 16.8 percent of arsenic emissions produced at the plant. The bag house stack characteristics are provided in Table 3-3 and the emissions using the stack test data and characteristics and the equation used to estimate emissions from the stack are provided in Table 3-4.

Dr. Libicki stated in her second rebuttal report that stack test data should be used to determine the emissions for the Arsenic Kitchens stack. Yet that only covers the Arsenic Kitchens stack and doesn't include the amount of dust generated in the entire Arsenic Plant which includes the Arsenic Roaster, Hot Cottrell, Arsenic Kitchens, and any releases from the Arsenic Cottrell area. Dr. Libicki did not provide the calculations she made to derive the lead and arsenic values she estimates but they are similar to my estimates in my December report when using the Arsenic bag house data above in Table 3-5. This is just one example of Dr. Vornberg not addressing all emissions at the facility. Dr. Libicki is showing with her calculations that the Arsenic Stack is releasing lead and arsenic into the atmosphere that was otherwise not accounted for in the mass balance calculations Dr. Vornberg produced.

**Table 3-3: Bag House Stack Measurements Based on Ref 199:146**

| Equipment Specifications | |
|---|---|
| Application | Arsenic Furnace Venting |
| Powder | Arsenic Fume |
| Filtering mean | Teflon over Teflon |
| Number of compartments | 3 |
| Total number of filtering bags | 540 |
| Nº of Bags/Compartment | 180 |
| Nº of Rows/Compartment | 12 |
| Max. Temp for the fabric | 135 ºC |
| Capacity | 20,000 ACFM |
| Bag Diameter | 6.25" |
| Bag Length | 168 inches |
| Total Filtering Surface | 12,370 sq ft |
| Gross Filtering Speed | 2.87 CFM/sq ft |
| Net Filtering Speed | 4.31 CFM/sq ft |
| Interstitial Speed | 205 ft/min |
| Compartment Length | 108 in |
| Compartment Height | 498 in |
| Compartment Width | 128 in |
| Hopper room | 44 in |

**Table 3-4: March 2008 Arsenic Bag House Stack Measurements and Emissions Calculations based on Ref 205**

| Days/Month | $PM_{10}$ (mg/m³) | Stack Velocity (m³/min) | $PM_{10}$ (MT/Month) |
|---|---|---|---|
| 31 | 6.37 | 566.00 | 0.16 |

Monthly $PM_{10}$ (MT) = Measured TSP (mg/m³) x Stack Flow Rate (20,000 ACFM) x 0.0283 m³/min / ACFM x 60 minutes/hour x 24 hours/day x 31 days/month / 1,000,000,000 mg/MT

**Table 3-5: Comparison of Libicki's Emissions to Sullivan's Emissions for the Arsenic Kitchen's Stack Alone**

| Emissions Type | Arsenic Plant Emissions | Sullivan's Arsenic Stack Only | Libicki's Arsenic Stack Only |
|---|---|---|---|
| $PM_{10}$ | 0.70 | 0.16 | 0.16 |
| Lead | 0.07 | 0.02 | 0.01 |
| Arsenic | 0.21 | 0.05 | 0.03 |

When performing a mass balance based upon Ref 236:4 for the various processes from the dust to the Arsenic Cottrell through the Arsenic Roaster and Arsenic Kitchens, the amount remaining

in arsenic equals 0.217 MT/month for 2005. This estimate provides a mass balance estimate that is close to the amount calculated for the Arsenic Kitchens stack in 2007. While there is uncertainty in these values, however, there obviously was an emissions issue for the Arsenic Kitchens to necessitate the creation of a separate stack / baghouse source. It is evident that the Defendants recognized fugitive emissions from the Arsenic Kitchens as shown in the title for Figure 3-4 (Ref 193:264).

Figure 3-4: Documentation of Fugitive Emissions from the Arsenic Kitchens during 2007




- **Dr. Libicki is focusing on published data that are more relevant to controlled stack sources or studies focused on $PM_{10}$ particle size analysis than studies based on fugitive emissions.** Starting on Page 21 of her March 19, 2021 rebuttal report, Dr. Libicki relies on references that are applicable to controlled stack sources or studies showing particle size data based on equivalent aerodynamic diameter (i.e., based on the indirect method involving a Cascade impactor or similar device) instead of field data specific to

fugitive emissions from smelters. There can be large differences between the small particles emitted from a controlled stack versus general fugitive emissions from smelter operations, which often contains much larger particles. Key points to grasp here are as follows:

1. Process emissions from controlled stack sources in smelter melting operations produce fine particles. Uncontrolled fugitive emissions can produce much larger particle size distributions.

2. The EPA AP-42 distributions are based on an instrument (a cascade impactor) that is suitable for (indirectly) estimating particle size for sources dominated by small particles ($PM_{10}$) based on measured weight at different stages of the impactor. When measuring in environments with a substantial fraction of large particles, these instruments have documented bias towards reporting smaller particles distributions.

3. Dr. Libicki and Mr. Hoffnagle are blurring the difference between process (controlled) and fugitive emissions and ignoring the substantial evidence that shows the particle size distribution differences between controlled stacks and fugitive emission rates are in fact large for smelter operations.

The main repository for EPA emission factors (AP-42) is based on process sources for particle size distributions that are often controlled and emitted through stack emissions. There are much more limited particle size data for the fugitives in AP-42 (Ref 183), but what is available for fugitive emissions (Ref 178) shows much larger particle sizes than for stacks, as would be expected. AP-42 (Ref 178) does not cover all of the main sources of fugitive particulate emissions from smelters; however, what it covers have large percentages of particles greater than $PM_{10}$ particle sizes as shown below in Tables 3-6 and 3-7. Other EPA documents and other literature, on the other hand, clearly demonstrate that the Defendants experts' assumption that all smelter emissions are dominated by small particles is inconsistent with the established literature and incorrect. These data clearly conflict with the Defendants' expert reports and deposition testimony.

**Table 3-6: Summary of Fugitive Source Particle Size Data from AP-42 Background Document (Ref 178:56)**

| Fugitive Source | Particulate Matter Emissions (kg/MT Processed) | $PM_{10}$ Emissions | Percent $PM_{10}$ |
|---|---|---|---|
| Crushing Mill | 0.0115 | 0.0042 | 36.5 |
| Blast Furnace Charge Building | 0.0061 | 0.0028 | 45.9 |
| Blast Furnace Feed Floor | 0.0032 | 0.0001 | 3.1 |
| Blast Furnace Tapping Platform | 0.0158 | 0.0028 | 17.7 |

**Table 3-7: Summary of Fugitive Source Particle Size Data from AP-42 Background Document from East Helena Lead Smelter (Ref 178:61)**

| Fugitive Source | Particulate Matter Emissions (kg/hour) | $PM_{10}$ Emissions | Percent $PM_{10}$ |
|---|---|---|---|
| East Helena Sinter Building | 0.34 | 0.01 | 2.9 |
| East Helena Dross Building/Reverberatory Furnace | 1.21 | 0.57 | 47.1 |
| East Helena Blast Furnace Building | 0.056 | 0.01 | 17.9 |

The emissions that require estimation were obviously fugitive, not stack emissions. Stack emissions were all set to $PM_{10}$ in my modeling. The impact from fugitive sources is quite large and of great significance for the exposure assessment. Fugitive emissions are much more significant than stack emissions, as stated by Defendants' own contractors: "*The conclusion is that fugitive lead emissions have approximately eight times the impact of stack emissions*" (Ref 135:2).

- **Dr. Libicki is improperly comparing DRP's $PM_{10}$ emission rates with our TSP emission rates.** Page 24: Table 6-4; Mr. Vornberg referred to $PM_{10}$ emission rates, and Dr. McVehil then modeled the pollutant in his CALPUFF file as $PM_{10}$ and used a $PM_{10}$ size mass geometric mean particle diameter of 4 µm. Dr. Libicki is making an "*apples versus oranges comparison*". With regards to TSP emission rates computed by Dr. Cheremisinoff and mine for calendar year 2001, my overall emission rates are similar to his estimates. As shown in Table 3-8 below for 2002 to compare directly with Vornberg, I am directly using Mr. Vornberg's $PM_{10}$ emissions data for the sources he identified.

**Table 3-8: 2002 $PM_{10}$ Vornberg to Sullivan Emission Rate Comparison**

| Sullivan PM10 | Difference with Vornberg |
|---|---|
| 32.04 | NA |
| 74.00 | 0.00 |
| 284.00 | 0.00 |
| 102.00 | 0.00 |
| 153.00 | 0.00 |
| 7.00 | 0.00 |
| 132.00 | 0.00 |
| 7.00 | 0.00 |
| 34.87 | NA |
| 526.00 | 0.00 |
| 789.00 | 0.00 |
| 42.23 | NA |
| 30.14 | NA |
| 22.19 | NA |
| 500.00 | 0.00 |
| 97.27 | NA |

- Dr. Libicki devotes much of her report (pages 21 through 46) to particle size distribution data. I disagree with her assessment and provide the details in Appendix C regarding particle size distributions. For completeness, the particle size distribution data are appropriate to review and comment on, but as stated at the outset of this report and stated at my latest deposition, I have focused on $PM_{10}$ and a recent year (2007) relative to the shutdown (when impacts for metals were at a relative low point) and accept the Vornberg estimates as the best available (when available) with the intent of seeking agreement on basic facts. If I: (1) accept the Dr. Libicki's position and do not scaling up to TSP, and (2) model a later year (2007) in the Defendants' operation of the CMLO when impacts were low relative to earlier years (as demonstrated directly in the measured metals data and Defendants' emissions data), I am giving the Defendants the best case analysis. However, even this best-case scenario for Defendants using data that clearly understates worst case years and impacts, *the air quality degradation is still severe*. Refer to Appendix A for this example.

## 4.0 Dr. Rouhani

**Overview**: Dr. Rouhani is a statistician who testified at this deposition of April 14th, 2021 that he is not an expert in air quality analysis: "*Q. Well, and you're not an air modeler either; right? A. I'm not.*" (Rouhani Deposition on April 14th, 2021, p. 62) He has created numerous plots in his March 19th, 2021 Supplemental Report to show that when he compares my modeling results with measured data on a day-by-day basis or hour-by-hour basis that the performance is poor. Any experienced and objective air quality modeler could have told him that it would be highly unlikely that any correlation would be shown when constraining an air quality model in time and space (i.e., expecting a high level of correspondence between a modeled and measured data point at a specific location and at a specific time).

As I show in this section, the EPA and the peer-reviewed literature warn against doing the "*fruitless*" analyses that Dr. Rouhani has done. Even for single isolated sources of air pollution where the emission rates are directly measured for each hour of the testing, model performance is not high what constrained in time and space. How could one expect better performance for a large metallurgical complex involving multiple river valleys with hundreds of sources, many of which are not inventoried, and the fugitive sources that are inventoried are estimated rather than measured?

I have not evaluated or presented the modeled data in the form that he has done, but rather present performance based on the resolution used for health assessments in the U.S.: 3 month rolling averages for lead, the annual average for arsenic, and for the 99th percentile of the 1-hour daily maximum $SO_2$ concentration. On this relevant basis for review, the performance of the modeling is well within reasonable expectations as I will show later in this section.

In summary, Dr. Rouhani has produced a rebuttal report based on a limited understanding of air quality that addresses issues that are not relevant to the matter at hand.

**Details**: Models are useful in describing distributions of concentrations or long-term average concentrations but are not capable of pairing in space and time due to inherent uncertainties in wind flow, atmospheric dilution, short-term variability in emission rates, other factors.

In short, he set up statistical tests that were inconsistent with expected model performance for air quality dispersion models. His focus was on model performance paired in time and space. If Dr. Rouhani were an expert in air quality modeling, he would have known *a priori* that these tests were unlikely to show „significant correlation. Long ago EPA guidance documents have stated that even under controlled conditions where a source is isolated and with measured emission rates, it is expecting too much of a dispersion model to be accurate in both time and space:

> *"We* (EPA) *acknowledge the issues and potential challenges associated with conducting field studies for use in model performance evaluations, especially during stable light wind conditions, given the potentially high degree of variability that may exist across the modeling domain and the increased potential for microscale influences on plume transport and dilution. This variability is one of the reasons that we discourage placing too much weight on modeled versus predicted concentrations paired in time and space in model performance evaluations."* (Ref 143:5).

The following excerpt from the EPA Guideline on Air Quality models spells out the reasons why significant correlation would not be expected when pairing modeled and measured concentration in time and space (such as predicting for example, $SO_2$ concentrations at a specific monitoring site for a specific hour or similar for heavy metals for a specific day, rather than on a long-term or distributional basis):

*"Gaussian models determine source impacts at discrete locations (receptors) for each meteorological and emission scenario, and generally attempt to estimate concentrations at specific sites that represent an ensemble average of numerous repetitions of the same ''event.'' Uncertainties in model estimates are driven by this formulation, and as noted in section 2.1.1, evaluations of model accuracy should focus on the reducible uncertainty associated with physics and the formulation of the model. The ''irreducible'' uncertainty associated with Gaussian plume models may be responsible for variation in concentrations of as much as ± 50 percent. ''Reducible'' uncertainties 16 can be on a similar scale. For example, Pasquill estimates that, apart from data input errors, maximum groundlevel concentrations at a given hour for a point source in flat terrain could be in error by 50 percent due to these uncertainties.*

*Errors of 5 to 10 degrees in the measured wind direction can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location. Such uncertainties do not indicate that an estimated concentration does not occur, only that the precise time and locations are in doubt. Composite errors in highest estimated concentrations of 10 to 40 percent are found to be typical. However, estimates of concentrations paired in time and space with observed concentrations are less certain. Model evaluations and inter-comparisons should take these aspects of uncertainty into account. For a regulatory application of a model, the emphasis of model evaluations is generally placed on the highest modeled impacts. Thus, the Cox-Tikvart model evaluation approach, which compares the highest modeled impacts on several timescales, is recommended for comparisons of models and measurements and model inter-comparisons. The approach includes bootstrap techniques to determine the significance of various modeled predictions and increases the robustness of such comparisons when the number of available measurements are limited. Because of the uncertainty in paired modeled and observed concentrations, any attempts at calibration of models based on these comparisons is of questionable benefit and shall not be done"* (Ref 143:28).

Other references caution about the pairing of measured and modeled data in time and space as Dr. Rouhani has done:

- "*Pairing in both time and space is clearly most stringent. Concentration fields often exhibit complex spatial patterns. As Weil et al (1992) point out, because of typical variations in wind direction of 20 to 40 degrees (or more in light winds), predicted plumes often completely fail to overlap observed plumes, even though the magnitudes and patterns may be similar. This difficulty of separating the effects of winds and plume dispersion is a common challenge for model evaluation*." (Ref 268:7)

- *"Moreover, it is typical for short-range dispersion field experiments to have concentration data measured along concentric arcs at several discrete distances from the source, and it is also customary to evaluate model performance based on the maximum concentration or the cross-line integrated concentration along each sampling arc. In this case, the value of R can be deceivingly high, mainly reflecting the fact that concentration*

*decreases with downwind distance, which any reasonable dispersion model will simulate. Therefore, the correlation coefficient is less useful in a typical evaluation exercise for dispersion models."* (Ref 268:8)

- **Dr. Rouhani does not understand the model calibration conflicts with established modeling methodology.** On Page 22 of Dr. Rouhani's deposition transcript of April 14, 2021, he demonstrated that he does not understand model calibration as it applies to modeling in the U.S. I have 46 years of experience in air quality meteorology and have never calibrated a model. Model calibration is not accepted by the U.S. EPA as I have documented in Section 2.0 (rebuttal of Mr. Hoffnagle). Forcing a model to better match at one or more locations can substantially degrade performance at other locations. This is the reason model calibration for air quality models is not allowed by EPA and should not be relied on in litigation.

> "*Q. Does the USEPA advise that model calibration should be done in air modeling? A. I don't believe that they have any broad recommendations about it. However, when data is available, when the -- when the concept is simulation of a historic condition, calibration is always conducted by model makers*."

In fact, EPA does have a recommendation about model calibration, i.e., do not calibrate models. EPA in Ref 143:28 prohibits the use of model calibration (which the Defendants' experts support when they adopt the McVehil modeling as the basis for their opinions). Dr. Rouhani is misinformed on this topic and clearly misspoke.

- **Dr. Rouhani did not conduct any review to determine if the statistical testing he conducted on a paired in time and space basis was appropriate for air quality modeling results.** On Pages 88-89 Of Dr. Rouhani's deposition transcript of April 14, 2021. he admitted that he had not conducted any research to see if the constraints he expected on the modeling (paired in time and space) was a reasonable expectation. If he had done so, he would have realized that he overly constrained the modeling with expectations that were unrealistic.

> *"Q. My question is, can you refer me to any article that has evaluated an air quality model by comparing a measured observation to a modeled observation at a given time and location, and found good performance? Can you cite me to an article that does that? A. I have not looked into it, I was not asked to do it, but it can be done."*

- **Dr. Rouhani was unfamiliar with the term: "*paired in time and space*."** On Page 69 of Dr. Rouhani's deposition transcript, he admitted that he was not familiar with the modeling term of pairing in time and space (it is not a legal definition as he testified). As I have quoted from EPA and other researchers in the preceding pages regarding the rebuttal of Mr. Hoffnagle's March 19, 2021 rebuttal report, air quality models do not demonstrate skill when constrained in time and space. This is common knowledge to experienced air quality modelers.

> *"Q. Okay. That's not a term that you're familiar with? A. I mean, you're a lawyer.· I don't know what you mean by pairing space and time. Q. So that's not a term that you're familiar with at all from air quality monitoring? A. If you show me the reference, then I can tell you what does it mean. Q. I'm not asking you about any particular reference. I'm asking you if you are familiar, in relation to air quality monitoring, with the term "pairing in space and time?" A. I'm not familiar. If you give me the reference, I'll be more than happy to review it and give you my answer."*

- **Dr. Rouhani demonstrated that he was not familiar with the fact that air quality assessments and standards are based on either long-term averages (seasonal or annual) or distributional (percentile) bases for short-term averages (e.g., 1-24 hour averages).** On Pages 72-73 Of Dr. Rouhani's deposition transcript, he demonstrates that he does not understand the fundamental basis for ambient air quality standards designed to protect public health and welfare. All air quality standards in the U.S. for example are regulated on a percentile or long-term basis that does not require demonstration of model

performance paired in time and space as Dr. Rouhani has done in the numerous figures in his report.

> "*Q. Would you agree that when the EPA considers setting standards to protect public health relevant to lead air concentrations, it's not considering daily or hourly averages? A. I believe they do because they – they have to simulate a condition for a sensitive receptor in order to define what should be the daily value, monthly value, so on and so forth.· So I believe that they look at those.· So I'm a bit puzzled by your question. Q. So is it your opinion that the EPA sets daily allowable -- allowable standards for lead in the U.S.? A. I don't know because I have to go and look up. Q. Now, for sulfur dioxide, do you understand the USEPA to set daily or hourly standards? A. I don't know. Q. And for particulate matter, do you have an understanding of whether the EPA sets daily or 1 hourly standards? A. I don't know. I need to go and look up.*"

- **<u>Dr. Rouhani erroneously describes how models are used in regulatory settings.</u>** On Page 78 of Dr. Rouhani's deposition transcript of April 14, 2021 mischaracterizes the use of air quality models in regulatory settings:

> "*Q. And would you agree that, in regulatory settings, air models are not evaluated in space and time, meaning they're not evaluated by pairing up an hourly measurement at a specific location with the modeled measurement at that time and location? A. Regulatory applications are generally intended for the future extreme hypothetical conditions. And -- and for those, you know, then using these specific time periods, and averaging time periods, is appropriate, yes.*"

The U.S. EPA, for example, uses air quality modeling for many purposes, including permitting, state implementation plans where designated areas are modeled for baseline and future control options, and for research purposes to support future regulatory strategies. Measured air quality data are used when available in these circumstances to confirm model performance.

For example, I have collected measured air quality data and conducted urban scale modeling and model performance for the U.S. EPA in Philadelphia, Baltimore, Charleston, West Virginia (Kanawha Valley), St. Louis, Atlanta, and some urban areas in Easter Europe. I compared modeling results with measured concentrations to ground the modeling. I did not pair the data in time and space but reviewed the performance on a longer-term basis. EPA and others use of modeling is clearly not limited to permit-related work projecting emissions into the future.

- **Dr. Rouhani has misrepresented EPA's Guideline on Air Quality Models regarding expected model accuracy.** Refer to Paragraph 19 on Page 7 of Dr. Rouhani's rebuttal report. The actual quotes from EPA guidance are clear that when modeling short-term averages that the modeled concentrations at some location in the modeling domain (such as along a comparable arc of receptors) can be expected to be within 10-40 percent of measured concentrations (assuming that the emissions from an isolated source are well known):

> *"Errors of 5 to 10 degrees in the measured wind direction can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location. Such uncertainties do not indicate that an estimated concentration does not occur, only that the precise time and locations are in doubt. Composite errors in highest estimated concentrations of 10 to 40 percent are found to be typical. However, estimates of concentrations paired in time and space with observed concentrations are less certain (Ref 143:28)."*

> "*The AERMOD modeling system has been extensively evaluated across a wide range of scenarios based on numerous field studies, including tall stacks in flat and complex terrain settings, sources subject to building downwash influences, and low-level nonbuoyant sources. These evaluations included several long-term field studies associated with operating plants as well as several intensive tracer studies. Based on these evaluations, AERMOD has shown consistently good performance, with ''errors'' in predicted versus observed peak concentrations, based on the Robust Highest Concentration (RHC) metric, consistently within the range of 10 to 40 percent (cited in paragraph 4.1(e))* (Ref 143:29)."

Note that when model validation is done, with the inclusion of detailed statistical analysis, that an isolated stack with known emission rates is used as the point of

comparison - - not a complex metallurgical facility with hundreds of release points and located in highly complicated terrain. Any objective review of the actual EPA quotes makes this very clear. On Page 122 of Dr. Rouhani's deposition transcript, he acknowledges this point, which invalidated the numerous plots expecting a high level of performance at specific locations on an hour-by-hour or day-by-day basis.

> "*Q. And the EPA here is only talking about one point, the highest point; right? Not every point in the model? A. Yes, this is -- this is non concurrent measurements, yes.*"

Dr. Rouhani's plots were based on concurrent measured and modeled concentrations.

- **Dr. Rouhani misstated the conclusion of a peer-reviewed paper that explained the problem of pairing of air quality modeling results in time and space.** For example, on Page 142-143 of Dr. Rouhani's deposition transcript of April 14, 2021, an example peer-reviewed technical paper was presented to him that documented that his approach of expecting a high level of model performance when constraining a model in time and space was "*fruitless.*" He acknowledged the statement but then misstated the authors position and concluded incorrectly that expecting a reliable model was fruitless, i.e., he dropped the specific point that the statement applied to - - the pairing of modeled and measured data in time and space as he has done throughout his rebuttal report was "fruitless."

> "*Q. Okay. So we go on in this article by Chang and Hanna, they write that, They – meaning Weil, et al. -- stress that, because of variations in wind direction, it is almost fruitless to attempt to compare predictions and observations paired in space and time. Do you see that? A. Yes. Q. And do you agree here that we're not just talking about regulatory applications? We are talking about all kinds of applications of air modeling. A. The document says what it says. I don't know whether they have included the models that Mr. Sullivan has used. And they may or they may have not, but their statements are clearly stated there. From their*

> *point of view, are fruitless, then it's a very negative thing that basically says that, you know, expecting a reliable air model appears to be, to these authors, a fruitless goal."*

A model is an approximation of actual conditions that is used to approximate air quality concentrations throughout broad areas that cannot be specifically modeled. Models also can be used to project future (or past) air quality levels. Models are routinely used in regulatory, research, and litigation-related applications, and clearly the authors in the above reference were not making the point Dr. Rouhani stated.

- **In spite of the fact that Dr. Rouhani produced many plots (Figures C-1 through C-18 that have multiple plots contained within them) showing modeled versus measured air quality data paired in time and space, Dr. Rouhani has never seen good performance on this basis.** On Page 82-83 Of Dr. Rouhani's deposition transcript, he testified that he had never seen modeling that accurately and reliably predicted hourly or daily air concentrations at specific locations. But, in this matter, he apparently expected an unrealistically high level of performance on an hourly and day-by-day basis.

> "*Q. Do you recall anytime in your career ever concluding that an air quality model could accurately or reliably predict hourly or daily air quality at a particular location? A. I -- I don't recall any case that -- as I told you this day, I have reviewed only a handful of models. Q. Do you recall ever, in any literature you've reviewed, any instance where an air quality model was able to reliably predict air quality at a given location at a specific time? A. The ones that I remember published in reviewed journals, they never presented their results as being reliable on an hourly value. They were, instead, showing the reliability of their model on the basis of some long-term averages. Q. So you agree, then, that you are not aware of any literature that has found an air quality model to be reliable when it is examined in the way that you're examining it in your report by matching specific hourly or daily measurements to the modeled results for that same time and location. A. As I recall that in those published results, they show*

> *the results of concurrent, you know, comparisons, but almost -- most -- now, I'm just sitting here, I'm just relying on my memory, of the ones that I reviewed, the final conclusions were always driven by some sort of a long-term average. But they always showed the results of concurrent comparison just to show people that what is the reliability of their model."*

- **Dr. Rouhani was regressing data on an hour-by-hour and day-by-day basis but was unaware that the fundamental emission time step was on a month-by -month basis.** On Pages 66-67 of his deposition transcript of April 14, 2021, Dr. Rouhani acknowledged that he had not considered the fact that monthly average emission rates were the basis for the modeling. On the other hand, in his comparisons of modeled and measured concentrations he expected to see the model account for hour-by-hour ($SO_2$) and day-by-day for variability for lead and arsenic. He was not aware of the fact that the emissions data were only available on a monthly basis. Dr. Rouhani should have understood the basis for the modeling prior to conducting statistical analysis at such short time scales that were inconsistent with the underlying data.

> "*Q. Are you aware that Mr. Sullivan actually used emissions rates that were averaged over one 1 month intervals for his modeling purposes, not daily or hourly? A. I did not look at his emission rates.*"

I displayed performance relative to measured data to provide a point of perspective - - a reality-check on the model. This was not a model validation of the CALPUFF model. I showed for the averaging times of interest from a health point of view (not based on data paired in time and space) how the model performance for the 3 month rolling averages period relevant for lead, annual average for arsenic, and the 99th percentile of the 1-hour daily maximum for $SO_2$ - - examples of how the air quality standards are designed to work.

As an example, the following is an appropriate correlation analysis matched to the averaging times of interest, including conducting statistical analysis with due consideration for the end use of the data for exposure assessment and site-specific

complexities. As shown in Table 4-1, I have shown the correlation with and without the Huanchan site. For perspective, the Huanchan site is located southeast of the smelter complex in a very narrow river valley and positioned on a small plateau on the hillside. Due to the complexity of this site, Dr. McVehil resorted to using a massive imaginary building to try to improve model performance (Hoffnagle Deposition of April 19th, 2021, p. 65-66). This was not a successful approach, but I agree that this site has complex flows that are not well represented by CALPUFF as configured for this analysis. If there were population in this area, further model optimization could have been attempted, including perhaps refining grid spacing at the expense of domain extent, and other procedures. For this case, however, there are no population affected anywhere near the Huanchan site. As shown in Table 4-1, correlation is much better without this complication.

**Table 4-1: Correlation Analysis With and Without Huanchan Site**

| | With Huanchan | | Without Including Huanchan | |
|---|---|---|---|---|
| Pollutant | R | $R^2$ | R | $R^2$ |
| Lead | 0.53 | 0.29 | 0.93 | 0.87 |
| Arsenic | 0.42 | 0.18 | 0.89 | 0.79 |
| $SO_2$ | 0.72 | 0.52 | 0.96 | 0.93 |

Table 4-1 shows the correlation analysis when dropped the Huanchan monitoring site that had consistent issues with poor correlation with the model. A distinct improvement is seen in the data when not including that monitoring site in the correlation analysis as shown in Table 4-1. It is evident that the Huanchan site is an outlier in this modeling analysis.

Providing this type of context is needed when displaying statistical analysis and conducting statistical tests that are meaningful for modeling analysis (rather than an idealized test that could never successfully be passed). Analysts should understand the

nuances in the data they are analyzing. Dr. Rouhani was simply processing numbers without understanding the context for his analyses.

- **Dr. Rouhani testified that a factor of +/- two represents expected accuracy in dispersion models.** On Page 134 of Dr. Rouhani's deposition transcript of April 14, 2021 he testified that the EPA 2008 guidance stated a target accuracy goal of plus or minus a factor of two. In this modeling for the La Oroya metallurgical complex in my judgment it is more likely than not that the modeling is within approximately a factor of two of actual concentrations or lower, i.e., the modeling generally is understating actual concentrations but can be expected to generally not overstate by more than ~ 2 fold. It also should be noted that when comparing modeled and measured data across a network of sites, the target goal of a factor of two would apply to the average bias. In addition, a factor of two is not a firm bright-line indicator of reliable modeling, but rather an often quoted target goal for average bias.

> "*Q. So you agree, then, that the EPA says you should not expect accuracy within 40 percent if you are pairing in space and time; correct? MR. WILL: Object to form. THE WITNESS: No, it's -- it's saying that -- it says what it says, that it will be even less certain, i.e., more variations. In the 2008 -- QUESTIONS BY MS. WILKINS: Q. i.e., greater -- A. EPA 2008 guidance document identifies that at plus or minus factor of 2.*"

The measured to modeled ratios for lead, arsenic, and $SO_2$ in 2007 are provided in Table 4-2 for using Sullivan's emission sources compared to Vornberg's emissions sources. Either way, the modeling is generally within about a factor of two for the three close-in sites (Hotel Inca, Sindicato, and Huanchan) and more typically understate rather than overstate impacts. These comparisons also are only for the $PM_{10}$ fraction for metals. Considering the above, it is more likely that my model estimates based on 2007 are understating actual concentrations at most locations by a factor of two or more.

## Table 4-2: Lead, Arsenic, and $SO_2$ Measured to Modeled Concentrations

**SULLIVAN LEAD** **VORNBERG ONLY LEAD**

| SITE | 2007 | | 2007 | | SITE |
|---|---|---|---|---|---|
| | MODELED | MEASURED | MODELED | MEASURED | |
| INCA | 1.23 | 1.27 | 0.93 | 1.27 | INCA |
| CUSH | - | - | - | - | CUSH |
| HUAN | 2.44 | 6.47 | 2.16 | 6.47 | HUAN |
| CASA | 0.13 | 0.42 | 0.11 | 0.42 | CASA |
| MARC | 0.37 | 1.03 | 0.33 | 1.03 | MARC |
| HUAR | 0.18 | 0.77 | 0.18 | 0.77 | HUAR |
| SIND | 4.48 | 2.09 | 3.14 | 2.09 | SIND |
| HUAY | 0.18 | 0.45 | 0.15 | 0.45 | HUAY |

**SULLIVAN ARSENIC** **VORNBERG ONLY ARSENIC**

| SITE | 2007 | | 2007 | | SITE |
|---|---|---|---|---|---|
| | MODELED | MEASURED | MODELED | MEASURED | |
| INCA | 0.49 | 0.83 | 0.41 | 0.83 | INCA |
| CUSH | - | - | - | - | CUSH |
| HUAN | 0.67 | 4.01 | 0.58 | 4.01 | HUAN |
| CASA | 0.05 | 0.17 | 0.05 | 0.17 | CASA |
| MARC | 0.14 | 0.42 | 0.13 | 0.42 | MARC |
| HUAR | 0.08 | 0.39 | 0.07 | 0.39 | HUAR |
| SIND | 1.42 | 1.01 | 1.16 | 1.01 | SIND |
| HUAY | 0.07 | 0.18 | 0.06 | 0.18 | HUAY |

**Table 4-2: Lead, Arsenic, and $SO_2$ Measured to Modeled Concentrations (Cont.)**

| | SULLIVAN $SO_2$ RESULTS | | VORNBERG $SO_2$ RESULTS | | |
|---|---|---|---|---|---|
| SITE | 2007 | | 2007 | | SITE |
| | MODELED | MEASURED | MODELED | MEASURED | |
| INCA | 9,295 | 11,552 | 8,075 | 11,552 | INCA |
| CUSH | 1,871 | 3,153 | 1,870 | 3,153 | CUSH |
| HUAN | 8,810 | 27,246 | 7,599 | 27,246 | HUAN |
| CASA | 764 | 1,577 | 754 | 1,577 | CASA |
| MARC | 2,651 | 5,184 | 2,541 | 5,184 | MARC |
| HUAR | 1,109 | 5,513 | 1,099 | 5,513 | HUAR |
| SIND | 18,167 | 16,539 | 15,011 | 16,539 | SIND |
| HUAY | 1,274 | 1,926 | 1,272 | 1,926 | HUAY |

It is evident based on Tables 4-1 and 4-2 that the modeling is reasonably representing reality and is more likely than not to be understating air quality impacts in 2007. Earlier years based on the Defendants' emissions data would be expected to be substantially higher still.

**Figure 4-1: $SO_2$ Measured to Modeled Comparison for 2007 for All Monitoring Stations**

(the red data point is the Huanchan site)




Figure 4-2: $SO_2$ Measured to Modeled Comparison for 2007 Excluding the Huanchan Monitoring Station



As a point of contrast, the following is an example of correlation when the model is constrained to time and space, where Dr. Rouhani is using 2007 lead as an example is (his figure C-3) is shown in Figure 4-3 below.

**Figure 4-3: Measured vs. Predicted 2007 Daily Lead**




An even more egregious example of misapplication of statistics is the regression analyses Dr. Rouhani conducted for $SO_2$ (his Figure C-15), which is shown in Figure 4-4.

**Figure 4-4: Measured vs. Predicted 2007 Hourly $SO_2$**

Figure C-15. Measured vs. Predicted Sullivan-Sullivan 2007 Hourly $SO_2$




- Dr. Rouhani stated on Page 4 of his rebuttal report that my reference to the modeling I did using the McVehil source treatments was "*inaccurate and misleading*. As I stated in my December 1, 2020 report I used his emissions data and release specifications. I did not state I replicated his modeling exactly because this was not even possible. I could not exactly replicate Dr. McVehil's modeling for the following reasons:

1. His upper air meteorological files were unavailable and based on upper air meteorological data from an undisclosed location that was not in the La Oroya area but at a similar latitude (this is not acceptable methodology).

2. If I included the massive building mentioned above, that would constitute improper methodology.

3. Dr. McVehil calibrated (adjusted his model results) one site at a time to match the measured air quality data more closely, which also is improper and novel methodology.

On Page 146 of the transcript of Dr. Rouhani's deposition of April 14, 2021, he further stated that I misstated Dr. McVehil's modeling:

> "*Q. Okay.· So when you say that Mr. Sullivan misrepresented Dr. McVehil's model, all you're talking about is that the numbers Dr. McVehil reported are not the same as the numbers that Mr. Sullivan reported; right? A. Yes*."

His basis for this opinion was that I did not get the same results as Dr. McVehil. He apparently was unaware that an exact replication was not feasible at this time. This point was confirmed by Mr. Hoffnagle.

- **Dr. Rouhani has extracted the wrong information on Page 5: Table 1.** Dr. Rouhani is comparing the wrong information. He has extracted results on the right side of Table A-2, which is the McVehil source treatment - - not mine as shown in Figure 4-5 below.

Figure 4-5: Original to New Lead Results from Dr. Rouhani

| | ORIG LEAD RESULTS | | NEW LEAD RESULTS | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.02 | 1.27 | 0.87 | 1.27 |
| CUSH | - | - | - | - |
| HUAN | 1.92 | 6.47 | 0.16 | 6.47 |
| CASA | 0.08 | 0.42 | 0.21 | 0.42 |
| MARC | 0.21 | 1.03 | 0.23 | 1.03 |
| HUAR | 0.08 | 0.77 | 0.09 | 0.77 |
| SIND | 5.11 | 2.09 | 2.93 | 2.09 |
| HUAY | 0.10 | 0.45 | 0.25 | 0.45 |

Dr. McVehil's results,

Not Sullivan

- **Dr. Rouhani identified an error in one of my tables in my June 22, 2020 rebuttal report.** Page 6: Dr. Rouhani observes that my McVehil runs do not exactly match the results Dr. McVehil reported for the period of March 2007 through February 2008. Refer to my comments for Mr. Hoffnagle and Appendix B where I have corrected this table from my June 22, 2020 rebuttal report.

- **Dr. Rouhani noticed differences between the modeling in my December 1, 2020 report and the June 22, 2020 report. Page 6:** Modeling results shown on December 1, 2020 report are different from the earlier modeling, most notably the reductions at Sindicato as explained in Appendix A of the December 1, 2020 report. As shown in that report, the results show a modest improvement in model performance but similar results to the earlier modeling based on Dr. Cheremisinoff's emissions data.

- **Dr. Rouhani identified the fact that my modeling of Dr. McVehil's source treatments produced different results than shown directly in Dr. McVehil's final report. Page 7:** There are good reasons for the differences between the modeling extracted from Dr. McVehil's report (Ref 113) and those displayed in my December 1, 2020 report based on Dr. McVehil's emission treatments. There are four reasons why my modeling of Dr. McVehil's sources does not match the modeling shown in Dr. McVehil's 2008 report. Dr. McVehil used an imaginary building, an unspecified location for upper air data, calibrated his results to better match measured data one site at a time, and also used a different modeling period. Rather, I used all of his source treatments and building treatments (except the massive building for the main stack) but relied on state-of-the-art meteorological data that was unavailable at the time of Dr. McVehil's modeling.

- **Dr. Rouhani referred to an obsolete reference that no longer applies to try to support his position that calibration of air quality models is acceptable to the EPA. Page 8:** This reference Dr. Rouhani is relying on dates back to 1978. Model calibration is not an accepted methodology by the U.S. EPA and has not been acceptable for decades. I have never in my career used model calibration, and if used in this matter it would constitute improper methodology based on the standard of care for modeling. Refer to Section 2.0 where I address model calibration in the rebuttal of Mr. Hoffnagle, where I provide a

quote from Mr. Hoffnagle's deposition testimony where he confirms that model calibration is not accepted by the EPA.

## 5.0 Mr. Connor

**Overview:** Mr. Connor's rebuttal report addresses just one aspect involving air quality modeling issues, i.e., airborne deposition to the surface. First, I note that my report of December 1, 2020 does not include deposition, and on this basis, his review is beyond the scope of the rebuttal. Second, Mr. Connor's assessment of the correlation between modeled airborne fine particulate matter ($PM_{10}$) and community dust wipe samples is regressing the wrong variables, and is misleading. In this section, I show that there are multiple reasons that his analysis is based on flawed methodology. The most obvious is shown below in Figure 5-1. The plot on the left is the actual data. The plot on the right is the portion that he is showing. He has cut off the lower values which obviously degrades any correlation that would exist. This statistical maneuver is referred to as "*range reduction,*" which can reduce or eliminate actual correlation that exists.

**Figure 5-1: Expansion of Mr. Conner's Exhibit J Lead Regression Plot Using a Partial Dataset[4]**




The correlation would not be expected to be high between airborne fine particulate matter and dust wipe samples, but the objective of correlation analysis is to see if the two variables go high and low in a similar fashion. By dropping the low values from the more distant locations, Mr. Connor has eliminated the moderate correlation that existed in the data. Better correlation would have been expected if he had regressed the proper variables, i.e., modeled deposition data based

[4] There are some differences for a few data points where I selected a more representative receptors from the model than Mr. Connor but generally we are extracting the same data from the measured and modeled data.

on the full range of TSP particles (rather than airborne concentrations of fine particulates), and wipe samples, and basing the modeling on the actual locations rather than the closest standard grid modeling location.

**Details**: In addition to commenting on the standard of care report of Dr. Matson, Mr. Connor has calculated correlation analyses attempting to relate air quality modeling of $PM_{10}$ to community dust wipe samples taken in 2007. He has concluded there is no correlation between the fine fraction of airborne particles ($PM_{10}$) and community dust samples taken in 2007. He does not opine or acknowledge, however, that in my June 22, 2020 rebuttal report and earlier in my expert report, I show there is a moderate correlation between modeled **deposition** based on **total suspended particulates** (rather than just the fine fraction of airborne particulates) that is significant and much higher than he has shown in his report.

Some context is needed for the air deposition pathway, especially when comparing modeled deposition and measured data (dust wipe samples or near-surface soil contamination). In my experience, modeling shows relatively smooth gradients in deposition rates, while measured data in the vicinity of an emitting facility show a generally decreasing trend in surface and soil contamination with distance that is embedded in a great deal of localized scatter. The real world has much more localized scatter than simulated by dispersion models that smooth out the scatter caused by complex flow around the numerous obstacles to wind flow. This is especially true in a complex setting such as La Oroya Antigua. I have compared and evaluated modeled deposition rates with measured data in many projects. Every one of the projects showed the same general trend, i.e., smooth modeled gradients in deposition rates and similar general trends in the measured data, but with a great deal of localized scatter. These differences are caused by a difference in scale. Models consider the surface conditions in a more homogenous fashion than reality. The actual deposition is much more complex at the microscale (e.g., within a single property or adjacent properties). The variability in measured data is caused by fine-scale differences in deposition patterns even within specific properties. The magnitude of the measured surface samples depends on where it is taken relative to obstacles to flow, such as homes, out buildings, fences, etc. In my experience, I have seen differences in the range of 4-5 fold or more occur on different sides of the same property.

On average, there can be similarities between modeled and measured deposition general trends, but the measured data will be much more variable within small distances than the model. This is especially true in La Oroya Antigua where Mr. Connor selected 10 locations among the 14 samples in the 2007 dust wipe data set. La Oroya Antigua is densely packed with structures that would be expected to create a high degree of localized variability. For example, a dustfall sample map for the 2008 community wipe samples location shown in Figure 5-2. It could be expected, for example, that the dust wipe samples would be similar for sites AJPS-4 and OAPS-5 because they are so close to each other. Instead, the results shown in Table 5-1 show a large difference even though the sampling locations are in very close proximity to each other. The above shows a seven-fold difference between sites OAPS-06 and AJPS-03, which are on different sides of the Sindicato building. Samples AJPS-04 and OAPS-05 are nearly a factor of two different and they appear to be nearly collocated.

If there are many measured wipe sample data points, smooth trends in measured data likely would be shown based on annulus analyses where the median surface contamination as a function of distance range is used to smooth the trend in the measured data. Such an analysis is not feasible in La Oroya because the data sets are too small. With such small data sets and the variability within the measured dust wipe sample, a high degree of correlation would not be expected even with comparable measured and modeled general trends. There is simply too much inherent scatter in the measured data for an analyst to expect high correlation. Using the approach taken by Mr. Connor, however, the correlation would be expected to be about zero, and it was. His analysis was not performed consistent with sound scientific methods and provided results that are of no value for this case.

**Figure 5-2: Site Map for Dust Fall Samples**




**Table 5-1: Actual Dust Fall Lead Concentrations (mg/kg) for Closest Sites**

| Site Name | June 2008 Lead Concentration (mg/kg) |
|---|---|
| AJPS-04 | 1,334 |
| OAPS-05 | 2,133 |
| OAPS-06 | 12,513 |
| AJPS-03 | 1,730 |

There are four major errors in Mr. Connor's analysis that resulted in his analysis showing no significant relationship:

1. **He is using $PM_{10}$ Air Concentrations Instead of Modeled Deposition Rates.** The CALPUFF model computes air concentration and also deposition rates to the surface. Community dust is caused by deposition to the surface from the airborne plume rather than the airborne concentrations that pass over locations. My modeling files were available. He chose the wrong parameter to regress, i.e., the airborne concentrations of $PM_{10}$ particulates rather than the actual modeled deposition based on total suspended particulates (TSP). From pages 116-117 of his April 28, 2021 deposition:

   *"Q. Would you agree that if you wanted to evaluate the predictive value of Mr. Sullivan's air model, it would be more appropriate to look at deposition rate versus these dust samples than air concentration versus the dust samples? A. I think that checking his model, if he'd done deposition rate, that would have been more pertinent."*

   The Defendants' had my modeling files and the TSP emission rates. They could have modeled deposition based on TSP, but Mr. Connor chose to rely on a less relevant term, airborne $PM_{10}$, to correlate with the dust wipe samples.

2. **He is using the wrong particle size**. I modeled only $PM_{10}$ in the December 1, 2020 report. That is the report he is rebutting. The only times I evaluated the correlation between modeled metals and community dust were in my 2019 expert report where I regressed deposition based on TSP and community dust, and then in my rebuttal report of June 22, 2020, where I refined this assessment based on a clarification of the coordinates for the sampling sites. The fine fraction of particles ($PM_{10}$) that Mr. Connor relied on is unsuitable for regression with surface dust wipe samples because the heavier portion of the particle size distribution would preferentially deposit. This is not a complicated point. Heavy particles fall faster than light ones in the turbulent atmosphere and the heavier particles preferentially deposit to the surface. As an example, a 30 µm spherical

particle is 27 times heavier than a 10 µm particle and 216 times heavier than a 5 µm particle. Mr. Connor was regressing the wrong particle size data. He is regressing the airborne $PM_{10}$ fine fraction that mostly passes over the surface rather than the deposition rate to the surface that is causing the dust loading in the first place. He also admitted that there could be larger particle sizes as shown in his deposition on pages 114 and 115 of April 28, 2021.

> "*QUESTIONS BY MS. WILKINS: Q. Okay. Well, would you agree that there would be deposition of particulate matter greater than 10 microns in the area that those dust samples were collected? MR. DRAKE: Object to the form. A. There could be. I haven't made that analysis. I haven't -- I haven't seen a particle size distribution. It would depend on a lot of factors. There could be particles greater than PM-10 there, yeah.*"

3. **He is using the wrong locations.** Mr. Connor is not using the actual locations (receptors) for the dust wipe sample, but the closest grid points he could find from my model runs for airborne $PM_{10}$. The Defendants had my modeling files and TSP emissions inventory and could have added discrete receptors to the CALPUFF file I provided, used the actual TSP emissions data shown in my December 2020 report, and modeled the dust wipe sampling sites at their actual locations. Instead, he used the closest standard grid receptor, which could be 150 m further away from the actual sampling sites. As the community dust wipe sample sets in 2007 and 2008 both show there can be large differences in deposition within distances much less than 150 m. He explained on p. 123 of his deposition of April 28, 2021 the following:

> "*So the -- the reason -- what I explained in the report is that I looked for -- I lined up samples that were -- I assigned them to a air modeling node that was within 150 meters.*"

4. **<u>He selected only part of the measured data set for regression, thereby using range reduction that would be expected to reduce the correlation.</u>** There are high and low rates of deposition, depending on whether or not the sample is taking in La Oroya or at other locations within the modeling domain that are further away. The complete data set was needed to appropriately compute the correlation. The objective was to see if there was a relationship between the independent variable (in this case he used modeled $PM_{10}$ airborne concentrations) and measured dust wipe samples. In other words, the analysis is to determine if the modeled value is high when the corresponding dust wipe sample is high, and vice versa. Sound analysis in this case required the use of the entire data set. Reducing the range of the variables biased the results towards lower correlation. Mr. Connor excluded the locations further away, which reduced the range under review from 14 samples to 10 samples, which were all clustered in La Oroya Antigua. His rationale for ignoring 4 of the 14 samples in the data set was as follows: *"The reason I didn't use the three samples is that two of them were in other towns, and one was up on the hillside where people wouldn't be in contact with that.*"(Mr. Conner's rebuttal report of March 19, Page 123) and *"For my analysis I focused on ten Convenio sampling locations – and their corresponding closest air modeling node – within La Oroya Antigua, as these were the locations where children in that community could most reasonably come into contact with outdoor dust* (Mr. Connor's rebuttal report Page 38)." This rationale is illogical. He was regressing two physical variables (modeled airborne $PM_{10}$ concentrations (such as for lead) with surface dust wipe samples (such as for lead). The functional relationship is independent of whether not children had contact potential at any specific location. In addition, the modeling analysis for this case is not just limited to La Oroya Antigua.

When range reduction is done in most data sets, including this one, the correlation will drop relative to the use of the complete data set. For example, it would be possible to show no correlation between the growth of boys as a function of age if the range in age were reduced sufficiently to be comparable to the scatter within the selected age range.

This is particularly true for measured deposition in areas like La Oroya with tightly clustered homes. For example, modeled airborne $PM_{10}$, or more appropriately modeled

TSP-based deposition to the surface, will smooth out the inherent variability that would be expected in a measured data set like this. The median concentrations across distances ranges from the smelter may have excellent correlation if there were sufficient sample sizes, but the inherent variability within even a small area can mask this relationship. This is true for dust wipe samples or soil sample data sets. I have also seen this true for groundwater contaminated by the air deposition pathway. On this basis, I did not expect high correlation when I regressed TSP-based deposition with the 2008 community dust sample set, but when using a more distributed data set of 23 samples, I found significant correlation, with the correlation coefficients within the range of 0.40 to 0.45. Without sufficient range, the scatter in the measured data would be expected to substantially reduce or eliminate correlation, even though on average the trends between modeled deposition and measured surface dust are correlated.

Examples from the literature concerning bias caused by reducing the range in correlation analysis are as follows:

> *"In the operation of an industrial process past experience often shows that certain variables are of major importance. In order to control fluctuations in the process, therefore, care is taken to hold precisely these variables very close to fixed values. As the "statistical significance" of any variable is greatly affected by the range it covers there is a strong probability, therefore, that the most important variables will be dubbed "not significant" by a standard regression analysis.*" (Ref 267:4).
>
> "*The preceding analysis has shown that increasing data range width is more effective than increasing the number of data points on the same data range in reducing the uncertainty in the slope of a regression line."* (Ref 266:3)

In my rebuttal report of June 22, 2020 based on Dr. Cheremisinoff's emissions and particle size treatments I showed there was correlation because I: (1) regressed the actual air pathway term that produces deposition to the surface (modeled deposition based on total suspended particulates), (2) modeled the actual locations where they were located, and (3) relied on a more

extensive measured dust wipe data set that had 23 samples, including samples throughout a broader area of the study domain (not just 10 samples clustered in La Oroya Antigua as Mr. Connor has done). Mr. Connor, on the other hand, focused on a narrow range of distances that greatly limited the range in the regression, which among the other issues listed above produced correlation coefficients in the range of 0.0062 for lead and 0.011 for arsenic. As listed above, there are good reasons why Mr. Connor's correlation analysis failed.

Table 5-2 is based on review of Mr. Connor's Exhibit K spreadsheet by using the full set of the 14 arsenic dust wipe samples documented in "*Convenio May 2007*" (including the 10 samples he relied on and the four samples highlighted in yellow that he excluded):

**Table 5-2: Measured Arsenic in Outdoor Dust 2007 from All 14 Arsenic Dust Wipe Samples**

| Location ID | X Coordinate | Y Coordinate | Measured Arsenic in Outdoor Dust, 2007 (mg/Kg) |
|---|---|---|---|
| 647 | 401812.2235 | 8726554.779 | 434 |
| 222 | 401789.2234 | 8726904.774 | 904 |
| 624 | 401879.2227 | 8726354.782 | 1178 |
| 156 | 402122.2196 | 8726172.784 | 1112 |
| 687 | 401797.2238 | 8726350.782 | 1748 |
| 1512 | 401713.2247 | 8726612.778 | 521 |
| 1578 | 401740.2244 | 8726636.778 | 2772 |
| 158 | 401693.2253 | 8726347.782 | 489 |
| 1102 | 401967.2214 | 8726480.78 | 1438 |
| 440 | 401934.2213 | 8727072.772 | 982 |
| 185 | 400323.2235 | 8725444.779 | 522 |
| 680 | 402622.2234 | 8726228.774 | 478 |
| 2593 | 395659.2227 | 8719500.782 | 232 |
| 1865 | 398641.2196 | 8727170.784 | 135 |

Two reasons were given for exclusion: (1) some locations did not represent children in La Oroya, and (2) one sample did not have a standard grid receptor within 150 m (because it was relatively far from La Oroya Antigua). Neither reason is justified. Mr. Connor has eliminated

sampling sites that would be expected to in general have lower dust fall rates because they are further from the sources.

In summary, Mr. Connor's regression analysis was an irrelevant exercise that was bound to show no correlation.

Table 5-3 provides both the arsenic and lead modeling to measured values analysis using the full datasets. Figures 5-3 through 5-6 show the comparison between using Conner's subset of the samples for regression and the proper complete dustfall samples that shows much better correlation, as expected.

**Table 5-3: Modeled to Measurements of the Dust Fall Samples in 2007**

| Location ID | 2007 Arsenic Air Modeling Concentration Results (µg/m³) | Measured Arsenic in Outdoor Dust, 2007 (mg/Kg) |
|---|---|---|
| 647 | 2.58 | 434 |
| 222 | 2.09 | 904 |
| 624 | 1.85 | 1178 |
| 156 | 2.14 | 1112 |
| 687 | 1.85 | 1748 |
| 1512 | 2.35 | 521 |
| 1578 | 2.35 | 2772 |
| 158 | 1.49 | 489 |
| 1102 | 2.02 | 1438 |
| 440 | 1.88 | 982 |
| 185 | 0.29 | 522 |
| 680 | 1.28 | 478 |
| 2593 | 0.07 | 232 |
| 1865 | 0.13 | 135 |

| Location ID | 2007 Lead Air Modeling Concentration Results (µg/m³) | Measured Lead in Outdoor Dust, 2007 (mg/Kg) |
|---|---|---|
| 647 | 5.04 | 1542 |
| 222 | 3.70 | 3212 |
| 624 | 3.42 | 4711 |
| 156 | 4.43 | 7980 |
| 687 | 3.20 | 8928 |
| 1512 | 4.22 | 1289 |
| 1578 | 4.22 | 6684 |
| 158 | 2.65 | 1651 |
| 1102 | 4.32 | 4087 |
| 440 | 3.52 | 2114 |
| 185 | 0.62 | 1516 |
| 680 | 3.41 | 1355 |
| 2593 | 0.15 | 855 |
| 1865 | 0.26 | 502 |

**Figure 5-3: Conner's Exhibit J Lead Regression Plot Using Incomplete Dataset**

**Exhibit J: Correlation Plot for Measured Lead in Dust vs. Modeled Lead in Air in May 2007** (Average of 3-month air lead averages which include May 2007, i.e., the Convenio dust sampling month in µg/m³ vs. lead in 2007 Convenio Dust Samples).




**Figure 5-4: Lead Regression Plot Using the Full Dust Fall Dataset**



**Figure 5-5: Conner's Exhibit K Arsenic Regression Plot Using Incomplete Dataset**

**Exhibit K: Correlation Plot for Measured Arsenic in Dust vs. Modeled Arsenic in Air in May 2007** (Modeled annual average arsenic in air in µg/m³ vs. arsenic in 2007 Convenio dust samples).




**Figure 5-6: Arsenic Regression Plot Using the Full Dust Fall Dataset**



Appendix A: Modeling Results Based on Inputting only the Vornberg Emissions Data to the CALPUFF modeling

Table A-1: Comparisons of $PM_{10}$ Model Performance for the Maximum Three-Month Rolling Average for Lead Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007

| | **SULLIVAN LEAD** | | **VORNBERG ONLY LEAD** | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.23 | 1.27 | 0.93 | 1.27 |
| CUSH | - | - | - | - |
| HUAN | 2.44 | 6.47 | 2.16 | 6.47 |
| CASA | 0.13 | 0.42 | 0.11 | 0.42 |
| MARC | 0.37 | 1.03 | 0.33 | 1.03 |
| HUAR | 0.18 | 0.77 | 0.18 | 0.77 |
| SIND | 4.48 | 2.09 | 3.14 | 2.09 |
| HUAY | 0.18 | 0.45 | 0.15 | 0.45 |

Table A-2: Comparisons of $PM_{10}$ Model Performance for Annual Average Arsenic Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007

| | **SULLIVAN ARSENIC** | | **VORNBERG ONLY ARSENIC** | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 0.49 | 0.83 | 0.41 | 0.83 |
| CUSH | - | - | - | - |
| HUAN | 0.67 | 4.01 | 0.58 | 4.01 |
| CASA | 0.05 | 0.17 | 0.05 | 0.17 |
| MARC | 0.14 | 0.42 | 0.13 | 0.42 |
| HUAR | 0.08 | 0.39 | 0.07 | 0.39 |
| SIND | 1.42 | 1.01 | 1.16 | 1.01 |
| HUAY | 0.07 | 0.18 | 0.06 | 0.18 |

Table A-3: Comparisons of Model Performance for the 99th percentile One-Hour Daily Maximum $SO_2$ Concentration Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007

| | **SULLIVAN $SO_2$ RESULTS** | | **VORNBERG $SO_2$ RESULTS** | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 9,295 | 11,552 | 8,075 | 11,552 |
| CUSH | 1,871 | 3,153 | 1,870 | 3,153 |
| HUAN | 8,810 | 27,246 | 7,599 | 27,246 |
| CASA | 764 | 1,577 | 754 | 1,577 |
| MARC | 2,651 | 5,184 | 2,541 | 5,184 |
| HUAR | 1,109 | 5,513 | 1,099 | 5,513 |
| SIND | 18,167 | 16,539 | 15,011 | 16,539 |
| HUAY | 1,274 | 1,926 | 1,272 | 1,926 |

Figure A-1: Comparisons of $PM_{10}$ Contour Mapping of the Maximum Three-Month Rolling Average for Lead Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007

Based on Sullivan 2020 Emissions




Based on Vornberg Emissions



Figure A-2: Comparisons of $PM_{10}$ Contour Mapping Annual Average Arsenic Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007

Based on Sullivan 2020 Emissions




Based on Vornberg Emissions



**Figure A-3: Comparisons of the Maximum One-Hour $SO_2$ Concentrations Based on the Sullivan Emissions data in Comparison to Model Performance Based on the Vornberg Emissions Data for 2007**

Based on Sullivan 2020 Emissions




Based on Vornberg Emissions



**Appendix B: Comparison of McVehil Results Versus Sullivan December 2020 Results**

**Table B-1: Correction to Table A-2 from Sullivan Rebuttal Report July 2020**

The fourth column in the second table shown in Table A-2 in the Sullivan Rebuttal report of July 2020 was not extracted correctly from the Excel processing file. This column has been corrected in this appendix.

| | ORIGINAL LEAD RESULTS | | NEW LEAD RESULTS | |
|---|---|---|---|---|
| SITE | 2007 | | 2007 | |
| | MODELED | MEASURED | MODELED | MEASURED |
| INCA | 1.02 | 1.27 | 0.64 | 1.27 |
| CUSH | - | - | - | - |
| HUAN | 1.92 | 6.47 | 0.96 | 6.47 |
| CASA | 0.08 | 0.42 | 0.08 | 0.42 |
| MARC | 0.21 | 1.03 | 0.17 | 1.03 |
| HUAR | 0.08 | 0.77 | 0.08 | 0.77 |
| SIND | 5.11 | 2.09 | 5.92 | 2.09 |
| HUAY | 0.10 | 0.45 | 0.10 | 0.45 |

## Appendix C: Particle Size Distributions

**Overview**: The emphasis of my air quality exposure analysis has been on the $PM_{10}$ fraction of lead and arsenic and gas-phase $SO_2$. The modeling shown in this rebuttal report, my rebuttal report of July 2020 and my emissions report of December 2020 I modeled $PM_{10}$ fractions. In my expert report I showed the results both ways, i.e., for $PM_{10}$ and TSP.

The Defendants' experts have provided misleading information regarding the emissions from the smelter operations, stating that the emissions of particulates are only in the $PM_{10}$ fraction. This statement is not true. This appendix explains the subtleties of particle size distributions for controlled stack sources (smaller particles) as compared to fugitive uncontrolled sources (larger particles). The objective of this appendix is to clarify the record. The primary take-away is that the $PM_{10}$ analysis shows extreme air quality impacts. The TSP is worse. Rather than overly confuse the record, I have focused on the $PM_{10}$ fraction which is directly what the Defendants have produced. This appendix confirms, however, that there is a substantial fraction of the fugitive emissions that are in particles larger than the $PM_{10}$ fraction contained in the Defendants' emissions data.

Based on the review of the full set of EPA and other available references that are designed specifically to address fugitive emissions (i.e., not stack releases and not for data sets limited to the use aerodynamic equivalent diameters (e.g., cascade impactors)), there is no basis to assert that all lead and arsenic that was emitted from the Defendants' facilities in La Oroya were limited to the $PM_{10}$ fraction.

In m expert report of February 2019, I present modeled results two ways: as the $PM_{10}$ fraction and for total suspended particulates (TSP). Review of the ratio of TSP / $PM_{10}$ across the specific set of plaintiffs' homes and schools is approximately 2. Even though for some sources the mass of TSP emissions compared to $PM_{10}$ is much greater than two, gravitational forces remove much of the mass in the $PM_{10}$ to $PM_{30}$ fraction in route to the monitoring locations and areas of public exposure in La Oroya and the surrounding area.

In my follow-up reports to my expert report of February 2019, i.e., reports of June 22, 2020, December 1, 2020, and this report, I have focused on the $PM_{10}$ fraction because: (1) direct

comparisons can be made with measured $PM_{10}$-based metals air quality data to directly demonstrate model performance, and (2) the emissions within the $PM_{10}$ fraction is dominated by the Vornberg fugitive emissions data that does not require the additional step of extrapolation to the TSP range.

The Defendants' did not conduct the field work required to directly identify the specific particle size data for each source, which requires that default data based on the literature to be interpreted for this facility. There is greater uncertainty in the TSP data on this basis. As will be shown in this appendix, there is no reasonable basis to speculate that all of the particulate emissions from the Defendants' operations were in the $PM_{10}$ range. Especially considering the fact that not all sources were inventoried, it is not surprising that in most cases the modeling is understating the directly measured $PM_{10}$ data. Adding to this the fact that emissions did occur beyond the $PM_{10}$ range, it more likely than not that most locations experienced total exposures to lead and arsenic that were on the order of double the $PM_{10}$ modeled concentrations I show in this report.

## Technical Discussion

The particulate form of air pollutants can be further distinguished by size categories such as particles less than 10 µm (referred to a $PM_{10}$) and particles less than 30 µm (commonly referred to as total suspended particulate matter (TSP or $PM_{30}$). The $PM_{10}$ fraction travels further downwind and is generally associated with deeper penetration into the respiratory system. The Defendants are ignoring direct measurements of particle size data (e.g., McCrone microscopy data in Ref 115). Rather, they are basing their technical position on AP-42 where an indirect method (cascade impactor) was used to estimate particle size distributions that are more applicable to stack releases. Cascade impactors have well documented bias when used for fugitive sources.

The extensive photos of fugitive emissions emanating from the open buildings at the La Oroya metallurgical complex were obviously fugitive, and were not stack emissions. The impact from fugitive sources is quite large and of great significance for the exposure assessment. According to the Defendants contractors, fugitive emissions are much more significant than stack emissions (to which I agree): "*The conclusion is that fugitive lead emissions have approximately eight*

*times the impact of stack emissions"* (Ref 135:2). The Defendants experts are blurring the difference between the particle size distributions for fugitive emissions and those emitted as process emissions and subsequently released through the stacks. These distributions are not the same. There are substantially more total suspended particulates (TSP) emissions than the $PM_{10}$ fraction for many of the source, which is a fact that the Defendants are contesting based on flawed methodology that is in conflict with the peer-reviewed literature and other authoritative sources. Figure C-1 presents an example of fugitive emissions (extracted from Exhibit 40 of Dr. Cheremisinoff's expert report). In this example, the stack emissions undergo control that reduces particle size prior to release. The fugitive emissions on the other hand are uncontrolled. There is no basis to expect comparable particle size data for emissions from stacks and fugitive sources. As subsequently explained, the literature also does not support this position.

**Figure C-1: Example of Fugitive Emissions (Ex. 40) Versus Stack Emissions (Ex. 53)**

Example of fugitive emissions

DRPE-0001396647

Exhibit 40. Shows Sinter Plant – Operations are not enclosed



Example of stack emissions



Dr. Cheremisinoff and I have relied on appropriate EPA sources to support the extrapolation from $PM_{10}$ to TSP for the Vornberg inventory. AP-42 provides some limited data on fugitive emissions from smelting, which on balance are supportive of our position, but are quite limited in scope. Consider the following examples of fugitive sources listed in AP-42 in Table C-1:

Table C-1: AP-42 $PM_{10}$ Example Fugitive Emissions Percentages for Lead and Copper Smelter Sources

| **Fugitive Emissions Source** | **Percent < $PM_{10}$** | **Source** |
|---|---|---|
| Sinter Building | 49% | Ref 220:5 |
| Copper Reverberatory Furnace Matte Tapping Operations | 74% | Ref 218:14 |
| Copper Reverberatory Furnace Slag Tapping Operations | 28% | Ref 218:15 |
| Copper Converter Slag and Copper Blow Operations | 96% | Ref 218:16 |

The particle size distributions for point sources emitting through stacks are quite different than fugitive emissions that are generally emitted from process buildings through the various openings in the structures. Point sources, which also can be referred to as process stack sources, are in fact generally comprised of $PM_{10}$ particles.[5] There is no disagreement there. Our most recent modeling based on our refinements in emission treatments for example modeled the stacks with a diameter of 1.65 µm (much lower than the upper limit of $PM_{10}$ and similar to what Dr. McVehil used in his modeling). These differences in terms of bottom line modeling results are

[5] Note: The generation of fines in the molten process is related to the fragmentation from bubbles forming in the sulfide during smelting as shown with temperature above 1870 F in a copper smelter as it fragments (Ref 258:2).

trivial, so we are in general agreement on particle size for the stacks. The differences in judgments are for the fugitives. AP-42 is much more focused on process emissions than fugitives.

Lead Smelters

The EPA study of two lead smelters as reported in Ref 115 provides direct measurement of fugitive source particle size data based on microscopy, which both Dr. Cheremisinoff and I relied on. These data show the $PM_{10}$ fractions to be as follows for fugitive emissions in Table C-2:

Table C-2: East Helena Smelter Study $PM_{10}$ Fugitive Emissions Percentages for Lead Smelter Sources

| **Fugitive Emissions Source** | **Percent < $PM_{10}$** | **Source** | **AP-42 Equivalent** |
|---|---|---|---|
| Sinter Building | 27.6% | Ref 115:40 | 49% |
| Dross Kettles | 27.2% | Ref 115:40 | No Data |
| Lead Reverberatory Furnace | 18.4% | Ref 115:40 | No Data |
| Lead Blast Furnace | 8.5% | Ref 115:40 | No Data |
| Zinc Furnace | 15.7% | Ref 115:40 | No Data |

The background document for Section 12.6 (primary lead smelters) in AP-42, for example, provides much more data on fugitives (Ref 251). The background document shows more than 50 percent of the fugitive particles from the blast furnace fugitive emissions are greater than $PM_{10}$, based on collection of $PM_{10}$ and hi-volume samplers for TSP (Ref 251:56). For most smelter sources in AP-42 on the other hand, the particle size distributions are limited to $PM_{10}$ and based on instruments that become ineffective when a large fraction of the particles are greater than 10 µm, which is the case for smelter fugitives (e.g., Ref 115:40 *particle-size distribution in calculated weight percent*). The methodology for the assessment of fugitive sources in the AP-42 background document is explained in Ref 251:53:

> *"Emissions from the remaining building volume sources were quantified using anemometers and high volume samplers with glass fiber filters to measure flow rates and pollutant concentrations through such openings as windows, doorways, and roof vents. In all cases, the temperature of the gas sampled approximates ambient, and the calculated filterable particulate emission rate can be assumed to be equivalent to the total particulate matter emission rate (i.e., no condensable material is* expected).

Copper Smelters

AP-42 data for copper smelters are shown in Section 12.3 (Ref 218:10-12), which was produced in October 1986 and reformatted in 1995, shows numerous distributions for process operations dominated by small 1-2 µm particles. These distributions, however, are limited to $PM_{10}$ with extrapolation up to $PM_{15}$ when deemed statistically appropriate as reported in the reference, i.e. "*NR = not reported because of excessive extrapolation*." In other words, they were not sampling in a manner that allowed for reliable and direct measurement above $PM_{10}$. [6] The diameters are shown as aerodynamic equivalent, which would be associated with collection on a device such as a cascade impactor and based on unit density.

More importantly, a reference produced for the EPA in 1977 from PEDCo Environmental, Inc. describes the characterization of fugitive emissions from primary copper smelting in detail for each copper smelting process. The following shows data from Ref 225:438, which was a study that measured a wide range of fugitive emissions, and not just $PM_{10}$ as focused in AP-42 for process / vented sources:

> Copper Roaster – *"Five percent of the fugitive particulate emissions from roasting are less than 5 µm and have an exit temperature of about 300-480°C (600-890°F). More extensive data concerning size characteristics of fugitive emissions from roasting are not available, however, presented here are additional characteristics of uncontrolled roaster exhaust gas which in all likelihood closely resemble the fugitive emission characteristics. Fifteen percent of the particulate in exhaust gas are less than 10 µm and 85 percent are greater than 10 µm. Lead content of the particulate is 0.5-12 percent by weight."*

[6] This is analogous to using an undersized scale to weigh the offensive line for the Pittsburgh Steelers. Assume all weigh in the range of 280 to 320 lbs., but the scale maxes out at 250. They would all weight 250 pounds based on the scale strictly because of the limitations of the measuring device.

> Copper Reverberatory Furnace - "*Fugitive particulate emissions from reverberatory furnaces consist mostly of copper oxides of which 50 percent are less than a 37 um mean diameter…*"
>
> Copper Converter – "*Little information is available concerning characteristics of fugitive emissions from converters except that 44 μm is the mean particulate diameter.*"

Ref 218:14-16 (fugitives AP-42) and the above data both show much larger particle size distributions than the process-related emission distributions in AP-42 Ref 218:10-12.

Table C-3 presents a summary of particle size data specific to fugitive emissions. Table C-4 presents data from AP-42 and other sources based on cascade impactor data. As shown, the fraction of the distributions less than $PM_{10}$ are markedly smaller than those shown in AP-42 for process / stacks sources, and/or those based on the use of cascade impactors.

## Table C-3: Summary of Fugitive Sources Particle Size Distributions

| Circuit | Fugitive Source | % PM 10 | Reference | Notes | Collection Method |
|---|---|---|---|---|---|
| Lead | Ore Crushing | 78.26% | Ref 183:5 | Ore crushing building | No Specific Method just Filterable Particulate |
| Lead | Lead Ore Storage | 86.00% | Ref 257:10 | Uncontrolled Fugitive Emissions | |
| Lead | Crushing Mill | 37.14% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Crushing Mill | 36.52% | Ref 251:56 | | Referenced Ref 115 so McCrone most likely |
| Lead | Sinter Machine | 98.00% | Ref 257:11 | Uncontrolled Fugitive Emissions | Aerodynamic Equivalent Diameter |
| Lead | Sinter Building | 49.50% | Ref 183:5 | | No Specific Method just Filterable Particulate |
| Lead | Sinter Building | 49.33% | Ref 251:24, 27 | | No Specific Method just Filterable Particulate |
| Lead | Sinter Building | 49.57% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Sinter Building (East Helena, MT) | 27.60% | Ref 115:40 | | McCrone Microscopy Method |
| Lead | Sinter Building | 27.87% | Ref 251:61 | | Referenced Ref 115 so McCrone most likely |
| Lead | Sinter Building (Glover, Missouri) | 18.30% | Ref 115:29 | | McCrone Microscopy Method |
| Lead | Blast Furnace | 89.00% | Ref 257:12 | Uncontrolled Fugitive Emissions | Aerodynamic Equivalent Diameter |
| Lead | Blast Furnace Building | 8.48% | Ref 251:61 | | Referenced Ref 115 so McCrone most likely |
| Lead | Blast Furnace Building | 8.50% | Ref 115:40 | | McCrone Microscopy Method |
| Lead | Blast Furnace Floor Building | 36.65% | Ref 251:56 | 1990 East Helena Emissions Inventory | - |
| Lead | Blast Furnace Charge Building | 45.91% | Ref 251:56 | 1990 East Helena Emissions Inventory | - |
| Lead | Blast Furnace Charge Building | 50.00% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Blast Furnace Feed Floor | 59.68% | Ref 251:56 | 1990 East Helena Emissions Inventory | - |
| Lead | Blast Furnace Feed Area | 59.29% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Blast Furnace Tapping Platform | 17.40% | Ref 251:56 | 1990 East Helena Emissions Inventory | - |
| Lead | Blast Furnace Tap Area | 20.00% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Dross Plant/Bullion | 23% | Ref 251:25, 28 | | No Specific Method just Filterable Particulate |
| Lead | Dross Plant | 23% | Ref 259:69 | 1990 Lead SIP Emissions Inventory | - |
| Lead | Dross Kettles | 98% | Ref 257:13 | Uncontrolled Fugitive Emissions | Aerodynamic Equivalent Diameter |
| Lead | Dross Kettles | 27.20% | Ref 115:40 | | McCrone Microscopy Method |
| Lead | Dross Building/Reverberatory Furnace | 21.38% | Ref 251:61 | 1990 East Helena Emissions Inventory | - |
| Lead | Reverberatory Furnace | 18.35% | Ref 115:40 | | McCrone Microscopy Method |
| Lead | Reverberatory Furnace | 98.00% | Ref 257:14 | Uncontrolled Fugitive Emissions | Aerodynamic Equivalent Diameter |
| Copper | Limestone Dust Handling | 60% PM 5 | Ref 225:438 | Average of 45-70% | - |
| Copper | Copper Roaster | 5% PM 5 | Ref 225:438 | | - |
| Copper | Copper Roaster | 10% | Ref 225:438 | | - |
| Copper | Copper Reverberatory Furnace | 50% PM 37 | Ref 225:438 & Ref 252:275 | | - |
| Copper | Copper Converter | 50% PM 44 | Ref 225:438 & Ref 252:275 | | - |
| Copper | Copper Casting | 16% | Ref 225:438 | | - |
| Copper | Copper Casting | 46% PM 74 | Ref 225:438 | | - |
| Zinc | Zinc Roaster | 15.70% | Ref 115:40 | | McCrone Microscopy Method |
| Dust | Fugitive Road Dust | 35.38% | Ref 259:69 | Emissions Inventory | 1990 Lead SIP |

**Table C-4: Summary of Process versus Fugitives Data and Method of Collection of Particle Size Distribution Data**

| Particles Sizes using Cascade Impactors or from Control Devices from Process Emissions | | | | | |
|---|---|---|---|---|---|
| Circuit | Source | % PM | Reference | Control Technology | Collection Method |
| Lead | Ore-Storage-Bin Area | ~80% PM 4.6 | Ref 115:30 | - | Cascade Impactor |
| Lead | Sinter Building (Glover, Missouri) | ~95% PM 5.6 | Ref 115:30 | - | Cascade Impactor |
| Lead | Lead Sintering | 50% PM 1 | Ref 252:295 | ESP | - |
| Lead | Sinter Plant Ventilation | 50% PM 15 | Ref 252:295 | Doyle Wet Scrubber | - |
| Lead | Blast Furnace | 86.30% | Ref 257:9 | Baghouse Controlled | - |
| Lead | Blast Furnace Charge-Feed Area | ~95% PM 4.9 | Ref 115:30 | - | Cascade Impactor |
| Lead | Blast Furnace Tapping Operation | ~80% PM 4.6 | Ref 115:30 | - | Cascade Impactor |
| Lead | Blast Furnace Roof Opening | 88% PM 4.6 | Ref 115:39 | - | Cascade Impactor |
| Lead | Blast Furnace | 50% PM 2 | Ref 252:295 | Baghouse | - |
| Lead | Blast Furnace | 50% PM 0.165 | Ref 252:275 | Average of 0.03-0.3 um | - |
| Lead | Silver Refinery | 50% PM 1 | Ref 252:295 | Baghouse | - |
| Copper | Copper Roaster | 33% PM 5 | Ref 232:11 | Baghouse | Cascade Impactor |
| Copper | Copper Reverberatory Furnace | 100% PM 10 | Ref 198:247 | ESP | Cascade Impactor |
| Copper | Copper Converter | 100% PM 5 | Ref 231:12 | Baghouse | Brinks Impactor |
| Zinc | Zinc Roaster | 50% PM 5 | Ref 252:295 | ESP | - |
| Zinc | Zinc Roaster | 50% PM 20 | Ref 252:295 | Cyclone | - |

Note that most of these sources were controlled, which would have effectively removed particles greater than $PM_{10}$. In addition, the measurement devices, when listed, were based on inertial impactors that can have substantial limitations if used for fugitive sources without a pre-cutter (e.g., a cyclone) to remove the larger particles that would have adversely affected instrument performance if that were the case.

**May 28, 2021**

## Limitations of Cascade Impactors

AP-42 is generally considered a reliable source. The AP-42 references that the Defendants rely on are all (or nearly all) cases are based on one method of measuring particle size. The method is an indirect one that relies on an instrument called a cascade impactor. The cascade impactor is suitable for $PM_{10}$ monitoring.[7] But, when reviewing references directly measuring particle size for fugitive sources under a microscope, much larger particle size distributions were found. I relied on an EPA research study conducted in 1976 at two smelters in the U.S. (Ref 115). That study measured particle size two ways: (1) by direct measurement under a microscope, and (2) by cascade impactors. I appropriately relied on the more direct data. The cascade impactor data (the same type of instrument used for the process / stack sources in AP-42) show for example for the blast furnace at the East Helena smelter that 1.5 percent of the particles were greater than $PM_5$ while direct measurement showed 98 percent were greater than $PM_5$, i.e., the two methods were in direct contradiction. Refer to Figure C-1 for an example.

Direct measurement under a microscope proved there were many large particles that bounced their way through the cascade impactor[8], ending up on the finer stages of the instrument, with large particles being weighed in the finer fractions, thereby biasing the particle size distributions. In fact, in the second of the two studies in Ref 115 (East Helena), the researchers only presented cascade impactor data for one source and relied on the direct measurement (microscopy) for five sources.

[7] By 1987 EPA abandoned the TSP standard (just applies now to lead monitoring) and adopted the $PM_{10}$ standard. It makes sense that the current AP-42 particle size distributions are now more focused on $PM_{10}$.

[8] There are five stages to the Cascade impactors used in Ref 115 for example. The largest size cutoff (> ~ 5 µm) should be retained in the first stage (at least 50 percent of them). The next stage should capture somewhat smaller particles and so forth until there is a filter at the end that captures the very smallest particles that are left. With particle bounce, however, particles substantially larger than 10 µm can bounce their way through the various stages and even end up in the backup filter at the end. This biases the distributions towards much small particles size than actually occur.

Figure C-1: Comparison of Particle Size Distribution for the East Helena Blast Furnace Building Based on Direct Measurement (microscopy) Versus Indirect Measurement Based on a Cascade Impactor




There is peer-reviewed literature that shows that when a large fraction of the particles is greater than $PM_{10}$ that the cascade impactors perform poorly.

- For example, Ref 260:4 states the following: "*A significant number of mineral like particles, which were larger than 5 μm were observed on the backup filter of the cascade impactor equipped with dry impactions surfaces. These particles should not have reached the backup filter*." The backup filter in this reference should have been for particles less than 1.1 μm.

- Ref 264:27 states: "*Particle bounce is a feature which is known to affect cascade impactors. Large particles travelling at high velocity can rebound on impact with the collection plate and be re-entrained it the airstream and carried to the next collection*

*stage. At that point, their velocity will be higher and the probability on bounce will be even greater. These particles can often reach the final collection filter. To some extent, this effect can be diminished by coating the collection substrates with grease although this adds to the difficulties in handling and analysis (Marple Series 290, 2006).”*

- Ref 247:4 shows mischaracterization of particle size associated with particle bounce placing larger particles in finer sections, as well as increasing wall losses in the impactors as particle size increases. In these experiments the particles were within the $PM_{10}$ fraction. If larger particles were included, especially those much larger than the $PM_{10}$ fraction, unless a pre-cutter was used to remove the larger particles prior to the airstream entering the impactor, larger errors could be expected.
- Ref 248:8 states the following: “*If sampling in environments containing particles larger than 10 micrometers, a pre- separator must be used to prevent particle bouncing and re-entrainment errors. Researchers have shown that significant errors will occur with large particles if no pre-separator is used*.” Based on Ref 115:40 (distributions by weight) generally 70-75 percent of the particle size distribution at smelters are greater than 10 µm.
- Ref 263:5 describes the benefits of microscopy (as I have relied on from Ref 115:40 (by weight table) in comparison to impactor measurements: *“In comparing (Figs.* ***2,3)*** *the mass-size distributions derived from SEM measurements to the distributions derived from the ECDs of the impactor stages and of the cyclones, it is* of *major concern to bear in mind that in the case of the* SEM (scanning electron microscopy) *distributions the contributions of all the stages to a particular size range have been taken into account. This means that the SEM-based distributions are not influenced by particle bounce-or blow-off and reentrainment effects, and that they are comparable to a distribution that would result from analysis of a total filter sample. Because ECD-based distributions merely assign the mass collected on a stage to a size parameter resulting from an ideal model, it is obvious that the above-mentioned phenomena will affect this type of*

*distributions since ECDs will no longer be appropriate to describe the size distributions of the particles actually found on the stages."*

The literature shows that if there are a substantial amount of large particles, a cyclone device, or another comparable device, needs to be used prior to the air stream entering the cascade impactor. The cyclone physically removes the larger particles (such as those greater than 10-15 um) from entering the cascade impactor and adversely affecting performance. There is no mention in Ref 115 of a cyclone or other form of "pre-cutter" to remove particles too large for the instrument to properly process. The literature that became available after that study was conducted further clarified the limitations of the cascade impactors and why there was such a divergence in results.

Without a pre-cutter, particle bounce results in larger particles being retained in finer fractions. Since the mass collected at each stage is only weighed and not visually inspected when using cascade impactors, the mass of the large particles is counted with the smaller particle sections, thereby biasing the distribution towards fine particles. As an example, a 30 µm spherical particle has the same mass as 27,000 one µm spherical particles, assuming they have the same density. Similarly, a 15 µm particle would have the same mass (weight) as 3,375 one µm particles. As is obvious, a few larger particles entering the wrong stage can create major errors and bias in the reported particle size distributions.

Particle bounce is most pronounced when there are large particles and when the receiving surface is not coated to minimize bounce of the particles, which can result in the larger particles passing through to subsequent stages of the impactor or being retained on the walls of the instrument rather than on the collecting surfaces (Ref 247:3-5). In Ref 115 (the data set used by Dr. Cheremisinoff and I), for example, glass fiber filters were used at each stage. There also was no indication that a pre-cutter cyclone was used as recommended when cascade impactors are used in situations where there are particles substantially larger than $PM_{10}$, as was the case in Ref 115. As described in Ref 248:8 …" *If sampling in environments containing particles larger than 10 micrometers, a pre- separator must be used to prevent particle bouncing and re-entrainment*

*errors. Researchers have shown that significant errors will occur with large particles if no pre-separator is used."* Based on the photo on Ref 115:175, which shows the 5-stage cascade impactor in use without a pre-cutter, and the fact that a dominant fraction of the mass collected on impactor were much greater than 10 µm, it is evident that the removal of the larger particles to allow for accurate sizing of the $PM_{10}$ fraction was not done in Ref 115. The heating of molten metals would be expected to produce fine particles, but other activities in the same operations create fugitive emissions with a different particle size distribution. e.g., as explained in the EPA Generalized Particle Size distribution document for inhalable particles (< $PM_{10;}$ Ref 254:48):

> *"Category 8 covers the melting, smelting, and refining of metals (including glass) other than aluminum. All primary and secondary production processes for these materials which involve a physical or chemical change are included in this category. Materials handling and transfer are not included. Particulate emissions are a result of high temperature melting, smelting, and refining."*

Cascade impactors such as the 5-stage Sierra Cascade Impactor used in Ref 115 were designed for $PM_{10}$ analysis. In fact, the largest cutoff as used in Ref 115 was ~ 5 µm. When using such an instrument in an environment where approximately two-thirds of the particles were measured to be greater than 20 µm, the instrument was used far beyond the range for which it was designed.

**Appendix D: Modeled Concentrations (µg/$m^3$) for Plaintiff's Homes and Schools Based on 2007 Modeling of the $PM_{10}$ Lead and Arsenic and $SO_2$**

| REC # | UTM X | UTM Y | 3-MONTH LEAD | ANNUAL ARSENIC | MAX 1-HR $SO_2$ |
|---|---|---|---|---|---|
| 1 | 402028 | 8726362 | 7.65 | 2.11 | 37,219 |
| 2 | 401840 | 8726516 | 8.80 | 2.58 | 25,200 |
| 3 | 396271 | 8722582 | 0.17 | 0.07 | 2,210 |
| 4 | 402068 | 8726390 | 7.31 | 2.02 | 37,668 |
| 5 | 396673 | 8722528 | 0.18 | 0.08 | 2,088 |
| 6 | 401784 | 8726914 | 6.97 | 2.09 | 21,547 |
| 7 | 401858 | 8726461 | 8.78 | 2.56 | 26,060 |
| 8 | 401864 | 8726457 | 9.08 | 2.62 | 27,632 |
| 9 | 400167 | 8725626 | 0.63 | 0.26 | 6,867 |
| 10 | 401862 | 8726913 | 6.23 | 1.85 | 18,928 |
| 11 | 401735 | 8726855 | 7.06 | 2.15 | 23,062 |
| 12 | 401735 | 8726855 | 7.06 | 2.15 | 23,062 |
| 13 | 401919 | 8726305 | 5.86 | 1.85 | 21,693 |
| 14 | 398295 | 8723833 | 0.29 | 0.12 | 3,766 |
| 15 | 402055 | 8726248 | 7.83 | 2.23 | 33,696 |
| 16 | 402123 | 8726232 | 7.96 | 2.15 | 35,439 |
| 17 | 402141 | 8726206 | 7.89 | 2.14 | 33,107 |
| 18 | 401777 | 8726448 | 7.27 | 2.36 | 23,299 |
| 19 | 401810 | 8726922 | 6.89 | 2.04 | 21,122 |
| 20 | 401800 | 8726931 | 6.86 | 2.05 | 21,066 |
| 21 | 401860 | 8726942 | 6.32 | 1.88 | 19,945 |
| 22 | 402059 | 8726250 | 7.88 | 2.23 | 33,572 |
| 23 | 401259 | 8726151 | 2.48 | 0.95 | 18,311 |
| 24 | 401856 | 8726714 | 7.19 | 2.11 | 20,341 |
| 25 | 398569 | 8724025 | 0.32 | 0.13 | 3,365 |
| 26 | 402044 | 8726458 | 6.80 | 1.99 | 35,483 |
| 27 | 401811 | 8726430 | 7.71 | 2.44 | 24,662 |
| 28 | 401753 | 8726339 | 5.30 | 1.85 | 21,189 |
| 29 | 401897 | 8726459 | 8.87 | 2.50 | 29,510 |
| | | | | | |
| 30 | 395700 | 8733112 | 0.11 | 0.05 | 891 |
| 31 | 401983 | 8726231 | 6.54 | 2.08 | 26,299 |
| 32 | 399097 | 8724218 | 0.37 | 0.16 | 3,522 |
| 33 | 401881 | 8726286 | 5.79 | 1.90 | 21,346 |
| 34 | 396851 | 8722563 | 0.19 | 0.08 | 2,192 |
| 35 | 398732 | 8724177 | 0.33 | 0.14 | 3,039 |
| 36 | 397276 | 8723038 | 0.21 | 0.09 | 2,246 |
| 37 | 399662 | 8724935 | 0.47 | 0.20 | 4,351 |
| 38 | 399993 | 8725399 | 0.57 | 0.24 | 5,873 |
| 39 | 401710 | 8726282 | 4.37 | 1.54 | 20,199 |
| 40 | 399407 | 8724599 | 0.41 | 0.18 | 3,702 |
| 41 | 398815 | 8723696 | 0.35 | 0.15 | 4,579 |
| 42 | 398604 | 8723883 | 0.33 | 0.14 | 4,155 |
| 43 | 402014 | 8726228 | 7.24 | 2.20 | 31,727 |
| 44 | 401977 | 8726235 | 6.49 | 2.08 | 25,665 |
| 45 | 408880 | 8712696 | 0.18 | 0.07 | 1,325 |
| 46 | 402000 | 8726362 | 7.70 | 2.15 | 33,801 |
| 47 | 401769 | 8726531 | 7.51 | 2.35 | 21,582 |
| 48 | 398387 | 8724052 | 0.29 | 0.12 | 2,671 |
| 49 | 399402 | 8724549 | 0.42 | 0.18 | 3,509 |
| 50 | 383288 | 8711980 | 0.08 | 0.03 | 974 |
| 51 | 395537 | 8720334 | 0.17 | 0.07 | 2,111 |
| 52 | 401701 | 8726295 | 4.25 | 1.49 | 19,807 |

Plaintiff homes are identified with receptors 1-29, while the schools are identified with receptors 30-52.

# Appendix E: Model Sensitivity to Particle Size Distributions for $PM_{10}$

## Annual Arsenic

| UTM-X | UTM-Y | NEW COMPOSITE | MCVEHILL- 0.48 GMMD | MCVEHILL- 4.0 GMMD | |
|---|---|---|---|---|---|
| 400.687 | 8726.178 | 0.48 | 0.49 | 0.45 | INCA |
| 399.778 | 8724.919 | 0.21 | 0.22 | 0.19 | CUSH |
| 403.240 | 8724.176 | 0.70 | 0.72 | 0.66 | HUAN |
| 395.830 | 8733.212 | 0.05 | 0.05 | 0.04 | CASA |
| 398.578 | 8723.916 | 0.14 | 0.15 | 0.12 | MARC |
| 408.880 | 8712.696 | 0.07 | 0.08 | 0.06 | HUAR |
| 401.312 | 8725.800 | 1.24 | 1.26 | 1.20 | SOMI |
| 401.816 | 8726.147 | 1.62 | 1.64 | 1.57 | FUND |
| 396.078 | 8730.359 | 0.06 | 0.06 | 0.05 | VADO |
| 401.628 | 8726.322 | 1.49 | 1.51 | 1.45 | SIND |
| 395.472 | 8719.722 | 0.07 | 0.08 | 0.06 | HUAY |

## Three-Month Lead

| UTM-X | UTM-Y | NEW COMPOSITE | MCVEHILL- 0.48 GMMD | MCVEHILL- 4.0 GMMD | |
|---|---|---|---|---|---|
| 400.687 | 8726.178 | 1.19 | 1.23 | 1.09 | INCA |
| 399.778 | 8724.919 | 0.51 | 0.55 | 0.45 | CUSH |
| 403.240 | 8724.176 | 2.57 | 2.66 | 2.41 | HUAN |
| 395.830 | 8733.212 | 0.11 | 0.12 | 0.10 | CASA |
| 398.578 | 8723.916 | 0.32 | 0.36 | 0.27 | MARC |
| 408.880 | 8712.696 | 0.18 | 0.21 | 0.13 | HUAR |
| 401.312 | 8725.800 | 3.53 | 3.60 | 3.36 | SOMI |
| 401.816 | 8726.147 | 4.59 | 4.62 | 4.49 | FUND |
| 396.078 | 8730.359 | 0.14 | 0.15 | 0.12 | VADO |
| 401.628 | 8726.322 | 4.11 | 4.14 | 4.02 | SIND |
| 395.472 | 8719.722 | 0.17 | 0.18 | 0.14 | HUAY |

**Figure E-1: Annual Arsenic Concentrations (µg/m³) for Base New Composite Run**




**Figure E-2: Annual Arsenic Concentrations (µg/m³) for New Composite Run with 0.48 GMMD**




**Figure E-3: Annual Arsenic Concentrations (µg/m³) for New Composite Run with 4.0 GMMD**



**Figure E-4: Three-Month Lead Concentrations (μg/m$^3$) for Base New Composite Run**




**Figure E-5: Three-Month Lead Concentrations (μg/m$^3$) for New Composite Run with 0.48 GMMD**




**Figure E-6: Three-Month Lead Concentrations (μg/m$^3$) for New Composite Run with 4.0 GMMD**



**Appendix F: Resume of David A. Sullivan, Certified Consulting Meteorologist**

**DAVID A. SULLIVAN**

**CERTIFIED CONSULTING METEOROLOGIST (#256)**

## Education/Professional Certification

M.S. Meteorology, Pennsylvania State University, 1974.
B.S. Meteorology and Oceanography, New York University, 1972.
Certified Consulting Meteorologist (#256), 1980-present.

## Biosketch

David Sullivan is a Certified Consulting Meteorologist (CCM) with 46 years of professional experience in air quality and meteorological analysis. Mr. Sullivan has served as a Certified Consulting Meteorologist since 1980, with a specialization in the integrated use of air quality dispersion modeling and measured air quality data. His range of expertise includes dispersion modeling, exposure assessment, meteorological and air quality analysis, emissions assessment, and the design, implementation, and analysis of air quality and meteorological field studies. Mr. Sullivan has designed and developed dispersion modeling software for acute exposure, dense gas releases, agricultural-related air quality exposures, and urban-scale air quality management systems. He has managed many urban-scale studies of toxic and criteria pollutants in the U.S., and on an international basis in Eastern Europe and Southeast Asia. Mr. Sullivan has served as Study Director on many air quality and meteorological monitoring field studies, including more than 50 field studies conducted over the past 20 years. This work included studies conducted to meet the U.S. Environmental Protection Agency's (EPA) Good Laboratory Practice (GLP) requirements. Field study experience includes flux assessment for complex area sources, odor assessment, noise monitoring, and covariance meteorological data collection.

*Urban-Scale Air Quality Analysis* - Mr. Sullivan has extensive experience in the assessment of urban-scale exposures to toxic air pollutants, having served as the Principal Investigator for EPA's six-year Integrated Environmental Management Project (IEMP). He was the Principal Investigator for the air quality components of the EPA Project Silesia (industrial areas in the Czech Republic and Poland), conducted the dispersion modeling support for EPA's Baltimore Total Exposure Assessment Methodology (TEAM) study, and other major U.S. studies of urban-scale exposures to toxic and criteria pollutants. Mr. Sullivan was responsible for guiding the exposure assessments for two World Bank studies in Russia that provided technical assistance in setting priorities to reduce airborne health risks in heavily industrialized Russian cities. He has designed, implemented, and interpreted data for EPA urban-scale air toxics monitoring systems for the following metropolitan areas: Philadelphia, Baltimore, Denver, and Charleston (WV), and urban-scale studies of criteria pollutants in Atlanta (ozone precursors) and St. Louis ($SO_2$). Mr.

Sullivan was the Principal Investigator for Sullivan Environmental's work for the U.S. Trade and Development Agency on the International "*Breathe Easy Jakarta*" project. This work involved compiling an emissions inventory, conducting dispersion modeling, designing an air quality monitoring network for the Jakarta, Indonesia metropolitan area, and conducting Work Group meetings with Indonesian officials. This project was performed in collaboration with the U.S. Environmental Protection Agency and U.S. Department of State.

*Air Quality Field Studies* - Over the past 20 years, Mr. Sullivan has managed, and also participated in the field programs, for over 50 field studies for flux analysis as a function of time for area sources, which was focused on agricultural applications. His experience includes the collection and interpretation of air quality samples, meteorological data, and soil sampling data, noise analysis, personal sampling, and odor analysis. This research includes the collection of airborne concentrations (off-field and on-field profile monitoring), wind profile data, soil monitoring (temperature, soil moisture, and chemical concentrations), collection of odor samples, and monitoring of noise at industrial / commercial facilities.

*Air Quality Model Development* - Mr. Sullivan has directed the development of two EPA modeling systems, i.e., the TOXST peak exposure model, and the prototype Air Quality Integrated Management System (AIMS) installed in Baltimore. Mr. Sullivan developed the dense gas emergency response modeling system, RiskMan$^{Pro}$, including the generation of release characteristics and analysis of downwind concentrations for dense gas and non-dense gas applications. Mr. Sullivan directed the development of the Fumigant Emissions Modeling System (FEMS), i.e., Monte Carlo-based software to enhance the realism of modeling airborne exposures to agricultural fumigants (pesticides), where the following terms can be treated as Monte Carlo variables: the timing of the application, emission rate, and consideration of the uncertainty around the mean of meteorological variables (wind speed, wind direction, and atmospheric stability).

## Specific Experience

1988 to present – Sullivan Environmental Consulting, Inc. Alexandria, Virginia (*President*)
1980 to 1987 Versar, Inc. – Springfield, Virginia (*Senior Meteorologist*)
1978 to 1980 NUS Corporation, Denver, Colorado (*Meteorologist*)
1974 to 1977 NUS Corporation, Rockville, Maryland (*Meteorologist*)

Mr. Sullivan has conducted and managed a wide range of research-related and applied air quality studies. The following provides examples of projects that show the range of his experience, including projects involving research, model development, applied modeling, and exposure assessment:

**Air Quality Analysis of Jakarta, Indonesia** – Sullivan Environmental completed in 2012 a two-year contract for the U.S. Trade and Development Agency to conduct air quality analysis of the

Jakarta, Indonesia metropolitan area. This project was referred to as the "*Breathe Easy Jakarta*" project, which is a cooperative initiative involving U.S. and Indonesian participants. The primary emphasis of this project was to design an air quality monitoring network for the Jakarta metropolitan area, including fixed-site and mobile monitoring capability for air quality, as well as meteorological monitoring. To support this task, urban-scale emissions assessment and CALPUFF modeling of the metropolitan area was conducted for criteria pollutants to support monitor placement, and to support the optimal allocation of mobile monitoring capability. Mr. Sullivan managed and served as the Principal Investigator for the U.S. component for work conducted from 2010 through 2012 under this contract.

**Member of Expert Panel for Modeling of Air Quality Impacts from Timber Fumigation in New Zealand** - Mr. Sullivan was a member of the four-person expert panel convened by the New Zealand Environmental Protection Agency to develop a modeling approach to evaluate airborne exposures to methyl bromide associated with timber fumigation at the Port of Tauranga in the North Island of New Zealand. Mr. Sullivan then served as Project Manager for the implementation of the modeling based on the joint statements of the expert panel. The modeling included the evaluation of near-field exposures to applicators and port bystanders as well as far-field exposures beyond the boundary of the facility. Monte Carlo modeling methods were used to replicate actual port operations, which included fumigation activities at various locations within the port and also for onboard applications for ships. The modeling was compared with available measured data collected routinely and as part of special studies at the port.

**U.S. Air Force Toxic Vapor Dispersion SBIR Project** – David Sullivan was the Principal Investigator and Project Manager for a U.S. Air Force Toxic Vapor Dispersion Small Business Innovative Research (SBIR) project. This study evaluated the feasibility of designing a modeling system that could estimate air quality impacts from dense and non-dense gas releases. This design considered building influences on ambient concentrations, and differences between ambient and indoor concentrations as a function of building and meteorological conditions, and time after release.

**Evaluation of Pesticide Deposition From Wind Erosion Associated with Pesticide Applications on Federal Lands in the Western U.S**. - Mr. Sullivan was responsible for the CALPUFF modeling analysis of regional impacts from pesticide applications on separate tracts of land in a region that included farming areas. Deposition modeling was used as an input to a hydrology model to account for vertical movement within the soil. Soil concentrations of the pesticide were modeled as a function of time and depth throughout the region. Model performance relative to extensive soil measurements also was conducted as a function of time.

**EPA Geographic Studies of Toxic Air Pollution** – Principal Investigator and Task Manager for air quality analyses performed for EPA toxic integration studies performed in Philadelphia, Baltimore, Silicon Valley (CA), Kanawha Valley (WV), and Denver. This experience included developing emissions data for point and area sources (including temporal and spatial allocation of emissions), designing and implementing air toxics monitoring programs, performing dispersion modeling, and model performance evaluation. These studies involved characterizing

concentrations of toxic air pollutants throughout major metropolitan areas, such as in Philadelphia and Baltimore, as well as microscale modeling analyses of major chemical plants in the Kanawha Valley of West Virginia, and conducting model performance evaluations. The Kanawha Valley study was conducted at the request of the EPA Administrator Lee Thomas, in response to concerns regarding toxic air pollutants after the Bhopal tragedy. These studies included oversight by the U.S. Environmental Protection Agency's Science Advisory Board.

**Evaluation of Airborne Exposures Associated with Waste Ash Disposal**– This project involved evaluating airborne emissions of $PM_{2.5}$, $PM_{10}$, $PM_{30}$, specific metals, and PAHs associated with unloading / storage, wind-blown emissions while stored on a near-beach setting, and removal. The emission rates for unloading from the barges, transferring to dump trucks, travel on unpaved and paved surfaces, dumping, bulldozing, and wind erosion were evaluated. U.S. Environmental Protection Agency (EPA) emission factors were used as well as published methodology to compute wind erosion emissions. Air exposures were evaluated throughout the community and for specific individuals within the community. Model performance assessment was performed based on data collected at a similar source area.

**Modeling of Lead Smelter Emissions Within a Mid-Western Metropolitan Area** - This analysis involved the modeling of airborne and soil deposition of lead emissions from a secondary lead smelter located in a suburban area. AERMOD modeling was conducted to evaluate air concentration fields within the affected community, as well as the estimation of soil concentrations. The modeling results were compared with available concurrent measured airborne data, and an extensive soil data base of lead concentrations.

**Air Quality Analysis for Gas Station in Montgomery County Maryland** - Mr. Sullivan served as the Principal Investigator for air quality, odor, and noise analyses that were conducted to evaluate environmental exposures from a gas station that is planned to be located at a suburban mall in Wheaton, Maryland. This project included emissions assessment, air quality analysis , noise, and odor monitoring at a comparable facility, dispersion modeling of gas station operations and nearby sources (including nearby roadways, selected nearby mall sources, and parking lot sources. Mr. Sullivan presented testimony on multiple occasions, including to the Montgomery County Council, Montgomery County Planning Board, and to the Board of Appeals Hearing Examiner.

**Modeling of Soil Lead Concentrations in the Vicinity of a Superfund Site** – Mr. Sullivan conducted a modeling analysis at a western location that evaluated the airborne and soil lead concentrations in a town that contained numerous chat piles and tailings flats. Soil lead concentrations were computed as a function of time throughout this region. This analysis was conducted using the EPA ISCST3 dispersion model, with model performance considering available measured airborne and soil concentrations.

**Evaluation of Potential Pesticide Residues at an Organic Farming Operation in Western U.S.** – David Sullivan evaluated the potential for adjacent farming operations to create pesticide residues on an adjacent organic farm. This evaluation included emissions assessment, dispersion modeling, evaluation of residue data, and meteorological data assessment.

**Odor Assessment Project for a Major Apartment Unit Near a Waste Transfer Facility** – This study was conducted in the Washington D.C. metropolitan area. The project involved a proposed residential apartment building that was planned for development in the general vicinity of a waste transfer facility. Field olflactometer analysis, collection of odor samples with Tedlar™ bags sampled using a vacuum chamber, and dilution modeling based on the AERMOD dispersion model were used to assess the relative odors around the perimeter of the waste transfer facility in relation to the planned development.

**Evaluation of Noise Levels Associated with Industrial Operation in Northern Virginia** – A field study of noise levels was conducted around the perimeter of an industrial facility that had noise sources at rooftop and at ground level. A distributional analysis of noise levels was conducted throughout an entire 24-hour diurnal cycle, with additional follow-up sampling conducted. Noise modeling also was conducted to evaluate the expected noise levels as a function of height above ground level (upper story exposures) for a range of mitigation options.

**Evaluation of Worker Exposures at an Industrial Facility Using a Biocide** – Mr. Sullivan was the Study Director for a Good Laboratory Practice (GLP) study conducted in response to a data request from the U.S. Environmental Protection Agency to evaluate personal exposures and fixed-site concentrations throughout the process areas of two industrial facilities. Comparisons were made between fixed-site and personal sampling based data.

**Development of the Fumigation Exposure Modeling System (FEMS)** – Mr. Sullivan managed the development of a dispersion modeling system to support the evaluation of airborne exposures from the use of agricultural fumigants. The system treats the initiation of an application, emission rates over time, and meteorological parameters as Monte Carlo variables. Software was developed to use the EPA models ISCST3 or CALPUFF6 to evaluate agricultural fumigation applications. FEMS was reviewed and accepted by the EPA Science Advisory Panel (SAP).

**U.S. Study of Environmental Control Measures for Ostrava, Czechoslovakia and Katowice, Poland** – David Sullivan served as Project Manager for Sullivan Environmental's support to this three-year study of the highly industrialized region of Northern Czechoslovakia and Southern Poland, which was conducted by the U.S. Environmental Protection Agency. Mr. Sullivan was responsible for the air quality aspects of this project, which included emissions assessment, dispersion modeling, model performance evaluation, and consulting support for enhancing ambient air toxics and criterion pollutant monitoring in one of the most industrialized areas in Eastern Europe.

**$PM_{10}$ SIP Support to Allegheny County, Pennsylvania (Pittsburgh)** – David Sullivan managed the development of the modeling strategy for a model-supported State Implementation Plan (SIP) for the Clairton area, which included complex coke oven sources and terrain influences. Mr. Sullivan was responsible for software development to link several models for simple and complex

terrain into an easily managed system (including the BLP, ISCST2, and RTDM models). He also guided the enhancement of meteorological monitoring activities in the Clairton, Pennsylvania area.

**PM$_{2.5}$ SIP Support to Allegheny County, Pennsylvania** – Sullivan Environmental provided meteorological support to Allegheny County for CALMET modeling. This work supported the development of the State Implementation Plan (SIP) to control airborne fine particulates (PM$_{2.5}$) in Allegheny County. The scope of work included the development of the CALMET input file, as well as conducting a performance evaluation of the computed meteorological fields.

**Baltimore Air Toxics Study**– Mr. Sullivan managed the technical analyses performed for this EPA-funded study, which was one of three urban-scale studies mandated by Congress in the Clean Air Act of 1990. These outputs helped to support the EPA development of a national strategy for air toxics. This study required extensive emissions assessment, dispersion modeling, and the development of an air quality management software system to facilitate the integration of modeling and monitoring initiatives in the Baltimore metropolitan area. End products of this study included summaries of exposure and risk as a function of nearly 200 source categories. Co-control issues involving air toxics and ozone precursors also were evaluated for a range of control alternatives. The Air Quality Integrated Management System (AIMS) software was developed through this study as a fully integrated air quality management system that connects emissions, dispersion modeling, and ambient monitoring into a mutually supportive urban-scale air quality management system.

**Mirant Potomac Power Generation Facility in Alexandria Virginia** –Sullivan Environmental provided technical expertise to the City of Alexandria in terms of dispersion modeling based on AERMOD and CALPUFF, as well as evaluation and interpretation of measured air quality data, and providing recommendations for monitoring site locations. Mr. Sullivan served as the task manager for Sullivan Environmental's involvement in this project, which included detailed evaluation of plume impaction on a nearby high-rise residential building.

**EPA Dioxin Monitoring Study** – David Sullivan served as the Principal Investigator and Project Manager for Sullivan Environmental's activities on an EPA dioxin air quality monitoring study. He was responsible for developing a plan for the monitoring program, which included gas and vapor phase airborne dioxin measurements, as well as vegetation, dry fall, and wet fall sampling. Mr. Sullivan drafted a report to interpret the results of this study in comparison with other available field data and model estimates of dioxin exposures.

**Virginia Paving Facility in Alexandria Virginia** – Sullivan Environmental served as independent experts to help resolve technical issues involving the City of Alexandria, the facility, and local residents. Mr. Sullivan managed this project and provided technical support in terms of review of emissions estimates, dispersion modeling methods, and guidance on the design of an air quality monitoring program. Mr. Sullivan presented oral presentations at public meetings.

**Air Quality Monitoring Study to Evaluate Total Suspended Particulate Emissions in the Vicinity of a Sand and Gravel Mine** - Mr. Sullivan was responsible for site selection, network

set-up and operation, and data interpretation for a five-station study of total suspended particulate (TSP) at a quarry located in rural Maryland. A meteorological monitoring station also was installed onsite and operated to support data interpretation. Mr. Sullivan provided expert testimony at a zoning hearing related to this matter.

**Review of the Nine City Study and Panel Study Data Set** – Sullivan Environmental served as a subcontractor to Harvard School of Public Health on this project, which was conducted to study the air quality in nine cities in the Russian Federation. The scope of this project included inspecting monitoring sites and monitoring procedures, and conducting a detailed statistical evaluation of the air quality data collected at 14 air quality monitoring sites located in 9 cities in Russia. Mr. Sullivan developed a final database to support statistical analysis of this extensive data set that included coverage of $PM_{10}$, $PM_{2.5}$, $SO_2$, $NO_2$, and selected volatile organics. This review also included a quantitative analysis of quality assurance records relative to goals stated in the quality assurance plan.

**Dispersion Modeling to Support Air Quality Permits for Industry** – David Sullivan has broad modeling experience for permit applications, including Prevention of Significant Deterioration (PSD), air quality permits to construct, accident analyses to support OSHA process safety management, hazardous waste incineration permits, and modeling to support California air toxics permitting. This experience includes a broad range of industries and coverage in the following States: Virginia, South Carolina, North Carolina, Oklahoma, California, Illinois, Pennsylvania, and New York. Examples are offered as follows:

- *PSD Permit* - I-95 Lorton (Virginia) PSD permit for the Fairfax County mass burn incinerator.
- *State Air Quality Permits to Construct* - Permits for industrial applications for cement plants located in South Carolina and Oklahoma.
- *OSHA Process Safety Management* - Permits for two process areas for industry in South Carolina.
- *Hazardous waste incineration permits* for facilities in Pennsylvania and Illinois.
- *Proposition 65* modeling analyses to support risk assessment in California.

**Atmospheric Research for the U.S. Department of Agriculture (CSREES)** – Co-Project Director on a research grant awarded by the USDA that included evaluating airborne impacts from the use of the agricultural fumigant, metam-sodium. This grant was awarded to Texas A & M as the prime contractor. Six field studies were conducted from 2002 through 2004 to compute emission rates of the active ingredient, methyl isothiocyanate, as a function of time. These studies included alternative forms of product application and used dispersion modeling and statistical methods to compute best-fit emission rates as a function of time based on air quality monitoring

networks of 8 to 10 air quality monitors. Mr. Sullivan was the Principal Investigator for the airborne flux assessment.

**EPA "Six Month" Study** – Task Manager for EPA's "35-County" Study of Air Toxics. This was one of the three studies collectively referred to as the "*Six Month Study of Air Toxics,"* which was one of the guiding forces for EPA's air toxics initiatives in the mid to late 1980s. Mr. Sullivan was responsible for the compilation of emissions factors and dispersion modeling for this study. The study computed estimates of toxic emissions from all 3,000 counties in the U.S., and performed dispersion modeling for 35 of these counties.

**Air Quality Quick Response** – Program Manager for the EPA Air Quality Quick Response Team of the Stationary Source Compliance Division. Authored manual with procedures for all facets of an emergency response action, i.e., emissions characterization, ambient monitoring, dispersion modeling, and health assessments. As a field team member and as Advance Field Team Leader, Mr. Sullivan provided quick response for the following assignments:

- Secondary lead smelter (Fredericktown, New Jersey)
- Secondary lead smelter (Brooklyn, New York)
- Chemical company (North Haven, Connecticut).
- Hazardous waste facility (Baton Rouge, Louisiana)
- Hazardous waste in abandoned underground mine (Pittston, Pennsylvania)

**Fairfax County I-95 / Lorton Incinerator PSD Permit** – Mr. Sullivan was the principal analyst and Program Manager for the I-95 Incinerator PSD permit, Lorton, Virginia. He was responsible for all modeling and data interpretation.

## Associations / Certification

Professional Member of the American Meteorological Society, Certified Consulting Meteorologist (#256) since 1980.

Air & Waste Management Association.

American Chemistry Society.

## Publications

Sullivan, D.A., R.D. Sullivan, and D.J. Hlinka, Applying Lessons Learned from Agricultural Studies of Airborne Pesticides Emissions to Waste Management Sources, Proceedings of the Air and Waste Management Association Annual Meeting, Boston, Massachusetts, June 2018.

Sullivan, D.A., R.D. Sullivan, and D.J. Hlinka, On-Field Atmospheric Dilution of Emissions from Agricultural Fumigants, Proceedings of the Air and Waste Management Association Annual Meeting, Boston, Massachusetts, June 2018.

Sullivan, D. A., D. J. Hlinka, M.T. Holdsworth, Assessing the Changing Impacts Over Time of Gas Station Related Source $NO_2$ Concentrations, Proceedings of the Air & Waste Management Association's Annual Meeting, June 2016, New Orleans, Louisiana.

Ajwa, H., Sullivan, D.A., Holdsworth, M.T., Sullivan, R.D., and Nelson, S, Reduction of Methyl Isothiocyanate Atmospheric Emissions after Application of Metam Sodium by Shank Injection, Journal of Environmental Quality, JEQ201305.0182, 2013.

Ajwa, H.A., M.S. Stanghellini, S. Gao, Sullivan, D.A, A.R. Khan, J.W. Ntow, and R. Qin, California Agriculture Journal, "Fumigant Emission Reduction Using VaporSafe Totally Impermeable Film," July-September 2013.

Gao, S., H. Ajwa, R. Qin, M. Stanghellini, and D.A. Sullivan, "Emission and Transport of 1,3-Dichloropropene and Chloropicrin in a Large Field Tarped with VaporSafe TIF," Environmental Science & Technology, 47, 405-411, 2013.

Sullivan, D.A., and H. Ajwa, "Evaluation of Empirical Wind Erosion Emission Factors for Air Quality Modeling," Soil Science Society of America Journal, Volume 75, Number 4, July-August 2011.

Qin, R., S. Gao, H. Ajwa, D.A. Sullivan, D. Wang, and G. Hanson, "Field Evaluation of a New Plastic Film (Vapor Safe) to Reduce Fumigant Emissions and Improve Distribution in Soil, Journal of Environmental Quality, 40: 1195-1203, 2011.

Sullivan, D.A., and H. Ajwa, "Review of Airborne Emissions from Agricultural Fumigants: Design and Uncertainty Considerations for the Use of the Integrated Horizontal Flux Method," Journal of Environmental Quality, September 27, 2010 (*published online*).

McIntosh, D.L, J.H. Stewart, T.A. Myatt, J.E. Sabato, G.C. Flowers, K.W. Brown, D.J. Hlinka, D.A. Sullivan, "Use of CALPUFF for Exposure Assessment in a Near-Field, Complex Terrain Setting," Atmospheric Environment , 44:262-270, 2010.

Chellemi, D.O., H. Ajwa, and D. Sullivan, "Atmospheric Flux of Agricultural Fumigants From Raised-Bed, Plastic-Mulch Crop Production Systems," Atmospheric Environment, Volume 44, Issue 39, 5279-5286, 2010.

Sullivan, D.A., and H. Ajwa, "Cost-effective Airborne Flux Monitoring Programs For Agricultural And Other Applications," Paper #133, Proceedings of the Annual Meeting of the Air & Waste Management Association, Detroit, MI, 2009.

Qin, R, S. Gao, J.A. McDonald, H. Ajwa, S. Shem-Tov, and D.A. Sullivan, "Effect of Plastic Tarps Over Raised-Beds and Potassium Thiosulfate in Furrows on Chloropicrin Emissions from Drip Fumigated Fields," Chemosphere, Volume 72, 558-563, 2008.

Sullivan, D.A., M.T. Holdsworth, and D. J. Hlinka, "Control of Off-Gassing Rates of Methyl Isothiocyanate from the Application of Metam-Sodium by Chemigation and Shank Injection," Atmospheric Environment, (38), 2457 – 2470, 2004.

Sullivan, D. A., M.T. Holdsworth, and D. J. Hlinka, "Monte Carlo-Based Dispersion Modeling of Off-Gassing Releases from the Fumigant Metam-Sodium for Determining Distances to Exposure Endpoints," Atmospheric Environment, (38), 2471-2481. 2004.

Nelson, S.D., D.W. Dickson, H.A. Ajwa, and D. A. Sullivan, "Efficacy of Metam Sodium Under Drip and Surface Spray Application in Florida Tomato Production," Subtropical Plant Science, 56: 16-20, 2004.

Lebedev, N.V., Furman, R.D., Kislitsyn V.A., Konygin, E.A., Vasil'eva, M.I., Segedevich, I.I, Shashina, E.A., Kin, S., Kanningham, K., and Sullivan, D. "Economic Efficiency of Sanitation Measures at the JSC "Severstal" in the City of Cherepovets (Russian Federation)," 1: Med Tr Prom Ekol; (4) 18-25. (*article is in Russian*), 2002.

Levy, J.I., J.D. Spengler, D.J. Hlinka, D.A. Sullivan, and D. Moon, "Using CALPUFF to Evaluate the Impacts of Power Plant Emissions in Illinois: Model Sensitivity and Implications," Atmospheric Environment, 1077-1086, Vol. 36, Issue 6, February 2002.

Sullivan, D.A., and D.E. Guinnup, "Enhanced TOXST", *Reviews in Toxicology,* 1 (1997), *In Vivo* Toxicology and Risk Assessment", IOS Press, 1997.

Sullivan, D.A., T. Lahre and M. Alford, "Assessing Multiple Pollutant Multiple Source Cancer Risks From Urban Air Toxics (Summary of Approaches and Insights From Completed and Ongoing Urban Air Toxics Assessment Studies)", EPA-450/2-89-010, U.S. Environmental

Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, NC, April 1989.

Woodcock, B., D.A. Sullivan, and A. Gleit, "Coal as a Marine Boiler Fuel: Environmental Effects, The Journal of Environmental Sciences, Volume XXVI, March/April 1983, 41-46.

Panofsky, H.A., D.W. Thomson, D.A. Sullivan, and D.E. Moravek, "Two-Point Velocity Statistics Over Lake Ontario," Boundary-Layer Meteorology, Volume 7, 309-321, 1974.

Sullivan, D.A., "A Study of Horizontal Coherence Over Lake Ontario," Master's Thesis, The Pennsylvania State University, 1974.

**Example Presentations**

Sullivan, D.A., D.J. Hlinka, M.T. Holdsworth, R.D. Sullivan, T. Swaminathan, and H. Gear, EDN as a Viable Alternative For Port Timber Fumigation, Methyl Bromide Alternatives Outreach Conference, 2020 (remote participation due to pandemic).

Sullivan, D.A., D.J. Hlinka, M.T. Holdsworth, R.D. Sullivan, and I.R. Gear, "Forest Product Fumigation: The Challenges of Modeling Airborne Exposures From an Active Port," Methyl Bromide Alternatives Outreach Conference, 2020 (remote participation due to pandemic).

R.D. Sullivan, and D.A. Sullivan, "Characterizing Worker Exposure to Pesticides Without Personal Monitors: A Developing Challenge for all Pesticides"," Annual Meeting of the American Chemistry Society, San Diego, CA, August 2019.

R.D. Sullivan, and D.A. Sullivan, "Refining Dispersion Modeling to Meet Evolving Regulatory Requirements," Annual Meeting of the American Chemistry Society, San Diego, CA, August 2019.

Sullivan, D.A., and R.D. Sullivan, "Modeling Exposures From Agricultural Pesticides," Annual Meeting of the American Chemistry Society, Washington, D.C., August 2017.

Sullivan, D.A., D. J. Hlinka, R.D. Sullivan, and T. Swaminathan," Modeling Airborne Exposures From Fumigation at a Port: Example EDN, Methyl Bromide Alternatives Outreach Conference, November 2017.

Sullivan, D.A., R. D Sullivan, "On-Field Dilution of Airborne Flux: Importance for Modeling Exposures," Methyl Bromide Alternatives Outreach Conference, Orlando, Florida, 2014.

Sullivan, D.A., D. J. Hlinka, M.T. Holdsworth, R. D Sullivan, "Refinement in the Modeling of Buffer Zones," Methyl Bromide Alternatives Outreach Conference, Orlando, Florida, 2014.

Sullivan, D.A., H. Ajwa, M.T. Holdsworth, R.D. Sullivan, "Metam Sodium Shank Compaction Applications as a Case Study in Mitigating Airborne Flux," Annual Meeting of the American Chemistry Society, Philadelphia, PA, 2012.

Sullivan, D.A., "Review of Design Issues for On-Field Flux Assessment Methods," Annual Meeting of the American Chemistry Society, Washington, D.C., August 2009.

Sullivan, D.A., "Air Quality Impacts at Tar Creek", Metals Epidemiology Research Group, Harvard School of Public Health, Boston, MA, Seminar: October 24, 2007.

Sullivan, D.A., Invited Speaker at California Department of Pesticide Registration's VOC Symposium held in Sacramento, CA, title of presentation: "Estimating VOC Emissions From Agricultural Fumigants", May 2007.

Sullivan, D.A., "Updates in FEMS Model to More Accurately Represent Exposures From Fumigants," Methyl Bromide Alternatives Outreach Conference, Orlando, FL, November 2006.

Sullivan, D.A., "CALPUFF Modeling of Fumigation Applications: Advancing the State-of-the-Art in Computing Buffer Zones," 232nd National Meeting of the American Chemical Society, San Francisco, CA, September 2006.

Sullivan, D.A., "Options to Estimate Emission Rates: When to Rely on Ambient–Based Emissions and When to Use On-Field Flux Methods," 232nd National Meeting of the American Chemical Society, San Francisco, California, September 2006.

Sullivan, D.A., M.T. Holdsworth, and D.J. Hlinka, Background Document on the Fumigant Emissions Modeling System (FEMS), presented to the EPA Science Advisory Panel, August 2004.

Sullivan, D.A., D.J. Hlinka, and M.T. Holdsworth, "The Integrated Use of Dispersion Modeling and Ambient Monitoring to Evaluate Air Quality Sources with Complex Emissions," Paper # 406, Annual Meeting of the Air & Waste Management Association, Indianapolis, Indiana, June 23, 2004.

Sullivan, D.A., "Update: Research of the Metam-Sodium Task Force on Efficacy and Odor Management," Methyl Bromide Alternatives Outreach Conference, Orlando, Florida, November 2002.

Sullivan, D.A., "The Use of Empirically-Based Treatments to Model Exposures From Sources of Air Toxics That Cannot be Well Defined by Emission Factors or Direct Measurements," presented at the Coordinating Research Council Air Toxics Modeling Workshop, The Woodlands, Texas, and February 26-27, 2002.

Sullivan, D.A., Instructor for Atmospheric Science and Risk Projections for Hazardous and Radioactive Material Releases to the Environment, Harvard School of Public Health, Cambridge, Massachusetts, August 1998.

Sullivan, D.A., Development of RiskMan$^{Pro}$ Software to Promote Strategic Planning for Risk Management Programs, Annual Meeting of the Air & Waste Management Association, Toronto, Ontario, June 1997.

Sullivan, D.A., Technology for Environmental Uses: Computer Science Resources for Environmental Managers, Course Instructor, George Washington University, November 15, 1996.

Sullivan, D.A., Baltimore Air Toxics Study (BATS), Air & Waste Management Association (AWMA) Emission Inventory: Key to Planning, Permits, Compliance & Reporting Conference, New Orleans, Louisiana, September 1996.

Sullivan, D.A., The Air Quality Integrated Management System (AIMS), presented at the Fall Meeting of the Carolinas Air Pollution Control Association, Myrtle Beach, South Carolina, October 25, 1995.

Sullivan, D.A., and T.G. Grosch, Air & Waste Management Association Faculty for Professional Development Course: <u>Application of the New EPA TOXST Model: More Realistic Evaluation of Peak Air Quality Exposures</u>. Presented June 18, 1995, San Antonio, TX.

Sullivan, D.A., "Strategic Planning and Coordination Efforts for the EPA Baltimore Air Toxics Study," presented at the 88th Annual Meeting of the Air & Waste Management Association, San Antonio, TX, June 1995.

Sullivan, D.A., Invited presenter at Air Quality Symposium on Exposure Assessment Methods, Sponsored by American International Development Agency (AID), Nizhnii Tagil, Russia, March 1995.

Sullivan, D.A., and D. Guinnup, "Enhanced Version of TOXST," presented at the 87th Annual Meeting of the Air & Waste Management Association, Cincinnati, OH, June 1994.

Sullivan, D.A., T. G. Grosch, and D. J. Hlinka, "Air Quality Assessment of Katowice, Poland," presented at the 87th Annual Meeting of the Air & Waste Management Association, Cincinnati, OH, June 1994.

Sullivan, D.A., "Air Toxics: The Evaluation of Peak Exposures," invited paper presented at the 25th Year Spring Meeting of the Carolinas Air Pollution Control Association, Raleigh, NC, April 1994.

Sullivan, D.A., guest speaker at the March 16, 1994 meeting of the local chapter of the American Institute for Chemical Engineers in Baltimore, MD. Topic of the presentation was: "Meeting the Challenge of Estimating Peak Ambient Air Quality Concentrations Without Extreme Conservatism: A Description of EPA's New TOXST Model."

Sullivan, D.A., "Modeling Acute Exposures," presented at the Research Triangle Chapter of the Society for Risk Analysis Workshop entitled: Living with Uncertainty: The Future of Exposure Assessment, Chapel Hill, NC, October 1993.

Sullivan, D.A., S.S. Lande, and J. R. Foster, "CMA Model Development Initiatives in the Evaluation of Peak Exposures," presented at the Electric Power Research Institute Symposium on Toxic Air Pollution, Washington, DC, July 1993.

Sullivan, D.A., "The Application of Integrated Environmental Management Concepts to Track Emission Reduction Strategies Required Through the Clean Air Act Amendments of 1990," presented at the 86th Annual Meeting of the Air & Waste Management Association, Denver, CO, June 1993.

Sullivan, D.A., D. J. Hlinka, and T.G. Grosch, "Project Silesia Phase I Ambient Air Quality Analysis (Method and Results)," presented at the 86th Annual Meeting of the Air & Waste Management Association, Denver, CO, June 1993.

Sullivan, D.A., T. G. Grosch, and D J. Hlinka, "The Evaluation of Peak Exposures to Meet State and Clean Air Act Requirements: Benefits of Establishing a Proactive Position," presented at the 86th Annual Meeting of the Air & Waste Management Association, Denver, CO, June 1993.

Sullivan, D.A., "Establishing Environmental Priorities in the Industrial Centers of Ostrava, Czechoslovakia and Katowice, Poland," presented at the Annual Meeting of the Air & Waste Management Association, Kansas City, MO, June 1992.

Sullivan, D.A., T. G. Grosch, and D. J. Hlinka, "Atlanta Ozone Precursor Study: Dispersion Modeling of $NO_x$ and NMOC," presented at the Annual Meeting of the Air & Waste Management Association, Kansas City, MO, June 1992.

Sullivan, D.A., D. J. Hlinka, and T. G. Grosch, "Monitoring Network Strategies to Address the Potential 15-Minute to 1-Hour $SO_2$ Ambient Air Quality Standards," presented at the Annual Meeting of the Air & Waste Management Association, Kansas City, MO, June 1992.

Sullivan, D.A., and C.P. Silberman, "Results of the Exposure Assessment for the Study of Noncancer Health Effects in the Kanawha Valley of West Virginia," presented at the Annual Meeting of the International Society of Exposure Analysis: Measuring, Understanding and Predicting Exposures in the 21st Century, Atlanta, GA, November 1991.

Sullivan, D.A., "Comprehensive Apportionment of Air Toxic Risks Considering Chronic, Short-term, and Potential Exposure," presented at the Annual Meeting of the Air & Waste Management Association, Vancouver, British Columbia, June 1991.

Sullivan, D.A., "Comparison of Modeled and Measured Ozone Precursors for the Atlanta Ozone Study," presented at the Annual Meeting of the Air & Waste Management Association, Vancouver, British Columbia, June 1991.

Sullivan, D.A., "Lessons Learned From the U.S. Environmental Protection Agency's Kanawha Valley Studies of Toxic Air Pollutants," presented at the Annual Meeting of the Air & Waste Management Association, Pittsburgh, PA, June 1990.

Sullivan, D.A., "A Technical Perspective on the Use of Dispersion Models to Estimate Exposure to Air Toxics," presented at the Annual Meeting of the Air & Waste Management Association, Pittsburgh, PA, June 1990.

Sullivan, D.A., "VOC Dispersion Modeling", presented at the EPA Quail Roost III Volatile Organic Receptor Modeling Workshop, Research Triangle Park, NC, December 13-15, 1989.

Sullivan, D.A., "An Evaluation of the Effectiveness of Dispersion Modeling to Estimate Human Exposure: A Case Study Based on the Baltimore Total Exposure Assessment Methodology (TEAM) Study," presented at the 1989 EPA/ Air & Waste Management Association International Symposium on Total Exposure Assessment Methodology, Las Vegas, Nevada, November 29, 1989.

Sullivan, D.A., luncheon speaker at EPA/ Water Pollution Control Federation workshop on "Air Emissions From POTWS", Alexandria, Virginia, July 11, 1989.Sullivan, D.A., speaker at EPA Urban Air Toxics Workshops in Anaheim, CA (February 15-17, 1989); Denver, CO (March 8-10, 1989); and Baltimore, MD (April 15-17, 1989).

Sullivan, D.A., T. Lahre and M. Alford, "Assessing Multiple Pollutant Multiple Source Cancer Risks From Urban Air Toxics (Summary of Approaches and Insights From Completed and Ongoing Urban Air Toxics Assessment Studies)", EPA-450/2-89-010, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, NC, April 1989.

Sullivan, D.A., presented testimony for EPA at TSCA Hearings on EPA Asbestos Rule, Arlington, VA, September 19-20, 1988.

Sullivan, D.A., speaker at workshops on hazardous waste incineration, presented by EPA (Office of Solid Waste) in Kansas City, MO, (September 21, 1988) and Alexandria, VA (September 13, 1988).

Sullivan, D.A., Guest Speaker for the Instrument Society of America, "Presentation of the Results of the EPA Kanawha Valley Air Toxics Study", Charleston, WV, February 9, 1988.

Sullivan, D.A., speaker: Presented Air Quality Protocol and results for EPA Kanawha Valley Study to the EPA Science Advisory Board (SAB), Washington, DC, August 28, 1986, September 18, 1986, and March 16, 1987.

Sullivan, David A., "Monitoring and Modeling of Toxic Pollutants in Philadelphia," American Society for Quality Control Congress, Baltimore, MD, May 6, 1985.

Sullivan, David A., and Alan Jones, "Results of the U.S. Environmental Protection Agency's Air Toxics Analysis in Philadelphia." Air Pollution Control Association Annual Meeting, Detroit, MI, June 19, 1985.

Sullivan, David A., Charles Carter, and John Richards," Urban-Scale Monitoring Programs for Airborne Toxics in Philadelphia and Baltimore," National Meeting of the American Chemical Society, Philadelphia, PA, August 28, 1984.

Sullivan, David A., speaker: "Air Toxics Emissions Inventory Workshop," Sponsored by Region I of the U.S. Environmental Protection Agency, Lexington, MA, June 6, 1984.

Sullivan, David A., and Jerome B. Strauss, "A Sensitivity Analysis of Plume Depletion in the Modeling of Particulate Emissions in the Coal Mining Industry," Annual Meeting of the Air Pollution Control Association, New Orleans, LA, June 24, 1982.

Sullivan, David A., and Jerome B. Strauss, "Monitoring of Airborne Emissions from a Hazardous Waste Site," presented at the Management of Uncontrolled Hazardous Waste Sites Conference, Washington, DC, October 29, 1981.

Sullivan, David A., lecturer UCLA Extension Course on "Underground Coal Conversion," conducted sessions on environmental licensing, Los Angeles, CA, March 1980, and March 1981.