**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | Case No. 4:11-cv-00044-CDP |
| Plaintiffs, | ) | (CONSOLIDATED) |
| | ) | |
| vs. | ) | |
| | ) | |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE OPINION TESTIMONY OF JACK V. MATSON UNDER FEDERAL RULE OF CIVIL PROCEDURE 26, FEDERAL RULE OF EVIDENCE 702, AND *DAUBERT***

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................... 1

II.    LEGAL STANDARD ................................................................................... 3

III.   ARGUMENT AND CITATION OF AUTHORITY ....................................... 3

   A.  Dr. Matson Did Not Properly Disclose His Opinions in Accordance with
       Rule 26 and this Court's Case Management Order ...................................... 3

      1.  Dr. Matson's December 2020 Report Does Not Articulate a Standard-
          of-Care Opinion ........................................................................................ 4

      2.  Dr. Matson Has Not Disclosed What Portions of Dr. Cheremisinoff's
          Opinions and Analysis He Has Adopted as His Own .................................. 5

      3.  Dr. Matson May Not Adopt Dr. Cheremisinoff's Opinions as His Own
          Because He Performed No Analysis to Verify the Information
          Contained in Dr. Cheremisinoff's Report Was Reliable ............................ 11

      4.  Dr. Matson Cannot Use His Rebuttal Reports and Deposition Testimony
          to Disclose New Opinions, Including Those Relating to Sulfur Dioxide,
          Arsenic, and the Reliability of Air Monitoring Data .................................. 15

   B.  Dr. Matson's Opinions Are Unreliable ..................................................... 18

      1.  Dr. Matson Conducted No Analysis to Support His Standard of Care
          Opinion ..................................................................................................... 18

      2.  Dr. Matson Ignores Peruvian Environmental Laws and Regulations ......... 21

      3.  Dr. Matson's Claim that Defendants Failed to Prioritize Fugitive
          Emissions Reductions Ignores Facts that Contradict His Opinion ............. 24

      4.  Dr. Matson Did Not Conduct a Reliable Analysis of the Efficacy of
          DRP's Community Health Interventions ................................................... 26

   C.  Any Corporate Social Responsibility Opinion Must Be Excluded ............... 28

      1.  Dr. Matson Is Not Qualified to Offer CSR Opinions ................................. 28

      2.  Dr. Matson Did Not Conduct a Reliable CSR Analysis ............................. 29

IV.    CONCLUSION ........................................................................................... 30

i

## <u>TABLE OF AUTHORITIES</u>

*Am. Auto. Ins. Co. v. Omega Flex, Inc.*,
    783 F.3d 720 (8th Cir. 2015) ...................................................................28

*Amorgianos v. National R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)......................................................................24

*Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*,
    669 F. Supp. 2d 514 (M.D. Pa. 2009)........................................................24

*Cholakyan v. Mercedes-Benz, USA, LLC*,
    281 F.R.D. 534 (C.D. Cal. 2012) ..............................................................12

*Ciomber v. Coop. Plus, Inc.*,
    527 F.3d 635 (7th Cir. 2008) ................................................................4, 11

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993)........................................................................ *passim*

*In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. March 31, 2017)...........................................12

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................................................28, 29

*Glastetter v. Novartis Pharm. Corp.*,
    252 F.3d 986 (8th Cir. 2001) ....................................................................19

*Horton v. Maersk Line, Ltd.*,
    903 Fed. App'x 791 (11th Cir. 2015) ........................................................19

*Johnson v. Avco Corp.*,
    702 F. Supp. 2d 1093 (E.D. Mo. 2010).......................................................18

*Junk v. Terminix Int'l Co.*,
    628 F.3d 439 (8th Cir. 2010) ....................................................................23

*Levinson v. Westport Nat'l Bank*,
    2013 WL 3280013 (D. Conn. June 27, 2013)..............................................16

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ................................................................21

*Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*,
    327 F.3d 771 (8th Cir. 2003) ......................................................................4

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    2008 WL 2324112 (S.D.N.Y. June 5, 2008) ..............................................19

*Meyer v. Currie Tech Corp.*,
  329 F.R.D. 228 (D. Neb. 2018)............................................................................16

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018)...................................................................24

*Peeler v. Boeing Co.*,
  2015 WL 13841120 (W.D. Wash. Oct. 1, 2015) ..................................................11

*In re Prempro Prods. Liab. Litig.*,
  554 F. Supp. 2d 871 (E.D. Ark. 2008)............................................................28, 29

*In re ResCap Liquidating Trust Litig.*,
  432 F. Supp. 3d 902 (D. Minn. 2020).................................................................12

*Rios v. Bigler*,
  847 F. Supp. 1538 (D. Kan. 1994)......................................................................18

*Robson v. Duckpond Ltd.*,
  2021 WL 719887 (E.D. Mo. Feb. 24, 2021).......................................................15

*Sanchez v. Bos. Sci. Corp.*,
  2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014).................................................24

*SEC v. Nutmeg Grp., LLC*,
  2017 WL 1545721 (N.D. Ill. Apr. 28, 2017) .........................................................5

*Shipp v. Murphy*,
  2021 WL 3575678 (8th Cir. Aug. 14, 2021).......................................................28

*Simon v. Select Comfort Retail Corp.*,
  2016 WL 160643 (E.D. Mo. Jan. 14, 2016) ........................................................12

*Thorn v. Sundstrand Aerospace Corp.*,
  207 F.3d 383 (7th Cir. 2000) ..............................................................................18

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999).................................................................................12

*U.S. v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) .....................................................................18, 21

*Werth v. Hill-Rom, Inc.*,
  856 F. Supp. 2d 1051 (D. Minn. 2012)..........................................................11, 15

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
  254 F.3d 706 (8th Cir. 2001) ..............................................................................28

*Woods v. Wills*,
 2005 WL 5990326 (E.D. Mo. Oct. 27, 2005) ........................................................28

**Other Authorities**

Ashley C. Walter & Scott J. Shackelford, Corporate Social Responsibility Is Now
 Legal, Bus. L. Today ........................................................................................29

Federal Rule of Civil Procedure 26 ........................................................... *passim*

Federal Rule of Evidence 702 .................................................................3, 15, 21, 28

8A Wright & Miller, Fed. Prac. & Proc. Civ. § 2118 (3d ed. 2010).........................18

# I.    __INTRODUCTION__

Following the death of Plaintiffs' expert Nicholas Cheremisinoff, Ph.D. in August 2020, Plaintiffs designated Dr. Matson as their sole expert on the topic of standard of care.  Dr. Matson's opinion boils down to the assertion that Defendants violated the standard of care, as well as its Corporate Social Responsibility obligations, because Doe Run Peru ("DRP") did not complete four discrete projects designed to control fugitive lead emissions by 2000 or 2001, a few years earlier than DRP actually completed those projects.  (Ex. B, Deposition of Dr. Jack V. Matson ("Matson Dep.") 01/26/2021, at 194:20-25, 195:1-2, 200:7-15.)  Dr. Matson's opinion testimony is not admissible for several reasons.

***First***, Dr. Matson did not properly disclose his opinions in accordance with Federal Rule of Civil Procedure 26(a)(2)(B), which required his December 1, 2020 report to include "a complete statement of all opinions the witness will express and the basis and reasons for them."  Rather than conducting ***his own analysis*** of relevant information and articulating ***his own opinions*** and the bases for them, Dr. Matson's December 1, 2020 report disclosed merely a single-sentence opinion adopting, without qualification or explanation, the ***entirety*** of Dr. Cheremisinoff's prior ***639 pages*** of reports, as well as all of the testimony from his two-day deposition:

> Upon reviewing Dr. Cheremisinoff's Expert Report and the materials cited in his expert report, [his] deposition transcripts and exhibits, and his expert rebuttal reports, I have determined that Dr. Cheremisinoff's Expert Opinion was reached using reasonable engineering methodology.  I agree with both the substance of this opinion and the underlying bases. . . .  I agree with Dr. Cheremisinoff that Defendants did not exercise reasonable care to protect Plaintiffs from harm by failing to apply practices and implement controls recognized by industry and authoritative sources to reduce air emissions, in particular lead, originating from the La Oroya Metallurgical Complex in a timely manner.

(Ex. A, Expert Report of Dr. Jack V. Matson ("Matson Report") 12/1/2020 at 1-2.)[1]

---

[1] The only substantive area of Dr. Cheremisinoff's work that Dr. Matson did not adopt wholesale

1

As Dr. Matson's report and his January 2021 deposition testimony confirm, however, Dr. Matson performed *no* work to verify that Dr. Cheremisinoff's analyses and conclusions were reliable.  Dr. Matson is not permitted to adopt wholesale Dr. Cheremisinoff's voluminous work without performing such analysis, as well-established federal law makes clear.  But even if such wholesale adoption were allowed, Dr. Matson provided contradictory deposition testimony, actually disavowing certain of Dr. Cheremisinoff's opinions, analyses, and commentary with which he disagreed.  Then when pressed for specifics, Dr. Matson repeatedly refused to testify as to which of Dr. Cheremisinoff's opinions he agreed with and which he did not, leaving Defendants unable to discern the opinions Dr. Matson intends to offer at trial and the bases therefor.  Dr. Matson then attempted to use his subsequent May 2021 "rebuttal" reports and July 2021 deposition regarding those reports to fill the gaps and disclose new opinions and analyses he was required to include in his original report.  He cannot do so under the Rules.

*Second*, even putting aside these significant and fatal procedural deficiencies, Dr. Matson's standard-of-care opinion should be excluded because it is not the product of reliable principles and methodologies.  In arriving at his opinion that DRP should have completed four fugitive lead emission projects within the first two years of owning the La Oroya Complex, Dr. Matson performed no technical analysis, modeling, or calculations showing that such projects could have been completed during that time and would have materially reduced lead emissions—nor did he analyze the efficacy of DRP's community health programs.  Dr. Matson's opinion is also flawed because it ignores the dozens of projects that DRP did complete during that time period that improved air and water quality in La Oroya, and it seeks to replace Peruvian environmental law—

---

was Dr. Cheremisinoff's so-called "emissions inventory," which is being handled by another Plaintiffs' expert, David Sullivan.

which dictated the environmental projects DRP was to complete and on what timetable—with his own subjective beliefs as to which projects should have been completed and on what timetable.

**Third**, to the extent Dr. Matson attempts to frame his standard-of-care opinion within the context of "Corporate Social Responsibility" ("CSR"), any such opinion should also be excluded. Dr. Matson is not a CSR expert and is not qualified to opine on CSR.  Further, Dr. Matson did not conduct a CSR analysis—much less a reliable one—in arriving at his opinion.  Ignoring fundamental factors such as state sovereignty and social consent, Dr. Matson simply falls back on his general opinion that DRP should have performed four emission-control projects sooner than it did without applying any technical analysis or specialized knowledge.

Accordingly, Dr. Matson's testimony does not satisfy the disclosure requirements of Rule 26 and the reliability requirements of Rule 702 and *Daubert* and should be excluded.

## II.    LEGAL STANDARD

Defendants incorporate by reference the legal standard governing exclusion of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), set forth in their contemporaneously filed Memorandum of Law in support of their Motion to Exclude the Proffered Opinion Testimony of Plaintiffs' Expert Witness David L. MacIntosh.

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.  Dr. Matson Did Not Properly Disclose His Opinions in Accordance with Rule 26 and this Court's Case Management Order

Dr. Matson did not properly disclose his opinions, which requires exclusion under the Federal Rules of Civil Procedure.  First, his December 2020 report does not include a complete statement of his opinions and the bases for them.  Second, to the extent Plaintiffs assert the disclosure is proper because Dr. Matson wrote that he is adopting Dr. Cheremisinoff's opinions and bases, Dr. Matson still did not disclose what portions of those opinions and what underlying

bases he is adopting, and his deposition testimony on these topics belies any claim that the "disclosure" in his report was sufficient.  Third, in any event, Dr. Matson cannot "adopt" Dr. Cheremisinoff's opinions and bases without analyzing whether the information contained in Dr. Cheremisinoff's reports was reliable, which he failed to do.  Fourth, Dr. Matson cannot then use rebuttal reports and deposition testimony in an effort to cure the defects in his original report.

### 1. Dr. Matson's December 2020 Report Does Not Articulate a Standard-of-Care Opinion

Rule 26(a)(2)(B) requires that an expert report contain "'a complete statement of all opinions to be expressed and the basis and reasons therefore' and 'the data or other information considered by the witness in forming the opinions.'"  *Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*, 327 F.3d 771, 780 (8th Cir. 2003) (affirming exclusion of expert testimony where report did not contain a complete statement of all opinions); s*ee also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) (expert's report "must include the 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions").

Here, Dr. Matson's December 2020 report merely contains a single sentence "adopting" the entirety of Dr. Cheremisinoff's standard of care opinions:

> I agree with Dr. Cheremisinoff that Defendants did not exercise reasonable care to protect Plaintiffs from harm by failing to apply practices and implement controls recognized by industry and authoritative sources to reduce air emissions, in particular lead, originating from the La Oroya Metallurgical Complex in a timely manner.

(Ex. A, Matson Report at 2.)  This is not a proper disclosure under Rule 26.  Dr. Matson's report, for example, does not identify the environmental practices and controls he contends Defendants should have implemented.  It includes no technical analysis, data, calculations, or other support whatsoever for what impact the unidentified practices and controls would have actually had on air lead emissions.  Dr. Matson's report includes no discussion of whether the unidentified

environmental controls were widely used by other similar smelters in Peru, South America, or anywhere else in the world, or whether the controls were even technologically available and compatible with this particular facility, which Dr. Matson acknowledges is the most complex in the world.  (Ex. C at 98:11-25.)  Dr. Matson provides no support or citation to any laws, regulations, or other environmental standards requiring or even recommending the unidentified controls he contends were necessary.  Nor is there any analysis, consideration, or discussion of whether the unidentified controls were even available to DRP, or in Peru more generally, during the unidentified time periods.  And Dr. Matson does not analyze whether such controls were economically feasible at the Complex given the other environmental controls and projects developed, constructed, and implemented by Defendants during the same time period, as required by the Peruvian Government in the "Environmental Adjustment and Management Program" (or "PAMA," for its acronym in Spanish).

In sum, there is nothing—only a single sentence from Dr. Matson that he agrees with Dr. Cheremisinoff's conclusions.  That is entirely insufficient under Rule 26 and should result in Dr. Matson's exclusion.  *See, e.g.*, *SEC v. Nutmeg Grp., LLC*, 2017 WL 1545721, at *19 (N.D. Ill. Apr. 28, 2017) (excluding expert testimony where discussion in report was "contained in several single sentences simply stating that [he] agrees with [other expert's] approach and method" and that amounted "to no more than a series of bottom-line conclusions").

### 2.  Dr. Matson Has Not Disclosed What Portions of Dr. Cheremisinoff's Opinions and Analysis He Has Adopted as His Own

As the basis for his conclusory standard-of-care opinion, Dr. Matson again states only that he "agrees with" Dr. Cheremisinoff's conclusions, which are spread across Dr. Cheremisinoff's 639 pages of expert reports and 502-pages of deposition testimony:

> Upon reviewing Dr. Cheremisinoff's Expert Report and the materials cited in his expert report, [his] deposition transcripts and exhibits, and his expert rebuttal

reports, I have determined that Dr. Cheremisinoff's Expert Opinion was reached using reasonable engineering methodology. ***I agree with both the substance of this opinion and the underlying bases.***

(Ex. A, Matson Report at 1-2 (internal citations omitted) (emphasis added).)

Dr. Matson then testified—at least initially—that these two sentences should be understood to mean that he is adopting and restating the entirety of Dr. Cheremisinoff's work:

> Q:     And is that what you've done in this case, ***your report just subsumes Dr. Cheremisinoff's work?***
>
> A:     ***Yes.***
>
> Q:     ***Are you adopting everything that Dr. Cheremisinoff wrote as yours,*** with the exception of the emission inventory?
>
> A:     I'm accepting what I stated here, which was I accepted his—his methodology and—and the substance of his opinions and the underlying bases. ***So the answer would be yes.***

(Ex. 2 at 58:25-59:10 (emphasis added); Ex. D at 311:19-312:5 (affirming adoption of all Dr. Cheremisinoff's opinions except emissions inventory opinions).)  But when pressed, Dr. Matson equivocated and offered contradictory testimony:

> So I think I took a week or two to read [Dr. Cheremisinoff's] report, see what the bases of his report were. ***And although I saw some areas that potentially were difficult***, I readily agreed to—I don't want to use the word align, but to accept his report ***and then work out any issues that—where we may have had differences.*** But, I mean, overall I thought he wrote an excellent report and it certainly provided me with a background in the case, ***and I used a lot of what I learned from that report to make my opinion.***

(Ex. D at 305:24-306:12 (emphasis added); *see also id.* at 312:4-5 (stating that he "accepted" Dr. Cheremisinoff's report "as a basis for my opinions"); Ex. B at 73:24-74:2 (testifying that Dr. Cheremisinoff "writes differently than I do, and he articulates things differently from me" and "I may agree or disagree with [him] in the details").)

Despite Defendants' repeated attempts to clarify the specific areas where his and Dr. Cheremisinoff's opinions diverged, Dr. Matson ***refused to do so***, claiming he could not identify

the points where he disagreed with Dr. Cheremisinoff without walking through the 639 pages of

Dr. Cheremisinoff's reports line-by-line in his deposition:

> Q:     Sitting here right now, ***is there anything you disagree with in Dr.
> Cheremisinoff's 600 pages of reports?***
>
> A:     ***I can't give you a blanket answer to that.  You're going to have to be more
> specific.***
>
> Q:     ***Is there anything that you saw in your review of Dr. Cheremisinoff's
> reports that was inaccurate?***
>
> A:     Again, ***you're going to have to be more specific*** on that.
>
> [. . .]
>
> Q:     Dr. Matson, ***did you identify any errors in Dr. Cheremisinoff's reports?***
>
> A:     Again, ***you'll have to be more specific.***
>
> Q:     Okay.  You can't answer that question generally?
>
> A:     In a broad sense, no.
>
> Q:     You certainly didn't identify any errors in Dr. Cheremisinoff's work in your
> report in this case; is that fair?
>
> A:     Well, I've told you about the emissions inventory on a number of occasions.
> There may be some instances that I have some disagreement on, but I can't
> think of them right now.  ***You're going to just have to plow through it, and
> I'll answer those questions.***

(Ex. B at 59:24-62:7 (emphasis added).)  But even when questioned about specific portions of Dr.

Cheremisinoff's report, Dr. Matson again refused to identify those portions with which he agreed

and disagreed:

> Q:     All right.  Let's look at Section 4 [of Cheremisinoff's report].  It's entitled
> "Industrial Complex Operations."  Do you see that?
>
> A:     Yes.
>
> Q:     That's a section of his report that you've studied and you're familiar with,
> right?
>
> A:     Yes.
>
> Q:     You're adopting the content of that section as your own?
>
> A:     Yes.
>
> Q:     You agree with everything in that section of his report?
>
> A:     Well, let's start with page 17 and we'll go down through it.

Q:      Well, maybe you can do that on your own time, but just see if you can answer my question, which is: Do you agree with everything in Section 4 of Dr. Cheremisinoff's report?

A:      I can't answer that question, because we need to go through it thoroughly, and I'll be happy to answer those questions.

Q:      And I just want to make sure I didn't miss it somewhere in your Rule 26 expert report in this case. ***There's nowhere in that report where you went through Cheremisinoff's report and specified for the reader what you agreed with and what you didn't agree with in Cheremisinoff's report; is that correct?***

A:      ***On a line-by-line way, no.***

(Ex. B at 68:13-69:22 (emphasis added).)  Dr. Matson played the same cat-and-mouse game on every section of Dr. Cheremisinoff's report.  (*See, e.g.*, *id.* at 69:23-70:7 (Section 6, "Good Industry Practices"); *id.* at 70:8-18 (Section 7, "Air Quality Standards"); *id.* at 70:19-71:14 (Section 8, "Smelter Complex Air Discharges"); *id.* at 71:15-72:14 (Section 8.4, "Pollution Reduction Projects"); *id.* at 72:15-77:19 (Section 9, "Standard of Care Opinions").)

Only as Dr. Matson's deposition proceeded over the course of two days did he even begin to identify any points where he believed Dr. Cheremisinoff was wrong or where he disagreed with Dr. Cheremisinoff's analysis.  For instance, on the critical issue of the standard of care, Dr. Matson pointed out numerous points of disagreement with Dr. Cheremisinoff:

Q:      I want you to tell me what your opinions are.  You can start wherever you'd like, Doctor.  I'm giving you free rein.  Tell me what your opinions are.  We have 14 hours, or 10 hours, or however many we have left.  Tell me what your opinions are.

A:      Okay.   What I'm going to do here is—I'm on page 137 [of Dr. Cheremisinoff's report], and I'm going to articulate it in my own words what he meant.  So, for instance, he has "Defendants gave no priority in reducing air pollution and their harm to the public at large, including Plaintiffs' first few years of their ownership and control.  Over the first three years, they could have reduced fugitive air emissions by more than 2,000 tons per year but chose to do nothing."  Okay.  In a holistic way, I agree with that statement that they didn't give it—I wouldn't say no priority, but they didn't give it much of a priority.  It certainly wasn't their main priority.

And then it goes on to say that "they could have reduced fugitive air

8

> emissions by more than 2,000 tons per year but chose to do nothing." My thing is that they did do a few things. It didn't have a significant impact, but they did do some minor repairs.
>
> Secondly, when he says that they could have reduced air emissions by more than 2,000 tons but chose to do nothing, that 2,000 tons numbers, I have questions about it, but they could have done significant reductions in air emissions, and, again, but chose to do nothing. Well, they did a little bit. So that's how I—that's my explanation of that opinion.

(Ex. B at 75:24-77:9; *see also id.* at 82:17-24 (stating Cheremisinoff was "incorrect").) Just with respect to this one sentence of Dr. Cheremisinoff's report, Dr. Matson identifies at least four points of disagreement.

And the areas of disagreement go to the heart of this case. For example, Dr. Matson has identified the enclosure of the lead blast furnace building as one of four critical fugitive emission control projects DRP should have undertaken earlier than it did, and the timeline of when DRP completed this project is central to Dr. Matson's standard-of-care opinion. Yet, Dr. Matson acknowledged that Dr. Cheremisinoff's analysis on this critical issue was wrong:

> Q:     Do you agree with Dr. Cheremisinoff that the lead furnace building was not enclosed as of 2009?
>
> A:     No. It was my understanding that it was enclosed [before 2009].

(Ex. C at 205:21-25.) Dr. Matson even rejected Dr. Cheremisinoff's key opinions regarding the *volume* of fugitive emissions DRP could have eliminated in the first three years of its ownership. (Ex. B at 75:24-77:9.)

Likewise, the extent to which air quality would have improved if DRP had implemented Dr. Matson's preferred emission control projects on his preferred schedule—rather than completing the numerous other air pollution control projects that it did complete on that schedule—goes directly to whether Plaintiffs suffered any harm from the purported failings he has identified and whether DRP's actions to reduce emissions from the facility were reasonable. Yet, at his second deposition in July 2021, Dr. Matson testified that Dr. Cheremisinoff wrongly relied

upon certain air monitoring data in reaching his opinions:

> Q:    Okay.  So it's your view the ambient air monitoring data from the Sindicato station from 1995 through 1999 are too unreliable to use; is that right?
>
> A:    Yes, that's my opinion.
>
> Q:    Okay.  Now, as we just talked about, you've reviewed Dr. Cheremisinoff's report in this case, right?
>
> A:    Well, he did.  And I—you know, I discarded his use of that and discarded his opinion on that matter.
>
> Q:    Great.  So Dr. Cheremisinoff was wrong when he relied on pre-2000 data from Sindicato?
>
> A:    Say that again more slowly.
>
> Q:    Sure.  *You believe that Dr. Cheremisinoff was wrong to have relied on pre-2000 data from the Sindicato station and you're not adopting the use of that data?*
>
> A:    *Correct.*
>
> Q:    Okay.  *You don't say that at all in your original report back in December 2020; is that fair?*
>
> A:    *No.  Back in 2020 I had not had the time to go back and see in depth the data.*[2]

(Ex. D at 24:10-25:9.)  This is not a trivial point—Dr. Matson states that reliability of the data is "a very, very significant factor" in this case.  (*Id.* at 28:10-12.)

Despite Dr. Cheremisinoff's mistakes and Dr. Matson's points of disagreement, as the above-cited testimony reflects, Dr. Matson's December 2020 report identifies ***no*** points where he does not adopt Dr. Cheremisinoff's work and analysis or expresses disagreement therewith.  And none of the points of disagreement identified subsequently at deposition are contained in Dr. Matson's December 2020 report.  Under Rule 26, Dr. Matson was required to issue a report that completely sets out the opinions he is offering and the bases for those opinions.  FED. R. CIV. P.

---

[2] Dr. Matson later contradicted his own testimony, stating that he had ample time to review Dr. Cheremisinoff's report. (Ex. D at 49:14-16 ("No. I had time to prepare my report for December 1st.  It was a short period of time, but I had time to do it.").)

26(a)(2)(B).  *See, e.g., Ciomber*, 527 F.3d at 642 ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify[.]"); *Werth v. Hill-Rom, Inc.*, 856 F. Supp. 2d 1051, 1060 (D. Minn. 2012) (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)) (explaining that expert witness discovery rules are intended to prevent parties from being "ambushed" by surprise information); *Peeler v. Boeing Co.*, 2015 WL 13841120, at *1 (W.D. Wash. Oct. 1, 2015) (excluding improperly disclosed expert opinion in part because in absence of proper report, defendants "had no idea . . . what questions to ask at deposition").  Rule 26 does not permit an expert to adopt in one-sentence more than 600 pages of another expert's analysis and opinions and more than 500 pages of deposition transcripts, only to force the opposing party to read 639 pages of the other expert's reports line-by-line in his deposition so he can identify—*for the first time*—areas where he and the other expert disagree and explain—*for the first time*—what his actual opinions are.  Nor does Rule 26 permit Plaintiffs to flip the burden on Defendants to ask the perfect question to ascertain what opinions Dr. Matson will be offering.  Rule 26 is not a game of expert hide-and-seek.

In sum, Dr. Matson did not disclose his opinions and the bases for them in accordance with Rule 26.  And now, despite deposing Dr. Matson for 21 hours, beyond the four fugitive emission projects discussed above, Defendants are no closer to understanding what opinions he may try to offer at trial.  This is prejudicial and precisely the type of gamesmanship Rule 26 prohibits.

### 3. Dr. Matson May Not Adopt Dr. Cheremisinoff's Opinions as His Own Because He Performed No Analysis to Verify the Information Contained in Dr. Cheremisinoff's Report Was Reliable

Putting aside the procedural defects in Dr. Matson's "disclosure," Dr. Matson cannot simply "adopt" Dr. Cheremisinoff's opinions and bases as his own because he repeatedly testified he did not verify Dr. Cheremisinoff's calculations or confirm that his analyses were correct.  An expert may not adopt the opinions of another expert without doing his own independent analysis

11

to verify the accuracy and reliability of those opinions. *See, e.g.*, *Simon v. Select Comfort Retail Corp.*, 2016 WL 160643, *4 (E.D. Mo. Jan. 14, 2016) (Ross, J.) ("Rule 703 does not permit an expert to simply 'parrot' the opinions of other experts. . . . 'An expert's opinion must be based upon his or her own application of principles within his [or] her expertise to the facts of the case.'") (quoting *Hill v. Fikes Truck Line, LLC*, 2012 WL 5258753, at *4 (E.D. Mo. Oct. 24, 2012) (collecting cases and excluding testimony that was "entirely that of another expert").[3]

Here, Dr. Matson testified that he neither analyzed the data and information relied on by Dr. Cheremisinoff nor verified his calculations and analyses to confirm they were reliable, accurate, or correct before issuing his report:

> Q:    So that I'm clear, then, you reviewed what Dr. Cheremisinoff had, but you didn't do any of your own independent analysis of that information; is that right?
>
> A:    Yes.

(Ex. C at 148:25-149:4; *see also id.* at 221:24-25 (testifying that he did not check Dr. Cheremisinoff's report for accuracy against the cited materials).) Rather, Dr. Matson's "review" consisted merely of reviewing Dr. Cheremisinoff's work and ***assuming*** it was correct:

> Q:    Did you prepare your own timeline from review of materials?
>
> A:    No.
>
> Q:    Did you construct air quality trends from air monitoring data as part of your work?

---

[3] *See also In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) (excluding testimony as unreliable for "failure to assess the validity of the opinions of the experts he relied upon" and "unblinking reliance on those experts' opinions"); *In re ResCap Liquidating Trust Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020) (an expert cannot "'simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon'"); *In re Fluidmaster, Inc. Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *24 (an expert "cannot simply adopt wholesale the ideas of another expert without any independent analysis");.*Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 546 (C.D. Cal. 2012) (excluding opinion where expert "took [the other expert's] conclusions, engaged in little, if any, evaluation of their merits, and reproduced [the other report] wholesale").

A:     No, not separate from his work.

Q:     Did you conduct a forensic analysis that consisted of studying air quality trend charts in relation to air quality standards and the timeline of events, activities, and practices in order to assess Doe Run Peru's actions?

A:     I reviewed that information and accepted his.

(Ex. B at 88:5-17.)  In particular, Dr. Matson did not verify the accuracy or reliability of the air monitoring data upon which Dr. Cheremisinoff relied:

Q:     ***You have undertaken no analysis to assess the reliability of the data in Cheremisinoff's Figure 7 for 1996, right?***

A:     Yes***.  I don't have any way to determine its reliability.  It may indeed be reliable or—or not.***  But in the context in which we're talking about it, Nick [Cheremisinoff] did use it.

Q:     Right.  And if Nick—

A:     And must have assumed that it was reliable.

Q:     And if [Dr. Cheremisinoff] assumed it's reliable, Dr. Matson assumes its reliable, right?

A:     Well—well, let's assume for now that its reliable.

Q:     No.  No, I can't assume that.  My question for you is:  ***If Dr. Cheremisinoff thought it reliable, that's all you needed to know, right?***

A:     ***I assume that he assumed it was reliable.***

Q:     And you did no further analysis than that, correct?

A:     No.

Q:     ***No, did you no further analysis?***

***A:     Correct.***

Q:     And you're aware, from the Knight Piesold report in 1996, that there were significant concerns about the reliability of the ambient air quality monitoring data in La Oroya at the time, correct?

A:     Yes.

(Ex. C at 193:3-194:9 (emphasis added); *see also id.* at 171:12-14, 172:1-3 (testifying that he assumed the accuracy of information contained in Exhibit 7 of Cheremisinoff's report and did not review the underlying source material for the exhibit).)  Remarkably, when presented with data that called into question the reliability of Dr. Cheremisinoff's analyses, Dr. Matson testified he

needed to "do further study and analysis" before "verifying the accuracy of the information. . . ." (*Id.* at 178:16-20.)  But the time for that work had expired ***before*** Dr. Matson submitted his Report.

Dr. Matson also did not verify Dr. Cheremisinoff's emissions calculations:

Q:    And this—this graphic reflects Dr. Cheremisinoff's calculations of arsenic concentration in the ambient air at the Sindicato station from 1996 to 2009, right?

A:    Yes.

Q:    You did not rerun these calculations, I take it?

A:    Correct.

Q:    ***So you're assuming that they're accurate, right?***

A:    ***Yes.***

[. . .]

Q:    So when Dr. Cheremisinoff says in his report that Doe Run Peru exposed the public to historically high air emissions, you're not able to say whether that's accurate or not?

[. . .]

Q:    So you just don't know if that's accurate or not, because you haven't analyzed and compared the level of emissions during Doe Run Peru's operation to those of its predecessors; is that right?

A:    Yes.

[. . .]

Q:    And when it says, in this sentence, that Doe Run Peru exposed the public at large to unprecedented levels of harmful air pollution, I take it again that you, Jack Matson, haven't compared the level of air pollution during Doe Run Peru's operations to those of its predecessors?

A:    Yes.

(Ex. C at 157:9-162:25.)

These are not isolated examples.  Dr. Matson did not verify the accuracy of information used by Dr. Cheremisinoff to analyze the air pollution projects DRP completed.  (*Id.* at 115:7-12 ("Q: Okay.  Let me ask you this, then: Is this table correct that there were only four projects conducted between 1999 and 2004 aimed at addressing air pollution?  A: Well, that's what it says. That's all I can—that's my answer.  That's what it says.").)  Nor did he confirm whether Dr.

14

Cheremisinoff's calculations of plant downtime were correct, which is critical to Dr. Cheremisinoff's opinion that DRP could have completed additional emission-control projects sooner than it did.  (*Id.* at 221:22-25 ("Q: Okay.  And you agree with that calculation? A: I did not independently try to make that calculation.  I relied on his numbers.").)  Dr. Matson also did not verify whether the photographs of the CMLO relied on by Dr. Cheremisinoff accurately depicted site conditions.  (Ex. C at 194:23-195:20, 196:23-197:11, 209:19-23, 211:4-212:8, 216:21-24.) This approach is so inconsistent with Rule 26 that Dr. Matson testified he has ***never once*** prepared a report like this one in the over 45 years he has been serving as an expert witness in environmental lawsuits.  (Ex. B at 87:18-23.)

In short, Dr. Matson has not done the work necessary under Rule 702 to verify the accuracy and reliability of Dr. Cheremisinoff's work so that he can rely on it as his own.  His opinions, which are expressly predicated on that unverified work, are inadmissible in this case.

### 4.    Dr. Matson Cannot Use His Rebuttal Reports and Deposition Testimony to Disclose New Opinions, Including Those Relating to Sulfur Dioxide, Arsenic, and the Reliability of Air Monitoring Data

In addition to the substantial disclosure problems created by his "adoption" of Dr. Cheremisinoff's reports, Dr. Matson then violated Rule 26 a second time by endeavoring to use his May 2021 rebuttal reports and July 2021 deposition to backfill the prior inadequate disclosure of his opinions.  Rule 26 prohibits experts from using "rebuttal" reports to disclose new opinions that could have and should have been disclosed in their initial reports.  *See Robson v. Duckpond Ltd.*, 2021 WL 719887, at *3 (E.D. Mo. Feb. 24, 2021) (Clark, J.) ("Supplemental reports cannot disclose new opinions, however, because allowing supplementation 'whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation.'")  Nor does Rule 26 permit experts to offer new expert opinions through deposition testimony.  *See Werth*, 856 F. Supp. 2d at 1065 ("'Rule 26(a)(2) does

not allow parties to cure deficient expert reports by supplementing them with later deposition
testimony.'") (quoting *Ciomber*, 527 F.3d at 642 (explaining that the purpose of Rule 26 "would
be completely undermined if parties were allowed to cure deficient [expert] reports with later
deposition testimony")); *Meyer v. Currie Tech Corp.*, 329 F.R.D. 228, 234 (D. Neb. 2018)
(excluding expert's opinion not disclosed in report and first disclosed at expert's deposition);
*Levinson v. Westport Nat'l Bank*, 2013 WL 3280013, at *5 (D. Conn. June 27, 2013) (where
"[t]here is no evidence that the information [the expert] added was previously unknown or
unavailable to him . . . the failure to include [this information] in his original report . . . cannot be
substantially justified").

But this is precisely what Dr. Matson has done.  The most egregious example is Dr.
Matson's eleventh-hour disclosure of new opinions relating to sulfur dioxide and arsenic
emissions.  Dr. Matson's December 2020 report contained ***no*** opinions relating to sulfur dioxide
or arsenic emissions—in fact, ***sulfur dioxide and arsenic are never mentioned in his report***.  (*See*
Ex. A, Matson Report; Ex. D at 19:11-13 (testifying that his reports contain no opinions related to
sulfur dioxide).)  And during his initial deposition in January 2021, Dr. Matson confirmed that he
is offering ***no*** opinions on sulfur dioxide and arsenic.  (Ex. B at 47:7-12.)  His two May 2021
"rebuttal" reports also did not include a single mention of sulfur dioxide or arsenic.  (*See* Ex. E,
Dr. Jack V. Matson Responses to Supplemental Expert Opinion of John A. Connor and Corby G.
Anderson 5/28/2021; Ex. F, Dr. Jack V. Matson Response to Supplemental Expert Report of Joe
W. Pitts III 5/28/2021.)  Yet, on redirect examination by Plaintiffs' counsel at the very end of his
July 2021 deposition—literally in the twentieth hour of sworn testimony—Dr. Matson testified for
the first time that he was indeed adopting and intending to testify about Dr. Cheremisinoff's
opinions regarding sulfur dioxide and arsenic emissions.  (Ex. D at 18:12-19:13, 319:15-320:6.)

16

Similarly, Dr. Matson's December 2020 report contained no opinions on the reliability of air monitoring data in La Oroya or that DRP breached the standard of care by failing to collect such data. Nevertheless, in his May 2021 rebuttal reports, Dr. Matson asserts—for the first time—that pre-2000 air monitoring data are not reliable.[4] And, on redirect examination by Plaintiffs' counsel at the end of his July 2021 rebuttal deposition, Dr. Matson disclosed an entirely new opinion again—that DRP's alleged failure to collect reliable air monitoring data in the period immediately after its acquisition breached the standard of care. (*Id.* at 324:18-25:3.)

Dr. Matson admitted that he developed these **new** opinions in the six months **following** disclosure of his initial report in December 2020. Dr. Matson testified that he continued to "examine" Dr. Cheremisinoff's reports and while initially "[t]here were parts that I didn't think fit in with my opinions[,] since that time [I] worked through those. And now what you see in my rebuttal reports are—and my initial report are my opinions." (Ex. D at 18:3-8.) Dr. Matson even claims that **he may have more opinions in the future** that he has not yet disclosed:

> A:    I think I reserve the right to take information from that report if necessary.
>
> Q:    So you may—there may be content in Dr. Cheremisinoff's report that you've never analyzed that's not in your reports, but you may analyze it later and then talk about it at trial; that's your position?
>
> A:    Well, that report is a resource for me, and I may, yes.

(*Id.* at 20:7-15.) But that is not how the Federal Rules work. Rule 26 does not allow an expert to supplement his opinions continuously by conducting additional analysis that could have and should have been completed in accordance with the expert report disclosure deadline contained in

---

[4] Dr. Matson's new opinions regarding the reliability of the air monitoring data directly contradict his prior testimony, and that of Dr. Cheremisinoff, which relied on this same data to opine about changes in air quality following DRP's acquisition of the Complex in late 1997. His flip-flop on this issue is an attempt by Plaintiffs to walk back Dr. Matson's prior admissions that DRP's efforts significantly improved air quality from 1999 to 2001. (Ex. C at 155:17-156:3.)

the Court's scheduling order. Where, as here, Dr. Matson admits he had ready access to the information underlying these opinions when his December 2020 report was prepared, any opinions offered by Dr. Matson that were not expressly contained in that report should be excluded.[5]

## B. Dr. Matson's Opinions Are Unreliable

To pass muster under *Daubert* and "meet the standard of evidentiary reliability, expert testimony must be (1) grounded in the method and procedures of science, (2) authenticated by more than subjective belief or unsupported speculation, and (3) supported by appropriate validation—i.e., good grounds, based on what is known." *U.S. v. Frazier*, 387 F.3d 1244, 1295 (11th Cir. 2004) (en banc). In other words, "an expert's opinion must be based on the facts normally relied upon in the field, and the opinion must fit the facts of the particular case. Additionally, an expert's opinion must have a 'reliable basis in the knowledge and experience of his discipline.'" *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1108 (E.D. Mo. 2010).

Even if properly disclosed—which it was not—Dr. Matson's opinion that DRP violated the standard of care by not completing four fugitive lead emissions projects several years earlier than it did is unreliable for at least three reasons.

## 1. Dr. Matson Conducted No Analysis to Support His Standard of Care Opinion

The Eighth Circuit has held that to be reliable, an expert's opinions must be supported with

---

[5] Dr. Matson's serial supplementation continued even after he issued his reports and concluded his depositions. He used his errata to materially change his testimony—sometimes changing "yes" to "no"—without providing the required basis for such changes. (*See* Ex. G, Errata at 55:5 (changing testimony to state his opinion is DRP should have completed certain projects in the 2000 "to 2001 timeframe"); *id.* at 56:5 (altering testimony to state that he didn't analyze DRP's reasons for not completing his four projects because "that wasn't my role as an expert in this case"). *See, e,g, Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 388-89 (7th Cir. 2000); *Rios v. Bigler*, 847 F. Supp. 1538, 1547 (D. Kan. 1994) ("The court will only consider those changes which clarify the deposition, and not those which materially alter the deposition testimony as a whole."); 8A Wright & Miller, FED. PRAC. & PROC. CIV. § 2118 (3d ed. 2010).

sufficient data or reliable principles. *See, e.g.*, *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) ("[T]he district court's gatekeeping role separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge."). There is good reason for this requirement: where an expert "fail[s] to explain his methodology," there is "no way of determining the reliability of [that expert]'s opinion." *Horton v. Maersk Line, Ltd.*, 903 Fed. App'x 791, 799 (11th Cir. 2015); *see In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2008 WL 2324112, at *4 (S.D.N.Y. June 5, 2008) ("'One cannot assess the reliability of reasoning or methodology that is unexplained.'") (quoting *Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999)).

Here, however, Dr. Matson conducted **no analysis whatsoever** to support his opinion that the four emission control projects around which his opinion centers could have been completed on the schedule he identified. For example, Dr. Matson admits DRP was required to implement simultaneously numerous significant environmental projects during the period from 1998 to 2001:

- Dr. Matson admits that the "La Oroya Complex was in very poor condition at the time it was acquired by Doe Run Peru"; "ventilation systems and pollution control equipment needed to be installed for many processes"; the pollution control equipment "that was installed needed to be repaired and upgraded"; there was "excessive corrosion in the facility's large flues and ducts"; and the "smelting technology was extremely outdated" and "inappropriate for a facility that was going to try to control emissions." (Ex. C at 100:10-101:4.)

- Dr. Matson admits that, as a result of these significant environmental issues, DRP "had to undertake numerous complex capital projects simultaneously," and "in the early years of the ownership of the plant," was "undertaking many different tasks all at the same time." (*Id.* at 101:10-18.)

- And Dr. Matson admits large environmental projects like those DRP was implementing "frequently involve the same vendors and staff, all of whom have a finite amount of time that can be devoted to a modernization effort" and necessarily "compete for limited time and resources." (*Id.* at 102:13-103:6.)

Yet, Dr. Matson conducted **no analysis** of whether, given these realities, it was even possible to complete the projects he identified between 1998 and 2001, much less showing that the

19

failure to do so was objectively unreasonable and a breach of the standard of care.  His report is *silent* as to the resources available to DRP between October 1997 and 2001, the physical condition of the facility upon taking it over and the impact that had on DRP's ability to complete the projects on his preferred timetable, the impact on the environment of other projects DRP completed during the same period, and the actual time required to develop, engineer, and construct his preferred projects during the period from 1998 to 2001.

Nor did Dr. Matson conduct any analysis comparing the air quality benefits of his preferred projects to those provided by the numerous other emission control projects that DRP completed during the same period.  For example, Dr. Matson unequivocally admits that "Doe Run Peru decreased lead emissions from the main stack by more than 41 percent between 1999 and 2001" and "reduced the concentration of lead in ambient air by about 48 percent between 1999 and 2001." (Ex. C at 153:15-154:9.)  But Dr. Matson conducted *no analysis* to show his preferred projects would have provided any greater benefit than those DRP completed.  Dr. Matson completed no modeling; he performed no calculations; and he conducted no technical analysis of any kind.  (Ex. B at 87:18-88:17.)  Without such analyses, Dr. Matson has no basis—much less a reliable one—to testify that the choices made by DRP and the Peruvian government about which environmental projects should be completed and on what schedule were unreasonable.

Even worse, Dr. Matson did not compare DRP's emission-control efforts between October 1997 and 2001 to those implemented at other smelters in Peru or South America:

> Q:   Have you compared—have you conducted any analysis comparing the approach that Doe Run Peru took to controlling emissions at the La Oroya smelter to an approach taken by any other smelter or mining operation in Peru at the same time?
>
> A:   Well, I—the answer is *no*.
>
> [. . .]
>
> Q:   Have you conducted any analysis comparing the approach that Doe Run

Peru took to controlling emissions at the La Oroya smelter to any approach taken by any other smelter or mining operation in South America at the same time?

A:    *No*.

(Ex. D at 95:11-96:6 (emphasis added).)  Dr. Matson could not identify a single smelter anywhere in the world that had completed one of the projects he identified—enclosing and ventilating the blast furnace and dross plant—before 2000, as he claims DRP should have done:

Q:    By 2000 *you cannot identify for us any smelter in the world that had enclosed the blast furnace and the dross plant as recommended*….?

**A:    *I did not examine it in that way.***

(*Id.* at 131:10-15 (emphasis added).)

At its core, Dr. Matson's opinion simply cherry-picks four projects that DRP completed in 2006 and says, in hindsight, that it should have completed these same projects a few years earlier. This opinion, unsupported as it is by any analysis or reliable application of technical knowledge or expertise, is unhelpful to the jury and should be excluded.  *See* Fed. R. Evid. 702 Advisory Committee Note (2000) ("the trial court's gatekeeping function requires more than simply 'taking the expert's word for it'"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Frazier*, 387 F.3d at 1261 (*ipse dixit* opinion testimony not admissible).

## 2.    Dr. Matson Ignores Peruvian Environmental Laws and Regulations

Dr. Matson testified that the methodology he typically utilizes for determining the standard of care for an industrial facility first requires consideration of the country and city in which the facility is operating and the relevant environmental statutes and regulations governing the facility's operations and environmental practices.  (Ex. B at 39:9-21; *id.* at 119:8-120:9.)  But Dr. Matson concedes he has not followed his own methodology here.  This is not surprising.  Dr. Matson has

21

no expertise or experience whatsoever with Peruvian environmental laws and regulations.[6] And, as a result, he fails to ground his analysis in the applicable laws, regulations, and practices of Peru and ignores the legal framework under Peruvian law within which DRP was operating.

In the 1990s, Peru passed its first real environmental laws and established a national program to bring industrial facilities like the La Oroya Complex into compliance with its new requirements.  (Ex. H, Ministerial Resolution 257-2006.)  Under this program, the government developed and/or approved an "Environmental Adjustment Program" (or "PAMA," for its acronym in Spanish) for every mining or metallurgical facility, which established a comprehensive set of priority environmental and pollution control projects that each facility was required to complete over a 10-year period to bring the facility into compliance with Peru's new environmental standards.  (Ex. B at 176:4-9.)  The PAMA for the La Oroya Complex provided DRP 10 years—or until January 13, 2007—to complete the projects it identified.  (Ex. H.)  In 2006, however, the Government of Peru amended the PAMA to add additional projects—including the specific fugitive emission control projects Dr. Matson identified—giving DRP through the end of 2006 to complete them.  (Ex. H.)

Crucially, ***Dr. Matson admits DRP completed the projects he identified by the deadline the Peruvian government set***.  (Ex. C at 98:4-10)  Yet, while acknowledging he was aware of the

---

[6] As Dr. Matson admits, he has no training regarding Peruvian environmental laws and regulations (Ex. B at 127:9-11); he has no experience interpreting Peruvian laws and regulations (*id*. at 127:5-8); he did not review the Peruvian environmental statutes governing the smelting industry (*id*. at 134:6-136:13); he does not know when Peru began to regulate smelter air emissions (*id*. at 128:2-4); he does not know when Peru began to regulate air quality generally (*id*. at 128:8-10); other than the limited materials included in Dr. Cheremisinoff's report, he made no effort to familiarize himself with the relevant laws and regulations governing the facility (*id*. at 89:15-20); he has never served as an expert involving a facility in Peru or anywhere outside the United States (*id*. at 25:15-26:4); he has never consulted with any mining or metallurgical facilities in Peru (*id*. at 26:7-9); and he has never advised any company on statutory or regulatory environmental responsibilities in Peru (*id*. at 26:10-13).

PAMA and that Peru had the superior interest in deciding which projects needed to be prioritized, Dr. Matson dismisses without explanation or analysis Peru's decision giving DRP through December 2006 to implement the fugitive emission control projects he identified.  (Ex. B at 125:16-127:3.)  He also ignores that the four projects he insists should have been completed earlier were not identified by the Peruvian government in the original PAMA.  (Ex. D at 59:1-5.)  According to Dr. Matson, the Peruvian government was wrong in not prioritizing his preferred projects:

> Q:    That's what I'm asking.  Is the government—is it your view that the government of Peru got it wrong in putting anything other than fugitive lead emission projects as the top priority in the PAMA?
>
> A:    Well, **they got it wrong** in not having fugitive lead emissions as a top priority . . . .

(*Id.* at 62:5-14 (emphasis added); *see also* Ex. B at 183:20-25 (stating if he was responsible for the PAMA "of course it would" look different).)   In other words, without having any expertise, experience, or even familiarity with Peruvian environmental laws and regulations—and without having even visited the facility in question—Dr. Matson dismisses decisions made by the Peruvian government as to which projects DRP was to prioritize, and he seeks to impose his own manufactured standard of care, which he admits no smelter in the world satisfied.[7]  (Ex. D at 130:18-131:15.)

Dr. Matson's failure to follow his own methodology and consider Peruvian environmental

---

[7] Dr. Matson asserts that DRP acted negligently by failing to renegotiate the PAMA and trying to convince the Peruvian government that his four preferred projects were a higher priority. (Ex. B at 178:25-179:6.)  But Dr. Matson admits he does not know if Peru would have agreed to this modification or how long this process would take. (Ex. D at 208:17-209:5.)  And, again, Dr. Matson provides no analysis or scientific methodology to support this opinion. No calculations. No modeling. No analysis of Peruvian law (which he has no experience with and is not qualified to opine on). Under *Daubert*, Dr. Matson's speculation that the Peruvian government would have modified the PAMA if only DRP had asked is insufficient and should be excluded.

laws and regulations renders his standard of care opinion unreliable. *See, e.g., Junk v. Terminix Int'l Co.,* 628 F.3d 439, 448 (8th Cir. 2010) (expert's opinion properly excluded where expert's "failure to follow his own general practice . . . created too great an analytical gap between his opinion and the data on which it relied"); *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (testimony properly excluded where expert failed to apply his own stated methodology to the facts of the case).

### 3. Dr. Matson's Claim that Defendants Failed to Prioritize Fugitive Emissions Reductions Ignores Facts that Contradict His Opinion

Under *Daubert*, an expert's failure to consider relevant facts and information contrary to his conclusions renders those opinions inherently unreliable. *See, e.g.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II),* 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted."), *aff'd,* 982 F.3d 113 (2d Cir. 2020); *Sanchez v. Bos. Sci. Corp.*, 2014 WL 4851989, at *11 (S.D. W. Va. Sept. 29, 2014) ("a reliable expert would not ignore contrary data"); *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 669 F. Supp. 2d 514, 523 (M.D. Pa. 2009) (expert's "failure to reassess his opinion in light of [contrary data] is 'the antithesis of good science'").

In developing his opinion that DRP violated the standard of care because it did not complete his chosen fugitive lead emission control projects on his preferred schedule, Dr. Matson refuses to acknowledge work that DRP completed or complexities that DRP faced in modernizing the Complex during the initial years of its ownership. For example, while Dr. Matson asserts that DRP should have paved the facility in the first years of its ownership to reduce fugitive dust emissions from vehicle traffic (Ex. D at 134:9-15), he ignores contrary evidence showing the need to coordinate paving projects with the construction of other projects. He fails to cite documents

showing that paving projects were coordinated with construction of the industrial wastewater treatment plant, which required the installation of more than 15 km of underground piping and conveyance structures.  (Ex. I, DRRCE-00555395 (addressing Phase VII of the Industrial Waste Water Treatment Plant project, noting that it involves construction of "industrial water discharge channels" and "pavement of the road affected by the project").)  Indeed, the only document Dr. Matson cites as support for his opinion that paving should have been completed by 2001 actually shows paving projects commencing in 1999 and extending over an 8-year period ***through 2007***, consistent with the timeline for other projects' construction. (Ex. D at 147:1-150:11.) Yet, Dr. Matson ignores this contrary data and makes no attempt to reconcile his opinion with it.

Likewise, Dr. Matson ignores the significant work DRP completed to reduce fugitive lead emissions.  For instance, Dr. Matson insists that "after purchasing the facility in October 1997, [DRP] only implemented three air pollution control projects before the end of 2003," despite voluminous and undisputed evidence to the contrary.  (Ex. C at 130:6-11; *id.* at 126:9-142:19.)  By way of example:

- Dr. Matson acknowledges that DRP "undertook a major rehabilitation of the copper roaster flue between August and October of 2001." (Ex. C at 137:22-25.)

- Dr. Matson admits that DRP made major structural repairs to "flues A and B of the copper roaster and the reverberatory furnace's flue." (Ex. D at 72:21-75:23.)

- Dr. Matson admits that DRP instituted a "permanent flue maintenance" program on the copper, lead, and zinc flues "to reduce the entry of false air and fugitive emissions," and took other actions "to reduce concentrations of heavy metals and dust in the air," including actions to reduce "main stacks particulate matter emissions and the control of fugitive emissions," which resulted in improved air quality in La Oroya (*Id.* at 66:18-69:14).

- Dr. Matson admits that "corrosion and resulting holes in flues and ducts can result in fugitive emissions" and that "repairing flues and ducts are important projects to reduce fugitive emissions." (Ex. C at 137:2-25.)

And yet, Dr. Matson somehow steadfastly asserts that these projects to repair flues and ducts had

"nothing to do with decreasing fugitive lead emissions." (Ex. D at 66:18-67:11, 72:21-73:14.)

This refusal to acknowledge contrary evidence cannot be reconciled with the testimony from other of Plaintiffs' experts and Dr. Matson's express admissions. In fact, Plaintiff's own emissions expert, David Sullivan, testified that the copper roasters were the largest or second largest source of lead emissions in the Complex. (*Id.* at 75:13-77:11.) Dr. Matson, however, was not even aware of Mr. Sullivan's opinions and had not reviewed his report. (*Id.* at 75:13-76:5.) Moreover, Dr. Matson conceded that if emissions from the copper roasters contained substantial amounts of lead, making repairs to the flues discussed above would reduce fugitive lead emissions. (*Id.* at 77:2-11.) Yet, Dr. Matson's standard-of-care opinion ignores this information, which directly contradicts his claim that Defendants did not prioritize reducing fugitive lead emissions.[8]

### 4. Dr. Matson Did Not Conduct a Reliable Analysis of the Efficacy of DRP's Community Health Interventions

Throughout DRP's tenure, it implemented numerous programs to mitigate exposures to lead in the community and to improve the health of La Oroya's residents. (Ex. C at 12:22-24:4.) These programs included a wide array of community health interventions used in other smelter communities, such as education regarding the risk of lead and means to reduce exposures;

---

[8] Dr. Matson also dismisses as "irrelevant" numerous other projects DRP implemented to improve the environment, reduce emissions, and improve public health—including projects to reduce or eliminate highly polluted wastewater discharges to local rivers, to redesign and replace antiquated smelting technology, and to reduce arsenic emissions from the facility—despite his admission that these and other projects were effective, consistent with the standard of care, required by the PAMA, and ultimately improved the air and water quality in and around the La Oroya Complex. (Ex. B at 240:12-24, 243:2-245:3 (DRP reduced lead stack emissions by 74%, arsenic stack emissions by 86%, lead ambient air levels by 69%, lead wastewater discharges by nearly 100%, and arsenic wastewater discharges by 95%).) However, Dr. Matson admits these projects "compete" for resources and can affect the time required to complete other projects, so they cannot be "irrelevant" to his evaluation. (Ex. C at 102:13-103:6.) Likewise, to the extent Dr. Matson attempts to offer new opinions regarding arsenic exposures, projects to reduce arsenic emissions and safely handle and dispose of arsenic wastes cannot be irrelevant, either.

renovating homes to remove lead sources; establishing school lunch programs to combat malnutrition, which reduces blood lead levels in children; installing community hand washing stations and shower facilities in schools; paving playgrounds and other areas where children could be exposed to soil contaminated by historical operations; commissioning the first community blood lead study to evaluate blood lead levels in La Oroya; and providing ongoing health services and medical care to children in the community.  (*Id.*)

Despite the detailed analysis by Defendants' experts and the demonstrated declines in community blood lead levels that were achieved (Ex. J, Expert Report of John Connor (11/26/2019) (excerpts); Ex. K, Errata for Expert Report of John A. Connor (5/1/2020)), Dr. Matson asserts that DRP's community health programs were "inconsequential" and "didn't have a significant effect on [the community's] health" (Ex. C at 22:16-23:17), but this "opinion" is not admissible.  First, Dr. Matson is entirely unqualified to evaluate these programs. He is not a medical doctor; he is not a toxicologist; he is not an epidemiologist; he is not an expert in human health risk assessment; and he has no experience with the design or evaluation of community health and exposure mitigation programs, in smelter communities or otherwise (although he could not identify a single community health program in any smelting community in the world that was more expansive).  (Ex. C at 22:16-24:2, 255:7-18.)  In fact, Dr. Matson at times refused to answer questions about these programs, claiming they were "medical questions" he was "not going to answer" because "questions like blood-lead levels are not within [his expertise]."[9]  (*Id.* at 15:6-17:3.)  Second, by his own admission, his "assessment" of these programs consisted of nothing

---

[9] Plaintiffs' counsel also objected to questions about DRP's programs to reduce children's blood lead levels, claiming they were "way outside the scope of his report" and that "he doesn't deal at all with community program-monitored children's blood-lead levels," which "is a medical issue, and it's not within the scope of Jack's report."  (Ex. C at 15:16-16:22.)

more than reading two reports written by others and parroting their content.  (*Id.* at 23:7-24:2.)

The law is clear that an expert's testimony may not consist of merely reading selections from various exhibits without additional analysis based on their expertise.  *See, e.g.*, *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 881, 886 (E.D. Ark. 2008) (excluding expert testimony that did "nothing more than read exhibits" and "did not provide analysis, opinion, or expertise"), *exclusion aff'd by In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 571 (8th Cir. 2009) (affirming district court decision to strike expert testimony where "record reflects that often [the expert] simply read the contents of exhibits"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").  Dr. Matson's lack of qualifications, and his failure to conduct any actual assessment of the efficacy of DRP's community health programs requires exclusion of any opinions regarding those programs.

### C.  Any Corporate Social Responsibility Opinion Must Be Excluded

To the extent Dr. Matson couches his opinion as a "CSR" opinion, it must be excluded because Dr. Matson is not qualified to offer CSR opinions and did not conduct a reliable analysis.

#### 1.  Dr. Matson Is Not Qualified to Offer CSR Opinions

Rule 702 requires that the "'area of the witness's competence match[] the subject matter of the witness's testimony.'"  *Shipp v. Murphy*, 2021 WL 3575678, at *3 (8th Cir. Aug. 14, 2021); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (court must "perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise").  The Eighth Circuit has "repeatedly upheld the exclusion or reversed the admission of expert design testimony that went beyond the expert's expertise." *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 724 (8th Cir. 2015) (collecting cases); *see also Woods v. Wills*, 2005 WL 5990326, at *7 (E.D. Mo. Oct. 27, 2005) (expert not

qualified because he lacked "the necessary educational background and professional training").

As an initial matter, while Dr. Matson repeatedly testified that he believes CSR is simply a "subset" of the broader issue of duty and standard of care, (Ex. D at 285:10-13), it is not.  CSR is its own discipline with various fields of study.  *See, e.g.,* Ashley C. Walter & Scott J. Shackelford, Corporate Social Responsibility Is Now Legal, Bus. L. Today, January 2015, at 1 (describing CSR as its own practice area with different fields).  Accordingly, just like any other area of study, an expert in CSR must have qualifications in the area of CSR.

Dr. Matson, however, has no qualifications to serve as an expert on CSR.  He has no formal CSR education, training, or certifications.  (Ex. A, Matson Report, Attach. A.)  Unlike Defendants' CSR expert, Chip Pitts, who is a world-renowned expert on CSR, Dr. Matson has authored no books or articles on CSR, and he has never served as a consultant or advisor to any CSR initiative. (Ex. C at 253:18-25; Ex. D at 270:24-272:10.)  Indeed, he could not answer even the most basic questions about fundamental CSR principles such as "social license"—a concept that is critical to environmental regulation and decision-making in Peru.  (*Id.* at 285:23-289:6.)  In short, because he is not qualified as a CSR expert, Dr. Matson's CSR opinions must be excluded.

### 2.  Dr. Matson Did Not Conduct a Reliable CSR Analysis

Given that Dr. Matson is not a CSR expert, he did not conduct a CSR analysis.  Dr. Matson's CSR opinion in his December 2020 report consists solely of quoting select portions of various Defendant depositions and documents without offering any actual analysis.  As discussed above, however, Dr. Matson may not offer "opinions" that merely recite from or spin documents written by others without additional analysis based on his expertise.  *See, e.g.*, *In re Prempro Prods.*, 554 F. Supp. 2d at 881; *In re Fosamax Prods.*, 645 F. Supp. 2d at 192.

Indeed, Dr. Matson conceded that a proper CSR methodology must consider and account for various factors, including state sovereignty, national priorities, community engagement, and

social license.  (Ex. D at 282:6-10 (agreeing that CSR standards "implore corporations to respect host country priorities"); *id.* at 282:11-15 (stating "the core principle in CSR is focusing on host country determinations regarding the appropriate balance between economic, social, and environmental concerns"); *id.* at 283:2-8 (agreeing that "in evaluating whether a company complied with CSR principles one factor you'd want to look at is whether they were involved in active engagement with the community"); *id.* at 291:1-14 (testifying that "[o]ne of the factors that you would want to look at in deciding whether a company complied with its CSR principles is whether the community in which it operates has consented to its operations").

But his report is silent on these factors.  It contains no discussion, explanation, or analysis of these issues whatsoever.  As explained above, Dr. Matson did not consider Peruvian environmental laws and regulations in arriving at his opinions, and he testified that he disagreed with the Peruvian government's set of priorities established in the PAMA.  (*Id.* at 62:5-21; Ex. B at 125:16-126:17; Ex. C at 95:18-96:23.)  Dr. Matson admitted that DRP was actively involved in the La Oroya community, but he conducts no analysis of that involvement in forming his CSR opinions.  (Ex. D at 283:2-17.)  Dr. Matson admitted that continued operation of the La Oroya Complex was critical to Peru's economy (Ex. C at 249:15-251:9), but he conducted no analysis balancing environmental and economic considerations, as CSR requires.  And, regarding social license, he admitted he had not even reviewed the Social License specifically granted to DRP covering the operation of the La Oroya Complex—indeed, he was not even aware that in Peru a governmental authority could grant a formal license to a company to consent to its industrial activity.  (Ex. D at 292:9-293:23.)

In short, Dr. Matson conducted no CSR analysis and any CSR opinions must be excluded.

## IV.    **CONCLUSION**

For these reasons, Defendants request that Dr. Matson's opinions be excluded.

Respectfully submitted,

**KING & SPALDING LLP**

By: _/s/ Geoffrey M. Drake___
    Tracie J. Renfroe, #16777000T
    trenfroe@kslaw.com
    1100 Louisiana Street
    Suite 4000
    Houston, Texas 77002
    Telephone: (713) 751-3200
    Facsimile: (713) 751-3290

    Andrew T. Bayman, #043342GA
    abayman@kslaw.com
    Carmen R. Toledo, #714096GA
    ctoledo@kslaw.com
    Geoffrey M. Drake, #229229GA
    gdrake@kslaw.com
    1180 Peachtree Street, N.E.
    Suite 1600
    Atlanta, Georgia  30309
    Telephone: (404) 572-4600
    Facsimile: (404) 572-5100

    James P. Cusick, #4041653NY
    jcusick@kslaw.com
    1185 Avenue of the Americas, 34th Floor
    New York, New York  10036
    Telephone:  (212) 556-2170
    Facsimile:  (212) 556-2222

    *Attorneys for Defendants The Renco Group, Inc., D.R. Acquisition Corp., Doe Run Cayman Holdings, LLC, Ira L. Rennert, The Doe Run Resources Corporation, Theodore P. Fox, III, Marvin M. Kaiser, Albert Bruce Neil, Jeffrey L. Zelms*

| **LEWIS RICE LLC** | **DOWD BENNETT LLP** |
|---|---|
| Thomas P. Berra, Jr., #43399MO | Edward L. Dowd, Jr. #28785MO |
| tberra@lewisrice.com | edowd@dowdbennett.com |
| Michael J. Hickey, #47136MO | Jeffrey R. Hoops, #69813MO |
| mhickey@lewisrice.com | jhoops@dowdbennett.com |
| 600 Washington Ave., Suite 2500 | 7733 Forsyth Blvd., Suite 1900 |
| St. Louis, MO  63102-2147 | St. Louis, Missouri 63105 |
| Telephone: (314) 444-7600 | (314) 889-7300 (telephone) |

Facsimile:  (314) 241-6056                (314) 863-2111 (facsimile)

*Attorneys for Defendants The Doe Run Resources Corporation, Marvin K. Kaiser, Albert Bruce Neil, Jeffery L. Zelms, and Theodore P. Fox, III*

*Attorneys for Defendants The Renco Group, Inc., DR Acquisition Corp., Ira L. Rennert, and Doe Run Cayman Holdings, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of November, 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Geoffrey M. Drake*