IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO EXCLUDE THE OPINIONS OF DR. JACK MATSON</u>**

# Table of Contents

I. Factual Background ................................................................................................ 2

II. Legal Standard ................................................................................................... 4

III. Argument ........................................................................................................... 5

    A. Dr. Matson's standard of care opinion is admissible. ................................... 5

        1. Dr. Matson is qualified to offer a standard of care opinion. ................... 5

        2. Dr. Matson's reports describe a reliable methodology in reaching his standard of care opinions based on the facts of the case. ........................................ 6

        3. Defendants' arguments go to the weight, not admissibility, of his testimony. ....... 10

        4. Dr. Matson reliably analyzed the efficacy of Defendants' community health interventions. .............................................................................. 13

    B. Dr. Matson properly adopted Dr. Cheremisinoff's report and should be allowed to offer opinions based on Dr. Cheremisinoff's work on this case. .................. 14

        1. Dr. Matson is permitted to adopt Dr. Cheremisinoff's reports and opinions. ......... 14

        2. Dr. Matson has disclosed which portions of Dr. Cheremisinoff's opinions and analysis he has adopted as his own. ........................................... 17

        3. Any Rule 26 violations are substantially justified and harmless. ........................... 21

        4. Dr. Matson sufficiently analyzed the information in Dr. Cheremisinoff's report before adopting it. .............................................................. 25

        5. Dr. Matson's rebuttal reports and deposition testimony appropriately supplement his opinions. ........................................................... 26

    C. Dr. Matson's CSR opinion is admissible. ................................................... 28

IV. Conclusion ...................................................................................................... 30

# Table of Authorities

## Cases

*Abbott v. Lockheed Martin Corp.*,
No. 06-701, 2014 WL 6613148 (S.D. Ill. Nov. 21, 2014) ..................................................... 24

*Anderson v. Ridge Tool Co.*,
No. 06-116, 2008 WL 3849923 (E.D. Ky. Aug. 14, 2008) .................................................. 20

*Bonner v. Isp Techs.*,
259 F.3d 924 (8th Cir. 2001) ....................................................................................... 9, 11

*Cholakyan v. Mercedes-Benz USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ................................................................................. 18, 26

*Ciomber v. Coop. Plus, Inc.*,
527 F.3d 635 (7th Cir. 2008), ........................................................................................... 17

*Cmtys. Actively Living Indep. & Free v. City of L.A.*,
No. 09-0287, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) ............................................... 23

*Comm'r of Dep't of Plan. & Nat. Res. v. Century Aluminum Co.*,
No. 05-62, 2013 WL 2468301(D.V.I. June 7, 2013) ............................................................ 5

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........................................................................................................... 9

*Fulton v. Honkamp Krueger Fin. Servs.*,
No. 20-1063, 2021 WL 1116399 (D. Minn. Mar. 24, 2021) ............................................... 20

*Hill v. Fikes Truck Line, LLC*,
No. 11-816, 2012 WL 5258753 (E.D. Mo. Oct. 24, 2012) ................................................. 26

*Hose v. Chicago NW Transp. Co.*,
70 F.3d 968 (8th Cir. 1995) ................................................................................. 11, 16, 29

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
9 F.4th 768 (8th Cir. 2021) ................................................................................... 4, 11, 16

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
No. 14-5696, 2017 WL 1196690 (N.D. Ill. Mar. 31, 2017) ............................................... 26

*In re Levaquin Prods. Liab. Litig.*,
No. 08-1943, 2010 WL 8399948 (D. Minn. Nov. 12, 2010). ............................................. 22

*In re ResCap Liquidating Trust Litig.*,
432 F. Supp. 3d 902 (D. Minn. 2020) ............................................................................... 26

*Indiana Insurance Co. v. Valmont Electric, Inc.*,
No. 97-009, 2003 WL 22244787 (S.D. Ind. July 31, 2003) ............................................... 15

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) ........................................................................................... 22

*Jacobson Warehouse Co. v. Schnuck Mkts., Inc.*,
No. 17-00764, 2019 WL 2612712 (E.D. Mo. June 25, 2019) ............................................. 27

*Johnson v. Dayton Elec. Mfg. Co.*,
   140 F.3d 781 (8th Cir. 1998) ........................................................................ 22

*Khoday v. Symantec Corp.*,
   93 F. Supp. 3d 1067 (D. Minn. 2015), *as amended* (Apr. 15, 2015) ......................... 4

*Kuhn v. Wyeth, Inc.*,
   686 F.3d 618 (8th Cir. 2012) ......................................................................... 4

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
   No. 04-396, 2010 WL 3892860 (N.D. Ind. Sept. 30, 2010) ............................... 18, 19

*Loudermill v. Dow Chem. Co.*,
   863 F.2d 566 (8th Cir. 1988) ......................................................................... 11

*Marmo v. Tyson Fresh Meats, Inc.*,
   457 F.3d 748 (8th Cir. 2006) ..................................................................... 4, 27

*Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*,
   327 F.3d 771 (8th Cir. 2003) ......................................................................... 17

*Metavante Corp. v. Emigrant Sav. Bank*,
   619 F.3d 748 (7th Cir. 2010) ......................................................................... 17

*Morel v. Daimler-Chrysler Corp.*,
   259 F.R.D. 17 (D.P.R. 2009) ................................................................. 15, 22, 24

*Nature's Plus A/S & Dermagruppen A/S v. Nat. Organics*,
   No. 09-4256, 2014 WL 12964552 (E.D.N.Y. Oct. 29, 2014) ............................... 22

*Noffsinger v. Valspar Corp.*,
   No. 09-916, 2013 WL 12340488 (N.D. Ill. Jan. 4, 2013) ..................................... 24

*Oberstar v. F.D.I.C.*,
   987 F.2d 494 (8th Cir. 1993) ......................................................................... 22

*PacifiCorp v. Gas Transmission Nw. Corp.*,
   No. 10-00099, 2013 WL 12433260 (D. Or. Nov. 26, 2013) ................................. 21

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
   No. 09-61490, 2011 WL 2295269 (S.D. Fla. June 8, 2011) ................................. 27

*Peeler v. Boeing Co.*,
   No. 14-0552, 2015 WL 13841120 (W.D. Wash. Oct. 1, 2015) ............................. 21

*Rodrick v. Wal-Mart Stores East, L.P.*,
   666 F.3d 1093 (8th Cir. 2012) ....................................................................... 22

*SEC v. Nutmeg Grp., LLC*,
   No. 09-1775, 2017 WL 1545721 (N.D. Ill. Apr. 28, 2017) ................................. 16

*Shipp v. Arnold*,
   No. 18-4017, 2019 WL 4040597 (W.D. Ark. Aug. 27, 2019) ..................... 15, 18, 19

*Sikkelee v. Precision Airmotive Corp.*,
   No. 07-00886, 2021 WL 392101 (M.D. Pa. Feb. 4, 2021) ................................. 18

*Simon v. Select Comfort Retail Corp.*,
  No. 14-1136, 2016 WL 160643 (E.D. Mo. Jan. 14, 2016) ..................................... 25

*Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*,
  47 F.3d 277 (8th Cir. 1995) ............................................................................. 21

*Thompson v. Doane Pet Care Co.*,
  470 F.3d 1201 (6th Cir. 2006) ......................................................................... 20

*TIC - The Indus. Co. Wyoming v. Factory Mut. Ins. Co.*,
  No. 10-3153, 2012 WL 2830867 (D. Neb. July 10, 2012) ................................. 24

*Todero v. Blackwell*,
  No. 17-01698, 2021 WL 4472550 (S.D. Ind. Sep. 30, 2021) ............................. 23

*U.S. ex rel. Agate Steel, Inc. v. Jaynes Corp.*,
  No. 13-01907, 2015 WL 1546717 (D. Nev. Apr. 6, 2015) .................................. 18

*United States v. 14.3 Acres of Land*,
  No. 07-886, 2010 WL 11509255 (S.D. Cal. Dec. 1, 2010) .................................. 24

*United States v. Ameren Mo.*,
  229 F. Supp. 3d 906 (E.D. Mo. 2017), *aff'd*, 9 F.4th 989 (8th Cir. 2021) .............. 20

*United States v. Finch*,
  630 F.3d 1057 (8th Cir. 2011) ............................................................................ 4

*Webb v. City of Maplewood*,
  No. 16-1703, 2021 WL 5371247 (E.D. Mo. Nov. 18, 2021) ........................... 9, 12

*Werth v. Hill-Rom, Inc.*,
  856 F. Supp. 2d 1051 (D. Minn. 2012) .............................................................. 21

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ............................................................................. 22

**Rules**

Fed. R. Civ. P. 32(a) ............................................................................................ 23

Fed. R. Evid. 703 ................................................................................................. 11

iv

Dr. Jack Matson is a licensed professional engineer with a Ph.D. in environmental engineering and a half-century of relevant experience. He will testify that Defendants failed to meet the standard of care in their operation of the La Oroya Complex by failing to apply industry practices in a timely manner to reduce air emissions, particularly fugitive lead emissions. He bases his opinions on his review of documents and expert reports produced in this case. In addition to offering his own opinions, Dr. Matson has also adopted the central opinions of Plaintiffs' former expert, the late Dr. Nicholas Cheremisinoff.

Defendants have moved to completely exclude Dr. Matson from the trial of this case. They argue that he did not properly disclose his opinions in accordance with Rule 26, that his opinions are unreliable, and that he is not qualified to offer opinions regarding corporate social responsibility (CSR). These arguments are meritless. Defendants suggest that Dr. Matson's only standard of care opinion is his adoption of Dr. Cheremisinoff's work, but that is not true. Setting aside any work Dr. Cheremisinoff did on this case prior to his passing, Dr. Matson has offered his own well-supported, reliable standard of care opinion, disclosed in his initial report and two rebuttal reports. Defendants' disagreements with his conclusions are not grounds for exclusion.

Dr. Matson also properly adopted Dr. Cheremisinoff's opinions in his reports and across three days of deposition testimony. Courts frequently allow substitute expert witness testimony like that offered by Dr. Matson, and Defendants' case law citations are inapposite. Moreover, the proper time for Defendants to raise their supposed discovery violation was when the violation occurred, not months later during *Daubert* briefing. Finally, Dr. Matson is qualified to offer expert testimony regarding CSR and offers a reliable CSR opinion that the jury should be

1

allowed to consider. Much of Defendants' motion argues the merits of the case, not bases for exclusion under the Federal Rules or *Daubert*. The Court should deny Defendants' motion.

## I.    Factual Background

This case involves massive amounts of toxic air pollution that affected not just the Plaintiffs but whole communities within the vicinity of La Oroya, Peru. It is undisputed that from October 1997 to June 2009, Defendants' Complex emitted lead, sulfur dioxide, and arsenic (among other pollutants) into the air surrounding La Oroya. All three are harmful toxic chemicals that are well known to cause a variety of health problems, particularly in children.

Dr. Matson became involved in this case after Plaintiffs' original standard of care expert, Dr. Cheremisinoff, unexpectedly died.[1] After being contacted by Plaintiffs in August 2020, Dr. Matson submitted his expert report less than four months later, on December 1, 2020.[2] Based on his review of Dr. Cheremisinoff's expert report, the materials cited therein, his deposition transcripts and exhibits, and his expert rebuttal reports, Dr. Matson adopted both the substance and the underlying bases of Dr. Cheremisinoff's opinions,[3] which he restated in his own words.[4]

---

[1] Doc. 1225-1, 12/1/2020 Expert Report of Dr. Jack Matson at pdf p. 3. Dr. Cheremisinoff's 376-page report assessed the air pollution management practices of Defendants' Complex and considered whether those practices were reasonable and consistent with industry and authoritative guidance, as well as whether Defendants violated their obligations and duties to Plaintiffs. Dr. Cheremisinoff sat for a two-day deposition in May 2019 and produced five rebuttal reports in June 2020. Before he could be deposed on his rebuttal reports, Dr. Cheremisinoff passed away on August 9, 2020.

[2] *See generally* Exh. 33, 7/2/2021 Deposition of Dr. Jack Matson at 305:6-312:13 (describing his engagement). All citations to exhibits herein ("Exh.") refer to the exhibits attached to the Declaration of Nathan D. Stump, filed separately.

[3] *See* Exh. 34, 2/18/2019 Expert Report of Dr. Nicholas Cheremisinoff at pdf p. 11 ("Defendants failed to exercise reasonable care to protect Plaintiffs from harm caused by the air pollution from the La Oroya metallurgical complex. They had both an **Obligation** and a **Duty** to apply good industry practices within a timely manner to reduce and control harmful air pollution to within internationally recognized levels that are protective of human health." (emphasis in original.)).

[4] Defendants repeatedly claim, both here and in their summary judgment motions, that Dr. Matson's opinion "boils down to the assertion that Defendants violated the standard of care ... because Doe Run Peru ... did not complete four discrete projects designed to control fugitive lead emissions ... a few years earlier than" it actually did. Doc. 1225, Defts' Mem. in Support of Matson *Daubert* Mot. at 1. That characterization of Dr. Matson's opinion is false

2

At that time, Dr. Matson also offered a supplemental opinion: that by not promptly addressing the smelter's airborne lead emissions, Defendants failed to meet their CSR obligations to protect Plaintiffs from harm.[5] The remainder of Dr. Matson's December 2020 expert report details the basis and methodology for his supplemental opinion.[6]

The following month, in January 2021, Dr. Matson sat for a two-day deposition, the transcript of which is 550 pages long. During his deposition, Dr. Matson responded to Defendants' extensive questions regarding his adopted opinions, his differences of opinion and phrasing compared to Dr. Cheremisinoff, and his supplemental opinion.

On March 19, 2021, defense experts John Connor, Joe Pitts, and Corby Anderson each issued supplemental reports responding to Dr. Matson's opinions, totaling 100 pages of criticism. On May 28, 2021, Dr. Matson issued two rebuttal expert reports responding to those experts. One of his rebuttal reports responds to Connor and Anderson, who attack his opinions about Defendants' efforts to reduce fugitive lead emissions, including the amount of the reduction, the timeline on which emissions-reducing projects could have been implemented, Defendants' failure to renegotiate the PAMA, and the impact of Defendants' community health initiatives.[7] In

---

and transparently self-serving. Dr. Matson cited four projects that could have been done sooner as *examples* of how Defendants could have acted sooner to address the fugitive lead emission problem in La Oroya. *See* Doc. 1225-6, 5/28/2021 Response of Dr. Jack Matson to Supplemental Expert Report of Joe Pitts III at pdf p. 6. His actual opinion is not nearly so narrow. *See* Doc. 1225-1 at pdf p. 4 ("I agree with Dr. Cheremisinoff that Defendants did not exercise reasonable care to protect Plaintiffs from harm by failing to apply practices and implement controls recognized by industry and authoritative sources to reduce air emissions, in particular lead, originating from the La Oroya Metallurgical Complex in a timely manner.").

[5] *See id*. at pdf pp. 3-4.

[6] *See id*. at pdf pp. 4-17.

[7] *See generally* Doc. 1225-5, 5/28/2021 Expert Rebuttal Report of Dr. Jack Matson to Supplemental Expert Opinion of John Connor and Expert Report of Corby Anderson.

his other rebuttal report, Dr. Matson responds to Mr. Pitts' criticisms of his supplemental opinion and his qualifications for offering it.[8]

Dr. Matson sat for another deposition in July 2021, where he responded to Defendants' questioning regarding his rebuttal reports. Since that time, Defendants have not sought permission to depose Dr. Matson for a third time or filed any motion to address the Rule 26 issues they raise for the first time in this motion.

## II.    Legal Standard

For expert testimony to be admissible in the Eighth Circuit, the expert must be qualified to assist the finder of fact, the testimony must be relevant, and the testimony must be reliable or trustworthy in an evidentiary sense. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). Proponents of expert testimony need not demonstrate that the assessments of their experts are correct, and trial courts are not empowered "to determine which of several competing scientific theories has the best provenance." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). Rather, the burden is on the proponent to prove that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1076 (D. Minn. 2015), *as amended* (Apr. 15, 2015) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006)). Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility. *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011).

---

[8] *See generally* Doc. 1225-6.

III.    **Argument**

A.    **Dr. Matson's standard of care opinion is admissible.**

1.    **Dr. Matson is qualified to offer a standard of care opinion.**

Dr. Matson received his Ph.D. in environmental engineering from Rice University and has over 50 years of experience as a professional environmental engineer.[9] He has worked in industry as a process chemical engineer at an oil refinery and a chemical plant and as an environmental engineering consultant for chemical manufacturing facilities.[10] As a professor, he has taught courses on environmental engineering, environmental chemistry, engineering design, hazardous waste management, and environmental law and regulation and has conducted and supervised graduate-level research in areas including environmental chemistry, chemical engineering, and chemical emissions from industrial facilities.[11] He has served as the chair of both the regulation development and enforcement committees of the Texas Air Control Board.[12] His experience includes using and relying on industry standards to form opinions as to whether corporations have conducted their operations in a manner consistent with their obligations.[13]

Dr. Matson has served as a standard of care expert witness for over 40 years in cases concerning environmental contamination from industrial emissions, releases, and discharges, and has been qualified by state and federal courts to serve in such capacity.[14] Dr. Matson's knowledge, experience, and expertise qualify him to offer standard of care opinions in this case.

---

[9] *See* Doc. 1225-1 at pdf p. 19.

[10] *Id*.

[11] *Id*. at pdf pp. 19-20.

[12] Doc. 1225-6 at pdf p. 3.

[13] *Id*.

[14] *Id*.; *See, e.g.*, *Comm'r of Dep't of Plan. & Nat. Res. v. Century Aluminum Co.*, No. 05-62, 2013 WL 2468301, at *4 (D.V.I. June 7, 2013) (admitting standard of care testimony regarding waste disposal); Exh. 36, Rep. and Rec., *Kellum v. Kuhlman Corp.*, No. 2001-0313, at 4 (July 6, 2004).

2.    **Dr. Matson's reports describe a reliable methodology in reaching his standard of care opinions based on the facts of the case.**

Dr. Matson's reports demonstrate that he employed a reliable methodology, supported by the record and his own extensive experience, in reaching his opinion that Defendants failed to protect Plaintiffs from harm by not prioritizing the reduction of air lead emissions in a timely manner.[15] In his December 2020 report, he analyzes documents produced in this case to demonstrate how Defendants acknowledged their duties to Plaintiffs. He points to numerous statements by Defendants and their agents, including executives, indicating that they were aware of the smelter's health and environmental effects and that they accepted that they had a duty to Plaintiffs.[16] He analyzes the backgrounds and qualifications of four of Defendants' corporate managers – Jeffrey Zelms, Bruce Neil, Daniel Vornberg, and Kenneth Buckley – and opines that they were qualified in the lead industry, understood the importance of reducing lead emissions, and possessed decision-making authority, but failed to take appropriate steps in a timely manner.[17] Dr. Matson also observes that local Doe Run Peru employees were highly educated and trained but did not have authority to implement the necessary pollution controls.[18]

According to Dr. Matson, Defendants understood the effect of lead emissions on local community health from their experience operating the Herculaneum smelter – experience that in Dr. Matson's opinion should have informed them of the importance of reducing lead air emissions.[19] Dr. Matson further opines that Defendants understood the importance of reducing

---

[15] *See* Doc. 1225-1 at pdf pp. 4-17.

[16] *See id.* at pdf pp. 4-7.

[17] *See id.* at pdf pp. 7-10.

[18] *See id*. at pdf pp. 10-11.

[19] *See id*. at pdf pp. 11-12.

fugitive lead emissions from the Complex before they acquired it.[20] He discusses how they

received a report by Knight Piesold in 1996 that recommended controlling emissions from

fugitive sources to achieve the greatest incremental improvement to the community.[21] The 1996

report also recommended constructing a comprehensive emissions inventory to inform

Defendants' priorities in reducing air quality impacts.[22]

Dr. Matson also analyzes the PAMA, which discussed uncontrolled fugitive emissions

from the copper, lead, and zinc circuit. He highlights a statement by Vornberg that shows

Defendants knew they could not meet lead air quality standards without reducing lead emissions

from fugitive and secondary emissions sources.[23] He further discusses studies that revealed

elevated blood lead levels (BLLs) in children living near the smelter, as well as contemporary

evaluations by consultants that recommended reducing lead emissions as an immediate

priority.[24]

Finally, Dr. Matson evaluates Defendants' community hygiene initiatives, concluding

that they did not significantly reduce elevated BLLs but merely shifted the responsibility for

achieving those reductions onto the community and NGOs.[25] While Defendants widely

disseminated information about those programs as proof of their commitments to community

health, "the most important projects to improve community health – controls for fugitive lead

emissions – were not given priority."[26] He analyzes reports by St. Louis University researchers,

---

[20] *See id*. at pdf pp. 12-14.

[21] *See id*. at pdf p. 12.

[22] *See id*. at pdf pp. 12-13.

[23] *See id*. at pdf p. 13.

[24] *See id*. at pdf pp. 13-14.

[25] *See id*. at pdf pp. 15-17.

[26] *Id*. at pdf p. 15.

the Peruvian Department of Environmental Health (DIGESA), and the CDC that explain how
these community hygiene initiatives could not effect lower BLLs while Defendants continued to
pump lead into the air.[27] He also highlights statements by Defendants and their agents that
insinuated Plaintiffs' lead-induced health issues were caused by non-smelter sources of lead,
such as lead paint, leaded gasoline, and children eating crayons.[28]

Dr. Matson provides further color to his opinions in his rebuttal reports. In one report, he
responds to Defendants' claim that he ignored their early modernization and maintenance
projects, explaining that those efforts reduced stack emissions, whereas Defendants had a duty to
prioritize the reduction of fugitive lead emissions.[29] He also points out that, because Defendants
never measured fugitive emissions before completing those early projects, there is no evidence
that the projects had any effect on fugitive emissions.[30] Dr. Matson goes on to explain his
disagreement with defense experts about Defendants' calculations and data selection,[31] their
capacity to complete certain projects to reduce fugitive emissions during the first few years they
owned the Complex,[32] the unsupported claim that they could not renegotiate the 1997 PAMA,[33]
the aptness of comparing the La Oroya and Herculaneum smelters,[34] the effect of Defendants'
community health initiatives,[35] and the significance of historically contaminated soil.[36]

---

[27] *See id*, at pdf pp. 15-17.

[28] *See id*. at pdf p. 17 (quoting internal source asking, "Does this give the impression we are saying 'it's not our
fault?'").

[29] *See* Doc. 1225-5 at pdf pp. 3-4.

[30] *See id*. at pdf p. 4.

[31] *See id*. at pdf pp. 4-7.

[32] *See id*. at pdf pp. 7-9, 11-14.

[33] *See id.* at pdf pp. 9-11.

[34] *See id*. at pdf p 14.

[35] *See id*. at pdf pp. 14-16.

[36] *See id*. at pdf pp. 16-17.

In his other rebuttal report, Dr. Matson responds to Defendants' attacks on his

qualifications, explains how he applied his expertise in reaching his opinions,[37] discusses again

the significance of Defendants' obligations to reduce fugitive lead emissions and the role the

PAMA plays in his opinions,[38] and describes how he considered the context of La Oroya and

surrounding communities in reaching his opinions.[39]

Taken together, Dr. Matson's reports comprise forty pages of analysis, citations to dozens

of records produced in this case, and application of his half-century of experience to demonstrate

that Defendants knew of their duties and had the knowledge and ability to comply with them but

failed to do so. Dr. Matson's step-by-step process allows the Court and the factfinder to review

his sources, consider his reasoning, and verify his logic. That is sufficient to survive a *Daubert*

motion, because the relevant question is whether he employed a reliable and verifiable

methodology, not whether his conclusions are correct. *See Webb v. City of Maplewood*, No. 16-

1703, 2021 WL 5371247, at *3 (E.D. Mo. Nov. 18, 2021) (citing *Daubert v. Merrell Dow

Pharm., Inc.*, 509 U.S. 579, 595 (1993), and *Bonner v. Isp Techs.*, 259 F.3d 924, 932 (8th Cir.

2001)) (explaining that the Court's role is "limited to determining whether expert testimony is

pertinent to an issue in the case and whether the methodology underlying the testimony is

sound.... not to determine whether the opinions are correct").

While Dr. Matson at times frames his opinion as a CSR opinion, his reports and

deposition testimony are clearly addressed to the standard of care. The topics he discusses –

Defendants' knowledge and public acknowledgment of their duties, their employees'

qualifications and capacities to address fugitive lead emissions, Defendants' failure to take

---

[37] *See* Doc. 1225-6 at pdf pp. 3-6.

[38] *See id.* at pdf pp. 6-8, 10-13.

[39] *See id.* at pdf pp. 8-10.

appropriate actions, and the impacts that their failures had on Plaintiffs – are directly relevant to a standard of care opinion. He testified at his deposition that he considers CSR to be a subset of the broader issues of duty and standard of care.[40] This interplay can be seen in Dr. Matson's reports, where, for example, he opines that "delaying the fugitive lead emissions reduction projects until 2005 timeframe *did not meet the standard of care* based on [Defendants'] CSR statements and their PAMA commitments to bringing the plant into compliance for community health benefits,"[41] and that Defendants' early projects "*did not meet the standard of care* as described in the Defendants['] own CSR statements[.]"[42]

Dr. Matson offers a reliable, well-supported standard of care opinion that stands firmly on its own, apart from the opinions Dr. Cheremisinoff offered in this case before his passing. Because Defendants focus on alleged "procedural deficiencies" relating to the way in which Dr. Matson adopted Dr. Cheremisinoff's opinions,[43] they spend relatively little time addressing Dr. Matson's qualifications and his own opinions. Plaintiffs now turn to those remaining critiques.

### 3. Defendants' arguments go to the weight, not admissibility, of his testimony.

Defendants accuse Dr. Matson of ignoring certain facts in formulating his standard of care opinion. They focus this argument on their simultaneous implementation of other

---

[40] Exh. 33, 7/2/2021 Matson Dep. at 284:24-285:13. Defendants cite a two-paragraph note that nowhere "describe[es] CSR as its own practice area with different fields." *See* Doc. 1225 at 29 (citing Exh. 37, Ashley C. Walter and Scott J. Shackelford, *Corporate Social Responsibility Is Now Legal*, Bus. L. Today (Reprod. Fenwick & West, LLP) (2015) at pdf p. 1).

[41] Doc. 1225-5 at pdf p. 8 (emphasis added).

[42] *Id*. (emphasis added); *see also id*. at pdf p. 16 (opining that Defendants "disregarded CSR and standard of care obligations"); *id*. at pdf pp. 17-18 (discussing the scope of his "standard of care" opinions); Doc. 1225-6 at pdf pp. 4-5 (discussing the information he considered in "conducting a standard of care analysis in this case"); *id*. (describing how he "conduct[ed] a standard of care or CSR evaluation in this case"); *id*. at pdf p. 5 (justifying his opinion that "Defendants did not meet the applicable standard of care and their CSR to protect the community from harmful emissions"); *id*. (opining that "the industry standard of care applicable to Defendants included applying good industry practices in a timely manner"); *id*. at pdf p. 13 (opining that "Defendants did not meet the standard of care or [their] CSR commitments").

[43] Doc. 1225 at 2. Plaintiffs respond to this argument below.

environmental projects, the air quality benefits of those projects,[44] and Peruvian environmental laws and regulations.[45] But challenges like these are not grounds for exclusion. Further, Dr. Matson did consider many of these facts and simply assigned them different weights than Defendants. Defendants can explore those differences on cross-examination.

Defendants' criticisms are not suitable for a *Daubert* challenge. As the Eighth Circuit has "stated numerous times..., the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *In re Bair Hugger*, 9 F.4th at 778; *Hose v. Chicago NW Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (citing *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)); *see also Bonner v. Isp Techs.*, 259 F.3d at 929; Fed. R. Evid. 703. Only if "an expert's opinion is so *fundamentally unsupported* that it can offer no assistance to the jury" must such testimony be excluded. *Loudermill*, 863 F.2d at 570 (emphasis added). The proper forum for Defendants to raise their challenges is cross-examination.

Furthermore, Dr. Matson did consider many of the facts Defendants mention. For example, Defendants claim that he "concedes" he failed to consider relevant environmental statutes and regulations,[46] but that is simply false. When asked whether he "stud[ied] Peruvian law and standards on air emissions ... for [his] work in this case," Dr. Matson answered, "Yes."[47] He clearly considered Peruvian regulations but assigned them a different weight than Defendants. For example, Defendants harp on the idea that "DRP completed the projects he identified by the deadline the Peruvian government set,"[48] but Dr. Matson did not ignore that

---

[44] *See id.* at 19-21, 24-26.

[45] *See id.* at 21-24.

[46] *See id.* at 21; *see also generally id.* at 21-24 (section of brief regarding environmental regulations).

[47] Exh. 31, Jan. 2021 Deposition of Dr. Jack Matson (vol. I) at 89:8-11; *see also id.* at 89:12-90:22 (describing analysis of environmental regulations).

[48] Doc. 1225 at 22 (emphasis removed).

fact. He testified that compliance with Peruvian air quality standards or the PAMA was

insufficient by itself to meet the standard of care.[49] In his opinion, "the number one priority in

terms of direct impacts on the health of the community" should have been reducing fugitive lead

emissions.[50] He explains in one of his reports that Defendants could have renegotiated the

PAMA (as they eventually did) to prioritize controlling fugitive lead emissions.[51]

      Nor did Dr. Matson ignore Defendants' simultaneous implementation of other

environmental projects or any associated air quality benefits.[52] He explains in one of his reports

how Defendants' own experts question the reliability of the very emissions data that supports

Defendants' claims of substantial air quality improvement in the early years.[53] He goes on to

explain why certain projects could have been completed in those first several years despite other

projects happening at the same.[54] He testified at his deposition that those other projects had only

a small impact on fugitive lead emissions.[55] Dr. Matson also explained why he does not believe

that working on other projects simultaneously would have caused staff constraints and delays in

performing projects to address fugitive emissions.[56] In other words, he considered this

information but simply reached a different result. That is not a basis for exclusion. *See Webb*,

2021 WL 5371247, at *3.

---

[49] Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 130:21-131:8; *see also id*. at 166:16-18 ("[I]s complying with the
PAMA equivalent to satisfying the standard of care?" "No.").

[50] *See* Exh. 33, 7/2/2021 Matson Dep. at 59:1-62:21.

[51] *See* Doc. 1225-5 at pdf pp. 9-11.

[52] *See* Doc. 1225 at 19-21, 24-26.

[53] *See* Doc. 1225-5 at pdf pp. 4-7.

[54] *See id*. at pdf pp. 11-14.

[55] *See* Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 213:24-214:2; *see also id*. at 181:25-182:5 ("[N]one of those
[projects] have to do with fugitive lead emissions[.]")

[56] *See* Exh. 33, 7/2/2021 Matson Dep. at 163:16-167:22.

4.    **Dr. Matson reliably analyzed the efficacy of Defendants' community health interventions.**

Defendants also argue that Dr. Matson did not reliably analyze their community health interventions and that his opinions regarding those programs should be stricken.[57] Once again, Defendants misstate the record and ignore Dr. Matson's reports. First, they attack his qualifications.[58] But Dr. Matson does not need to be a medical doctor, a toxicologist, or an epidemiologist to evaluate Defendants' community initiatives with respect to the standard of care, and Defendants cite no authority suggesting otherwise. Next, Defendants incorrectly claim that Dr. Matson admitted that his only assessment of those initiatives was reading two reports and "parroting their content."[59] In fact, Dr. Matson cites a variety of sources to support his opinion that the programs did not significantly reduce elevated blood lead levels and had the effect of shifting the blame onto Plaintiffs and NGOs.[60]

Dr. Matson cites a public health expert who explained that initiatives like Defendants' "'are helpful when blood lead levels are relatively low,'"[61] but then he observes that "a 1999 study indicated children living near the smelter had elevated BLLs, all above the WHO limit, a 2000/2001 study revealed average BLLs of approximately 1200 residents in La Oroya were more than 2.5 times above the WHO limit, and a 2004 study found that almost 100% of the children under age 6 tested had BLLs above the WHO limit."[62] He also points to press releases and

---

[57] *See* Doc. 1225 at 26-28.

[58] *See id.* at 27.

[59] *See* Doc. 1225 at 27-28 (citing Exh. 32, Jan. 2021 Deposition of Dr. Jack Matson (vol. II) at 23:7-24:2). In the deposition testimony cited by Defendants, Dr. Matson did *not* admit that his assessment involved reading two reports and parroting their content.

[60] *See* Doc. 1225-1 at pdf pp. 15-17.

[61] *See id.* at pdf p. 15 (quoting Fernando Serrano).

[62] *Id.*

hearings as examples of Defendants downplaying their own responsibility for health issues by blaming lead paint, leaded gasoline, and children eating crayons for high BLLs in La Oroya.[63]

In a rebuttal report, Dr. Matson explains that there is no evidence to support Defendants' claims that these initiatives reduced lead exposure to the community, pointing to evidence that the community was continuing to be exposed to elevated levels of lead despite those programs, as well as the CDC's recommendation that priority be given to reducing smelter emissions in order for community hygiene programs to be effective in reducing BLLs.[64] This section contains citations to and analysis of numerous documents, belying Defendants' assertion that Dr. Matson simply parroted two reports and nothing further.

### B. Dr. Matson properly adopted Dr. Cheremisinoff's report and should be allowed to offer opinions based on Dr. Cheremisinoff's work on this case.

Defendants spend most of their motion arguing that Dr. Matson failed to properly disclose his opinions in accordance with Rule 26. This argument has nothing to do with Dr. Matson's own opinions and instead focuses on alleged "procedural deficiencies" in the way Dr. Matson adopted most of Dr. Cheremisinoff's opinions.[65] Dr. Matson's adoption of Dr. Cheremisinoff's opinions was proper, however, and any deficiency was substantially justified, harmless, and not prejudicial to the defense.

### 1. Dr. Matson is permitted to adopt Dr. Cheremisinoff's reports and opinions.

While the circumstances of Dr. Matson's involvement in this case are uncommon and unfortunate, they are not unheard of. Courts assessing expert witnesses who have been substituted for a deceased expert have held that the substitute expert "should be able to proceed

---

[63] *See id.* at pdf p. 17.

[64] *See* Doc. 1225-5 at pdf pp. 14-16.

[65] Doc. 1225 at 2.

with his testimony as any other expert would with the caveat that he address the same subject matter as [the prior expert] without meaningful changes." *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D.P.R. 2009). Similarly, courts have permitted substitution of a new expert on the condition that the new expert "have a similar area of expertise and ... express only opinions like those previously held by the [prior] expert." *Indiana Insurance Co. v. Valmont Electric, Inc.*, No. 97-009, 2003 WL 22244787, at *1 (S.D. Ind. July 31, 2003).[66] "Assuming that there is no meaningful change in the subject matter and theories expressed by Plaintiff's new expert," courts have found "that Defendants will suffer little prejudice ... as the new expert must hold substantially the same opinions as" the prior expert. *Shipp v. Arnold*, No. 18-4017, 2019 WL 4040597, at *3 (W.D. Ark. Aug. 27, 2019).

In his December 2020 report, in addition to offering his supplemental opinion, Dr. Matson agrees with and adopts Dr. Cheremisinoff's opinion that Defendants did not exercise reasonable care because they failed to apply practices and implement controls necessary to reduce air lead emissions.[67] This is allowed under the Federal Rules of Civil Procedure. Specifically, Dr. Cheremisinoff opined (*inter alia*) that Defendants knew the Complex's operations harmed the public in La Oroya, including Plaintiffs; that Defendants did not prioritize air pollution reduction; that Defendants' operation of the Complex without addressing airborne fugitive emissions between 1997 and 2000 constituted a breach of the standard of care; and that Defendants took advantage of weak environmental enforcement policies.[68]

---

[66] Defendants' motion does not challenge Dr. Matson's qualifications to offer a standard of care expert opinion or to adopt Dr. Cheremisinoff's opinions. Their challenges to his qualifications relate only to his CSR opinion and his assessment of Defendants' community health programs. *See generally* Doc. 1224, Defts' Matson *Daubert* Mot.

[67] Doc. 1225-1 at pdf p. 4.

[68] *See* Exh. 34, 2/18/2019 Cheremisinoff Rep. at pdf pp. 12-14. As described at greater length below, Dr. Matson explained at his deposition that he would have phrased these opinions differently than Dr. Cheremisinoff did.

Dr. Matson's December 2020 report meets the requirements of Rule 26.[69] Defendants

complain that it does not include technical analysis, data, calculations, discussions of

environmental controls at other Peruvian smelters, citations to laws, regulations, or other

environmental standards, or address the cost of implementing pollution controls at the

Complex,[70] but arguments regarding the factual basis of Dr. Matson's opinions are not proper

subjects of a *Daubert* motion. *In re Bair Hugger*, 9 F.4th at 778; *Hose*, 70 F.3d at 974.

Defendants do not explain how the absence of any complained-of information renders his

methodology unreliable or undisclosed. Further, Dr. Matson addresses some of these topics

through his express adoption of Dr. Cheremisinoff's report,[71] and as discussed earlier in this

brief, Dr. Matson's supplemental opinion, standing alone, addresses some of these topics as well.

Defendants' reliance on *SEC v. Nutmeg Grp., LLC*, No. 09-1775, 2017 WL 1545721, at

*19 (N.D. Ill. Apr. 28, 2017), is misplaced. The court in that case specifically stated that an

alleged violation of Rule 26(a) "is not a basis for exclusion under *Daubert*[.]" *Id.* at *10 n.9.

Further, that case did not involve a substitute expert witness adopting the opinions of a properly

disclosed witness;[72] rather, it involved an expert seeking to adopt and testify to the opinions of

an *undisclosed* expert, which the court held was improper. *See id.* at 18 (internal citation omitted)

("[A] disclosed expert cannot merely serve as the 'mouthpiece' of an undisclosed expert."). The

court found that it had "little basis to determine whether [the disclosed expert's] opinions about

[the undisclosed expert's opinions] are reliable." *Id.* at *19. Here, by contrast, Dr. Cheremisinoff

was disclosed as an expert, issued six reports, and sat for a two-day deposition. The Court can

---

[69] *See* Doc. 1225 at 4-5.

[70] *See id.*

[71] *See, e.g.*, Exh. 34, 2/18/2019 Cheremisinoff Rep. at pdf pp. 53, 98, 105, 109, 177 (discussing applicable regulations); *id.* at pdf pp. 204-243, 355-376 (technical data and calculations).

[72] Defendants do not cite a *single case* in their Rule 26 argument involving a substituted expert witness.

consider whether Dr. Matson's opinions about Dr. Cheremisinoff's reports are reliable based on the reports themselves. Defendants, however, have chosen not to focus their motion on the reliability of those reports, relying instead on a flawed Rule 26 argument.[73]

### 2.    Dr. Matson has disclosed which portions of Dr. Cheremisinoff's opinions and analysis he has adopted as his own.

Defendants argue that Dr. Matson has failed to disclose which portions of Dr. Cheremisinoff's opinions and analysis he has adopted as his own, including on topics that go to the heart of the case.[74] But that is untrue. In fact, Dr. Matson explained which portions of Dr. Cheremisinoff's opinions he has adopted, and he is entitled to express substantively similar opinions in his own words and elaborate on his opinions during his depositions. To the extent Defendants argue that there remains uncertainty, they have suffered no prejudice.

Dr. Matson testified that he is adopting "the substance of [Dr. Cheremisinoff's] opinions and the underlying bases," except for Dr. Cheremisinoff's emissions inventory.[75] As Dr. Matson pointed out, Dr. Cheremisinoff articulated his opinions in his own voice.[76] Having taken over the project from another expert, Dr. Matson did "as good a job as [he] could to understand what [Dr. Cheremisinoff] said, how he articulated it."[77] Acknowledging that Dr. Cheremisinoff's report is "now [his] report," Dr. Matson stated that he "agree[s] with the overall conclusions,"[78] and that

---

[73] Defendants' reliance on *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008), and *Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*, 327 F.3d 771, 780 (8th Cir. 2003), is unavailing; they are readily distinguishable on the facts. *Mems* involved an expert's report that was not disclosed until after business hours the night before he was scheduled to testify, and *Ciomber* involved an expert's report comprising "eight terse statements" and the stated basis for the expert's conclusion was "inspection, analysis." *Cf. Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (describing *Ciomber* as a case "where the expert clearly deviated from the established scope of his expected opinion"). Also, neither case involved a substitute expert.

[74] *See* Doc. 1225 at 5–11.

[75] Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 58:25–59:10; Exh. 33, 7/2/2021 Matson Dep. at 311:12–312:5.

[76] *See* Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 72:22–74:2.

[77] *Id.* at 74:3–75:1.

[78] *Id.*

17

while he "would have phrased [the report] differently, ... that doesn't mean that [Dr. Cheremisinoff] made a mistake or was incorrect. There's gray areas in this," he explained, and Dr. Cheremisinoff "tried to be ... in his writing style more yes and no rather than gray areas."[79] Over the course of three days of depositions, Dr. Matson responded to Defendants' questioning by expressing his adopted opinions in his own voice.

Dr. Matson's expression of similar opinions in his own words is proper. "[T]he substitute expert is not compelled to merely repeat the words of his or her predecessor. He or she may use different language and even reach slightly broader conclusions so long as the new report is substantially similar in all material respects to the previous report." *Sikkelee v. Precision Airmotive Corp.*, No. 07-00886, 2021 WL 392101, at *5 (M.D. Pa. Feb. 4, 2021) (citations omitted). As long as the new opinion is "substantively similar" and not "contrary to or inconsistent with" the original opinion, *Shipp*, 2019 WL 4040597, at *2 (citing *U.S. ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 13-01907, 2015 WL 1546717, at *2 (D. Nev. Apr. 6, 2015)), "[t]he substitute expert 'should have the opportunity to express his opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to perform.'" *Id.* (quoting *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 04-396, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010)). The fact that Dr. Matson could identify minor points of disagreement with Dr. Cheremisinoff is actually a sign of reliability, as it "demonstrates that the expert conducted an independent evaluation of the evidence." *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 545 (C.D. Cal. 2012) (describing as "troubling" an adopting expert's inability to identify a single point of disagreement).

---

[79] *Id.* at 83:1-84:10.

One moment during Dr. Matson's deposition that Defendants rely on is instructive. Dr. Matson explained that, while Dr. Cheremisinoff said Defendants gave "no priority" to fugitive air emissions, it is Dr. Matson's opinion that Defendants "didn't give it much of a priority. It certainly wasn't their main priority."[80] While Dr. Cheremisinoff opined that Defendants "chose to do nothing," Dr. Matson explained that "they did do a few things [that] didn't have a significant impact[.]" He also expressed mild disagreement with the exact figure (2,000 tons) by which Defendants could have reduced air emissions, saying simply that Defendants could have "done significant reductions[.]"[81]

Defendants contend that this excerpt shows "numerous points of disagreement" with Dr. Cheremisinoff's standard of care opinion and is indicative of Dr. Matson's undisclosed opinions.[82] But that misconstrues Dr. Matson's response. This excerpt is an example not of undisclosed disagreements with Dr. Cheremisinoff but of Dr. Matson's efforts to express substantively similar opinions in his own words. Substitute expert witnesses are permitted to express their adopted opinions in this way. *See, e.g., Shipp*, 2019 WL 4040597, at *2 (quoting *Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *2) ("The substitute expert 'should have the opportunity to express his opinions in his own language....'").

Rule 26 "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *United States v. Ameren Mo.*, 229 F.

---

[80] Doc. 1225 at 8-9 (quoting Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 75:24-77:9).

[81] Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 75:24-77:9; *see also id*. at 82:13-24 (similarly qualifying Dr. Cheremisinoff's contention that Defendants did "no" work). Defendants incorrectly characterize this testimony to say that Dr. Matson "rejected" Dr. Cheremisinoff's opinions regarding the 2,000 tons figure. *See* Doc. 1225 at 9. In fact, Dr. Matson testified that his opinion is that "[i]t was a high number, but that 2,000 tons, from my inspection, seemed to be high. And so … it was a – a distinction without a big difference." Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 86:4-20.

[82] Doc. 1225 at 8-9.

Supp. 3d 906, 1015 (E.D. Mo. 2017), *aff'd*, 9 F.4th 989 (8th Cir. 2021) (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006)). Simply because Dr. Matson did not state his opinions in "the precise words" Defendants think he should have used is not a basis to sanction or exclude him. *See Ameren*, 229 F. Supp. 3d at 1015; *see also Anderson v. Ridge Tool Co.*, No. 06-116, 2008 WL 3849923, at *4 (E.D. Ky. Aug. 14, 2008) (holding that none of the purposes of Rule 26(a)(2) had been "contravened" by the expert's report, as it provided "sufficient information for the Defense to prepare a very effective cross-examination of ... [the expert's] methodology").

Defendants argue that when asked about "specific portions" of Dr. Cheremisinoff's report, Dr. Matson "refused to identify" where his opinions and Dr. Cheremisinoff's diverged.[83] But the "specific portions" Defendants allude to are *entire sections* of Dr. Cheremisinoff's report. When asked to list specific disagreements with those long sections, Dr. Matson answered that he could not recall the disagreements from memory but would answer specific questions.[84] Defendants may not have liked that response to their overbroad questions, but it does not merit striking Dr. Matson from the case. *Cf. Fulton v. Honkamp Krueger Fin. Servs.*, No. 20-1063, 2021 WL 1116399, at *3 (D. Minn. Mar. 24, 2021) ("While a few of [deponent's] statements, if read in isolation, may seem to be broad refusals, the Court finds the record is clear that the statements were a response to the overbreadth of [deposing party's] questions[.]").

In fact, Defendants' own memorandum reveals that they did not struggle as much as they claim to identify specific areas of disagreement: after asserting that Dr. Matson refused to

---

[83] Doc. 1225 at 6-8.

[84] *See, e.g.*, Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 68:13-69:22 (asking blanket question about 21-page Section 4 (Exh. 34, 2/18/2019 Cheremisinoff Rep. pdf pp. 21-41)); Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 69:23-70:7 (similar question regarding 51-page Section 6 (Exh. 34, 2/18/2019 Cheremisinoff Rep. at pdf pp. 45-96)).

elucidate those areas, in the next breath Defendants identify several instances where Dr. Matson explained his specific disagreements in response to Defendants' questions.[85] Further, these disagreements only worked to Defendants' advantage, because they disclaimed or qualified in some way opinions and figures that reflected poorly on Defendants' conduct. Defendants have suffered no prejudice from having Dr. Matson trim back some of Dr. Cheremisinoff's opinions. *Cf. PacifiCorp v. Gas Transmission Nw. Corp.*, No. 10-00099, 2013 WL 12433260, at *4 (D. Or. Nov. 26, 2013) (exclusion unwarranted where substitute expert walked back details of prior expert's opinions; he had "reache[d] [the same] conclusion through a different analysis").

Defendants cite four cases to suggest that Dr. Matson's reports and deposition testimony violate Rule 26, inventing quoted language to bolster their argument.[86] None of those cases implicate Rule 26 or a substitute witness adopting a prior expert's opinions. The court in *Peeler v. Boeing Co.*, No. 14-0552, 2015 WL 13841120 (W.D. Wash. Oct. 1, 2015) precluded certain expert testimony because the expert *never* produced a report, and the proffering party had not justified the delay. *Id*. at *1. By contrast, Dr. Matson has produced three reports and he has adopted several others, and Dr. Cheremisinoff's death justifies any arguably late disclosure.

### 3.    Any Rule 26 violations are substantially justified and harmless.

Despite seeking exclusion for what they characterize as "procedural deficiencies,"[87] Defendants do not mention, much less analyze, the relevant factors for determining whether a Rule 26 violation is justified or harmless. "[E]xclusion of critical evidence is an extreme sanction, and thus, a district court's discretion is not unlimited," *ZF Meritor, LLC v. Eaton*

---

[85] *See* Doc. 1225 at 8-10 (citing Dr. Matson's disagreement with Dr. Cheremisinoff regarding lead blast furnace building and reliability of certain air monitoring data).

[86] *See id*. at 10-11. The word "ambushed" does not appear in *Werth v. Hill-Rom, Inc.*, 856 F. Supp. 2d 1051, 1060 (D. Minn. 2012) or *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)).

[87] Doc. 1225 at 2.

*Corp.*, 696 F.3d 254, 297 (3d Cir. 2012) (quotation omitted). Indeed, the Eighth Circuit has "a 'judicial preference for adjudication on the merits[.]'" *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 784 (8th Cir. 1998) (quoting *Oberstar v. F.D.I.C.*, 987 F.2d 494, 504 (8th Cir. 1993)).

"A district court considers several factors in determining whether a Rule 26 violation is justified or harmless, including: '(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.'" *Rodrick v. Wal-Mart Stores East, L.P.*, 666 F.3d 1093, 1096-97 (8th Cir. 2012) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (noting that a district court can allow evidence violating Rule 26(a) if the violation was justified or harmless)). Here, all four factors support a finding that any violations are substantially justified or harmless.

     *a.*    *Prejudice*

"The possibility the opposing party will be prejudiced ... often depends on the circumstances of the particular case, including, among other factors, 'the ability of opposing counsel to depose or cross-examine the new expert,' and the amount of time the opposing party has to complete additional discovery and otherwise prepare for the new expert's testimony at trial." *Nature's Plus A/S & Dermagruppen A/S v. Nat. Organics*, No. 09-4256, 2014 WL 12964552, at *6 (E.D.N.Y. Oct. 29, 2014) (quoting *Morel*, 259 F.R.D. at 20). "[A] lack of evidence suggesting undue prejudice based on a failure to disclose Rule 26 information cuts against the Court excluding expert testimony." *In re Levaquin Prods. Liab. Litig.*, No. 08-1943, 2010 WL 8399948, at *2 (D. Minn. Nov. 12, 2010).

Defendants include just one passing reference to prejudice in their brief,[88] focusing instead on a variety of areas where they have identified small disagreements between Dr. Matson and Dr. Cheremisinoff, areas where they believe Plaintiffs' experts are factually incorrect, and four fugitive emissions projects identified by Dr. Matson relating to his standard of care opinion.[89] Dr. Matson's deposition transcripts reveal multiple, full days of vigorous cross-examination on these same topics. Defendants' demonstrated ability to cross-examine Dr. Matson and prepare a motion seeking to exclude his opinions as unreliable indicates that they have suffered no prejudice.[90] *Cf. Todero v. Blackwell*, No. 17-01698, 2021 WL 4472550, at *8 (S.D. Ind. Sep. 30, 2021) (there was "no prejudice" where plaintiff had time to "review [expert's] report, depose him, and prepare an extensive *Daubert* motion and motion in limine"); *Cmtys. Actively Living Indep. & Free v. City of L.A.*, No. 09-0287, 2011 WL 4595993, at *5 (C.D. Cal. Feb. 10, 2011) (denying motion to strike allegedly late-disclosed expert testimony where moving party "had the opportunity to depose him and likely could have anticipated most, if not all, of these issues"). Tellingly, Defendants have not sought additional time to depose Dr. Matson.

   b. *Ability to cure prejudice*

  Defendants also have had ample opportunity and ability to cure any potential prejudice. Dr. Matson was deposed in January 2021 and again in July 2021. Four months passed before Defendants filed their motion to exclude Dr. Matson, and the trial date has not even been announced. Courts have found lengths of time far shorter than those in this case to be sufficiently long to prevent prejudice to a party opposing a substitute expert. *See, e.g.*, *Abbott v. Lockheed*

---

[88] *See* Doc. 1225 at 11.

[89] *See id*. at 5-11.

[90] Defendants also conducted a two-day deposition of Dr. Cheremisinoff, at which they elicited testimony from him regarding his opinions and his methodology. This deposition testimony is still part of the case and may be introduced at trial. *See* Fed. R. Civ. P. 32(a).

*Martin Corp.*, No. 06-701, 2014 WL 6613148, at *2 (S.D. Ill. Nov. 21, 2014) (three months before trial is generally "ample lead time for preventing prejudice to the party opposing a substitute expert"); *United States v. 14.3 Acres of Land*, No. 07-886, 2010 WL 11509255, at *1 (S.D. Cal. Dec. 1, 2010) (denying motion to exclude substitute witness because moving party had "ample time to prepare" where there was no trial date set and there were less than four months before motion *in limine* hearing).

### c.    Disruption to trial

With no trial date set in the case, allowing Dr. Matson's testimony would cause no disruption at all. *Cf. TIC - The Indus. Co. Wyoming v. Factory Mut. Ins. Co.*, No. 10-3153, 2012 WL 2830867, at *8 (D. Neb. July 10, 2012) (allowing substitution of an expert where the trial was "still two months away and, upon the parties' motion, could be continued again to permit a full and fair trial of all the issues"); *Morel*, 259 F.R.D. at 21 ("[Party opposing substitute witness] will not be prejudiced by the substitution because they have time to prepare for cross-examination. An ability to cure or mitigate any prejudice resultant from submitting late expert disclosures with minimum disruption to trial weighs in favor of harmlessness.").

### d.    Bad faith or willfulness

There can be no argument that the timing of Dr. Matson's disclosures – necessitated only by the untimely death of Dr. Cheremisinoff – was in any way the product of bad faith or willfulness on the part of the Plaintiffs. *See Morel*, 259 F.R.D. at 20 ("Death of an expert witness falls squarely within the category of circumstances that require a late disclosure[.]"); *see also Noffsinger v. Valspar Corp.*, No. 09-916, 2013 WL 12340488, at *7 (N.D. Ill. Jan. 4, 2013) ("Because the death of an expert is neither common nor readily predictable, allowing Dr. Pacheco to substitute will not set a precedent that will encourage parties in other cases to disregard discovery deadlines.").

24

### 4.    Dr. Matson sufficiently analyzed the information in Dr. Cheremisinoff's report before adopting it.

Defendants next argue that Dr. Matson cannot adopt Dr. Cheremisinoff's opinions and bases as his own because, they allege, Dr. Matson "testified he did not verify Dr. Cheremisinoff's calculations or confirm that his analyses were correct."[91] This argument fails on two levels. First, there is no rule of law that Dr. Matson needed to spend years recreating all of Dr. Cheremisinoff's work, particularly when Dr. Matson has the same relevant subject matter expertise. Second, the characterization is unfair. While he did not verify *every* calculation or re-create *every* step of Dr. Cheremisinoff's report, Dr. Matson did perform his own analysis in adopting Dr. Cheremisinoff's report, developing his own standard of care opinion, and in responding to the defense experts.[92]

Dr. Matson's testimony about the steps he took to analyze, assess, and confirm the claims made by Dr. Cheremisinoff differentiate this case from the cases cited by Defendants, where experts "simply parrot[ed]' the opinions of other experts," *Simon v. Select Comfort Retail Corp.*, No. 14-1136, 2016 WL 160643, at *4 (E.D. Mo. Jan. 14, 2016); where the expert was not qualified to testify on the subject matter, *In re Fluidmaster, Inc., Water Connector Components*

---

[91] Doc. 1225 at 11-15.

[92] *See, e.g.*, Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 80:15-81:4 (describing documents he considered that were not cited by Dr. Cheremisinoff); *id*. at 81:5-14 (testifying that he made effort to confirm that documents included in and cited in Dr. Cheremisinoff's report included all relevant records); *id*. at 84:25-85:3 (testifying that he checked references to confirm statements in report); *id*. at 89:8-90:22 (testifying that he considered Peruvian laws and standards on air emissions); *id*. at 92:11-18 (testifying that he reviewed and confirmed that the charts Dr. Cheremisinoff prepared were correct and accurate); *id*. at 104:10-105:1 (testifying that he analyzed whether each Defendant individually failed to exercise reasonable care); *id*. at 166:5-167:5 (describing analysis of PAMA as it relates to his standard of care analysis); Exh. 32, Jan. 2021 Matson Dep. (vol. II) at 23:7-19 (testifying that he read reports to assess efficacy of Defendants' community health initiatives); *id*. at 145:21-147:20 (describing assessment of environmental benefits of reduction of dust emissions from the main stack); *id*. at 149:5-150:16 (describing calculations he performed); *id*. at 164:6-17 (testifying that he compared production figures and emissions figures across time); Exh. 33, 7/2/2021 Matson Dep. at 21:7-24 (describing analysis of air monitoring data from the Sindicato station); *id*. at 213:15-215:24 (identifying studies analyzed to support statement regarding efficacy of Defendants' community health initiatives).

*Prods. Liab. Litig.*, No. 14-5696, 2017 WL 1196690, at *24 (N.D. Ill. Mar. 31, 2017); where the

proffered testimony was "entirely that of another expert," *Hill v. Fikes Truck Line, LLC*, No. 11-

816, 2012 WL 5258753, at *4 (E.D. Mo. Oct. 24, 2012); where the expert did not discuss his

assessment of an opinion's validity, methodology, underlying reasoning, or factual basis, or even

reveal the identity of the undisclosed expert offering the opinion, *In re ResCap Liquidating Trust*

*Litig.*, 432 F. Supp. 3d 902, 932 (D. Minn. 2020); or where the expert "could not identify a single

point of disagreement" with the other expert. *Cholakyan*, 281 F.R.D. at 545. Furthermore, none

of these cases involved a substitute expert witness.

### 5. Dr. Matson's rebuttal reports and deposition testimony appropriately supplement his opinions.

Defendants claim that Dr. Matson improperly used his rebuttal reports and deposition

testimony to disclose new opinions, including those relating to sulfur dioxide, arsenic, and air

monitoring data.[93] But Dr. Matson was responding to Defendants' criticisms, which is a proper

use for a rebuttal report. After he issued his December 2020 report, Defendants' experts

produced three reports attacking his opinions. Dr. Matson responded with two rebuttal reports

defending himself and addressing the arguments made in those supplemental reports.[94]

For example, Connor argues in his supplemental report that Dr. Matson ignored certain

actions Defendants took in the first years of operations that significantly improved air quality;[95]

that the PAMA committed Defendants to certain improvements and that Defendants lacked the

authority to modify those commitments;[96] and that Defendants could not have competed the four

---

[93] *See* Doc. 1225 at 15-18.

[94] *See* Exh. 33, 7/2/2021 Matson Dep. at 313:7-22 (testifying that the purpose of his rebuttal reports was to provide "a point-by-point response to [Defendants'] rebuttal opinions").

[95] *See* Exh. 35, 3/19/2021 Supplemental Expert Report of John Connor at pdf pp. 3-9.

[96] *Id*. at pdf pp. 9-15.

fugitive emissions control projects Dr. Matson identified as examples by April 2000.[97] Dr. Matson responds to these criticisms in one of his rebuttal reports. He opines that Defendants' actions in its first years of operations are not relevant to his opinion on prioritization of other projects;[98] that Defendants' opinions that their actions improved air quality in the first years of ownership are based on flawed methodology and on data that Defendants' own experts deem unreliable;[99] that Defendants' other projects would not have prevented them from completing his recommended projects early in their ownership;[100] and that Defendants could have modified their commitments under the PAMA.[101]

These are direct responses to Mr. Connor's criticisms of Dr. Matson's opinions. That is the very purpose of rebuttal reports. *See Marmo*, 457 F.3d at 759  (internal quotation marks omitted) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."). "[R]ebuttal evidence may be used to challenge the evidence or theory of an opponent." *Jacobson Warehouse Co. v. Schnuck Mkts., Inc.*, No. 17-00764, 2019 WL 2612712, at *3 (E.D. Mo. June 25, 2019); *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490, 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011) ("A rebuttal expert can testify as to the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts.").

Defendants complain that Dr. Matson should not be allowed to offer opinions on sulfur dioxide or arsenic, despite having adopted Dr. Cheremisinoff's reports. They claim that he

---

[97] *Id*. at pdf pp. 15-18.

[98] Doc. 1225-5 at pdf pp. 3-4.

[99] *Id*. at pdf pp. 4-7.

[100] *Id*. at pdf pp. 7-9, 11-14.

[101] *Id*. at pdf pp. 9-11.

"confirmed that he is offering *no* opinions on sulfur dioxide and arsenic,"[102] but they cite to deposition testimony where Dr. Matson stated merely that his *focus* was on lead rather than sulfur dioxide or arsenic.[103] In fact, in the surrounding lines of deposition testimony that Defendants do not cite, Dr. Matson testified that he was prepared to answer questions with respect to sulfur dioxide and may offer testimony at trial concerning arsenic emissions; Defendants then changed the subject.[104]

Defendants' objections to Dr. Matson's testimony regarding the reliability of Defendants' pre-2000 air monitoring data in La Oroya fare no better. In one of his rebuttal reports, Dr. Matson discusses certain admissions defense experts made about air monitoring data during depositions that occurred in 2021 – that is, *after* Dr. Matson issued his December 2020 report.[105] Dr. Matson cannot be faulted for not responding to those admissions before they were made.

### C.    Dr. Matson's CSR opinion is admissible.

Defendants conclude their motion by calling into question Dr. Matson's qualifications to offer CSR opinions and criticizing the opinion itself. As explained earlier in this brief, Dr. Matson's CSR opinion is inextricably tied to his standard of care opinion. Dr. Matson is highly qualified to offer CSR opinions, with 50 years of experience as a professional environmental engineer in academia, industry, consulting, and a state administrative agency.[106] He has taught at

---

[102] Doc. 1225 at 16 (emphasis in original) (citing Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 47:7-12).

[103] *See* Exh. 31, Jan. 2021 Matson Dep. (vol. I) at 47:7-12; *see also id.* at 47:7-19.

[104] *See id*. at 46:16-48:12.

[105] *See* Doc. 1225-5 at pdf pp. 4-7 (citing 2021 deposition testimony from Connor and Dr. Shari Beth Libicki to support argument that Defendants' opinions are "based on ... data Defendants' experts admit is unreliable."); *see also* Exh. 33, 7/2/2021 Matson Dep. at 26:5-27:12 (explaining that he included discussion of air monitoring data in his rebuttal report (Doc. 1225-5) because Connor's rebuttal report and deposition testimony contradicted his report).

[106] Doc. 1225-6 at pdf p. 3.

the collegiate level on engineering ethics and CSR,[107] and he has personal experience with analyzing CSR standards to form opinions as to whether corporations have complied with them.[108] His CSR opinions have been accepted in a variety of courts.[109] Defendants complain that he has not written a book on CSR and does not have any CSR-specific certifications, but they point to no authority that an expert must have these specific credentials.[110]

Defendants spend a single paragraph speeding through topics that their own CSR expert emphasizes and that Dr. Matson acknowledges can be relevant to a CSR analysis.[111] But once again, pointing to gaps in factual basis goes to the weight, not the admissibility, of the testimony. *See Hose*, 70 F.3d at 974 (internal quotations and citation omitted) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). One of Dr. Matson's rebuttal reports addresses some of those topics, including his balancing of environmental and economic considerations, the relationship between the PAMA and Defendants' CSR responsibilities, and the circumstances in La Oroya during Defendants' ownership of the Complex.[112] Defendants charge that he failed to consider Peruvian environmental laws and regulations and that he failed to consider the effects of the community health initiatives, but those claims have been debunked earlier in this brief, and the same reasoning applies here.[113]

---

[107] *Id*.

[108] *Id*.

[109] *Id.*

[110] *See* Doc. 1225 at 28-29.

[111] *See id.* at 29-30.

[112] *See generally* Doc. 1225-6.

[113] *See* Doc. 1225 at 29-30; *see also supra* at 11-14 (addressing Defendants' arguments).

## IV.    Conclusion

Dr. Matson will explain to the jury that Defendants could have made significant reductions of fugitive lead emissions at low cost early on in their ownership of the Complex but instead performed other projects that had a minimal effect on community health. He will also testify that Defendants did not meet their CSR obligations to protect Plaintiffs from harm. Dr. Matson stepped into the case after the death of Plaintiffs' original standard of care expert, Dr. Cheremisinoff, and his review, adoption, rephrasing, and supplementation of Dr. Cheremisinoff's opinions complies with the Federal Rules of Civil Procedure. His opinions, including his adopted opinions, are based on a reliable methodology, and Defendants' criticisms go to their weight, not admissibility. Defendants have not, and cannot, demonstrate that they have suffered prejudice from any allegedly late disclosure because the qualifications Dr. Matson has made to Dr. Cheremisinoff's opinions redound to Defendants' benefit. Moreover, Defendants should not be rewarded for waiting until the last possible moment to seek the most extreme remedy for Dr. Matson's claimed discovery violations. The Court should deny Defendants' motion and allow the jury to hear Dr. Matson's testimony.

Respectfully submitted,

**SCHLICHTER BOGARD & DENTON LLP**

By: _/s/ Nathan D. Stump_
Jerome J. Schlichter, #32225
Nelson G. Wolff, #40796
Kristine K. Kraft, #37971
Nathan D. Stump, #71641
100 South 4th Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
jshlichter@uselaws.com
nwolff@uselaws.com
kkraft@uselaws.com
nstump@uselaws.com
*Attorneys for Plaintiffs*

30