IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| A.O.A., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE DOE RUN RESOURCES CORPORATION, *et al.*,<br><br>Defendants. | Case No. 4:11-cv-00044-CDP (CONSOLIDATED) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF DAVID SULLIVAN**

# Table of Contents


I. Factual Background ..... 2

II. Legal Standard ..... 6

III. Argument ..... 7

A. Sullivan's TSP modeling is reliable and unrelated to his interpretation of the Two Smelter Study. ..... 7

1. Sullivan's extrapolation of $PM_{10}$ to TSP in the fugitive emissions data is supported by multiple EPA studies, including the Two Smelters Study. ..... 9

2. Sullivan's conclusion regarding particle size distribution is further supported by the relevant literature. ..... 12

B. Defendants' challenge to the accuracy of Sullivan's air modeling goes to the weight, not the admissibility, of his testimony. ..... 15

1. Defendants' argument is legally unsupported. ..... 16

2. Defendants' argument misinterprets EPA guidance. ..... 17

IV. Conclusion ..... 20

# Table of Authorities

**Cases**

*Abarca v. Franklin Cty. Water Dist.*,
761 F. Supp. 2d 1007 (E.D. Cal. 2011) .... 14

*Adams v. Cooper Indus., Inc.*,
No. 03-476, 2007 WL 1805586 (E.D. Ky. June 21, 2007) .... 7

*Am. Auto. Ins. Co. v. Omega Flex, Inc.*,
No. 11-00305, 2013 WL 2628658 (E.D. Mo. June 11, 2013) .... 20

*B.H. v. Gold Fields Mining Corp.*,
No. 04-0564, 2007 WL 188130 (N.D. Okla. Jan. 22, 2007) .... 3

*Bell v. Westrock CP LLP*,
No. 17-829, ECF No. 208 (E.D. Va. Nov. 18, 2019) .... 3

*Bonner v. ISP Techs., Inc.*,
259 F.3d 924 (8th Cir. 2001) .... 16

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .... 16

*David E. Watson, P.C. v. United States*,
668 F.3d 1008 (8th Cir. 2012) .... 8

*EEOC v. Am. Nat'l Bank*,
652 F.2d 1176 (4th Cir. 1981) .... 8

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .... 16

*Hartle v. FirstEnergy Generation Corp.*,
7 F. Supp. 3d 510 (W.D. Pa. 2014) .... 17

*Herd v. ASARCO*,
No. 01-891 (N.D. Okla. June 25, 2003) .... 3

*Hill v. Sw. Energy Co.*,
858 F.3d 481 (8th Cir. 2017) .... 8

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
9 F.4th 768 (8th Cir. 2021) .... 6, 16

*Johnson v. Mead Johnson & Co., LLC*,
754 F.3d 557 (8th Cir. 2014) .... 14

*Khoday v. Symantec Corp.*,
93 F. Supp. 3d 1067 (D. Minn. 2015), *as amended* (Apr. 15, 2015) .... 7

*Kozlov v. Associated Wholesale Grocers, Inc.*,
818 F.3d 380 (8th Cir. 2016) .... 16

*Kuhn v. Wyeth, Inc.*,
686 F.3d 618 (8th Cir. 2012) ............ 6, 16

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............ 14

*Madding v. MG Indus. Inc.*,
No. 99-2593, ECF No. 143 (D.S.C. Nov. 14, 2000) ............ 3

*Marmo v. IBP, Inc.*,
No. 00-527, 2005 WL 675810 (D. Neb. Feb. 4, 2005) ............ 15

*Marmo v. Tyson Fresh Meats, Inc.*,
457 F.3d 748 (8th Cir. 2006) ............ 7

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*,
401 F.3d 901 (8th Cir. 2005) ............ 8

*Mortimer v. A.O. Smith Corp.*,
No. 13-04169, 2015 WL 12533103 (E.D. Pa. Oct. 23, 2015) ............ 14

*Powell v. Tosh*,
942 F. Supp. 2d 678 (W.D. Ky. 2013), *adhered to on denial of reconsideration*, No. 09-00121, 2013 WL 1878934 (W.D. Ky. May 3, 2013) ............ 15

*Richman v. Sheahan*,
415 F. Supp. 2d 929 (N.D. Ill. 2006) ............ 9

*Roundup Prod. Liab. Litig.*,
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............ 14

*SEC v. Das*,
723 F.3d 943 (8th Cir. 2013) ............ 8

*United States v. Ameren Missouri*,
421 F. Supp. 3d 729 (E.D. Mo. 2019), *aff'd in part*, 9 F.4th 989 (8th Cir. 2021) ............ 17

*United States v. Finch*,
630 F.3d 1057 (8th Cir. 2011) ............ 7

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004) ............ 14

*Weitz Co. v. MH Washington*,
631 F.3d 510 (8th Cir. 2011) ............ 16

*Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ............ 8

**Regulations**

40 C.F.R. Pt. 51 ............ 4, 18

Plaintiffs' expert meteorologist, David Sullivan, has spent more than 45 years assessing air quality in some of the most polluted locations on the planet. He will testify that, according to data from Defendants' own air monitoring stations, measured concentrations of lead, arsenic, and sulfur dioxide emissions from Defendants' Complex were "extremely high" – hundreds or thousands of times higher than Peruvian and American limits and among the highest he has seen in his career. Sullivan will also testify that his modeled air concentrations are reasonably consistent with Defendants' measured data and likewise show extreme air quality degradation throughout La Oroya, particularly in the places where Plaintiffs lived and attended school.

Defendants have filed a limited motion that raises only two challenges, both of which are addressed to Sullivan's air modeling opinions.[1] Most of their brief focuses on a single factual predicate he relied on for his own emissions inventory: that most fugitive particulate emissions from the Complex – emissions from sources other than the stacks – would have been larger than 10 microns in diameter.[2] Defendants claim that findings published in a 1976 study by the U.S. Environmental Protection Agency (EPA) refute that conclusion. Defendants further argue that all of Sullivan's modeling results are insufficiently accurate to be deemed reliable and relevant.

---

[1] *See* Docs. 1212, Defts' Sullivan *Daubert* Mot. and 1214, Defts' Mem. in Support of Sullivan *Daubert* Mot. In his Initial Report, Sullivan offers 12 opinions to within a reasonable degree of scientific certainty. *See* Doc. 1214-1, 2/17/2019 Expert Report of David Sullivan at pdf pp. 14-16. As he explained at his deposition, only three of his opinions – the fifth, seventh, and eighth – depend in any way on his modeling results. Exh. 42, 3/26/2019 Deposition of David Sullivan at 173:2-175:19. (All citations to exhibits herein ("Exh." or "Exhs.") refer to the exhibits attached to the Declaration of Nathan D. Stump, filed separately.) Defendants' motion does not address any of his other nine opinions.

[2] Particles smaller than ten microns (10 millionths of a meter) in diameter are referred to as "$PM_{10}$." Because larger particles are also present in airborne emissions, $PM_{10}$ particles represent only a fraction of total suspended particulates ("TSP"). *See* Doc. 1214-4, 5/28/2021 Expert Rebuttal Report of David Sullivan at pdf p. 6 (defining TSP as particles up to 30 microns (µm) in diameter). What that fraction would have been for fugitive emissions from the Complex is a subject of disagreement between the parties. This disagreement, however, affects only a small portion of Sullivan's air modeling results. Most of his modeling is based exclusively on $PM_{10}$, a subject on which the parties largely agree.

These arguments have no merit. Sullivan's opinion about particle size distributions in fugitive emissions is reasonable and well-supported. He thoroughly explains the basis for his opinion, cites other references that support his conclusion, and demonstrates how his interpretation of the 1976 study aligns with EPA's. Sullivan also employed a reliable method for modeling air concentrations, and his modeled results generally fall within the standard rule of thumb used in his field. Defendants misinterpret EPA guidance and apply the wrong standard, and their attack on his air modeling results is merely a disagreement with his conclusions, which is not a proper basis for exclusion. The Court should deny Defendants' motion in its entirety.

## I. Factual Background

This case involves massive amounts of toxic air pollution that affected not just the Plaintiffs but whole communities within the vicinity of La Oroya, Peru. It is undisputed that from October 1997 to June 2009, the Complex emitted lead, sulfur dioxide, and arsenic (among other pollutants) into the air surrounding La Oroya. All three are harmful toxins that are well known to cause a variety of health problems, particularly in children.

Sullivan is an expert in air quality dispersion modeling – computer generation of expected airborne concentrations and surface deposition. He also has expertise in air quality and meteorological monitoring, exposure assessment, and media transfers of airborne pollutants to top-layer soils and other surfaces. He has served as the principal investigator for many EPA studies of toxic air pollution and has helped develop air quality modeling systems for the EPA.[3] Over the past 20 years, Sullivan has performed approximately 50 air quality/meteorological

[3] Doc. 1214-1 at pdf p. 14.

monitoring studies to estimate airborne emissions from complex area sources.[4] His air modeling testimony has been accepted by trial courts across the country.[5]

Plaintiffs retained Sullivan to evaluate the air quality and deposition impacts in and around La Oroya. His opinions are detailed in four highly technical reports,[6] much of which focus on the measured data collected from Defendants' air monitoring stations. According to Sullivan, there is "no basis to refute the fact that air quality in La Oroya was extremely ... degraded [for] lead, arsenic, and $SO_2$ when [Doe Run Peru] operated the smelter."[7] Measured sulfur dioxide concentrations were hundreds of times higher than levels accepted in the United States; measured arsenic concentrations were up to 12,500 times higher.[8] Sullivan will testify that even "at the fringes of La Oroya," measured concentrations of heavy metals and sulfur dioxide were "among the highest levels on the planet" and "hundreds of times worse than anything I have ever seen in my career."[9]

Sullivan will further testify that "many residents closer to the smelter and/or at higher elevation than the monitoring sites ... [likely] experienced airborne concentrations much higher

[4] *Id.*

[5] *E.g.*, *Bell v. Westrock CP LLP*, No. 17-829 (E.D. Va. Nov. 18, 2019), ECF No. 208 (denying motion to exclude); *Herd v. ASARCO*, No. 01-891, ECF No. 530 (N.D. Okla. June 25, 2003), ECF No. 530 (same); *Madding v. MG Indus. Inc.*, No. 99-2593 (D.S.C. Nov. 14, 2000), ECF No. 143 (same). Sullivan's testimony has been limited only once. *See B.H. v. Gold Fields Mining Corp.*, No. 04-0564, 2007 WL 188130, *4 (N.D. Okla. Jan. 22, 2007) (excluding Sullivan's opinion about a particular wind erosion equation and permitting all his other testimony).

[6] Defendants filed all four reports as exhibits. *See* Doc. 1214-1 ("Initial Report"); Doc. 1214-2, 6/22/2020 Rebuttal Expert Report of David Sullivan ("Rebuttal Report"); Doc. 1214-3, 12/1/2020 Additional Expert Report of David Sullivan ("Additional Report"); Doc. 1214-4, 5/28/2021 Supplemental Expert Report of David Sullivan ("Supplemental Report").

[7] Doc. 1214-2 at pdf p. 6.

[8] *Id.* at pdf pp. 7-8.

[9] *Id*. at pdf p. 8.

than those measured concentrations."[10] To support that opinion, Sullivan used a CALPUFF[11] air quality model (sometimes called a dispersion or Gaussian puff model) to estimate concentrations of lead, arsenic, cadmium, and sulfur dioxide in the air and the settled dust in the areas where each Plaintiff lived and went to school.[12] He ran his model three times to account for the parties' respective assessments of fugitive emissions and particle size distributions, using as inputs three different emissions inventories: one created by Dr. Daniel Vornberg, the former Vice President for Environmental Affairs at Doe Run Resources Corporation (the "Vornberg inventory"); one created by Plaintiffs' expert, Dr. Nicholas Cheremisinoff (now deceased); and one generated by Sullivan himself.[13] All three model runs showed extreme environmental degradation.[14]

$PM_{10}$ versus TSP

The Vornberg inventory captured only $PM_{10}$ data and did not include the full range of particle sizes known as total suspended particulate (TSP).[15] In creating his own emissions inventory, Sullivan accounted for these larger particles in the Complex's fugitive emissions by estimating the proportion of $PM_{10}$ to TSP from all fugitive sources and then using those

---

[10] Doc. 1214-1 at pdf p. 17.

[11] CALPUFF is a modeling application approved by the EPA for use in estimating "single source pollutant concentrations resulting from the long range transport of primary pollutants." 40 C.F.R. Pt. 51 App. Y § III.A.3. CALPUFF "is widely used in the U.S. for air quality analysis for sites located in areas with complex wind flow and for long-range dispersion." Doc. 1214-1 at pdf p. 11. While there are many models that can be used to evaluate air quality, Defendants have not challenged Sullivan's decision to model air concentrations using CALPUFF.

[12] *See id.* at pdf pp. 17-18. Sullivan's air model incorporates both fugitive and stack emissions, as well as both particulate emissions (e.g., lead, arsenic, and cadmium) and gaseous emissions (e.g., sulfur dioxide). Defendants challenge only Sullivan's estimates of fugitive particulate emissions. *See* Doc. 1214 at 5 n.2.

[13] Sullivan and Dr. Cheremisinoff added six additional sources of fugitive emissions to the Vornberg inventory, to capture all sources of pollution associated with Defendants' operations. *See* Doc. 1214-3 at pdf pp. 71-83. While Defendants dispute those additions, they do not move to exclude Sullivan on that ground, Doc. 1214 at 7, and those additions make only a small difference to the total emissions inventory. *See* Doc. 1214-4 at pdf p. 39 (Table 3-1).

[14] Doc. 1214-1 at pdf pp. 40-88 (Section 6), 93-141, 160-174 (Apps. D, E and G). Section 6 and Appendices D and G of Sullivan's Initial Report contain the only modeling Sullivan conducted based on the TSP estimates Defendants seek to exclude. Plaintiffs also produced in discovery the same model results based solely on $PM_{10}$. *See* Doc. 1214-1 at pdf p. 70 n.12.

[15] *See* Doc. 1214-3 at pdf p. 30. Defendants dispute this fact but do not belabor the point. *See* Doc. 1214 at 7.

proportions to "scale up" the Vornberg data, to better approximate Plaintiffs' total exposure.[16] Sullivan derived some of his estimated proportions from information published in a 1976 EPA study called *Sample Fugitive Lead Emissions from Two Primary Lead Smelters* (hereinafter the "Two Smelters Study").[17] He also relied on six other references involving similar types of smelter operations to support his opinions.[18] Sullivan extensively discusses his methodology for scaling up $PM_{10}$ emissions to TSP emissions in his 2021 Supplemental Report, devoting an entire appendix to the topic.[19]

Although he reached his own conclusions about the relative particle sizes present in the smelter's fugitive emissions, Sullivan never used his "scaled up" fugitive TSP concentrations to model air emissions. Rather, his TSP modeling was conducted based on Dr. Cheremisinoff's emissions inventory.[20] Sullivan modeled TSP concentrations only once, in his February 2019 Initial Report. In that same report, and in two subsequent reports, Sullivan also ran his CALPUFF modeling program using only $PM_{10}$ data – once with some slight modifications to account for other missing inputs, and once without any modifications at all. The differences in his $PM_{10}$ and TSP modeling results are "relatively small," with both sets of results "grossly exceed[ing] established standards and guidance."[21] In each scenario, the primary take-away is the same: "the $PM_{10}$ analysis shows extreme air quality impacts. The TSP is worse."[22]

---

[16] Doc. 1214-4 at pdf p. 6.

[17] Defendants filed a copy of the Two Smelters Study as an exhibit. *See* Doc. 1214-5.

[18] *See* Doc. 1214-4 at pdf p. 104 (Table C-3).

[19] *See id.* at pdf pp. 50-54, 95-110 (App. C).

[20] *See* Doc. 1214-1 at pdf p. 41 ("An extensive assessment of emission rates and release specifications was conducted by Dr. Nicholas Cheremisinoff[.]"); *see id*. at pdf p. 55 ("Particle Size Distributions": "The emissions data are based on the expert report of Dr. Cheremisinoff, 2019.").

[21] Doc. 1214-4 at pdf p. 9 (showing a 16% increase for lead, a 12% increase for arsenic, and a 6% increase for $SO_2$).

[22] *Id*. at pdf p. 95.

Sullivan's Model Accuracy

Sullivan assessed the reliability of his air modeling in his Initial Report.[23] There is no single authoritative guideline that air modelers use to test modeled results' reliability, so air modelers must use their judgment and expertise to evaluate whether their results are reliable. Sullivan opined that "a standard rule of thumb for expected model performance is ~ ± a factor of two" and found that, when compared to average measured concentrations, the average concentrations generated by his model generally fell within that range.[24] He further considered that modeled results outside that range were nearly always *lower* than comparable measured concentrations.[25] In fact, "[o]f the 64 pairs of measured and modeled data including $SO_2$, lead, and arsenic, the model is *understating* for 57 of the 64 comparisons."[26] "This means that risk assessment based on these results will generally tend to provide a lower bound estimate."[27]

## II. Legal Standard

For expert testimony to be admissible in the Eighth Circuit, the expert must be qualified to assist the finder of fact, the testimony must be relevant, and the testimony must be reliable or trustworthy in an evidentiary sense. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). Proponents of expert testimony need not demonstrate that the assessments of their experts are correct, and trial courts are not empowered "to determine which of several competing scientific theories has the best provenance." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). Rather, the burden is on the proponent to prove that the expert

---

[23] *See* Doc. 1214-1 at pdf pp. 130-141 (App. E).

[24] *Id.* at pdf p. 87 (citing Ref. 152, U.S. EPA, *Example Application of Modeling Toxic Air Pollutants in Urban Areas* (June 2002) at pdf p. 17).

[25] *Id.*; *see also* Doc. 1214-2 at pdf p. 51.

[26] Doc. 1214-2 at pdf p. 51 (emphasis added).

[27] *Id.*

is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1076 (D. Minn. 2015), *as amended* (Apr. 15, 2015) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006)). Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility. *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011).

## III. Argument

The Court should allow Sullivan to testify about each set of air quality modeling results that he computed, as well as his reconstructed fugitive emissions inventory. His methodology for modeling TSP concentrations in fugitive emissions is supported by reliable science, and he never uses those estimated TSP concentrations for any modeling. Defendants' challenge to Sullivan's modeling results clearly focuses on their disagreement with his conclusions, which go to the weight of the evidence, not its admissibility. Sullivan's general methodology – inputting various sets of fugitive emissions data into the widely accepted CALPUFF modeling software program to model dispersion of pollutants in the areas where Plaintiffs lived and attended school – is reliable and has been accepted in other courts.[28]

### A. Sullivan's TSP modeling is reliable and unrelated to his interpretation of the Two Smelter Study.

Defendants challenge the air modeling that Sullivan conducted using TSP estimates in his Initial Report.[29] But their challenge is fatally flawed from the outset because Sullivan's TSP modeling was based on *Dr. Cheremisinoff's* TSP estimates.[30] For his *own* estimation of TSP

---

[28] Defendants' expert, Gale Hoffnagle, once criticized an opposing expert in a similar case for *not* using CALPUFF. *See Adams v. Cooper Indus., Inc.*, No. 03-476, 2007 WL 1805586, at *9 (E.D. Ky. June 21, 2007).

[29] *See generally* Doc. 1214-1.

[30] *See* Doc. 1214-1 at pdf p. 55.

emissions, which was not used for any modeling, Sullivan considered data from the Two Smelters Study, as well as six other sources, and concluded that fugitive emissions – unlike stack emissions – contain a substantial percentage of particulate matter larger than $PM_{10}$.[31] Defendants argue that Sullivan is misreading the Two Smelters Study, that his underlying assumption about relative particle size is wrong, and that his TSP modeling "artificially increas[es] his overall estimated fugitive lead rates[.]"[32] From there, they assert that his TSP modeling should be excluded because it "grossly exaggerates fugitive air emissions."[33] This argument is largely unsupported by case law[34] and has no effect on any of Sullivan's modeling opinions.

"An expert's opinions are not inadmissible simply because an underlying assumption may be contestable." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 615 (8th Cir. 2011) (citing *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005)); *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (*Daubert* motion was properly denied where the movant merely "expressed a disagreement with the underlying assumptions [the expert] made in his calculations"). "So long as the methods employed are scientifically valid, mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 486 (8th Cir. 2017) (cleaned up) (quoting *SEC v. Das*, 723 F.3d 943, 950 (8th Cir. 2013)).

---

[31] *See* Doc. 1214-4 at pdf p. 30 ("[E]xtensive EPA literature on particle size distributions for fugitive emissions ... shows the distributions are generally dominated by particles greater than 10 µm[.]"); *see id.* at pdf p. 104 (App. C).

[32] Doc. 1214 at 2.

[33] *See id* at 1; *see also id.* at 7 (asserting Sullivan incorrectly "assum[ed] that the overwhelming majority ... of fugitive lead and arsenic emissions from the Complex were contained in large particles").

[34] In one of their few legal citations, Defendants describe *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1195 (4th Cir. 1981) – a case pre-dating *Daubert* by over a decade – as "holding [an] expert's opinion unreliable when it drew conclusions from only one of seven years of data." It should be noted that the opinion contains no discussion or even mention of expert witnesses.

"Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). "The question is not whether the opinion is based on assumptions, but whether there is some factual support for them." *Id.* Here, Sullivan has good grounds for determining the relative proportion of $PM_{10}$ to TSP emitted from fugitive sources at the Complex. His opinion that many of these fugitive particles were larger than 10 microns is reasonable and supported by multiple reference materials.

**1. Sullivan's extrapolation of $PM_{10}$ to TSP in the fugitive emissions data is supported by multiple EPA studies, including the Two Smelters Study.**

Defendants contend that "the vast majority" of fugitive emissions from the La Oroya Complex between 1997 and 2009 were smaller than 10 microns, and they spend the better part of their brief explaining how the Two Smelters Study single-handedly proves their point.[35] But the Two Smelters Study used two different methods to estimate particle sizes: (1) direct measurement under a microscope; and (2) indirect measurement using a cascade impactor.[36] These two methods produced conflicting results.[37] Sullivan relies on the Two Smelters Study's microscopy[38] results, which show significant proportions of larger particles in fugitive emissions.

[35] *See* Doc. 1214 at 6-16.

[36] *See* Doc. 1214-4 at pdf p. 106.

[37] *See id.* at pdf pp. 106-07; *see also* Exh. 44, 7/9/2021 Deposition of David Sullivan at 127:24-128:16 ("They conflicted.").

[38] Microscopy "is a direct procedure where a scientist looks at the actual filtered material and counts and comes up with the actual directly measured distribution by weight." Exh. 43, 1/19/2021 Deposition of David Sullivan at 182:10-183:1.

As Sullivan has explained,[39] the problem with using cascade impactors is that they are specially designed to capture and measure only smaller particles.[40] Peer-reviewed research shows that if cascade impactors are used to measure emissions containing larger particles (like fugitive emissions from a lead smelter),[41] they will produce skewed results, with a "well documented bias" toward showing a higher percentage of small particles, unless they are fitted with an extra device – sometimes called a "cyclone," or a "pre-cutter" or "pre-separator" – that removes the larger particles before they can enter the cascade impactor's system of filters.[42]

In forming his opinion, Sullivan noticed that the Two Smelters Study did not mention a pre-cutter and that the picture of the cascade impactor used in the Two Smelters Study appeared not to have a pre-cutter installed.[43] He also knew from experience that (a) the Sierra cascade impactor used was specifically designed for $PM_{10}$ analysis;[44] and (b) the glass fiber filters in the cascade impactor were not coated to minimize particle bounce, thereby allowing larger particles to pass through to subsequent impactor stages or to stick on the instrument's walls rather than on collecting surfaces.[45] Finally, he considered the microscopy evidence, which showed that "a dominant fraction of the mass collected on [the] impactor were much greater than 10 μm," suggesting that a pre-cutter was not used and that large particles likely made their way onto the

---

[39] Sullivan has previously responded to all the points raised in Defendants' first *Daubert* argument, explaining in detail his methodology for scaling up $PM_{10}$ to TSP across more than 90 pages of deposition testimony and 20 pages of his supplemental expert report. *See* Doc. 1214-4 at pdf pp. 50-54, 95-110; *see also* Exh. 43, 1/19/2021 Sullivan Dep. at 178:17-228:8; Exh. 44, 7/9/2021 Sullivan Dep. at 122:20-164:9. Defendants simply ignore his response.

[40] *See* Doc. 1214-4 at pdf p. 51.

[41] *See id.* at pdf p. 51 (fugitive emissions typically "have large percentages of particles greater than $PM_{10}$").

[42] *See id.* at pdf pp. 96, 106-110 (describing limitations of cascade impactors).

[43] *Id.* at pdf pp. 109-10; *see also* Doc. 1214-5 at pdf p. 176 (Fig. C-3) (impactor photograph).

[44] Doc. 1214-4 at pdf p. 110; *see also* Exh. 43, 1/19/2021 Sullivan Dep. at 184:6-185:17.

[45] Doc. 1214-4 at pdf p. 109.

finer stages of the instrument.[46] Based on these facts, Sullivan concluded that the particle size distributions measured indirectly via cascade impactor were not reliable.[47]

Defendants, of course, seize on the cascade impactor measurements to dispute Sullivan's interpretation of the Two Smelters Study, calling his views "scientifically indefensible and grossly misleading."[48] Relying on their own expert, Shari Beth Libicki, they assert that the microscopy evidence from the Two Smelters Study examined only particles captured in Stage 1 filters, i.e., only the largest particles. "Without the full set of data from the remaining five filters," Defendants argue, "there is no valid scientific basis for Mr. Sullivan to prepare full-scale particle size distributions for fugitive sources at the Complex."[49]

But Sullivan concludes that the microscopy results reported in the Two Smelters Study reliably included particle measurements from filters at all five stages.[50] Recognizing that the Two Smelters Study itself "isn't totally clear" on this point,[51] Sullivan cites a peer-reviewed article that explains, "in the case of the SEM [scanning electron microscopy] distributions the contributions of all the stages to a particular size range have been taken into account," such that "they are comparable to a distribution that would result from analysis of a total filter sample."[52]

---

[46] *Id.* at pdf pp. 109-110.

[47] See Exh. 43, 1/19/2021 Sullivan Dep. at 226:8-227:2 ("I would place greater emphasis on direct measurement than indirect assessment that was done with those impactors. I mean, that was my conclusion[.]").

[48] Doc. 1214 at 12 (initial caps removed).

[49] *Id.* at 15; *see also id.* at 14 n.7.

[50] *See* Exh. 44, 7/9/2021 Sullivan Dep. at 142:4-146:1.

[51] *Id.* at 145:2-146:1.

[52] Doc. 1214-4 at pdf p. 108 (quoting E. Dekeyser, et al., *Size Distribution Analysis of Cascade Impactor and Multistage Cyclone Emission Samples by a SEM-Based Imaging System*, 12 SCANNING 41 (1990)); *see also* Exh. 44, 7/9/2021 Sullivan Dep. at 143:15-144:6 ("[I]f you're going to do a particle size distribution by microscopy, you do the analysis based upon all five filters.").

It is much more plausible, as Sullivan suggests, that the number references in the table are merely shorthand for *all* filters associated with a particular cascade impactor set.

**2. Sullivan's conclusion regarding particle size distribution is further supported by the relevant literature.**

To challenge Sullivan's extrapolation of $PM_{10}$ fugitive emissions to TSP, Defendants rely heavily on an outdated edition of an EPA document known as AP-42, which interpreted the Two Smelters Study and describes "[t]he size distribution of fugitive emissions at a primary lead processing plant [a]s fairly uniform, with approximately 79 percent of these emissions at less than 2.5 micrometers."[53] Sullivan, however, relies on seven authoritative sources to support his own opinion, including the current (fifth) edition of AP-42, which shows high percentages of larger particles in fugitive emissions from certain sources.[54]

Sullivan includes his analysis of fugitive emissions particle size distributions in his final report.[55] His Table C-3 (reprinted in part below) provides a summary of fugitive particle size distributions by emissions source.[56] The ninth and tenth rows show estimates of the $PM_{10}$ fraction of TSP in fugitive emissions from a sinter building. Sullivan's interpretation of the Two Smelters Study (shown in row nine) accords with EPA's estimate (shown in row ten): both

[53] *See* Doc. 1214 at 8 (quoting Doc. 1214-11, U.S. EPA, *AP-42: Compilation of Air Pollutant Emissions Factors,* Vol. 1, (4th ed. 1985) at pdf p. 9 (7.6-6)). As Defendants well know, the old 1985 version of AP-42 they rely on has been revised and no longer includes the quote excerpted above. *See also* Doc. 1214-4 at pdf p. 106 n.7 (explaining that EPA abandoned its focus on TSP distributions in 1987 and now emphasizes PM10 distributions).

[54] *See* Doc. 1214-4 at pdf p. 101 (citing § 12.6); Exh. 45, U.S. EPA, *AP-42: Compilation of Air Pollutant Emission Factors* (5th ed. 1995) ("1995 AP-42") at pdf p. 61.

[55] *See* Doc. 1214-4 at pdf pp. 100-103 (discussing AP-42 data).

[56] *Id.* at pdf p. 104.

reflect a $PM_{10}$ fraction of approximately 28%.[57] Similarly, both EPA and Sullivan estimate a $PM_{10}$ fraction of roughly 8.5% from the blast furnace building.[58]

**Table C-3: Summary of Fugitive Sources Particle Size Distributions**

| Circuit | Fugitive Source | % PM 10 | Reference |
|---|---|---|---|
| Lead | Ore Crushing | 78.26% | Ref 183:5 |
| Lead | Lead Ore Storage | 86.00% | Ref 257:10 |
| Lead | Crushing Mill | 37.14% | Ref 259:69 |
| Lead | Crushing Mill | 36.52% | Ref 251:56 |
| Lead | Sinter Machine | 98.00% | Ref 257:11 |
| Lead | Sinter Building | 49.50% | Ref 183:5 |
| Lead | Sinter Building | 49.33% | Ref 251:24, 27 |
| Lead | Sinter Building | 49.57% | Ref 259:69 |
| Lead | Sinter Building (East Helena, MT) | 27.60% | Ref 115:40 |
| Lead | Sinter Building | 27.87% | Ref 251:61 |
| Lead | Sinter Building (Glover, Missouri) | 18.30% | Ref 115:29 |
| Lead | Blast Furnace | 89.00% | Ref 257:12 |
| Lead | Blast Furnace Building | 8.48% | Ref 251:61 |
| Lead | Blast Furnace Building | 8.50% | Ref 115:40 |
| Lead | Blast Furnace Floor Building | 36.65% | Ref 251:56 |
| Lead | Blast Furnace Charge Building | 45.91% | Ref 251:56 |

Sullivan also cites particle size data collected in 1990 from a primary lead smelter in Montana.[59] Those data similarly show that $PM_{10}$ particles comprised less than half the fugitive emissions from several sources, including the blast furnace tapping platform (17.4%), the crushing mill (36.5%), and the blast furnace charge building (45.9%).[60]

Defendants completely ignore the sources Sullivan cites in his supplemental report.[61] Instead, they remain fixated on the flawed cascade impactor data collected in 1976, from which

[57] *See id.* (27.6% for Sullivan vs. 27.87% for EPA). In his reports, Sullivan refers to the Two Smelters Study as "Ref. 115" and 1995 AP-42 as "Ref. 251."

[58] *See id.* (8.48% and 8.5%, respectively).

[59] *See* Exh. 45, 1995 AP-42 at pdf pp. 50-57.

[60] *Id.* at pdf p. 56.

[61] *See, e.g.*, Doc. 1214-4 at pdf p. 104 (citing inter alia Ref. 225, EPA's *Technical Guidance for Control of Industrial Process Fugitive Particulate Emissions* (March 1977) at pdf p. 438 (estimating $PM_{10}$ as 15% of TSP from the copper roaster, with mean particulate emission sizes of 37 and 44 microns from the copper reverberatory furnace and copper converter, respectively) and Ref. 259, *Air Quality Permit* for ASARCO LLC's primary lead smelter in

they conclude that 94.6% of TSP from the sinter building and 95.5% of TSP from the blast furnace building were $PM_5$.[62] It is Defendants' preferred figures – not Sullivan's – that contradict the current scientific literature. At a minimum, this is a battle of the experts, and the Court should reject Defendants' request to choose sides. *See Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1039 (E.D. Cal. 2011) (when grounded in reasonable differences in scientific evaluation, particle size dispute is "a scientific factual dispute" that "should be determined by the trier of fact, not by the Court on a motion to exclude").

When the expert testimony is "within 'the range where experts might reasonably differ,' the jury, not the trial court, should be the one to 'decide among the conflicting views of different experts.'" *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 564 (8th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)); *accord, e.g.*, *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1150–51 (N.D. Cal. 2018) ("[D]ifferent interpretations of these studies are not necessarily evidence of unreliability, and [the expert's] interpretations of the same core studies evaluated by the plaintiffs are sufficiently grounded in scientific principles to be admissible. The plaintiffs may raise their concerns via cross-examination."); *Mortimer v. A.O. Smith Corp.*, No. 13-04169, 2015 WL 12533103, at *11 (E.D. Pa. Oct. 23, 2015) ("To the extent that Defendant has an expert who bases his opinion on reliable studies supporting a different opinion, the matter is one that 'should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny.'" (quoting *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004)).

---

East Helena, Montana (2006) at pdf p. 69 (reflecting that $PM_{10}$ comprises 37.1% of TSP from crushing mill, 49.6% of TSP from sinter building, 50% of TSP from blast furnace charge area, 20% of TSP from blast furnace tap area, 23% of TSP from dross plant, and 35.4% of TSP from fugitive road dust)).

[62] *See* Doc. 1214 at 11-12 (citing Doc. 1214-12, 3/19/2021 Supplemental Expert Report of Shari Libicki at pdf pp. 33, 37 (Tables 7-1, 7-2)). $PM_5$ are even smaller particles, less than 5 microns.

Sullivan's fugitive emissions inventory is supported by sound science, as well as his substantial experience. There is no legal basis to prevent him from testifying about his TSP modeling results or his reconstructed fugitive emissions inventory, and the Court should deny the motion. *Cf. Powell v. Tosh*, 942 F. Supp. 2d 678, 717 (W.D. Ky. 2013), *adhered to on denial of reconsideration*, No. 09-00121, 2013 WL 1878934 (W.D. Ky. May 3, 2013) (where air modeling expert describes his data and explains his choices, "issues of [the expert's] data selection and his use of that data go more to the weight of his testimony and, therefore, more appropriately are matters for challenging his testimony on cross-examination"); *see also Marmo v. IBP, Inc.*, No. 00-527, 2005 WL 675810, at *2 (D. Neb. Feb. 4, 2005) ("I leave to [defendant] to bring out on cross-examination whether these [air modeling] expert opinions are premised on erroneous calculations or inaccurate factual information.").

### B. Defendants' challenge to the accuracy of Sullivan's air modeling goes to the weight, not the admissibility, of his testimony.

In the final three pages of their brief, Defendants argue that all of Sullivan's air modeling results are insufficiently accurate to be deemed reliable and relevant.[63] Specifically, Defendants argue that Sullivan's modeled values are not within 40% of measured values at multiple monitoring sites and therefore must be excluded.[64] This argument has two problems. First and foremost, it fails as a matter of law: challenges to an expert's conclusions go to the testimony's weight, not its admissibility. Second, it is factually invalid, as it misinterprets EPA guidance regarding evaluation of an air model's accuracy. Using the appropriate benchmark, Sullivan's air modeling is sufficiently accurate to be reliable.

---

[63] Doc. 1214 at 18-20.

[64] *See id.* at 19-20.

**1. Defendants' argument is legally unsupported.**

The Supreme Court has made clear that when considering the reliability of expert scientific testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993); *accord, e.g.*, *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016). Although "conclusions and methodology are not entirely distinct from one another," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), conclusions are still off limits unless they are "connected to existing data only by the ipse dixit of the expert," *id.*, or where the expert is "truly unable to explain the link between the facts and the result." *Weitz Co. v. MH Washington*, 631 F.3d 510, 528 (8th Cir. 2011).

Sullivan's modeling outputs are not "ipse dixit." He took fugitive emissions inventories largely calculated by Defendants and ran that data through a widely accepted modeling program (CALPUFF), the use of which Defendants do not challenge. In each report, Sullivan cites to numerous references supporting the emissions data he used in the model. Based on Sullivan's air modeling expertise, he explains that his modeling results are reasonably accurate and consistent with the measured air quality data collected by Defendants, particularly given the complicated topography in and around La Oroya.

Defendants' disagreements with Sullivan's modeling results and his judgments in reaching those results are topics properly left for cross-examination at trial. *See In re Bair Hugger*, 9 F.4th at 788 ("[T]he standard for admissibility is 'lower than the merits standard of correctness[.]'" (quoting *Kuhn*, 686 F.3d at 625)); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 932 (8th Cir. 2001) (where the expert's "methodology was scientifically valid, the scientific questions were best addressed by allowing each side to present its experts and then submitting their opinions to the jury"); *cf. Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 519

(W.D. Pa. 2014) ("To the extent that the other field observations are inconsistent with [air modeler's] predictions, that evidence goes to weight, not admissibility. The court does not find a serious methodological flaw with respect to defendant's argument [that the modeler] failed to validate his model because he compared his results to field observations.").

**2. Defendants' argument misinterprets EPA guidance.**

Defendants are also judging Sullivan's air modeling by the wrong yardstick. The parties agree there will necessarily be some degree of variability between air quality measurements and modeled results.[65] "Modeling outputs will not perfectly match monitoring data." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 781 (E.D. Mo. 2019), *aff'd in part*, 9 F.4th 989 (8th Cir. 2021). But a disagreement over the permissible range of variability is not a basis to exclude Sullivan's modeling results, particularly where the benchmark itself is not rigidly defined by any established authority.[66]

As Sullivan explains in his Initial Report, "a standard rule of thumb for expected model performance is ~ ± a factor of two,"[67] meaning modeled averages generally fall between one-half to two times the measured averages. A rule of thumb is "a general principle regarded as roughly correct but not intended to be scientifically accurate."[68] It is an objective, not a rule. Tables A-1 through A-3 of Sullivan's Supplemental Report compare his model's results to measured values for two emissions inventories (Sullivan and Vornberg).[69] The tables show that modeled results

---

[65] *See* Doc. 1214 at 18 ("When conducting air quality modeling, it is understood that there will be some degree of variability from air quality measurements....").

[66] *Id*.

[67] Doc. 1214-1 at pdf p. 87 (citing Ref. 152, EPA, *Ex. App. of Modeling Toxic Air Pollutants* (June 2002) at pdf p. 17 ("For model evaluation studies, a factor of two agreement between modeled and observed values is generally considered to be acceptable.")).

[68] Merriam-Webster, *Rule of Thumb.* https://www.merriam-webster.com/dictionary/rule%20of%20thumb (last accessed Mar. 14, 2022).

[69] *See* Doc. 1214-4 at pdf pp. 88-90.

generally fell within the "typical approximate factor of two accuracy objective for long-term model estimates."[70] They also show that estimated concentrations were almost always *lower than* the measured concentrations.[71] In other words, the model *understates* the pollution.[72]

Relying heavily on their expert statistician, Dr. Shahrokh Rouhani, Defendants counter that "the permissible range of variability" is ± 40%, not a factor of two, and that the "vast majority" of Sullivan's modeled concentrations fall outside "the USEPA's 40% typical margin of error."[73] But Rouhani is admittedly not an air modeling expert, and he pulls his 40% figure from a contrived reading of an EPA document he clearly does not understand.[74] Here is the relevant portion of that document:

> Errors of 5 to 10 degrees in the measured wind direction can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location. Such uncertainties do not indicate that an estimated concentration does not occur, only that the precise time and locations are in doubt. Composite errors in highest estimated concentrations of 10 to 40 percent are found to be typical. However, estimates of concentrations paired in time and space with observed concentrations are less certain.[75]

In this short excerpt, EPA is noting that wind direction can be highly variable at any given hour, and that even small differences in wind direction can lead to large differences between measured and modeled concentrations at particular locations and specific points in time. EPA goes on to explain that, while differences in wind direction typically account for a 10 to 40

---

[70] *Id.* at pdf p. 21.

[71] *See, e.g., id.* at pdf p. 88.

[72] *See* Doc. 1214-2 at pdf p. 51.

[73] Doc. 1214 at 19-20 (quoting Doc. 1248-1, 3/19/2021 Supplemental Report of Shahrokh Rouhani at pdf p. 10).

[74] *See generally* Doc. 1248, Pltfs' Mem. in Support of Rouhani *Daubert* Mot.

[75] Doc. 1214-14, EPA, *Revisions to the Guideline on Air Quality Models*, 82 Fed. Reg. 5182, 5209 (Jan. 17, 2017) at pdf p. 29. Note: this can also be found at 40 C.F.R. § Pt. 51, App. W.

percent margin of error for highest estimated concentrations, estimates of individual concentrations paired in time and space will be even "less certain."[76]

Nowhere in this excerpt, or any other reference, does the EPA assert that an air model is invalid unless it accurately predicts values within 40% of measured concentrations. It is simply a made-up standard. In fact, just a few sentences above the excerpted portion, the EPA explains that "evaluations of model accuracy should focus on the reducible uncertainty associated with physics and the formulation of the model. The 'irreducible' uncertainty associated with Gaussian plume models may be responsible for variation in concentrations of as much as +/- 50 percent. 'Reducible' uncertainties can be on a similar scale."[77] This additional context further undercuts Defendants' reliance on an imaginary 40% benchmark.

Defendants complain that "[b]y under-predicting results at locations further away from the Complex, Mr. Sullivan significantly over-predicts concentrations at the Sindicato monitoring station … located in La Oroya nearest to the Complex, where many of the Plaintiffs lived and attended school."[78] They contend that this reveals "systematic biases" that render Sullivan's model results unreliable "under any of his emission treatment scenarios."[79] But the problem here is not that the modeled estimates are too high but rather that the measured concentrations are too low. As Sullivan explains in his initial report, measured concentrations at the Sindicato station are lower than they should have been because the air monitor was inappropriately sited.[80] He proffers EPA siting criteria and demonstrates how they apply to the Sindicato station, referencing

---

[76] *See* Doc. 1248 at 8 ("For this reason, EPA discourages 'placing too much weight on modeled versus predicted concentrations paired in time and space' when evaluating model performance" (quoting Doc. 1214-14 at pdf p. 6)).

[77] Doc 1214-14 at pdf p. 29.

[78] Doc. 1214 at 20.

[79] *Id.* (quoting Doc. 1248-1, Supp. Rouhani Rep. at pdf p. 10).

[80] *See* Doc. 1214-1 at pdf pp. 177-186 (App. I).

pictures of the area and windflow diagrams in his discussion.[81] He concludes "with a high level of confidence that the measured concentrations, especially for particulates, are understated at the Sindicato site due to failure to follow sound practice and specific EPA guidance documents...."[82] Defendants may disagree with Sullivan about the accuracy of the Sindicato readings, but those disagreements can be explored at trial. They are not proper grounds for excluding any of Sullivan's modeling results. *See, e.g.*, *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, No. 11-00305, 2013 WL 2628658, at *7 (E.D. Mo. June 11, 2013) (argument that expert "drew the wrong conclusion from scientifically accepted testing goes to the weight and credibility of his testimony, not its reliability").

## IV. Conclusion

It is important for the jury to understand the full magnitude of the pollution Plaintiffs were exposed to from the Complex. Sullivan is an experienced, qualified expert whose air modeling results are directly relevant to that issue. He used a reliable, generally accepted air modeling software application and Defendants' own emissions estimates to generate his modeled concentrations. His opinion about the relative particle size distributions in fugitive emissions is reasonable and well-supported, and his results generally fall within the accepted margin of error for air modeling in the field. Defendants, meanwhile, have failed to put forward any valid, legal basis to exclude any of Sullivan's testimony. Their disagreement with the factual bases for his opinions and conclusions can be presented to the jury during cross-examination; they do not warrant exclusion. The Court should deny this motion.

---

[81] *See id.*

[82] *Id.* at pdf p. 186; *see also* Doc. 1214-2 at pdf p. 47 ("[T]here were siting problems at Sindicato that should be considered when reviewing the modeled versus measured data."). Sullivan's conclusion is echoed in the 2005 report by Integral Consulting, Inc., which observed surprisingly low $SO_2$ readings at the Sindicato monitoring site compared with another monitoring station farther away. *See* Exh. 14, *Human Health Risk Assessment Report, La Oroya Metallurgical Complex.*, Integral Consulting Inc. (Dec. 2, 2005) at pdf p. 157.

Respectfully submitted,

**SCHLICHTER BOGARD & DENTON LLP**

By: */s/ Nathan D. Stump*
Jerome J. Schlichter, #32225
Nelson G. Wolff, #40796
Kristine K. Kraft, #37971
Nathan D. Stump, #71641
100 South 4th Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
jshlichter@uselaws.com
nwolff@uselaws.com
kkraft@uselaws.com
nstump@uselaws.com

*Attorneys for Plaintiffs*