NO POLLUTION ENTERPRISES

# STANDARD OF CARE ASSESSMENT OF THE AIR POLLUTION MANAGEMENT OF THE LA OROYA METALLURGICAL COMPLEX

**EXPERT REPORT**
**for**
**Sister Kate Reid, et al. v. Ira Rennert, et al.**
**Case No. 4:11-cv-00044-CDP (consolidated)**

February 18, 2019

Prepared for:

**Schlichter, Bogard & Denton, LLP**
100 South Fourth Street, Suite 1200
St. Louis, MO 63102

**No Pollution Enterprises**
31 Willow Spring Drive, Suite 303
Charles Town, WV 25414

Prepared by:

Nicholas P. Cheremisinoff, Ph.D. Principal

***Technical Consultation, Forensic Pollution Reconstruction, Litigation Support for the Environment***

This report has been prepared in the matter of Sister Kate Reid, et al., v. Ira Rennert, et al. on behalf of the client, Schlichter, Bogard & Denton, LLP. The report is copyrighted and may not be quoted, reproduced, used or distributed electronically, in printed or audio format without the expressed written permission of NPE for any other matter other than the aforementioned case. The findings and opinions documented herein are specific to the case matter. Any unauthorized use of the information, statements and opinions expressed herein as well as distribution without the written permission of NPE shall be considered a violation of U.S. copyright laws and a breach of client privilege. NPE will take any and all legal steps to prevent the misuse of its work product. ©2019 NPE.

EXHIBIT 34

# Table of Contents


1. EXECUTIVE SUMMARY ... 1
  1.1 Scope of Expert's Assignment ... 1
  1.2 Organization of Report ... 2
  1.3 Summary of Opinions ... 3
2. EXPERT QUALIFICATIONS ... 7
3. DEFINITIONS AND ABBREVIATIONS ... 10
4. INDUSTRIAL COMPLEX OPERATIONS ... 13
  4.1 Overview ... 13
  4.2 Production Volumes ... 15
  4.3 Estimates of Ore and Concentrates ... 16
  4.4 General Descriptions of Smelter Circuits ... 16
    4.4.1 Materials Handling of Ores and Concentrates ... 17
    4.4.2 Copper Circuit ... 18
    4.4.3 Slag Cableway ... 20
    4.4.4 Lead Circuit ... 21
    4.4.5 Zinc Circuit ... 25
    4.4.6 Companion Metal Recovery Platforms ... 30
  4.5 Location of Production Platforms and Point Sources ... 32
5. METHODOLOGY ... 34
6. GOOD INDUSTRY PRACTICES ... 37
  6.1 Due Diligence ... 37
    6.1.1 Explanation of Environmental Due Diligence ... 37
    6.1.2 Defendants' Due Diligence ... 40
    6.1.3 Regulatory Due Diligence ... 56
  6.2 Standards and Benchmarking ... 58
  6.3 Good Industry Practices ... 58
  6.4 Environmental Management Systems ... 60
  6.5 Emissions Inventories ... 62
  6.6 Authoritative Best Practice Resources ... 68

7. AIR QUALITY STANDARDS .......... 89
7.1 Relevance of Air Quality Standards .......... 89
7.2 Peru Maximum Permissible Limits .......... 89
7.3 Lead .......... 91
7.3.1 Lead Air Quality Standards .......... 91
7.3.2 Ambient Lead Concentrations .......... 91
7.4 Arsenic .......... 92
7.5 Particulate Matter .......... 95
7.6 Sulfur Dioxide .......... 97
7.6.1 General Findings .......... 97
7.6.2 Sindicato Monitoring Data Analysis .......... 99
8. SMELTER COMPLEX AIR DISCHARGES .......... 108
8.1 Point Sources .......... 108
8.2 Fugitive Emissions .......... 108
8.3 Documented Fugitive Emission Sources .......... 114
8.4 Pollution Reduction Projects .......... 115
8.4.1 Confidence in Emissions Inventory .......... 115
8.4.2 Magnitude of Fugitive Emissions .......... 116
8.4.3 Reduction of PM Emissions .......... 116
8.4.4 Reduction of Lead Emissions .......... 118
8.4.5 Reduction of Arsenic Emissions .......... 119
8.4.6 $SO_2$ Emissions .......... 120
8.4.7 Overall Assessment of Air Pollution Projects .......... 126
9. STANDARD OF CARE OPINIONS .......... 136
9.1 Statement of Opinions .......... 136
9.2 Basis of Opinions .......... 140
10. CITATIONS .......... 171

ANNEX A – Curriculum Vitae
ANNEX B – Exhibits
ANNEX C – Electronic Files (Separate)
- DRP – Emissions Inventory Reconstruction.xlsx

EXHIBIT 34

- DRP – Sindicato PM Analysis.xlsx
- DRP – Sindicato SO2 Analysis.xlsx
- DRP – Hotel Inca SO2 Analysis.xlsx
- DRP – Chronological Records.xlsx
- DRP – Fugitive Emissions Source Terms.xlsx
- DRP – Point Source Emissions Source Terms.xlsx
- DRP – Fugitive Emissions Release Times.xlsx
- DRP – SINDICATO - SO2_PM Hourly Air Monitoring Data (2001-2009).xlsx
- DRP – HOTEL INCA - SO2_PM Hourly Air Monitoring Data (2001-2009).xlsx
- DRP – Daily Lead Air Monitoring (2000-2009).xlsx
- DRP – Daily Arsenic Air Monitoring (2000-2009).xlsx
- DRP – Plant Stoppages.xlsx
- 008_ambient-lead_exh-1.xlsx (https://cfpub.epa.gov/roe/indicator.cfm?i=5)

**LIST OF EXHIBITS**

Exhibit 1. Satellite image of the facility geographic location. Key features noted are the locations of the refinery, the smelter, the landfill, communities impacted, and the location of air monitoring stations.

Exhibits 2A-2I. Production volume trend charts.

Exhibit 3. Stacked bar chart of the annual calculated ore tonnage managed at the smelter.

Exhibit 4. Image identifying locations of operating buildings where different production platforms are located.

Exhibit 5. Image identifying location of major stacks.

Exhibit 6. Lead MPLs and levels measured in European countries.

Exhibit 7. Plot of ambient average annual lead concentration reported for the Sindicato air monitoring station.

Exhibit 8. Plot comparing lead concentrations measured at the Sindicato monitoring station compared to the Peru MPL, EU country and U.S. ambient levels.

Exhibit 9. Plot of ambient average monthly lead concentrations reported for the Sindicato air monitoring station.

Exhibit 10. Plot of ambient average monthly arsenic concentration reported for the Sindicato air monitoring station.

Exhibit 11. Annual hourly average PM10 concentrations regressed from Sindicato air monitoring records.

Exhibit 12. Summary of protective health standards summarized in Defendants' 1996 document.

Exhibit 13. Ambient annual average $SO_2$ concentrations reported for the Sindicato air monitoring station compared against the Peru MPL and US NAAQS.

Exhibit 14. Timeline plot showing number of days per month the Peru daily average $SO_2$ MPL exceeded.

Exhibit 15. Monthly percent of days in which Peru MPL exceeded.

Exhibit 16. Daily 24 hour average $SO_2$ concentrations reported for the Sindicato air monitoring station.

Exhibit 17. Plot of 24-hour maximum daily $SO_2$ ambient concentration.

Exhibit 18. Monthly report of hourly $SO_2$ monitoring data for Sindicato

Exhibit 19. Chart of the numbers of monitoring alert events.

Exhibit 20. Plot of 24-hour average $SO_2$ ambient concentration.

Exhibit 21. Plot of monthly average $SO_2$ ambient concentration.

Exhibit 22. Plot of 12-month rolling average monthly $SO_2$ ambient concentration.

Exhibit 23. Plot of 3-month rolling average monthly $SO_2$ ambient concentration.

Exhibit 24. Plot of annual $SO_2$ ambient concentration.

Exhibit 25. Trend charts of Air Quality Alerts (top chart) and refining volume (bottom chart).

Exhibit 26A. Approximate Summer seasonal variation in ambient air concentration.

Exhibit 26B. Approximate Fall seasonal variation in ambient air concentration.

Exhibit 26C. Approximate Winter seasonal variation in ambient air concentration.

Exhibit 27. Seasonal fluctuations in ambient air quality.

Exhibit 28. Frequency distribution of number of emergency events triggered by Alerts.

Exhibit 29. Shows Emergency condition trend chart for La Oroya.

Exhibit 30. Air quality trend comparison between Sindicato and Hotel Inca monitoring stations.

Exhibit 31. Estimated cumulative particle size distributions reconstructed from U.S.EPA studies for fugitive emission sources.

Exhibit 32. CCTV images of the copper converter.

Exhibit 33. Interior of dross plant.

Exhibit 34. Copper roaster.

Exhibit 35. Copper circuit.

Exhibit 36. Copper circuit.

Exhibit 37. Site photo revealing no roof vents.

Exhibit 38. Massive plume releases shown.

Exhibit 39. Shows open canopy roof on copper converter.

Exhibit 40. Shows Sinter Plant – Operations are not enclosed

Exhibit 41. Ore handling operations showing only partial enclosures.

Exhibit 42. Operations with open roofs and holes showing evacuation of workroom air to the outside.

Exhibits 43-133. Photos of smelter complex showing fugitive emissions.

Exhibit 134. Trend plots of TSP emissions and PM10 monitoring data at Sindicato.

Exhibit 135A. Shows Sindicato monthly average air quality trends. Production records show final production month June/May 2009.

Exhibit 135B. Sindicato raw monitoring data reported during and after plant closure in June 2009.

Exhibit 136. Pie chart shows Total Particulate discharges to air accounted for. Total Particulates are TSP which extends to PM30 or more. Fugitive emissions are largest source and greater than the stack emissions which contain metals.

Exhibit 137. Pie chart shows contribution of PM10 by point and fugitive sources. Fugitive emissions are on same order as stack (point source) discharges and comparable to Main Stack.

Exhibit 138. Pie charts show contributions of TSP and PM10 by point and fugitive sources.

Exhibit 139. PM trend charts for period 1 showing no impacts from Defendants' actions on air quality.

Exhibit 140. PM trend charts for period 2 showing Defendants' actions had impact on air quality.

Exhibit 141. PM trend charts show impacts from projects.

Exhibit 142. Stacked bar chart shows PM emissions reductions over time.

Exhibit 143. Trend bar chart shows some of the PM emissions reductions are attributed to declining plant production.

Exhibit 144. PM trend charts showing when projects implemented and their impacts along with Peru MPL.

Exhibit 145. PM monitoring data showing compliance reached by 2005.
Exhibit 146. Lead composition by source.

Exhibit 147. Pie charts showing breakdown of lead emissions from fugitives and stacks.

Exhibit 148A. Lead discharges influenced by improved controls.

Exhibit 148B. Trend chart of refined zinc production.

Exhibit 149. Other fugitive emission sources that could have been reduced.

Exhibit 150. Arsenic composition by source.

Exhibit 151. Pie chart showing contribution of arsenic to air from fugitives and point sources.

Exhibit 152. Arsenic Discharges to Air by Source (MT) and Actions Taken to Reduce Discharges.

Exhibit 153. Production volume trend lines.

Exhibit 154. Main stack $SO_2$ emissions trend chart noting actions taken by Defendants to reduce source.

Exhibit 155A. Trend charts of Main stack operating conditions.

Exhibit 155B. Charts generated by Zegarra (2007) showing major changes to Main Stack operating conditions.

Exhibit 156. Trend charts of work stoppages.

Exhibit 157A. Capacities of Lead Smelters in U.S.

Exhibit 157B. Comparison of Facility-wide Arsenic Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack).

Exhibit 157C. Comparison of Facility-wide Cadmium Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack).

Exhibit 157D. Comparison of Facility-wide Lead Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack).

Exhibit 157E. Total U.S. Facility-wide Lead & Arsenic Releases to Air Compared to La Oroya Main Stack.

# 1. EXECUTIVE SUMMARY

## 1.1 Scope of Expert's Assignment

My name is Nicholas Cheremisinoff. I am over the age of eighteen (18) years, of sound mind and capable of making the statements contained herein. The facts recited herein are made on my personal knowledge.

I have been engaged by the law firm Schlichter, Bogard & Denton, LLP (the Client). The scope of my work is to assess the air pollution management practices of the La Oroya Complex and to determine the extent to which the Defendants violated their obligation and duty to the public, including the plaintiffs.

The La Oroya Complex includes both a smelter and a metals refinery which are situated on two separate properties near one another and in close proximity to residential communities. Although the smelter complex and metals refinery have integrated operations, only the smelter is considered in this assessment. The assessment focuses on the air pollutants lead (Pb), arsenic (As), cadmium (Cd), particulate matter (PM) and sulphur dioxide ($SO_2$).

In order to perform the assessment, a historical reconstruction of the air emissions inventories was prepared over the time period of October 23, 1997 through May 2009. These inventories document both reported and calculated air discharges of the pollutants from point and fugitive sources. The inventories were transmitted in electronic format to another expert responsible for performing air dispersion modelling.

This report documents my investigation of the air pollution management practices of the La Oroya smelter complex. I evaluated whether reasonable practices recognized by industry and authoritative sources were applied in a timely fashion to control the air discharges in a way that protected the plaintiffs from harm. The evaluation of whether reasonable and timely practices were applied constitute a Standard of Care assessment.

Numerous records were examined including but not limited to process flow sheets, engineering drawings, plot plans, stack and air quality monitoring records, material balances flow sheets, air dispersion modelling reports, production volume records, corporate internal memoranda, engineering studies, Defendants' reported and estimated air discharges, reports on operational practices, third-party inspection reports, still photographs, closed circuit television footage of operations, engineering assessments of proposed plant changes, incident reports, site inspection reports, Peruvian regulatory requirements and correspondences with the facility, Power Point and other presentations summarizing pollution control projects, testimonies and affidavits of corporate representatives and fact witnesses, soil testing results, wastewater testing and waste estimates, environmental management and facility modernization plans, cost estimates and schedules for pollution controls, and many others. I have supplemented my investigation with satellite and aerial imagery of the complex, authoritative literature on measured air emissions from other lead smelters, published emission factors, good industry practices and accepted norms of air quality and emissions from lead smelters as documented by authoritative organizations such as the U.S.EPA, the World Health Organization, the European Commission, and the lead smelting industry. My analysis and opinions are to within a reasonable degree of scientific certainty. Because of the voluminous nature of records, I reserve the right to supplement this

report should additional documents not considered or inadvertently missed be brought to my attention.

I am being compensated as an expert in this matter at the following rates: $395 per hour for analysis and consultations, $595 per hour for deposition testimony, and $4,500 per day for trial testimony.

### 1.2 Organization of Report

The report is organized as follows:

Section 2 (Expert Qualifications) explains my qualifications to offer expert testimony.

Section 3 (Definitions & Abbreviations) provides brief explanations of terms and abbreviations used throughout the report.

Section 4 (Industrial Complex Operations Overview) explains the operations of the La Oroya smelter complex.

Section 5 (Methodology) explains the methods, practices and basis I used for my analysis and opinions.

Section 6 (Good Industry Practices) documents the practices which I rely on as a basis for the standard of care assessment.

Section 7 (Air Quality Standards) documents recognized safe air quality standards which I rely on as benchmarks for assessing whether actions taken over time to reduce air emissions impacted air quality.

Section 8 (Smelter Complex Air Discharges) documents the air emissions.

Section 9 (Standard of Care Opinions) documents my opinions and the basis.

Section 10 (Citations) – References additional to those identified in footnotes that I relied on.

Annex A – Curriculum Vitae.

Annex B – Exhibits.

Annex C – Electronic Files (Separate).

### 1.3 Summary of Opinions

The following states my overall opinion.

**Opinion** - Defendants failed to exercise reasonable care to protect Plaintiffs from harm caused by the air pollution from the La Oroya metallurgical complex. They had both an **Obligation** and a **Duty** to apply good industry practices within a timely manner to reduce and control harmful air pollution to within internationally recognized levels that are protective of human health.

**Obligation and Duty** - Their Obligation and Duty stems from a reasonable expectation that a company conducts its business with social responsibility. Whether an organization or individual(s), there is an obligation to operate a business in a manner that does not cause an unreasonable risk of harm to others.

Social responsibility is a **Duty** to perform in ways that maintain a balance between the economy and the environment. While there are trade-offs between economic development and the welfare of society and environment, when a corporation or individuals understand that their practices are causing serious harm to others they have the duty to eliminate the harm they are causing.

**Pre-acquisition Knowledge** - The Defendants had **Knowledge** prior to the purchase of the facility in which they understood that operations were causing great harm to the public at large, including Plaintiffs. They decided to purchase the La Oroya metallurgical complex and continue operating in an unsafe manner. Prior to purchase, Defendants had the following knowledge:

1. The few air pollution controls relied on at the facility were decades old, inefficient and outdated technologies;
2. Little to no maintenance had been performed on air pollution controls and those that were used were largely in a state of disrepair;
3. Many sources operated without any air pollution controls and freely discharged toxic pollutants to the atmosphere. More than 90 uncontrolled point sources were known throughout the smelter complex with only a few having been stack tested;
4. Fine particulate matter emissions from stacks and fugitive emission sources were enriched with toxic lead, cadmium and arsenic;
5. The SO2 emissions from the Main Stack were so large that the local air quality exceeded levels that are considered unsafe by international and U.S. standards;
6. Fugitive air emissions from the facility were not controlled and were as large to greater than the 90 uncontrolled sources and from the Main Stack. Major building operations such as the sinter plant, dross plant, copper converter aisle and lead smelting furnaces released toxic fumes and fine particulate matter containing lead, arsenic and cadmium into workrooms that were then released directly through openings in the roofs of buildings. Defendants knew or should have known that these uncontrolled air emissions were transported by atmospheric winds into the community where the public at large including Plaintiffs were exposed;
7. There were no reliable air monitoring stations in the community;
8. Corporate representatives who performed due diligence for the purpose of informing Defendants' decision makers considering purchase of the metallurgical complex witnessed particulate matter covering the streets and homes of La Oroya and La Oroya

Antigua, which they acknowledged contained toxic lead, arsenic and cadmium which could only have come from the air pollution from the smelter complex;

9. They knew or should have known that the air pollution emissions from the complex were larger than any comparable lead smelter in the United States and should have known that the plume discharge from just the Main Stack of the smelter complex was larger than the facility-wide emissions from all U.S. lead smelters combined;
10. The results of both air dispersion modeling conducted by the World Bank's consultant as well as observations made by Defendants' representatives who reported toxic dusts on streets and homes made it obvious that residential communities had insufficient set-backs from the industrial operations.

Defendants understood both from the PAMA and the information gathered prior to purchase that should they operate the metallurgical complex without significant changes to process operations, process technologies, air pollution controls, building upgrades and air pollution management practices, the public at large would be harmed. They also knew prior to purchase that the Peruvian air quality standards were both in draft form and less protective than those recognized by the U.S.EPA, the World Health Organization, the European Community, and many countries. They further understood that there were weak and ineffective environmental enforcement practices in Peru, thereby affording them an opportunity to continue operating the complex with little regulatory oversight until the regulatory climate changed at some unknown point in the future.

The Defendants **Breached the Standard of Care**.

***Breach 1: Defendants gave no priority to reducing air pollution and harm to the public at large including Plaintiffs during the first several years of their ownership and control. Over the first three years they could have reduced fugitive air emissions by more than 2,000 tons per year but chose to do nothing.***

- There were multiple immediate actions the Defendants could have and should have taken to reduce air pollution and harm from SO2, lead, arsenic and cadmium, but because there was little to no regulatory oversight and few consequences for continued poor environmental performance, they delayed efforts to spend the money needed to apply good industry practices that reduce air emissions.
- Defendants could have shut down the La Oroya Complex or parts of the Complex and installed pollution controls on uncontrolled sources before operating. Also, they could have reduced production levels and limited operating hours to reduce pollution. They did none of this.
- Over almost the entire period of ownership and operation of the metallurgical complex the air quality for lead, arsenic and SO2 in the community were above levels considered safe by international norms.
- Only after the Defendants suspended operations of the complex in June 2009 did ambient air quality levels fall to levels recognized to be safe.

***Breach 2: Defendants' actions between 1997 and 2000 constitute a breach of the standard of care, exposing the public to historically high air emissions. Despite extensive knowledge of***

***how polluting the complex was when they acquired it, they ramped up production while taking no actions to control emissions.***

- They did not add controls to the more than 90 uncontrolled stacks and other emission sources which they knew were gross and created unsafe levels at lower production volumes.
- They ignored large fugitive air emissions which they understood had a greater impact on community air quality than the combined air emissions from the main stack and other point sources.
- They knew or should have known that by increasing production volumes without having upgraded existing pollution controls, adding new controls, making operational changes, and upgrading buildings that air emissions would increase proportionately.
- Defendants operated the complex in a manner that did not prioritize implementing pollution controls and protecting public health. During the same time, Defendants increased production and produced a monetary benefit at the expense of public health.

Increasing production allowed the Defendants to make more money, but by increasing the production volumes to historically high levels they exposed the public at large to unprecedented levels of harmful air pollution. Their actions show they were driven by profits and corporate greed at the expense of public safety.

***Breach 3: Defendants took advantage of weak environmental enforcement policies enabling them to defray investments into needed controls, extend meeting compliance obligations, and to ignore good industry practices.*** Their actions breached the standard of care because:

- Defendants knew or should have known from the knowledge they acquired during pre-acquisition that the metallurgical complex could not be operated in a safe manner.
- They were a sophisticated lead smelter operator and knew or should have known the good industry practices that had to be implemented in order to operate safely.
- They did not act on their knowledge and ignored good practices.

In the United States, good industry practices are embodied under statutory obligations that are subject to strict enforcement. Because not all companies act responsibly, there is need to regulate and enforce good industry practices. Regulations and enforcement incentivize responsible behavior because there are monetary and criminal penalties when good practices are not applied to controlling air pollution.

Peru did not have comparable statutory and enforcement incentives. This enabled Defendants to argue for open ended compliance schedules, and to defray costs for process changes, new pollution controls for point sources, and building improvements to reduce fugitive emissions that they knew or should have known were needed to prevent harm to the public. Defendants did not apply any of the following good industry practices:

a. Prepare emissions inventories. They had multiple authoritative resources to rely on plus experience in operating U.S. smelters that enabled them to prepare accurate and reliable air emissions inventories for both the smelter and the refinery. Because there were no inventories prepared: (1) emission sources were not prioritized; (2) open-ended environmental management plans were prepared with no reasonable goals and targets established to reduce air quality to within safe levels; (3) the facility's

environmental performance could not be tracked and priorities and effective plans to reduce harm could not be defined. The consequences were:

  i. The largest and most harmful sources of pollution were allowed to discharge in an uncontrolled manner. The air emissions freely communicated with the atmosphere and were transported by winds into the communities over most of the ownership and operating period;
  ii. The public was exposed to unsafe levels of lead, arsenic, cadmium and SO2 over the entire period of ownership and operation;
  iii. Unreliable air dispersion modeling was performed which understated the harm caused by operations to regulators; concealed the need to establish reasonable limits to hours of operations and throughput volumes needed to reduce harm; and allowed unsafe setbacks between plant operations and the public.

b. Proper commissioning of air pollution controls. Newly installed pollution controls were not stack tested. The consequences were:
  i. There was no confirmation that as-built equipment performed according to design expectations;
  ii. Emissions reductions reported to the Government of Peru were not verified;
  iii. The public's exposure to lead, arsenic, cadmium and SO2 was prolonged.

c. Netting analysis was never performed. Failure to perform a netting analysis allowed Defendants to blindly make changes to the Main Stack operating conditions. The consequence was to worsen SO2 air quality in the community and expose the public to unsafe levels.

d. PAMA statutory monitoring requirements – Defendants failure to follow statutory monitoring requirements resulted in under reporting the harmful impact of metal emissions from the plant and kept the public misinformed.

e. Upgrading air quality monitors critical to warning the public of severe air quality conditions and meeting compliance obligations. The consequences were that the public was exposed to high and dangerous levels of SO2 and the Government of Peru misinformed of dangerously high air emissions.

f. Adoption of an effective environmental management system (EMS). The consequences were:
  i. There was no commitment and formalized approach to continually improve environmental performance;
  ii. Compliance obligations were not met;
  iii. Compliance schedules remained open ended;
  iv. Maximum financial gains were justified at the expense of good environmental performance and public safety;
  v. Good industry practices were ignored;
  vi. The public at large was exposed to harmful air emissions over the entire operation of the complex.



EXHIBIT 34

## 2. EXPERT QUALIFICATIONS

I am a chemical engineer specializing in the safe handling and management of chemicals and hazardous materials with more than 40 years of industry, business, and applied research experience. I hold three degrees in chemical engineering from the same academic institution, Clarkson University, formally known as Clarkson College of Technology. My Bachelor of Science in chemical engineering was conferred May 18, 1974. My Master of Science in chemical engineering was conferred May 25, 1975. My Doctor of Philosophy in chemical engineering was conferred May 21, 1978.

Currently, I am the Principal of No Pollution Enterprises (a.k.a N&P Limited), an environmental consulting firm located in Charles Town, West Virginia. I am also a member of the Board of Directors of Thermochem Recovery International, a developer of steam reforming gasification systems located in Baltimore, MD. I am also senior technical advisor on environmental projects to Princeton Energy Resources, International in Rockville, MD.

I have experience in both the public and private sectors. My experience includes product and process design for chemical manufacturing and refining industries, air and water emissions management including quantifying emissions, performing environmental site assessments, evaluating distressed industrial properties, advising employers and clients on environmental liabilities at the time of purchase, mergers or acquisitions involving industrial installations, preparing environmental impact statements and emissions inventories, and working with financial institutions and donor agencies on privatization and large infrastructure investments including environmental due diligence assessments for sovereign guaranteed loans .

I have worked with the New Jersey Department of Environmental Protection on implementing industry training programs on conducting safe work practices at contaminated properties, and performing environmental site assessments, site remediation, and removal of underground storage tanks. I have conducted training programs on waste management, pollution prevention and site remediation practices with the New Jersey Department of Environmental Protection and U.S. EPA Region IV in their international programs. These programs have required knowledge and understanding of responsible waste and pollution management, safe chemical handling practices, environmental auditing and inspection practices, facility permitting and closure rules/practices, pollution prevention practices, and assembling air emissions inventories. I have led and/or participated in numerous continuing education programs that have trained several thousand industry personnel on waste management, pollution prevention, the application of environmental and safety management systems, on air pollution control technologies, and industry best practices. I have served as the U.S. resident technical advisor to the Government of Ukraine's Ministry of Environment and Nuclear Safety under a technical support program funded by the United States Agency for International Development, where I led a team of Ukrainian national engineers to perform environmental audits of emissions from industrial operations to develop model emissions inventories and improve environmental performance by the adopting and implementing pollution prevention practices. I have also assisted with drafting environmental regulations in Ukraine and Jordan, as well as worker safety standards for the power industry in Nigeria.

I have assisted the National Inspectorate of the Ministry of Environment and Nuclear Safety in Kiev in restructuring its environmental enforcement program by assisting with training inspectors on verifying emissions inventories and reporting requirements by industry.

I have worked for the World Bank Organization, where I was assigned to the Kiev offices to prepare draft regulations on Integrated Pollution Prevention legislation in conformance with the European Directives.

I worked for USAID, USTDA, the IFC, and the European Bank of Reconstruction & Development (EBRD) performing due diligence to investigate environmental impacts from privatization and restructuring of various industrial investment and loan projects. These assignments involved performing technical assessments and recommending environmental management and mitigation plans, and pollution mitigation strategies for various industrial complexes including steel mills, coal fired power plants, pharmaceutical plants, coal mining operations, gas pipelines, on and offshore gas and oil extraction operations, and oil refineries.

For various entities including U.S lending institutions, the World Bank Organization, the U.S. Trade & Development Agency, the European Bank of Reconstruction & Development, the U.S Agency for International Development, various private investment groups, land developers and my former employer Exxon, I was part of or lead combined technical and business teams that performed environmental & safety due diligence for mergers, acquisitions, purchases and loans involving large industrial complexes such as refineries, plastics and petrochemical plants, steel mills, oil & gas extraction fields, coal fired power plants, and other installations. In these various assignments it was necessary to define:

- Environmental statutory obligations – for overseas installations clients/employers required definition of local statutes and how these differ from U.S. and international statutes for air, water and solid waste management;
- Baseline air and water emissions and how these compared to local statutes and to other similar installations of comparable production capacities;
- Sensitive receptors potentially exposed to air and water pollution as well as pathways of exposure to releases;
- Mitigation plans and costs for reducing emissions within acceptable levels and to meet statutory requirements;
- Delineation of environmental concerns such as waste impoundments, lagoons, untreated effluent discharges to land and surface water bodies;
- Condition, age and status of air pollution controls and projected cost estimates for ensuring these are in good working order and whether they met local and international emission standards;
- Recommendations for closures for parts of facilities which were unprofitable and or highly polluting, including detailed decommissioning plans and projected costs;
- Impacts the investment has on local workforces, local industries, and overall social-economic impacts that affect the sustainability of the contemplated investment, loan, purchase or merger.

I have held academic positions, including adjunct professor in the Department of Civil and Environmental Engineering at the New Jersey Institute of Technology; ran continuing education

programs on environmental auditing practices for Farleigh Dickenson University, and have been an invited Lecturer at Ukrainian Academy of Sciences, the Jordan University of Science and Technology, Texas A&M University, University of Missouri-Rolla, Cooper Union University, and the University of Leuven.

I authored, co-authored or edited more than 100 technical books and several hundred state-of-the-art review articles and research papers on chemical engineering practices, pollution prevention, refinery and petrochemical manufacturing practices, waste and pollution management, air pollution control technologies, worker safety, all embodying good industry practices as a theme.

Essentially, I have spent decades working with industry stakeholders, communities, lending institutions, and governmental officials on responsible waste and pollution management, the application of best management practices and technologies that prevent worker and community exposures from the mishandling of toxic and dangerous waste and chemical products resulting from industrial activities. More information on my education, training, experience, publications and a list of litigations in which I have provided opinions and served as an environmental standard of care expert in both federal and state courts is contained in my Curriculum Vitae (Annex A).

## 3. DEFINITIONS AND ABBREVIATIONS

AIDA – The Interamerican Association for Environmental Defense (AIDA) (Spanish: *Asociacion Interamericana para la Defensa del Ambiente*). AIDA is a non-profit international environmental law organization founded in 1996 by a collaboration of five environmental organizations in the Americas including Earthjustice. AIDA's headquarters is in San Francisco, California. The organization works internationally with partners in many different countries including Argentina, Canada, Chile, Colombia, Costa Rica, Ecuador, Mexico, and Peru. AIDA works primarily to improve and protect human health and the environment.

AP-42 – A compilation of emission factors (EFs) of air pollutants. EFs are numeric values which relate the quantity of a pollutant released into the ambient air with a certain activity. This compilation was first compiled and published by the U.S. Public Health Service in 1968. In 1972, it was revised and issued as the second edition by the US Environmental Protection Agency EPA. In 1985, the subsequent fourth edition was split into two volumes: Volume I has since included stationary point and area source emission factors, and Volume II includes mobile source emission factors. Volume I is currently in its fifth edition and is available on the WWW. Volume II is no longer maintained as such, but roadway air dispersion models for estimating emissions from onroad vehicles and from non-road vehicles and mobile equipment are available on the WWW. In routine common usage, Volume I of the emission factor compilation is referred to as simply AP-42. AP-42 is not simply used in the United States but is universally relied on in multiple countries for preparing emissions inventories.

AQS – Air Quality Standard(s)

Baghouse – An air pollution control device and dust collector that removes particulates out of air or gas released from commercial processes.

CAA – Clean Air Act

CCTV – Closed Circuit Television

Central Cottrell – The primary dust control system at the smelter. There are about 21 parallel ductwork transfers sections at the smelter which capture process streams --- each of these sections are comprised of a battery of four sections in series. Each of these sections contains fourteen rows of collecting electrodes which remove dust from the process streams and discharge to the Main Stack. This control technology is known broadly as electrostatic precipitation or ESP (electrostatic precipitator). Further information can be found in Oroya Metallurgical Operations 1970.[1]

CERCLA – Comprehensive Environmental Response, Compensation and Liability Act

EAP – Environmental Action Plan(s)

[1] DRPE-0000081350



EXHIBIT 34

EBRD – European Bank of Reconstruction & Development

EIP – Environmental Impact Program

EMS – Environmental Management System

ESP – Electrostatic Precipitator; a pollution control device that that removes fine particles, like dust and smoke, from a flowing gas using the force of an induced electrostatic charge minimally impeding the flow of gases through the unit. An ESP applies energy only to the particulate matter being collected. There are two general technologies – wet ESPs and dry ESPs. The La Oroya smelting complex uses dry types but conditions incoming air to the Central Cottrell with acid towers.

HAP – Hazardous Air Pollutants

IDLH – Immediately Dangerous to Life and Health

IER – Initial Environmental Review

IFC – International Finance Corporation, a branch of the World Bank.

ISO – The International Organization for Standardization, an organization that sets standards in businesses and technologies. Relevant to this report are the ISO 14000 Environmental Management Standards. The ISO 14000 family of standards provides practical tools for companies and organizations of all kinds looking to manage their environmental responsibilities. The standards focus on environmental systems to achieve this. Various ISO standards in the family focus on specific approaches such as audits, communications, labelling and life cycle analysis, as well as environmental challenges such as climate change. The ISO 14000 family of standards are developed by ISO Technical Committee ISO/TC 207 and its various subcommittees.

MACT – Maximum Achievable Control Technology

MPL – Maximum Permissible Limit(S)

MT – Metric Tons. MT is a non-SI metric unit of mass equal to 1,000 kilograms; or one megagram (Mg); it is equivalent to approximately 2,204.6 pounds, 1.10 short tons (US) or 0.984 long tons (imperial).

NAAQS – U.S. National Ambient Air Quality Standards. The California Air Resources Board explains "An air quality standard defines the maximum amount of a pollutant averaged over a specified period of time that can be present in outdoor air without harming public health, and thus, it defines clean air. The Clean Air Act Amendments of 1970 instruct the U.S. Environmental Protection Agency (U.S. EPA) to set primary National Ambient Air Quality Standards (NAAQS) to protect public health, and secondary NAAQS to protect plants, forests,

crops and materials from damage due to exposure to six air pollutants. These pollutants include: particulate matter, ozone, nitrogen oxides, sulfur oxides, carbon monoxide, and lead."[2]

NESHAP – National Emission Standards for Hazardous Air Pollutants

NIOSH – National Institute for Occupational Safety & Health

PAHs – Polycyclic Aromatic Hydrocarbons

PAMA – The official abbreviation for Peru's Environmental Mitigation and Management Plan for the La Oroya metallurgical complex.

PM2.5 – particle sizes of 2.5 microns (μ) and smaller.

PM10 – particle sizes of 10 microns (μ) and smaller.

P2 – Pollution Prevention

SVOCs – Semi-volatile Organic Compounds

TRI – Toxics Release Inventory

TSP – Total Suspended Particulates

USAID – U.S. Agency for International Development

U.S.EPA – United States Environmental Protection Agency

USTDA – U.S. Trade & Development Agency

VOCs – Volatile Organic Compounds

WBO – World Bank Organization

[2] https://www.arb.ca.gov/research/aaqs/naaqs/naaqs.htm

# 4. INDUSTRIAL COMPLEX OPERATIONS

## 4.1 Overview

The La Oroya industrial complex is divided into two plant circuits – a smelting plant and a metals refinery. The smelter performs primary lead smelting, primary copper smelting, zinc recovery, precious metals and other minerals recovery and metal concentrating operations. The metals refinery performs the operations of product shaping and forming – comprised of Copper Melting and Casting, Copper Rod Mill, and Sulfuric Acid Recovery (acid recovery is performed both at the smelter and refinery complex); it essentially produces finished lead and copper products received from the smelter and sends some waste and off-spec products back to the smelter for reprocessing. The refinery is separate from the smelter and is situated southwest of the smelter, across the Mantaro River. The analysis is restricted to the smelter complex only. Regarding the refinery:

The refinery has been excluded from the assessment because sufficient records could not be located to assess the air emissions and pollution management practices.

- Few records have been identified describing the refinery operations,
- No air emissions inventories have been identified,
- No records on pollution controls employed at the refinery have been identified,
- No lists of maintenance and age of air pollution controls have been located,
- No records concerning upgrades to air pollution controls have been located,
- No emission factors for any air pollution controls have been located,
- No operating conditions or physical dimensions of stacks, building vents and emissions sources have been identified,
- No stack test reports or data have been located,
- No records concerning waste piles and waste management have been located,
- No records on operating times have been located,
- No records on pollution prevention assessments have been located,
- No environmental management plans have been identified,
- No incident reports have been located.

The absence of such records makes it impossible to develop a reliable reconstruction of the historical air emissions and to perform a standard of care assessment of this part of the complex.

It is concluded that the air discharges from the refinery are less than the smelter because of the nature of the process. The refinery is based on electrolytic technology (Betts process[3]) in which one would expect low air emissions; however, there is no basis to assume these air discharges to be insignificant. Exhibit 126 is a photograph of building roof vent emissions from the refinery. This photo shows high opacity plume releases which are comprised of particulate matter likely containing lead, arsenic, and cadmium. Additionally, the electrolytic process relies on acid etching technology and is a source of sulfur dioxide emissions. The exclusion of the refinery from the analysis means that air emissions inventories assembled herein are conservative.

[3] https://www.ila-lead.org/UserFiles/File/factbook/chapter4.pdf

The primary production circuits of the smelter are comprised of the following:[4]

1. Ore and Concentrate Preparation Circuits;
2. Copper Circuit;
3. Lead Circuit;
4. Zinc Circuit;
5. Metal Recovery production platforms which include a Selenium-Tellurium Plant, Silver-Gold recovery, Cadmium Plants, an Indium Recovery Plant, an Antimony Recovery Plant, Sodium Bisulphite Plant, and Arsenic Kitchens;
6. Specialty Plants comprised of a Coke Plant and an Oxygen Plant; and
7. Solid waste management operations which includes on-site waste stockpiling and final disposal at the Huanchan landfill.

The cited records document that the smelter discharges both gaseous and particulate matter to the atmosphere. The particulate matter (PM) contains metals which include Lead (Pb), Arsenic (As), Cadmium (Cd) and various other metals. Gaseous air discharges include Sulfur dioxide ($SO_2$) PAHs, VOCs, and SVOCs. PAHs discharged to air are largely associated with the coke plant which was removed from service in 2004 (Coke Battery Stack A retired on January 26, 2004 and Coke Battery Stack B retired on November 7, 2004).[5]

The La Oroya Complex is the only significant source of particulate matter, sulfur dioxide, lead, arsenic, and cadmium in the area surrounding La Oroya according to a 2005 study by the Peruvian Department of Environmental Health (DIGESA) which concluded that the smelter represented 99% of the total emissions of particulate matter, lead, and sulfur dioxide in the La Oroya airshed. The smelter reportedly represents 99.6% of total suspended particulate (TSP), 99.4% of PM-10, 99.9% of lead, and 99.978% of sulfur dioxide emissions in the La Oroya airshed.[6]

Fugitive and point source discharges to air from the smelter are considered. The air emissions inventory analysis covers the time period between October 23, 1997 and May 2009. The beginning date corresponds to the date in which Defendants took possession of the facility[7] and the end date corresponds to the final record of production of the smelter by the Defendants.[8] Defendants completely suspended operations of the La Oroya Complex on June 3, 2009.[9] Air monitoring records for PM and metals extending through December 2009 were also examined in the analysis. Air monitoring records for $SO_2$ extending through June 30, 2009 were also reviewed.

[4] DRPE-0000081350 - Cerro de Pasco, Oroya Metallurgical Operations, Feb. 1971; DRPE-0002133915 - PAMA, Jan. 1997; DRRC-00077581 - Knight Piesold, Environmental Evaluation of La Oroya Complex, Final Report, Sept. 1996.
[5] DRPE-0001207789
[6] DRPE-0000646269
[7] Stock Transfer Agreement
[8] drpe-0000877470
[9] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014. "On June 3, 2009, almost five months before the PAMA was scheduled to expire, Doe Run Peru completely suspended operations at the Complex, because it was unable to obtain financing without a PAMA extension, and unable to pay its concentrate suppliers."

Exhibit 1 is a satellite image of the facility. The key features noted are the locations of the refinery, the smelter, the landfill, communities impacted, and the location of air monitoring stations.

Table 1 lists the location and time periods over which the monitors were operated. The Sindicato monitoring station is the closest to the smelter and provides air quality data for La Oroya.

Table 1. Air Monitoring Stations.

| Station | Period | Source |
|---|---|---|
| Huanchan | Sept. 1998 – Present | DRPE-0000642846 |
| Sindicato 1 | Sept. 1998 – Present | DRPE-0000642846 |
| Sindicato 2 | After 2005 | DRRC-Study-0000316 |
| Hotel Inca | March 2000 – Present | DRPE-0000642846 |
| Cushurupampa | March 2000 - 1/12/2007 | DRPE-0000335081 |
| Casaracra | March 2000 – Present | DRPE-0000642846 |
| Marcavalle | 1/16/2007 – Present | DRPE-0000335081 |
| Huaynacancha | 5/12/2007 – Present | DRPE-0001561321 |
| Huari | 3/1/2007 – Present | DRPE-0000335085 |

### 4.2 Production Volumes

A reconstruction of the historical production volumes over the analysis period was prepared. Production volumes are required in order to calculate air emissions by application of published emission factors. Defendants' records report annual and monthly production volumes.[10] Production volume trend charts summarize the manufacturing footprints in Exhibits 2A through 2I. Reference year 1996 is included. Table 2 provides total production volumes for the smelter between 1997 and May 2009.

Table 2. Production Volumes for Smelter & Refinery between 1997 and May 2009.[a]

| Product | Amount | Unit |
|---|---|---|
| Lead Bullion | 1,682,425 | U.S. Tons |
| Refined Lead | 1,553,038 | U.S. Tons |
| Copper Blister | 904,648 | U.S. Tons |
| Refined Copper | 836,494 | U.S. Tons |
| Refined Zinc | 846,972 | U.S. Tons |
| Metal By-Products[11] | 163,284 | U.S. Tons |
| Gold | 880,208 | Troy Ounces |
| Silver | 409,829,315 | Troy Ounces |
| Other Metals[12] | 19,201 | U.S. Tons |
| Sulfuric Acid | 675,669 | U.S. Tons |

[a]Production volumes for 1997 include production by Centromin.

[10] DRPE-0000877469; DRPE-0000877470; DRRCE-00781230
[11] Arsenic Trioxide, Copper Sulfate, Zinc Sulfate, & Zinc Dust
[12] Bismuth, Antimony, Selenium, Tellurium, & Indium

Exhibit 2H is a plot of the monthly production of base metal (lead bullion, copper blister, refined zinc) for the time period in which Defendants operated the complex. The total estimated production is 3,434,045 U.S. Tons of these three metals. The plot shows that production rose between October 1997 and about August 2002, and then declined through about February 2003. Thereafter, production volumes rose through about October of that year, but then showed a declining trend. In August 2008 there was a significant reduction in production volume for reasons not known. Another major decline occurred in November 2008. Between February and March 2009 there was approximately a 45% decline in production; thereafter the smelter operated for a few additional months at reduced levels before operations were suspended at the smelter on June 3, 2009.[13]

### 4.3 Estimates of Ore and Concentrates

No purchase or inventory records of ore and concentrates were located. A reconstruction of the ore and concentrate tonnages handled at the smelter over the analysis period was estimated. These tonnages are required in order to calculate air emissions by application of published emission factors. Records describe plant operations and provide average monthly amounts of ores and concentrates for 1970.[14] From this report, the tons of ore to smelt lead, copper, and roast zinc were calculated:

- 6.3 tons ore to produce 1 ton copper blister
- 2.3 tons ore to produce 1 ton lead bullion
- 2.9 zinc ore/concentrates to produce 1 ton refined zinc

These material handling metrics were multiplied by the smelter production volumes in order to obtain ore tonnages. Exhibit 3 is stacked bar chart of the annual calculated ore tonnage managed at the smelter.

Between 1997 (full year) and May 2009, the smelter managed approximately 12,038,353 U.S. tons of ore comprised of

- 5,686,397 tons copper ore
- 3,908,902 tons lead ore
- 2,443,054 tons zinc ore/concentrates

### 4.4 General Descriptions of Smelter Circuits

A 1970 report describes in some detail the operations of the smelter complex.[15] This report by the Cerro de Pasco Corporation predates Defendants' purchase of the facility. A review of site drawings, process flow sheets and material balance flow sheets, photographs and video images have established that this report is reliable and closely explains the primary production platforms

---

[13] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014. "On June 3, 2009, almost five months before the PAMA was scheduled to expire, Doe Run Peru completely suspended operations at the Complex, because it was unable to obtain financing without a PAMA extension, and unable to pay its concentrate suppliers."
[14] DRPE-0000081350; DRRCE-00383656; DRRCE-00336064
[15] DRPE-0000081350, Cerro de Pasco, Oroya Metallurgical Operations, Feb. 1971

of the smelter complex at the time of purchase and throughout the time period of the analysis.[16] The following is a brief description of each production platform. Generalized process flow diagrams of each of these platforms can be found in the cited report. The following process descriptions are paraphrased from the Cerro de Pasco report.

### 4.4.1 Materials Handling of Ores and Concentrates

**Materials and Bedding Plant**

The materials handled are:

- Copper Ores and Concentrates sent to the Copper Roasters
- Lead Ores and Concentrates sent to the Sinter Plant
- Silica Flux sent to the Converters

Ores and concentrates are transported from the mines and concentrators to the smelter by means of railroad cars and trucks. The ores are conveyed along the high-line and discharged into receiving bins while the concentrates are dumped into two separate pockets - one for lead and the other for copper- one on either side of the main Lima-Huancayo railroad.

Concentrates are then transferred by conveyor belts to the copper, lead or silica beds. There are roughly 2.5 miles of conveyor belts. The ores are discharged from the bottom of the receiving bins and are conveyed to gyratory coarse crushers. The product from these primary crushers then passes along further conveyors to the Mill where fine crushing is carried out by means of crushers and rolls. After sampling the final product, which consists largely of minus 1/4" material, is conveyed to the Bedding Plant.

The Bedding Plant consists of three groups of storage bins. Group 1 bins are used for coke (decommissioned 2004-2005), sinter and clays that are sent to the gyratory crusher and then to the Mill. Groups 2 and 3 are used for storage of the ores, limerock, silica, and various smelter and refinery reverts.

The bedding plant and bins are enclosed operations and believed not to be a major source of fugitive discharges to the outside. Conveyor belts are a source of fugitive dusts. Normally such operations have covers. The effectiveness of the covers in controlling fugitive dusts depends largely on how well they are maintained. The unloading of materials from gondola cars and trucks is a source of fugitive dusts which contain metals (Pb, Zn, As, and others).

**Coarse and Fine Crushing Operations**

This part of the plant includes gyratory crushers to reduce the coarse material to minus 4-½ inch. Double deck vibrating screens transfer product, where the undersize (-¼”) passes directly to the bedding plant. Crushers are used for size reduction of oversize material. Large rolls are also employed in closed circuit with rectangular double deck vibrating screens for further size

[16] DRRC-00056365-381; DRRC-00061579-590; DRRC-00069217-226; DRRC-00078349-879; DRRC-00081865-3092; DRRC-00091873-2008; DRRCE-00316664; DRRCE-00377569; DRRCE-00795470-76; DRPE-0002133915; RENCOGRP-000095-002671; RENCOGRP-015362; RENCOGRP-017579

reduction and classification. The final product from this section which is -¼" is conveyed to the bedding plant. A conical ball mill is used for grinding silica, or other material to 90% minus 200 mesh. Normally the emissions from such operations are controlled by baghouses. No records were found identifying pollution controls. Fugitive dust emissions contain metals (Pb, Zn, As, and others) as these are reported in ore assays.[17]

### 4.4.2 Copper Circuit

**Overview**

The copper circuit has two main processes: smelting and refining. The smelter treats complex copper concentrates to obtain blister copper for the refinery. The refinery produces copper cathodes of 99.97% purity.

Copper smelting begins with feed preparation. Concentrates are weighed, sampled and mixed with lime and silica fluxes and recycled materials. The blend is then roasted in multiple hearth roasters to remove arsenic, antimony and sulfur. Sulfur is removed as $SO_2$ gas.

Arsenic from the roaster is captured by an electrostatic precipitator (ESP) and is processed later to produce arsenic trioxide. About 10% of the arsenic trioxide was historically sold, and 90% was mixed with cement and lime to form a concrete material that is disposed of in the off-site landfill (Huanchan landfill). While there are scant records over the analysis period it is believed that all the arsenic trioxide produced was waste and disposed of at the landfill during the time Defendants operated the facility.

The roasted copper calcine is transported to the oxyfuel-fired reverberatory furnace where it is smelted to form molten copper matte containing 30% copper and a disposable slag containing <1% copper. This slag is granulated in water and disposed of in the slag deposit at Huanchán.

Copper matte, still containing some sulfur, is smelted with oxygen and silica and is further purified in converters to form blister copper, slag and gas containing dust and $SO_2$. The copper blister contains roughly 98.5% copper, 6,500 gr/MT silver and 1 oz/MT gold. The converter slag, rich in iron and containing some copper, is recycled to the oxyfuel-fired reverberatory furnace. The blister copper is cast into anodes for refining in the copper refinery at Huaymanta.

Gases and dust from both the oxyfuel furnace and the copper converters are ducted to the Central Cottrell, where a reported 95-97% of the particulate material is recovered through a series of electrostatic precipitators for additional processing and recovery of minor metals.

**Roasting Operations**

A certain amount of sulfur must be removed from the product after smelting in order to yield a matte capable of being treated efficiently in the converters. Impurities in the ore (notably arsenic

[17] DRRCE-003883656



EXHIBIT 34

and antimony) are also partly volatilized during the roasting stage leaving a calcine composed of a mixture of oxides, sulfides and sulfates.

Preparation of the feed and bedding of the ores and concentrates together with fluxes are pre-steps to roasting. The mixed material from beds is conveyed to bins above the roasters where, by means of a feeder(s), the raw material is fed to the top of the dryer hearth of each roaster. Partially dried feed passes on to the roasting hearths where it drops from one hearth to the next alternately at the center of the roaster. The calcine from the bottom hearth falls into a storage bin and is periodically discharged into calcine cars which take the product to the Copper Reverberatory (reverb) furnaces.

There are multiple copper roasters that are serviced by a fewer number of dust roasters and arsenic roasters. The dust roasters treat a mixture of Central Cottrell (an electrostatic precipitator, abbreviated as ESP) dust with lead concentrate as a flux. This calcine is charged to the lead beds. The arsenic roasters treat a mixture of arsenic Cottrell dust and copper bed mix and this calcine is charged to the copper reverb furnaces. The feed mixtures for both the dust and arsenic roasters are prepared in the dust handling plant.

The dust handling plant consists of storage bins for Central Cottrell dust, arsenic Cottrell dust, lead concentrates and copper bed mix. Mixing is carried out in a screw conveyor and a mixing-wetting drum.

Hot Cottrells (ESPs) are situated beside the arsenic and dust roasters to collect the mechanically entrained dust in the exhaust gases and return it to the lower roaster hearths. Clean gases from the arsenic roasters pass through the arsenic kitchens before joining the main roaster flue. The clean gases from the dust roasters pass along the main flue to the arsenic Cottrell. Gases from the other roasters pass direct to the roaster flue, where part of the dust that is carried over settles out, while the remainder enters the arsenic Cottrell for final recovery.

The primary pollution controls in this part of the plant are ESPs. The discharges are piped to the Main Stack. This part of the operation has fugitive dusts containing metals (arsenic, some lead, and other metals) and hot vapors.

**Smelting**

The smelting process separates the metal sulfides in the calcine from gangue material (waste), producing a suitable matte for charging to the converters. This is accomplished in reverb furnaces with the aid of appropriate fluxes at a temperature of 1250°C. The copper is present in the charge as a mixture of sulfides and oxides. It is converted to cuprous sulfide (Cu2S) in the presence of iron sulfides.

Precious metals are absorbed by the matte produced. Calcine from the roasters is transported in calcine cars and discharged into hoppers situated above the reverb furnaces. The hot feed is then charged along the side walls of the furnace by means of charging pipes passing through the furnace roof. The heat required for smelting is supplied by oil burners at the converter aisle end

of the furnace. Prior to 2004, fuel oil for heating was augmented by coal tar when available from the Coke Plant.

During smelting, the charge separates out into two layers; a heavy matte layer composed of metal sulfides which sinks to the bottom of the bath and a lighter slag layer containing the gangue and f1uxing materials. The slag is tapped out at the front end of the furnace opposite the burners, granulated with water and sent to the slag dump by means of an aerial tramway. The matte is tapped out through the side of the furnace via a copper launder into large ladles and transferred to the converters for further treatment. Gaseous combustion products leaving the furnace pass through waste heat boilers where part of the sensible heat is recovered for steam production. These gases then enter the reverberatory flue leading to the Central Cottrell building.

**Converter Section**

The products from this part of the process are Blister Copper Anodes and Converter Slag. The converter slag is returned to the reverb furnace.

The converter operation consists of blowing air through the molten matte received from the reverb furnaces thereby oxidizing the iron sulfides to ferrous oxide, which is subsequently slagged off with silica, and the cuprous sulfide to copper. No fuel is necessary since all the heat required is provided by the chemical reactions (i.e., exothermic process).

The conversion of matte to blister copper takes place in two stages. The charge is first blown to pure cuprous sulfide (called "White Metal"), during which time the iron is oxidized and a slag formed with the addition of silica. This slag contains ~3% copper and is returned to the reverb furnace via return launders, one on either side of the oil burners, in order to recover the valuable copper. During the second stage of blowing the remaining sulfur is oxidized to sulfur dioxide ($SO_2$) leaving a blister copper which is poured into a ladle and transferred to the holding furnace prior to casting into anode molds. Each converter is equipped with a ventilation hood and flue through which the exhaust gases pass to a large header flue leading to conditioning towers ahead of the smelter's Central Cottrell.

### 4.4.3 Slag Cableway

Beginning in 1930, a cable car system with a 600 t/day capacity was used for transporting granulated slag from both the copper reverb furnace and the lead blast furnaces to the Huanchan landfill.[18] At the time of privatization, approximately 25% of the slag produced in the copper and lead circuits was discharged to the river. Investments in this project were completed in 2001 and totaled almost US$10 million. Since 2002, the discharge has been reduced and was eliminated as of December 2006 with the installation of additional solids-liquid separation equipment.[19]

[18] DRPE-0002133915
[19] DRPE-0001974767

### 4.4.4 Lead Circuit

**General Description of the Primary Lead Smelting Process**

Primary lead smelters operate according to the general scheme explained in the following section (U.S. EPA 1995a). Lead (Pb) is a natural element that exists as a sulfide ore containing small amounts of copper (Cu), iron (Fe), zinc (Zn), precious metals, and other trace elements. Lead in the ore is concentrated at or near the mine.

The processing of lead concentrate into metallurgical lead involves 3 major steps: sintering, reduction, and refining. The third step, refining, has five steps. Primary lead smelting produces lead (Pb), Copper (Cu), Zinc (Zn) and precious and other metals in small amounts.

Step 1. Sintering - The primary purpose of the sinter machine is the reduction of sulfur content of the feed material. The feed material consists of:

- Lead concentrates, including pyrite concentrates that are high in sulfur content, and concentrates that are high in impurities such as arsenic, antimony, and bismuth, as well as relatively pure high-lead-concentrates;
- Lime rock and silica, incorporated in the feed to maintain a desired sulfur content;
- High-lead-content sludge byproducts from other facilities (not believed to have been handled by the Doe Run Peru smelter); and
- Undersized sinter recycled from the roast exiting the sinter machine.

The undersized sinter return stream mixes with the other feed components, or green feed, as the two streams enter a rotary pelletizing drum. A water spray into the drum enhances the formation of nodules in which the sinter returns form a core rich in lead oxide and the green feed forms a coating rich in lead sulfide. The smaller nodules are separated out and conveyed through an ignition furnace, then covered with the remaining nodules on a moving grate and conveyed through the sinter machine (a large oven). Excess air is forced upward through the grate, facilitating combustion, releasing $SO_2$ and oxidizing the lead sulfide to lead oxide. The "strong gas" from the front end of the sinter machine, contains 2.5 to 4 percent $SO_2$, which is vented to gas cleaning equipment before being piped to a sulfuric acid recovery plant. Gases from the rear part of the sinter machine are recirculated up through the moving grate and are typically vented to a baghouse. That portion of the product which is undersized, usually due to insufficient desulfurization, is filtered out and recycled through the sinter; the remaining sinter roast is crushed before being transported to the blast furnace.

Step 2. Reduction - The sinter roast is conveyed to the blast furnace in charge cars along with coke, ores containing high amounts of precious metals, slags (sometimes byproducts dusts from other smelters; unknown for the La Oroya Complex), and byproduct dusts from baghouses and various other sources within the facility. Iron scrap is added to the charge to aid heat distribution and to combine with the arsenic in the charge.

The blast furnace process rate is controlled by the proportion of coke in the charge and by the air flow through the tuyeres in the floor of the furnace. Prior to 2004, the La Oroya Complex had a coke plant. This plant was decommissioned, and coke was purchased.



EXHIBIT 34

The charge descends through the furnace shaft into the smelting zone, where it becomes molten, and is tapped into a series of settlers that allow the separation of lead from slag. The slag is allowed to cool before being stored, and the molten lead of roughly 85 percent purity is transported in pots to the dross building.

Step 3. Refining (at the smelter) - The drossing area consists of interconnected kettles, heated from below by natural gas combustion. The lead pots arriving from the blast furnace are poured into receiving kettles and allowed to cool to the point at which copper dross rises to the top and is skimmed off and transferred to a reverberatory furnace. The remaining lead dross is transferred to a finishing kettle where wood chips, coke fines, and sulfur are added and mixed to facilitate further separation. This sulfur dross is also skimmed off and transferred to the reverberatory furnace. Added to the drosses in the reverberatory furnace is tetrahedrite ore, which is high in silver content but low in lead, coke fines, and soda ash. When heated, the dross in the reverberatory furnace separates into 3 layers:

- lead bullion settles to the bottom and is tapped back to the receiving kettles,
- matte (copper sulfide and other metal sulfides), which rises to the top, and
- speiss (high in arsenic and antimony content) which along with matte is usually forwarded to copper smelters.

The refining step in the processing of lead ore to metallurgical lead (i.e., the refining of the bullion in cast iron kettles) occurs in 5 steps:

1. removal of antimony, tin, and arsenic;
2. removal of precious metals (zinc combines with gold and silver to form an insoluble intermetallic at operating temperatures);
3. vacuum removal of zinc;
4. removal of bismuth (calcium and magnesium are added to form an insoluble compound with the bismuth that is skimmed from the kettle; and
5. removal of remaining traces of metal impurities through the adding of NaOH and NaNO3.

The final refined lead, from 99.990 to 99.999 percent pure, is cast into pigs for shipment (in the case of the La Oroya Complex, lead was refined in Huaymanta across the Mantaro River).

**Sinter Plant**

The sintering plant removes a large portion of sulfur present in the feed and produces material suitable for smelting in the Lead Blast Furnaces. The material is in the form of coarse hard lumps with sufficient strength and porosity providing a permeable charge inside the blast furnaces. Proper sulfur balance is critical to the process. Too high a sulfur content in the blast furnace charge causes a high proportion of lead to concentrate into the matte formed, which leads to poor recovery, and further can result in the formation of zinc and copper sulfide crusts inside the furnace shaft.

When Defendants acquired the facility, sulfur removal was carried out in one stage by the use of a "one-pass" sintering operation. This configuration was to be changed about ten years after ownership with the addition of a sulfuric acid recover plant which was not completed. The feed

from the beds is diluted with sinter fines in the proportion of 2.5 parts sinter fines to 1 part of bed mix to give a sinter machine feed of 6.5 to 7.0% sulfur.

Preparation of materials and the bedding of ores and concentrates together with the necessary fluxes prior to sintering have been previously explained. Sinter machines are fed with a mixture of bed mix and sinter fines from bins. Feeding machines transport the bedding mix and fines with transfer belts to drum pelletizers and thence via belt to machine feed bins that are laid out on the machine pallets. Downdraft machines receive up to 7-½" bed material from the feed bins. Updraft machines provided with a split feed bin are used to provide separate feeds for the ignition layer and the main feed layer.

Feed for the ignition layer bins are mixed with 1-2% coke fines to ensure good ignition. Pellets are fed directly to the machine and laid out on the machine pallets. The sinter bed is ignited with oil burners set in an igniter stove. On the downdraft machines, air is drawn through the bed along the whole length of the machine and, with the sulfur present as the fuel, a continuous sintering operation takes place with the ignited zone passing through the bed. On the updraft machines, air is drawn down through the ignition layer to get good ignition, and when the main layer is reached, air is then forced up through the bed from the bottom. The heat generated during this process is sufficient to cause incipient fusion of the charge and, at the sintering temperatures of the order of 800$^{o}$C, the silicates present become viscous and on cooling tend to agglomerate the fine particles into a porous mass.

The sinter product from the machines is discharged by apron feeders from the machine storage bins to belts and a double-decked vibrating screen. The coarse fraction is sent directly to storage bins at the lead blast furnace. The middle fraction passes via a vibratory conveyor through smooth rolls and is conveyed to bins together with the fine fraction via other belts. The sinter product from one of the machines is discharged from the storage bin by conveyor to a belt, thence via a primary crusher. Material screening operations are performed whereupon undersize material drops directly to the sinter fines tank, and the oversize passes through a secondary smooth roll crusher then on to a belt, thus forming a closed circuit. From the fines tank, the sinter fines are transported by a feeder belt to bins.

Each sinter machine draft fan discharges into a header flue which leads the gases, via the converter flue, to the Central Cottrell. The remaining plant ventilation system discharges into Scrubbers where the gases are cleaned and the resulting slurry transferred to a thickener for the recovery of the valuable solids present by filtering with a drum filter. Overflow liquors from the thickener are pumped back to the Scrubbers.

The air discharges from this part of the operation include both point and fugitive sources. Emissions to the Central Cottrell are combined with the other streams.

The following are process parameters considered relevant in the analysis:[20]

- Sinter product tonnage per month (typical) = 21,622 D.S.T.
- Sinter product composition (table below)

[20] DRPE-0000081350; DRRCE-00383656

| | Comp. | Units |
|---|---|---|
| SiO2 | 10.700 | % |
| AL2O3 | 1.300 | % |
| CaO | 9.900 | % |
| Fe | 11.700 | % |
| Pb | 39.200 | % |
| Zn | 6.500 | % |
| Cu | 3.030 | % |
| As | 0.900 | % |
| Sb | 0.700 | % |
| Bi | 0.320 | % |
| S | 1.600 | % |
| Ag | 42.800 | Oz./Ton |
| Au | 0.056 | Oz./Ton |

**Lead Blast Furnaces**

The sinter is delivered by means of belt conveyors to storage bins above each of the three blast furnaces. Similar arrangements are made for conveying and storing the coke required for the smelting process. The sinter is then withdrawn from these bins into charging cars located on either side of each furnace and periodically charged into the blast furnace together with the requisite amount of coke. Other materials such as scrap iron are added to prevent formation of arsenic crusts in the shaft.

Air for the blast furnace is supplied through tuyeres positioned around the lower part of the furnace. This air burns the coke to produce sufficient heat for the smelting process at the same time forming carbon monoxide which reduces the lead oxide in the charge to metallic lead. On No. 3 furnace the molten lead then runs down into the furnace hearth or lead-well, from where it is tapped out continuously into a small pot of three tons capacity and transferred to the Drossing Plant by means of diesel-powered trammers. At the same time a mixture of slag, matte and speiss is formed which, being less dense, settles out on top of the lead-well. This slag mixture is tapped out of the furnace every six or seven minutes into a moveable settler where it separates out into three layers. Any lead entrained in the slag sinks to the bottom of the settler followed by the matte and speiss while the lighter slag floats on top and overflows into a launder where it is granulated with water and sent to a slag dump. Lead and the matte-speiss are periodically tapped out from the settler, the former being sent to the drossing kettles while the latter is charged into the reverberatory dross retreatment furnace. No 1 and *2* furnaces are fitted with continuous slag tapping facilities. The molten lead, slag, matte and speiss run continuously from the furnace hearth into a settler, from whence the slag overflows into the granulating launder. The lead, matte and speiss flow from the lead riser into a refractory-lined pot and are transported to the drossing kettles.

Waste gases leaving the top of the blast furnaces are drawn along a balloon flue to the Central Cottrell where dust is recovered before the gases pass on to the Main Stack.
The following are process parameters considered relevant in the analysis:[21]

[21] DRPE-0000081350; DRRCE-00383656

- Total charge per month (typical) = 22,095 D.S.T.
- Charge breakdown:
  - 99% Sinter
  - 1% Scrap Iron
- Furnace Products:
  - Lead bullion produced per month (typical) = 14,709,517 Lbs. (roughly 7,355 tons)
  - Slag (approximate reported value) = 11,135 S.T. per month

**Drossing Plant**

Molten lead tapped from the blast furnaces at about 800°C is transported in small three ton pots to the Drossing Plant, where it is partially refined by removing copper. On arrival at the Drossing Plant, the molten lead is discharged into a copper drossing kettle whereby controlled cooling, down to about 350°C, the copper compounds present become insoluble and separate out as a dross, leaving a copper/lead eutectic containing only .05% Cu. The lead is further cooled to 320°C, and the copper content further reduced to .005% Cu by treatment with elemental sulfur. The copper drosses are charged into an oil-fired reverberatory furnace where at a temperature of 1100°C and the addition of about 2-3% soda ash the dross forms matte and speiss. These two materials separate out into two distinct layers; the lead sinks to the bottom of the hearth and is periodically tapped out into second decopperizing kettle. Matte and speiss are also tapped out periodically and sent to the copper circuit. The decopperized lead is pumped to a kettle at the casting section and maintained at 450°C. Return scrap anodes from the Lead Refinery are melted down either in the Drossing Plant kettles or casting kettles. Casting is carried out at the Huaymanta Lead Refinery.

The following are typical production volumes (reported levels from the 1970 record):

- Copper dross produced = 3,216 S.T./month
- Reverberatory Furnace Production:
  - Lead Bullion = 2,015 S.T./month
  - Matte = 548 S.T./month
  - Speiss = 450 S.T./month
- Lead Anode Production = 15,302,217 Lbs./month

### 4.4.5 Zinc Circuit

**Roasters**

The roasting operation converts zinc sulfide to zinc oxide which is readily soluble in the subsequent leaching operation. This part of the operation also recovers $SO_2$ gases to produce sulfuric acid of 98% purity.

Flotation zinc concentrates are transported by railroad and unloaded to a concentrate pad under the High Line. These concentrates are then reclaimed by means of a traxcavator, dumped through a 3 inch grizzly and crushed in a hammer mill to break up larger lumps before being conveyed to storage bins above the pelletizing section and fluid bead roaster bins. About 60% of the

concentrates are fed to fluid bed roasters while the remaining charge goes to a turbulent layer roaster.

The feed to the Fluid Bed roasters is in the form of strong, hard pellets. The concentrate is first densified in pug mills with the addition of zinc sulfate solution, sulfuric acid, and roaster flue dust. The zinc oxide in the roaster flue dust reacts with the acid to form more zinc sulfate which serves as a binder. The mixture is pelletized. The pelletized material is dried in rotary kiln dryers, screened to remove fines, and then conveyed to the fluid bed roasters. Pelletized charge is fed to the roasters that are maintained at a temperature of 1000$^{o}$C. The roast reactions are exothermic. About 35% of the material charged to the fluid bed roasters is carried out with the flue gases. The exhaust gases pass through waste heat boilers to recover some of the heat, followed by cyclones which remove coarse particulates. From the cyclone separators, the gases enter flue systems, in which they are carried to the Central Cottrell which removes particulates and then discharges to the main stack.

The dust removed by the cyclones is conveyed to the main calcine stream leading to the screening and grinding section, or the dust is sent to the pelletizing section as required. The concentrate is directly fed to the Turbulent Layer Roaster by means of a belt slinger. Roasting is carried out in the bed formed by the coarse feed and in the roaster chamber the fine bed is floating in its trip to the flue.

The separating temperature is 960$^{o}$C which is controlled by water cooling. About 70% of the feed charged is carried over with the gases and collected in a waste heat boiler, cyclones and ESP. Exhaust gases previously cooled to 350$^{o}$C with $SO_2$ strength to 9 to 10% pass to the Sulfuric Acid Plant to produce acid. The calcine is cooled and conveyed to storage silos by means of cooler conveyor redlers and a pneumatic conveyor.

Oxide dust precipitated in the Cottrell units joins the calcine stream at the screening and grinding unit. Calcine from the Turbulent Layer and Fluid Bed roasters passes through cooling redlers and drums. After cooling, the product from the Fluid Bed roasting process is ground in a ball mill, passed over a 35-mesh screen and the oversize re-ground in the ball mill. The fine calcine, containing less than 1.5% sulfur together with the Turbulent Layer roaster calcine, is then transferred by redler conveyors to the leaching section.

The following are process parameters considered relevant in the analysis[22]:

- Average monthly tonnage concentrates = 18,200 W.S.T.
- Composition: 1.6% Pb, 0.29% Cu, 50.8% Zn, 10.4% Fe, 3.9 Oz/Ton Ag
- Acid Consumption = 69.0Lbs S.S.T/month
- Operating time of Pelletizers = 80%
- Turbulent Layer Roaster:
    - Capacity = 240 W.S.T/day
    - Operating Temp. = 960$^{o}$C

[22] DRPE-0000081350; DRRCE-00383656

- Flue dust recovery = 70% of charge by means of boiler, cyclones and ESP. Reported estimated recovery 110 ST/day; Operating time = 92.7%

**Leach Extraction, Purification and Zinc Dust Manufacturing**

The leaching process dissolves zinc oxide and zinc sulfate contained in the calcine. This is accomplished in a batch operation by adding the fine calcine to tanks containing spent electrolyte plus make up acid. The iron present is oxidized with manganese dioxide in order to precipitate this element as ferric hydroxide together with any zinc ferrites present. Other impurities such as arsenic and antimony are also precipitated during this operation. A flocculating reagent is added to improve the settling and filtration rates, whereupon the solution is passed through pressure filters to remove the insoluble impurities. The residue is washed counter-currently with dilute zinc sulfate solution followed by water to recover entrained soluble zinc compounds before being stockpiled for possible treatment at a future date.

The impure zinc sulfate solution then enters the purification section where further impurities including copper, cadmium, and small amounts of antimony are precipitated by means of zinc dust. The resulting suspension is filtered through Shriver presses, leaving a filter cake which is discharged into hoppers and sent to the Cadmium Plant for further treatment.

The pure, clear filtrate is sent to storage tanks from which it is withdrawn as required and pumped to the electrolytic tankhouse. Zinc dust required in the purification cycle is produced by distillation in small retorts in the zinc dust section of the plant. Liquated zinc slab is charged to a furnace for melting prior to charging the retorts with liquid zinc. The distilled zinc is condensed and then screened. The -100 mesh fraction is used for purification.

**Electrolytic Platform**

This part of the circuit is at the refinery. The electrolytic tankhouse consists of eighteen blocks or units each containing twenty cells arranged in two rows of ten. Electrolysis of the zinc sulphate solution takes place between aluminum cathodes and lead anodes. The anodes are cast at the plant from a 1% silver-lead alloy, the silver being added to reduce the solubility of lead anode during electrolysis. The cathodes are made from 3/16 in. aluminum sheet riveted to a copper cross bar for suspension in the electrolytic cell. To facilitate stripping, each cathode is provided with detachable polyethylene edge strips for the two vertical edges. After a 16-hour deposition period the cathodes are lifted from the cells and the zinc deposit is stripped off and sent to be melted. This melting operation is carried out in a top charged, low-frequency induction furnace. Pure molten zinc is then transferred by means of a pump to an automatic casting machine where it is cast into slabs. Traces of zinc sulfate adhering to the cathode sheets along with any zinc oxide formed during melting, rise to the surface of the melt as a dross which has to be removed periodically with the use of ammonium chloride as a sweating agent to avoid overheating of the furnace. The dross is charged to a rotating kiln-type furnace for liquating and recovery of some of the metal entrained in the dross. When liquid, the metal is tapped into a one-ton ladle and cast into slabs. Remaining dross is blended with concentrate in the Zinc Roasting Plant. These latter operations take place at the smelter.

**Zinc Sulfate Production Platform**

The dilute zinc sulphate solution from a storage tank is fed to a Multivane scrubber through which pass the gases from the main fan and secondary blower. The scrubber spray cools the gases by evaporation and washes dust from the gases stream. The concentrated solution from the scrubber is pumped to a spray machine located in the center on a vaned annulus supported at the top of the Drying Chamber with a lower conical section. The spray machine utilizes a centrifugal disc atomizer directly connected to a motor which is capable of developing speeds up to 18,000 RPM. Hot gases from a direct oil fired air heater enter the Drying Chamber at the top and circulate down around the rotating disc with a swirling motion imparted by fixed vanes, which aid in producing intimate mixing between the hot gases and spray.

The hot gases convey the dry product through the bottom of the Drying Chamber cone to a cyclone collector. The cyclone collector separates the dry product from the hot gases. By cyclonic action the powder is removed and drops into a separating hopper from which it is removed by a rotary air lock to a storage hopper. The gases from the cyclone collector and storage hopper are drawn off by a main fan and secondary blower, respectively. These gases are passed through the scrubber, as aforementioned, to remove their remaining dust content.

Like a number of other sources, records of the stacks where emissions from scrubbers and cyclones were released to air have not been located.

The following are process parameters considered relevant in the analysis:[23]

- Plant capacity = 22,000 Lbs./day of monohydrate zinc sulfate
- Production (typical) = 218,000 Lbs./month
- Stack temperatures = 330$^{o}$F (estimated from drying chamber outlet)
- Scrubber circulation rate = 43 gpm @ 15 psig
- Volume per day scrubber feed = 6,241 gallons

**Zinc Leach Residue Plant**

Up to 17% of the zinc present in the concentrate feed to the Zinc Roasting Plant remains in the leach residue together with other valuable metals. Part of this residue (pulp containing 40% solids) is sent to the Leach Residue Plant for further treatment in order to recover the zinc and other valuable metals. After filtering and drying, the residue is pelletized with coal and bentonite (as a binder) before being fed into a rotary kiln together with anthracite.

The kiln is fired in such a manner that there is a reducing condition in the bed of materials in the kiln and an oxidizing atmosphere above the bed. At a temperature of 1000$^{o}$C, and under a reducing condition of the bed material, zinc, lead, cadmium and indium volatilize while silver and copper remain with the reduced iron in the bed.

[23] DRPE-0000081350; DRRCE-00383656

The kiln discharge product (kiln calcine) is cooled below the re-oxidation point under reducing conditions, this condition being formed by the presence of unburned carbon. Magnetic separation of the calcine into coal, ash and sponge iron for further treatment is then carried out.

The sponge iron stays in the form of pellets and contains 50% to 60% Fe along with the bulk of the copper and silver. This product is stockpiled for use in the precipitation of copper from mine water or for use in the lead blast furnaces.

Volatilized zinc, lead, cadmium and indium oxidize in the kiln and after condensing and cooling, are collected as "kiln fume" in a baghouse. To recover the valuable metals from the fume, the following hydrometallurgical treatment is carried out in the processes explained below. Like a number of other sources, records of the stacks where emissions from scrubbers and cyclones were released to air have not been located.

**Fume Leaching**

The kiln fume collected in the baghouse is leached with sulfuric acid in the form of spent electrolyte. This leaching, carried out at 70$^{o}$C, results in the zinc and cadmium being brought into solution. In the following filtration step this impure zinc sulfate solution is separated from the residue (known as the second leach residue) which contains the lead and indium.

**Purification**

In order to provide a zinc sulphate solution suitable for electrolysis, the cadmium and other impurities have to be precipitated. This is achieved by using zinc dust as the precipitant in the neutral impure solution at a temperature of 80$^{o}$C. The pure solution and purification residue are then separated by filtration after which the residue is shipped to the cadmium plant for further treatment and the solution pumped to the electrolytic zinc plant for electro-winning. A cell block independent from the rest of the zinc plant is used for the recovery of zinc and the spent electrolyte from this block used for the aforementioned fume leaching.

**Indium Recovery via Acid Leaching**

Indium is extracted from the second zinc leach residue by leaching at a temperature of 70$^{o}$C with sulfuric acid. This is followed by filtration, the resulting residue, (third leach residue) containing mostly lead sulfate, being sent to the lead smelter and the solution to a neutralization step.

**Neutralization**

The solution from the previously mentioned filtration is neutralized by the addition of soda ash to obtain a pH of 4 in order to leave the iron in solution. Indium (In) from this solution is then precipitated by zinc dust and the residue. This product contains 8% In after filtration and is sent to the indium plant for recovery of the indium.

### 4.4.6 Companion Metal Recovery Platforms

**Anode Residue Plant**

Dewatered anode slimes arrive in railway cars from the Lead Refinery and in drums from the Copper Refinery. They are mixed with recirculated dusts from reverb Cottrells and the converter baghouses. The mixture is pelletized in a drum and charged to two small reverb furnaces, which melt and oxidize the material. An antimony-rich fusion slag is then skimmed off for shipment to the Antimony Plant where antimony metal is extracted.

The metal from the reverb furnaces is transferred to converters where it is blown twice. The first slag (converter slag) contains most of the antimony and less than 1.5% bismuth and is returned to the lead beds because it is refractory and viscous. The second slag, which is rich in bismuth is transferred to a small reverb furnace for reduction to the metal with coke fines. A lead-copper matte is also formed in this furnace by the addition of pyrite. This material is recirculated to the Lead Smelter.

Fire refining of bismuth takes place in several stages. During the first step the copper is oxidized and drossed off while the antimony, selenium and tellurium are collected into a caustic slag which is sent to the Selenium Plant. The bismuth is then pumped to the second and third kettles where the silver is recovered by treating with metallic zinc (Parkes Process), the crust formed being transferred to a special drossing crucible. Zinc and lead are then removed by passing chlorine gas through the melt and the residual chlorine is removed by blowing with air. After a final treatment with caustic fluxes the refined bismuth (99.999 grade) is cast into ingots ready for marketing. Also refined air atomized bismuth -20 mesh, and refined bismuth needles are prepared on request.

Occasionally, instead of completing the refining cycle, a base bullion is made in the third kettle consisting of an eutectic of lead and bismuth (60% Bi, 40% Pb). This alloy is then cast into slabs. The charge remaining in the converter contains approximately 50% Ag and 30% Bi and this is transferred to one of the two cupellation furnaces for the recovery of a Dore bullion. Oxidation and slagging operations are carried out in the Cupel and various products are formed as shown in the flowsheet, the main ones being a Dore bullion containing about 99% Ag and .3% Au which is cast into anodes for the Silver Refinery, and a bismuth slag which is returned to the reduction reverberatory furnace for recovery of bismuth as metal. Fume from the cupel is collected by a scrubber and wet electrostatic precipitator. Like a number of other sources, records of the stacks where emissions from scrubbers were released to air have not been located.

Products made are:

- Dore anodes = 1,333,788 troy oz/mo. (99% Ag, 0.2% Au)
- Bismuth metal = 110,160 Lbs./mo.
- Base bullion = 9,630 Lbs./mo.

**Selenium-Tellurium Plant**

Cupel precipitator slurry and niter slag from the cupels contain selenium and tellurium which are leached out with caustic soda, pH of the solution obtained is adjusted using sulfuric acid to



EXHIBIT 34

precipitate tellurium dioxide, which is separated by filtration. Tellurium dioxide cake is washed and then dissolved with caustic soda to form sodium tellurite which flows by gravity through four cells where electrolytic tellurium is obtained. After washing and drying, the tellurium is melted down in an oil-fired crucible and cast out into pigs or sticks ready for shipment.

The solution from tellurium dioxide precipitation contains the selenium, pH of this solution is adjusted to 5.5 by adding sulfuric acid, and zinc dust is then added to eliminate lead, tellurium and silica by precipitation. The resulting solution is then filtered and the filtrate treated with some more sulfuric acid and after cooling, selenium is precipitated with sodium bisulphite as amorphous selenium dioxide. This is heated and transformed into metallic selenium. The metallic selenium is washed, dried and ground to -20 mesh and packed in steel drums. Production volumes are small: Selenium = 1,258 Lbs./mo.; Tellurium = 3,183 Lbs./mo.

**Other Metals**

Other metals recovered at the refinery in small quantities include silver, cadmium, indium, and antimony. These processes are not evaluated in the analysis.

**Arsenic Plant**

Dust collected from the Arsenic Cottrell is roasted together with copper bed mix, added to supply more heat during the roasting operation. The arsenic volatilizes and the fume evolved passes over to the Arsenic Kitchens where a product containing approximately 95% As2O3 settles out and is collected by means of a screw conveyor. This arsenic dust is stockpiled or marketed as required. Gases pass from the kitchen to a Cottrell where the remaining fume is precipitated and collected by means of screw conveyors. The calcine produced is sent to the copper reverb furnaces. The following are typical production quantities: Calcine = 2,354 D.S.T./mo; Arsenic dust to stock = 516.8 D.S.T./mo; Arsenic Trioxide for shipment = 44.3 D.S.T/mo.

**Sodium Bisulphite Plant**

The smelter has a production platform for sodium bisulphite which is marketed as a flotation agent. It has both internal and external customers for this product. Production is small – typically 250,000 Lbs./mo. (dry basis).

**Coke Plant**

Coking operations were decommissioned between 2004 and 2005 and were a source of PM, PAHs and $SO_2$ air discharges.[24] Particulate matter (PM) from the coke batteries contains only trace levels of lead and arsenic (U.S.EPA 2008); this source is not considered in the analysis.[25]

There were two batteries based on conventional technology. Emissions were controlled with two tar scrubbers. The following are typical operational data:

---

[24] DRPE-0001974767
[25] DRPE-0000645875, DRP analytical results from the coke battery stacks show "n.d." for arsenic, cadmium, and lead.

- Cycle time = 15.0 hours
- Charges coked = 875/mo.
- Coarse coke produced = 3,991 D.S.T/mo.

### 4.5 Location of Production Platforms and Point Sources

Site and engineering drawings were consulted to identify buildings in which production platforms operated.[26] The drawings were superimposed over satellite images of the facility and georeferenced to obtain approximate coordinate locations. Exhibit 4 is an image with a key identifying the locations of operating buildings. Georeferenced locations for those buildings that calculated and reported estimates could be prepared for the air emissions inventory are documented in DRP – Fugitive Emissions Source Terms.xlsx accompanying this report.

Various records produced in this matter were consulted in order to identify the location of some stacks. Since the facility does not have a formalized emissions inventory, a review of site engineering drawings, records describing operations, and satellite images were relied on to locate as many of these features as possible. Exhibit 5 identifies the approximate locations of the stacks at the smelter. Georeferenced stack locations are documented in the Excel file (DRP – Point Source Emissions Source Terms.xlsx) accompanying this report. Georeferencing was performed by superimposing Defendants' engineering drawings and plot plans over satellite images of the facility in order to identify the approximate locations of stacks using easting and northing coordinates.[27]

Not all building operations and release points such as stacks could be identified. Because the Defendants did not prepare an air emissions inventory there are incomplete and missing records which:

- Identify all buildings by designation
- Identify all stacks by designation
- Identify all stacks removed from service by designation
- Identify roof and other building vents by designation
- Define coordinates of buildings and point source releases
- Define heights and dimensions of buildings

The Defendants' documentation of air emission sources is so poor that stack information such as height, diameter, location, stack temperature, stack velocity and volumetric flow rates are not recorded in many instances. A glaring example is multiple scrubbers used by the Defendants at the sinter plant.[28] Such controls have release points that are stacks. The locations and operating conditions of different stacks are not reported in the Defendants' records, with the exception of one scrubber stack.[29] Other examples are records which note the use of baghouses in various buildings.[30] All baghouse operations have stack releases; but no records could be located

---

[26] DRPE-0000845115; DRPE-0001285583; DRRCE-00384625; DRRC-00052369; DRPE-0000643320; DRPE-0000081350; DRPE-0000906644
[27] DRPE-0000643320; DRPE-0002133915, pg. 288-290 (shows stack locations).
[28] DRRCE-00922042
[29] DRPE-0001979317
[30] RENCOGRP-002468; DRPE-0002104173

concerning the information of these stacks. The absence of these records shows that the air emissions were not being monitored and controlled.

## 5. METHODOLOGY

The methodology I applied to reach my opinions is:

1. A forensic reconstruction of the events and activities relevant to air pollution control at the smelter;
2. Preparation of annual air emissions inventories in order to quantify air discharge reductions from actions taken by the Defendants over time;
3. Construction of air quality trend charts from data reported from monitoring stations;
4. Studying the air quality trend charts in relation to air quality standards and the timeline of events, activities and practices in order to assess Defendants' actions; and
5. Consulting authoritative sources of good industry practices for controlling air emissions, which were compared against the Defendants practices to assess reasonableness.

The forensic reconstruction provides a timeline of activities concerning relevant material handling and air pollution management practices. The air emissions inventories are source terms which constitute a quantification of the estimated facility-wide air pollution over the period of the analysis.

The forensic reconstruction involves assembling documents and records produced by the Defendants chronologically and according to subject categories. Each document is then examined for its relevance to the Defendants' work assignments and pollution management practices. A timeline of the events, practices employed, and the information obtained from each of the documents are summarized and documented. All documents are identified either by a Bates Stamp or description in terms of date, subject matter and other identifying markers in those instances when Bates stamps are not included on a document.

No attempts are made to interpret information gathered from documents. The information obtained from each document is either directly quoted or paraphrased as close as reasonably possible to the original statements found. No relevant facts obtained from documents are excluded, including contradictory statements and information.

In the case of testimonies, all statements made by fact witnesses are considered to be truthful and factual. Testimonies given by designated corporate representatives are considered to be formal statements made on behalf of the Defendants and are taken to be factual. Testimonies given by fact witnesses that are not corporate representatives are considered factual to within the best recollection of the person.

In situations where contradictions of facts are identified among documents or testimonies, effort is made to identify and consider other records and or testimony to corroborate and distinguish between more likely than not or most probable facts and suspect information.

For example, Kenneth Buckley, who served as President and General Manager of the La Oroya Complex from September 1997 through September 2003, testified that when he took charge of



EXHIBIT 34

the smelter operations beginning in 1997, efforts were immediately made to repair and replace inoperable baghouses.[31] His testimony is unreliable because:

1. No records have been found that document that baghouses were repaired, replaced or upgraded over the time period he testified to;
2. Air quality trend charts constructed from air monitoring records show no improvements to air quality over the time period he testified the upgrades and repairs were made (see trend charts in Exhibits 134, 139, and 144). If major repairs were made to inoperable baghouses, then the air monitors would have reflected reductions in particulate matter and metals concentrations in the ambient air. No improved air quality is observed from the trend charts until after about August 2003; and
3. Progress reports on the air pollution projects documented in the PAMA show no monies were authorized and spent on air pollution controls for the period.[32]

As another example, Jefferey Zelms, Doe Run President and CEO, testified that it was not possible to first make upgrades to the smelter before operating it, and that pollution levels would increase if production volumes were reduced. See the following questions and answers from his deposition.[33]

> **Q.** "… certainly Doe Run Resources, or even Renco, could have made a decision to shut down that smelter before continuing to operate it after the purchase"
> **A.** "Absolutely not."
> **Q.** "couldn't they? They couldn't make that decision?"
> **A.** "We had evidence where facilities, like kinds of facilities elsewhere in the world, had been closed, shut down, as you use the expression, and the emission levels increased. Just looking at it from that singular standard, not profitability, not earnings, not any of those other esoteric statements, it would have been wrong to close La Oroya."
> **Q.** "Certainly technology and engineering projects could have been done to reduce and control stack and fugitive emissions before continuing to operate that smelter and complex after"
> **A.** "No, Ma'am."

Without any evidence, Zelms testified that it was not possible to shut down the smelter, install pollution controls on uncontrolled stacks, or to limit production volumes because according to him emission levels would increase. Air quality trend charts show that within days of Defendants suspending operations of the La Oroya Complex on June 3, 2009, ambient air quality levels in Sindicato fell to levels that were considered safe according to Peruvian and U.S. standards. See the trend charts in Exhibit 135B. The testimony of Zelms is not credible.

---

[31] RENCOGRP-015317 – Witness Statement of Kenneth Buckley, February 10, 2014. "For example, the baghouses, which are critical for collecting the dust emitted by the smelter, were all in terrible shape and had massive holes. There were also holes in the ductwork. Immediately after we acquired the Complex, I had crews going around fixing the biggest issues."
[32] RENCOGRP-002468 - The PAMA for the Metallurgical Complex of La Oroya 2004-2011 Period
[33] June 21, 2017 Deposition of Jeffery Zelms, P. 101-102.

The analysis and computational results for air discharges rely on EPA-approved methodology and are to within a reasonable degree of scientific certainty. Opinions are arrived at based on the weight of evidence examined and the application of reasonable scientific assumptions that enables stating more likely than not or most probable. In matters such as this there are gaps resulting from missing records and faulty memories of fact witnesses. To the extent possible, I cross-reference different documents and testimonies and when disagreement has been found, noted these and applied the overall weight from several sources to conclude the most probable.

As I have done in other assessments performed over the years, I do not assume that the absence of records constitutes that certain actions or practices were not followed. Rather, I rely on indicators and cross-references to determine whether certain practices were likely relied on or not. In some instances, engineering assumptions are applied to calculations based on the weight of records. In all instances the assumptions are stated and documented for transparency.

My analysis is supplemented with a review of authoritative references from the regulatory, scientific and industrial communities. Because of the voluminous nature of documents produced in this matter, I reserve the right to supplement my analysis and assessment should additional records which may have been inadvertently overlooked or new records not previously disclosed be brought to my attention.

The computational methodology I applied to preparing emissions inventories is based on U.S. EPA approved calculation methods and is widely used and recognized in the scientific and industrial communities. The approach to the computation of mass releases is based on the application of emission factors. In some instances, the Defendants have quantified the air discharges from application of both undocumented mass balances and engineering judgement. In other limited instances stack emission measurements are reported. The Defendants' calculated and measured air discharges for sources it has quantified are not challenged and are relied on. There is significant lack of documentation on the methodology and basis by which Defendants prepared calculated estimates of fugitive emissions such that I am unbale to ascertain whether reasonable methodology was applied. I have therefore had to assume that their reported estimates are reliable in preparing my air emissions inventories.

# 6. GOOD INDUSTRY PRACTICES

## 6.1 Due Diligence

### 6.1.1 Explanation of Environmental Due Diligence

Corporations, lending institutions, and donor agencies require environmental due diligence as a standard business practice in order to avoid becoming party to transactions that cause harm to the public, violate statutory obligations and international norms of acceptable air quality, and from acquiring liabilities from costly cleanup of legacy and ongoing pollution.

In the United States the 1980 promulgation of CERCLA (Comprehensive Environmental Response, Compensation and Liability Act) prompted lending institutions to impose requirements for environmental due diligence assessments for loans involving property transactions. Prior to CERCLA, due diligence of environmental liabilities was given little attention except by sophisticated corporations. Uninformed buyers purchased contaminated properties which were recognized after the transaction to require both remedial actions from legacy pollution and modernization to address pollution that exceeded the market value of the property. This exposed lending institutions to financial liabilities as new owners sometimes abandoned the properties leaving the lending institutions with distressed properties. Environmental due diligence practices demanded by lending institutions have been widely adopted and applied by the private sector since this time.[34]

Practices for conducting environmental due diligence became more sophisticated over the years, providing buyers, sellers and lending institutions ever increasing information about a subject property prior to sale.[35] Business globalization disseminated these same practices for transactions outside of the U.S.; see as examples World Bank[36] and EBRD[37] for their environmental due diligence requirements, protocols and practices. These institutions require good practices so that infrastructure investments are sustainable. The same or similar practices have been universally adopted by corporations and private investors because no entity purchases properties and assets without understanding the true market value and potential downstream risks of the purchase. Environmental due diligence defines for lending institutions, prospective buyers and investors:

- Local environmental statutory obligations that must be met in order to continue operations lawfully;
- A benchmark between local statutory requirements and international norms along with the likelihood that regulations will become more stringent over time. A buyer

[34] Cheremisinoff, P. N. and N. P. Cheremisinoff, Professional Environmental Auditor's Guidebook, Noyes Publications, Park Ridge, N.J. 1993

[35] See following references: Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.; ASTM E1528-06 - Standard Practice for Limited Environmental Due Diligence: Transaction Screen Process (Transaction Screen); ASTM E1527-05 - Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (Phase I ESA); ASTM E1903-97 (2002) - Standard Guide for Environmental Site Assessments: Phase II Environmental Site Assessment Process (Phase II ESA).

[36] IBRD-IDA/World Bank Group, The World Bank Environmental and Social Framework, International Bank for Reconstruction and Development/The World Bank, Washington, DC, 2017 – accessible at http://pubdocs.worldbank.org/en/837721522762050108/Environmental-and-Social-Framework.pdf

[37] Visit the EBRD (European Bank for Reconstruction and Development) for numerous examples of due diligence assessments for infrastructure investments by private and public partners at https://www.ebrd.com/esia.html

contemplating the purchase of overseas property needs to know if there are new or pending statutory obligations and what would be the costs to meet these;

- Baseline air and water emissions and how these compare to local statutes and to other similar installations of comparable production capacities. Benchmarking the environmental performance along with the age and condition of major equipment and pollution controls of a facility against other existing facilities helps to define costs for modernization and true market value;
- Sensitive receptors exposed to air and water pollution as well as pathways of exposure. A responsibly acting buyer requires this information in order to assess pollution control upgrades because it would not want to harm the public;
- Delineation of historical and ongoing environmental concerns and the costs to address these. In many to most situations these are shared costs between buyer and seller;
- Condition, age and status of air pollution controls and projected costs for ensuring these are in good working order and whether they require replacement or upgrades in order to meet local and international air quality standards so that they are protective of human health;
- Recommendations and costs for decommissioning parts of a facility which are unprofitable and or highly polluting;
- Impacts to local workforces, industries, the environment, and the overall social-economic aspects that affect the sustainability of the contemplated investment.

In every assignment I undertook for a client or employer contemplating a corporate merger, an investment or when I served in the capacity as a lending institution's or owner's engineer each of the above issues where examined in an environmental due diligence assessment prior to the transaction. The information gathered from the due diligence always culminated in recommended environmental action and mitigation plans along with projected costs and schedules. This information was used by the buyer to:

1. Establish whether the property was being offered at fair market value;
2. To define and assess hidden costs that can add further risks to the investment;
3. To aid decision makers to determine whether the transaction should move forward.

Corporations, lending institutions, and donor agencies require environmental due diligence in order to avoid becoming party to transactions that cause harm to the public, violate statutory obligations and international norms of acceptable air quality, and from acquiring liabilities from costly cleanup of legacy and ongoing pollution. It is my 40+ years of experience that corporations conduct environmental due diligence in order to obtain at a minimum the following information:

1. An understanding of whether the facility is operating legally; i.e., meeting statutory obligations;
2. An understanding as to whether the local current environmental statutory obligations are comparable to international norms that are protective of human health, and the likelihood that the local obligations will become more stringent over time;
3. An understanding as to whether the facility is causing a public health risk and the nature of the risk(s);

4. An identification of the primary pollutants that are being released and pose health risks to the public;
5. An understanding as to whether there are adequate set-backs between the facility and residential areas;
6. An understanding of the levels of investments and time needed to bring the facility into environmental compliance and reduce or eliminate harm to the public;
7. An assembly of cost information, recommendations and necessary upgrades or modernization efforts to assist decision makers to determine whether the investment is worth the time and effort. The costs to address environmental liabilities and ongoing pollution may exceed the market value of the property and assets, in which case the transaction is abandoned or the price heavily discounted.

In some instances, mitigation and environmental action recommendations may be too costly; however, the transaction may still appear attractive to a buyer. In such a situation the buyer may weigh the option of neighboring property buy-outs, relocation of communities, and relocation of major emission sources in order to remove the public from harmful pollution and offset some infrastructure costs for modernization. Defendants purchased nearby homes and relocated a blast furnace to provide additional setback from their lead smelting operations in Herculaneum, Missouri.[38]

A due diligence assessment is not merely fact finding. Responsible decision makers rely on technical recommendations and cost projections which define the pathways forward to good environmental performance. The World Bank, EBRD and all U.S. financial institutions as well as responsible companies require guidance on how the property is to be managed should the transaction move forward. This is done by preparing:

1. Environmental action plans which explain the steps and costs for reducing or controlling air, water and solid wastes – not simply for the purpose of meeting statutory obligations, but to ensure that the local community is not being harmed;
2. Environmental Management Plans which detail the levels, requirements, protocols, tools and procedures to be implemented, monitored and strengthened over the implementation period;
3. Mitigation plans which prioritize environmental issues and define immediate steps needed to address high priority pollution and statutory obligation deficiencies; and
4. Health & safety plans which address immediate worker safety issues.

The recommendations define for the decision maker:

1. The justifications/reasons for steps, programs, upgrades, mitigation and action plans. The recommendations are intended to be prescriptive with best engineering judgement and detailed documentation of the achievable reductions to air, water and solid wastes;

[38] See June 21, 2017 Deposition of Jeffery Zelms, P. 288, L. 17. P. 302, L. 3.; State of Missouri, et al. v. The Doe Run Resources Company, Case No. 07JE-CC0052, Consent Judgement, Final May 21, 2007. EPA approved the Missouri SIP containing control measures to bring the Herculaneum area into attainment with the 1978 lead NAAQS. Consent Judgment Modification 07JE-CC00552; Doe Run Herculaneum, MO. The state remains obligated to submit a SIP to attain the 2008 lead NAAQS.

2. The estimated manpower requirements to implement these;
3. The estimated time needed to implement the recommendations;
4. The costs and savings;
5. The basis for all calculations, analyses, assumptions and other information which support the findings and recommendations. Good practices include detailed documentation because decision makers often demand peer reviews for large transactions.

Once a decision is made to move forward with the transaction, the buyer has a duty to act on the knowledge it obtains from performing due diligence in order to ensure that its operations do not harm the public and do not operate without meeting statutory obligations. Failure to meet this duty is tantamount to irresponsible behavior that places the public in harm's way.

### 6.1.2 Defendants' Due Diligence

The La Oroya smelter complex was a large investment involving an aging and complex industrial facility. The level of this investment is comparable to some privatization projects I worked on as a member of technical and business teams performing certain aspects of due diligence.

At the time of purchase, the Defendants agreed to the following terms as part of the transaction based on the PAMA[39]:

1. To implement modern technology to change operating processes that would improve the competitiveness of the facility (i.e., improve financial performance) and improve the environmental performance of the complex. A primary focus on the environmental side (for air pollution) was to reduce the $SO_2$ emissions from the Main Stack through sulfuric acid recovery with an investment of $141 million.

2. Defendants further agreed to implement an Environmental Impact Program (EIP) at an additional $129.1 million. This part of sales agreement was aimed at modernizing the complex to not only improve productivity but improve environmental performance.

Combined these investments (essentially the sales price) added up to $270.1 million. Both the seller and buyer agreed that the modernizations and improvements for environmental performance would begin in 1997 and reach completion by 2006.

It is important to recognize that because of the age, condition and past operating practices, the environmental liabilities of this facility were formidable and multi-media. The EIP as well as modernization aspects addressed water and solid waste in addition to air pollution.

In the PAMA, Centromin (seller) laid out detailed environmental action and mitigation plans with shared responsibilities between itself and the Defendants for water and solid waste aspects; but no such plans to address the air pollution were included. Only a general commitment exists in the original agreement to improve air quality by first addressing $SO_2$ emissions from the Main

[39] DRPE-0002133915, PAMA, Jan. 1997

Stack. Because there were no prescriptive action plans, remedies, or mitigation plans to address air pollution issues from the complex, the onus was left on the buyer to assess these prior to deciding to purchase and operate the facility by performing its own due diligence.

The Defendants performed due diligence which included gathering intelligence on air pollution but then heavily discounted information that was critical to operating the complex safely. They did not use their knowledge to devise plans to address air pollution over a reasonable time. I found no evidence that the Defendants considered the efforts needed to reduce air pollution to achieve safe air quality levels prior to and after purchase. They only acknowledged that some ill-defined level of effort would be needed to reduce pollution. See Vornberg who wrote in 1997 "… we indicated that Doe Run has already identified a number of technical modifications that might be desirable. These include an alternate approach to meeting the 83% sulfur removal standard maintaining the existing lead smelting technology… As such, we anticipate preparing a PAMA modification request within the first one or two years of operation… While we do not seek approval of these modifications, we would appreciate confirmation that our understanding is correct that the law and MEM policy will allow a concession holder to propose such a modification."[40] His statements show that there was no forward planning or consideration to address harmful air pollution and that there were no priorities established. Defendants did not begin to address air pollution until about 6 or more years after purchase. Their failure to act on the knowledge acquired from fact finding efforts in a timely manner caused the public including Plaintiffs to be subjected to prolonged exposures to harmful air pollution.

- The Defendants sent corporate representatives down to tour the facility and surrounding community.
- Representatives were given reports that constitute environmental audits which they relied on for fact finding purposes.
- They had discussions with the Government of Peru concerning statutory obligations and the PAMA.[41]

No records have been identified that support that the Defendants used the knowledge gained to prepare and consider environmental action and mitigation plans. No reasonable programs or projects were undertaken to reduce air emissions and improve air quality until pressure from the Government of Peru was applied 6 years later, and even then there were open-ended compliance schedules which allowed unsafe air quality levels to persist over the entire period of ownership and operation of the complex. The following summarizes information Defendants acquired prior to purchase and failed to address in a timely manner:

1. The air pollution controls were decades old, inefficient and based on outdated technologies. See for example on page DRRC-00077620 of the Knight Piesold report

[40] DRRC-00087801

[41] Renco's corporate representative K. Buckley provided a sworn statement in which he indicated that the company had inspected and performed due diligence including examination of environmental issues of the smelter prior to and at the time of acquisition. Buckley testified that "In August 1997, shortly after receiving notice from Peru that we were the winning bidders for the La Oroya Complex, Renco and Doe Run Resources (which together formed the Renco Consortium) sent me to Peru … in order to perform due diligence on the La Oroya Complex." - Buckley, K., Witness Statement, Feb. 10, 2014 (RENCOGRP-015317)



EXHIBIT 34

where it is reported that the main pollution control (Central Cottrell) for the smelter complex had been installed back in 1971;

   a. Pollution controls needed to be inventoried, prioritized and placed on a formalized replacement schedule. I could not locate any records over the entire history of ownership that support this was done.

2. Little to no maintenance had been performed on air pollution controls and many were in a state of disrepair;[42]
3. Many sources operated without any air pollution controls and freely discharged toxic pollutants to the atmosphere;
   a. Many point sources were identified under the PAMA,[43] but Defendants had established no plans to address these until years after purchase.
   b. There is no evidence to show that these sources had stack tests and hence the emissions were not known both at time of purchase and throughout the period of ownership.
4. Particulate matter emissions from stacks and fugitive emission sources were enriched with lead, cadmium and arsenic;
5. The $SO_2$ emissions from the Main Stack were so large that the local air quality exceeded levels that are considered unsafe by international and U.S. standards;
6. Fugitive air emissions were not controlled and understood to have a greater impact on causing poor air quality than the stack emissions. Major building operations such as the sinter plant, dross plant, copper converter aisle and lead smelting furnaces released toxic fumes into workrooms that were then released directly through openings in the roofs of buildings, where they were transported by atmospheric winds into the community;
7. The facility had never prepared a facility-wide emissions inventory and hence there was no baseline of the air emissions from the smelter and refinery. Such information is critical to defining mitigation strategies to reduce air emissions in order to be protective of human health and in meeting compliance schedules;
8. There were no reliable air monitors in the community;
9. The existing air quality standards of Peru were both in draft form and below levels considered to be safe by the U.S.EPA, the World Health Organization, the European Community and a number of Latin and South American countries;
10. The streets of La Oroya and La Oroya Antigua were covered with particulate matter containing lead, arsenic and cadmium resulting from the air emissions from the complex;
11. The stack discharges were many orders of magnitude above other lead smelters operated throughout the world. The Defendants knew or should have known that more likely than not the La Oroya smelter was the most polluting lead smelter in the world;
12. Air dispersion modeling showed than the residential communities had insufficient set-backs from the industrial operations and that the smelter could not be operated as it had in the past without endangering human health;
13. Immediate major investments would be needed to reduce harmful air emissions to within safe limits for the public.

---

[42] RENCOGRP-015317 - Witness Statement of Kenneth Buckley, February 10, 2014. Kenneth Buckley stated that equipment such as "baghouses, which are critical for collecting the dust emitted by the smelter, were all in terrible shape and had massive holes" at the time the smelter complex was purchased.
[43] DRPE-0002133915, PAMA, Jan. 1997

All of these facts were uncovered by the Defendants through documents they had at the time and from corporate representatives who inspected the complex and surrounding community.

Knight Piesold published a report titled "Environmental Evaluation of the La Oroya Metallurgical Complex" in September 1996.[44] The study is referenced in the PAMA and reports:

- "…operational modifications will be required to promote continued operations at La Oroya in compliance with Peruvian and generally accepted environmental standards" – p. DRRC-00077589; p. DRRC-00077592.

- "Airborne emissions of sulphur-dioxide ($SO_2$), metals, and PM10 particulate matter are high and exceed generally accepted international standards." – p. DRRC-00077590. On p. DRRC-00077618 the report states "…ambient concentrations in the region around La Oroya are exceedingly high. Nearly all measured pollutant levels are well above the standards set by the World Bank and the United States Environmental Protection Agency (U.S.EPA), as well as proposed Peruvian standards."

- The Defendants understood that the plant posed a significant health risk at the time it contemplated purchase both based on the statement noted immediately above and from statements made on page DRRC-00077618 - "Due to the large size and complexity of the La Oroya facility, its age, and location, there are significant air quality concerns for continuing operations at La Oroya. These issues relate both to $SO_2$ discharges and elevated metals concentrations and deposition rates."

- The Defendants understood that substantial investments would be needed in order to operate the plant in a manner protective of human health - "remedial actions to bring the facility into compliance with proposed Peruvian standards and generally accepted world standards would involve a significant capital expenditure." – p. DRRC-00077590.

- The Defendants understood the pathways of community exposure and that particulate matter deposition from the smelter created an unsustainable environment for humans - "Airborne emissions have impacted the soils surrounding the facility. Metal concentrations, in some areas, exceed those that are generally accepted for agricultural and residential areas. Large areas surrounding the project site have characteristics of soil burn out which may decrease vegetation levels due to the defoliation action of the $SO_2$ emissions and acid rain." – p. DRRC-00077590.

- Defendants understood the high public health risk because the smelter complex had inadequate controls - "… the potential for emissions of air pollutants from the La Oroya facility is high. These pollutants include particulate matter, metals and sulfur dioxide ($SO_2$) which could affect the health of the population… $SO_2$ emissions are reduced by only a small fraction through production of limited quantities of sulfuric acid." – p. DRRC-00077607.

[44] DRRC-00077581 - Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, Final Report, Sept. 1996

- The Defendants should have understood that the La Oroya smelter complex was more likely than not the worst polluting lead smelter in the world and certainly worse than all lead smelters in the United States combined. They had operated lead smelters in the U.S. and were a major industry force in the smelting industry according to their literature.[45] The Knight Piesold report states "The main stack at La Oroya currently emits on the order of 815 tons per day of $SO_2$. Dust emissions total approximately 10 tons per day, consisting of roughly 2.5 tons of lead, 1.4 tons of arsenic, 0.8 tons of zinc, and smaller quantities of other metals." – p. DRRC-00077607.
  - At the time the Defendants inspected the La Oroya complex, there were three major lead smelters in the United States: Doe Run - Herculaneum, MO (owned and operated by the Defendants), ASARCO/Doe Run - Glover, MO,[46] and ASARCO - East Helena, MT. Exhibit 157A is a table which reports the production capacities of each of these facilities along with the La Oroya smelter. The La Oroya complex ranked as the 2nd largest lead smelter out of four and the Defendants' Herculaneum plant was the largest.
  - Exhibits 157B through D show histograms which compare the reported facility-wide (fugitive plus stack) air emissions for arsenic, cadmium and lead against the discharges from La Oroya's Main Stack, respectively. The facility-wide air discharges from the U.S. facilities were dwarf compared to the La Oroya Main Stack, not just at the time, but over the Defendants' entire ownership and operating history with the exception of the last few months of operation when production levels were reduced, and operations abandoned (note, the ASARCO - East Helena plant ceased operations 2002, ASARCO/Doe Run - Glover, MO ceased production circa 2004, and the Doe Run - Herculaneum ceased operations in 2013[47]).
  - Exhibit 157E shows two charts which compare the total U.S. facility-wide air emissions and the air discharges from the La Oroya smelter's Main Stack through 1997. When the Defendants toured the facility and decided to purchase the complex, the Main Stack alone was discharging 6.3 times more lead to the atmosphere than all the major lead smelters in the United States. The Main Stack was discharging more than 33 times more arsenic to the atmosphere that all the major lead smelters in the United States, which included plants operated by the Defendants.
  - When the Defendants toured the facility in 1997 there was 10 years of TRI (Toxics Release Inventory) records plus years of operating experience with their U.S. smelters. Defendants knew or should have known how polluting and harmful the air emissions from the La Oroya plant were and further recognized that any decision to purchase the facility would require placing high priority on reducing

[45] The History of Doe Run, a Natural Resources Company. AOA et al - EDMO - Doc# 871-2 - Ex B - Doe Run _ Who We Are, DRRC-00073012 - Renco Group Corporate Portfolio
[46] Defendants purchased the ASARCO Glover plant in 1998. The History of Doe Run, a Natural Resources Company. AOA et al - EDMO - Doc# 871-2 - Ex B - Doe Run _ Who We Are
[47]https://www.thenewamerican.com/usnews/constitution/item/16881-epa-closure-of-last-lead-smelting-plant-to-impact-ammunition-production

air pollution. The Main Stack was only one source of the air pollution; fugitive emissions also had a significant impact to air quality.

- The Defendants were advised that emissions from fugitive sources and uncontrolled secondary stacks exceeded those of the main stack - "Though the main stack is the largest source of air emissions, significant quantities of the same pollutants are emitted from numerous smaller stacks, as well as from many fugitive (non-stack) emission sources." – p. DRRC-00077607. See also p. DRRC-00077608 "… the fraction of total dust and metals released from low altitude sources as compared to the main stack is probably larger for particulate matter than for $SO_2$."

- See also page DRRC-00077619-20 – "Though the largest quantity of emissions are released from the main chimney, significant amounts of both $SO_2$ and metals are emitted at lower levels within the plant and from shorter stacks. It is important to recognize that these low altitude emissions probably affect ambient concentrations in the local community and on the plant site more than the main stack. Thus, it is emphasized that emission reduction cannot be restricted to the main stack. In fact, the greatest incremental improvement to ground-level air quality is likely to be achieved initially by control of some of the larger sources of low altitude emissions."

- The Defendants understood that there was no quantitative baseline for the air emissions. Unlike other lead smelters operated in other parts of the world including smelters they operated in the U.S., there were no emissions inventories and no or few stack tests had been conducted that quantified the air discharges through actual measurements - "Though some stack testing has been carried out in the smaller stacks, no definitive data exist from which to quantify actual total facility emissions." – p. DRRC-00077608.

- Defendants understood that the air pollution regulations in Peru were new and evolving, and further, that they were not protective of human health at the time. They further understood from experience operating lead smelters in the United States that statutory obligations become more stringent over time as more knowledge is acquired. On pages DRRC-00077613-14 of the Knight Piesold report it states: "The Peruvian government is currently in the process of promulgating new environmental laws and regulations for the mining and metallurgical sector." On pages DRRC-00077615-16 it states: "Current requirements for air pollution analysis and control in mining and metallurgical processing… tend to be general in nature, rather than setting forth quantitative limits or standards… the proposed Peruvian $SO_2$ standards are generally higher (less restrictive) than $SO_2$ standards in most other nations."

- When the Defendants reviewed the Knight Piesold report, they learned that an air modeling study of the main stack emissions had been performed. The results of the study showed the maximum annual concentrations of $SO_2$ and PM10 to be on the order of 7,000 $\mu g/m^3$ and 175 $\mu g/m^3$, respectively (p. DRRC-00077619). The report noted these concentrations to be very high.



EXHIBIT 34

  - These $SO_2$ concentration far exceeded the levels considered safe not only for Peru, but for Germany, Thailand, the World Bank, United States, Kuwait, China, Australia, Poland, Canada and Mexico (see DRRC-00077670 and Exhibit 12).
  - The PM10 levels far exceeded levels considered to be safe in the United States (the 1997 U.S. NAAQS for PM2.5 (24 hours) is 65 $\mu g/m^3$ and for PM10 (24-hours) is 150 $\mu g/m^3$ not to be exceeded more than once per year on average over 3 years[48]).
  - The Defendants should have recognized from the study that should the facility continue to operate in the manner in which it was that the neighboring community was too close to the operations and that the air quality was unsafe.

- The Defendants learned that there were unreliable air monitors placed throughout sensitive public areas and communities. "Site visits to each monitoring station… identified concerns in the areas of instrumentation siting, instrumentation maintenance, and sample analysis procedures. These concerns are directly related to data quality and usefulness. Generally, the data are adequate for estimating relative areas and times of high or low pollutant impacts, and they provide an indication of overall air quality, but they may not be adequate for assessing compliance with any specific air standard or determining a precise maximum impact level. The meteorological data collection sites probably do not provide a complete definition of regional dispersion meteorology." – page DRRC-00077682.

- The Defendants understood that they had an obligation and duty under the PAMA it was required to prepare and negotiate with the Government of Peru to "identify and quantify emissions of particulate matter and gases to the atmosphere, and describe controls and processes used for reduction of emissions." - p. DRRC-00077615.

- Defendants understood that they had a long lead time to upgrade the smelter complex and bring it into compliance. Page DRRC-00077621 states: "Based on the evaluations conducted for this report, it appears that achievement of this level of control at La Oroya cannot be expected except by multiple process changes and/or major modifications to much of the smelter. Such changes or modifications will be required over a ten-year period."
  - The historical reconstruction of the Defendants' practices show that instead of placing priority on air pollution management and steadily reducing the air pollution over the 10-year period they agreed upon to bring the facility into compliance, they delayed actions, never reducing air quality to within safe limits.

Defendants knew prior to purchase what uncontrolled pollution sources existed at the smelter. The PAMA[49] identifies about 90 uncontrolled sources which are listed in Table 3. Table 3 reports 44 uncontrolled air discharge sources containing lead and arsenic, 20 uncontrolled sources of $SO_2$, and there are 2 Cadmium Plants with an undisclosed number of release points.

---

[48] https://www.epa.gov/pm-pollution/table-historical-particulate-matter-pm-national-ambient-air-quality-standards-naaqs
[49] DRPE-0002133915, PAMA, Jan. 1997

Prior to purchase the Defendants sent designated representatives down to the La Oroya smelter complex.[50] They toured the facility and observed the deteriorated conditions of pollution controls.

- When their representatives walked through the facility in 1997 it is hard to imagine that they did not see massive plumes of toxic air emissions bellowing from the copper converter section as shown by the images in Exhibit 32. The photo images are date stamped 2008. Eleven years after the purchase these images show massive plumes of uncontrolled air emissions comprised of fine particulate matter, lead, arsenic cadmium and $SO_2$. See also Exhibit 38 which shows massive plume releases from the copper converter section and lead smelting section of the plant. These photos are date stamped 2008 – eleven years after the plant was purchased.

- When their representatives walked through the smelter's dross plant and sections of the copper circuit in 1997 it is hard to imagine that they did not observe hot plumes of air released into workrooms from roasters and furnaces that rose to the open roofs of the buildings where they freely communicated with the outside atmosphere as shown by the photos in Exhibits 34 through 36. The photographs shown in these exhibits are date stamped 2008. Clearly over the 10-year period it was afforded under the PAMA to modernize the plant, the Defendants did little to nothing to control these harmful air pollutants.

- When their representatives walked or drove through the plant in 1997 it's hard to imagine that they did not pass by a major section of the complex – the sinter plant. Exhibit 40 shows a photo of the outside of this building. This is a building operation that has no walls. A massive cloud of air emissions containing fine particulate matter laced with lead, arsenic and cadmium along with $SO_2$ are shown in the photo freely communicating with the atmosphere. The photo is date stamped 2008. Clearly over the 10-year period it was afforded under the PAMA to modernize the plant, the Defendants did little to control these harmful fugitive air pollutants.

- When their representatives toured the plant in 1997 it's is hard to imagine that they did not inspect the ore handling operations as these are critical to the feed section of the smelter. They would have seen the operations shown by the photos in Exhibit 41 which shows ore and concentrate dusts being emitted to the outside because there are no controls and numerous openings allowing emissions to freely communicate with the outside. The ores and concentrate dust particles contain lead, arsenic and cadmium. The photos in this exhibit are date stamped 2008. See also the photos in Exhibits 42. Over the 10-year period it was afforded under the PAMA to modernize the plant, the Defendants appear to have done little to nothing to control these harmful fugitive air pollutants.

[50] "In August 1997, shortly after receiving notice from Peru that we were the winning bidders for the La Oroya Complex, Renco and Doe Run Resources (which together formed the Renco Consortium) sent me to Peru with several other representatives of the Renco Consortium in order to perform due diligence on the La Oroya Complex." - Buckley, K., Witness Statement, Feb. 10, 2014 (RENCOGRP-015317)

- When their representatives toured the facility in 1997, logically they did their homework and were aware of the large number of uncontrolled pollution sources from numerous stacks that had never been stack tested (see Table 3 from the PAMA). It is hard to imagine that the stack plumes shown in Exhibits 45, 47, 78, 79, 86, 88-116, 126, and 130 would not have caught their attention and become a focus to consider immediate actions to reduce the air emissions through stack testing and investing in air pollution controls. These photos span from 1999 through 2009 and show no noticeable reductions in air emissions.

- When their representatives toured the facility in 1997, it is hard to imagine that they did not get a sense of scale of how polluting the plant was. The Knight Piesold report states: "The main stack at La Oroya currently emits on the order of 815 tons per day of $SO_2$. Dust emissions total approximately 10 tons per day, consisting of roughly 2.5 tons of lead, 1.4 tons of arsenic, 0.8 tons of zinc, and smaller quantities of other metals." – p. DRRC-00077607. See Exhibits 43, 46, 47, 48, and 51 for a sense of scale of the massive toxic plume discharge from this single source.

- When their representatives toured the facility in 1997, it is hard to imagine that they did not gain appreciation of how harmful and extensive the fugitive emissions from the smelter were. The Knight Piesold report states on DRRC-00077619-20 – "Though the largest quantity of emissions are released from the main chimney, significant amounts of both $SO_2$ and metals are emitted at lower levels within the plant and from shorter stacks. **It is important to recognize that these low altitude emissions probably affect ambient concentrations in the local community and on the plant site more than the main stack."** Photos of fugitive sources are shown in Exhibits 38, 40, 41, 44, left image of Exhibit 45, 56, 63, 65, 67, 68, 69, 70, 72, 74, 79, 82, 83, 84, 87, 93, 94, 95, 98, 107, 117, 120, 123, and 131. A number of these photos are date stamped 2008/2009. Air pollution management at the smelter was not a priority for the Defendants.

- The air emissions from the refinery were also not their concern – see Exhibit 126 which shows high opacity plume discharges from building vents. I could not locate any records on air emissions inventories, stack tests, lists of pollution controls, estimates of air emissions, maintenance of air pollution controls, incident reports and other relevant records. The absence of these records indicates no attention was given to pollution control.

Table 3. Uncontrolled emission sources identified in PAMA.[51]

| Source of Emission | Emission Time Days/Year | Emission Height meter | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| **PREPARATION PLANT** | | | | | |
| • Emissions from mixer for dust manipulation. | 365 | N.D. | Dust of unaltered sulfides | Cool air. | Gas washer. Forced draft. |
| • Emissions from 7 hoppers that collect and store Cottrell dust. | 365 | N.D. | Dust of roasted sulfides coming from Cottrells. | Air. | Bag filters. Forced draft. |
| • Emissions from 7 hoppers that collect and store Cottrell dust. | 365 | N.D. | Dust of roasted sulfides. | Air. | Bag filters. Forced draft. |
| **PLANT OF REVEBERATION COPPER FURNACES** | | | | | |
| • Emissions from entrance to black filter scrubbings from slag and slag channel of Oxy-fuel reverb furnace | 365 | N.D. | Scrub and slag dust. | Acid Gases of $SO_2$ & $H_2S$. | None. Forced draft. |
| **BLISTER COPPER RETENTION FURNACE** | | | | | |
| • Water vapor emissions generated from copper anode cooling, machine No. 1 mol. | 365 | N.D. | Blister Copper dust. | Water vapor. | None. Natural draft. |
| • Water vapor emissions generated from copper anode cooling, machine No. 1 mol. | 365 | N.D. | Blister Copper dust. | Water vapor. | None. Natural draft. |
| **AGGLOMERATION PLANT** | | | | | |
| • Emissions from Agglomeration machine and Crushing area. | 365 | N.D. | Pre-roasted and non-roasted sulfide dust. | | Bag filters. Forced draft. |
| • Emissions from transportation system of agglomerated product and fine and thick sinter hoppers. | 365 | N.D. | Sinter dust (roasted sulfides). | Acid diluted gases. $SO_2$. | Bag filters. Forced draft. |
| • Emissions from discharge of sinter fines to feeding tanks 3A; 4A; 5A y 6A. | 365 | N.D. | Sinter dust (roasted sulfides). | Air. | Bag filters. Forced draft. |
| I. Emissions from discharge of dust pump. | 365 | N.D. | Sinter dust (roasted sulfides). | Air. | Bag filler. Forced draft. |
| II. Emissions from FX/203 belt spill over as mn-off and from 2165 transporter that conducts sinter 2200 y 2230 hoppers. | 365 | N.D. | Sinter dust (roasted sulfides). | Air. | Gas washer. Forced draft. |
| III. Emissions from 103/104 belts transporting fine sinter. | 365 | N.D. | Sinter dust (roasted sulfides). | Air. | Gas washer. Forced draft. |
| IV. Emissions from transportation belt (2221) and discharge belt (2202) of thick sinter and from discharge belt of sinter fines (2233). | 365 | N.D. | Sinter dust (roasted sulfides). | Air. | Gas washer. Forced draft |
| **LEAD FURNACES PLANT** | | | | | |
| V. Emissions from slag channels of low-blast furnace. | 365 | 19 | Slag dust. | Water vapor. $H_2S$. | None. Forced draft. |
| VI. Combustion gas emission from Pb melting pan at Melting and Molding section. | 365 | N.D. | None. | Combustion gases.$CO_2$. | None. Natural draft. |

[51] DRPE-0002133915 – Table 4.1.1/10, PAMA, Jan. 1997



EXHIBIT 34

| Source of Emission | Emission Time | Emission Height | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| | Days/Year | meter | | | |
| **LEAD FOAMING PLANT** | | | | | |
| VII. Combustion gas emission from pan No. 1 of lead foaming. | 365 | N.D. | None. | Combustion gases.$CO_2$. | None. Natural draft. |
| VIII. Combustion gas emission from pan No. 2 of lead foaming. | 365 | N.D. | None. | Combustion gases.$CO_2$. | None. Natural draft. |
| IX. Combustion gas emission from pan No. 3 of lead foaming. | 365 | N.D. | None. | Combustion gases.$CO_2$. | None. Natural draft. |
| X. Combustion gas emission from pan No. 4 of lead foaming. | 365 | N.D. | None. | Combustion gases.$CO_2$. | None. Natural draft. |
| XI. Emissions from entrance to filter Pb, scrub and speiss of Reverb Furnace for Treatment of Lead Foaming. | 365 | N.D. | Lead dust, speiss. | CO2 gases. | None. Forced draft. |
| XII. Emissions of speiss granulation equipment of Reverb Furnace for Treatment of Lead Foaming. | 365 | N.D. | None. | Water vapors. | None. Natural draft. |
| **COKE PLANT** | | | | | |
| XII. Emission from tower of water elimination from tar. | 365 | N.D. | None. | Water vapor, tar, phenols. | None. Natural draft. |
| **PLANT OF FLUID BED ZN ROASTERS** | | | | | |
| XIII. Emission from collection hopper of roasted pellets. Reactor No. 1. | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.). | Acid gases. $SO_2$. | None. Natural draft. |
| XIV. Emission from collection hopper of roasted pellets. Reactor No. 2. | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.). | Acid gases. $SO_2$. | None. Natural draft. |
| XV. Emission from collection hopper of roasted pellets. Reactor No. 3. | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.). | Acid gases. $SO_2$. | None. Natural draft. |
| XVI. Emission from mechanical transportation of dry green pellets. | 365 | N.D. | Dust of Zn concentrates. | Air. | Bag filter. Natural draft. |
| XVII. Emission from lime-ash transportation (8B belts, cooler, redler7B 1/2). | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.) | Diluted acid gases. $SO_2$. | None. Forced draft. |
| **PLANT OF TURBULENT BED ZN ROASTERS AND OF SULFURIC ACID** | | | | | |
| XVIII. Emission from transportation of recovered dust of roaster fumes. | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.). | Air. | None. Forced draft. |
| XIX. Emission from neutral leaching tank of lime-ash in tank No. 1. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XX. Emission from neutral leaching tank of lime-ash in tank No. 2. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXI. Emission from neutral leaching tank of lime-ash in tank No. 3. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXII. Emission from neutral leaching tank of lime-ash in tank No. 4. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |



EXHIBIT 34

| Source of Emission | Emission Time | Emission Height | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| | Days/Year | meter | | | |
| XXIII. Emission of ferrite tanks 1 and 2. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXIV. Emission from pellets mills and fine and thick classifiers. Air transportation system of lime-ash. | 365 | N.D. | Lime-ash dust (oxides of Zn, Pb, Fe, etc.). | Acids vapors ($H_2SO_4$; Zn $SO_4$). | Bag filters. Forced draft. |
| **PURIFICATION AND ELECTROWINNING PLANT (REFINERY)** | | | | | |
| XXV. Emissions generated in purification tank No. 1. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXVI. Emissions generated in purification tank No. 2. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXVII. Emissions generated in purification tank No. 3. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXVIII. Emissions generated in purification tank No. 4. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXIX. Emissions generated in purification tank No. 5. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXX. Emissions generated in purification tank No. 6. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXXI. Emissions generated in purification tank No. 7. | 365 | N.D. | None. | Acids vapors ($H_2SO_4$; Zn $SO_4$). | None. Natural draft. |
| XXXII. Emissions in Zn cathode melting at Ajax Furnace. | 365 | N.D. | Zn Particles. | Combustion gas. $CO_2$. | None. Forced draft. |
| XXXIII. Emissions generated from cooling of Zn bars in the molding machine. | 365 | N.D. | None. | Water vapor. | None. Natural draft. |
| XXXIV. Emissions from grinding and classification of Zn foams. | 365 | N.D. | Dust and Zn particles. | Air. | |
| XXXV. Emissions from combustion of Morgan Furnace of "scrap" melting of Zn cathodes. | 365 | N.D. | None. | Combustion gas. $CO_2$. | None. Natural draft. |
| **Zn DUST PLANT** | | | | | |
| XXXVI. Emissions from combustion furnace of Zn volatilization retort No. 1. | 365 | N.D. | None. | Combustion gas. | None. Natural draft. |
| XXXVII. Emissions from combustion furnace of Zn volatilization retort No. 2. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |



EXHIBIT 34

| Source of Emission | Emission Time | Emission Height | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| | Days/Year | meter | | | |
| XXXVIII. Emissions from combustion furnace of Zn volatilization retort No. 3. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| XXXIX. Emissions from combustion furnace of Zn volatilization retort No. 4. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| XL. Emissions in leaching tank of lime-ash in tank No. 4. | 365 | N.D. | None. | Acids vapors ($H_2S0_4$; Zn $SO_4$). | None. Natural draft. |
| XLI. Emissions from combustion furnace of Zn volatilization retort No. 5. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| XLII. Emissions from combustion furnace of Zn volatilization retort No. 6. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| **CADMIUM PLANT No. 1** | | | | | |
| XLII1. Emissions combustion chamber of cadmium distillation retort No. 2. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| XLIV. Emissions from air of cadmium weighting. | 365 | N.D. | None. | Uncontrolled emission of combustion gases | None. Forced draft. |
| XLV. Emissions from leaching and purification cadmium tanks. | 365 | N.D. | None. | Acid vapors. | None. Forced draft. |
| XLVI. Emissions from the 5 cementation tanks and the 3 recovery cells. | 365 | N.D. | None | Acid vapors (risk of arsenamine). | None. Forced draft. |
| **CADMIUM PLANT No. 2** | | | | | |
| XLVII. Emissions from 12 precipitation cells of cadmium sponge. | 365 | N.D. | None. | Acid vapors. | None. Forced draft. |
| XLVIII. Emissions from 2 tanks of leaching, 1 of circulation and 1 of testing. | 365 | N.D. | None. | Acid vapors. | None. Forced draft. |
| XLIX. Emissions of ferrous solution tank. | 365 | N.D. | None. | Acid vapors. | None. Natural draft. |
| **PLANT FOR ZINC LEACHING WASTE TREATMENT** | | | | | |
| L. Emissions from transportation of waste "cake" and waste drier. | 365 | N.D. | Mineral dust (Zn ferrite) | Water vapor. | None. Forced draft. |
| LI. Combustion gas emission from waste drier. | 365 | N.D. | None. | Combustion gases. $CO_2$. Air. | None. Forced draft. |
| LII. Emissions from bucket mechanical transportation, dry waste and anthracite silos. | 365 | N.D. | Mineral dust (Zn ferrite). | | Dust multi-cyclone. Forced draft. |
| LIII. Emissions Kiln furnace. | 365 | N.D. | Mineral dust (Zn oxides). | Combustion gases. | Bag filter. Forced draft. |
| LIV. Emissions in magnetic separation. | 365 | N.D. | Mineral dust (Fe and oxides). | Air. | None. Forced draft. |
| LV. Emissions from neutral leaching tanks, acid leaching, indium precipitation and neutralization tanks. | 365 | N.D. | None. | Acid vapors. | None. Forced draft. |



EXHIBIT 34

| Source of Emission | Emission Time | Emission Height | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| | Days/Year | meter | | | |
| **INDIUM PLANT** | | | | | |
| LVI. Emissions from 2 indium crucibles, extraction cell by solvents, 4 cementation indium cells and 2 storage tanks (1 of HCl and one organic). | 365 | N.D. | None. | Acid vapors. | None. Forced draft. |
| LVI1. Emissions from acid washing tank, acid leaching tank, alkaline leaching tank, 2 auxiliary tanks, Soln dump, Soln storage tank, "Pregnant", ppn tank, HCl, 1 of ppn, NaOH, among others. | 365 | N.D. | None. | Combustion gas. | None. Natural draft. |
| **ANODIC WASTE PLANT** | | | | | |
| LVII1. Fume emissions generated during Sb and Bi oxidization of S in Converters No. 1, No. 2. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | Bag filter. Forced draft. |
| LIX. Fume emissions generated during Sb and Bi oxidation of S in Conveners No. 3, No. 4. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | Bag filter. Forced draft. |
| LX. Fume emissions generated during Bi reduction in Reduction Reverb Furnace. | 365 | N.D. | Scarce metallic dust. | Combustion gases. | Bag filter. Forced draft. |
| LXI. Emissions in furnace of cups No. 1, 2, and 3. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | Trombones, gas washer and precipitation. Electrostatic, humid. |
| LXII. Emissions from filter entrance of cups No. 1, 2 and 3. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | Bag filter. Forced draft. |
| LXIII. Emissions Bi pans No. 3 and 4. | 365 | N.D | Scarce dust (metallic oxide) | Chloride gases. | Bag filter. Forced draft. |
| LXIV. Emissions in combustion chamber of bismuth refining pan No. 1. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXV. Emissions in combustion chamber of bismuth refining pan No. 2. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXVI. Emissions in combustion chamber of bismuth refining pan No. 3. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXVII. Emissions in combustion chamber of bismuth refining pan No. 4. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXVIII. Emissions in combustion chamber of bismuth refining pan No. 5. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXIX. Emissions in combustion chamber of bismuth refining pan No. 6. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | None. Natural draft. |
| LXX. Emissions in tellurium melting. | 365 | N.D. | Scarce dust (metallic oxide) | Combustion gases. | Gas scrubber. Forced draft. |
| LXXI. Emissions in selenium solution precipitation and purification tank No. 1. | 365 | N.D. | None. | Acid vapors | None. Natural draft. |
| LXXII. Emissions in selenium solution precipitation and | 365 | N.D. | None. | Acid vapors. | None. Natural |



EXHIBIT 34

| Source of Emission | Emission Time | Emission Height | Type of Solids | Type of Gases | Treatment Equipment |
|---|---|---|---|---|---|
| | Days/Year | meter | | | |
| purification tank No. 2. | | | | | draft. |
| **SILVER REFINERY PLANT** | | | | | |
| LXXII1. Emissions of partition pan No. 1 and cementation silver tank. | 365 | N.D. | None. | Acid vapors. $NO_3$. | None. Natural draft. |
| LXXIV. Emissions of partition pan No. 2 and cementation silver tank. | 365 | N.D. | None. | Acid vapors. $N0_3$. | None. Natural draft. |
| LXXV. Emissions of combustion chambers of the 2 partition pans. | 365 | N.D. | None. | Combustion gases. | None. Natural draft. |
| LXXVI. Office and dressing-room ventilation. | 365 | N.D. | None. | Environmental air. | None. Natural draft. |
| LXXVII. Ventilation of skylights by 4 ventilators. | 365 | N.D. | None. | Environmental air. | None. Forced draft. |
| LXXVIII. Ventilation of pan room by 2 ventilators. | 365 | N.D. | None. | Environmental air. | None. Forced draft. |
| LXXIX. Ventilation of machine house by 1 ventilator. | 365 | N.D. | None. | Environmental air. | None. Forced draft. |
| LXXX. Ventilation of room 1 of rectifiers by 1 ventilator. | 365 | N.D. | None. | Environmental air. | None. Forced draft. |



EXHIBIT 34

Defendants' executives have testified regarding the due diligence performed prior to purchasing the complex.

- Kenneth Buckley, who served as President and General Manager of the La Oroya Complex from September 1997 through September 2003 testified that he went to Peru several times performing due diligence and to negotiate the terms of the sale agreement. He noted that during his several visits to La Oroya prior to the purchase of the facility that "it was obvious to me and others who were with me (and it would have been obvious to anyone with experience in smelting operations) that the town was highly contaminated."[52]

- Dennis Sadlowski, Renco's Vice President of Law, testified that Defendants understood at the time of purchase "that the homes and streets near the Complex were filthy and covered with dust and smelter outfall…"[53]

It is reasonable to conclude that these representatives reviewed the same records I have and that they observed firsthand the magnitude and seriousness of the air pollution from the complex. It is reasonable for me to conclude that the information they gathered was conveyed to decision makers that approved the purchase the facility. Defendants did not purchase an unknown entity. They knew they were acquiring a highly polluting industrial complex that had decades-old operating equipment in poor shape and ineffective pollution controls that were not simply outdated compared to the standards of the day, but in many instances were not functional. It is reasonable to conclude that Defendants understood clearly that the facility was a serious threat to public health.

They had performed due diligence which was fact finding only. They failed to use that knowledge to reduce air pollution and harm. They were in fact provided with a recommended path forward to address the air emissions – Knights Piesold recommended that the buyer conduct a comprehensive study of the emissions of the entire La Oroya complex. "The survey should estimate pollutant emissions from all operations, including fugitive sources, and should then detail potential methods and costs for controlling each of these emissions."[54] Defendants understood in 1996 that a detailed survey of all emissions should be performed before facility improvements should be considered. There are no records that Defendants considered the level of effort, time and costs to develop this critical baseline information at the time it contemplated purchase, nor did it bother undertaking such an effort prior to 2004. Years after the acquisition, the Defendants turned attention to fugitive air emissions – in 2004 they proposed modifying the PAMA to include projects aimed at reducing fugitive emissions.[55] "When a complete emissions evaluation is available … dispersion modeling analyses will be more reliable and useful for assessing the air quality benefits to be gained by various improved controls, stack modifications, or process changes."

[52] RENCOGRP-015317 – Witness Statement of Kenneth Buckley, February 10, 2014
[53] RENCOGRP-015265 – Witness Statement of Dennis Sadlowski, February 19, 2014
[54] DRRC-00077581 – Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, 1996
[55] RENCOGRP-002468 – The PAMA for the Metallurgical Complex of La Oroya, 2004-2011 Period

As detailed more fully below, they gave low to no priority over the first half dozen years of ownership and operation to addressing air emissions, and then dragged their feet over the remaining time they operated the complex to implement piecemeal projects to reduce air emissions. As documented in Section 9, I could not identify any records produced by the Defendants which support that any of the few projects they did manage to implement reduced emissions in ways that significantly improved the air quality in La Oroya. While there are records which report the mechanical completion of certain pollution controls such as the installation of a baghouse or a scrubber that is not evidence that the Defendants reduced harmful air discharges. All equipment and controls require formal commissioning and stack testing for which no records have been found verifying actual performance.

When the Defendants performed their fact-finding mission prior to purchase, they could have prepared mitigation and environmental management plans and defined how long it would take to implement these along with costs and projected emissions reductions. This is normally what is done when applying good practices for performing due diligence. Defendants never did that neither before nor after purchase – they just "agreed" at the time of purchase to reduce emissions and bring the facility within compliance by 2006. When they failed to do so, they offered excuse after excuse as to why they were unable to do so (see Section 9). They performed due diligence to gather information but never acted on that information. They had a duty to use the knowledge they acquired to make the plant safe and prevent harm to the public.

### 6.1.3 Regulatory Due Diligence

In every assignment I undertook over the past 40 years the buyer, investor, donor agency and or lending institution required understanding of the local (in-country) environmental regulatory obligations. No rational person, investment group, corporation, lending institution or donor agency would move forward with an investment without understanding the statutory obligations under which it may conduct business. Every country throughout the world has local environmental statutory obligations that are unique. Armed with an understanding of the in-country statutory obligations and enforcement practices, the buyer understands how these differ from how business is conducted in the United States and other parts of the world. With such information the buyer knows:

1. Whether the environmental obligations and enforcement practices are comparable to their own U.S. operations;
2. Whether the environmental obligations and enforcement policies are comparable to other parts of the world;
3. Whether the environmental obligations and enforcement policies are evolving and likely to become more restrictive over time and the likelihood of when the regulatory climate might change.

A country with weak environmental statutes and enforcement presents the opportunity to act unscrupulously by conducting business by meeting only minimum statutory obligations for that country. However, when a corporation knows that the statutory requirements and enforcement practices fall below those in the United States or Europe where such practices and policies are intended to be protective of human health, their actions are irresponsible because it understands that poor environmental performance causes harm.

It is reasonable for me to conclude that the Defendants performed due diligence prior to purchase and understood the differences between regulatory requirements, practices and enforcement policies in Peru and the United States where they operated similar facilities. Over my career I have extensively published summaries of the U.S. environmental requirements and practices; have helped train and inform overseas regulatory agencies along with U.S.EPA in Ukraine, Jordan, Nigeria and some Balkan countries of the U.S. regulatory requirements and practices, and have been cited in U.S. Congressional hearings on such practices.[56] The publications cited in the footnote provide source references which support the descriptive differences between the enforcement practices of Peru and the United States at the time of the transaction.

Peru did not have a formal air permit program. In the United States, as in Europe and other parts of the world, facilities operate under a formal permit. In the U.S., a Title V permit would be applicable to a facility of the magnitude and nature of the La Oroya smelter complex. Such a permit defines the allowable or permissible air discharges of priority pollutants on a point by point basis as well as fugitive emissions, and further defines the specific air pollution controls and capture efficiencies on a source by source basis. Such a permit has prescriptive monitoring requirements including Continuous Emissions Monitoring and all such permits require regular inspection and maintenance of pollution controls. No new pollution controls or changes to a facility may legally occur without formal review by a regulatory agency and all new equipment must be verified as meeting the control levels specified in the permit at the time of commissioning. No such comparable permit system and enforcement practices existed at the time of inspection or was ever created for the facility.

In the U.S, when facilities are out of compliance, a formalized compliance schedule is defined through a Consent Order, which constitutes a legally binding agreement between the regulatory agency and the facility operator. Consent Orders in the U.S. (also the EC) are prescriptive and define specific actions, outcomes and schedules to bring the facility within compliance. See for example the Consent Order that the Defendants entered into for the Herculaneum smelter.[57] That order did not allow an ill-defined time period in which to reduce air emissions – rather it ordered the Defendants to reduce air emissions according to a time schedule in which the sources were prioritized and individually required to be in compliance by specified dates.

In the U.S. air emissions from industrial facilities are monitored, tracked and reported. Every stack, building roof vent, waste pile, road surface has a designation and facilities are required to measure or calculate the annual emission from each source using approved emission factors. These are referred to as annual emissions inventories. All point sources are placed on a scheduled stack test. The basis for air emissions estimates prepared by calculation is required to be documented (e.g., AP-42[58] emission factors may be used, or state/EPA vetted/approved

[56] See Curriculum Vitae in Annex A

[57] State of Missouri, et al. v. The Doe Run Resources Company, Case No. 07JE-CC0052, Consent Judgement, Final May 21, 2007. EPA approved the Missouri SIP containing control measures to bring the Herculaneum area into attainment with the 1978 lead NAAQS. Consent Judgment Modification 07JE-CC00552; Doe Run Herculaneum, MO. The state remains obligated to submit a SIP to attain the 2008 lead NAAQS.

[58] AP-42 contains emissions factors and process information for more than 200 air pollution source categories. A source category is a specific industry sector or group of similar emitting sources. The emissions factors have been developed and compiled from source test data, material balance studies, and engineering estimates. The Fifth Edition of AP-42 was published in January 1995.

emission factors derived from stack tests). Stack tests are required to be witnessed by state regulatory agency representatives. Facilities are inspected with both announced and unannounced visits. Environmental agencies have hot lines where citizens may register complaints to be followed up by inspections by the regulatory agency. Facilities are required to document the reasons for upsets and episodic air pollution releases that cause harm or nuisance along with their corrective actions to prevent reoccurrence. And to ensure that facilities take their obligations to control air pollution seriously, facilities in the U.S. must deal with financial penalties for non-compliance. None of these practices and enforcement policies existed at the time of purchase or at any point in time during the operation and ownership of the facility.

When the Defendants performed their due diligence in 1997, they were cognizant of the differences between the regulatory enforcement practices of Peru and the United States. They admitted that they were shutting down their U.S. operations because environmental standards in the U.S. were becoming more stringent and it was too expensive to bring their outdated facilities into environmental compliance.[59] Defendants understood the high degree of freedom they had to pollute in the absence of regulatory oversight and operating permits in comparison to their operations in the U.S. Jefferey Zelms, Doe Run President and CEO testified that he proposed the purchase of the La Oroya Complex because it was an opportunity for “making money”.[60]

### 6.2 Standards and Benchmarking

The standard of care assessment is a benchmarking analysis. The benchmarking allows an assessment as to whether the Defendants applied reasonable practices to reduce air pollution in order to achieve safe air quality levels. The standards relied on are the Air Quality Standards specified by the Government of Peru.[61]

Because the Peruvian air quality standards changed over the time period of the analysis, becoming more protective and comparable to those in the United States, the air quality standards under the U.S. NAAQs were also considered along with air quality levels reported for various countries.

### 6.3 Good Industry Practices

I understand reasonable practices to be Good Industry Practices that are documented in the literature, including those practices that are required under air pollution control permits in the United States and European countries. Air pollution control permits document good industry practices which operators of industrial facilities have statutory obligations to comply with. The absence of statutory obligations in Peru is not considered a reasonable basis to ignore and not apply good industry practices, especially since the Defendants understood prior to purchasing the metallurgical complex that the air pollution was gross and causing harm. The Good Industry

---

Since then EPA has published supplements and updates to the fifteen chapters available in Volume I, Stationary Point and Area Sources. https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emissions-factors

[59]https://republicofmining.com/2014/01/03/last-u-s-lead-smelter-closes-toxic-history-in-ore-rich-missouri-by-tim-jones-bloomberg-news-december-23-2013/; https://www.citizen.org/sites/default/files/renco-memo-03-12.pdf

[60] June 21, 2017 Deposition of Jeffery Zelms

[61] 2001 - SD 074-2001-PCM - Environmental Air Quality National Standards Regulation; Normas Legales, 1996 - RM-315-96-EM-VMM

Practices considered are those which were in mainstream acceptance from about 1970 through 2009.

The term 'Good Industry Practices' is a general term of art. There are other terms of art which I consider have the same meaning. These are:

- Best Management Practices (BMPs);
- Best Practices; and
- Best Available Control Technology (BACT)

The terms "Best" and 'Best Available Control Technology' should not be equated with cost. None of these terms require or imply that a practice or technology to control an air emission source should be based on achieving maximum control regardless of cost. BACT means that an operator has carefully evaluated emission control alternatives (relative to energy, environmental and economic impacts) and selected controls or practices that meet the objective of reducing pollution to levels that are safe. In the U.S. a top-down BACT is performed when evaluating control options. This means that the lowest possible emission rate is first considered with the highest level of control (and often most costly), but then less effective and costly alternatives are justified if they achieve the goal of meeting safe air quality standards.

There is insufficient information from records and testimonies produced in this matter which allow me to assess whether the most appropriate pollution control efficiency was assigned in specifying controls based on a need to achieve Maximum Achievable Control. There are sufficient records to assess whether combinations of control technologies and actions were and should have been taken to reduce air emissions using conventional controls and practices that would not be cost prohibitive and capable of achieving safe air quality levels in accordance with the standards.

I have considered whether reasonable practices were applied in assessing:

- Defendants' quantification of air pollution through emissions inventories. Without accurate and reliable emissions inventories a facility cannot identify the sources that have the largest impacts to poor air quality and harm. The consequence is that priorities for an effective environmental management program including levels of funding, efforts and schedules are not possible to establish. This leaves both meeting compliance obligations and continued harm to the public open ended.
- Whether practices were applied to assign controls and implement programs to reduce air emissions within safe levels. Good industry practices are documented in literature from authoritative bodies with citations identified Section 6.6.
- Whether Defendants performed stack testing to quantify emissions and develop emission factors that are needed to manage and select controls.
- Whether documented practices were and could have been applied earlier in the ownership and operation of the metallurgical complex. Given what the Defendants learned from conducting their due diligence prior to purchase, it is reasonable to conclude that high priority to modernizing and installing pollution controls was needed to operate the complex safely.

- Whether the Defendants introduced and applied an effective environmental management system that is consistent with the norms generally recognized by industry as a whole, such as the ISO 14000 environmental management standards.
- Whether there was a commitment to air pollution control. Responsible companies place environmental performance at the same level of importance as financial bottom line. It is widely recognized that good environmental performance and good financial performance are complimentary.
- Whether Defendants applied their understanding and knowledge of controlling fugitive air emissions in a timely manner.
- Whether the Defendants applied similar to same good practices they were obligated under statutory requirements for their U.S. smelters to control air emissions from the complex.
- Whether the Defendants applied reasonable practices to monitoring the impacts of their air pollution in meeting air quality standards.
- Whether the Defendants took corrective actions in a timely manner to address uncontrolled emission sources.
- Whether the Defendants prepared reasonable environmental action and management plans that were consistent with achieving safe operation of the complex.
- Whether the Defendants established reasonable implementation schedules to achieve compliance and reduce harm to the public.
- Whether the projects implemented by the Defendants improved air quality to within safe levels.
- Whether practices and verifiable records were prepared and maintained by the Defendants to support that pollution controls installed were capable of achieving compliance and reducing air quality to within safe levels.
- Whether statutory compliance schedules were met.
- Whether air monitoring requirements were met.
- Whether Defendants were transparent by carefully documenting the basis and representations made to the public and Government of Peru on the air pollution reductions claimed for various projects implemented.
- Whether Defendants applied good science, recognized industry methodology and reasonable practices to quantifying air emissions which were relied on for risk assessments and in preparing environmental management plans.

### 6.4 Environmental Management Systems

Environmental Management Systems (EMS) are a part of Best Practices. All companies have some type of EMS. EMS's that are recognized as being based on the very best practices are the U.S. Responsible Care Program and the ISO 14000 Environmental Management System (see Responsible Care 2018). The ISO standards are implemented under a certificate program where a 3rd-party auditor assists the company in setting up the management system. Follow-up audits are conducted to ensure that the EMS is effective and follows the standard. The ISO 14000 certificate carries global recognition and is considered a green seal of approval.

The ISO 14000 environmental management standard was first introduced in the early to mid-1990s and is intended to provide practical tools for companies to manage their environmental

responsibilities. ISO 14000 is a series of international environmental management standards, guides, and technical reports. The standards specify requirements for establishing environmental policy, determining environmental impacts of business and manufacturing operations, planning environmental objectives, implementing programs to meet objectives, and conducting corrective actions and management reviews (see ASQ[62], Cheremisinoff 2001, Cheremisinoff and Ben-David Val 2001, Cheremisinoff 2003, 2005, 2006a & b, 2008). An EMS begins with establishing a corporate Environmental Policy statement that defines the company's commitment to pollution prevention and continual improvement to environmental performance.

Companies that have an EMS track their:

- Performance in meeting statutory obligations in a timely manner,
- Performance in reducing pollution,
- Performance in reducing or eliminating causes for continued violations, exceedances, practices which lead to upsets, the consequence of which can be large episodic releases;
- Incident reports and the root causes of episodic releases.

Metrics are used to track performance referenced to a base year. Common metrics that companies track are:

- Air emissions,
- Compliance,
- Maintenance (as equipment and pollution controls must be properly serviced to ensure they operate efficiently). This extends to retiring and or modernizing old unreliable equipment and controls,
- Source reduction, pollution prevention and pollution control projects – most notably documenting the emissions reductions achieved,
- Air quality.

Formalized tracking systems called Environmental Management Information Systems (EMIS) are applied to evaluate performance trends, assign and schedule corrective actions, and to communicate within the company.

A proper EMS has goals and targets based on a corporate wide commitment to achieving continual improved environmental performance. This is done by commitment to pollution prevention, complying with statutory obligations, tracking emissions through emissions inventories, placing environmental performance at the same level of importance as financial performance, and continually improving operations and practices aimed at reducing pollution.[63] It is not reasonable for a company to claim it is committed to good environmental performance and will lower emissions over some period of time without following good practices and management tools. A proper EMS is based on a formalized plan with appropriately assigned resources to support scheduled projects aimed at reducing emissions that improve overall performance in accordance with goals, targets, and commitments. The EMS must define how the

---

[62] http://asq.org/learn-about-quality/iso-14000/

[63] Green Profits: A Manager's Handbook to ISO 14001 and Pollution Prevention, Butterworth-Heinemann Publishers, United Kingdom, (2001); Achieving Environmental Excellence: Integrating P2 and EMS for Improved Profitability, Government Institutes, Washington, D.C. (2003); https://www.iso.org/iso-14001-environmental-management.html.

company intends to achieve compliance and reduce emissions to levels that are protective of the public. Defendants' EMS was inadequate from the start because it never established a baseline of emissions and did not verify emissions reductions from various projects, and therefore under-reported the risks of exposures to lead and arsenic.

The best known EMS is the ISO 14000 family of environmental management standards. For a facility to demonstrate that it applies the good practices of a proper EMS, a 3rd party audit is required in order to validate whether the EMS follows good practices. The La Oroya Complex was issued an ISO certificate on July 21, 2006 by the ISO registered 3rd party auditor TUV Rheinland.[64] On March 11, 2008 the certification was revoked because of non-compliance with the Peruvian environmental laws and the absence of verifiable pollution prevention measures Defendants claimed to have taken to reduce air emissions.[65] This shows that internationally good practices for the overall management of air pollution were not followed by the Defendants. This is a reason why Defendants:

- Missed compliance schedules,
- Continually argued for extensions on compliance schedules,
- Failed to replace inaccurate $SO_2$ monitors, leaving the public at indeterminate levels of risk,
- Failed to prepare emissions inventories which are required to track environmental performance,
- Failed to control and eliminate fugitive emissions,
- Failed to place controls on more than 90 uncontrolled sources of emissions.

### 6.5 Emissions Inventories

The means by which air emissions are tracked are annual emission inventories. An emission inventory is an accounting that documents the mass releases of pollutants by source. Emissions from both point (stack) and fugitive sources are quantified to provide a facility-wide measure of pollution. This allows the operator to know which of its sources are most polluting and which have become more or less polluting over time. By examining trend charts of environmental metrics such as air pollution through the EMS one can establish whether practices are resulting in lower emissions or the air pollution is worsening over time. Trend charts are relied on to prioritize areas of needed improvement and to assist technical staff in developing programs to reduce the pollution, strengthen environmental management practices, and refine goals and targets that corporations apply to achieving improved environmental performance.

An emissions inventory is not simply a spreadsheet summarizing annual mass releases over time. The smelter is a large complex facility with numerous sources, emissions and other tracking information that requires management of a large amount of information; e.g.

- Locations of pollution sources;
- Release heights of emissions;
- Conditions of release (such as temperature, stack velocity);

[64] DRPE-0000092210
[65] DRRCE-00637760



EXHIBIT 34

- Type of release (point vs. fugitive);
- Particle information (such as particle size, particle density, particle size class – TSP, PM10, PM2.5);
- Type of control used;
- Control efficiency of the control device;
- Emission factor applied to calculating the source emission;
- Reference source(s) for emission factors applied to release estimate (literature such as AP-42 vs stack test);
- Referenced basis for preparing emission estimate or calculated release.

Based on my review of the record produced by Defendants, it does not appear that Defendants assembled the above information into a standardized annual emissions inventory for *any* single year during their ownership and operation of the La Oroya Complex, despite their understanding that annual emissions inventories are necessary for managing pollution. For example, and in contrast, Defendants prepared a detailed annual emissions inventory for their Glover, MO lead smelter (Glover 1999).[66]

Trend charts and environmental performance tracking are also used to keep the public aware of emissions. Many companies publish their annual emissions on web sites for the public to gain better understanding of what they are breathing and the efforts being taken to reduce pollution. In the U.S. this is most often done by reporting annual air emissions for regulated Hazardous Air Pollutants to the EPA's Toxics Release Inventory (TRI).

In the United States, the preparation of emissions inventories is and has been driven for decades by statutory requirements both at state and the federal levels under the federal Clean Air Act. Environmental regulatory agencies obligate industrial complexes to prepare detailed air emissions inventories in order to demonstrate compliance with permits such as Title V permits, as a basis to levy fines for violations and for annual pollution fees that facilities are obligated to pay for polluting. The Defendants are well versed in the preparation of inventories; as an example, Glover (1999) is an electronic spread sheet prepared by the Defendants of the annual air discharges by source for their Glover Plant in Missouri. The Defendants also operated the Herculaneum lead smelter in Missouri and had a Title V permit. For both of their U.S. smelters, they were required to prepare accurate air emissions inventories. The same practices that they applied in the U.S. were applicable to the La Oroya Complex regardless of whether there were statutory requirements or not.

At the time the Defendants operated the La Oroya smelter complex, there were no rigorous reporting requirements in Peru comparable to the North American system. Point source emissions were historically monitored and continued to be monitored throughout Defendants' operation of the smelter. But there was no statutory reporting requirement for fugitive air emissions.

---

[66] DRRCE-00313421



EXHIBIT 34

The absence of statutory obligations to quantify point and fugitive emissions has no bearing in the assessment. Nonetheless, when Defendants purchased the smelter complex, they understood that the preparation of emissions inventories is a standard good industry practice and necessary to ensure that surrounding communities are not exposed to an unreasonable risk of harm. Defendants are sophisticated operators and understood at the time of purchase that these were significant air discharges that cause harm to the community. Further, Defendants knew at the time of purchase (from the 1997 PAMA) that the majority of the pollution sources from the smelter had never been quantified and were uncontrolled, and that baseline emissions data had never been established for these sources. They knew how to quantify and reduce these air discharges when they purchased the facility. They did not have to be instructed by a regulation to do so. They also understood, like all other similar companies, that in order to control and reduce harmful emissions they needed to first quantify their air pollution, then implement programs that it verified reduced pollution. Further, Defendants understood fugitive emissions from the La Oroya Complex were significant and contributed substantially to the poor air quality in La Oroya. Yet still at the time they ceased operations in 2009, after more than 11 years of ownership and operation, Defendants still had not quantified air emissions from most of these sources.

In searching and reviewing many records produced by the Defendants, I did not find any formal assembly of the annual emissions inventories for any year and so I conclude that Defendants never prepared an emissions inventory for the La Oroya Complex. Failure to prepare annual emissions inventories is a failure to uphold the industry standard of care because it means that Defendants did not have a reasonable environmental management system/program that placed priority on reducing fugitive air emissions that it knew were harmful to the community at large. Further, the absence of emissions inventories shows that Defendants operated the smelter complex blindly because they did not take time to quantify emission sources. Defendants operated the plant without a quantitative understanding of the sources of fugitive air discharges, and failed to prioritize controlling these large emissions, which were the most significant source of exposure to the surrounding communities, including Plaintiffs. These findings are supported by the chronological assembly of historical records and by considering how few air discharge sources Defendants quantified.

In comparison, the U.S.EPA's reporting requirements for primary lead and copper smelters and zinc refining, which Defendants were required to follow in the United States, requires reporting of the following fugitive emissions sources for the primary copper and lead smelting circuits and the zinc smelter (U.S.EPA 1978d – see Tables 2-11 and 2-13):

Primary Lead Circuit (*Fugitive Sources 1, 2, 5, 8-25 contain lead, arsenic and cadmium*):

1. Railroad car and truck unloading
2. Blast furnace flue dust
    a. Storage
    b. Handling and transfer
3. Limestone
    a. Storage
    b. Handling and transfer
4. Silica sand
    a. Storage

    b. Handling and transfer
5. Lead ore concentrate
    a. Storage
    b. Handling and transfer
6. Iron ore
    a. Storage
    b. Handling and transfer
7. Coke
    a. Storage
    b. Handling and transfer
8. Mixing and pelletizing
9. Sinter machine
10. Sinter return handling
11. Sinter machine discharge and screens
12. Sinter crushing
13. Sinter transfer to dump area
14. Sinter product dump area
15. Charge car or conveyor loading and transfer of sinter
16. Blast furnace monitor
    a. Charging
    b. Blow condition
    c. Upset
    d. Tapping
17. Lead pouring to ladle and transfer
18. Slag pouring
19. Slag cooling
20. Slag granulator and slag piling
21. Zinc fume furnace vents
22. Dross kettle
23. Reverberatory furnace leakage
24. Silver retort building
25. Lead casting

Primary Copper Circuit (*Fugitive Sources 1, 2, 5-19 contain lead, arsenic and cadmium*):
1. Unloading and handling of ore concentrate
2. Ore concentrate storage
3. Limestone flux unloading and handling
4. Limestone flux storage
5. Roaster charging
6. Roaster leakage
7. Calcine transfer
8. Charging reverberatory furnace
9. Tapping of reverberatory
10. Reverberatory furnace leakage
11. Slag tapping
12. Converter charging



EXHIBIT 34

13. Converter leakage
14. Slag tapping from converter
15. Blister copper tapping
16. Blister copper transfer
17. Charging blister copper to fire refining furnace
18. Copper tapping and casting
19. Slag tapping and handling

Zinc Smelter Circuit (*Fugitive Sources 1, 2, 5-8 contain lead, arsenic and cadmium*):

1. Railroad car or truck unloading
2. Zinc ore concentrate
    a. Storage
    b. Handling and transfer
3. Sand
    a. Storage
    b. Handling and transfer
4. Coke
    a. Storage
    b. Handling and transfer
5. Sinter machine discharge and screens
6. Coke-sinter mixer
7. Retort furnace building
    a. Retort furnace tapping
    b. Retort furnace residue discharge and cooling
    c. Retort furnace upset
8. Zinc casting

In addition to the above sources, EPA identifies fugitive emissions generated from heavy machinery traffic on paved and unpaved plant roads, material handling practices of waste and sinter piles, and windswept erosion of storage and waste piles.[67] In total, there are about 55 sources. Process upsets and abnormal feeds can also be the cause of intermittent, high level fugitive particulate emissions[68], bringing the total to 56 sources. There are at least 47 sources which contain lead, arsenic and levels of cadmium based on the nature of the operation and the materials handled at these operations. Of these, only 11 sources have been quantified in the present analysis with 10 being estimated by the Defendants for the first time around the 2005.[69]

Defendants' estimated fugitive air discharges were characterized by AIDA (2004).[70] I agree with AIDA's assessment, which included the following:

- Doe Run's emissions inventory is wholly inadequate for designing a mitigation plan.

---

[67] AP-42, Section 13.2.1 – Paved Roads, Section 13.2.2 – Unpaved Roads, Section 13.2.4 – Aggregate Handling and Storage Piles, Section 13.2.5 – Industrial Wind Erosion

[68] See Incident Reports, DRPE-0000601441, DRPE-0000601440

[69] DRRCE-00754308

[70] Note document was translated from the Spanish language to English and hence quotations are not applied in the event of translation inaccuracies.

- There is scant basis for DRP's emissions estimates.

- If the sources of fugitive and stack emissions are not understood with some detail, it is difficult to design a valid mitigation plan for an industrial facility. This is especially true when diverse and complex sources exist, such as at the La Oroya Metallurgical Complex. While rough estimates can be of some use, they are not an appropriate basis on which to design a long-term plan for mitigation.

- To date, DRP has conducted only a crude assessment of emissions. The justification document states that "Nunca se ha realizado un estudio detallado de las emisiones fugitives de polvo de la Planta, ni tampoco se ha efectuado una medición de las emisiones" and that the information that exists is merely "un estimado grueso [a gross estimate]" By comparison, annex III of DRP's proposal describes an up-to-date emissions inventory. Such an inventory would include "estimates of measurements of not only stack emissions, but process fugitives, building volume source emissions, and blowing material from piles of material, as well as transportation related re-entrainment of dust. There might be **40 or 50 separate sources identified by type**, and spatially defined by an x, y, and z coordinate.

- The fugitive emissions estimate that DRP has submitted to MEM so far includes only ten process and building sources, with no information on the location of those sources. From these ten sources, DRP claims to emit 374 tons of fugitive emissions each year. To mention only a few obvious omissions, DRP has failed to include fugitive emissions from potentially significant sources such as Huanchan, the concentrates deposits and handling processes, and vehicular re-dispersal of dust. It is therefore quite likely that the fugitive emissions have been vastly underestimated.

- DRP's estimate of $SO_2$ fugitive emissions is also unreliable. DRP's consultants estimated these emissions by taking the ambient concentrations and back calculating to a hypothetical $SO_2$ emissions rate using simplified Gaussian plume model. As DRC is aware, far better methods for such estimates exist.

- The failure to accurately assess emissions sources is especially problematic given DRP's argument that the proposed mitigation actions will eliminate a determined percentage of total fugitive emissions. Obviously, unless the total amount of fugitive emissions is accurately known, DRP cannot determine how much of the problem might be resolved by proposed measures. Because DRP's emissions assessment likely underestimates fugitive emissions, it overestimates the positive impact of proposed actions on air quality.

- The accuracy of DRP's stack emissions estimates is also questionable. For example, DRP claims that closing the Tostadores New Jersey de Zinc [New Jersey Zinc Roasters] and operating the new Hornos Rotatorios Cortos [Short Rotary Furnaces] would reduce lead emissions from the stack by 876 tons per year. This is surprising given that DRP reports the total estimated stack emissions of lead as being only 656 tons per year, or 120 tons per year less than the amount that the company claims will be eliminated by these actions. Clearly, before attempting to assess the impact of specific proposed measures or

design an improved mitigation plan, Doe Run needs to more carefully consider, and better document, current emissions from all sources.

- DRP needs to conduct a detailed inventory to provide a greater understanding of all the point, volume, and area source emissions that exist at the facility. This could be done at relatively low cost by developing a detailed process flow chart for the facility and reviewing the existing literature and process data. Detailed information on expected emissions sources associated with primary smelters and methods for estimating such emissions is available in EPA Document AP – 42, Chapter 12 (Metallurgical Industry). The documents related to lead, copper, and zinc smelting, as well as coke operations, are particularly relevant to the La Oroya Metallurgical Complex. Although the emission factors presented in the AP-42 are not necessarily directly applicable because the factors were developed contemplating a foundation that already incorporates various control technologies, the document explains the appropriate methods for an accurate estimate of emissions. **The previous AP-42 version, produced by the EPA in 1986, may be more closely applicable to the situation in La Oroya**.

- DRP does not consider the bioavailability of contaminants from different sources. Fugitive metal particulate emissions tend to be larger and less highly oxidized than those that have passed through the smelting process. In general, these factors make metal stack emissions more readily bioavailable than fugitive emissions. Therefore, the human health benefit generated by reducing process metals emissions is greater than that obtained by eliminating an equal quantity of fugitive metals emissions. Although this has been emphasized by DRP in the past, the greater health benefit associated with treating stack emissions was not considered by DRP in proposing to postpone the installation of stack emissions control technology. Bioavailability data should be considered in any plan intended to mitigate human health impacts.

Emissions inventories serve as a baseline for the facility operator and allow it to prioritize those sources of discharges that are the most polluting and should be brought under control. Without such a baseline the operator is not managing its air pollution, it is simply polluting.

In addition to the criticisms noted by AIDA, I also criticize the inadequacy and unreliability of the estimates Defendants reported. The following subsection documents authoritative studies Defendants should have been intimate with at the time it acquired the La Oroya smelter complex, given their experience as a sophisticated operator. Instead, Defendants applied imprecise methods to developing gross mass emission estimates and then blindly implemented mitigation programs that were not verified for effectiveness and which appear to have had, at best, marginal impacts to reducing air quality levels, never achieving air quality levels necessary to protect the health of the surrounding communities or considered safe by the Peruvian government or pursuant to international norms.

### 6.6 Authoritative Best Practice Resources

Dennis Sadlowski, Renco's Vice President of Law, stated that "Renco has a diverse international portfolio that currently consists of leading companies across a wide range of industries including mining and mineral recovery… with locations in the U.S., Mexico, Peru, Brazil, South Africa,

India, U.K, France, Spain, Germany, Hungary, Poland, the Czech Republic, Slovakia and Romania" (Sadlowski, 2014).

As a sophisticated operator, Defendants are aware of the same body of literature on good practices dealing with air pollution management of primary lead and copper smelters and zinc refining cited herein. Extensive global holdings and operations make the Defendants versed in international norms and how these differ from the PAMA.

The following are reference citations that I have relied on in the assessment and that I expect Defendants should have been aware of and applied in their operation of the La Oroya Complex.

**U.S.EPA (1973)** is an emission test which was part of a comprehensive study to determine a control strategy for lead emissions from stationary sources from within a primary lead smelter. EPA states "a well-defined emissions inventory… is vital to the development of a regulatory strategy for lead. Such an inventory will define the extent of the problem by… quantifying the emissions from these sources and determining the extent and effectiveness of… general particulate control technology for lead." EPA's publication documents extensive fugitive air emissions from multiple sources. It quantifies and prioritizes the major sources of particulate fugitive and point source emissions which contain lead. The citation shows how to develop a quantitative air emissions inventory in order to establish a baseline of the emissions from a lead smelter and where to focus efforts to reduce these. The plant at which this sampling was performed was the Glover lead smelter in Missouri which was owned and operated at the time by the America Smelting and Refining Co. The Defendants purchased and operated this plant years later and presumably was aware of the emissions testing.

**U.S.EPA (1974)** is titled "Background Information for New Source Performance Standards: Primary Copper, Zinc and Lead Standards." EPA documents information on the derivation of proposed standards of performance for new and modified primary copper, zinc, and lead smelters. EPA's report describes the various extraction processes available for copper, zinc, and lead, the various systems available for controlling emissions of sulfur oxides and particulate matter from these processes, the economic impact of the proposed standards, the environmental and energy-consumption effects associated with the various processes and control systems, and the general rationale for the proposed standards. EPA states that the "standards developed require control at levels typical of **best demonstrated existing technology**. These levels were determined by extensive on-site investigations; consideration of process design factors, maintenance practices, available test data, and characteristics of plant emissions; comprehensive literature examination; and consultations with the National Air Pollution Control Techniques Advisory Committee, members of the academic community, and industry." Defendants understood the good practices for pollution control for lead smelters 23 years prior to the purchase of the La Oroya smelter complex. They also understood these good practices were updated and strengthened in the Federal Register over the years; most notably in 1999.

**U.S.EPA (1975)** is titled "Particulate Collection Efficiency Measurements on a Wet Electrostatic Precipitator." This report provides fractional and overall particulate collection efficiency measurements. Measurements and discussions related to dry ESPs are included in this study. The report documents advantages of wet ESPs over dry methods. The report provides guidance on

how to improve collection efficiency. Defendants knew and acknowledged at the time of purchase of the La Oroya facility that the Central Cottrell was an old, inefficient pollution control but did not take steps to improve collection efficiency until about mid-2006. See page DRRC-00077620 of the Knight Piesold report where it is reported that the Central Cottrell) had been installed back in 1971 and not upgraded or replaced.

**U.S.EPA (1976a)** is titled "Fine Particulate Emissions Information System." EPA developed a computerized data base which contained all available fine particle source test measurements and control device evaluations. The data base contains particulate source characteristics, control device(s) parameters, test details, particulate physical, biological and chemical properties, and particle size distribution data. EPA states that the data base can serve the needs and interests of a broad spectrum of users. "These users include plant officials, control device manufacturers, measurement equipment/method developers, government officials responsible for the development of fine particulate control strategies…" More than 20 years prior to the purchase of the La Oroya smelter complex, there was extensive data on pollution controls directly applicable to the facility. There are no records which I have located where Defendants applied basic data and information contained in this and other EPA published works to quantify their air emissions. Few records have been located on even estimated control efficiencies from baghouses, scrubbers, and cyclones which it understood in 1997 were old, unreliable and inoperable to a large degree. I could not find any records of stack tests performed for such controls – at the very least Defendants could have relied on authoritative published works life this citation to:

- Estimate control efficiencies,
- Develop emission factors and baseline air discharge data, and
- Review and assess the controls it needed to replace and upgrade to reduced fine particulate emissions.

Defendants knew that the particulate matter released from stacks, fugitive sources and various point source controls contained lead, arsenic and cadmium and that particle sizes extended into the fine particulate ranges (PM2.5). They also knew, as documented in this EPA publication, that controls have cut sizes and are less efficient in capturing these particles in the fine particulate size range. They did not apply this knowledge to reduce air emissions except in a few projects which were performed years after they took over operations and then did not document testing to verify whether these had reduced the air emissions.

**U.S.EPA (1976b)** is EPA's technical manual for the measurement of fugitive emissions. It explains roof monitor sampling methods for industrial fugitive emissions. The manual provides "a guide for the utilization of the Roof Monitor Sampling Method in the measurement of fugitive emissions. Criteria for the selection of the most applicable measurement method and discussions of general information gathering and planning activities are presented. Roof monitoring sampling strategies are described and sampling system design, sampling techniques, and data reduction are discussed." (p.1)

EPA's manual includes manpower requirements and time estimates for typical applications of the method for programs designed for overall and specific emissions measurements. The manual provides a model set of procedures to the measurement of fugitive emissions from an electric arc

furnace steel making plant which can be adapted to a lead smelter, a copper smelter and/or zinc refining operation.

EPA's manual was accessible to lead smelters more than 20 years prior to Defendants' purchase of the La Oroya smelter complex. This publication explains comprehensive and prescriptive methods and procedures for measuring fugitive emissions. This technical manual which explains the procedures and measurement methods in great detail are referenced and described in multiple other EPA reports in which the Agency went into lead smelters and did emissions testing with the operator. See as examples U.S.EPA (1977a), U.S.EPA 1979a-c, U.S.EPA 1979d, and U.S.EPA 1979e.

Two decades prior to Defendants' purchase of the smelter complex there were well established monitoring and measurement methods established for lead smelters. Examination of the cost and manpower requirements reported in EPA's manual show that it would have cost Defendants thousands of dollars – not millions – to implement a program. The information in the manual shows it would have taken Defendants weeks to perhaps a few months to measure their fugitive emissions – not years. EPA's application of these practices at other lead smelters shows testing was completed within weeks to a couple of months.

When Defendants purchased the La Oroya smelter, they knew how significant the fugitive air emissions were and how these contaminated the air and land areas in La Oroya. They may not have had a statutory requirement to measure and eliminate these emissions, but it understood that the operation of the smelter was causing harm to the public. They could have applied the EPA good industry practices to identify the sources of these emissions, developed reliable emission rates and plant-specific emission factors, assembled a detailed emissions inventory, and then develop a well-designed program to reduce these emissions. Further, they could have applied the test methods of U.S.EPA (1976b) to quantitatively establish the effectiveness of mitigation efforts and applied this to further refine programs to achieve even more emissions reductions in order to bring airborne concentrations in the community to within acceptable levels.

Defendants did little to address the fugitive air discharges until roughly 2004. The few actions it took prior to that time had no impact on improving the extremely poor air quality in La Oroya. It developed gross unreliable estimates of a few of the fugitive emission sources and made unsubstantiated claims in which it represented to the Government of Peru and the public that the few projects it implemented beginning around 2006 greatly reduced emissions and improved air quality. Exhibits and documents assembled in Section 9 support that the annual average lead concentration reported for the Sindicato air monitoring station was more than twice that of the allowable air quality standard established by the Government of Peru in 2008 (Exhibit 148A).

While the analysis shows that the air quality in La Oroya for lead did improve from their actions, the unsupported reductions in emissions it claimed did not bring the air quality in La Oroya to within levels considered protective of human health. Further, the modest reductions in fugitive emissions were not achieved until nearly 10 years after the facility was acquired by Defendants. If Defendants had followed the good practices explained in U.S.EPA (1976b) and all the other published works in this subsection of the report, they more likely than not could have improved

the air quality in only a few years and if they had addressed the copper converter section of the smelter, they could have improved air quality further.

**U.S.EPA (1977a)** is a report titled "Sample Fugitive Lead Emissions from Two Primary Lead Smelters." Fugitive emissions from the ASARCO Glover Missouri and East Helena Montana lead smelters were measured and comparisons between the plants are reported. The relevance of this study has direct bearing on the La Oroya smelter. No records have been located that document Defendants measured any fugitive emissions sources at the La Oroya smelter. This EPA report provides a basis for preliminary estimates that Defendants could have made beginning in the 1st year of operation to establish a baseline of the plant's air pollution and to begin reducing emissions through a formal EAP. The report provides data on particle size, particle size distribution, particle densities, mass release rates, emission factors, release conditions, and more – all of which are data required to assemble an air emissions inventory for fugitives. The report further explains test methods and procedures for fugitive emission measurements. I found no records to support that Defendants relied on the information and practices reported in this or any other of the good industry citations documented in this subsection to address fugitive emissions.

**U.S.EPA (1977b)** documents emission factors and emission source information for primary copper smelters. This authoritative citation documents "an intensive engineering evaluation of air pollutant emission sources at primary (and secondary copper) smelters…" It documents extensive collections of reference data for primary smelters as well as the development of emission factors for major types of air-pollution emitting operations and equipment within this type of plant. The citation includes information dealing with process descriptions and emission factors, methods, formulae and computation procedures for quantifying fugitive and point source air emissions. No records have been located where Defendants relied on this or similar published works to develop their own fugitive emission estimates for the La Oroya smelter.

**U.S.EPA (1977c)** is titled "Proceedings: Particulate Collection Problems using ESP's in the Metallurgical Industry." This publication contains industry reported data on the use of ESPs in the collection of fumes and particulates from smelter operations. Information, industry experience and data on problems operating ESPs and their inability to operate at high collection efficiencies are covered. Recommended plant optimization studies and measurements aimed at improving particle collection efficiency are described throughout the publication (see as examples pp. 87-88, 93, 107, 115, 122-126, 148, 150-152, 235-249). In conjunction with this publication, see U.S.EPA (1977e) which reports:

- "For ESPs… information indicates differences in the collection efficiency between particulates and lead. Lead compounds are probably less efficiently removed by ESP… whenever lead emissions are concentrated in the very fine particle sizes."
- "ESP… will be less efficient for removal of lead compounds that concentrate on the very fine particulate sizes."

See also **U.S.EPA (1977f) –** "Electrical resistivity of the particles, especially lead oxide particles must be considered in evaluating precipitator performance. Resistivity of lead dusts usually exceeds the maximum $10^{10}$ ohm-cam designed for electrostatic precipitation. Efficiency of the ESP decreases dramatically with particle smaller than 1 to 2 µm diameter…"

And in addition to these authoritative reports see **U.S.EPA (1998a)** – "Metal oxide fumes from furnaces used in secondary copper smelters may be controlled by fabric filters, ESPs, or wet scrubbers ... Electrostatic precipitators are not as well suited to this application, having a low-collection efficiency for dense particulates, such as oxides of lead and zinc."

When Defendants acquired the La Oroya smelter complex in 1997, they knew that the ESPs, especially the Central Cottrell unit, were installed in the 1940s[71] and were unreliable and had overall poor collection efficiencies. Records indicate that in 2001 the Defendants began addressing the poor efficiency of their ESP, making marginal improvements in 2001 which had no impact on air quality in Sindicato.[72] Note the following:

- No records have been found where Defendants performed any sampling of the inlets and discharge from the Central Cottrell and the Main Stack. While they monitored the mass rates of total dust to the Cottrell and the discharge from the Main Stack, there are no records to support that they knew anything more than the overall collection efficiency of the Central Cottrell. It has no knowledge of the particle size distribution, the amount of oxide metals or even density of particles.
    - All collection devices such as ESPs, baghouses, cyclones, multiclones and scrubbers have a cut size and a fractional efficiency curve. The cut size and the fractional efficiency curve are unique to the machine design and the density of the dust particles handled. The term 'cut size' is defined as "the diameter of those particles collected with 50% efficiency. "Collection efficiency for particles larger than the cut size will be greater than 50% while that for smaller size particles will be less." (U.S.EPA (1973b).
- The relevance of this can be found in statements reported in U.S.EPA (1978a) and subsequent EPA published studies in which EPA reports that the corresponding drift distance of 5 micron particles varies from 2 to 6 kilometers and airborne elemental concentrations near primary lead smelters to be nearly 66% lead and 88% cadmium in particle sizes under 4.7μ.

In December 2007 Defendants undertook an additional modest program to improve the overall collection efficiency of the Central Cottrell to reduce lead and particulate stack discharges (see Section 9 for citations and discussion). These efforts were shoddy and derelict because they ignored the poor collection efficiencies of their ESP in the smaller particle size range. From the first day of operation, Defendants should have recognized the inadequacy of the complex's primary particulate control but did not take any actions to improve collection efficiency until years later and when they did, they missed or ignored the fact that the Main Stack released particulates that were heavily populated with the smaller particle sizes containing high levels of metals.

**U.S.EPA (1977d)** covers primary lead smelters, primary copper smelters, and primary zinc production, all of which were performed at the La Oroya smelter complex. The study focuses on particulate matter which "escapes from a defined process flow stream(s) due to leakage,

[71] DRPE-0000081350 - Oroya Metallurgical Operations 1970, pp.6, 92-102
[72] DRRCE-00568738



EXHIBIT 34

materials charging/handling, inadequate operational control, lack of reasonably available control technology, transfer or storage. (p.1-3)" Of relevance to the La Oroya smelter is the focus of this study on fugitive emissions. Pertinent statements are:

- Pp.2-122 reports particle size distributions for fugitive particulate emissions for the roasting areas, reverberatory (reverb) furnaces, and roasting and casting operations of primary copper smelters. Further on in this study typical emission rates and emission factors are reported. An example of a model emissions inventory is provided. On p.2-125 pollution control strategies for primary copper smelters are described along with their effectiveness.
- Similar data and information are reported for primary lead smelters beginning on p.2-130. Pp.2-134 through 2-138 provides emission factors of fugitive particulate emissions sources for primary lead smelters.
- Pp.2-140 through 2-142 provides additional data on typical emission rates, lead concentrations in particulates and particle size information for fugitive emission sources.
- Pp.2-143 through 2-147 documents control technology options for primary lead production with the focus given to control of fugitive dust emissions.
- Pp.2-150 through 2-163 provides the same type of information and data as above for fugitive emissions for primary zinc production.

This EPA publication provides extensive instruction on:

1. How to develop estimates for fugitive dust emissions;
2. How to assemble a plant-wide emissions inventory to track emissions, prioritize the emissions, and to apply these to developing control and mitigation strategies;
3. Control options for reducing fugitive emission sources.

This study was available to the industry sector 20 years prior to the Defendants' acquisition of the La Oroya smelter complex and more than 27 years prior to it taking any actions to begin addressing fugitive emissions at the facility. Even when Defendants began addressing large fugitive emissions from the smelter, they ignored the data and practices in this publication, which also appear in later EPA publications.

**U.S.EPA (1977e)** is part of a two-volume publication which reports on the national emissions inventory of lead by source in the United States. Operations relied on by lead and copper smelters and zinc refining are among the highest sources of lead emissions. It is hard to conclude that the Defendants did not understand at the time it acquired the La Oroya smelter complex that the facility was the only significant source of lead emissions since there are no other heavy industries in the area. The publication also provides emission rates, control technologies and costs for controls for fugitive emission sources from smelting operations. EPA notes on p.2-26 that "lead control is… coincidental with particulate control."

At the time Defendants acquired the facility they knew and understood that fugitive dust (i.e., particulate emissions) emissions were ultra-high and of similar or larger in magnitude to stack emissions from the complex. Defendants did little to address fugitive emissions until approximately 2006.



EXHIBIT 34

On p.2-37 EPA notes a good practice to controlling some of the fugitive emissions is to enclose furnace charging, tapping, and material handling operations. As reported in Section 9 of this report, the Defendants did not adopt such good practices until after 2006.

**U.S.EPA (1977f)** is part of the same two volume published study. P.4-39 provides lead emission rates and emission factors for ore crushing and grinding operations. As documented in Section 9 of this report, these were largely open sources of fugitive emissions that appear not to have been controlled. Beginning on p.4-43 emissions from primary lead production are explained in which EPA notes that sintering is among the larger sources of particulate and lead emissions. The sinter plant at the La Oroya complex was an open source – i.e., it was an uncontrolled fugitive source in which the building was not enclosed until sometime after 2006. Fugitive emissions from the sinter plant freely communicated with the outside air and were transported into La Oroya by atmospheric winds.

P.4-47 EPA states "The sintering machine is a major source of atmospheric emissions from primary lead smelters." In Table 4-5 of this authoritative study EPA gives exhaust gas characteristics for this part of the process. Emissions data from lead blast furnaces, dross reverb furnaces, zinc fuming furnace areas, lead casting roof ducts, from ore handling, from sinter product dump areas are given in extensive tables. Among many millions of records produced by the Defendants, no evidence was found that Defendants relied on EPA practices and data to develop reliable estimates of air emissions. No records have been found in which measurements of fugitive dust emissions were made. Defendants made gross estimates of some emission sources beginning around 2004 and began applying some of the control methods explained by EPA in this publication after 2006 without verifying the effectiveness of the practices. EPA's authoritative publication provides emission rates, emission factors, methods for estimating and controlling fugitive dust emissions from zinc refining and primary copper smelting. Almost none of the control methods for fugitive emissions for the primary copper circuit at the La Oroya complex were ever implemented and only one source was eliminated in the zinc circuit in 2004.

**U.S.EPA (1978a)** is an EPA position paper on the state of control technology for industrial fugitive process particulate emissions. While this paper may or may not have been in the public domain at the time of its publication, the information contained in it was. All information explained in this citation is disclosed and documented in the citations listed above and others cited in the paper and in citations following this discussion. The following are excerpts from this paper. Lead smelters in the U.S. would most certainly have understood how large the fugitive emissions from smelting operations are and how these pose a significant health risk to communities. As a sophisticated operator, I would expect Defendants understood this at the time they inspected the La Oroya smelter complex prior to purchase. Their designated corporate representative Dennis Sadlowski stated that Defendants understood at the time of purchase "that the homes and streets near the Complex were filthy and covered with dust and smelter outfall."[73] EPA reports:

- "Tables 4 and 5 give data on fugitive process emissions from lead and copper smelting. Highest rates for fugitive emissions come from sintering and concentrate storage and

[73] RENCOGRP-015265 – Witness Statement of Dennis Sadlowski, February 19, 2014



EXHIBIT 34

transfer. For these sources, as well as others, the emissions are primarily in the respirable size range."

- "Highest rates for fugitive emissions from copper smelters come from unloading of concentrate, roaster charging, and converter charging and tapping. For these sources and most copper smelter operations, the emissions are primarily less than 15µm. However, for blister furnace charging and tapping, most particles are larger than 15µm."
  - Exhibits assembled and reported on in Section 9 of this report show these were open uncontrolled sources.

- "… it may be concluded that zinc [processing]…, like copper and lead, give rise primarily to respirable particles…"

- "… nonferrous metal industrial operations give rise primarily to small or respirable particles with only one exception which is not a major source in copper processing."

- "Sintering and two of the open sources – vehicular traffic and storage pile activities – are major sources and combined account for almost a third of iron and steel fugitive dust."

- "… fugitive emissions are difficult to collect and control. They are diffuse and tycically come from many small sources as opposed to a single large emitter… Fugitive emissions can also be diffuse in the sense that there are low level emissions from a large area as in the case of wind erosion from storage piles or dust from in-plant vehicular traffic."

- "Process upsets and abnormal feeds can also be the cause of intermittent, high level fugitive particulates."
  - Few records on process upsets have been loacted prior to about 2006. These are embodied in Incident Reports. Incident Reports are discussed at greater length in Section 9 of this report.
  - Few of the Incident Reports identified provide quantitative data or information on the amounts and durations of releases that occurred during upset conditions.
  - Few records have been located where Defendants relied on Incident Reports to reduce reoccuring events to reduce these emissions.[74]
  - The smleter complex is an old facility with process operating equipment dating back to the 1940s. It is logical that a plant this old had frequent upsets leading to a significant number of episodic releases of fugitive emissions which Defendants did not track and bring under control by assessing root causes and implementing good practices to eliminate them. Defendants' corporate representative stated there "had not been much in the way environmentally protective practices or controls instituted under Centromin" (Sadlowski 2014) implying that the equipment was old, inefficient and had not been replaced or modernized over the years, thereby making these unreliable.

[74] DRPE-0000601441; DRPE-0000601440

- "… [fugitive dust] sampling can be via (1) quasi-stack sampling where a collection hood near the source is sampled; (2) roof monitor sampling in which a large enclosed area such as a building is sampled; or (3) upwind-downwind sampling where fugitive emissions are back-calculated from particuate measurements around the source perimter."
    - No records have been located which support that in-plant measurements and sampling of fugitive sources were made.

- "… mathematical modeling has shown that the average drift distance of 15 micron particles emitted 3 meters above the level of surrounding structures can vary from 300 to 800 meters depending on topography alone… The corresponding drift distance of 5 micron particles varies from 2 to 6 kilometers."
    - Among the millions of pages of records searched, no information on particle size distribution of stack and fugitive discharges has been found. This has profound implications on the poor control efficiency of the Central Cottrell since the control efficiency for the small particle sizes is known to be very low.
    - Defendants understood that La Oroya and La Oroya Antigua are in close proximity to the smelter and there is inadequate set-backs because the industrial complex was originally built at a time when set backs were not considered.

- "Although the inter-plant roads are frequently paved, fugitive emissions can be substantial when the surface dust loading is allowed to accumulate. These emissions can be reduced by paving unpaved roadways, by periodically watering, oiling, or flushing the roads… or by sweeping (which can aggravate the problem more than solve it unless vacuum sweepers are used)."
    - Defendants did not complete paving inter-plant roads until 2006. Sections of the smelter complex were paved over a 4-year period beginning in 2001.
    - In October 2005 DRP purchased two industrial sweeping vehicles to clean the paved areas of Old La Oroya and of the Complex; they also applied watering methods to control fugitive dusts from machinery.[75]

- Both metals concentrations and particle size data are reported for two lead smelters (Glover Plant in Missouri and East Helena Plant in Montana). Table 13 of the citation shows very high mass concentrations for particulate sizes in the submicron region, especially for sinter building fugitives. Table 15 reports nearly 66% lead and 88% cadmium in particles less than 4.7µ from samples taken near the smelters. More data is reported in Table 16. Other particle size data for fugitives from ducted copper reverb furnace gases are reported in Table 18. These data could have been consulted by Defendants in developing a fugitive emissions inventory. Consideration of these reported emissions could have aided in devising sampling programs and fugitive emissions mitigation strategies.

- On p.35, EPA reports that it estimated that 50-60 wt. % of the fugitives from the copper converter aisle was in the "respirable size" range. Photo exhibits shown in Section 9 of

[75] DRPE-0001974767

this report show that the copper converter aisle had a canopy roof and the fugitive emissions were intentionally discharged to the outside without any controls. As far as I have been able to establish from records, this practice continued through June 2009 when the plant shut down.

**U.S.EPA (1978b)** is an assessment of fugitive particulate emission factors. This EPA report contains major sections relevant to preparing fugitive emissions estimates for the La Oroya smelter. Primary copper smelters, primary lead smelters and zinc production are covered on pp.2-31 through 2-51. The report provides calculation methods, emission factors and release conditions for fugitives. The Defendants could have applied the information in this report to developing preliminary estimates of their fugitive emissions at any time during the first year of operating the plant and then supplemented calculations with in-plant sampling and testing to verify and improve accuracy. With reliable quantification of the fugitives it then could have devised programs to reduce these discharges with measurable benefits.

Defendants made gross estimates of fugitives in 2004; these estimates were based on a methodology that is unreliable and ignored both properties and conditions of the discharges. Defendants limited estimates to a few sources – AIDA (2004) estimated there to be 40 or 50 separate fugitive sources. I have identified up to 57 sources of which at least 47 contain significant levels of lead, arsenic and cadmium.

- Defendants made no serious attempts to identify, quantify and control fugitive emissions. They operated the plant for nearly 10 years before it took a few concrete steps to reduce some fugitive sources. They relied on gross estimates for a few fugitive sources and then randomly began reducing emissions without verifying the emissions reductions.

- AIDA noted that Defendants' estimate of $SO_2$ fugitive emissions was unreliable. They made no reasonable attempts to estimate these emissions using more precise methods and never quantified these discharges from the sinter plant, which the EPA document could have been used for.

- As noted by AIDA, failure to accurately assess emissions sources is problematic. Defendants never established the total amount of fugitive emissions and in fact seriously underestimated these discharges. One of the consequences was that they overstated the projected positive impacts from mitigation plans they had argued would be completed by 2012.

Defendants could have used the EPA publication and those cited earlier as a basis to conduct a detailed inventory to provide understanding of all the point, volume, and area source emissions. Nothing prevented it from reviewing the existing literature and process data and then devising a logical mitigation program that had goals and target reductions that it could have verified by site testing and sampling. The costs for such a program would have been minimal and it would have more likely than not brought the fugitive emissions down to levels that allowed the plant to meet the air quality standards defined by the Government of Peru within only 2-4 years at the most. Instead, over the entire period of operation, most of these emissions freely communicated with

the environment as verified by air monitors which reported unsafe levels for the La Oroya community.

**U.S.EPA (1978c)** is a report that presents the findings of an investigation of air pollutant emissions from the reverb furnace pollution control system at a primary copper smelter. EPA reports that the study was performed to assess the degree of particulate emissions control and control problems associated with the application of electrostatic precipitators. When Defendants acquired the La Oroya smelter complex in 1997 it knew that the ESPs, especially the Central Cottrell unit, were old, poorly maintained and had low control efficiency. It did not take the time and effort to evaluate how inefficient this ESP was when the facility was purchased, and it was not until 2001 that it made incremental improvements to collection efficiency.

**U.S.EPA (1978d)** is identified earlier in this report. EPA provides a comprehensive listing of the sources of fugitive dust emissions from primary lead and copper smelters and zinc refining. This study contains extensive discussions and data on emission rates, emission factors, properties of and conditions under which fugitive dusts releases occur, the levels of metals typically found in the fugitive emissions, as well as good industry practices to control these. The citation provides a prescriptive basis by which an operator can develop a detailed emissions inventory and devise strategies to reduced fugitive dust emissions containing toxic metals.

**U.S.EPA (1979a-c) and (1979d)** cover testing programs for arsenic levels found in fugitive emissions from copper smelters. Several primary copper smelters were evaluated reporting on extensive in-plant sampling of fugitive dust discharges from the converter aisle, during the slag and blow cycle, and matte tapping operation at the reverb furnace. All of the investigations report high levels of arsenic and $SO_2$, emphasizing the need for collection and ducting to control devices. The relevance of these citations is explained in the citation below.

**U.S.EPA (1979e)** covers lead emissions from primary copper smelters. EPA states that “copper smelters are a significant source of airborne particulates” (p.1). This report covers one of seven copper smelters that EPA performed fugitive emission testing. Large levels of fugitive lead releases are shown from the sampling data for various emissions points within the copper smelter. Lead fugitive emissions from the converter line alone were reported to be 2 kg/hr. Other parts of the smelter where large fugitive emissions of lead were measured include reverb furnaces, roasters, at the sulfuric acid recovery plant, and calcine baghouses. The report is relevant because (1) it emphasizes the critical need to collect fugitive dust emissions from various stages of the process using hoods and ducting these to control devices; and (2) it provides detailed information on test methods, instrumentation, sampling procedures, and EPA approved methods to sample and measure fugitive emissions. I could find no records to support that Defendants performed any in-plant testing, either with their own staff or 3rd-party consultants to obtain measurements of their fugitive dust emissions in any part of the smelter complex. As reported by AIDA (2004) ‘if the sources of fugitive and stack emissions are not understood with some detail, it is difficult to design a valid mitigation plan… This is especially true when diverse and complex sources exist, such as at the La Oroya Metallurgical Complex. While rough estimates can be of some use, they are not an appropriate basis on which to design a long-term plan for mitigation.’

**U.S.EPA (1980)** is titled “Control of Copper Smelter Fugitive Emissions.” This is a comprehensive report dealing with fugitive emissions from copper smelting and emission control measures. This study examines controls applied by the smelting industry and provides recommended improved practices and alternative control devices. A significant portion of the report concerns emission control measures. EPA considered the devices and practices in use at the time and then made recommendations for more advanced controls and modifications that could enhance control efficiency, including adaptations of equipment used in other industries and changes in the smelting process, ranging from introduction of relatively simple process devices to major process changes. When Defendants purchased the La Oroya complex in 1997, they had extensive guidance and a roadmap to immediately begin reducing fugitive emissions containing lead and arsenic. The chronological assembly of records in Section 9 of this report shows that barely any efforts at all were taken by Defendants to reduce the fugitive emissions from the copper circuit.

On p.49 of EPA’s authoritative publication hooding systems are discussed. EPA reports “Emissions of sulfur dioxide and particulate from copper smelting are contained to some extent by hooding systems… Secondary hooding systems are being used also to partially control fugitives from some Peirce-Smith converters. At some smelters a fixed hood (Figure 28) located above the sliding gate is used in conjunction with the primary hood during blowing operations. Although it is somewhat effective during the blowing phases, the hood serves little use in controlling fugitive emissions when the converter is in the "rolled-out" position, i.e., when the gate is in the upmost position and the converter is pouring or receiving charge.”

On p.60 EPA explains that careful operator attention is required to ensure that hood capturing systems are effective. It reports on a variety of problems where hood capture effectiveness is poor unless properly controlled and that there are proper alignments, regular inspections and engineered adaptations to smelting practices. In Table 4 (p.62) EPA reports typical hooding efficiencies that can be as low as 50% for different stages of the smelting operation.

- It would be a leap in logic to assume that Defendants even gave an afterthought to ensuring their hoods were operating at high efficiencies. As documented in Section 9 of this report, the converter section had a canopy roof. Photo and plant CCTV images produced among Defendants’ records show high rising plumes of particulate and gaseous emissions releases to the atmosphere in an uncontrolled manner. These emissions were never addressed at any point in time as far as I can tell.

On p.63 EPA discusses building enclosure as a control option for converter buildings. EPA explains that this approach entails problems and can be costly. But this is a 1980 publication in which EPA writes that despite problems and cost, it is a technically feasible option. It states “Because of the problems with the currently used hooding systems, which are ineffective when the converter is pouring or receiving charge, the concept of total building enclosure has arisen… With proper design, maintenance, and cooperation of plant personnel, collection of converter fugitive emissions by total building enclosure could be very effective. Proper design would involve such factors as tightness of the building, capacity of the takeaway fans, movable truck and rail doors, lighting, and ventilation throughout the entire building… Maintenance, particularly of the air moving equipment, would be important to minimize problems with system ventilation imbalances. Training and daily performance of employees would be very important to

ensure that doorways, louvers, or other openings are kept closed at all times when not in use. Such careful practice by plant personnel would minimize disturbance of airflows. The merit of total converter building enclosure is the possibility that such a system could capture nearly all of the fugitive emissions."

- Defendants understood that the converter section was a major fugitive emission source. Even efforts to partially enclose the building would have been better than ignoring the emissions, which is what they did.

**U.S.EPA (1983)** ("Inorganic Arsenic Emissions from Low-Arsenic Primary Copper Smelters - Background Information for Proposed Standards") are proposed standards of performance intended to limit emissions of inorganic arsenic from existing and new primary copper smelters processing feed materials containing less than 0.7 percent arsenic. The proposed standards implement Section 112 of the Clean Air Act and are based on determination of June 5, 1980 (45 FR 37886), that inorganic arsenic presents a significant risk to human health as a result of air emissions from one or more stationary source categories and is therefore a hazardous air pollutant. Long before Defendants purchased and operated the smelter complex, they knew that arsenic was a hazardous air pollutant. Defendants did not begin to reduce these emissions until almost a decade after they acquired the facility. There are approximately 50 sources at the smelter containing arsenic, many of which are fugitives, which Defendants never quantified and developed control strategies for controlling.

Statutory requirements like the CAA are intended to be protective of human health. Defendants purchased an industrial complex in a country that they understood from the beginning did not have air quality standards that were protective for arsenic and lead as well as $SO_2$, cadmium and fine particulate matter. They knew that because there were no protective air quality standards and ineffective enforcement policies and practices that they had free reign to pollute. They conducted operations with little sense of urgency to take actions to reduce harmful air emissions and operated the facility for a decade or more without taking efforts to reduce emissions that they intentionally released in an uncontrolled manner.

**U.S.EPA (1985)** is EPA's 5-year review of the U.S. National Ambient Air Quality Standard (NAAQS) in which it has the responsibility to develop for each pollutant air quality criteria that reflects the latest scientific knowledge about the pollutant's effect upon humans. EPA revised the particulate matter standard and published it in the Federal Register on March 20, 1984. It replaced the thirteen year-old standard for total suspended particulates. The revised standard represents the primary step in the chain of events that lead to the development of regulations and rules to be included in State Implementation Plans, resulting in enforceable standards applicable to existing sources. EPA evaluated control technologies available and their applicability in controlling particulate matter in the lower micron levels. Defendants operated smelters in the United States and were knowledgeable of how standards intended to be protective of human health became more protective over time. Statutes like the CAA are intended to be protective of human health; they are not simply statutory obligations. By the time 1997 came along, Defendants knew much more about safe levels of exposure and pollution control than EPA's 1985 publication.

**Pollution Prevention Act (1990)** focused industry, government, and public attention on reducing the amount of pollution through cost-effective changes in production, operation, and raw materials use. U.S. Congress focused industry attention on applying good industry practices to reduce multi-media pollution by focusing on good industry practices. This act had a profound impact on the way U.S. manufacturing operations managed raw materials, waste streams, air emissions, energy and other media that are part of business operations. Throughout the 1990s many thousands of case studies were published by U.S. companies on pollution reductions achieved from the adoption of good industry practices. These same pollution prevention programs rolled out across Europe. By the time Defendants purchased the La Oroya smelter, pollution prevention practices were well entrenched in global manufacturing operations across all industry sectors.

**U.S. EPA (1995a)** is AP-42 Metallurgical Industry, Section 12.6 - Primary Lead Smelting. This standard well-recognized publication provides emission factors, none of which were applied by Defendants in developing emissions inventories at any point in time. Without knowing the plant's emissions, it is not possible to define a program to reduce the pollution. See also **U.S.EPA (2007)** which is AP-42 Metallurgical Industry, Section 12.18 - Lead bearing Ore Crushing and Grinding. This provides emission factors which the Defendants never considered in devising reasonable estimates of emissions.

**U.S.EPA (1995b)**. Appendix B.2 - Generalized Particle Size Distributions provides generalized particle size distribution data for many different operations, including ore sizing and grinding operations, as well as pollution controls such as ESPs, baghouses, cyclone separators and scrubbers. I have seen no evidence that Defendants took the time and effort to measure the PSD of particulate matter discharged from stacks and various pollution controls. The consequence of this is that it had no knowledge of the magnitude of fine particulate matter emissions (PM2.5) which EPA has documented to be the highest risk to human health from dust emissions. None of the air dispersion modeling studies it contracted consultants to perform acknowledge fine particulate matter. Its health risk studies do not appear to acknowledge PM2.5. None of Defendants pollution controls were designed to be effective for fine particulate matter control and none were upgraded to control fine particulate matter containing lead and arsenic. Defendant could have applied the data and information in this publication to develop emission estimates and account for these factors in pollution control strategies. Like the other information and good practices explained in this section, Defendants ignored this authoritative study and had ineffective environmental management practices.

**U.S.EPA (1995c)** is an industry sector notebook of the nonferrous metals industry. This notebook is a snapshot of the emissions and compliance records of the industry sector. EPA's publication stresses the importance of adopting pollution prevention practices at lead and copper smelters and zinc refining. On p.73 EPA wrote "t[T]he best way to reduce pollution is to prevent it in the first place. Some companies have creatively implemented pollution prevention techniques that improve efficiency and increase profits while at the same time minimizing environmental impacts. This can be done in many ways such as reducing material inputs, re-engineering processes to reuse by-products, improving management practices, and employing substitution of toxic chemicals. Some smaller facilities are able to actually get below regulatory thresholds just by reducing pollutant releases through aggressive pollution prevention policies."

EPA's publication describes the 35/50 Program beginning on p.133 which was EPA's voluntary program to reduce toxic chemical releases and transfers of 17 chemicals. Participating companies pledged to reduce their toxic chemical releases and transfers by 33% as of 1992 and 50% as of 1995 from the 1988 baseline year. Exhibit 31 of EPA's report (p.115) shows that the Defendants participated in the program and reported to have reduced the emissions from their St. Louis smelter by 49% in 1993 by implementing pollution prevention programs. They clearly understood the positive impacts of implementing pollution prevention practices to improving environmental performance at the time it purchased the La Oroya smelter.

**U.S.EPA (1998a)** is titled "Locating and Estimating Air Emissions from Sources of Lead and Lead Compounds." Chapter 4 of EPA's authoritative publication discusses emissions from primary smelting. Table 4-1 lists domestic primary lead smelters in the U.S. of which two of the three were owned and operated by the Defendants. The table (p.4-1) lists the Defendants' Herculaneum smelter as the largest plant in the U.S. in terms of production.

EPA reports "Because lead emissions generally are associated with PM emissions, devices used to control PM emissions should also control lead emissions. However, no data on the effectiveness of fabric filters and ESPs in controlling lead emissions are available." EPA's statement emphasizes the need and importance of performing stack tests and developing source and site-specific emission factors and establishing control efficiencies. I was unable to locate stack test records for pollution controls nor documents or reports which verified control efficiencies for the controls it took over or even replaced a few times over the years. This leads me to conclude that Defendants simply operated the smelter complex without carefully managing air emissions.

Table 4-2 of EPA's authoritative publication documents lead emission factors for specific primary lead operations. I could not find any records produced by the Defendants that they relied on emission factors in preparing emission estimates. I could not find any records in which they ever prepared a formalized emissions inventory.

On p.4-10 EPA reports "The lead content of particulate emissions ranges from 20 to 65 percent. For blast furnaces, the lead content of total PM ranges from 10 to 40 percent. The lead content of particulate emissions from dross reverberatory furnaces ranges from 13 to 35 percent. For processes where the operating temperature is near the boiling point of lead, such as the sinter machine, lead fume may be emitted." Surely Defendants knew all of this at the time they acquired the facility in 1997. When their corporate representatives walked through the smelter complex prior to and after the purchase of the complex he could not help but see the large uncontrolled fugitive emissions from the dross plant, the sinter plant, the converter section of the smelter, from the ore handling operations, nor could it not have acknowledged the fugitive emissions from the unpaved road system within the plant or from waste piles of arsenic trioxide, slag and other wastes. Their corporate representatives saw a sinter plant with no walls where emissions freely discharged to the atmosphere. They saw blast furnaces spewing hot air containing lead and arsenic rapidly rising from the interior of building operations and being released directly to the atmosphere. They saw the converter section with nothing more than a canopy roof spewing an endless cloud of fine particulate matter loaded with high levels of arsenic and lead into the air and being carried off to residential areas. Cited exhibits document

what Defendants knew before and at the time they owned and operated the complex. Defendants had no plans to address these and invested minimal effort and resources to reduce and control these emissions for nearly a decade.

Section 4.3 of EPA's authoritative publication covers emissions from primary copper smelting.

Beginning on p.4-24 EPA reports "Particulate matter and $SO_2$ are the principal air contaminants emitted from primary copper smelters. Actual emissions from a particular smelter will depend upon the smelting configuration (type and mix of equipment used), control devices applied, and the operating and maintenance practices employed. Typically, lead will be emitted as PM. In addition, actual lead emissions will vary depending on the quantity of lead introduced to the smelter with the copper-bearing feed materials. The available emission factors for smelting and converting are presented in Table 4-5." Again, EPA's statement emphasizes the importance of developing site and process-specific emission factors, emission rates, capture efficiencies, and in developing accurate inventories. Defendants' records are noticeably absent of this basic data and information. Defendants' records support that it did not even rely on the literature published emission factors to develop even gross estimates of emissions. Without any quantitative understanding of the pollution levels and sources of emissions, it is not possible to devise a meaningful control strategy. They ignored good practices and applied poor environmental management practices over the entire history of operation.

On p.4-27 of EPA's authoritative publication it reports "In addition to process emissions, significant quantities of fugitive emissions are also generated during material handling operations and furnace charging and tapping. Fugitive particulates emitted from primary copper smelting consist primarily of metallic oxides and dust. Major sources of fugitive emissions are shown in Figure 4-9. Principal sources include ore concentrate unloading and handling, calcine transfer operations, furnace tapping operations, and converter charging and skimming operations. Information on chemical characteristics of fugitive particulate, including lead content, from a variety of these sources is presented in Table 4-6. The data illustrated in the table suggest that the principal source of fugitive lead emissions may be the converters, with fugitive particulate emissions containing 2 to 6 percent lead." There is no excuse for Defendants to not have known this at the time they acquired the complex.

On p.4-30 EPA states "Fugitive emissions produced by the majority of smelter fugitive sources, including ore concentrate handling, calcine transfer, and furnace tapping (matte and slag), are controlled by enclosing the fugitive emission points in a hood and exhausting the captured emissions to a control device for collection. Fugitive emissions associated with converter operations are much more difficult to control. These emissions are substantial and occur during charging, skimming, or pouring operations when the converter mouth is rotated out from under the primary hood. **<u>They also result from primary hood leakage</u>**. Control techniques for converter fugitive emissions include secondary hoods of various designs and ventilating the converter building to a control device. All plants currently operating have hooding at all smelting furnace/vessel matte and slag tapping points. Six of the eight plants in operation have both primary and secondary hoods on Pierce-Smith converters." The La Oroya smelter used the same capturing hood systems to capture fugitives.

- I could not find test and service records for hood devices. When the facility was acquired by Defendants, they acknowledged that equipment was in poor operational shape, unreliable and highly polluting. The hood capturing systems were primary controls used to capture fugitives and yet among millions of documents no records concerning testing of hood efficiencies could be located. There are no records located which refer to regular maintenance, inspection and testing of hood efficiencies, nor could I find records which obtained measurements to confirm whether there were adequate hood face velocities to ensure good capture efficiency, or information on rates of leakage or misalignment. Given Defendants' lack of attention to stack testing and to fugitive emissions, it is more likely than not that capturing hoods were highly ineffective and that fugitive emissions were larger than the estimates reported in my analysis. Their lack of attention to these critical controls is a significant failure on the part of Defendants to apply good practices to managing fugitive emissions.

**U.S.EPA (1998b)** is titled "Stationary Source Control Techniques Document for Fine Particulate Matter." EPA presented information on the health effects of elevated concentrations of respirable particulate matter (PM) in ambient air. This analysis lead to revisions of the national ambient air quality standards (NAAQS) for PM. In this publication EPA added a new "indicator" to measure respirable PM concentrations. The previous indicator was PM10, which is defined as particle matter having a nominal aerodynamic diameter of 10 micrometer (μm) or less. The additional indicator is based on smaller particles, PM2.5, defined as PM less than or equal to 2.5 micrometer in aerodynamic diameter. EPA stated that the purpose of its document is to support the development of implementation strategies for attaining revised ambient standards for PM, based on PM2.5 and PM10. The publication is a revision of the EPA's 1982 guidance on *Control Techniques for Particulate Emissions from Stationary Sources* (U.S.EPA 1982). It states, "the focus of this document is on the control of PM10 and PM2.5 emissions from industrial sources."

With this publication, the EPA made it clear that PM2.5 is a higher health risk than PM10. Defendants understood that all of their stack emissions were comprised of PM10 and from the literature sources cited above, it further knew that there were significant portions of these particulate air emissions that extended into the PM2.5 range. They further knew or should have known from the above citations that their pollution controls had the lowest control efficiencies in the smaller particle size range. Particles released from 50 or more sources at the smelter contain lead, arsenic and cadmium.

It does not appear that Defendants bothered to measure, estimate, or acknowledge PM2.5 emissions from any of the fugitive emissions sources over their entire ownership period. These emissions were intentionally released directly to the atmosphere, the consequence of which these high risk pollutants were transported by atmospheric winds into the La Oroya and surrounding communities.

**U.S.EPA (1999)** is the Federal Register covering *National Emission Standards for Hazardous Air Pollutants from Primary Lead Smelting*. The NESHAP standards embody all of the good industry practices that lead smelters are to adopt in order to control their lead, arsenic, cadmium, $SO_2$ and fine particulate matter emissions. Indeed, what were voluntary good industry practices promoted by EPA and responsible industry stakeholders for several decades as note in the

citations above, became mandatory. Regulations become necessary when the actions of some companies ignore reasonable good practices.

The following are excerpts and my comments on the pertinent good practices explained in NESHAP:

- "Primary lead smelters have been identified by the EPA as significant emitters of lead compounds, and other metal hazardous air pollutants (HAP) including arsenic, antimony, and cadmium. Exposure to lead compounds may result in adverse effects on the blood, central nervous system and kidneys. Chronic exposure to arsenic is associated with skin, bladder, liver and lung cancer and other developmental and reproductive effects. This NESHAP provides protection to the public by requiring all primary lead smelters to meet emission standards that reflect the application of maximum achievable control technology (MACT)."
    - The Defendants were operating two lead smelters in the United States when EPA wrote this. Defendants understood that the good industry practices explained in NESHAP are applicable to the emissions from the La Oroya smelter.

- A supplemental proposal was published in the Federal Register on February 12, 1999 (64 FR 7149). "This notice proposed an operating limit that would require owners and operators of a primary lead smelter to operate and maintain each baghouse such that the required bag leak detection system would not sound more than five percent of the operating time."
    - There is no evidence to support that such a practice was ever adopted by Defendants. In fact, no stack test records have been located.
    - No monitoring records have been located for some of the secondary stacks, such as those servicing baghouses and cyclones.
    - No records have been located which document improvements in collection efficiencies to baghouses that were repaired or replaced.

- EPA proposed operating and control standards to limit metal HAP emissions from: (1) process sources, (2) process fugitive sources, and (3) fugitive dust sources. EPA states "Process source emissions are discharged as the main exhaust of a sinter machine or smelting furnace through a chimney, flue, or ductwork. Process sources that are regulated include sinter machines, blast furnaces, and dross furnaces. Process fugitive emission sources that are regulated include sinter machine charging and discharging, sinter crushing and sizing, blast furnace tapping, and dross furnace charging and tapping."
    - The smelter complex had all of these emission sources. Defendants knew before and at the time they acquired the plant that the mass emission rates from the Main stack were nothing short of obscene and that many to most of the other sources that EPA cites were uncontrolled.

- EPA wrote "Fugitive dust sources that are regulated include plant yards and roadways subject to wind and vehicle traffic, process areas, and materials handling and storage areas."
    - Defendants did not complete paving in-plant roads until about 2006.

  - No records could be located on how Defendants managed stockpiles of arsenic trioxide and other toxic waste piles at the smelter.

- "Process and Process Fugitive Sources A ''plant wide'' emission limit is being promulgated for lead compounds from process and process fugitive emission sources. The lead compound emission limit is a surrogate for all metal HAP's… The aggregated lead emissions from the following process and process fugitive sources are limited to 500 g/Mg of lead produced (1.0 lb/ton of lead produced): (1) Sinter machine; (2) Blast furnace; (3) Dross furnace; (4) Dross furnace charging location; (5) Blast and dross furnace tapping locations; (6) Sinter machine charging location; (7) Sinter machine discharge end; (8) Sinter crushing and sizing equipment; and (9) Sinter machine area."
  - Defendants did not prepare a plant wide emissions inventory. They had no idea what the emissions were from each of the major sources identified by EPA. The consequence of this is that they had no basis or even rudimentary idea of how to apply good practices to these sources.

- EPA further wrote – "**<u>In addition to the emission limit</u>**, work practice standards are required for the above listed fugitive sources (items 4 through 9). The charging, tapping, and sinter handling sources identified above (items 4 through 8) shall be equipped with a hood ventilated to an air pollution control device. The hood design and ventilation rate shall be consistent with the American Conference of Governmental Industrial Hygienists (ACGIH) recommended practices. In addition, the sinter machine and sinter crushing and sizing equipment shall be located in a building ventilated to a baghouse or equivalent device at a rate that maintains in-draft through any doorway opening."

- "The operator must install a bag leak detection system for each baghouse used on a process or process fugitive source. The bag leak detection system shall be equipped with an audible alarm that automatically sounds when an increase in particulate matter (PM) emissions above a predetermined level is detected."

- "Operators are further required to maintain and operate each affected baghouse such that the bag leak detection device does not sound more than five percent of the total operating time in any 6-month period. Alarms caused by startups, shutdowns, or malfunctions are not included in the alarm time calculation if the condition is described in the startup, shutdown, and malfunction plan and the operator follows all the procedures in the plan prescribed for the subject condition."
  - I have been unable to find a record or reference to a record where such practices were adopted and enforced by Defendants.

- EPA further explained standards for fugitive dust sources. These are in the form of work practice and operating standards. The EPA promulgated these standards through Standard Operating Procedures (SOP) for fugitive dust sources.
  - Some of these good practices were found to be implemented by Defendants but records support these did not begin until as early as 2004 and possibly later. Further discussion is given in Section 9.



EXHIBIT 34

- Compliance Test Methods were established by EPA to measure the lead emissions from the process and process fugitive sources included in the plant wide emission limit. Testing of lead compound emissions from process and process fugitive emission control devices are to be conducted according to EPA reference method 12 (40 CFR part 60, appendix A). Sampling locations for all compliance tests must be determined by EPA reference method 1. Stack gas velocity and volumetric flow rate is to be determined by EPA reference method 2. EPA further specified rigorous procedures for calculating lead emission rates supported by stack testing and measurements of fugitive emissions.
  - As already noted, Defendants had no formal emissions inventory. There are no referenced emission factors identified among records. There is a noticeable absence of stack test reports and records are devoid of any fugitive emissions testing.

- NESHAP also established Monitoring Requirements. Operators are required to develop and operate according to a SOP manual for operation and maintenance of the control devices used to comply with the emission limits. Each smelter's SOP manual is to be reviewed and subject to approval by the EPA Administrator. Prescriptive methods and procedures for alarms, leak detection systems for both point and fugitive sources are covered. EPA states "The system shall be capable of detecting PM emissions at concentrations of 10 milligrams per actual cubic meter (0.004 grains per actual cubic foot) and provide an output of relative PM emissions. Operators shall continuously record the bag leak detection system output. Such a device shall serve as an indicator of the performance of the baghouse and shall provide an indication of when maintenance of the baghouse is needed."
  - Defendants had no regulatory oversight that ensured that such good practices were ever adopted. They knew from NESHAP that these were good industry practices, but the lack of regulatory inspection and enforcement in Peru allowed these practices not to be implemented in a consistent manner.

- The standards include maintenance and inspection requirements on aggressive schedules to ensure that pollution controls were operating at highest levels of control.
  - Defendants acquired a facility which their corporate representatives have acknowledged had old, inefficient and unreliable pollution controls.

- The NESHAP standards include sinter building ventilation balancing – i.e., establishing baseline ventilation parameters and practices to ensure that hoods are properly operating and ducted.
  - Exhibit 50 shows the sinter plant was an open building – i.e., no walls. As seen in the exhibit, fugitive emissions were intentionally discharged to the outside.

# 7. AIR QUALITY STANDARDS

## 7.1 Relevance of Air Quality Standards

All air quality standards (AQS) are established in order to define a safe level of air quality for the public. In the U.S. these are embodied under the CAA and various standards like the NAAQS.[76]

AQS are not universal. They vary between countries, and even in the United States there are differences between standards whereupon the minimum safe levels are established by the Federal Government.

In this matter, AQS are relevant because they are the benchmark by which to gauge the actions taken by Defendants in reducing emissions to within safe levels.

## 7.2 Peru Maximum Permissible Limits

A legal notice published Maximum Permissible Limits (MPL) in 1996 (Normas Legales (1996)). The limits are set forth in Article 226 of the Amended Text of the General Mining Law (Supreme Decree No. 1492-EM) which calls for the implementation of provisions contained in Legislative Decree No. 613 – Environmental Code and Natural Resources related to mining and energy activities. Maximum Permissible Limits were approved for sulfur dioxide ($SO_2$), particulate matter (PM), lead (Pb) and arsenic (As). The MPLs were intended to be protective of human health. The following definitions for concentrations are given in the notice:

- Daily arithmetic mean concentration – defined as the concentration obtained by dividing the sum of the concentrations measured for 24 hours by the number of measurements taken. "For this purpose samples taken at least 16 hours." Referred to in this memo as Allowable Daily Average.
- Annual arithmetic mean concentration – defined as the concentration obtained by dividing the sum of the values calculated for the daily arithmetic mean concentration of the number of days that the measurements were performed. "For this purpose the duration of the calendar year shall be taken into consideration."
- Annual geometric mean concentration – defined as the concentration obtained removing the Nth root (n is the number calculated for the daily average concentration arithmetic values) of the product of arithmetic mean concentrations.
- Suspended particles – defined as particles with aerodynamic diameters less than 10µm (i.e., PM10).

These definitions are consistent with those used in other countries. The MPLs defined in the notice are summarized in Table 4.

[76] https://www.epa.gov/naaqs

Table 4. The 1996 Peru Maximum Permissible Limits.[77]

| Pollutant | 30-min (µg/m³) | Monthly Avg. (µg/m³) | Avg. Daily (µg/m³) | Avg. Annual (µg/m³) | Annual Geometric Mean (µg/m³) |
|---|---|---|---|---|---|
| Anhydrous Sulfur | | | 572[a] | 172 | |
| PM10 | | | 350[a] | | 150 |
| Lead | | 1.5 | | 0.5 | |
| Arsenic | 30[a] | | 6 | | |

[a]Not to be exceeded more than once per year

The MPLs listed in Table 4 are for ambient air concentrations at receptor locations. These were specified by the Government of Peru as maximum limits of exposure not to be exceeded for public safety.

Defendants were mandated to control their air discharges in order to achieve these MPLs. In accordance with the PAMA, Defendants were required to bring the facility within compliance with maximum allowable discharge limits that would meet the MPLs within 10 years. They had the responsibility of defining the allowable discharge limits from the smelter's sources and then implementing projects that would reduce emissions to levels that would meet the MPLs.

In 2001 the Government of Peru revised the Peru AQS for lead and PM10 (Supreme Decree (2001, 2003)) and $SO_2$ ($SO_2$ is discussed separately under Section 7.6.2). The revised standards became more health protective and comparable to the U.S. NAAQS. Table 5 lists both the revised Peruvian standard and the U.S. NAAQS for PM and lead.

Table 5. Revised Peruvian AQS (bottom) and U.S. NAAQS.

| U.S. NAAQs | | | | | |
|---|---|---|---|---|---|
| Pollutant | | Primary/Secondary | Averaging Time | Level | Form |
| Lead (Pb) | | primary and secondary | Rolling 3 month average | 0.15 µg/m³ (1) | Not to be exceeded |
| Particulate Matter | PM2.5 | primary and secondary | 24 hours | 35 µg/m³ | 98th percentile, averaged over 3 years |
| | PM10 | primary and secondary | 24 hours | 150 µg/m³ | Not to be exceeded more than once per year on average over 3 years |
| (1) In areas designated nonattainment for the Pb standards prior to the promulgation of the current (2008) standards, and for which implementation plans to attain or maintain the current (2008) standards have not been submitted and approved, the previous standards (1.5 µg/m³ as a calendar quarter average) also remain in effect. | | | | | |
| https://www.epa.gov/criteria-air-pollutants/naaqs-table | | | | | |

| Peru Air Quality Standards | | | | | |
|---|---|---|---|---|---|
| Pollutant | | Primary/Secondary | Averaging Time | Level | Form |
| Lead (pb) | | primary and secondary | Annual | 0.5 µg/m³ (1) | Annual Average |
| | | | Monthly | 1.5 µg/m³ (2) | NE more than 4 times/year |
| Particulate Matter | PM10 | primary and secondary | Annual | 50 µg/m³ (2) | Arithmetic mean annual |
| | | primary and secondary | 24 hours | 150 µg/m³ (2) | NE more than 3 times/year |
| | PM2.5 | None | | | |
| (1) SUPREME DECREE No. 069-2003-PCM (see http://www.digesa.minsa.gob.pe/norma_consulta/DS-069-2003-PCM.pdf) | | | | | |
| (2) SUPREME DECREE No. 074-2001-PCM - ENVIRONMENTAL AIR QUALITY NATIONAL STANDARDS REGULATION, 2001 | | | | | |
| NE - Not to exceed | | | | | |

[77] Normas Legales (1996)



EXHIBIT 34

## 7.3 Lead

### 7.3.1 Lead Air Quality Standards

The review supports that the Peruvian Average Annual MPL specified for lead in the 1996 public notice was in line with standards in other countries. The Commission of the European Communities (EC) provides a list of the MPLs established by European nations (European Commission 1997). MPLs cited in this document were applicable up to 1999.

Exhibit 6 documents the MPLs for different EU nations. Most EU countries had established a legislative level of 2.0µg/$m^3$ for the Avg. Annual MPL. Only three countries had established more protective limits: 0.5µg/$m^3$ (Finland and Holland), and 0.2µg/$m^3$ (Poland). Poland is the only country listed that had an MPL for a daily avg. (1.0 µg/$m^3$). None of the countries listed had legislative monthly average MPLs.

The WHO recommended guideline for that time period was 0.5 µg/$m^3$, which Peru chose to adopt.[78]

The US MPL established by the U.S.EPA applicable during this time period was promulgated in 1978 and established to be 1.5µg/$m^3$ based on a quarterly average. In October 2008, U.S. EPA announced new standards setting airborne lead particle exposure limits at 0.15µg/$m^3$.[79]

The 1996 environmental evaluation of the La Oroya metallurgical complex reported that the proposed standards for lead were higher (meaning less restrictive) than other countries (DRRC-00077581. The above comparisons contradict this claim. Rather Peru MPLs established for lead were protective of human health and consistent with and even more protective than other countries based on the time period.

### 7.3.2 Ambient Lead Concentrations

Exhibit 1 shows the locations of air monitoring stations that Defendants relied on for air quality measurements. The Sindicato monitoring station is most representative of air quality in La Oroya and La Oroya Antigua.[80] Ambient air monitoring stations were operating since 1994[81] prior to Defendants' purchase of the facility, although some were shut down and relocated. The Sindicato station continued to operate and was supplemented with a more precise $SO_2$ monitor in 2004. A draft memorandum dated February 11, 2004 identified the Sindicato monitoring station as being most representative of community exposures.[82] It is reasonable to assume that Defendants took the time to review ambient air monitoring records and understood how the plant's air pollution impacted the surrounding communities.

---

[78] Normas Legales (1996)
[79] https://www.epa.gov/criteria-air-pollutants/naaqs-table
[80] DRRC-00051190 – Integral Consulting, Human Health Risk Assessment Report – La Oroya Metallurgical Complex, December 2, 2005
[81] DRRC-00077581 – Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, 1996. "As of March, 1994, Peruvian Government regulations require that all mining and metallurgical companies establish an ambient monitoring program."
[82] DRRC-00051190

Exhibit 7 is a plot of average annual lead concentrations reported for the Sindicato air monitoring station. Defendants operated the smelter complex between 1997 and June 2009. The Peru MPL is noted on the graph. For comparative purposes, the air monitoring data reported for 1996 is included on the graph.

The plot shows that after Defendants began operating the smelter complex air quality significantly worsened. Monitoring data show that air quality did not return to historical levels of 1996 until 2007. At no time between 1997 and 2008 were ambient air concentrations of lead at Sindicato at or below the Peruvian MPL. Ambient concentrations of lead measured at the Sindicato air monitoring station were only slightly below the MPL by June 2009.

Exhibit 8 is a plot which compares the lead concentrations reported for the Sindicato air monitoring station to the Peruvian MPL levels, levels measured in EU countries, and levels measured in the US. These comparisons show that lead concentrations in air were as much as 10 times above the Peru MPL, more than 17 times above levels measured in EU countries, and nearly 27 times higher than levels measured in the US. Even when the facility ceased operation in June 2009, lead levels were 1.5 times higher than EU countries have reported and 3.3 times higher than average annual levels reported for that year in the U.S.

Exhibit 9 is a plot of the average monthly lead concentrations reported for the Sindicato air monitoring station. Concentrations are compared against the Peruvian monthly MPL. The plot shows that monthly averages began to decrease after 2000 but generally were significantly above the MPL until about the 1st quarter of 2007. Although monthly averages tended to trend to lower levels, there are very few months where the MPL was met until after early 2007, and even into 2008 certain months exceeded the MPL. While the period between early to mid-2007 shows a declining trend in concentration, the annual averages exceeded the MPL for the entire operational period.

### 7.4 Arsenic

There is no ambient air standard for arsenic in the United States. WHO (2000) has reported that a safe level of arsenic in air cannot be established. It is not clear the basis by which the Government of Peru established MPLs. Table 4 reports two MPLs: an MPL for 30 minutes of exposure that may not be exceeded more than once per year, and an average daily MPL.

No records have been identified in which Defendants monitored the daily and 30-min averages. Records from 2000 to 2009 show that daily average concentrations were recorded every three days at monitoring stations. Records for earlier years report only monthly or annual averages.

The absence of monitoring records which track air quality conditions in relation to the MPLs supports the view that Defendants did not concern themselves with community exposure to arsenic. Monitoring stations were operable from the time Defendants began operating the smelter complex. In order for the facility to reduce emissions to within safe levels in the community, baseline data would be required to know how the plant's releases influence air quality in the surrounding area; but there is no evidence that Defendants concerned themselves with establishing strategies to reduce these emissions.

Two years of daily monitoring records were examined in detail (2006 and 2007). These records appear to only report a daily average arsenic concentration (although it is not clear that the reported values are daily averages or simply spot measurements).[83] Assuming these records to be based on an integrated daily average of data taken over 24 hours, the daily average MPL was exceeded on multiple occasions. An additional concern is that measurements were reported only for every other day. It is impossible for Defendants to have established whether they were in compliance without having obtained and reviewed daily measurements based on integrated averages taken over 24 hour periods. Further, the absence of continuous monitoring records shows that Defendants ignored the 30-min MPL altogether.

Table 6 provides the Defendants reported daily records for 2006. Highlighted values are those measurements which exceed the average daily MPL. Defendants' records show:

1. No data was gathered on 30-min MPL concentrations. The Government of Peru's position was this MPL should not be exceeded more than once per year. It is not possible to establish with absolute certainty whether this occurred at the time since Defendants only obtained either a daily average or spot measurement every other day. However, high values reported in Table 6 strongly suggest that the 30-min MPL was exceeded. See as examples the recorded concentrations for the month of March, April, and October. The average daily arsenic concentrations range from >10 to >16$\mu g/m^3$. It is within scientific certainty that levels over a 24-hour period for any one of these extreme day events exceeded the 30-min MPL.

2. Table 6 is an example of the summary statistics of the air monitoring data. The bottom of the table and the last three columns report average, maximum and minimum values. These reported values provide a false impression when initially examined because they imply daily averages rarely exceed the MPL. There is no information that allows either the Peruvian regulatory agency or the public to be informed of whether the 30-min MPL was ever exceeded. The statistical averages are meaningless because they only reflect an average, minimum and maximum for the data values recorded from random sampling days. Defendants therefore masked the severity of arsenic concentration in the community.

[83] DRPE-0000645981; DRPE-0001561600

Table 6. Sindicato air monitoring results for arsenic for 2006.[84]

| Date | Enero | Febrero | Marzo | Abril | Mayo | Junio | Julio | Agosto | Septiembre | Octubre | Noviembre | Diciembre | Promedio | Max. | Min |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4.829 | | | 16.485 | 1.341 | | | | 0.909 | 1.003 | | | 4.913 | 16.485 | 0.909 |
| 2 | | | 10.065 | | | | | 2.144 | | | | | 6.105 | 10.065 | 2.144 |
| 3 | | 4.892 | | | | 2.300 | 2.234 | | | | 3.240 | 1.274 | 2.788 | 4.892 | 1.274 |
| 4 | 3.500 | | | 5.937 | 3.826 | | | | 6.415 | 1.461 | | | 4.228 | 6.415 | 1.461 |
| 5 | | | 7.790 | | | | | 2.713 | | | | | 5.252 | 7.790 | 2.713 |
| 6 | | 2.541 | | | | 1.029 | 4.292 | | | | 3.160 | 5.836 | 3.371 | 5.836 | 1.029 |
| 7 | 0.834 | | | 15.830 | 3.573 | | | | 0.886 | 9.647 | | | 6.154 | 15.830 | 0.834 |
| 8 | | | 0.947 | | | | | 3.847 | | | | | 2.397 | 3.847 | 0.947 |
| 9 | | 4.011 | | | | 3.297 | 0.919 | | | | 2.553 | 4.646 | 3.085 | 4.646 | 0.919 |
| 10 | 1.874 | | | 1.533 | 2.070 | | | | 0.904 | 2.139 | | | 1.704 | 2.139 | 0.904 |
| 11 | | | 8.347 | | | | | 1.105 | | | | | 4.726 | 8.347 | 1.105 |
| 12 | | 5.752 | | | | 1.462 | 0.880 | | | | 7.514 | 3.212 | 3.764 | 7.514 | 0.880 |
| 13 | 0.839 | | | 8.534 | 1.530 | | | | 3.235 | 1.488 | | | 3.125 | 8.534 | 0.839 |
| 14 | | | 1.637 | | | | | 0.939 | | | | | 1.288 | 1.637 | 0.939 |
| 15 | | 3.681 | | | | 0.882 | 0.892 | | | | 3.603 | 3.683 | 2.548 | 3.683 | 0.882 |
| 16 | 1.554 | | | 3.446 | 2.216 | | | | 1.174 | 2.851 | | | 2.248 | 3.446 | 1.174 |
| 17 | | | 6.506 | | | | | 1.720 | | | | | 4.113 | 6.506 | 1.720 |
| 18 | | 5.100 | | | | 0.946 | 2.818 | | | | 1.430 | 1.599 | 2.379 | 5.100 | 0.946 |
| 19 | 4.200 | | | 4.397 | 2.545 | | | | 2.745 | 1.481 | | | 3.074 | 4.397 | 1.481 |
| 20 | | | 14.700 | | | | | 3.361 | | | | | 9.030 | 14.700 | 3.361 |
| 21 | | 4.200 | | | | 1.583 | 2.497 | | | | 2.952 | 2.753 | 2.797 | 4.200 | 1.583 |
| 22 | 1.429 | | | 4.670 | 3.551 | | | | 0.901 | 10.458 | | | 4.202 | 10.458 | 0.901 |
| 23 | | | 6.882 | | | | | 0.919 | | | | | 3.901 | 6.882 | 0.919 |
| 24 | | 2.164 | | | | 1.116 | 0.881 | | | | 1.860 | 2.665 | 1.737 | 2.665 | 0.881 |
| 25 | 2.766 | | | 0.982 | 2.037 | | | | 0.900 | 3.190 | | | 1.975 | 3.190 | 0.900 |
| 26 | | | 14.103 | | | | | 1.043 | | | | | 7.573 | 14.103 | 1.043 |
| 27 | | 5.500 | | | | 6.464 | 4.444 | | | | 3.173 | 4.490 | 4.814 | 6.464 | 3.173 |
| 28 | 3.278 | | | 2.264 | 1.190 | | | | 1.599 | 3.713 | | | 2.409 | 3.713 | 1.190 |
| 29 | | | 3.234 | | | | | 3.818 | | | | | 3.526 | 3.818 | 3.234 |
| 30 | | | | | | 2.571 | 4.986 | | | | 3.489 | 1.195 | 3.060 | 4.986 | 1.195 |
| 31 | 4.500 | | | | 0.880 | | | | | 9.308 | | | 4.896 | 9.308 | 0.880 |
| PROM | 2.691 | 4.205 | 7.421 | 6.408 | 2.251 | 2.165 | 2.484 | 2.161 | 1.967 | 4.249 | 3.297 | 3.135 | 3.780 | 6.826 | 1.366 |
| MAX | 4.829 | 5.752 | 14.700 | 16.485 | 3.826 | 6.464 | 4.986 | 3.847 | 6.415 | 10.458 | 7.514 | 5.836 | 9.030 | 16.485 | 3.361 |
| MIN | 0.834 | 2.164 | 0.947 | 0.982 | 0.880 | 0.882 | 0.880 | 0.919 | 0.886 | 1.003 | 1.430 | 1.195 | 1.288 | 1.637 | 0.834 |

RESUMEN MENSUAL DE CONCENTRACION DE ARSENICO LAS 24 HORAS DEL 01/01/06 AL 31/12/06

| | Enero | Febrero | Marzo | Abril | Mayo | Junio | Julio | Agosto | Septiembre | Octubre | Noviembre | Diciembre | Promedio | Max. | Min |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROM | 2.691 | 4.205 | 7.421 | 6.408 | 2.251 | 2.165 | 2.484 | 2.161 | 1.967 | 4.249 | 3.297 | 3.135 | 3.536 | 7.421 | 1.967 |
| MAX | 4.829 | 5.752 | 14.700 | 16.485 | 3.826 | 6.464 | 4.986 | 3.847 | 6.415 | 10.458 | 7.514 | 5.836 | 7.593 | 16.485 | 3.826 |
| MIN | 0.834 | 2.164 | 0.947 | 0.982 | 0.880 | 0.882 | 0.880 | 0.919 | 0.886 | 1.003 | 1.430 | 1.195 | 1.084 | 2.164 | 0.834 |

[84] DRPE-0000645981



EXHIBIT 34

Monthly average arsenic concentrations reported for the Sindicato air monitoring station are plotted in Exhibit 10. It shows that after Defendants began operating the plant, arsenic levels in air increased nearly tenfold for some months and years. Elevated arsenic levels persisted well into 2009 before operations at the Complex were completely suspended in June 2009.

The following are conclusions from this part of the assessment:

1. The Government of Peru MPL did not provide adequate levels of public protection. WHO (2000) has reported that a safe level of arsenic in air cannot be established. In the U.S., although there is no general air pollution limit for arsenic, it is a priority pollutant under the CAA and air emissions from industrial facilities are strictly regulated and require accurate emissions reporting, as well as the use of pollution controls normally mandated under air pollution control permits issued by individual states. These are facts that would have been known and understood by Defendants at the time of acquisition of the La Oroya smelter.

2. There are no records to support that Defendants took steps to reduce arsenic emissions to within safe levels to protect the public. Their monitoring records support that they simply recorded air quality data because they had agreed to do so under the PAMA agreement. They did not bother to collect meaningful measurements to guide in devising operational and control strategies to reduce the plant's emissions to levels that would be protective of public health or even to meet statutory obligations which they would have understood to be unsafe.

## 7.5 Particulate Matter

The Government of Peru initially defined two MPLs in 1996, both of which were for PM10 which it later revised in 2001. The two initial limits were an average daily limit of 350µg/m$^3$ and an annual mean geometric MPL of 150µg/m$^3$. Both MPLs were not protective of human health – neither by the standards of the day and certainly not by current standards in the U.S. and EU.

Around 2001 both the Government of Peru and the U.S. revised the MPL for PM10. No standard was developed by the Government of Peru for PM2.5 which is universally recognized as fine particulate matter and a higher health risk. The U.S. NAAQS for PM2.5 based on a 24-hour average was 65µg/m$^3$ in 1997 and then made more protective in 2006 (35µg/m$^3$). Table 7 summarizes the 1997 U.S. NAAQS. Defendants knew about these standards since they operated smelters in the U.S. and understood these were intended to define safe levels.

Table 7. Historical US Particulate Matter (PM) National Ambient Air Quality Standards (NAAQS).[85]

| Final Rule/Decision | Primary/Secondary | Indicator | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| 1997 62 FR 38652 Jul 18, 1997 | Primary and Secondary | $PM_{2.5}$ | 24 hour | $65\mu g/m^3$ | 98th percentile, averaged over 3 years |
| | | | Annual | $15.0\mu g/m^3$ | Annual arithmetic mean, averaged over 3 years |
| | | $PM_{10}$ | 24 hour | $150\mu g/m^3$ | Initially promulgated 99th percentile, averaged over 3 years; when 1997 standards for PM10 were vacated, the form of 1987 standards remained in place (not to be exceeded more than once per year on average over a 3-year period) |
| | | | Annual | $50\mu g/m^3$ | Annual arithmetic mean, averaged over 3 years |

The average daily MPL (PM10) defined by the Government of Peru was about 2.3 times greater (350/150) than the 24 hour average defined for PM10 under the 1997 U.S. NAAQS.

The Annual Geometric Mean MPL is not clearly defined in the 1996 legal notice.[86] Originally, the U.S. NAAQS defined the 99th percentile averaged over 3 years.[87] It is not known whether the authors of the Peruvian standards relied on a similar scientific foundation. Since the Peruvian MPLs were not sufficiently protective of health, the statutory definitions are not relevant. Hence comparisons explained below are relative to the prevailing U.S. NAAQS based on the 1997 rule and Government of Peru's revised 2001 AQS.

The annual arithmetic mean averaged over the years 2005 through 2007 was calculated from the Sindicato data to be approximately $71\mu g/m^3$, which exceeds the $50\mu g/m^3$ U.S. NAAQS.[88] The ambient air levels of PM10 exceeded the safety standard.

The 1997 U.S. NAAQS support that 24-hour average concentrations at Sindicato reflect poor air quality. The Peruvian MPLs did not acknowledge PM2.5, which is a higher health risk from an air quality standpoint. Further, the particulate matter measured at Sindicato contains metals. Both lead and arsenic concentrations measured at Sindicato show alarmingly high concentrations of these metals significantly above what is considered a health hazard. Defendants understood that the reduction of these toxic metals in airborne concentrations had to be achieved by reduction of particulate matter emissions from both point and fugitive sources. It therefore should have imposed operational practices and invested in technologies to reduce PM emissions, including PM2.5 to achieve levels in ambient air that would be significantly below the Peruvian MPLs and even the U.S. NAAQS.

[85] https://www.epa.gov/pm-pollution/table-historical-particulate-matter-pm-national-ambient-air-quality-standards-naaqs
[86] Normas Legales, El Percuano, page 141259, July 19, 1996
[87] https://www.epa.gov/criteria-air-pollutants/naaqs-table
[88] https://www.epa.gov/criteria-air-pollutants/naaqs-table

Bennett and Knapp (1989) measured the particle size distribution (PSD) of particulate matter released from lead smelters. They reported that the PSD heavily favors PM2.5 and that the highest concentration of metals is found among these smaller particles. As a sophisticated operator of lead smelters, Defendants would know this.

Exhibit 11 is a plot of the annual hourly average PM10 concentration at Sindicato. Since toxic metal measurements were not continuously monitored, the PM10 data serves as a surrogate. This plot shows that almost every day of the year there were peak concentrations of pollutants typically occurring between the 10th and 13th hour of the day. The PM10 contains arsenic, lead, and cadmium. These peak concentration events further support that the average daily MPL for arsenic was exceeded on, more likely than not, a daily basis. Defendants ignored the MPL for arsenic and none of the projects it implemented to reduce air emissions had major impacts on reducing ambient air concentrations of these toxic metals.

## 7.6 Sulfur Dioxide

### 7.6.1 General Findings

Exhibit 12 compares MPLs established in different countries to those established by the Government of Peru in 1996. The Government of Peru defined two MPLs in 1996; an annual average, and a 24-hour average (average daily). The Peru MPLs were greater than other countries, including the U.S. and recommended standard by the World Bank; however, the average daily MPL had an additional protective guideline by specifying that the MPL is not to be exceeded more than once per year.

Exhibit 13 is a plot of the annual average $SO_2$ concentrations reported for the Sindicato monitoring station. It shows that except for the first two years that Defendants operated the smelter complex, the $SO_2$ levels were dramatically worse than in 1996 before Defendants ownership. Both the Peruvian MPL (as of 1996) and U.S. NAAQS limits are shown on the plot.

- At no point during Defendants ownership and operation of the La Oroya Smelter were ambient $SO_2$ levels below the least restrictive Peruvian MPL.[89] The comparisons show that the air quality worsened from 1.1 to nearly 4.3 times more than the Peruvian MPL, and from 2.5 to more than 9 times more than the U.S. NAAQS between 1997 and 1998. The air quality data shows a 272% increase in annual average $SO_2$ concentrations between 1997 and 2008.

Records for 24-hour average (daily average) $SO_2$ concentrations reported at Sindicato were identified for the years 2001 through 2008. As reported in Exhibit 12, the Peru MPL in 1996 was 572µg/m$^3$ whereas the U.S. NAAQS called for a more protective limit of 365µg/m$^3$. The Government of Peru did recommend an additional protective guideline by specifying that the MPL was not to be exceeded more than once per year. In 2001 the Peruvian 24-hr standard for $SO_2$ became more protective: 365 ug/m$^3$ not to exceed more than 1 time per year. This MPL has been applied in my $SO_2$ analysis post 2000.

[89] Peruvian SO2 MPL became more protective in 2001; revised from 172 to 80 µg/m$^3$ - SD 074-2001-PCM - Environmental Air Quality National Standards Regulation (2001).

Exhibit 14 is a chronological chart of the number of days per month in which the Peru daily average MPL was exceeded for the period between January 1, 2001 and November 30, 2008. Over these 95 months, every single month had at least one day that exceeded the safe limit (24-hr daily average) recommended by the Government of Peru. The chart shows that number of days in a month in which the $SO_2$ MPL was exceeded increased substantially over the time period in which Defendants operated the smelter complex.

Exhibit 15 is a chronological chart of the percent of days in a month in which the Government of Peru MPL was exceeded. Like Exhibit 14, this chart reveals that air quality significantly worsened over the time period in which Defendants operated the facility. The trend line on the chart shows that between January 2001 and November 2008, the residents of La Oroya were subjected to increasing numbers of days and hours of higher concentrations of $SO_2$.

Exhibit 16 is a chronological chart of the daily average $SO_2$ concentration reported for the Sindicato air monitoring station for the period beginning January 1, 2001 through November 30, 2008. The chart includes the NIOSH standard for immediately dangerous to life and health (NIOSH (2017)) and the WHO recommended safe limits.[90] WHO (2005) recommends a Short-term Exposure not to be exceeded over 10 min. averaging period of 500µg/m$^3$, and a Long-term Exposure limit (over 24-hours) of 20µg/m$^3$.

- As a chemical engineer that has worked in industrial settings, I have always been cognizant of these standards. They are intended to be protective of workers and represent safe levels that should not be exceeded or if they are, workers must be provided with protection such as appropriate respirators.
- Workers in industrial settings are protected from unsafe levels with the use of respirators and rotational assignments from areas of high concentrations. The public was exposed to levels where no such protection was provided.

Exhibit 16 shows $SO_2$ concentrations exceed levels that NIOSH and WHO consider incapable of supporting life. There are reported daily (24-hr) average concentrations at Sindicato that approach 3,000µg/m$^3$. Both the frequency and magnitude of the daily average concentrations rose significantly from 2003 through 2008.

One must bear in mind that the monitoring data reported is an average taken over 24 hours. This means that as an example when a concentration of 2,500µg/m$^3$ was reported, there were concentrations that were more likely than not many times higher (i.e., in the league of many thousands of µg/m$^3$). Knight Piesold's environmental assessment in 1996[91] reports the maximum 1-hour $SO_2$ concentrations at Sindicato exceed 5,000µg/m$^3$, and the authors didn't even consider these to be reliable measurements since they further reported that the highest recorded $SO_2$ concentrations represent the upper limit of the monitor's response and may not reflect actual $SO_2$ levels. Defendants should have been attentive to this report when they performed their due diligence. They understood that the $SO_2$ monitors were unreliable, yet despite this they did not

[90] World Health Organization, 2005. WHO Air Quality Guidelines for Particulate Matter, Ozone, Nitrogen Dioxide and Sulfur Dioxide, Global Update 2005: Summary of Risk Assessment, Geneva, 2006
[91] DRRC-00077581 - Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, Final Report, Sept. 1996

replace these with more precise monitors. Integral (2005) reports that all community monitors used for recording $SO_2$ ambient air concentrations have an upper threshold limit except Sindicato 2 which was installed sometime after 2005.

People living in La Oroya were exposed to greater risks than workers at the smelter. Various photos produced by Defendants show workers were equipped with respirators; residents were not.

The monitoring data shows this threshold was exceeded and hence all the reported monitoring data except for Sindicato 2 are not accurate as they do not report any concentrations above the instrument upper limit of resolution.

### 7.6.2 Sindicato Monitoring Data Analysis

The Sindicato monitoring station reports hourly concentrations of $SO_2$ in units of $\mu g/m^3$. To make more precise comparisons of monitoring data to air quality standards, all monitoring records have been converted to normal temperature and pressure conditions (25$^o$C and 1 atm.). The conversion calculations made are based on the following formulae:

- Some of the earliest monitoring data records are reported in units of ppb. The following conversion factor based on the ideal gas law was used to convert to $\mu g/m^3$: 1ppb = 2.62$\mu g/m^3$.
- Integral[92] reports the following conversion factor to convert from standard to normal temperature and pressure: 0.92. All monitoring values reported in units of $\mu g/m^3$ were multiplied by 0.92.

**Data Completeness**

Monthly average monitoring records covering 1996-2000 are 100% complete[93]; however, no hourly monitoring records have been identified. The completeness of hourly monitory records for the remainder of the analysis period is summarized in Table 8. Monitoring data in which No values or "0" values are reported are excluded as these reported entries are unusable.

Table 8. Completeness of Hourly Monitoring Records.

| Year | N | $N_{max}$ | % Complete |
|---|---|---|---|
| 1998-2000 | - | 26,280 | - |
| 2001 | 8,595 | 8,760 | 98.1 |
| 2002 | 8,653 | 8,760 | 98.8 |
| 2003 | 8,678 | 8,760 | 99.1 |
| 2004 | 8,750 | 8,784 | 99.6 |
| 2005 | 8,330 | 8,760 | 95.1 |
| 2006 | 8,742 | 8,760 | 99.8 |
| 2007 | 8,964 | 8,760 | 99.2 |
| 2008 | 7,964 | 8,784 | 90.7 |

[92] DRRC-Study-0000316 – Integral Consulting Inc., Human Health Risk Assessment Report, Dec. 2, 2005, P. 17.
[93] DRPE-0000642844

| | | | |
|---|---|---|---|
| Thru 6/30/2009 | 4,232 | 4,344 | 97.4 |
| Overall | 72,638 | 100,752 | 72.1 |

N = Number of measurements reported

**Data Reliability**

Integral reports that community monitors used for recording $SO_2$ ambient air concentrations have an upper threshold limit of 6,000µg/$m^3$.[94] Integral reports this limit to be under normal conditions; however, I don't think this statement is reliable. Monitoring records for Sindicato 1 report maximum $SO_2$ measurements to be 6,023µg/$m^3$ for actual conditions. This is equivalent to about 5,542µg/$m^3$ under normal conditions.

Integral further notes "limited amount of sulfur dioxide ambient air monitoring data is available from another monitor in Sindicato that does not have this upper threshold. Sulfur dioxide concentrations collected at this monitor, identified as Sindicato 2, indicate that ambient air concentrations of sulfur dioxide can exceed 6,000µg/$m^3$…" Monitoring values reported for the Sindicato station after 2006 (Sindicato 2) show hourly concentrations significantly exceeding the reported monitor's threshold.

Exhibit 17 shows a plot of the 24-hour maximum daily $SO_2$ ambient concentration. This plot shows the monitoring data is in suspect prior to 5/24/2006 since there is an apparent upper limit to $SO_2$ concentration. Statistically, only about 1% of the values for this period are at or slightly above the sensor's upper threshold limit. Integral concludes that since only a small population of the records is at the upper threshold, the monitor's upper threshold limit was exceeded infrequently. It therefore discounts the exceedances in their analysis and relies on the reported concentrations as a reasonably accurate measure of the $SO_2$ ambient levels over time.

The data from Sindicato 2 (data values plotted after 5/24/2006) show nearly 40% of the values lie above the sensor threshold limit. There is no basis to conclude that only a small population of measurements recorded with the original sensor prior to 2006 exceeded the sensor's upper limit.

Monitoring records prior to 2001 that have been located among discovery documents only report monthly average concentrations. These are more likely than not biased low for two reasons: (1) the upper threshold limit of the monitoring sensor, and (2) Defendants applied averaging methods to measurements which result in calculated low mean values. Exhibit 18 is a screenshot of a workbook for one month's worth of measurements.[95] There are numerous hourly data entries in the workbook for which there are zero (0) and No (---) values. These are included in the Defendants' calculated averages, which is unreasonable – when a 0-value or No-value is recorded, the sensor is not measuring. As an example – if a month has 28 days, the continuous monitor records 672 measurements when the monitor is functioning 100% of the time (i.e., 24 hourly measurements in a day × 28 days = 672 data entries). When the sensor is off-line for a period of time, one may not assign zero-values as measured values when calculating a mean. A statistical mean refers to the mean or average that is used to derive the central tendency of the

[94] DRRC-Study-0000316 – Integral Consulting Inc., Human Health Risk Assessment Report, Dec. 2, 2005, P. 17.
[95] DRPE-0000335409



EXHIBIT 34

data in question. It is calculated by adding all the data points in a population and then dividing the total by the number of data values – the resulting number is known as the mean or the average. By populating non-measurement entries with zero values, the calculated mean is biased low. For the sample worksheet shown in Exhibit 18, Defendants report a monthly mean $SO_2$ concentration of 390µg/m$^3$ based on their method of averaging. By excluding the 0- and No-value data entries, the "true" monthly average concentration based on the actual measurements is calculated to be 520.3µg/m$^3$. That is a 33% difference (i.e., the reported monthly average concentration is 33% lower than the true monthly average). Defendants reporting practices of their monitoring data are deceptive and misleading.

**Air Quality Standards and Alerts**

Benchmarks are relied on to compare against the monitoring records. Benchmarks relied on are Air Quality Standards and Air Quality Alerts.

The standards used for benchmarks are as follows:

- U.S. NAAQS (National Air Quality Standards) – Only the 1996 NAAQS[96] is considered. These standards call for a Primary Annual and 24-hour $SO_2$ concentrations which were revoked and replaced in 2010:
  - o 1996 Primary calls for 24-hr average limit of 0.14ppm (366.8µg/m$^3$) Not to be exceeded more than 1 time per year;
  - o 1996 Primary Annual is 0.03ppm (78.6µg/m$^3$) – annual arithmetic average value.
  - o For comparative purposes only (not considered in present analysis) – the 2010 revised NAAQS is 75ppb (196.5 µg/m$^3$) based on the 99th percentile averaged over 3 years. The form of the 1-hr standard is the 3-year average of the 99th percentile of the yearly distribution of 1-hr daily max. $SO_2$ (Federal Register 2010).
- In 2001 the Government of Peru published final air quality standards, part of which covered $SO_2$.[97] These standards were first published for public comment more than 2 years earlier, which gave Defendants ample opportunity to challenge the more restrictive standards. For $SO_2$, the following standards were promulgated:
  - o Annual concentration 80µg/m$^3$ – Arithmetic mean annual
  - o 24 hours - 365µg/m$^3$ – Not to be exceeded more than 1 time per year.
  - o Transitional standard – Annual Arithmetic Mean Value of 100µg/m$^3$ – This limit established an air pollutant concentration level temporarily established as part of the progressive process of implementing air quality standards. It was intended to be applied to cities or zones that after the monitoring had been performed, have values greater than this limit. It serves as a screening standard to assist in devising action plans to improve air quality.

The 24-hr and annual average Peruvian standards are nearly equivalent to the U.S. NAAQs (prior to 2010).

---

[96] 61FR 25566, May 22, 1996, https://www.epa.gov/so2-pollution/table-historical-sulfur-dioxide-national-ambient-air-quality-standards-naaqs
[97] Supreme Decree No. 074-2001-PCM: Environmental Air Quality National Standards Regulation

Additional Air Quality Alert levels are defined as "Watch Out" (interpreted by me to mean close monitoring required); "Danger" and "Emergency." These benchmarks are summarized in Table 9.

Table 9. Alert Benchmarks.[98]

| Type Alert | 3-hr Moving Avg. Conc. (μg/m$^3$) |
|---|---|
| Watch Out | > 500 |
| Danger | > 1,500 |
| Emergency | > 2,500 |

These benchmarks were published on the Peruvian DIGESA (General Directorate of Environmental Health) web site to alert communities of poor air quality and emergency conditions.

**Ambient Air Quality Standards Comparisons**

Comparisons against the standards are conservative since the data is biased low for the period before about mid-2006. The earlier comparisons are based on non-normalized concentrations, but the general trends reported are consistent with the more precise analysis here.

Table 10 reports the number of exceedances of the 24-hr standard. This standard is not to be exceeded more than 1 time per year. The monitoring data shows that the standard was exceeded every year. Between 40% and 70% of the 24-hour average concentrations exceeded the standard for different years.

Table 10. No. exceedances of 24-hr standard (Jan. 2001-June 30, 2009).

| Year | No. Exceedances 24-hr Standard | % Records Exceeded | N |
|---|---|---|---|
| 2001 | 207 | 57 | 364 |
| 2002 | 170 | 47 | 363 |
| 2003 | 184 | 50 | 365 |
| 2004 | 201 | 55 | 365 |
| 2005 | 224 | 61 | 365 |
| 2006 | 231 | 63 | 365 |
| 2007 | 241 | 66 | 365 |
| 2008 | 236 | 70 | 335 |
| Thru 6/30/2009 | 73 | 40 | 181 |
| **Totals** | **1,767** | **58** | **3,068** |

N = number of days

[98] http://www.digesa.minsa.gob.pe/aire/index.aspx

Table 11 compares the annual average $SO_2$ concentrations against the U.S. NAAQS (Annual concentration 80µg/$m^3$ – Arithmetic mean). Annual concentrations exceeded the standard by factors of >2 to >8 times.

Table 11. Annual average $SO_2$ concentrations compared to U.S. NAAQS.

| Year | Annual Avg. (µg/$m^3$) | Exceeded Standard by Factor of |
|---|---|---|
| 1996 | 238 | 3.0 |
| 1997 | 181 | 2.3 |
| 1998 | 193 | 2.4 |
| 1999 | 498 | 6.2 |
| 2000 | 408 | 5.1 |
| 2001 | 467 | 5.8 |
| 2002 | 398 | 5.0 |
| 2003 | 397 | 5.0 |
| 2004 | 423 | 5.3 |
| 2005 | 475 | 5.9 |
| 2006 | 526 | 6.6 |
| 2007 | 650 | 8.1 |
| 2008 | 679 | 8.5 |
| Thru 6/30/2009 | 416 | 5.2 |

The reported annual average concentrations greatly exceeded the Transitional standard (Annual Arithmetic Mean Value of 100µg/$m^3$).[99] As noted, this limit established an air pollutant concentration level temporarily established as part of the progressive process of implementing air quality standards.

**Alert Benchmark Comparisons**

The 3-hour rolling average $SO_2$ concentrations were compared against the Alert Benchmarks. To calculate the 3-hour rolling average concentration, zero and 'no-value' reported values were populated with surrogates by marching the last measured data value forward to the next reported measurement.

Exhibit 19 is a chronological bar chart tracking the numbers of Alerts by year. The Alert thresholds were applied back to 2001. There are thousands of reported values for any given year between 2001 and 2008 in which the "Watch Alert" (monitor more closely) threshold was triggered. Of these records, nearly 50% are above the "Danger" threshold and about half of these are "Emergency" air quality events. Refer to the statistical summaries in Tables 12 and 13.

[99] SD 074-2001-PCM - Environmental Air Quality National Standards Regulation (2001), Annex 2

Table 12 Percent of "Watch Out" Alerts Resulting in "Danger" Alerts.

| Month | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009[a] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 21 | 52 | 43 | 46 | 42 | 29 | 55 | 53 | 53 |
| 2 | 38 | 33 | 37 | 36 | 34 | 36 | 53 | 63 | 38 |
| 3 | 30 | 36 | 32 | 32 | 31 | 30 | 54 | 52 | 36 |
| 4 | 65 | 49 | 25 | 47 | 40 | 45 | 49 | 48 | 25 |
| 5 | 59 | 47 | 48 | 40 | 55 | 51 | 60 | 60 | 31 |
| 6 | 45 | 54 | 61 | 60 | 53 | 56 | 65 | 54 | 11 |
| 7 | 48 | 41 | 38 | 48 | 66 | 70 | 57 | 60 | 0 |
| 8 | 50 | 44 | 48 | 41 | 47 | 48 | 61 | 61 | 0 |
| 9 | 46 | 43 | 34 | 41 | 45 | 57 | 60 | 49 | 0 |
| 10 | 26 | 36 | 44 | 36 | 40 | 38 | 60 | 54 | 0 |
| 11 | 44 | 36 | 56 | 38 | 50 | 48 | 57 | 48 | 0 |
| 12 | 42 | 28 | 43 | 31 | 42 | 47 | 57 | 0 | 0 |
| **Total** | **43** | **41** | **42** | **40** | **44** | **45** | **57** | **55** | **39** |

[a]2009 Values thru June 30

Table 13. Percent of "Danger Alerts" Resulting in "Emergency" Alerts.

| Month | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25 | 49 | 47 | 36 | 38 | 38 | 65 | 56 | 51 |
| 2 | 39 | 39 | 43 | 36 | 56 | 47 | 64 | 71 | 45 |
| 3 | 41 | 57 | 31 | 36 | 27 | 33 | 51 | 51 | 30 |
| 4 | 44 | 51 | 40 | 40 | 50 | 44 | 52 | 59 | 73 |
| 5 | 56 | 56 | 47 | 51 | 51 | 47 | 74 | 68 | 43 |
| 6 | 56 | 47 | 56 | 43 | 50 | 56 | 77 | 63 | 0 |
| 7 | 42 | 58 | 42 | 54 | 65 | 64 | 63 | 55 | 0 |
| 8 | 40 | 51 | 45 | 31 | 49 | 69 | 60 | 55 | 0 |
| 9 | 47 | 46 | 43 | 35 | 45 | 69 | 52 | 55 | 0 |
| 10 | 42 | 38 | 37 | 42 | 45 | 43 | 56 | 49 | 0 |
| 11 | 40 | 36 | 37 | 47 | 42 | 55 | 56 | 50 | 0 |
| 12 | 42 | 24 | 46 | 32 | 34 | 60 | 50 | 0 | 0 |
| **Total** | **44** | **46** | **43** | **40** | **46** | **53** | **59** | **58** | **46** |

To get a sense of the magnitude of these excursions compared to the total lapse time for any given month, the percent of monthly hours when emergency air quality conditions existed are tabulated in Table 14.

Table 14. Percentage of Monthly Hours when "Emergency" Threshold Exceeded.

| Month | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1.2 | 4.4 | 4.7 | 4.2 | 4.0 | 3.2 | 10.9 | 11.5 | 9.3 |
| 2 | 2.4 | 4.3 | 4.5 | 4.0 | 4.5 | 4.6 | 10.1 | 18.6 | 5.7 |
| 3 | 2.8 | 4.6 | 2.6 | 2.7 | 2.8 | 3.1 | 8.3 | 9.3 | 1.7 |
| 4 | 8.1 | 6.0 | 2.5 | 4.4 | 5.1 | 5.8 | 7.8 | 8.3 | 1.5 |

| Month | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 8.6 | 4.2 | 3.8 | 3.2 | 7.7 | 4.8 | 8.2 | 8.7 | 3.1 |
| 6 | 5.4 | 4.4 | 7.1 | 4.3 | 4.7 | 5.3 | 8.8 | 6.5 | 0.0 |
| 7 | 4.0 | 3.4 | 2.4 | 4.4 | 7.7 | 9.3 | 5.4 | 7.4 | 0.0 |
| 8 | 2.4 | 2.8 | 1.9 | 1.1 | 4.6 | 4.4 | 5.4 | 7.8 | 0.0 |
| 9 | 4.3 | 2.9 | 1.7 | 3.3 | 2.1 | 6.8 | 4.0 | 4.9 | 0.0 |
| 10 | 2.6 | 3.2 | 3.1 | 3.9 | 4.6 | 3.5 | 11.0 | 6.2 | 0.0 |
| 11 | 5.4 | 4.0 | 4.2 | 4.9 | 5.0 | 8.9 | 9.6 | 6.7 | 0.0 |
| 12 | 5.6 | 1.1 | 5.0 | 3.1 | 4.0 | 8.2 | 10.6 | 0.0 | 0.0 |
| **Mean** | **4.4** | **3.8** | **3.6** | **3.6** | **4.7** | **5.7** | **8.3** | **8.0** | **1.8** |
| **Min** | **1.2** | **1.1** | **1.7** | **1.1** | **2.1** | **3.1** | **4.0** | **0.0** | **0.0** |
| **Max** | **8.6** | **6.0** | **7.1** | **4.9** | **7.7** | **9.3** | **11.0** | **18.6** | **9.3** |

The percentages reported in Table 14 indicate significant time periods in which the community in Sindicato was exposed to extremely poor air quality.

**Air Quality Trends**

Exhibit 20 is a plot of the 24-hour average (daily average) $SO_2$ concentration. The chart shows that the daily average $SO_2$ air concentrations at the Sindicato air monitoring station increased dramatically over time; however, I conclude that this trend is more likely an artifact of the monitoring data. Monitoring data prior to about mid-2006 is in suspect because of the upper limit of the monitoring sensor.

Exhibit 21 is a plot of the monthly average concentrations. The plot shows concentrations to have increased significantly over time. This is shown more clearly by the plot in Exhibit 22 which is the 12-month rolling average concentration. I believe these charts to be anomalies caused by the limitations of the sensors upper limit prior to mid-2006.

Exhibit 23 is a plot of the 3-month rolling average $SO_2$ concentration using the most reliable data set (Sindicato 2 – post 5/24/06 records). Between July 2006 and March 2008, the trend shows a dramatic increase in $SO_2$ concentration and then a generally declining trend. I have linked the declining trend largely to turndown in plant production.

Exhibit 24 is a plot of the annual $SO_2$ ambient concentration. The plot shows an increasing trend through 2008; however, given the uncertainty of monitoring data prior to mid-2006, this trend is likely fortuitous. The plot does show that the annual air quality standard was exceeded significantly for all years.

Trend charts constructed from the Alert benchmarks are also instructive. The Alert threshold levels are below the sensor upper threshold. Exhibit 25 shows two trend charts – the top chart is a histogram of the number of events which fall into the Emergency and Danger Air Quality Alert categories. The bottom chart is the smelter's metals production volume. A comparison of these two charts shows that despite declining production volumes the numbers of Danger and Emergency air quality conditions increased significantly since 2001 and only began to decline after 2008 when the smelter began shutting down operations.

The Integral report makes assertions of expected improvements to air quality based on planned improvements Defendants committed to make. It reported that compared to base year 2004 there would be a 5-7% reduction in ambient $SO_2$ levels in La Oroya by 2007 and by 2011, about a 70% reduction.[100] The top trend chart in Exhibit 25 shows that the air quality significantly worsened between 2004 and 2007. There were nearly 59% more hours in a year when the Danger Alert threshold was exceeded and more than a 131% increase in the number of hours designated as Emergency air quality. Defendants used their consultant's report as a basis to report progress under the PAMA. The monitoring data supports that Defendants made significant misrepresentations to the Government of Peru in reporting their progress to reduce these emissions and improve air quality.

**Hourly and Seasonal Variations**

Integral[101] reports that there was insufficient data to evaluate seasonal trends, but state that peak concentrations for the summer and fall months (Nov.-July) were consistently greater than during the winter and spring months (May-Dec.). They go on to explain that Defendants reported that they instituted the Intermittent Control Program which include provisions for curtailing operations that produce $SO_2$ emissions during periods when meteorological conditions exist that could adversely impact air quality in the area. Integral reports that this Program was implemented during the winter months of 2003-2004, however, further study reveals this program was started around 2000.[102]

Integral's analysis was based on examination of 1 years-worth of monitoring records. I examined about 3 years of monitoring records (mid 2006-mid 2009 which are the most reliable measurements from Sindicato 2).

Exhibits 26A through 26C are trend charts showing the variation in $SO_2$ concentration as a function of the time of day for each month and year of the records relied on. Peak concentrations consistently occur around 11:00-hrs to noon of each day. Given the unique topographical features of the region, there are valley and river winds which have a dominating influence on the air quality.

Comparisons between the hourly trend charts in Exhibits 26A-26C show month to month variations, but I have concluded these are likely not that significant. This is better illustrated in Exhibit 27 which shows the seasonal variations in mean concentration as a function of the hour of the day for the different seasons. The winter season shows the highest average peak concentrations, but these are not much higher than the summer months. The fall months generally show lower peak concentrations. The summer months show the greatest variability in which the average trend chart shows peak concentrations to occur earlier in the morning hours and much higher concentrations during the early morning hours and late evenings. These trends are significant because they provide general guidance on how the smelter could have taken affirmative actions to curtail emissions. Exhibits 26A-26C & 27 show that one course of

[100] Ibid, Integral Report – see Table 6.1
[101] Ibid, Integral Report, pp. 40-41
[102] DRPE-0001974767, pg. 97.

affirmative action would have been for the operator to reduce production volumes between the hours 07:00 hours and 14:00 hours. Another prudent action would have been to more carefully monitor and possibly cut back production levels during the early morning/late evening hours during summer months.

The hourly trend charts do not support that Defendants had any viable program aimed at improving air quality through the Intermittent Control Program.

Exhibit 28 is a trend chart showing the time of day in which Emergency Alerts were triggered for each year. Not surprisingly, these poor air quality conditions repeatedly occurred around 11:00-hrs. Noted in this chart is the production volume by year. Metals refining volumes were established based on sales. There is no evidence to support that Defendants took actions to curtail production to reduce emissions impacts.

Exhibit 29 shows a trend chart of the annual number of days in which Emergency conditions prevailed in La Oroya due to $SO_2$ impacts. The time period covered in the trend chart is 2001-2009. By 2007 there was a 42% increase in these incidents compared to 2001. The plant ceased production on June 3, 2009. Production for 2009 was about 72% lower than 2008.

Exhibit 30 compares the annual hours of Emergency Alerts between the Sindicato and Hotel Inca monitoring stations. The Hotel Inca station is the closest monitoring station to Sindicato. The comparison shows that other communities were also adversely impacted by $SO_2$; however, La Oroya was the most severely impacted. Other monitoring stations are located at significant distances from the smelter but would still have been impacted.

# 8. SMELTER COMPLEX AIR DISCHARGES

## 8.1 Point Sources

Only the smelter is considered in the analysis. No records of air emissions from the refinery were located.

Defendants did not prepare a formal air emissions inventory; they measured and recorded emissions from the Main Stack and several secondary stacks. Few emission records for the Main Stack or secondary stacks were located post 2007. Smelter production records show the plant was operating during this period; thus, there would be continued releases from the plant.

Considerable effort went into reconstructing an emissions inventory which includes:

- Locations of stacks
- Stack heights
- Stack exit velocities
- Stack temperatures
- Stack diameters
- Particle information (particle size, particle size distribution, particle density
- Approximate annual hours of operation
- Time period (approximate dates) point sources operated

Particle size, PSD, and particle density data are obtained from authoritative literature (citations included in electronic file) and are assembled in DRP – Emissions Inventory Reconstruction.xlsx. Because records for the facility are incomplete, some assumptions and approximations were made of the physical parameters of some point sources. These assumptions are documented in the electronic file.

No calculations were made of the mass emissions for point sources where emissions were reported by the Defendants. For those point sources where no emissions data were reported, no calculations were made because of insufficient information regarding the emissions and operating characteristics of the source.

## 8.2 Fugitive Emissions

Vornberg[103] developed crude estimates of some fugitive emissions for the smelter complex in 2004 which McVehil-Monet[104] relied on for air dispersion modeling reported in 2005. The modeling work performed by McVehil-Monet was applied to a risk assessment and to demonstrate that Defendants were making progress in reducing fugitive emissions.

The basis by which Vornberg prepared estimates is poorly documented and it took considerable effort and review of numerous records in order to establish his basis. The following is what I understand to be the basis from examination of Defendants' records:

1. Model year 2002 was relied on as the starting basis for the estimates.

[103] DRRCE-00922042
[104] DRRCE-00754308



EXHIBIT 34

2. The estimate is theoretical and not based on in-plant measurements of fugitive sources. The theoretical estimate relies on metal loss balances for the three production circuits (lead, copper, zinc).
3. To estimate the dust from metal losses, a multiplier of 2.5 was used (i.e., the dust to metal ratio is reported to be 2.5).[105] The basis for this multiplier is not documented but is believed to be a rough estimate derived from ore assays or dust material balances.

Defendants' engineers then assigned dust losses to 10 sources for 2002. The estimates are based on undocumented engineering judgment or consensus among plant personnel. I believe these to be nothing more than guesses based on the following:

- Photographs of sources show these to be uncontrolled sources. One example is the sinter plant building which was comprised of a steel structure without walls and a canopy roof (Exhibit 40). Another example is the copper converter aisle where building emissions were exhausted at the top of the building and can be seen billowing around a canopy roof (Exhibit 39, Exhibit 71). Other examples in which there are holes in walls and ceilings as well as large openings in operations buildings are explained further on in this report. These all show that the fugitive source emissions were intentionally exhausted from workroom areas and released in an uncontrolled manner to the outside.
- Defendants did not perform any measurements of fugitive emissions from processing buildings. Section 6.6 documents many authoritative sources on how to obtain reliable fugitive emission measurements. None of these practices were applied by Defendants.

Vornberg then set out to develop a program to reduce the emissions from each of the 10 sources. There are various projects scheduled for implementation to reduce the fugitives. A review of multiple records support that these projects were implemented (one in 2005 and most of the projects that were implemented were completed between 2006 and 2007). As explained further on, the cost of these projects was minimal.

Table 15 reports the PM10 dust emissions that were established for 2002, 2005, 2007 and 2011 based on projects that were scheduled to be implemented. Using these projected reductions in emissions I prepared a fugitive emissions inventory, supplemented by my own calculated emissions for other sources.

Table 15. PM10 Emissions (MT) inventory prepared by Vornberg.[106]

| Source | 2002 | 2005 | 2007 | 2011 | Scheduled Project |
|---|---|---|---|---|---|
| Sinter Plant Fugitives | 74 | 74 | 12 | 12 | Bldg and source enclosures |
| Sinter Plant Scrubber | 284 | 284 | 10 | 10 | Remove scrubber, replace with baghouse and tie into feed to Central Cottrell |
| Blast Furnace | 102 | 68 | 17 | 17 | Bldg enclosure 2005 |
| Dross Plant | 153 | 153 | 38 | 38 | Bldg enclosure 2006 |
| Casting Anodes | 7 | 7 | - | - | With ventilation of Dross Plant in 2006 |
| Slimes Plant | 132 | 132 | 132 | 13 | Ag circuit modernization |

[105] DRPE-0000045843
[106] DRRCE-00922042



EXHIBIT 34

| Source | 2002 | 2005 | 2007 | 2011 | Scheduled Project |
|---|---|---|---|---|---|
| Lead Electrolytic | 7 | 7 | 7 | 2 | Ventilation casting equipment |
| Copper Converter Aisle | 526 | 526 | 526 | 132 | Partial enclosure |
| Copper Roaster | 789 | 789 | 789 | 197 | Enclosure of roasters and bldg |
| NJ Zinc Roaster | 500 | - | - | - | Decommissioned 12/31/04 |
| **Sum** | **2,574**[107] | **2,040** | **1,531** | **421** | |

The following explains the basis for the emissions inventory I developed and my estimates. For sources not accounted for by Defendants' fugitive estimates I have relied on U.S.EPA reported emission factors to calculate mass releases for some sources. There is not enough information for me to calculate emissions for most sources. There are over 50 sources of fugitive emissions. Combining both Vornberg's and my estimates there are 15 sources accounted for.

Both Vornberg's estimates and mine are gross and may not be considered precise. The calculated emissions I have made are for uncontrolled sources. To account for emission reductions, I have assumed that Defendants' projected credits (emissions reductions) from planned projects are reliable and have adjusted my calculations to reflect these.

Unlike Vornberg and McVehil that created a crude inventory, I prepared as accurate a fugitive emissions inventory as possible. The inventory contains the following information:

1. Mass releases of dust, metals and where possible $SO_2$
2. Particle size distribution data
3. Approximate temperature of release
4. Location of each source georeferenced to a base map
5. Duration of releases

Data on release temperatures were obtained from U.S.EPA reported measurements for similar sources at primary lead, copper smelters and zinc refining operations. Particle size distribution (PSD) data and particle density data were obtained from the same authoritative sources based on measurements reported by the U.S.EPA. Reference citations for each input variable assigned by me in the inventory and calculations are documented in the electronic file (DRP - Emissions Inventory Reconstruction.xlsx).

PSD is most relevant to the air dispersion study. These were reconstructed from literature reported measurements (see DRP - Emissions Inventory Reconstruction.xlsx) and are assumed to be representative of the dust emissions for the La Oroya smelter. Exhibit 31 shows the estimated cumulative particle size distributions reconstructed from U.S.EPA studies for fugitive emission sources.

The inventory has been prepared for all years covering the analysis period. I was requested by my Client to provide the inventory for model years 1998, 2001, 2006, 2007, and 2008 for air

[107] Coke Plant emissions of 1,000 MT/yr not included. Coke Plant decommissioned 2004-2005.



EXHIBIT 34

dispersion modeling by another expert engaged in this matter. I relied on the inventory for all years evaluated in order to assess air pollution trends.

As noted, Defendants' estimated mass emissions assume PM10. From the particle size distribution data reported in Exhibit 31, the dust emissions have been corrected to TSP up to 30 microns.

Emission Factors (EFs) for 2002 are tabulated in Table 16. Metal compositions are reported as metal to dust ratios (kg/kg) for each source. The basis for these values is noted in the table. EFs for $SO_2$ are based on the 2002 emission estimate prepared by Vornberg.

The EFs applied to later years based on the projected emission credits from projects are summarized in Table 17.

Table 16. 2002 Emission Factors and Metal Compositions.

| Circuit | Source ID | Bldg. Emission Source | Bldg. No.[108] | TSP EF | $SO_2$ EF | Units | Metal to Dust Ratio (kg/kg) | | | Basis for Metal/Dust Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Pb | As | Cd | |
| Lead | 1 | Ore mixing and pelletizing (crushing) | 3 | 0.12 | | kg/MT Pb produced | 0.342 | 0.010 | | DRPE-0000081350_1970MetallurgicalOperations, p. 29 |
| Lead | 2 | Sinter Plant Bldg. Fugitives (Less scrubber releases) | 18 | 2.13 | | kg/MT Pb produced | 0.405 | 0.022 | 0.010 | Used by DRP in its balance method |
| Lead | 3 | Sinter Plant Scrubbers | 18 | 2.26 | | kg/MT Pb produced | 0.405 | 0.022 | 0.010 | Assumed to be same as Sinter Plant Bldg. |
| Lead | 4 | Blast Furnace Bldg. Area | 53 | 1.94 | | kg/MT Pb produced | 0.587 | 0.034 | 0.037 | Used by DRP in its balance method |
| Lead | 5 | Dross Plant | 33 | 2.91 | | kg/MT Pb produced | 0.262 | 0.065 | 0.001 | Used by DRP in its balance method |
| Lead | 6 | Casting Anodes Section | 33 | 0.13 | | kg/MT Pb produced | 0.571 | 0.033 | 0.003 | Used by DRP in its balance method |
| Lead | 7 | Slimes Plant | 14 | 3.14 | | kg/MT Pb produced | 0.076 | 0.004 | 0.000 | Used by DRP in its balance method |
| Lead | 8 | Lead Electrolytic Plant | 33 | 0.13 | | kg/MT Pb produced | 0.571 | 0.033 | 0.003 | Used by DRP in its balance method |
| Lead | 9 | Lead Reverberatory Furnace | 53 | 1.50 | | kg/MT Pb produced | 0.587 | 0.034 | 0.037 | Assumed to be same as Blast Furnace Bldg. Area |
| Copper | 10 | Copper Converter Aisle | 8 | 52.94 | 264 | kg/MT Cu produced | 0.076 | 0.026 | 0.000 | Used by DRP in its balance method |
| Copper | 11 | Copper Roaster | 2 | 79.41 | 208 | kg/MT Cu produced | 0.076 | 0.076 | 0.003 | Used by DRP in its balance method |
| Copper | 12 | Reverberatory smelting furnace | 32 | 4.25 | 52 | kg/MT Cu produced | 0.076 | 0.076 | 0.003 | Assumed to be same as copper roaster |
| Copper | 13 | Ore mixing and pelletizing (crushing) | 3 | 0.33 | | kg/MT Cu produced | 0.025 | 0.019 | | Composition of bedding from DRRCE-00383656 |
| Zinc | 14 | Concentrate handling, screens, mixers | 51 | 0.15 | | kg/MT Zn produced | 0.016 | | | DRPE-0000081350_1970MetallurgicalOperations, p.43 |
| Zinc | 15 | Zinc Roasting Operations | 39 | 41.40 | | kg/MT Zn produced | 0.020 | 0.002 | 0.002 | Used by DRP in its balance method |

108 See Exhibit 4.



EXHIBIT 34

Table 17. Emission Factors for Model Years.

| | | | | TSP Emission Factors | | | | $SO_2$ EF | |
|---|---|---|---|---|---|---|---|---|---|
| **Circuit** | **Source ID** | **Bldg. Emission Source** | **Bldg. No.** | **Model Years 1998 & 2001** | **Model Year 2006** | **Model Years 2007 & 2008** | **Units** | **All Model Year** | **Units** |
| **Lead** | **1** | Ore mixing and pelletizing (crushing) | 3 | 0.123 | 0.123 | 0.123 | kg/MT Pb produced | | |
| | **2** | Sinter Plant Bldg. Fugitives | 18 | 2.134 | 2.134 | 0.346 | kg/MT Pb produced | | |
| | **3** | Sinter Plant Scrubbers | 18 | 2.265 | 2.265 | 0.080 | kg/MT Pb produced | | |
| | **4** | Blast Furnace Bldg. Area | 53 | 1.940 | 1.294 | 0.323 | kg/MT Pb produced | | |
| | **5** | Dross Plant | 33 | 2.911 | 0.723 | 0.723 | kg/MT Pb produced | | |
| | **6** | Casting Anodes Section | 33 | 0.133 | - | - | kg/MT Pb produced | | |
| | **7** | Slimes Plant | 14 | 3.136 | 3.136 | 3.136 | kg/MT Pb produced | | |
| | **8** | Lead Electrolytic Plant | 33 | 0.133 | 0.133 | 0.133 | kg/MT Pb produced | | |
| | **9** | Lead Reverberatory Furnace | 53 | 1.500 | 1.000 | 0.250 | kg/MT Pb produced | | |
| **Copper** | **10** | Copper Converter Aisle | 8 | 52.940 | 52.940 | 52.940 | kg/MT Cu produced | 264 | kg/MT Cu produced |
| | **11** | Copper Roaster | 2 | 79.409 | 79.409 | 79.409 | kg/MT Cu produced | 208 | kg/MT Cu produced |
| | **12** | Reverberatory smelting furnace | 32 | 4.250 | 4.250 | 4.250 | kg/MT Cu produced | 52 | kg/MT Cu produced |
| | **13** | Ore mixing and pelletizing (crushing) | 3 | 0.332 | 0.332 | 0.332 | kg/MT Cu produced | | |
| **Zinc** | **14** | Concentrate handling, screens, mixers | 51 | 0.152 | 0.152 | 0.152 | kg/MT Zn produced | | |
| | **15** | Zinc Roasting Operations | 39 | 41.403 | - | - | kg/MT Zn produced | | |
| | | | ***SUM*** | ***192.8*** | ***147.9*** | ***142.2*** | | | |



EXHIBIT 34

## 8.3 Documented Fugitive Emission Sources

Exhibits 32 through 42 are typical examples of the large fugitive emissions releases from the smelter complex.

- Exhibit 32 shows CCTV images of the copper converter building. Massive clouds of fugitive emissions are seen bellowing from this part of the operation.
- Exhibit 33 shows an interior photo of the dross plant. Hot gases with entrained particulates containing lead rise to the top of this building and are released through the roof.
- Exhibit 34 is a photo of the copper roaster. The photo shows a blast of hot vapors being released into the room and rapidly rising to the ceiling level where the emissions were released to the outside. Authoritative sources documented in Section 6.6 and the electronic emissions inventory file (DRP - Emissions Inventory Reconstruction.xlsx) report these gases are typically released at temperatures between 600 and 650$^{o}$C, giving them high thermal buoyancy to be carried off site into La Oroya.
- Exhibit 35 is also a photo of the interior of the copper roaster building where fugitives are released from the furnace. The photo shows that the ceiling of the building is open, only protected by a canopy to prevent rain from entering. This photo and others demonstrate intentional actions on the part of Defendants to evacuate the emissions to the outside in an uncontrolled manner.
- Exhibit 36 again shows the interior of the copper circuit. Fugitives can be observed being released through open roof and windows.
- Exhibit 37 is a site photo showing various buildings which I have identified on the photo. None of these buildings have any roof vents that are piped to controls. In fact, none of the buildings have roof vents at all which is what Defendants claimed to be point sources when they had McVehil-Monet perform air dispersion modeling. The entire modeling effort and risk assessment performed by Defendants' consultants is unreliable and grossly overstated the expected improvements to air quality from projects that were planned.
- Exhibit 38 are various photos of the converter section and other parts of the plant. The plant looks like it's on fire, but what is seen are uncontrolled clouds of fugitive dust emissions containing lead, arsenic and cadmium.
- Exhibit 39 is a photo of the copper aisle. The roof to this operation is a canopy covering where fugitives were intentionally evacuated to the outside without any controls.
- Exhibit 40 is a photograph of the sinter plant building. This building not only lacked adequate air pollution controls, the operations are not enclosed. Air emissions are shown billowing from the operations in an uncontrolled manner. According to U.S.EPA literature the temperature of the fugitives is on the order of 800$^{o}$C.[109] These clouds of toxic metal dusts and vapors have large thermal buoyancy which allows them to be carried off site and into La Oroya. The due diligence performed by Defendants prior to acquiring this facility would have more likely than not proved how harmful the operations of the smelter were to the surrounding area.

[109] PEDCo Environmental Inc, Technical Guidance for Control of Industrial Process Fugitive Particulate Emissions, EPA-450/3-77-010, U.S.EPA 1977 reports following temperatures for emissions: Blast Furnace - P. 2-141 reports exit temperatures are 760-980C (1400-1800F); P. 2-131 - Drossing kettles (uncovered) - temperatures cool to about 370-480C (700-900F); Copper Roasting - Fugitives have an exit temperature of 300-480C (600-890F); For the Copper Reverb Furnace EPA-450-010 (1977) reports fugitive particulate emissions have an exit temp of 149-416C (300-780F)



EXHIBIT 34

- Exhibit 41 shows various photos of ore and materials handling operations. Operations are conducted in areas and buildings where fugitive dusts freely communicate to the outside.
- Exhibit 42 shows photos of building operations with open roofs and holes. Workroom environments were intentionally released to the atmosphere without any controls.

Exhibits 43-133 are photos of smelter complex showing fugitive emissions. The fugitive emissions at the smelter were larger than the stack emissions. These should have been immediately addressed by a program that systematically reduced them. Defendants never quantified these, did not establish a reasonable program for emissions reduction and pollution prevention projects, and allowed these emissions to persist for years.

### 8.4 Pollution Reduction Projects

#### 8.4.1 Confidence in Emissions Inventory

The emissions inventory I reconstructed was relied on to examine pollution trends and to assess the impact of projects Defendants implemented to reduce pollution over time. The inventory consists of mass releases from stacks (point sources) and fugitive sources.

The point source emissions are measured for the most part, although methods such as mass balances and limited stack tests likely supplement these. Regardless, these are considered more precise than the fugitive emissions.

Fugitive emissions are gross estimates. Defendants based their estimates on crude assumptions without any measurements to verify source specific releases. My estimates for a few sources are based on the application of U.S.EPA reported emission factors which have low confidence ratings and are considered to be typical but not precise. Projected emissions reductions claimed by Defendants had to be relied on for estimates made after 2002.

Further, there are more than 50 fugitive sources at the smelter alone and an unknown number at the refinery. Only 15 sources at the smelter have been estimated.

Combined, the point and fugitive discharges to air represent a very conservative estimate of the total annual pollution releases. Despite this being a crude estimate, I have confidence in the inventory because the air monitoring data follows the air pollution trend over time. This can be seen in Exhibit 134 which shows two trend plots. The top trend plot shows the estimated monthly particulate matter (TSP) for stack and fugitive sources. The bottom trend chart is the monthly average PM10 monitoring data at Sindicato. Comparing these two trend charts shows they closely follow each other. Projects implemented after late 2003 as well as declining production volumes led to fewer emissions and improved air quality. See also Exhibits 135A-135 B.

Exhibit 135A is a trend chart of the Sindicato monthly average air quality trends. Exhibit 135B is a trend chart of the Sindicato PM10 and metals monitoring data reported during operations and after operations were suspended at the Complex in June 2009. Both trend charts are consistent with the air emissions inventory and production volume records of the plant. Plant production rapidly declined after about February 2009.

This gives me confidence in the plant-wide emissions inventory from the standpoint that it generally follows the air quality trends of the monitoring station.

### 8.4.2 Magnitude of Fugitive Emissions

The primary air pollution controls used at the smelter were ESPs, baghouses, and scrubbers. The emissions from these controls were released through stacks. These controls generally remove particulates above PM10 to about 100% (U.S.EPA 1995b). Cyclones were also used but no records could be found on their locations and emission rates.

Fugitive emissions were uncontrolled and have broad particle sizes (see Exhibit 31).

The emissions inventory shows that the largest dust emissions (and hence metals) from the smelter were fugitives.

- Exhibit 136 is a pie chart which shows total particulate discharges to air accounted for. Total Particulates are TSP which extend to PM30 or more. The chart shows that the fugitive emissions are the largest source category and greater than the stack emissions. This chart could be construed as biased because the fugitives include particle sizes larger than 10 microns; Exhibit 137 therefore is more of a apples to apples comparison.
- Exhibit 137 is a pie chart which shows the contribution of PM10 by point and fugitive sources. Fugitive emissions are on same order as stack (point source) discharges and comparable to Main Stack.

Exhibit 138 provides pie charts showing contributions of TSP and PM10 by point and fugitive sources. Based on total particulate mass emissions, roughly 83% of the smelter's emissions are fugitives. The lower chart is based on PM10, showing that about 50% of the air pollution (particulates and metals) are from fugitive emissions.

These findings are not all that surprising. An environmental evaluation of the complex by Knight Piesold, which Defendants had access to when they did their due diligence in 1996/97, reported that reducing fugitive emissions was essential in ultimately reducing the impact of the Complex's emissions in La Oroya. As a sophisticated operator of smelters, Defendants also would have been familiar with the authoritative literature which reports that fugitive emissions can be larger than the stack emissions for an entire plant (U.S.EPA 1978a, b).

### 8.4.3 Reduction of PM Emissions

The air monitoring data for Sindicato was relied on to evaluate Defendants' actions to reduce PM, lead and arsenic. This section documents the actions taken by Defendants to reduce PM emissions and the impact on air quality.

Exhibit 134 shows trend plots of TSP emissions and PM10 monitoring data. There are two time periods which become apparent from the PM10 monitoring data. Period 1 is the time period roughly before Aug. 2003; Period 2 is from Sept. 2003 through Dec. 2008. The last few months of monitoring records in 2009 are not considered in this discussion because all improvements to air quality came from the plant's rapid closure.



EXHIBIT 34

- Monitoring data shows no trend prior to about Aug. 2003 (see bottom trend chart). This indicates that any actions taken by Defendants to reduce PM emissions had no impact on improving air quality.
- From about Sept. 2003 onward there is a statistically significant downward trend in the monitoring data supporting that actions taken by Defendants improved the air quality.

This can be seen in more detail by Exhibits 139 and 140. Exhibit 139 shows PM trend charts for period 1 showing no impacts from Defendants' actions on air quality. There is no statistically significant correlation. In comparison, the PM trend charts for period 2 (Exhibit 140) shows a statistically significant impact from actions taken by Defendants to reduce the emissions resulting in improved air quality.

Exhibit 141 shows trend charts – the top chart shows the trends for fugitive and stack emissions; the bottom chart shows the trend for the monitoring data. Up until Aug. 2003 Defendants reduced stack emissions but took no steps to reduce fugitives. Other actions they took during this period were passive (installed a CCTV system and work stoppage program to reduce $SO_2$ emissions; installed additional air monitoring stations). None of their actions had any impact on reducing ambient PM10 concentrations.

After Sept. 2003 there were further reductions in point source emissions, but fugitive emissions continued to be largely ignored until about 2005. From 2005, and into 2007, Defendants took steps to reduce fugitive emissions. The steps taken during this period significantly reduced the PM10 ambient air concentration.

Exhibit 142 is a trend chart expressed as a stack bar chart showing the PM emissions reductions for different sources. These emissions include both stack and fugitives. This trend chart shows that smelters PM10 emissions fell substantially over the operation. The decline in PM10 emissions were from a combination of actions taken by Defendants and declining production volumes. Exhibit 143 is a trend bar chart which shows declining production which accounts for some of the emissions reductions.

Exhibit 144 consists of trend charts of the PM10 plant-wide emissions (top chart) and the ambient air concentration measured at Sindicato (bottom). The actions taken by Defendants are noted on these charts. There are 7 actions identified on the chart:

- By 2004 the coke batteries were retired, reducing PM10 emissions by 975MT. This had no impact on metals (see U.S.EPA 2008);
- In 2006 fugitive emissions from the Dross and Electrolytic Casting section were reduced by 115MT;
- By 2007 emissions from the secondary stacks and fugitives at the Sinter Plant, Blast Furnace & Lead Rev. Furnace were reduced by 834.1 MT;
- By 2008 the Main Stack emissions had been reduced by 1,396 MT
- Between 2001 and 2006 the plant roads were paved. There are no estimates of the emissions reductions;
- Truck Washing & Street Sweeping practices were implemented in 2005. There are no estimates of the emissions reductions;

- In 2000 a work stoppage program was implemented. This program was intended to reduce $SO_2$ emissions. There are no estimates of the PM10 emissions reductions.

Defendants' actions did not bring the facility into compliance for PM10 until 2005. See Exhibit 145 which is a timeline plot of the PM10 monitoring data for Sindicato. As noted in the exhibit, while the facility achieved compliance in accordance with the Peru standard, ambient air quality was about 9 times higher than the more protective NAAQS. There was no standard for PM2.5.

### 8.4.4 Reduction of Lead Emissions

U.S.EPA literature reports that lead and arsenic concentrations in particulate matter vary by source. No measurements were made by Defendants to assess the metals levels from different fugitive sources. Exhibit 146 reports the lead levels as reconstructed from Defendants records and documented in the electronic file DRP – Emissions Inventory Reconstruction.xlsx.

The emissions inventory shows that 69% of the lead emissions from the plant are from fugitive emissions based on TSP. The finer fraction (PM10) comprised 39% (see Exhibit 147). Secondary stacks contributed very little to lead emissions. My analysis shows that by 2007 Defendants reduced PM10 emissions from the secondary stacks by more than 50%, a reduction of nearly 400MT per year over the 1998 level, but this was a misplaced priority because it did little to reduce lead emissions. The same may be said for the decommissioning of the coke batteries in 2004 resulting in nearly 1,000MT reduction in PM10 but this had negligible reductions in lead.

Exhibit 148A shows trend charts for lead. The top chart shows the trend for plant-wide lead discharges to air. Noted on the chart are the source reduction programs Defendants implemented. The top chart breaks out the trend for lead emissions from the Main Stack and Fugitives. The bottom trend chart shows the monitoring data. There are several events or projects noted on the trend charts:

- Between 1999 and 2000 there was a sharp decline in emissions from the main stack. The reason for this has not been determined from the records review. It is possible efforts were taken by Defendants to reduce these at that time as there is evidence that Defendants either eliminated some sources or made repairs to some sources which collect dust that is sent to the Central Cottrell. Kenneth Buckley[110] stated that equipment such as baghouses "which are critical for collecting the dust emitted by the smelter, were all in terrible shape and had massive holes" at the time the smelter complex was purchased.
- By mid to late 2004, Defendants began focusing on fugitive emission reductions. The two trend charts show that no reductions in these emissions were made until after 2005 and were completed by 2007.
- In Dec. 2004 the zinc roasters were decommissioned; in 2005, zinc production fell by 39.4% (see Exhibit 148B).
- In late 2006 Defendants made collection efficiency improvements to the Central Cottrell and appears to have completed most to all of the projects it intended to implement on fugitive emission control.

[110] RENCOGRP-015317 – Witness Statement of Kenneth Buckley, February 10, 2014

In examining the air monitoring data trend chart (bottom chart Exhibit 148A) I see that there was essentially no impact on air quality. While Defendants reduced the Main Stack's lead emissions significantly by 2000, the improvements to air quality were insignificant since the monitoring data shows the ambient air quality to be about 6 times greater than the MPL established by the Government of Peru as being protective of human health. None of the efforts taken by Defendants reduced the ambient lead levels to the safe annual MPL.

The Government of Peru had established two MPLs for lead. The other MPL it established was a monthly average not to be exceeded more than 4 times per year (see Table 5). Defendants ignored this MPL standard. It only measured metals in dust collected every three days. Since a third of the monthly measurements were never made, the MPL was ignored.

Defendants had the opportunity to reduce lead fugitive emissions further but chose not to. Exhibit 149 is a trend chart expressed as a stack bar chart of the fugitive sources Defendants ignored. Fluctuations from year to year on the total emissions reported in the chart are attributed to production volumes only and not any source reduction projects. There is considerably more than 100MT of lead emissions from fugitive sources alone which could have been addressed by Defendants.

### 8.4.5 Reduction of Arsenic Emissions

No measurements were made by Defendants to assess the arsenic levels from different fugitive sources. Exhibit 150 reports the arsenic levels as reconstructed from Defendants records and documented in the electronic file DRP – Emissions Inventory Reconstruction.xlsx.

On a PM10 basis, fugitive sources account for more than 1/3rd of the arsenic emissions (see Exhibit 151).

The Government of Peru had established an MPL for arsenic (Table 4); however, this standard was not protective of human health. There is no ambient air standard for arsenic in the U.S. in part because WHO (2000) has reported that a safe level of arsenic in air cannot be established. Defendants ignored both international safe levels as well as those specified by the Government of Peru. The Peru MPL is a 30-minute average and an average daily limit for ambient air concentration. Neither of these were measured by Defendants.

Exhibit 152 is trend chart expressed as a stacked bar chart of the arsenic releases by source. The source reduction methods implemented by Defendants are noted on the chart. Significant reductions to these air emissions largely took place after 2006.

Exhibit 10 is a plot of the monthly average arsenic levels reported for the Sindicato monitoring station. It must be borne in mind that the averages are not true averages since measurements were made only every third day. The plot is the arithmetic mean of measured values for each month. The trend plot shows very high and erratic arsenic measurements prior to 2000 but thereafter the levels remained elevated and largely unchanged.

### 8.4.6 $SO_2$ Emissions

As reported in Section 7.6, $SO_2$ concentrations in ambient air increased to alarmingly high background levels in La Oroya over the entire analysis period. One reason these emissions worsened is that Defendants operated the smelter at historically high production volumes. Exhibit 153 shows the production volume history dating back to 1965 and through Defendants' operational period. Despite Defendants' understanding of how poor a state the smelter equipment and especially pollution controls were when they acquired the complex in 1997, it ramped up production to levels far above normal production history, subjecting the surrounding communities to unprecedented levels of air pollution.

Defendants identified and estimated the $SO_2$ discharges to air from different sources within the smelter. The estimates are tabulated in Table 18 as tons per day. The 2011 column of values are projected based on Defendants' program to bring the facility within compliance for $SO_2$ emissions.

Table 18 shows that about 10-12% of the $SO_2$ discharges to air are from fugitive emission sources and the balance from the smelter's main stack. According to Defendants, the Main Stack is the dominant source affecting community $SO_2$ air quality. Their conclusion implies that any actions taken to reduce fugitive emission sources would have had marginal to insignificant impacts to $SO_2$ ground level concentrations in La Oroya and other communities.

Table 18. $SO_2$ Emissions in Tons per Day.[111]

| Sources | 2002 | 2005 | 2007 | 2011 |
|---|---|---|---|---|
| **STACK EMISSIONS** | | | | |
| Main stack (DRPE-0000044063) | 907 | 804 | 680 | 150 |
| Main stack (Defendants emissions records - spreadsheets) – avg. values | 909 | 813 | 794 | |
| **FUGITIVE EMISSIONS** | | | | |
| Sinter plant scrubber stack | - | - | - | - |
| Subtotal sinter plant scrubber | - | - | - | - |
| Building roof vents | | | | |
| Copper roaster | 35 | 35 | 35 | 9 |
| Copper converter aisle | 43 | 43 | 43 | 11 |
| Reverberatory furnace | 9 | 9 | 9 | 9 |
| Blast furnace | - | - | - | - |
| Dross plant | - | - | - | - |
| Subtotal roof vents | 86 | 86 | 86 | 28 |
| **Buildings fugitives** | | | | |
| Copper roaster | 3 | 3 | 3 | 1 |
| Copper converter aisle | 5 | 5 | 5 | 1 |
| Reverberatory furnace | 1 | 1 | 1 | 1 |
| Sinter plant | - | - | - | - |

[111] Values reported are from DRPE-0000044063; discrepancies with emissions records spreadsheets lead to the conclusion that 2007 records are projections. Basis for estimating contribution from fugitives is actual $SO_2$ tpd from spreadsheets.



EXHIBIT 34

| Sources | 2002 | 2005 | 2007 | 2011 |
|---|---|---|---|---|
| Subtotal fugitives | 9 | 9 | 9 | 3 |
| **TOTAL FUGITIVES** | 95 | 95 | 95 | 31 |
| Contribution of $SO_2$ Emissions from Fugitives (reported in DRPE-0000044063) | 10% | 12% | 14% | 21% |
| Contribution of $SO_2$ Emissions from Fugitives based on actual reported discharges from Main stack | 10% | 12% | 12% | |

The Main Stack is described in DRPE-0000472722. The elevated stack height (above grade) is 167.6 m (550ft). Other features are Stack diameter 13.13m (43ft); Stack Exit Velocity 7.6m/s (25fps); primary pollution control an Electrostatic Precipitator (Central Cottrell).

In general engineering terms this is a short stack. The discharges from the main stack are of similar magnitude to large coal fire power plants (many of which are or have been retired over the past decade). Power plant stacks are typically on the order of 1,000 ft. based on modern scaling principles -- twice the height of the smelters.

**PAMA Requirement to Reduce Main Stack Daily Discharges**

The Government of Peru required the facility to reduce Main Stack $SO_2$ discharges to 175tpd. This stack discharge limit is believed to allow Defendants to meet the air quality standard for $SO_2$. The primary action Defendants proposed to achieve this was by constructing sulfuric acid recovery plants for the copper, lead and zinc circuits. Only the lead and zinc projects were completed. The copper circuit plant was abandoned in 2009 when the smelter shut down and after multiple requests for extension. The copper circuit acid recovery plant was perceived by Defendants to have provided the greatest impact to reduced $SO_2$ emissions, and hence was critical to meeting the air quality standards. The following is a brief description of the timeline of events concerning the copper circuit acid plant.

The original PAMA called for the construction of two sulfuric acid plants - one for the Copper Circuit and one for the Lead and Zinc Circuits to treat $SO_2$ emissions. Under the PAMA schedule, this project was to be completed last, with construction scheduled to begin in 2003 and completed by 2006.[112] In the planning and design process, Defendants' engineers learned that three separate sulfuric acid plants-one for each circuit; not two (and not a single sulfuric acid plant either) was needed.[113]

- February 17, 2004 – Bruce Neil[114] wrote to the Ministry of Energy and Mines ("MEM") and provided them with a lengthy report titled "PAMA Para El Complejo Metallurgico de La Oroya 2004-2011" requesting a five-year extension of the PAMA (January 2007 through December 2011) to develop an expanded sulfuric acid plants project, and to

[112] Request for PAMA Modification No. 1215214, Table 2 at 5; Exhibit C-028, PAMA Operative Version, Section 3.3.2 at 171-72. See also Neil Witness Stmt. at, paragraph 15-16.
[113] Detailed request for a PAMA extension at 49-50. See also Neil Witness Stmt. at, paragraph 15-16.
[114] Became General Manager of Doe Run Peru S.R.L. ("DRP") and President in December 2003.

complete a number of complementary projects to control fugitive emissions, reduce particulate emissions from the main stack, and generally reduce lead exposure.[115]

- December 23, 2004 – The Government of Peru passed a decree allowing mining operations to apply for an extension of one or more PAMA projects, subject to additional conditions, guarantees and more rigorous sanctions. The law allowed for a maximum extension of four years. Applications were due by December 31, 2005.[116]
- December 20, 2005 – Defendants filed an Application for Exceptional Extension of the "Sulfuric Acid Plants" Project, requesting an extension of four years to complete the project by December 31, 2010.

The Peruvian Sate determined that the 4-year extension was excessive, given the fact that it is a priority for the Peruvian State to adequately protect the health of the people and the quality of the environment and that the execution is technically viable within a shorter term.[117]

- May 25, 2006 – The MEM granted Defendants an extension of two years and ten months beyond the original ten-year PAMA period [until October 2009]. The MEM explained that this extension was justified for the follow reasons:

  *The PAMA in the mining sector was the first experience of using this instrument in Peru, thus the PAMA presented in this first phase, including the PAMA of the La Oroya Metallurgical Complex, were prepared with limited technical detail and a very basic level of engineering (conceptual), which did not contemplate the remediation of some environmental problems, which in some cases were significant, as they were not completely or adequately identified or characterized.*

  *In the specific case of the PAMA for the La Oroya Metallurgical Complex, one of the sources of contamination that was not initially identified was fugitive emissions, the importance of which was not fully understood, since in addition to the emissions of particulate material, including heavy metals, they were not sufficiently measured. Their effects on health, particularly the effects of lead, were detected through subsequent monitoring in 1999, within the initial context of the studies performed to eliminate lead from gasoline in the country.*[118]

- January 2007 – The originally-scheduled completion date for the PAMA, Doe Run Peru had completed all but the PAMA project for the sulfuric acid plants (as well as the environmental and fugitive emissions projects that the Ministry of Energy & Mines had imposed as a condition of receiving the extension). By the end of 2008, Doe Run Peru's total investment on the PAMA and related projects had increased to more than US$300 million.[119]

[115] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014
[116] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014
[117] 2006 - MR 257-2006-MEM DM - DRRC-00075367 - 5-29-2006 MEM response to DRPs request for extension of time for sulfuric acid plant
[118] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014
[119] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014



EXHIBIT 34

- March 5, 2009 – Defendants requested a deadline extension to finish the third and final sub-project of the final PAMA project based on the economic force majeure event.
- June 3, 2009 – Almost five months before the PAMA was scheduled to expire, Defendants suspended operations at the Complex, because they were unable to obtain financing without an extension and unable to pay its concentrate suppliers without financing.
- June 25, 2009 – Defendants wrote to the Ministry of Energy & Mines providing a comprehensive proposal for a 30-month PAMA extension that included a fresh equity injection, and capitalization of the inter-company debt. The next day the Ministry rejected the request, stating that Defendants did not provide enough specifics.[120]
- July 8, 2009 – Defendants provided a detailed and comprehensive report to MEM titled, "Request for Extension of Deadlines to Complete the Copper Circuit Sulfuric Acid Plant Project based on Act of God or Force Majeure Grounds" seeking a 30-month extension to complete the final PAMA project. MEM denied this request as well.
- September 26, 2009 – Congress passed a law ("Extension Law") granting Defendants an extension of 30 months. The Extension Law gave Defendants ten months to obtain financing and to restart operations of the Complex (or until July 27, 2010), and an additional 20 months for the technical completion and start-up of the final project (or until March 27, 2012)
- October 29, 2009 – MEM issued an Executive Decree setting forth "requirements" with which Defendants were required to comply, which made it impossible for Defendants to obtain financing, restart the Complex, finalize the remaining portion of the final project, or benefit from the PAMA extension. For example, MEM required that the funding to finish the final PAMA project be funneled through an existing trust controlled by the Directorate General of Mining in which Defendants would have to deposit 100 percent of all gross revenues from metal sales and/or operations, including any other revenues regardless of their origin. This made it impossible to secure financing because no bank or entity would loan money unsecured, and Defendants were not able to pledge any of its revenues as collateral for a loan.
- July 11, 2010 – Seven months after MEM issued Supreme Decree 075-2009, and less than two months before Defendants were scheduled to resume operations under Extension Law, the government issued an amended Supreme Decree. The amended Supreme Decree provided "that twenty percent (20%) of the gross income [Doe Run Peru] obtains as a consequence of contracts on metals and/or from its operations be channeled monthly through the trust" and therefore amended the 100 percent requirement to 20 percent. The amended decree, however, did not amend the deadline to restart the facility, which was July 27, 2010, less than two months after the issuance of the amendment.[121]

[120] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014
[121] RENCOGRP-015265 – Witness Statement of Dennis Sadlowski, February 19, 2014

**Actions to Reduce $SO_2$ Discharges**

There are six actions Defendants undertook to attempt to reduce $SO_2$ emissions from the Main stack:

1. Operational changes (circa 2000);
2. Work stoppages aided by real time CCTV (closed circuit TV) monitoring for fugitives (circa 2000);
3. Decommissioning of NJ Roasters Zinc Plant (end 2004)
4. Zinc sulfuric acid recovery plant upgrade (end 2006)
5. Lead circuit sulfuric acid recovery plant (late 2008)
6. Copper circuit sulfuric acid recovery plant (12% mechanical completion June 2009; projected completion 2011).

In addition to these actions, in 1997 Defendants considered increasing the Main Stack height from 550 ft. to 1,100 ft. and changing its location but rejected this as it would not have brought the facility within full compliance. Defendants' analysis did support that by increasing the stack height to 1,100 ft. that the $SO_2$ ambient air concentrations in La Oroya would significantly improve with an anticipated 50% reduction in monitored levels at Sindicato.

Actions 1 through 5 were implemented resulting in varying degrees of $SO_2$ reductions. The incremental reductions in stack emissions resulting from each action have been obtained by averaging Defendants' daily reported $SO_2$ emissions and in some instances annual average stack discharges over the time periods each of the actions were implemented.

Exhibit 154 is a trend chart of the tons per day of $SO_2$ discharges from the Main Stack in which each of the actions taken by Defendants are noted, and my estimates of the reductions reported for each one. Additional comments on each are provided below.

**Operational Changes**

This period is from Jan. 1997 through Dec. 1999. Records have not been located which describe the changes/actions made by Defendants to reduce stack discharges for this period; however, the general changes made are explained by Zegarra (2007)[122]. Defendants made significant changes to operating conditions between 1999 and 2001, and then continued to make other process changes without taking into consideration the impact to the dispersion characteristics on the Main Stack. Main stack operating conditions are illustrated by the trend charts in Exhibit 155A. The charts show that Defendants not only reduced the concentration of $SO_2$ in stack (which resulted in a lowering of $SO_2$ mass emissions), but also significantly lowered the stack exit velocity and stack gas temperature. Exhibit 155B are plots prepared by Zegarra that show the impacts of Defendants' actions to stack operating conditions more clearly. These changes to the operating conditions of the main stack were counter to good practice.

[122] DRPE-0000077931

While $SO_2$ mass discharges were reduced beginning in 2000, both lower stack velocity and temperature resulted in a worsening of air quality. By lowering the stack velocity there is less upward momentum of the stack plume and the lower/cooler stack gas temperature would have decreased the thermal buoyancy of the plume. Both actions are generally recognized by engineers to contribute to poor dispersion. Given the facts that the Main Stack is a relatively short stack and the unique meteorological conditions resulting in almost daily inversions, there is reason to believe these actions, at best, did not improve air quality in La Oroya and may have worsened it. I have seen no evidence that Defendants performed air dispersion modeling to assess the impacts to air quality of changing the main stack's operating conditions. It is not considered good practice to make changes to stack conditions, especially ones that are so important to the air pollution of the entire complex, without having considered impacts to ground level concentrations near sensitive receptors.

Zegarra wrote "due to the drastic reduction of the physical properties of the gases emitted by the stack (temperature, volume, pressure and velocity) that was 20% in average, we conclude that the gas discharge capacity of the main stack is over-designed, harming the gas dispersion potential, which causes the high pollution levels register in the different monitoring stations, and in some cases, do not allow us to fulfill the environmental commitments."

**Work Stoppages and Real Time CCTV**

Work stoppages and real time CCTV are the only actions applied to reduce stack emissions between Jan. 2000 and Dec. 2004. Exhibit 156 shows trend charts and reported hours of work stoppages per year. These records show Defendants reduced operating hours during periods of poor atmospheric conditions. Unfortunately, I have found no evidence that supports that these actions reduced $SO_2$ concentrations at the monitors. It is unclear why Defendants even bothered to implement this practice since they concluded that the contribution of fugitive emissions to $SO_2$ releases was minimal.

**Decommissioned NJ Roasters at Zinc Plant**

On the last day of 2004, Defendants decommissioned inefficient and polluting roasters in the zinc circuit.[123] There is a sufficient period of time stretching to the next action in December 2006 to assess the impact to stack discharges. This action shows that Defendants were able to reduce $SO_2$ stack discharges about 10.4% (Exhibit 154). This reduction left the stack discharges about 4.6 times higher than the 175tpd PAMA requirement.

The air monitoring data after 5/24/06 seems to be the best quality; however, because the monitoring data cannot be compared against the previous period, it is not possible to assess whether this action resulted in less of an impact to community exposure. The levels of $SO_2$ in the air are so gross during this period that likely ~10% reduction in stack discharges had no measurable impact.

[123] DRPE-0001974767

**Zinc Circuit Sulfuric Acid Plant Upgrade**

In December 2006 Defendants upgraded the zinc circuit sulfuric acid recovery plant. The annual production capacity for this unit is 62,000 tons. Defendants spent $5.7MM on the upgrades.[124] This improved operations and a comparison of stack discharge data shows a modest 10.4% reduction in mass discharges compared to the prior period (Exhibit 154).

**Lead Circuit Acid Recovery Plant**

In September 2008 Defendants completed the installation of a new lead circuit sulfuric acid recovery plant. This platform cost $61.51MM and has an annual production capacity of 115,000 tons.[125]

- The project was approved in July 2006
- Detailed engineering began in Aug. 2006 and was completed Nov. 2007
- Procurement activities started Mar. 2007
- Construction began July 2007
- The platform was fully commissioned and handed over to operations in Sept. 2008.

This project took 27 months from start to completion, or a little over 2 years.

Stack records reviewed showed a 16.4% reduction of $SO_2$ discharges from the main stack (Exhibit 154). This platform only ran for a few months before the smelter began to wind down operations and drastically reduce production. There are insufficient air monitoring records over a long enough period of time to assess whether this resulted in reduced impacts to air quality.

### 8.4.7 Overall Assessment of Air Pollution Projects

**Overall**

Sections 8.4.3 through 8.4.6 explain and document the estimated pollution reductions for what has been determined to be the most significant programs. The review does not give a complete explanation of the totality of efforts initiated by Defendants to reduce air emissions. This section is a chronological summary of all of the air pollution control related projects that I could find that are documented in the discovery records. In examining the totality of these records, Table 19 summarizes Defendants' programs in terms of number of projects and investments made into reducing air emissions:

---

[124] DRRCE-00568738
[125] DRRCE-00658064

Table 19. Summary of Air Pollution Projects

| Year | Spent, $ | Total No. Projects | No. Projects Aimed at Controlling Fugitive Emissions | Impact to Air Quality in La Oroya |
|---|---|---|---|---|
| 1999 | 630,000 | 1 | 0 | None |
| 2000 | Unknown | 1 | 1 | None |
| 2001 | 7,340,000 | 1 | 0 | Insignificant |
| 2004 | 300,000 | 1 | 1 | None |
| 2005 | 26,200,000 | 7 | 5 | Significant |
| 2006 | 11,440,000 | 8 | 5 | Additive and Significant |
| 2007 | 15,920,892 | 11 | 10 | Additive and Significant |
| 2008 | 271,010,000 | 3 | 0 | None – 2 of 3 projects abandoned |

The most significant impacts to improving air quality in La Oroya (and presumably other communities) came from projects implemented after 2006. The air quality trend chart in Exhibit 148A (bottom trend chart) shows lead levels fell sharply between 2006 and 2007. Most of this improvement to air quality is associated with the good practices that Defendants finally began adopting to reduce fugitive emissions. All of the fugitive emission reduction projects identified could have been implemented within the first two years of operation. Further, because most of the projects implemented were poorly executed and ill-planned, further reductions were never achieved to bring air quality within safe limits.

**Project Summaries**

**1999. Environmental Monitoring Stations & Aerial Photography**
Source Document: DRRCE-00568738
Objective: To monitor air quality in the surrounding areas of the Metallurgical Complex
Completion: October 1999
Cost: $630,000
Environmental Benefits: No direct benefit and poorly implemented. Ineffective metals monitoring because data was intermittent; $SO_2$ monitors were inaccurate; incomplete meteorological data which hampered modeling.

**2000. Control of Fugitive Emissions by CCTV**
Source Document: DRPE-0001974767
Objective: Defendants installed a closed-circuit TV ("CCTV") system in 1999 that allowed it to monitor fugitive emissions. It implemented a stop work program where Defendants report that it uses daily meteorological forecasts to identify periods of poor dispersion and large fugitives – it would use this information to stop operations emitting the highest amounts of $SO_2$ for periods of 4 to 6 hours during such days. Defendants report that thermal inversion is a natural phenomenon that occurs in La Oroya at all times of the year, but especially in summertime.
Completion: CCTV installed October 1999; Work stoppage program began in 2000.
Cost: Unknown

Environmental Benefits: None - Air quality trends of SO2 show no impacts from the project.

**2001. Modernization of the Electrostatic Precipitation System & Dust Collection Systems**
Source Document: DRRCE-00568738
Objective: Project claimed to reduce the dust emissions from the Main Stack by 23% through the modernization of the electrostatic collection systems, installation of filters and dust collectors, and the reduction of the recycling of metallurgical dust.
Completion: October 2001
Cost: $ 7.34 million
Environmental Benefits: Important and necessary project that reduced PM containing lead and arsenic, but overall benefits marginal to incremental. Air quality trends for PM10, arsenic and lead show no impacts from the project.

**2004. Decommissioning of New Jersey Roasters**
Source Document: DRPE-0001974767
Objective: To deactivate the three New Jersey roasters of the zinc circuit. Project described the roasters as old technology that produced gases with low $SO_2$ content and a high concentration of particulate matter that did not favor the production of sulfuric acid. Capacity of zinc concentrates were reduced from 155,000 to 95,000 MTPY. Refined zinc production was reduced from 75,000 to 45,000 MTPY. Reduced PM emissions from main stack by 1.1 MTPD, and $SO_2$ emission reduced by 130 MTPD.
Completion: December 2004
Cost: $300,000
Environmental Benefits: Significant for PM and lead but $SO_2$ reductions problematic. Zegarra (2007) reports that because Defendants did not consider the impact to the Main Stack's dispersion from the removal of the roasters and other actions the $SO_2$ levels in La Oroya worsened. Table 1 of Zegarra (2007) reports Main Stack temperature to decrease in 2005, which this project may have contributed to.

**2005. Short Rotary Furnaces #1 And #2**
Source Document: RENCOGRP-002468
Objective: To reduce the concentration of particulate matter containing lead in the Main Stack as well as fugitive emissions. The project aimed to reduce the circulating load of metallurgical dust by improving the efficiency of Central Cottrell. The project consists of the purchase and installation of two short rotary furnaces for the treatment of dust generated in the pyrometallurgical processes in the copper and lead circuits (copper converters, lead smelter, copper and lead reverberator). The rotary furnaces were to improve the reduction process which improved yields in recovering lead and bismuth, and fix impurities, such as arsenic, into a stable phase for final disposal. By refraining from recycling the smelter dust back to the principal lead circuit, the generation and emission of secondary dust through the Main Stack was reduced.
Completion: Short Rotary Furnace #1 was commissioned March 2004. Short Rotary Furnace #2 was commissioned March 2005. During the execution of the Special Exam, auditors verified the operation of the rotary furnaces in which the recirculating fine materials are treated and which consist basically in separating the metals in different phases, lead as bullion, arsenic in the speiss and cadmium as dust to be recovered in the cadmium plant.
Cost: $19 million



EXHIBIT 34

Environmental Benefits: Emission reductions could not be verified or quantified from records review. Air monitoring trend charts for lead and arsenic in Exhibits 148A and 153 show no impact to air quality. Benefits likely incremental.

**2005. Arsenic Cottrell Control System Improvements**
Source Document: RENCOGRP-002468
Objective: To reduce PM emissions from Main Stack. Accomplished by increasing the collection area of the five units in the Arsenic Cottrell. Replaced the collecting tube sheets with plates -- installed deflectors throughout the by-pass pipe to facilitate the acceleration of particulate matter.
Completion: Conducted between 2004 and 2005
Cost: $400,000
Environmental Benefits: See Exhibit 10 – the arsenic airborne concentrations at Sindicato (monitoring data) don't fluctuate much between 2004-2005 and there is an uptick in 2006.

**2005. Washing and Draining Station for Trucks, Polymetallic Concentrate Deposit**
Source Document: DRPE-0001974767
Objective: Wash station for trucks and other vehicles. This removes particulate material adhered to truck tires, chassis or bins, and prevent this material from being carried outside the Complex and deposited on access roads. System uses pressurized water, which is collected and directed to tanks where the particulate material separates from the water prior to water recirculation.
Completion: Nov. 2005
Cost: $600,000
Environmental Benefits: Incremental – good practice that could have been implemented years earlier.

**2005. Street Sweeping Equipment**
Source Document: DRPE-0001974767
Objective: To reduce fugitive dusts on access roads. Defendants purchased two industrial sweeping vehicles to clean the paved areas of Old La Oroya and of the Complex.
Completion: October 2005
Cost: $700,000
Environmental Benefits: general good practice to control fugitives but has incremental to minimal benefit. Benefits additive and should have been implemented years earlier.

**2005. Improvements to Ventilation System of Cadmium Plant #2**
Source Document: RENCOGRP-002468
Objective: To reduce the fugitive gas and particulate matter emissions generated in the dissolution and precipitation processes. Project involved installation of a gas cleaning system, and the repowering of the existing ventilation system. Reduced the localized contamination of the work area.
Completion: 2005
Cost: $400,000
Environmental Benefits: Minimal - This project had important benefits for worker protection but air quality improvements in La Oroya likely not affected.

**2005. New Coke Storage Area and Closure of Coke Plant**
Source Document: DRPE-0001974767
Objective: To eliminate the coke plant produced. As of 2005, 100% of metallurgical coke used in the metallurgical operations was imported. Condition a storage area of the imported coke, with a 10,000 tons capacity. Gradually cease operations of the coking furnaces. By 2004, battery "A" comprised of 10 furnaces ceased to operate, while the second battery "B", with the same characteristics, ceased to operate by the end of 2005. (Battery A closed January 2004, Battery B closed November 2004)
Cost: $800,000
Completion: 2005
Environmental Benefits: Reduced PM emissions by about 1,000MT. PM from coking operations contain nil metals hence project did nothing for lead and arsenic reductions (see U.S.EPA 2008).

**2005. Ventilation System in Antimonite Plant**
Source Document: RENCOGRP-002468
Objective: To eliminate the pollution generated during the smelting process and oxidation of mixed dust emanating from the Anodic Waste Plant, and to recover the antimonite contained in the lead load that is sent to Central Cottrell. Involves enclosure of the Antimonite Plant and the installation of baghouses to make the reverberator and converter ventilation systems independent, to then operate these units independently.
Cost: $700,000
Completion: Scheduled 2004-2005
Environmental Benefits: The project aims to control fugitive emissions. Additive to the reduction of fugitives. No quantitative records document reductions.

**2006. Engineering Evaluation of Dust Capturing Systems**
Source Document: RENCOGRP-002468
Objective: This was an engineering study to analyze the performance of the dust capturing systems and to outline actions and investments. Study included field- and office-work.
Completion: Conducted between 2005 and 2006
Cost: $ 450,000
Environmental Benefits: None.

**2006. Reduction of Dust Emissions from the Main Stack**
Source Document: RENCOGRP-002468
Objective: This project, comprised of five sub-projects, is aimed at decreasing dust emissions from the Main Stack. It includes the evaluation of dust capturing systems from different plants, conditioning of units 1, 2 and 3 of the Central Cottrell to operate with the gases from the sintering plant, improvements to the control systems of the Arsenic Cottrell, and the decommissioning of three New Jersey roasters from the zinc circuit.
Completion: Projects were implemented between 2004 and 2006.
Cost: Unknown
Environmental Benefits: Incremental benefits. Exhibits 144 and 145 show these projects helped to reduce PM10 levels and contributed to reductions to lead and arsenic levels.

**2006. Zinc Sulfuric Acid Plant Upgrade**
Source Document: DRRCE-00568738
Objective: Reduce $SO_2$ emissions from the zinc circuit by capturing them and transforming them into sulfuric acid. Acid production was projected to increase from 48,000 to 62,000 annual tons. The project had financial returns because sulfuric acid was made and marketed.
Cost: $5.7 million
Completion: December 2006
Environmental Benefits: None. Records could not be located that verify how much $SO_2$ air emissions were reduced. Regardless, $SO_2$ air levels from monitoring show air quality worsened.

**2006. Handling and Humidifying Lead Smelting Beds**
Source Document: DRPE-0002104173
Objective: Minimize the wind dispersal of particles in lead concentrate storage areas. The smelting beds include lateral and humidified enclosures using a water spray system to maintain the proper humidity to prevent the dispersion of particles by wind. By maintaining the smelting beds with the proper humidity, the wind dispersal of particulate matter containing lead is minimized contamination.
Cost: $643,619
Completion: 2006
Environmental Benefits: Fugitives emission control project – this is a good practice. Contribution to reducing fugitive emissions incremental.

**2006. Enclosure of Copper Reverberator Loading Zone**
Source Document: RENCOGRP-002468
Objective: To properly capture and handle the gases and dust produced from the loading of the oxy-fuel furnace. The project involves the enclosure of the loading zone in the Oxy-Fuel Reverberator building and the installation of a baghouse system to capture the dust produced during the unloading of calcine into the furnace. Fugitive emissions and particulate matter are controlled
Cost: $1.5 million
Completion: 2006
Environmental Benefits: Fugitives emission control project – this is a good practice. Contribution to reducing fugitive emissions incremental. This project could have been implemented years earlier.

**2006. Improvements to Arsenic Plant Ventilation and Packaging Systems**
Source Document: DRPE-0002104173,
Objective: To control and reduce the fugitive emissions of arsenic trioxide particles generated during the packaging and dispatch stages in the Arsenic Plant. Automates the packaging system of arsenic trioxide and encapsulates the dispatch area, including the installation of a ventilation system. Capturing arsenic powder at the arsenic trioxide condensing unit outlet and decreasing powder load towards the Arsenic Cottrell from 16.02 to 9.61 MT/day, estimating an in feed reduction to the main chimney of 0.40MT/day. Emission reduction through the main chimney projected to decrease from 1 to 0.60 MT/day
Cost: $1,604,069
Completion: 2006

Environmental Benefits: Fugitives emission control project – this is a good practice. Contribution to reducing fugitive emissions is incremental – this project is implemented along with others between 2006 and 2007 resulting in improved air quality in Sindicato. See as example trend charts in Exhibit 141 and 144. This project could have been implemented years earlier.

**2006. Plant Roads Paving**
Source Document: DRPE-0001974767
Objective: Defendants paved, from 2001 to December 2006, approximately 63,000 $m^2$ of access roads.
Cost: $1.69 million
Completion: 2006
Environmental Benefits: Fugitives emission control project – this is a good practice. It is ridiculous that it took 5 years for Defendants to implement this project. It should have done this within the 1st year of operation.

**2006. Improvements to Ajax and Kiln Furnace Dust Capturing Systems**
Source Document: RENCOGRP-002468
Objective: To minimize the emission of zinc gases and dust produced during the slagging and smelting of refined zinc in the Ajax Furnace. To reduce particulate matter and lead emissions produced during the unloading of the Kiln Furnace. Install a new baghouse in the Ajax Furnace. Improve efficiency of the bag house in the Kiln Furnace by replacing the current reverse air cleaning system with a pulse jet system, adapting an additional compartment, and improving the gas cooling system.
Cost: $600,000
Completion: 2006
Environmental Benefits: Fugitives emission control project – this is a good practice. Contribution to reducing fugitive emissions incremental. This project could have been implemented years earlier.

**2007. Maintenance Program for equipment and ductwork**
Source Document: DRPE-0002104173
Objective: Defendants established a preventive maintenance program for ductwork and equipment in the zinc circuit and acid plant and it changed plates in ducts of the smelter to control fugitive emissions of PM and $SO_2$.
Completion: Work began in 2006 and extended into 2007
Cost: Unknown
Environmental Benefits: Unknown. This program could have been implemented years earlier.

**2007. Repowering of A, B and C Ventilation Systems at the Sinter Plant**
Source Document: DRPE-0002104173
Objective: To reduce lead emissions improve workroom conditions. The project strengthens existing baghouses at the sinter plant; installation of a new baghouse in system and the replacement of the system's scrubber with a baghouse. Project projected that lead fugitive emissions would be reduced by 111.98 MT/year.
Cost: $1,656,505

Completion: January 2007
Environmental Benefits: Very significant – this project focused on reducing fugitive emissions.

**2007. Enclosure and Improved Ventilation System of Foaming Plant and Lead Furnaces**
Source Document: DRPE-0002104173
Objective: Enclosure of the lead furnaces and foaming plant deck board, which includes the installation of a ventilation system composed of ducts, negative pressure ventilators and two dust collectors (bag houses) to maintain a proper air quality within the enclosures. After the complete enclosure of the buildings of the Dross Plant and Lead Furnaces, gas extraction systems and the baghouses with a nominal capacity of 260,000 ACFM were scheduled to be installed. Prior to that, structural repairs to the buildings were made along with civil works.
Cost: $1,212,342
Completion: January 2007
Environmental Benefits: Significant – this project focused on reducing fugitive emissions. Like others implemented between 2005 and 2007, this reduced PM and lead fugitive emissions.

**2007. Improvements to Dust Capturing Systems in Anodic Waste Plant**
Source Document: RENCOGRP-002468, DRPE-0002104173
Objective: Installation of a new baghouse of 20,000 ACFM for the converters' facility, repowering the existing baghouse, and replacing two electrostatic precipitator units. Reduce the dust load to Central Cottrell and fugitive emissions of particulate matter.
Cost: $2.41 million
Completion: January 2007
Environmental Benefits: Incremental – this project is implemented along with other fugitive emissions controls between 2006 and 2007 resulting in improved air quality in Sindicato. See as example trend charts in Exhibit 141 and 144.

**2007. Installation of baghouse at lead foam reverb furnace**
Source Document: DRPE-0002104173
Objective: An uncontrolled emission source was routed to a baghouse. Previously these emissions were captured in part by hoods which sent gases to Main Stack via Central Cottrell. Project claims to have reduced emissions through the Main Stack from 0.09 to 0.01 MT/day.
Cost: $1.81 million
Completion: January 2007
Environmental Benefits: Incremental – this project is implemented along with others between 2006 and 2007 resulting in improved air quality in Sindicato. See as example trend charts in Exhibit 141 and 144.

**2007. Installation of Lead Furnace Baghouses**
Source Document: DRPE-0002104173
Objective: To increase the dust capturing efficiency of units 13, 14 and 15 in the Central Cottrell which decreased the emissions of PM from Main Stack. Project aims to improve capture of lead powder generated at the furnace and which is currently sent to Central Cottrell units. Project description reports improving collection efficiency from 96.7% to a minimum efficiency of 99%, thus reducing particulate matter emission through the main chimney from 0.46 to 0.14 MT /day.
Cost: $3.17 million

Completion: January 2007
Environmental Benefits: Significant. This along with others over this period contributed to improved air quality of PM and lead (see trend charts in Exhibits 145 and 148A). It is rather shocking that this project was implemented so late in Defendants' operation. It knew in 1997 at the time it acquired the facility that the Central Cottrell was old and had low PM collection efficiency. This project could have been implemented years earlier.

**2007. Handling and Humidifying Copper Smelting Beds**
Source Document: DRPE-0002104173
Objective: To minimize the wind dispersal of PM in the copper concentrate storage areas. Smelting beds include lateral and humidified enclosures that are humidified using a water spray system to maintain proper humidity and prevent the wind dispersions. By maintaining the smelting beds with proper humidity, fugitive emissions are minimized.
Cost: $ 390,726
Completion: January 2007
Environmental Benefits: Incremental. It's a good practice that controls fugitives. This project could have been implemented years earlier.

**2007. Conditioning of Units 1, 2 and 3 of Central Cottrell (lead sintering)**
Source Document: DRPE-0002104173, RENCOGRP-002468
Objective: To increase the capture efficiency of Central Cottrell units 1, 2, and 3. The project increased the gas cleaning area and dust capture efficiency by retiring three Zinc Circuit New Jersey Fluid Bed Roasters. This reduced emissions from the Main Stack from 0.60 to 0.52 MT/day beginning of 2007. The removal of the roasters enabled the Central Cottrell to receive 50% more gases produced in the lead sintering process.
Cost: $110,166 (originally budgeted for $250,000)
Completion: Project was scheduled for 2005 but not completed until January 2007
Environmental Benefits: Contributes to reduction of PM and lead – monitoring data trend charts decline significantly during this period. This action also contributed to a worsening of the $SO_2$ (see Zegarra 2007).

**2007. Handling of Nitrous Gases from Anodic Waste Plant**
Source Document: DRPE-0002104173, RENCOGRP-002468
Objective: To eliminate nitrous gas emitted into the environment through the existing chimneys of the Anodic Waste Plant. Project installed a gas-cleaning scrubber containing a chemical agent that fixes the nitrous gases in an aqueous solution for its subsequent recycling.
Cost: $2.23 million
Completion: August 2007
Environmental Benefits: This is a source reduction/fugitives emission control project that eliminated NO. It had no benefit to reducing lead, arsenic and PM.

**2007. Enclosure of Copper Roaster Calcine Loading Zone**
Source Document: RENCOGRP-002468
Objective: To minimize fugitive emissions from unloading of calcine from the copper roasters to the calcine carriers. Project specified encapsulating the copper roasters unloading zone and the installation of ventilation systems for handling gas and capturing particulate matter.

Cost: $1 million
Completion: Scheduled for 2006-2007
Environmental Benefits: Unknown – cannot find records that verify project was ever completed

**2008. Construction of Lead Acid Plant**
Source Document: DRRCE-00568738
Objective: Reduce $SO_2$ emissions from the Lead Circuit. The plant had a design annual production capacity of 115,000 tons of H2SO4. The project had financial returns because sulfuric acid was made and marketed.
Cost: $61.51 million
Completion: September 2008
Environmental Benefits: None. Records could not be located that verify how much $SO_2$ air emissions were reduced. Regardless, $SO_2$ air levels from monitoring show air quality worsened (Exhibit 21).

**2008. Construction of Copper Acid Plant**
Source Document: DRRCE-00568738
Objective: Intended to capture $SO_2$ emissions from the Copper Circuit.
Completion: Never completed. Construction began in June 2008 and shutdown in December of the same year. The plant was 55% mechanically completed.
Cost: Total projected investment was US$130.1 million. Actual spent was $63.9 million.
Environmental Benefits: None. Project abandoned.

**2008. Copper Furnace Modernization Project**
Source Document: DRRCE-002104173, DRRCE-00568738
Objective: This project aimed to install a modern Isasmelt furnace to optimize the control of the sulfur dioxide emissions. Copper roasters and oxy- fuel blast furnace were to be replaced by an Isasmelt melt reactor (rendering it easier to fix sulfur as H2SO4) as a part of the copper melting upgrading in order to build the H2SO4 plant.
Completion: Never completed. Project was abandoned in December 2008. The plant was 50% mechanically completed. Construction began in January 2008.
Cost: Project was budgeted for $179.1 million. At time project abandoned US$79.4 million was spent.
Environmental Benefits: None. Project abandoned.

**2008. New Ventilation System for Slag Granulation**
Source Document: RENCOGRP-002468
Objective: To prevent water vapors generated in the slag granulation channels of the Lead Furnaces from escaping. Install a ventilation system that captures the water vapors produced during the lead slag granulation process.
Completion: Unknown – not sure implemented
Cost: $500,000
Environmental Benefits: Unknown – records do not describe or quantify.

# 9. STANDARD OF CARE OPINIONS

## 9.1 Statement of Opinions

**Opinion** - Defendants failed to exercise reasonable care to protect Plaintiffs from harm caused by the air pollution from the La Oroya metallurgical complex. They had both an **Obligation** and a **Duty** to apply good industry practices within a timely manner to reduce and control harmful air pollution to within internationally recognized levels that are protective of human health.

**Obligation and Duty** - Their Obligation and Duty stems from a reasonable expectation that a company conducts its business with social responsibility. Whether an organization or individual(s), there is an obligation to operate a business in a manner that does not cause an unreasonable risk of harm to others.

Social responsibility is a **Duty** to perform in ways that maintain a balance between the economy and the environment. While there are trade-offs between economic development and the welfare of society and environment, when a corporation or individuals understand that their practices are causing serious harm to others they have the duty to eliminate the harm they are causing.

**Pre-acquisition Knowledge** - The Defendants had **Knowledge** prior to the purchase of the facility in which they understood that operations were causing great harm to the public at large, including Plaintiffs. They decided to purchase the La Oroya metallurgical complex and continue operating in an unsafe manner. Prior to purchase, Defendants had the following knowledge:

1. The few air pollution controls relied on at the facility were decades old, inefficient and outdated technologies;
2. Little to no maintenance had been performed on air pollution controls and those that were used were largely in a state of disrepair;
3. Many sources operated without any air pollution controls and freely discharged toxic pollutants to the atmosphere. More than 90 uncontrolled point sources were known throughout the smelter complex with only a few having been stack tested;
4. Fine particulate matter emissions from stacks and fugitive emission sources were enriched with toxic lead, cadmium and arsenic;
5. The SO2 emissions from the Main Stack were so large that the local air quality exceeded levels that are considered unsafe by international and U.S. standards;
6. Fugitive air emissions from the facility were not controlled and were as large to greater than the 90 uncontrolled sources and from the Main Stack. Major building operations such as the sinter plant, dross plant, copper converter aisle and lead smelting furnaces released toxic fumes and fine particulate matter containing lead, arsenic and cadmium into workrooms that were then released directly through openings in the roofs of buildings. Defendants knew or should have known that these uncontrolled air emissions were transported by atmospheric winds into the community where the public at large including Plaintiffs were exposed;
7. There were no reliable air monitoring stations in the community;
8. Corporate representatives who performed due diligence for the purpose of informing Defendants' decision makers considering purchase of the metallurgical complex witnessed particulate matter covering the streets and homes of La Oroya and La Oroya

Antigua, which they acknowledged contained toxic lead, arsenic and cadmium which could only have come from the air pollution from the smelter complex;

9. They knew or should have known that the air pollution emissions from the complex were larger than any comparable lead smelter in the United States and should have known that the plume discharge from just the Main Stack of the smelter complex was larger than the facility-wide emissions from all U.S. lead smelters combined;
10. The results of both air dispersion modeling conducted by the World Bank's consultant as well as observations made by Defendants' representatives who reported toxic dusts on streets and homes made it obvious that residential communities had insufficient set-backs from the industrial operations.

Defendants understood both from the PAMA and the information gathered prior to purchase that should they operate the metallurgical complex without significant changes to process operations, process technologies, air pollution controls, building upgrades and air pollution management practices, the public at large would be harmed. They also knew prior to purchase that the Peruvian air quality standards were both in draft form and less protective than those recognized by the U.S.EPA, the World Health Organization, the European Community, and many countries. They further understood that there were weak and ineffective environmental enforcement practices in Peru, thereby affording them an opportunity to continue operating the complex with little regulatory oversight until the regulatory climate changed at some unknown point in the future.

The Defendants **Breached the Standard of Care**.

***Breach 1: Defendants gave no priority to reducing air pollution and their harm to the public at large including Plaintiffs during the first several years of their ownership and control. Over the first three years they could have reduced fugitive air emissions by more than 2,000 tons per year but chose to do nothing.***

- There were multiple immediate actions the Defendants could have and should have taken to reduce air pollution and harm from SO2, lead, arsenic and cadmium, but because there was little to no regulatory oversight and few consequences for continued poor environmental performance, they delayed efforts to spend the money needed to apply good industry practices that reduce air emissions.
- Defendants could have shut down the La Oroya Complex or parts of the Complex and installed pollution controls on uncontrolled sources before operating. Also, they could have reduced production levels and limited operating hours to reduce pollution. They did none of this.
- Over almost the entire period of ownership and operation of the metallurgical complex the air quality for lead, arsenic and SO2 in the community were above levels considered safe by international norms.
- Only after the Defendants suspended operations of the complex in June 2009 did ambient air quality levels fall to levels recognized to be safe.

***Breach 2: Defendants' actions between 1997 and 2000 constitute a breach of the standard of care, exposing the public to historically high air emissions. Despite extensive knowledge of how polluting the complex was when they acquired it, they ramped up production while taking no actions to control emissions.***

- They did not add controls to the more than 90 uncontrolled stacks and other emission sources which they knew were gross and created unsafe levels at lower production volumes.
- They ignored large fugitive air emissions which they understood had a greater impact on community air quality than the combined air emissions from the main stack and other point sources.
- They knew or should have known that by increasing production volumes without having upgraded existing pollution controls, adding new controls, making operational changes, and upgrading buildings that air emissions would increase proportionately.
- Defendants operated the complex in a manner that did not prioritize implementing pollution controls and protecting public health. During the same time, Defendants increased production and produced a monetary benefit at the expense of public health.

Increasing production allowed the Defendants to make more money, but by increasing the production volumes to historically high levels they exposed the public at large to unprecedented levels of harmful air pollution. Their actions show they were driven by profits and corporate greed at the expense of public safety.

***Breach 3: Defendants took advantage of weak environmental enforcement policies enabling them to defray investments into needed controls, extend meeting compliance obligations, and to ignore good industry practices.*** Their actions breached the standard of care because:

- Defendants knew or should have known from the knowledge they acquired during pre-acquisition that the metallurgical complex could not be operated in a safe manner.
- They were a sophisticated lead smelter operator and knew or should have known the good industry practices that had to be implemented in order to operate safely.
- They did not act on their knowledge and ignored good practices.

In the United States, good industry practices are embodied under statutory obligations that are subject to strict enforcement. Because not all companies act responsibly, there is need to regulate and enforce good industry practices. Regulations and enforcement incentivize responsible behavior because there are monetary and criminal penalties when good practices are not applied to controlling air pollution.

Peru did not have comparable statutory and enforcement incentives. This enabled Defendants to argue for open ended compliance schedules, and to defray costs for process changes, new pollution controls for point sources, and building improvements to reduce fugitive emissions that they knew or should have known were needed to prevent harm to the public. Defendants did not apply any of the following good industry practices:

a. Prepare emissions inventories. They had multiple authoritative resources to rely on plus experience in operating U.S. smelters that enabled them to prepare accurate and reliable air emissions inventories for both the smelter and the refinery. Because there were no inventories prepared: (1) emission sources were not prioritized; (2) open-

ended environmental management plans were prepared with no reasonable goals and targets established to reduce air quality to within safe levels; (3) the facility's environmental performance could not be tracked and priorities and effective plans to reduce harm could not be defined. The consequences were:

i. The largest and most harmful sources of pollution were allowed to discharge in an uncontrolled manner. The air emissions freely communicated with the atmosphere and were transported by winds into the communities over most of the ownership and operating period;

ii. The public was exposed to unsafe levels of lead, arsenic, cadmium and SO2 over the entire period of ownership and operation;

iii. Unreliable air dispersion modeling was performed which understated the harm caused by operations to regulators; concealed the need to establish reasonable limits to hours of operations and throughput volumes needed to reduce harm; and allowed unsafe setbacks between plant operations and the public.

b. Proper commissioning of air pollution controls. Newly installed pollution controls were not stack tested. The consequences were:

i. There was no confirmation that as-built equipment performed according to design expectations;

ii. Emissions reductions reported to the Government of Peru were not verified;

iii. The public's exposure to lead, arsenic, cadmium and SO2 was prolonged.

c. Netting analysis was never performed. Failure to perform a netting analysis allowed Defendants to blindly make changes to the Main Stack operating conditions. The consequence was to worsen SO2 air quality in the community and expose the public to unsafe levels.

d. PAMA statutory monitoring requirements – Defendants failure to follow statutory monitoring requirements resulted in under reporting the harmful impact of metal emissions from the plant and kept the public misinformed.

e. Upgrading air quality monitors critical to warning the public of severe air quality conditions and meeting compliance obligations. The consequences were that the public was exposed to high and dangerous levels of SO2 and the Government of Peru misinformed of dangerously high air emissions.

f. Adoption of an effective environmental management system (EMS). The consequences were:

i. There was no commitment and formalized approach to continually improve environmental performance;

ii. Compliance obligations were not met;

iii. Compliance schedules remained open ended;

iv. Maximum financial gains were justified at the expense of good environmental performance and public safety;

v. Good industry practices were ignored;

vi. The public at large was exposed to harmful air emissions over the entire operation of the complex.

### 9.2 Basis of Opinions

***Breach 1: Defendants gave no priority to reducing air pollution and their harm to the public at large including Plaintiffs during the first several years of their ownership and control. Over the first three years they could have reduced fugitive air emissions by more than 2,000 tons per year but chose to do nothing.***

#### A. Air Quality

- Exhibit 7 shows a plot of the ambient average annual lead concentrations reported from the Sindicato air monitoring station. It shows that air concentrations did not fall to levels considered safe until after 2009. Defendants understood that the Sindicato monitoring station was most representative of community exposures.[126]
- Exhibit 8 shows a comparison of the ratio of Sindicato lead concentrations in air to the Peru MPL, typical ambient levels reported for the EU and US ambient levels. The comparisons show:
  - Ambient lead air concentrations exceeded the level considered safe by the Government of Peru over the entire operation and ownership period.
  - Lead levels were as much as 27 times greater than reported for the United States.
  - Lead levels were as much as 17 greater than reported in EU countries.
- Exhibit 9 is a plot of the ambient average monthly lead concentrations reported for the Sindicato air monitoring station. The plot shows that not until 2007 did lead levels fall to within a range considered safe by the Government of Peru. The levels were still considerably above ambient levels typically reported for the U.S. and EU nations (refer back to Exhibit 8).
- Exhibit 10 is a plot of the ambient average monthly arsenic concentrations reported for the Sindicato air monitoring station. Levels fell substantially after 2000 but fluctuated and remained elevated. According to the World Health Organization there are no safe levels for arsenic because it is highly toxic.[127]
- Exhibit 12 summarizes the protective health standards recognized in 1996 for $SO_2$. It shows that Peru had the least protective standards compared to other countries.
- Exhibit 13 is a plot of the ambient annual average $SO_2$ concentrations reported for the Sindicato air monitoring station compared against the Peru MPL and U.S. NAAQS. It shows that the air quality worsened over the entire period of ownership and operation. Air quality levels were many times greater than the levels considered safe by Peru and orders of magnitude greater than levels considered to be safe in the U.S.
- Exhibit 20 is a plot of 24-hour average $SO_2$ ambient concentration compared against the Peru standard. It shows that over the entire period of ownership and operation the ambient air concentrations far exceeded levels considered safe by Peru.
- Exhibit 24 is a plot of the annual $SO_2$ ambient air concentration measured in Sindicato. It shows that over the entire period of ownership and operation the air concentrations were unsafe and well above protective levels recognized by both Peru and the U.S.

---

[126] DRRC-00051190

[127] WHO 2000. World Health Organization, Arsenic. In: Air quality guidelines for Europe, 2nd ed. Copenhagen, World Health Organization Regional Office for Europe, pp. 125–128

- Exhibit 135A is a plot of the Sindicato monthly average air quality trends for PM10, lead and arsenic. Exhibit 135B is a plot of the Sindicato raw monitoring data reported during and after plant closure in June 2009. The plots show that the ambient air quality levels fell to within safe levels after May/June 2009. This time period coincides with the shutting down of the plant (see production volume trend charts in Exhibit 2 which show production volumes declined after Dec. 2008).

**B. Failure to Give Priority and Take Corrective Actions to Reduce Air Pollution**

Section 6.1.2 documents the Defendants' Pre-acquisition Knowledge. Defendants acted irresponsibly because they took no actions to address the harm cause by air pollution from the metallurgical complex which they understood prior to purchase. After acquisition they should have assigned personnel and resources to do the following:

a. Prepared environmental action and mitigation plans along with schedules.
b. Physically inspect and audit all emission sources. They should have started by assigning name designations to every source (e.g. EP or Emission Point #1, 2, …). This should have included all stacks, roof vents, waste piles, access and egress roads. By identifying sources and assigning designations they could have begun quantifying and prioritizing the sources which required immediate attention.
c. Identify all uncontrolled sources and or sources with controls in poor operational state.
d. Applied AP-42 to obtain initial estimates of mass emissions from each source. Based on these estimates, they could have prioritized sources from highest to lowest and then established a schedule for stack testing, sizing, performing engineering tie in designs and begin procurement of appropriate pollution controls beginning with the largest emission sources.
e. They should have invested in training staff on pollution prevention practices and then formed a team empowered with authority and resources to perform a comprehensive pollution prevention audit across the facility complex. The team should have been given the mandate of identifying as many fugitive sources as possible, prioritizing the sources' emissions, and formulating mitigation and pollution prevention recommendations. The recommendations should have been prescriptive, detailed, defined expected reductions, included cost estimates, and recommended implementation schedules for management review and approval.

These practices are and have been in the mainstream of good industry practices for decades. I have been applying and writing about such practices since the early 1990s.[128] There is no excuse

[128] See following book publications for case studies and documented citations from U.S.EPA on pollution prevention practices and good industry practices: See book publications - Handbook of Pollution Prevention and Cleaner Production: Volume 4 - Clean Electricity through Advanced Coal Technologies, Elsevier, UK (2012); Handbook of Pollution Prevention and Cleaner Production: Volume 3 - Best Practices in the Agrochemical Industry, Elsevier, UK (2011); Handbook of Pollution Prevention and Cleaner Production: Volume 2 - Best Practices in the Wood and Paper Industries, Elsevier, UK (2010); Handbook of Pollution Prevention and Cleaner Production: Volume 1 - Best Practices in the Petroleum Industry, Elsevier, UK (2009); Responsible Care: A New Strategy for Pollution Prevention and Waste Reduction through Environmental Management, Gulf Publishing Co., Houston, TX (2008); Refinery Manager's Guide to ISO 14001 Implementation, Gulf Publishing Co., Houston, TX (2006); Environmental Management Systems Handbook for Refineries: Pollution Prevention through ISO 14001, Gulf Publishing Co., Houston, TX (2006); Environmental Technologies Handbook, editor, Government Institutes, Oxford, UK (2005); Achieving

for not having initiated and systematically executing immediate corrective actions within the first 18 months of taking over the facility given what the Defendants knew and understood prior to acquisition. Note:

- I have not been able to locate any records where a facility-wide emissions inventory was prepared for the facility.
- I have not been able to locate any records for stack tests of any point source.
- Of the 90+ uncontrolled point sources (see Table 3), I have only been able to locate a handful of records to show that some controls were installed and none were stack tested to verify they worked.

The World Bank's consultant Knight Piesold[129] advised the Defendants at the time of pre-acquisition inspection that it was critical to begin developing plant-wide emissions estimates in order to prioritize mitigation and environmental management action plans. The Bank's consultant recommended that a complete emissions evaluation be done before air dispersion modeling was performed which would have further assisted the Defendants in devising engineering solutions to reducing pollution from major point sources - "When a complete emissions evaluation is available … dispersion modeling analyses will be more reliable and useful for assessing the air quality benefits to be gained by various improved controls, stack modifications, or process changes."

Defendants acknowledged in 2004 that "A comprehensive fugitive metals emission inventory from the plant has previously never been assembled and fugitive building emission testing has not been conducted…"[130]

The importance of the observations and recommendation made by the Bank's consultant should not be underscored. When the facility was purchased, the Defendants had no quantitative understanding of the air emissions on a source by source basis. Without such baseline data it is not possible to devise effective mitigation and environmental management plans. Defendants ignored this. Again in 2004 they were advised of the need to develop this baseline data to devise effective pollution control management – see AIDA (2004): 'if the sources of fugitive and stack emissions are not understood with some detail, it is difficult to design a valid mitigation plan… This is especially true when diverse and complex sources exist, such as at the La Oroya

---

Environmental Excellence: Integrating P2 and EMS for Improved Profitability, Government Institutes, Washington, D.C. (2003); Handbook of Air Pollution Prevention and Control, Butterworth-Heinemann Publishers, United Kingdom, (2002); Handbook of Water and Wastewater Treatment Technologies, Butterworth Heinemann Publishers, United Kingdom, (2002); Green Profits: A Manager's Handbook to ISO 14001 and Pollution Prevention, Butterworth-Heinemann Publishers, United Kingdom, (2001); Pollution Prevention Practice Handbook, Marcel Dekker Publishers, NY and Basel, (2001); Handbook of Pollution and Hazardous Materials Compliance, Noyes Publications, Park Ridge, NJ (1996); Pollution Prevention Software Systems Handbook, Noyes Publications, Park Ridge, NJ (1996); Environmental and Health & Safety Management: A Guide to Compliance, Noyes Publications, Park Ridge, NJ (1995).

[129] DRRC-00077581 - Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, Final Report, Sept. 1996

[130] DRRC-00051190

Metallurgical Complex. While rough estimates can be of some use, they are not an appropriate basis on which to design a long-term plan for mitigation.'[131]

AIDA[132] also wrote:

a. Fugitive emissions are eight times greater than the impact of stack emissions for metals on air quality in La Oroya.

b. Fugitive emissions likely contribute greatly to ambient lead levels in La Oroya Antigua, and there is no doubt that these must be reduced for to meet the Peruvian standards and for La Oroya to be safe for human habitation. However, this does not necessarily justify a plan to significantly postpone the treatment of stack emissions. DRP has yet to present convincing evidence in support of this argument.

c. Fugitive emissions estimate that DRP has submitted to MEM so far includes only ten process and building sources, with no information on the location of those sources. From these ten sources, DRP claims to emit 374 tons of fugitive emissions each year. To mention only a few obvious omissions, DRP has failed to include fugitive emissions from potentially significant sources such as Huanchan, the concentrates deposits and handling processes, and vehicular re-dispersal of dust. It is therefore quite likely that the fugitive emissions have been vastly underestimated.

The Defendants placed no priority on reducing the air pollution from the complex. They were not under obligation to meet a formal compliance schedule because when they purchased the facility they had a 10-year window to bring the facility into compliance. They did not devote resources and effort to begin assessing baseline air emissions from the plant, prioritizing the air emissions and reducing these on a priority basis.

If the Defendants indeed placed priority on reducing harm to the public, then:

- They could have purchased properties and offered relocation allowances to community members to remove them from the harmful pollution and to allow themselves time to fully evaluate and develop sound environmental action plans. This decision could have been made prior to acquisition and implemented within the first year of operation. Instead, they ignored the harm being caused to the public at large, ignored the World Bank's recommendations on how best to develop an environmental management program and then again in 2004 ignored AIDA's recommended same good practices.
- They could have and should have implemented pollution prevention audits and action plans to systematically reduce, eliminate and bring under control the numerous fugitive emission sources that they initially observed first hand when they toured the plant prior to

[131] DRRC-00066701 - AIDA 2004. Comments on the air quality modeling done for the "Technical Justification" for Proposed Modifications to the La Oroya Metallurgical Complex PAMA, Prepared by Anna Cederstav, Ph.D., Asociación Interamericana para la Defensa del Ambiente, February 17, 2004

[132] Ibid, AIDA 2004.

acquisition. When their representatives toured the facility prior to purchase, they observed how polluting these sources were. Defendants had a copy of the Knight Piesold report which states on DRRC-00077619-20 – "Though the largest quantity of emissions are released from the main chimney, significant amounts of both $SO_2$ and metals are emitted at lower levels within the plant and from shorter stacks. **It is important to recognize that these low altitude emissions probably affect ambient concentrations in the local community and on the plant site more than the main stack."** One only needs to look at the photos of fugitive sources in Exhibits 38, 40, 41, 44, left image of Exhibit 45, 56, 63, 65, 67, 68, 69, 70, 72, 74, 79, 82, 83, 84, 87, 93, 94, 95, 98, 107, 117, 120, 123, and 131 to gain understanding of how polluting this plant is. Most of these photos are date stamped 2007 through 2009. Every one of these sources released uncontrolled harmful emissions containing fine particulate matter laced with high levels of lead, arsenic and cadmium, as well as $SO_2$. The Defendants ignored most of these over the entire ownership and operation of the smelter complex.

### C. Defendants could have reduced air emissions by more than 2,000 tons per year as early as 2000

- Exhibit 40 shows a photo of the sinter plant building. This is a building operation that has no walls. A massive cloud of air emissions containing fine particulate matter laced with lead, arsenic and cadmium along with $SO_2$ are shown in the photo freely communicating with the atmosphere. The photo is date stamped 2008. Defendants had to have observed this during pre-acquisition inspection and if they missed it at the time they certainly knew of the condition of this part of the operations when they took over operations.
  - o According to Vornberg's estimates[133] there were 74 tons of fine particulate matter fugitive emissions from the sinter plant and another 284 tons being discharged from old, inefficient scrubbers servicing this operation (see Table 15 - PM10 Emissions (MT) inventory prepared by Vornberg). Defendants projected reductions of 94% achievable in 2007/2008, based on a two year project.
  - o If the Defendants were placing priority on reducing harm to the public at large including Plaintiffs, the uncontrolled toxic air emissions from this part of the smelter complex should have been reduced by 94% by no later than 2000.

- Exhibit 120 shows photos of the fugitive emissions from the blast furnace operations. Clouds of fugitive air emissions containing fine particulate matter laced with lead, arsenic and cadmium along with $SO_2$ are shown freely communicating with the atmosphere. The photo is date stamped 2006. Defendants had to have observed this during pre-acquisition inspection and if they missed it at the time they certainly knew of the condition of this part of the operations when they took over operations.
  - o According to Vornberg's estimates[134] there were 102 tons of fine particulate matter fugitive emissions containing lead, arsenic and cadmium from this source (see Table 15 - PM10 Emissions (MT) inventory prepared by Vornberg). By 2005, Vornberg projected that these fugitive emissions would be reduced by 33%

[133] DRRCE-00922042
[134] DRRCE-00922042

(down to 68 tons) by enclosing the building operations and reducing uncontrolled fugitive emissions from freely discharging to the atmosphere. He then projects another 51 tons reduction by 2007 with the completion of efforts to enclose building operations. In total that is an 83% reduction in fugitive air emissions from this part of the smelter complex operations (reduction of 85 tons per year in total).

  - It is unreasonable to take 5 years to patch up the holes in roofs and walls, to replace broken windows, and to install baghouses to capture fugitive dusts. There is no excuse for not having achieved these reductions within the first 1 to 2 years of operating the complex, thereby eliminating harm to the community by 1999-2000 from this source.

- Exhibits 33, 59-61, 75, 76, and 119 show photos of hot toxic vapors released from the dross plant building operations. The toxic vapors are comprised of fine particulate matter containing lead, arsenic and cadmium along with $SO_2$. These emissions are released into the workrooms and then evacuated through openings in walls and the ceilings of the building directly to the atmosphere where they freely communicate with the outside and are transported by atmospheric winds into the community. Defendants had to have observed this during pre-acquisition inspection and if they missed it at the time they certainly knew of the condition of this part of the operations when they took over operations.
  - According to Vornberg's estimates[135] there were 153 tons of particulate matter containing toxic metals being released from the dross plant. He reported a 75% reduction in these fugitive emissions after 2005 from enclosing building operations (a 115 ton reduction). According to Vornberg, these reductions could be achieved in 2006 with no more than 1 year of effort. It is inexcusable that these reductions were not made no later than early 1999.

- Exhibits 32, 34, 35, 36, 38 (photo in upper left hand corner), 39 (shows only a canopy roof on copper converter allowing fugitives to flow our uncontrolled), 45 (left side photo of copper converter aisle), 65, 66, 67, 69, 70, 71, 77, 78, 80, 81, 82, 87, 97, 98, 100, 102, 105-106, 112, 113, 120 (right hand photo), 122, 124, 128 (lower images), and 132 are photos of the uncontrolled fugitive emissions released from the Copper Converter Aisle and Copper Roasters. These emissions comprised of fine particulate matter laced with lead, arsenic and cadmium along with $SO_2$ were evacuated through open roofs directly to the outside where they freely communicated with the atmosphere and were transported by winds into the community, exposing the public including Plaintiffs 24 hours a day, 365 days a year. It is inconceivable to me that the Defendants' designated representatives who toured the plant during the pre-acquisition period, who toured the neighboring community and reviewed the Knight Piesold study did not understand how harmful these air emissions were to the neighboring community.
  - According to Vornberg's estimates[136] there were 1,315 tons a year of fine particulate matter with high concentrations of lead, arsenic and cadmium being

[135] DRRCE-00922042
[136] DRRCE-00922042



EXHIBIT 34

released in the particulate fugitives of the copper converter and copper roasters. The Defendants never lifted a finger to address these harmful emissions. Their environmental action plans consisted of enclosing the building operations and placing controls on fugitive releases which were not planned to be completed until 2011. From the time Defendants acquired the plant in 1997, they were going to take 13 years to simply enclose building operations and reduce these emissions.

- According to Vornberg's estimates[137] there were 500 tons of fine particulate matter containing lead, arsenic and cadmium along with $SO_2$ being released from aging, inefficient Zinc Roasters. The Defendants retired these units on 12/31/04 thereby eliminating the fugitive emissions.
    - The Defendants did not have to wait until the end of 2004 to remove these inefficient units and eliminate the fugitive emissions. They could have and should have formed a pollution prevention team to audit the complex within the first six months of taking possession of the plant to identify uncontrolled sources including equipment which was old, inefficient and required replacement or decommissioning, and then developed action plans to reduce the emissions. Such practices are routinely applied by responsible companies.
    - If a business decision was needed to keep these inefficient units operational, then the team could have devised interim measures to better control and reduce the emissions. Instead the Defendants simply did nothing and got around to retiring these antiquated and highly polluting units at a time when they were no longer profitable.

- Defendants could have shut down the La Oroya Complex or parts of the Complex and installed pollution controls on uncontrolled sources before operating. Also, they could have reduced production levels and limited operating hours to reduce pollution. They did none of this. Jefferey Zelms, Doe Run President and CEO, testified that air emission levels could increase if they took such responsible actions.[138] However, air quality trends in Exhibit 135B show that when operations at the La Oroya Complex were suspended on June 3, 2009, ambient air quality levels fell to within safe limits recognized under Peruvian and U.S. air quality standards.

Defendants took possession of the property and operations in 1997. Between the time they took over operations and 2000, they implemented only two projects:

- 1999 – Installation of Environmental Monitoring Stations & Aerial Photography.[139] This action did not reduce air emissions and provided the company with no more information and knowledge than it already had during pre-acquisition. It already understood that it had to begin reducing fugitive emission sources and placing controls on uncontrolled sources.

[137] DRRCE-00922042
[138] June 21, 2017 Deposition of Jeffery Zelms, P. 101-102.
[139] DRRCE-00568738

- 2000 - Control of Fugitive Emissions by CCTV.[140] This action had no impact on reducing any air emission. Exhibit 141 shows trend charts of air quality showing zero impact to air quality over the time period.

Defendants' projects did nothing to reduce harmful air pollution. Defendants could have eliminated over 2,000 tons per year of harmful air pollution (Vornberg estimates of uncontrolled emissions that could be controlled from the Sinter plant, Blast Furnace, Dross plant, Copper Converter Aisle, Copper Roasters, and NJ Zinc Roasters – see Table 15) by 2000 to no later than 2001 with almost immediate reductions if efforts had been initiated in steps. Their actions are irresponsible and breached the standard of care.

If the Defendants were not prepared to address these harmful emissions in a timely manner, then they should never have purchased and operated the complex. There are no reasons that justify the Defendants from not assigning engineering talent from the start of ownership and operation of the complex to address these emissions. They could have and should have started placing partial enclosures to seal building operations, identified the uncontrolled sources and placed controls on them and devised a formal plan and schedule to modernize these operations within the first six months of operation. The technical solutions for reducing and controlling these air emissions involved:

- Identifying uncontrolled sources,
- Supplementing efforts with field measurements to quantify releases,
- Installing roofs and capturing hoods for vapors to prevent/reduce emissions to the outside,
- Identifying all uncontrolled sources and placing standard controls on them like baghouses and scrubbers which don't take years but rather months to procure.

***Breach 2: Defendants' actions between 1997 and 2000 constitute a breach of the standard of care, exposing the public to historically high air emissions. Despite extensive knowledge of how polluting the complex was when they acquired it, they ramped up production while taking no actions to control emissions.***

1. Defendants took ownership and directed operations in October 1997. They had extensive information prior to acquisition of how polluting the plant was and how harmful air emissions were to the public (see discussions and exhibits cited above).
    a. The World Bank's consultant Knight Piesold[141] advised the Defendants at the time of pre-acquisition inspection that it was critical to begin developing plant-wide emissions estimates in order to prioritize mitigation and environmental management action plans.
    b. They knew there were more than 90 point sources (Table 3) that had never been stack tested and had no air pollution controls.

[140] DRPE-0001974767
[141] DRRC-00077581 - Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, Final Report, Sept. 1996

2. Defendants saw and had documentation from Knight Piesold's report that fugitive emissions were extensive; See DRRC-00077619-20 – "Though the largest quantity of emissions are released from the main chimney, significant amounts of both $SO_2$ and metals are emitted at lower levels within the plant and from shorter stacks. It is important to recognize that these low altitude emissions probably affect ambient concentrations in the local community and on the plant site more than the main stack."
   a. Refer again to photos of fugitive sources in Exhibits 38, 40, 41, 44, left image of Exhibit 45, 56, 63, 65, 67, 68, 69, 70, 72, 74, 79, 82, 83, 84, 87, 93, 94, 95, 98, 107, 117, 120, 123, and 131 which show some of these emissions. Defendants would have observed similar emissions to those shown in the photos during the pre-acquisition tour of the smelter.

3. Refer to photos of the massive plume of toxic air discharges from the Main Stack (Exhibits 43, 46, 47, 48, and 51). Defendants' representatives would have observed similar emissions when they toured the complex during pre-acquisition. The Knight Piesold report states: "The main stack at La Oroya currently emits on the order of 815 tons per day of $SO_2$. Dust emissions total approximately 10 tons per day, consisting of roughly 2.5 tons of lead, 1.4 tons of arsenic, 0.8 tons of zinc, and smaller quantities of other metals."[142] I do not know how the Defendants did not recognize how irresponsible it would be to ramp up production without taking actions to control these and other sources of air emissions.

4. Exhibit 2I is a plot of the base metal smelting production from 1965 through 2001. The plot shows Defendants ramped up production to historically high volumes from the time they took over through 2000. Defendants made no changes to process and operational practices that affected air pollution when they took over the facility or throughout this period of industrial expansion. They did not add controls to the more than 90 uncontrolled stacks. They did not address the fugitive air emissions. They implemented two projects between the time they took possession and began operating the plant through 2000 (1999 - Installation of Environmental Monitoring Stations & Aerial Photography[143]; and in 2000 - Control of Fugitive Emissions by CCTV.[144]); neither of these had any effect on controlling the air pollution, were minimal investments on their part, and provided no new information on how polluting the plant was and what needed to be done to reduce the air pollution.

Defendants' actions over this period constitute a breach of the standard of care. The smelter's historical production volume records were known to the Defendants from the PAMA along with the emissions from the Main Stack[145]; they were advised of many uncontrolled sources and the harmful impacts from fugitive emissions. They knew or should have known that by increasing production volumes without having upgraded pollution controls and or making operational changes that air emissions would increase proportionately. Increasing production allowed the

[142] DRRC-00077607
[143] DRRCE-00568738
[144] DRPE-0001974767
[145] DRPE-0002133915 - PAMA, Jan. 1997

Defendants to make more money, but by increasing the production volumes to historically high levels they exposed the public at large to unprecedented levels of harmful air pollution.

***Breach 3: Defendants took advantage of weak environmental enforcement policies enabling them to defray investments into needed controls, extend meeting compliance obligations, and to ignore good industry practices.***

**A. Weak Environmental Enforcement Policies and Practices**

The Defendants operated two lead smelters in the United States (in Herculaneum and Glover. Missouri). Both of those smelters had statutory obligations to comply with the Clean Air Act (CAA). Failure to comply carries fines, penalties, and severe actions such as shutting down operations and even imprisonment for willful violations.

No comparable system existed in Peru. Good practices that are required under U.S. permits did not exist allowing Defendants to sidestep practices that it knew as an experienced lead smelter operator would control air pollution. The following summarizes good practices that are statutory obligations under U.S. permits.

***Permitting***

Compliance with the CAA is managed through a permit system. The permit system requires smelters to adopt good industry practices; i.e., the application of best practices is a statutory obligation. See the Defendants' Title V permit for their Herculaneum smelter and emissions inventory for the Glover smelter.[146] The permit and emissions inventory shows that the Defendants had statutory obligations to prepare emissions inventories and apply good industry practices:

1. Smelters must identify and designate by name every emission point. The operator is required to identify all emission points including stacks, roof and other vents, waste stockpiles, in-plant roads and all sources that potentially release air emissions.
2. Smelters must identity the air pollutants for each source (e.g. TSP, PM10, PM2.5, Lead, Arsenic, Cadmium, $SO_2$, other).
3. Every source is assigned an allowable emission rate. The emission rate is established based on air dispersion modeling projections at the time of permit application. Dispersion modeling establishes the allowable emission rate based on determination that the air emissions do not place the public at risk from exposure to the air pollution.
4. Every source is required to either be controlled or have been demonstrated via the air dispersion model to be insignificant.
5. Every source that is required to be controlled must specify:
    a. The uncontrolled emissions from the source.
    b. The method of control.
    c. The efficiency of the control.
    d. The basis for the stated control efficiency.

[146] DRRCE-00313421; Part 70 Permit to Operate, Operating Permit #OP2006-011B, effective December 17, 2007. Herculaneum, MO. Title V permits renewable every 5 years.

   e. Limits to production volumes, times of operation and combinations of controls to limit air emissions.
6. The smelter is required to as accurately as possible prepare annual emissions inventories. The emissions inventories allow both the operator and regulator to assess whether the smelter is complying with the CAA and operating safely. Permits specify that best practices must be applied to prepare inventories based on:
   a. Use of CEM (Continuous Emissions Monitoring);
   b. Stack Testing;
   c. Application of regulatory approved emission factors;
   d. Mass balance method.
7. The smelter is required to comply with monitoring requirements, e.g.:
   a. CEM
   b. Opacity
   c. Pressure, temperature
   d. Emission rates
8. The smelter is required to maintain pollution controls in good working order.
9. The smelter is required to perform annual stack testing.
10. The smelter is required to report all exceedances of the permit and to provide written notice of reasons and corrective actions, usually within 24 hours.

Defendants understood at the time of pre-acquisition that no comparable permit system existed in Peru which had a statutory obligation to apply the above good industry practices to operate the complex safely. At no point in time over the entire ownership and operation of the complex did such strict statutory obligation exist.

***Polluter Pays Principle***

The U.S. system is based on a polluter pays principle. Every state regulatory agency has an established pollution fee for hazardous air pollutants (HAPs) and Criteria Air Pollutants (caps) that are defined under the federal CAA. The more a facility pollutes, the higher the annual pollution fees a facility is required to pay the state regulatory agency. The fees are based on a per ton basis with most states establishing a cap on annual pollution fees. There is therefore incentive for U.S. companies to pollute less.

No such comparable polluter pay principle existed at the time the Defendants purchased the facility or at any point over the ownership and operation. Defendants did not have the same incentive to reduce their air emissions as a U.S. smelter.

***Stack Testing***

Under the U.S. system, all stack tests are performed annually with pre-approved methods and are witnessed by a representative from the environmental regulatory agency. Failure to comply with permit limits results in both a citation and fine, which incentivizes reducing emissions. Repeated failures may result in the issuance of a Consent Order which includes more fines and a compliance schedule.



EXHIBIT 34

- Defendants were not obligated to perform stack testing. Since these critical tests were not performed the Defendants had no reasonable basis to perform air modeling, to establish programs to reduce air emissions or even to assess how harmful their air pollution was.
- Without performing stack tests, the operator cannot verify control efficiencies of any pollution control devices installed.
- Without performing stack testing, it is not possible to verify whether emission rates are exceeding levels causing harm.

***Transparency and Requirement to Apply Good Science***

Under the U.S. system, the basis by which a facility reports its annual air emissions and controls them must be well documented and based on methods approved by the regulatory agency. The good practice of developing emission inventories using accurate methods that are based on sound science and reasonable engineering assumptions is a statutory obligation in the U.S. but was not so in Peru.

- It is obvious that actual measurement via CEM is more precise than an annual stack test; that a stack test provides a more reliable basis to estimate a source's emission than a published emission factor; that the application of peer reviewed emission factors is more reliable than rough material balances that lack actual measurements.

***Commissioning New Equipment***

Under the U.S. system, any intended changes to a facility require a permit modification. The reason for this is to ensure that any process changes or the addition of new equipment do not result in the release of more harmful air emissions. Permit modifications require that the smelter operator submit a detailed proposed design change which documents whether the change results in a net increase or decrease in air emissions from the facility. Once approved newly installed major pieces of equipment require separate permits to construct and to operate.

- The smelter must demonstrate through good industry commissioning practices that the unit has been built according to design and operates at the efficiency called for in the permit application.
- The smelter operator has a statutory obligation to evaluate and determine before making modifications that the new equipment or controls do not result in releasing higher levels of emissions. No operator may simply install equipment without first verifying that the proposed changes do not create additional pollution and harm to the public; and there is regulatory oversight under the permit system to ensure this.
- No such comparable system making best practices a statutory obligation existed in Peru at the time the La Oroya metallurgical complex was acquired.
- No such rigorous enforcement of applying these good practices existed over the period of ownership and operation of the complex.

***Application of BACT***

U.S. smelters are required to comply with the Prevention of Significant Deterioration (PSD) program permitting which requires that a permit applicant analyze all technically feasible

emission control alternatives and demonstrate that the emission rate(s) proposed is reflective of the best available control technology (BACT).[147]

- A BACT analysis evaluates each emission control alternative relative to energy, environmental and economic impacts. This procedure is called a top-down BACT, meaning that the lowest possible emission rate must be considered first.
- The control technique with the lowest emission rate may only be dropped from consideration if there are legitimate energy, environmental or economic reasons. If so, the emission control technique with the next lowest emission rate may then be considered. The progression continues until an emission rate is identified as BACT.
- Part of the PSD requirement is to evaluate the projected impact of the new emissions on the existing ambient air levels in order to show that an attainment area will not fall into non-attainment.

U.S. smelters are also subject to the MACT (Maximum Achievable Control Technology) standard. This is a level of control that was introduced by Title III of the 1990 Clean Air Act Amendments. The purpose of these Amendments was to expedite the development of standards that would reduce hazardous air pollutant (HAP) emissions.

- When developing a MACT standard for a particular source category, U.S. EPA looks at the level of emission control currently being achieved by the best-performing similar sources through various control methods, such as clean processes, control devices and work practices. These emission levels establish a baseline (referred to as the "MACT floor") for the MACT standard.
- The "MACT floor" is the initial determination of the MACT standard for each industry source category. It provides the minimum level of HAP emission control requirement for new and existing sources. The MACT floor for new sources is equivalent to the level of HAP emission control achieved by the best-controlled similar source, and the "MACT floor" for existing sources is the average level of HAP emission control achieved by the top 12 percent of that industry group's currently operating sources.
- At a minimum, a MACT standard must achieve, throughout the industry, a level of emissions control that is at least equivalent to the MACT floor. Under 1990 CAA Amendments, U.S. EPA can establish a more stringent standard when this makes economic, environmental and public health sense.
- MACT standards require smelters to prepare work plans for a study of best practices and best available technology in place at other smelting facilities and other facilities with fugitive emissions control challenges. When these studies are imposed through a permit or a Consent Order, they are to be completed within a specified time period so that effective corrective actions can be established to reduce emissions such as fugitives.

BACT and the MACT standard embody good practices that enable the smelter operator to select, specify and size air pollution controls, to establish limits to hours of production and throughput volumes, and to devise good operational practices to control emissions, especially fugitive emissions. The practices establish emission reduction levels needed to reduce ambient air levels

[147] http://www3.cec.org/islandora/en/item/2195-best-available-technology-air-pollution-control-en.pdf

within safe limits. In the U.S., these good practices are statutory obligations and are apparent in the Title V Permit of the Herculaneum smelter and emissions inventory of the Glover smelter.

## B. Sophisticated and Knowledgeable

Defendants understood from their domestic smelter operations that the way in which the La Oroya smelter operated, the complex would never be issued a permit and would face significant enforcement actions if it were operating in the United States. Indeed, their Herculaneum smelter was the subject of serious enforcement actions, a costly Consent Order[148] and civil action for causing harm in the same manner it has done to the Plaintiffs.

- Defendants were not children that required step by step instructions on how to reduce the air pollution of the complex.
- Defendants were well versed on good practices that were statutory obligations under U.S. environmental regulations.
- Defendants had both **Obligation** and **Duty** to apply the good industry practices within a timely manner in order to reduce and control harmful air pollution to within internationally recognized levels that are protective of human health; irrespective of statutory requirements.
- The lack of regulatory incentives in Peru enabled irresponsible behavior, allowing Defendants to delay making upgrades and installing pollution controls. This enabled Defendants to defray capital investments into pollution controls, thus reducing capital and operating outlay and making them more profitable.
- Weak and ineffective regulatory oversight and permit rules in Peru offered cost advantages compared to operating such a complex in the U.S. or any other country where good practices are embodied under operating permits and are strongly enforced.

## C. Emissions Inventories

Preparing and maintaining well documented annual air emissions inventories is a fundamental good industry practice that is a statutory requirement in the United States. No comparable system existed at any point in time when Defendants inspected, acquired and operated the complex. Defendants understood the reasons for this good practice because they operated two lead smelters in the U.S. The reasons for preparing emissions inventories are:

1. So that emissions can be addressed on a priority basis.
2. So that BACT can be applied through application of sound engineering practice and air dispersion tools. The inventory helps the operator to:
    a. Specify proper controls and control efficiencies on a source by source basis.
    b. Specify operating hours and throughput limits to limit emissions and optimize selection of cost-effective controls.
3. To perform netting analysis to ensure that proposed operational changes do not result in higher plant emissions.
4. To demonstrate to regulators that the facility is being operated safely and not causing harm to neighbors.

---

[148] State of Missouri, et al. v. The Doe Run Resources Company, Case No. 07JE-CC0052, Consent Judgement, Final May 21, 2007.

5. To allow the operator to track its emissions over time in order to assess whether more resources and efforts are needed to reduce plant and source-specific emissions further in order to prevent harm to the public.

The following parameters and their relevance comprise a detailed emissions inventory.

1. Every emission source has a designated name.
    a. Reason – large complex facilities have numerous sources. Good practice for managing large databases makes use of name or number designations.
2. Pollutants emitted on a source by source basis are identified – e.g., TSP, PM10, PM2.5, lead, arsenic, $SO_2$, other.
    a. Reason – so that the specific pollutants to be controlled and monitored are known and can be managed on both point by point and facility-wide basis.
3. Every emission source is identified as either a fugitive or point source.
    a. Reason – Fugitive sources can be more difficult to control and monitor because there may be many such sources. Distinguishing between point and fugitive sources helps prioritize efforts and resources to control the emissions.
4. Every emission source has an assigned control method (in some instances, minor or insignificant sources have no controls). The control method is documented – e.g. for stacks, controls can be wet scrubbers, cyclones, baghouses, ESPs, multiclones, settling chambers, afterburners, flares, other. For fugitive sources controls can include capping, dust suppressant methods, operating hour limits, truck and machinery washing, street sweeping, speed limits for heavy machinery and vehicles, other.
    a. Reason – To document that BACT or reasonable controls are being applied to every major or significant source.
5. For every control, the age or year of installation is recorded.
    a. Reason – To ensure that up to date controls are in use, do not require replacement or require more frequent maintenance inspections.
6. For every controlled source, the numeric control efficiency is documented.
    a. Reason – So that the controlled emission rates are known and exceedances can be tracked and corrective actions devised to eliminate these.
7. For every controlled source an emission factor (EF) along with the basis of the EF is documented. The basis may be published EFs (e.g., AP-42), EFs from another smelter, stack testing, or continuous emissions monitoring (CEM). Plant and source-specific EFs are considered most reliable under the U.S. system.
    a. Reason – Under the U.S. system, only regulatory approved EFs may be applied to quantify emissions. For regulators, knowing the basis and source of the EF verifies whether the reported emission rates in the inventory represent reasonable estimates of the emissions. To the operator, the application of reliable EFs to developing mass emission estimates is critical to acting responsibly so that it meets its duty and obligation to ensure that the air pollution is not causing poor air quality and harming the public.
8. For every source, the release conditions are reported. For stacks this includes the following information: Stack elevation, stack diameter, volumetric throughput, stack velocity, stack temperature. For buildings this includes information on roof vents, numbers and sizes of openings, temperatures. For waste piles this includes such information as the height of piles, plan areas, particle sizes and particle size distribution.

   a. Reason – This data along with mass pollutant emission rates constitute the input data required for air dispersion studies.
9. For every source accurate coordinates (latitude/longitude, easting/northing) of release points are recorded.
   a. Reason – So operators know where controls are. So that operators can couple such information in their environmental management practices for inspections, to perform maintenance, to track emissions, to plan maintenance. So that the smelter operator can perform accurate air dispersion modeling. So that the operator knows and maintains a permanent record of what controls, stacks and other parts of the process operations have changed over time.

Inventories are maintained in a centralized file(s) so that:
1. They can be reviewed for accuracy and reliability by both the operator and a regulator;
2. So that the basis, assumptions and sources of information like EFs can be reviewed and updated with more accurate information on a regular basis;
3. So that the operator can manage the pollution.

Defendants did not do any of this – neither for the smelter nor the refinery. They had no statutory obligation to do so, and they did not invest the time and effort to prepare emissions inventories because it required money that it apparently did not want to spend.

Preparing an accurate and reliable air emissions inventory requires a lot of work – especially for a complex site like the La Oroya metallurgical complex.

- When Defendants acquired the complex, there were only measured emissions from the Main Stack and only a few secondary stacks.
- They knew before purchasing the complex that there were more than 90 uncontrolled point sources and that the fugitive emissions were widespread.

Beginning the first week of acquiring the complex, the Defendants should have begun allocating resources to develop an emissions inventory:

- first and foremost, to establish a baseline of how polluting the emissions were from the facility;
- then to prioritize the emissions sources;
- then to develop environmental action and mitigation plans to reduce emissions systematically.

It did none of this using reasonable, good practices at any point in time over the ownership and operation of the complex. Their failure or refusal to spend the money on developing the inventory is in my opinion the most important failure on their part to meet their obligation and duty to act responsibly. The consequences of not having invested the monies, time and effort to prepare reliable annual emissions inventories were:

1. Baseline plant-wide emissions were never quantified. Without this quantification it was not possible prioritize air emission sources and devise meaningful mitigation and action plans to reduce them.
   a. No priorities could be established.
   b. No meaningful schedules to reduce emissions could be planned.

c. No accurate planning for budgets and required levels of effort could be established.
d. No master plan for bringing the complex within compliance and reducing harm to the community could be prepared.
e. Set-backs for the community could not be defined to reduce exposure.
f. Reliable risk assessments could not be performed.
g. No netting analysis could be performed and hence any projects implemented were done so without giving consideration as to whether such projects caused increased in emissions and more harm.

2. The Government of Peru was misled as to whether the projects planned would likely improve air quality and reduced harm to the public. The Government of Peru was denied information to enable its determination of whether reasonable and beneficial actions were being implemented in ways that reduced harm over reasonable periods of time and whether the operator was making reasonable progress to complying with standards.

3. The Government of Peru was denied its right to verify whether the Defendants were being reasonable and applying good science and best information to reporting emissions and bringing them under control.

4. BACTs were never applied to the facility. Without a reliable and accurate emissions inventory, it was not possible for Defendants to specify and size the most effective and appropriate controls. They just forged ahead with projects that were not vetted and carefully reviewed using sound engineering practices to ensure that:
   a. The proper control device was selected.
   b. The appropriate level of control could be guaranteed.
   c. The dependability, reliability of the level of control was adequate.
   d. That the operating hours intended for a source did not require limits to ensure that air emissions were not excessive.
   e. That allowable safe emission rates were established based on control efficiency, hours of operation and throughput or allowable hourly emission rates.

5. Effective environmental management of the plantwide emissions was never implemented. Without annual emissions inventories:
   a. No facility can track its environmental performance and gauge its efforts to reduce pollution.
   b. No facility can assess the priorities and establish whether budgets and level of effort are adequate and effectively reducing emissions.
   c. No facility can gauge and devise corrective actions to improve environmental performance and compliance.

**D. Emissions Inventories Tools and Best Practices**

Defendants were sophisticated operators of lead smelters in the United States and were intimae with the resources, tools and recognized practices for developing accurate and reliable emission factors needed to develop emissions inventories. Section 6.6 documents the authoritative

resources of best practices that the Defendants relied on in developing emissions inventories for their U.S. facilities.

- Defendants could have applied the emission factors from AP-42 to develop initial estimates of emissions for baseline pollution from the complex.
- Defendants could have consulted the numerous U.S.EPA publications cited in Section 6.6 which report:
    - Typical emission rates for fugitive sources from similar smelters;
    - Typical temperatures and release times for specific fugitive emission sources from lead smelters;
    - Typical particle size distributions of particulate matter containing lead and arsenic from similar to same sources from lead smelters in order to establish baseline emissions estimates.
- Defendants could have relied on their own reported emissions and measurements from their U.S. smelters to develop emission factors and estimates from the La Oroya smelter.
- Citations in Section 6.6 show and lead by prescriptive examples the type of information and level of detail a reasonable emissions inventory should have in order to prioritize sources and reduce them.

If the good practices and data reported in the citations in Section 6.6 and information relied on from Defendants' smelters in the U.S. had been applied, then there would have been an initial estimate of the plantwide emissions. This would have empowered Defendants to:

1. Begin prioritizing sources and developing mitigation and management plans including budgets;
2. Defined the need for more precise information on emission factors and other data needed to manage the air emissions.

Section 6.6 documents authoritative U.S.EPA methods for constructing scaffolding and test methods for performing stack tests, obtaining measurements of fugitive emissions from buildings, for accurately quantifying and defining particle size distributions of particulate matter containing lead, arsenic and a cadmium. Even if the Defendants wanted to save money and not invest in the efforts needed to obtain accurate plantwide and source specific data to accurately quantify and characterize the emissions from their facility, they could have relied on the published information reported by EPA from measurements taken at similar installations to develop a baseline for the La Oroya metallurgical complex in order to devise an appropriate program to reduce air pollution. They had years of operating experience and data from their own U.S. installations as a guide.

Defendants relied on many of the good practices and data cited in Section 6.6 to develop emissions inventories and to manage air emissions from their U.S. smelters because they had a statutory obligation to do so and faced enforcement action for failure not to apply such good practices. There were no such statutory obligations forcing the Defendants to act responsibly in Peru and the regulators in Peru were neither experienced nor knowledgeable enough to insist that such resources and good practices be applied. This is apparent when the MEM granted Defendants an extension on meeting compliance by two years and ten months beyond the original ten-year PAMA period [until October 2009]. The MEM explained that this extension

was justified for the follow reasons:[149] *The PAMA in the mining sector was the first experience of using this instrument in Peru, thus the PAMA presented in this first phase, including the PAMA of the La Oroya Metallurgical Complex, were prepared with limited technical detail and a very basic level of engineering (conceptual), which did not contemplate the remediation of some environmental problems, which in some cases were significant, as they were not completely or adequately identified or characterized… In the specific case of the PAMA for the La Oroya Metallurgical Complex, one of the sources of contamination that was not initially identified was fugitive emissions, the importance of which was not fully understood, since in addition to the emissions of particulate material, including heavy metals, they were not sufficiently measured. Their effects on health, particularly the effects of lead, were detected through subsequent monitoring in 1999, within the initial context of the studies performed to eliminate lead from gasoline in the country.*[150]

Defendants most certainly understood how important the effects of fugitive emissions were on the effects of lead to the public because they were informed of this at the time of pre-acquisition and from their own experiences in operating smelters in the U.S. They took advantage of the lack of sophistication, experience, knowledge and poor enforcement practices in Peru. They saved themselves time and money by not sharing their own knowledge and experience in managing and controlling air emissions. They minimized their operating costs and defrayed investments into reducing air pollution in order to maximize profits, with understanding that they were causing prolonged harm to the public and Plaintiffs.

### E. Open Ended Compliance and No Obligations to Act Responsibly

From the moment the Defendants took possession of the complex they should have invested time and resources to define the baseline emissions from the entire facility (i.e., an emissions inventory). That would have been a logical starting point to develop an effective environmental management plan to meet compliance obligations and to meet their obligation and duty to operate the complex safely.

Defendants were not under obligation to meet a formal compliance schedule because when they purchased the facility they had a 10-year window to bring the facility into compliance. They did not devote resources and effort to begin assessing baseline air emissions from the plant, to prioritizing the air emissions and reducing these on a priority basis because from the Defendants' standpoint they had 10 years over which to do this.

Defendants knew prior to their purchase of the facility that a comprehensive emissions inventory had never been performed. Knight Piesold[151] recommended a comprehensive study of the emissions of the entire La Oroya complex, stating:

---

[149] 2006 - MR 257-2006-MEM DM - DRRC-00075367 - 5-29-2006 MEM response to DRPs request for extension of time for sulfuric acid plant
[150] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014
[151] DRRC-00077581 – Knight Piesold, Environmental Evaluation of La Oroya Metallurgical Complex, Final Report, Sept. 1996



EXHIBIT 34

- "It is not feasible at this time to provide a list of specific actions and facility improvements to assure compliance from an operational perspective. Any proposed change at one production facility will have implications for other parts of the plant."
- "The survey should estimate pollutant emissions from all operations, including fugitive sources, and should then detail potential methods and costs for controlling each of these emissions."
- "When a complete emissions evaluation is available … dispersion modeling analyses will be more reliable and useful for assessing the air quality benefits to be gained by various improved controls, stack modifications, or process changes."

Defendants understood a detailed survey of all emissions needed to be performed in order to develop an emissions inventory before facility improvements could be established and efforts defined to meet compliance. Defendants did not even attempt to do this prior to 2004 and then what they did was grossly inadequate (see Section 8.4.7 for a chronology of documented actions taken by Defendants to reduce air emissions).

There is no evidence that such a survey was ever performed or that attempts were even made prior to 2004. It's only in 2004 that Defendants began to acknowledge:

- "A comprehensive fugitive metals emission inventory from the plant has previously never been assembled and fugitive building emission testing has not been conducted. However, a rough estimate has now been developed by including the process fugitive stack data and engineering estimates."[152]
- "A detailed study has never been done on the fugitive dust emissions from the Plant, nor measurement of fugitive emissions of the buildings in the plants. Nevertheless, a gross estimate has been developed through data analysis of the emissions of the chimney and engineering estimates in base of the metallurgical balances"[153]

As late as 2004, AIDA warned the Defendants 'if the sources of fugitive and stack emissions are not understood with some detail, it is difficult to design a valid mitigation plan… This is especially true when diverse and complex sources exist, such as at the La Oroya Metallurgical Complex. While rough estimates can be of some use, they are not an appropriate basis on which to design a long-term plan for mitigation.'[154]

Because there was no emission inventory, there was no plan ever prepared to bring the facility within compliance and reduce harm to the community. The Defendants developed a revised proposal and schedule to achieve compliance. Note the following:

- The Government of Peru required the facility to reduce the Main Stack $SO_2$ discharges to 175tpd. This stack discharge limit is believed to allow Defendants to meet the air quality standard for $SO_2$. The primary action Defendants proposed to achieve this was by

---

[152] DRRC-00051190 – Air Quality Analysis of Modified PAMA Projects for La Oroya, February 11, 2004
[153] DRRC-00051193 – Bruce Neil, PAMA for the Metallurgical Complex of La Oroya, February 17, 2004
[154] DRRC-00066701 – AIDA 2004. Comments on the air quality modeling done for the "Technical Justification" for Proposed Modifications to the La Oroya Metallurgical Complex PAMA, Prepared by Anna Cederstav, Ph.D., Asociación Interamericana para la Defensa del Ambiente, February 17, 2004

constructing sulfuric acid recovery plants for the copper, lead and zinc circuits. Only the lead and zinc projects were completed.

- This statutory obligation did not mean that the Defendants did not have an obligation and duty to reduce other harmful air emissions from lead and arsenic. They had a duty and obligation to comply with meeting the safe levels of these metals in the community – see Table 5. These were not addressed as priorities by Defendants.

- The copper circuit plant was abandoned in 2009 when the smelter shut down and after multiple requests for extension. The copper circuit acid recovery plant was perceived by Defendants to have provided the greatest impact to reduced $SO_2$ emissions, and hence was critical to meeting the air quality standards.

- The original PAMA called for the construction of two sulfuric acid plants - one for the Copper Circuit and one for the Lead and Zinc Circuits to treat $SO_2$ emissions. Under the PAMA schedule, this project was to be completed last, with construction scheduled to begin in 2003 and completed by 2006.[155] In the planning and design process, Defendants' engineers learned that three separate sulfuric acid plants-one for each circuit; not two (and not a single sulfuric acid plant either) was needed.[156]

- February 17, 2004 – Bruce Neil[157] wrote to the Ministry of Energy and Mines ("MEM") and provided them with a lengthy report titled "PAMA Para El Complejo Metallurgico de La Oroya 2004-2011" requesting a five-year extension of the PAMA (January 2007 through December 2011) to develop an expanded sulfuric acid plants project, and to **<u>complete… projects to control fugitive emissions, reduce particulate emissions from the main stack, and generally reduce lead exposure</u>**.[158]

- December 23, 2004 – The Government of Peru passed a decree allowing mining operations to apply for an extension of one or more PAMA projects, subject to additional conditions, guarantees and more rigorous sanctions. **The law allowed for a maximum extension of four years. Applications were due by December 31, 2005.**[159]

- December 20, 2005 – Defendants filed an Application for Exceptional Extension of the "Sulfuric Acid Plants" Project, requesting an extension of four years to complete the project by December 31, 2010.

- May 25, 2006 – The MEM granted Defendants an extension of two years and ten months beyond the original ten-year PAMA period [until October 2009]. The MEM explained that this extension was justified because: *"In the specific case of the PAMA for the La Oroya Metallurgical Complex, one of the sources of contamination that was not initially identified was fugitive emissions, the importance of which was not fully understood, since in addition to the emissions of particulate material, including heavy metals, they were not*

---

[155] Request for PAMA Modification No. 1215214, Table 2 at 5; Exhibit C-028, PAMA Operative Version, Section 3.3.2 at 171-72. See also Neil Witness Stmt. at paragraph 15-16.
[156] Detailed request for a PAMA extension at 49-50. See also Neil Witness Stmt. at, paragraph 15-16
[157] Became General Manager of Doe Run Peru S.R.L. ("DRP") and President in December 2003.
[158] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014
[159] RENCOGRP-015247 - Witness Statement of Bruce Neil, February 18, 2014

*sufficiently measured. Their effects on health, particularly the effects of lead, were detected through subsequent monitoring in 1999, within the initial context of the studies performed to eliminate lead from gasoline in the country.*[160] This is knowledge that the Defendants as sophisticated lead smelter operators knew and understood as early as 1996 and did not act on or share with the Government of Peru.

- March 5, 2009 – Defendants requested a deadline extension to finish the third and final sub-project of the final PAMA project [sulfuric acid plants] based on the economic force majeure event.

- June 3, 2009 – Almost five months before the PAMA was scheduled to expire, Defendants suspended operations at the Complex.

- June 25, 2009 – Defendants wrote to the Ministry of Energy & Mines providing a comprehensive proposal for a 30-month PAMA extension that included a fresh equity injection, and capitalization of the inter-company debt. The next day the Ministry rejected the request, stating that Defendants did not provide enough specifics.[161]

- July 8, 2009 – Defendants provided a detailed and comprehensive report to MEM titled, "Request for Extension of Deadlines to Complete the Copper Circuit Sulfuric Acid Plant Project based on Act of God or Force Majeure Grounds" seeking a 30-month extension to complete the final PAMA project. MEM denied this request as well.

- September 26, 2009 – Congress passed a law ("Extension Law") granting Defendants an extension of 30 months. The Extension Law gave Defendants ten months to obtain financing and to restart operations of the Complex (or until July 27, 2010), and an additional 20 months for the technical completion and start-up of the final project (or until March 27, 2012)

The Defendants had an open-ended compliance schedule in which they presented argument after argument to the Government of Peru to allow indefinite extension of their obligation and duty to operate the complex in a safe manner so as not to adversely impact corporate greed. They applied the same irresponsible tactics with their Herculaneum lead smelter in the United States and got away with irresponsible behavior for almost 10 years until the U.S.EPA used its authority under the CAA to impose immediate corrective actions to end open ended compliance that allowed continued harm to the public. The Consent Order[162] for the Herculaneum plant required Defendants to:

- Immediately control Sinter Machine Wheel Tunnel Ventilation fugitives:
    - Enclose and ventilate the hot gas section of the Wheel Tunnel of the Sinter Machine. Gases were required to be immediately routed to baghouses which were

[160] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014
[161] RENCOGRP-029170 - Claimants Memorial on Liability, February 20, 2014
[162] State of Missouri, et al. v. The Doe Run Resources Company, Case No. 07JE-CC0052, Consent Judgement, Final May 21, 2007.

specified to meet a total suspended particulate specification of 0.022 grains per dry standard cubic foot of air.

- Rate of Wheel Tunnel ventilation had to be continuously measured. Wheel Tunnel ventilation was required to be continuously operated and maintained including during times when the Sinter Machine is not operational, unless it interferes with maintenance work being performed on the equipment.
- Ordered to redesign the Sinter Machine process gas ventilation measurement system or baghouse system to allow different bag, fan, or cleaning mechanism designs to be submitted to the state regulatory agency for approval. These redesigns had to demonstrate improved performance. Defendants were required to file recordings of fan amperages, fan outages, and ventilation rate monitoring and maintain records to show compliance.

- For baghouses – they were ordered to immediately upgrade the bags and bag cleaning system. New bags were required to be cleaned using reverse flow technology. Upgrades were required to include higher volumetric capacity and must meet a TSP specification of 0.022 grains per dry standard cubic foot of air. Rate of ventilation was required to be continuously measured at a point immediately after the gases exit the baghouse, and the ventilation system must be continuously operated and maintained.

- For some sources, extensions of no more than 1 year were granted for construction of enclosures to capture fugitive emissions and install proper controls like baghouses.

- For fume unloading stations – the Defendants were given a 1 year schedule install a fume handling system. Fume from baghouses were ordered to be re-routed to the Mix Room and fed to the Sinter Machine when the Sinter Machine is in operation. During times that the Sinter Machine is not in operation, fumes from baghouses were required to be wetted and augered into a railcar for storage to eliminate fugitives; Defendants were given 1 year to devise designs to properly maintain a drop sleeve that reaches down to the top of the railcar on the fume to the railcar drop point to minimize the effective drop height of the conveyed concentrate. The augered fume must contain a daily average of 8% moisture. These actions reduced fugitives. The fume storage piles were ordered to be wetted to reduce fugitives and records of these analyses were ordered to be maintained for inspection, review and oversight by the regulatory agency; Defendants were ordered to treat storage piles with a proprietary compound according to manufacturer's specifications to minimize fugitive emissions from wind erosion.

- For baghouses – Defendants were ordered to immediately install interlock control systems that restrict air feeds to tuyeres at the bottom of furnaces when baghouse fans are not operational, such as during an electrical malfunction or mechanical failure; To immediately install process alarm systems that notify blast furnace operators when there is a malfunction at baghouse fans. When an alarm is triggered by a baghouse malfunction, operators at the blast furnace were ordered to take immediate action to control the operation of the blast furnace to minimize emissions. Recordkeeping requirements were also mandated so that there could be oversight to ensure these practices were followed.



EXHIBIT 34

- Defendants were ordered to relocate a blast furnace within one year because of inadequate setbacks to the community. They were also ordered to reduce ductwork length and increase ventilation flowrates. Ventilation was required to be continuously measured at a point immediately after the gases exit a baghouse, and the ventilation system was required to operate at all times except during baghouse maintenance, when the furnace is not operating, or during other periods non-representative of normal operations. The relocation had to also reduce the length of the charge belt that conveys sinter as feed to the furnace shuttle feeder. Once the furnace had been relocated, Defendants were ordered not construct or rebuild another furnace in the old location.

- For the Blast Furnace operations, the Defendants were given 1 year to make ventilation improvements and to redesign hoods for servicing furnaces. Defendants were further ordered to install an improved ventilation hood system on the front of the blast furnace. The hoods had to be designed to improve the capture of fugitive emissions into the blast furnace building and to include the addition of a ventilation duct and hood over the slag launder to directly ventilate the flow of slag into the granulation tank.

- For Kettle Heat Stacks the Defendants were ordered to meet compliance in controlling fugitive emissions within 1 year of the Consent Order – The had to install cameras that continuously monitor the opacity of the exits of the Kettle Heat Stacks. Cameras were required to be used to quickly identify kettle failures so that operators can take immediate action to mitigate lead emissions from stacks. When operators suspect a kettle failure, the burners were required to be shut off immediately. Before returning the suspect kettle to service, the kettle and the kettle setting was ordered to be inspected and completely cleaned of any product. After cleaning the product from the kettle setting, the department foreman is to inspect the setting to assure that all of the lead-bearing materials have been removed. Records must be maintained in order for the regulatory agency to verify these practices are applied.

- For controlling building fugitive emissions, Defendants were ordered to immediately prepare work plans for a building ventilation study for the Sinter Building, Blast Furnace Building, and the Refinery Building. The work plan had to identify building openings, ventilation sources that are typically operated at continuous rates, ventilation sources where rates can be varied, and a procedure for measuring inflow into the buildings – **<u>the same good practices explained and documented in Section 6.6 of this report.</u>** The Defendants were instructed that the goal of this effort was to develop a mathematical relationship between inflow rates and process and hygiene fan amperages, and to establish minimum fan amperages that assure that particles emitted within the building are being appropriately captured by the ventilation systems. They were given 90 days of approval of the work plan by the state regulatory agency to complete the ventilation study. Within 60 days of completion of the study, the Defendants were required to summarize the findings and report these to the state regulatory agency. Upon approval of the study and its findings, the minimum fan amperages identified in the study were required to become enforceable conditions.

- For smelting operations, the Defendants were given 1 year to prepare a work plan for a study of best practices and best available technology in place in at least three other smelting facilities and other facilities with fugitive emissions control challenges. The work plan and study had to be completed and delivered to the regulatory agency within 180 days of the Defendants being notified that the air quality data for the second calendar quarter of 2008, or any quarter thereafter, exceeds 90% of the 1.5 µkPb/m3 quarterly average lead standard. The study must list all best practices and best available technologies identified and, for each technology or practice, must identify those technologies and/or practices that Defendants deems technically feasible and cost-effective for inclusion as contingency measures, quantify associated emissions reductions, and provide a time frame for implementation of each. Within 60 days of its receipt of the study, the state regulatory agency agreed to advise Defendants whether the projects and timelines proposed by them are acceptable and if it agreed that any of the identified technologies or practices are not technically feasible and cost-effective.

For La Oroya, there were never:

- Any reasonable work plans or schedules to address building fugitive emissions.

- Any compliance schedules established and imposed by the Government of Peru with prescriptive corrective actions to control fugitive emissions and uncontrolled point sources. Indeed, the Government of Peru lacked experience, knowledge, resources and expertise to devise the same technical corrective actions imposed on Herculaneum. They relied on the Defendants' knowledge as a sophisticated lead smelter to operate the complex safely and the assumption that the Defendants would act responsibly.

- Any oversight on practices applied by the Defendants to control emissions and operate the complex safely. Defendants did not document the basis for their controls, did not document their monitoring of emissions, and did not document corrective actions. They did not even have an emissions inventory which quantified the pollution. Without an emissions inventory Defendants had no idea what emission sources to control.

### F. Air Modeling and Set Back

Because the Defendants had no reliable air emissions inventory, the risk assessment performed based on air modeling was unreliable and misleading. Source terms used in modeling were:

1. Based on gross estimates of mass emissions.
   a. No emission factors were documented and applied by Vornberg.
   b. None of the fugitive emissions from buildings were based on measurements or recognized methods and U.S. EPA sources documented in Section 6.6.
2. Estimates reported for $SO_2$ emissions were based on unscientific methods. AIDA[163] noted:

[163] DRRC-00066701 – AIDA 2004. Comments on the air quality modeling done for the "Technical Justification" for Proposed Modifications to the La Oroya Metallurgical Complex PAMA, Prepared by Anna Cederstav, Ph.D., Asociación Interamericana para la Defensa del Ambiente, February 17, 2004

a. DRP's estimate of $SO_2$ fugitive emissions is unreliable. DRP's consultants estimated these emissions by taking the ambient concentrations and back calculating to a hypothetical $SO_2$ emissions rate using simplified Gaussian plume model. As DRC is aware, far better methods for such estimates exist.
b. To model $SO_2$ contamination, MMA has used a "Valley Box Model" to assess the amount of fugitive emissions from the smelter. This is an outdated Gaussian model used years ago by EPA to back calculate emissions rates from the concentration at a receptor. It is a screening-level model that is not appropriate for drawing conclusions regarding the relative impact of fugitive and stack emissions.
c. Doe Run 's calculations erroneously apply modeling results for sulfur dioxide gas directly to heavy metal particulates, disregarding the considerable difference between gaseous and particulate contamination.
d. The modeling studies are based on assumptions that grossly underestimate stack emissions and overestimate fugitive emissions.
e. The failure of the model to accurately predict La Oroya monitoring data proves that it is not a suitable model.

3. AIDA also noted that the air quality modeling to assess contributions of stack vs. fugitive emissions to ground level contamination is based on assumptions and questionable data. Stack emission were ignored by Defendants' modeling altogether. Only a few fugitive emission sources were modelled, and no attempts were made to account for the more than 90 uncontrolled emission sources across the plant in the McVehil dispersion modeling.

4. Canopy roofs and openings in buildings are mischaracterized by McVehil as line sources.

5. Particulate matter emissions are all defined as PM10 in McVehil's modeling. The many citations in Section 6.6 report that the particles released from fugitive sources are predominantly PM2.5 (i.e., fine particulate matter).

6. Conditions of plume releases used in air dispersion modeling are not accurate and not even remotely characteristic of conditions for fugitives. U.S.EPA citations documented in Section 6.6 report measured temperatures; see PEDCo Environmental Inc., Technical Guidance for Control of Industrial Process Fugitive Particulate Emissions, EPA-450/3-77-010, U.S.EPA 1977 reports following temperatures for emissions: Blast Furnace - P. 2-141 reports exit temperatures are 760-980C (1400-1800F); P. 2-131 - Drossing kettles (uncovered) - temperatures cool to about 370-480C (700-900F); Copper Roasting - Fugitives have an exit temperature of 300-480C (600-890F); For the Copper Reverb Furnace EPA-450-010 (1977) reports fugitive particulate emissions have an exit temp of 149-416C (300-780F).
7. Accurate meteorological data was not relied on nor were CCTV and still photographs consulted to account for the thermal buoyancy of plumes which has a profound impact on dispersion and how far emissions travel. Instead. hypothetical and unreliable meteorological data was used for modeling purposes. AIDA noted: To determine the relative contributions of stack and fugitive emissions to long-term ground-level air quality, modelers need detailed vertical temperature and wind data, and information on mixing heights at different times of the day as compared to the effective stack height.

> Only with this information can modelers assess into what layers different contaminant sources emit, and to what extent there is mixing or buildup of contamination. Modelers must also consider the complex wind patterns that exist in a mountainous and urban environment. None of this data appears to exist for La Oroya. Thus, the modeling presented by DRP is hypothetical and should be rejected.

These deficiencies made the findings from the risk assessment unreliable. The application of unreliable findings to devising priorities and environmental action plans recommended to and approved by the Government of Peru were misguided because the findings and conclusions were unreliable. The consequences of Defendants' efforts which are at best shoddy and even incompetent were:

- The risks to the public were not accurately defined.
- The Government of Peru was provided with unreliable conclusions and recommendations from which to evaluate the Defendants progress towards compliance and improving operations of the complex.
- Appropriate set-backs needed to protect the public from harmful pollution were never established.
- Defendants were able to argue for further time to reduce emissions and defray necessary investments to reduce pollution.

### G. Netting and Blind Changes to Operations

Permitting rules and strict enforcement practices in the United States require that the operators of lead smelters apply common sense and good practices to carefully vet and assess the impacts of proposed changes to operations and equipment. An operator cannot simply blindly make changes without evaluating whether the proposed changes cause additional pollution and harm. No such regulatory oversight and rules existed in Peru. Defendants knew this not simply to be a statutory requirement in the U.S., but common sense. The Government of Peru relied on the expertise and knowledge of the Defendants as a sophisticated operator to act responsibly.

Defendants did not see the need to act responsibly. Defendants made significant changes to operating conditions between 1999 and 2001, and then continued to make other process changes without taking into consideration the impact to the dispersion characteristics on the Main Stack.[164] Main stack operating conditions are illustrated by the trend charts in Exhibit 155A. The charts show that Defendants not only reduced the concentration of $SO_2$ in stack (which resulted in a lowering of $SO_2$ mass emissions), but also significantly lowered the stack exit velocity and stack gas temperature. Exhibit 155B are plots prepared by Zegarra (2007) that show the impacts of Defendants' actions to stack operating conditions more clearly. These changes to the operating conditions of the main stack were counter to good practice.

While $SO_2$ mass discharges were reduced beginning in 2000, both lower stack velocity and temperature resulted in a worsening of air quality. By lowering the stack velocity there is less

[164] DRPE-0000077931



EXHIBIT 34

upward momentum of the stack plume and the lower/cooler stack gas temperature would have decreased the thermal buoyancy of the plume. Both actions are generally recognized by engineers to contribute to poor dispersion. Given the facts that the Main Stack is a relatively short stack and the unique meteorological conditions resulting in almost daily inversions, there is reason to believe these actions, at best, did not improve air quality in La Oroya and may have worsened it. Defendants failed to perform air dispersion modeling to assess the impacts to air quality of changing the main stack's operating conditions. It is irresponsible to make changes to stack conditions, especially ones that are so important to the air pollution of the entire complex, without having considered impacts to ground level concentrations near sensitive receptors.

Zegarra wrote "due to the drastic reduction of the physical properties of the gases emitted by the stack (temperature, volume, pressure and velocity) that was 20% in average, we conclude that the gas discharge capacity of the main stack is over-designed, harming the gas dispersion potential, which causes the high pollution levels register in the different monitoring stations, and in some cases, do not allow us to fulfill the environmental commitments."[165]

## H. Improper Commissioning of Controls and Misrepresentations

Auditors determined that the Defendants were installing equipment. Defendants were claiming that based on the money they spent and the degree of completion that they were bringing the facility within compliance and reducing air emissions. Auditors noted that while the equipment was physically installed or efforts were underway to complete engineering tie-ins, there was no evidence that the equipment as-built performed according to the control efficiency specified by the Defendants.[166] Demonstration of performance is a requirement for meeting compliance.

Under the United States permitting system, a facility cannot simply install equipment and claim operating efficiencies for controls without performing proper commissioning. Strict enforcement and environmental regulatory oversight forces irresponsible companies to apply good practices when commissioning pollution controls. Operators need to perform stack tests to confirm that the control efficiencies of the equipment they claim reduce pollution actually perform according to design specifications. This is not only a regulatory requirement but it is good engineering common sense. There was no verification that the Defendants followed these good practices. There is little evidence to support that the Defendants took reasonable actions that resulted in reducing harm to the public by simply installing hardware. Exhibits 7-10, 12, 13, 20, and 24, show that the MPL's mandated by the Government of Peru were never achieved. Defendants' actions did not result in ambient air quality levels that were protective of the public and the Plaintiffs.

## I. Inadequate Environmental Management System

The Defendants had no effective Environmental Management System. Part of this stems from the fact that it never prepared a reliable emissions inventory. Without an emissions inventory it

---

[165] DRPE-0000077931
[166] DRPE-0002104173

could not track environmental performance and devise reasonable action plans to control air emissions. Their failure to track these emissions also contributed to their noncompliance.

Trend charts were reconstructed in my analysis. Refer to Exhibits 134, 139-144, 148A, 149, 152, and 154. Defendants should have been constructing the same types of trend charts to assess their progress in reducing emissions facility wide and focusing on compliance. Instead, they focused on the emissions from only a few sources such as the main stack and failed to meet their ambient air monitoring requirements.

- Defendants should have been comparing their progress in reducing emissions to the ambient air quality measured in the communities. See for examples Exhibits 7-11, 13-17, 19-30, 134, 135A, 135B, 139-141, 144-145, and 148A. An effective EMS would have required the Defendants to continually assess whether the projects being implemented were having positive impacts on improving the air quality for the public and the Plaintiffs.

- Continually monitoring and improving environmental action plans based on trend charts would have guided the Defendants in establishing priorities and allocating appropriate annual funds to address reductions. See for examples the pie charts in Exhibits 136-138 and 147 which identify the predominant sources of emissions at the smelter. Such charts should have been assembled within the first year of operation so that the Defendants could prioritize those emission sources that required immediate attention. These types of charts could have been readily constructed if the Defendants had prepared an emissions inventory and had an effective EMS.

- Over the entire operating period of the smelter, the Defendants never prepared emissions inventories or tracked their environmental performance on a facility wide basis. If they had done so, then they would have realized the need to focus attention and resources on the fugitive emissions.

- Because the Defendants did not have an effective EMS, they did not follow their statutory obligations for monitoring ambient air quality. As documented in Section 7, Defendants did not measure 30-minute averages for arsenic; did not obtain daily measurements for lead and arsenic; and did not accurately calculate and report daily and monthly averages for these pollutants and $SO_2$. Their failure to do so reflects poor environmental management practices because their statutory obligations were ignored.

A central requirement for an EMS is to track the environmental performance of a facility. Defendants failed to apply this basic common sense, good industry practice that is fundamental to acting responsibly. Defendants' failure to do so is why it took years before this plant even had some reductions in air emissions that resulted in only incremental improvements to ambient air quality. An EMS requires that a facility focus on:

- Tracking environmental performance.
- Continually improving performance – i.e., reducing air emissions.
- Meeting compliance obligations.

- Meeting compliance schedules.
- Taking corrective actions.
- Updating environmental action plans.
- Projecting and continually reassessing appropriate resources, including budgets.
- Ensuring that proper monitoring tools are used – see for example Exhibit 17, which shows that the $SO_2$ air monitor used at Sindicato was unreliable. This was also true for other air monitors that were intended to safeguard the public as well as meet compliance obligations. Defendants operated inaccurate monitors through at least 2006; if the Defendants had an EMS they would have immediately corrected this problem upon taking possession of the facility.
- Focusing on pollution prevention projects. An EMS requires corporate-wide commitment to pollution prevention and pollution control. This commitment was absent.
- Companies that implement an ISO EMS place environmental performance on the same level of priority as financial performance. In contrast, Defendants placed bottom line financial performance above good environmental performance.

The La Oroya Complex was issued an ISO certificate on July 21, 2006 by the ISO registered 3rd party auditor TUV Rheinland.[167] The issuance of that certificate was based on training staff at the facility to adopt an EMS consistent with the management practices of ISO 14001. On March 11, 2008 the certification was revoked because of non-compliance with the Peruvian environmental laws and the absence of verifiable pollution prevention measures that Defendants claimed to have taken to reduce air emissions.[168]

- Not until 2006 did the Defendants decide to strengthen their environmental practices with the tools responsible companies apply to control pollution and to comply with statutory obligations.
- Two years after being trained and being given the tools for an EMS, the registration/certification was revoked because of failure to apply an EMS.

The following are specific reasons the 3rd-party auditor cited for revoking the certification: "Analysis data results of air quality standards for 2007 (ECAs) provided by your Company on February 22, 2008 as per our request, exceeds maximum annual permissible lead levels in four out of six stations. Resolution 257/2006 MEM/DM and Report No. 118/2006 MEM —AAM/AA Annex I, Item 1.1 A, establish that it is compulsory to comply with air quality standards as of December 2006. The ISO 14001 regulation establishes that the Company that adopts a management system standard must comply with the current legislation and commitments with the authorities. Therefore, in accordance with clause 3.5 of the General Contracting Conditions (Rev. 8), we hereby inform you that TUV has decided to revoke the Certification, issued to the Environmental Management System of your Company, for the above mentioned reasons… we hereby inform you that as of this date, you will not be able to use the Certificate."[169]

[167] DRPE-0000092210
[168] DRRCE-00637760
[169] DRPE-0001990099

Tuven identified specific violations in its review; among them was a fine levied against DRP in the amount of $234,000 in 2007. This fine was based on five violations:

- Exceeding maximum permissible atmospheric limits at 2 measuring station, with respect to particulate parameters. (Serious Infraction)
- Illegally dumping in the Mantaro River without adopting provisional measures to prevent it, in three dumping sites. (Serious Infraction)
- Exceeding the permitted limit of liquids dumped at one authorized dump site. (Serious Infraction)
- Emitting Sulfur Dioxide without authorization or measurement. (Serious Infraction)
- Inadequately transporting metallic waste products. (Minor Infraction)[170]

Tuven's documentation shows that there was no commitment to comply with statutory obligations that are intended to protect the public.

An EMS is universally recognized to assist and strengthen a company's efforts, resources and focus its priorities on pollution prevention, meeting compliance obligations, and continually improving environmental performance. Defendants failed in all three of these areas. Defendants had no effective Environmental Management System, which is contrary to overall good industry practices.

[170] DRRC-00089046

## 10. CITATIONS


1. AIDA 2004. Comments on the air quality modeling done for the "Technical Justification" for Proposed Modifications to the La Oroya Metallurgical Complex PAMA, Prepared by Anna Cederstav, Ph.D., Asociación Interamericana para la Defensa del Ambiente, February 17, 2004.

2. Bennett and Knapp (1989). Bennett, R. L. and K. Knapp, Characterization of Particulate Emissions from Non-ferrous Smelters, JAPCA 39: 169-174, 1989

3. Cheremisinoff 2001, Pollution Prevention Practice Handbook, Marcel Dekker Publishers, NY and Basel, 2001

4. Cheremisinoff and Ben-David Val 2001, Green Profits: A Manager's Handbook to ISO 14001 and Pollution Prevention, Butterworth-Heinemann Publishers, United Kingdom, 2001

5. Cheremisinoff 2003, Achieving Environmental Excellence: Integrating P2 and EMS for Improved Profitability, Government Institutes, Washington, D.C., 2003

6. Cheremisinoff 2005, Environmental Technologies Handbook, editor, Government Institutes, Oxford, UK, 2005

7. Cheremisinoff 2006a, Environmental Management Systems Handbook for Refineries: Pollution Prevention through ISO 14001, Gulf Publishing Co., Houston, TX, 2006

8. Cheremisinoff 2006b, Refinery Manager's Guide to ISO 14001 Implementation, Gulf Publishing Co., Houston, TX, 2006

9. Cheremisinoff 2008, Responsible Care: A New Strategy for Pollution Prevention and Waste Reduction through Environmental Management, Gulf Publishing Co., Houston, TX, 2008

10. DRPE-0000081350_1970MetallurgicalOperations

11. DRPE-0000092210

12. DRPE-0000335409

13. DRPE-0001207789

14. DRPE-0001974767

15. DRPE-0002104173, Special Inspection of La Oroya Metallurgical Complex – February 2007

16. DRPE-0002133915

17. DRRC-00077581 - Environmental Evaluation of La Oroya Metallurgical Complex, Sept. 1996

18. DRRC-00051190

19. DRRCE-00383656

20. DRRCE-00637760

21. DRRCE-00922042

22. European Commission 1997. Air Quality Daughter Directives: Position Paper on Lead, Commission of the European Communities, Directorate – General XI, November 1997

23. Federal Register 2010. 75FR35520, Jun 22, 2010

24. Glover 1999. Annual air emissions inventory prepared by Defendants for their U.S. lead smelter

25. Integral 2005. Integral Consulting Inc., Human Health Risk Assessment Report, DRRC-Study-0000316, Dec. 2, 2005.

26. NIOSH 2017. https://www.cdc.gov/niosh/npg/npgd0575.html

27. Normas Legales 1996. El Percuano, page 141259, July 19, 1996

28. Oroya Metallurgical Operations 1970. Cerro de Pasco Corp. process description document, 1970

29. PAMA 1997, DRPE-0002133915, Environmental Management and Adaptation Program (PAMA), 1/13/1997

30. Pollution Prevention Act 1990. 42 U.S.C. §13101 et seq., 1990

31. Responsible Care 2018, http://www.nsf.org/services/by-type/management-systems/environmental-health-safety/responsible-care-management-system

32. Sadlowski 2014. Affidavit of D. A. Sadlowski, February 19, 2014

33. Supreme Decree 2001. Supreme Decree No. 074-2001-PCM – Environmental Air Quality National Standards Regulation, 2001

34. Supreme Decree 2003. Supreme Decree No. 069-2003-PCM available at http://www.digesa.minsa.gob.pe/norma_consulta/DS-069-2003-PCM.pdf




EXHIBIT 34

35. U.S.EPA 1973. Air Pollution Emission Test: American Smelting and Refining Co., Glover Plant, EMB 73-PLD-1, Aug. 1974

36. U.S.EPA (1973b), Air Pollution Engineering Manual, 2nd Edition, Air Pollution Control District, County of Los Angeles, May 1973, p. 95

37. U.S.EPA 1974. Background Information for New Source Performance Standards: Primary Copper, Zinc and Lead Standards, Vol. 1 Proposed Standards, EPA-450/2-74-002a, Oct. 1974

38. U.S.EPA 1975. Particulate Collection Efficiency Measurements on a Wet Electrostatic Precipitator, EPA-650/2-75-033, Mar. 1975

39. U.S.EPA 1976a. Fine Particulate Emissions Information System, EPA-600/2-76-174, June 1976

40. U.S.EPA 1976b. Technical Manual for the Measurement of Fugitive Emissions: Roof Monitor Sampling Method for Industrial Fugitive Emissions, EPA-600/2-76-089b, May 1976

41. U.S.EPA 1977a. Sample Fugitive Lead Emissions from Two Primary Lead Smelters, Prepared by Midwest Research Inst., Kansas City, Mo, PB-276 356, Oct. 1977

42. U.S.EPA 1977b. Emission Factors and Emission Source Information for Primary and Secondary Copper Smelters, PB-280 377, Dec. 1977

43. U.S.EPA 1977c. Proceedings: Particulate Collection Problems using ESP's in the Metallurgical Industry, EPA-600/2-77-208, Oct. 1977

44. U.S.EPA 1977d. Technical Guidance for Control of Industrial Process Fugitive Particulate Emissions, EPA-450/3-77-010, Mar. 1977

45. U.S.EPA 1977e. Control Techniques for Lead Air Emissions, Volume I, Chapters 1-3, EPA-450/2-77-012, Dec. 1977

46. U.S.EPA 1977f. Control Techniques for Lead Air Emissions, Volume II, Chapter 4 - Appendix B, EPA-450/2-77-012, Dec. 1977

47. U.S.EPA 1978a. Drehmel, D. C., D. P. Daugherty and Ch. H. Gooding, Position Paper - State of Control Technology for Industrial Fugitive Process Particulate Emissions, June 19, 1978

48. U.S.EPA 1978b. Assessment of Fugitive Particulate Emission Factors for Industrial Processes, EPA-450/3-78-107, Sept. 1978



EXHIBIT 34

49. U.S.EPA 1978c. Trace Element Study at a Primary Copper Smelter, Vol. 1, EPA0600/2-78-065a, Mar. 1978

50. U.S.EPA 1978d. Zoller, J, T. Bertke, and T. Janszen, PEDCO Environmental, Assessment of Fugitive Particulate Emission Factors for Industrial Processes, EPA-450/3-78-107, September 1978

51. U.S.EPA 1979a. Arsenic Non-Ferrous Smelters: Emission Test Report Phelps-Dodge Copper Smelter Ajo Arizona, EMB Report 78-CUS-8, Feb. 1979

52. U.S.EPA 1979b. Arsenic Non-Ferrous Smelters: Emission Test Report Phelps-Dodge Copper Smelter Ajo Arizona, EMB Report 78-CUS-9, Feb. 1979

53. U.S.EPA 1979c. Arsenic Non-Ferrous Smelters: Emission Test Report Phelps-Dodge Copper Smelter Ajo Arizona, EMB Report 78-CUS-10, Mar. 1979

54. U.S.EPA 1979d. Arsenic Non-Ferrous Smelters: Emission Test Report Kennecott Copper Corporation Magna Utah, EMB Report 78-CUS-13, Apr. 1979

55. U.S.EPA (1979e). Copper Smelters: Emission Test Report – Lead Emissions, EMB Report 79-CUS-14, Sept. 1979

56. U.S.EPA 1980. Control of Copper Smelter Fugitive Emissions, EPA-600/2-80-079, May 1980

57. U.S.EPA 1982. Control Techniques for Particulate Emissions from Stationary Sources—Volume 1. (EPA-450/3-81-005a). U.S. Environmental Protection Agency, Research Triangle Park, North Carolina. September 1982

58. U.S.EPA 1983. Inorganic Arsenic Emissions from Low-Arsenic Primary Copper Smelters - Background Information for Proposed Standards, EPA-450 3-83-010a, Apr. 1983

59. U.S.EPA 1985. Fine Particulate Matter Particle Size Analysis-Size Consist Evaluation and Control Technology Summary, April 1985

60. U.S.EPA (1990). Appendix B.2 AP-42: Generalized Particle Size Distributions, Sept. 1990

61. U.S. EPA 1995a. AP-42 Metallurgical Industry, Sect. 12.6 Primary Lead Smelting, Jan. 1995

62. U.S.EPA 1995b. Appendix B.2 - Generalized Particle Size Distributions, Sept. 1990 (Reformatted Jan. 1995)

63. U.S.EPA 1995c. EPA Office of Compliance Sector Notebook Project: Profile on the Nonferrous Metals Industry, EPA/310-R-95-010, Sept. 1995

64. U.S.EPA 1998a. Locating and Estimating Air Emissions from Sources of Lead and Lead Compounds, EPA-454/R-98-006, May 1998

65. U.S.EPA 1998b. Stationary Source Control Techniques Document for Fine Particulate Matter, EPA Contract No. 68-D-98-026, Oct. 1998

66. U.S.EPA 1999. Federal Register/Vol. 64, No. 107/Friday, June 4, 1999

67. U.S.EPA 2007. AP-42 Metallurgical Industry, Sect. 12.18 Lead bearing Ore Crushing and Grinding, Mar. 2007

68. U.S.EPA 2008. Emission Factor Documentation for AP-42, Section 12.2 - Coke Production, Final Report, May 2008

69. WHO 2000. World Health Organization, Arsenic. In: Air quality guidelines for Europe, 2nd ed. Copenhagen, World Health Organization Regional Office for Europe, pp. 125–128 (http://www.euro.who.int/__data/assets/pdf_file/0005/74732/E71922.pdf).

70. WHO 2005. World Health Organization, Air Quality Guidelines for Particulate Matter, Ozone, Nitrogen Dioxide and Sulfur Dioxide, Global Update 2005: Summary of Risk Assessment, Geneva, 2006

71. Zegarra 2007. Interoffice memo, Technical Proposal for the Environmental Impact Reduction from the Gas Emissions through the Main Stack, June 7, 2007 - DRPE-000007793



EXHIBIT 34

# ANNEX A

# CURRICULUM VITAE

# NICHOLAS P. CHEREMISINOFF, PH.D.

## EDUCATION

**1977:** Ph.D. in Chemical Engineering, Clarkson College of Technology, Potsdam, NY
**1975:** M.Sc. in Chemical Engineering, Clarkson College of Technology, Potsdam, NY
**1974:** B.Sc. in Chemical Engineering, Clarkson College of Technology, Potsdam, NY

## EMPLOYMENT HISTORY

**2014 – Present**: Member of Board of Directors of ThermoChem Recovery International, Inc., Baltimore, MD
**2002 – Present**: Senior Technical Consultant, Princeton Energy Resources, International, LLC, Rockville, MD
**1992 – Present**: Principal, N&P Ltd, Charles Town, WV
**1980 – Present**: Invited lecturer at University of Missouri-Rolla, University of Maryland, University of South Carolina, Texas A&M University, Russian Academy of Sciences, Ukrainian Academy of Sciences, Farleigh Dickenson University, University of Michigan, East Coast Hazmat Conferences, and Guest Speaker on Canadian Radio Broadcast Corp.
**1979 – 1992**: Exxon Chemical Co. and Exxon Research and Engineering Co., USA, Brussels
**1977 – 1992**: Adjunct Professor at Dept. of Civil & Environmental Engineering, New Jersey Institute of Technology, Newark, NJ.
**1977 – 1979**: Union Camp Corp., Lawrenceville, NJ.

## SELECT CAREER ACCOMPLISHMENTS

**U.S. Agency for International Development (USAID) –** Senior technical advisor on design of industrial wastewater treatment and cogeneration plant for the Greater Amman Municipality slaughterhouse project, Jordan.
**U.S. Trade & Development Agency (USTDA) –** Project Manager and senior technical advisor on development of National Electricity Health and Safety Codes, Nigeria.
**USAID** – Chief of Party and Senior Advisor for Jordan Industrial Waste Manifest project, a multi-year project aimed at developing industrial waste regulations for the Gov. of Jordan, Amman, Jordan.
**USAID** – Task 3 Project Manager for RIAL Phase I & II (Reuse for Industry, Agriculture & Landscaping) – Responsible for developing national strategy for industry water reuse and recycling. Technical to ministries of Environment, Health, Water Authority, Trade, international lending institutions, and U.S. Mission on pollution prevention and environmental impacts from water conservations infrastructure investments.
**USAID** – (Romania) Training and pilot demonstration programs at industrial and municipal water treatment and drinking water supply plants on improved operational efficiency and quality, P2 (Pollution Prevention) and alternative waste management practices. Established a national program for zero sewer discharge standards for priority pollutants.
**USAID** – P2 specialist on Samara, Russia Regional Investment Initiative Program - Environmental Component under USAID, dealing with pollution prevention and regional environmental action plan development to attract US investment opportunities. Focused on



EXHIBIT 34

water quality and management improvements at various industrial facilities including slaughtering and meat rendering plants, machine building operations, refineries.
**USAID** – (Bulgaria) Training and consulting on P2 and EMS (Environmental Management Systems) to industry with a focus given to water and power generation. Facilities included tanneries, slaughtering and meat rendering plants, machine building operations, refineries, wood making.
**USAID** – (Macedonia) Training and consulting on EMS/P2, conducted P2 audits; Assisted in defining/structuring Environmental Funds program. Developed engineering basis for recycling options at pharmaceutical and cosmetics plants, textile manufacturing plants, beverage and food production facilities, meat rendering and slaughtering facilities, and tanneries.
**USAID/USEPA** – (Ukraine) Under K&M Engineering and CH2MHILL served as in- Country Industrial Waste Management Project Manager, Ukraine. Responsibilities included Resident Project Manager on Institutional Strengthening of Environmental Enforcement; establishment of a Regional Environmental Center; trained Ukrainian enterprises on Pollution Prevention (P2) and Waste Minimization; developed national legislation on industrial hazardous wastes, developed pesticide registration program; implemented fate and transport models for environmental impact assessments at coke- chemical, wood preserving, iron and steel, machine building, munitions manufacturing sites, farm and slaughtering operations; developed regional infrastructure among environmental enforcement agency and industry.
**USAID** – (Balkans) Under DAI developed case studies and designed P2 Forum and Web site for P2 programs to assist industry.
**USDOE/USDOD (U.S. Depts. of Energy and Defense)** – Numerous assignments. Highlights include: (1) Prepared Congressional Report for Subcommittee on Energy Budgets for Worldwide Projected Market Growth of Advanced Turbines for the Utility Industry and Impediments to Market Growth; (2) Technology Survey and R&D Projection Needs for Small-scale Coal Gasification Technologies; (3) Technology Survey and R&D Projection Needs for Fuel Cell Technologies for Power Generation; (4) Environmental Impact Assessment of Tritium Extraction plant for SALT 2 Armaments Treaty; (5) Emergency Cooling System Design Review for Point Pleasant Power Plant, NJ.
**U.S. Export Import Bank** – (Uzbekistan) Under Eurasia Environmental Services serves as technical and business consultant on the Shurtan Gas Processing Plant modernization project, Uzbekistan. Responsible for evaluating low $NO_X$ compressor technology for gas transfer stations as proposed by General Electric Corp of U.S. Led team in developing environmental impact statement and assessing project-financing options for 9 million U.S. dollar loan.
**USTDA** – (Balkans) Definitional Missions to define project opportunities and environmental impact assessments in the Balkans (Romania, Bulgaria, Macedonia, Bosnia-Herzegovina, Croatia, Albania). Implemented regional rationalization study on the debundling of INA (oil and gas monopoly-producer of Balkans) oil, gas and downstream chemical manufacturing businesses, including chlor-alkalis, agro-chemicals and coal-tars.
**USTDA** – (Latin America) Definitional Missions to define project opportunities in oil, gas and renewable energy.
**World Bank Organization (WBO)** – (Ukraine) Developed national legislation on European Union IPPC (Integrated Pollution Prevention and Control) permitting. Established model permits for the Power Generation, Coke Chemicals, and Steel Making industry sectors.
**WBO** – (Ukraine) Under the Donetsk Pollution Abatement Loan Program, responsible for conducting environmental impact studies and technical feasibility assessments of industrial enterprise projects aimed at pollution prevention/abatement and energy savings.



EXHIBIT 34

**WBO –** (Russia) Conducted business evaluations and technical feasibility studies for oil field expansions by Tyumen Oil in Siberia.
**WBO –** (Turkmenistan) Under Eurasia Environmental Services assessed technology options and costs for mercury cleanup on Nura River. Developed detailed remediation plans and emergency response plans for cleanup operations.
**WBO/USTDA –** (Russia) Assisted in feasibility assessment for wind power generation farm to provide electrification to St. Petersburg grid. Assessment extended to assess feasibility for providing wind-powered electricity to rural towns and villages to replace diesel generator technology.
**Exxon Research & Engineering Co. and Exxon Chemical Co.** – Numerous assignments ranging from refinery and chemical plant expansions, pollution and health & safety, synthetic elastomer manufacturing/product development. Positions ranged from technical, group and section manager to product development manager.
**International Business and Engineering Consultants, Caracas, Venezuela** – Technical expert assigned to refinery modernization projects in Maricaibo, Curacil, and Aruba. Conducted plant wide energy efficient and environmental audits at four refineries and one light ends manufacturing plant. Assisted design teams in debottlenecking fluid catalytic cracker operations, lube oils distillation plant, and paramins refining.
**KBR-Halliburton** – Prepared environmental impact statement for Nizhnekamsk Refinery polyolefins plant expansion, Republic of Tatarstan.
**Madison Gas & Electric Corp.** – Developed preliminary design basis and technical feasibility assessment for conversion of oil fired boilers power generating boilers to biomass feed systems.
**U.S. Private Sector Clients –** Environmental, waste and health & safety consultant to various clients including Public Service Gas & Electric Corp., New Jersey**,** Chase and Sanborn Food Corp., Becton Dickenson Pharmaceutical Co., Gates Wire and Cable Co., Goodyear Tire and Rubber Co., Merola Hazardous Waste Transporters Corp., Safety Clean Corp., Municipalities.
**OECD (Organisation for Economic Co-operation and Development) –** (Ukraine) Studies and special reports on development of environmental management systems and application of economic instruments for waste management.
**TACIS (Technical Assistance to the Commonwealth of Independent States, European Commission)** –European Union Project Manager on Institutional Strengthening of the State Environmental Inspectorate of Ukraine. Responsible for managing project dealing with restructuring of the Environmental Inspectorate of Ukraine as prerequisite to becoming a European Union member. Tasks included development of pollution fees restructuring, personnel training and qualifications for inspectorates, financing schemes for regional laboratories, communications improvement between regional inspectorates, developing long-term budget forecasting for the inspectorate, agro-chemicals (pesticides) registration program.
**Yukong Chemical Corporation** – (Seoul, South Korea) Technical advisor on Japan Synthetic Rubber technology for EPDM manufacture. Conducted plant wide audit; assisted technical design team in design modifications to polymerization reactors, rubber finishing (drying) and packaging stages, hexane recycling streams, and modernization of integrated systems controls. Assisted Product Development Group in developing TPO elastomers and soft sponge products for European automotive markets. Additionally assisted in redesign of on-site combined municipal and industrial wastewater treatment plant facility.

**PUBLICATIONS**

*Book publications authored, co-authored or edited*

1. Groundwater Remediation – A Practical Guide for Environmental Engineers and Scientists, Wiley-Scrivener Publishing, UK (2017).
2. Perfluorinated Chemicals (PFCs) – Contaminants of Concern, Wiley-Scrivener Publishers, UK (2016).
3. Pollution Control Handbook for Oil and Gas Engineering, Wiley-Scrivener Publishers, UK (2016).
4. Hydraulic Fracturing Operations: Handbook of Environmental Management Practices, Wiley-Scrivener Publishers, UK (2015).
5. Industrial Dust Explosion Guidebook, Wiley Publishers, United Kingdom (2014).
6. Industrial Gas Flaring Practices, Wiley Publishers, NJ (2013).
7. Handbook of Pollution Prevention and Cleaner Production: Volume 4 - Clean Electricity through Advanced Coal Technologies, Elsevier, UK (2012).
8. Handbook of Pollution Prevention and Cleaner Production: Volume 3 - Best Practices in the Agrochemical Industry, Elsevier, UK (2011).
9. Emergency Response to Offshore Oil Spills, Wiley & Sons, NJ (2011).
10. Handbook of Pollution Prevention and Cleaner Production: Volume 2 - Best Practices in the Wood and Paper Industries, Elsevier, UK (2010).
11. Handbook of Pollution Prevention and Cleaner Production: Volume 1 - Best Practices in the Petroleum Industry, Elsevier, UK (2009).
12. Responsible Care: A New Strategy for Pollution Prevention and Waste Reduction through Environmental Management, Gulf Publishing Co., Houston, TX (2008).
13. Refinery Manager's Guide to ISO 14001 Implementation, Gulf Publishing Co., Houston, TX (2006).
14. Environmental Management Systems Handbook for Refineries: Pollution Prevention through ISO 14001, Gulf Publishing Co., Houston, TX (2006).
15. Gasification Technologies: A Primer for Engineers and Scientists, CRC Press, Taylor & Francis Group, Boca Raton, FL (2005).
16. Environmental Technologies Handbook, editor, Government Institutes, Oxford, UK (2005).
17. Achieving Environmental Excellence: Integrating P2 and EMS for Improved Profitability, Government Institutes, Washington, D.C. (2003).
18. Wastewater and Biosolids Treatment Technologies, Government Institutes, Washington, D.C. (2003).
19. Handbook of Solid Waste Management and Waste Minimization Technologies, Butterworth-Heinemann Publishers, United Kingdom, (2003).
20. Industrial Solvents Handbook, 2nd Edition, Marcel Dekker Publishers, NY and Basel (2003).
21. Handbook of Air Pollution Prevention and Control, Butterworth-Heinemann Publishers, United Kingdom, (2002).
22. Handbook of Water and Wastewater Treatment Technologies, Butterworth Heinemann Publishers, United Kingdom, (2002).
23. Green Profits: A Manager's Handbook to ISO 14001 and Pollution Prevention, Butterworth-Heinemann Publishers, United Kingdom, (2001).
24. Pollution Prevention Practice Handbook, Marcel Dekker Publishers, NY and Basel, (2001).



EXHIBIT 34

25. Handbook of Chemical Process Equipment, Butterworth-Heinemann, Oxford, UK (2000).
26. Handbook of Hazardous Chemical Properties, Butterworth-Heinemann, Oxford, UK (2000).
27. Chemical Engineer's Condensed Encyclopedia of Process Equipment, Gulf Publishing Co., Houston, TX (2000).
28. Handbook of Industrial Toxicology and Hazardous Materials, Marcel Dekker Publishers, Basel, (1999).
29. Liquid Filtration, 2nd Edition, Butterworth-Heinemann, Oxford, United Kingdom (1998).
30. Fire and Explosion Hazards Handbook of Industrial Chemicals, Noyes Publications, Westwood, NJ (1998).
31. Guide to Wastewater Treatment Technologies, Noyes Publications, Westwood, NJ (1998).
32. Advanced Polymer Processing Operations, Noyes Publications, Westwood, NJ (1998).
33. Pressure Safety Design Practices for Refineries and Chemical Plants, Noyes Publications, Westwood, NJ (1998).
34. Handbook of Engineering Polymeric Materials, Editor, Marcel Dekker Publishers, Inc., NY and Basel (1997).
35. Guide to Ground Water Remediation, Noyes Publications, Park Ridge, NJ (1997).
36. Electrotechnology: Industrial and Environmental Applications, Noyes Publications, Park Ridge, NJ (1996).
37. Biotechnology for Waste and Wastewater Treatment, Noyes Publications, Park Ridge, NJ (1996).
38. Handbook of Pollution and Hazardous Materials Compliance, Noyes Publications, Park Ridge, NJ (1996).
39. Pollution Prevention Software Systems Handbook, Noyes Publications, Park Ridge, NJ (1996).
40. Noise Control in Industry, Noyes Publications, Park Ridge, NJ (1996).
41. Materials Selection Deskbook, Noyes Publications, Park Ridge, NJ (1996).
42. Guide to Fiberglass Reinforced Plastics, Noyes Publications, Westwood, NJ (1996).
43. Safety Management Practices for Hazardous Materials, Marcel Dekker Publishers, NY (1996).
44. Laboratory Guide for Polymer Characterization, Noyes Publications, Westwood, NJ (1996).
45. Multiphase Reactor and Polymerization Systems Hydrodynamics - Advances in Engineering Fluid Mechanics Series, Editor, Gulf Publishing Co. Houston, TX (1996).
46. Mixed-Flow Hydrodynamics: Advances in Engineering Fluid Mechanics Series, Editor, Gulf Publishing Co., Houston, TX (1996).
47. Environmental and Health & Safety Management, Noyes Publications, Park Ridge, NJ, (1995).
48. Process Engineering Data Book, Technomic Publishing Co., Lancaster, PA (1995).
49. Pesticide Registration Handbook, Marcel Dekker Publishers, NY and Basel (1995).
50. Handbook of Emergency Response to Toxic Chemical Releases: A Guide to Compliance, Noyes Publications, Park Ridge, NJ (1995).
51. Environmental and Health & Safety Management: A Guide to Compliance, Noyes Publications, Park Ridge, NJ (1995).

52. Hazardous Materials and Waste Management: A Guide for the Professional Hazards Manager, Noyes Publications, Park Ridge, NJ (1995).
53. Certified Transportation Specialist Training Manual, National Assoc. of Safety & Health Professionals, Washington, D.C. (1994).
54. Transportation of Hazardous Materials: A Guide to Compliance, Noyes Publications, Park Ridge, NJ (1994).
55. Dangerous and Toxic Properties of Industrial and Consumer Products, Marcel Dekker Publishers, Inc., NY (1994).
56. Toxic Properties of Pesticides, Marcel Dekker Publishers, Inc., NY (1994).
57. Encyclopedia of Fluid Mechanics: Supplement 4 - Advances in Flow Dynamics, Editor, Gulf Publishing Co., Houston, TX (1994).
58. Dangerous and Toxic Properties of Polymer Chemical Additives, Marcel Dekker Publishers, Inc., New York City (1994).
59. Compressors and Fans, Prentice Hall Publishers, Englewood, NJ (1993).
60. Materials and Components for Pollution and Process Equipment, Prentice Hall Publishers, Englewood, NJ (1993).
61. Heat Transfer Equipment, Prentice Hall Publishing, Englewood, NJ (1993).
62. Carbon Adsorption for Pollution Control, Prentice Hall Publishers, Inc., Englewood, NJ (1993).
63. Filtration Equipment for Wastewater Treatment, Prentice Hall Publishers, Inc., Englewood, NJ (1993).
64. Lead: A Guidebook to Detection, Remediation and Control, Prentice Hall Publishers, Inc., Englewood, NJ (1993).
65. Encyclopedia of Fluid Mechanics: Supplement 1 - Applied Mathematics in Fluid Dynamics, Editor, Gulf Publishing Co., Houston, TX (1993).
66. Encyclopedia of Fluid Mechanics: Supplement 3 - Advances in Multi-phase Flows, Editor, Gulf Publishing Co., Houston, TX (1993).
67. An Introduction to Polymer Rheology and Processing, CRC Press, Boca Raton, FL (1993).
68. Elastomer Technology Handbook, Editor, CRC Press, Boca Raton, FL (1993).
69. Professional Environmental Auditors' Guidebook, Noyes Publications, Park Ridge, NJ (1993).
70. Lead Remediation Manual. Hazardous Lead Worker Training, SciTech Publishers, Inc., Morganville, NJ (1992).
71. Guidebook to Commercial Polymers: Properties and Applications, Polymer Process Engineering Series, PTP Prentice Hall, Englewood Cliffs, NJ (1993).
72. Guidebook to Extrusion Technology, Polymer Process Engineering Series, PTP Prentice Hall, Englewood Cliffs, NJ (1993).
73. Pumps and Pumping Operations, Prentice Hall Publishers, Englewood, NJ (1992).
74. Emergency Response Handbook, National Association of Safety & Health, Washington, D.C. (1992).
75. Trainers Guide to Emergency Response & Toxic Chemical Releases, SciTech Publishers, Inc., Morganville, NJ (1992).
76. Handbook of Emergency Response and Toxic Chemical Release, SciTech Publishers, Inc. Morganville, NJ (1992).
77. Handbook of Ceramics and Composites - Volume 1, Editor, Marcel Dekker Publishers, Inc., NY (1990).

78. Handbook of Ceramics and Composites - Volume 2, Editor, Marcel Dekker Publishers, Inc., NY (1991).
79. Encyclopedia of Fluid Mechanics: Volume 10 - Surface and Groundwater Flow Phenomena, Gulf Publishing Co., Houston, TX (1990).
80. Handbook of Heat and Mass Transfer Operations: Volume 4 - Advances in Reactor Design and Combustion Science, Gulf Publishing Co., Houston, TX (1990).
81. Encyclopedia of Fluid Mechanics: Volume 9 - Polymer Flow Engineering, Editor, Gulf Publishing Co., Houston, TX (1990).
82. Polymer-Plastics Test Methods, SciTech Publishers, Inc., Morganville, NJ (1990).
83. Practical Fluid Mechanics for Engineers and Scientists, Technomic Publishers, Lancaster, PA (1990).
84. Encyclopedia of Civil Engineering Practice - Volume 1, co-editor, Technomic Publishing Co., Lancaster, PA (1988).
85. Encyclopedia of Civil Engineering Practice - Volume 2, co-editor, Technomic Publishing Co., Lancaster, PA (1989).
86. Encyclopedia of Civil Engineering Practice - Volume 3, co-editor, Technomic Publishing Co., Lancaster, PA (1989).
87. Encyclopedia of Civil Engineering Practice - Volume 4, co-editor, Technomic Publishing Co., Lancaster, PA (1990).
88. Encyclopedia of Civil Engineering Practice - Volume 5, co-editor, Technomic Publishing Co., Lancaster, PA (1990).
89. Handbook of Polymer Science and Technology - Volume 1, Editor, Marcel Dekker Publishers, Inc., NY (1988).
90. Handbook of Polymer Science and Technology - Volume 2, Editor, Marcel Dekker Publishers, Inc., NY (1988).
91. Handbook of Polymer Science and Technology - Volume 3, Editor, Marcel Dekker Publishers, Inc., NY (1989).
92. Handbook of Polymer Science and Technology - Volume 4, Editor, Marcel Dekker Publishers, Inc., NY (1990).
93. Liquid Filtration for Process & Pollution Control, SciTech Publishers, Inc., Morganville, NJ (1989).
94. Handbook of Heat and Mass Transfer Operations: Volume 3 - Catalysis, Kinetics and Reactor Engineering, Editor, Gulf Publishing Co., Houston, TX (1989).
95. Respiratory Protection Guidebook, SciTech Publishers, Inc., Morganville, NJ (1989).
96. Pumps, Compressors and Fans Pocket Handbook, Technomic Publishers, Lancaster, PA (1989).
97. Encyclopedia of Fluid Mechanics: Volume 8 - Aerodynamics and Compressible Flows, Editor, Gulf Publishing Co., Houston, TX (1989).
98. Flow Measurement for Engineers and Scientists, Marcel Dekker, Inc., NY (1988).
99. Encyclopedia of Fluid Mechanics: Volume 7 - Rheology and Non-Newtonian Flows, Editor, Gulf Publishing Co., Houston, TX (1988).
100. Polymer Mixing and Extrusion Technology, Marcel Dekker Publishers, NY (1987).
101. Industrial Radiation Hazards Deskbook, Technomic Publishing Company, Lancaster, PA (1987).
102. Practical Statistics for Engineers and Scientists (includes software package- DATA FIT), Technomic Publishing Company, Lancaster, PA (1987).



EXHIBIT 34

103. Encyclopedia of Fluid Mechanics: Volume 6 - Complex Flow Phenomena and Modeling, Editor, Gulf Publishing Co., Houston, TX (1987).
104. Handbook of Heat and Mass Transfer Operations: Volume 1 - Heat Transfer Operations, Editor, Gulf Publishing Co., Houston, TX (1986).
105. Handbook of Heat and Mass Transfer Operations: Volume 2 - Mass Transfer and Reactor Design, Editor, Gulf Publishing Co., Houston, TX (1986).
106. Instrumentation for Process Flow Engineering, Technomic Publishing Company, Lancaster, PA (1986).
107. Instrumentation for Complex Fluid Flows, Technomic Publishing Company, Lancaster, PA (1986).
108. Encyclopedia of Fluid Mechanics: Volume 1 - Flow Phenomena and Measurement, Editor, Gulf Publishing Co., Houston, TX (1986).
109. Encyclopedia of Fluid Mechanics: Volume 2 - Dynamics of Single Fluid Flows and Mixing, Editor, Gulf Publishing Co., Houston, TX (1986).
110. Encyclopedia of Fluid Mechanics: Volume 3 - Gas-Liquid Flows, Editor, Gulf Publishing Co., Houston, TX (1986).
111. Encyclopedia of Fluid Mechanics: Volume 4 - Solids and Gas-Solid Flows, Editor, Gulf Publishing Co., Houston, TX (1986).
112. Encyclopedia of Fluid Mechanics: Volume 5 - Slurry Flow Technology, Editor, Gulf Publishing Co., Houston, TX (1986).
113. Fluid Flow Pocket Handbook, Gulf Publishing Co., Houston, TX (1984).
114. Heat Transfer Pocket Handbook, Gulf Publishing Co., Houston, TX (1984).
115. Liquid Filtration Pocket Handbook, Gulf Publishing Co., Houston, TX (1984).
116. Hydrodynamics of Gas-Solids Fluidization, Gulf Publishing Co., Houston, TX (1984).
117. Fluid Mechanics and Unit Operations, Butterworth Publishers, Ann Arbor, MI (1983).
118. Liquid Filtration, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1983).
119. Fluid Flow: Pumps, Pipes and Channels, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1982).
120. Handbook of Fluid in Motion, Editor, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1982).
121. Chemical and Process Equipment Design, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1982).
122. Gasohol Sourcebook, Ann Arbor Science Publishers, Ann Arbor, MI (1981).
123. Unit Conversions and Formulas Manual, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1981).
124. Chemical and Nonchemical Disinfection, Ann Arbor Science Publishers, Ann Arbor, MI (1981).
125. Process Level Instrumentation and Control, Marcel Dekker, Inc., NY (1981).
126. Cooling Towers: Selection, Design and Practice, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1981).
127. Biomass: Applications, Technology and Production, Marcel Dekker, NY (1980).
128. Wood for Energy Production, Ann Arbor Science Publishers, Ann Arbor, MI (1980).
129. Applied Fluid Flow Measurement: Fundamentals and Technology, Marcel Dekker Publishers, Inc., NY (1979).
130. Fiberglass Reinforced Plastics Deskbook, Ann Arbor Science Publishers, Ann Arbor, MI (1978).



EXHIBIT 34

131. Fluid Mechanics and Unit Operations, Ann Arbor Science/Butterworth Publishers, Ann Arbor, MI (1978).
132. Industrial and Hazardous Wastes Impoundment, Ann Arbor Science Publishers, Ann Arbor, MI (1978).
133. Gasohol for Energy Production, Ann Arbor Science Publishers, Ann Arbor, MI (1978).
134. Fundamentals of Wind Energy, Ann Arbor Science Publishers, Ann Arbor, MI (1978).

*Select Journal, Book Chapter and Special Report Publications*

135. Economic Study of Bioenergy Production from Digesters at Dairies in California, Princeton Energy Resources International, LLC, Rockville, MD (December, 2008).
136. Assessment of the Commercial Potential for Small Gasification Combined Cycled and Fuel Cell Systems, HM Associates, Princeton Energy Resources International, LLC, and TFB Consulting (March, 2003).
137. Regulatory and Business Strategies for Industrial Water Recycle and Reuse, First Regional Water-Reuse Conference, Amman, Jordan, December 2003
138. The Application of Economic Instruments to Promote Water Recycling and Reuse, First Regional Water-Reuse Conference, Amman, Jordan, December 2003
139. Methodology for Conducting Pollution Prevention Audits, Pollution Engineering Magazine, September 2002.
140. Spotlight on Chlorinated Hydrocarbons, Pollution Engineering Magazine, November 2001.
141. National Defense Programs Lead to Groundwater Contamination: The Perchlorate Story, Pollution Engineering Magazine, September 2001.
142. OECD Technical Report - Developing Environmental Action Plans in the Donetsk Oblast Region of Ukraine, OECD Publication, Paris, France (1997).
143. Lead Remediation, Chapter 14 in Encyclopedia of Environmental Control Technology, P.N. Cheremisinoff - Editor, Gulf Publishing Co., Houston, TX (1995).
144. OSHA and OSHA Regulations, Chapter 7 in Encyclopedia of Environmental Control Technology, P.N. Cheremisinoff - Editor, Gulf Publishing Co., Houston, TX (1995).
145. Training Your Hazmat Employees, The National Environmental Journal Magazine, Atlanta, GA, (1994).
146. Emerging Technologies and Applications for Polymers, Journal of Polymer - Plastics Technology and Engineering, V. 30, N. 1 (1991).
147. Study of Hydrodynamic and Viscoelastic Parameters Effecting the Skin Properties of Extruded Elastomers, Journal of Macromolecular Science and Chemistry, Academic Press, NY (1990).
148. Principles of Polymer Mixing and Extrusion, Chapter 26 in Encyclopedia of Fluid Mechanics - Vol. 7, Gulf Publishing Co., Houston, TX (1990).
149. Techniques for Polymer Property Characterization, Chapter 13 in Encyclopedia of Engineering Materials, Marcel Dekker Publishers, NY (1990).
150. Rheological Characterization and Processability Testing, Chapter 32 in Encyclopedia of Fluid Mechanics - Vol. 7, Gulf Publishing Co., Houston, TX (1989).
151. Predicting the Extrusion Performance of EPDMs, Journal of Polymer-Plastics Technology and Engineering, V. 27, N. 1 (1988).
152. Developments in Ethylene-Propylene Elastomers for Extruded Applications, Automotive Polymers and Design, V. 6, N. 3 (March 1987).

153. Spotlight on Environmental Software, Pollution Engineering Magazine, (Jan. 1987).
154. Statistical Regression Routines on Spreadsheet Software, Chemical Engineering Magazine, (August 17, 1987).
155. Fundamentals of Momentum and Heat Transfer, Chapter I in Handbook of Heat and Mass Transfer, Vol. 1, pp. 3-82, Gulf Publishing Co., Houston, TX (1986).
156. Application of Magnetic Stabilization to Fluidized Beds, Chapter 37 in Encyclopedia of Fluid Mechanics - Vol. 4, pp. 1145-1160, Gulf Publishing Co., Houston, TX (1986).
157. Overview of Industrial Fluidized Bed Reactors, Chapter 27 in Encyclopedia of Fluid Mechanics - Vol. 4, pp. 853-928, Gulf Publishing Co., Houston, TX (1986).
158. Entrainment Correlations, Chapter 32 in Encyclopedia of Fluid Mechanics - Vol. 4, pp. 1043-1062,Gulf Publishing Co., Houston, TX (1986).
159. Particle Properties and Characterization, Chapter I in Encyclopedia of Fluid Mechanics - Vol. 4, pp. 3-38, Gulf Publishing Co., Houston, TX (1986).
160. Design Guidelines for Flare Gas Practices, Chapter 43 in Handbook of Heat and Mass Transfer - V. 1, pp. 1401-1433, Gulf Publishing Co., Houston, TX (1986).
161. Design Practices in Combustion and Incineration, Chapter 42 in Handbook of Heat and Mass Transfer, V. 1, pp. 1351-1400, Gulf Publishing Co., Houston, TX (1986).
162. Cooling Tower Operations, Chapter 34 in Handbook of Heat and Mass Transfer - V. 1, pp. 1065-1102, Gulf Publishing Co., Houston, TX (1986).
163. Unit Operations of Wastewater Treatment, Chapter 31 in Encyclopedia of Fluid Mechanics - V. 5, pp. 1267-1368, Gulf Publishing Co., Houston, TX (1986).
164. Industrial Centrifuging Practices, Chapter 29 in Encyclopedia of Fluid Mechanics V. 5, pp. 123 1 - 1246, Gulf Publishing Co., Houston, TX (1986).
165. Industrial Filtration Equipment, Chapter 17 in Encyclopedia of Fluid Mechanics V. 5, pp. 717- 790, Gulf Publishing Co., Houston, TX (1986).
166. Industrial Sedimentation Practices, Chapter 16 in Encyclopedia of Fluid Mechanics, V. 5, pp. 685-716, Gulf Publishing Co., Houston, TX (1986).
167. Particulate Capture from Process Gas Streams, Chapter 40 in Encyclopedia of Fluid Mechanics - V. 5, pp. 685-716, Gulf Publishing Co., Houston, TX (1986).
168. Flow of Solids Through Bins and Pipes, Chapter 5 in Encyclopedia of Fluid Mechanics - V. 4, pp. 145- 194, Gulf Publishing Co., Houston, TX (1986).
169. Mixing of Granular and Loose Solids, Chapter 3, in Encyclopedia of Fluid Mechanics - V. 4, pp. 61 - 108, Gulf Publishing Co., Houston, TX (1986).
170. Design Features of Fans, Blowers and Compressors, Chapter 42 in Encyclopedia of Fluid Mechanics - V. 2, pp.1208-1334, Gulf Publishing Co., Houston, TX (1986).
171. Pump Classifications and Design Features, Chapter 34 in Encyclopedia of Fluid Mechanics - V. 2, pp. 95 1 - 1000, Gulf Publishing Co., Houston, TX (1986).
172. Industrial Flow Measuring Devices, Chapter 39 in Encyclopedia of Fluid Mechanics - V. 1, pp. 1339- 1407, Gulf Publishing Co., Houston, TX (1986).
173. Measurement Techniques for Multiphase Flows, Chapter 38 in Encyclopedia of Fluid Mechanics - V. 1, pp. 1280-1338. Gulf Publishing Co., Houston, TX (1986).
174. Spotlight on Environmental Software, Pollution Engineering Magazine, Vol. 27, No. 3 (1986).
175. Properties and Concepts of Single Fluid Flows, Chapter 10 in Encyclopedia of Fluid Mechanics - V. 1, pp. 277-352, Gulf Publishing Co., Houston, TX (1986).
176. Experimental Methods for Studying the Hydrodynamics of Gas-Solid Fluidized Beds, I&EC Process Design and Development, (April 1986).



EXHIBIT 34

177. Hydrodynamic Mixing of Dispersed and Atomized Flows, Chapter 13 in Encyclopedia of Fluid Mechanics - Vol. 3, pp. 301-364, Gulf Publishing Co., Houston, TX (1986).
178. Fluid Mechanics of Crossflow Magnetically Stabilized Fluidized Beds, I&E Process Design & Development, V. 24, pp. 719-725 (July 1985).
179. Plant Site Selection Factors, Chapter 30 in Industrial Odor Technology Assessment Handbook, pp. 457-467, Ann Arbor Science Publishing, Ann Arbor, MI (1985).
180. Measurement Techniques for Industrial Wasteflows, in French language, Eau DuOuebe V. 14, N. 3, (Aug. 1981).
181. Wastewater Flow Measuring Devices, Pollution Engineering Magazine, V. 12, N. 9, (1980).
182. Assessing Fluid Flow Measurements, Water & Sewage Works Journal, V. 127, N. 7, (1980).
183. Heat Transfer with Stratified Gas-Liquid Flow, AICHE Journ. V. 25, N. 6 (Dec. 1979).
184. Stratified Turbulent-Turbulent Gas-Liquid Flow, AICHE Journ. V. 25, N. 1 (Nov. 1979).
185. Annular Two Phase Flow: Film Height and Heat Transfer, AICHE-DIMP Report #6 (April 1978).
186. Gravity Settling Chambers, Chap. 9 in Air Pollution Control & Design Handbook, Ann Arbor Science Publishing, Ann Arbor, MI (1977).
187. Ventilating System Noise Control, Chap. 15 in Industrial Noise Pollution Control Handbook, Ann Arbor Science Publishing, Ann Arbor, MI (1977).
188. Report on the Lamella Gravity Settler, Pollution Engineering Magazine, V. 9, N. 3, (1977).
189. Estimating Noise from Control Valves, Pollution Engineering Magazine, V. 9, N. 6, (1977).
190. Stratified Two-Phase Flow: Pressure Drop and Holdup, AICHE - DIMP Report # 5 (June 1977).
191. Heat Transfer to Two Phase Stratified Gas-Liquid Flows, AICHE - DIMP Report (June 1977).
192. Heat and Momentum Transfer Analogies for Horizontal, Stratified Two-Phase Flow, A Report on Results and State-of-the-Art Design for AICHE-DIMP (June, 1976).
193. Heat and Momentum Transfer Analogies for Stratified and Annular Flows, Proceedings of Two Phase Flow and Heat Transfer Symposium, Cincinnati, OH (1976).
194. Basic Pointers on Selecting and Installing Pipe Insulation, Pollution Engineering Magazine, V. 30, N. 10, (1976).
195. Calculating Air Flow Requirements for Fume Exhaust Hoods - Total and Partial Enclosure Types, Plant Engineering Magazine, V. 30, N. 5, (1976).
196. Liquid Level Control Devices, Pollution Engineering Magazine, V. 7, N. 7, (1975).
197. Pumps: Application & Design Basics - Parts I and 11, Water & Sewage Works Journal, V. 122, Nos. 9, 10, (1975).
198. Survey of Fluid Flow Measurement Techniques & Fundamentals, Water & Sewage Works Journal, V. 122, N. 12, (1975).
199. Electrostatic Precipitators - Fundamentals and Applications, Plant Engineering Magazine, V. 28, Nos. 9, 11, (1974).
200. Cyclone Separators - Fundamentals, Applications & Designs - Parts 1 and 2, Plant Engineering Magazine, V. 28, Nos. 103. 14-15, (1974).
201. Pollution Engineering Noise Glossary, Pollution Engineering Magazine, V. 5, N. 5, (1973).



EXHIBIT 34

202. Corrosion Resistance of Piping and Construction Materials, Pollution Engineering Magazine, V. 5, N. 8, (1973).
203. Fabric Filtration for Dust Collection, Plant Engineering Magazine, in four parts, V. 27, Nos. 11-15, (1973).
204. Understanding Packed Tower Wet Scrubbers - Part 1, Plant Engineering Magazine, V. 27, N. 23, (1973).
205. Understanding Packed Tower Wet Scrubbers - Part 2, Plant Engineering Magazine, V. 27, N. 25, (1973).

*Reports to U.S. Congress*

206. Technology Assessment and Environmental Impact of the USDOE Tritium Extraction Process for Meeting Nuclear Armaments Production under SALT II Treaty Guidelines; subcontract under K&M Engineering & Consulting Co. (Washington, D.C.) for the Department of Defense, January, 1998.
207. Impact of USEPA NOx Emission Standards on Combined Cycle Natural Gas Turbines and Its Implications to the U.S. Department of Energy's Advance Turbine Systems Program, subcontract under The PERI Group, Washington, D.C., 2000.
208. State of the Environment and Sustainable Development of Ukraine, U.S. Agency for International Development and Gore-Kuchma subcommittee on Sustainable Development in Newly Independent States of the Former Soviet Union – Environmental Policy & Technology Program, Washington, D.C. and Kyiv, 1997.

*Sessions Chaired and Conference Deliveries*

209. AICHE Houston National Conference Presentation – Paper 1: Pollution Prevention and Waste Management Practices in the Wood Preserving Industry, Dallas, TX, 2005
210. AICHE Houston National Conference Presentation – Paper 2: Pollution Prevention Case Study at the Jordan Oil Refinery, Dallas, TX, 2005
211. State Department Delegation Program to Samara, Russia—*Impact on Pollution Prevention to Promoting Foreign Investment Strategies into the Samara Region*, Environmental Action Programme, under the U.S. State Department initiative to promote sustainable development and growth to the Samara Region of Russia, 1998.
212. Chair Person - Session on Integration of Newly Independent States Environmental Legislation with International Community - USEPA-Ukrainian Roundtable Pittsburgh Conference, June 1997.
213. National Environmental Work Group Coordinator for Ukrainian Environmental Policy and Legislation Development, Gore-Kuchma Committee for Sustainability of Ukraine - Sept. 1996 – 1998.
214. Keynote Lecturer on Modern Refinery Design Practices and Environmental Management, Venezuelan Oil Refiners Association, Caracas, Venezuela, March 1996 Conference.
215. Invited Lecturer - Academy of Sciences of the Former USSR, Environmental Liability and Policy Development In NIS Countries, Moscow, Spring 1996.
216. Lead Instructor on Workshop for Refinery Flare Gas Operations and Environmental Technologies, Venezuelan Oil Refiners Association, Maracaibo, Venezuela, March 1995 Conference.



EXHIBIT 34

217. Designing EPDM for Production Efficiency, Paper delivered to International Conference Program, The Plastics and Rubber Institute, Katholieke Universiteit, Leuven, Belgium, April 16-17, 1991.
218. Designing EPDM Products for Extrusion Application, 2nd Paper delivered to International Conference Program, The Plastics and Rubber Institute, Katholieke Universiteit, Leuven, Belgium, April 16-17, 1991.
219. International Rubber Conference, Paper Presentation – Design Technology Advancements for EPDM Sponge Seals, Paris, France, June 12-14, 1990.
220. Study of the Hydrodynamic and Viscoelastic Properties Affecting the Surface Appearance of the Extruded EPDM Compounds, Paper presented to International Congress and Exposition – SAE (Engineering Society for Advanced Mobility Land, Sea, Air and Space) Detroit, MI (Feb. 27-Mar. 3, 1989).
221. International Rubber Conference, Paper Presentation - Designing EPDMs for Production Efficiency, Melbourne, Australia, 1988.
222. RUBBEREX 86, Australian Rubber Conference, Paper Presented - New Developments in Ethylene - Propylene Elastomers for Extruded Applications, Melbourne, Australia, April, 1986.
223. Zurich International Conference of Mathematical Modeling, Paper Presentation - Mathematical Model for Freely Bubbling Fluidized Beds, Zurich, Switzerland, 1983.
224. Invited Lectures - Department of Chemical Engineering, University of Missouri-Rolla, 1983.
225. Invited Lecturer - AICHE Engineering Series, Northeast Conference, Winter 1982.
226. AICHE International Conference on Fluid Bed Reactor Design Advancements, - Presented Two Paper - Applications of Fluidized Bed Reactors to Synthetic Fuels and Development of Magnetically Stabilized Fluid Bed, Mexico City, Spring 1982.

*Journal Editorships*

Served as Senior Editor for the following Research and Scientific Journals:

1. Journal of Polymer-Plastics Technology and Engineering, published bi-monthly, Marcel Dekker Publishers, Inc., Basel Switzerland (1988-1998).
2. International Journal of Engineering Fluid Mechanics, published quarterly, Gulf Publishing Co., Houston, TX (1988-1991).



EXHIBIT 34

**EXPERT WITNESS EXPERIENCE**

1. Abarca, et al. v. Merck & Co., Inc., et al., United States District Court Eastern District of California, Docket # 1:07-CV-0388 DOC-BLB
2. Acuna Escobar, et al. v. Doe Run Resources Corp. et al., Circuit Court of St. Louis, MO, Case No. 1622-CC01187
3. Adam Thomas, Sr., et al. v. Mobil Oil Corporation, et al., Case No. 90-23370, Chalmette, LA
4. Adelino Acosta, et al. v. Shell Oil Company, et al., Superior Court of California, County of Los Angeles, Central District, Case No. NC 053643
5. Amanda Anderson, et al., v. Columbian Chemicals Company, et al., and Freeport McMoRan Corp., v. Westchester Fire Insurance Company et al., Circuit Court of Marshall County, West Virginia, Civil Action. No. 11-C-153K
6. Amy Turner v. Dr. Miracle's, United States District Court, M.D. Louisiana Docket # 11-779
7. Anderson, et al. v. Estate of P. Sauget, Cerro Flow Products, Pharmacia Corp., and Monsanto AG Products, LLC, Sauget, IL, Case No. 09-L-0073
8. Anita Auchard et al. v. Tennessee Valley Authority, United States District Court, E.D. Tennessee, Knoxville, Docket # 3:09-cv-00054
9. Arabie, et al. v. Citgo Petroleum Corp., Calcasieu LA, Docket # 06-3967-H
10. Barbara Campbell Ramsey, as Trustee of Allen T. Campbell Trust/Campbell Decedents Trust, v. Pacific Quartz, Inc., MBH Electronics, Inc., Case No. 30-2008-00078246-CU-TTCXC
11. Behr Dayton Thermal Products, LLC Litigation. Case No. 03:08-cv-00326 (WHR-MJN), Dayton, OH
12. Beverly Diane Dorman v. Ciba Geigy Corporation, Circuit Court of Washington County, AL, Docket # 65-CV-2004-000038.00
13. Blake Chapman, et al. v. Voestalpine Texas LLC, Civil Action No. 2:17-cv-00174, Corpus Christi, TX
14. Bristol-Myers Squibb Environmental Contamination Litigation, Superior Court of New Jersey, Master Docket No. ATL-1-3517-08MT, Case No. 281, New Brunswick, NJ
15. Carolyn Baker, et al. v. Chevron USA, Inc., et al., United States District Court for the Southern District of Ohio Western Division, Docket # 1:05-CV-227 cons. With 1:09-CV-656
16. Concepcion and Rosario Acosta, et al. v. Shell Western Exploration and Production, Inc. and Shell Oil Company et al., Fifth Judicial District Court, Lea County, New Mexico, Case No. CV-99-00509, Hobbs, New Mexico
17. Control Solutions Inc. v. Gharda USA Inc., et al., Court Of Appeals Of Texas, First District, Houston, Docket # 2004-67993
18. Cynthia Paige, et al. v. Dura-Wood, LLC, et al., 9th Judicial District Court Parish of Rapides, LA, Docket # 214,913-F

19. D. Bollum, et al. v. BNSF Railway Co., Dallas, TX, Docket # 27-CV-08-28882
20. Dennis and Gail Davis v. BNSF Railway Co., Dallas, TX, Docket #25, 151
21. Don Adams, et al. v. ALON USA, LP, et al., District Court of Howard County, TX 118th Judicial, Docket # 2009-CV-46548
22. Doug Pauls, et al. v. Richard Warren, et al., Case No. LALA 105144-Division C, Iowa District Court in and for Wapello County, Eldon, IA
23. Douglas & Deborah Shukers v. Triumph Aerostructures, LLC., d/b/a Triumph Aerostructures Vought Commercial Division, U.S. District Court, Western District of Arkansas, El Dorado Division, Case No. 1:13-cv-1002
24. Elk River Chemical Spill, Freedom Industries, Charleston, WV
25. Edward Ardoin, et al. v. Hartford Accident & Indemnity co., et al., 14th JDC, Calcasieu Parish, LA, Case No. 2002-3665
26. Franco, et al. v. Coronet Industries Inc., et al., Pensacola, FL, Docket # 04-CA-002576
27. Fred Beck, et al. v. Koppers Inc., Mississippi, Docket # 3:03V60-P-D
28. Freeman, et al. v. Grain Processing Corp., Muscatine IA, Docket # LACV021232
29. Gardiner Family, LLC, v. Crimson Resource Management, Case 1:15-at-00410, CA
30. Gateway Energy and Coke (SunCoke Energy) Coke Facility, Granite City, IL
31. Gavin Landfill Litigation, Circuit Court of Raleigh County, West Virginia, Civil Action No. 16-C-8000
32. Gracie Hartle, et al. v. First Energy Generation Corp., Shippingport PA, Docket # 08-1019
33. Harry Stephens Farms, INC. and Harry Stephens, individually and as managing partner of Stephens Partnership, v. Helena Chemical Co., Inc., and Exxon Mobil Corporation, Successor to Mobil Chemical Co., United States District Court Eastern District of Arkansas Eastern Division, Docket # 2:06-CV-00166 JMM cons. With 4:07-CV-00278 JMM
34. Invista B.V., et al. v. E.I. Du Pont De Nemours and Company, United States District Court Southern District of New York, Docket # 1:08-CV-03063-SHS
35. James Benefield v. International Paper Co., Docket # 2:09 cv232-WHA
36. Jay Burdick, et al. v. Tonoga Inc. (d/b/a/ Taconic), New York Supreme Court, Index No. 00253835, Petersburgh, NY
37. Jeanette Moss Anthony, et al. v. Drummond Company, Inc., et al., United States District Court for the Middle District of Alabama Northern Division, Docket # CV 2008-2067
38. Jerry Dovico, et al. v. Valley View Swine, LLC, et al., Case No. LALA105144 – Division A, Iowa District Court in and for Wapello County, Batavia and Eldon, IA
39. John Williams & Monica Harris-Williams, and Ramona Sykes, et al. v. Magnesium Elektron North America, Inc., Case No. 11-L-001163
40. Kerr-McGee Wood Treating Facility, Avoca, PA
41. L. Hensley and R. Hensley v. Plains Exploration & Production Corp., Los Angeles, Docket # SC094173



EXHIBIT 34

42. Linda Faust v. BNSF Railway Co., Tarrant County, 9th Judicial District, Docket # 153-212928-05
43. Louisiana Pacific and PACTIV Wood Treatment Litigation, Docket # 2:06-CV-00083-LES-CSC, Florella, FL
44. Marianne Nelson-Rayburn, et al. v. The Boeing Company, Case No. BC491145, Los Angeles, CA
45. Marissa L. Talkington, f.k.a. Marissa L. Hill, et al., v. Columbian Chemicals Company, Civil Action No. 13-C-65K, Marshall County, WV
46. Mary Ann Piccolo v. Headwaters Inc., Case No. 130700053, 7th Judicial District Court, Carbon County, UT
47. New Jersey-American Water Company, Inc. v. E.I DuPont de Nemours & Co. and the Chemours Company, Civil Action No. 1:18-cv-02767-JHR-KMW, NJ
48. Palla Farms, LLC, v. Crimson Resource Management Corp., et al., Case No. S-1500-CV-283013-DRL, Kern County, CA
49. Patty Brady, et al. v. International Paper Company, et al., CV-2012-900138.00, Selma AL
50. R. E. Price, et al. v. Roy O. Martin Lumber Co., LP, et al., Alexandria, LA
51. Rainer v. Valero Energy Corp., Tenn., Docket # ALJ No. 2013-CAAA-00001
52. Rivetta v. U.S. Steel Corp, et al., PA, Civil Div. GD10-1445.
53. Redlands Tort Litigation, Docket # RCV 31496, Redlands, CA
54. Rhonda Brasel, et al. v. Weyerhaeuser Co., Docket # 07-0437, Texarkana, TX
55. Robert Andrews, et al. v. Antero Resources Corp., Antero Resources Bluestone LLC & Hall Drilling LLC, Civil Action No. 13-C-434-3, Circuit Court of Harrison County WV
56. Robinson v. Columbian Chemical Carbon Black Corp., Docket # 04-C-293 K, Wheeling, WV
57. Ronald Colson, et al. v. Colfax Treating Co. LLC, et al., US District Court, Western District of Louisiana, Alexandria Division, Case No. 1:09-CV-1739, Pineville, LA
58. Russell Winburn, et al. v. Doug Hoksbergen, PSL, Inc., and Cargill Pork, LLC, Case No. LALA002187, Iowa District Court in and for Poweshiek County, Grinnell & Lynnville, IA
59. Shayne Lambert, et al. v. Mettiki Coal, LLC, et al., Civil Action No. 11-C-013140 OC Circuit Court of Garrett County, MD
60. Shutes, et al. v. Platte Chemical, IL, Docket # C12002-272
61. Scott D. McClurg, et al. v. Mallinckrodt, Inc., et al., Case No. 4:12-CV-00361-AGF, Hazelwood, MO
62. Sink Float Litigation, Docket # 11-C-5000000, Wheeling, WV
63. Smith, et al. v Honeywell Industries, et al., Civil Action No. 2:10-cv-3345
64. Thomas L. Brantley, et al. v. International Paper Company, United States District Court for the District of Columbia, Docket # 2:09-CV-230-WHA-TFM
65. United States Steel v. Witherup Fabrication & Erection, Civil Division No. GD10-1445

66. Virginia Asselin v. BNSF Railway Company, 96th Judicial District Court of Tarrant County, Texas, Docket # 96-223182-07
67. Virginia Brooks, et al. v. International Paper Company, United States District Court for the District of Columbia, 2:09-CV-946-WHA-TFM
68. Willie Buard, et al. v. Colfax Treating Co. LLC et al., Docket # 214915, Alexandria, LA



EXHIBIT 34

# ANNEX B

# EXHIBITS

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 1. Satellite image identifying key features of facility and surrounding area.




EXHIBIT 34

Exhibit 2A.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov.-97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 2B.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov.-97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 2C.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 2D.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

Exhibit 2E.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

**Exhibit 2F.**




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 2G.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

Exhibit 2H.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 2I.**




EXHIBIT 34

Sources: Prior to Nov. 1997 - DRRCE-00781230, Nov. 97-Oct. 08 - DRPE-0000877469

NO POLLUTION ENTERPRISES

## Exhibit 3.




Estimates calculated as follows: DRPE-000081350 provides monthly ore tonnages [Copper (29,400), Lead (16,580), Zinc (18,200)].
Based on 1970 production, the ore to metal ratio was obtained [Ore to metal (t/t): Copper (6.3), Lead (2.3), Zinc (2.9)].
Ore to metal ratios multiplied by production volumes for each year to obtain estimate.

EXHIBIT 34

NO POLLUTION ENTERPRISES

# Exhibit 4. Smelter Features




EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 5. Stack Locations




EXHIBIT 34

## Exhibit 6. Lead MPLs and levels measured in European countries

| Country | Yearly averages (µg/m$^3$) | |
|---|---|---|
| | Legislated level | Level measured |
| Austria | --- | <0.5 |
| Belgium | 2.0 | <0.1 (95) |
| Denmark | 2.0 | <0.2 (93) |
| Finland | 0.5 | <0.1 (93) |
| France | 2.0 | --- |
| Germany | 2.0 | <0.3 (93) |
| Greece | n.a. | n.a. |
| Holland | 0.5 | <0.1 |
| | 2.0 (perc. 98th) daily average | |
| Ireland | 2.0 | <0.5 (91) |
| Italy | 2.0 | <1.0 (92) |
| Luxembourg | 2.0 | <0.5 (92) |
| Portugal | 2.0 | <0.5 (94) |
| Spain | 2.0 | <0.6 (95) |
| Sweden | 1.5 (quarterly) | <0.1 (95) |
| United Kingdom | 2.0 | <0.2 (93) |
| Switzerland | 1.0 | --- |
| Poland | 1.0 daily average | 20 max. (93) |
| | 0.2 | 0.1-3.2 (93) |
| US EPA (1978) | 1.5 (quarterly) | |
| WHO | Recommended Guideline 0.5 | |

EXHIBIT 34

Source: Table 1.7, Air Quality Daughter Directives: Position Paper on Lead, Commission of the European Communities, Directorate – General XI, November 1997

NO POLLUTION ENTERPRISES

**Exhibit 7. Ambient average annual lead concentrations reported for the Sindicato air monitoring station.**




Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 8. Comparison of Sindicato lead concentrations in air to Peru MPL, EU country levels, and US ambient levels. EU country levels taken as averages reported in table (Exhibit 6), for values '<', half reported value was used according to EPA protocol; US ambient levels obtained from U.S.EPA at https://cfpub.epa.gov/roe/indicator.cfm?i=5**




EXHIBIT 34

**Exhibit 9. Ambient average monthly lead concentrations reported for the Sindicato air monitoring station.**




Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

EXHIBIT 34

**Exhibit 10. Ambient average monthly arsenic concentrations reported for the Sindicato air monitoring station.**




Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 11. Annual hourly average PM10 concentrations**




Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 12. Summary of protective health standards summarized in Defendants' 1996 document (DRRC-00051190)




| $SO_2$ Standards as of 1996 in µg/m³ (DRRC-00077670) | | | | | |
|---|---|---|---|---|---|
| | 1/2-hr | 1-hr | 3-hr | 24-hr | Annual |
| Peru | | | | 572 | 172 |
| Germany | | 400 | | | 140 |
| Thailand | | 780 | | 300 | 100 |
| World Bank | | | | 500 | 100 |
| US | | | 1300 | 365 | 80 |
| Kuwait | | 453 | | 160 | 80 |
| China | 500 | | | 150 | 60 |
| Australia | | 450 | | 150 | 50 |
| Poland | 600 | | | 300 | 32 |
| Canada | | 450 | | 150 | 30 |
| Mexico | | | | 341 | |

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 13. Ambient annual average $SO_2$ concentrations reported for the Sindicato air monitoring station compared against the Peru MPL and US NAAQS.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.

EXHIBIT 34

**Exhibit 14. Timeline plot showing number of days per month the PERU daily average $SO_2$ MPL exceeded.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

Exhibit 15. Monthly percent of days in which Peru MPL exceeded.




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 16. Daily 24 hour average $SO_2$ concentrations reported for the Sindicato air monitoring station.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 17. Plot of 24-hour maximum daily $SO_2$ ambient concentration.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 18. Monthly report of hourly $SO_2$ monitoring data for Sindicato

DOE RUN PERU La Oroya Division

**DIOXIDO DE AZUFRE ATMOSFERICO DEL 01/06/05 AL 30/06/2005**
**Camp. LA OROYA / Est. G03 SINDICATO**
**Fuente: ASUNTOS AMBIENTALES**

Fecha: 06/20/18
Pág. 1/7
Análisis de S02 en µg/m3

**Hora del día**

| Time / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | PROM | MAX | MIN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.1 | 420.4 | 3075.3 | 2523.5 | 225.4 | 16.9 | 8.0 | 6.6 | 1.0 | 0.8 | 0.7 | 4.1 | 12.4 | 11.0 | 11.6 | 9.2 | 4.7 | 263.9 | 3075.3 | 0.0 |
| 02 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 114.0 | 1236.3 | 2153.9 | 2595.5 | 897.4 | 1025.3 | 18.3 | 12.9 | 9.1 | 13.4 | 10.3 | 18.7 | 17.0 | 13.9 | 10.7 | 5.2 | 339.7 | 2595.5 | 0.0 |
| 03 | 3.9 | 0.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.0 | 641.8 | 5267.0 | 2760.2 | 1984.6 | 6019.7 | 3896.3 | 971.7 | 18.7 | 23.0 | 25.5 | 30.0 | 25.6 | 23.6 | 24.8 | 17.1 | 10.8 | 906.2 | 6019.7 | 0.0 |
| 04 | 0.0 | 2.2 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 2.6 | 233.2 | 1286.6 | 408.9 | 1761.9 | 738.7 | 8.3 | 4.3 | 4.5 | 7.9 | 11.0 | 9.8 | 10.4 | 6.9 | 4.3 | 2.4 | 187.7 | 1761.9 | 0.0 |
| 05 | 3.9 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.0 | 0.0 | 13.5 | 1234.0 | 4224.8 | 5909.2 | 763.4 | 168.4 | 48.4 | 12.7 | 11.0 | 19.0 | 16.6 | 12.3 | 8.7 | 4.8 | 1.5 | 518.9 | 5909.2 | 0.0 |
| 06 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 32.2 | 12.1 | 3.1 | 0.0 | 0.7 | 0.2 | 1.6 | 1.5 | 3.1 | 8.6 | 8.8 | 10.9 | 37.3 | 190.7 | 129.0 | 80.4 | 21.7 | 190.7 | 0.0 |
| 07 | 119.4 | 71.8 | 25.5 | 20.4 | 13.5 | 12.5 | 6.6 | 10.7 | 5.8 | 720.9 | 1126.1 | 495.8 | 734.9 | 66.3 | 13.3 | 13.8 | 18.2 | 20.9 | 21.6 | 22.4 | 15.1 | 9.5 | 6.3 | 4.4 | 149.0 | 1126.1 | 4.4 |
| 08 | 0.0 | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23.0 | 755.4 | 2557.0 | 5.2 | 1.9 | 2.6 | 2.7 | 4.4 | 12.3 | 12.8 | 14.5 | 15.1 | 10.9 | 8.1 | 5.4 | 3.8 | 143.2 | 2557.0 | 0.0 |
| 09 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 3.1 | 6.5 | 16.4 | 16.7 | 20.9 | 19.3 | 15.6 | 12.3 | 9.5 | 5.0 | 0.3 | 11.4 | 20.9 | 0.3 |
| 10 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23.1 | 5560.1 | 6019.7 | 6023.1 | 2833.3 | 478.1 | 215.7 | 20.3 | 1.2 | 22.7 | 21.0 | 16.4 | 9.1 | 3.1 | 0.4 | 3.2 | 885.4 | 6023.1 | 0.0 |
| 11 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1382.5 | 5122.7 | 4735.7 | 824.5 | 6.3 | 1.2 | 1.0 | 1.7 | 3.7 | 4.6 | 7.3 | 3.7 | 2.6 | 1.9 | 6.1 | 4.0 | 504.6 | 5122.7 | 0.0 |
| 12 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 221.2 | 2015.9 | 1945.6 | 784.9 | 26.3 | 21.7 | 4.7 | 0.3 | 0.9 | 3.6 | 4.7 | 2.2 | 0.0 | 0.0 | 3.4 | 16.0 | 210.5 | 2015.9 | 0.0 |
| 13 | 27.0 | 38.8 | 4.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4129.7 | 3102.6 | 1858.1 | 251.8 | 46.4 | 201.8 | 1155.6 | 12.7 | 5.4 | 12.3 | 13.0 | 8.6 | 3.0 | 0.1 | 7.9 | 9.7 | 453.7 | 4129.7 | 0.0 |
| 14 | 0.0 | 10.4 | 2.8 | 2.3 | 10.6 | 18.1 | 20.7 | 33.4 | 189.0 | 30.8 | 69.7 | 85.0 | 12.5 | 5.3 | 7.8 | 9.7 | 1.2 | 3.0 | 6.4 | 8.8 | 9.5 | 2.3 | 0.0 | 0.0 | 22.5 | 189.0 | 0.0 |
| 15 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2774.0 | 2982.0 | 554.7 | 118.6 | 542.7 | 3.0 | 0.6 | 1.1 | 3.4 | 7.5 | 19.8 | 10.2 | 12.0 | 13.2 | 8.0 | 2.6 | 293.9 | 2982.0 | 0.0 |
| 16 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 3.2 | 218.4 | 282.6 | 344.0 | 299.5 | 26.4 | 8.2 | 2.6 | 4.7 | 5.0 | 2.6 | 4.9 | 0.8 | 0.4 | 0.0 | 50.3 | 344.0 | 0.0 |
| 17 | 7.7 | 14.1 | 8.7 | 3.2 | 7.2 | 15.4 | 29.0 | 48.4 | 495.6 | 2774.3 | 2293.4 | 2350.7 | 162.1 | 20.0 | 13.2 | 9.2 | 9.6 | 15.4 | 27.8 | 19.8 | 11.0 | 3.8 | 1.8 | 2.3 | 347.7 | 2774.3 | 1.8 |
| 18 | 0.0 | 0.0 | 0.1 | 0.0 | 17.2 | 22.4 | 28.5 | 50.6 | 44.3 | 166.5 | 1591.5 | 4783.4 | 1938.6 | 883.7 | 901.1 | 68.7 | 8.5 | 14.8 | 24.7 | 24.3 | 13.7 | 4.6 | 3.7 | 0.5 | 441.3 | 4783.4 | 0.0 |
| 19 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.3 | 840.9 | 1408.4 | 1002.8 | 314.1 | 352.6 | 760.2 | 221.3 | 0.0 | 0.4 | 2.6 | 2.6 | 1.9 | 0.2 | 0.0 | 12.2 | 1.3 | 205.2 | 1408.4 | 0.0 |
| 20 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 969.1 | 4789.2 | 1610.9 | 86.2 | 181.0 | 27.0 | 263.4 | 0.9 | 4.1 | 4.2 | 10.3 | 6.7 | 3.7 | 1.2 | 0.1 | 0.9 | 331.6 | 4789.2 | 0.0 |
| 21 | 27.0 | 11.6 | 0.2 | 0.0 | 0.0 | 105.0 | 892.7 | 2009.4 | 349.6 | 317.9 | 974.8 | 600.5 | 506.5 | 103.2 | 17.8 | 6.2 | 8.1 | 15.8 | 26.0 | 26.9 | 22.5 | 17.8 | 11.4 | 8.2 | 252.5 | 2009.4 | 0.0 |
| 22 | 0.0 | 2.1 | 1.4 | 0.0 | 0.5 | 0.9 | 4.3 | 13.0 | 861.9 | 955.1 | 1556.5 | 4425.6 | 4909.3 | 2708.8 | 25.0 | 19.7 | 20.9 | 29.0 | 23.5 | 13.9 | 10.1 | 3.8 | 1.3 | 0.1 | 649.4 | 4909.3 | 0.0 |
| 23 | 0.0 | 0.0 | 0.0 | 50.3 | 482.4 | 1484.6 | 894.4 | 147.7 | 1496.1 | 3522.8 | 2669.2 | 3925.8 | 523.1 | 15.8 | 7.4 | 5.0 | 15.7 | 43.1 | 33.7 | 25.5 | 19.5 | 17.0 | 9.7 | 5.9 | 641.5 | 3925.8 | 0.0 |
| 24 | 0.0 | 0.0 | 0.0 | 0.0 | 8.5 | 5.2 | 1.4 | 0.0 | 407.9 | 3723.1 | 4643.9 | 1861.5 | 3830.7 | 776.5 | 35.1 | 10.0 | 11.5 | 17.7 | 19.9 | 16.4 | 13.9 | 7.8 | 8.6 | 8.1 | 642.0 | 4643.9 | 0.0 |
| 25 | 7.7 | 3.0 | 11.2 | 22.6 | 24.1 | 25.5 | 23.0 | 27.0 | 22.9 | 1.5 | 1088.3 | 387.7 | 79.6 | 12.3 | 13.1 | 9.1 | 5.0 | 8.8 | 10.5 | 9.3 | 6.7 | 3.1 | 0.1 | 0.1 | 75.1 | 1088.3 | 0.1 |
| 26 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 305.3 | 2585.6 | 4594.0 | 4653.0 | 1834.2 | 1721.1 | 1219.4 | 2125.5 | 21.0 | 15.6 | 14.4 | 11.2 | 4.1 | 1.5 | 2.1 | 0.3 | 796.2 | 4653.0 | 0.0 |
| 27 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 27.3 | 1281.3 | 4278.4 | 4957.3 | 2447.5 | 782.5 | 237.3 | 17.2 | 16.0 | 11.5 | 2.1 | 4.3 | 1.9 | 0.7 | 0.0 | 586.1 | 4957.3 | 0.0 |
| 28 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 248.4 | 1037.5 | 3439.9 | 5573.9 | 533.3 | 0.3 | 0.0 | 0.0 | 1.4 | 3.7 | 5.1 | 2.7 | 4.4 | 1.2 | 0.0 | 0.0 | 452.2 | 5573.9 | 0.0 |
| 29 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.0 | 2284.6 | 6019.1 | 637.4 | 5.8 | 0.6 | 0.0 | 0.2 | 0.4 | 1.8 | 2.1 | 1.5 | 1.3 | 0.9 | 0.8 | 0.0 | 373.4 | 6019.1 | 0.0 |
| 30 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 737.7 | 5189.4 | 4703.4 | 3214.8 | 1689.8 | 1787.6 | 359.5 | 15.0 | 8.6 | 10.0 | 6.2 | 9.1 | 2.6 | 0.4 | 0.0 | 0.0 | 738.9 | 5189.4 | 0.0 |
| PROM | 6.8 | 5.4 | 1.9 | 3.4 | 19.4 | 58.3 | 65.5 | 81.0 | 577.5 | 2031.5 | 2293.6 | 1910.5 | 1402.0 | 626.0 | 215.6 | 89.4 | 8.4 | 12.6 | 14.5 | 12.4 | 10.3 | 12.3 | 9.0 | 5.9 | 390.0 | 3359.6 | 0.2 |
| MAX | 119.4 | 71.8 | 25.5 | 50.3 | 482.4 | 1484.6 | 894.4 | 2009.4 | 4129.7 | 5560.1 | 6019.7 | 6023.1 | 6019.7 | 3896.3 | 1219.4 | 2125.5 | 23.0 | 43.1 | 33.7 | 26.9 | 37.3 | 190.7 | 129.0 | 80.4 | 906.2 | 6023.1 | 4.4 |
| MIN | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.5 | 3.1 | 0.0 | 0.7 | 0.2 | 0.0 | 0.0 | 0.4 | 0.7 | 2.1 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | 11.4 | 20.9 | 0.0 |

**Numerical average reported by Defendant**

EXHIBIT 34

Source: DRPE-0000335409

NO POLLUTION ENTERPRISES

**Exhibit 19. Chart of the numbers of monitoring alert events.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.
Alert Levels - http://www.digesa.minsa.gob.pe/aire/index.aspx

EXHIBIT 34

## Exhibit 20. Plot of 24-hour average $SO_2$ ambient concentration.




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

**Exhibit 21. Plot of monthly average $SO_2$ ambient concentration.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original Bates stamped records of data values.
Values have been corrected for standard temperature and pressure.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 22. Plot of 12-month rolling average monthly $SO_2$ ambient concentration.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 23. Plot of 3-month rolling average monthly $SO_2$ ambient concentration.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 24. Plot of annual $SO_2$ ambient concentration.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 25. Trend charts of Air Quality Alerts (top chart) and refining volume (bottom chart).**







EXHIBIT 34

Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure. No daily measurements prior to 2001. Missing daily measurements for December 2008. Production: DRPE-0000877469, DRPE-0000877470

NO POLLUTION ENTERPRISES

# Exhibit 26A. Approximate Summer seasonal variation in ambient air concentration.




EXHIBIT 34

Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

NO POLLUTION ENTERPRISES

## Exhibit 26B. Approximate Fall seasonal variation in ambient air concentration.




EXHIBIT 34

Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

NO POLLUTION ENTERPRISES

**Exhibit 26C. Approximate Winter seasonal variation in ambient air concentration.**




EXHIBIT 34

Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

NO POLLUTION ENTERPRISES

**Exhibit 27. Seasonal fluctuations in ambient air quality.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

## Exhibit 28. Frequency distribution of number of emergency events triggered by Alerts.




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values. Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.
Production: DRPE-0000877469, DRPE-0000877470

| Refined Copper, Lead, & Zinc Production (MT) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **2001** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009*** |
| 265,472 | 260,313 | 247,186 | 244,610 | 222,736 | 221,118 | 218,627 | 211,706 | 51,801 |

* Through May 2009

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 29. Shows Emergency condition trend chart for La Oroya.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 30. Air quality trend comparison between Sindicato and Hotel Inca monitoring stations.**




Source: See DRP - Sindicato SO2 Analysis.xlsx for original bates stamped records of data values.
Values have been corrected for standard temperature and pressure.
No daily measurements prior to 2001. Missing daily measurements for December 2008.

EXHIBIT 34

**Exhibit 31. Estimated cumulative particle size distributions reconstructed from U.S.EPA studies for fugitive emission sources.**




Source: DRP – Emissions Inventory Reconstruction.xlsx, worksheet Release Conditions & Comp PSD

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 32. CCTV images of the copper converter. Source: DRPE-0002230318**




EXHIBIT 34

Exhibit 33. Interior of dross plant. Source DRPE-0002224684
Date: 5/06/2007



Exhibit 34. Copper roaster. Source DRPE-0002229381

EMISIONES FUGITIVAS EN EL PROCESO DE PRE – AFINO DE COBRE
Lugar: Horno de retención Nº 2
Fecha: 08 / Feb / 2008
Hora: 10:40 hrs




Hot rapidly rising vapors from furnace

EXHIBIT 34

**Exhibit 35. Copper circuit. Source: DRPE-0002229381**

**EMISIONES FUGITIVAS EN EL PROCESO DE PRE – AFINO DE COBRE**
**Lugar: Horno de retención Nº 2**
**Fecha: 08 / Feb / 2008**
**Hora: 10:40 hrs**




**Open Roof**

EXHIBIT 34

Exhibit 36. Copper circuit. Source DRPE-0002229381




EXHIBIT 34

**Vapors released through open roof; some thru windows – No vents**

**EMISIONES FUGITIVAS EN EL PROCESO DE PRE – AFINO DE COBRE**
**Lugar: Horno de retención Nº 2**
**Fecha: 08 / Feb / 2008**
**Hora: 10:40 hrs**

NO POLLUTION ENTERPRISES

**Exhibit 37. Site photo revealing no roof vents**
**Date: 2009 (Est.)**




Source: http://semanaeconomica.com/article/sectores-y-empresas/mineria/234317-doe-run-se-declaro-desierta-la-cuarta-subasta-de-la-venta-de-activos/

NO POLLUTION ENTERPRISES

**Exhibit 38. Massive plume releases shown. Source: DRPE-0002141172**



**Exhibit 39. Shows open canopy roof on copper converter. Source: DRPE-0000089946**
**Date: 2007**



DRPE-0001396647

NO POLLUTION ENTERPRISES

**Exhibit 40. Shows Sinter Plant – Operations are not enclosed**



NO POLLUTION ENTERPRISES

**Exhibit 41. Ore handling operations showing only partial enclosures. Source: DRPE-0001375276, Date: 2008**



Ventilador Roy Tapper H Pb 1



Canal de granulación H Pb 1



Ducto gases de granulación H Pb 2



Canal de granulación H Pb 1

EXHIBIT 34

**Partial Enclosures Only**

NO POLLUTION ENTERPRISES

**Exhibit 42. Operations with open roofs and holes showing intentional evacuation of workroom air to the outside.**
**Source: DRPE-0000047129, Date: 2006**



**Ducto A-17 corroído prematuramente por abrasión.**



**Codo corroído y falta colocar techo del pleno # 2**

**Codo corroído y falta colocar techo del pleno # 2**

# Natural ventilation through roof

EXHIBIT 34

**Exhibit 43 – Smelter Photograph**
**Date: Unknown**




EXHIBIT 34

Source: http://news.stlpublicradio.org/post/former-doe-run-subsidiary-criticized-smelter-pollution-peru#stream/0

**Exhibit 44**
**Date: 1999**







EXHIBIT 34

**Exhibit 45**
**Date: 1999**







EXHIBIT 34

DRPE-0000028363

NO POLLUTION ENTERPRISES

**Exhibit 46**
**Date: 1999-2002 (Est.)**



DRPE-0000049001

NO POLLUTION ENTERPRISES

**Exhibit 47**
**Date: 7/22/2007**



EXHIBIT 34

DRPE-0000049001

**Exhibit 48**
**Date: 7/22/2007**



EXHIBIT 34

DRPE-0000049001

NO POLLUTION ENTERPRISES

**Exhibit 49**
**Date: 7/22/2007**



EXHIBIT 34

DRPE-0001396647

NO POLLUTION ENTERPRISES

**Exhibit 50**




EXHIBIT 34

NO POLLUTION ENTERPRISES




Source: https://www.pitt.edu/~mabbott1/climate/mark/Current_Research/Andean%20Metallurgy/AndeanMetallurgy.html

Exhibit 52

**EMISIONES FUGITIVAS CHIEMNEA BAH HOUSE COCINAS DE ARSENICO**
**15 DICEIMBRE 2007**
**12-8**




EXHIBIT 34

DRPE-00000170521

DRPE-00000865194

Exhibit 53
Date: 5/22/2008




EXHIBIT 34

DRPE-00000865194

**Exhibit 54**
**Date: 5/22/2008**




EXHIBIT 34

DRPE-00000865194

Exhibit 55
Date: 5/22/2008




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 56**

## RECUBRIMIENTO DE OLLAS CON TAPAS – AREA DE ESPUMAJE



**ANTES**

**OLLA SIN TAPA CON EMISIONES FUGITIVAS**




**DESPUES**

**OLLA CON TAPA CONECTADO HACIA EL SISTEMA DE VENTILACION DE ENCERRAMIENTO DE DROSS PLANT**

EXHIBIT 34

Date: 2007 (DRPE-0001245539)

NO POLLUTION ENTERPRISES

Exhibit 57

# MEJORA EN EL SISTEMA DE SUCCION DE LA FAJA 81A –PLANTA DE AGLOMERACION



ANTES



DESPUES

EXHIBIT 34

Date: 2007 (DRPE-0001245539)

NO POLLUTION ENTERPRISES

Exhibit 58

**RECUBRIMIENTO INTEGRAL DE LAS BATIDORAS PLANTA DE ESPUMAJE**

ANTES



OLLA CON LA BATIDORA SIN TAPA PRESENCIA DE EMISIONES FUGITIVAS

DESPUES



OLLA CON LA BATIDORA CON TAPA SIN EMISIONES FUGITIVAS

Date: 2007 (DRPE-0001245539)

EXHIBIT 31

DRPE-0001973667

Exhibit 59




**OBSERVACION Nº 1**: Se verifican emisiones fugitivas nivel II en Dross Plant durante la fusión de scrapt de plomo en la olla Nº 3.

EXHIBIT 34

DRPE-0001973667

**Exhibit 60**




EXHIBIT 34
Exhibit 59 (Zoomed)

Exhibit 61




**OBSERVACION Nº 2**: Se verifican emisiones fugitivas nivel II en el Horno Reverbero de Plomo de Dross Plant .

EXHIBIT 34

DRPE-0001973667

**Exhibit 62**

NO POLLUTION ENTERPRISES




Emisiones fugitivas nivel II-
Horno Reverbero de Plomo

EXHIBIT 34

DRPE-0001973667

Exhibit 63




**OBSERVACION Nº 3**: Se verifican emisiones de polvo nivel III durante la preparación del lecho de fusión de plomo.

EXHIBIT 34

DRPE-0001973667

**Exhibit 64**




Emisiones de polvo nivel III- Lecho de fusión de plomo

EXHIBIT 34

DRPE-0001973667

**Exhibit 65**
**8/10/2008**




Emisiones fugitivas nivel III-
Horno de Retención de Cobre

EXHIBIT 34

**OBSERVACION Nº 4**: Se verifican emisiones fugitivas nivel III en el Horno de Retención de Cobre, las cuales impactaron en la estación de monitoreo Sindicato.

DRPE-0001973667

NO POLLUTION ENTERPRISES

Exhibit 66
8/10/2008




EXHIBIT 34

**OBSERVACION N° 5**: Se verifican emisiones fugitivas nivel III en Convertidores de Cobre, las cuales impactaron en la estación de monitoreo Sindicato.

Emisiones fugitivas nivel III- Convertidores de Cobre




**OBSERVACION Nº 1**: Se verifican emisiones fugitivas nivel III en la Planta de Tostadores de Cobre, las cuales impactaron en la Estación Sindicato, donde se registraron altas concentraciones de $SO_2$ y $PM_{10}$.

Emisiones fugitivas nivel III en Tostadores de Cobre

EXHIBIT 34

DRPE-0001978291

**Exhibit 68**




**OBSERVACION Nº 2**: Se verifican emisiones fugitivas nivel III en la Planta de Antimonio debido a agrietamiento en los ductos.

Emisiones fugitivas en ducto de Planta de Antimonio

EXHIBIT 34

Exhibit 69

NO POLLUTION ENTERPRISES




Emisiones fugitivas nivel III en Horno Reverbero de Cobre

EXHIBIT 34

**OBSERVACION Nº 3**: Se verifican emisiones fugitivas nivel III en el Horno Reverbero de Cobre, debido a caída de ladrillos en el techo. Estas emisiones se registraron desde las 10:15 a.m. hasta 13:125 p.m. generando altas concentraciones de $SO_2$ y $PM_{10}$ en la Estación Sindicato.

DRPE-0001978291

**Exhibit 70**










Emisiones fugitivas nivel III – Horno Reverbero de Cobre

DRPE-0002141172

Exhibit 71




EXHIBIT 34

EMISIONES FUGITIVAS CONVERTIDORAS 09 NOV 08

DRPE-000224684

Exhibit 72
5/06/2007

NO POLLUTION ENTERPRISES

**INSPECCION AL C.M.L.O. 06 de mayo de 2007**




Foto 1. Horno Reverbero en Polvo de Zinc

DRPE-000224684

**Exhibit 73**
**5/06/2007**



**INSPECCION AL C.M.L.O. 06 de mayo de 2007**

Foto 2. Chimenea de moldeo de Zinc.

EXHIBIT 34

DRPE-000224684

Exhibit 74
5/06/2007



EXHIBIT 34

**INSPECCION AL C.M.L.O. 06 de mayo de 2007**

Foto 3. Convertidor en Residuos Anódicos.

DRPE-000224684

**Exhibit 75**
**5/06/2007**

NO POLLUTION ENTERPRISES

**INSPECCION AL C.M.L.O. 06 de mayo de 2007**



Foto 4. Interior Dross Plant.

EXHIBIT 34

DRPE-000224684

**Exhibit 76**
**5/06/2007**

NO POLLUTION ENTERPRISES



**INSPECCION AL C.M.L.O. 06 de mayo de 2007**

Foto 5. Emisiones de Gases de combustión Ollas de Dross Plant

EXHIBIT 34

DRPE-000224684

**Exhibit 77**
**5/06/2007**



**INSPECCION AL C.M.L.O. 06 de mayo de 2007**

Foto 6.
Convertidores de Cobre

EXHIBIT 34

DRPE-000224684

**Exhibit 78**
**5/06/2007**

**INSPECCION AL C.M.L.O. 06 de mayo de 2007**



Foto 7. Carro Calcinero Tostadores de Cobre

EXHIBIT 34

DRPE-000224684

**Exhibit 79**
**5/06/2007**



**INSPECCION AL C.M.L.O. 06 de mayo de 2007**

Foto 8. Vista desde Circunvalación.

EXHIBIT 34

DRPE-0002229381

Exhibit 80
2/08/2008

**EMISIONES FUGITIVAS EN EL PROCESO DE PRE – AFINO DE COBRE**










EXHIBIT 34

**Lugar: Horno de retención Nº 2 Fecha: 08 / Feb / 2008 Hora: 10:40 hrs**

DRPE-0002229381

**Exhibit 81**
















EXHIBIT 34

DRPE-0002231354

NO POLLUTION ENTERPRISES

**Exhibit 82**




EMISIONES FUGITIVAS CONVERTIDORAS 09 NOV 08

EXHIBIT 34

DRPE-0002426555

Exhibit 83




EXHIBIT 34

**Emisiones de polvos y gases por el techo del horno Oxy Fuel**

DRPE-0002426555

**Exhibit 84**




EXHIBIT 34

**Emisiones de polvos y gases por el techo del horno No 3 de Plomo**

DRPE-0002426555

Exhibit 85




EXHIBIT 34

**Emisiones de polvos y gases por mantenimiento tostador 16 y cambio de planchas ducto inclinado**

DRPE-0002426555

Exhibit 86




EXHIBIT 34

Emisiones de polvos y gases por la chimenea del Baghouse de plomo

DRPE-0002426555

Exhibit 87




EXHIBIT 34

Emisiones de polvos y gases techo de los convertidores de cobre

DRPE-0002426555

**Exhibit 88**




EXHIBIT 34

**Emisiones de polvo planta nueva, por rebalse del tanque 7**

Exhibit 89

NO POLLUTION ENTERPRISES




EXHIBIT 34

**Emisiones de polvo planta nueva, por rebalse del tanque 7.**

DRPE-0002426555

Exhibit 90




EXHIBIT 34

Emisiones de polvo planta nueva, por rebalse del tanque 7.

DRPE-0002426555

Exhibit 91




EXHIBIT 34

Emisiones de polvos y gases por el techo convertidor 6

DRPE-0002426558

Exhibit 92




EXHIBIT 34

Emisiones de polvos y gases por el techo del horno Oxy Fuel

DRPE-0002426558

Exhibit 93




EXHIBIT 34

**Emisiones de polvos y gases por el convertidor 5**

DRPE-0002426558

Exhibit 94




EXHIBIT 34

Emisiones de polvos y gases Espumaje de Plomo

DRPE-0002426558

Exhibit 95




EXHIBIT 34

**Emisiones de polvos y gases Horno Oxy Fuel**

DRPE-0002426558

Exhibit 96




EXHIBIT 34

**Emisiones de polvos y gases ducto principal y salida del ducto inclinado Tostadores de cobre**

DRPE-0002426558

Exhibit 97




EXHIBIT 34

**Emisiones de polvos y gases ducto principal y salida del ducto inclinado Tostadores de cobre**

DRPE-0002426558

Exhibit 98




EXHIBIT 34

Emisiones de polvos y gases convertidor 5

DRPE-0002426558

Exhibit 99




EXHIBIT 34

Emisiones de humos de mala combustión por falta de regulado de quemadores - Olla No 2 Espumaje de Plomo.

DRPE-0002426559

Exhibit 100
















EXHIBIT 34

Emisiones de Tostadores de Cobre y Antimonio 28 dic.-07

DRPE-0002426562

**Exhibit 101**




EXHIBIT 34

**Emisiones de polvos y gases por el techo del horno Oxy Fuel**

DRPE-0002426562

NO POLLUTION ENTERPRISES

**Exhibit 102**




EXHIBIT 34

**Emisiones de polvos y gases por el convertidor 5**

DRPE-0002426562

**Exhibit 103**




EXHIBIT 34

**Emisiones de polvos y gases Espumaje de Plomo**

DRPE-0002426562

NO POLLUTION ENTERPRISES

Exhibit 104




EXHIBIT 34

Emisiones de polvos y gases Horno Oxy Fuel

DRPE-0002426562

Exhibit 105




EXHIBIT 34

**Emisiones de polvos y gases ducto principal y salida del ducto inclinado - Tostadores de cobre**

DRPE-0002426562

Exhibit 106




EXHIBIT 34

Emisiones de polvos y gases ducto principal y salida del ducto inclinado - Tostadores de cobre

DRPE-0002426562

Exhibit 107




EXHIBIT 34

Emisiones de polvos y gases convertidor 5

DRPE-0002426562

Exhibit 108




EXHIBIT 34

**Emisiones de humos de mala combustión por falta de regulado de quemadores - Olla No 2 Espumaje de Plomo.**

DRPE-0002426564

Exhibit 109




EXHIBIT 34

Emisiones de polvos y gases por el techo del horno Oxy Fuel

DRPE-0002426564

Exhibit 110




EXHIBIT 34

Emisiones de polvos y gases por el techo del horno No 2 de Plomo

DRPE-0002426564

Exhibit 111




EXHIBIT 34

**Emisiones de polvos y gases por mantenimiento tostador 16 y cambio de planchas ducto inclinado oxy Fuel**

DRPE-0002426565

Exhibit 112

**EMISIONES DE POLVOS Y GASES PLANTA TOSTADORES DE COBRE 07 MARZO 2007 GUARDIA 8-4**







EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 113
1999

CIRCUITO DE COBRE













EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 114**
**1999**

**FUNDICION DE PLOMO**













EXHIBIT 34

DRPE-0000028152

Exhibit 115




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 116**

**REFINERIA DE ZINC**




EXHIBIT 34

DRPE-0000028152

NO POLLUTION ENTERPRISES

Exhibit 117





- **EMISION FUGITIVA**

EXHIBIT 34

2006 - DRPE-0000647013

NO POLLUTION ENTERPRISES

Exhibit 118





- **EMISION FUGITIVA**

EXHIBIT 34

2006 - DRPE-0000647013

Exhibit 119

- ENCERRAMIENTO DROSS PLANT Y HORNOS DE PLOMO



Este proyecto debió concluirse en agosto del 2006.

Piso de carga Hornos de Plomo



Zona posterior Dross Plant descubierta

EXHIBIT 34

NO POLLUTION ENTERPRISES

Exhibit 120



Hornos de Plomo



Convertidores de Cobre

- **EMISIONES FUGITIVAS DEL CMLO**

EXHIBIT 34

2006 - DRPE-0000647013

Case: 4:11-cv-00044-CDP Doc. #: 1277-34 Filed: 03/24/22 Page: 333 of 376
PageID #: 50929

NO POLLUTION ENTERPRISES

**Exhibit 121**






# Emisión Fugitiva Ducto Roy Tapper

EXHIBIT 34

2006 - DRPE-0000647013

2006 - DRPE-0000647013

Exhibit 122

- **EMISIONES FUGITIVAS DEL CMLO**



NO POLLUTION ENTERPRISES

**Exhibit 123**

# Situación actual




EXHIBIT 34

2006 - DRPE-0000867982

DRPE-0002227959

**Exhibit 124**

Reverbero Oxy Fuel y Convertidores de Cobre.




EXHIBIT 34

DRPE-0001509975

**Exhibit 125**

NO POLLUTION ENTERPRISES

Hornos de Pb., No 3, Convertidor No. 5, Horno Ajax y Residuos Anódicos.




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 126**



*Chimenea de gases de combustión del caldero de Huaymanta*
*[Refinery]*

EXHIBIT 34

May 3, 2009 - DRPE-0001253527

**Exhibit 127**










Planta de Aglomeracion

DRPE-0000663138

DRPE-0000654974

**Exhibit 128**

NO POLLUTION ENTERPRISES

Convertidores de cobre




EXHIBIT 34

DRPE-0000654740

**Exhibit 129**

Horno Oxy Fuel, Convertidores de Cobre y Hornos de Plomo




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 130**
**6/27/2007**













EXHIBIT 34

DRPE-0000654725

DRPE-0000601839

**Exhibit 131**

Horno Oxy-Fuel y Convertidoras




EXHIBIT 34

DRPE-0000601441

**Exhibit 132**

NO POLLUTION ENTERPRISES

# Ducto inclinado de Tostadores de Cobre – techo del los tostadores







EXHIBIT 34

DRPE-0000601440

**Exhibit 133**

Torre de Short Rotary
June 21, 2007





EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 134. Trend plots of TSP emissions and PM10 monitoring data at Sindicato







EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 135A. Shows Sindicato monthly average air quality trends. Production records show final production month May/June 2009.**




Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

EXHIBIT 34

NO POLLUTION ENTERPRISES

# Exhibit 135B. Sindicato raw monitoring data reported during and after plant closure in June 2009.










EXHIBIT 34

Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

**Exhibit 136. Pie chart shows Total Particulate discharges to air accounted for. Total Particulates are TSP which extend to PM30 or more. Fugitive emissions are largest source and greater than the stack emissions which contain metals.**




EXHIBIT 34

**Exhibit 137. Pie chart shows contribution of PM10 by point and fugitive sources. Fugitive emissions are on same order as stack (point source) discharges and comparable to Main Stack.**




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 138. Pie charts show contributions of TSP and PM10 by point and fugitive sources.**







EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 139. Trend charts for period 1 showing no impacts from Defendants' actions on air quality.**




EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 140. Trend charts for period 2 showing Defendants' actions had impact on air quality.







EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 141. PM trend charts show impacts from projects.







EXHIBIT 34

Exhibit 142. Stacked bar chart shows emissions reductions over time.




EXHIBIT 34

**Exhibit 143. Trend bar chart shows some of the emissions reductions are attributed to declining plant production.**




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 144. PM trend charts showing when projects implemented and their impacts along with Peru MPL.**




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 145. PM monitoring data showing compliance reached by 2005.**




| Year | No. Exceedances 24-hr PM10 Peru Standard | Compared to Peru Standard | Standard compared to US NAAQS |
|---|---|---|---|
| 2001 | 74 | 25X over compliance | |
| 2002 | 132 | 44X over compliance | 270X over compliance |
| 2003 | 65 | 22X over compliance | |
| 2004 | 10 | >3X over compliance | |
| 2005 | 0 | In compliance | 9X over compliance |
| 2006 | 0 | In compliance | |
| 2007 | 1 | In compliance | |
| 2008 | 0 | In compliance | In compliance |
| 2009 | 0 | In compliance | |

2008 - Missing Dec. Records
2009 - Missing Aug.-Oct. Records

EXHIBIT 34

Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

Exhibit 146. Lead composition by source.




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 147. Pie charts showing breakdown of lead emissions from fugitives and stacks.**

Lead Discharge to Air from TSP Fraction (MT)
(Oct. 97- Dec. 08)




Lead Discharge to Air from PM10 Fraction (MT)
(Oct. 97- Dec. 08)




*2008 Records Missing for Secondary Stacks

EXHIBIT 34


Exhibit 148A. Lead Discharges Influenced by Improved Controls
Procss Fugitives Addressed
Main Stack
Lead Discharge to Air (MT)
900
800
700
600
500
400
300
200
100
0
1998
1999
2000
2001
2002
2003
2004
2005
2006
2007
2008
Begin focus on fugitives
1. Cottrell CE improvement
2. Fugitives reduced at Sinter Plant, Dross Plant, Blast Furnace
Sindicato Annual Average Lead Concentration (µg/m³)
5.5
5.0
4.5
4.0
3.5
3.0
2.5
2.0
1.5
1.0
0.5
0.0
1. Remove Zn Roaster
2. Reduce Zn Production
Peru Annual Avg. AQS

EXHIBIT 34

Exhibit 148B. Trend chart of refined zinc production.




Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov.-07-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 149. Other fugitive emission sources that could have been reduced.**




EXHIBIT 34

NO POLLUTION ENTERPRISES

## Exhibit 150. Arsenic Composition by Source.




| Fugitive | Stack | Source |
|---|---|---|
| F10 | | Arsenic Kitchens |
| | MS | Main Stack |
| F4 | | Dross Plant |
| F1 | | Blast Furace Area |
| F5 | | Copper Converter, Roaster, Smelting Furnace |
| F2 | | Sinter Plant |
| F7 | | Ore Processing |
| F3 | | Ore Handling |
| F6 | | Slimes |
| F8 | | Zinc Roasting |
| F9 | | Concentrates and screens |
| | SS | Sec. Stacks |

EXHIBIT 34

Exhibit 151. Pie chart showing contribution of arsenic to air from fugitives and point sources.




EXHIBIT 34

NO POLLUTION ENTERPRISES

**Exhibit 152. Arsenic Discharges to Air by Source (MT) and Actions Taken to Reduce Discharges.**




EXHIBIT 34

**Exhibit 153. Production volume trend lines.**




EXHIBIT 34

Sources: Prior to Nov. 1997 - DRRCE-00781230; Nov. 97-Oct. 08 - DRPE-0000877469; Nov. 08-May 09 - DRPE-0000877470

NO POLLUTION ENTERPRISES

**Exhibit 154. Main stack $SO_2$ emissions trend chart noting actions taken by Defendants to reduce source.**




EXHIBIT 34

Sources: DRPE-0001974767 and DRP records on Main Stack discharges.

NO POLLUTION ENTERPRISES

**Exhibit 155A. Trend charts of Main stack operating conditions.**




EXHIBIT 34

**Exhibit 155B. Charts generated by Zegarra (2007) showing major changes to Main Stack operating conditions.**




EXHIBIT 34

Source: DRPE-0000077931

**Exhibit 156. DRP trend charts of work stoppages.**

## PARADAS VOLUNTARIAS DE PLANTAS DEL COMPLEJO METALÚRGICO DE LA OROYA




| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | *2009 |
|---|---|---|---|---|---|---|---|---|---|
| CIRCUITO DE COBRE | 1,149 | 1,374 | 2,258 | 1,388 | 1,247 | 2,118 | 3,221 | 1,973 | 84 |
| CIRCUITO DE PLOMO | 509 | 70 | 339 | 929 | 552 | 1,068 | 1,155 | 449 | 23 |
| CIRCUITO DE ZINC | 824 | 737 | 1,252 | 922 | 1,460 | 0 | 0 | 0 | 0 |
| TOTAL DE PARADAS | 2,482 | 2,181 | 3,849 | 3,239 | 3,259 | 3,186 | 4,376 | 2,422 | 107 |

***Nota:*** *(*) Hasta marzo del 2009*

EXHIBIT 34

Source: RENCOGRPE-211743.xls

NO POLLUTION ENTERPRISES

**Exhibit 157A. Capacities of Lead Smelters in the United States**

| Facility | Lead Production Capacity (U.S. Tons) |
|---|---|
| Doe Run - Herculaneum, MO | 250,000* |
| ASARCO - Glover, MO | 136,000* |
| La Oroya Lead Smelter, Peru | 137,800* |
| ASARCO - East Helena, MT | 72,500** |

EXHIBIT 34

*US Securities and Exchange Commission, Form 10-K, Fiscal year ended on October 31, 2004, https://www.sec.gov/Archives/edgar/data/1061112/000104746905007373/a2154039z10-k.htm
**USEPA (1998) – Locating and Estimating Air Emissions from Sources of Lead and Lead Compounds

NO POLLUTION ENTERPRISES

**Exhibit 157B. Comparison of Facility-wide Arsenic Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack). Data for U.S. smelters obtained from U.S.EPA's Toxics Release Inventory. Data for Main Stack reported from Defendants' records.**




EXHIBIT 34

U.S.EPA TRI - https://www.epa.gov/toxics-release-inventory-tri-program

NO POLLUTION ENTERPRISES

**Exhibit 157C. Comparison of Facility-wide Cadmium Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack). Data for U.S. smelters obtained from U.S.EPA's Toxics Release Inventory. Data for Main Stack reported from Defendants' records.**




EXHIBIT 34

U.S.EPA TRI - https://www.epa.gov/toxics-release-inventory-tri-program

Exhibit 157D. Comparison of Facility-wide Lead Air Emissions from U.S. Lead Smelters vs. La Oroya (Main Stack). Data for U.S. smelters obtained from U.S.EPA's Toxics Release Inventory. Data for Main Stack reported from Defendants' records.




EXHIBIT 34

U.S.EPA TRI - https://www.epa.gov/toxics-release-inventory-tri-program

**Exhibit 157E.**







EXHIBIT 34

U.S.EPA TRI - https://www.epa.gov/toxics-release-inventory-tri-program