UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

A.O.A. et al., )
)
Plaintiffs, )
)
vs. ) No. 4:11-cv-00044-CDP
) (CONSOLIDATED)
DOE RUN RESOURCES CORPORATION, )
et al., )
)
Defendants. )

VIDEOTAPED DEPOSITION OF DAVID SULLIVAN

VOLUME I

Taken on behalf of Defendants

March 26, 2019

Kathy Heeb, CCR #1361

PohlmanUSA Court Reporting (877) 421-0099



**EXHIBIT 42**

Page 170

**I can be confident I'm understating, and generally by about a factor of 2, relative to the testing done, rather than overstating.**
Q. And the locations of measured data that you're comparing are Sindicato?
**A. I'm looking at all of them. I mean we have Huanchan, Sindicato, Hotel Inca, plus we have other ones. But I wanted to make sure, especially Sindicato and Inca, which are the closest to Antigua, the most population resided, and where the schools were, and the closer in impacts where release heights are the most important, that it was not overstating. And what I found was that that base scenario would tend to be high in there, but just for the schools that were really along the central highway, let's say low. Like Sindicato is. But again, if I go up that hillside, it doesn't make much difference.**
Q. And in -- and with respect to the amount of fugitive emissions that was in the materials, the data that Dr. C provided to you, he was the one that did the estimates of actually how much fugitive emissions are coming out of this plant.
**A. Correct.**
Q. Do you know how that compared with any earlier work that was done to estimate fugitives by

Page 171

the company, by DRP?
**A. It's really noted that Dr. McVehil had done some modeling work earlier on. I don't recall off the top of my head how far his emission rates matched up. He didn't cover all the sources that Dr. C covered. First of all, he couldn't do a one-by-one comparison, and Dr. McVehil's modeling in particular was really nonstandard, so we really didn't rely upon that much.**
Q. And we'll talk a little bit more about that later. But the bottom line is you didn't really focus on how different their fugitive emission estimates were compared to what Dr. C provided to you.
**A. I don't recall. I may have looked at George McVehil's results, but we didn't focus in depth on that, no.**
Q. Okay. And then just to close the loop on this, on TSP looks like your -- what we said earlier, which is the 30 microns or less is generally TSP and that's what you used here.
**A. That's correct. I mean, obviously if he put a high volume sampler out, as you probably know, if you measure -- you're going to get more than just 30.**
Q. Right.
**A. But for modeling purposes we go up to 30**

Page 172

**microns.**
Q. And that was just -- my point was, I mean you say typically defined, in this case TSP, as far as you're concerned for your modeling work, was 30 microns or less.
**A. Yes.**
Q. So turning to page 12. Going from page 12 to 14. Would it be fair to say that these are in fact the opinions that you have formed in this case that you have also included in your report?
**A. Yes.**
Q. There aren't other opinions that are tucked away and hidden in other locations, all of these are the opinions, and the rest of the report tends to try to explain bases and so on for them, correct?
**A. I think that's fair, but I did list some a few minutes ago that I would say would be additive to these.**
Q. I understand, but they're not in your report.
**A. Correct.**
Q. All right.
So the first opinion, and there is no other way I know but to go through them one at a time. First opinion is that the measure -- well, I guess

Page 173

there is one more overarching way.
Tell me, if you could, of the opinions that you've expressed here, which of them are dependent on your modeling work and which of them are not, if there are some that fall either within or without that particular qualification.
**A. Well, yes, as I mentioned earlier in my verbal opinions, that even putting the model to the side, basically my knowledge of valley meteorology and proximity of Antigua and its elevation relative to these sources, I know that the impacts in the core of Antigua would be substantially higher than what's been measured. I don't need a model to tell me that. I would be able to opine and tell the risk assessors 5 to 10 times higher than what you see at Antigua -- at Inca, Sindicato, and Huanchan, that's what I expect to see in that core area of Antigua. I don't need a model. A model allows me to show for each plaintiff what my expectation is, to fine tune that a bit, but that's the overarching issue here. But models makes it more specific to each plaintiff, but that's the overarching opinion that I have.**
Q. So are you saying you didn't need to do modeling to arrive at any of these opinions?
**A. Well, the modeling allows the risk assessor**





EXHIBIT 42

**to have specific information for each plaintiff. Some live in Antigua, some live far away, so it does provide a means of look at the measured data and extrapolate to other places. It's very useful for that. But I'm saying especially for Antigua, I feel very confident that those impacts on the core of Antigua are a lot higher than where Doe Run placed its monitors.**

Q. I don't think you quite answered my question so I'm going to try it again.

Are any -- and maybe I'll ask it a little differently. Are any of these opinions dependent, that you couldn't -- you could not provide them as they're written, but for the fact that you did the modeling?

**A. Let me take a look and see.**

**The first four on page 12 would not be dependent upon the model.**

**On page 13, of course the first one is about modeling so that one is model based.**

**Photographic evidence is not -- doesn't depend on the modeling. The third bullet point is about modeling. As is fourth, fourth bullet point.**

**Fifth bullet point on page 13, that statement applies without modeling being there. You**



**can't model every single emission point that's there. And the fact that the elevation penalty is an issue for the volume that would affect the concentration, that's independent of the model to some extent.**

**The last bullet point on page 13, don't need to have a model to say this. But if Doe Run had done a sound dispersion modeling assessment, they would have recognized that they had no monitors where most of the impacts were occurring. Just on the fringes of where that area was.**

**And on page 14, that statement doesn't need the model. And the last bullet point, general statement. Doesn't need a model to make that statement.**

**So a model is helpful, it does provide a basis to estimate specific exposures for each plaintiff home and school. But essentially these other statements can serve without the model. The model just provides more information.**

Q. So going at the very beginning, you mentioned the measured air concentrations collected by -- and I'll just say DRP -- directly show, and you use the words severe, so that -- what do you mean as far as severe? Is that a qualitative or a quantitative opinion?



MS. KRAFT: I'm just going to clarify for the report, the report says collected by defendants directly shows severe air quality impacts in La Oroya.

MR. WILL: Yeah, he used the word severe and I'm asking what he means by it.

Q. Go ahead.

**A. I've done modeling in some of the most polluted places you can find and modeled them: Russia, the Czech Republic, Poland, and in Jakarta. I've never seen concentrations within 20 or 30-fold of what I saw in La Oroya. It's the highest concentrations I've seen in my 43-year career. I consider that severe.**

Q. Of which substances?

**A. Sulfa dioxide, lead, and arsenic and cadmium.**

Q. And the US standards you're referring to, are those NAAQS standards?

**A. Well, for the sulfa dioxide it's NAAQS standard. For arsenic and cadmium it's cancer scores. You know, in the United States, we don't have standards for arsenic. But the states do have guideline values and maximum allowable values. And, you know, these values measured in La Oroya are orders of magnitude, many orders of magnitude above those**



**kind of levels.**

Q. I don't want to be too fussy. When I think of orders of magnitude, I tend to think of like multiples of 10, a hundred, a thousand. Are you talking about it in that context? Or orders of magnitude like twice, three times, four times, five times?

**A. Let me give you an example. Let's take arsenic. The most common state guideline value for arsenic on an annual base in the US is .00024. That's equivalent to 1 times 10 to minus 6 cancer risk. Three zeros and a 24. But we're measuring numbers, you know, measuring just on PM10 fraction, numbers like 10 to 15. So that's, you know, more than probably -- more than 10,000-fold higher than acceptable values in the US.**

Q. And do you know how those measured numbers compare to what was going on before Doe Run Peru operated the facility?

**A. I don't recall there being measured air quality data prior to that time being available. It started in '97, the measured data set that I saw that I've seen, so I don't -- I don't know what it was prior to that time.**

Q. You do know what the production numbers





EXHIBIT 42

**A. No, I don't think that I do disagree with anything in here.**

MR. WILL: Okay. It's 5:00. Probably a good time to break. Go off the record.

THE VIDEOGRAPHER: Going off the record at 5:00 p.m.

(Recess taken.)

(Whereupon the deposition concluded at 5:00 p.m.)

(The exhibits were retained by the court reporter.)



REPORTER CERTIFICATE

I, KATHY HEEB, a Certified Shorthand Reporter, do hereby certify that there came before me at Schlichter, Bogard & Denton, LLP, 100 S. Fourth Street, Suite 1200, St. Louis, Missouri,

DAVID SULLIVAN

who was by me first duly sworn; that the witness was carefully examined, that said examination was reported by myself, translated and proofread using computer-aided transcription, and the above transcript of proceedings is a true and accurate transcript of my notes as taken at the time of the examination of this witness.

I further certify that I am neither attorney nor counsel for nor related nor employed by any of the parties to the action in which this examination is taken; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

Dated this 1st day of April 2019

______________________________________

Kathy Heeb, CSR, CLR





**EXHIBIT 42**