IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,

Plaintiffs,

vs. No. 4:11-cv-00044-CDP
(CONSOLIDATED)

DOE RUN RESOURCES
CORPORATION, et al.,

Defendants.

VIDEOTAPED VIDEOCONFERENCE Deposition
of DAVID SULLIVAN, CCM
Taken on July 9th, 2021



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,

Plaintiffs,

vs. No. 4:11-cv-00044-CDP
(CONSOLIDATED)

DOE RUN RESOURCES
CORPORATION, et al.,

Defendants.

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DAVID SULLIVAN, CCM, taken on behalf of the Plaintiffs, all participants present by Zoom videoconference, on the 9th day of July, 2021, before Gretta G. Cairatti, RPR, CRR, MO-CCR #790, IL-CSR #084-003418.



APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:
KRISTINE K. KRAFT, ESQ.
Schlichter, Bogard & Denton, LLP
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
314/621-6115
kkraft@uselaws.com

FOR THE DEFENDANTS THE RENCO GROUP, INC., et al.:
RANDY J. BUTTERFIELD, ESQ.
ARI GORDIN, SUMMER ASSOCIATE
King & Spalding LLP
1180 Peachtree Street, N.E., Suite 1600
Atlanta, GA 30309
404/572-3511
rbutterfield@kslaw.com



APPEARANCES (CONTINUED):

FOR THE DEFENDANTS THE DOE RUN RESOURCES CORPORATION, et al.:
ROBERT J. WILL, ESQ.
Lewis, Rice & Fingersh, L.C.
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
314/444-7700
rwill@lewisrice.com

THE VIDEOGRAPHER:
JOHN M. GORE, CLVS
360 Litigation Services
10097 Manchester Road, Suite 102
St. Louis, MO 63122
314/394-2206
jgore@360litigationservices.com

_ _ _ _ _ _ _ _



**EXHIBIT 44**

Page 121

general, but he calls them PM10 and we believe him.
Q. And you acknowledged previously the purpose of his work, and Dr. McVehil's work, as far as a -- was a compliance issue as opposed to the type of modeling and the work that you've done in this case, which is more for an exposure issue; is that correct?
A. Well, I think you talk that Mr. Vornberg and Dr. McVehil were doing modeling to try to accurately project concentrations and to try to accurately, to the best of their ability, be able to project benefits to show reduction. They weren't doing it for litigation, but they were trying to be accurate.
Q. Right.
A. That's my assumption.
Q. Okay.
A. And, I mean, based upon looking at the model results relative to, you know, modeling Mr. Vornberg's emissions information, generally speaking, although the models tend to be a little bit low, he's in the right ballpark. I mean, I believe he's captured much of the major sources in his assessment; not all, but much of it.
Q. Okay. Let's go to 38, page 38.

Page 122

A. That's page --
Q. Your page 38 of your Exhibit 49, which is your May report.
A. All right. I'm there.
Q. Okay. Where -- where is the work that is -- where's the work that you did that reflects the calculations in Table 3. -- or 3-1?
A. I don't recall exactly which spreadsheet but it should be in the spreadsheets we provided, or you could just -- could go to the tables that we show in the report and add up all the lead sources and determine what percentage the six additional sources were. It could be computed that way as well.
Q. And is that comparing PM10 to PM10, or TSP to PM10?
A. It's PM10 to PM10.
Q. Okay. Let's go to page 49.
A. All right.
Q. At the bottom, your bullet point, "Dr. Libicki is focusing on published data that are more relevant to controlled stack sources or studies focused on PM10 particle size analysis than studies based on fugitive emissions."
What -- what specific data are you

Page 123

referring to there?
A. In terms of the fugitive emissions or what document --
Q. No, what -- what data are you saying that she's focusing on?
A. She's focusing largely on AP-42 and more recent EPA references. We -- we've looked at, more broadly than that, to look at studies that are much more focused on the fugitive components from smelters and brought those into Appendix -- I believe it's Appendix C in the back.
Q. Is that primarily the two lead smelter study that we marked in a prior deposition as Exhibit 41?
A. That's certainly a part of it but we show tables much more extensive data than that, that shows similar results. When you look at the fugitive component as your objective, and you use microscopy as your basis or other means that can separate out the PM -- the PM10 from the higher particle sizes beyond just using a cascade impactor, you find quite different results than what Dr. Libicki is showing in her analysis.
(Deposition Exhibit 41 shared for identification.)

Page 124

QUESTIONS BY MR. WILL:
Q. I'm going to upload -- I've uploaded to the chat Exhibit 41. I'm going to pull it up on screen share. Hold on a second.
When I say the two lead smelter study, you understand that I'm talking about this which was previously marked in a deposition of yours as Exhibit 41; right?
A. Correct.
(Deposition Exhibit 54 marked for identification.)
QUESTIONS BY MR. WILL:
Q. Okay. And let me pull up one more here. I'm going to -- I've pulled up and marked as Sullivan Exhibit 54 a document that I'd ask if you would describe for -- or identify, rather, for the record.
A. This is a background report for AP-42, Section 12.6.
Q. Okay.
A. The date -- I'm looking for a date. I don't see a date shown on the title page.
Q. Let me -- I believe -- I'm not sure if I have a specific date, either. But it -- it's certainly a reference that is later in time than the

Page 125

two smelter report which goes back to the 1970s; right?
A. I believe it is more recent than that.
Q. So let -- let's take a look and -- well, strike that.
Is the two smelter study, is it focusing on stack emissions or fugitive emissions?
A. Fugitive.
Q. Okay. Go to page 51 of your report. It has Tables 3-6 and 3-7.
Do you see that?
A. I do.
Q. And am I correct that the document I've marked as Exhibit 54 is the Reference 178 that you are citing, or is that a different source? Is that something else?
A. I don't recall what -- right off the top of my head, what Reference 178 is. I mean, I could look it up but I don't know off the top of my head.
Q. I'll -- I'll represent to you that it -- it is, in fact, the AP-42 document.
A. All right.
Q. And, I mean, you say it's the background document in the caption of your tables, and I'm just telling you, this is the background report that you

Page 126

had identified as Reference 178, and then you have a page number; okay?
A. I'll take that as a given, yeah.
Q. Okay.
A. Sounds good.
Q. So let's go ahead and go to page 56. And page 56 is, in fact, the two lead smelter study.
A. Let me see. Page -- let me get myself organized.
Q. Page 56 of the AP-42 background document actually is --
A. You said page 52 or page 56?
Q. Well, it's -- the PDF is page 56, the document page 56 is the primary lead smelter, but the PDF 56 is not. The PDF 56 is -- is actually something else.
A. I'm on 56 of the PDF right now.
Q. Okay. And that --
A. It's actually page 52.
Q. Okay. And usually, when you make a reference to a page number, you're referring to the page number as a PDF page number, aren't you?
A. In my reports I do, yes.
Q. Yeah. So, I mean, for example, so this is actually a source emission testing from 1990 that

Page 127

you're referring to in Table 3-6; right?
A. That's correct.
Q. Okay. And that is not included in the two lead smelter study which was from 1977; right?
A. Different dataset is how I interpreted it, yes.
Q. Okay. I mean, which of these sources, the -- the AP-42 East Helena or the AP-42 ASARCO -- rather, the AP-42 ASARCO: East Helena versus the AP-42 1977 study, which do you consider more accurate?
A. I -- I don't have an opinion on which one is more accurate at this time. I guess you have to clarify that, which one's more accurately representing the La Oroya smelter.
Q. And which do you think?
A. I don't have an opinion.
Q. Okay.
A. But they both -- this one also shows, if you look at particulate matter in kilograms per metric ton, that you're finding that the -- that the TSP is higher than the PM10, typically, by -- by a fair amount.
Q. Do you have any opinion as to which of the two sources, the 1990 testing or the 1970s era

Page 128

testing that was done, is -- is more reliable?
A. Well, the testing that was done in '77 for the fugitives did include two different methodologies. They used the cascade impactor and they showed they used microscopy. They conflicted. And the microscopy data made a lot more sense than the other one did, and they were directly measuring particle size, where the cascade impactor's an indirect method.
And so this -- this later dataset shows data much more similar to the microscopy dataset. So in that sense, there -- I would say it's confirmatory in that context, but which one best represents the La Oroya operations, which is obviously quite an old smelter, I don't have an opinion on that.
Q. Okay. Now, in -- in your report in the Table 3-6, you report PM10 numbers. Did you -- you know, did you see, also, the total lead numbers that were in the reference document that I have up on the screen that's 56?
A. Well, this analysis is looking at particle size. We use direct lead and arsenic fractions, you know, separately. So this Table 3-6 is strictly looking at particle size. The ratios

Page 129

are based on the Vornberg datasets.
Q. Okay. All right. But in -- in this case, particulate matter is shown as .0115 kilograms per microgram of particulate, and the total lead was only .0006 kilograms per -- well -- or is that microgram or megagram?
A. Megagram.
Q. Okay. The big M, I'm sorry.
In other words, that if you look at those numbers, it's less than 5 percent of the total particulate is -- is lead; right?
A. Well, for that smelter. Again, we're using data from Vornberg, primarily, for our work. We're using this kind of table to strictly make the point that there's quite a lot of particles that are greater than PM10. In fact, the majority are greater than PM10 from the fugitives. We want -- that's the point we're making on the record. We're not saying, you know, which one -- between this East Helena data versus the one in '77, which one more accurately represents La Oroya, I don't have an opinion. But the opinion I do have is that these studies that show data for the fugitives specifically, show a lot more larger particles than Dr. Libicki or Mr. Hoffnagle are saying in their reports.

Page 130

Q. Okay. If you look at -- let's go to the blast -- blast furnace charge building. And is that the blast furnace on the list of your sources? Would that be the equivalent?
A. Let me look at the data. The blast furnace tapping platform, blast furnace feed floor, blast furnace charge building. The '77 study, as I recall, was -- was more or less for the overall operation of that building, has subdivided this here. The results have some differences, I mean, there's no question, within that operation.
Q. Okay.
A. I don't have an opinion about how that relates, at this point, to the '77 study.
Q. And making the same comparison that I made before, which is looking at total particulates to total lead, it's -- it shows that there's a fraction, it's -- less than 4 percent, roughly, of the total particulate is lead in that -- that line that's blast furnace charge building on the Table 4.3-1 that we're looking at from the AP-42; right?
A. Right. That's that facility, but again, putting this in context, we do have data, based upon -- primarily based upon Mr. Vornberg's

Page 131

assessment specific to La Oroya, what the fraction is. This type of table is useful in identifying, at least roughly, the percentage of the total particulate set is PM10.
Q. All right. I mean, there really wouldn't be, because you -- you don't have the emissions separated in the work that you've done yourself, you really can't compare this sort of agglomeration of the numbers in the Table 3-6 on page 51 to the figures that Vornberg generated, really, can you?
A. Well, I mean, we're just -- again, we're just using this for the PM10 fraction as a demonstration. The fact that there's a lot of -- a lot of mass is in the size fraction greater than ten microns. That -- we're not using this beyond that point.
Q. And I didn't see where there was a particle size distribution reported for the 1990 work. I mean, did you find one anywhere for the --
A. Beyond this --
Q. -- blast furnace as a whole?
A. Beyond this table?
Q. Right.
A. I don't recall specifically. I mean, I recorded in my report the various references that I

Page 132

reviewed and what the values were. That's in Appendix C. I did record what I had observed.
Q. And if I'm correct, back in 2000 -- in the December 2020 report, you didn't use -- those figures from the 1990 source emission testing, you didn't use that for calculating your emissions inventory, did you?
A. No, I relied upon the two smelter study of 1977 as the basis for estimating particle size.
Q. Okay. Why did you use the older rather than the newer data?
A. Well, there's no -- there's no basis to conclude that this newer data is more representative of this quite old smelter in La Oroya, Peru, than the 1977 data that was collected.
Q. It would certainly show a different particle size distribution, wouldn't it?
A. We could -- it could be assessed but it's going to show the same general framework. I mean, it's going to show the fact that most of the mass is being emitted from the size that's greater than PM10. And it would support the point that I've made that when we model PM10, we model it for a good year relative -- relative to the Defendants' point of view, which would be 2007, we model that because of





EXHIBIT 44

Page 133

the high numbers, if we were to extrapolate -- based upon 1990 or '77 type data, extrapolate off the TSP, the TSP's going to be higher. That's -- that's the main point I'm making with the TSP issue.
Q. Okay. Table 3-7, in fact, that is the -- let me go, because we did before -- that's 1976 testing, and that's from -- this is from the two smelter study; isn't it?
A. I don't know as I sit here if that -- if that is from there. Let's see.
Q. This is --
A. This says 1990.
Q. -- Table 3-7 on your report, page 51 --
A. Okay.
Q. -- you have Reference 178, the same one, except instead of page 56, it's page 61; this is page 61 of Reference 178.
A. All right, I'm there.
Q. Okay. So here you're looking at East Helena, same plant; right? I mean, it's the East Helena plant is the same in the 1990 testing that we were looking at and what we're looking at here now, it's just from different years.
A. Well, when you say the same, I don't know that that's the case. There's been no changes to

Page 134

the facility between 1976 and 1990? I don't think we've established that.
Q. Okay. I'm not saying that there may have been changes, but it's the same facility.
A. Well, it's the same location. To say it's the same facility, I would think would have the same operational characteristics, and we don't really know that.
Q. Were there two smelters in East Helena that ASARCO ran?
A. Not that I'm aware of, but my point is different. My point is that there's a 14-year time span there. Could they have made modifications to the facility that would change the particle size distribution? I would say that would certainly seem plausible to me.
Q. Okay. And that's a fair statement. So in that respect, you didn't undertake any comparison to see whether the facility, as it existed in the time of the 1976 work, resembled more or less than the state of the facility in 1990 when it's compared with what La Oroya was like; right?
A. I would say that would be a fairly challenging assessment to -- to do. I mean, we're using 1977 dataset as -- obviously it's a default

Page 135

dataset -- to extrapolate up to the TSP dataset. The Defendants have no data they've collected that shows actual distributions. So we have to use the default. 1977 certainly is a reasonable default, it's a major EPA study, but there's no basis, really, to conclude that one is better than the other. We use this as a general indication of scale-up.
Q. Okay. And that -- but that -- my point is, you didn't do any type of an analysis -- when you're talking about different facilities, because it's got different controls or whatever, you didn't really do any kind of comparison to see whether the 1976 version of East Helena versus the 1990 version of East Helena more accurately or closely matched conditions at the La Oroya facility.
A. We did not. We accepted the 1977 data as -- as a reasonable default to use for this matter and -- well, I'll leave it at that.
Q. Okay. And in your report, again, page 51, the East Helena sinter building, you reference, and you indicate that the particulate matter emissions for total is .34 kilograms per hour.
Do you see that?

Page 136

A. Yes.
Q. Okay. And then in the table, I see 1.22 kilograms per hour. What's -- what's -- what am I missing here, the difference between those two?
A. You're referring to the -- now, which page -- you're on page 61?
Q. Well, I'm talking about Table 3-7, there's a column that says, Particulate Matter Emissions; okay?
A. I see that.
Q. I'm assuming that means total particulate; right?
A. That sounds correct.
Q. Okay. And in Table 3-7, you report it as .34; right?
A. Yes.
Q. Okay. On this -- on this chart, I don't see .34. I see 1.22 particulate matter, which would be total. The PM10 fraction I see is .34, but for total particulate, I see 1.22; right?
A. I'm trying to find the 1.22. Where do you see the 1.22?
Q. I still have my screen up, I just highlighted it.
A. I see it. So the sinter building you're


EXHIBIT 44

Page 137

referring to.
Q. Right. That's what we're talking about, sinter building.
A. All right.
Q. I'm thinking, did you do some kind of a transcription error here?
A. I just don't -- I don't recall. I'd have to review this further. It doesn't seem to match, I agree.
Q. Okay.
A. Yeah, I'd have to assess that. I don't -- I can't replicate it right now.
Q. Okay. Let's go ahead and skip on a little bit. Let me go to Appendix C of your report that starts at page 94.
A. All right.
Q. So, in this particular instance, you have, in the second paragraph of page 94 -- let me pull it up -- you indicate that the Defendants' experts are stating that the emissions of particulates are only in the PM10 fraction and therefore it's a misleading comparison. Am I reading that right?
A. You are.
Q. Okay. Can you point me to where

Page 138

Dr. Libicki says that it's only PM10 fraction?
A. I recall that in either her report or her deposition transcript. I don't recall exactly where she said it but that's -- that's my understanding that she did say that. I know Mr. Hoffnagle did -- made that statement, for sure.
Q. Didn't she say "mostly", not "only"?
A. Well, mostly wouldn't be correct, either, based upon the record, but I don't -- unless you point it out to me, I don't recall exactly where she said that.
Again, Mr. Hoffnagle did testify that it's -- when asked, that it's all PM10. I don't have the exact quote, but that's basically what he said.
Q. And that's because his view is, it's -- it's pretty much exclusively PM10 that ultimately reaches the La Oroya community and that the -- anything above PM10, for the most part, drops out before that, and you disagree with him; right?
A. Well, I don't recall him saying that. He basically was referring to the emissions, as I recall, being PM10.
Q. Okay.
A. It certainly wouldn't all fall out. PM15 and PM20, even some PM30, depending upon release

Page 139

height, would make it to La Oroya.
Q. Depending on release height.
A. It's -- I don't recall -- I don't recall him parsing it out that way. I recall him indicating the particles are -- are PM10.
Q. On -- in Table 2-40 of your report, I think it's actually going to go back a couple pages -- well, actually, wrong report.
In page 92 of your December 2020 report, so your original report, you -- you provided the references that were in support of the different particle size distribution sources that you used. I can pull it up here and get it up so we'll have it.
Am I correct, all of the references for the following sources, sinter plant, blast furnace, Dross kettles, lead reverb furnace, and zinc furnace, all of those are Reference 115 which, in fact, is the two smelter study; correct?
A. The -- that's mostly correct. The sinter plant, blast furnace, Dross kettles, lead reverb furnace, and the zinc furnace. Ore concentrates, different reference.
Q. And I didn't mention those. I only mentioned those four because -- well, five, actually, if I could get it -- those are all

Page 140

referenced to the two smelter study, those five?
A. That's correct.
Q. Okay. And your -- so your PSD figures for your lead and zinc circuits are not coming from any source other than the two smelter study, not AP-42, in a bigger sense, or somewhere else; right?
A. Well, they're coming from Reference 115, the two smelter study; that's the basis that we use.
Q. I mean, that hasn't changed. The only difference between how you dealt with it and how Dr. Cheremisinoff did was he took one sample, one measurement, and you did an averaging of a couple of values; right?
A. Well, that, plus at least one instance where he used, in our judgment, incorrect distribution, and we corrected that. But primarily the results were -- are similar. There's some differences but they're similar.
Q. Okay. So now I'm going to flip back to Exhibit 41 and I'm going to go to page 40 of the PDF but it's actually page 25 of the report; okay? I've got it up on the screen. You can take a look at what you have, or my screen, whichever you prefer.
And is that -- that would be the colon 40 on Reference 115. So in other words, going back to



**EXHIBIT 44**

Page 141

Exhibit 30, that page 40, that's, again, it's a PDF reference, and I just want to make sure we're on the same page here that that -- that reference in your report from December is to this particular page.

A. Well, that's -- that sounds correct, at least for one of the facilities. There's two facilities that have data. It's a weight percent that was used.

Q. Okay. And so you're actually -- you're actually going forward in -- in time, in my questioning, but that's fine.

So you don't use the first part. You're not referring to this particular size distribution and number percent in Exhibit 30. You're using the weight percent in Exhibit 30 when you're coming up with these particle size distributions; right?

A. Correct.

Q. Okay. And that -- and that remains true throughout the work that you've done and reported in your rebuttal report; right? I mean, you're not -- you're not changing any of the methodology for how you came up with your particle size distribution from what you did in December 2020; right?

A. No, we felt -- I felt that the -- the EPA 1977 report was a suitable default basis to come up

Page 142

with PSD values.

Q. Okay.

A. Particle size distribution values.

Q. Okay. So let's take a look at -- at the results here. And for example, you have the sinter building, these are the numbers that you're looking at right in this little block; right? That's what you're looking at when you're coming up with the figures for the sinter plant for particle size distribution that you used in this -- in this round of work, in your -- in your round that we started in December of 2020; right?

A. Well, yes, we have used that then. I believe that Dr. Cheremisinoff used the same reference. He did it slightly different than us, but yeah, it goes back to the beginning.

Q. Okay. And they refer to two samples. There's number 3042 and number 3047; correct?

A. Yes, it's very tiny for me to read, but that sounds right. The best I can read --

Q. I'll blow it up. How about that?

A. That would be helpful.

Q. Is that helpful for our older eyes? I wear glasses because I can't do it anymore, either, but there you go. 3042 --

Page 143

A. That's correct.

Q. -- and 3047; right?

A. Yeah, that's correct. Yes.

Q. All right. And do you know where those samples were taken and how they were taken?

A. I've read the report. I don't recall the specific location for the air intake for those, but it was at the sinter building.

Q. Okay. They were -- they were from a cascade impactor, weren't they?

A. The -- these samples, the cascade impactor -- my understanding is, the microscopy was done from the five stages of the cascade impactor; that's correct.

Q. Okay. And in fact, when McCrone did the particulate analysis on the filter paper, it was actually looking at the filter paper from the Stage 1 filter of the cascade impactor; isn't that accurate?

A. Well, the standard way, as I showed in this appendix, for microscopy, they would use all five stages. There's no reason for them to assume that the cascade impactor exactly worked as planned. I mean, of course, a lot of evidence shows it doesn't. So if you're going to do a particle size

Page 144

distribution by microscopy, you do the analysis based upon all five filters. And because the fact that you can get large particles going into the finest filter, there would be no reason for them to assume that that -- that the cascade impactor worked perfectly, because it doesn't.

Q. Going back to page 23, this -- this discusses the -- the five stage impactor and the filters. Do you see that?

A. I do.

Q. Okay. And Stage 1 is everything that's over 4.6 microns in size; right?

A. In theory, that's correct.

Q. And again, all these are fugitive emissions; right?

A. They were measuring fugitive emissions, but the issue you -- the figures you're showing right there, they are theoretical, and that's what ideally would happen. But if you have a situation with fugitive release with lots of larger particles, there's a high potential for those larger particles to skip all the way through to the fine fraction and other stages in between.

Q. All right.

A. And I show that analysis in my


EXHIBIT 44

Page 145

Appendix C.
Q. So when you're seeing the -- I mean, what's the number mean? When you see the number on page 40, the -- are you saying it's five different filters that he's looking at?
A. Well, that -- that would be standard procedure. I mean, the documentation isn't totally clear exactly what McCrone did, but based upon literature, and standard practice, if they're doing microscopy, there's no reason to assume that the cascade impactor is working exactly as planned. They can directly see --
THE COURT REPORTER: I'm sorry? I'm sorry, Doctor, you faded -- or you faded out.
THE WITNESS: Because they can see --
THE COURT REPORTER: Thank you.
THE WITNESS: -- precisely what the particle sizes are with microscopy. With a cascade impactor, you're assuming that the inertial characteristics will allow you to accurately parse out the different sizes. Literature shows that there's a lot of problems with that. When you're dealing with a distribution, there's lots of large particles in it, like these fugitive

Page 146

situations would.
QUESTIONS BY MR. WILL:
Q. All right. Well, it seems like you don't agree with me, so I'm going to go ahead and let's go -- we're still in Exhibit 41. We're going to go to page 98; okay?
A. Okay.
Q. And in this, there is a column on sampling data, and it has a number of different filter numbers. Do you see those?
A. Can you make it larger, Mr. Will? I can't see --
Q. I surely can. Anything for you.
A. Thank you.
MS. KRAFT: And Bob, can we take just a five-minute break --
MR. WILL: When I get -- when I get a spot, yeah.
MS. KRAFT: Okay. We've been going a long time and I --
MR. WILL: That's fine, but let me finish my thought here; okay?
QUESTIONS BY MR. WILL:
Q. So again, let's take a look, and I just want to focus on two -- the two numbers of the

Page 147

filters that I've referenced earlier, the samples 3042 and 3047; right? So here it shows 3042 right here, and what does it say about the size range of that filter?
A. Well, it's theoretically greater than 5 microns.
Q. Okay. It's not all of the stages. It's only one filter from Stage 1; correct? That's what's shown here on this table.
A. That -- that's correct, but in terms of doing a microscopy analysis, that would not make sense just to use one of the filters.
Q. I'm like you, I'm not assuming anything, I'm just reporting what's on this table. And what this table says is Filter No. 3042 is capturing particles, the size range is over 5.9 microns; right? That's what it says.
A. That's what it says.
Q. Okay. And if you drop down to 3047, you see that, right here, it has only one stage -- it says, Stage 1 -- and it's for particles that are greater than 4.6 microns; right?
A. Correct.
Q. Okay. So -- and I'll -- just to confirm that this is sort of consistent, again, Stage 1 --

Page 148

Table 5, Stage 1 is 3042, Stage 1, 3047, they're both just Stage 1 filters here, and frankly -- and I won't belabor the point, there's a couple other tables -- but they all say the same thing. Those two filters are identified in these tables as a Stage 1 filter.
A. Okay.
Q. All right. You don't have any reason to dispute that those tables are accurately reporting what the stage is for those particular filters that are listed in his report; right?
A. That they say what they say, but what I can say is that if you look at all the fugitive references that I show in Appendix C, that the -- the data that's shown in Appendix C supports the interpretation that I've done, that it's -- the particle size that is being collected, dominated by larger particles.
Q. Okay. Well --
A. And I'm using this analysis, at this point in the last two reports, I am showing PM10 results and making a statement that the -- the TSP fraction is going to be substantially higher. I'm saying by a factor of two higher in my judgment. That's supported by all the data that I've reviewed.

Page 149

Q. Okay. Where's the work that substantiates that claim that you just said, that -- that the review of ratio of TSP to PM10 across specific set of Plaintiffs' homes and schools is approximately two? Is that -- does that cite specific data or is that references from other places?

A. Well, what I'm referring to -- well, the factor of two came from the December -- not December -- the March 2019 report, but Table C-3 is showing the percent of PM10 for various fugitive sources, and you can see that the percentage -- the percentage of PM10, it varies, but there's lots of these sources that are -- there's only a small fraction of the PM10 portion. And so my point is that the statement that I've made that if you extrapolate from TSP, up, even quantitatively, it's going to be higher for TSP than PM10, based on my initial analysis so far, by a factor of two higher, and whether or not they analyze five filters or one filter, the '77 study, the data shown in Table C-3, supports the interpretation that most of these particles are larger than PM10.

Q. So you're pointing to this chart, Table C-3, as your substantiation for the statement

Page 150

that you make about the approximately 2 relationship of TSP to PM10?

A. Well, more specifically, I would say it shows the fact that much of the particles for the sources that we're concerned about here are greater than PM10. They're dominated by particles greater than PM10. You can't, from this particular analysis, quantify how much that would affect their quality.

Q. Okay.

A. What I'm saying is that this analysis, as shown in Table C-3, certainly does support the fact that it's mostly larger particles, and TSP will be significantly higher than the PM10.

MR. WILL: Okay. Well, Miss Kraft has asked for a break, and that's fine with me. I will tell you that we're getting really close to the end, so if you're willing to bear with me a little bit longer, I should be wrapped up not too much more time; okay? Maybe 10, 15 minutes, I think.

THE WITNESS: Okay.

MS. KRAFT: Yeah, so you want to take 5 minutes? I just --

MR. WILL: Yeah, 5, 10 minutes. Something short.

Page 151

MS. KRAFT: Yeah. I'm fine --

MR. WILL: We'll get back to it and finish this up.

MS. KRAFT: All right. Thanks.

THE VIDEOGRAPHER: We're off record at 12:49.

(Short recess taken.)

THE VIDEOGRAPHER: We're back on record at 12:58.

QUESTIONS BY MR. WILL:

Q. Just to kind of focus on what I believe that you had said, for the sources in the lead circuit that we've talked about, all of those -- all of those four sources that I mentioned, the sinter plant, the blast furnace, the Dross kettles, and the lead reverb, all those PSDs, those particle size distribution numbers, were taken from the two smelter study; right?

A. That's correct.

Q. There may have been other studies that you cite to but those are the ones that you were -- that's the one that you relied on for the lead circuit.

A. For those sources, yes.

Q. On page 99 of your report, your

Page 152

Exhibit 49, these -- these are showing both lead and copper smelter sources. The fugitive copper circuit sources you referenced are at Reference 220, the sinter building.

Do you see that?

A. You're on page 99 of my report?

Q. Of your report, right. The reference is number 220, and it says, 5, but that reference, is that, in fact, an AP-42 document?

A. I'm not seeing the Reference 220 on page 99 of my document. Are you referring to the actual page or the E-page.

Q. I'm on Exhibit 49, it is page 99 of the -- both the PDF and the document. It's that Table C-1.

A. Okay. I'm there.

Q. I -- I -- okay. Now, do you see where I'm saying the smelt -- the sinter building?

A. I do.

(Deposition Exhibit 56 marked for identification.)

QUESTIONS BY MR. WILL:

Q. Okay. And that's Reference -- that's Reference 220, and I just want to -- give me a second here, I'm going to -- I'll load it up. I'm

Page 153

going to share my screen but I've loaded up what I have marked as Exhibit 56. Do you recognize that as your source number -- Reference No. 220?
A. I can't confirm it's Reference 220, but this looks like one of our -- one of my references, yes.
Q. I'm sorry, I had something distracting me that I had to silence. It was a loud buzzing on a cell phone.
So the percentage of fugitive emission sources that are shown are -- at 10 microns and smaller are 74 percent, 28 percent, and 96 percent in that Table C-1. It's a different reference but those are the percentages that you report, whereas the sinter building, which is the Reference 220, you report it's a 49 percent -- percentage; correct?
A. That's correct.
Q. Okay. So let's take a look at page 14 of Exhibit 56, which is your Reference 220.
A. Can you make it bigger please, Mr. Will?
Q. I surely can.
All right. So in -- in this instance, we have some fugitive emission sources for reverberatory furnace; okay?
A. Okay.

Page 154

Q. That's on page 14. And the slag tapping operations on page 15.
Do you see those?
A. Mm-mm, I do.
Q. And on page 16, the copper converter slag and blow operations.
Do you see those? They're all portrayed on 14, 15, and 16, of the same reference that you did use for the sinter building?
A. These are -- these are, as I see, these are expressed as aerodynamic equivalent diameters, so these would be cascade impactor results.
Q. So you didn't use those figures in your work -- or in your chart. You only used page 5. Reference 220:5, why is it that you didn't use the references from the same source that you relied on for the sinter building as you did -- and you didn't rely on those for the other three that I pointed out?
A. Can you bring up page 5? Because I'm trying to see these. Is this page 5? I can't read it, unfortunately.
Q. This is 12.3-5. So this is page 5.
A. Can you make it bigger, please?
Q. Yeah. Oh, wrong one.

Page 155

A. Little bit bigger still?
Okay. Well, our intent -- my intent was to include as much information as we could find. I don't recall why those three were not included. As you see from the tables I put together, I tried to be pretty extensive. You can see Tables C-3 and C-4. Actually I -- I mean, obviously, I wasn't trying to not include them.
Q. On page 101 of your report, again, this is copper smelters, you have another reference in addition to one that we've talked about, it's Reference 225.
A. Okay.
Q. Right here, following shows data from 225:438?
A. Right.
Q. You didn't use that reference and percentages that are reported there, either, did you?
A. Well, I'm showing the results in the quote. I mean, I'm just --
Q. Yeah, but you didn't -- you didn't use those to calculate your copper emissions inventory, did you?
A. No, I -- as I mentioned, I selected a

Page 156

default source. There's plenty of default potential sources that could be -- be applied, and I tried to summarize them in this appendix to the extent that I could.
But again, this is showing, for the copper roaster, 5 percent of the fugitive particulate emissions are less than 5 microns. So it's showing quite a -- a much more heavily weighted distribution than has been asserted by the experts on the defense side. It says that 85 percent are greater than 10 microns in that particular quote at the bottom of page 101.
Q. Okay. I think I probably did a boo-boo here and it's actually my bad, so I'm going to backtrack a little bit because as I was looking at it, I realized that something was off.
So my -- my understanding now, having looked at another source, is that on page 99, actually Reference 218:14, 15, 16, these are the numbers from the AP-42 reference that I had up, which was 14, 15, and 16.
A. Mm-mm.
Q. So this copper smelter, Exhibit 56, was actually your Reference 218 and not 217.
A. Okay.

Page 157

Q. I guess my point is, these numbers on pages 14 through 16 that you've reported in that chart, you didn't use those when you were doing your own particle size distribution calculations in December -- that were reported in your December 2020 report.
A. Well, no, I mean, you can see that these particular tables, such as Table 12.3-12, it's expressed as aerodynamic equivalent diameter. So they can only go up so high in extrapolation with that. They can't -- they can't do PM30. So what -- what it's basically showing, they can show that 74 percent was -- was -- was less than PM10 but they -- they can't -- they can't really accurately go up to PM30 with that instrument. That's the point.
Q. And that's why you didn't use them before?
A. I mean, that's my recollection, but I don't really fully recall. I certainly was not trying to exclude any -- any samples from our appendix.
Q. All right. And we did talk, I think, at the last deposition, about the method that you did use to derive your particle size distribution

Page 158

percentages for the copper circuit. Have you done anything since my deposition of you back in January to further educate yourself or understand how those numbers were derived?
A. Which numbers again are you referring to?
Q. The particle size distribution numbers that you used for fugitive sources in the copper circuit.
A. Well, the work I have done since the deposition is contained in Appendix C. So that -- that does show the further review that I've conducted.
Q. Yeah, but you didn't change any of the numbers or how you derived those PSD sources that you used in December 2020; right?
A. No. I mean, basically, as you can see, from December of 2020 and in May of 2021, I'm only modeling PM10. I'm showing default data for the full distribution, but I'm not modeling it.
(Deposition Exhibit 55 marked for identification.)
QUESTIONS BY MR. WILL:
Q. I am going to -- so that I kind of clear up my own error here, I'm going to go ahead and mark one more exhibit. I'm uploading Exhibit 55, which

Page 159

I've marked, and this -- this is actually the part of the AP-42 that's related to the lead circuit and this, in fact, is Reference 220, which I mistakenly said was reference 218 before. But in trying to be fair, I wanted to make sure that I had you take a look at that document and take a look at Exhibit -- or page 5 of the PDF, which I'm going to pull up, and in fact, this is the source of -- on page 99 of Exhibit 49, this is the source of that 49 percent percentage figure that you report in that Table C-1.
Do you see that?
A. I'm trying to see. Sinter building?
Q. I'll make it bigger.
A. Thank you.
Q. Sinter building fugitives.
A. I see it.
Q. This is what you're referring to as the source, the reference, for sinter building that you have the 49 percent calculation shown. I'm just trying to figure out where that 49 percent is coming from on that page.
A. I believe if you -- if you take the ratio of .058 to .118, you'll approximately have .49.
Q. Okay. So it's these two figures right there.

Page 160

A. I believe so.
Q. Okay. Did you -- you didn't use any of the other ratios on this particular reference in calculating PSD, did you?
A. Well, I don't -- I don't recall. There's some strange things in this table that you can see that the PM10 fraction being higher than the particulates, there's some things going on there, but I think for ore crushing, the ore -- we did have a pretty high fraction of PM10. My recollection, which may be -- I think is correct, I think it was 85 percent we assumed was -- was PM10. So it was heavily weighted on that part towards PM10.
Q. All right. And that was -- that was something that I just kind of wanted to come back to is this -- this ore crushing idea. Do you understand what ore crushing means in the context of how EPA refers to it in, for example, this document, the AP-42 on -- on the lead smelting in Exhibit 55? What -- what is it that they're referring to?
A. They're referring to ore crushing, making it suitable sizes for the process, is my understanding.
Q. Is -- is ore crushing the same as concentrate crushing?


EXHIBIT 44

Page 161

A. Well, they do concentrate -- well, the answer is, is it exactly the same? I would say probably not. At the -- at the La Oroya smelter, they have two crushing operations. They have a -- a course crushing operation and a fine crushing operation to get the material down to the correct size.

We -- in our report, I showed an emission rate from just one source of grinding. Actually, the -- although there's some uncertainty in some respects of how much control they had there on the particulates from that operation, I didn't include a lot of the steps along the way that I could have that would have produced much higher emission rates.

Q. And when they are talk -- when they're talking about ore crushing, are they talking about raw ore or are they talking about concentrate?

A. On this particular table, it's -- let me read the footnote. It says ore crushing. And I'm looking at the table to see what -- what D is referring to; entire ore crushing building at one facility. Well, in the case of La Oroya, the fine particulates are -- are crushed at a building right adjacent to the preparation plant, and that's -- that's the crushing they do. It is concentrate so

Page 162

it's -- it's not in exactly the same form but it's -- it's a crushing operation inside a structure.

Q. Well, certainly, if you're crushing raw ore, and there's dust or what have you, it's going to have a very different lead content than if you're crushing concentrate where you've already removed most of the non-metal part of the substance; right?

A. Well, the PSD analysis is not related to the -- to the metal, but to the particle sizes. So, I mean, the issue is, this crush -- this ore handling has a number of steps involved with it. You have unloading of the railcars. You'd have -- you convey it -- you convey it various places. It goes to the coarse crusher, it goes to the fine crusher, and then it's dumped into the open bedding plant, or the preparation plant area. Each one of those steps along the way creates dust. And in fact, some of it creates a lot more dust than we're accounting for. You know, for example, the -- there is data on ore concentrate handling that's a much higher emission rate than the .15 kilograms per metric ton we're using.

But as Dr. Libicki pointed out, there's some aspects along the way that has some controls.

Page 163

I agree with that. There's the conveyors have some carbon to it. But if you look at certain pictures, such as if you went to my Reference 193, which is Dr. Cheremisinoff's report, and you turn to Exhibit 63 and 64, you see a lot of fugitives being generated when they dump the material, the fine crushed ore, onto the -- onto the piles inside the -- the preparation plant, which is an open roof structure, and you're seeing visible fugitive emissions being emitted from there. That's part of the handling operations that, you know, we don't have enough information to fully account for. But handling operations from ore concentrate are, like, almost 10 times higher than the .15 value that I'm actually using.

So in summary, I mean, what I'm using is a lowball estimate of likely what the ore crushing amounts to, but even with that said, I mean, ore crushing is not a big fraction. I think in 2007 it was 4 percent of the lead emissions were coming from all the ores, the copper, lead, and zinc; all combined was 4 percent.

Q. And -- and you did never observe the ore crushing operations at the La Oroya smelter yourself at any point in time, did you?

Page 164

A. No, they weren't crushing ore when I was there in 2018.

Q. I mean, you haven't seen any -- any video or photos of the operation in process during the time that DRP was operating the smelter, have you?

A. No, but I have seen photographs of the bed preparation plant conveyor dumps that occurred there, and clearly there was visible dust, and there was not controls.

MR. WILL: Give me a couple minutes and I may just be about done.

THE VIDEOGRAPHER: We are off record at 1:21.

(Short recess taken.)

THE VIDEOGRAPHER: Back on record at 1:23.

MR. WILL: Mr. Sullivan, I have no further questions of you at this time.

THE WITNESS: Very good.

MS. KRAFT: Okay. I don't have any questions.

MR. WILL: And you'll read and sign; right?

MS. KRAFT: Yes.

THE COURT REPORTER: Okay.



EXHIBIT 44

Page 165

THE VIDEOGRAPHER: We're off record at 1:23.

Page 166

REPORTER'S CERTIFICATION

I, Gretta G. Cairatti, RPR, CRR, MO-CCR #790, IL-CSR #084-003418, in and for the State of Missouri, duly qualified and authorized to administer oaths and to certify to depositions, do hereby certify that pursuant to notice in the civil cause now pending and undetermined in the United States District Court for the Eastern District of Missouri, Eastern Division, to be used in the trial of said cause in said court, I was attended by Zoom videoconference, by the aforesaid witness; and by the aforesaid attorneys; on the 9th day of July, 2021.

That the said witness, being of sound mind and being by me first carefully examined and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, thereupon testified as is shown in the foregoing transcript, said testimony being by me reported in shorthand and caused to be transcribed into typewriting, and that the foregoing pages correctly set forth the testimony of the aforementioned witness, together with the questions propounded by counsel and remarks and objections of counsel thereto, and is in all respects a full,

Page 167

true, correct and complete transcript of the questions propounded to and the answers given by said witness; that signature of the deponent was reserved by agreement of counsel.

I further certify that I am not of counsel or attorney for either of the parties to said suit, not related to nor interested in any of the parties or their attorneys.

Witness my hand at St. Louis, Missouri, this 15th day of June, 2021.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Certified Court Reporter in and for the
State of Missouri

Page 168

360 Litigation Services
Thursday, July 15, 2021
Robert Will, Esq.
Lewis Rice LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63102-2147
Re: Deposition of DAVID SULLIVAN, CCM
Date: July 9, 2021
Case: A.O.A., et al. vs. Doe Run Resources Corporation, et al.

Robert Will, Esq.,
Your witness did not waive the right to read and sign his/her deposition in the above referenced matter. Enclosed is the copy of the deposition you ordered, together with errata sheets and additional signature page. Please instruct your witness to read the transcript, list any corrections (including page and line number) on the errata sheets, sign and date the errata sheets and signature page.

Within 30 days, please return the errata sheets and signature page to our office for further processing. Your prompt cooperation will be appreciated.

Sincerely,

360 Litigation Services
Production Department
10097 Manchester Road, Suite 102
St. Louis, MO 63122
(314) 394-2206(main)
(314) 394-2207(fax)
Office@360litigationservices.com



EXHIBIT 44