NO POLLUTION ENTERPRISES



# Expert Rebuttal Report in Response to the Opinions of Corby G. Anderson

**Sister Kate Reid, et al. v. Ira Rennert, et al.**

**Case No. 4:11-cv-00044-CDP (consolidated)**

June 22, 2020

Prepared for:

**Schlichter, Bogard & Denton, LLP**

100 South Fourth Street, Suite 1200

St. Louis, MO 63102

**N & P Limited**

**d/b/a No Pollution Enterprises**

31 Willow Spring Drive, Suite 303

Charles Town, WV 25414

Prepared by:

Nicholas P. Cheremisinoff, Ph.D. Principal

***Technical Consultation, Forensic Pollution Reconstruction, Litigation Support for the Environment***

This report has been prepared in the matter of Sister Kate Reid, et al. v. Ira Rennert, et al., on behalf of the client, Schlichter, Bogard & Denton, LLP. The report is copyrighted and may not be quoted, reproduced, used or distributed electronically, in printed or audio format without the expressed written permission of NPE for any other matter other than the aforementioned case. The findings and opinions documented herein are specific to the case matter. Any unauthorized use of the information, statements and opinions expressed herein as well as distribution without the written permission of NPE shall be considered a violation of U.S. copyright laws and a breach of client privilege. NPE will take any and all legal steps to prevent the misuse of its work product. ©2020 NPE.

**EXHIBIT 53**

## Table of Contents

1. INTRODUCTION AND EXECUTIVE SUMMARY ........ 1

2. FALSE METALLURGY EXPERIENCE REQUIREMENTS ........ 8

3. MISREPRESENTATIONS OF SMELTER COMPLEX MODERNIZATION ........ 12

4. UNSUBSTANTIATED CLAIMS THAT THE LA OROYA SMELTER EMISSIONS WERE COMPARABLE TO OTHER SMELTERS ........ 23

*Anderson's False Narrative* ........ 26

5. MISREPRESENTATION OF FATE & TRANSPORT ........ 30

## Tables

Table 1. Chronology of Air Pollution Control Projects ........ 20

## 1. INTRODUCTION AND EXECUTIVE SUMMARY

I am a chemical engineer specializing in the safe handling and management of chemicals and hazardous materials with more than 40 years of industry, business, and applied research experience. Essentially, I have spent decades working with industry stakeholders, communities, lending institutions, and governmental officials on responsible waste and pollution management, the application of best management practices and technologies that prevent worker and community exposures from the mishandling of toxic and dangerous waste and chemical products resulting from industrial activities. My education, training, experience, and qualifications as an environmental standard of care expert remain the same as documented in my February 18, 2019 Expert Report.

I am being compensated as an expert in this matter at the following rates: $395 per hour for analysis and consultations, $595 per hour for deposition testimony, and $4,500 per day for trial testimony.

This report is submitted mainly in response to the report of Dr. Corby G. Anderson (Nov. 26, 2019) who has criticized the scientific findings of my Expert Report published on February 18, 2019. My rebuttal to his criticisms is briefly summarized as follows:

1. Dr. Anderson makes statements that are not supported by evidence and in a number of instances require leaps of logic. He has not performed a scientific investigation of the Defendants' historical operations and failed to identify records which support his opinions.
2. Comments made throughout his report are intentionally misleading, biased, and intended to distract the Court with issues that have nothing to do with my analysis and standard of care opinions with regard to air pollution control and management of the complex.
3. He attempts to confuse the trier of fact and Court with misleading arguments that imply or assert that air pollution and its management for smelters are unique and distinct from any other industry sector. As such, he concludes only metallurgical engineers are uniquely educated and trained to deal with air pollution. His statements amount to nonsense and demonstrate ignorance and a lack of industry knowledge. Refineries, pulp & paper mills, chemical plants, pharmaceutical plants, cement plants, steel mills, tire manufacturing plants, rubber and plastics manufacturing plants, industrial wastewater treatment works, coke chemical plants, coal burning power plants, secondary copper and primary copper smelting plants, secondary and primary lead smelting plants, waste disposal incineration plants, and a vast and wide range of industry sectors all rely on universal pollution controls, pollution control strategies and pollution control management practices to tackle air pollution problems. Hardware controls like wet scrubbers, cyclones, multiclones, baghouses, electrostatic precipitators (ESPs), settling chambers, and many other pieces of hardware are used and adapted to address air emissions across most to all industry sectors, irrespective of the day-to-day operations and specific chemical toxins that make up the composition of air emissions. In my 40+ years as a professional dealing with air emissions issues, the same universal tools are used at refineries and chemical plants that are far more sophisticated complexes than the Defendants' smelter.
4. Anderson is unqualified to offer opinions because he lacks understanding, training and experience in air pollution control and management practices. He has no background or understanding of Pollution Prevention, Source Reduction, Fate & Transport, or



EXHIBIT 53

Environmental Management Systems which becomes apparent from his unsupported and unscientific opinions. He lacks understanding of the basic tools and methods universally recognized and applied by responsible companies to control and manage air pollution.

5. Anderson misrepresents my analysis, opinions, and area of expertise. I have stated and documented that my expertise lies in pollution controls and air pollution management. This expertise applies universally across all industry sectors. This expertise does not require knowledge of day-to-day operations dealing with concentrate specifications or contractual requirements which Anderson erroneously claims impacts air pollution management. My analysis and opinions focus on the tens of thousands of tons of toxic uncontrolled fugitive and point source air emissions discharged to the atmosphere and transported into the community by atmospheric winds between 1998 and early 2009 that could have been addressed by the Defendants. This report reiterates the many examples documented in my Expert Report which show that the Defendants did not apply reasonable strategies, good practices, or hardware controls to reduce and eliminate emissions, especially fugitive emissions. From the day the Defendants purchased the smelter complex they knew that building process and outside fugitive emissions were as large as if not greater than stack emissions. The exhibits assembled in my Expert Report, and to a large extent reassembled here, show the Defendants did little to nothing to address these in a timely fashion and in many cases did nothing at all. Anderson ignored documented evidence in my Expert Report and has offered unsupported, biased statements and arguments that are untrue.

6. For more than 150 years there have been authoritative published works on air pollution control hardware and strategies. None of these published works are specific to any one industry sector. Anderson ignores the scientific and industrial press literature or is unaware of these authoritative sources. This makes him unprepared and unqualified to offer opinions in this matter. None of the published works state that the pollution controls, strategies and methods to control air pollution, especially fugitive air emissions, are unique to any specific industry sector.

7. Anderson is ignorant of the sources of fugitive emissions and their fate & transport. He discusses none of these emissions or the mechanisms by which lead, arsenic, cadmium, and $SO_2$ were discharged uncontrolled to the atmosphere and their subsequent impact on Plaintiffs and unprotected communities as a whole. He offers standard of care opinions without acknowledging and evaluating how these emissions were discharged and impacted the community and Plaintiffs. His opinions are based not simply on ignoring evidence, but require leaps of logic in order to accommodate his personal opinions:

   a. Multiple records and photographic evidence stretching over the entire time Defendants owned the smelter complex substantiate that process fugitive emissions from multiple building operations were released directly into workrooms and then discharged to the outside. The discharges occurred through holes in building walls, open and broken windows, openings in roofs, open doorways, corroded transfer lines that were allowed to deteriorate over many years, and by direct contact with the outside by operating some processes in the open. These workroom emissions contained toxic dusts with high concentrations of lead, arsenic, cadmium and in some instances hot vapors containing metal fumes and $SO_2$. The releases were often in the form of hot vapor clouds which imparted thermal buoyancy, ensuring that

when they came into contact with atmospheric winds, they were transported into the surrounding residential community. There is no consideration of these mechanisms and basic facts which are supported by extensive evidence ranging from photos, CCTV images, to internal documents in which DRP documented that these emissions caused harm to the Public, and years of air quality monitoring data which show that the poor and dangerous air quality was a direct result of the air pollution from the smelter complex. Anderson offers merely a personal opinion that his client addressed these air emissions by modernizing the smelter, a claim which he has failed to support with any demonstrable evidence. His personal opinion requires ignoring the process fugitive emissions, ignore fate and transport mechanisms by which air pollutants are transported.

b. Anderson does not consider any of the outside fugitive air emission sources. In fact, he ignores them utterly. There are multiple photographs which show the addition of fine aggregates to outdoor storage piles, transfer of these aggregates in uncovered transfer lines, movement of the fines with heavy machinery, movement of heavy machinery and vehicles over the fine silty layers created on in-plant roadway surfaces, and that uncapped land areas and building surfaces are subject to windswept erosion. All of these mechanisms are recognized and documented by industry and regulatory agencies like the U.S. EPA. All of these mechanisms and sources were recognized and accounted for when the Defendants prepared emission calculations for its U.S. smelter operations. When this fine particulate matter became airborne, it was transported off site into communities by atmospheric winds. The particulates contained lead, arsenic, and cadmium. He sidesteps the fact that these air emissions could have been calculated and controlled by the Defendants by following the same recognized computational and basic monitoring practices it applied to its US smelter operations. Because these emissions were never measured or quantified in La Oroya, his logic is such that these air emissions never occurred, despite photographic evidence and authoritative published works which contradict his personal views. He offers a simple opinion – that his client modernized the smelter complex and that these emissions apparently never existed.

   i. In my Expert Report I acknowledged these sources and mechanisms, but because the Defendants did not monitor and take measurements, I was unable to quantify the air emissions. I identified records in which the Defendants claim that road surfaces were capped thereby reducing at least these fugitive emissions; but upon more careful consideration of the photographic evidence reassembled in this report, I now find these to have been open sources of dust emissions all the way through the time Defendants shuttered the smelter complex in 2009. There is no basis or evidence to support Anderson's opinion that the facility was modernized both with control hardware upgrades and the adoption of good practices. There is overwhelming evidence that show well within scientific certainly that these and other fugitive sources were ignored by Defendants.

8. Anderson writes that my opinions are nonsense because I have a "…lack of metallurgical knowledge and experience." He says I ignore the fact that Defendants prepared formulations of concentrates for production campaigns. His criticism and argument are nonsensical.

a. He does not explain how the day-to-day, on-site decision-making process that is inherent in the effective operation of a metallurgical facility has anything to do with controlling the air pollution at the facility. There is not a single technical reason the day-to-day, on-site decision-making process that he explains loosely as business and product quality requirements have anything to do with eliminating the air emissions shown in any of the exhibits. Defendants' own photos make it clear:

i. There were holes in the walls and ceilings of process buildings where process emissions were released;

ii. There were open windows through which process emissions were released to the atmosphere;

iii. There were buildings that had no roofs, allowing process emissions to discharge freely to the outside;

iv. There were transfer lines conveying dusts with lead and arsenic that had holes in them. Those damaged transfer lines leaked toxic dust emissions to the outside;

v. There were unpaved road surfaces covered with fine silt in which particulate matter was contaminated with lead, arsenic and cadmium. When heavy machinery and vehicular traffic ran over these surfaces airborne fugitive dust emissions were transported into the surrounding community;

vi. There were large tracks of land and building surfaces covered with dust deposits from furnaces and process emissions. These were sources of windswept erosion which U.S. EPA has documented are readily transported off site;

vii. There were uncovered outside storage piles containing fine aggregates with large amounts of fine, silty materials containing arsenic, lead and cadmium. U.S. EPA documents these to be major sources of fugitive dust emissions;

viii. The sinter building had limited air pollution controls and no shielding. Vornberg reported an estimated 358 tons per year of PM10 laced with arsenic, cadmium and lead being released as building process emissions from this one operation. Nowhere does Vornberg mention that one must account for the day-to-day, on-site decision-making process that is inherent in the effective operation of a sophisticated metallurgical facility in order to enclose buildings, install controls and eliminate air emissions;

ix. The risk assessments and modified PAMA show that Defendants' proposals do not acknowledge the need for any specific metallurgical knowledge and experience.

9. Anderson presents a false narrative, offering falsehoods, undocumented and unsupported claims in order to offer testimony that amounts to self-serving statements intended to justify the Defendants' irresponsible actions.

a. His report does not identify, document, or cite any records showing that concrete steps were taken to reduce the process and outside emissions throughout the smelter complex.

b. His false opinions stem from the fact he did not conduct a historical reconstruction of the operations and pollution controls.

10. Anderson presents narratives in which he claims to have verified modernization of the smelter complex that improved air emissions. His statements are false and baseless. Anderson's words are "…DRP made a wide range of improvements to the smelting processes, air pollution controls, wastewater treatment, and solid waste management and disposal." He does not understand that the air pathway is the only recognized mechanism by which Plaintiffs were exposed to and harmed by his client's pollution. He asserts, without presenting evidence, that "These improvements were reasonable and appropriate, and consistent with modern smelting and pollution control practices employed at that time at other facilities."

a. He does not identify any other smelter that was operated as horribly as the Defendants' with respect to air pollution management. He claims that the pollution control practices were consistent with modern smelting and pollution controls practices of other facilities. His statements are baseless and he cannot identify a single smelter who was operating with similar practices and controls at the time.

b. Anderson ignores evidence. He claims the facility made improvements that were reasonable and appropriate, and consistent with modern smelting and pollution control practices employed at that time at other facilities, yet he makes no reference to DRPE-0000045876. This is the DRP's spreadsheet documenting annual fugitive emissions from the three primary production circuits operated at the smelter complex. This record reports 141,519 tons of fugitive dusts from just the three primary production circuits. The same record reports that once the smelter implemented certain building enclosure operations by 2011 there would still be about 12,000 tons of lead in fugitive emissions alone being released directly to the atmosphere.

c. His opinion that the Defendants made a wide range of improvements to the smelting processes, in particular its air pollution controls, is in direct contradiction to the chronological reconstruction of photo exhibits assembled in my Expert Report. These exhibits document modest changes to gross pollution levels between 1999 and 2009. He had all of this presented to him in my Expert report, but he decided neither to challenge the historical reconstruction, or to prepare any independent analysis. He ignores evidence and offers a personal and unqualified opinion. There are extensive records and evidence which when benchmarked to the earliest days of operation by the Defendants support that the smelter complex was not modernized as he claims.

11. Anderson ignores the relevance of the ISO registration the smelter went through and reasons it was revoked. This is significant because it is the basis by which responsible corporations manage their emissions. The facility's ISO certificate was revoked because of non-compliance with the Peruvian environmental laws and the absence of verifiable pollution prevention measures that Defendants claimed to have taken to reduce air emissions. In other words, the auditor found that the Defendants had misrepresented their actions to reduce air emissions.

a. The auditor identified specific violations in its review; among them was a fine levied against DRP in the amount of $234,000 in 2007. This fine was based on multiple violations.

b. The auditor's documentation shows that there was no commitment to comply with statutory obligations that are intended to protect the public. This does not support Anderson's personal views that his client brought the facility up to modern standards.

c. The revocation of the ISO 14000 Environmental Management System certification is contrary to Anderson's opinion that the facility was modernized to meet modern standards.

12. Anderson made misrepresentations on fate and transport and the mechanisms by which Plaintiffs were exposed to lead, arsenic, cadmium and $SO_2$. He states "… Cheremisinoff purports to evaluate DRP's modernization effort, but his analysis is improperly limited because he considers only those projects he identifies as significant to control air emissions from the facility… Cheremisinoff ignores all other modernization projects in his standard of care analysis, including major projects DRP was undertaking to address the very significant liquid effluent discharges and major solid waste handling issues…"

a. Anderson apparently never examined any of the relevant scientific background studies. His opinions are nearly identical to Connor's and neither he nor Connor understand the relevant fate and transport mechanisms that exposed Plaintiffs.

b. The Peruvian Department of Environmental Health (DIGESA) defined the primary pathway of toxins from the smelter into the community. It reported that the smelter represented 99% of the total emissions of particulate matter, lead, and sulfur dioxide in the La Oroya airshed. The smelter represents 99.6% of total suspended particulate (TSP), 99.4% of PM-10, 99.9% of lead, and 99.978% of sulfur dioxide emissions in the La Oroya airshed.

c. The 1996 Environmental Evaluation of the La Oroya Metallurgical Complex concluded that airborne emissions of sulfur-dioxide ($SO_2$), metals, and PM-10 particulate matter are high and exceed generally accepted international standards.

d. The U.S. EPA who visited the site in 1999 concluded that other pathways such as water and solid waste were insignificant to residential community risks.

e. The World Bank reported the same conclusion.

f. The Gov. of Peru reported the same conclusion.

g. All of the analysis and opinions I have offered on standard of care exclusively address air pollution control and management because the air pathway is the only relevant exposure route that has been recognized by authoritative sources. Since Anderson ignores that the air pathway is the predominant pathway by which Plaintiffs were exposed to lead, arsenic, cadmium and $SO_2$ he has no basis for offering opinions.

13. Anderson writes that changes Defendants made to the La Oroya complex and its smelting process were "reasonable and appropriate to bring the facility up to modern standards." He offers no explanation of what he means by "modern standards." My Expert Report



EXHIBIT 53

documents many pages and authoritative sources on the relevant standards to air pollution issues at the La Oroya smelter, including the ISO standards which were revoked. Anderson does not cite any standards he relied on to support his opinion. I stated in my Expert Report that I did a standard of care assessment which is a benchmarking analysis. The methodology and practices I applied are identical to those approved by state and federal courts where I was proffered and accepted as an expert. Benchmarking allows an assessment as to whether the Defendants applied reasonable practices to reduce air pollution in order to achieve safe air quality levels. The standards I relied on are the Air Quality Standards specified by the Government of Peru, the ISO Environmental Management System, and the same international standards Defendants were aware of and made its own internal benchmarks to. In contrast, Anderson does not define any standards he relied on. He did not apply a recognized scientific methodology to perform a benchmark analysis that would allow him to offer a qualified opinion on standard of care. His personal opinions do not meet the criteria of being within a reasonable degree of scientific certainty.

## 2. FALSE METALLURGY EXPERIENCE REQUIREMENTS

Anderson writes "…Cheremisinoff appears to have no education or applied experience in the mineral processing or extractive metallurgy of non-ferrous metals, or of project execution to change or modernize metallurgical processes and emissions controls at such facilities…. Dr. Cheremisinoff also does not take account of the day-to-day, on-site decision making process that is inherent in the effective operation of a sophisticated metallurgical facility… DRP was required to closely analyze and monitor the contents of the feedstocks to be processed at the facility, which DRP documented in the various daily and monthly metallurgical reports described above. This was necessary so that DRP could make timely and prudent decisions about how specific concentrates and recirculating byproducts would be processed, taking into account process and metallurgical requirements, business needs, and contractual obligations. In my experience, these are "hands on" decisions specifically made on site and on a daily or even shift-by-shift basis through sophisticated metallurgical models and operational experience by the documentation and metallurgical reports DRP prepared."

Anderson's opinion demonstrates he is unqualified to offer standard of care opinions on air pollution control and management. He does not explain or provide reasons why the day-to-day, on-site decision-making processes in the operation has anything to do with controlling or eliminating air pollution from the facility. The following exhibits, which were included in my Expert Report, demonstrate how his opinions are false.

1. Exhibit 1 shows miles of unpaved roads within the smelter complex.
2. Exhibit 2 is a photo showing unpaved road surfaces from my Report. The date of the photo is 2007. The road is covered with a fine silt which when disturbed becomes airborne. The silt contains lead, arsenic and cadmium. Ten years after Defendants purchased the smelter complex, these fine silty sources remained source of fugitive air emissions.
3. Exhibit 3 shows another photo of the of the smelter's road surfaces covered with silt. The date of the photo is 2007.
4. Exhibit 4 is a photo showing fine silty material covering land areas and building roofs. The date of the photo is 2005 and is not much different than the photos cited above.
5. Exhibit 5 is a photo showing a section of plant road covered with fine silt. The date of the photo 2007.

In my Expert Report, I documented authoritative sources that provide detailed explanations of the sources of fugitive emissions from unpaved road surfaces at industrial complexes including lead, copper and zinc smelters. Some of these authoritative publications were in the public domain more than 20 years prior to the Defendants' purchase of the smelter complex. Nowhere in those authoritative sources does it state that the fugitive emissions generated from silty roads requires unique knowledge or understanding of the metallurgical chemistry specific to lead, copper or zinc smelting. Dr. Anderson should understand that spills as well as particle deposition from vents and stacks contaminated the surface of the roads and any open areas within the smelter complex. These mechanisms include vehicular and heavy machinery traffic which disturb silty road surfaces, and windswept erosion which cause fine particulate matter to become airborne. These emissions are then transported by atmospheric winds into surrounding communities and are well-recognized

sources of fugitive dust via the mechanisms documented by the U.S. EPA references cited in my Expert Report.

There is no specific knowledge of metallurgical chemistry needed to render my opinions and observations in my Expert report which state:

1. The Defendants took nearly a decade to begin controlling fugitive emissions;
2. The Defendants never quantified these emissions or accounted for them in any risk assessments;
3. The Defendants had multiple low cost fugitive emission control methods for these emissions that stretched back to documented good industry practices from the early 1970s and yet took years to implement these and, in some instances, never implemented any actions.

I have documented unpaved and open surfaces as a source of fugitive air emissions which is consistent with the authoritative literature. It is irrefutable that the silty material on unpaved road surfaces, building roof surfaces, and open land areas contain lead, arsenic and cadmium; Defendants' corporate representatives testified to the widespread contamination of the area.[1]

The pathways of the emissions into to surrounding community and the available control methods have all been documented with authoritative citations in my Expert report. Other than the following information and expertise which are documented in my Expert report and reiterated here, there is no additional information and expertise needed to evaluate these air emissions and to assess whether reasonable actions were taken to address them:

1. the sources of pollution;
2. the composition of the pollutants;
3. the time periods over which the pollution occurred;
4. the fate & transport mechanisms that transported the pollutants;
5. the control practices and controls relied on; and
6. the practices that could have been applied to control the emissions.

Anderson does not address any of the items listed above as necessary to assess whether reasonable practices were applied. When I performed my standard of care analysis, I researched the same information for each pollution source, and I did so over time to determine whether the smelter complex improved its practices and reduced its air emissions. The methodology and investigative practices I applied are identical to those used in all litigation projects where I was proffered and approved by state and federal courts as a standard of care expert on air pollution management. My opinions are therefore to within a reasonable degree of scientific certainty; the same cannot be said for Anderson. He does not rely on any comparable methodology and he did not examine the information needed to assess the standard of care issues for air pollution sources let alone for the complex as a whole. Instead, he offers the unsubstantiated claim that I lack some metallurgical knowledge and experience that he does not explain, thus rendering my analysis and opinions

---

[1] RENCOGRP-015317 – Witness Statement of Kenneth Buckley. "It was obvious to me and the others who were with me (and it would have been obvious to anyone with experience in smelting operations) that the town was highly contaminated."

unreliable. This reduces his opinions to personal views and his criticisms of my expertise and work as personal attacks.

***Pollution Prevention (P2)***

The term Pollution Prevention (P2) appears foreign to Anderson. P2 are good practices that were widely adopted by industry beginning in 1990. Anderson ignores these. By ignoring P2 practices, he is unable to assess whether the Defendants adopted good practices over time to reduce or eliminate air emissions. Anderson's lack of understanding of P2 practices means he is unqualified to offer opinions as to whether there were good industry practices that could have been applied.

Refer to Exhibits 6 through 8. These exhibits were cited and discussed in my Expert Report which Anderson ignored. The captions and features written in English are as close to literal translations of Defendants' notations as possible.[2]

Exhibit 6 is a photo that documents a P2 practice that was implemented in the dross plant in which uncontrolled fugitive emissions from lead melting pots were covered and the vapors sent to a ventilation and control system.

It is obvious that the fugitive emissions contain lead since the operation is inside the dross plant. It is also obvious that covering the open tops of the pots and directing the fugitive vapors to a ventilation system with controls to eliminate the source of the fugitive emissions is a good practice. These observations do not require any metallurgical knowledge and experience, and especially no information on day-to-day operations that Anderson claims are necessary to identify the pollution source and a remedy. The remedy in this example is based on common sense and experience with P2 practices. He failed to recognize or perhaps intentionally chose not to comment on the fact that the example shown in Exhibit 6 is a relatively small P2 practices that took Defendants 9 years to implement. For an experienced engineer such as myself, this example is among the lowest hanging fruit that can be addressed by a P2 program and could have been addressed within the first few months of the Defendants' taking possession of the smelter.

Exhibit 7 is another example of a P2 practice implemented after years of operating the plant. The before photo documents uncontrolled fugitive dust emissions from the agglomeration plant. As documented in my Expert Report, the dusts contain lead, arsenic and cadmium. The Defendants installed a capturing hood to control these fugitive emissions in 2007, 9 years after its purchase of the smelter complex. It took the Defendants 9 years to begin controlling a minor source of fugitive emissions with a common sense remedy that falls into the P2 category.

Exhibit 8 is another example of a P2 practice implemented after years of operating the plant. The exhibit shows before and after photos that are documented and discussed in my Expert Report. The exhibit shows uncovered lead mixing pots in which fugitive emissions are released into the workroom. There are numerous other exhibits and discussions in my Expert Report that document the workroom fugitives like those shown in Exhibit 8 were released to the outside through open roofs, windows, doors and uncontrolled vents. In my Expert Report, I identified that the fugitive

[2] https://translate.google.com/

emissions in these photos contained lead and likely arsenic, because Defendants identified these toxic metals in the emissions. No additional information is required beyond recognizing:

- The fugitive emissions contained toxic lead and arsenic;
- The fugitive emissions are released to the outside where they are transported by atmospheric winds into the community;
- That the elimination of these emissions could be accomplished by common sense application of covers and pollution controls;

Anderson's criticism that I lack knowledge and expertise on metallurgical issues has nothing to do with pollution prevention practices and standard of care opinions on whether reasonable efforts were taken in a timely fashion to control air emissions. He does not perform an assessment of good practices, but simply offers an unqualified opinion that the facility modernized and reduced emissions to levels he considers personally to be acceptable. Taking 10 years to address a small fugitive emissions source like the one shown in Exhibit 8 is excessive and certainly does not support his opinion that the plant modernized over a reasonable time period. The pollution prevention practice applied is based on common sense, not some special knowledge of metallurgical issues which he relates largely to product quality and meeting contractual production agreements as he explains.

My observations and opinions on these fugitive emissions do not require any specialized metallurgical knowledge that I lack.

## 3. MISREPRESENTATIONS OF SMELTER COMPLEX MODERNIZATION

Anderson misrepresents that the smelter complex was modernized in a timely fashion. He ignored relevant evidence, failed to document the methodology he applied in arriving at his opinion, and offers no analysis or documented reconstruction that would allow him to assess how conditions and air pollution control practices at the smelter changed over time. He does not have the necessary experience, credentials, or knowledge to offer qualified standard of care opinions on pollution control, pollution management, or source reduction and air control strategies.

When I performed my standard of care assessment, I researched and documented the air pollution control practices and conditions of the smelter complex and developed a chronological assembly of records and evidence that allowed me to determine how conditions such as emissions, practices, and controls changed at the smelter complex over time. This allowed me to benchmark changes against the earliest days of operation by the Defendants. The analysis, methodology and practices I employed are identical to those I applied in other litigation matters where I was proffered and approved as a standard of care expert on pollution management by state and federal courts. Because I applied a recognized and rigorous methodology in preparing my standard of care assessment, my opinions are to within a reasonable degree of scientific certainty. The following is evidence Anderson seemingly ignored, leading him to improper conclusions.

- Exhibit 9 is a photo taken during an inspection of the reverberatory furnace. Zinc dust is identified in the caption of the photo.
    - The fact that this exhibit shows these uncontrolled emissions to have existed in 2007 is a strong indicator that these uncontrolled emissions continued for years which stems from placing a low to no priority on pollution control.
- Exhibit 10 (A) is a photo of fugitive emissions from an open pot used for melting lead scrap at the Dross Plant in 2008. Exhibit 10 (B) is a photo of the fugitive emissions within the workroom of the dross plant taken a year earlier in May 2007.
    - The dates on the photos show that these toxic emissions containing lead and arsenic were released for more than a decade directly to the outside, where they were transported by atmospheric winds into the community. That is a noteworthy benchmark that the trier of fact should not be denied.
- Exhibit 11 is a 2008 photo which describes fugitive emissions from another part of the Reverb Lead Furnace in the Dross Plant. It is obvious that the particulate matter and vapors released into the workroom contain lead and arsenic and that these emissions are so extensive that the visibility in the workroom is greatly impaired. He again denies the trier of fact an important benchmark on the poor practices relied on at the smelter complex that stretched over many years and in some instances were never addressed.
- Exhibit 12 is a photo showing fugitive emissions being released uncontrolled into a workroom from a converter in the anodic waste section of the plant.
    - The process emissions are highly contaminated with arsenic. See the windows towards the left of the converter. Some of the panels on those windows are open to the atmosphere. See the fugitive emissions flowing upwards towards the roofline of the workroom. The date of this photo is 2007 which is 9 years after Defendants



EXHIBIT 53

took over operations. That is a long time for such emissions to be ignored by the Defendants. No records could be identified post 2007 that support whether these emissions were ever addressed.

Exhibit 13 is a 2009 photo of a large section of the smelter. Building features are identified on the photo. It is an important benchmark that Anderson has denied the trier of fact because he ignored evidence. When compared to other photo exhibits and records, one sees a facility that is closer to that of being largely frozen in time rather than a facility whose features changed facility-wide from modernization and process changes that reduced air emissions. A benchmark comparison of the building features to other records is worth examining. Buildings are identified by letters.

- (A) Main Stack: Records show that no physical changes to stack height were ever made, but a record does show that the operating conditions of the stack were changed causing poor dispersion and worsening pollution. See an internal memo which reports "due to the drastic reduction of the physical properties of the gases emitted by the stack (temperature, volume, pressure and velocity) that was 20% in average, we conclude that the gas discharge capacity of the main stack is over-designed, harming the gas dispersion potential, which causes the high pollution levels register in the different monitoring stations, and in some cases, do not allow us to fulfill the environmental commitments."[3]
- (B) Dross Building: There are several benchmarks that Anderson ignored because of his poorly executed investigation. In doing so he denied the trier of fact evidence and jumped to the incorrect conclusion that his client modernized the plant by making process and other changes that reduced air emissions and raised the air pollution management to modern standards.
  - Exhibit 6 shows a 2007 photo of process fugitive emissions released into the workroom and then directly through the building roof to the outside. This same exhibit shows that a cover was placed on at least one kettle to eliminate some of the process emissions, but this was done 9 years after operations were taken over by Defendants. There is absolutely no reason for it to take 9 years to literally put a cover on a kettle.
  - Exhibit 10 shows process fugitive emissions released into the workroom as late as 2008 (Exhibit 10A). That does not support Anderson's assertion that the plant was modernized with process changes and good practices in a timely fashion.
  - Vornberg provided estimates of fugitive emissions from this building operation. He reported 153 tons of PM10 were released annually through openings in the building.[4] These particulates contained lead and arsenic. He also reported that 75% of these process fugitive emissions would be eliminated after 2005 by enclosing the dross building. According to Vornberg's memo, these reductions would be achieved by 2006. While Vornberg projected significant emissions reductions, photos are more reliable evidence than a document that cannot be verified from other records. The photos show those process emissions continued to be released

[3] DRPE-0000077931
[4] DRRCE-00922042



EXHIBIT 53

freely to the outside at least until 2008, raising questions as to whether Vornberg's projected emissions reduction from building enclosures are reliable.

- (C) Slime/Anodic Building: The 2009 features are not visible in Exhibit 13; but there are other photo exhibits which allow benchmark comparisons.
  - Exhibit 12 shows a 2007 photo of process fugitive emissions released into the workroom from the anodic waste plant. The emissions are documented to contain arsenic. Anderson ignored this photo and concealed the fate and transport mechanisms by which Plaintiffs were exposed to these toxic dusts and metal fumes. The windows to the left of the converter show broken panes. Hot process vapors rapidly flowed to the roofline where they were released directly to the outside.
  - Vornberg reported an estimated 132 tons per year of PM10 process fugitive emissions released from this building. He reported in his memo[5] that there were no plans to enclose the building operations and reduced these emissions until 2011.
  - This is a rather important benchmark that Anderson ignored. It contradicts his opinion that his client modernized the plant. The process fugitive emissions from this building were released uncontrolled from the day Defendants took over the smelter complex to the day it abandoned operations in 2009.
- (D) Lead Furnace: The 2009 photo (Exhibit 13) shows that the building roof is not enclosed.
  - Exhibit 24 is a 2006 photo which shows building process emissions from the copper converter, the copper roaster, and also the lead furnaces (see feature to far left of photo). This photo shows that the roof of the lead furnace building had openings that appear no different than those shown in the 2009 photo.
  - Exhibit 30 shows several CCTV screenshots of stack and process fugitive emissions from different sections of the smelter complex. Exhibit 30 (D) shows building fugitive emissions from lead furnaces and the loading floor. The date of the photo is 1999. There is no appreciable difference between the levels of emissions through the open roof of this building operation and those shown in the 2006 photo of Exhibit 24.
  - Exhibit 40 is DRP's 2007 CCTV image of building process emissions of dust and gases from the roof of the No. 2 Lead furnace. This photo does not support Anderson's opinions.
  - Exhibit 11 is a photo which DRP describes as fugitive emissions from the Reverb Lead Furnace being released into the workroom in 2008. Anderson has not considered this evidence. The workroom process emissions are so extensive in this photo that there is hardly any visibility. These emissions were dispersed into the air and into the community.
- (E) Copper Converter Section: Examining this feature closely shows the roof is open to the atmosphere.

[5] Ibid DRRCE-00922042

- Exhibit 54 shows two photos from 1999. The images show both building process fugitive emissions and stack releases. The photo to the left looks much like the copper converter section.
- Exhibit 53 (D) shows massive plumes of emissions from the cooper converter section in a 1999 CCTV screenshot.
- Exhibit 15 is a 2008 photo which documents fugitive emissions from the pre-refine furnace process in the copper converter section of the plant. Note windows in the back of the building. This building has an open canopy roof which allowed the emissions to escape into the environment.
- Exhibit 21 is a 2007 photo of the copper converter. It shows that the roof of the building has an open canopy roof. Anderson does not address this, yet the workroom emissions seen in Exhibit 15 escaped through this open roof.
- Exhibit 24 is a 2006 photo – again showing that the copper converter building had an open canopy roof in which the copious amounts of process emissions are shown released directly to the atmosphere.
- Exhibit 25 shows 2008 CCTV screenshots of massive plumes of process emissions being released through the canopy roof of the copper converter section. These images directly contradict Anderson's opinions.
- Exhibit 47 shows more massive plumes being released from the copper converter roof (bottom photos). The date of the images is 2007.
- Exhibit 48 shows more massive plume releases from the copper converter section. The process fugitive emissions are so excessive that visibility is impaired. The date of the CCTV screenshots is 2007.
- The benchmarks show that the emissions in 1999 visually look the same and just as massive and uncontrolled in 2007 and 2008. These photos do not support Anderson's opinions.
- Vornberg reported an estimated 526 tons per year of PM10 released from the building and that DRP intended to begin partial enclosure of the building operations to reduce these emissions in 2011.

- (F) Copper Reverb Furnace Operations: The details of this feature in the 2009 photo are not clear. The photos only show the approximate location of this operation and it is believed parts of the operations may have resided in other buildings. Nonetheless there are historical benchmarks to the emissions from this operation that Anderson ignored.
    - Copper reverb furnaces are believed to be part of roasting operations. As reported in my Expert Report, a certain amount of sulfur must be removed from the product after smelting in order to yield a matte capable of being treated efficiently in the converters. Impurities in the ore (notably arsenic and antimony) are also partly volatilized during the roasting stage leaving a calcine composed of a mixture of oxides, sulfides and sulfates. Preparation of the feed and bedding of the ores and concentrates together with fluxes are pre-steps to roasting. Process operations are explained in detail in my Expert Report. It is a complicated process with several air emission release points. One of these stems from the calcine from the bottom

hearth which falls into a storage bin and is periodically discharged into calcine cars which take the product to the Copper Reverberatory (reverb) furnaces. As best as I have been able to determine from poor records provided by Defendants, these operations were spilt over several buildings.

- Exhibit 46 shows some of emissions from the section of the plant identified as the reverb oxy-fuel section. The date of the photo is 2007. Basic technology is described in the general literature in which it sates "The benefits of oxy/fuel burners ... include up to 100% production increases, energy savings, … lower CO, CO2, NOX, ***85% lower combustion products***, ***50% furnace off-gas and up to 60% lower particulate emission***."[6]
    - Exhibit 27 shows fugitive emissions from the ductwork from the oxy-fuel section. These emissions are indicative of structural damage to the ductwork. The releases indicate that the duct work has leakage and as such it cannot be operating as originally designed and in fact operated at considerably lower efficiencies. The consequence of this is that the furnaces released higher amounts of combustion products, more furnace off-gas and higher particulate emissions. The date of the photo in the exhibit is 1999.
    - Exhibits 28 and 29 are photos showing significant fugitive emissions from the same oxy-fuel transport line, but these photos were taken in 2007 and 2008. The photos do not support that the Defendants modernized this section of the smelter to reduce these emissions and thereby reduce the emissions downstream at the furnaces. I searched for records to see what Defendants did to improve these operations and found none. Anderson does not even mention this part of the plant.
    - Exhibit 53 shows 1999 CCTV screenshots of uncontrolled emissions from this part of the operations. Exhibit 53 (B) is most relevant because it shows the emissions from the calcine from the bottom hearth which falls into a storage bin and is periodically discharged into calcine cars which take the product to the Copper Reverberatory (reverb) furnaces. The only project I was able to identify was one documented in 2007. This is identified in my Expert Report as the Enclosure of Copper Roaster Calcine Loading Zone (Source: RENCOGRP-002468). The objective of the project was to reduce the fugitive emissions from unloading of calcine from the copper roasters to the calcine carriers. The project specified encapsulating the copper roasters unloading zone and the installation of ventilation systems for handling gas and capturing particulate matter. Defendants claimed to have spent $1millon on this project. The problem with this project is the environmental benefits from this project could not be verified from any records and in fact I was unable to find additional records that verify whether this modernization project was ever completed or that actual expenditures were spent. Anderson does not provide records that document that the project was implemented. The fact that it took 9 years after acquiring the smelter complex to address this emission source does not support his opinion that Defendants allocated reasonable resources to bring the facility up to modern standards. And since the project cannot be verified as having been completed and emissions reductions

[6] Baukal, C. Industrial Combustion and Pollution Control. John Zink Company, LLC., Tulsa Oklahoma. Marcel Dekker, Inc. 2004

quantified and verified, it cannot be asserted that Defendants brought the facility up to modern standards as claimed by Anderson.

- Vornberg does not provide emissions estimates for the Copper Reverb Furnace Operations but it is logical that these are likely part of his estimates accounted for in copper roaster sections and copper converter aisles. He reported combined emissions of 1,315 tons of PM10 per year containing lead and arsenic. Vornberg reported that these emissions would begin to be addressed in 2011 with partial enclosure of building operations.
- Anderson did not produce records that show Defendants did anything to reduce these emissions prior to shutting down operations in early 2009.
- Arsenic recovery is part of the operations. Vornberg provided no estimates of these emissions but these are known to be significant given the volumes of arsenic wastes documented in my Expert Report. While Anderson makes no reference to these emissions, I identified relevant benchmarks in my Expert Report which are reiterated here. There were some modernization projects implemented to reduce these emissions.
  - One project was implemented in 2005. This is identified in my Expert Report as Arsenic Cottrell Control System Improvements (Source: RENCOGRP-002468). The objective of the project was to reduce PM emissions from the Main Stack. This was reported to have been accomplished by increasing the collection area of the five units in the Arsenic Cottrell. Replaced the collecting tube sheets with plates; installing deflectors throughout the by-pass pipe to facilitate the acceleration of particulate matter. Defendants documented spending $400,000. While these emissions were reduced, arsenic airborne concentrations at Sindicato (monitoring data) did not show much change over 2004-2005 and there is an uptick in 2006 which indicates the project had little impact on air quality improvement
  - Another arsenic modernization project was implemented in 2006. My Expert Report identifies this as Improvements to Arsenic Plant Ventilation and Packaging Systems (Source: DRPE-0002104173). The objective of this project was to reduce the fugitive emissions of arsenic trioxide particles generated during the packaging and dispatch stages in the Arsenic Plant. This modernization project automated the packaging system for arsenic trioxide and encapsulated the dispatch area, including the installation of a ventilation system, and capturing arsenic powder at the arsenic trioxide condensing unit outlet. This had the effect of decreasing the metal powder load towards the Arsenic Cottrell from 16.02 to 9.61 MT/day, estimating an in-feed reduction to the main chimney of 0.40MT/day. Emission reduction through the main chimney were projected to decrease from 1 to 0.60 MT/day. Defendants reported to have spent $1,604,069. While more substantive in nature, there is again no evidence from air quality monitors in Sindicato that air quality improved. The reductions in arsenic emissions

are also relatively small which likely explains why nearby air monitors did not see significant air quality improvements.

- These last two projects reflect modest modernization efforts; certainly not significant projects that brought the facility up to modern standards.

- (G) Sinter Plant: The 2009 photo shows a building operation that has no walls or shielding. Process operations were completely open to the atmosphere the entire time Defendants operated the smelter complex. This building was a major source of process fugitive emissions at least until 2007.
  - Vornberg reported an estimated 358 TPY of PM10 of building process emissions. The emissions were estimated to be distributed between wet scrubbers and process fugitive discharges as follows: Building process fugitives = 74 MT PM10; Scrubber emissions = 284 MT PM10. The dust emissions contained lead, arsenic, and possibly smaller concentrations of cadmium.
  - Vornberg projected that these emissions would be reduced by 94% by 2007 (Building process emissions to be reduced to 12 MT and scrubber emissions to 10 MT).
  - This was a strong modernization project for the smelter complex. This project is discussed in my Expert Report and is identified as Repowering of A, B and C Ventilation Systems at the Sinter Plant (Source Document: DRPE-0002104173). The project is described as strengthening existing baghouses at the sinter plant, installation of a new baghouse in the system and the replacement of the system's scrubber with a baghouse. The source document reports that lead fugitive emissions would be reduced by 111.98 MT/year which is noteworthy. But I have two criticisms:
    - This project could have been implemented years earlier. Assuming Vornberg's projected completion of 2007 was met, it took 9 years to address this major source. I contend such a project, given its importance and the magnitude of emissions, should have been started in 1999 and completed a couple of years later. In either case, Defendants took a fairly lengthy time between 1998 and 2007 to eradicate these emissions, especially since the project appears to have involved upgrades with off-the shelf pollution controls as opposed to specialty designed controls.
    - My 2nd criticism lies with the fact that no records have been identified that verify whether the project actually achieved Vornberg's emission reductions or those claimed in the source document cited. Normally I might not question the projected reductions; however, as explained further on, Defendants' records reflect a history of the company installing pollution controls and reporting they achieved emission reductions when in fact they had never conducted stack tests or confirmed that equipment even operated properly.
  - One project alone does not support Anderson's claim that the plant was brought up to modern standards with appropriate efforts in a timely manner. He did not perform any historical reconstruction, nor did he document any records he relied

on to support his opinion. At best his assertions are a personal point of view and not based on a facility-wide examination of records over time as I did.

The consequence of his lackluster review of historical practices at the complex is that he conceals that these emissions were released uncontrolled to the air for nearly a decade where they were transported into the surrounding community. Anderson is further remiss to consider what Defendants could have done to mitigate these emissions. He does not address these issues – he just opines that his client modernized the complex and brought the facility up to modern standards within a reasonable amount of time. Apparently, a reasonable amount of time to him is on the order of a decade for minor emission sources. I do not consider that reasonable and in fact believe this source reduction could have and should have been done within the 1st year of operating the smelter complex.

Consider the copper converter section of the smelter. Anderson ignores evidence like Exhibits 21 and 22 which are 2007 photos of the open roof canopy to the copper converter section of the plant. He further ignores Exhibits 23 and 24 which are 2006 photos showing emissions bellowing uncontrolled through the open roof of the same building. Exhibits 25 and 26 show 2008 CCTV images of massive plumes released through the roof of the copper refining section of the smelter.

The caption for Exhibit 26 states, "***Level III fugitive emissions are verified in the Copper Retention Furnace, which impacted the Sindicato monitoring station.***" More than 10 years after his client purchased and began operating the smelter, Defendants acknowledged how harmful process air emissions are. I have been unable to identify any records that support that Defendants took steps to modernize this section of the plant and reduce these emissions.

Anderson offers no explanation or documentation as to what his clients did to reduce uncontrolled process emissions from the copper converters. Other than his personal opinion, he has no basis or evidence to demonstrate that changes Defendants made to the La Oroya complex and its smelting process were reasonable and appropriate to bring the facility up to modern standards.

Anderson provides no evidence that supports that the gross pollution documented in CCTV screenshots are an improvement over the emissions from any previous year of operation. Records I documented show that Vornberg reported that the fugitive emissions from this section of the plant shown by the process emissions in Exhibit 25 and 26 would not be addressed until 2011.[7] Exhibit 12, a 2009 photo, shows no changes to the roofs of the building were ever made. There are simply too many benchmarks, contradictions, and demonstrable facts that do not support Anderson's assertion that "changes DRP made to the La Oroya complex and its smelting process were reasonable and appropriate to bring the facility up to modern standards."

- If that is true, then he would be able to demonstrate so with an emissions inventory showing emissions reductions over time, along with photographic evidence from Defendants' records.
- He would be able to explain the photographic exhibits above. Anderson does not provide a single concrete example of what the Defendants did to modernize the plant and reduce these documented emissions.

---

[7] DRRCE-00922042

Based on his opinion, it is perfectly reasonable not to enclose emission sources, not perform stack tests, not develop an emissions inventory, and not replace broken windows and install capturing hoods for at least 10 years. I do not agree with this assessment especially since I worked for many years at older industrial complexes.

My Expert Report documented those actions taken or proposed by DRP to reduce emissions. I found that the vast majority of practices implemented only had marginal impacts to reducing emissions. Anderson does not challenge any of the documentation I assembled, and he offers no comparable analysis which refutes my findings and opinions. He only offers a personal opinion that is unsupported by evidence.

Table 1 is a chronological summary of the air pollution projects identified and documented in my Expert Report.

**Table 1. Chronology of Air Pollution Control Projects**

| ID | Year | Description | Environmental Benefits |
|---|---|---|---|
| 1 | 1999 | Environmental Monitoring Stations & Aerial Photography | None. |
| 2 | 2000 | Control of Fugitive Emissions by CCTV | Unknown. |
| 3 | 2001 | Modernization of the Electrostatic Precipitation System & Dust Collection Systems | Marginal to incremental. Air quality trends for PM10, arsenic and lead show no impacts from the project. |
| 4 | 2004 | Decommissioning of New Jersey Roasters | Significant for PM and lead but $SO_2$ reductions problematic. |
| 5 | 2005 | Short Rotary Furnaces #1 And #2 | Emission reductions could not be verified/quantified from records review. Air monitoring trend charts for lead and arsenic in showed no impact to air quality. Benefits likely incremental. |
| 6 | 2005 | Arsenic Cottrell Control System Improvements | Arsenic emission reductions could not be verified. Air monitoring in Sindicato did not show improvement to AQ. |
| 7 | 2005 | Washing and Draining Station for Trucks, Polymetallic Concentrate Deposit | Incremental and emission reductions not quantified. |
| 8 | 2005 | Street Sweeping Equipment | Incremental to minimal benefit. |
| 9 | 2005 | Improvements to Ventilation System of Cadmium Plant #2 | Important benefits for worker protection but air quality improvements in La Oroya were not realized |
| 10 | 2005 | New Coke Storage Area and Closure of Coke Plant | Reduced PM emissions by about 1,000MT. PM from coking operations contain nil metals hence project did nothing for lead and arsenic reductions. |
| 11 | 2005 | Ventilation System in Antimonite Plant | No quantitative records document reductions. |
| 12 | 2006 | Engineering Evaluation of Dust Capturing Systems | None. |
| 13 | 2006 | Reduction of Dust Emissions from the Main Stack | Incremental benefits. |
| 14 | 2006 | Zinc Sulfuric Acid Plant Upgrade | Records could not be located that verify how much $SO_2$ air emissions were reduced. Regardless, $SO_2$ air levels from monitoring show air quality worsened. |



EXHIBIT 53

| ID | Year | Description | Environmental Benefits |
|---|---|---|---|
| 15 | 2006 | Handling and Humidifying Lead Smelting Beds | Contribution to reducing fugitive emissions incremental. |
| 16 | 2006 | Enclosure of Copper Reverberator Loading Zone | Incremental. |
| 17 | 2006 | Improvements to Arsenic Plant Ventilation and Packaging Systems | Emission reduction through the main chimney projected to decrease from 1 to 0.60 MT/day. |
| 18 | 2006 | Plant Roads Paving | No estimates of emissions reductions reported. |
| 19 | 2006 | Improvements to Ajax and Kiln Furnace Dust Capturing Systems | Incremental. |
| 20 | 2007 | Maintenance Program for equipment and ductwork | Unknown. |
| 21 | 2007 | Repowering of A, B and C Ventilation Systems at the Sinter Plant | Very significant. |
| 22 | 2007 | Enclosure and Improved Ventilation System of Foaming Plant and Lead Furnaces | Significant but not quantified. |
| 23 | 2007 | Improvements to Dust Capturing Systems in Anodic Waste Plant | Incremental. |
| 24 | 2007 | Installation of baghouse at lead foam reverb furnace | Incremental. |
| 25 | 2007 | Installation of Lead Furnace Baghouses | Significant. |
| 26 | 2007 | Handling and Humidifying Copper Smelting Beds | Incremental. |
| 27 | 2007 | Conditioning of Units 1, 2 and 3 of Central Cottrell (lead sintering) | Contributes to reduction of PM and lead – monitoring data trend charts decline significantly during this period. This action also contributed to a worsening of the $SO_2$. |
| 28 | 2007 | Handling of Nitrous Gases from Anodic Waste Plant | No benefit to reducing lead, arsenic and PM. |
| 29 | 2007 | Enclosure of Copper Roaster Calcine Loading Zone | Unknown – cannot find records that verify project was ever completed. |
| 30 | 2008 | Construction of Lead Acid Plant | None. Records could not be located that verify how much $SO_2$ air emissions were reduced. Regardless, $SO_2$ air levels from monitoring show air quality worsened. |
| 31 | 2008 | Construction of Copper Acid Plant | None. Project abandoned. |
| 32 | 2008 | Copper Furnace Modernization Project | None. Project abandoned. |
| 33 | 2008 | New Ventilation System for Slag Granulation | Unknown – unknown if implemented. |

My reconstruction accounts for 33 projects that DRP initiated over the history of its ownership and operation of the smelter complex. Of the 33:

- 4 Projects were either abandoned or could not be verified as ever being completed (Project IDs 29, 31-33);
- 14 Projects either had no benefits to improving lead, arsenic or $SO_2$ air quality and/or emissions reductions estimates and/or test records could not be located to verify quantitative reductions were ever achieved (Project IDs 1-2, 5-6, 9-12, 14, 18, 20, 27-28, 30);
- 11 Projects either had incremental to marginal environmental benefits (Project IDs 3, 7, 8, 13, 15-17, 19, 23-24, 26);

- 4 Projects were significant to very significant; however, no records could be located which documented the emissions reductions (Project IDs 4, 21-22, 25).

These metrics don't support Anderson's opinion that the changes made to the La Oroya complex and its smelting process were reasonable and appropriate to bring the facility up to modern standards; especially since projects cannot be verified, there appear to be no records of pollution reductions, major projects were abandoned, and many projects had at best incremental to marginal emissions reductions.

## 4. UNSUBSTANTIATED CLAIMS THAT THE LA OROYA SMELTER EMISSIONS WERE COMPARABLE TO OTHER SMELTERS

Anderson's words are "…DRP made a wide range of improvements to the smelting processes, air pollution controls, wastewater treatment, and solid waste management and disposal systems..." Plaintiffs' were exposed to toxic air emissions; in particular lead, arsenic, cadmium and $SO_2$. Any opinion he has rendered regarding wastewater and solid waste management is irrelevant in this matter. The following evidence contradicts his assertion that Defendants' improvements were reasonable and appropriate:

- Exhibit 36 is a 2007 photo showing massive fugitive emissions from the arsenic kitchens. Nine years after the facility was taken over by the Defendants, the plant is shown to release copious amounts of arsenic dust and fumes directly into the air.
- Exhibit 37 shows massive plumes of process emissions from copper and antimony roaster operations being released to the outside in 2007, nearly a decade after Defendants took possession of the smelter complex.
- Exhibit 38 is a 2007 CCTV screenshot showing massive dark plumes described by Defendants as combustion fumes caused by inefficient burners.
- Exhibit 39 is a 2007 CCTV screenshot of dust and gas emissions from the Oxy Fuel furnace roof.
- Exhibit 40 is documented by DRP to show process emissions of dust and gases from the roof of the No. 2 lead furnace. It does not appear that Anderson reviewed Vornberg's estimates for these process building emissions.[8] He has done no quantitative analysis of the mass emissions from the smelter and made no attempts to even develop emissions estimates.
- Exhibit 41 shows 2007 CCTV screenshots of dust and gas emissions from the copper roaster plant. The process emissions are so thick that it is hard to make out the buildings.
- Exhibit 42 is a 2007 CCTV screenshot described by DRP as showing dust and gas emissions from lead foaming operations. If it were not for DRP's caption, the source of the emissions would be unidentifiable because the air emissions are so extensive, they impair visibility.
- Exhibit 43 shows 2008 CCTV screenshots of massive plume releases that are building process fugitive emissions.
- Exhibits 45 through 52 show the same gross levels of process fugitive emissions stretching over more than a decade.
    - Exhibit 47 is a 2006 photo in which DRP's caption reads "Post environmental impact control on ambient air quality." There is hardly any visibility over the smelter complex and one can see the sky is not overcast.

See Exhibits 53 through 55, noting the dates of the photographs. Exhibits 53 and 54 show emissions from various parts of the smelter documented in 1999. Exhibit 55 shows emissions from 2009. These can be compared to the exhibits presented earlier, including some within the same

[8] DRRCE-00922042

earlier and late stages of DRP's operations, which show that conditions barely changed from the time the plant was acquired.

I do not know how one can state that a facility made improvements and modernized a plant when they cannot state when and what air pollution control projects were implemented. He has not produced a single record that quantifies the mass emissions reductions from projects that he is simultaneously unable to document.

Anderson asserts "These improvements were reasonable and appropriate, and consistent with modern smelting and pollution control practices employed at that time at other facilities." In that case, he should identify what, if any, other smelter in the world was operated as horribly as Defendants' with respect to air pollution management. He did not identify what any other smelters were doing to control air their emissions.

- I reviewed what other smelters emissions were and how they controlled them. See the 1987 Bureau of Mines study[9] in which lead emissions inventories for multiple U.S. lead smelters were reported. The Bureau of Mines shows the DRP facility to be the most polluting in terms of air emissions. The study documents how critical fugitive emissions are and that there are multiple good practices to controlling these.

Anderson's incomplete analysis misses key evidence. Serious doubt is thrown on his claims that the facility made improvements that were reasonable, appropriate and consistent with modern smelting and pollution control practices employed at that time at other facilities in light of DRPE-0000045876. This document is DRP's spreadsheet documenting annual fugitive emissions from the three primary production circuits operated at the smelter complex. The three primary circuits are lead, copper and zinc. There are also production circuits for precious metals (gold and silver), metal salts, cadmium, arsenic, and sulfuric acid. DRPE-0000045876 reports:

- 62,903 tons of annual fugitive emissions from the copper circuit.
- 53,060 tons of annual fugitive emissions from the lead circuit.
- 25,556 tons of annual fugitive emissions from the zinc circuit.

This record reports 141,519 tons of fugitive dusts from just the three primary production circuits. Furthermore, the Defendant claims that once it implemented certain building enclosure operations in 2011 there would still be about 12,000 tons of lead in fugitive emissions being released directly to the atmosphere Anderson has not identified another smelter which releases such great amounts of emissions, nor have I.

Anderson ignores the ISO registration which the smelter went through and reasons it was revoked. This is significant because it is the basis by which responsible corporations manage their emissions.

- The La Oroya Complex was issued an ISO certificate on July 21, 2006 by the ISO registered 3rd party auditor TUV Rheinland.[10] The issuance of that certificate was based

---

[9] Smith, R. et al. (1987), Lead Reduction in Ambient Air Technical Feasibility and Cost Analysis at Domestic Primary Lead Smelters and Refineries
[10] DRPE-0000092210

on training staff at the facility to adopt an EMS consistent with the management practices of ISO 14001.

- On March 11, 2008 the certification was revoked because of non-compliance with the Peruvian environmental laws and the absence of verifiable pollution prevention measures that DRP claimed to have taken to reduce air emissions.[11] In other words, the auditor found that DRP had misrepresented its actions to reduce air emissions.
- The auditor cited the following for revoking the certification: "Analysis data results of air quality standards for 2007 (ECAs) provided by your Company on February 22, 2008 as per our request, exceeds maximum annual permissible lead levels in four out of six stations. Resolution 257/2006 MEM/DM and Report No. 118/2006 MEM —AAM/AA Annex I, Item 1.1 A, establish that it is compulsory to comply with air quality standards as of December 2006. The ISO 14001 regulation establishes that the Company that adopts a management system standard must comply with the current legislation and commitments with the authorities. Therefore, in accordance with clause 3.5 of the General Contracting Conditions (Rev. 8), we hereby inform you that TUV has decided to revoke the Certification, issued to the Environmental Management System of your Company, for the above mentioned reasons… we hereby inform you that as of this date, you will not be able to use the Certificate."[12]

The auditor identified specific violations in its review; among them was a fine levied against DRP in the amount of $234,000 in 2007. This fine was based on five violations:

d. Exceeding maximum permissible atmospheric limits at 2 measuring stations, with respect to particulate parameters. (Serious Infraction)

e. Emitting Sulfur Dioxide without authorization or measurement. (Serious Infraction)

The auditor's documentation shows that there was no commitment to comply with statutory obligations that are intended to protect the public. This does not support Anderson's personal views that his client brought the facility up to modern standards.

Refer to Exhibit 8 of a worker wearing a respirator - he is wearing it for a reason. The workroom air is toxic; it is laced with lead, arsenic, cadmium and in some cases $SO_2$. That is what was released directly to the outside and transported to the community by atmospheric winds.

Anderson fails to offer any concrete examples of what Defendants did to reduce and eliminate air emissions in his report and his opinions are not helpful to the trier of fact. He has not done any scientific analysis which supports his opinions. He did not reconstruct a timeline of the air pollution control steps taken by Defendants over the history of its operations and he does not refute my assembly of records. My Expert Report documents all of the records I could find where Defendants took steps to reduce air emissions.

Exhibits presented herein show dozens of examples stretching over the Defendants' operational history in which there were no modernization steps taken to reduce poor practices and eliminate

[11] DRRCE-00637760
[12] DRPE-0001990099



EXHIBIT 53

process fugitive emissions. These examples do not even begin to show how polluting and harmful the smelter's air emissions were.

***Anderson's False Narrative***

Anderson presents false, undocumented and unsupported claims in order to offer testimony that amounts to nothing less than self-serving statements intended to justify the Defendants' irresponsible action. He does not offer concrete examples of actions taken to modernize the smelter in order to reduce air emissions, nor does he identify, document, or cite records produced by his client showing that concrete steps were taken to reduce the process and outside emissions throughout the smelter complex.

There is an old saying that 'one picture is worth a thousand words.' The dates of the photos in my expert report stretch over the historical operating period of the complex by these Defendants. These photos support that the Defendants did not take reasonable steps in a timely manner to address air pollution. DRP's photos do not support any part of a false narrative that the operator/owner modernized the smelter bringing it up to some international standard Anderson does not even define. While industry as a whole in the United States and throughout Europe beginning in 1990 focused on pollution prevention practices to eliminate the identical types of emissions at the smelter, the Defendants were blinded by simple corporate greed and only took minimal actions.

- Refer again to Exhibit 30 which are a series of photos from 1999 showing fugitive dust and gas emissions from different part of the smelter. These discharges are significant and reflect a dirty plant operation.
- Refer to Exhibits 31 through 35. In all of the examples shown in these photo exhibits, the fugitive emission sources are outdoor emissions resulting from the handling of aggregates and storage piles. The aggregates, dusts and particles shown in these photos contain lead, arsenic and cadmium. U.S. EPA reports the following about these outdoor fugitive emissions:[13]
    - "Inherent in operations that use minerals in aggregate form is the maintenance of outdoor storage piles. Storage piles are usually left uncovered, partially because of the need for frequent material transfer into or out of storage."
    - "Dust emissions occur at several points in the storage cycle, such as material loading onto the pile, disturbances by strong wind currents, and loadout from the pile. The movement of trucks and loading equipment in the storage pile area is also a substantial source of dust."
    - "The quantity of dust emissions from aggregate storage operations varies with the volume of aggregate passing through the storage cycle. Emissions also depend on 3 parameters of the condition of a particular storage pile: age of the pile, moisture content, and proportion of aggregate fines. When freshly processed aggregate is loaded onto a storage pile, the potential for dust emissions is at a maximum."
    - "Fines are easily disaggregated and released to the atmosphere upon exposure to air currents, either from aggregate transfer itself or from high winds. As the

[13] U.S. EPA, 13.2.4 Aggregate Handling And Storage Piles, available at https://www3.epa.gov/ttn/chief/ap42/ch13/final/c13s0204.pdf

aggregate pile weathers, however, potential for dust emissions is greatly reduced. Moisture causes aggregation and cementation of fines to the surfaces of larger particles."

- "Silt (particles equal to or less than 75 micrometers [:m] in diameter) content is determined by measuring the portion of dry aggregate material that passes through a 200-mesh screen, using ASTM-C-136 method. Table 13.2.4-1 summarizes measured silt and moisture values for industrial aggregate materials."
- "Total dust emissions from aggregate storage piles result from several distinct source activities within the storage cycle:
  - 1. Loading of aggregate onto storage piles (batch or continuous drop operations).
  - 2. Equipment traffic in storage area.
  - 3. Wind erosion of pile surfaces and ground areas around piles.
  - 4. Loadout of aggregate for shipment or for return to the process stream (batch or continuous drop operations)."
- "Either adding aggregate material to a storage pile or removing it usually involves dropping the material onto a receiving surface. Truck dumping on the pile or loading out from the pile to a truck with a front-end loader are examples of batch drop operations. Adding material to the pile by a conveyor stacker is an example of a continuous drop operation."
- "Watering and the use of chemical wetting agents are the principal means for control of aggregate storage pile emissions. Enclosure or covering of inactive piles to reduce wind erosion can also reduce emissions. Watering is useful mainly to reduce emissions from vehicle traffic in the storage pile area. Watering of the storage piles themselves typically has only a very temporary slight effect on total emissions. A much more effective technique is to apply chemical agents (such as surfactants) that permit more extensive wetting. Continuous chemical treating of material loaded onto piles, coupled with watering or treatment of roadways, can reduce total particulate emissions from aggregate storage operations by up to 90 percent."

With these explanations in mind, the following exhibits are noted:

- Exhibit 31 shows a series 2008 photographs of ore handling operations in which the aggregate handling is open to the outside. There are openings in which fugitive dusts are feely discharged to the outside where they are transported by atmospheric winds into the community. Anderson's opinions are faulty for the following reasons:
  - He provides no evidence that the practices used in 2008 creating these emissions were any different than in 1998.
  - He provides no evidence that any modernization reduced, controlled or eliminated these emissions. The photos show the surrounding enclosures to be deteriorated with openings and holes all of which are source for emissions to the outside.



EXHIBIT 53

  - If the Defendants modernized the plant and took reasonable steps to control emissions, there would not be holes and openings where fugitive dusts are directly released into the surrounding atmosphere remaining a decade after Defendants purchased and took over operations.
  - Anderson does not provide specific metallurgical information he claims is needed in order to recognize emissions shown in the photos. An educated engineer or scientist does not need additional information to understand that the dust particles contain lead and arsenic; that they are released uncontrolled to the outside; that they are readily transported into the surrounding community; and that they could have been prevented by the good practices explained above.
  - Anderson does not provide evidence to support that Defendants adopted any of the controls U.S. EPA explained above to eliminate these fugitive emissions.
  - Anderson does not provide either his or DRP's calculations or measurements that quantify the fugitive emissions. He claims that his client made vast improvements that brought the smelter up to international standards, but he has not calculated or reported how these emissions were reduced over the years by some actions that are not apparent from DRP's photos or documentation.
- Exhibit 32 shows 2006 photos of open roofs and holes in transfer lines, about 8 years after the Defendants purchased the complex.
  - Anderson should explain why it takes 8 years to place enclosures and hoods to reduce these fugitive emissions. Anderson documents no evidence in his report to suggest that the Defendants did anything to control these emissions.
  - The descriptions of the photos are instructive . Photo (A) shows A-17 duct is prematurely corroded by abrasion; (B) shows corroded elbow and missing roof of plenum # 2. Anderson claims that as an engineer I do not understand basic metallurgy, however, he does not recognize that abrasions causing the type of damage shown to the transfer lines do not happen overnight. These are the result of years of neglect and lack of maintenance. Once again, Anderson has provided no evidence that support his bogus explanation and opinions.
- See Exhibit 33, a 2008 photo showing extensive fugitive dust emissions directly released to the outside. These emissions could have easily been controlled with covers within the 1st few months of operations. There is no evidence to support that Defendants did anything to control these toxic emissions.
- Anderson does not show any records in support of his claim that Defendants adopted good practices and modernized the plant to reduce the emissions shown in Exhibit 34. The photo is dated 2008. It shows excessive fugitive dust emissions from dropping fine aggregates on to an outside pile.[14]
  - There are no fugitive dust emission controls shown in the 2008 photo. The photo was taken a decade after Defendants took over the smelter complex. Anderson cites

[14] U.S. EPA, 13.2.4 Aggregate Handling And Storage Piles, available at https://www3.epa.gov/ttn/chief/ap42/ch13/final/c13s0204.pdf



EXHIBIT 53

no concrete examples that substantiate the Defendants modernized the plant to reduce these emissions.

- See Exhibit 35, a 2008 photo of fugitive emissions from windswept erosion at the smelter. EPA states that "watering and the use of chemical wetting agents are the principal means for control of aggregate storage pile emissions. Enclosure or covering of inactive piles to reduce wind erosion can also reduce emissions. Watering is useful mainly to reduce emissions from vehicle traffic in the storage pile area. Watering of the storage piles themselves typically has only a very temporary slight effect on total emissions. A much more effective technique is to apply chemical agents (such as surfactants) that permit more extensive wetting. Continuous chemical treating of material loaded onto piles, coupled with watering or treatment of roadways, can reduce total particulate emissions from aggregate storage operations by up to 90 percent."
  - These control practices are not being applied to control the emissions in the 2008 photo. Apart from his personal opinion, Anderson failed to produce records which show that Defendants controlled these outside emissions anytime between 1998 and 2008 or even later.

Defendants did not modernize the plant as Anderson claims. It did not adopt good industry practices as he asserts that enabled the facility to claim in any shape of form that it met reasonable standards to protect the public from is toxic emissions. He does not offer evidence such as maintenance records, work orders, dust control plans, or emission inventories which estimate the fugitive emissions to show if they were ever reduced. He has nothing other than his personal non-qualified and unscientific opinion.

## 5. MISREPRESENTATION OF FATE & TRANSPORT

Anderson states "… Cheremisinoff purports to evaluate DRP's modernization effort, but his analysis is improperly limited because he considers only those projects he identifies as significant to control air emissions from the facility… Cheremisinoff ignores all other modernization projects in his standard of care analysis, including major projects DRP was undertaking to address the very significant liquid effluent discharges and major solid waste handling issues that were identified and prioritized in the PAMA and described in the Knight Piesold report."

Anderson does not seem to understand the relevant fate and transport mechanisms that exposed Plaintiffs in this matter.

The Peruvian Department of Environmental Health (DIGESA) defined the primary pathway of toxins from the smelter into the community. It reported that the smelter represented 99% of the total emissions of particulate matter, lead, and sulfur dioxide in the La Oroya airshed. The smelter represents:

- 99.6% of total suspended particulate (TSP),
- 99.4% of PM-10,
- 99.9% of lead, and
- 99.978% of sulfur dioxide emissions in the La Oroya airshed.

The 1996 Environmental Evaluation of the La Oroya Metallurgical Complex concluded that airborne emissions of sulfur-dioxide ($SO_2$), metals, and PM-10 particulate matter are high and exceed generally accepted international standards.[15]

Like Connors, Anderson does not acknowledge that Plaintiffs' exposure is due to excessive air pollution that was largely released in the form of uncontrolled emissions that freely communicated with the atmosphere. The unrestricted mass releases were from numerous point (stacks) and fugitive sources (both from process building emissions and outside sources). Atmospheric winds transported the toxins (lead, arsenic, cadmium, ultrafine particulate matter, $SO_2$) into the surrounding communities where Plaintiffs were exposed via inhalation, skin and ingestion. These consequences are well documented with blood level tests and years of robust monitoring records from sensors that recorded ambient air quality concentrations as early as 1997; and even DRP's own photos like Exhibit 26 in which DRP wrote "Level III fugitive emissions are verified in the Copper Retention Furnace, which impacted the Sindicato monitoring station."

- Various photo exhibits (examples Exhibits 6 through 12, 14 through 20, 22, 25-26, 31-32, and 40) are instructive. The dates of these photos stretch over the history of Defendants' ownership of the smelter. They show conclusively that the workroom process air releases were released directly to the outside. Anderson ignores the obvious and only pathway that caused harm to the Plaintiffs. In order for his opinions to hold, the smelter would have had to be hermetically sealed in order to prevent the air discharges from being transported into the surrounding areas.

My analysis and opinions I have offered on standard of care deal exclusively with air pollution control and management because the air pathway is the only relevant exposure route that has been

[15] DRRC-00077581 - Environmental Evaluation of La Oroya Metallurgical Complex – 1996 (Knight Piesold)



EXHIBIT 53

recognized by authoritative sources. Neither Connor nor Anderson have any basis to criticize my analysis or opinions on air pollution controls and management.



EXHIBIT 53



Exhibit 1. Reconstructed Roads Within Smelter Complex

**EXHIBIT 53**



Exhibit 2. Uncapped road from Cheremisinoff Expert Report. DRPE-000224684. Date of photo 5/06/2007

**EXHIBIT 53**

NO POLLUTION ENTERPRISES



Exhibit 3. Plant road showing fine silty material covering road surface and embankment. Date: 2007; DRPE-0000049001

**EXHIBIT 53**

NO POLLUTION ENTERPRISES




Exhibit 4. Shows uncapped land areas and building roofs covered with contaminated silt from Cheremisinoff Expert Report. Estimated date of photo is 2005.

EXHIBIT 53

NO POLLUTION ENTERPRISES



Exhibit 5. Shows silty roads and uncapped areas from Cheremisinoff Expert Report. DRPE-000224684. Date of photo 5/6/2007

**EXHIBIT 53**



ANTES = BEFORE

OLLA SIN TAPA CON EMISIONES FUGITIVAS = POT WITHOUT LID [SHOWING] FUGITIVE EMISSIONS




= TOP

= DUCTWORK TO VENT [FUGITIVES]

AFTER = DESPUES

Pot with lid connected to the dross plant enclosure ventilation system = OLLA CON TAPA CONECTADO HACIA EL SISTEMA DE VENTILACION DE ENCERRAMIENTO DE DROSS PLANT

**EXHIBIT 53**

Exhibit 6. Shows the covering of pots with foam area lids at the dross plant. Date: 2007 (DRPE-0001245539)

NO POLLUTION ENTERPRISES



ANTES = BEFORE



AFTER = DESPUES

EXHIBIT 53

Exhibit 7. Photos show "improvement in the suction system of belt 81 A - Agglomeration plant." Date: 2007 (DRPE-0001245539)

NO POLLUTION ENTERPRISES

BEFORE = ANTES



OLLA CON LA BATIDORA SIN TAPA PRESENCIA DE EMISIONES FUGITIVAS = Mixer pot without lid showing fugitive emissions

DESPUES = AFTER



Mixer pot with lid showing fugitive emissions captured = OLLA CON LA BATIDORA CON TAPA SIN EMISIONES FUGITIVAS

EXHIBIT 8

Exhibit 8. Shows P2 practice of covering lead pot mixers. Date: 2007 (DRPE-0001245539)




Exhibit 9. Photo shows inspection of a reverberatory furnace. The emissions identified as zinc dust; DRPE-000224684. Date: 5/06/2007.

**EXHIBIT 53**




Exhibit 10. (A) Photo of fugitive emissions from an open pot used for melting lead scrap. DRPE-0001973667. Date: 08/10/2008.
(B) Photo of interior of dross plant showing toxic fugitive emissions released through openings in the roof. DRPE-0002224684. Date: 5/06/2007

**EXHIBIT 53**




Exhibit 11. DRP describes the photo as fugitive emissions from the Reverb Lead Furnace; Date: 2008, DRPE-0001973667

**EXHIBIT 53**

NO POLLUTION ENTERPRISES





Exhibit 12. Photo of fugitive emissio[illegible]te plant. Emissions contain arsenic.
DRPE-000224684; Date: May 6, 2007

EXHIBIT 53

NO POLLUTION ENTERPRISES






Exhibit 13. Site photo shows no roof vents. Date: 2009 (Est.)

EXHIBIT 53

http://semanaeconomica.com/article/sectores-y-empresas/mineria/234317-doe-run-se-declaro-desierta-la-cuarta-subasta-de-la-venta-de-activos/




(A)




Open
Roof

(B)

Exhibit 14. (A) Copper roaster section. DRP describes these as fugitive emissions in the pre-refine process from Holding Oven No, 2. DRPE-0002229381. Date: 02/08/2008. (B) Shows same fugitive emissions released to the atmosphere through an open canopy roof.

**EXHIBIT 53**




Exhibit 15. Fugitive emissions from the pre-refine furnace process in the copper converter section of the plant. Note windows in the back of the building and building has an open canopy roof. Date: 2008.

EXHIBIT 53




Exhibit 16. Fugitive building emissions released through open windows. DRPE-00000865194
Date: 5/22/2008

**EXHIBIT 53**

Case: 4:11-cv-00044-CDP Doc. #: 1277-53 Filed: 03/24/22 Page: 50 of 89
PageID #: 51313






Exhibit 17. Photo of fugitive process emissions released through windows. DRPE-00000865194, Date: 5/22/2008

**EXHIBIT 53**

NO POLLUTION ENTERPRISES




EXHIBIT 53

Exhibit 18. Photos of process fugitive emissions released through open windows and through stacks that had never been stack tested at the zinc refinery. DRPE-0000028152. Date: 1999





Exhibit 19. Photo identified by DRP as process fugitive emissions in 2006. DRPE-0000647013

**EXHIBIT 53**

NO POLLUTION ENTERPRISES




Exhibit 20. Process fugitive emissions released through open windows and roofs in the copper refining section. The emissions contain arsenic and lead. DRPE **EXHIBIT 53** 2/08/2008




EXHIBIT 53

Exhibit 21. Shows open canopy roof on copper converter. DRPE-0000089946; Date: 2007

NO POLLUTION ENTERPRISES




Exhibit 22. Described by DRP as fugitive emissions released from the short rotary tower. The roof of the building is an open canopy that released workroom emissions directly to the atmosphere. One can also see fugitive emissions being discharged through open windows and doorways in these photos. Date: June 21, 2007; DRPE-0000601440

○ - *Identifies building process emissions directly released to outside through windows, doors, holes*

**EXHIBIT 53**





Exhibit 23. Described by DRP as building process fugitive emissions; Date: 2006, DRPE-0000647013

**EXHIBIT 53**




Exhibit 24. Described by DRP as emissions from the smelter complex. Individual buildings identified by the defendant are noted in the photo. Date: 2006; DRPE-0000647013

**EXHIBIT 53**




Exhibit 25. CCTV screenshots showing massive toxic plume discharges from the copper converter section. Dates: 2008; DRPE-0002229381

**EXHIBIT 53**




Exhibit 26. Described by DRP as fugitive emissions from the Copper Retention Furnace. DRP further reports in the photo "Level III fugitive emissions are verified in the Copper Retention Furnace, which impacted the Sindicato monitoring station." Date: 8/10/2008; DRPE-0001975667.

**EXHIBIT 53**




Exhibit 27. Photo of fugitive emissions from oxy-fuel transport ductwork, Date: 1999; DRPE-0000028363

**EXHIBIT 53**

NO POLLUTION ENTERPRISES






Exhibit 28. DRP describes the photo as dust and gas emissions from toaster maintenance and plate change oxy fuel inclined duct. Date: 2007; DRPE-0002426564

EXHIBIT 53




Exhibit 29. DRP describes this as fugitive emisisons fom the ductwork pipeline feeding the roy tapper. This is believed to be the transport ductork for the oxy-fuel supply. Date: 2008; DRPE-0000647013

**EXHIBIT 53**




Exhibit 30. Photos of process emissions from (A) the agglomeration plant; (B) ductwork leading to the agglomeration plant; (C) flue gases from combustion operations; (D) Fugitive emissions from lead furnaces and loading floor; Date: 1999; DRPE-0000028152

EXHIBIT 53




EXHIBIT 53

Exhibit 31. Ore handling operations showing emissions released to the outside through openings. DRPE-0001375276, Date: 2008




Exhibit 32. Operations with open roofs and holes showing intentional evacuation of workroom air to the outside. (A) A-17 duct prematurely corroded by abrasion; (B) Corroded elbow and missing roof of plenum #2; DRPE-0000047129, Date: 2006

**EXHIBIT 53**

NO POLLUTION ENTERPRISES




Exhibit 33. Shows profuse amounts of outside dust emissions; Date: 5/22/2008; DRPE-00000865194

EXHIBIT 53




Exhibit 34. DRP describes the photo as Level III dust emissions verified during the preparation of the lead melt bed. Date: 2008; DRPE-0[illegible]

EXHIBIT 53

NO POLLUTION ENTERPRISES




Exhibit 35. DRP describes the photo as Level III Dust Emissions from the Lead Melting Bed. This is an example of windswept erosion events at th[illegible]; DRPE-0001973667

EXHIBIT 53




Exhibit 36. DRP describes the photo as showing fugitive emissisons from the arsenic kitchens. The date of the photo is Dec. 15, 2007. DRPE-00000170521

EXHIBIT 53




Exhibit 37. CCTV screenshots showing process emissions from Copper and Antimony Roasters released to the outside. Date: 2007; DRPE-0002426559

**EXHIBIT 53**




Exhibit 38. DRP describes the image as emissions of poor combustion fumes due to lack of regulation of burners - Pot No. 2 Lead Foaming. Date: 2007; DRPE-0002426558

**EXHIBIT 53**




Exhibit 39. DRP describes the CCTV image product and gas emissions from the Oxy Fuel furnace roof. Date: 2007; DRPE-0002426562

**EXHIBIT 53**




Exhibit 40. Emissions of dust and gases from the roof of the No. 2 Lead furnace; Date: 2007; DRPE-0002426564

EXHIBIT 53




Exhibit 41. Described by DRP as powder and gas emissions from the copper roaster plant, Date: 2007; DRPE-0002426565

**EXHIBIT 53**




Exhibit 42. CCTV screenshot described [illegible] dust and gas emissions from lead foaming operations. Date: 2007; DRPE-0002426562

EXHIBIT 53




Exhibit 43. Shows Massive plume releases that are building process fugitive emissions. Date: 2008; DRPE-0002141172

**EXHIBIT 53**

NO POLLUTION ENTERPRISES






EXHIBIT 53

Exhibit 44. Shows Sinter Plant – Operations are not enclosed. Date: 2008; DRPE-0001396647; Compare this to Exhibit 13.

NO POLLUTION ENTERPRISES




Exhibit 45. Described by DRP as lead emissions f[illegible] along with emissions from other. Date: 2007; DRPE-0001509975

EXHIBIT 53




Exhibit 46. Shows fugitive emissions from the reverb oxy-fuel and copper converter sections. Date: 2007; DRPE-0002227959

**EXHIBIT 53**



Exhibit 47. Photo of the fugitive air emissions across the plant. DRP's caption reads "Post-environmental impact control on ambient air quality." Date: 2006; DRPE-0000867982

**EXHIBIT 53**

NO POLLUTION ENTERPRISES






Exhibit 48. Shows process fugitive emissons fro... onverters. Date: 2007; DRPE-0000654974

**EXHIBIT 53**




EXHIBIT 53

Exhibit 49. (A) Combustion emissions, (B) Combustion emissions, (C) & (D) NOX emissions from chimneys. Date: 2007; DRPE-0000654725




Exhibit 50. CCTV screenshots showing process fugitive emissions from converters. Date: Nov. 2008; DRPE-0002141172

**EXHIBIT 53**

NO POLLUTION ENTERPRISES



Exhibit 51. Photo showing plantwide air emissions from an inspection conducted May 6, 2007; DRPE-000224684

EXHIBIT 53



Exhibit 52. DRP's caption reads "combustion gas fireplace of the Huaymanta cauldron refinery." Date: 2009; DRPE-0001253527

**EXHIBIT 53**




Exhibit 53. Emissions from copper section. (A) Copper roaster plant; (B) Calcination car emissions; (C) Oxy-fuel reverb plant process emissions; (D) Process emissions from copper converters. Date: 1999; DRPE 0000028152

**EXHIBIT 53**




Exhibit 54. Building process fugitive and stack emissions. Date: 1999; DRPE-0000028363 and DRPE-0000028363-4

**EXHIBIT 53**




Exhibit 55. CCTV screenshots of building process emissions from agglomeration plant. Date: 2009; DRPE-0000663138

**EXHIBIT 53**

Testimony given by Nicholas P. Cheremisinoff, PhD since publication of February 18, 2019 Expert Report "STANDARD OF CARE ASSESSMENT OF THE AIR POLLUTION MANAGEMENT OF THE LA OROYA METALLURGICAL COMPLEX"

**April 15, 2019 (Deposition)** – Gestamp Wind North America, Inc. and Roth Rock Wind Farm, LLC vs. Mettiki Coal, LLC. Case No. C-11-CV-18-000014

**January 8, 2020 (Trial testimony)** – Martha Custer, et al. v. Cerro Flow Products, Inc., et al. Case No. 09-L-295

**February 13-14, 2020 (Trial testimony)** - Concepcion and Rosario Acosta, et al., v. Shell Western Exploration and Production, Inc., and Shell Oil Company. Case No. D-506-CV-1999-00509

**May 5, 2020 (Deposition)** - Guy W Manuel v. BP Exploration and Production, INC., and BP America Production Company. Civil Action No.: 1:19-CV-00315-LG-RHW

**EXHIBIT 53**