UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:11 CV 44 CDP |
| | ) | |
| IRA L. RENNERT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR APPLICATION OF PERUVIAN LAW AND SUMMARY JUDGMENT UNDER PERUVIAN LAW, OR, ALTERNATIVELY, <u>DISMISSAL UNDER TRANSNATIONAL LAW DOCTRINES</u>**

**Table of Contents**

I.  Introduction ................................................................................3

II.  Procedural History .....................................................................4

III.  Background ...............................................................................7

IV.  The Defendants and Related Entities ......................................11

V.  Choice of Law ..........................................................................15

   A.  Legal Standard ......................................................................17

   B.  Article 1971 and Negligence ................................................21

      1.  *Actual Conflict* ................................................................22

      2.  *Peruvian Law Applies to the Immunity Defense* ...........24

      3.  *Summary Judgment Not Warranted* ...............................26

   C.  Article 1981 and Vicarious Liability of the Upstream Defendants ...............28

      1.  *No Actual Conflict* .........................................................29

2.  *Missouri Law Applies to Vicarious Liability Claims* ....................................31

   a.  Significant Contacts re Piercing the Corporate Veil............................32

      i.  *Undercapitalization* .........................................................32

      ii.  *Control* ......................................................................34

   b.  Significant Contacts re Agency ...........................................39

VI.  International Comity and Transnational Law Doctrines ...................................41

   A.  Adjudicatory Comity, or International Comity Abstention........................44

   1.  *True Conflict* ...............................................................48

   2.  *Place of Wrongful Conduct*...........................................................52

   3.  *United States-Peru Trade Promotion Agreement* .........................60

   4.  *Consideration Given to Letters from Peruvian Officials*............................62

   5.  *Abstention Not Warranted* .........................................................66

   B.  The Presumption Against Extraterritoriality ...........................................68

   C.  Act of State Doctrine ...............................................................70

   D.  Foreign Affairs Doctrine..........................................................71

VII.  Certification for Interlocutory Appeal............................................................74

## I.  Introduction

Plaintiffs are numerous Peruvian citizens who allege that they were injured when they were exposed as children to toxic substances from the La Oroya Complex, a metallurgical smelting and refining complex operating in La Oroya, Peru.  They claim that the defendants, several interrelated American companies and their executives and directors, acting from Missouri and New York, prioritized profit over safety by authorizing and directing the Complex to emit excessive levels of toxic substances into the La Oroya environment without proper safety protocols in place.  Plaintiffs allege that defendants' Missouri conduct is responsible for their serious medical and developmental injuries from their exposure to lead and other toxic substances emitted from the Complex.

This Order addresses defendants' Motion for Application of Peruvian Law and Summary Judgment Under Peruvian Law, or, Alternatively, Dismissal under Transnational Law Doctrines.  (ECF 1230.)  In determining defendants' earlier motion to dismiss, I ruled that Missouri law would govern this dispute.  *A.O.A. v. Rennert*, 350 F. Supp. 3d 818 (E.D. Mo. 2018).  In that same Order, I rejected defendants' argument that the case should be dismissed on the basis of international comity.  *Id.*  Defendants now argue that the complete factual record developed through discovery shows that those conclusions should change and, further, that additional transnational doctrines warrant dismissal.

I continue to conclude, as I did before, that Missouri law applies to most of this case. But I agree with defendants that it is appropriate to apply Peruvian law to one issue: defendants' claim that they are immune from liability because of what they refer to as the "safe harbor" of Article 1971 of the Peruvian Civil Code. Even under Peruvian law, however, numerous genuine issues of material fact remain in dispute about whether Article 1971 precludes defendants' liability in this case.

I have also fully considered defendants' alternative motion to dismiss based on various transnational law doctrines. I again decline to abstain based on international comity, and I conclude that dismissal under the other transnational doctrines proffered by defendants is not warranted. I recognize, however, that reasonable jurists might disagree on those issues. Because decisions on whether to abstain and/or dismiss under transnational doctrines are governed by factors that present controlling questions of law on which there is substantial ground for difference of opinion, I will certify the issues for interlocutory appeal under 28 U.S.C. § 1292(b).

The many other motions filed by the parties remain pending.

## II.  Procedural History

The long and complicated history of this litigation began in 2007 when Sister Kate Reid and Megan Heeney began filing in Missouri state court several

actions as next friends on behalf of plaintiffs, alleging state tort claims against the

defendant companies, executives, and directors.  The first case filed in October

2007 was removed to this Court and then remanded for lack of subject-matter

jurisdiction.  (Case No. 4:07CV1874 CDP, ECF 61.)  After amendment in state

court, the case was again removed, but plaintiffs dismissed it without prejudice.

(Case No. 4:08CV525 CDP, ECF 51.)  Shortly thereafter, two additional cases

were filed in state court; they were removed and then remanded, again for lack of

subject-matter jurisdiction.  (Case Nos. 4:08CV1416 CDP, ECF 19; 4:08CV1420

CDP, ECF 19.)  After significant activity in the state court, one of the named

defendants, The Renco Group, instituted an arbitration proceeding against Peru in

2010, seeking indemnification for these cases.  Defendants again removed in 2011,

this time based on the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, as implemented by 9 U.S.C. §§

201, *et seq.*  I denied the plaintiffs' motion to remand (ECF 45), and that denial as

well as my denial of the defendants' motion to stay this consolidated case pending

arbitration was affirmed by the Eighth Circuit Court of Appeals.  *Reid v. Doe Run

Res. Corp.*, 701 F.3d 840 (8th Cir. 2012).

Since that time, more Peruvian plaintiffs have filed Missouri state-court

actions through next friends Reid and Heeney, and defendants removed those cases

to this Court asserting the same jurisdictional basis.  All cases filed through next

friends Reid and Heeney are consolidated into this action for pretrial purposes. The consolidated action presently comprises 40 cases and more than 1420 individual plaintiffs.[1]  Sixteen of those plaintiffs are in a Discovery Cohort, and discovery has been fully worked up and completed as to those plaintiffs.

Plaintiffs' amended complaint filed February 21, 2017 (ECF 474) is the operative complaint before the Court.  In October 2018, on defendants' motion to dismiss that complaint, I applied Missouri law and dismissed several claims and defendants.  *See generally A.O.A.*, 350 F. Supp. 3d 818 (E.D. Mo. 2018).  The remaining defendants have now filed a number of motions for summary judgment on all remaining claims arguing, *first*, that Peruvian law applies to all aspects of this case, under which they assert they are entitled to judgment as a matter of law on all claims and, *second*, that they are entitled to summary judgment on all claims even under Missouri law.  Defendants also move to dismiss the case in its entirety arguing that various transnational doctrines require abstention.  Finally, both sides have filed several motions to exclude or limit expert testimony.

For the reasons that follow, I will deny defendants' motion to apply Peruvian

---

[1] Several years after this litigation began, Father Chris Collins filed a number of cases as next friend on behalf of additional Peruvian children, raising the same allegations against the same defendants.  All cases filed through next friend Collins are consolidated into a separate action, which is pending before a different judge of this Court.  *See J.Y.C.C., et al. v. Doe Run Res. Corp., et al.*, Case No. 4:15CV1704 RWS (E.D. Mo.).  The plaintiffs in that consolidated case number more than a thousand as well.  The attorneys who represent the plaintiffs in the Collins cases are not associated in any respect with plaintiffs' attorneys in this Reid/Heeney case.

law to the remaining claims in this action except to the extent defendants seek to apply Article 1971's "safe harbor" defense, and I will deny their motion for summary judgment on that defense.  I will also deny their motion to dismiss under transnational doctrines.  The other motions for summary judgment and to exclude expert witnesses remain pending.

## III.  Background

In 1922, a private company founded and began operating the La Oroya Complex in La Oroya, Peru.  The Complex consisted of smelters and refineries that processed minerals mined from the Andes mountains into copper, lead, zinc, and other metals.  In 1974, the government of Peru expropriated the Complex and transferred its ownership and operations to Centromin Peru S.A., a Peruvian government-owned company.  As part of Peru's plan to promote private investment, Centromin reorganized in 1996 and created subsidiary companies, which included establishing the La Oroya Complex as a subsidiary metallurgical company, Metaloroya, which was then marked for privatization and offered for sale in 1997.  On October 23, 1997, defendants The Renco Group (Renco) and Doe Run Resources Corporation (DRR) purchased Metaloroya (*i.e.*, the Complex) from Centromin pursuant to a Stock Transfer Agreement (STA).  Because terms of the bidding process required that sale of Metaloroya be to a Peruvian company, Renco and DRR formed "Doe Run Peru" (DRP) in Peru for purposes of acquiring the

7

Complex.[2]  They also formed "Doe Run Mining" in Peru as DRP's direct parent company.

When the STA was executed in October 1997, the Complex was operating under a plan developed in January 1997 that required Centromin to incorporate measures to reduce or eliminate emissions from the Complex within ten years to bring the Complex into compliance with laws governing maximum allowable levels of emissions.  The plan was developed in accordance with the Programa de Adecación y Manejo Ambiental (PAMA), which was a program established under Peruvian environmental protection laws that required every mining company to agree to an environmental remediation plan.  Centromin's PAMA was developed after studies of the Complex's environmental impact on La Oroya and its surrounding area showed significant pollution of the environment, including lead contamination in the soil.

Pursuant to the STA, Centromin and Metaloroya/DRP[3] each agreed to assume certain obligations under PAMA.[4]  Centromin agreed to continue some

_____

[2] The heading of the STA identified and defined the contracting parties as Metaloroya (the "Company"), DRP (the "Investor"), and Centromin.  (ECF 545-9.)  Renco and DRR subscribed to the STA and warranted DRP's compliance with its terms.  (*Id.* at hdr.  p. 25, "Additional Clause.")

[3] Metaloroya formally merged into DRP in December 1997.

[4] Centromin's original January 1997 PAMA was divided into the "Centromin PAMA" and the "Metaloroya PAMA" to reflect each entity's obligations.

environmental clean-up projects that it had begun, including remedying the environment around the La Oroya Complex.  Centromin also agreed to assume all liability for any claims by third parties arising from toxic emissions released before the sale of the Complex.  For its part, Metaloroya/DRP agreed to fulfill certain projects and clean-up efforts identified in the PAMA and be responsible to third parties for any damages it alone caused.

In accordance with its business plan, DRP began operating the Complex at maximum capacity to increase production and output.  The Complex operated continuously until 2009.  In early 2009, lenders severed their credit lines with DRP, and DRP ceased operations at the Complex in June of that year.  It went into bankruptcy shortly thereafter.[5]

Plaintiffs are Peruvian citizens who allege that they were injured when they were exposed as children to toxic substances emitted from the Complex beginning October 24, 1997.[6]  They bring their claims against the companies that purchased and invested in the Complex – Renco, D.R. Acquisition Corporation, and DRR; the direct parent of DRP – Doe Run Cayman Holdings, LLC (Cayman Holdings); and certain executives and officers at these companies – Ira L. Rennert, Marvin K.

---

[5] On the evidence and information before the Court, it appears that DRP's Peruvian bankruptcy proceedings continue to date.

[6] All plaintiffs were children when their respective cases were initially filed.  Many have since reached majority age.

Kaiser, Albert Bruce Neil, and Jeffrey L. Zelms.  Plaintiffs allege that these

defendants, acting from Missouri and New York, controlled the Complex in a

manner that resulted in plaintiffs' exposure to lead and other toxic substances,

causing serious medical and developmental injuries.  They seek damages under

state tort theories of negligence, including breach of assumed duties, negligent

performance of an undertaking, and direct participation liability.  For some of these

claims, the defendants' liability rests upon plaintiffs' assertions of agency and

control sufficient to pierce the corporate veil.

The claims that remain in this action are set out in seven counts of plaintiffs'

amended complaint:

Count I – Negligence against defendants Rennert, Renco, DRR, D.R. Acquisition, and Cayman Holdings;

Count II – Negligence against Rennert, Kaiser, Neil, and Zelms;

Count VIII – Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms against DRR, Cayman Holdings, Kaiser, Neil, and Zelms;

Count IX – Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms against Renco, D.R. Acquisition, and Rennert;

Count X – Negligent Performance of an Undertaking against DRR, Cayman Holdings, Kaiser, Neil, and Zelms;

Count XI – Negligent Performance of an Undertaking against Renco, D.R. Acquisition, and Rennert; and

Count XII – Direct Participation Liability against Renco and Rennert.

10

## IV.  The Defendants and Related Entities

**Ira L. Rennert** – Rennert resides in New York, is Chairman and Chief Executive Officer of Renco, and is the primary shareholder of Renco.  He and several trusts he established for himself and his family own 97.9% of Renco.  Rennert is also Director and Chairman of several other Renco-owned and affiliated companies and entities, including those named in this lawsuit as described below.

**The Renco Group, Inc.** – Renco is a private, family-owned investment holding company founded by Rennert in 1975.  Renco was later incorporated in New York, and its principal place of business is in New York.  Rennert controls Renco.  Renco holds 100% of the shares of D.R. Acquisition.

**D.R. Acquisition Corp.** – D.R. Acquisition is a holding company incorporated in Missouri in 1994 and owned 100% by Renco.  Its principal place of business is in Missouri.  Rennert is Sole Director and Chairman of the Board of D.R. Acquisition and, in this role, appoints its officers.  D.R. Acquisition owns 100% of the shares of DRR.

**Doe Run Resources Corp.** – DRR is a natural resource company incorporated in New York with its principal place of business in Missouri.   Its primary business is in mining, smelting, recycling, and fabrication of metals.  It was acquired in 1994 by Renco-owned D.R. Acquisition.  Since 1994, Rennert has served as DRR's Chairman of the Board.  He served as its Sole Director from 1994

11

to 2002, was one of three Directors from 2002 to 2007, and has been Sole Director again since 2007.  From 1997 to 2007, DRR held the primary ownership interest in Doe Run Cayman, Ltd., a non-party to this action.

**(Non-parties) Doe Run Cayman, Ltd. and Doe Run Mining, S.R.L.** – Doe Run Cayman and Doe Run Mining were incorporated on September 10, 1997. Doe Run Mining was formed in Peru as a holding company of wholly owned subsidiary DRP for purposes of acquiring Metaloroya.  Doe Run Cayman was formed in the Cayman Islands as a holding company to acquire the stock of Doe Run Mining.  Rennert was Chairman and Sole Director of Doe Run Cayman.  Doe Run Cayman was a wholly owned subsidiary of DRR.  Neither Doe Run Cayman nor Doe Run Mining had any independent operations.

Doe Run Mining merged into DRP in June 2001.  With this merger, Doe Run Cayman became the direct parent of DRP.

**Doe Run Cayman Holdings, LLC** – Cayman Holdings is a Missouri limited liability company with its principal place of business in Missouri.  It was formed in February 2007 by its Sole Member, D.R. Acquisition, to hold 100% interest in Doe Run Cayman.  Shortly thereafter, in March 2007, D.R. Acquisition transferred the shares of Doe Run Cayman to Cayman Holdings pursuant to a Share Transfer Agreement approved and executed by Rennert.  As a result, DRR no longer had an interest in Doe Run Cayman.  Also in March 2007, D.R.

12

Acquisition executed a dividend of its membership interest in Cayman Holdings to Renco, transferring 100% of its membership interest to Renco.  Renco thus became the Sole Member of Cayman Holdings, the direct parent of DRP.  Cayman Holdings has no independent operations.

**(Non-party) Doe Run Peru** – DRP was formed in Peru in September 1997 for the purpose of acquiring Metaloroya from Centromin.  At the time, Doe Run Mining was the direct parent of DRP, owning more than 99% of its shares, with the remainder owned by DRP employees.  With Doe Run Mining's merger into DRP in 2001, Doe Run Cayman became DRP's direct parent.  In March 2007, through the transactions described above, Cayman Holdings became the direct parent of DRP.  DRP ceased operating the Complex in June 2009 and has been in bankruptcy under Peruvian law since that time.

**Jeffrey Zelms** – During the period relevant to this litigation, Zelms was a Missouri resident[7] and held the following positions in several Doe-Run-affiliated organizations, having been appointed to those positions by Rennert:

- President and CEO of DRR from 1994 to 2006;

- Vice Chairman of DRR from 1999 to 2006;

- President and CEO of D.R. Acquisition from 1994 to 2005;

---

[7] On the evidence and information before the Court, Zelms continues to reside in Missouri.

- President of Doe Run Cayman from 1997 to 2007.

From 1994 through his retirement, Zelms – in his various roles – reported directly to Rennert.  Upon his retirement and continuing through 2013, Zelms was a paid consultant for DRR pursuant to an agreement executed by Rennert.

**Marvin K. Kaiser** – During the period relevant to this litigation, Kaiser held the following Doe-Run-affiliated positions:

- Vice President and CFO of DRR from 1994 to 2006;

- Vice President and CFO of D.R. Acquisition from 1994 to 2005;

- Vice President of Doe Run Cayman from 1997 to 2007;

- Finance Manager of Doe Run Mining from 1997 to 2000;

- Finance Manager of DRP from 1997 to 2001;

- Executive Vice President of DRP beginning 2002.

Kaiser resided in Missouri from 1994 to 2003.  During his last few years as an officer of DRR, he commuted from Kentucky to Missouri for his work.

**Albert Bruce Neil** – Neil worked for DRR as General Manager of a smelting plant in Glover, Missouri.  In 2003, Zelms transferred him from that plant to DRP and appointed him President and General Manager of DRP.  During the period relevant to this litigation, Neil held the following positions:

- President and General Manager of DRP from 2003 to 2006;

14

- Vice President of DRR from 2004 to 2005;

- Vice Chairman, President, and CEO of DRR from 2006 to 2012 (appointed by Rennert);

- President of D.R. Acquisition from 2006 to 2011;

- President of Doe Run Cayman in 2007;

- President of Cayman Holdings from 2008 to at least 2009.

Neil lived in Peru from 2003 through 2005. During all other periods relevant to this litigation, Neil lived in Missouri. After assuming his officer and director roles with DRR in 2006, Neil acted with Rennert's approval as a consultant to DRP on an as-needed basis and was involved in apprising Rennert of DRP's status.

## V.  Choice of Law

In my October 2018 Order, I determined that Missouri law applied to this case, concluding that the laws of Peru and Missouri did not actually conflict in any significant, substantive way with regard to the claims in the case, and that the allegations of the amended complaint were sufficient to state claims under either forum's laws. *A.O.A.*, 350 F. Supp. 3d at 847-48. In their current motion, defendants contend that the summary judgment record requires me to take a fresh look at the choice-of-law issue because, according to defendants, the record now establishes that plaintiffs cannot recover against them under Peruvian law. Defendants assert that this circumstance shows that the relevant Missouri and

15

Peruvian laws conflict and that, under choice-of-law rules on the facts of this case, I must apply Peruvian law.  And under Peruvian law, defendants argue, they are entitled to judgment as a matter of law.

Defendants raise three specific arguments to support their assertion:  1) that testimony from plaintiffs' proffered experts shows that plaintiffs cannot recover for negligence because defendants complied with relevant government regulations; 2) that expert testimony shows that plaintiffs cannot recover from the upstream defendants on their veil-piercing and agency theories of liability for DRP's alleged negligent conduct; and 3) that, because of 1 and 2 above, plaintiffs' claims cannot survive under Articles 1971 and 1981 of the Peruvian Civil Code, respectively. These arguments are largely based on a very restricted reading of the testimony of plaintiffs' standard-of-care expert witness, Dr. Jack Matson, and of plaintiffs' financial expert witness, Kyle Ann Midkiff.  Defendants interpret Dr. Matson's testimony as limiting plaintiffs' claims to DRP's delay in completing four discrete projects relating to fugitive lead emissions, and as admitting that the projects were completed timely under PAMA.  They interpret both Dr. Matson's and Ms. Midkiff's testimony as showing that DRP was never inadequately capitalized and that defendants never exercised control over DRP.  Defendants also attribute statements to their own Peruvian law expert, Keith S. Rosenn, that he did not make.

For the following reasons, I continue to conclude that there is no conflict between the relevant Missouri and Peruvian laws as they apply to plaintiffs' asserted claims in this action and that Missouri law applies to the claims. Defendants' "safe harbor" immunity *defense* under Article 1971, however, is different. Because there is no Missouri analogue to this defense, an actual conflict exists between Missouri and Peruvian law on the issue. Applying Missouri's choice-of-law analysis, I conclude that Peru has the most significant relationship to this defense and therefore apply Peruvian law to that issue alone. But because genuine issues of material fact exist on the Article 1971 defense, that is, whether defendants were acting "in the regular exercise of a right," defendants are not entitled to summary judgment under Peruvian law.

A.    Legal Standard

As indicated above, federal subject-matter jurisdiction in this action lies with defendants' invocation of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States."). Although the case arises under the laws and treaties of the United States, it raises only state-law claims. In *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502 (2022), the Supreme Court recently held that in a case upon which federal subject-matter jurisdiction is based on the laws and

treaties of the United States, but which raises only non-federal claims "(relating to property, torts, contracts, and so forth)" that turn only on state law and have no substantive federal component, the district court should apply the forum State's choice-of-law rule instead of a federal one. *Id.* at 1507-08, 1509 (case brought under Foreign Sovereign Immunities Act raising non-federal property-law claims). Noting that the forum State's choice-of-law rule would apply if the state-law suit was filed in state court, or in federal court under diversity-of-citizenship jurisdiction, the Court saw no reason for federal law to supplant an otherwise applicable rule. *Id*. at 1509. *See also California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022) (Supreme Court in *Cassirer* dispelled uncertainty in which choice-of-law rule to apply in federal question and other cases in which jurisdiction not grounded in diversity). I therefore apply Missouri's choice-of-law rules to this action.

Under Missouri law, the first step in a choice-of-law analysis is to examine whether the different states' laws at issue actually conflict. *Nestlé Purina PetCare Co. v. Blue Buffalo Co.*, 129 F. Supp. 3d 787, 790 (E.D. Mo. 2015). If there is such a conflict, then I must determine which law applies. *Id.* at 791. If there is no conflict, I need not undergo a choice-of-law analysis; I apply the forum State's law, provided that that State has significant contact or aggregate contacts to the parties and occurrence at issue, creating State interests, "such that choice of its law

is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S.

302, 313 (1981).  *See also In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs.*

*Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *4 (W.D. Mo. Mar. 21,

2019) (class action) (same).

The parties appear to dispute what constitutes an actual conflict for choice-

of-law purposes.  Defendants cite Second Circuit precedent stating that an actual

conflict does not require demonstration that the choice of which rule to apply *will*

be outcome determinative, but instead only requires different substantive rules that

have a "significant *possible* effect on the outcome of the trial." *Finance One Pub.*

*Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).

Plaintiffs, in a footnote, suggest that I look to "whether 'a person subject to

regulation by two states can comply with the laws of both.'" (ECF 1275 at hdr. p.[8]

18 n.37 (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993)).)

Last year, the United States District Court for the Western District of Missouri

articulated that "[u]nder Missouri law, a conflict of laws does not exist unless the

interests of the two states cannot be reconciled." *Rey v. General Motors LLC*, No.

4:19-CV-00714-DGK, 2021 WL 4786469, at *3 (W.D. Mo. Oct. 13, 2021)

---

[8] Given the inconsistent pagination of the briefs and several thousand pages of exhibits submitted
in this action, I will refer to the page number identified in the ECF header of a filed document
when citing to that document.

(internal quotation marks and citation omitted) (appeal pending).  Applying that standard to the circumstances of that case, the court appeared to adopt the test urged by the defendants here by finding an actual conflict where application of each forum's law was "*potentially* outcome determinative."  *Id.* (emphasis added).

I will apply the standard urged by defendants and used by the Western District in *Rey* and look to whether the relevant law of each forum is potentially outcome determinative on the issues raised.  Under the principle of "*dépéçage*," I apply this test individually to each particular issue.  *In re NuvaRing® Prods. Liab. Litig.,* 957 F. Supp. 2d 1110, 1113 (E.D. Mo. 2013) (citing *Glasscock v. Miller,* 720 S.W.3d 771, 775 (Mo. Ct. App. 1986)); *Johnson v. Avco Corp.*, No. 4:07CV1695 CDP, 2009 WL 4042747, at *3 (E.D. Mo. Nov. 20, 2009).

If I find a conflict between the relevant laws, I must apply the most-significant-relationship test as set forth in the Restatement (Second) of Conflict of Laws to determine the applicable law.  *See Reid v. Doe Run Res. Corp.*, 74 F. Supp. 3d 1015, 1023-24 (E.D. Mo. 2015); *A.O.A.*, 350 F. Supp. 3d at 847.  "When tort claims are at issue, the applicable law is 'the local law of the state which, as to that issue, has the most significant relationship to the occurrence and the parties.'" *Nestlé Purina PetCare*, 129 F. Supp. 3d at 791 (quoting *Thompson by Thompson v. Crawford,* 833 S.W.2d 868, 870 (Mo. banc 1992)).  *See also* Restatement (Second) of Conflict of Laws § 145 (1971).  To determine which state has the most

significant relationship, Missouri courts must consider:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.  *Id.* at § 145(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.*

Against this backdrop, I turn to defendants' claim that Articles 1971 and 1981 of Peru's Civil Code conflict with Missouri law on the relevant issues and that consideration of the Restatement factors dictates that Peruvian law applies.

B.    Article 1971 and Negligence

Article 1971.1 of Peru's Civil Code provides that there can be no civil liability for one who acts "in the regular exercise of a right."  Defendants interpret this to mean that they are immune from liability for any personal injury or environmental damage caused by any actions they or DRP may have taken *so long as* they complied with their obligations under the PAMA.  Because Missouri law provides no such immunity, defendants argue an actual conflict exists.  And, defendants argue, because the summary judgment record shows that they complied with PAMA regarding the four projects they claim plaintiffs' experts concede are the only bases for plaintiffs' negligence claims, they are entitled to judgment as a matter of law under Article 1971.

21

1.    *Actual Conflict*

Defendants argue that Dr. Matson's testimony effectively limited plaintiffs' negligence claims to the alleged delay in completing four projects at the Complex that would have reduced fugitive lead emissions.  Defendants contend that when this testimony is juxtaposed with Ms. Midkiff's that DRP was not undercapitalized at the time plaintiffs claim the projects should have been completed, defendants cannot be found liable for DRP's failure to implement the projects earlier than it did because 1) they lacked the necessary control over DRP, and 2) Dr. Matson agreed that the four projects were timely completed under PAMA.

Plaintiffs' evidence of negligence, however, is not limited to the testimony of Dr. Matson cited by defendants, and their evidence of upstream control is not limited to the testimony of Ms. Midkiff.

Dr. Matson stated he agreed with plaintiffs' prior expert, Dr. Cheremisinoff, who is now deceased, that defendants did not exercise reasonable care when they failed to apply practices and implement controls recognized by industry and authoritative sources to reduce emissions.[9]  Dr. Matson testified that defendants had knowledge of the harmful effects of lead emissions, that they knew fugitive emissions were a major source of contamination that could cause injury, and that

---

[9] Plaintiffs indicate that they believe some of Dr. Cheremisinoff's deposition testimony may be admissible at trial, but they did not submit any of that testimony in response to this motion.

the PAMA did not prevent them from taking necessary remedial actions.  Plaintiffs also cite to defendants' own documents that show that even after completion of certain enclosure projects they undertook later, defendants still expected dangerous levels of fugitive lead emissions.  Contrary to defendants' assertions, Dr. Matson's testimony does not show that plaintiffs could not recover under Peruvian law on their negligence claims; nor is there anything in the evidence that shows that the laws of Missouri and Peru conflict on the torts alleged in the amended complaint.  The summary judgment record does not show that my earlier ruling on the application of Missouri law to plaintiffs' asserted claims should be changed.

But defendants' immunity *defense* under Article 1971 is different.  Defendants argue that Article 1971 provides a "safe harbor" or immunity from liability so long as they complied with the requirements of the PAMA.  Missouri law provides no such immunity.[10]  And they argue Dr. Matson's testimony that the four fugitive emissions projects were timely completed under PAMA entitles them to this defense.  Because which law applies to this defense is potentially outcome

---

[10] The government contractor defense recognized in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), seems somewhat analogous, but upon examination is not.  That defense is a creation of federal common law for products liability cases and imposes different requirements than Article 1971:  it requires that the government approved precise specifications for whatever equipment caused the injury, that the equipment conformed to the specifications, and that the supplier warned the government about risks from the product that were known to the supplier but not the government.  *See In re: Aqueous Film-Forming Foams Prods. Liab. Litig.,* MDL No. 2:18-mn-2873-RMG, 2022 WL 4291357 (D.S.C. Sept. 16, 2022).

determinative, I conclude that an actual conflict between Peruvian and Missouri law exists on this issue, but on this issue alone.[11]

### 2.     *Peruvian Law Applies to the Immunity Defense*

Having concluded that an actual conflict exists between Missouri and Peruvian law on defendants' immunity defense, I look to Missouri's choice-of-law rule to determine which forum's law applies to the issue.

Consideration of the § 145 Restatement factors governing tort claims as set out above leads me to a neutral conclusion as to which law applies.  While plaintiffs' injuries occurred in Peru, the conduct that plaintiffs claim caused the injuries is alleged to have largely occurred in Missouri through the overarching decisions and actions of the defendants taken here.  Likewise, although the nationalities of the parties are diverse, the defendants are incorporated and/or have their principal place of business here, reside here, and/or conducted substantial business here directly related to this cause of action.  Finally, the relationship between the parties is centered in Peru, given that plaintiffs' connection to the

---

[11] Plaintiffs argue that Peru's environmental laws are more specific than Article 1971 and render 1971 inapplicable here.  On the earlier motion to dismiss, both sides argued about whether Section 142.2 of the General Environment Act (GEA) rendered Article 1971 inapplicable to a mining operation.  Plaintiffs continue to make this argument, but in their reply brief to the instant motion for summary judgment, defendants point out that the GEA was not passed until 2005 (ECF 843-12), so it could not apply to actions taken before that date.  The provisions of the previous Environmental and Natural Resources Code, passed in 1990, are far more general (ECF 843-6), and neither party has addressed how those provisions interact with Article 1971.

Complex is in Peru and their exposure to the toxins emitted by the Complex occurred there.

Consideration of additional factors as set out in § 146 of the Restatement, however, leads me to conclude that the law of Peru, and specifically Article 1971 of its Civil Code, applies.  Section 146 of the Restatement (Second) of the Conflict of Laws governs actions for personal injury and creates a presumption in favor of applying the law of the jurisdiction where the injury occurred.  *Dorman v. Emerson Elec. Co.*, 12 F..3d 1354, 1359 (8th Cir. 1994).  That presumption may be rebutted, however, if "with respect to the particular issue, some other state has a more significant relationship[.]"  Restatement (Second) of the Conflict of Laws § 146. In determining which state has a more significant relationship, § 146 directs that I look to the principles stated in § 6 of the Restatement.  Those principles are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and,
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of the Conflict of Laws § 6.

Here, for several reasons, Peru has the most significant relationship with regard to the particular issue of defendants' Article 1971 immunity defense.  First and foremost, plaintiffs' injuries occurred in Peru, so I start with the presumption

that Peruvian law applies.  Moreover, Article 1971 states a policy of Peru to provide immunity to parties who are exercising a "right" given to them by the government.  In the context of this case, that immunity would deprive injured Peruvian citizens of compensation that would otherwise be available to them.  This may reflect a policy decision by Peru that economic interests may override the interests of compensating injured persons, although the Article is not specific to mining situations.  Additionally, and especially when considered in light of PAMA, Peru has a strong interest in the certainty, predictability, and uniformity of result for claims related to PAMA.  Accordingly, Article 1971 applies to defendants' "safe harbor" immunity defense.

### 3.    *Summary Judgment Not Warranted*

Assertion of this immunity defense under Article 1971, of course, is not the same as proving entitlement to summary judgment thereon.[12]  Defendants argue that Article 1971 absolves them from all liability on plaintiffs' claims because the work at the Complex was the result of their assumption of obligations under

---

[12] Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  I must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.  *Scott v. Harris,* 550 U.S. 372, 379 (2007).  My function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

PAMA and because they complied with the PAMA timeline regarding the four fugitive emissions projects they assert constitute the only remaining bases for plaintiffs' negligence claims.[13/14]

This protection is not as broad as defendants urge. On the earlier motion to dismiss, both sides presented expert witnesses who testified about this provision of Peru's Civil Code. Mr. Rosenn, defendants' expert, described Article 1971 as follows: "*If* Doe Run Peru complied with the environmental obligations it assumed under the La Oroya PAMA and the STA, it would come within the principle of non-liability created by Article 1971 of the Civil Code." (ECF 150-1 at hdr. p. 26, ¶ 57. Emphasis added.) He went on to state that under Peruvian law, whether DRP did or did not meet the criteria for exclusion from liability is a "factually dense question." (*Id.* at hdr. p. 28, ¶ 60.)

This factually dense question must remain for trial, as genuine disputes remain on the issue. Whether defendants fully complied with PAMA is itself disputed. Although the evidence is extremely confusing about which PAMA

---

[13] As discussed above, the summary judgment record shows that plaintiffs' viable claims are not so limited.

[14] Notably, defendants now argue that this is an element of plaintiffs' case and not an affirmative defense despite their position taken earlier in this litigation that Article 1971 provided them a "defense." (*See* ECF 909, Defts.' Reply Memo. re Appl. of Foreign Law, at hdr. p. 80 – referring to whether defendants could "successfully utilize the Article 1971 defense"; *id.* – referring to their "simple argu[ment] that the defense is available"; *id.* at hdr. p. 81 – referring to whether defendants "will later successfully establish immunity under Article 1971.")

projects DRP was obligated to perform versus those retained by Centromin, the parties agree at least as to one of the projects that DRP did not complete: building new sulfuric acid plants. But plaintiffs assert that completion of the specific "projects" listed in PAMA is not all that was required to comply with Peruvian law, given that PAMA's purpose was to reduce emissions to levels at or below Peru's environmental standards. In the currently pending arbitration between Peru and Renco, Peru itself asserts that defendants had not met all PAMA obligations at the time they shut down the smelter. And there is evidence that defendants had internal discussions about whether the substantial payments DRP was obligated to send to DRR were limiting DRP's ability to make further environmental improvements.[15] From the contested evidence, a jury could also conclude that defendants acted recklessly or maliciously, which certainly would not be insulated by PAMA. These "factually dense" questions cannot be resolved on summary judgment, as the material facts remain genuinely contested.

Accordingly, while Peruvian law applies to defendants' Article 1971 immunity defense, defendants are not entitled to summary judgment on the defense.

C.     Article 1981 and Vicarious Liability of the Upstream Defendants

In my October 2018 Order, I set out the substantive law of Missouri and

---

[15] *See* discussion *post* at Section VI.A.

Peru on veil-piercing and agency theories of liability and determined that there was

no actual conflict between the two forums' laws. *A.O.A.*, 350 F. Supp. 3d at 836-

40, 847.  And I found that plaintiffs' allegations fell squarely within the relevant

laws of both fora and, if proven, could provide a basis to impose liability on

defendants under those theories. *Id.* at 836-40.  In their current motion here,

defendants do not challenge those earlier findings nor ask that I revisit them.

Instead, defendants assert a new argument that Article 1981 of Peru's Civil Code

precludes plaintiffs from pursuing their veil-piercing and agency claims in the

circumstances of this case, whereas Missouri law does not.[16]  Given this actual

conflict, defendants argue, I must apply Peruvian law to plaintiffs' claims and

dismiss them under Article 1981.  For the following reasons, I continue to

conclude that no actual conflict exists and that Missouri law applies to plaintiffs'

theories of vicarious liability.

1.   *No Actual Conflict*

Under Peruvian law, when a subordinate relationship exists and the

subordinate acts on behalf of the parent and causes damage, then the parent may be

liable for the acts of the subordinate.  (ECF 871-121, Espinoza Report at ¶ 5.24.)

---

[16] Defendants aver that because plaintiffs' direct liability claims rely on the same facts and factors as the veil-piercing/agency claims, they determined to address only the vicarious liability theories here.  (ECF 1231 at hdr. p. 16, n.4.)

This type of relationship is a low bar, only requiring a "causal relationship" between the parties. (*Id.* at ¶ 5.25.) Thus, if it is possible to exercise power over a party, then a subordinate relationship is present because of the mere existence of the relationship and the exercise of control. Accordingly, the relationships between defendants, their agents, and DRP as their alter-ego could qualify as "subordinate" relationships if plaintiffs can prove their veil-piercing or agency allegations. And liability under Peruvian law is established when there is the mere existence of a relationship between the principal and agent. (*Id.* at ¶ 5.26.) When a party directs another to act, and the latter causes damages while performing those duties, then the "direct principal and the vicarious principal are subject to joint liability." (*Id.* at ¶ 5.27.) This is not substantively different from the law of Missouri.

Regarding this vicarious liability, defendants contend that Article 1981 of Peru's Civil Code requires that, in order for a principal to be liable for a subordinate's conduct, there must have been an actual adjudication of the subordinate's liability in a prior judicial proceeding. And they assert that expert testimony establishes that that adjudication must have been made in a prior *separate* judicial proceeding. But the experts do not say that. Instead, the experts agree that for there to be liability of the principal, liability of the subordinate must simply be proven. This, of course, is no different from what Missouri law requires.

The experts also agree that there must be a "judicial determination" of the subordinate's liability before the principal is determined to be liable, but none of the experts say that that must take place in a separate judicial proceeding.[17]  It is not at all uncommon in Missouri and federal courts to hold bifurcated trials or to ask the jury to answer special interrogatories, either of which could easily accomplish this prior determination requirement.  Thus, Article 1981 does not preclude plaintiffs' claims to the extent they rest on veil-piercing or agency theories of liability, and there remains no conflict between the substance of Missouri and Peruvian law on these issues.

2.   *Missouri Law Applies to Vicarious Liability Claims*

With no conflict, I apply Missouri law to plaintiffs' veil-piercing and agency claims given the State's significant contacts with the defendants, their challenged conduct, and the occurrences giving rise to this cause of action, creating State interests.  *Hague*, 449 U.S. at 313; *In re Dollar Gen. Corp.*, 2019 WL 1418292, at *4.  Several significant contacts are set out in my October 2018 Order on defendants' motion to dismiss.  *See A.O.A.*, 350 F. Supp. 3d at 848.  And evidence adduced through discovery and presented on summary judgment further shows

---

[17] Defendants' expert, Mr. Rosenn, says it is not uncommon for a criminal case against an agent/employee to be followed by a civil case against the principal/employer.  (ECF 843-17 at hdr. p. 17, ¶ 39.)  While it may be not uncommon in that context, neither Mr. Rosenn nor any other expert says two different proceedings are *required* for the type of civil liability alleged here.

Missouri's significant contacts as they relate to plaintiffs' veil-piercing and agency claims.

### a. Significant Contacts re Piercing the Corporate Veil

Defendants argue that the testimony of plaintiffs' relevant experts shows that DRP was not undercapitalized and that defendants lacked the requisite control over DRP and thus that plaintiffs cannot demonstrate that any liability-inducing conduct occurred in Missouri.[18]  I disagree.  As described above, defendants read the testimony of plaintiffs' experts too narrowly, and plaintiffs have presented sufficient evidence beyond expert testimony that shows relevant aggregate contacts with Missouri.

### i. Undercapitalization

Defendants strenuously argue that plaintiffs cannot demonstrate that DRP was undercapitalized and, on that basis alone, cannot proceed on their veil-piercing claim.  But undercapitalization is not required to be shown in order to pierce the corporate veil, although it can be used to show that control of a subordinate entity

---

[18] To pierce the corporate veil under Missouri law, plaintiffs must show defendants' dominant control of DRP, that the control was used to commit a fraud or wrong or breach of a duty, and that the control and breach of duty proximately caused plaintiffs' injury.  *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. Ct. App. 1986).  In this motion, defendants challenge plaintiffs' evidence on the first *Collet* factor, *i.e.*, control, and argue that undercapitalization is required to meet the second factor.  For purposes of this motion, I address only those arguments and do not undertake an exhaustive analysis of all three *Collet* factors.

was used for an improper purpose. *Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305, 307-08 (8th Cir. 1992). The Midkiff testimony defendants point to on capitalization therefore does not end the analysis. And even on this point, there is sufficient evidence that pivotal decisions regarding DRP's capitalization were made in Missouri and directly affected Missouri corporations.

First, the financing structure for DRP's purchase of Metaloroya was arranged by Renco and implemented by Zelms and Kaiser in their executive roles with DRR. This structure included a $125 million capital contribution to Metaloroya that was immediately "loaned" back from Metaloroya to Doe Run Mining and never directed to DRP. This financing decision implemented by decisionmakers in Missouri thus deprived DRP of its own purported capital. Indeed, evidence shows that DRP was structured from its inception to be undercapitalized as a stand-alone entity, especially regarding its ability to comply with its environmental obligations. *Cf. Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. Ct. App. 1986) (veil-piercing analysis focuses on the "transaction attacked").

Evidence also shows that Renco and DRR arranged for DRP to be a guarantor on DRR's debts to DRR's bondholders despite DRP's difficulties meeting its own obligations. Moreover, the upstream Renco/Doe Run entities caused substantial monies to be transferred to themselves from DRP through

33

service and management contracts, fees, and other methods, which decreased

DRP's on-hand capital needed to meet its environmental obligations.  Indeed,

evidence shows that Eric Peitz, DRP's Treasurer, warned his superiors at DRR as

early as 1998 that DRP would not be able to afford to undertake additional

environmental remediation as long as it was burdened with the upstream payments.

### ii.  Control

Plaintiffs have also produced evidence showing that defendants controlled

DRP from Missouri.[19]

First, defendants Renco and DRR caused DRP's incorporation.  DRP's

ownership is directly traceable to and dependent upon the panoply of Renco/Doe

Run upstream companies, including companies incorporated in and managed from

---

[19] *Collet*, 708 S.W.2d at 284, sets out eleven factors to consider when measuring the degree of control exercised by a dominant corporate entity/shareholder over a subordinate:

    (1)  The parent corporation owns all or most of the capital stock of the subsidiary.

    (2)  The parent and subsidiary corporations have common directors or officers.

    (3)  The parent corporation finances the subsidiary.

    (4)  The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

    (5)  The subsidiary has grossly inadequate capital.

    (6)  The parent corporation pays the salaries and other expenses or losses of the subsidiary.

    (7)  The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

    (8)  In the papers of the parent corporation or the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility isreferred to as the parent corporation's own.

    (9)  The parent corporation uses the property of the subsidiary as its own.

    (10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation and the latter's interest.

    (11) The formal legal requirements of the subsidiary are not observed.

Missouri by their executives, including their Director, Rennert.

Evidence also shows significant overlap of officers and directors throughout the Renco/Doe Run entities, including DRP. The individual defendants (including some Missouri citizens) simultaneously held executive and board positions among the various entities (including Missouri corporate citizens): Zelms was President, CEO, and Vice Chairman of DRR at the same time he was President and CEO of D.R. Acquisition, and at the same time he was President of Doe Run Cayman, DRP's direct parent. Likewise, Kaiser was Vice President and CFO of DRR at the same time he was President of D.R. Acquisition and Doe Run Cayman, which overlapped with his time as Finance Manager of both Doe Run Mining and DRP and as Executive Vice President of DRP. As for Neil, he was Vice President of DRR at the same time he was President and General Manager of DRP and later was Vice Chairman, President, and CEO of DRR while simultaneously serving as President of Doe Run Cayman/Cayman Holdings, DRP's direct parent. And although Rennert did not hold the title of "Director" or "Chairman" with DRP directly, he nevertheless was Director and Chairman of all other entities who themselves exerted control over DRP, and he established policies under which he "controlled [DRP] in a manner similar to other Renco companies (normally by [himself] in [his] capacities as shareholder and director)[.]" (ECF 640-10, Mar. 13, 1998 Memo to Zelms from Rennert.) Finally, evidence before the Court shows

35

that other individuals likewise held officer and/or director positions simultaneously in the Renco/Doe Run entities, including but not limited to Kenneth R. Buckley (DRP, Doe Run Mining, and DRR), Dennis A. Sadlowski (Doe Run Cayman and DRR), and John Binko (Renco and DRR).

Plaintiffs have also presented evidence that salaries and bonuses of some DRP executives and employees, including DRP General Managers and Presidents Buckley and Neil, were paid exclusively by DRR in Missouri pursuant to employment agreements with DRR and compensation packages arranged and signed by Rennert.  In addition, several DRR employees acted as advisors and/or consultants to DRP to establish policies and protocols in safety, sales, financial operations, environmental issues and more, and to participate in discussions and negotiations with the Peruvian government regarding DRP's PAMA obligations. Several intercompany agreements required DRP to pay several million dollars each year to DRR and Renco for these services, and other agreements required DRP to pay millions of dollars upstream in "flat fees."[20]  And as further evidence of the overlap of executive duties, Buckley signed these agreements in his capacity as an officer of DRP, Doe Run Mining, *and* DRR.  Kaiser also signed a bond indenture on behalf of DRR as issuer and on behalf of Doe Run Cayman, Doe Run Mining

---

[20] When DRP sought extensions from the Peruvian government to meet its PAMA obligations, the government conditioned its approval on DRP stopping these upstream money transfers.

and DRP, as guarantors.

There is also evidence that DRP took orders from DRR, which itself was directed by Renco and Rennert in its dealings with DRP.  For instance, although Buckley was part of the due diligence team regarding the purchase of the Complex and was appointed General Manager of DRP upon its purchase, DRR nevertheless counseled Buckley as to which employees to retain at the smelter; and it was DRR, not DRP, that awarded the contract for upgrades to the Complex.  Dan Vornberg, Director of Environmental Affairs at DRR, oversaw the environmental issues at the Complex because DRP did not have anyone capable of performing such work. Evidence also shows that DRR and Renco negotiated contracts with third parties for the Complex to process and provide certain refined metals.  DRP was not involved in these negotiations and indeed was deliberately excluded from the conversations.  (*See* Chaput Dep., ECF 1277-56 at hdr. pp. 10-11, dep. pp. 272-74.)  In addition, when Peitz sounded the alarm that DRP's financial health and PAMA obligations were in peril in part because of the millions of dollars being sent upstream to DRR, DRR continued to demand – and DRP continued to pay – the upstream payments.[21]  And when Vornberg repeatedly informed Zelms in 2000 and 2001 of DRP's immediate need to move forward on the zinc-ferrites project to

---

[21] Evidence shows that Peitz had these concerns and shared them as early as 1998.  (ECF 640-77.)

address profitability issues and environmental concerns, Zelms did not act upon it. (*See* ECF 640-2, June 14, 2017 Zelms Dep. at hdr. pp. 35-37, dep. pp. 133-44.) Follow-up requests for permission to move forward on the project went unanswered, which financial personnel described as "incredible." (*See* ECF 1279-38.)[22]

Finally, plaintiffs have presented evidence showing that Renco, DRR, and their executives described, referred to, and publicly acknowledged DRP as a department or division of Renco/DRR and not an independent entity. Such evidence includes but is not limited to DRP being described as the "Peruvian operations" of DRR, as one of DRR's "facilities," as DRR's "fifth division," as one of Renco's "locations," and as an "expansion" of DRR. (*E.g.*, Blinko Dep., ECF 1277-54; DRR Corporate Profile, ECF 1277-64; Renco Investment Booklet, ECF 640-58.) Organizational charts identified executive roles at DRP as positions over DRR's "Peru Operations." (*E.g.*, Neil Dep., ECF 1277-60 at hdr. pp. 7-8, dep. pp. 70-74.) Zelms, as President and CEO of DRR, referred to DRR and DRP jointly when referring to profitability of operations and implementation of projects. Memoranda originating from Kaiser as DRR's CFO referred to "the Peruvian activities" of DRR. (*E.g.*, Kaiser Memo., ECF 640-37.) Indeed, despite holding

---

[22] Actual work on the ferrites project began in June 2005. (ECF 1277-72.)

executive positions for several years at Doe Run Cayman, Doe Run Mining, and DRP, Kaiser identifies his professional work during this time as being performed on behalf of DRR only.  (*See* Kaiser Resumé, ECF 1277-78.)

> b.  Significant Contacts re Agency

In their motion, defendants appear to conflate the elements of veil-piercing and agency, arguing that plaintiffs' failure to provide evidence of complete control and undercapitalization defeats their claims based on both theories.  But agency liability and veil-piercing are based on different factors.

Unlike piercing the corporate veil, "[c]omplete domination or control of the agent by the principal . . . is not required to establish an agency relationship." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 380 (Mo. Ct. App. 2014).  "A traditional agency theory focuses on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim."  *Id.*  There are three essential elements of an agency relationship:

> 1)  that an agent holds a power to alter legal relations between the principal and a third party;
> 2)  that an agent is a fiduciary with respect to matters within the scope of the agency; [and]
> 3)  that a principal has the right to control the conduct of the agent with respect to matters entrusted to the agent[.]

*Id.* at 382-83.  A power of attorney creates a principal-agent relationship.  *See Randall v. Randall*, 497 S.W.3d 850, 855 (Mo. Ct. App. 2016); *Arambula v.*

*Atwell*, 948 S.W.2d 173, 176 (Mo. Ct. App. 1997). And a corporation can act only through its agents. *State ex rel. Cedar Crest Apartments, LLC v. Grate*, 577 S.W.3d 490, 495 (Mo. banc 2019).

In their various motions for summary judgment, defendants address plaintiffs' agency theory of liability only as it pertains to DRP as an agent acting on behalf of the defendants. (*See* ECF 1233 at hdr. p. 93; ECF 1242 at hdr. pp. 40-41.) Defendants do not address plaintiffs' theory as to any other alleged agent-actor, other than generally asserting in a cursory manner that plaintiffs' agency claims fail. (*See* ECF 1301 at hdr. pp. 47-48.) In response, plaintiffs abandon their corporate agency theory of liability as to DRP acting as an agent of defendants. (*See* ECF 1276 at hdr. p. 13, n.1; hdr. p. 149.)

Throughout the amended complaint, however, and indeed in each of the remaining Counts, plaintiffs plainly allege that Missouri citizen DRR as well as Renco and/or Rennert committed tortious conduct "by and through" their agents or that they "and their agents" committed such conduct. The amended complaint plainly identifies the individual defendants (all who lived and conducted business in Missouri during the relevant time) and others as agents on behalf of the Missouri corporate defendants and related entities, as well as the bases on which those individuals achieved agent status, including holding powers of attorney to act on behalf of the relevant principal-entities in relation to the transactions at issue in this

case.  These allegations go unchallenged by defendants, and they are sufficient to show Missouri's significant contacts to plaintiffs' agency claims.

Accordingly, because there is no conflict between Article 1981 and Missouri law on plaintiffs' veil-piercing and agency claims, and because Missouri has significant contacts creating State interests on the claims, I continue to find that Missouri law governs the claims.  I will therefore deny defendants' motion to apply Peruvian law to these theories of liability.  Because Peruvian law does not apply, defendants' contention that they are entitled to summary judgment on the claims under Article 1981 of Peru's Civil Code is without merit and will be denied.

## VI.  International Comity and Transnational Law Doctrines

Defendants alternatively move to dismiss this action under the doctrine of international comity as well as various other transnational doctrines.  Defendants argue that dismissal of this action is warranted under those doctrines because proceeding on plaintiffs' claims in this Court would transgress "bedrock principles of transnational law and sovereignty."  (ECF 1231 at hdr. p. 36.)

International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895).  "Although more than mere courtesy and

41

accommodation, comity does not achieve the force of an imperative or obligation."
*Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971).

Rather, it "is a discretionary rule of practice, convenience, and expediency." *JP
Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423
(2d Cir. 2005) (internal quotation marks and citations omitted).

The doctrine has been variously described as amorphous, fuzzy, and elusive.
*JP Morgan*, 412 F.3d at 423 (quoting Harold G. Maier, *Extraterritorial
Jurisdiction at a Crossroads: An Intersection Between Public and Private
International Law,* 76 Am. J. Int'l L. 280, 281 (1982)); *Laker Airways Ltd. v.
Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984).  But courts
generally understand international comity to encompass two distinct doctrines.
*See*, *e.g*, *Mujica v. AirScan Inc.*, 771 F.3d 580, 598-99 (9th Cir. 2014).  The first is
prescriptive comity, "the respect sovereign nations afford each other by limiting
the reach of their laws." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817
(1993) (Scalia, J., dissenting).  "That comity is exercised by legislatures when they
enact laws, and courts assume it has been exercised when they come to interpreting
the scope of laws their legislatures have enacted." *Id.*  The second is adjudicatory
comity, which is referred to as a "comity among courts" and viewed as "a
discretionary act of deference by a national court to decline to exercise jurisdiction
in a case properly adjudicated in a foreign state[.]" *In re Maxwell Commc'n Corp.*

*plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996).

Defendants argue that both prescriptive and adjudicatory comity require dismissal of plaintiffs' claims. First, they argue that adjudicatory comity requires that I decline to exercise jurisdiction over this action because Peru has the greater interest, thereby making Peru the more appropriate forum for adjudication of plaintiffs' claims. I previously rejected this argument in ruling defendants' earlier motion to dismiss. *A.O.A.*, 350 F. Supp. 3d at 848-53. But "comity is a fluid doctrine that can change in the course of the litigation[,]" *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 569 (9th Cir. 2020) (internal quotation marks and citation omitted), and defendants contend that legal and factual changes merit reconsideration of my earlier decision. Second, defendants argue that the presumption against extraterritoriality, a prescriptive comity doctrine, requires dismissal of plaintiffs' claims because Missouri common law does not apply to conduct in Peru. Third, they argue that dismissal is also required under the act of state doctrine, another prescriptive comity doctrine, because adjudicating plaintiffs' claims will necessitate ruling on the validity of acts taken by Peru within its own territory. Finally, defendants invoke the foreign affairs doctrine to argue that adjudicating plaintiffs' state-law claims will encroach upon the federal government's exclusive power over foreign affairs.

For the following reasons, defendants' arguments fail, and I will deny their

alternative motion to dismiss under transnational law doctrines.

A.   Adjudicatory Comity, or International Comity Abstention

"Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred upon them." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  But in some private international disputes, principles of adjudicatory comity counsel courts to refrain from exercising that jurisdiction.  *Id.*  Thus, adjudicatory comity is an abstention doctrine.  The task for a court evaluating a request for dismissal on adjudicatory comity grounds "is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006).  Because there is no clear test for identifying such exceptional circumstances in the adjudicatory comity context, "courts have been left to cobble together their own approach[.]" *Mujica*, 771 F.3d at 603 (quoting Donald Earl Childress III, *Comity as Conflict: Resituating International Comity as Conflict of Laws*, 44 U.C. Davis L. Rev. 11, 51 (2010)) (internal quotation marks omitted).

In their earlier motion to dismiss, defendants argued that both prescriptive and adjudicatory comity were implicated here and that consideration of the factors

44

set out in § 403(2) of the Restatement (Third) of Foreign Relations Law required

dismissal of plaintiffs' claims.[23]  In response, plaintiffs argued that defendants'

prescriptive comity defense failed because there was no true conflict between

Missouri and Peruvian law.  (*See* ECF 640 at hdr. pp. 78-79.)  As to adjudicatory

comity, plaintiffs recognized that the Eighth Circuit had not yet spoken on its

prospective application – that is, in the absence of a foreign judgment or parallel

foreign proceeding – and argued that neither the Restatement factors nor other tests

articulated by other circuit courts warranted abstention.  (*Id.* at hdr. pp. 79-92

(citing *In re: Vitamin C Antitrust Litig.*, 837 F.3d 175, 184 (2d Cir. 2016)[24];

*Mujica*, 771 F.3d at 603-08.)  Looking at both the Restatement and the test

---

[23] Those factors are:
   (a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
   (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
   (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
   (d) the existence of justified expectations that might be protected or hurt by the regulation;
   (e) the importance of the regulation to the international political, legal, or economic system;
   (f) the extent to which the regulation is consistent with the traditions of the international system;
   (g) the extent to which another state may have an interest in regulating the activity; and
   (h) the likelihood of conflict with regulation by another state.

[24] After briefing closed on the earlier motion to dismiss, the Supreme Court vacated and remanded *In re: Vitamin C.  See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd*., 138 S. Ct. 1865 (2018).

described by plaintiffs, which required me to assess the strength of the United States' interest in using a foreign forum, the strength of Peru's interests, and the adequacy of the alternative forum, *see Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004); *Mujica*, 771 F.3d at 603,[25] I concluded that abstention was inappropriate in the circumstances of this case.

In reaching my conclusion, I reasoned that, under either test urged by the parties, the most important factor was the interests of each sovereign. *A.O.A.*, 350 F. Supp. 3d at 850. I noted that neither the United States nor Peru adopted a specific position on this litigation: the State Department was silent on the issue, and plaintiffs and defendants presented letters from Peruvian officials asserting contradictory positions. I also determined that there was no true conflict between the relevant Missouri laws and their Peruvian analogues. I concluded that a comparable form of relief existed under Peruvian law for each of plaintiffs' plausible claims and that defendants could have complied with the laws of both Missouri and Peru. *Id.* at 851-52. The location of the conduct, the nationality of the parties, and the character of the conduct in question did not support dismissal

---

[25] *Mujica* also considers several factors outlined in *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 614 (9th Cir. 1976), to assess each sovereign's interest: "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [countries], and (5) any public policy interests." *Mujica*, 771 F.3d at 603-04. *See also Cooper*, 960 F.3d at 566 (applying the three-factor *Ungaro-Benages* test and the five-factor *Timberlane* test).

either.  Plaintiffs are Peruvian children injured in Peru, but they chose to sue

United States defendants in the United States for defendants' alleged decisions and

actions taken in the United States.  While Peru has an interest in providing a forum

for redressing the injuries of its citizens, the United States also has a "significant

interest in providing a forum for those harmed by the actions of its corporate

citizens."  *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1232 (9th Cir.

2011) (addressing California's interest in its resident corporations).  *Cf. CL-*

*Alexanders Laing & Cruickshank v. Goldfeld*, 709 F. Supp. 472, 481 (S.D.N.Y.

1989) (addressing motion to dismiss on grounds of *forum non conveniens*, court

noted that a cognizable state interest exists when a United States corporation

executes securities fraud abroad).  I determined that the remaining factors were

neutral.  *A.O.A.*, 350 F. Supp. 3d at 852.  Finally, I determined that Peru was not an

adequate alternative forum because it was likely unable to exercise jurisdiction

over defendants.  *Id.*

Because neither the United States nor Peru clearly opposed the Court's

exercise of jurisdiction, the strength of Peru's interest in providing a forum for the

litigation did not outweigh the United States' interest, and it was not clear that Peru

provided an adequate alternative forum, I declined to surrender my "virtually

unflagging obligation" to exercise jurisdiction and denied defendants' motion to

dismiss on international comity grounds.  *A.O.A.*, 350 F. Supp. 3d at 853.  Where,

as here, there is no parallel foreign proceeding, abstention "requires a serious problem that would be created by federal court proceedings but that would not be present if the matter were adjudicated abroad." *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1032-33 (11th Cir. 2014).  Defendants failed to show such a problem.

Defendants now argue that I need to reevaluate that conclusion in light of the summary judgment record, asserting specifically that the record shows 1) a true conflict between Missouri and Peruvian law; 2) the alleged wrongful conduct took place in Peru, with no nexus between defendants' conduct in the United States and the relevant conduct in Peru; and 3) that foreign interests embodied in the United States-Peru Trade Promotion Agreement, or TPA, dictate that adjudication of plaintiffs' environmental claims must take place in Peru.

1. *True Conflict*

Defendants rely on their factual averments made in relation to their choice-of-law analysis to argue that a true conflict exists between Missouri and Peruvian law, thus warranting abstention.  If the analysis were that simple, I would deny this argument for the reasons set out in Section V above.  But determining whether a true conflict of law exists for purposes of abstaining under international comity principles is not so straightforward.

First of all, the Eighth Circuit has not determined whether adjudicatory

comity requires a true conflict of law.  And other courts have taken diverse

positions, primarily differing in their treatment of the Supreme Court's "true

conflict" analysis in *Hartford Fire*.  In *Hartford Fire*, when determining whether

the district court should have declined to exercise jurisdiction over Sherman Act

claims against London reinsurers, the Supreme Court noted that "[t]he only

substantial question in this litigation is whether 'there is in fact a true conflict

between domestic and foreign law.'"  509 U.S. at 798 (quoting *Société Nationale*

*Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 555

(1987) (Blackmun, J., concurring in part and dissenting in part)).  The Court

explained that "[n]o conflict exists, for these purposes, 'where a person subject to

regulation by two states can comply with the laws of both.'"  *Id.* at 799 (quoting

Restatement (Third) of Foreign Relations Law § 403, Comment *e*).  Because there

was no true conflict between British law and the law of the United States, the

Court reasoned that there was "no need . . . to address other considerations that

might inform a decision to refrain from the exercise of jurisdiction on grounds of

international comity."  *Id.*

The Tenth Circuit has interpreted this language to require a true conflict to

invoke adjudicatory comity.  *See United Int'l Holdings, Inc. v. Wharf (Holdings)*

*Ltd.*, 210 F.3d 1207, 1223 (10th Cir. 2000).  And the Third Circuit views the

language as requiring a true conflict of law in the absence of a foreign judgment or

ongoing proceeding in a foreign tribunal.  *See Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 393 (3d Cir. 2006).  The Ninth Circuit, however, does not require proof of a true conflict.  *Mujica*, 771 F.3d at 602.  Because *Hartford Fire* did not address the "other considerations" bearing on comity, and other courts have generally required proof of such a conflict only when prescriptive comity was at issue, the Ninth Circuit concluded that, "[a]t least in cases considering adjudicatory comity, we will consider whether there is a conflict between American and foreign law as one factor in, rather than a prerequisite to, the application of comity."  *Id.* at 600-02.[26]

---

[26] The court noted that the Second, Eleventh, and Federal Circuit Courts had also not required proof of a true conflict when considering adjudicatory comity.  *Mujica*, 771 F.3d at 600-01 (citing *JP Morgan*, 412 F.3d at 424; *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006); *Ungaro-Benages*, 379 F.3d at 1238; *Int'l Nutrition v. Horphag Rsch. Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001)).  After the Ninth Circuit decided *Mujica*, the Second Circuit explained that it did not consider the presence of a true conflict as sufficient to warrant dismissal; but it did not decide, as the Ninth Circuit did in *Mujica*, that a showing of "true conflict" is merely a factor, rather than a threshold requirement, for abstention.  *In re: Vitamin C Antitrust Litig.*, 837 F.3d 175, 185 (2d Cir. 2016), *vacated and remanded sub nom. Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865 (2018).  Though it noted an earlier case in which it did not require a true conflict in an adjudicatory comity context, the court did not decide whether abstention requires a true conflict because there was a true conflict before it.  *Id.* at 186.  In its opinion after remand, the Second Circuit noted that the Supreme Court did not disturb that portion of its previous decision, and it therefore applied the same approach.  *See In re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 145 n.11 (2d Cir. 2021), *cert. denied sub nom. Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.,* 143 S. Ct. 85 (2022).  While acknowledging *Hartford Fire*'s explanation that "to warrant dismissal on the basis of international comity, the two countries' legal demands must be irreconcilable," 8 F.4th at 144 (citing *Hartford Fire*, 509 U.S. at 799), the Second Circuit nevertheless described a true conflict as "merely 'an important criterion for a comity dismissal.'"  *Id.* at 145 (quoting *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011)).  The Second Circuit's position thus appears to be more ambiguous than as ascribed by the *Mujica* court.

Whether a true conflict is an absolute requirement or merely a factor to consider, none exists here "for these purposes" to warrant abstention.  As they did in their conflicts/choice-of-law argument, defendants again take a narrow view of Dr. Matson's testimony, and specifically his testimony that "Doe Run Peru could satisfy Peruvian environmental standards for air quality and yet not satisfy the standard of care."  (ECF 1231-3, Matson Dep., hdr. p. 9, dep. p. 131.)  Defendants contend that this statement shows that Peruvian and Missouri environmental standards differ and thus are in conflict for comity purposes.  But Dr. Matson does not purport to be an expert on Peruvian law, and plaintiffs do not offer his opinion for this reason.  In any event, under Federal Rule of Civil Procedure 44.1, the determination of foreign law is a ruling on a question of law made by the Court, not by Dr. Matson.  And, as noted above and in my October 2018 Order, the relevant Peruvian and Missouri laws governing plaintiffs' asserted claims do not conflict.  But even accepting Dr. Matson's statement as true, the relevant inquiry in the comity analysis is not whether it is possible to comply with the law of one sovereign and not the other.  Rather, it is whether "a person subject to regulation by two states can comply with the laws of both."  *Hartford Fire*, 509 U.S. at 799 (internal quotation marks and citation omitted).  Defendants do not argue that, with regard to the standard of care, it was impossible to comply with both Missouri and Peruvian law.  Under *Hartford Fire*, therefore, there is no true conflict for

51

international comity purposes.

2.    *Place of Wrongful Conduct*

Defendants again return to Dr. Matson's and Ms. Midkiff's testimony to argue that any alleged misconduct took place only in Peru and not in the United States.  Reasserting their claim that the four fugitive emission projects are all that remain of plaintiffs' case, defendants assert that both experts agreed that DRP itself had enough capital to complete the projects within the first two years of operating the Complex, that neither expert identified any instance where Renco or Rennert prohibited DRP from completing a necessary environmental project, and that neither expert could identify a circumstance where a parent company of DRP denied an expenditure request for environmental projects.  Defendants argue that this testimony shows that the relevant decisions regarding environmental projects were made by DRP in Peru and not by any other actor elsewhere.  Therefore, defendants contend, "all that is left" to support plaintiffs' claims against them are typical activities common to a domestic corporation, which is not enough under *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), to create a nexus between DRP's conduct in Peru and defendants' domestic conduct sufficient to maintain jurisdiction in this forum.  For the following reasons, this argument is unavailing.

In *Nestlé*, the plaintiffs sought a judicially-created cause of action under the Alien Tort Statute (ATS) to recover damages from two companies based in the

United States who allegedly aided and abetted the plaintiffs' enslavement by providing technical and financial resources to their enslavers in Ivory Coast. 141 S. Ct. at 1935. To determine whether the plaintiffs sought an impermissible extraterritorial application of the ATS, the Court analyzed whether the "conduct relevant to the statute's focus occurred in the United States." *Id.* at 1936 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)) (internal quotation marks omitted). Even though plaintiffs alleged that "every major operational decision by both companies [was] made in or approved in the U.S.," the Court determined that nearly all the conduct allegedly aiding and abetting forced labor – "providing training, fertilizer, tools, and cash to overseas farms" – occurred in Ivory Coast. *Id.* at 1937. Because making "operational decisions" is an "activity common to most corporations," the Court reasoned that "generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek—aiding and abetting forced labor overseas—and domestic conduct." *Id.* at 1937.

Defendants argue that the Court's reasoning in *Nestlé* should apply here because, as the Ninth Circuit has noted, "the guiding principle of [the Supreme Court's ATS] cases applies equally in the context of adjudicatory comity: the weaker the nexus between the challenged conduct and U.S. territory or U.S. parties, the weaker the justification for adjudicating the matter in U.S. courts and

applying U.S. federal or state law." *Mujica*, 771 F.3d at 605-06.  Defendants

contend that, like in *Nestlé*, there is no nexus between the challenged conduct –

DRP's operations in Peru – and defendants' corporate decision-making in the

United States.

I agree with defendants that the nexus between the challenged conduct and

the United States is critical in the adjudicatory comity analysis, and that the

location of the relevant conduct is a salient factor when assessing that nexus.  *See*

*Mujica*, 771 F.3d at 605 ("*Kiobel* [*v. Royal Dutch Petroleum Co.*, 569 U.S. 108

(2013)] and the lower-court decisions that have followed in its wake confirm the

importance of" the location of the conduct and nationality of the parties).  I also

agree that, as in *Nestlé*, many important facts in this case concern conduct abroad –

here, the operation of the La Oroya Complex.  But the similarities with *Nestlé* end

there.

In their amended complaint, plaintiffs do not merely make generic

allegations that defendants made general operational decisions in the United States.

Plaintiffs assert instead that defendants exerted complete control over DRP from

their offices in Missouri and New York, which included making decisions that

caused DRP to emit toxins and other harmful substances at levels harmful to

plaintiffs, despite knowing of such harm.  Plaintiffs also claim that despite their

knowledge of their ability to rectify the harm, defendants failed to implement

54

measures to do so, failed to take various actions to protect plaintiffs, and/or

actively concealed evidence of the harm they caused.  Plaintiffs allege that

defendants made these decisions and took these actions in the United States so as

to make substantial profit for their United States companies at the expense of

plaintiffs' health.  (ECF 474, Amd. Compl.)  Unlike in *Nestlé*, the plaintiffs here

allege more domestic activity than general decision-making.  They allege that the

specific decisions to engage in the conduct that forms the bases of their claims

were made in the United States.  And decisions to engage in tortious conduct

cannot be considered activities "common to most corporations."

  Much of the evidence that has now been developed during discovery

supports plaintiffs' claims.  For instance, plaintiffs have submitted evidence that:

- Defendants dominated and controlled DRP; [27]

---

[27] *See supra* Section V.C.2(a)(ii).  Despite defendants' insistence that DRP was wholly responsible for its operations, they have stated elsewhere that DRP was subject to their control or relied on their expertise.  For example, in its 1998 Senior Note Offering, DRR explained that "Doe Run and the Guarantors are indirect subsidiaries of Renco, of which Mr. Ira Leon Rennert is the controlling shareholder.  As a result of his indirect ownership of Doe Run and the Guarantors, Mr. Rennert is, and will continue to be, able to direct and control the policies of Doe Run and the Guarantors, including mergers, sales of assets and similar transactions."  (ECF 1229-16, Doe Run Senior Notes Offering Memorandum, at hdr. p. 215.)  As noted above, DRP was one of the Guarantors.  And when SUNAT, the Peruvian tax authority, initiated an audit in 2003 to determine the true market value of the services provided by DRR to DRP under the intercompany agreements, DRR instructed its employees to emphasize that American DRR executives controlled  DRP's day-to-day operations:  "The key decision makers in Peru, and the ones who control the day to day services from the United States, are Ken Buckley, Ken Hecker, Eric Peitz, Tony Worcester in the Lima office, and Bob Roscoe in the Cobriza facility."  (ECF 1279-35, Technical, Managerial and Professional Services Agreement for Services Performed Partially Within and Partially Outside of Peru Memorandum, at hdr. p. 3.)  They also encouraged DRP employees to reiterate to SUNAT that "reliance on US personnel for technical, managerial

- As part of the financing structure that was arranged by Renco and implemented by Zelms and Kaiser, DRP financed nearly all of its original purchase price and was a Guarantor of $255 million to $355 million on DRR Senior Notes;[28]

- DRP transferred over $100 million to DRR and Renco through intercompany agreements and interest payments on its acquisition loan between 1998 and 2008; [29]

- Defendants knew that these upstream payments and financial structure hampered DRP's ability to meet its PAMA obligations;[30]

- Defendants knew that DRP could not finance its PAMA projects out of

---

and professional assistance" was "critical" to DRP's "continued success in operations." (*Id.* at hdr. p. 4.)

[28] *See* ECF 871-21, March 12, 1998 Indenture Agreement; ECF 871-19, October 23, 1997 Promissory Note, at hdr. pp. 4-5; ECF 871-14, June 28, 2017 Kaiser Dep. at hdr. pp. 3-5, dep. pp. 95-101; ECF 871-3, June 14, 2017 Zelms Dep. at hdr. pp. 11-12, 14, dep. pp. 158-63, 202; ECF 871-25, April 2, 1998 Working Capital Facility Letter.

[29] *See, e.g.*, ECF 640-29, March 20, 1999 Doe Run Peru Financial Statements; ECF 640-30, March 9, 1998 Technical, Managerial and Professional Services Agreement; ECF 640-32 – 640-36 (Service Agreements); ECF 640-41 (detailing $86,018,977 in intercompany fees from 1998 to 2007); ECF 871-23, December 22, 2008 Email from Gary Mard to Dennis Sadlowski and Neil ("The combined total of cash received from Peru is $125,390,157.").

[30] *See* ECF 871-42, January 29, 2001 Email from Ken Hecker to Kaiser at hdr. p. 2 ("Doe Run Peru has been requested to transfer $3.0 million to Doe Run Resources (U.S.) this week.  In my opinion, Doe Run Peru's financial condition precludes any such transfer of funds until commercial circumstances change significantly.  As you know, Doe Run Peru's heavy interest burden and reduced commercial environment have reduced our liquidity and brought into question our ability to meet PAMA requirements and complete necessary capital investments."); ECF 871-44, December 28, 2005 Email from Dante Circi to Wayne Rich re DRP's transfer of $333,000 to DRR ("Increasing your liquidity is obviously reducing our liquidity, and is putting in danger the objective to extend the PAMA."); ECF 871-43, July 27, 2017 Peitz Dep. at hdr. p. 5, dep. pp. 273-74 (DRR had an adverse effect on DRP's ability to complete environmental-related projects to control emissions), hdr. p. 2, dep. p. 78 ("[D]uring the time you were at [DRP], then, as a result of this undercapitalization, was there difficulty with [DRP] having sufficient funds to pay for environment – environmental improvements including modernizing the facility?" "Yes.").

its cash flow[31] and that DRP's financial distress was attributable, in part, to its debt financing and intercompany payments;[32]

- DRR/Renco employees handled efforts to seek outside financing, but the institutions they approached expressed concern over DRP's financial obligations to DRR;[33]

- DRR/Renco continued to demand the payments anyway,[34] and DRP continued to guarantee DRR's debt until 2007;[35]

- DRR employees Buckley, Neil, Vornberg, and Zelms managed DRP's environmental and modernization projects;[36]

---

[31] *See* ECF 871-38, December 31, 1998 Memo from Vornberg to Chaput ("We are expected to finance [the PAMA projects] out of cash flow. We CANNOT finance all of the PAMA projects (as a separate question from revenue generating process projects) out of cash flow, especially the acid plant, but maybe the wastewater projects as well.").

[32] *See* ECF 871-40, September 4, 2000 Strategy Memo from Buckley and Hecker to Zelms, at hdr. pp. 3-4 ("All of the above illustrate that Doe Run's business model – 100% debt financing – is flawed . . . . DRP, for example, has financed all of its purchase price, embarked on a major capital investment program, and sent large intercompany payments north.  That is simply not a reasonable expectation, and we are unaware of any company, in any industry, that has managed a similar feat. . . . The handling of the $125 million capital contribution when La Oroya was purchased in 1997 has created a potentially difficult situation in light of DRP's current liquidity problems."); ECF 871-44.

[33] *See* ECF 871-26, June 30, 2000 Email from Credit Lyonnais to Kaiser; ECF 871-27, July 4, 2000 Email from Credit Lyonnais to Peitz; ECF 871-28, December 1, 2000 Memo from WestLB to Peitz; ECF 871-29, September 5, 2000 Email from Credit Lyonnais to Peitz and Kaiser; ECF 871-53, October 11, 2005 Presentation from financial strategist to Kaiser, Neil, Peitz, Chaput, at hdr. p. 4 ("No bank will proceed with arranging financing for Doe Run Peru until they are assured that adequate collateral will be available to back up the new Facility.  *If they want Doe Run Peru to have access to the Financing, Renco and the Note Holders will have to agree that the new lenders have first and unencumbered access to Doe Run Peru's cash and assets*.").

[34] *See* ECF 871-42; ECF 871-44.

[35] *See* ECF 871-56, December 18, 2006 DRR Memo.

[36] *See, e.g.*, ECF 871-3, June 14, 2007 Zelms Dep. at hdr. pp. 5-6, dep. pp. 115-19 (Vornberg assigned to handle environmental matters and provided environmental reports to Buckley and Zelms), hdr. p. 7, dep. pp. 123-24 (hiring decisions and communications with NGO task force),

- Defendants received regular reports about the pollution control projects at DRP and addressed the environmental affairs during monthly meetings in Missouri that were attended by Rennert and DRR's top executives;[37]

- Beginning in 1999, DRP's expenditures for environmental remediation projects exceeding $10,000 required approval from Rennert and several DRR executives or their delegates[38]; and by 2004, Rennert required AFEs for all expenditures exceeding $5000;[39]

- Defendants knew before they purchased the Complex that "ambient concentrations in the region around La Oroya" were "exceedingly high" and required controlling fugitive and secondary stack emissions;[40]

---

hdr. pp. 8-9, dep. pp. 128-29 (Vornberg reported to Zelms on all important projects affecting Complex); hdr. p. 9, dep. p. 132 (Zelms agreeing that he was "instrumental in environmental improvements over the La Oroya complex," which was "one of [his] responsibilities as president of [DRR]"), hdr. p. 10, dep. pp. 137-38 (Zelms felt need for monthly reports from Vornberg on environmental projects), hdr. p. 20, dep. p. 269-70 (Vornberg established agenda for Rennert re environmental portion of executive meeting). *See also*, *e.g.*, ECF 871-39, June 9, 2017 Buckley Dep. at hdr. p. 2, dep. p. 71; hdr. p. 7, dep. pp. 230-32.

*See also*, *e.g.*, ECF 871-65, November 1, 1999 Peru Environmental Tracking Report from Vornberg to Zelms and Buckley; ECF 871-71, March 23, 2005 DRR Board Meeting Minutes (Neil asked to lead long-term lead abatement plan). DRP personnel were encouraged to reiterate to SUNAT that assistance from "senior US environmental people" was specifically needed in the environmental area, described as "one of the key areas" where it made economic sense to rely on "the expertise of US personnel in Doe Run." (ECF 1279-35 at hdr. p. 5.)

[37] *E.g.*, ECF 871-3, June 14, 2017 Zelms Dep. at hdr. pp. 8-9, dep. pp. 128-29; hdr. p. 10, dep. pp. 137-38; hdr. p. 18-19, dep. pp. 262-68; hdr. p. 20, dep. pp. 269-70.

*See* also, *e.g.*, ECF 871-14, June 28, 2017 Kaiser Dep. at hdr. p. 11, dep. p. 201; ECF 871-39, June 9, 2017 Buckley Dep. at hdr. pp. 3-4, dep. pp. 196-98; ECF 1279-36, February 10, 2004 Vornberg email to Kaiser on Neil's PAMA Presentation on Rennert.

[38] ECF 640-22, June 9, 1999 Spending Authorization Procedure.

[39] ECF 871-3, June 14, 2017 Zelms. Dep. at hdr. p. 17, dep. p. 244; ECF 640-23 at hdr. pp. 15-16, February 11, 2004 Binko Letter to Zelms.

[40] ECF 1233-15, 1996 Knight Piésold report at hdr. pp. 28, 39-43. *See also* ECF 871-48, Sept. 20, 2017 Neil Dep. at hdr. p. 2, dep. p. 120; hdr. pp. 3-4, dep. pp. 124-25; hdr. p. 5, dep. p. 138.

- Defendants knew that fugitive emissions were a significant source of contamination that was not being controlled under the PAMA, with effects on air quality eight times greater than stack emissions;[41]

- By February 2004, no comprehensive fugitive metal emissions inventory had been performed;[42]

- DRP's articulated goal for its first year of operating the Complex was to operate at maximum capacity with minimum investment;[43]

- DRP's business plan provided that operations of the copper, lead, and zinc smelters and refineries would immediately increase to maximum capacity in order to produce several additional tons of products;[44] and

- In March 2005, more than seven years after Renco and DRR purchased the Complex, Rennert recognized that defendants needed to develop a long-term plan regarding lead abatement.[45]

From the evidence submitted on the record, a factfinder could conclude that defendants exerted control over DRP to such a degree that the tortious conduct committed at the Complex was the act of defendants themselves – born out of their conduct and decisions made in the United States. There is a sufficient nexus, therefore, between defendants' conduct in the United States and DRP's operations

---

[41] ECF 871-48, Sept. 20, 2017 Neil Dep. at hdr. p. 2, dep. p. 120; hdr. pp. 3-4, dep. pp. 124-25; hdr. p. 5, dep. p. 138. *See also* ECF 1233-66, Feb. 17, 2004 Letter from Neil o/b/o DRP to Peru's Ministry of Energy and Mines, at hdr. p. 7.

[42] *See* ECF 871-48, Sept. 20, 2017 Neil Dep. at hdr. p. 6, dep. p. 152.

[43] ECF 909-24, Business Plan & Budget 1998, prepared Oct. 31, 1997.

[44] *Id.*

[45] ECF 871-71, March 23, 2005 DRR Board Meeting Minutes, at hdr. p. 5.

in Peru to maintain jurisdiction here over plaintiffs' claims.

3.      *United States-Peru Trade Promotion Agreement*

In my October 2018 Order, I rejected defendants' contention that exercising jurisdiction would frustrate the goals or provisions of the TPA.  I interpreted Chapter 18.4 paragraph four of the TPA to allow this litigation, finding that it provides that "each party . . . must provide remedies 'for violations of a legal duty under that Party's law relating to the environment or environmental conditions affecting human health, which may include rights such as:  to sue another person under that Party's jurisdiction for damages under that Party's laws.'"  *A.O.A.*, 350 F. Supp. 3d at 852 (quoting ECF 545-12, TPA Ch. 18, at hdr. p. 4)[46] (emphasis removed).  In their current motion here, defendants argue that I essentially construed Article 18.4(4) of the TPA to be a mini-ATS provision when I determined that it provided for the citizens of one country to seek remedies for violations of the environmental laws of another.  They claim that the TPA instead requires remedies for violations of a country's laws relating to the environment to be heard in that country's own courts.

I continue to disagree with defendants' contention that the TPA forbids this

---

[46] Defendants attached Chapter 18 of the TPA as Exhibit 10 to its memorandum supporting its motion to dismiss.  It is docketed at ECF 545-12.  In *A.O.A.*, I errantly cited this document as "ECF 545-10."  I correctly cite it here and provide this explanation in order to avoid any confusion.

Court's jurisdiction.  When defendants raised the same claim in their earlier motion to dismiss, they omitted language from the TPA to reach a more favorable interpretation.  They claimed that Article 18.3(5) "commits the United States to refrain from 'undertak[ing] environmental law enforcement activities in [Peru].'" (*See* ECF 545 at hdr. p. 38 (quoting TPA, art. 18.3(5)).)  But Article 18.3(5) is not an interdiction; it merely provides that "[n]othing in this Chapter shall be construed to *empower* a Party's authorities to undertake environmental law enforcement activities in the territory of another Party[.]"  (ECF 545-12 at hdr. p. 3.  Emphasis added.)  And the United States is not undertaking law enforcement activities in Peru.

Likewise, defendants asserted that Article 18.4(4) "obligates Peru to . . . provide its citizens with 'effective access to remedies for violations of [Peru's] environmental laws or for violations of a legal duty under [Peru's] law relating to the environment or environmental conditions affecting human health.'"  (ECF 545 at hdr. p. 38 (quoting TPA, art. 18.4(4)).)  I agree that it does so, but defendants altered some of the original language to suggest that the TPA *requires* such claims to be litigated in Peru.  Unadulterated, Article 18.4(4) provides that:

> Each Party shall provide persons with a legally recognized interest under its law in a particular matter appropriate and effective access to remedies for violations of that Party's environmental laws or for violations of a legal duty under that Party's law relating to the environment or environmental conditions affecting human health[.]

The plain language of the Article appears to provide for this Court's exercise of jurisdiction over plaintiffs' claims in this litigation, that is, that United States defendants violated Missouri law relating to environmental conditions affecting human health.  Given this plain language, I decline defendants' invitation to examine the legislative history behind the TPA to construe its meaning.  *See Gemsco v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and meaning of a statute cannot be overcome by a legislative history which through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.").

Nevertheless, defendants do not identify any provision in the TPA that shows a United States foreign policy interest in resolving these claims in Peru. Even though the TPA "recognize[s] the sovereign right of each Party to establish its own levels of domestic environmental protection" (ECF 545-12 at hdr. p. 2, TPA art. 18.1), and requires Peru to provide citizens with effective remedies for violations of its laws, defendants do not explain how this Court's exercise of jurisdiction in this action impedes these rights or requirements.

Accordingly, I continue to conclude that application of the TPA does not warrant dismissal of this action.

4.    *Consideration Given to Letters from Peruvian Officials*

In their motion here, defendants mention that my October 2018 decision to

deny international comity abstention was based in part on my conclusion that neither the United States nor Peru had issued an express position on whether this litigation should proceed in Missouri. (*See* ECF 1231 at hdr. p. 36.) That conclusion was based in part on competing letters that the parties submitted from Peruvian officials purporting to reflect the view of the Peruvian government. *See A.O.A.*, 350 F. Supp. 3d at 850-51. Although in the present motion defendants do not relitigate the treatment I gave those letters, they state in a footnote that they wish to preserve that issue for appeal. (ECF 1231 at hdr. p. 37 n.10.) I will therefore revisit the issue myself.

As summarized in my October 2018 Order, the letters submitted by the parties reflected different views on the propriety of plaintiffs' claims being litigated in this forum. Plaintiffs provided two letters dated August 2017 from Peruvian Congressmen directed to Peru's Ministry of Finance that spoke favorably of these cases proceeding in Missouri. (ECF 640-85, 640-86.) Defendants presented two letters – one dated October 2007 and the other dated April 2017 – both from the Peruvian Minister of Economy and Finance directed to divisions of the Department of State.[47] The 2007 letter expressed the opinion that this case should be heard in Peru and requested that the Department of State notify the

---

[47] The 2007 letter was directed to the U.S. Ambassador to Peru. (ECF 545-13.) The 2017 letter was directed to the Chief of Investment Arbitration, Office of the Legal Advisor. (ECF 545-3.)

relevant Missouri court that the lawsuit must be filed in Peru and, further, "take

such other steps" so that any court of the United States will refuse to review the

case. (ECF 545-13.) The April 2017 letter was sent pursuant to Article 10.21 of

the TPA in relation to arbitration proceedings brought by Renco and DRR against

Peru wherein the petitioners argued that Peru should appear in or assume liability

for this action. That letter outlined Peru's understanding of Article 18 of the TPA

and its interests thereunder, and it referred to the 2007 letter that strongly

suggested that Peruvian authorities hear and resolve this dispute. (ECF 545-3.)

Because the letters from each side were contradictory and were obtained for

purposes of this litigation, I did not find either set to be persuasive regarding Peru's

sovereign interest in this matter. *A.O.A.*, 350 F. Supp. 3d at 851. And because the

April 2017 letter did not *expressly* advocate for dismissal of this action on the basis

of international comity and appeared equivocal on whether this litigation *may*

affect Peru's sovereignty, I weighed this apparent lack of express interest heavily

against dismissal. *Id.*

Upon reflection, I may have been too dismissive of the representations made

in the April 2017 letter, especially given its lengthy recitation of Peru's sovereign

interests under the TPA and its own laws, as well as the effect extraterritorial

determination of claims involving its policies regarding public health, the

environment, and natural resources could possibly have on its sovereign interests,

which the letter claims would run counter to the "text and spirit" of the TPA.  Even with more thoughtful consideration, however, and assuming that the positions articulated in that letter reflect the official policy of Peru, my conclusion remains the same that the sovereign interests of the United States and Peru do not warrant abstention in the circumstances of this case.

As noted by the Eleventh Circuit, abstention in the absence of a parallel foreign proceeding is reserved for "rare (indeed often calamitous) cases in which powerful diplomatic interests of the United States and foreign sovereigns aligned in supporting dismissal." *GDG Acquisitions*, 749 F.3d at 1034.  Defendants have not demonstrated that the interest of the United States supports dismissal, and I am not persuaded that the TPA reveals a policy of litigating these claims in Peru. Moreover, while the April 2017 letter may articulate relevant Peruvian policy, including a preference that the issues in this action that touch upon such policy be litigated in Peru, I note that the Republic of Peru does not take this position in the Renco/DRR arbitration.[48]  Indeed, Peru recently acknowledged in that proceeding that "a federal court *will hear* the Missouri Plaintiffs' claims" and "*will apply* either Missouri negligence law or Peruvian negligence law to determine the

---

[48] *See The Renco Group, Inc. & Doe Run Resources, Corp. v. The Republic of Peru & Activos Mineros S.A.C.*, Case No. 2019-47 (Perm. Ct. Arb.) (Respondents' Counter-Memorial, Apr. 1, 2022), *available at* https://pcacases.com/web/sendAttach/35805.

substantive claims."[49]  Notably absent is any advocation for a Peruvian forum to hear these claims or an articulation that its sovereign interests are jeopardized by this Court's exercise of jurisdiction over them.  There is nothing before the Court showing that the powerful diplomatic interests of the United States and Peru are aligned in supporting dismissal of this case.

Finally, the State Department has thus far remained silent in this case.  I agree that this silence does not equal indifference, and I am sure there are a variety of reasons the State Department may have elected not to file a statement of interest here.  But where there is no true conflict between the laws of the United States and a foreign sovereign, and there is no parallel proceeding affronted by this Court's exercise of jurisdiction, a showing by the United States that it is interested in dismissal is critical to justifying the surrender of this Court's "virtually unflagging obligation" to exercise the jurisdiction granted to it.  *See Colorado River*, 424 U.S. at 817.  Without such a statement, "simply because foreign relations might be involved" does not diminish this obligation.  *Gross*, 456 F.3d at 394.

5.    *Abstention Not Warranted*

As demonstrated above, defendants overstate the factual and legal changes since my ruling on their earlier motion to dismiss.  But *even if* 1) the location of most of the relevant conduct took place in Peru, 2) the October 2007 and April

---

[49] *Id.* at .pdf p. 138, brief p. 123.  (Emphasis added.)

2017 letters assert the official policy of Peru opposing this Court's jurisdiction, and

3) the TPA does not explicitly contemplate this kind of litigation to go forward – in

short, even if Peru has a strong interest in using a Peruvian forum to litigate

plaintiffs' claims – defendants have nevertheless failed to identify "exceptional

circumstances" justifying what would be a rare surrender of jurisdiction.

Moreover, judicial economy and fairness to the parties weigh against

abstention. *See Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1076-77 (D.

Nev. 2020) (noting the *Mujica* factors are non-exhaustive and judicial economy

and fairness to the parties relate to the interest of the United States). Plaintiffs

have pursued their claims in this Court for more than a decade. The parties have

*inter alia* established an initial trial pool, identified several plaintiffs as members of

a discovery cohort, engaged and examined several expert witnesses, completed

extensive discovery, and submitted dispositive motions. To abstain now would

simply be unfair to plaintiffs and substantially postpone resolution of their claims.

Accordingly, because 1) there is no true conflict of laws or a parallel foreign

proceeding on plaintiffs' claims, 2) Missouri and New York have an interest in the

conduct of its corporate citizens abroad, 3) there has been no showing of aligned

sovereign interests in dismissal, 4) there has been no showing of the United States'

official position on dismissal of this proceeding, and 5) abstention would postpone

resolution of plaintiffs' already long-litigated claims, I will again deny defendants'

motion to abstain on international comity principles.

B.    The Presumption Against Extraterritoriality

Defendants next argue that the presumption against extraterritoriality

forecloses the application of Missouri common law to conduct in Peru.  The

presumption against extraterritoriality is a canon of statutory construction derived,

in part, from international comity principles.  *Hartford Fire*, 509 U.S. at 817

(Scalia, J., dissenting), *cited approvingly in F. Hoffmann-La Roche Ltd. v.*

*Empagran S.A.,* 542 U.S. 155, 164 (2004).  It provides that "[w]hen a statute gives

no clear indication of an extraterritorial application, it has none[.]"  *Kiobel*, 569

U.S. at 115 (quoting *Morrison v. National Austl. Bank Ltd.*, 561 U.S. 247, 254

(2010)) (internal quotation marks omitted) (second alteration added).  The

presumption "rests on the perception that Congress ordinarily legislates with

respect to domestic, not foreign matters[,]" *Morrison*, 561 U.S. at 255, and "serves

to protect against unintended clashes between our laws and those of other nations

which could result in international discord." *EEOC v. Arabian Am. Oil Co.*, 499

U.S. 244, 248 (1991).  *See also RJR Nabisco, Inc.,* 579 U.S. at 335.

Defendants reason that because the presumption against extraterritoriality

would foreclose application of Missouri statutes abroad, the result should be the

same for Missouri common law claims.  But defendants do not explain why.  The

presumption against extraterritoriality guides courts as they determine what a

legislature has done; it is silent as to the common law. *See* Jeffrey A. Meyer,

*Extraterritorial Common Law: Does the Common Law Apply Abroad?*, 102 Geo.

L.J. 301, 334 (2014) ("To date, the presumption against extraterritoriality has been

applied to curb geographical extension of statutes but not the common law. The

presumption has been justified as an expression of implied legislative intent rather

than an implied limit on legislative authority or power."); Katherine Florey, *State*

*Law, U.S. Power, Foreign Disputes: Understanding the Extraterritorial Effects of*

*State Law in the Wake of Morrison v. National Australia Bank*, 92 B.U. L. Rev.

535, 574 (2012) ("[B]ecause [the presumption] is first and foremost an interpretive

canon, it has little to say about common law that poses no issue of legislative

intent."). Other courts have concluded the same. *See Armada (Singapore) Pte Ltd.*

*v. Amcol Int'l Corp.,* 244 F. Supp. 3d 750, 758 (N.D. Ill. 2017); *Leibman v.*

*Prupes*, No. 2:14-CV-09003-CAS, 2015 WL 3823954, at *6 (C.D. Cal. June 18,

2015) ("[T]he presumption is limited to statutes by its terms.").

Citing *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021),

defendants contend that the presumption also applies to common law claims. But

in *City of New York*, the Second Circuit opined "that foreign policy concerns

foreclose New York's proposal here to recognize a federal common law cause of

action targeting emissions emanating from beyond our national borders." *Id.* at

101 (emphasis added). By contrast, this Court is not being asked to recognize or

extend a new federal cause of action – it is only being asked to apply existing state common law.  Defendants cite no law limiting the reach of Missouri common law. Nor do they identify any court that has found that state common law does not apply extraterritorially.  I will therefore deny defendants' extraterritoriality argument as well.

## C.      Act of State Doctrine

Defendants next argue that the act of state doctrine warrants dismissal of plaintiffs' claims.  That doctrine requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."  *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).[50]  Defendants claim that adjudicating plaintiffs' claims will necessarily require me to second-guess the validity of Peru's actions.  Specifically, they claim that it will require me to evaluate which of plaintiffs' injuries are attributable to DRP and which are attributable to Peru's state-owned entities.  They also argue that I will have to evaluate whether Peru's environmental demands as contained in the PAMA adequately addressed environmental concerns in the community and Complex.

Defendants' arguments are meritless.  "The act of state doctrine is not some

---

[50] The act of state doctrine has been described as "closely related" to or a "manifestation" of international comity.  *See In Re: Vitamin C*, 8 F.4th at 162 n.44; *William S. Dodge, International Comity in American Law*, 115 Colum. L. Rev. 2071, 2092 (2015).  *But see W.S. Kirkpatrick & Co.*, 493 U.S. at 404 ("This Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years.").

vague doctrine of abstention but a '*principle of decision* binding on federal and state courts alike.'" *W.S. Kirkpatrick & Co.*, 493 U.S. at 406 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964)) (emphasis in *W.S. Kirkpatrick & Co.*). "Act of state issues only arise when a court *must* decide—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Id.* Here, I am not asked to decide the legality of the operation of Peru's state-owned entities or any Peruvian law. Even if adjudication of plaintiffs' claims requires me to evaluate whether Peru's state-owned entities caused some of plaintiffs' injuries or the efficacy of Peru's environmental protections, the *legality* of those actions is not a question that must be decided. "Accordingly, 'the factual predicate for application of the act of state doctrine does not exist' here because '[n]othing in the present suit requires the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country the official act of a foreign sovereign.'" *In Re: Vitamin C*, 8 F.4th at 162 n.44 (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405) (alteration in *In Re: Vitamin* C).

D.     Foreign Affairs Doctrine

Finally, defendants argue that plaintiffs' claims must be dismissed under the foreign affairs doctrine. Under that doctrine, state laws that intrude into the federal government's exclusive authority over foreign affairs are preempted. *See United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared

by the States; it is vested in the national government exclusively."); *Zschernig v. Miller*, 389 U.S. 429, 432 (1968) (Oregon statute was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress.").

Federal courts generally understand the foreign affairs doctrine to preempt state laws through either conflict preemption or field preemption. *See Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 213 (4th Cir. 2022); *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071-72 (9th Cir. 2012); *see generally Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419-20 (2003). Under conflict preemption, state law must yield when there is a "sufficiently clear conflict" with federal foreign policy. *Garamendi*, 539 U.S. at 420. Courts consider "the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Id.* But even in the absence of an express policy, under field preemption, a state law is preempted when a state "attempts to 'establish its own foreign policy' . . . [or] 'has more than some incidental or indirect effect in foreign countries.'" *Mayor & City Council of Balt.*, 31 F.4th at 213 (quoting *Zschernig*, 389 U.S. at 441, 434). *See also Movsesian*, 670 F.3d at 1072 (citing *Deutsch v. Turner Corp.*, 324 F.3d 692, 709 n.6 (9th Cir. 2003)). A state law has more than some incidental effect in foreign countries when it "disturb[s] foreign relations," *Zschernig*, 389 U.S. at 441,

72

or has "great potential for disruption."  *Id.* at 435.

Defendants argue that plaintiffs' claims would "undoubtedly conflict" with the express foreign policy laid out in the TPA for the same reasons they argue that maintaining jurisdiction conflicts with the TPA, that is, because plaintiffs' claims would undermine Peru's "sovereign right to 'establish its own levels of domestic environmental protection and environmental development priorities,'" and would call into question the TPA's broader policies of respecting Peruvian regulatory and legal systems and allowing United States companies to do business in Peru under Peruvian law.  (ECF 1231 at hdr. pp. 44-45 (quoting TPA art. 18.1).)

But this argument fails for the same reasons described above.  Though the TPA recognizes Peru's sovereign ability to set its own environmental standards and priorities, plaintiffs' claims do not hinder Peru's ability to do so.  To the extent plaintiffs' claims are directed to defendants' conduct in the United States that touches upon activity in Peru, there is no conflict of laws on plaintiffs' asserted claims.  And to the extent Peru's relevant laws and regulations may provide a defense to plaintiffs' claims, *e.g.*, Article 1971, this potential for a defense under Peruvian law and defendants' ability to invoke it here furthers Peru's policies and does not thwart them.  Accordingly, the TPA's general policies of respecting Peru's legal systems and allowing United States companies to conduct business in Peru under Peruvian law are not frustrated by litigating plaintiffs' claims here.

73

In any event, these ostensible conflicts are insufficiently clear to preempt a state law in "an area of 'traditional competence' for state regulation—tort law," *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1187 (C.D. Cal. 2005), which seeks to hold Missouri and New York corporate citizens accountable for the harm they cause to others. *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535, 558 (N.D. Cal. 2021) (rejecting preemption argument in part because of California's "strong interest in the conduct of its corporations," and because the decision to violate California law allegedly occurred from defendants' California headquarters).

To the extent defendants' argument can be read to assert that plaintiffs' claims are subject to field preemption, this contention fails as well. Missouri has not attempted to "establish its own foreign policy" through its negligence law. And defendants have not argued, let alone shown, that plaintiffs' claims will "disturb foreign relations" or have "great potential for disruption." This litigation has been pending in courts in the United States for more than 15 years; such disruption would have become apparent by now. I will accordingly deny defendants' motion to dismiss on this basis as well.

## VII.  Certification for Interlocutory Appeal

Under 28 U.S.C. § 1292(b), a district judge may certify an otherwise unappealable order for immediate appeal if the order "involves a controlling

question of law as to which there is substantial ground for difference of opinion"

and "an immediate appeal from the order may materially advance the ultimate

termination of the litigation[.]"  I find that these criteria are met in this case.

I recognize that interlocutory appeals are discouraged and should be

authorized only sparingly and in extraordinary cases.  *Union Cty., Iowa v. Piper*

*Jaffray & Co.*, 525 F.3d 643, 646 (8th Cir. 2008).  In my more than 32 years as a

judge in the district court, I have considered several requests to certify orders for

interlocutory appeal under § 1292(b).  I recall granting only two of those requests,

and on both occasions the Eighth Circuit granted appellants permission to appeal

the orders.  *See Bolon v. Rolla Pub. Sch.*, 917 F. Supp. 1423, 1434 (E.D. Mo.

1996), permission to appeal granted in part, Misc. Case No. 96-8031 (8th Cir. Oct.

1, 1996) (order); *Munroe v. Cont'l W. Ins. Co.*, No. 4:10CV1942 CDP, 2012 WL

6553952, at *1 (E.D. Mo. Dec. 14, 2012), permission to appeal granted, Misc.

Case No. 12-8031 (8th Cir. Feb. 11, 2013) (order).  The issues addressed in this

Order represent another rare and extraordinary circumstance where interlocutory

review by the appellate court is warranted.

Central to the Court's analysis on defendants' alternative motion to dismiss

are controlling questions of law dispositive of the issues in this case:  First,

whether under transnational doctrines, including the doctrine of prospective

adjudicatory comity, it is appropriate to adjudicate in this forum a foreign citizen's

claims that tortious conduct allegedly committed in the United States by a United States citizen caused them to sustain personal injury wholly within the borders of a foreign sovereign.[51]   Key to this issue is what role a "true conflict," the presence or absence of a parallel foreign proceeding, and the foreign policy of the United States play in application of the doctrines.  Second, whether the TPA renders the claims nonjusticiable in this forum given that the claims are intertwined with Peru's environmental laws and/or legal duties under Peru's laws relating to the environment or environmental conditions affecting human health.

There are also substantial grounds for difference of opinion.  Substantial grounds exist when

> (1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; (2) the question is one of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question.

*Alternative Med. & Pharmacy, Inc. v. Express Scripts, Inc.*, No. 4:14 CV 1469

---

[51] *See, e.g.*, *Movsesian*, 670 F.3d at 1071 (§ 1292(b) interlocutory appeal on question of application of foreign affairs doctrine); *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) (§ 1292(b) interlocutory appeal on international comity questions); *Philipp v. Fed. Republic of Ger.*, 253 F. Supp. 3d 84, 87 (D.D.C. 2017) (foreign policy preemption questions and issues of international comity appropriate for interlocutory appeal), permission to appeal granted, Misc. Case No. 17-8002 (D.C. Cir. Aug. 1, 2017) (order) (per curiam); *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, No. CV 15-1082-LPS, 2016 WL 7440471, at *2 (D. Del. Dec. 27, 2016) (international comity implications warrant immediate appeal), permission to appeal granted, Misc. Case No. 17-8001 (3d Cir. Jan. 25, 2017) (order).

CDP, 2016 WL 827934, at *1 (E.D. Mo. Mar. 3, 2016) (internal quotation marks

and citations omitted).  The difference of opinion must arise out of genuine doubt

as to the correct legal standard.  *Id.*  As described in this Memorandum and Order,

genuine doubt exists as to the correct legal standard to be applied to each question.

For purposes of this Order, I resolved the questions based on my interpretation of

the law, but there is doubt as to which law applies and indeed as to what the law

actually is.  As to international comity and transnational doctrines, the correct

resolution of the difficult and novel questions is not substantially guided by

previous decisions, the Eighth Circuit has not yet addressed this area of the law,

and the various circuits that have weighed in are split in their resolution with

differing definitions and applications of the controlling law.  The TPA question is

likewise difficult and novel, has little if any precedent, and is one of first

impression in this circuit.

Moreover, conclusively resolving the questions would greatly advance the

termination of this litigation.  If, as defendants contend, transnational doctrines

require me to abstain from exercising jurisdiction over this action or the TPA

precludes me from exercising jurisdiction, this litigation will be over – at least in

courts of the United States.  But if, as plaintiffs contend and as I have found,

neither the asserted abstention doctrines nor the TPA requires me to dismiss this

case, then I will proceed to determine the substantive motions for summary

judgment on the merits of plaintiffs' claims, and the parties and I will prepare for hybrid jury and non-jury trials as well as anticipated litigation over appropriate remedies.  And discovery will continue – and in most cases will commence – on the more than 1400 plaintiffs who are not yet part of a Discovery Cohort.  *United States Rubber Co. v. Wright,* 359 F.2d 784, 785 (9th Cir. 1966) (per curiam) ("The legislative history of subsection (b) of section 1292 . . . indicates that it was to be used only in extraordinary cases where decision of an interlocutory appeal might avoid protracted and expensive litigation."), *cited approvingly in Union Cty.*, 525 F.3d at 646; *see also Alternative Med. & Pharmacy*, 2016 WL 827934, at *1 (same).  I understand that the parties have already put in great time and expense, but without resolution of these novel, difficult, and case-dispositive legal questions, this litigation will go on years into the future at even greater expense – possibly unnecessarily so.

Finally, this is an exceptional case.  As described above, it contains novel controlling issues of law, is a consolidation of 40 lawsuits, and involves the claims of more than 1420 plaintiffs of whom only 16 have had discovery completed on their specific claims.  *See Union Cty.*, 525 F.3d at 647 (for § 1292(b) analysis, a case that is a consolidation of "approximately 40 cases" is "extraordinary"); *United States Rubber Co.*, 359 F.2d at 785 (§ 1292(b) reserved for extraordinary cases where decision on appeal may avoid protracted and expensive litigation).  Under

no circumstance can it be said that this is a typical case with typical questions not worthy of consideration for interlocutory appeal.  *Cf. Union Cty.*, 525 F.3d at 647.

For these reasons, I will certify this Order under 28 U.S.C. § 1292(b) for immediate appeal.[52]  Any party wishing to appeal has ten days from the date of this Order within which to apply to the Eighth Circuit for permission to appeal.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion for Application of Peruvian Law and Summary Judgment Under Peruvian Law, or, Alternatively, Dismissal Under Transnational Law Doctrines [1230] is **GRANTED in part and DENIED in part** as follows:

- Defendants' motion for application of Peruvian law is granted only as to their "safe harbor" defense under Article 1971 of Peru's Civil Code.  In all other respects, the motion for application of Peruvian law is denied.

- Defendants' motion for summary judgment under Peruvian law is denied.

- Defendants' alternative motion for dismissal under transnational doctrines is denied.

**IT IS FURTHER ORDERED** that, pursuant to 28 U.S.C. § 1292(b), this Memorandum and Order is certified for immediate appeal.  Any party wishing to

---

[52] I am aware that because § 1292 permits interlocutory appeals from an "order," the Eighth Circuit may address "any issue fairly included within the certified order," including an issue not particularly certified.  *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

take an appeal must apply to the Eighth Circuit Court of Appeals within ten (10)

days of the date of this Order.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 20th day of January, 2023.