**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

```
A.O.A., et al.,                    )
                                   )
     Plaintiffs,                   )
                                   )
     v.                            )
                                   )
                                   )  No. 4:11-CV-00044 CDP
DOE RUN RESOURCES CORPORATION, et  )
al.,                               )
                                   )
     Defendants.                   )
```

**STATUS HEARING**
**BEFORE THE HONORABLE CATHERINE D. PERRY**
**UNITED STATES DISTRICT JUDGE**
**APRIL 23, 2025**

```
APPEARANCES:
For Plaintiffs:      Jerome J. Schlichter, Esq.
                     Kristine K. Kraft, Esq.
                     SCHLICHTER BOGARD LLC
                     100 S. 4th Street, Suite 1200
                     St. Louis, MO  63102

For Defendants:      Geoffrey M. Drake, Esq.
                     KING & SPALDING, LLP
                     1180 Peachtree Street, N.E., Suite 1600
                     Atlanta, GA  30309

                     Tracie J. Renfroe, Esq.
                     KING & SPALDING, LLP
                     1100 Louisiana Street, Suite 4100
                     Houston, TX  77002

(Appearances Continued on Page 2.)

REPORTED BY:         SHANNON L. WHITE, RMR, CRR, CSR, CCR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7966
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
```

APPEARANCES CONTINUED:


For Defendants:        Thomas P. Berra, Jr., Esq.
                       Andrew T. Bayman, Esq.
                       LEWIS RICE LLC
                       600 Washington Avenue, Suite 2500
                       St. Louis, MO  63101

                       Edward L. Dowd, Jr., Esq.
                       DOWD BENNETT LLP
                       7733 Forsyth Boulevard, Suite 1900
                       Clayton, MO  63105

3

**(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT, STARTING**

**AT 1:01 PM:)**

1    THE COURT:  Good afternoon.  We're here in A.O.A. v.

2    Doe Run, et al. Case 4:11-CV-44.  So let me just start by

3    asking counsel for the plaintiff to please identify

4    yourself -- or, plaintiffs, please identify yourself for the

5    record.

6    MR. SCHLICHTER:  Jerry Schlichter with the Schlichter

7    Bogard firm.

8    MS. KRAFT:  Good afternoon, Your Honor.

9    Kristine Kraft, Schlichter Bogard.

10   THE COURT:  All right.  And would counsel for the

11   defendants identify yourself, whoever wants to go first.

12   MS. RENFROE:  Good afternoon, Your Honor.  Tracie

13   Renfroe with King & Spalding for all of the defendants.

14   MR. DRAKE:  Good afternoon.  Geoffrey Drake, King &

15   Spalding, for the defendants.

16   THE COURT:  Okay.

17   MR. BAYMAN:  Good afternoon, Your Honor.  Andrew

18   Bayman also with King & Spalding for all the defendants.

19   MR. BERRA:  Tom Berra from Lewis Rice for the Doe Run

20   Resources Corporation and the Doe Run individual defendants.

21   MR. DOWD:  Good afternoon, Your Honor.  Ed Dowd, Dowd

22   Bennett, for the Renco defendants.

23   THE COURT:  All right.  I do have the status report

4

1    or the schedule that you all proposed, the joint agenda for

2    today's hearing.  It's been a while since I've seen you all,

3    in person at least.  Let me start by asking -- let me just

4    start with this supplemental discovery issue.

5           The plaintiffs -- what is it the plaintiffs think

6    should happen?

7           MR. SCHLICHTER:  As to supplemental discovery, Your

8    Honor?

9           THE COURT:  Yes.

10          MR. SCHLICHTER:  Yes.  We believe that at least from

11   our standpoint, our side, we want to have supplemental medical

12   exams of the cohort.

13          THE COURT:  Medical exams.

14          MR. SCHLICHTER:  And we believe that if the defense

15   also wants them, that process should begin now because it's

16   going to involve a lot of scheduling issues.  It's going to

17   involve logistics, et cetera.  And we believe there's no

18   reason, while you're working on the motions, to have this all

19   wait, as they are seeking to do, until you rule on every

20   motion before we even begin to address supplemental medical

21   exams.  We're not talking about --

22          THE COURT:  So you've got three doctors; right?

23          MR. SCHLICHTER:  Yes.

24          THE COURT:  Is that who you would be talking about

25   doing it, doing the exams?  And what do you think the scope of

1    the supplemental exams would be?

2          MR. SCHLICHTER:  Updating their current medical

3    status.

4          THE COURT:  No change in methodology or anything

5    else?  Just updating from the last time till now?

6          MR. SCHLICHTER:  Updating.  And it's been quite a

7    few years, in some cases 2016 and others 2018.  So, yes,

8    simply updating, bringing up to date their medical status.

9          THE COURT:  And then you would have the expert

10   witnesses or the examiners do supplemental reports?

11         MR. SCHLICHTER:  Yes.

12         THE COURT:  And then what kind of other discovery do

13   you contemplate from this?  More depositions of these

14   plaintiffs?  More depositions of the experts?  What are you

15   thinking?

16         MR. SCHLICHTER:  We don't need any -- we don't

17   propose any updated discovery or reports of nonspecific --

18   nonplaintiff-specific experts, Your Honor.

19         THE COURT:  Right.  We're just talking about the

20   three specific causation experts that you've put forward;

21   right?

22         MR. SCHLICHTER:  That's correct.  Now, there is one,

23   one of our general causation -- our general causation expert

24   epidemiologist, Dr. Bellinger, who's got some health issues

25   and has been ill.  We may want to take his deposition with no

1    additional material or report just because we want to make

2    sure we're preserving his testimony, depending on his

3    availability at trial, for health reasons.

4              THE COURT:  Okay.

5              MR. SCHLICHTER:  The only other -- I'm sorry, Your

6    Honor.

7              THE COURT:  Go ahead.

8              MR. SCHLICHTER:  The only other update in discovery

9    that we will seek at an appropriate time is updated financial

10   information on the defendant and -- on defendants and

11   Mr. Rennert personally for the punitive damages count.

12             THE COURT:  Okay.  Now, the defendants say you need

13   some supplemental discovery of the final cohort plaintiffs

14   before -- oh, after I rule on the motions and before trial.

15   And then you also said some updated fact discovery.  Well, you

16   talk about the experts.  What is it the defendants want,

17   Mr. Drake?

18             MR. DRAKE:  Yes.  Thank you, Your Honor.  Appreciate

19   the opportunity to see you today and to be heard on this

20   issue.

21             I think there are three components that are maybe the

22   sources of some disagreement among the parties that we're

23   trying to sort through.

24             THE COURT:  Well, actually, what I want to know is

25   what you want.

1          MR. DRAKE:  We would like to start first with medical

2     records, supplemental medical reports, and supplemental

3     response to the interrogatories for the 16 discovery cohort

4     plaintiffs.  That would be followed by very short supplemental

5     depositions of the plaintiffs.  We haven't taken those

6     depositions or seen or heard from the plaintiffs for eight to

7     ten years.

8          We would then proceed, if the Court is inclined to

9     grant this, with short medical supplemental examinations,

10    first by the plaintiffs' experts with reports, with short

11    depositions of those experts that our experts would go and do

12    reports, have short depositions of our experts.  And then I

13    think we would be close to being prepared.

14         But we want to make sure that those expert

15    examinations that Mr. Schlichter's talking about are very

16    tailored.  And we have concerns even with what he articulated

17    today as to the scope of what those examinations would be.

18         For example, Dr. Hu, one of their three experts, he

19    didn't even examine three of the plaintiffs in the first

20    instance.  It's not clear to me if they're envisioning that

21    expert now, all of a sudden, examining the plaintiffs --

22         THE COURT:  That seems like something pretty easy to

23    deal with.  What else about the scope?

24         MR. DRAKE:  The other issues with the scope, Your

25    Honor, is that these examinations -- we're very critical of

1    their examinations, I think it's fair to say.

2              THE COURT:  Obviously.  The motions are under

3    submission.  I know that.

4              MR. DRAKE:  So it wouldn't make any sense for us,

5    Your Honor, to have those experts now conduct the same types

6    of examinations that we're already critical of that could be

7    wasteful or, second, that they try to plug holes or gaps in

8    the examinations that we were critical of.

9              For example, one of the plaintiffs' experts,

10   Dr. Hopkins, attests to the fact that she believes that these

11   plaintiffs are at increased risk of blood pressure -- high

12   blood pressure in the future.  She never actually tested their

13   blood pressure.  She should not be allowed to do so now.  So

14   these are the issues we would want to work through with the

15   plaintiffs on the scope of the examinations.

16             THE COURT:  And what about your -- who are the

17   experts that you would have do the supplemental exams?

18             MR. DRAKE:  We have three experts who have conducted

19   the examinations in the first instance -- Dr. Chalhub,

20   Dr. Banner, and Dr. Morote.

21             THE COURT:  Okay.  Tell me those other two, because

22   I've only got a motion -- *Daubert* motions related to Chalhub.

23   So tell me who the other are.

24             MR. DRAKE:  Dr. Banner.  And he's a toxicologist and

25   also an M.D.  So he examined all of the plaintiffs in the

1   first instance.  And Dr. Morote is our neuropsychological

2   expert.

3           And in terms of sequencing the examinations, we also

4   have an issue there which we'd be happy to discuss with Your

5   Honor, but we don't think it's going to be as easy as bringing

6   the plaintiffs into one location and having them meet with all

7   their experts and then all of our experts in a very short

8   period of time.

9           THE COURT:  So what is -- is that the issue, or is

10  there something else?

11          MR. DRAKE:  This is a significant issue, for sure,

12  Your Honor, because, one, we would need to see the results of

13  their experts' examinations to understand where their experts

14  are coming from.

15          THE COURT:  Right.

16          MR. DRAKE:  But take the neuropsychological experts

17  as just one example.  A plaintiff cannot sit through some

18  supplemental neuro-psych examination by their expert and then

19  do one for our expert the next day.  I believe that the

20  medical community recognizes that at least six months would

21  have to transpire between those two examinations for the

22  second exam to at all be reliable, trustworthy, and

23  methodologically sound.  You can't just put a person through

24  multiple neuro-psych examinations in a short, condensed

25  period.

1    THE COURT:  Why not?

2    MR. DRAKE:  Because there's a test bias.  Essentially

3    you do the test one day, and then if you do the same test the

4    next day, it doesn't produce a reliable result; so there needs

5    to be some gap in time.  And I'm using six months as an

6    example.  I'm not sure that it couldn't be five months or

7    seven months, but I'm just using that as an estimate.

8    THE COURT:  Okay.  Anything else that you think you

9    need in terms of supplemental discovery?

10   MR. DRAKE:  No.  Those would be the core components

11   of it, Your Honor.

12   THE COURT:  Well, when you say "core components,"

13   that makes me think there's something else.

14   MR. DRAKE:  No.  I didn't mean to imply that there

15   would be.  It would be the records and the written --

16   the written piece, the depositions, the medical examinations,

17   and the depositions of the experts.

18   THE COURT:  And you would do the medical -- you would

19   do the depositions before any of the examinations --

20   MR. DRAKE:  The supplemental depositions of the

21   plaintiffs, we would, Your Honor.

22   THE COURT:  And then would you do supplemental

23   depositions of the experts?

24   MR. DRAKE:  That would probably need to occur if the

25   experts are going to be opining and offering observations and

1   opinions about what occurred with the examination.  We learned

2   from the first time around that, of course, the experts

3   produce reports and they produce backup data information, but

4   you still don't get the whole picture until you have an

5   opportunity to examine the expert, preferably before they take

6   the stand at a trial.

7            THE COURT:  Okay.  So what -- logistically, the last

8   time you brought the plaintiffs and their parents or adults, I

9   think for some of them, here for their depositions, et

10  cetera -- and I guess I don't know where the exams took place

11  of the plaintiffs' witnesses.  But in any event, tell me how

12  that's going to work this time.  How long does it take to get

13  a visa for purposes like this?

14           MR. SCHLICHTER:  At the present time, Judge, it's a

15  bit of an open question.  The last time it took probably close

16  to five to six months before.  We don't know what that

17  situation will be now.  There is a way of expediting it.  And

18  if you remember, you issued an order which helped to expedite

19  the process, which we would ask again for you to do at that

20  time.

21           But in terms of the logistics, Your Honor, there's a

22  theme here that's been here for 17 years during the time this

23  case has been pending, and you can read not even between the

24  lines, on the lines.  We're talking about they can't do

25  medical exams until they redepose the plaintiffs, until they

1   get written reports from our experts, until they depose those

2   experts, and then they can't do exams also at the same time as

3   ours because they need six months between that.

4          I want to just give you an example, if you're not

5   convinced, that the strategy here of continuing to delay is

6   front and central to strategy.  Just for this hearing, after

7   the Supreme Court ruled, the next day they filed their

8   out-of-time renewed request for summary judgment, which you

9   summarily denied.

10          The same day, at one day after the Supreme Court

11   ruling, we asked for the status conference.  They did not

12   respond at all.  They didn't say they agreed; they didn't say

13   they disagreed.  They let the full time expire for responding

14   to a motion and then didn't respond.

15          We then thereafter asked again for the Court to set a

16   status hearing, which you did for today.  So then they call

17   and they said they can't do it today and they can't do it for

18   more than two weeks till one day, May 8.  You can talk to

19   Kris.  Kris can verify this.  I wasn't on those calls.  They

20   can do it May 8 -- that's the only date -- because they have

21   to have all their attorneys here for a status conference

22   despite the fact that we said you can agree on what the terms

23   are, what the issues are in advance.

24          And we asked about the reasons they can't be here.

25   We didn't hear -- Kris didn't hear a satisfactory answer, and

1   we resisted.  They said it's nonnegotiable.  They wouldn't

2   give any other date more than two weeks from today.

3          And we said, no, we are not agreeing, and we're going

4   to go to the Court to keep this date if that's your position.

5   Lo and behold, they dropped it, but only after that.

6          That is representative, Your Honor, of what's going

7   on in this case, what has gone on in this case, and what we're

8   seeing more of today, frankly, in somewhat surprising, even

9   for all this background, six months between neuro-psychic

10  exams, citing some -- really some medical literature?  It's

11  ridiculous.  I've handled lots of personal injury cases for

12  the plaintiff over lots of years.  I've never heard of that,

13  just as an example.

14         Also, there's no automatic right.  When you have a

15  supplemental exam for trial, it's a routine part of personal

16  injury cases.  We have a supplemental medical examination to

17  update the medical that they then, if they want a supplemental

18  because time has gone on for a while, that they get to then

19  shut down the process and do all this discovery, written

20  discovery, depose the plaintiffs, get the reports, get all

21  that before they do their own exams?  There's no right to

22  that.  I've never seen it before.  And the reason?  It's just

23  to continue to delay this case.

24         These kids were minors at the time we started, Your

25  Honor, as you well know.  They are now all adults, young

1  adults.  What they're talking about, you're talking perhaps

2  another couple of years before we'd ever get to trial.  And

3  that's the strategy.

4          So I think when the Court -- we would ask you to look

5  at this in light of that strategy because, if this continues,

6  we're going to be here a long, long time.

7          THE COURT:  Given the current state of the

8  immigration world in this country and the difficulty people

9  have with visas and with getting them and also then, you know,

10  having them remain in effect -- and I realize there would be a

11  court order so perhaps this would be different -- I'm

12  concerned about the length of time it will take, and I'm

13  concerned about if things will blow up at the last minute.

14          MR. SCHLICHTER:  In that regard, could I say one

15  thing, Your Honor?

16          THE COURT:  Yeah.

17          MR. SCHLICHTER:  Yes.  For us, we anticipate our

18  experts going down there to do their supplemental exams.

19          THE COURT:  Yeah.

20          MR. SCHLICHTER:  So if that's part of what you're

21  thinking about, that's how we intend to do this.

22          THE COURT:  Right.  I think -- I mean, to me, that

23  makes some sense.  I assume the defendants, of course, would

24  oppose anything happening in Peru in this case because, as

25  you've told me once or twice before, plaintiffs filed this

1   lawsuit here, et cetera.  Correct?

2          MR. DRAKE:  Yes, that would be our position, Your

3   Honor.  And the plaintiffs continue to obviously maintain the

4   position that these cases belong here, and that's where we

5   are, and we're here today.

6          Obviously, Mr. Schlichter gave a lengthy speech

7   there, with a lot of attacks on our side.  I won't go through

8   them all, Your Honor, unless you're interested in hearing our

9   response tit for tat on how we got to this date or how we all

10  changed our travel plans to arrive today or whatnot.  But I

11  want you to know, Your Honor, that we're happy to address

12  those issues if Your Honor would like us to.  I don't think

13  they're central to the discussion today and what we need to

14  accomplish.

15         THE COURT:  I didn't ask you before when you talked

16  about the additional discovery you needed.  And, you know,

17  Mr. Schlichter is right.  It's not just his personal injury

18  cases.  Lots of personal injury cases do update a medical exam

19  before trial if it's been a period of time.  And defendants

20  are entitled to notice and discovery on that because, after

21  all, it's not right to have somebody come in at trial and say,

22  "Oh, now I need three more surgeries that we didn't tell you

23  about before."  I mean, that happens all the time.

24         Were you suggesting that any of this supplemental

25  discovery might open up more rounds of motion practice?

1    MR. DRAKE:  Well, I'm concerned about that, yes, Your

2    Honor.  What we were really envisioning when it came to the

3    medical examinations would be something much more narrow.  And

4    we'd be happy to confer with the other side and try to reach a

5    protocol on this.  It would be a much more narrow set of

6    examinations, kind of consistent with what Your Honor just

7    said, which is to briefly supplement and address their medical

8    condition and state of affairs.

9         You would not, for example, need a supplemental

10   neuropsychological evaluation to accomplish that.  These

11   individuals have an IQ.  They were tested by their expert.

12   They were tested by their expert -- by our expert rather.

13   That number is not going to change.  Their IQ is what their IQ

14   is.  We don't need to do another examination.

15        So what we were originally envisioning was a very

16   narrow, discrete set of updated examinations to examine and

17   figure out what their current medical state is because we

18   haven't received any records.

19        I mean, Mr. Schlichter's here saying that he's upset

20   that we're delaying the case, which we're not doing at all.

21   If he was eager to move forward, I would think that he would

22   have brought with him today or sent to my office in the last

23   few weeks an updated set of medical records.  We'd be happy to

24   start reviewing them and moving forward, but we don't have

25   those.  They haven't been collecting them, to my knowledge.

1      THE COURT:  Okay.  All right.  That's the questions I

2  had on this.

3      Then there was a paragraph in your agenda on the

4  parties' position on the number of plaintiffs to proceed in

5  the first trial.  And I do understand what -- you know, that

6  the plaintiffs want more and the defendant wants just one.  I

7  am -- I mean, I can listen to arguments.  I can't imagine

8  they're going to be much different than what I heard before

9  and what you -- what we've talked about.  But I -- and you

10  presented in your -- in the initial plans you gave me back

11  quite a while ago about what the trial would look like.  I

12  am -- I'll give you a chance to respond to this if you want

13  to.

14      But one of the questions I have is how those get

15  selected.  Assuming it's less than the total number -- and I'm

16  still thinking four is the number that makes sense to me --

17  how are we going to select them?  Do you want me to pick them

18  randomly from the discovery cohort?  Each side suggests four

19  that they want and I can pick from those?

20      I can select based on the information that's in the

21  record before me about the plaintiffs, if that's the way to do

22  it, or whatever you all tell me about the four you offer or

23  you suggest.

24      What do you think, Mr. Schlichter?  And I appreciate

25  your quoting me back about -- the defendants quoting me back

1  about in the earlier -- your earlier submission about what

2  I've said.  And I do -- I've had some experience with this.

3  Go ahead.

4          MR. SCHLICHTER:  Yes, Your Honor.  There are a couple

5  of different ways you could do it.  Obviously, it's your call,

6  and it's completely discretionary.

7          One ancient almost example of what was done by a

8  St. Louis judge was decades ago in the very first mass tort

9  case that went to trial in St. Louis.  That was in state

10  court.  And as a matter of fact, it was the Times Beach case

11  in which we represented the plaintiff and Lewis Rice

12  represented one of the defendants.  Andy Rothschild was the

13  lead lawyer at that time, and he's since retired.

14          What was done there was it was a bigger cohort than

15  four.  It was six.  And what the court asked both sides to do

16  would be to pick two what they identified as representative

17  cases of large exposure and two that were small exposure and

18  sort that out that way, which both sides did.

19          And the rationale for that, Your Honor, was this:

20  That unless you have cases with large exposure, everybody

21  knows the downside is zero.  The upside is part of what a

22  bellwether trial reveals, and what is the upside on cases that

23  have substantial potential.  And in that case, we had a boy

24  with leukemia, and we had a woman who died during the trial,

25  during the preparation, of breast cancer at the age of 29.

1    Those are who the judge picked for the upside and then

2    correspondingly picked some for the downside.  So that's one

3    approach you could take.

4             I don't think it's worth your time, Your Honor, for

5    you to dig into deep medical records to do this.  I think the

6    parties ought to suggest it to you.  You're probably eager to

7    hear something that would suggest not more of your time rather

8    than less.

9             THE COURT:  Yeah.  Well, that's -- and I agree with

10   that.  I don't really need to dig in.

11            Mr. Drake, what's your suggestion?

12            MR. DRAKE:  Well, I think we're somewhat generally

13   aligned, it sounds like, on what we were thinking as well,

14   which I don't think these cases are exactly the same as the

15   ones Mr. Schlichter was describing in terms of having kind of

16   a low exposure and a large exposure, because all the injuries

17   are essentially within the same range.  They're very similar

18   allegations.  So we're not dealing with different types of

19   cancers but something along the lines that where we each pick

20   two cases or suggest two cases or perhaps suggest -- I think

21   Your Honor put this out there -- three or four cases each and

22   write a page on each and let Your Honor have an opportunity to

23   see the facts, as the sides lay them out, and then narrow that

24   down to four.  That would be, I think, suitable.  I think

25   that's better than random.

1    THE COURT:  Is there any chance that you all could

2    agree on four?

3    MR. DRAKE:  That seems unlikely based on the parties'

4    course.

5    MR. SCHLICHTER:  I would say there's little.

6    THE COURT:  Yeah.  Okay.  That answers that.

7    And then there was a paragraph 3 of the agenda is

8    really -- intrigues me:  Additional legal issues to be

9    resolved before trial.  What on earth are you talking about?

10   MR. DRAKE:  Well, Your Honor, we fully appreciate

11   that Your Honor denied our motion to leave -- for leave to

12   file the renewed summary judgment motion.  And we're not here

13   today to try to relitigate or ask leave to refile that motion.

14   That's been addressed.

15   But I think what we're concerned about, whether it's

16   in motions in limine, briefing on jury instructions, or some

17   other way the Court would prefer to handle it, Your Honor's

18   order of January 2023 holding that Peruvian law applies with

19   respect to whether the defendants are entitled to an immunity

20   under Section 1971 and relatedly whether we -- whether Doe Run

21   Peru did or did not violate the PAMA raises a number of legal

22   issues.

23   THE COURT:  These are not additional legal issues.

24   They're the things you raised in your request to file a

25   supplemental summary judgment.

```
 1            MR. DRAKE:  Not entirely.  That was one of the
 2   issues, that's correct, Your Honor.  And coming out of that
 3   motion, which is why we filed it, depending on how the Court
 4   rules on that motion, there may be additional issues that are
 5   purely of law that would have to be decided, before the jury
 6   is charged in some way or the other, around Peruvian law.  And
 7   we just wanted to flag for Your Honor that as we're thinking
 8   through the approach to the trial of these matters -- and,
 9   again, these can be through motions in limine; it could be
10   through jury instructions or other sorts of pretrial brief,
11   however the Court would prefer to handle them -- I think it
12   will be efficient and probably behoove the parties and the
13   Court to address some issues like those before we impanel a
14   jury because I think we have to reach some certainty, before
15   the jury is charged, on what is a fairly novel legal question.
16            THE COURT:  All right.  And I realize it's premature
17   to give me an answer to this question, but I still want to
18   know.  What do you think is the earliest you can get the -- if
19   we did what you all are proposing here, what you're proposing,
20   Mr. Schlichter, and I rule on the motions, which I am working
21   on, what do you think the earliest we can get these cases to
22   trial would be?  For the first trial.
23            MR. SCHLICHTER:  If we don't go through the
24   cumbersome layers and layers of things that they suggested?
25            THE COURT:  Yeah.
```

1    MR. SCHLICHTER:  I guess I would just ask if -- do

2  you have some idea, Judge, of the approximate time that you'll

3  get through the motions?  I know that's a big ask.

4    THE COURT:  See, Mr. Schlichter is old enough, Mr.

5  Dowd's old enough, Mr. Berra's old enough to remember a judge

6  on this court -- and I've probably quoted him to you -- Judge

7  Hungate's rule, when you asked him about motions, is "Assume

8  all motions will be denied"; right?  So assume all motions

9  will be denied.  That's the underlying theme for today.

10    So yeah.  So assuming that will happen relatively

11  quickly, not next week.

12    MR. SCHLICHTER:  Yeah.  With that assumption, Your

13  Honor, depending on the logistical issues of the timing of

14  things such as visas and on how quickly they move on exams, if

15  they want to do them, first half of next year.

16    Your Honor, I know you've made it clear it's going to

17  be four probably, but just so that you know our thinking in

18  terms of how things are different now to some degree, not

19  totally, but to some degree from when you ruled on in your

20  order directing this case to go to mediation, which is the

21  order in which you also set it for, what's happened that does

22  change the situation somewhat is this -- are these things:

23  One, mediation went nowhere.  Two, the Supreme Court case now

24  has clarified that these cases will go to trial whereas that

25  was the existential issue before.

1        And so the importance of a bellwether and the

2   significance of a bellwether trial is enhanced because we now

3   know that that bellwether trial will be something, the result

4   of which on appeal will remain in effect and not be subject to

5   being usurped by a Supreme Court ruling.

6        Further, the concept, when you have this many people

7   or any number of plaintiffs, is to try to get the most

8   representative group of bellwether clients so that, if you

9   look at it as a bell curve where the most examples are at the

10  peak of the bell curve and a couple outliers in either

11  direction, when you have four, it tends to make possible

12  outliers disproportionate whereas, if you have more, you're

13  more confident that it is truly representative of what others

14  might do.

15       And I mentioned exposure before.  That was a critical

16  factor for the judge in the state court who decided to have a

17  bigger cohort than four.  And that's because in this kind of a

18  case, the more exposure you have, the more -- a higher

19  percentage of the overall exposure that that first case

20  represents, which means more risk for both sides, more risk of

21  a bunch of people saying no money for us and more risk for, on

22  the other side, for a bunch of people saying you're going to

23  get hit pretty hard.

24       And weighing that in the equation of the entire

25  global cases is part of what both sides would do.  And then

1   there are the efficiencies.  Now things are very clear as to

2   what's going to happen.  We've got -- we have nine experts,

3   three of whom have case-specific information as to the

4   plaintiffs.

5         They have 14 experts, as you're digging through,

6   three of whom have plaintiff-specific information.  So that

7   means for us we've got six witnesses who will be testifying to

8   epidemiology, accounting issues, all the other issues

9   repeatedly, virtually verbatim at each case.  They've got 12

10  who will be doing that.

11        So the inefficiency of having -- and then all the

12  corporate witnesses whose testimony will be the same whether

13  it's Plaintiff 4 or 6 or 8.  So putting all that together, the

14  inefficiency is now clear of a tremendous amount of repetition

15  and testimony.

16        And the other thing that I would add to that equation

17  that's clearer now than it was, Your Honor, is there is, from

18  our observation, going -- there is a strategy of serial

19  trials, not one and then done, serial trials, which is

20  consistent with the strategy that's been utilized for

21  17 years.

22        So if we're talking about four and we have, let's

23  say, I don't know, say four trials, we're talking about an

24  enormous amount of repetitive time and testimony and, at the

25  end of the process, 16 cases that have been decided versus, if

1   you say ten, 40 cases.  That's a big proportion of the

2   exposure.  And so that's why -- that's the background for us

3   doing it.  We didn't do it willy-nilly.  Just wanted you to

4   know that.  It's your call.  It's totally discretionary.  But

5   those are the reasons.

6              THE COURT:  Yeah.  And what do you think about --

7   yes, ma'am, Ms. Renfroe.

8              MS. RENFROE:  Thank you.

9              THE COURT:  What were you thinking about timing of

10  the trial?

11             MS. RENFROE:  Your Honor, may I approach?

12             THE COURT:  Yeah.  And I'll tell you, when you get to

13  trial or other things, that the way -- the mics at the table

14  don't work when you stand up, and yet we want you to stand up,

15  you know.  So it's a pain.  Go ahead.

16             MS. RENFROE:  Thank you very much.  Is this one

17  working?

18             THE COURT:  Yeah.

19             MS. RENFROE:  All right.  You asked me about the

20  timing of the trial.  I'd like to answer that.  And then if

21  the Court will permit me, I would very much like to respond to

22  what Mr. Schlichter said about the number of plaintiffs who

23  should be included or ought to be included in a trial.

24             With respect to the timing of a trial, whether it's

25  one or four, as the Court has already ordered, we think no

1    sooner than next July, July 2026. And we've built into our

2    analysis of the timetable the steps that Mr. Drake described.

3    And while some of those perhaps could be compressed, when you

4    take into account the need to get medical records, which is

5    very fundamental and straightforward, by way of updating the

6    medical condition of these plaintiffs -- and there are 16 that

7    remain in the discovery cohort that we would need to get

8    medical records for unless the Court chose another path --

9    then we are talking, we think, practically about July of 2026,

10   which is not far from what Mr. Schlichter said, if I heard him

11   correctly.

12          So let me pause there and see if the Court has any

13   questions about my answer.

14          THE COURT: No. I understand.

15          MS. RENFROE: Thank you. With respect to the number

16   of plaintiffs that should be included in this first trial,

17   every point that Mr. Schlichter just made, almost every point

18   supports our position that the first trial ought to be

19   included -- ought to include a single plaintiff.

20          He's right the mediation was not successful, and he's

21   right, subject to the rulings that this Court may make on the

22   motions, there will be a jury trial. And it's because there

23   will be a trial and potentially review by a court of appeals

24   maybe by one side or another, maybe both, it's critically

25   important to make sure that that first trial is fair and

1    includes a representative plaintiff.

2            To try to address this entire docket of all these

3    claims -- there are hundreds, as the Court knows -- it's not

4    realistic that they would all be tried, and our clients are

5    not interested in a series of serial trials.

6            However, to get these parties back to a path of

7    potential resolution of these hundreds of cases, we think the

8    first trial, as long as it's fair and of a representative

9    plaintiff and delivers a fair verdict, that is the best way to

10   get the parties back on a resolution path.  As soon as we have

11   a trial of multiple plaintiffs, the risk of jury confusion,

12   the certainty of jury confusion and an unfair verdict

13   increases.

14           What we want is a verdict that we can trust, that we

15   can count on as being informative of the issues on liability,

16   the issues on causation, individual causation, and the issues

17   around harm, if any.

18           The more plaintiffs that are included in a trial, the

19   risk of jury confusion goes way up.  The plaintiffs' burden is

20   essentially -- burden of proof is essentially diluted.

21           Think about what Mr. Schlichter said about the

22   specific facts around these plaintiffs.  We're talking about

23   specific details about their entire lifetime of where they

24   resided within La Oroya, what part of the community they

25   resided in, for how long, what their residence conditions were

1  like, where they went to school, where that school was

2  located, the years that they were living there relative to

3  the years that the defendants were doing what they were doing.

4        Then you have the specific medical records and

5  medical conditions.  Then you have educational records,

6  educational history, employment records, employment history.

7        To correct Mr. Schlichter in his count of the number

8  of experts, while there are 23 experts that have been

9  identified collectively by all sides, seven of them, only

10 seven, are plaintiff specific.

11       But think about seven different expert witnesses

12 talking about one plaintiff.  Multiply that times two.  That's

13 essentially seven times two, 14 different accounts from expert

14 witnesses.  Multiply it times three.  Now we're asking a jury

15 to keep up with 21 different sets of testimony about

16 plaintiff-specific information.  And so -- and it just goes on

17 and on.

18       Asking a jury to keep separate the evidence about

19 each individual plaintiff and all of those details around

20 their alleged causation, their exposure causation and injury

21 case is, I believe, Your Honor, respectfully, asking too much.

22 And that's why we urge the Court to select a single plaintiff

23 for the first trial.

24       Now, I know the Court decided and issued a ruling

25 that it would be four plaintiffs.  And for the reasons I just

1   mentioned, we would renew our request that it be a single

2   plaintiff but certainly no more than four.

3            I'm happy to take any questions from the Court.

4            THE COURT:  No.  I understand.  And I appreciate your

5   position on that.

6            All right.  What about Defendant Zelms, who passed

7   away?  There's been a suggestion of death filed.  Are you

8   going to sub -- is there somebody who's going to be

9   substituted, or is there -- is he dismissed from the case?

10  Your deadline is in a week from Monday; so you've got --

11           MR. SCHLICHTER:  Yeah.  We intend to do something to

12  keep him in the case, Your Honor.  We are researching that at

13  this minute.

14           THE COURT:  Okay.  Because as I count it -- and I

15  could be wrong -- but I believe it's Monday, May 5 is the

16  deadline, because it's 90 days after the suggestion of death.

17  Right?

18           MR. SCHLICHTER:  I believe so, Your Honor, but I

19  frankly didn't come here prepared to talk about this deadline.

20           THE COURT:  Yeah.  It wasn't in there.  I understand

21  that.  So just be --

22           MR. SCHLICHTER:  We appreciate that.  Your Honor, if

23  I could speak just very briefly to the points --

24           THE COURT:  Yeah.

25           MR. SCHLICHTER:  I don't know how many cases

1   Ms. Renfroe has tried, if any, personal injury cases with

2   multiple plaintiffs, but I have.  And I find what she said is

3   remarkable, at least, when she says that it would be confusing

4   for the jury to hear about more than one.

5          The opposite.  It would tell the story of these

6   people who may live in different locations and what their

7   experience was and what their health effects are rather than

8   one who could well be an outlier.  We're not going to agree on

9   who one would ever be.  She said a representative one.  You

10  know enough about the way this case has gone we wouldn't agree

11  on who's representative.

12         But apart from that, I didn't hear anything about the

13  end game.  Yeah, platitudes about, well, that will tell us all

14  this.

15         And, by the way, I believe the strategy will be, if

16  they operate consistently with what they've done to this point

17  in this 17-year saga, will be, well, wait a minute.  We can't

18  have another trial till we go through the appeal.  We've got

19  all these appellate issues.  So let's have a two-year delay

20  before we go to trial, Plaintiff No. 2.

21         That's what we're talking about here.  I didn't hear

22  anything that suggests that that would somehow mean there's a

23  path to a global resolution, because that's not what they're

24  seeking.  They're seeking to delay, and that's further

25  evidence of it.

1          THE COURT:  Okay.

2          MS. RENFROE:  Would Your Honor like to hear from me

3   on that?

4          THE COURT:  Well, yeah.  You're going to say, no,

5   we're not delaying, and we have a right to appeal every single

6   decision that's appealable.

7          MS. RENFROE:  What I was going to say, Your Honor, is

8   if we get -- if we can try a case, single plaintiff, get a

9   verdict that we all trust -- and this is what I said

10  earlier -- that, I believe, will give the parties the

11  information they need to value these cases.  The problem has

12  been the parties are valuing the cases very differently.  We

13  think a jury verdict of a single plaintiff will give us the

14  information we need to understand what a proper value should

15  be.

16         And so I was explaining -- and I'm sorry if I wasn't

17  clear in my explanation -- that the path to resolution of

18  these cases globally could be returning the parties to

19  settlement discussions by mediation or otherwise following a

20  verdict that everybody trusts.

21         I didn't hear Mr. Schlichter say that he couldn't

22  trust a verdict of a single plaintiff.  I understand the plea

23  for efficiency, judicial economy, but those considerations

24  cannot overtake the importance of due process and a fair

25  trial.

1      And I'm happy for the Court to check my trial record

2  on the number of cases --

3      THE COURT:  I assumed you had.

4      MS. RENFROE:  -- that I have tried with multiple

5  plaintiffs.

6      THE COURT:  I assumed as much.  I'm not going to need

7  to verify that.

8      MS. RENFROE:  Thank you.

9      THE COURT:  Okay.  Well, there's a lot for me to

10  consider here.  So let me -- I guess this is a question I have

11  for the plaintiffs.  And it hasn't happened so far in this

12  case, so I don't think it will, but there are -- well, are any

13  of your -- of this discovery cohort getting cold feet about

14  going forward with this, or do you know that?

15      I mean, you may need to talk to them and say, you

16  know, here's what's going to happen, but that's -- sometimes

17  when we do this, you know, we pick somebody for a trial and

18  then that trial goes away and it settles or is dismissed,

19  whatever.  Do you have any --

20      MR. SCHLICHTER:  No cold feet, Your Honor.

21      THE COURT:  I expected you to answer that way.

22      MR. SCHLICHTER:  We are in deep touch with our

23  clients, with this cohort.  There is one of the cohort who has

24  moved to Spain.  And with his position, job there, and his

25  travel restrictions, that's a potential issue for the

1   logistics of these exams and the trial, and we're sorting

2   through that with him.

3        He doesn't have cold feet, but he has different

4   logistics than the people in Peru.  But, no, nobody has cold

5   feet.

6        THE COURT:  And people do have issues like that.  I'm

7   not surprised.

8        Okay.  I'm going to take a short break.  It will

9   be -- yeah, I will take a ten-minute recess, and then we'll be

10  back, and I'll talk about some of this stuff.  I'm not going

11  to give you a lot of definitive rulings today, but there are

12  things I need to tell you and we need to talk about.

13       MR. DRAKE:  Your Honor?

14       THE COURT:  Yes.

15       MR. DRAKE:  Very quickly before you go on break.  If

16  it's helpful when you return, we just went through the

17  process, as Your Honor may know from Judge Sippel, of bringing

18  the cohort in the *Collins* case from Peru to the United States

19  for depositions.  Mr. Berra led that effort.  He would be

20  happy to answer any questions about the ease with which that

21  worked getting through the immigration system.

22       THE COURT:  Yeah.  Tell me how that worked.

23       MR. BERRA:  Thank you, Your Honor.

24       I don't know if Mr. Schlichter or Ms. Kraft has been

25  in contact with the plaintiffs' lawyers in that case, but we

1    did just complete bringing a cohort and their entire families

2    to the United States in a process that just ended about

3    three months ago.

4          We were able to get all but a few of them here.  The

5    folks that did not come here, it was for their own reasons

6    relating to work issues and a couple of, frankly,

7    criminal-type matters that made them ineligible to receive

8    visas to enter the United States.  And we were able to get

9    that accomplished.  It did not take six months to do that.

10         The normal appointments with the embassy in Peru are

11   scheduled out quite far out in the distance, but there were

12   processes that we were able to follow, and we worked

13   cooperatively with the plaintiffs' counsel to be able to get

14   that accomplished on a much, much shorter time frame.  And all

15   of those folks came here.

16         THE COURT:  And you completed that, you say,

17   three months ago, which would have been January 23?

18         MR. BERRA:  January, that's correct.  It was before

19   January 23.  I will acknowledge that.

20         THE COURT:  Was it before January 20?

21         MR. BERRA:  It was before January 20, Your Honor,

22   yes.

23         My point is that I'm not sure what anyone has done to

24   test those waters at this point or not, and we're happy to

25   work with counsel because, again, we just went through it.

1          The order and the approach that we used in *Collins*

2     was the same order and approach that we utilized in Your

3     Honor's case here with counsel.  So we followed the same basic

4     approaches and protocols.

5          And one of the things that we did and why we did that

6     there was because moving the whole band, if you will, to Peru

7     is much more difficult and complicated, actually, than

8     bringing the plaintiffs here.  It's much more difficult to get

9     a series of expert witnesses, their support teams, different

10    testing folks to all be able to get to Peru to be able to do

11    these things.

12         I'm not suggesting that this presents impossibility,

13    but it is very, very difficult, for example, to have an entire

14    team of neuropsychologists and their support folks be able to

15    get to Peru for an extended period of time to conduct tests of

16    16 cohort members.

17         We all understood that and agreed to that in this

18    case when we brought everybody here the last time to do the

19    depositions and the examinations seriatim.  And we just did

20    that in *Collins*, and everyone has agreed there that for

21    testing they're going to be coming back up here.

22         Now, I realize we did that once in this case and that

23    we're asking to do it again, but the years that have passed

24    mandate that we do it that way.

25         The second issue that I'll comment on has to do with

1   this neuropsychology issue.  This is not an arm injury case.

2   These are latent brain injury cases.  They are very subtle,

3   and they're very challenging to demonstrate.  The primary

4   method for doing that is to engage a neuropsychologist to

5   conduct a series of tests that take an entire day.

6           Those tests are all normed.  They're complicated

7   tests.  And they are set up specifically that, if you do them

8   in a short period of time thereafter, there's a practice

9   effect, and the examinations no longer hold weight.

10          So what Mr. Drake was talking about when he said

11  six months is not an attempt to delay the case.  It was to

12  prove the point that Mr. Drake was making that perhaps instead

13  of doing a full neuropsychological battery, we might want to

14  simply have an interview, for example, by the

15  neuropsychologist that talks to the person about how they're

16  doing; where are they working; are they functioning in

17  society; are they still in school; what are their

18  relationships with their family members?

19          Those issues are not esoteric.  They're actually

20  central and germane to the types of claims that are being made

21  by the plaintiffs in this case that have to do with cognitive

22  and behavioral impairments that are alleged from the exposure

23  to lead.

24          If you do an entire neuropsychological battery, the

25  complicated tests associated with that, you inherently

1   interject into the case the timelines that Mr. Drake was

2   talking about.  This isn't about delay.  This is just about

3   science.

4           So what we were suggesting is, if there is going to

5   be this approach, there are things we probably still need to

6   talk about between the lawyers which we haven't had an

7   opportunity to do yet.  And we simply wanted to point that out

8   to Your Honor.

9           We have just gone through some of this.  We were able

10  to make it work.  We can talk to them again about what it

11  might take to get folks here and how to do this, Your Honor,

12  but we think it's doable.

13          THE COURT:  Have you talked to your -- or do you know

14  your neuropsychologists and your -- the neurological,

15  neuropsychology people that you have about whether they would

16  find it sufficient to do the kind of abbreviated interview

17  that you're talking, or will they say, "I can't make an

18  opinion based on this.  I need to do the full deal"?

19          MR. BERRA:  They've already made their opinions.  And

20  to Mr. Drake's point, if you begin that part of the process

21  all over again, you interject -- you asked before, for

22  example, Your Honor, would there be more motion practice?

23          The odds of motion practice are greatly heightened if

24  there are complete and total neuropsychological examinations

25  that start all over again.  We haven't approached our

1   neuropsychologist about exactly how she would do things

2   because, frankly, we're waiting to see what the results are of

3   this discussion and the discussions with plaintiffs' counsel.

4          We'll do whatever we need to do, you know, as it's

5   ultimately determined, but I'm simply suggesting again that

6   the process for bringing them here simplifies everything for

7   all of the parties' experts.  It's much easier to do the

8   examinations that way, regardless of the form that they take,

9   and we should all be discussing exactly what it is they want

10  to do and why.

11         Why does Clemente Vega want to do an entire day of

12  neuropsychological exams again?  We don't know.  Is he doing

13  new tests?  Is it a different battery?  Were there flaws with

14  the first test that we pointed out in our *Daubert* motion to

15  you that he's now going to do differently?

16         There are a variety of examination protocols that

17  could have been adopted.  He selected a certain protocol very

18  intentionally, very specifically.  We had a different one.

19  And we've taken issue with his protocol, and we've pointed

20  those things out to Your Honor.

21         We have no idea what he's going to do now.  Is it

22  exactly the same thing that he did six years ago, or is it a

23  whole new battery of tests?  We don't know.  And those are the

24  sorts of things that I would humbly submit we're going to have

25  to sort through.

1    THE COURT:  I think that you've got a lot you're

2  going to have to sort through.

3    MR. BERRA:  Thank you, Your Honor.

4    THE COURT:  Okay.  We'll be in recess until two

5  o'clock.

6    **(COURT RECESSED FROM 1:49 PM UNTIL 2:10 PM.)**

7    THE COURT:  Well, I appreciate you all clarifying all

8  these things, and I'm not going to tell you answers to

9  everything because there's too much for me to know what we're

10  really going to do, but I know where we're going to start.

11    First, I want you to know -- I mean, I am working on

12  the motions, and I will rule things as quickly as possible,

13  but I can't guarantee when.  And I know that a lot of the

14  further action you want to have is going to depend on what is

15  in those rulings, especially with regard to the expert

16  witnesses who may be -- who would be involved in any

17  reexaminations.  So I will get it as soon as I can.

18    As I said, you should assume we'll have trials, or at

19  least one trial.  And that would be nice if that was all we

20  had.  But if we have to have multiple trials, we'll have

21  multiple trials.

22    I'm not changing the number of plaintiffs, but as

23  time goes on, I will reconsider it.  I cannot -- I would not

24  spend much time -- for the plaintiffs' side, I wouldn't spend

25  much time worrying that I'm going to go down to one.

1    For the defendants' time, I wouldn't spend much time

2  worrying that I'm going to go up to 16.  But I will think

3  about whether four is the right number.  I still think it

4  probably is, but I'm not going to make you pick one right now,

5  or I'm not going to -- you know, I've already said that, but I

6  will reconsider as we move along this process.

7    So we will do supplemental discovery.  And it needs

8  to be very limited.  So the first thing the plaintiffs need to

9  start working on getting the updated medical records and

10  the -- we didn't really do interrogatories.  We did those

11  plaintiff sheets; right?

12    And I don't know.  The defendants are entitled to

13  some updates on those, but I don't know exactly what.  And I'm

14  not looking for -- none of this is meant to expand discovery.

15  It's meant to update discovery so we can move forward to this

16  trial.

17    So I would like -- I'm going to order you all to meet

18  and work on these issues.  So I want you to talk about the

19  fact sheet supplementation and what and when it should include

20  if you need to do it.  I mean, you know, the fact that some

21  people have jobs now and they didn't when they filled those

22  out, those are things that are going to make a difference.

23    But you all -- I want you to talk about that and see,

24  and then you're going to come back and report to me the

25  result.  But start now on getting updated medicals.  I know

1   that takes a while, if there are any, you know.  Whatever

2   you've got.

3        The exams.  I think we do need to have updated exams,

4   but I think the scope of those needs to be limited.  It's not

5   a do-over.  It's not start with new methodologies or

6   protocols, but it's not necessarily do everything else over.

7        I want you both to talk to your expert witnesses

8   before we meet again so that you can tell me what they say --

9   and then I want you to talk to each other about this -- about

10  what they say is doable from their point of view in terms of a

11  more limited evaluation rather than all of the tests that they

12  did before that take a long time.

13       So that's something I want you all to talk to the

14  witnesses.  Each of you talk to your own witnesses, see what

15  they say, and then -- because I do want it to all happen

16  promptly.  We're not going to wait six months in between

17  whatever we're doing.  So that's something you're going to

18  report back to me the next time I see you.

19       In doing this supplemental discovery and talking

20  about it, there are five plaintiffs who do not have a history

21  of measured blood levels -- blood lead levels, and I do not

22  want you to do supplemental discovery on those five.  I'm not

23  ruling on the motions.  I won't know until I've digged further

24  into the motions.  But because there's a question about those

25  five, I don't want them to be included in this process.  So

1   you're only going to be dealing with 11 right now.

2           Once I've been through all the motions and we see

3   what's going on, and assuming we're moving to another trial,

4   we'll deal with them in the next trial pool group of however

5   many are left after this first trial.  But do go ahead with

6   the other 11.

7           I'm going to keep working on everything while you are

8   doing the logistics.  I do believe there are some -- well,

9   you're going to have some time where you're going to try to

10  figure some stuff out.  So we will do the supplemental -- some

11  supplemental discovery.  I want you all to meet and try to

12  agree on the scope, talk about it, see if you can limit it.

13          I am thinking about pretty significant limitations.

14  I think that there may be -- and I'm inclined to allow

15  additional depositions of the plaintiffs, but I'm going to

16  limit those very severely; so like an hour per plaintiff is my

17  suggestion.  I'm not saying that right now, but that would be

18  all it is.  What's your job?  What are you doing now?  That

19  sort of thing.  But not big.

20          And I want to do this if -- if everybody is going to

21  go to Peru, I want this -- well, actually, if the plaintiffs

22  are coming up here, I want this all to happen in the same time

23  period so they're not coming up multiple times.  It's going to

24  be hard enough to get them here for this and then to get them

25  back for trial.  So that's what's going to happen.

1        I am considering telling you all that you're going to

2   go to Peru to do it.  And I understand that's really awful,

3   but that might be what's necessary.  That's even more reason

4   we ought to do this all together.

5        So right now I'm not telling you that it's got to be

6   in Peru or here.  I know we passed that, you know, we did that

7   before, and I think that was the right thing.  And I think,

8   you know, there's reasons that plaintiffs, et cetera, would

9   have to come here, but I want you all to figure out some other

10  things about that.  So that's still up in the air, but it's a

11  possibility it would be different.

12       I want both sides to do what you can do to talk to

13  whoever you have to talk to.  There's expert lawyers you all

14  know -- you've probably got gazillions of them in your own

15  firms -- who know exactly what's going on with people getting

16  visas to come to the United States.  They know exactly what is

17  happening right now.  They may not know what will happen next

18  week, but I want you to get your best estimate of how long it

19  would take to get visas and whether anybody who's experienced

20  in this can tell you and then you can tell me whether you

21  expect there to be problems.

22       This is not what it was last year when you did all

23  the ones in Judge Sippel's case.  It may be that everybody

24  will say, "Oh, it will be the same.  You can just do the same

25  things."

1          But they may say, you know, "We can get you the

2   visas, but we can't promise you that, when they get to the

3   border, they'll actually be able to come in."  I mean, how

4   many court orders do I have to do?  You all have to tell us

5   because, you know, things are happening right now that are not

6   the way things were last year in terms of visas being honored

7   even when people show up at the port of entry.

8          So we need to know what you think will happen

9   realistically and how long it will take and what complications

10  there are.  And I don't expect the lawyers in here to know the

11  answer to that.  I expect you to find some lawyers who have a

12  better idea about it and give me your best good faith ideas

13  about that because that's why -- that may be a real problem.

14  And I don't want to -- we got to get them here for trial

15  next year, and I don't want to -- you know, if there are

16  problems, that's a problem.

17         So I'm not going to rule on, you know, how many

18  plaintiffs will -- I mean, I'm not changing my ruling of the

19  four plaintiffs, but I'm going to think about it.

20         Now, with regard to these other legal issues that you

21  all have talked about, I'm not going to require this right

22  now, but the way -- how we're going to handle this is I will

23  be ordering you to produce draft jury instructions for me.

24  And, again, I'm not going to require it right now because

25  you've got other things to do, but just know that this is

1    what's going to happen.  So I'll ask you to do jury

2    instructions.

3         And from the plaintiff I'll want the plaintiffs'

4    verdict directing instructions.  I don't need all the

5    boilerplate.  I don't need damages.  I don't need any of that

6    stuff.  I just need the verdict directing instructions.

7         And from the defendant I want the verdict directing

8    instructions for your affirmative defenses.  And you told me

9    there's going to be a lot of work on the -- especially on the

10   issue of the safe harbor, and I understand that, and so I want

11   you to do some of that work now.  But it's -- you don't have

12   to do it before our next meeting.  I'll give you a deadline at

13   the next meeting.

14        The other thing I need from you all -- and this you

15   need to do jointly.  And this is not something that is

16   necessarily going to be super easy when I tell you how I want

17   it, but I agree with -- I guess it was Mr. Drake who said I

18   didn't need to do all this work myself of some things.  I'm

19   going to give you all some work that I have started and not

20   finished, and it's not the highest priority on my list, but I

21   want to have it from you all because you know the case.

22        I want some kind of a chart or a one-page summary for

23   each of the 11 plaintiffs we're talking about now that has

24   basic information and in the same format for each of them.

25   The things I want are the initials that were listed first on

1   the docket sheet and their full names now, their dates of

2   birth, their -- let me see if I can get the things.

3       And recognize this won't be updated.  You're going to

4   do this before you do the extra discovery.  And all of these

5   things I want you to have -- I mean, their names and things

6   aren't that necessary, but -- to do it this way.  But all that

7   next group of stuff I want you to have a citation in this

8   chart to the record that is before me now.  I have like

9   100,000 pages of exhibits, okay?  And I want you all to say --

10  if you say this plaintiff has this medical condition, I want a

11  citation to somebody telling me that.

12      I want to know their names, their dates of birth,

13  their dates in La Oroya or in the area where they were

14  allegedly exposed, the distance from their home and their

15  school from the source of the alleged exposure, their current

16  job/school location, medical status, what injuries they claim.

17      And it doesn't have to be -- you don't have to fight

18  over the plaintiff says they have this; the defendant says

19  they have this.  Just tell me in general what -- well, you can

20  do that.  Just tell me what they're claiming.  And there are

21  some things that the defendants' experts agree on; so put that

22  in there too.  So tell me what they are.  And it needs to be,

23  like I say, in the same format.

24      And I want you all to divide up the work.  I don't

25  want it to be all the plaintiffs doing this.  I think the

1    defendants have many more resources to do this.

2         You've got -- I bet you don't know the answer to a

3    question, Mr. Drake, that I'm going to ask you.  How many

4    litigation legal assistants does King & Spalding have?

5         MR. DRAKE:  I don't know the answer to that off the

6    top of my head, Judge.

7         THE COURT:  I'm glad.  If you did, I was going to

8    worry.  But you have a lot.

9         MR. DRAKE:  We have a lot, Your Honor, and we're

10   happy to help.

11        THE COURT:  And I want you to do it jointly, though.

12   It's not only the defendants, but it's also not only the

13   plaintiffs.  So you all have to decide how to do that.

14        And I'm not setting a trial date now.  We need to get

15   through this and figure out what we're going to do.  So here's

16   what we're going to do.  On all the issues about the

17   supplemental discovery that you need to be able to report --

18   and, if possible, I want you to make agreements -- you know,

19   what you're going to update in terms of the fact sheets, what

20   you all think reasonable amount.  And I know we haven't ever

21   agreed on this in anything about those sheets, but I'm hoping

22   that there will be some agreement about the minimum that is

23   necessary for everybody to be able to move forward.

24        And then, you know, so all that -- the scope of any

25   additional discovery of the experts of the plaintiffs, I'd

 1  like to know what you're talking about.  And I don't think

 2  there needs to be a lot of written things except the updated

 3  medical records and then whatever you all think is reasonable

 4  on the fact sheets.  And in the next report you give me, if

 5  you disagree about all these things, you can then tell me

 6  that.

 7           The examinations, like I say, have to be limited so

 8  that we're not going -- and any depositions will be limited by

 9  time.  Depositions of the plaintiffs will be limited by time.

10  And if you think there's a way to limit -- a reasonable

11  limitation on the experts' depositions, you can tell me that.

12  I don't know enough about -- well, two of them I don't even

13  have motions on; so I don't know anything about them.  But you

14  all need to see if you can reach any agreements as to

15  limitations.

16           And then especially I want you all to be prepared to

17  address -- you don't have to put it in the written joint

18  filing unless you think you have agreement on it and you feel

19  comfortable putting it in there -- what it will take, how long

20  it should take, and whether you can anticipate any

21  difficulties in getting the plaintiffs here for the

22  examinations for the -- and for any supplemental discovery,

23  supplemental depositions if we have a way to do that.

24           Then I'd like to see if you can have agreements on

25  what kind of reports you expect from the plaintiffs' examiners

1  and then what kind of reports you expect from the defendants'

2  examiners.  I want you all to tell me if they can -- if they

3  will accept a modified supplemental examination so it's not

4  all of the tests that people have seen.  And I suspect there

5  are ways -- to the extent there are testing, there are ways to

6  mix things up so it's not -- there's not so much learned

7  answers to the tests.

8          Let me see.  Then here's what I want you to do.  So

9  the main things are the scope of the supplemental discovery,

10  the length of time to get everybody here, and when it's

11  realistic to think they can come here to have their

12  examinations.

13         I do want them to be examined -- the examinations

14  should be the same time, same general time, and certainly the

15  same trip for both sets, plaintiffs' and defendants' experts.

16  And I'd like a real description as to what you're really going

17  to do, not just -- you know, I need to know some specifics.  I

18  want the plaintiffs' chart with citations.

19         And I will, at the next meeting, talk about a date

20  for the jury instructions.  If you think there's a reasonable

21  time frame for doing that, you can put it in there.  A lot of

22  your dates and plans for here of what you're going to say to

23  me about how long things need to take and when things can

24  happen, you know, may be dependent on this many days after

25  this or something like that.  You can do that.

1        And so I want you all to meet and confer.  You're

2   going to have to start meeting and conferring immediately on

3   these topics.  I want a report from you on those topics and

4   anything else you think we should discuss at our next

5   conference on not later than May 23.  So that's a month from

6   today.

7        Provide any agreements on any issues, any

8   disagreements -- set them out in one document much like you

9   did this time -- and anything else you think we should discuss

10  at the next status conference.  Our next status hearing will

11  be on May 28, and it will be at 1 p.m.

12       So that is -- and I'll send out an order having some

13  of this in it.  I'm not going to be able to summarize

14  everything I just said in an order.  But you all need to be

15  working on these things with each other and also with your

16  experts and with your plaintiffs and with your people on the

17  ground who pull all the records and things like that.  And I

18  want a report of the status of all of that on the 23rd.

19       And also especially I want to know -- I'd like

20  somebody with an educated ability to give their best estimate

21  of what they think -- what issues there might be about

22  bringing these plaintiffs in, because what I can see is if we

23  scheduled a trial for a year from now or maybe next June or

24  something, we can't still be working on getting people here

25  for their examinations next June.  I mean, once we pick a

1   trial date, I don't want to delay it.  We need to get this

2   case to trial.

3          Like I say, I know part of that is the motions.  But

4   don't work.  I mean don't wait for me.  You need to just

5   assume that while you all are doing those things, I'm working

6   on these things.  And, again, I haven't made final decisions

7   on anything on the summary judgments or the *Daubert* motions.

8   They are all still in process, but I will get done what I

9   think we need as quickly as possible, okay?  And I'll see you

10  in a month.

11         MR. SCHLICHTER:  Two --

12         THE COURT:  Questions?  Yes.

13         MR. SCHLICHTER:  Not a question, just notification to

14  the defendants and you a couple things.  No big deal.

15         One is that we could do Lima rather than going to a

16  rural area if the depositions or exams took place there.  So

17  we could do that in Lima.

18         Second thing is that Nathan Stump is not here, who's

19  very much a part of this case, because he's been in trial in

20  the Southern District of New York today, and that's the reason

21  he's not here.

22         THE COURT:  No.  I understand.  And when you stood

23  up, that reminded me of something I wanted to say, and I don't

24  remember what it was; so it must not be important.

25         Anything from the defendant further?  Okay.  We'll

1    see you.  And you don't all have to be here, but whoever comes

2    needs to be prepared to answer all the questions.  Okay?

3            MS. RENFROE:  Yes, Your Honor.

4            MR. SCHLICHTER:  Thank you, Your Honor.

5            MR. DRAKE:  Thank you, Your Honor.

6            MS. KRAFT:  Thank you.

7                **(PROCEEDINGS CONCLUDED AT 2:31 PM.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 53 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 24th day of April, 2025.


/s/Shannon L White
_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter