UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A., et al.,                           )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )        No. 4:11 CV 44 CDP
                                          )
IRA A. RENNERT, et al.,                   )
                                          )
            Defendants.                   )

## MEMORANDUM AND ORDER

Plaintiffs are numerous Peruvian citizens who allege that they were injured when they were exposed as children to toxic substances from the La Oroya Complex, a metallurgical smelting and refining complex operating in La Oroya, Peru, during the period that defendants operated the Complex as Doe Run Peru. Defendants are several interrelated American companies and their executives and directors.   In this action, plaintiffs claim that defendants prioritized profit over community safety by authorizing and directing the Complex to emit excessive levels of toxic substances into the La Oroya environment without proper safety protocols in place.   Plaintiffs claim that defendants' conduct caused them to suffer serious medical and developmental injuries from their exposure to lead and other toxic substances emitted from the Complex.

Presently pending before the Court are defendants' motions for summary

judgment as well as plaintiffs' and defendants' several motions to limit or exclude expert testimony.   This Order addresses some of the motions relating to expert testimony.

## I.   Relevant Background

The litigation history of this case and the history of the La Oroya Complex, the various defendants' involvement therewith, and the nature of plaintiffs' claims were thoroughly set out in my Memorandum and Order entered January 20, 2023.[1] As is relevant to resolution of the instant motions, a truncated summary of that history follows:

In 1922, a private company founded and began operating the La Oroya Complex in La Oroya, Peru.   In 1974, the government of Peru expropriated the Complex and transferred its ownership and operations to Centromin Peru S.A., a Peruvian government-owned company.   On October 23, 1997, defendants The Renco Group (Renco) and Doe Run Resources Corporation (DRR) purchased the Complex through their newly formed entity, "Doe Run Peru" (DRP).   DRP operated the Complex continuously through June 2009.   DRP entered into bankruptcy shortly thereafter.

---

[1] That Order addressed and largely denied defendants' Motion for Application of Peruvian Law and Summary Judgment Under Peruvian Law, or, Alternatively, Dismissal Under Transnational Law Doctrines.   (ECF 1322, Memo. & Order, *reported at A.O.A. v. Rennert*, No. 4:11 CV 44 CDP, 2023 WL 346001 (E.D. Mo. Jan. 20, 2023)).   The Eighth Circuit affirmed that decision, *Reid v. Doe Run Res. Corp.*, 110 F.4th 1049 (8th Cir. 2024), and the Supreme Court denied defendants' petition for writ of certiorari on March 3, 2025, 145 S. Ct. 1309 (2025).

The Complex consists of smelters and refineries that process minerals mined from the Andes mountains into copper, lead, zinc, and other metals. When DRP purchased the Complex in October 1997, the Complex was operating under a plan developed in January 1997 that required measures to reduce or eliminate emissions from the Complex to bring the Complex into compliance with Peruvian environmental laws within ten years.[2] The plan was developed after studies of the Complex's environmental impact on La Oroya and surrounding areas showed significant pollution of the environment, including lead contamination in the soil. Under the terms of the October 1997 sale of the Complex, Centromin and DRP agreed to each assume certain obligations under the PAMA plan.

The terms of the sale also provided for Centromin to assume all liability for any claims by third parties arising from toxic emissions released before the October 1997 sale of the Complex. DRP agreed to be responsible to third parties for any damages it alone caused, which Renco and DRR warranted. (Stock Exchange Agreement, "Additional Clause," ECF 545-9 at hp. 25.[3])

Plaintiffs are Peruvian citizens who allege that they were injured when they were exposed as children to toxic substances emitted from the Complex beginning

---

[2] The plan was developed in accordance with the Programa de Adecación y Manejo Ambiental (PAMA), which required that every mining company agree to an environmental remediation plan.

[3] Given the inconsistent pagination of the briefs and several thousand pages of exhibits submitted in this action, I will refer to the page number identified in the ECF header of a filed document (*i.e.*, "hp.") when citing to that document.

October 24, 1997.   They bring their claims under Missouri law against the companies that purchased and invested in the Complex – Renco, D.R. Acquisition Corporation, and DRR; the direct parent of DRP – Doe Run Cayman Holdings, LLC (Cayman Holdings); and certain executives and officers at these companies – Ira L. Rennert, Marvin K. Kaiser, Albert Bruce Neil, and Jeffrey L. Zelms.[4]   Plaintiffs allege that these defendants, acting from Missouri and New York, controlled the Complex in a manner that exposed plaintiffs to excessive levels of lead and other toxic substances, causing serious medical and developmental injuries.   They seek damages under state-law tort theories of negligence, including breach of assumed duties, negligent performance of an undertaking, and direct participation liability.

Of the more than 1380 plaintiffs whose claims remain pending in the case, sixteen make up a Discovery Cohort, and discovery has been fully worked up and completed as to those plaintiffs ("DC plaintiffs").   As part of that discovery, the parties have secured several expert witnesses who have reported, opined, and testified to various matters involved in the case, including environmental, economic, and medical issues.   The parties seek to exclude or limit the opinions and testimonies of many of their opponents' experts.   Of the thirteen expert witnesses challenged, this Memorandum and Order addresses the parties' motions directed to nine of them:   plaintiffs' experts David Sullivan, David L. MacIntosh, David C.

---

[4] Zelms died on January 13, 2025.   (ECF 1435, Sugg. of Death.)   Pursuant to the parties' stipulation, Zelms was dismissed from this case on June 24, 2025.   (ECF 1470, 1487.)

Bellinger, Karen Hopkins, Jill E. Ryer-Powder, Howard Hu, and Clemente Vega;

and defendants' experts Shahrokh Rouhani and Elias G. Chalhub.   I will address the

other four challenged experts in later orders.

## II.   Legal Standard

The admission of expert testimony is governed by Rule 702, Federal Rules of

Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an opinion
> or otherwise if the proponent demonstrates to the court that it is more
> likely than not that:
>
> > a) the expert's scientific, technical, or other specialized knowledge
> > will help the trier of fact to understand the evidence or determine a
> > fact in issue;
>
> > b) the testimony is based upon sufficient facts or data;
>
> > c) the testimony is the product of reliable principles and methods;
> > and
>
> > d) the expert's opinion reflects a reliable application of the
> > principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended Dec. 1, 2023)[5]; *see also David E. Watson, P.C. v.*

*United States*, 668 F.3d 1008, 1015 (8th Cir. 2012).   The proponent of expert

---

[5] The purpose of the December 2023 amendments was to clarify that the proponent of expert testimony must meet all of Rule 702's substantive standards for admissibility by a preponderance of evidence and, further, to correct prior, inaccurate applications of Rule 702 given that "many courts have [incorrectly] held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility."   Fed. R. Evid. 702 advisory committee's note (1) to 2023 amendment.

opinion and testimony must satisfy each criterion of Rule 702 by a preponderance of the evidence.

The purpose of a motion to exclude expert testimony is to ensure that only reliable and relevant expert testimony is presented to a jury. *Russell v. Whirlpool Corp.,* 702 F.3d 450, 456 (8th Cir. 2012). While a party's mere disagreement with an expert's assumptions and methodologies does not warrant exclusion, *David E. Watson*, 668 F.3d at 1015, I must nevertheless be satisfied that the expert has a sufficient basis for their opinion and that they reliably applied the methodology to the facts of the case. Fed. R. Evid. 702 advisory committee's note (1) to 2023 amendment. *See also Webb v. City of Maplewood*, No. 4:16CV1703 CDP, 2021 WL 5371247, at *2 (E.D. Mo. Nov. 18, 2021) (an otherwise qualified expert may not simply offer conclusory opinions without providing a basis for the conclusions). "[E]ach expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note (2) to 2023 amendment.

In forming their opinion, an expert can rely on another expert's information – *e.g.*, facts, data, conclusions, and opinions – so long as their ultimate opinion is an independent determination "based upon [their] own application of principles within [their] expertise to the facts of the case." *Refrigeration Supplies, Inc. v. Acadia Ins. Co.*, 507 F. Supp. 3d 1096, 1102 (E.D. Mo. 2020) (quoting *Hill v. Fikes Truck Line,*

*LLC*, No. 4:11-CV-816 CAS, 2012 WL 5258753, at *3 (E.D. Mo. Oct. 24, 2012)).
*See also Craton v. Birds Eye Foods, Inc.*, No. 1:10-cv-541, 2013 WL 12421822, at
*10 (W.D. Mich. Dec. 20, 2013).   The Federal Rules of Evidence do not permit an
expert to merely "parrot" the opinions of other experts.   *Refrigeration Supplies*, 507
F. Supp. 3d at 1102.

I have broad discretion in determining whether expert testimony should be
allowed, *Russell,* 702 F.3d at 456, and I should resolve doubts regarding the
usefulness of an expert's testimony in favor of admissibility.   *Masters v. City of
Independence, Mo.*, 998 F.3d 827, 838 (8th Cir. 2021); *Marmo v. Tyson Fresh
Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).   "Vigorous cross-examination,
presentation of contrary evidence, and careful instruction on the burden of proof are
the traditional and appropriate means of attacking shaky but admissible evidence."
*Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).   An expert's opinion
need not be proven correct nor resolve an ultimate issue of fact in order to be
admissible.   *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001); Fed. R.
Evid. 702 advisory committee note (1) to 2023 amendment.   But it cannot be
speculative, unsupported by sufficient facts, or contrary to the facts of the case.
*Masters*, 998 F.3d at 838.   If the expert's opinion is so fundamentally unsupported
that it can offer no assistance to the jury, it must be excluded.   *Bonner*, 259 F.3d at
929-30.

## III.  Discussion

It goes without saying that this is a very complicated case with complex issues, especially science-based issues.   When the case is broken down into its component parts, however, the issues become more easily understandable.   This approach is helpful and necessary to address the several motions to exclude or limit expert testimony.

I therefore begin with what the parties generally agree about in this case:

- La Oroya, Peru, is contaminated with lead in its soil, air, water, and dust.

- The La Oroya Complex emitted lead and other contaminants before DRP began its operations on October 24, 1997.

- The Complex continued to emit lead and other contaminants when and after DRP began operations on October 24, 1997.

- Other sources of lead were present in La Oroya before and during DRP's operation of the Complex, such as lead-based gasoline, lead paint, etc.

- Ingestion of lead can cause certain physical and cognitive injuries.

- Plaintiffs allege that they experience those physical and cognitive injuries.

- Those same physical and cognitive injuries can have causes other than lead.

With those premises in place, the following questions need to be resolved:

- Did DRP's emissions beginning October 24, 1997, cause plaintiffs' claimed injuries?

- If so, did defendants' conduct in Missouri and New York cause the injurious DRP emissions?

Each side has proffered several expert witnesses to opine and offer testimony

establishing the factual premises set out above and, further, to offer opinions answering the core questions.   The opinions of the thirteen challenged experts fall into four general categories:   contamination of La Oroya, general medical causation, specific medical causation, and liability.   The nine experts addressed in this Memorandum and Order have opined in the broad categories of contamination and medical causation.

A.    Contamination of La Oroya

>    Challenged Experts:    David Sullivan, for plaintiffs
>    Dr. Shahrokh Rouhani, for defendants
>    Dr. David L. MacIntosh, for plaintiffs

Broadly speaking, the parties agree that La Oroya is contaminated with lead and other contaminants and was so contaminated during the period plaintiffs claim they sustained injury.   The parties dispute the level of contamination at and around La Oroya, the extent to which emissions from the Complex contributed to the contamination, and the level of contamination that occurred during DRP's operation of the Complex.   On those issues, the parties challenge the opinions and testimony of competing air modeling experts, David Sullivan and Dr. Shahrokh Rouhani; and defendants challenge the opinions and testimony of Dr. David L. MacIntosh, plaintiffs' proffered expert on the extent to which emissions from the Complex affected the DC plaintiffs' blood lead levels (BLLs).

1.    *David Sullivan*

David Sullivan is a meteorologist and air modeler proffered by plaintiffs as an expert to evaluate and opine on air quality and deposition impacts in and around La Oroya based on available emissions data collected by DRP at several monitoring sites.   For purposes of his opinions here, Sullivan focused his review on the period during which DRP operated the Complex, that is, from October 1997 to June 2009.

According to Sullivan, the data showed that the measured concentrations of lead, sulfur dioxide, and arsenic in the air greatly exceeded the U.S. National Ambient Air Quality Standards and, further, that the ambient air concentrations of those contaminants were directly related to DRP's operation of the Complex. Sullivan opined that operation of the Complex that predated DRP's operations (*i.e.*, "legacy impacts") was not the primary source of plaintiffs' air exposure to the contaminants.   Sullivan also provided estimations of contaminant impacts at locations beyond DRP's specific monitoring sites and opined that maximum impacts occurred at locations nearer to the Complex, which is where plaintiffs' residences were located.

As to other sources of lead, Sullivan acknowledged that Central Highway passes through La Oroya and that leaded gasoline was used in Peru until 2004.   But Sullivan noted that DRP's monitoring site at Hotel Inca, which is relatively close to the highway, did not measure a significant downward trend in lead concentration

after 2004.    Sullivan therefore concluded that leaded gasoline was not a dominant source of the substantial lead exposures in La Oroya.    Moreover, Sullivan observed that immediately upon the Complex ceasing operations in June 2009, measured air concentrations of lead, arsenic, sulfur dioxide, and cadmium were low.    Sullivan opined that if sources other than the Complex were the dominant source of airborne contaminant impacts, measured concentrations would not have precipitously decreased as soon as operations at the Complex ceased.

In challenging Sullivan's opinions, defendants focus on what they assert to be "two fundamental defects" that render the foundations of his testimony inadmissible.    Defendants first contend that Sullivan grossly exaggerates the fugitive air emissions from the Complex, which resulted in his opining on conditions that never existed during DRP's operations of the Complex.    Defendants next argue that the results of Sullivan's modeling of ambient air concentrations fail to fall within his proclaimed standard margin of error, that is, a factor of two.    Defendants contend this overestimation of concentrations at one station nearest to the Complex and underestimation at stations farther from the Complex, when compared with actual measurements, renders his air modeling unreliable.

I will deny defendants' motion to exclude Sullivan's opinions and testimony.

First, as to fugitive air emissions from the Complex, Sullivan opines that the measured data from the various stations around La Oroya understate the level of

actual lead particulate in the air because larger particulate matter was not measured.

Defendants counter that Sullivan misinterprets both the measured data and the

studies he claims support his conclusion.   Sullivan cites to numerous studies

measuring fugitive emissions at sinter buildings, and he interpreted the results of

those studies based on his experience as well as standard practice in electron

microscopy studies.   Notably, current EPA guidance largely accords with

Sullivan's interpretation of the Two Primary Lead Smelters Study relevant to the

particulate matter here.   Under Federal Rule of Evidence 702, "the question is not

whether [an expert's] opinion is based on assumptions, but whether there is some

factual support for them."   *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill.

2006).   Here, because there is some factual support for Sullivan's emissions

inventory, an explanation of the accepted methodolody he used, and a reliable

application of that methodology, I will not exclude his inventory opinions.   To the

extent defendants proffer their own expert who opines to different results,

competing expert testimony is best tested at trial through the adversary process.

*See Blue Buffalo Co., Ltd. v. Wilbur-Ellis Co. LLC*, No. 4:14 CV 859 RWS, 2024

WL 111712, at *4 (E.D. Mo. Jan. 10, 2024).

    As to air modeling predictions, Sullivan used an accepted method of air

modeling with insight relevant to the question of air contamination in and around La

Oroya during the relevant period.   The factor-of-two error rate does not preclude its

use in the case.   *See Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 519 (W.D. Penn. 2014).   And to the extent some of Sullivan's estimations fall below or above that error rate, the accuracy of his estimations is more properly challenged through cross-examination.   *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012), *cited approvingly in Roberson v. Kansas City S. Ry. Co.*, No. 4:22-CV-00358-RK, 2024 WL 4502924, at *6 (W.D. Mo. Oct. 16, 2024).   *See also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("The focus, of course, must be solely on the principles and methodology, not the conclusions they generate.)   Indeed, defendants appear to attack only Sullivan's results and do not point to any step in his modeling methodology as unreliable.

Plaintiffs have demonstrated by a preponderance of the evidence that Sullivan has a sufficient basis for his opinions and that he reliably applied his methodology to the facts of the case.   Whether his conclusions are accurate is not a basis for excluding his testimony.   I will therefore deny defendants' motion to exclude the expert opinions and testimony of David Sullivan.

2.   *Shahrokh Rouhani*

Dr. Shahrokh Rouhani is an environmental scientist, engineer, and consultant in environmental statistics and geostatistics whom defendants retained to opine on the reliability of claims and statistical models, calculations, and conclusions made by David Sullivan and other of plaintiffs' proffered experts.   Plaintiffs' motion

seeks to exclude Dr. Rouhani's opinions regarding Sullivan's air modeling predictions.

According to Dr. Rouhani, Sullivan's air models are based on misrepresentations of earlier modeling results and yield statistically biased and unreliable predictions.   Dr. Rouhani also opines that Sullivan's representation about the general consistency of his three model runs is inconsistent and unreliable. To reach his conclusions, Dr. Rouhani analyzed two kinds of comparisons: nonconcurrent and concurrent.   He explained that nonconcurrent comparisons, such as those used by Sullivan, apply a chemical-specific averaging scheme that does not require measured and modeled values to be synchronous.   Concurrent comparisons, by contrast, compare the measured results for a particular date, time, and location with a model's predicted results for that same date, time, and location.   Concurrent comparisons are also known as "pairing in time and space" comparisons.

In this case, Dr. Rouhani described Sullivan's nonconcurrent comparisons as measuring 1) the three-month rolling average of lead concentrations in the air, 2) the annual average for arsenic, and 3) the annual 99th percentile of the daily 1-hour maximum for sulfur dioxide.   (ECF 1248-1 at hp. 8.)   Dr. Rouhani opined that because nonconcurrent comparisons can mask the inherent biases and weaknesses of Sullivan's predictive models, it was necessary to make concurrent comparisons to measure the accuracy of Sullivan's modeling results.   Dr. Rouhani noted that while

Sullivan's modeling schemes produced predictions outside the margin of error, Sullivan's predictions fared even worse under the concurrent-comparisons scheme.

Plaintiffs move to exclude Dr. Rouhani's "concurrent comparison" opinions under Federal Rules of Evidence 702 and 403.   Plaintiffs contend that the concurrent-comparison method is not a reliable way to evaluate an air model given that small differences in air variables such as wind direction can result in wide variations in measured air concentrations on any given day.   Plaintiffs contend that, to be reliable, concurrent comparisons require air modeling to predict identical conditions at a given site at a specific time, which is impossible to achieve in the field.   They therefore argue that Dr. Rouhani's reliance on such unreliable comparisons to critique Sullivan's established air modeling schemes, which are designed to estimate concentrations of chemicals over time, renders his critique unreliable.   Indeed, plaintiffs argue, Dr. Rouhani fails to identify any specific literature supporting his methodology or any journal presentation that an air model's "hourly basis" result is reliable.   Moreover, the EPA has cautioned against "placing too much weight on modeled versus predicted concentrations paired in time and space in model performance evaluations." *Revisions to the Guideline on Air Quality Models: Enhancements to the AERMOD Dispersion Modeling System and Incorporation of Approaches to Address Ozone and Fine Particulate Matter*, 82 Fed. Reg. 5182 (Jan. 17, 2017).

- 15 -

Considering Dr. Rouhani's concurrent-comparison results in a vacuum, one can arguably find that they are based on sufficient facts and data and on a valid methodology.   *See* Fed. R. Evid. 702(b), (c).   But I cannot say that they are properly applied to the facts of this case or that they would be helpful to the jury. *See* Fed. R. Evid. 702(a), (d); Fed. R. Evid. 403 (court may exclude evidence if the danger of confusing the issues, misleading the jury, or wasting time substantially outweighs its probative value).   While Dr. Rouhani's concurrent-comparison analysis shows that Sullivan's models do not and cannot predict concentrations of air contaminants at a particular location on a particular date at a particular time, there is no dispute that the models Sullivan used were neither intended nor designed to accurately predict those "paired in time and space" measurements.   If I were to allow Dr. Rouhani to testify to his opinion that concurrent-comparison modeling shows Sullivan's air concentration predictions to be unreliable, a substantial danger exists that the jury could confuse Sullivan's modeling ability to predict concentrations of contaminants over long periods of time – which is the relevant measure of accuracy in this case – with the ability to predict concentrations on particular days at particular locations.   Simply stated, the jury could confuse apples with oranges.

Given that Dr. Rouhani's opinion evidence as to concurrent comparisons would largely be irrelevant to critique Sullivan's modeling and would likely cause

- 16 -

confusion and mislead the jury on this highly scientific issue, and thus not be helpful to the jury, I will grant plaintiffs' motion to exclude that portion of Dr. Rouhani's opinion evidence that addresses concurrent comparisons.

    3.   *David L. MacIntosh*

Dr. David L. MacIntosh has a master's degree in Environmental Science and a doctoral degree in Environmental Health.   He primarily works on projects involving public health, specializing in management of human health risks posed by hazardous substances.   Plaintiffs proffer Dr. MacIntosh as an expert to evaluate and render opinions on the DC plaintiffs' BLLs and the extent to which those BLLs are attributable to emissions from the Complex during DRP's operations from October 1997 to June 2009.

Dr. MacIntosh created three models to conduct his evaluations:   1) a community average blood lead model, which analyzed the relationship between air lead and the BLLs of children 0 to 7 years of age in the La Oroya community between 1999 and 2007; 2) a predictive model to estimate the BLLs of the DC plaintiffs at ages 2, 5, and 7, including plaintiffs who did not have actual BLL measurements at those ages; and 3) an allocation model to calculate the percentage of BLLs attributable to DRP's operation of the Complex.   Defendants argue that all models are based on an unsupported assumption that air lead is the single factor causing elevated BLLs in the La Oroya community and in the DC plaintiffs,

- 17 -

ignoring all other significant sources of lead.   Defendants further contend that Dr. MacIntosh's predictive model lacks confirmation that BLLs strongly correlate to current air lead emissions and, further, that the single-factor slope model he used cannot produce estimated BLLs for individuals given the inherent differences between individuals and their exposures.   Finally, defendants argue that Dr. MacIntosh bases his allocation model on improper valuations of background community BLLs and incorrect assumptions of blood lead half-life.   To the extent defendants also argue in their motion that Dr. MacIntosh's several corrections and revisions to the model render his ultimate conclusions unclear, defendants do not challenge plaintiffs' averment in response that the models and opinions set out in Dr. MacIntosh's June 10, 2019, Second Supplement to Expert Report (ECF 1229-14) control.   (*See* ECF 1269, Pltfs.' Memo. at hpp. 7-8, n.9.)

For the following reasons, I will grant in part and deny in part defendants' motion to exclude the opinions of Dr. MacIntosh.

As an initial matter, I disagree with defendants' characterization that Dr. MacIntosh considered only air lead and ignored contamination of soil and dust as contributing to BLLs.   As Dr. MacIntosh explains, his research as well as other studies of contamination in La Oroya show that airborne lead emitted from the Complex settled on surfaces such as roads, playgrounds, sidewalks, food, etc., which led to contaminated dust, soil, and interiors of homes.   Consequently, persons did

- 18 -

not only inhale airborne lead but also ingested lead from contact with contaminated surfaces, including surfaces in their homes from tracking dust inside.   (ECF 1229-14 at hpp. 11, 13-14.)   As the pathway for exposure for *ingested* lead began with airborne lead, Dr. MacIntosh reasons that he appropriately focused on air lead emitted from the Complex as the primary source of lead in the La Oroya BLLs. Because Dr. MacIntosh has provided a sufficient basis for his reasoning and methodology, defendants' disagreement is not a basis for exclusion.

As to Dr. MacIntosh's predictive model, I will not exclude his opinion testimony merely because he used a single-factor slope model instead of a multi-factor model, such as the Integrated Exposure Uptake Biokinetic (IEUBK) model.   Given the facts of this case, and especially that air lead data were available for the relevant period (*see* ECF 1229-14 at hp. 17), Dr. MacIntosh's use of a slope model based on air lead emissions was not so fundamentally unsupported that results based on that model should be excluded rather than admitted and impeached through cross-examination.   *See In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 788 (8th Cir. 2021).   Defendants may question why Dr. MacIntosh chose that model, and their own expert may offer opinions as to why a multi-factor model should have been used, but merely because an opposing expert believes that a different modeling system would be better in the circumstances is not a basis to exclude the use of an otherwise accepted system.   *See In re Vitamin C*

*Antitrust Litig.*, No. 05-CV-0453, 2012 WL 6675117, at *8-9 (E.D.N.Y. Dec. 21, 2012) (court will not take sides in dispute between experts about intricacies of modeling; it is for the jury to determine whether methodological decisions render analyses more or less persuasive); *see also Blue Buffalo Co.*, 2024 WL 111712, at *4 (expert testimony to be tested by the adversary process with competing expert testimony and cross-examination).   Indeed, there is evidence that use of the IEUBK model is discouraged when measuring BLLs in areas of active emissions, such as the case here.   A study's limitations as applied to the facts of a particular case may be presented to the jury and tested through the traditional means of cross-examination and contrary evidence.   *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 632 (8th Cir. 2012).

To the extent defendants challenge the wide range and accuracy of the predicted BLL values, that challenge is more properly addressed through cross-examination.   *See Lapsley*, 689 F.3d at 805; *Daubert*, 509 U.S. at 595. Indeed, the range of Dr. MacIntosh's predicted values is based on community-level data to account for individual variation, which defendants themselves argue must be considered in assessing BLLs.

I agree, however, that while Dr. MacIntosh's predicted range of BLL values is generally admissible, as is his analysis of the DC plaintiffs' *measured* BLLs to make conclusions regarding their individual predicted range(s), asking a jury to assign predictive individual BLLs to those DC plaintiffs with *no* measured BLLs would be

asking it to reach a complex scientific conclusion on mere speculation.   Dr. MacIntosh acknowledges that children in a community who have reasonably similar levels of lead in their environments nevertheless can have substantially different BLLs.   (ECF 1229-14 at hp. 22.)   While Dr. MacIntosh cites reports recommending a "default assumption" of upper, median, and low-end BLLs in any given neighborhood based on individual variability factors such as behavior, physiological characteristics, and building conditions (*id.* at hpp. 22-23), applying that assumption to those DC plaintiffs with no measured BLLs invites speculation as to whether their levels would fall in the predictive range and, if so, where – that is, at the low end, median, or high end.   Because Dr. MacIntosh's opinions as to those DC plaintiffs' predicted BLLs are speculative at best, they will be excluded.

As to defendants' contention that Dr. MacIntosh's allocation model is unreliable as being based on an improper valuation of background community BLLs and incorrect conclusions on the half-life of historical lead, my review of Dr. MacIntosh's report, the data and studies on which he relied, and the detailed steps of his analyses and reasoned conclusions shows defendants' disagreement to be founded on the studies and historical data Dr. MacIntosh relied on and his related interpretations.   A challenge that an expert did not rely on "the right" studies in reaching his opinion may be a valid point on which to cross-examine the expert at trial but not to exclude his testimony *in toto*.   *In re Celexa & Lexapro Prods. Liab.*

*Litig.*, 927 F. Supp. 2d 758, 764 (E.D. Mo. 2013).   *See also Kuhn*, 686 F.3d at 632 (the studies on which the expert relied, although not perfect, were sufficient to support his opinion).   Any limitations of the studies and information on which Dr. MacIntosh relied in reaching his conclusions may be presented to the jury and tested "through the traditional means of cross examination and presentation of contrary evidence."  *Id.*

I also disagree that Dr. MacIntosh's conclusions on the correlation between BLLs and current air lead emissions are so unsupported as to be unreliable and thus not admissible at trial.   From his review of scientific literature and extensive historical data, including historical lead and BLL measurements in the La Oroya region, Dr. MacIntosh concluded that the BLLs of La Oroya children "at any point in time" were strongly associated with the concentration of lead in the air in the community in which they lived and that air lead concentrations were the result of currently active emissions from the Complex.   (ECF 1229-14 at hp. 4.)   Upon comparing changes in BLLs with changes in the level of lead emissions from the Complex, Dr. MacIntosh found a correlation between the two, that is, BLLs increased with an increase in air lead emissions.   With that information, as well as information and data from air modeling studies, evaluations, and related literature, Dr. MacIntosh opined that the air lead emissions from the Complex during DRP's operations accounted for the DC plaintiffs' increase in BLLs during that period.   As

his opinion is based on the facts of the case and a reliable application of his supported methodology, it will not be excluded.    To the extent defendants challenge Dr. MacIntosh's conclusion that each DC plaintiff's BLL increased at an approximately equal percentage rate over the duration of DRP's operations of the Complex, I cannot say that that conclusion is so unreliable that it should not even be tested by cross-examination or weighed by any jury.    Indeed, having concluded that Dr. MacIntosh's underlying methodology is sufficiently sound, it would be improper to exclude his testimony because of his conclusions.    *See Daubert*, 509 U.S. at 595.

Therefore, defendants' motion to exclude the opinion and testimony of Dr. MacIntosh will be granted in part and denied in part, as set forth above.

B.    <u>General Medical Causation</u>

Challenged Experts:    Dr. David C. Bellinger, for plaintiffs
Dr. Karen Hopkins, for plaintiffs
Dr. Jill E. Ryer-Powder, for plaintiffs
Dr. Howard Hu, for plaintiffs
Dr. Elias G. Chalhub, for defendants

To prove causation, plaintiffs must show both that the toxin is capable of causing injuries like those suffered by the plaintiffs (general causation) and directly caused or directly contributed to cause plaintiffs' injuries (specific causation). *Bonner*, 259 F.3d at 928 (citing *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105,

1106 (8th Cir. 1996))[6]; *see also Blanks v. Fluor Corp.*, 450 S.W.3d 308 (Mo. Ct. App. 2014).   "In other words, [plaintiffs] must put forth sufficient evidence for a jury to conclude that the product was capable of causing [their] injuries, and that it did."   *Bonner*, 259 F.3d at 928.   For general causation in a toxic tort case, plaintiffs "must prove [] levels of exposure that are hazardous to human beings generally[.]"   *Wright*, 91 F.3d at 1106.

Both sides have presented experts who offer opinions on only general causation, that is, whether exposure to lead and/or other toxins at the levels claimed is sufficient to cause injuries like those suffered by plaintiffs.   Other experts offer opinions on only specific causation, that is, whether lead and/or other toxins caused the DC plaintiffs' injuries, and whether it was DRP's lead emissions that did so. Some experts offer opinions on both general and specific causation.   I address the general-causation opinions here and will follow with the specific-causation opinions.   Where an expert intertwines their general- and specific-causation opinions, my discussion in relevant part is likewise intertwined, regardless of the section heading under which it falls.

1.    *David C. Bellinger*

Dr. David C. Bellinger is a Professor of Neurology at Harvard Medical School

---

[6] I use the term "general causation" to refer to the question of whether exposure to the relevant toxin can cause the types of injuries at issue in this case, and the term "specific causation" to refer to the question of whether exposure to that toxin from DRP's emissions actually caused each plaintiff's injuries.   *See In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 799 (8th Cir. 2021) (using those terms similarly).

and a Professor in the Department of Environmental Health at the Harvard T.H. Chan School of Public Health in Boston.   He holds a Ph.D. in Psychology and a Master of Science in Epidemiology.   His primary focus is on chemical and metabolic factors that perturb the developing nervous system.

Plaintiffs proffer Dr. Bellinger as a general-causation expert, having retained him to (a) examine the epidemiological literature on adverse health consequences to children exposed to lead and arsenic; (b) review Dr. Clemente Vega's reports of neuropsychological evaluations and Dr. Karen Hopkins' reports of medical examinations of the DC plaintiffs who were exposed during childhood to lead and arsenic emitted from the Complex; and (c) address whether the deficits in cognitive and behavioral functioning, as well as any other adverse health consequences described in those reports, are consistent with the epidemiology literature. Although defendants challenge Dr. Bellinger's opinions, they do not challenge his qualifications to render general-causation opinions, conceding that he is a "well-recognized neuropsychologist and epidemiologist who has published numerous academic papers on the potential effects that exposures to lead and . . . arsenic[] can have on neurodevelopment."   (ECF 1217, hp. 5.)

Regarding lead exposure, Dr. Bellinger reviewed and thoroughly summarized various literature, reports, and studies regarding physical and neurocognitive manifestations of lead toxicity, particularly in children, and opined that no

concentration of lead in the blood is considered safe.   Citing the U.S. Agency for

Toxic Substances and Disease Registry (2017), Dr. Bellinger reported that children

manifest observable signs and symptoms of lead toxicity that correlate with specific

ranges of blood lead concentrations:

- Mild toxicity (BLL within range of 35-50 μg/dL)
  - Myalgia (muscle pain) or paresthesia ("pins and needles sensation")
  - Mild fatigue
  - Irritability
  - Lethargy
  - Occasional abdominal discomfort
- Moderate toxicity (BLL within range of 50-70 μg/dL)
  - Arthralgia (joint pain)
  - General fatigue
  - Difficulty concentrating
  - Muscular exhaustability
  - Tremor
  - Headache
  - Diffuse abdominal pain
  - Vomiting
  - Weight loss
  - Constipation
- Severe toxicity (BLL at 70 μg/dL and higher)
  - Paresis or paralysis
  - Encephalopathy (may abruptly lead to seizures, changes in consciousness, coma, and death)
  - Lead line (blue-black) on gingival tissue
  - Colic (intermittent, severe abdominal cramps)

(ECF 1217-1, hpp. 4-5.)   As to neurocognitive and behavioral impacts of lead, Dr.

Bellinger opined that

> Overall, the experimental and epidemiological literature demonstrates
> unequivocally that exposure to lead in childhood impairs
> neurodevelopment, causing reduced IQ, dysfunction in various
> neuropsychological domains, and behavioral abnormalities, including

ADHD and aggression.   Compared to their peers, children with greater exposures also have less academic success.   These neurocognitive and behavioral impairments cause lifelong impacts on employability and socioeconomic status.   In the long-term, adults who were exposed to lead as children achieve lower socioeconomic status based on their occupation.

(*Id.*, hp. 13.)

Regarding arsenic, Dr. Bellinger admits that data on the effects of arsenic exposure is not as great, as readily available, or as conclusive as that regarding lead. Upon review of such data and studies, however, he reports that the toxicity of arsenic is "well-known" and that "[h]igh-dose exposure can cause an acute poisoning that is characterized by nausea, vomiting, diarrhea, and abdominal pain, and peripheral neuropathies, including paresthesias, numbness, and pain."   (ECF 1217-1, hp. 14.) He also summarized studies showing that children exposed to arsenic in high doses experienced damage to their brain development, residual neurological handicaps, and poor performance as adults on neuropsychological tests; that studies showed that subclinical levels of arsenic can cause "developmental neurotoxicity," as demonstrated by an inverse relationship between children's arsenic exposure and IQ test scores; that pregnant women exposed to arsenic-contaminated soil experienced greater risk of later intellectual disability in their children; and that children with higher urinary concentrations of arsenic were more likely to demonstrate oppositional behaviors and have ADHD scores in the "clinically concerned" range. (*Id.* at hpp. 14-15.)   Finally, Dr. Bellinger cited studies showing that arsenic is a

human carcinogen with chronic exposure being "associated with lung, bladder, and
skin cancers, and possibly others."  (*Id.* at hp. 14.)

As to the DC plaintiffs in this case, Dr. Bellinger opined that the high level of
lead to which they were exposed during childhood – as demonstrated by their BLLs
– was sufficient to cause or contribute to cause their adverse health conditions.   He
further opined that their claimed impairments – including gastrointestinal problems,
poor growth, headache, vomiting, lethargy, muscle weakness, and joint pain – are
consistent with signs of lead exposure and toxicity correlating to their BLL ranges.
Dr. Bellinger also opined that the DC plaintiffs' claimed impairments in
neuropsychological, behavioral, and academic functioning were consistent with the
neurodevelopment sequalae of increased childhood lead exposure, and he noted that
many DC plaintiffs required either remedial support services and/or grade retention
in school.   Finally, Dr. Bellinger opined that La Oroya children experienced arsenic
exposure at levels sufficient to directly cause neurodevelopment impairments and,
further, that cancer risks due to arsenic exposure in La Oroya exceed those
considered acceptable.   (ECF 1217-1, hpp. 14-17.)

Defendants challenge Dr. Bellinger's opinions on the alleged neurodevelop-
mental impacts of lead and arsenic exposure, and the alleged cancer risks of arsenic.
They also seek to exclude Dr. Bellinger's opinions to the extent they cross over into
specific causation.

First, defendants argue that Dr. Bellinger did not follow his own methodology by failing to consider other potential causes for the DC plaintiffs' behavioral and cognitive issues.   As an initial matter, to establish general causation, plaintiffs do not need to prove that lead exposure *alone* caused their adverse health and cognitive issues, only that it was capable of causing them.   Indeed, under Missouri law, which applies here, "a plaintiff is not required 'to exclude every causative factor, save that for which the defendant is liable.'"   *Nelson v. American Home Prods. Corp.*, 92 F. Supp. 2d 954, 957 (W.D. Mo. 2000) (quoting *Kircher v. Purina Mills, Inc.,* 775 S.W.2d 115, 117 (Mo. banc 1989)).   Moreover, defendants' argument appears to be directed to specific-causation opinions, which plaintiffs insist Dr. Bellinger does not render.   Dr. Bellinger plainly opines that the DC plaintiffs' symptoms and alleged injuries are *consistent with* lead exposure and the associated BLLs in the ranges they experienced, which are permitted general-causation opinions, are supported by scientific literature and several epidemiological studies, and are within the claimed limit of Dr. Bellinger's testimony.   *See Allen v. American Cyanamid Co.*, No. 11-CV-0055, 2021 WL 1092804, at *14 (E.D. Wis. Mar. 22, 2021) ("Plaintiffs argue that Lanphear's testimony will be limited to general causation.   Lanphear's assertion that Plaintiffs' childhood blood lead levels were sufficient to result in brain injury and cognitive defects does fall into the category of general causation and is supported by the epidemiological studies on which Lanphear relies.").   Dr.

Bellinger's failure to consider other potential causes for the DC plaintiffs' behavioral and cognitive issues is not a basis to exclude his general-causation opinions.

Defendants next argue that Dr. Bellinger's opinion that ADHD can be caused in part by lead exposure is not based on proper scientific methodology.   They contend that Dr. Bellinger shows only that lead is *associated* with ADHD and that he cannot offer any evidence that lead exposure *causes* ADHD.   A review of the scientific materials upon which Dr. Bellinger relies belies defendants' argument. While some studies describe a strong associational relationship between lead exposure and ADHD, other studies describe a causal relationship.   *Compare*, *e.g.*, ECF 1217-10, Clinical Psychology Review, *Lead and Attention-Deficit/ Hyperactivity Disorder (ADHD) symptoms: A meta-analysis* (Goodlad, *et al.*, Jan. 29, 2013), *with*, *e.g.*, ECF 1277-2, U.S. EPA, *Integrated Science Assessment for Lead* (June 2013) (EPA ISA).[7]

While I agree that evidence of mere association with nothing more is not admissible as causation testimony, there is more than mere association here.   Dr. Bellinger reviewed and relied on several peer-reviewed, epidemiological studies that spanned several decades; involved more than 10,000 children; and included parent-reported accounts, diagnostic studies, and clinician interviews, as well as

---

[7] This exhibit, filed by plaintiffs, contains only excerpts of the ISA.   The entire 1886-page ISA, which defendants refer to in their motion (*see* ECF 1217, hp. 16 at n. 12), can be found at https://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=518908.

studies that accounted for covariates.    As summarized by Dr. Bellinger, those studies show through measurable data consistent evidence of significant associations between greater lead exposure and ADHD symptoms.    Given the strong factual basis for Dr. Bellinger's conclusions and the consistent support provided by the several credible studies he reviewed, Dr. Bellinger sufficiently bridges the gap between the strong associations of lead exposure with ADHD symptoms and the general-causation requirement.    *See In re Bair Hugger*, 9 F.4th at 779-80.    "[E]xperts 'need not testify to what is known to a certainty but must only state an inference or assertion derived by the scientific method.'"    *In re Flint Water Cases*, No. 17-10164, 2021 WL 5847102, at *6 (E.D. Mich. Dec. 9, 2021) (quoting *Jahn v. Equine Servs., PSC.*, 233 F.3d 382, 388 (6th Cir. 2000)).    After all, "[t]here are no certainties in science."    *Daubert*, 509 U.S. at 590.    On the evidence before the Court, I cannot say that Dr. Bellinger's general-causation opinion regarding lead exposure's relationship to ADHD lacks evidentiary support or ignores the evidence to such a degree that the opinion is merely a speculative conclusion.    I will therefore not exclude the opinion.

I will likewise not exclude Dr. Bellinger's general-causation opinion regarding the relationship between lead exposure and aggressive behaviors. Defendants are correct that scientific literature continues to report the relationship as associational.    *See*, *e.g.*, ECF 1217-11, PLOS Medicine, *Association of Prenatal*

- 31 -

*and Childhood Blood Lead Concentrations with Criminal Arrests in Early Adulthood* (Wright, *et al.*, May 27, 2008); ECF 1277-3, CDC Advisory Committee on Childhood Lead Poisoning Prevention, *Low Level Lead Exposure Harms Children: A Renewed Call for Primary Prevention*, (Jan. 4, 2012).   Notably, however, the June 2013 EPA ISA – which both plaintiffs and defendants cite to support their respective positions – concluded that:

> The consistent epidemiologic evidence from prospective and cross-sectional studies for criminal offenses and measures of conduct disorders, but uncertainty due to lack of clear evidence for aggression in animals, is sufficient to conclude that a causal relationship is likely to exist between Pb exposure and conduct disorders in children and young adults.

EPA ISA (June 2013) at 4-296-97.   The ISA based this conclusion on several studies that found, *inter alia*:

- Links between concurrent BLLs in adolescents to cognitive function decrements and delinquent or criminal behavior;
- Associations of teacher and parental ratings of aggressive, antisocial, and delinquent behavior with biomarkers of cumulative lead exposure;
- Increased confidence of associations of biomarkers of earlier childhood lead exposure with delinquent and criminal acts; and
- Statistically significant association between early childhood lead levels in teeth and increase in number of documented violent or property convictions at ages 14-21 years.

(*Id.* at 1-78, 4-183-86.)   Also, many of the studies upon which the ISA relied to form its conclusions accounted for and made adjustments based on several confounding variables, and Dr. Bellinger relied on several of those same studies in rendering his opinion in this case.   *Compare*, *e.g.*, EPA ISA (June 2013) at

4-183-84, 4-192, 4-295 *with* Bellinger Report, ECF 1217-1 at hpp. 10-11, 23.   As

with the relationship between lead exposure and ADHD, Dr. Bellinger's opinion as

to the relationship between lead exposure and aggressive behaviors is not based on

mere association but rather a careful and supported review of scientific literature and

studies strongly suggesting a causal relationship.   I will not exclude that opinion

evidence.   *See In re Flint Water Cases*, No. 17-10164, 2021 WL 5631706, at *8

(E.D. Mich. Dec. 1, 2021).

I agree with defendants, however, that Dr. Bellinger overstates the association

between arsenic exposure and neurological development.   Dr. Bellinger

acknowledges that evidence of arsenic's neurotoxicity is less developed than that

involving lead, noting that "[t]he epidemiological evidence on the developmental

neurotoxicity of chronic arsenic exposure is much more limited and thus less

conclusive than that for lead."   (ECF 1217-1 at hp. 14.)   Although Dr. Bellinger

discusses several studies showing that arsenic impairs neurodevelopment, which he

contends "provides clear cause for concern" (*id.*), neither the studies nor Dr.

Bellinger provide reliable evidence of the dose at which neurological effects would

be expected to occur; nor does Dr. Bellinger identify which of the DC plaintiffs'

impairments are consistent with arsenic exposure.   Indeed, Dr. Bellinger admits

that data is not available regarding the internal arsenic exposures of La Oroya

residents (that is, measurements of the concentrations in biomarkers such as urine,

blood, or hair).   In short, Dr. Bellinger does not bridge the gap between arsenic's association with neurodevelopmental impairments and a causal relationship to the impairments alleged here.   *See Wright*, 91 F.3d at 1106 (plaintiffs "must prove [] levels of exposure that are hazardous to human beings generally").

Dr. Bellinger's report describes an even more tenuous connection between arsenic exposure and cancer.   Dr. Bellinger refers to a 2012 report from The International Agency for Research on Cancer, part of the World Health Organization, which concluded that there was sufficient evidence to consider arsenic a human carcinogen, as chronic exposure has been associated with lung, bladder, and skin cancers, and possibly others.   And he refers to risk estimates made by Integral Consulting, Inc., that indicate that the cancer and non-cancer risks because of arsenic exposure in La Oroya exceed those considered to be acceptable.   But, as with the neurodevelopmental risks associated with arsenic, Dr. Bellinger refers to no studies and renders no opinion on the level of arsenic exposure necessary to create a cancer risk, nor does he identify any correlation between the exposure modalities of La Oroya residents and the subjects of the earlier studies.   Notably, his final opinion regarding arsenic exposure addresses only the neurological risk associated therewith and omits any reference to cancer risk.[8]   I will therefore grant defendants' motion to the extent it seeks to exclude that portion of Dr. Bellinger's opinion evidence that

---

[8] At his April 2019 deposition, Dr. Bellinger testified that he was not providing an opinion about whether arsenic might be a carcinogen in the context of the La Oroya plaintiffs here.   (Bellinger Depo., ECF 1217-2 at hp. 34, depo. p. 82.)

addresses the neurodevelopmental and cancer-causing effects of arsenic toxicity.

Finally, because plaintiffs insist that they did not proffer Dr. Bellinger to render expert opinions on specific causation and he agrees that he will not testify to such (*see* Bellinger Depo., ECF 1217-2 at hp. 9, depo. p. 31), I will grant defendants' motion to exclude Dr. Bellinger's specific-causation opinion that lead exposure caused the DC plaintiffs' claimed injuries.

2.    *Karen Hopkins*

Dr. Karen Hopkins received her medical degree from NYU in 1981 and is a physician practicing in New York.   She completed an advanced fellowship in Developmental Pediatrics at Albert Einstein College of Medicine, where she remained on the faculty as an Assistant Professor of Pediatrics and Attending Developmental Pediatrician for six years.   Since 1994, she has been: (1) a Clinical Associate Professor of Pediatrics in the Division of Developmental Behavioral (DB) Pediatrics at NYU School of Medicine; (2) an attending physician at the Hassenfeld Children's Hospital at NYU Langone; and (3) the Clinical Director of DB Pediatrics at Bellevue Hospital Center, the major clinical training site of NYU School of Medicine.   She currently practices and teaches DB Pediatrics at those institutions. As part of her practice, she has examined and evaluated hundreds of patients who suffered lead poisoning from exposure to lead in their early childhood years.

Plaintiffs retained Dr. Hopkins to offer both general- and specific-causation

opinions regarding the adverse developmental effects of lead exposure in children generally, and particularly to the DC plaintiffs who were exposed to toxins emitted from the Complex during DRP's operations.   Dr. Hopkins completed reports in December 2016 and supplemental reports in February 2019.   (ECF 1229-2.)   To render her opinions, she reviewed, *inter alia*, each DC plaintiff's personal profile sheet, medical records, academic records, available BLL tests, neuropsychological testing from Dr. Vega, and deposition testimony.   She reviewed the expert reports of Drs. Bellinger and MacIntosh; the expert reports of Drs. Jill E. Ryer-Powder and Clemente Vega; several health studies regarding lead contamination in La Oroya; government publications on lead risk assessment; and other lead-related literature. She also personally examined and interviewed each DC plaintiff and interviewed at least one parent or guardian of each plaintiff.   I address Dr. Hopkins' general-causation opinions here and her specific-causation opinions *post*.

Before I address the substance of Dr. Hopkins' opinions, I must address defendants' contention that Dr. Hopkins is disqualified from testifying as an expert as she admitted at her deposition that she considers herself an advocate for the plaintiffs here.   Questions regarding any purported bias are to be addressed on cross-examination and resolved by the jury.   *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 820 (8th Cir. 2015).

As to the substance of Dr. Hopkins' general-causation opinion, Dr. Hopkins

opines that a child's exposure to toxic levels of lead can result in physical impairments as well as deficits in cognitive, behavioral, and academic functioning in a manner consistent with the injuries claimed by the DC plaintiffs.   Defendants seek to exclude that general opinion, arguing that Dr. Hopkins improperly cherry-picked favorable information from only a few articles; merely parroted Dr. Bellinger's report; failed to conduct the appropriate Bradford-Hill analysis to bridge the gap between association and causation; and improperly relied on governmental risk-assessment publications.   I reject those contentions.[9]

In reaching her general-causation opinion, Dr. Hopkins relied on her own extensive experience with and expert knowledge of childhood lead exposure and its associated injuries, her own assessment of published peer-reviewed literature, and Dr. Bellinger's comprehensive review of relevant scientific literature.   I cannot say that Dr. Hopkins merely parroted Dr. Bellinger's opinions where her opinions appear to be based on her own independent application of principles within her area of expertise.   *Craton*, 2013 WL 12421822, at *10 (experts "can base their opinion in part on facts, data, conclusions, or opinions from other experts.").   Moreover, given the level to which lead exposure and its effects have been studied and documented, and the extent to which such information and studies are commonly relied upon by experts in the field, including Dr. Hopkins, "it is hardly a stretch" for

---

[9] I also reject defendants' argument that Dr. Hopkins' general-causation opinion must be excluded for her failure to sufficiently explain the bases of her opinion in her Rule 26 expert reports.

her to conclude that lead exposure in children at the levels measured here can cause or contribute to cause adverse health, cognitive, behavioral, and academic outcomes. *See In re Flint Water Cases*, 2021 WL 5847102, at *10.   She did not rely on only risk-assessment publications in reaching her conclusion.   Finally, Dr. Hopkins' failure to exhaustively analyze every available study or mechanically apply the Bradford-Hill criteria to her causation analysis does not determine the admissibility of her opinions.   *See In re Celexa & Lexapro*, 927 F. Supp. 2d at 765 (application of Bradford-Hill criteria "is by no means required" for opinion to be admissible); *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803 (E.D. La. 2011) ("it is far from clear that an expert must review all of the available studies simply to cross the threshold of admissibility.").   The presence of studies that cut against Dr. Hopkins' opinion is a subject for cross-examination, not a barrier to admissibility.

I will deny defendants' motion to exclude Dr. Hopkins' general-causation opinion.

### 3.    *Jill E. Ryer-Powder*

Dr. Jill E. Ryer-Powder has a bachelor's degree in Interdisciplinary Studies in Agriculture and Life Science (specialty in Nutrition), a master's degree in Nutrition Science and Policy, and a Ph.D. in Toxicology.   She conducted post-doctoral research at the University of Southern California/Children's Hospital of Los Angeles in the area of inhalation toxicology.   She is board certified in toxicology

and has more than 30 years' experience in toxicology, human health risk assessment, litigation support, and occupational toxicology.   Plaintiffs proffer Dr. Ryer-Powder as an expert to opine on whether there was a complete exposure pathway of lead, arsenic, and sulfur dioxide released from the Complex during DRP's operations to the DC plaintiffs' neighborhoods and schools and into their bodies, as well as to offer opinions about the adverse health effects that could result from such exposure. Defendants appear to not challenge Dr. Ryer-Powder's qualifications to render general-causation opinions.   They explicitly challenge, however, her qualifications to render specific-causation opinions.

In her report, Dr. Ryer-Powder offers four opinions:   1) that each DC plaintiff was exposed to harmful levels of lead, arsenic, and sulfur dioxide emitted from the Complex during DRP's operations from October 1997 to June 2009 through the air they breathed and the dust and soil they ingested; 2) that concentrations of lead in the air, dust, and soil that plaintiffs were exposed to directly caused or contributed to cause increases in BLLs that were much greater than background levels in Peru and much greater than 10 µg/dL, a BLL known to be consistent with severely adverse and irreversible health effects in children; 3) that each plaintiff was exposed to concentrations of arsenic that directly resulted in an increased risk of cancer and the likelihood of adverse effects to skin, the nervous system, and the vascular system; and 4) that sulfur dioxide concentrations exceeded

regulatory levels, with plaintiffs' exposures high enough to be directly associated with the potential for adverse health effects.

Upon careful review of defendants' several arguments, the evidence submitted, and the parties' respective positions, I will grant in part and deny in part defendants' motion to exclude Dr. Ryer-Powder's expert opinions and testimony.

Defendants argue that Dr. Ryer-Powder is not qualified to render a specific-causation opinion that plaintiffs' exposure to arsenic directly resulted in an increased risk of cancer and other adverse health conditions.   Regardless of her qualifications, Dr. Ryer-Powder's "increased risk" opinion based on arsenic exposure is not admissible in the circumstances of this case.

Missouri law permits a plaintiff to recover for an injury that has not yet occurred if the injury is reasonably certain to occur in the future.   *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 130 (Mo. banc 2007).   "A claim for increased risk of cancer is simply an element of damages seeking compensation for future consequences of present damage."   *Thomas v. FAG Bearings Corp., Inc.*, 846 F. Supp. 1400, 1408 (W.D. Mo. 1994).   "In order to recover, [therefore,] plaintiffs must prove that the risk of contracting cancer (or any other disease) is a reasonable certainty."   *Id.*   "To show that a risk is a reasonable certainty, there must be evidence of a quantified risk – medical evidence must establish that an individual plaintiff will more likely than not develop cancer."   *Id.*; *see also Elam v. Alcolac,*

*Inc.*, 765 S.W.2d 42, 208 (Mo. Ct. App. 1988) (expert testimony must quantify probability as greater than fifty percent).   Dr. Ryer-Powder does not testify to such, nor do the evidence and studies she cites support such a conclusion.

Plaintiffs argue, however, that they do not seek damages for a *future* injury, which would require evidence of "reasonable certainty."   Rather, citing *Swartz*, they argue that Missouri law permits evidence of future risk to assist the jury in evaluating *present* injuries, which is what they seek to do here.   Plaintiffs' argument is misplaced.   As relevant to plaintiffs' argument, Missouri law allows juries "to consider all evidence of past and present injuries, including the increased risk of future injury *that those present injuries create*[.]"   *Swartz*, 215 S.W.3d at 132 (emphasis added).   In *Swartz*, plaintiff's pelvis and lower back were fractured as a result of an automobile accident.   The accident also caused bulging discs in plaintiff's lower back.   Experts testified that because of those injuries, plaintiff was at increased risk of needing surgery in the future.   The Missouri Supreme Court determined that the fact that plaintiff's "back injury carries with it at least a 25 percent chance, and perhaps a 50 percent chance, of requiring surgery in the future makes it a worse injury than a back injury that has a lesser chance of future complications[.]"   *Id.* at 132-33.

Unlike the plaintiff in *Swartz*, the plaintiffs here do not assert nor proffer any evidence that the alleged physical or cognitive injuries that they presently suffer

from carry with them a future risk of cancer or adverse effects to skin, nervous system, and vascular system.   They assert instead that their mere exposure to arsenic increases that risk.   But "exposure to arsenic" is not their present injury. To say otherwise would be analogous to the *Swartz* court finding that the automobile accident was plaintiff's present injury, rather than the back injury.   I will not permit Dr. Ryer-Powder to testify to her opinion that plaintiffs' exposure to arsenic directly resulted in an increased risk of cancer and the likelihood of other adverse effects.

Nor may Dr. Ryer-Powder testify to her opinion that the DC plaintiffs' increased BLLs and resulting adverse health effects were caused by their exposure to and ingestion of harmful levels of contaminants that were emitted from the Complex during defendants' ownership and operation of the Complex from October 1997 to June 2009.   An opinion that plaintiffs' injuries were caused by emissions from the Complex during DRP's operations borders on specific causation.   I agree with defendants that Dr. Ryer-Powder wholly fails to account for historical emissions when considering background BLLs in La Oroya, despite acknowledging studies that refer to their significance.   Notably, even Dr. MacIntosh found significant historical contributions to BLLs and accounted for their effect over time. To render an opinion that plaintiffs' increased BLLs were caused by the toxins that emanated from the Complex during DRP's operations requires a separation of background BLLs from those attributable to those operations.   *Cf. McMunn v.*

*Babcock & Wilcox Power Generation Grp., Inc.*, 131 F. Supp. 3d 352, 399 (W.D. Pa. 2015) ("Plaintiffs still must demonstrate that they were exposed to 'this radiation,' that is, inhaled uranium from the Apollo plant in excess of normal background radiation amounts.   Otherwise, they cannot demonstrate causation."). Dr. Ryer-Powder did not reliably do that here given her unsupported assumptions that the background BLLs were similar to others throughout Peru and that historical emissions from the Complex did not affect plaintiffs' BLLs.   For the reasons set out in defendants' motion to exclude, I cannot say that Dr. Ryer-Powder's methodology in making those assumptions was sound.   While I agree that "it is hardly a stretch" to conclude that the DC plaintiffs were exposed to enough toxins to cause harms consistent with those they claim, *see In re Flint Water Cases*, 2021 WL 5847102, at *10, the *method* used by Dr. Ryer-Powder to conclude that the harmful exposure that caused plaintiffs' injuries occurred during the period DRP operated the Complex is not reliable.   Her opinion based thereon is inadmissible and will be excluded.

My conclusion, however, does not preclude the jury from hearing Dr. Ryer-Powder's general-causation opinion that exposure to lead causes increased BLLs, which can cause adverse health effects.   When considered with Sullivan's admissible testimony on lead air emissions inventories, Dr. MacIntosh's admissible testimony on BLLs attributable to defendants' operation of the Complex, and Dr. Bellinger's admissible testimony on the effects of lead at different BLLs, Dr.

Ryer-Powder's testimony can assist a jury in determining whether DRP's operation of the Complex caused the health conditions plaintiffs complain of.

I will also permit Dr. Ryer-Powder to testify to her opinions that the measured levels of sulfur dioxide at the La Oroya monitoring stations and modeled levels at the DC plaintiffs' schools and residences exceeded regulatory limits and are associated with adverse health effects.   Because those adverse health effects – *i.e.*, lung function changes, respiratory irritation, nosebleeds – are consistent with health conditions several DC plaintiffs experienced as revealed through Dr. Hopkins' physical examinations, Dr. Ryer-Powder's opinion testimony that exposure to such levels of sulfur dioxide can cause those effects is relevant and admissible as general-causation evidence.   Given the evidence that some DC plaintiffs have or currently experience signs and symptoms consistent with sulfur dioxide exposure, Dr. Ryer-Powder is also permitted to testify to future complications from those present injuries.   *See Swartz*, 215 S.W.3d at 132-33.[10]

Finally, I will not exclude Dr. Ryer-Powder's opinions to the extent she relies on the results of Sullivan's air modeling without verifying the results herself. Experts may rely on the opinions and conclusions of other qualified experts if a proper foundation is laid.   *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1103 (E.D.

---

[10] I disagree that Dr. Ryer-Powder's sulfur-dioxide opinions address specific causation as she does not suggest nor identify any individual DC plaintiff who suffered a health effect or currently suffers a health effect because of exposure to sulfur dioxide.   Nor does she offer specific opinions on the measured effect any individual DC plaintiff may experience in the future because of present injuries caused by sulfur dioxide exposure.

- 44 -

Mo. 2010).   As I have already determined Sullivan's opinions admissible at trial, defendants' arguments that Dr. Ryer-Powder's opinions are unreliable because of Sullivan's claimed flaws are moot.   *Jackson v. Asplundh Constr. Corp.*, No. 4:15CV00714 ERW, 2016 WL 4705603, at *5 (E.D. Mo. Sept. 8, 2016).   Nor will I exclude Dr. Ryer-Powder's opinions because of her reliance on a report regarding the health effects of sulfur dioxide exposure authored by the Agency for Toxic Substances and Disease Registry (1998) (ATSDR), which has been characterized as a "secondary source" that cannot alone constitute a basis for expert testimony.   *See C.W. v. Textron, Inc.*, No. 3:10 CV 87 PPS, 2014 WL 1047940, at *5 (N.D. Ind. Mar. 17, 2014) (citing *LeBlanc v. Chevron USA, Inc.*, 396 Fed. Appx. 94, 100 (5th Cir. 2010)).   A simple reading of Dr. Ryer-Powder's report shows that the ATSDR is not her only source for identifying adverse health effects.   *See*, *e.g.*, ECF 1229-18 at hpp. 37-38.   And to the extent defendants rely on their own expert to contend that Dr. Ryer-Powder committed errors in various of her calculations and relied on incorrect data, such assertion amounts to nothing more than a dispute between battling experts, into which courts are wary to wade.   *Potter v. Hy-Vee, Inc.*, 560 S.W.3d 598, 607 (Mo. Ct. App. 2018).   It is up to the jury, not this Court, to weigh the credibility of dueling experts and to determine which expert, if any, to believe. *Refrigeration Supplies*, 507 F. Supp. 3d at 1104.

4.    *Howard Hu*

Dr. Howard Hu is a physician-scientist, internist, and preventive medicine specialist with a doctoral degree in Epidemiology.   When Dr. Hu rendered his opinions in this case in 2019, he was an Affiliate Professor at the University of Washington School of Public Health and Adjunct Professor at the University of Michigan.   In the fifteen years before that, Dr. Hu held the following positions: Founding Dean of the Dalla Lana School of Public Health and Professor of Environmental Health, Epidemiology, Global Health, and Medicine, University of Toronto; NSF International Endowed Chair of the Department of Environmental Health Sciences, Professor of Environmental Health, Epidemiology and Medicine; Founding Director of the NIH/NIEHS Environmental Health Core Sciences Center, and Associate Physician at the University of Michigan and University of Michigan Health System; and Professor of Occupational & Environmental Medicine, Founding Director of the NIH/NIEHS Center for Children's Environmental Health, Director of the Occupational Medicine Residency at the Harvard School of Public Health and Associate Physician in the Brigham & Women's Hospital in Boston. Dr. Hu has decades of experience leading multi-institutional and international teams of scientists, students, and fellows devoted to investigating the environmental, nutritional, social, psychosocial, genetic, and epigenetic determinants of chronic disease and impaired child development in population-based studies worldwide.

He has published over 200 peer-reviewed articles about lead exposure and resulting impacts on health, including research relevant to IQ and other aspects of cognition, behavior, educational attainment, physical growth, and blood pressure.   His qualifications as an expert are not disputed.

Plaintiffs retained Dr. Hu to provide expert evaluation of each DC plaintiff regarding the potential health impacts of exposure to emissions from the Complex during the time of DRP's operations.   Dr. Hu offers opinions on both general and specific causation.   I address his general-causation opinions here and his specific-causation opinions *post*.   In preparation for his report on general causation, Dr. Hu conducted a comprehensive literature review and consulted the reports of several of plaintiffs' other experts and some of the studies they relied on.   He also reviewed and relied on several studies conducted on the relationship between lead exposure and school performance, IQ levels, academic achievement, and educational proficiency.

Dr. Hu reported that his general-causation opinions were consistent with Dr. Bellinger's and the "widely accepted conclusions regarding specific lead-outcome relationships reached by systematic review of decades of research conducted by the U.S. National Toxicology Program (NTP)" (ECF 1229-9 at hp. 13) – specifically, that "in children, the evidence is sufficient to conclude that lead exposure . . . is associated with adverse neurological effects, including reduced intelligence,

neuropsychological function, and academic achievement and increased incidence of attention-related and other problem behaviours (such as ADHD)"; and that, with regard to academic achievement, "a plethora of recent studies . . . demonstrate that elevations in blood lead are associated with poor performance in a broad range of standardized tests . . . ."  (*Id.*)

Defendants challenge Dr. Hu's general-causation opinions on two fronts. First, they contend that Dr. Hu merely and impermissibly parrots Dr. Bellinger's opinions without additional analysis or reference to appropriate studies.   They also argue that the studies to which Dr. Hu does cite refer only to lead's *association* with behavioral and other related outcomes rather than lead's *causation* effect, thereby rendering Dr. Hu's opinions unsupported – particularly because he failed to apply the Bradford-Hill causation criteria to his analysis.   Defendants' arguments are without merit.

A review of Dr. Hu's report shows that he did not parrot Dr. Bellinger's report or opinions.   Dr. Hu's opinions are based on his own independent application of principles within his area of expertise to the facts of the case.   Merely because his independent analysis led to conclusions consistent with those of another expert does not render his opinions as "parroting."   *Cf. Craton*, 2013 WL 12421822, at *10. Defendants' contention that Dr. Hu cites only a "single study" regarding lead's effect on intelligence and "no studies" other than the NTP regarding lead's

association with behavioral outcomes and learning disorders (*see* ECF 1223 at hp. 14) is disingenuous.   In addition to the NTP and the Lanphear (2006) study Dr. Hu addresses in the body of his report, and to which defendants refer as the only studies cited, Dr. Hu cites to no less than nine additional studies to support his analysis and general conclusions.   (*See* ECF 1229-9 at hpp. 13-15, nn. 23, 25-32.)   And several of those studies were independent of the studies upon which Dr. Bellinger relied in forming his opinions.   Moreover, as with Dr. Hopkins' general-causation opinions, given the level to which lead exposure and its effects have been studied and documented, and the extent to which such information and studies are commonly relied upon by people in the field, I cannot say that Dr. Hu is merely hiding behind Dr. Bellinger's opinions in reaching his own – yet similar – conclusions.

I also reject defendants' argument that Dr. Hu's failure to apply the Bradford-Hill criteria in evaluating lead's association with adverse health effects renders his causation opinion insufficient.   Broadly speaking, as set out above and as recognized by several courts, it is well documented that the exceedingly strong association between lead and decrements in IQ and other behavioral outcomes is more than sufficient to bridge the gap between such association and general causation.   *See* ATSDR 2020 Lead Toxicological Profile at 133; EPA ISA (June 2013).   *See also*, *e.g.*, *Blanks*, 450 S.W.3d at 328-29; *Farella v. City of New York*, No. 05-5711, 2007 WL 19387, at *6 (S.D.N.Y. 2007); *United States v. New York*

*City Hous. Auth.*, 347 F. Supp. 3d 182, 191 n.3 (S.D.N.Y. 2018); *In re Flint Water Cases*, 2021 WL 5847102, at *5.    Moreover, a review of Dr. Hu's report shows that he indeed applied Bradford-Hill criteria in rendering his general-causation opinions, albeit without specifically identifying his analysis as a "Bradford-Hill" analysis. *See*, *e.g.*, ECF 1229-9 at hpp. 13-15 (addressing strength of association, consistency between population-based data, magnitude of association increases with magnitude of exposure, plausibility, etc.).    Regardless, whether Dr. Hu did or did not apply the Bradford-Hill criteria to defendants' satisfaction does not determine the admissibility of his opinions, as application of such criteria "is by no means required[.]"    *In re Celexa & Lexapro*, 927 F. Supp. 2d at 765.

Based on the foregoing, I do not find that Dr. Hu's general-causation opinions are so fundamentally unsupported that they must be excluded.    And I conclude that Dr. Hu's discussion of the neurological effects of lead exposure, including adverse intellectual and behavioral outcomes, would be helpful to a jury in assessing general causation.    I will therefore deny defendants' motion to the extent it seeks to exclude Dr. Hu's general-causation opinions.

5.    *Elias G. Chalhub*

Dr. Elias G. Chalhub is a physician in Mobile, Alabama, and professor of Neurology at the University of South Alabama.    He is a member of and board examiner for the American Board of Psychiatry and Neurology.    He is also a

member of the American Board of Pediatrics.    Defendants retained Dr. Chalhub to review the reports of plaintiffs' experts regarding neurological damage attributable to lead exposure and to render opinions as to the reliability of those reports.    In so doing, Dr. Chalhub rendered general-causation opinions, including that there is no scientifically established causal relationship between lead exposure and neurological disease or adverse cognitive function and, further, that neuropsychological tests cannot diagnose cognitive impairment.    Plaintiffs' challenges to those general-causation opinions are addressed here.    To the extent Dr. Chalhub also rendered specific-causation opinions regarding the existence and cause of the DC plaintiffs' claimed neurological injuries, plaintiffs' challenges to those opinions are addressed *post*.

I will not exclude Dr. Chalhub's opinion regarding the associational relationship between lead exposure and cognitive/behavioral issues – that is, that while there may be some association, it is not so strong to support a finding of general causation.    While both Drs. Bellinger's and Hu's opinions bridge that gap, Dr. Chalhub opines – on review of some of the same information upon which Drs. Bellinger and Hu relied, as well as other studies – that there is no bridge.    As plaintiffs' aim their challenge primarily on Dr. Chalhub's *conclusion* reached upon the same or similar information and methodology as their own experts, I will deny their motion to exclude that opinion.    *See Daubert*, 509 U.S. at 595 (focus of the

court on a motion to exclude should not be on the conclusions reached by the

expert).   At trial, Dr. Chalhub can explain why his conclusion runs counter to the

several studies and court decisions finding not only that strong associations exist but

also that they are so strong as to create a bridge to causation.   *See Olson*, 481 F.3d at

626 ("Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence.")

I likewise will not exclude Dr. Chalhub's opinion that neuropsychological

tests cannot alone establish a causal link between lead exposure and the cognitive/

neurological impairments alleged by plaintiffs here.   As plaintiffs recognize, Dr.

Chalhub acknowledges the benefit of such tests to help identify cognitive deficits in

children, and he relies on those tests in his own neurological practice.   Although Dr.

Chalhub himself is not a neuropsychologist, nor has he administered the tests

himself, his general-causation opinion is not offered to evaluate the testing

procedure or its reliability.   Rather, his opinion is based on his decades long

experience in diagnosing and treating children for neurological conditions based, in

part, on neuropsychological testing and other evaluation techniques.   Defendants

have met their burden of demonstrating Dr. Chalhub's expertise on this limited

issue.   *See Gannon Int'l, Ltd. v. Lexington Ins. Co.*, No. 4:07-CV-31 CAS, 2008

WL 3244025, at *9 (E.D. Mo. Aug. 6, 2008) (an expert may be qualified by his

knowledge, skill, or experience; lack of specific license or certification is not disqualifying); Fed. R. Evid. 702.   Contrary to plaintiffs' assertion, Dr. Chalhub does not appear to disqualify the use of neuropsychological testing *in toto* – only that that testing *alone* cannot diagnose lead-based neurocognitive impairments, especially in circumstances where there is no objective evidence of any neurological deficits.   I will not exclude that opinion.

C.    Specific Medical Causation

Challenged Experts:    Dr. Clemente Vega, for plaintiffs
Dr. Karen Hopkins, for plaintiffs
Dr. Howard Hu, for plaintiffs
Dr. Elias G. Chalhub, for defendants

To make a submissible case of negligence under Missouri law in this toxic tort case, plaintiffs must put forth sufficient evidence for a jury to find specific causation, that is, to conclude that DRP's emission of toxic substances was the direct cause of or directly contributed to cause plaintiffs' injuries.   *Bonner*, 259 F.3d at 928; *Blanks*, 450 S.W.3d at 373-74.   Plaintiffs are not required to "prove an absolutely positive causal connection."   *Nelson*, 92 F. Supp. 2d at 957 (quoting *Tenbarge v. Ames Taping Tool Sys., Inc.,* 128 F.3d 656, 658-59 (8th Cir. 1997)).   "Instead, a submissible case on causation is made where the evidence is susceptible to a reasonable inference that injuries to plaintiff resulted from defendant's product." *Id.* (cleaned up).   An expert's testimony on such matters "must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it

provides the assistance the finder of fact requires." *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 391 (8th Cir. 2018) (internal quotation marks and citations omitted). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (internal quotation marks and citations omitted).

1.    *Clemente Vega*

Dr. Clemente Vega is a practicing neuropsychologist, board certified in Clinical Neuropsychology by the American Board of Professional Psychology and board certified as a Subspecialist in Pediatric Neuropsychology. He is an instructor of psychology at Harvard Medical School. Brain surgery is his area of focus. Plaintiffs retained Dr. Vega to testify that lead emitted from the La Oroya Complex during defendants' operation of the Complex caused neuropsychological disorders in the DC plaintiffs and reduced their intelligence.

In addition to conducting a personal examination of each DC plaintiff, Dr. Vega also reviewed their medical records, BLL test results, and academic records; relevant depositions of the plaintiffs and parent/guardians; expert reports of Drs. Hopkins, Bellinger, MacIntosh, and Ryer-Powder; and several scholarly articles. Based on that review, his examinations and observations, and application of testing protocols, Dr. Vega rendered an opinion regarding each DC plaintiff's general

intellectual abilities, academic skills, attention, executive function skills, language,

visual-spatial processing, learning and memory, motor skills, emotional/personality

functioning, and adaptive skills.   Dr. Vega opined that the neuropsychological

impairment(s) identified for each respective DC plaintiff were consistent with

known consequences of exposure to lead as children; that that plaintiff was exposed

to high lead levels from defendants' operation of the La Oroya Complex; and that

such exposure was sufficient to cause that plaintiff's identified conditions and

impairments.   Dr. Vega ultimately opined that the lead emissions from defendants'

operations directly contributed to cause the neuropsychological problems identified

by the examination.   He concludes his reports by recommending educational and

behavioral interventions like stimulant medications, supportive instruction at

school, and online math programs.

Defendants move to exclude Dr. Vega's reports and opinions in their entirety.

Upon careful review of the several arguments defendants proffer, the extensive

evidence submitted, and the parties' respective positions, I will grant the motion in

part and deny it in part.

As an initial matter, I will exclude Dr. Vega's general-causation opinion that

the neuropsychological impairments suffered by the DC plaintiffs are consistent

with the known consequences of children exposed to lead.   Instead of his own

experience, training, and independent analysis on the question, Dr. Vega largely

relies on Dr. Bellinger's expert opinions but without explanation of how or why he reached the same conclusions. On the evidence before the Court, I cannot say that Dr. Vega's general-causation opinion that the DC plaintiffs' claimed impairments are consistent with childhood lead exposure is based upon his *own* application of principles within his expertise to the facts of this case. *See Refrigeration Supplies*, 507 F. Supp. 3d at 1102; *Hill v. Fikes Truck Line, LLC*, No. 4:11-CV-816 CAS, 2012 WL 5258753, at *3 (E.D. Mo. Oct. 24, 2012).[11]

But that does not preclude his specific opinions that lead exposure caused or contributed to cause the DC plaintiffs' claimed neuropsychological/developmental impairments. "[S]pecific causation experts are permitted to build from the plaintiffs' admissible general causation opinions" and can rely on them to rule in potential causes of injury. *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 958 (N.D. Cal. 2019). Given his background and extensive experience in childhood neuropsychology and in discerning etiologies of neuropsychological impairments, Dr. Vega is qualified to render opinions as to the existence and cause of the DC plaintiffs' neuropsychological impairments here. That he is not a toxicology expert in lead is of no instance, as other experts have provided those lead-related pieces of the puzzle upon which Dr. Vega can rely. *See id.* at 960; *see also Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1143 (S.D. Fla. 2021)

---

[11] Because I will exclude the opinion for the reason stated, I need not consider defendants' argument that Dr. Vega is not qualified to render it.

(expert's "testimony need not prove the plaintiffs' case by [itself]; [it] must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble[.]") (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (1998)).

Based on his expertise, training, and experience, as well as his on-the-ground research into developing a test battery appropriate to the facts of this case (*see* ECF 1229-23 at hpp. 18-19), Dr. Vega evaluated each DC plaintiff through the use of several testing protocols, including Bateria-III Woodcock-Munoz and subtests, the MMPI (2d ed.), the Child Behavioral Checklist, the Memoria Verbal-Prosa, the Finger Tapping Test, the Symbol Digit Modalities Test, and others; his review of each plaintiff's respective medical records, test results, and academic records; and his review of plaintiffs' depositions as well as the depositions of their guardians or parents. Such a flexible approach "is the generally accepted approach" for neuropsychological evaluation. *Baxter v. Temple*, 949 A.2d 167, 181 (N.H. 2008). *See also Necessary elements (or not) of a proper IME*, 1 Litig. Handbook of Forensic Med., Psychiatry & Psych. § 5:5 (2024) ("[A] flexible battery approach allows the examiner to select tests according to the individual case and clinical needs. The modern trend seems to be the use of a more flexible battery."). Defendants' challenge to the adequacy of Dr. Vega's selected tests goes to the accuracy of the testing, "which is fodder for cross-examination rather than a reason to exclude the evidence." *United States v. Reynolds*, No. 1:20-cr-24, 2021 WL

3750156, at *2 (W.D. Mich. Aug. 25, 2021).   When combined with his review of the admissible general-causation reports of Drs. MacIntosh, Ryer-Powder, and Bellinger – that is, plaintiffs' calculated BLLs, that lead exposure causes increased BLLs, and that increased BLLs correlate to manifestations of neurological and other impairments – Dr. Vega's review of the evidence and test results from an accepted and particularized protocol led him to conclude that each DC plaintiff's exposure to lead contributed to cause their neuropsychological issues.   Because Dr. Vega's opinions that lead exposure caused or contributed to cause the DC plaintiffs' claimed neuropsychological/developmental impairments are within the bounds of what can be concluded from a reliable application of his basis and methodology, and they are not so fundamentally unsupported to offer no assistance to the jury, I will permit them to come in at trial.   *See* Fed. R. Evid. 702 advisory committee's note (2) to 2023 amendment; *Bonner*, 259 F.3d at 929-30.   To the extent defendants' expert disagrees with Dr. Vega's methodology and conclusions, I will not wade into that battle of the experts.   *Potter*, 560 S.W.3d at 607.

Defendants also argue that Dr. Vega's opinions must be excluded for his failure to conduct a differential diagnosis analysis to rule out other possible etiologies of plaintiffs' neuropsychological impairments.[12]   I disagree.   As an initial matter, I note that the Eighth Circuit has "consistently ruled that experts are

---

[12] The differential diagnosis/etiology method is to first "rule in" the scientifically plausible causes of injury and then rule out the least plausible causes.   *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 563 (8th Cir. 2014).

not required to rule out all possible causes when performing the differential etiology analysis." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 563-64 (8th Cir. 2014) (listing cases).  "And, a differential expert opinion can be reliable even 'with less than full information.'" *Id.* at 564 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759 (3d Cir. 1994)).  To the extent defendants argue that Dr. Vega failed to consider the full context of the plaintiffs' educational, familial, social, and medical histories in reaching his conclusion that lead exposure caused their injuries, "the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation." *Rucker v. Drake*, No. 4:00CV1369 ERW, 2001 WL 36095910, at *2 (E.D. Mo. Dec. 13, 2001) (quoting *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000)).  Defendants will have a chance to cross-examine Dr. Vega on the accuracy of his conclusions given plaintiffs' personal histories.  *Id.*

I also note, however, that Dr. Vega testified at his deposition that he *did* conduct differential etiology analyses during his examinations of the DC plaintiffs and determined that any other possible etiology or sources of impairment were "noncontributory" and thus not worthy of specific notation.  The purported flaw of not specifically documenting ruled-out etiologies is more appropriately a subject for cross-examination rather than exclusion.  *See Johnson*, 754 F.3d at 564; *see also In re Paoli*, 35 F.3d at 759 (judge should only exclude evidence if the flaw is large

- 59 -

enough that the expert lacks good grounds for his conclusions).   To the extent it is unclear whether Dr. Vega excluded any particular cause, he can clarify at trial.   *In re Flint Water Cases*, 2021 WL 5847102, at *11.

I will deny defendants' motion to the extent it challenges Dr. Vega's conclusions regarding the extent of the DC plaintiffs' cognitive injuries, including age and grade comparisons.   *Daubert*, 509 U.S. at 595 (focus of court should not be on the conclusions reached by the expert).   I will also deny defendants' motion to the extent it seeks to exclude Dr. Vega's opined recommendations to remediate plaintiffs' neurocognitive limitations.   Regardless of the availability of the recommended modalities to these plaintiffs or a manner to implement them, Dr. Vega's testimony will assist the jury in its understanding of the extent of plaintiffs' present injuries and their effect.

Finally, I will not permit Dr. Vega to testify to his opinion that it was specifically the lead emissions from the Complex during DRP's operations that caused the neuropsychological problems identified by his examinations.   Dr. Vega is not qualified to offer expert opinions about the source of the lead to which plaintiffs were exposed.   His opinion that DRP's operations caused plaintiffs' injuries is not admissible.   *In re Flint Water Cases*, 2021 WL 5631706, at *8.

2.   *Karen Hopkins*

Dr. Hopkins' qualifications, experience, and methodology are set out above

and will not be repeated here.

Dr. Hopkins conducted a physical examination of each DC plaintiff.   When
she considered the results of those examinations in combination with her review of
each plaintiff's medical and academic records, the deposition testimony of each
plaintiff and their parent/guardian, contemporaneous interviews of each plaintiff and
their parent/guardian, and Dr. Vega's findings, Dr. Hopkins made conclusions that
addressed 1) each plaintiff's specific injuries, 2) whether those injuries were caused
by lead exposure, and 3) particularly exposure to lead emitted by the Complex
during DRP's operations.   Dr. Hopkins expounded upon and clarified her
conclusions during her deposition.

Notably, although Dr. Hopkins individualized each DC plaintiff's symptoms
and impairments,[13]  she rendered the same specific-causation opinion for every
plaintiff in her report:

> [Plaintiff's] exposure to lead, as a result of his living in La Oroya
> throughout his childhood, adversely affected his neuropsychological
> development, resulting in the impairments and deficits in cognitive,
> behavioral, and academic functioning identified in this report.   During
> the course of his childhood, [plaintiff] was exposed to toxic levels of
> lead from the La Oroya smelter[.] . . . [Plaintiff's] cognitive, and
> behavioral injuries and the neuropsychological deficits identified in my
> report and in Dr. Vega's report, are consistent with the known health
> and neurodevelopmental consequences to children who are exposed to
> lead at the levels to which [plaintiff] was exposed. . . . In addition to the
> brain damage [plaintiff] has suffered, he is also at an increased risk for

---

[13] In their memorandum, defendants summarize each plaintiff's symptoms and impairments that
Dr. Hopkins attributes to lead exposure.   (ECF 1221 at hpp. 22-27.)

future health problems because of the chronic nature of his lead
poisoning.   This includes an increased risk for cardiovascular illness,
and for renal disease.

Therefore it is my opinion to a reasonable degree of medical certainty
that the lead emissions during the time of Defendants' operations
directly caused the health and neuropsychological problems
experienced by [plaintiff] that are identified in this report.   [Plaintiff]
suffered brain damage from his exposure to lead from the La Oroya
smelter during his childhood when Defendants operated the smelter.
His injuries are permanent.   [Plaintiff] has experienced and continues
to experience cognitive, emotional, behavioral, and educational
impairment and delays as a result of his chronic lead exposure.   This
will adversely affect his opportunities for continued educational
progress and for future employment.

My opinions stated throughout this report are made with a reasonable
degree of medical certainty.

(ECF 1229-2 at, *e.g.*, hpp. 11-12.) (Footnote and citations omitted.)

As with the opinions of plaintiffs' other experts, defendants raise several

challenges to Dr. Hopkins' specific-causation opinions in their motion to exclude

her expert testimony.   For the following reasons, I will grant the motion in part and

deny it in part.

First, I disagree with defendants' contention that Dr. Hopkins' opinions must

be excluded for her alleged failure to consider alternative causes of plaintiffs'

claimed injuries.   Dr. Hopkins testified at her deposition that a differential

diagnosis consists of looking at other potential causes of a claimed impairment,

eliminating those other potential causes, and making an assessment based on a "very

direct possible cause" that remains.   (Hopkins Depo., ECF 1221-1 at hp. 62, depo.

p. 202.)   Dr. Hopkins testified that she engaged in that analysis when considering plaintiffs' claimed impairments but did not document the process.   (*Id.*).   Failing to specifically document ruled-out etiologies is more appropriately a subject for cross-examination rather than exclusion.   *See Johnson*, 754 F.3d at 564; *see also In re Paoli*, 35 F.3d at 759.   To the extent it is unclear whether Dr. Hopkins excluded any particular cause, she can clarify at trial.   *In re Flint Water Cases*, 2021 WL 5847102, at *11.

Moreover, as noted above, experts are not required to rule out all possible causes of a claimed injury when performing a differential etiology analysis. *Johnson*, 754 F.3d at 563-64 (listing cases).   Here, while Dr. Hopkins acknowledged that some impairments (such as ADHD, headaches, body mass, behavioral and cognitive issues) may have etiologies other than lead (such as genetics, malnutrition, and socioeconomics), she nevertheless concluded that lead exposure contributed to cause the impairments suffered by the DC plaintiffs in the particular circumstances here given the nature and consistency of their symptoms and presentation, the duration of plaintiffs' exposure to toxic levels of lead, the high BLLs, and the established knowledge that such high BLLs sustained over a period of time cause damage.   I cannot say that Dr. Hopkins' conclusion, based on her experience, expertise, and evaluation lacks support or ignores the evidence to such a degree that the opinion is merely a speculative conclusion.   To the extent

defendants argue that several possible causes of plaintiffs' injuries nevertheless remain uneliminated goes to the accuracy of Dr. Hopkins' conclusions, which is not a basis for exclusion.   *In re Flint Water Cases*, 2021 WL 5847102, at \*11; *Daubert*, 509 U.S. at 595.

Nor will I exclude Dr. Hopkins' opinions regarding the permanence of the DC plaintiffs' neurocognitive/neuropsychological impairments.   Dr. Hopkins bases her opinion on, *inter alia*, several decades of experience treating and managing care for hundreds of children affected by lead poisoning, as well as peer-reviewed studies supporting the conclusion.   In forming their opinions, medical experts are permitted to rely on their professional experience as well as publications that provide additional support for their view.   *See In re Flint Water Cases*, 2021 WL 5847102, at \*12 (citing *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004); *In re Heparin Prod. Liab. Litig.*, 803 F. Supp. 2d 712, 745 (N.D. Oh. 2011); *Seifert v. Balink*, 888 N.W.2d 816, 837 (Wis. 2017)).   Dr. Hopkins' testimony regarding the likely permanence of plaintiffs' neurocognitive symptoms is sufficiently reliable to be admissible.   *Id.*

Dr. Hopkins provides no analysis or documented studies, however, to support her opinion that lead exposure adversely affected each DC plaintiff's opportunities for continued educational progress and for future employment.   Instead, she appears to base her conclusion on the *ipse dixit* leap that "if you have decreased

cognitive level and abilities, you're going to have decreased opportunities for employment[.]"   (Hopkins Depo., ECF 1221-1 at hp. 138, depo. p. 401.)   Dr. Hopkins testified that she had no knowledge about employment opportunities in general and that she could not offer a specific opinion as to any plaintiff regarding a particular job that they could not obtain or aspire to because of lead-caused limitations, stating that knowledge of such jobs is not needed to conclude that opportunities would be diminished.   (*Id.* at hp. 138, depo. p. 401; hp. 240, depo. p. 773.)   Because Dr. Hopkins does not connect her diminished-opportunities opinion to existing data nor reliably apply any type of methodology in forming the opinion, it must be excluded.   *In re Flint Water Cases*, No. 17-10164, 2021 WL 5925190, at *6 (E.D. Mich. Dec. 15, 2021) ("experts must base their conclusions on *some* affirmative evidence") (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("the expert's conclusions . . . must have a basis in established fact")).

I will also exclude Dr. Hopkins' opinion that lead exposure has caused the DC plaintiffs to be at increased risk in the future for cardiovascular illness and renal disease as well as additional health problems such as sterility in men, blood lead issues in women during pregnancy, and vitamin D metabolism.   Dr. Hopkins did not diagnose any plaintiff with kidney disease, hypertension, or any other type of cardiovascular disease; nor did she testify to or articulate any evidence that any DC plaintiff currently experiences sterility, blood lead elevation during pregnancy, or

vitamin deficiency.   Given that Dr. Hopkins does not base her future-risk opinion on any evidence of a *present* injury that would give rise to such risk, I will not permit her to testify to that opinion at trial.   *See Swartz*, 215 S.W.3d at 132.

Finally, I will exclude Dr. Hopkins' opinion that the lead emitted from the Complex during DRP's operations from 1997 to 2009 exclusively caused the DC plaintiffs' injuries.   While other experts proffer more than enough evidence demonstrating that during the period DRP operated the Complex the DC plaintiffs were exposed to lead emitted from the smelter at sufficient levels to cause their claimed injuries, Dr. Hopkins herself is not qualified to offer an expert opinion about the source of the lead that caused plaintiffs' injuries.   Her opinion that DRP's operations alone caused plaintiffs' injuries is not admissible.   *In re Flint Water Cases*, 2021 WL 5631706, at *8.

3.    *Howard Hu*

In addition to his general-causation opinions discussed above, Dr. Hu rendered the following specific-causation opinions:   that 1) lead exposure adversely impacted the DC plaintiffs' level of intelligence, with decrements in IQ scores attributable to emissions from the Complex during DRP's operations; 2) lead exposure contributed to cause the DC plaintiffs' neuropsychological and neurobehavioral impairments, with emissions from the Complex during DRP's operations responsible for 79-82% of the effects; 3) impacts of lead exposure on the

DC plaintiffs' neurobehavioral functioning, education, and occupational opportunities are likely permanent; and 4) the DC plaintiffs are at increased risk for developing hypertension as a result of chronic lead exposure.

In reaching his conclusions, Dr. Hu reviewed Drs. Vega's and Hopkins' examination results and reports as well as their summaries of plaintiffs' medical and other records; he personally interviewed and physically examined 13 of the 16 DC plaintiffs in 2018 and reviewed their responses to standardized questionnaires regarding their current health, medications, and history of symptoms related to certain conditions such as hypertension and respiratory illness; he reviewed plaintiffs' measured BLLs as reported by Dr. MacIntosh; he reviewed and considered scientific literature, reports, and studies regarding the correlation between lead exposure, BLLs, and IQ scores; he reviewed and considered scientific literature, reports, and studies on sources of lead other than the La Oroya Complex and those sources' contributions to BLLs; and he analyzed data derived from community-based BLL sampling of La Oroya children from 1997 to 2009 to estimate the percentage of a child's BLL attributable to the Complex during such period.

Defendants raise several arguments in support of their motion to exclude Dr. Hu's specific-causation opinions in their entirety.   Upon careful review of those arguments, the extensive evidence before the Court, and the parties' respective

positions, I will deny defendants' motion in part and grant it in part.

To the extent defendants challenge the foundation of Dr. Hu's opinion that lead exposure caused the DC plaintiffs' claimed impairments, I disagree that the information upon which Dr. Hu made this conclusion was insufficient.   Contrary to defendants' assertion, Dr. Hu evaluated the DC plaintiffs in a manner consistent with his standard practice – that is, by conducting a physical examination, reviewing laboratory tests, consulting with other specialists, and reviewing the patient's medical and exposure records.   To the extent his review of Spanish-based records consisted of reviewing Drs. Vega's and Hopkins' evaluation of them as he is not fluent in Spanish,[14]  I cannot say that that purported flaw in Dr. Hu's evaluation is so large as to render Dr. Hu's conclusions without foundation.   *In re Paoli*, 35 F.3d at 759.   *See also Crowe v. Marchand*, 506 F.3d 13, 17-18 (1st Cir. 2007) (expert permitted to review and rely on other experts' examination reports).   On cross-examination, defendants can explore whether and to what extent Dr. Hu reviewed the full context of the underlying records and reports in forming his opinions.

I also disagree that Dr. Hu's opinions must be excluded for his alleged failure to consider alternative causes of plaintiffs' claimed injuries.   As noted above, experts are not required to rule out all possible causes of a claimed injury when

---

[14] Drs. Vega and Hopkins are fluent in Spanish.   Dr. Hu is not.   (*See* Hu Depo., ECF 1277-16 at hpp. 5, 7, 28; depo. pp. 41, 50, 267.)

performing a differential etiology analysis.   *Johnson*, 754 F.3d at 563-64 (listing

cases).   Moreover, the record shows that Dr. Hu indeed considered factors other

than lead in concluding that lead exposure contributed to cause plaintiffs' claimed

injuries – with such other factors including, *inter alia*, maternal health and behavior,

anemia, obesity, and malnutrition.   To the extent defendants argue that Dr. Hu

should have considered additional factors or that his review of other possible causes

was deficient, they may present those asserted limitations to the jury through

cross-examination and contrary evidence.   *See Burton v. American Cyanamid*, 362

F. Supp. 3d 588, 597-98 (E.D. Wis. 2019); *Ingham v. Johnson & Johnson*, 608

S.W.3d 663, 710-11 (Mo. Ct. App. 2020).

Regardless, defendants' insistence on a differential diagnosis analysis

regarding IQ decrements is misplaced in the circumstances of this case and in the

particulars of Dr. Hu's relevant opinions.   Dr. Hu acknowledged that a diminution

in IQ scores may be caused by a combination of factors.   But his charge here was

not to determine the cause of plaintiffs' overall IQ scores.   Rather, he was retained

to opine on the extent lead exposure may have affected plaintiffs' overall

intelligence – that is, that even with other contributing factors being present (such as

malnutrition, etc.), to what extent did lead exposure cause *additional* decrements in

IQ, regardless of whether the subject had a low, medium, or high IQ.   Because Dr.

Hu is not attempting to identify a cause of a diagnosed condition or what caused a

particular IQ score, but rather is quantifying a detriment to plaintiffs' intelligence regardless of other factors, a differential diagnosis is not required.   *See Burton*, 362 F. Supp. 3d at 599-600.

Defendants also challenge the reliability of Dr. Hu's opinion that each DC plaintiff lost at least 6.9 IQ points because of lead exposure.   To the extent Dr. Hu relies on the Lanphear study to opine that BLLs in the range of those measured in the DC plaintiffs are consistent with at least a 6.9-point drop in IQ, I will permit him to testify to that as a general-causation opinion.   *See Allen*, 2021 WL 1092804, at *14. It is well-recognized that lead exposure leads to IQ decrements, and the Lanphear study is considered "high quality" and "the most compelling evidence" for effects of lead on IQ.   *Coalition of Battery Recyclers Ass'n v. E.P.A.*, 604 F.3d 613, 618, 622 (D.C. Cir. 2010).   Indeed, while defendants challenge Dr. Hu's conclusions based on the Lanphear study, they do not challenge the study itself.   Moreover, Dr. Hu thoroughly and adequately set out the basis of the Lanphear study, its potential shortcomings, and the reasons he determined it was applicable to the DC plaintiffs here.   (*See*, *e.g.*, ECF 1229-9 at hpp. 14-16.)

Dr. Hu's specific-causation testimony that each DC plaintiff suffered a minimum 6.9-point drop is a closer question.   I acknowledge defendants' argument and agree that conclusions from population-based epidemiological studies cannot alone support a finding that a specific individual suffered a specific IQ loss.   *See*,

*e.g.*, *Palmer v. Asarco Inc.*, No. 03-CV-0498 CVE-PJC, 2007 WL 2298422, at *6 (N.D. Okla. Aug. 6, 2007).   But in reaching his specific conclusions here, Dr. Hu relied on more than just the Lanphear and other population-based studies.   Dr. Hu interviewed and examined the individual plaintiffs and reviewed actual individualized data for them, including measured BLLs and neuropsychological test results showing impaired intellectual functioning.   When combined with his detailed analysis of the relevant epidemiological studies, his application of those studies to the records of the individual plaintiffs "is consistent with the practice of doctors and sufficient to withstand *Daubert*."   *Burton*, 362 F. Supp. 3d at 599 (admitting expert testimony that lead was responsible for 10-point drop in plaintiffs' IQ).   And, contrary to defendants' assertion, the loss of IQ points is considered a public health concern and relevant to educational attainment and work performance. *See*, *e.g.*, *Coalition of Battery Recyclers*, 604 F.3d at 616-17; *Food & Water Watch, Inc. v. United States Env't Prot. Agency*, No. 17-CV-02162-EMC, 2024 WL 4291497, at *39 (N.D. Cal. Sept. 24, 2024); *Jones v. NL Indus.*, No. 4:03 CV 229 M B, 2006 WL 1487026, at *3 (N.D. Miss. May 24, 2006).   I therefore will admit Dr. Hu's specific-causation opinion that lead exposure caused the DC plaintiffs to experience a minimum 6.9-point IQ loss.

Dr. Hu's attributing a percentage of plaintiffs' IQ loss to emissions from the Complex during DRP's operations is an even closer question.   In reaching those

conclusions, Dr. Hu took Dr. MacIntosh's estimated percentage of each DC plaintiff's BLLs attributable to the DRP-controlled emissions and, based on those percentages during relevant periods, applied average percentages to the 6.9-point IQ drop for that plaintiff based on age ranges the Lanphear study considered to have "the most explanatory power."   (*See*, *e.g.*, ECF 1229-9 at hpp. 15-16.)   For instance, regarding DC plaintiff G.S.A.Y.:   Dr. Hu 1) adopted Dr. MacIntosh's calculations of the percentage of BLLs attributable to DRP's operations; 2) calculated the mean of the values for the years G.S.A.Y. was 4 to 7 years old (78%, 83%, and 83% for the years 2007-2009) at 81%; 3) calculated G.S.A.Y.'s annual childhood average (age 6 months to 7 years) at 78%; and 4) concluded that exposure to DRP's lead emissions is responsible for 78-81% of G.S.A.Y.'s 6.9-point IQ drop (*see* ECF 1229-11 at hpp. 105-06), or, as calculated by defendants, a 5.4-5.6-point loss in IQ attributable to DRP (*see* ECF 1223 at hp. 36).

Dr. Hu draws upon no studies, tested methods, or scientific literature to support the methodology summarized above of quantifying the specific percentage of a specific individual's IQ loss attributable to one specific source of lead over a finite period.   While Lanphear's and other population-based epidemiological studies support Dr. Hu's conclusion that a certain range of IQ decrements occur within a certain range of BLLs and that the effect of lead exposure upon IQ scores is more pronounced at certain ages, it is a stretch to expand that accepted methodology

to opining that *one source of lead* is *alone* responsible for a precise range of an individual's IQ loss.   Plaintiffs provide no argument otherwise.   I will exclude Dr. Hu's specific-causation opinions to the extent they attribute a specific percentage of the DC plaintiffs' loss of IQ points to DRP's operation of the Complex.

Defendants' remaining arguments can be addressed in short order.   I will not exclude Dr. Hu's opinions to the extent he relied on Dr. MacIntosh's conclusions regarding the DC plaintiffs' BLLs.   Experts may rely on the opinions and conclusions of other qualified experts where, as here, a proper foundation is laid. *Johnson*, 702 F. Supp. 2d at 1103; *Jackson*, 2016 WL 4705603, at *5.   Defendants' challenge to Dr. Hu's reliance on Dr. MacIntosh's "percent attributable" calculations is moot given that I will exclude Dr. Hu's "percent attributable" opinion testimony at trial.   I will not permit Dr. Hu to testify to future risk of hypertension given that he does not base that opinion on any evidence of a *present* injury that would give rise to such risk.   *Swartz*, 215 S.W.3d at 132.   Finally, plaintiffs acknowledge and Dr. Hu admits that he will not offer opinion evidence at trial relating to plaintiffs' exposure to arsenic or sulfur dioxide or any increased risk of adverse health events caused by those toxins.   I will therefore grant defendants' motion to exclude any such opinions.

4.    *Elias G. Chalhub*

Dr. Chalhub examined each DC plaintiff, reviewed their medical and

educational records, depositions, and the reports and depositions of Drs. Hopkins, Vega, Hu, and Bellinger.   Based on those examinations and reviews, as well as his experience and review of scientific literature, Dr. Chalhub opined that there was no basis on which to conclude that any of the 16 DC plaintiffs had a neurological issue or any other illness or condition attributable to lead exposure.   Plaintiffs move to exclude that opinion, arguing that Dr. Chalhub failed to follow his own articulated methodology in reaching his conclusion and, further, that he is not qualified to render causation opinions on non-neurological conditions.

In his report, Dr. Chalhub stated that neurological damage can be determined only by clinical examination <u>and</u> objective laboratory studies, such as EEGs, MRIs, nerve conduction studies, and the like.   He opines that because the DC plaintiffs underwent no such objective studies here, plaintiffs' experts' opinions that plaintiffs suffer from neurological damage are unsupported.   Plaintiffs argue that because Dr. Chalhub likewise conducted no objective studies, he failed to follow his own methodology in determining the existence of a brain or neurological disorder, thus rendering unreliable his specific opinion that no DC plaintiff suffered a neurological disorder.   I agree that expert testimony may be excluded where experts inconsistently apply their stated methodology, *see Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003), or where the expert failed to conduct certain tests required to support his conclusion, *see Wade-Greux v. Whitehall Labs.,*

*Inc.*, 874 F. Supp. 1441, 1460 (D.V.I. 1994).   But here, Dr. Chalhub reported that he did not conduct objective tests because none of the DC plaintiffs exhibited clinical symptoms of neurological injury, stating that objective testing is necessary only where such symptoms exist.   "[I]f they have no complaints, we obviously wouldn't order any tests."   (Chalhub Depo., ECF 1252-17 at hp. 24, depo. p. 93 (cleaned up).)

I will permit Dr. Chalhub to testify to and defend on cross-examination his conclusions regarding whether and to what extent the DC plaintiffs suffer from neurological injury based on his examinations and review of other evidence in the case.   *See Daubert*, 509 U.S. at 595 (focus of the court on a motion to exclude should not be on the conclusions reached by the expert).   I will also permit Dr. Chalhub to testify to his critique of plaintiffs' experts' opinions that such injuries exist as well as to his opinion that such affirmative diagnoses cannot be made without objective laboratory testing.   The jury will decide which side's experts, if any, to believe.   *Refrigeration Supplies*, 507 F. Supp. 3d at 1104; *Potter*, 560 S.W.3d at 607.

I will likewise not exclude Dr. Chalhub's specific opinion that there is no basis to reasonably conclude that lead exposure contributed to any other illness, condition, or complaint experienced by the DC plaintiffs.   Plaintiffs' characterization of Dr. Chalhub's opinion as affirmatively stating that the DC

plaintiffs have no injuries – including non-neurological injuries – that could be associated with lead exposure is a misreading of his conclusion.   In his expert reports, Dr. Chalhub criticizes plaintiffs' experts for their lead-based causation opinions, asserting that they could not reach those conclusions without conducting a differential diagnosis analysis, which he claims they did not do.   He then concludes that, without consideration of other factors relevant to plaintiffs' claimed impairments – such as social, nutritional, and family history – "there is no basis to conclude to a reasonable degree of medical certainty that lead exposure contributed to any illness, condition, or complaint[.]"   (*See*, *e.g.*, ECF 1252-1 at hpp. 18-19.) Accordingly, even assuming that lead exposure can cause plaintiffs' claimed impairments, Dr. Chalhub opines that the record *here* does not provide a basis to make that conclusion.   In short, Dr. Chalhub disputes whether plaintiffs' experts conducted adequate differential diagnosis analyses regarding the DC plaintiffs' claimed impairments.   Resolution of that dispute is best left for the jury. *Refrigeration Supplies*, 507 F. Supp. 3d at 1104; *Potter*, 560 S.W.3d at 607.

## IV.   Conclusion

It is important to note that the expert witnesses in this action each rendered several opinions in their respective reports on the subject matter for which they were retained.   Several motions to exclude challenge only some of an expert's opinions and not their opinions *in toto*.   Therefore, in granting a motion to exclude, I am

excluding only the specific opinion challenged, and my ruling shall not be read to go beyond that opinion.   Likewise, my denying a motion to exclude permits the challenged opinion to come in at trial, and my ruling shall not be read that *only* that opinion will be admitted.   In short, this Memorandum and Order does not address the admissibility of any opinion that went unchallenged in the motions to exclude.

Accordingly, for the reasons set out above on the arguments made to the opinions challenged in the various motions to exclude, I make the following rulings:

<u>David Sullivan</u> – I will deny defendants' motion to exclude.

<u>Dr. Shahrokh Rouhani</u> – I will grant plaintiffs' motion to exclude.   Dr. Rouhani will not be permitted to testify at trial to his opinions expressed in his March 19, 2021, supplemental report, where he compares the daily and hourly concentrations estimated by Sullivan's models with measured values from the air monitoring sites at those same dates and times, *i.e.*, concurrent-comparison results.

<u>Dr. David L. MacIntosh</u> – I will grant defendants' motion to exclude in part and deny it in part.   Dr. MacIntosh can testify to all of his models as presented in his June 10, 2019, supplemental report.   Dr. MacIntosh can also testify to his conclusions regarding predictive BLL ranges, but not in regard to those DC plaintiffs with no measured BLLs.

<u>Dr. David C. Bellinger</u> – I will grant defendants' motion to exclude in part and deny it in part.   Dr. Bellinger can testify to his general-causation opinions regarding

the neurodevelopmental impacts of lead exposure and that such exposure can cause behavioral and cognitive issues, including ADHD and aggressive behaviors.   Dr. Bellinger can also testify to his general-causation opinions that the high level of lead to which the DC plaintiffs were exposed as children was sufficient to cause their adverse health conditions, and that their claimed symptoms and injuries are consistent with the associated BLLs in the ranges they experienced.

Dr. Bellinger cannot testify to his opinion that La Oroya children experienced arsenic exposure at levels sufficient to directly cause neurodevelopmental impairments.   Nor can he testify to his opinion of cancer risk from arsenic exposure in La Oroya.   Finally, Dr. Bellinger cannot testify to his specific-causation opinion that lead exposure caused the DC plaintiffs' claimed injuries.

Dr. Karen Hopkins – I will deny defendants' motion to exclude to the extent it seeks to exclude Dr. Hopkins' general-causation opinion that a child's exposure to toxic levels of lead can result in physical impairments as well as deficits in cognitive, behavioral, and academic functioning in a manner consistent with the injuries claimed by the DC plaintiffs.   Dr. Hopkins is permitted to testify to that general-causation opinion at trial.

To the extent defendants seek to exclude Dr. Hopkins' specific-causation opinions, I will grant the motion in part and deny it in part.   Dr. Hopkins can testify to her specific-causation opinion that lead exposure contributed to cause the

impairments suffered by the DC plaintiffs.   She may also testify to her specific-causation opinion of the likely permanence of plaintiffs' neurocognitive and neuropsychological impairments.   Dr. Hopkins cannot testify to her specific-causation opinion that lead exposure adversely affected each DC plaintiff's opportunities for continued educational progress and for future employment.   Nor can Dr. Hopkins testify to her specific-causation opinion that the DC plaintiffs have an increased future risk for cardiovascular illness and renal disease as well as additional health problems such as sterility in men, blood lead issues in women during pregnancy, and vitamin D metabolism.   Finally, Dr. Hopkins cannot testify to her specific-causation opinion that the lead emitted from the Complex during DRP's operations from October 1997 to June 2009 caused the DC plaintiffs' injuries.

Dr. Jill E. Ryer-Powder – I will grant defendants' motion to exclude to the extent it seeks to exclude Dr. Ryer-Powder's specific-causation opinions.   Dr. Ryer-Powder cannot testify to her specific-causation opinion that the DC plaintiffs' exposure to arsenic resulted in an increased risk of cancer and other adverse health conditions.   Nor can she testify to her specific-causation opinion that the DC plaintiffs' increased BLLs and resulting adverse health effects were caused by their exposure to toxins emitted from the Complex during DRP's operations from October 1997 to June 2009.

To the extent defendants' motion seeks to exclude Dr. Ryer-Powder's general-causation opinions, I will deny the motion.   Dr. Ryer-Powder can testify to her general-causation opinion that lead exposure causes increased BLLs which can cause adverse health effects.   She can also testify to her general-causation opinions that the measured and modeled levels of sulfur dioxide in La Oroya exceeded regulatory limits, are associated with adverse health effects, and can cause future complications.

Dr. Howard Hu – I will deny defendants' motion to exclude to the extent it seeks to exclude Dr. Hu's general-causation opinions.   Dr. Hu can testify to his general-causation opinion regarding the strong associations between lead exposure and increased incidence of attention-related and other problem behaviors (such as ADHD), as well as adverse neurological effects – including reduced intelligence, academic achievement, and neuropsychological function.   He can also testify to his general-causation opinions regarding the strong association between elevations in blood lead and poor performance in academic achievement, including that BLLs in the range of those measured in the DC plaintiffs are consistent with at least a 6.9-point drop in IQ.

To the extent defendants' motion seeks to exclude Dr. Hu's specific-causation opinions, I will grant the motion in part and deny it in part.   Dr. Hu can testify to his specific-causation opinion that lead exposure caused the DC plaintiffs' claimed

impairments and resulted in a detriment to plaintiffs' intelligence, including a minimum 6.9-point drop in IQ.   Dr. Hu cannot testify to his specific-causation opinion that attributes a specific percentage of plaintiffs' IQ loss to DRP's operation of the Complex.   Nor can Dr. Hu testify to his specific-causation opinion that plaintiffs suffer an increased risk of hypertension.   Finally, Dr. Hu cannot testify to any opinion regarding plaintiffs' exposure to arsenic or sulfur dioxide or to any opinion regarding increased risk of adverse health events related to those toxins.

Dr. Clemente Vega – I will grant defendants' motion to exclude to the extent it seeks to exclude Dr. Vega's general-causation opinion that the neuropsychological impairments suffered by the DC plaintiffs are consistent with the known consequences of children exposed to lead.

To the extent defendants' motion seeks to exclude Dr. Vega's specific-causation opinions, I will grant the motion in part and deny it in part.   Dr. Vega can testify to his specific-causation opinion that lead exposure caused or contributed to cause the DC plaintiffs' neuropsychological impairments.   He can also testify to his opinion regarding the extent of plaintiffs' cognitive injuries and to his recommended modalities to remediate the limitations caused by those injuries. Dr. Vega cannot testify to his specific-causation opinion that it was specifically the lead emissions from the Complex during DRP's operations that caused the DC plaintiffs' neuropsychological issues.

Dr. Elias G. Chalhub – I will deny plaintiffs' motion to exclude.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' Motion to Exclude, in Part, the Expert Opinions of Shahrokh Rouhani [1247] is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' Motion to Exclude, in Part, the Expert Opinions of Dr. Elias G. Chalhub [1249] is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' Motion to Exclude or Limit the Proffered Opinion Testimony of Plaintiffs' Expert Witness David Sullivan Under Rule 702 and *Daubert* [1212]; Motion to Exclude the Expert Testimony of David L. MacIntosh, Sc.D., CIH [1215]; Motion to Exclude or Limit the Expert Testimony of Dr. David C. Bellinger [1213]; Motion to Exclude the Expert Testimony of Dr. Karen Hopkins [1220]; Motion to Exclude the Expert Testimony of Jill E. Ryer-Powder, Ph.D. [1210]; Motion to Exclude the Expert Testimony of Dr. Howard Hu [1222]; and Motion to Exclude the Expert Testimony of Clemente Vega, Psy.D. [1216] are **GRANTED in part and DENIED in part** as set out in this Memorandum and Order.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 11th day of July, 2025.