UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.O.A, et al.,                          )
                                        )
    Plaintiffs,                    )
                                        )
    v.                             )        Case No. 4:11 CV 44 CDP
                                        )
IRA L. RENNERT, et al.,                 )
                                        )
    Defendants.                    )

# MEMORANDUM AND ORDER

## Table of Contents

I. Introduction ........................................................................... 3

II. Background ........................................................................... 3

III. The Defendants and Related Entities ................................. 5

IV. Remaining Claims ............................................................... 9

V. Summary Judgment and *Daubert* Motions ......................... 10

VI. Discussion ........................................................................... 12

   A.     Piercing the Corporate Veil ........................................ 14

     1.    *Control* ............................................................... 16

     2.    *Wrong or Unjust Act* ........................................ 23

     3.    *Causation* ......................................................... 26

     4.    *Challenged Expert Testimony* ......................... 27

       a.  Kyle Anne Midkiff ..................................... 27

       b.  Jonathan R. Macey ..................................... 29

     5.    *Conclusion* ....................................................... 33

   B.    Agency ...................................................................... 33

C.    Direct Participation Liability ........................................................39

D.    Standard of Care...........................................................................45

    1.    *Jack V. Matson*...................................................................46

    2.    *Corby G. Anderson* ...........................................................55

    3.    *Conclusion* .........................................................................58

E.    Causation......................................................................................59

    1.    *Arsenic, Sulfur Dioxide, and Cadmium Emissions*................60

    2.    *Lead Emissions* .................................................................62

F.    Damages........................................................................................67

    1.    *Economic Damages* ...........................................................67

    2.    *Punitive Damages* .............................................................69

G.    Individual Liability ......................................................................72

VII.  Conclusion..........................................................................................76

# I.  Introduction

Plaintiffs are numerous Peruvian citizens who allege that they were injured when they were exposed as children to toxic substances from the La Oroya Complex, a metallurgical smelting and refining complex operating in La Oroya, Peru, during the period that defendants operated the Complex as Doe Run Peru. Defendants are several interrelated American companies and their executives and directors.  In this action, plaintiffs claim that defendants prioritized profit over community safety by authorizing and directing the Complex to emit excessive levels of toxic substances into the La Oroya environment knowing that proper safety protocols were not in place.  Plaintiffs claim that defendants' conduct caused them to suffer serious medical and developmental injuries from their exposure to lead and other toxic substances emitted from the Complex.  Plaintiffs act through next friends Sister Kate Reid and Megan Heeney.

# II.  Background

The relevant background of the La Oroya Complex, the various defendants' involvement therewith, and the nature of plaintiffs' claims were thoroughly set out in my Memorandum and Order entered January 20, 2023, and will not be repeated here.  In that Memorandum and Order, I continued to find that Missouri law

applies to the claims and defenses in this case,[1] except for defendants' "safe harbor" defense under Article 1971 of Peru's Civil Code; denied defendants' motion for summary judgment under Peruvian law; and denied defendants' motion to dismiss the case under various transnational doctrines.[2] The Eighth Circuit Court of Appeals affirmed those decisions on August 1, 2024, *Reid v. Doe Run Res. Corp.*, 110 F.4th 1049 (8th Cir. 2024), and the Supreme Court denied defendants' petition for writ of certiorari on March 3, 2025, 145 S. Ct. 1309 (2025).

This Memorandum and Order addresses defendants' remaining motions for summary judgment wherein they assert that they are entitled to summary judgment under Missouri law on all claims. This Order also addresses the parties' remaining motions to limit or exclude expert testimony, and particularly the testimony of those experts who rendered opinions on the liability-related matters of corporate governance and standard of care.[3] For the reasons that follow, I will grant in part

---

[1] I had already determined in an earlier Memorandum and Order that Missouri law would govern this dispute. ECF 949, *reported at A.O.A. v. Rennert*, 350 F. Supp. 3d 818 (E.D. Mo. 2018).

[2] *See* ECF 1322, Memo. & Order, *reported at A.O.A. v. Rennert*, No. 4:11 CV 44 CDP, 2023 WL 346001 (E.D. Mo. Jan. 20, 2023). The findings and conclusions made therein are adopted and incorporated here for purposes of this Memorandum and Order.

[3] In a Memorandum and Order entered July 11, 2025, I ruled several other motions to exclude expert testimony, and particularly motions directed to experts who rendered opinions on medical causation and the contamination of La Oroya. (ECF 1506, Memo. & Order, *reported at A.O.A. v. Rennert*, No. 4:11 CV 44 CDP, 2025 WL 1918941 (E.D. Mo. July 11, 2025)). The findings and conclusions made therein are adopted and incorporated here for purposes of this Memorandum and Order.

and deny in part the motions for summary judgment.  I will likewise grant in part

and deny in part the remaining motions to limit or exclude expert testimony.

### III.  The Defendants and Related Entities

**Ira L. Rennert** – Rennert resides in New York, is Chairman and Chief

Executive Officer of The Renco Group, Inc. (Renco), and is the primary

shareholder of Renco.  He and several trusts he established for himself and his

family own 97.9% of Renco.  Rennert is also Director and Chairman of several

other Renco-owned and affiliated companies and entities, including those named in

this lawsuit as described below.

**The Renco Group, Inc.** – Renco is a private, family-owned investment

holding company founded by Rennert in 1975.  Renco was later incorporated in

New York, and its principal place of business is in New York.  Rennert controls

Renco.  Renco holds 100% of the shares of D.R. Acquisition Corp.

**D.R. Acquisition Corp.** – D.R. Acquisition is a holding company

incorporated in Missouri in 1994 and owned 100% by Renco.  Its principal place of

business is in Missouri.  Rennert is Sole Director and Chairman of the Board of

D.R. Acquisition and, in this role, appoints its officers.  D.R. Acquisition owns

100% of the shares of Doe Run Resources Corp.

**Doe Run Resources Corp.** – DRR is a natural resource company

incorporated in New York with its principal place of business in Missouri.  Its

primary business is in mining, smelting, recycling, and fabrication of metals.  It was acquired in 1994 by Renco-owned D.R. Acquisition.  Since 1994, Rennert has served as DRR's Chairman of the Board.  He served as its Sole Director from 1994 to 2002, was one of three Directors from 2002 to 2007, and has been Sole Director again since 2007.  From 1997 to 2007, DRR held the primary ownership interest in Doe Run Cayman, Ltd., a non-party to this action.

**(Non-parties) Doe Run Cayman, Ltd. and Doe Run Mining, S.R.L.** – Doe Run Cayman and Doe Run Mining were incorporated on September 10, 1997. Doe Run Mining was formed in Peru as a holding company of wholly owned subsidiary Doe Run Peru (DRP) for purposes of acquiring the Complex from Centromin Peru S.A., a Peruvian government-owned company.[4]  Doe Run Cayman was formed in the Cayman Islands as a holding company to acquire the stock of Doe Run Mining.  Rennert was Chairman and Sole Director of Doe Run Cayman. Doe Run Cayman was a wholly owned subsidiary of DRR.  Neither Doe Run Cayman nor Doe Run Mining had any independent operations.

Doe Run Mining merged into DRP in June 2001.  With this merger, Doe Run Cayman became the direct parent of DRP.

**Doe Run Cayman Holdings, LLC** – Cayman Holdings is a Missouri

---

[4] Centromin had several subsidiary companies, including "Metaloroya" which was the La Oroya Complex here.

limited liability company with its principal place of business in Missouri.  It was formed in February 2007 by its Sole Member, D.R. Acquisition, to hold 100% interest in Doe Run Cayman.  Shortly thereafter, in March 2007, D.R. Acquisition transferred the shares of Doe Run Cayman to Cayman Holdings pursuant to a Share Transfer Agreement approved and executed by Rennert.  As a result, DRR no longer had an interest in Doe Run Cayman.  Also in March 2007, D.R. Acquisition executed a dividend of its membership interest in Cayman Holdings to Renco, transferring 100% of its membership interest to Renco.  Renco thus became the Sole Member of Cayman Holdings, the direct parent of DRP.  Cayman Holdings has no independent operations.

**(Non-party) Doe Run Peru** – DRP was formed in Peru in September 1997 for the purpose of acquiring the Complex from Centromin.  At the time, Doe Run Mining was the direct parent of DRP, owning more than 99% of its shares, with the remainder owned by DRP employees.  With Doe Run Mining's merger into DRP in 2001, Doe Run Cayman became DRP's direct parent.  In March 2007, through the transactions described above, Cayman Holdings became the direct parent of DRP.  DRP ceased operating the Complex in June 2009 and entered into bankruptcy shortly thereafter.

**(Dismissed party) Jeffrey Zelms**[5] – During the period relevant to this litigation, Zelms was a Missouri resident and held the following positions in several Doe-Run-affiliated organizations, having been appointed to those positions by Rennert:

- President and CEO of DRR from 1994 to 2006;

- Vice Chairman of DRR from 1999 to 2006;

- President and CEO of D.R. Acquisition from 1994 to 2005;

- President of Doe Run Cayman from 1997 to 2007.

From 1994 through his retirement, Zelms – in his various roles – reported directly to Rennert.  Upon his retirement and continuing through 2013, Zelms was a paid consultant for DRR pursuant to an agreement executed by Rennert.

**Marvin K. Kaiser** – During the period relevant to this litigation, Kaiser held the following Doe-Run-affiliated positions:

- Vice President and CFO of DRR from 1994 to 2006;

- Vice President and CFO of D.R. Acquisition from 1994 to 2005;

- Vice President of Doe Run Cayman from 1997 to 2007;

- Finance Manager of Doe Run Mining from 1997 to 2000;

- Finance Manager of DRP from 1997 to 2001;

---

[5] Zelms died on January 13, 2025.  Pursuant to the parties' stipulation, Zelms was dismissed from this case on June 24, 2025.  (ECF 1470, 1487.)

• Executive Vice President of DRP beginning 2002.

Kaiser resided in Missouri from 1994 to 2003.  During his last few years as an officer of DRR, he commuted from Kentucky to Missouri for his work.

**Albert Bruce Neil** – Neil worked for DRR as General Manager of a smelting plant in Glover, Missouri.  In 2003, Zelms transferred him from that plant to DRP and appointed him President and General Manager of DRP.  During the period relevant to this litigation, Neil held the following positions:

- President and General Manager of DRP from 2003 to 2006;

- Vice President of DRR from 2004 to 2005;

- Vice Chairman, President, and CEO of DRR from 2006 to 2012 (appointed by Rennert);

- President of D.R. Acquisition from 2006 to 2011;

- President of Doe Run Cayman in 2007;

- President of Cayman Holdings from 2008 to at least 2009.

Neil lived in Peru from 2003 through 2005.  During all other periods relevant to this litigation, Neil lived in Missouri.  After assuming his officer and director roles with DRR in 2006, Neil acted with Rennert's approval as a consultant to DRP on an as-needed basis and was involved in apprising Rennert of DRP's status.

## IV.  Remaining Claims

The claims that remain in this action are set out in seven counts of plaintiffs'

amended complaint:

Count I – <u>Negligence</u> against defendants Rennert, Renco, DRR, D.R. Acquisition, and Cayman Holdings;

Count II – <u>Negligence</u> against Rennert, Kaiser, and Neil;

Count VIII – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against DRR, Cayman Holdings, Kaiser, and Neil;

Count IX – <u>Direct Liability for Breach of Assumed Duties Pertaining to Foreseeable Harms</u> against Renco, D.R. Acquisition, and Rennert;

Count X – <u>Negligent Performance of an Undertaking</u> against DRR, Cayman Holdings, Kaiser, and Neil;

Count XI – <u>Negligent Performance of an Undertaking</u> against Renco, D.R. Acquisition, and Rennert; and

Count XII – <u>Direct Participation Liability</u> against Renco and Rennert

## V. Summary Judgment and *Daubert*[6] Motions

There are three motions for summary judgment that remain pending in this action. In the first motion, all remaining defendants seek summary judgment on all remaining claims, asserting several bases upon which they argue they are entitled to judgment under Missouri law. In a supplemental motion, defendants Rennert and Renco seek summary judgment individually on Counts I, II, IX, XI, and XII. In a separate supplemental motion, defendants Kaiser and Neil seek summary

---

[6] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

judgment individually on Counts II, VIII, and X.[7]  In their motions, defendants

raise the following arguments:

<u>All Defendants' Motion for Summary Judgment Under Missouri Law</u>:

- That plaintiffs cannot establish the requisite control, undercapitalization, or caused injury in order to pierce the corporate veil;
- That plaintiffs cannot establish that an agency relationship existed between defendants and DRP;
- That plaintiffs cannot establish direct liability as no defendant undertook a duty to control, manage, or operate the Complex;
- That plaintiffs' negligence theory fails as they cannot establish the requisite standard of care;
- That plaintiffs cannot establish negligence based on their claimed exposure to sulfur dioxide, arsenic, and cadmium;
- That plaintiffs cannot establish that it was the lead emitted from the Complex during DRP's operations that caused their injuries;
- That plaintiffs have no proof of economic injuries; and
- That the evidence is insufficient to establish a claim for punitive damages.

<u>Defendants Renco and Rennert's Supplemental Motion for Summary Judgment</u>:

- That plaintiffs cannot establish the requisite control, undercapitalization, or caused injury in order to pierce the corporate veil;
- That plaintiffs cannot establish that an agency relationship existed between Renco/Rennert and DRP; and
- That neither Renco nor Rennert operated the Complex or took action

---

[7] In ruling summary judgment motions, I view the facts and inferences in the light most favorable to plaintiffs, the nonmoving parties.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The defendants, as the moving parties, have the burden to establish both the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  For purposes of these motions for summary judgment, I suspended Local Rule 4.01(E)'s requirements regarding the filing of separate Statements of Uncontroverted Material Facts.  (*See* CMO 17, ECF 1190.)

directly tied to DRP's alleged harmful conduct.

<u>Defendant Kaiser and Neil's Supplemental Motion for Summary Judgment</u>:[8]

- That plaintiffs cannot establish that either Kaiser or Neil had actual or constructive knowledge of any alleged wrongdoing; and
- That plaintiffs cannot establish that either Kaiser or Neil actively participated in any actionable wrong.

Also pending are four *Daubert* motions to limit or exclude expert testimony. In a Memorandum and Order entered July 11, 2025, I ruled nine other *Daubert* motions that were directed to experts who rendered opinions on medical causation and the contamination of La Oroya.[9] The remaining motions challenge the testimony of experts who rendered opinions relating to corporate governance and standard of care: namely, plaintiffs' experts Kyle Ann Midkiff and Jack V. Matson, and defendants' experts Jonathan R. Macey and Corby G. Anderson. For purposes of addressing the motions to limit or exclude their testimony, I adopt the Legal Standard set out in my July 11 Memorandum and Order.

## VI. Discussion

As noted above, all remaining counts of plaintiffs' amended complaint sound in negligence. To prevail on a claim of negligence under Missouri law, a

---

[8] This motion was originally filed on behalf of Theodore Fox and Jeffrey Zelms as well. Those defendants have since been dismissed from the case with prejudice.

[9] *See* ECF 1506, Memo. & Order, *reported at A.O.A. v. Rennert*, No. 4:11 CV 44 CDP, 2025 WL 1918941 (E.D. Mo. July 11, 2025).

plaintiff must establish that the defendant had a duty of care to protect the plaintiff from injury, that defendant failed in performing the duty, and that defendant's failure proximately caused harm to the plaintiff. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000). A duty of care to a plaintiff may hinge upon whether the defendant should have foreseen a risk in a given set of circumstances. *Taylor v. Dale-Freeman Corp.*, 389 S.W.2d 57, 61 (Mo. 1965). That being said, "foreseeability alone is not enough to establish a duty." *Stitt by Stitt v. Raytown Sports Ass'n*, 961 S.W.2d 927, 930 (Mo. Ct. App. 1998). There must be "some right or obligation to control the activity which presents the danger of injury." *Id.*; *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 840 (E.D. Mo. 2018). *See also Pippin v. Hill-Rom Co.*, 615 F.3d 886, 890 (8th Cir. 2010).

In a parent-subsidiary relationship, the parent is ordinarily not liable for the tortious acts of the subsidiary. An exception to this rule exists, however, when there is evidence to support piercing the corporate veil. *Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 384 (Mo. Ct. App. 1999). Otherwise, "a plaintiff who seeks recovery in tort against one joined as a defendant must identify that defendant as an actor in the production of the harm for which the plaintiff seeks recovery." *Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 183 (Mo. Ct. App. 1988); *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 372 (Mo. Ct. App. 2014).

As detailed above, the defendants' motions for summary judgment challenge

various aspects of plaintiffs' claims of negligence – namely piercing the corporate veil, agency, direct participation liability, standards of care, causation, damages, and individual liability. I address each of those challenges in turn.

A.     Piercing the Corporate Veil

Plaintiffs allege that defendants Rennert, Renco, DRR, D.R. Acquisition, and Cayman Holdings are jointly and severally liable for the Complex's negligent release of toxic materials and gases into plaintiffs' community, negligent failure to warn of such releases and their foreseeable effects, and negligent withholding of information regarding the dangers of exposure to these toxic substances. Plaintiffs seek to impose liability on these defendants by "piercing the corporate veil." Defendants contend that the evidence adduced is not sufficient as a matter of law to warrant such piercing and hold them liable for the Complex's conduct. Defendants also seek to limit the testimony of plaintiffs' corporate governance expert, forensic accountant Kyle Anne Midkiff, as it relates to whether the elements of veil-piercing are met in this case. Plaintiffs seek to limit the testimony of defendants' corporate governance expert, law professor Jonathan R. Macey.

Corporations are generally viewed as wholly separate legal entities, and their separateness is protected. *Fleming Cos., Inc. v. Rich*, 978 F. Supp. 1281, 1302 (E.D. Mo. 1997); *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 283 (Mo. Ct. App. 1986). But "[i]f a parent corporation completely dominates its subsidiary

14

and has created or is using the subsidiary corporation for some improper purpose, then the courts will disregard the corporate form of the subsidiary and hold the parent liable." *Blanks*, 450 S.W.3d at 377. *See also Collet*, 708 S.W.2d at 284.

To pierce the corporate veil and hold the defendant parent corporation(s) and/or shareholder(s) liable for the subsidiary's challenged conduct, plaintiffs must show:

> (1)  Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Collet*, 708 S.W.2d at 284.  All three elements must be met.  *See Mobius Mgmt. Sys., Inc. v. West Physician Search, L.L.C.*, 175 S.W.3d 186, 189 (Mo. Ct. App. 2005).  While undercapitalization is not required to be shown to pierce the corporate veil, it may be used as a proxy for the second *Collet* element. *Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305, 307-08 (8th Cir. 1992).

The determination of whether a corporate veil may be pierced is made upon

the particular facts of each case.  *Hibbs v. Berger*, 430 S.W.3d 296, 309 (Mo. Ct.

App. 2014).  *See also Blanks*, 450 S.W.3d at 376 (the inquiry is "highly fact-

specific").  If there are genuine disputes of material fact, summary judgment is  not

appropriate.

> 1.    *Control*

The degree of control exercised by a dominant corporate entity/shareholder

over a subordinate can be measured by considering the following eleven factors:

> (1)  The parent corporation owns all or most of the capital stock of the
> subsidiary.
> (2)  The parent and subsidiary corporations have common directors or
> officers.
> (3)  The parent corporation finances the subsidiary.
> (4)  The parent corporation subscribes to all of the capital stock of the
> subsidiary or otherwise causes its incorporation.
> (5)  The subsidiary has grossly inadequate capital.
> (6)  The parent corporation pays the salaries and other expenses or
> losses of the subsidiary.
> (7)  The subsidiary has substantially no business except with the
> parent corporation or no assets except those conveyed to it by the
> parent corporation.
> (8)  In the papers of the parent corporation or the statements of its
> officers, the subsidiary is described as a department or division of the
> parent corporation, or its business or financial responsibility is
> referred to as the parent corporation's own.
> (9)  The parent corporation uses the property of the subsidiary as its
> own.
> (10) The directors or executives of the subsidiary do not act
> independently in the interest of the subsidiary but take their orders
> from the parent corporation and the latter's interest.
> (11) The formal legal requirements of the subsidiary are not observed.

*Collet*, 708 S.W.2d at 284.  Any combination of these factors can support a

conclusion that a parent company exercises complete control and domination over its subsidiary. *Paglin v. Saztec Int'l, Inc.*, 834 F. Supp. 1184, 1191 (W.D. Mo. 1993). Not all factors must be met. *Id.*

Here, evidence shows that Renco and DRR caused DRP's incorporation. And DRP's ownership is directly traceable to and dependent upon the Rennert-controlled panoply of Renco/Doe Run upstream companies. More than 99% of DRP's shares were owned by Doe Run Mining. 100% of Doe Run Mining's shares were owned by Doe Run Cayman. DRR owned 100% of Doe Run Cayman, and D.R. Acquisition owned 100% of DRR. Finally, Renco owned 100% of D.R. Acquisition and Ira Rennert was the primary shareholder of Renco, with him and his family trusts owning more than 97% of its shares. When Cayman Holdings acquired Doe Run Cayman, and D.R. Acquisition transferred its ownership interest in Cayman Holdings to Renco, Renco – through Cayman Holdings – effectively controlled DRP given that Cayman Holdings had no independent operations. Like a Russian nesting doll, there is no separation of ownership among these entities. Each is wholly owned and encompassed by its immediate upstream parent, with Rennert encircling them all as the ultimate patriarch of the family of dolls.

Upstream control of DRP is further demonstrated by the significant overlap of officers and directors throughout the Renco/Doe Run entities, including DRP. As described above, the individual defendants simultaneously held executive and

board positions among the various entities:  Zelms was President, CEO, and Vice Chairman of DRR at the same time he was President and CEO of D.R. Acquisition, and at the same time he was President of Doe Run Cayman, DRP's direct parent. Likewise, Kaiser was Vice President and CFO of DRR at the same time he was Vice President and CFO of D.R. Acquisition, and at the same time he was Vice President of Doe Run Cayman, which overlapped with his time as Finance Manager of both Doe Run Mining and DRP and as Executive Vice President of DRP.  As for Neil, he was Vice President of DRR at the same time he was President and General Manager of DRP and later was Vice Chairman, President, and CEO of DRR while simultaneously serving as President of Doe Run Cayman/ Cayman Holdings, DRP's direct parent.  And although Rennert did not hold a director or officer position with DRP directly, he nevertheless was Chairman and Director of all other entities, who themselves exerted control over DRP.  Finally, evidence before the Court shows that other individuals likewise held officer and/or director positions simultaneously in the Renco/Doe Run entities, including but not limited to Kenneth R. Buckley (DRP, Doe Run Mining, and DRR), Dennis A. Sadlowski (Doe Run Cayman and DRR), and John Binko (Renco and DRR).

There is also evidence that salaries and bonuses of some DRP executives and employees, including DRP General Managers and Presidents Buckley and Neil, were paid exclusively by DRR pursuant to employment agreements with

DRR and compensation packages arranged and signed by Rennert.  In addition, several DRR employees acted as advisors and/or consultants to DRP to establish policies and protocols in safety, sales, financial operations, environmental issues and more, and to participate in discussions and negotiations with the Peruvian government regarding DRP's PAMA obligations.[10]  Several intercompany agreements required DRP to pay several million dollars each year to DRR and Renco for these services,[11] and other agreements required DRP to pay millions of dollars upstream in "flat fees."[12]  And as further evidence of the overlap of executive duties, Buckley signed these agreements in his capacity as an officer of DRP, Doe Run Mining, *and* DRR.[13]

There is a genuine dispute as to whether capitalization of DRP was "grossly inadequate" and, if so, when.  Some evidence shows that DRP paid its bills and kept capital projects afloat early on, but financial strife hit less than three years into

[10] PAMA, the acronym for "Programa de Adecación y Manejo Ambiental," was a program established under Peruvian environmental protection laws that required every mining company to agree to an environmental remediation plan.  The PAMA plan for the Complex, initially developed by Centromin and approved by Peru in January 1997, established a ten-year period for compliance.

[11] Some of these money transfers from DRP to Renco and DRR went through Doe Run Mining on their way upstream.

[12] When DRP sought extensions from the Peruvian government to meet its PAMA obligations, the government conditioned its approval on DRP stopping these upstream money transfers.

[13] *See also infra* n.15 (Kaiser executed indentures on behalf of *inter alia* DRR, Doe Run Cayman, Doe Run Mining, and DRP).

DRP's operation of the Complex. While defendants contend that outside factors caused this financial instability – and especially the crash of metal prices worldwide – plaintiffs have presented evidence that defendants' business model was to create and structure DRP from its inception to be undercapitalized as a stand-alone entity, especially regarding its environmental obligations. The financing structure for DRP's purchase of the Complex was arranged by Renco and implemented by Zelms and Kaiser. This structure included a $125 million capital contribution to Metaloroya[14] that was "loaned" back from Metaloroya to Doe Run Mining and never directed to DRP, thereby depriving DRP of its own purported capital. DRP's business model was based on 100% debt financing with several revolving lines of credit from lenders worldwide. Eric Peitz, DRP's Treasurer, likened it to repeatedly maxing out a credit card and applying for a new card from a new lender each time. DRP financed all of its purchase price, undertook capital-investment programs using debt financing, and was a guarantor on DRR's debts to DRR's bondholders despite difficulties meeting its own obligations.[15] Moreover, the upstream Renco/Doe Run entities caused substantial monies to be transferred to themselves from DRP through service and management

---

[14] *See supra* n.4.

[15] Notably, Kaiser executed such a bond indenture in March 1998 on behalf of DRR as issuer as well as on behalf of Doe Run Cayman, Doe Run Mining, and DRP as guarantors. (ECF 871-21.) Kaiser executed another indenture in October 2002 on behalf of DRR as issuer as well as on behalf of all guarantors, which included Doe Run Cayman and DRP. (ECF 871-32.)

contracts, fees, and other methods, which decreased DRP's on-hand capital needed to meet its environmental obligations.  Whether and to what extent the Renco-planned financial structure of DRP caused it to be undercapitalized regarding these obligations are questions to be resolved at trial.  *Cf. New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 225-26 (2d Cir. 2014) (no undercapitalization, but evidence showed subsidiaries were mere pockets of corporate parent).

There is also evidence that DRP took orders from DRR, which itself was directed by Renco and Rennert in its dealings with DRP.  For instance, although Buckley was part of the due diligence team regarding the purchase of the Complex and was appointed General Manager of DRP upon its purchase, DRR nevertheless counseled Buckley as to which employees to retain at the smelter; and it was DRR, not DRP, that awarded the contract for upgrades to the Complex.  Dan Vornberg, Director of Environmental Affairs at DRR, oversaw the environmental issues at the Complex because DRP did not have anyone capable of performing such work.  Evidence also shows that DRR and Renco negotiated contracts with third parties for the Complex to process and provide certain refined metals.  DRP was not involved in these negotiations and indeed was deliberately excluded from the conversations.  (*See* Chaput Depo., ECF 1277-56.)  In addition, when Peitz sounded the alarm that DRP's financial health and PAMA obligations were in peril

21

in part because of the millions of dollars being sent upstream to DRR, DRR continued to demand – and DRP continued to pay – the upstream payments.[16]  And when Vornburg repeatedly informed Zelms in 2000 and 2001 of DRP's immediate need to move forward on the zinc-ferrite project to address profitability issues and environmental concerns, Zelms did not act upon it.  Follow-up requests for permission to move forward on the project went unanswered, which financial personnel described as "incredible."

Finally, plaintiffs have presented evidence showing that Renco, DRR, and their executives described, referred to, and publicly acknowledged DRP as a department or division of Renco/DRR and not an independent entity.  Such evidence includes but is not limited to DRP being described as the "Peruvian operations" of DRR, as one of DRR's "facilities," as DRR's "fifth division," as one of Renco's "locations," and as an "expansion" of DRR.  (*E.g.*, Blinko Depo., ECF 1277-54; DRR Corporate Profile, ECF 1277-64; Renco Investment Booklet, ECF 640-58.)  Organizational charts identified executive roles at DRP as positions over DRR's "Peru Operations."  (*E.g.*, Neil Depo., ECF 1277-60 at hpp. 7-8,[17] depo. pp. 70-74.)  Zelms, as President and CEO of DRR, referred to DRR and DRP

---

[16] Evidence shows that Peitz had these concerns and shared them as early as 1998.  (ECF 640-77.)

[17] Given the inconsistent pagination of the briefs and several thousand pages of exhibits submitted in this action, I will refer to the page number identified in the ECF header of a party's filed document (*i.e.*, "hp." or "hpp.") when citing to that document.

jointly when referring to profitability of operations and implementation of projects. Memoranda originating from Kaiser as DRR's CFO referred to "the Peruvian activities" of DRR.  (*E.g.*, Kaiser Memo., ECF 640-37.)

In sum, plaintiffs have presented sufficient evidence on several of the eleven factors raising genuine issues of material fact as to whether Rennert and the Renco/ Doe Run upstream entities exerted control over DRP to such a degree that DRP at the time of the challenged conduct had no separate mind, will, or existence of its own as to the transaction at issue, that is, prioritizing profit over community safety by directing the Complex to emit excessive levels of toxic substances into the La Oroya environment without proper safety protocols in place.

2.    *Wrong or Unjust Act*

To pierce the corporate veil of a parent or shareholder, the control exercised must have been used in an improper manner.  *Collet*, 708 S.W.2d at 286.  While not a required element for veil piercing, "[i]nadequate capitalization is circumstantial evidence tending to show an improper purpose or reckless disregard for the rights of others."  *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 41 (Mo. banc 1999).  "'Inadequate capitalization' means assets that are very small in comparison to known risks associated with the planned corporate enterprise."  *Id.*

For the reasons stated above, there are genuine issues of material fact as to

whether DRP was adequately capitalized for purposes of meeting its environmental obligations.  Moreover, additional evidence shows that the upstream Renco/Doe Run entities knew the substantial environmental risks associated with the planned business model for DRP but nevertheless approved and/or directed that the Complex operate at maximum capacity without first implementing appropriate emission reduction systems.

When Renco/DRR purchased the Complex in October 1997, they were aware that, at that time, the Complex emitted dangerous levels of toxic substances into the surrounding environment; that every plant at the smelter emitted fugitive toxic emissions; and that more than 80 uncontrolled sources of fugitive emissions released additional pollution at low altitudes, causing concentrated particulate matter containing lead and other heavy metals to settle quickly over the inhabited areas surrounding the Complex.  (Renco Arbitration Memorial, ECF 1277-77; *see also* Sept. 1996 Environ. Eval. Final Report, ECF 1233-15.)  They also knew that the projects outlined in the PAMA were insufficient to adequately reduce toxic emissions, and they were particularly aware that the PAMA plan included only one project that addressed fugitive emissions despite there being 80 uncontrolled sources.  (ECF 1277-77.)  Despite this knowledge that the current level of operations at the Complex emitted dangerous levels of toxic substances into the environment and the surrounding inhabited areas and that "significant capital

expenditure" was needed to bring the Complex into compliance with Peruvian and
international emission standards (*see* ECF 1233-15 at hp. 11), DRP's articulated
goal for its first year of operating the Complex was to operate at maximum
capacity with minimum investment.  (Metaloroya Business Plan & Budget, ECF
909-24.)  Indeed, its business plan provided that operations of the copper, lead, and
zinc smelters and refineries would immediately increase to maximum capacity in
order to produce several additional tons of product.  (*Id.*)  And the 10-Year Master
Plan for DRP dated September 1998[18] emphasized fast-tracking revenue generation
notably before completing PAMA and other environment-related projects.  (10 Yr.
Master Plan, ECF 1279-10.) (*E.g.*, Three pellet roasters emit sulfur "directly to the
atmosphere via the main stack.  [They] will have to be shut down *in 2006* to meet
PAMA sulfur requirements."  ECF 1279-10 at hp. 46.  Emphasis added.)

Plaintiffs have produced sufficient evidence from which a factfinder could
conclude that Rennert and the upstream Renco/Doe Run entities controlled DRP
for the improper purpose of generating increased profits at the expense of
plaintiffs' health and other legal rights by knowingly emitting increased levels of
dangerous toxic substances into the environment and community without providing
sufficient funds or plans to implement safety protocols before doing so.

---

[18] Fluor Daniel, the entity that prepared the Master Plan, was the contractor DRR hired to
provide upgrades to the Complex.  It was Fluor from whom Renco purchased DRR in 1994.

3.    *Causation*

To satisfy the test for piercing the corporate veil, "the wrong done must be the proximate cause of injury to third persons who dealt with the corporation." *Edward D. Givers Heating & Air Conditioning Co. v. R. Webbe Corp.*, 885 S.W.2d 771, 774 (Mo. Ct. App. 1994).  *See also Collet*, 708 S.W.2d at 283.  Plaintiffs' claimed injuries are the physical and developmental injuries allegedly caused by DRP's emission of dangerously excessive levels of toxins from the Complex, which the upstream defendants deliberately determined for DRP to increase while knowing the dangerousness of such emissions and that proper safety protocols were not in place to protect plaintiffs or the community, and with no intention to implement needed environmental protections before fast-tracking the Complex's profitability.  As demonstrated here and in my Memoranda and Orders entered January 20, 2023, and July 11, 2025, there is sufficient evidence of record showing genuine issues of material fact on those claims and thus on the causation element.

Defendants argue that plaintiffs cannot establish that undercapitalization caused their injuries and that any explanation other than undercapitalization would be a "gin[ned] up new argument" that cannot be considered.  (ECF 1301 at hp. 45.)  As stated above, however, undercapitalization is not itself an element that must be proved to pierce the corporate veil.  Nevertheless, for reasons stated earlier, there are genuine issues of material fact regarding the extent to which the upstream

defendants undercapitalized DRP in relation to the contested matter at issue, that is, to increase profitability and minimize costs by maximizing smelter output without implementing emission-reduction systems, thereby exposing the surrounding community to known health risks associated with such output.

Moreover, contrary to defendants' assertion, plaintiffs do not rely on undercapitalization alone to make their case.  The amended complaint alleges that defendants used their control "to make substantial profit while causing injuries to the plaintiffs, *constituting fraud and injustice* that violates the plaintiffs' legal rights" (ECF 474, ¶¶ 95, 106) (emphasis added); and, further, "that the generation, handling, storage, release and disposal" of the toxic substances and failure to contain or control their emissions caused their injuries.  (*Id.*, ¶ 107.)  Plaintiffs' argument that defendants prioritized profits over community safety to the detriment of plaintiffs and the La Oroya community is neither new nor ginned up. Their claims comprise more than just undercapitalization.

       4.    *Challenged Expert Testimony*

       a.    Kyle Anne Midkiff

I will not exclude the opinion testimony of plaintiffs' corporate governance expert, Kyle Anne Midkiff, in its entirety as defendants request.  Contrary to defendants' assertion, Ms. Midkiff thoroughly explained how and why her examination of, *inter alia*, deposition testimony and available records, reports,

transactions, and communications spanning several years led to her conclusions regarding the financial status of DRP at its inception and beyond, including in relation to its financial ability to meet environmental obligations at issue in this case; as well as her conclusions regarding the involvement of Rennert and the upstream Renco/Doe Run entities in relation to DRP's operations, including in financial and environmental matters.

Ms. Midkiff's consideration of documented observations made by defendants' and DRP's employees and representatives, including their deposition testimony, does not render her opinions as mere parroting of their statements or as invading the province of the jury. Such consideration was a necessary component of Ms. Midkiff's review of an extensive record and was not the sole basis for her opinions. *Cf. Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (district court did not err in admitting expert testimony that was based, in part, on an individual's factual statements included in the record); *Hale Cnty. A & N. Transp., LLC v. City of Kansas City, Mo.*, 998 F. Supp. 2d 838, 845 (W.D. Mo. 2014) (expert may summarize evidence in reaching conclusion but cannot rely on comments of a witness as the sole basis for opinion); *CADCO, Inc. v. Fleetwood Enters., Inc.*, 220 S.W.3d 426, 434 (Mo. Ct. App. 2007) ("Usually, an expert witness' opinion testimony is based upon facts that the expert did not personally observe and of which the expert did not have personal knowledge."). In the

circumstances here, defendants' challenge to Ms. Midkiff's consideration of other witness statements is more appropriately the subject of cross-examination rather than exclusion. *See Hose*, 70 F.3d at 975. Ms. Midkiff may not testify, however, to the veracity of those statements nor to any fact witness' own purported but non-endorsed opinions.[19] *Hale Cnty. A & M. Transp.*, 998 F. Supp. 2d at 846; *State v. Rogers*, 529 S.W.3d 906, 911 (Mo. Ct. App. 2017).

Nor may Ms. Midkiff testify to legal conclusions, including that the evidence shows that the corporate veil was pierced. *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005) (expert is not permitted to offer an opinion on legal issues involved in a case); *see also HBC Ventures, LLC v. Holt MD Consulting, Inc.*, No. 5:06-CV-190-F, 2012 WL 4483625, at *9-10 (E.D.N.C. Sept. 27, 2012) (expert allowed to testify to corporate norms and governance and to offer opinions on whether relationship diverged from those norms, but he was "prohibited from opining on whether the corporate veil . . . should be pierced.").

      b.    Jonathan R. Macey

In this same vein, I will exclude the opinion testimony of defendants' corporate governance expert, Professor Jonathan R. Macey, to the extent he makes legal conclusions or gives legal credence to defendants' corporate conduct. This

---

[19] *E.g.*, Midkiff Report, ECF 1229-16 at hpp. 67-68 (quoting Peitz's deposition testimony regarding his "opinion as a Certified Public Accountant").

includes Professor Macey's various opinions that several aspects of the defendants' corporate conduct at issue in the case were "proper," "appropriate," "non-abusive," and the like.  As plaintiffs concede, Professor Macey may testify to corporate norms and governance and may offer opinions on whether defendants' corporate conduct was consistent with ordinary and customary business practices.  But he cannot testify to his judgment as to the propriety of defendants' conduct, as he would "necessarily be deeming [defendants'] version of the facts to be the credible account" and lead the jury to conclude that the defendants' conduct was lawful and did not rise to the level necessary to pierce the corporate veil, which is a cornerstone issue in the case.  *Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp.*, No. 1:15-CV-77 SNLJ, 2017 WL 3838627, at *2 (E.D. Mo. Sept. 1, 2017) (quoting *CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 587 (N.D. Ill. 2009)); *see also Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) (testimony that deputies carried out their lawful duties is a "pure legal conclusion," which is a shorthand way of saying defendants are not liable and could lead the jury to conclude that they "acted properly (i.e., lawfully).").

The danger of admitting expert testimony that blurs the line between explaining corporate practice and opining on the legality of a party's conduct is especially heightened here as Professor Macey is a well-recognized and

accomplished legal scholar and Yale law professor whose background and
expertise in corporate law will be presented to the jury.  Allowing testimony from a
legal expert that borders on legal conclusions "runs the risk of impermissibly
tilting the balance of powers between the parties and misleading the jury into
believing they are to look to the expert for legal guidance." *Allen v. American
Cyanamid*, No. 11-CV-0055, 2021 WL 1086245, at *6 (E.D. Wis. Mar. 22, 2021).

I will also exclude Professor Macey's testimony to the extent he opines on
the strength of the evidence and/or defendants' motivation(s) for their conduct.  It
is well established that weighing evidence and determining credibility are tasks
exclusive to the jury.  *Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th
Cir. 1998).  And while Professor Macey can testify generally to ordinary and
customary corporate practices and norms, why those practices and norms exist, and
whether an entity's actions were consistent therewith, he cannot testify or
hypothesize as to why defendants conducted (or did not conduct) their corporate
governance in certain ways.  *See Dunne v. Resource Converting,* LLC, No. 4:16
CV 1351 DDN, 2022 WL 2132449, at *6 (E.D. Mo. June 14, 2022) (citing *United
States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-CV-3003
(WMW/DTS), 2021 WL 101193, at *15 (D. Minn. Jan. 12, 2021) (expert
testimony that directly opines about a party's state of mind is inadmissible); *In re
ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 930 (D. Minn. 2020) (expert

can testify that an entity acted in accordance with regulations or established procedure, or provide other fact-based testimony as to what an entity actually did – "as opposed to what it was motivated by, thought, or intended," which crosses the line into inadmissible testimony)).  Witnesses with personal knowledge will have the opportunity to testify to those matters.  The jury can then decide what testimony to believe.

Finally, I will exclude the entirety of Professor Macey's opinion expressed in his report at Section VII.A ("Doe Run Peru Controlled its Own Day-to-Day Operations").  (Macey Rep., ECF 1254-1 at hpp. 38-40.)  That opinion is based solely on testimony and declarations of three Doe Run corporate officials who are fact witnesses and whose statements Professor Macey finds "compelling" and "detailed."  Professor Macey does not review any other evidence in rendering that opinion, nor does he engage in any independent analysis regarding DRP's day-to-day operations.  *See Hale Cnty. A & N. Transp.*, 998 F. Supp. 2d at 845-46 (expert may summarize evidence in reaching conclusion but cannot rely on comments of a witness as the sole basis for opinion; adoption of other witness's testimony as the primary basis for expert opinion crosses the line into improper bolstering).  Defendants' explanation that Professor Macey's experience alone provides the independent basis for the opinion appears to encourage approval of an *ipse dixit* opinion.  That, I will not do.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997) ("[N]othing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

I do not find, however, that Professor Macey's opinions plainly cross over into prohibited public policy pronouncements as plaintiffs contend. I will therefore deny plaintiffs' motion to exclude in that regard, but without prejudice to be raised at trial if plaintiffs believe his testimony there treads upon that line.

5.    *Conclusion*

Because there are genuine issues of material fact as to each element of piercing the corporate veil, I cannot say as a matter of law that defendants Rennert, Renco, DRR, D.R. Acquisition, and Cayman Holdings cannot be held liable for DRP's alleged negligent conduct in the management and operation of the La Oroya Complex. To the extent defendants seek summary judgment on this theory, their motions are denied.

B.    Agency

I will also largely deny defendants' motions for summary judgment to the extent they argue that plaintiffs cannot prevail on their principal-agent theories of liability.

"'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject

33

to his control, and consent by the other so to act.'"  *Blanks*, 450 S.W.3d at 382

(quoting Restatement (Second) of Agency § 1 (1958)); *see also State ex rel. Elson*

*v. Koehr,* 856 S.W.2d 57, 60 (Mo. banc 1993).   A principal is responsible for the

acts of an agent when the agent is acting with actual authority.  *Bach v. Winfield-*

*Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008); *Brovont v. KS-I*

*Med. Servs., P.A.*, 622 S.W.3d 671, 686 (Mo. Ct. App. 2020).   "Actual authority is

authority that the principal has given, either expressly or impliedly, to the agent,

empowering the agent to act on the principal's behalf."  *Bach*, 257 S.W.3d at 608.

A power of attorney creates a principal-agent relationship.  *See Randall v. Randall*,

497 S.W.3d 850, 855 (Mo. Ct. App. 2016); *Arambula v. Atwell*, 948 S.W.2d 173,

176 (Mo. Ct. App. 1997).

> There are three essential elements of an agency relationship:
>
> 1)  that an agent holds a power to alter legal relations between the principal and a third party;
> 2)  that an agent is a fiduciary with respect to matters within the scope of the agency; [and]
> 3)  that a principal has the right to control the conduct of the agent with respect to matters entrusted to the agent[.]

*Blanks*, 450 S.W.3d at 382-83.  "The absence of any one of these three

characteristics defeats the purported agency relationship."  *Id.* at 383.  "Whether an

agency relationship exists is generally a factual question for the jury."  *West v.*

*Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 11 (Mo. Ct. App. 2010).

A corporation can act only through its agents.  *State ex rel. Cedar Crest*

*Apartments, LLC v. Grate*, 577 S.W.3d 490, 495 (Mo. banc 2019). "'A corporation is liable . . . whenever a tortious act is committed by an agent within the scope of the agent's authority and in the course of the agent's employment.'" *Blanks*, 450 S.W.3d at 378-79 (quoting 10 Fletcher *Cyclopedia of the Law of Corporations* § 4877 (2006)). Under an agency theory, specific acts are attributed to the parent corporation as principal because of the parent's authorization of those acts. *Id.* at 379. "Only the precise conduct instigated by the parent is attributed to the parent." *Id.*

"'An agent who commits a tort may have more than one principal for at least some purposes,' and one of these is when the agent is an officer of interrelated entities." *Brovont*, 622 S.W.3d at 687 (quoting Restatement (Third) of Agency § 7.03 cmt. d (2006)). An organizational officer may be subject to tort liability when the officer directs another actor to engage in conduct that injures a third person. Restatement (Third) of Agency § 7.01 (2006). Individuals are responsible for the legal consequences of the torts they commit, whether committed independently or in acting as an agent of another. *Id.* Although an individual agent's conduct may subject the principal to liability, the agent himself is subject to individual liability for his torts. *Id.*

Notably, in their motions for summary judgment here, defendants' only argument on plaintiffs' agency theory is that plaintiffs cannot present any evidence

that DRP acted as an agent on any defendant's behalf, and particularly on behalf of Renco and Rennert.  (ECF 1233 at hp. 93; ECF 1242 at hpp. 40-41.)  Defendants do not address plaintiffs' theory as to any other alleged agent-actor, other than generally asserting in a cursory manner that plaintiffs' agency claims fail.  (*See* ECF 1301 at hpp. 47-48.)  Indeed, defendants appear to take the position that the amended complaint raises no other agency-based claims, asserting that Counts VIII through XII "attempt to *circumvent* . . . agency principles through amorphous theories of direct liability[.]"  (ECF 1233 at hp. 93, emphasis added.)[20]  But throughout the amended complaint, and indeed in each of the remaining Counts, plaintiffs plainly allege that Renco, DRR, and/or Rennert committed tortious conduct "by and through" their agents or that they "and their agents" committed such conduct.  And the amended complaint plainly identifies the individual defendants and others who acted as agents on behalf of the corporate defendants and related entities, as well as the bases on which those individuals achieved agent status, including holding powers of attorney to act on behalf of the relevant principal-entities in relation to the transactions at issue in the case.

Rule 56(c)(1), Federal Rules of Civil Procedure, provides that a party

---

[20] Citing my October 2018 Memorandum and Order that ruled their motion to dismiss, defendants aver that I construed plaintiffs' amended complaint to assert agency claims on only the theory that DRP was defendants' agent.  (*See* ECF 1301 at hp. 47, citing ECF 949.)  They are incorrect.  I limited the relevant discussion in that Memorandum and Order to the DRP-as-agent theory because that is the only basis on which defendants' motion to dismiss challenged plaintiffs' agency claims.  (*See* ECF 545 at hpp. 77-79.)

moving for summary judgment and asserting that a fact cannot be genuinely disputed "must support the assertion" by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Defendants did not do that here as to the non-DRP parties who plaintiffs allege are agents. Instead, in this regard, defendants assert "generally" with no evidence or substantive argument "that Plaintiffs' agency claims fail as a matter of law" (ECF 1301 at hp. 47); and defendants attempt to shift their summary judgment burden by arguing that "*Plaintiffs* do not explain how an agency theory would make sense with respect to any actor other than Doe Run Peru [and] do [not] attempt to establish the elements of agency for any other actor." (*Id.* at hpp. 47-48, emphasis added.) But on summary judgment, it is the moving party's initial burden to show that the record does not contain a genuine issue of material fact "and to identify that part of the record which bears out his assertion." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Pitts v. Cuba*, 913 F. Supp. 2d 688, 700 (E.D. Mo. 2012); Fed. R. Civ. P. 56(a), (c). I am not required to speculate as to which portion of the record defendants rely on to support their general assertion; nor am I obligated to wade through and search the entire record

37

for some specific facts supporting their argument.  *Enslein as Trustee for Xurex, Inc. v. Di Mase*, No. 16-09020-CV-W-ODS, 2019 WL 2505052, at *34 (W.D. Mo. June 17, 2019) (quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990)).  *See also Joe Hand Promotions, Inc. v. Shepard*, No. 4:12CV1728 SNLJ, 2015 WL 1976342, at *7 (E.D. Mo. Apr. 30, 2015) (defendant-movant's mere contention that there is insufficient evidence to establish plaintiff's claim "is woefully insufficient" to meet burden of showing entitlement to summary judgment).

In response to defendants' motions for summary judgment, plaintiffs have abandoned their corporate agency theory of liability as to DRP's actions as an agent of defendants, and they concede summary judgment on this claim.  (*See* ECF 1276 at hp. 13, n.1; hp. 149.)  Accordingly, I will grant summary judgment to defendants on plaintiffs' allegations that DRP was defendants' agent.  But because defendants have failed to present any evidence or argument demonstrating that they are entitled to judgment as a matter of law on plaintiffs' agency theory of liability as to the conduct of other agent-actors, I will deny their motions for summary judgment to the extent they cursorily assert that plaintiffs cannot prevail on those agency claims.  *See Kelter v. State Farm Mut. Auto. Ins. Co.*, No. 4:14CV1087 NCC, 2015 WL 417987, at *4 (E.D. Mo. Jan. 30, 2015) (denying motion for summary judgment for failure to comply with Rule 56).

C.    Direct Participation Liability

In Counts VIII, IX, and XII of the amended complaint, plaintiffs seek to hold each defendant liable for their direct participation in creating the harms that caused plaintiffs' alleged injuries.  In Counts X and XI, plaintiffs allege that the control that created those harms was formed by contractual obligations and other agreements between defendants, their agents and subsidiaries, and DRP.[21] Plaintiffs contend that by their control of and several agreements with and involving DRP, defendants assumed duties of care to the La Oroya community, including the plaintiffs here, and breached those duties through their specific conduct.

Direct participation liability is transaction specific and limited to situations where the defendant's undertaking is directly tied to the harmful conduct of the other to whom he rendered services.  This form of liability rests on the defendant's own conduct.  *A.O.A.*, 350 F. Supp. 3d at 845 (citing *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 234 (Ill. 2007); *Esmark, Inc. v. N.L.R.B.,* 887 F.2d 739, 757 (7th Cir. 1989)).

To the extent defendants generally argue in their motions for summary judgment that direct participation liability does not apply because undisputed facts

---

[21] Plaintiffs admit that the claims raised in Counts VIII-XII overlap.  (ECF 1276 at hp. 129, n.641.)

show that DRP was fully autonomous in operating the Complex and that no upstream entity or individual exercised any control over DRP's environmental operations, including financing to fund them, I reject that argument for the reasons set out above at Section VI.A.

I likewise reject defendants' general argument that Missouri law does not support a claim of direct participation liability for breach of assumed duties to third parties relating to foreseeable harms.  As I observed in my Memorandum and Order entered October 16, 2018, on defendants' motion to dismiss, Missouri recognizes that Section 324A of the Restatement (Second) of Torts provides the analytical framework for whether a defendant has assumed a duty toward a third person, *A.O.A.*, 350 F. Supp. 3d at 843-44; and Missouri courts have recognized and applied Section 324A to such claims.  *See*, *e.g.*, *Doe by & through Doe v. Ozark Christian Coll.*, 579 S.W.3d 220, 223-24 (Mo. Ct. App. 2019); *Berliner v. Milwaukee Elec. Tool Corp.*, 501 S.W.3d 59, 67 (Mo. Ct. App. 2016); *Plank v. Union Elec. Co.*, 899 S.W.2d 129 (Mo. Ct. App. 1995); *Brown v. Michigan Millers Mut. Ins. Co., Inc.*, 665 S.W.2d 630 (Mo. Ct. App. 1984).  Defendants' assertion that the law is nevertheless "undeveloped" does not preclude consideration of plaintiffs' viable claims arising thereunder.  *See Plank*, 899 S.W.3d at 131 (addressing claim under Section 324A(b) as one of first impression).

Turning to the substance of plaintiffs' direct liability claims, Section 324A

provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). When a defendant undertakes an activity that the defendant knows can affect the safety of third persons, the defendant has a duty of care to those third persons "to act in such a way that they will not be injured." *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18, 21-22 (Mo. 1953). "[W]hatever it was defendant undertook to do which it knew or should have known or foreseen would affect plaintiff's safety, the defendant had the duty to do it carefully." *Id.* at 22. Contracts setting out what a defendant undertook to do are "of interest" in the analysis. *Id.* at 21.

Here, the evidence set forth above at Section VI.A., below at Section VI.F.2., and in my Memorandum and Order entered January 20, 2023 (ECF 1322 at pp. 55-60), shows that there are genuine issues of material fact regarding the extent to which defendants undertook to render services to DRP, knew of or should

have known that their performance of such services was necessary to the protection of the La Oroya community from harmful emissions from the Complex, and failed to exercise reasonable care, which resulted in harm to the plaintiffs.

As to defendants DRR, Cayman Holdings, Renco, DR Acquisition, Rennert, and Kaiser, the question of direct liability must be presented to a jury given evidence of their alleged personal conduct in *inter alia* setting up and implementing the financing structure of DRP at its inception and throughout its operation, including but not limited to agreements to funnel money from DRP up the Renco/Doe Run chain of companies either directly or as conduits; establishing and implementing a business plan for the Complex that maximized product output without adequate safety protocols in place, which they knew or should have known was likely to increase toxic emissions from the Complex and cause harm to the La Oroya community; and overseeing the financing and environmental plans to prioritize projects (both PAMA and non-PAMA) that did not significantly reduce fugitive air emissions, which they knew posed the greatest risk to community health.  Whether defendants engaged in such conduct and, if so, breached the duty of care set out in Restatement Section 324A(a) (which requires a showing of increased risk of harm), or (b) (which requires a showing of defendants' intent to supplant DRP's relevant duty and become the primary provider of that duty owed

42

to a third party),[22] are questions for a jury to resolve.  *Brown*, 665 S.W.2d at 636.

The analysis involving defendant Neil is different but has the same outcome – that is, that genuine issues of material fact exist as to whether he undertook a duty he recognized or should have recognized as necessary for the protection of a third person and his failure to exercise reasonable care increased the risk of such harm, and/or he undertook to perform a duty owed by DRP to a third party and breached that duty.

In a February 2024 letter to Peru's Ministry of Energy & Mines (MEM) addressing PAMA and DRP's related obligations, Neil (in his capacity as President and General Manager of DRP) reported that execution of PAMA had not reached the "gravest environmental problems" of the Complex, which he acknowledged were fugitive lead emissions from the Complex into the La Oroya Community, 100% of which "affect the air quality[.]"  (*See generally* ECF 871-49, Neil Let. & Rep. to MEM, and particularly at hpp. 1, 6.)  He knew that reducing fugitive emissions had to be the "new priority" and had to be "dealt with now."  (Neil Depo., ECF 1277-60, at hpp. 14, 16; depo. pp. 155, 161-62.)  He reported to MEM that DRP was evaluating various alternative solutions to the problem, which "do not exclude the possibility of permanently paralyz[ing] our operations in La Oroya and proceed[ing] to the closing of the installation with the purpose of eliminating

---

[22] *See Plank*, 899 S.W.2d at 131-32.

the emissions into the environment." (ECF 871-49 at hp. 1.) Given social considerations in the La Oroya community, however – including La Oroya's economic dependence on the Complex and DRP's contributions to work education, educational infrastructure, cattle improvement, etc. – Neil proposed that the Complex continue operating but with a plan to implement environmental projects. (*See generally* ECF 871-49.)

From the evidence before the Court, however, it does not appear that DRP implemented fugitive emissions projects under Neil's stewardship (*see* Neil Witness Stmt., ECF 871-68), and air lead concentrations actually worsened in La Oroya (*see* Huyhua Aug. 2005 Email to Neil, ECF 1279-49 at hp. 3). To the extent defendants attempt to lay responsibility at the feet of MEM for its failure to timely modify the PAMA to include Neil's proposed projects, the record includes evidence that DRP was not restricted to implementing only PAMA-identified projects and that, indeed, DRP had implemented non-PAMA projects throughout its operations.

In short, there are disputed facts as to whether Neil's conduct constituted a failure to exercise reasonable care that increased the risk of harm to plaintiffs and/or a breach of duty owed to plaintiffs by DRP that he undertook, with such conduct including his proposal to MEM that the Complex continue its operations in favor of social considerations despite knowing the adverse health effects of the

44

Complex's toxic emissions, and the Complex's continued failure under Neil's watch to implement emissions-reducing projects.

On the information before the Court, there are disputed facts regarding each defendant's personal involvement in the Complex's claimed harm to the La Oroya community and the extent to which each defendant's individual conduct caused or exacerbated that harm. Defendants are therefore denied summary judgment on plaintiffs' claims asserting direct participation liability.

D.    <u>Standard of Care</u>

As set out above, to establish a claim for negligence, a plaintiff must prove *inter alia* that the defendant had a duty to protect the plaintiff from injury. "A duty is a requirement to conform to a standard of conduct for the protection of others against unreasonable risks." *Scott v. Dyno Nobel, Inc.*, 108 F.4th 615, 625 (8th Cir. 2024) (quoting *Pierce v. Platte-Clay Elec. Coop., Inc.*, 769 S.W.2d 769, 771 (Mo. banc 1989)). A company owes a duty to the population of a given area to guard against the careless release of toxic pollutants and other residues of their production process. *Elam*, 765 S.W.2d at 175. Accordingly, the appropriate standard of care to apply in this case is what an ordinarily careful and prudent smelter owner and operator would have done in the circumstances. *Cf. Scott*, 108 F.4th at 627.

Defendants move to exclude the entirety of the opinion evidence offered by

plaintiffs' only standard-of-care expert, Dr. Jack V. Matson, and argue that they are entitled to summary judgment on all claims because, with the exclusion of that evidence, plaintiffs lack the required expert testimony on the appropriate standard of care.  Alternatively, defendants seek to limit Dr. Matson's testimony to only his opinions relating to DRP's delay in completing four specific fugitive emissions control projects, and they argue that they are entitled to summary judgment on plaintiffs' claims to the extent they relate to conduct not involving those four projects.  In response, plaintiffs disagree that a lack of expert testimony itself on the standard of care defeats their claims of negligence in the circumstances of this case.  Nevertheless, they argue that even if expert testimony is required, Dr. Matson's opinions are admissible and not so limited as defendants posit.  Plaintiffs also move to limit the expert testimony of defendants' standard-of-care expert. Dr. Corby G. Anderson.

As defendants' summary judgment standard-of-care argument rests solely upon the necessity of and treatment given to Dr. Matson's expert testimony, that is where I first turn.

1.    *Jack V. Matson*

As an initial matter, I agree with defendants that the relevant facts at issue in this case are so technical or complex that expert testimony on the standard of care is necessary to assist the factfinder in resolving the issues.   *Cf. Wodohodsky v.*

*Hall*, 573 S.W.3d 645, 650 (Mo. Ct. App. 2019) (citing *Penzel Constr. Co., Inc. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 228-29 (Mo. Ct. App. 2017)).  But I do not agree that Dr. Matson's testimony is wholly inadmissible or that his opinions should be limited to four specific fugitive emissions projects.  His opinions regarding non-lead emissions and DRP's purported duty to collect reliable pre-2000 air monitoring data were not timely disclosed, however, so I will exclude them under Federal Rule of Civil Procedure 26(a)(2)(D); but I do not consider his other challenged opinions untimely as defendants contend.  I will also exclude Dr. Matson's supplemental opinion on Corporate Social Responsibility (CSR), as he is not qualified to render that opinion.  However, to the extent Dr. Matson's stated findings that support his CSR opinion also relate to his standard-of-care opinion regarding fugitive emissions (*e.g.*, defendants' knowledge of the benefits of and need for fugitive emissions controls, the lack of constraints on early development and implementation of such controls, the relative ineffectiveness of defendants' early community programs in decreasing air lead levels, etc.), those findings are not excluded.

Dr. Matson is a licensed professional engineer with a B.S. and M.S. in Chemical Engineering and a Ph.D. in Environmental Engineering.  He is the Emeritus Professor of Environmental Engineering at Pennsylvania State University.  His experience includes working as a process chemical engineer at an

oil refinery, as an environmental/process engineer at a chemical plant, and as an

environmental engineering consultant to the chemical industry.  He has served on

regulatory committees involving toxic air emissions and as an expert in cases

involving chemical releases to the environment from industrial facilities.  Plaintiffs

secured Dr. Matson as a substitute standard-of-care expert upon the unexpected

death of their initial expert, Dr. Nicholas P. Cheremisinoff, in August 2020.  Dr.

Matson rendered his initial expert report in this case in December 2020 and issued

two supplemental reports in May 2021 in response to defendants' relevant experts.

Dr. Cheremisinoff rendered opinions and was deposed on whether the

defendants' air pollution management practices at the Complex were reasonable

and consistent with industry and authoritative practices, and whether defendants

implemented such practices in a timely manner to protect plaintiffs from harm.

Upon review of Dr. Cheremisinoff's reports, opinions, and depositions; the

materials Dr. Cheremisinoff cited for his reports; and Peruvian and international

standards on air emissions (*see* Matson Jan. 2021 Depo., ECF 1277-31 at hp. 10,

depo. pp. 89-91), Dr. Matson largely agreed with Dr. Cheremisinoff's opinions and

opined that

> Defendants did not exercise reasonable care to protect Plaintiffs from
> harm by failing to apply practices and implement controls recognized
> by industry and authoritative sources to reduce air emissions, in
> particular lead, originating from the La Oroya Metallurgical Complex
> in a timely manner.

(Matson Rep., ECF 1225-1 at hp. 4.)  The core of Dr. Matson's opinion is that when DRP began operating the Complex, defendants should have prioritized developing and implementing controls to reduce fugitive lead air emissions given that such controls would have significantly reduced ambient air lead levels in the La Oroya community.  Dr. Matson opined that the relevant standard of care regarding public health required that defendants give a higher priority to those projects than what the PAMA timeline provided and, further, that defendants were not constrained by that timeline as demonstrated by their implementation of other projects that were outside PAMA's stated requirements.

Upon review of the record, including Dr. Matson's and Dr. Cheremisinoff's reports, depositions, and supporting materials, I cannot say that Dr. Matson adopted wholesale and merely parroted Dr. Cheremisinoff's opinions as defendants assert.  I am satisfied that Dr. Matson based his lead-emissions opinions on his independent review of the relevant material and independent application of principles within his area of expertise.  Indeed, Dr. Matson identified areas where he disagreed with Dr. Cheremisinoff – either in opinion or supporting data – and adapted his own opinions accordingly.  Merely because Dr. Matson could not cite by chapter and verse each of Dr. Cheremisinoff's statements that he disagreed with does not render his own articulated opinions as wholesale parroting.

Nor do I consider as undisclosed opinions Dr. Matson's deposition

testimony that clarified and explained his reported opinions, especially given

defendants' demonstrated opportunity to test Dr. Matson's reported opinions

during discovery.  *Cf. Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 971

F. Supp. 2d 896, 903 (E.D. Mo. 2013).  But to the extent Dr. Matson testified at his

rebuttal deposition to opinions that were not in his report, or testified to his intent

to render later opinions on such matters – including arsenic and sulfur dioxide

emissions – those opinions must be excluded as Dr. Matson did not properly or

timely disclose them as his own.  Dr. Matson's belated wholesale adoption of Dr.

Cheremisinoff's opinions relating to arsenic and sulfur dioxide – as first

acknowledged at his rebuttal deposition in July 2021 (ECF 1225-4 at hpp. 54-55,

depo. pp. 319-20) – without rendering his own opinion thereon and without

explaining his own analysis, is not a clarification or supplementation of his own

existing opinion.  Indeed, Dr. Matson testified at his initial deposition in January

2021 that he did not focus on arsenic and did not discuss with plaintiffs' attorneys

whether he would offer any arsenic-related opinions.  (*See* ECF 1225-2 at hp. 13,

depo. p. 47; hpp. 58-59, depo. pp. 244-45.)  *Cf. Williams v. TESCO Servs., Inc.*,

719 F.3d 968, 976 (8th Cir. 2013) (district court did not err in striking expert's

second report because it materially altered rather than merely clarified the expert's

original report and deposition testimony); *Emerson Elec. Co. v. Suzhou Cleva Elec.

Appliance Co.*, No. 4:13 CV 1043 SPM, 2015 WL 2176964, at *3 (E.D. Mo. May

8, 2015) (information in expert's untimely declaration may be considered if the challenged statements do not contradict prior deposition testimony or those statements provide more detailed information that is "entirely consistent with and do[es] not significantly expand on any of the opinions or reasons in the" expert's report). I will therefore exclude Dr. Matson's rebuttal opinions regarding arsenic and sulfur dioxide emissions as those opinions fall outside the substance of his opinions rendered in his December 2020 report.

I disagree with defendants' assertion that the remainder of Dr. Matson's rebuttal reports and testimony must be excluded as non-disclosed opinions, as my review shows them to mostly comprise proper responses to the reports and opinions of defendants' expert witnesses – including proper responses to those experts' reliance on what they themselves admitted was unreliable pre-2000 air monitoring data from the Sindicato station. (*See* Matson Suppl. Rep., ECF 1225-5 at hpp. 2-5.) *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006); *Drake v. Old Dominion Freight Line, Inc.*, No. 1:22-CV-21-ACL, 2024 WL 4903720, at *14 (E.D. Mo. Nov. 27, 2024). To the extent defendants argue that Dr. Matson improperly conducted a belated analysis of that data to reach a conclusion that was inconsistent with his earlier opinion (as well as with Dr. Cheremisinoff's opinion that he adopted), I note that Dr. Matson conceded that he cannot use an opinion that is based on unreliable data. (Matson July 2021 Depo.,

ECF 1277-33 at hpp. 2-3, depo. pp. 22-25.)  Dr. Matson's use of that data to

respond to defendants' experts can be explored on cross-examination at trial.

*Drake*, 2024 WL 4903720, at *14.  Finally, while I agree that Dr. Matson cannot

testify to his opinion first articulated at his July 2021 rebuttal deposition that DRP

"had an *obligation* to collect reliable air monitoring data before the year 2000" (*see*

ECF 1225-4 at hpp. 56-57, depo. pp. 324-25) (emphasis added), I will permit him

to testify to statements made in his December 2020 report regarding the recognized

importance of air monitoring and emissions inventories in determining air-quality

impacts of emissions reduction efforts (*e.g.*, Matson Rep., ECF 1225-1 at hpp. 11,

14, 16), and their relation to defendants' duty to protect plaintiffs from harm by

implementing practices and controls to reduce air lead emissions in a timely

manner.

I will not limit Dr. Matson's standard-of-care opinion to only the four

specific fugitive emissions projects that defendants contend are the only remaining

projects at issue in the case.  In his reports and as expounded during his

depositions, Dr. Matson identified those four projects as examples of what

defendants could and should have done sooner if they had prioritized fugitive

emissions controls upon their purchase of the Complex instead of waiting several

years to develop and implement them.  (*See*, *e.g.*, Matson Rep., ECF 1225-1 at hp.

12; Matson Jan. 2021 Depo., ECF 1225-2 at hpp. 53-57, depo. pp. 194-95, 200,

243; Matson Suppl. Rep., ECF 1225-5 at hpp. 6-8; Matson Suppl. Rep., ECF 1225-6 at hp. 6.)  Dr. Matson's focus on those four projects in his rebuttal reports and deposition was a reasonable response to that same focus by defendants' experts and did not limit his overarching opinion regarding defendants' failure to prioritize fugitive emissions controls from the outset.

I disagree that Dr. Matson failed to use a reliable methodology to render his standard-of-care opinion in the case.  In his reports and deposition testimony, Dr. Matson thoroughly addressed the information and analysis he used to support his opinion, including material Dr. Cheremisinoff addressed in his report, Peruvian and international standards on environmental matters and toxic emissions, defendants' efforts to address environmental matters in the La Oroya community, defendants' historical performance regarding environmental matters in a smelter community, several studies addressing the effectiveness of methods for reducing toxic ambient air, and on-site results of ambient air monitoring.  A challenge that an expert did not rely on "the right" information in reaching his opinion may be a valid point on which to cross-examine the expert at trial but not to exclude his testimony *in toto*.  *In re Celexa & Lexapro Prods. Liab. Litig.*, 927 F. Supp. 2d 758, 764 (E.D. Mo. 2013).  *See also Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 632 (8th Cir. 2012) (the studies on which the expert relied, although not perfect, were sufficient to support his opinion).  Any limitations of the information on which Dr.

Matson relied in reaching his opinion may be presented to the jury and tested "through the traditional means of cross examination and presentation of contrary evidence." *Id.* Moreover, to the extent defendants proffer their own experts who render different or conflicting opinions, competing expert testimony is best tested at trial through the adversary process. *See Blue Buffalo Co., Ltd. v. Wilbur-Ellis Co. LLC*, No. 4:14 CV 859 RWS, 2024 WL 111712, at *4 (E.D. Mo. Jan. 10, 2024).

Finally, I will exclude Dr. Matson's separate and supplemental opinion that defendants did not meet their "Corporate Social Responsibility" to protect plaintiffs from harm given defendants' failure to prioritize reducing fugitive lead emissions in a timely manner. (Matson Rep., ECF 1225-1 at hp. 4.) The record before me fails to show that Dr. Matson's educational and professional history, experience, or credentials render him qualified to opine on the business concept of "Corporate Social Responsibility."[23] As stated above, however, because the statements supporting that opinion relate to and support his standard-of-care opinion, I will not exclude those supportive statements or findings; but they cannot

---

[23] I am aware of no legal authority, and neither side cites to any, that requires or approves expert testimony on "Corporate Social Responsibility" and associated legal duties, if indeed there are any such duties. Regardless, to the extent the concept of corporate social responsibility may be relevant to this case, I am not convinced that expert testimony is necessary or would be helpful to the jury. As no motion seeks to exclude CSR expert testimony on this basis, I need not rule that question now; but I may address it in the future if the issue arises.

be used to articulate a separate opinion that defendants failed to meet their Corporate Social Responsibility to plaintiffs.

2.    *Corby G. Anderson*

Dr. Anderson is a licensed professional engineer with a B.S. in Chemical Engineering, an M.S. in Metallurgical Engineering, and a Ph.D. in Mining Engineering-Metallurgy.  He is a full research and tenured professor at the Colorado School of Mines and has global experience in *inter alia* chemical and metallurgical engineering, industrial plant operations, engineering design, and environmental affairs for mineral processing and metallurgical plants.  He has served as a director, executive, and advisor for several publicly traded mining companies in the United States and internationally.  Defendants retained Dr. Anderson to respond to Drs. Cheremisinoff's and Matson's standard-of-care opinions and to render his own related opinions.

In seeking to limit Dr. Anderson's testimony, plaintiffs do not challenge what Dr. Anderson describes as his four principal opinions.  (*See* Anderson Rep., ECF 1246-1 at hp. 3.)  Nor do they challenge his critiques of Drs. Cheremisinoff's and Matson's qualifications and opinions.  Instead, plaintiffs limit their challenge to Dr. Anderson's opining on two other matters:  1) that DRP's actions reduced

toxic fugitive air emissions[24] from the Complex and improved air quality; and 2) that obstacles outside defendants' control could have and actually delayed the completion of certain environmental projects at the Complex.  I will grant the motion.

Upon careful review of plaintiffs' arguments, the evidence submitted, and the parties' respective positions, I conclude that Dr. Anderson may testify to his opinion that the various projects defendants implemented *can* have the effect of reducing harmful air emissions and *can* improve air quality, but I agree with plaintiffs that he cannot testify to his opinion that defendants' projects *actually* reduced fugitive emissions or *actually* improved air quality.  Other than a chart in Dr. Cheremisinoff's report depicting measured lead emissions from the Complex's main and secondary stacks from January 1998 through November 2001 (*see* Anderson Rep., ECF 1246-1 at hpp. 47-48),[25] Dr. Anderson points to no studies, documents, or measured data to support his opinions that defendants' projects actually reduced fugitive emissions or improved air quality in general.  Dr. Anderson's reliance on only his expertise in the field to show the "obviousness" or

---

[24] Plaintiffs clarify in their reply brief that they seek to exclude Dr. Anderson's testimony regarding the reduction of *fugitive* air emissions rather than a reduction in toxic air emissions in general.  *See generally* Pltfs' Reply in Supp. of Mot. to Exclude, ECF 1288.

[25] This chart is consistently referred to as "Figure 16."

"intuitiveness" of those opinions[26] amounts to nothing more than an *ipse dixit*
opinion, which is not admissible as expert opinion evidence.  In short, Dr.
Anderson may testify that the projects implemented by defendants could be
expected to reduce fugitive air emissions from the Complex and improve air
quality, but he cannot testify that they actually did.

I also agree that Dr. Anderson cannot testify to his opinion that external
factors actually affected the timing of defendants' ability to implement various
pollution control projects at the Complex.  A review of Dr. Anderson's report and
deposition testimony shows that that opinion is based on speculation at best, as he
points to no reports, documents, or other factual evidence to support his
conclusion.  *See Masters v. City of Independence, Mo.*, 998 F.3d 827, 838 (8th Cir.
2021) (expert opinion cannot be speculative or unsupported by sufficient facts).
Nor may Dr. Anderson testify to an open-ended list of possible external factors that
could have affected the implementation of such projects, as that opinion is likewise
based on nothing more than speculation and may invite the jury to consider matters
irrelevant to the case.  But if fact-witness testimony or other factual evidence

---

[26] *E.g.*, Anderson May 2020 Depo., ECF 1246-3 at hpp. 34-38, depo. pp. 133, 140, 141, 152
(opinion that emissions reductions were actually achieved "intuitively" and "inherently" follows
from improvements to efficiency in smelter operations); hp. 61, depo. p. 242 ("You know, fixing
up baghouses and ductwork or changing the operation of your lead smelting process to become
more efficient obviously lessened the impacts.  Right?"); hp. 62, depo. pp. 245-46 ("it kind of
goes without saying" that "de facto, you're going to have less fugitive emissions and less
impacts" with certain projects).  *See also*, *e.g.*, Anderson Apr. 2021 Depo., ECF 1246-4 at hpp.
18, 22-23; depo. pp. 69, 87-90.

adduced at trial shows that the external factors that Dr. Anderson considered in his report in fact existed – such as global economic conditions, third-party vendor delays, geographical location of the Complex, etc. – then Dr. Anderson can testify that those identified external factors *could* affect the implementation of various pollution control projects at smelter sites such as the site at issue here.  But he cannot testify to his opinion that such external factors *actually* affected the timing of defendants' implementation of projects at the La Oroya Complex.

Plaintiffs limit their motion to exclude Dr. Anderson's opinions to only those addressed above that will be excluded.  I will therefore grant plaintiffs' motion in its entirety.  This ruling does not affect any other opinion rendered by Dr. Anderson that plaintiffs do not challenge in their motion.

3.    *Conclusion*

As set out above, defendants base their summary judgment standard-of-care argument on only the admissibility of Dr. Matson's expert testimony.  Because I will not exclude Dr. Matson's standard-of-care expert opinion in its entirety, nor limit it to only four fugitive emissions controls projects, I will deny defendants' motions for summary judgment to the extent they argue that plaintiffs cannot satisfy the standard-of-care element of their negligence claims.  Moreover, because there are genuine issues of material fact on whether defendants' alleged conduct met or breached the relevant standard of care in the circumstances of this case,

granting summary judgment on the standard-of-care question is not appropriate.

E.    Causation

To establish a claim of negligence under Missouri law, a plaintiff must prove that their injury was proximately caused by a defendant's breach of its duty to protect them.  *Scott*, 108 F.4th at 625.  "A submissible case is made if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence.  Absent compelling evidence which establishes the absence of causation, the causation question is for the jury."  *Id*. at 627 (quoting *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 996 (8th Cir. 2010)).  "If the logical conclusion from the evidence is that if certain things had been done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient."  *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 599 (Mo. Ct. App. 2013), *cited approvingly in Scott*, 108 F.4th at 627.

Defendants assert several bases on which they argue that plaintiffs cannot establish the requisite causation in this case:  1) that plaintiffs offer no proof that sulfur dioxide, arsenic, or cadmium caused any of their claimed injuries; 2) that the evidence fails to show that lead emitted by the Complex during DRP's operations caused any of plaintiffs' claimed injuries; 3) and that the evidence fails to show that plaintiffs would not have sustained their claimed injuries but for their exposure

to lead emitted from the Complex during DRP's operations.  I address each of defendants' contentions in turn.

1.    *Arsenic, Sulfur Dioxide, and Cadmium Emissions*

None of plaintiffs' specific-causation experts opined that exposure to arsenic, sulfur dioxide, or cadmium caused any Discovery Cohort (DC) plaintiff to suffer any of their claimed injuries.  (*See generally* July 2025 Memo. & Ord., ECF 1506.)  Plaintiffs appear to concede that point.  (*See* Pltfs' Consol. Memo. of Law in Oppos., ECF 1276 at hp. 165 – "Plaintiffs do not introduce evidence of their exposure to other harmful substances to argue that such exposure caused a diagnosable injury or is more likely than not to cause a future injury.")  But plaintiffs contend that increased risk of future injury caused by exposure to non-lead toxins is itself a compensable present injury, and that a diagnosable condition is not required for "foreseeable pain, suffering, and discomfort" caused by exposure to such toxins.  (*See id.* at hpp. 165-68.)  Plaintiffs' arguments fail.

As I explained in my July 11, 2025, Memorandum and Order, plaintiffs' "risk of future injury" argument is misplaced in the circumstances of this case. (ECF 1506 at pp. 41-42.)  To be compensable, risk of future injury must be created by a present injury, and mere *exposure* to a toxic substance is not a "present injury" that creates a risk of future injury.  *See id.* (citing *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 132 (Mo. banc 2007)).  To the extent Dr. Jill Ryer-

Powder, one of plaintiffs' general-causation experts, opined that the measured levels of sulfur dioxide in La Oroya are associated with adverse health effects consistent with respiratory symptoms exhibited by some DC plaintiffs (*see* ECF 1506 at p. 44), which may in turn constitute a present injury (*id.*), there nevertheless is no specific medical-causation evidence that sulfur dioxide more likely than not caused any DC plaintiff's claimed injury. *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1210 (8th Cir. 2000) (respiratory injuries are sophisticated and require expert testimony to prove specific causation); *see also Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) (plaintiff must put forth evidence that product was capable of causing her injuries, "and that it did."). Nor is there any specific-causation opinion that plaintiffs' claimed injuries were caused by arsenic or cadmium. Without such specific-causation evidence, plaintiffs cannot prove that those toxins caused their injuries. *Bonner*, 259 F.3d at 928. For these same reasons, I reject plaintiffs' argument that they may recover for pain and suffering caused by exposure to non-lead toxins.

Plaintiffs also contend that their exposure to non-lead toxins supports their claim for punitive damages given that defendants knew that emitting harmful substances in addition to lead "created a high risk of causing the injuries Plaintiffs experienced[.]" (ECF 1276 at hp. 169.) But again, there is no evidence sufficient to show that "the injuries Plaintiffs experienced" were caused by their exposure to

non-lead substances emitted from the Complex.

I will therefore grant defendants summary judgment to the extent plaintiffs seek recovery for injuries based on their claimed exposure to sulfur dioxide, arsenic, or cadmium.

2.    *Lead Emissions*

As an initial matter, defendants' general argument that plaintiffs lack the required admissible expert testimony on medical causation for their claims that lead exposure caused their injuries is foreclosed by my Memorandum and Order entered July 11, 2025.  (ECF 1506.)  That general argument for summary judgment is therefore denied.

I will grant defendants summary judgment, however, to the extent they argue that there is insufficient evidence of causation as to the five DC plaintiffs without measured blood lead levels (BLLs).  As I explained in the July 2025 Memorandum and Order, asking a jury to assign a predictive BLL to each of those plaintiffs for purposes of determining whether and to what extent their exposure to lead caused their claimed injuries – without those plaintiffs having any measured BLLs as a guide – invites conclusions based on only speculation, especially in the complex circumstances of this case.  (*See* ECF 1506 at pp. 20-21.)  I therefore excluded the expert testimony of Dr. David L. MacIntosh to the extent he assigned predictive BLL values to those five plaintiffs.  (*Id.*)  Without *any* evidence of individual

BLLs for those plaintiffs – either measured or predicted – the risk of a verdict based on nothing more than speculation is that much greater. *See Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (to withstand summary judgment, plaintiffs must present probative evidence sufficient to support the material facts such that a reasonable jury could return a favorable verdict based on more than mere speculation or conjecture). Moreover, affording all reasonable inferences in favor of plaintiffs as I must, I cannot conclude that community data – although admissible – is *alone* sufficient to support a finding that those five individual plaintiffs were themselves exposed to lead *at such levels* to cause their claimed impairments. *Cf. Thomas v. FAG Bearings Corp. Inc.*, 846 F. Supp. 1400, 1409 (W.D. Mo. 1994); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011) ("Averages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average."). "Allowing proof of group harm as a substitute for individual harm would not serve any notion of justice. . . . [Proof] of actual individual injury is necessary." *Thomas*, 846 F. Supp. at 1409.

I will deny defendants summary judgment to the extent they assert that plaintiffs cannot demonstrate that their injuries were caused particularly by lead emissions from the Complex during DRP's operations rather than from other sources, including lead emitted from the Complex before DRP took ownership in

October 1997.  First, unlike the circumstances in *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. banc 1984); *Hagen v. Celotex Corp.*, 816 S.W.2d 667 (Mo. banc 1991); and *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110 (Mo. banc 2007), upon which defendants rely, the plaintiffs here have submitted more than sufficient evidence identifying DRP as the entity that emitted toxic levels of lead during the relevant period and that plaintiffs were exposed to those particular emissions.  *Contra Zafft*, 676 S.W.2d at 243 (plaintiffs unable to identify which defendant produced product ingested by their mothers); *Hagen*, 816 S.W.2d at 672 (case remanded to trial court so that plaintiffs could present evidence of causative effect of specific product of identified defendant); *Benjamin Moore*, 226 S.W.3d at 113 (plaintiff could not identify any defendant as a manufacturer of the lead paint that was present at properties at issue).  "[W]here a plaintiff claims injury from a product, actual causation can be established only by identifying the defendant who made or sold that product." *Benjamin Moore*, 226 S.W.3d at 115.  Plaintiffs here have presented sufficient evidence, including admissible expert testimony (*see* ECF 1506), identifying DRP as the entity that emitted harmful levels of lead during the relevant period to such a degree that those emissions were a substantial factor in causing or contributing to cause plaintiffs' claimed injuries.  Defendants' assertion that plaintiffs were also exposed to lead from other sources does nothing more than underscore the genuine issues of material fact as to whether and to what

extent the defendants here are responsible for the injuries claimed.  On the record

before the Court, I cannot say that there is compelling evidence establishing that

the defendants' alleged conduct had no connection to plaintiffs' claimed injuries.

The question, therefore, is one for a jury.  *Scott*, 108 F.4th at 627.  I will deny

defendants summary judgment on their claimed theory that plaintiffs cannot

identify DRP as the source of the lead that caused their injuries.

Finally, defendants argue that plaintiffs cannot establish that they would not

have sustained their claimed injuries but for their exposure to lead emitted from the

Complex during DRP's operations.  Defendants focus their argument on the

undisputed evidence that plaintiffs were exposed to lead in the La Oroya

environment from background sources other than the Complex, and from lead that

remained in the environment from Complex operations that took place before DRP

bought and began operating the Complex in October 1997.  Defendants contend

that because there is no dispute that plaintiffs were exposed to such background

lead – and that that exposure would have continued even if DRP had shuttered the

Complex upon acquiring it in October 1997 – plaintiffs would have sustained their

same lead-based injuries had they not been exposed to DRP's lead emissions,

especially given plaintiffs' experts' opinions that no level of lead is considered

safe.  I disagree that there are no genuine disputes of material fact on this issue.

There is sufficient evidence before the Court, including admissible expert

testimony as summarized in my July 2025 Memorandum and Order, creating a genuine dispute as to whether during its operations, DRP emitted lead at levels that so greatly exceeded any background level of lead such that the plaintiffs in this case – who were exposed to DRP's lead as children – experienced lead-induced injuries of a nature, severity, and duration that would not have existed had they not been exposed to DRP's emissions.  On the evidence presented, a jury can conclude that DRP contributed significantly to the general lead contamination of the La Oroya community over the course of its operations.  Whether the level of background lead that would have been present in La Oroya during the relevant period without any contribution from DRP would have caused plaintiffs to suffer the same nature and severity of injuries is a disputed question of fact that is best left for a jury.

> . . . [A]lthough our law requires proof of cause to recover in tort, it does not require proof of a single cause.  The substantial factor standard—which ascribes liability to a cause which has played an important part in the production of the harm, even though the harm may have occurred absent that cause—is particularly suited to injury from chronic exposure to toxic chemicals where the sequent manifestation of biological disease may be the result of a confluence of causes.

*Elam*, 765 S.W.2d at 174.

To the extent defendants seek summary judgment on their "but for" argument, their motions are denied.

66

F.      Damages

Defendants assert that they are entitled to summary judgment on plaintiffs'

claims for economic and punitive damages, arguing, first, that plaintiffs have failed

to produce sufficient proof 1) that exposure to lead caused damage to their future

educational and/or career opportunities, or 2) that they will incur future medical

expenses because of their lead exposure; and, second, that the undisputed evidence

shows that plaintiffs cannot prove by clear and convincing evidence that they are

entitled to punitive damages.  Plaintiffs concede that they do not seek economic

damages for future medical expenses, so I will grant defendants summary

judgment in that regard.  In all other relevant respects, I will deny defendants

summary judgment on plaintiffs' claims for economic and punitive damages.

1.      *Economic Damages*

Defendants' first argument that the record lacks proof that lead exposure

damaged plaintiffs' educational or career prospects is foreclosed by my

Memorandum and Order entered July 11, 2025, wherein I concluded that the

opinion testimony of plaintiffs' experts Drs. Karen Hopkins, Clemente Vega, and

Howard Hu was admissible regarding the permanency of plaintiffs'

neurocognitive/neuropsychological impairments caused by lead (ECF 1506 at p.

64); opined recommendations of modalities needed to remediate plaintiffs'

neurocognitive limitations (*id*. at p. 60); and IQ loss caused by lead exposure and

its relevance to educational attainment and work performance (*id.* at p. 71).

Whether plaintiffs can prove such damage and its extent or value are matters to be

resolved at trial. *Cf. TERA II, LLC v. Rice Drilling D, LLC*, 679 F. Supp. 3d 620,

662 (S.D. Ohio 2023) (subsequent history omitted) (Ohio law) (plaintiffs need not

quantify economic damages to survive summary judgment, but only must offer

evidence of the existence of economic damages); *Princeton Radiology Assocs., PA

v. Advoc. Radiology Billing & Reimbursement Specialists, LLC*, No. 2:19-CV-

2311, 2022 WL 501205, at *2-3 (S.D. Ohio Jan. 3, 2022) (Ohio law) (nonmovant

not required to quantify economic damages at summary judgment, but must prove

them at trial); *Jones v. NL Indus.*, No. 4:03 CV 229 M B, 2006 WL 1487026, at *3

(N.D. Miss. May 24, 2006) (Mississippi law) (*extent* of damages supported by the

evidence is properly considered at trial rather than on summary judgment). *See

also*, *e.g.*, *Brenneke v. Dep't of Mo., Veterans of Foreign Wars of U.S. of Am.*, 984

S.W.2d 134, 142 (Mo. Ct. App. 1998) (Missouri courts do not require as strict a

level of proof of future lost wages as is required for lost profits; defendants free to

attack the grounds for such a claim at trial).

To the extent defendants contend that plaintiffs cannot prove that lead

exposure will cause them to incur future medical expenses, I note that plaintiffs did

not respond to this argument in opposing defendants' motions for summary

judgment. (ECF 1276 at hpp. 169-75.) Indeed, it appears that plaintiffs concede

that they do not seek future medical expenses as economic damages in the case.

(*See id.* at hpp. 166-67; hp. 175, n.849.)  I will therefore grant defendants summary judgment on any claim for economic damages based on plaintiffs' incurring future medical expenses.

2.    *Punitive Damages*

To recover punitive damages for negligence under Missouri law, a plaintiff must "demonstrate that the defendant showed a complete indifference to or conscious disregard for the safety of others."  *Dugan v. Hyatt Corp.*, 707 S.W.3d 669, 687 (Mo. Ct. App. 2024) (quoting *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 714 (Mo. Ct. App. 2020)).  A claim for punitive damages must be proven by clear and convincing evidence.  *Id.*  "Clear and convincing evidence is that which tilts the scales in the affirmative when weighed against the evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved."  *Id.* at 687-88 (cleaned up) (quoting *Ingham*, 608 S.W.3d at 714-15).  When determining whether the issue of punitive damages should be submitted to a jury,

> a court must consider "whether the evidence – giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact – is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity – that is, that it was highly probable – that the defendant's conduct was outrageous because of evil motive or reckless indifference."

*Id.* at 688 (quoting *Ingham*, 608 S.W.3d at 715).

Defendants assert that they are entitled to summary judgment on punitive

damages because the undisputed evidence shows that their conduct – including

spending hundreds of millions of dollars in upgrading the Complex to reduce

environmental contamination, continuing operations to sustain the local economy,

implementing projects throughout the La Oroya community to improve health and

safety, timely completing PAMA projects, and voluntarily completing non-PAMA

projects to the benefit of the La Oroya community – is antithetical to acting with

evil motive or with reckless indifference to the safety of others.  I do not disagree

that evidence supports defendants' assertion that they engaged in the actions they

describe.  But I cannot say that the evidence – when viewed *in toto* – is undisputed

regarding whether defendants knew or had reason to know that the totality of their

actions had a high degree of probability of causing injury.  *See Alack v. Vic Tanny*

*Int'l of Mo., Inc.*, 923 S.W.2d 330, 338 (Mo. banc 1996).

> "Conscious disregard or complete indifference" includes
> situations where the person doing the act or failing to act must be
> conscious of his conduct, and, although he has no specific intent to
> injure, must be conscious, from his knowledge of surrounding
> circumstances and existing conditions, that his conduct will naturally
> or probably result in injury.

*Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 583 (Mo. Ct. App. 1999) (citing

*Hoover's Dair, Inc. v. Mid-American Dairymen, Inc.*, 700 S.W.2d 426, 435 (Mo.

banc 1985)).  There is sufficient evidence creating genuine issues of material fact

as to whether defendants, from their knowledge of surrounding circumstances and

existing conditions, were conscious that their conduct in emitting excessive and toxic levels of lead from the Complex without adequate safety measures in place would naturally or probably result in injury to the La Oroya community, including the plaintiffs here who were children during the relevant time. Indeed, as summarized in my Memorandum and Order entered January 20, 2023, some of that evidence shows that defendants consciously decided to maximize output from the Complex without first implementing fugitive emissions controls, knowing that airborne lead concentrations were significantly impacted by fugitive lead emissions[27] and that the Complex lacked sufficient controls. For instance:

- Defendants knew before they purchased the Complex that ambient concentrations in the region around La Oroya were exceedingly high and required controlling fugitive and secondary stack emissions;

- Defendants knew that fugitive emissions were a significant source of contamination that was not being controlled under the PAMA, with effects on air quality eight times greater than stack emissions;

- By February 2004, no comprehensive fugitive metal emissions inventory had been performed;

- DRP's articulated goal for its first year of operating the Complex was to operate at maximum capacity with minimum investment;

- DRP's business plan provided that operations of the copper, lead, and zinc smelters and refineries would immediately increase to maximum capacity in order to produce several additional tons of products; and

---

[27] Indeed, in his February 2004 letter to MEM, Neil acknowledged that "100% of the fugitive emissions affect the air quality[.]" (Neil Let. to MEM, ECF 871-49 at hp. 6.)

- It was not until March 2005, more than seven years after Renco and DRR purchased the Complex, when Rennert recognized that defendants needed to develop a long-term plan regarding lead abatement.

(*See* Memo. & Ord., ECF 1322 at pp. 58-59, and *id.* at nn.40-45.)  When this evidence is considered with additional evidence of defendants' knowledge of the harmful effects caused by lead exposure,[28] there is more than sufficient evidence of convincing clarity from which a jury could reasonably conclude that defendants acted with the requisite recklessness to sustain plaintiffs' claim for punitive damages.  *Ingham*, 608 S.W.3d at 715; *B.F. v. Abbott Lab'ys, Inc.*, No. 4:12-CV-1760 CAS, 2016 WL 1392044, at *4 (E.D. Mo. Apr. 8, 2016) ("Viewing the evidence in the light most favorable to plaintiffs, it remains a disputed issue whether Abbott knew or had reason to know that there was a high degree of probability that its conduct would result in injury.").

Defendants' motions for summary judgment on plaintiffs' claim for punitive damages is denied.

G.    <u>Individual Liability</u>

Finally, defendants Rennert, Kaiser, and Neil contend that they cannot be

---

[28] *See*, *e.g.*, Neil Let. to MEM, ECF 871-49 at hp. 8; Matson Rep., ECF 1225-1 at hpp. 8-9, 11, 13-14; Matson Suppl. Rep., ECF 1225-5 at hpp. 14-16; 2001 Rep. to Comm., ECF 1233-71 at hpp. 20, 25; Buckley Witness Stmt., ECF 640-8 at hpp. 4-6, 7, 9; MEM Rep. on PAMA Ext. Req., ECF 1233-1 at hp. 7.  *See also, generally, Blanks v. Fluor Corp.*, 450 S.W.3d 308 (Mo. Ct. App. 2014).

held individually liable as corporate officers for any claimed injuries to plaintiffs because they did not personally take any action that caused those injuries. Rennert also contends that he held officer positions with only Renco and DRR and that, for officer liability to attach to him in this litigation, his wrongful conduct must have been directed at those entities, which plaintiffs do not allege.

In Missouri, "corporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong. This is true even when the officers are acting in their corporate capacity." *In re Kuecker Equip. Co.*, 338 B.R. 52, 60 (Bankr. W.D. Mo. 2006).

> The true basis of liability should be the violation by the officer or servant of some duty owed to the third person by reason whereof injury results to such third person. Certainly the managing officer of a corporation would not be liable to a third person for any injury resulting from a neglect of duty unless that duty was one he owed to such third person.

*Darling & Co. v. Fry*, 24 S.W.2d 722, 724 (Mo. Ct. App. 1930).

Based on the evidence described above at Sections VI.A. (piercing the corporate veil), VI.C. (direct participation liability), and VI.F.2. (punitive damages), as well as in my Memorandum and Order entered January 20, 2023, there are genuine issues of material fact regarding whether and to what extent the individual defendants personally participated in conduct that resulted in harm to the plaintiffs and had actual or constructive knowledge that such conduct would

cause harm.  To the extent Rennert contends that he cannot be held individually

liable for the alleged wrongdoings of DRP as he was not an officer thereof, there is

nevertheless evidence showing that he acted as a de facto officer given the level of

control he had over DRP as the patriarch of the Renco/Doe Run corporate entities

and his personal involvement in pivotal decisions that were intended to, and did,

directly affect DRP and its operations and financial structure.[29]

I also reject defendants' argument that the evidence cannot support a finding

that plaintiffs' injuries were caused by defendants' individual decisions and

conduct directed to and affecting DRP and its operations.  Causation requires

proving "a reasonable connection between the defendant's tortious conduct and the

plaintiff's injury."  *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 390 (8th Cir.

2018) (citing *Elam*, 765 S.W.2d at 173).  Simply put, plaintiffs must establish a

causal connection between the charged negligent conduct and the loss or injury

sustained.  *Blanks*, 450 S.W.3d at 370.

---

[29] *See, e.g.*, Doe Run 1998 Senior Notes Offering Memo., ECF 1229-16 at hdr. p. 215 (DRR
explains that "Doe Run and the Guarantors are indirect subsidiaries of Renco, of which Mr. Ira
Leon Rennert is the controlling shareholder.  As a result of his indirect ownership of Doe Run
and the Guarantors, Mr. Rennert is, and will continue to be, able to direct and control the policies
of Doe Run and the Guarantors, including mergers, sales of assets and similar transactions.").
As noted above, DRP was one of the Guarantors.  *See also, e.g.*, Mar. 13, 1998 Memo. to Zelms
from Rennert, ECF 640-10 (Rennert explains the establishment of policies under which he
"controlled [DRP] in a manner similar to other Renco companies (normally by [himself] in [his]
capacities as shareholder and director)[.]").

In the context of this case, plaintiffs have produced sufficient evidence for a reasonable jury to conclude that plaintiffs' lead-based injuries were caused by defendants' personal involvement in, *inter alia*, establishing DRP's business plan and managing DRP's financial structure and obligations (including obligations to other Renco/Doe Run entities), and the resulting effects on DRP's implementing environmental protections at the Complex, particularly projects involving fugitive emissions; decisions regarding the level of operations at the Complex without first implementing fugitive emissions controls, including the decisions to immediately maximize output upon acquiring the Complex and to continue operations at the Complex despite knowing, and indeed acknowledging, that such operations have harmed the community and would continue to harm the community without sufficient fugitive emissions controls in place; and, at baseline, simply failing to take the steps necessary to timely develop and implement fugitive emissions controls at the Complex.

As discussed above at Section VI.E. (causation), there is sufficient evidence from which a jury could conclude that DRP's lead emissions caused plaintiffs' claimed injuries and, for the reasons set out here, there is sufficient evidence from which a jury could conclude that defendants' individual actions and decisions were the necessary steps that put in motion (and maintained) those harm-inducing emissions from the Complex. Given that a jury may find a reasonable connection

between the defendants' alleged negligent conduct and the plaintiffs' claimed injuries, defendants' motions for summary judgment on the individual liability of Rennert, Kaiser, and Neil will be denied.

## VII.  Conclusion

As I noted in previous Memoranda and Orders, this is a complicated case with complex issues – many of which defendants have addressed in their various dispositive motions filed in the case, including the motions for summary judgment that are the subject of this Memorandum and Order.  For the reasons set out above, I will grant in part and deny in part defendants' omnibus motion for summary judgment under Missouri law that addresses all remaining claims in the case.  The specific rulings are delineated in my Order below.  I will deny the supplemental motions for summary judgment that Renco and individual defendants Rennert, Kaiser, and Neil filed challenging plaintiffs' claims of direct participation and individual liability.

Regarding the parties' motions to exclude or limit expert testimony, I share the same caveat that I expressed in my Memorandum and Order entered July 11, 2025, that is, that in granting a motion to exclude, I am excluding only the specific opinions challenged, and my ruling shall not be read to go beyond those opinions. Likewise, my denying a motion to exclude permits the challenged opinion to come in at trial, and my ruling shall not be read that only that opinion will be admitted.

In short, this Memorandum and Order does not address the admissibility of any opinion that went unchallenged in the motions to exclude.  With that understanding, I make the following rulings on the parties' remaining motions to exclude:

Kyle Anne Midkiff – I will grant defendants' motion to exclude in part and deny it in part.  Ms. Midkiff's testimony will not be excluded for her consideration of other witnesses' testimony and statements, but she cannot testify to the veracity of those statements nor to any purported opinions of non-endorsed witnesses.  Nor can Ms. Midkiff testify to legal conclusions, including whether the evidence shows that the corporate veil was pierced.

Professor Jonathan R. Macey – I will grant plaintiffs' motion to exclude in part and deny it in part without prejudice.  Professor Macey can testify to corporate norms and governance and why they exist, and he can offer opinions on whether the defendants' corporate conduct was consistent with ordinary and customary business practices.  But Professor Macey cannot testify to legal conclusions, including to his judgment that defendants' corporate conduct was "proper," "appropriate," "non-abusive," or in any other way legally sound.

Professor Macey cannot testify to his opinions on the strength or credibility of the evidence.  Nor can he testify to his opinions on defendants' motivation for their conduct.  Finally, Professor Macey cannot testify to his opinion expressed in

his report at Section VII.A, titled "Doe Run Peru Controlled its Own Day-to-Day Operations."

To the extent plaintiffs contend that various of Professor Macey's opinions cross over to prohibited public policy pronouncements, I will deny the motion to exclude but without prejudice to be raised at trial if necessary.

Dr. Jack V. Matson – I will grant defendants' motion to exclude in part and deny it in part. Dr. Matson can testify to his opinions that defendants breached the relevant standard of care owed to plaintiffs by failing to apply practices and implement controls to reduce lead air emissions from the La Oroya Complex in a timely manner, failed to prioritize the development and implementation of such controls, and that the PAMA timeline did not constrain defendants from such prioritization and implementation. I will not limit Dr. Matson's testimony to only his opinions regarding the four specific fugitive emissions projects that were detailed in both his and defendants' experts' reports and deposition testimony.

Dr. Matson cannot testify to opinions regarding arsenic or sulfur dioxide emissions. Nor can he testify to his opinion that defendants had an obligation to collect reliable air monitoring data before the year 2000. He can testify to the importance of such data, however, and their relation to his standard-of-care opinion regarding defendants' duty to protect plaintiffs from harm caused by lead air emissions from the Complex. Dr. Matson also cannot testify to his separate and

supplemental opinion that defendants did not meet their "Corporate Social
Responsibility" as that term of art is understood in the business industry.  I will not
exclude his statements supporting that opinion, however, to the extent they relate
to his admissible standard-of-care opinion.

Dr. Corby G. Anderson – I will grant plaintiffs' motion to exclude.  While
Dr. Anderson can testify to his opinion that the projects defendants implemented
could have reduced harmful fugitive air emissions and could have improved air
quality, he cannot testify that they actually did or that they "must" have.  Nor can
Dr. Anderson testify that external obstacles outside defendants' control actually
affected the timing of defendants' ability to implement pollution control projects at
the Complex.  To the extent the testimony of any fact witness or other factual
evidence adduced at trial shows the existence of specific external factors that Dr.
Anderson considered in his report, then Dr. Anderson can testify that such
identified factors could affect the implementation of pollution control projects at
smelter sites, but he cannot testify that they actually affected the Complex here.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion to Exclude the Expert
Testimony of Kyle Ann Midkiff [1226]; and Motion to Exclude the Opinion
Testimony of Jack V. Matson Under Federal Rule of Civil Procedure 26, Federal
Rule of Evidence 702, and *Daubert* [1224] are **GRANTED in part and DENIED**

**in part** as set out in this Memorandum and Order.

**IT IS FURTHER ORDERED** that plaintiffs' Motion to Exclude, in Part, the Expert Opinions of Jonathan R. Macey [1239] is **GRANTED in part and DENIED in part without prejudice** as set out in this Memorandum and Order.

**IT IS FURTHER ORDERED** that plaintiffs' Motion to Exclude, in Part, the Expert Opinions of Dr. Corby G. Anderson [1245] is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment Under Missouri Law [1232] is **GRANTED in part and DENIED in part** as follows:

- Defendants are granted summary judgment on plaintiffs' claims that Doe Run Peru was their agent;

- Defendants are granted summary judgment on plaintiffs' claims that their injuries were caused by emissions of sulfur dioxide, arsenic, and/or cadmium from the La Oroya Complex during Doe Run Peru's operations;

- Defendants are granted summary judgment on plaintiffs' claims that the following Discovery Cohort plaintiffs – Elvis Eduardo Palomino Santos (Case No. 4:12CV1345), Wilmer Fortunato Toribio Palomino (Case No. 4:12CV1352), Giancarlos Casimir Soto (Case No. 4:13CV1596), Jhoan Raymundo Rojas Barona (Case No. 4:13CV1596), and Anthony Tamir Mateo Chavez (Case No. 4:15CV705) – suffered lead-based injuries caused by emissions from the La Oroya Complex during Doe Run Peru's operations;

- Defendants are granted summary judgment on plaintiffs' claim for economic damages to the extent they seek to recover future medical expenses; and

- In all other respects, defendants' motion is denied.

**IT IS FURTHER ORDERED** that defendants Marvin Kaiser and Albert Bruce Neil's Supplemental Motion for Summary Judgment [1236] is **DENIED**.

**IT IS FURTHER ORDERED** that defendants The Renco Group, Inc., and Ira L. Rennert's Supplemental Motion for Summary Judgment [1241] is **DENIED**.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of September, 2025.