IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER GRANTING SUMMARY JUDGMENT ON FIVE DISCOVERY COHORT PLAINTIFFS WITHOUT MEASURED BLOOD LEAD LEVELS**

Plaintiffs respectfully ask the Court to reconsider its recent order granting summary judgment to Defendants as to "the five DC plaintiffs without measured blood lead levels (BLLs)."[1] *See* Doc. 1524 (Mem. and Order of September 9, 2025) ("the Order") at 62. A measured BLL is direct evidence of lead exposure, but it is not the *only* evidence upon which a reasonable jury could reliably find that a plaintiff's claimed injuries were caused by toxic exposure to lead. The Court itself found that Plaintiffs' "experts proffer ***more than enough evidence*** demonstrating that during the period DRP operated the Complex the DC plaintiffs were exposed to lead emitted from the smelter at sufficient levels to cause their claimed injuries." Doc. 1506 at 66 (emphasis added). That and other evidence creates a genuine issue of material fact on the question of causation as to the Selected Cohort Plaintiffs, and summary judgment on that issue accordingly should have been denied.

---

[1] These five DC plaintiffs – Elvis Eduardo Palomino Santos (No. 4:12CV1345), Wilmer Fortunato Toribio Palomino (Case 4:12CV1352), Giancarlos Casimir Soto (No. 4:13CV1596), Jhoan Raymundo Rojas Barona (No. 4:13CV1596), and Anthony Tamir Mateo Chavez (No. 4:15CV705) – will hereinafter be referred to as the "Selected Cohort Plaintiffs."

1

Reconsideration is warranted to correct that manifest error and avoid a significant injustice. In addition to the Selected Cohort Plaintiffs, there are hundreds of other plaintiffs in this consolidated action without a recorded BLL measurement. In granting summary judgment, the Court effectively ended their cases for that reason alone, without assessing their individual circumstances or the relative strength of their individual claims. *Cf. Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011) (observing "the individualized nature of the causation inquiry in mass tort cases") (citation omitted). "The traditional and foremost policy of the tort law is to deter harmful conduct and to ensure that innocent victims of that conduct will have redress." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 373 (Mo. Ct. App. 2014). Justice should not be foreclosed to hundreds of children who were directly harmed by the Defendants' conduct simply because they were never tested or given a copy of their blood work.

The Court reasoned that "asking a jury to assign a predictive BLL to each of those plaintiffs ... invites conclusions based on only speculation" and [w]ithout *any* evidence of individual BLLs ... the risk of a verdict based on nothing more than speculation is that much greater." Doc. 1524 at 62–63. But even without a measured or predicted BLL, there is ample evidence from which a jury could reasonably infer exposure and, in turn, causation, without resorting to speculation. For instance:

- When they were children, all of the DC plaintiffs lived or attended school in La Oroya, Peru. Doc. 1229-12 at pdf pp. 72–84.

- The town of La Oroya was contaminated with lead "during the period plaintiffs claim they sustained injury." Doc. 1506 at 9.

- Mr. Sullivan will testify that the measured concentrations of lead in the air "greatly exceeded" U.S. standards, the elevated levels were "directly related to DRP's

2

operation of the Complex," and "maximum impacts occurred at locations nearer to the Complex, which is where plaintiffs' residences were located." *Id.* at 10.

- From 1999 to 2007, children living in La Oroya and the surrounding areas were tested for lead exposure and repeatedly found to have significantly elevated BLLs. *See* Doc. 1229-12 at pdf pp. 19–20.

- Dr. MacIntosh will testify that the "air lead emitted from the Complex [w]as the primary source of lead in the La Oroya BLLs," *see* Doc. 1506 at 19, with airborne lead concentrations "strongly and positively associated with BLLs for individual children," Doc. 1229-12 at pdf p. 22.

- Dr. Ryer-Powder will testify that "each DC plaintiff was exposed to harmful levels of lead ... emitted from the Complex during DRP's operations from October 1997 to June 2009 through the air they breathed and the dust and soil they ingested[.]" Doc. 1506 at 39.

- Dr. Vega will opine that "lead exposure caused or contributed to cause the DC plaintiffs' claimed neuropsychological/developmental impairments." *Id.* at 58.

- Dr. Bellinger will testify that "the DC plaintiffs' symptoms and alleged injuries are consistent with lead exposure[.]" *Id.* at 29. He will further opine that the blood lead concentrations of the five Selected Cohort Plaintiffs would have been "comparable to those of the 12 in whom blood lead was measured." Doc. 1217-1 at pdf p. 13.

This and other evidence like it should have been sufficient to defeat summary judgment on the issue of causation for all the DC plaintiffs, and the mere absence of a measured BLL for the Selected Cohort Plaintiffs should not have been dispositive. The Court should amend its Order and allow the claims of the Selected Cohort Plaintiffs to proceed.

3

## Background

Several of Defendants' motions for summary judgment are addressed in the Order. *See* Docs. 1232, 1236, and 1240. Pertinent biographical information about the Selected Cohort Plaintiffs was included in Plaintiffs' consolidated opposition. *See* Doc. 1276 at pdf pp. 36–43.

Plaintiff Wilmer Toribio Palomino was born in January 1998 (Doc 1229-2, pdf p. 156) and spent his entire childhood in La Oroya Antigua (*id.* at pdf p. 160).

Plaintiff Elvis Eduardo Palomino Santos was born in April 1998 (*id.* at pdf p. 123) and lived in La Oroya Antigua until 2015 (*id.* at pdf p. 128).

Plaintiff Jhoan Raymundo Rojas Barona was born in December 1994 (*id.* at pdf p. 145). Growing up, he lived in La Oroya Nueva (1994–1997, 1999–2004) and La Oroya Antigua (1997–1999, 2004–2011) (*id.* at pdf p. 149).

Plaintiff Giancarlos Casimir Soto was born in June 1993 (*id.* at pdf p. 25) and lived in La Oroya Nueva until age 17 (*id.* at pdf p. 29).

Plaintiff Anthony Tamir Mateo Chavez was born in May 1998 (*id.* at pdf p. 101) and lived in La Oroya Nueva until age 18 (*id.* at pdf p. 106).

The Court issued its Order on the three outstanding summary judgment motions and attendant *Daubert* motions on September 9, 2025. Doc. 1524. The Order granted Defendants' Motion for Summary Judgment (Doc. 1232) as it pertained to the Selected Cohort Plaintiffs. *See id.* at 80. The Court wrote that "affording all reasonable inference in favor of plaintiffs as I must, I cannot conclude that community data – although admissible – is *alone* sufficient to support a finding that those five individual plaintiffs were themselves exposed to lead *at such levels* to cause their claimed impairments." *Id.* at 63 (emphasis in original).

4

**Legal Standard**

Reconsideration motions under Rule 60(b) are warranted for "any ... reason that justifies relief" (Rule 60(b)(6)) and to "correct manifest errors of law or fact." *Arnold v. ADT Security Servs.*, 627 F.3d 716, 721 (8th Cir. 2020) (internal citations omitted). While Rule 60(b)(6) motions are generally reserved for "extraordinary circumstances," a court may consider "the risk of injustice to the parties" where appropriate. *See Buck v. Davis*, 580 U.S. 100, 123 (2017) (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

Federal Rule of Civil Procedure 54(b) similarly permits the district court to "exercise its general discretionary authority to review and revise its interlocutory rulings prior to the entry of final judgment." *Auto Servs. Co., Inc. v. KPMG, LLP*, 537 F.3d 853, 856–57 (8th Cir. 2008) (internal citation omitted) ("[t]he power remained in the trial court until the entry of his final judgment to set aside, for appropriate reasons," orders entered).

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the suit's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts "view the evidence in the light most favorable to" the nonmovant, giving "that party the benefit of all reasonable inferences." *Do v. Wal-Mart Stores*, 162 F.3d 1010, 1012 (8th Cir. 1998) (internal citations omitted). "[T]he Court must consider whether there is enough evidence to permit a reasonable jury to find in favor of Plaintiff – not whether Plaintiffs have brought an open-and-shut claim." *In re Flint Water Cases*, 752 F. Supp. 3d 832, 859 (E.D. Mich. 2024). "[A] case may be given to a jury if circumstantial evidence is strong enough to support reasonable inferences necessary to the plaintiff's case free from speculation." *Hickerson v. Dist. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1258 (8th Cir. 2006). "[W]here multiple inferences may be possible, it is for the jury rather than the court to resolve the factual disputes." *Id.*

5

**Argument**

### I.    Specific BLLs are not required to establish causation.

The Court extinguished the claims of the Selected Cohort Plaintiffs because it determined that, without individual BLLs, the evidence was insufficient for a jury to reasonably infer exposure and causation. *See* Doc. 1524 at 63. But Plaintiffs have found no case requiring BLLs or similar test results, especially in a community-wide event such as this one, and the law is not so restrictive. Indeed, the admissible expert testimony described above is enough for a reasonable jury to find that the Selected Cohort Plaintiffs were exposed to lead emissions from Defendants' operation of the Complex at levels sufficient to cause or contribute to their injuries.

Quantifying an individual plaintiff's level of exposure – as a measured BLL would do – is not required to prove causation. *See Bonner v. Isp Techs.*, 259 F.3d 924, 931 (8th Cir. 2001) ("[I]t was not necessary that Bonner's experts quantify the amount of FoamFlush to which she was exposed in order to demonstrate that she was exposed to a toxic level of BLO."). "[W]hile ... exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, ... and need not invariably provide the basis for an expert's opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999). "[E]ven absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156–57 (3d Cir. 1999) (citing *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997)).

It is "well-established under Missouri law that juries may infer causation ... based on circumstantial evidence." *Hickerson*, 470 F.3d at 1258; *see, e.g.*, *Hollis v. Poplar Bluff Reg'l Med. Ctr., LLC*, 674 S.W.3d 76, 96–97 (Mo. Ct. App. 2023) (observing that "causal connection can be proven by reasonable inferences from proven fact or by circumstantial evidence – direct proof is not required") (citing, *inter alia*, *Marion v. Marcus*, 199 S.W.3d 887, 894 (Mo. App. W.D. 2006)).

6

Exposure, in particular, "can be shown by circumstantial evidence." *Callanan v. Chesterton*, 605 S.W.3d 109, 115 (Mo. Ct. App. 2020).

For example, in *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579 (Mo. Ct. App. 1999), the plaintiff alleged that she was injured by TCE from the defendant's facility in Joplin, Missouri. The evidence showed that she lived in a nearby village for several years shortly after the pollution occurred, and during that time "she drank well water, played outdoors, played in a local creek and pond, played in dirt at a nearby construction site, and sometimes slept in the basement of their home which occasionally contained moisture from groundwater." *Lewis*, 5 S.W.3d at 581. Based on those facts, the plaintiff's expert testified that in his opinion the plaintiff was exposed to TCE from the Joplin facility. On appeal, the defense argued that the evidence of exposure was too speculative to sustain the jury's verdict and "legally insufficient to establish causation." *See id.* at 585-86. The appellate court disagreed and sustained the verdict. *Id.* at 586.

The *Bednar* case is also instructive. There, the parents of a baby injured by formaldehyde emanating from a dresser sued the manufacturer and retailer. *Bednar v. Bassett Furniture Mfg. Co.*, 147 F.3d 737, 738–39 (8th Cir. 1998). The exact quantum of the baby's exposure to formaldehyde was unknown, and the district court entered summary judgment for the defendant on causation. The Eighth Circuit reversed, finding sufficient expert testimony and other circumstantial evidence from which "a jury could infer that it was more likely than not that baby Marian's illnesses were caused by exposure to unsafe levels of formaldehyde emanating from the dresser." *Id.* at 740. "The Bednars did not need to produce 'a mathematically precise table equating levels of exposure with levels of harm' in order to show Marian's level of exposure to gaseous formaldehyde, but only 'evidence from which a reasonable person could conclude that [the] defendant's emission has probably caused' the harm about which they complain." *Id.* (internal

7

citation omitted); *accord, e.g.*, *Mattis v. Carlon Elec. Prods.*, 295 F.3d 856, 860–61 (8th Cir. 2002); *see also Thompson v. Orkin, LLC*, 2025 U.S. Dist. LEXIS 350, at *44 (E.D. Mich. Jan. 2, 2025) (noting that "evidence of the precise level of chemical exposure is not necessary when other evidence supports the claim[]").

Courts have allowed lead exposure cases to proceed without an abnormal BLL reading. In *Cunningham v. Spitz*, 218 A.D.2d 639, 630 N.Y.S.2d 341 (App. Div. 2nd Dept. 1995), for instance, the appellate court affirmed the denial of summary judgment even though the plaintiff's BLL "did not fall within scientifically accepted definitions of lead poisoning." *Id.* "The allegation," the court explained, "is not that [the plaintiff] suffered lead poisoning but that as a result of his exposure to lead he was injured." *Id.*

In an unpublished opinion, an appellate court in Illinois affirmed a jury verdict for in utero exposure to lead even though the mother had no BLL test results before or after her pregnancy, and the child was not tested for years. *See Howell v. Chi. Hous. Auth.*, 407 Ill. App. 3d 1185, 998 N.E.2d 982, 2011 Ill. App. Unpub. LEXIS 204 (2011). The court expressly rejected an argument that, without measured BLLs, the opinions of the plaintiff's experts were "fabricated or based on speculation." *Howell*, 2011 Ill. App. Unpub. LEXIS 204 at *32. Given that the mother was exposed to lead paint chips "approximately every other day during her pregnancy," that the child showed an array of symptoms compatible with lead poisoning, and that scans "ruled out a significant genetic disease that involves the brain," *id.* at *27–28, the court found that "there was sufficient evidence to support plaintiff's expert's opinions," *id.* at *32. Plaintiffs have similarly presented sufficient evidence that the Selected Cohort Plaintiffs were exposed as children to lead emitted from the Complex and that their exposure caused or contributed to their injuries. That they do not have a specific piece of evidence (measured BLLs) should not condemn their claims.

8

**II.     There is more than enough evidence to establish exposure and causation.**

To determine whether a reasonable jury could find the causation element satisfied for the Selected Cohort Plaintiffs, it is appropriate to consider that "they were living in a city experiencing a lead pollution crisis." *In re Flint Water Cases*, 752 F. Supp. 3d at 860. In 1999, Peru's Ministry of Health studied 346 children living in close proximity to the Complex and found that 343 of them (**99.1%**) had BLLs greater than 10 µg/dL. *See* Doc. 1233-23 at pdf p. 8. Similarly, the 2004 CDC assessment explained that "[r]ecent (1999–2001) BLL surveys conducted in La Oroya found *all children* sampled had elevated BLLs (ranging from 15 to 80 micrograms per deciliter[.])" Doc. 871-70 at pdf p. 14 (emphasis added). Both studies identified Defendants' Complex as "the main reason for the high values of blood lead levels in children." Doc. 1233-23 at pdf p. 34; *see* Doc. 871-70 at pdf pp. 14–15, 21.

Contemporaneous reports from DIGESA and Integral Consulting showed a direct pathway of exposure from the smelter to the children in the vicinity. *See* Doc. 1229-12 at pdf p. 11. Like Dr. MacIntosh, Integral used toxicokinetic modeling to predict blood lead levels in children. *See* Doc. 1277-14 at pdf p. 26–27. All of the predictions were at or above the 10 µg/dL reference level:



9

*See id.* at pdf p. 50. Gradient similarly predicted in 2004 that **99.5%** of children in the community would have a BLL greater than 10 µg/dL. *See* Doc. 871-82 at pdf pp. 21–22. For the Selected Cohort Plaintiffs – all of whom lived or went to school in the La Oroya area during that time – this is persuasive circumstantial evidence of prolonged exposure that must be construed in Plaintiffs' favor at summary judgment.

The Court determined that "community data ... *alone*" was not enough to demonstrate that the Selected Cohort Plaintiffs were "exposed to lead *at such levels* to cause their claimed impairments." Doc. 1524 at 63 (emphasis in original). But this concern is adequately addressed by Dr. Bellinger, Plaintiffs' epidemiologist and one of the world's foremost experts on lead.

Dr. Bellinger relied in part on the Integral risk assessments and their findings that "all of the children in La Oroya Antigua would be expected to have a blood lead concentration greater than 10 [µg/dL]." Doc. 1217-1 at pdf p. 16. He found those predictions were "generally consistent with the results of blood lead testing conducted by the School of Public Health at St. Louis University in 2004–2005," where none of the children ages 6 months to 6 years in La Oroya Antigua had a blood lead concentration under 20 µg/dL.[2] *See id.* He concluded that the Select Cohort Plaintiffs likely had blood lead concentrations "comparable" to the other DC plaintiffs:

> Although blood lead concentrations were not measured in 5 of the 17 individuals in the Discovery Cohort, these individuals lived in the same environment over the same period as the 12 individuals in whom blood lead concentrations were measured. Based on the toxicokinetic modelling conducted by Integral Consulting, inc., it is more likely than not that the blood lead concentrations of the 5 individuals were comparable to those of the 12 in whom blood lead was measured.

---

[2] This finding is set forth in Doc. 1277-11. Of the Selected Cohort Plaintiffs, all were between 7 and 12 in 2004–2005, and three (Plaintiffs Palomino Santos, Toribio Palomino, and Rojas Barona) lived in La Oroya Antigua as children. *Especially* as to those three plaintiffs, this finding is overwhelming, near-dispositive circumstantial evidence that they had medically concerning levels of lead in their blood.

Doc. 1217-1 at 12. He offered those conclusions "with a reasonable degree of medical and scientific certainty." *Id.* at 14.

Dr. Bellinger will also explain that since 1991, the CDC has considered 10 µg/dL to be an "action level" (*id.* at 2), and that even blood lead levels as low as 5 µg/dL may be associated with decreased intelligence, behavioral difficulties, and learning problems. *Id.* at 3. "There is no known safe blood lead concentration." *Id.* He cites numerous respected landmark studies establishing that blood lead levels of 10 µg/dL and higher are associated with devastating health impacts. *Id.* at 5, *et seq.* He notes that "[m]edical records and parent history reports for all 17 individuals support the conclusion that the children in the Discovery Cohort showed classic signs of lead exposure and toxicity associated with blood lead concentrations in the ranges they experienced[.]" *Id.* at 15.

The Selected Cohort Plaintiffs were also individually assessed by highly accomplished medical experts, all of whom will testify to a reasonable degree of medical certainty that they suffered from brain damage due to chronic lead exposure.[3] Dr. Vega will testify that the Selected Cohort Plaintiffs had individual "neuropsychological sequelae and resultant impairments in cognitive, academic, behavioral, and emotional functioning" that are "consistent with the known consequences of children exposed to lead." *E.g.*, Doc. 1279-1 at 15. Dr. Hopkins will testify that lead exposure was "the predominant direct cause of" the Select Cohort Plaintiffs' reported injuries. *See* Doc. 1277-6 at pdf pp. 36–37; *e.g.*, Doc. 1229-2 at pdf pp. 108–109. And Dr. Hu will testify that lead exposure caused each of the Select Cohort Plaintiffs to experience a minimum 6.9-point IQ loss. *See, e.g.*, Doc. 1229-9 at pdf p. 50. In sum, there is sufficient evidence to establish both exposure and causation for all 16 DC plaintiffs, including those without measured BLLs, and summary judgment should not have been granted.

---

[3] The Court excluded certain opinions from these experts, but those admissible opinions remain. *See* Doc. 1506.

11

### III.    The facts of this case are distinguishable.

There are cases where the circumstantial evidence of toxic exposure is plainly deficient. In *Mascarenas v. Miles, Inc.*, 986 F. Supp. 582 (W.D. Mo. 1997), for instance, the court granted summary judgment because there was *no* reliable evidence that the plaintiff was actually exposed to the chemical in question as opposed to some other chemical. *Id.* at 588–589 ("All that is known is that plaintiff was exposed to a pesticide ... no evidence suggests (even slightly) that the pesticide he was sprayed with or exposed to was Guthion."). Similarly, in *Latimer v. Smithkline & French Labs., a Div. of Smithkline Beckman Corp.*, 919 F.2d 301 (5th Cir. 1990), the plaintiff alleged poisoning from a chemical that, as it turned out, he could not have conceivably encountered during the relevant time period. *Id.* at 304. And in *Rogers v. Armstrong World Indus., Inc.*, 744 F. Supp. 901 (E.D. Ark. 1990), there was no evidence the decedent was ever exposed to the toxin at issue. *Id.* at 905.

The facts and circumstances of this case present a stark contrast. Defendants' own consultants predicted that **99.5%** to **100%** of the children in La Oroya would have elevated blood lead levels. *See* Doc. 871-82 at pdf p. 21 (Gradient); Doc. 1277-14 at pdf p. 31 (Integral). "Observed blood lead levels for children in th[e] community [we]re significantly elevated, with geomeans of 35 µg/dL for 0-3 year olds and 32.7 µg/dL for 4 to 6 year olds." Doc. 871-82 at pdf p. 32. Integral further concluded that "[m]ost of the children in La Oroya are at risk for neurobehavioral effects...." Doc. 1277-14 at pdf p. 31. These and other similar findings were tied directly to lead emissions from Defendants' Complex. *See, e.g.*, *id.* at pdf p. 21. On that record, it is hardly "speculative" to conclude that the Selected Cohort Plaintiffs who lived and attended school in this same lead-burdened community and who experienced injuries consistent with childhood lead exposure were, in fact, exposed to unsafe levels of lead from the Complex.

12

This case is also readily distinguished from *Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013). There, the problems with the plaintiffs' case were myriad. Pathways of exposure to benzene that leached from the defendant's facility were not well-established, and scientific evidence of causation was inconsistent. *See id.* at 520–521. The plaintiffs' medical expert "admitted than he did not determine what exposure level to what chemical caused an increased risk of what disease in each plaintiff." *Id.* at 525. And the plaintiffs failed to identify "a specific chemical from the plume that can cause a serious latent disease; they prepared no estimate of each plaintiff's exposure to that specific chemical; and they ha[d] no idea whether they face[d] an increased health risk from the alleged exposure." *Id.*

The facts in *Baker* bear no resemblance to those presented here. Plaintiffs have produced evidence of a clear exposure pathway from the Complex to each DC plaintiff, and the health effects of childhood lead exposure are well understood. The Selected Cohort Plaintiffs were each examined by medical professionals who will testify that their neurological problems and other ailments are the direct consequence of lead exposure. The testimony of Dr. Bellinger and Dr. Hu will further establish that their injuries are consistent with various degrees of lead poisoning. These differences nullify the applicability of *Baker*.

Both the Court and the defense cite *Gates v. Rohom & Haas Co.*, 655 F.3d 255 (3d Cir. 2011). But *Gates* is not on point because it concerned questions of class certification, and this is not a class action lawsuit. The proffered evidence there "only showed average daily exposure, not minimum exposure, used average exposure over very long periods of time when exposure likely varied, and could not show that every class member was exposed above background." *Id.* at 265. Questions of commonality were left unanswered, and there were too many variables for a single concentration of vinyl chloride to establish a significant risk to each class member. *See id.* at 268.

13

The Court also referenced *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994), which held that "[a]llowing proof of group harm as a substitute for individual harm would not serve any notion of justice." *Id.* at 1409. But that is not what Plaintiffs offer. As shown above, each of the five DC plaintiffs without BLL measurements has been individually evaluated by Drs. Hopkins and Vega and found to evidence symptoms of lead exposure; each was adjudged by Dr. Ryer-Powder to have had a "direct pathway to exposure"; and each grew up in an area and at a time where multiple scientific studies establish that virtually all children in the area suffered from elevated blood lead levels.[4] *Thomas* is inapposite.

### Conclusion

We recognize that motions for reconsideration are rarely granted, but there are exceptional reasons to revisit this small portion of the Court's Order. In less than two pages, the Court issued a ruling that would wipe out the claims of hundreds of plaintiffs and deny them even the chance to seek justice for their injuries simply because they lack a documented blood test. That decision presents an extreme position that should not be taken lightly, especially given the dearth of any other cases that have held the same and the wealth of other evidence that shows the Selected Cohort Plaintiffs *were* exposed to toxic levels of lead from the Defendants' Complex. On reconsideration, the Court should find that all DC plaintiffs have made a submissible case on causation when the facts are construed in their favor (as they must be), and that summary judgment should be denied.

---

[4] To the extent the Court still believes that individual proof of exposure is lacking, Plaintiffs respectfully request a hearing and an opportunity to present additional evidence of behalf of the Selected Cohort Plaintiffs. Such evidence would show, for instance, that some of them did have measured BLLs taken but the documentation has since been lost; that they have siblings with measured (and elevated) BLLs; or that a medical provider told them their maladies were the result of lead exposure. These answers were given under oath during their depositions but are not part of the summary judgment record.

14

Respectfully submitted,

**SCHLICHTER BOGARD LLC**

Dated: October 7, 2025

By:   */s/ Nathan D. Stump*
NATHAN D. STUMP #71641 (MO)
JEROME J. SCHLICHTER #32225 (MO)
KRISTINE K. KRAFT #37971 (MO)
CORT A. VANOSTRAN #67276 (MO)
100 South 4th Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-7151 (fax)
jschlichter@uselaws.com
nstump@uselaws.com
kkraft@uselaws.com
cvanostran@uselaws.com

15