IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

A.O.A., et al.,                    )
                                   )
              Plaintiffs,          )
                                   )
v.                                 )   No. 4:11-cv-00044-CDP
                                   )   St. Louis, Missouri
DOE RUN RESOURCES                  )
CORPORATION, et al.,               )
                                   )   *MOTION HEARING*
              Defendants.          )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

NOVEMBER 20, 2025

Stephanie Rennegarbe, RDR, CRR, CBC
IL CSR #084-003232
750 Missouri Avenue
East St. Louis, IL  62201
618-482-9226
Stephanie_Rennegarbe@ilsd.uscourts.gov

*Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription*

APPEARANCES:

FOR THE PLAINTIFFS:    Nathan Stump, Esq.
                       Cort Andrew VanOstran, Esq.
                       Jessica M. Holmes, Eq.
                       Schlichter Bogard, LLC.
                       100 S. Fourth Street
                       Suite 1200
                       St. Louis, MO  63102
                       314-621-6115
                       nstump@uselaws.com
                       cvanostran@uselaws.com
                       jholmes@uselaws.com


FOR THE DEFENDANTS:    Mark Alan Sentenac, Esq.
                       King and Spalding, LLP.
                       1180 Peachtree Street, N.E.
                       Suite 1600
                       Atlanta, GA  30309
                       404-572-3571
                       msentenac@kslaw.com

                       Thomas Patrick Berra, Jr., Esq.
                       Lewis Rice, LLC.
                       600 Washington Avenue
                       Suite 2500
                       St. Louis, MO  63101
                       314-444-7600
                       tberra@lewisrice.com

(Proceedings began at 11:02 a.m.)

***************************

THE COURT:  All right.  Good morning.  We are here in the Doe Run cases, case #4:11-cv-44, the Peruvian Doe Run cases, and we are here for an expedited hearing.  I appreciate you being here.

Let me ask, who is speaking for the Plaintiffs here today?

MR. STUMP:  Nathan Stump on behalf of the Plaintiffs.

THE COURT:  Who else is at counsel table?

MR. STUMP:  I'll let them introduce themselves.

MR. VAN OSTRAN:  Good morning, Judge.  Cort VanOstran on behalf of Plaintiffs.

MS. HOLMES:  Jessica Holmes on behalf of Plaintiffs

THE COURT:  Okay.  What's your last name, ma'am?

MS. HOLMES:  Holmes.

THE COURT:  Holmes.  Oh, yeah, you were just entered in the case.  I understand.  Okay.

And for the Defendants, who's speaking?

MR. SENTENAC:  Good morning, Your Honor.  Mark Sentenac on behalf of the Defendants.

THE COURT:  Okay.  You are going to need to speak up. When you are talking I'm going to have you up at the lectern, because we have the Court Reporter remotely, but I appreciate that.

And, yes, sir?

MR. BERRA:  Tom Berra on behalf of Doe Run Industries.

THE COURT:  All right.  Thank you.

Okay.  So, Mr. Stump, I will hear -- Why don't you step up to the lectern.  This is your motion.  It was a motion for -- It was expedited because these are documents, as I understand your argument, you need to have for the deposition of Mr. Ira Rennert which will be on December 5th, is that correct?

MR. STUMP:  That's correct.

THE COURT:  Okay.  Go ahead and tell me what you need.  And I do want to mention, in the order I did setting this I said I didn't need any further briefing, because I would expect everybody to just tell me what's going on at this hearing.  The Defendants did file a brief, which by the time I had -- you know, on the schedule I had set, and I do appreciate that, it will shorten things, because now I know where both sides are coming from at least.

But, go ahead, Mr. Stump.

MR. STUMP:  Thank you.  You know, we have a Request for Production, it was RFP 9, which has now been the subject of briefing over the last eight years.  We served it in 2017. We ended up filing a Motion to Compel --

THE COURT:  The answer is well-known to me.

MR. STUMP: Okay; all right. So, the issue is that in response on the production, we got what's basically three things, three tranches of documents. It's about 3,800 pages in total. We have --

THE COURT: You filed a supplemental response that you got since the most recent order.

MR. STUMP: Yes, Your Honor.

THE COURT: Okay, go ahead.

MR. STUMP: We got J.P. Morgan Chase bank account statements. These are very bare bones. There's about 1,700 pages of them. This will give you a flavor: 945 pages of those, which is about a quarter of them, so seven years worth of statements for a single account, and half of those pages the balance of the account is 68 cents and it's just very bare bones. You know, it's just for showing the balance month after month.

So, that's one tranche, is the bank account statements. We got financial statements from Renco Group and we have -- It's about 277 pages, and it covers years 2017 to 2024. And then we got Mr. Rennert's personal tax returns. Those are for the years 2017 to 2023, and they comprise about 18 -- well, it's exactly 1,829 pages. So, it's about half of the production. So, that's what we got. And from those documents our problem is we cannot discern Mr. Rennert's net worth, which was the goal.

THE COURT:  Right.

MR. STUMP:  We tried to work that out with the Defense before we came to you.  We were unable to do that, and so we felt compelled to file a motion.

THE COURT:  Well, let me ask you this:  The -- What is it that you want?  What is it that you think you are entitled to?

MR. STUMP:  Well, there's other documents, surely, that would elicit information about --

THE COURT:  Yes, tell me what they are.

MR. STUMP:  So, you know, certainly he has had to have appraisals of his house, his personal property, a mortgage statement.  He has trusts.  We don't have any trust statements.  If he's ever applied for a loan, we imagine there would be some statement of his net worth provided to a third-party lender, a statement of his investment holdings, if he's got a will or any estate planning documents that would show what he owns, titles for vehicles, if he has an aircraft, jewelry.  We know he has a substantial art collection.  We have no valuation on that.  In other words, we know it's a little piece, we know something about the income that he reported to the IRS, we know something about some of the bank accounts that he has.  We think there are other accounts we doesn't have statements for, because in those records it will show a transfer from this account to another account and the

number on that other account is one we didn't get statements for.

THE COURT:  Well, it could be for somebody else's account, couldn't it?

MR. STUMP:  It could be.  It could be, but basically the bottom line is we don't know.  We don't have anything close to a complete picture of Mr. Rennert's assets and liabilities, which is what you ordered them to produce.

THE COURT:  You know, but this is a Request for Production of documents, right?  I mean, whether my order was -- went farther than the RFP went, which it did, but I also think that was not what I intended and I think you knew that.

Well, let me ask you this:  Is it your position that he has to create a financial statement for purposes of this litigation?

MR. STUMP:  I don't think he has to, Your Honor.  We looked at that law --

THE COURT:  Because I didn't intend to order him to create new documents.  I intended this to be a document production of what documents already existed.  And I guess I wasn't clear in the orders, but that's what I intended.

MR. STUMP:  Yes, Your Honor.  Yeah, so, no, we don't disagree with that.  But, as I just sort of enumerated, many, many other documents of a person of Mr. Rennert's means should have or should have access to, even if he doesn't have -- And

I want to make sure the Court remembers, we were asked to provide documents for our clients related to their medical history, their education history, their employment history. They didn't have those documents, either. We ran a whole team up and down the Andes Mountains to try to track these documents to satisfy their document request, and apparently what they are doing with our request is just shrugging their shoulders and saying, "We don't have it." What efforts have they made to go to third-party institutions to say, you know, "Mr. Rennert submitted an appraisal to get a loan, so we would like to have a copy of that"? What efforts have they made? They haven't explained that at all.

THE COURT: And, so, I guess tell me how it -- Can you ask him in his deposition -- I mean, what are you going to ask him in his deposition?

MR. STUMP: Well, that's another point, Your Honor. I think the deposition, the way we envisioned it, would be we had a set of documents that would show something about his net worth, we could cross-examine about that -- specifically, the income tax returns are 180 pages long -- to try to decipher what this means and what that means. I don't know that Mr. Rennert, especially Mr. Rennert, Sr., is going to be able to do that. And my concern is we are flying up to New York for these. Even though we brought our Plaintiffs here, we have noticed them for New York as an accommodation to Mr. Rennert

to go there, and what he's going to say is, "I don't know, ask my accountant, I don't recognize this document," and that's going to be the deposition.

THE COURT:  Is that what he said before?

MR. STUMP:  That's generally how he's been in other depositions, yes.

THE COURT:  What about in your deposition in this case?

MR. STUMP:  That's what I mean, in our previous depositions in this case.  And I'll just point out, too, the Defense offered his son, Ari Rennert, as a substitute on his net worth.  They said, "We could have him prepared."  This is in documentation they filed with the Court, it's in Document 1505.  They said he can speak to Mr. Rennert's net worth so you don't have to depose his dad.  And I wonder how would they get his son prepared for that deposition to be able to testify to his net worth when we don't have documents that would show that?  So, what documents could they be relying on to get him prepared for that deposition to answer questions?  I don't know.

THE COURT:  And when are you taking his deposition?

MR. STUMP:  Also in New York.

THE COURT:  I know.  *When*?

MR. STUMP:  Oh, *when*.  That's on the 18th of December.

THE COURT: Yeah, so after the other -- after Mr. Rennert's deposition?

MR. STUMP: Yes, Your Honor.

THE COURT: Let me ask you this, one of the questions I have. Why are you here now when you got the responses back in earlier mid-September? It's, you know -- So then you filed November 13th, so two months later, when it's only essentially a week until the deposition, given that next week is Thanksgiving week.

MR. STUMP: Let me give you the practical answer first. There's been a lot going on in the case in that period of time. We have had all of our clients up here doing supplemental medical exams and depositions, a lot going on. But, also, we did notify them almost immediately after we got the direction. It was a week later we sent a letter, a formal letter saying it's deficient, we need more information. So, we sent two letters to them, we sent an e-mail, and we had a phone call before we filed this motion.

THE COURT: Yeah, they said -- Is their characterization of the phone call accurate?

MR. STUMP: Your Honor, I was not on the phone call.

THE COURT: Well, you need to be able to answer this question, okay? You are speaking for your client.

MR. STUMP: Yeah, and my understanding from speaking with Mr. VanOstran, who handled the phone call, is that the

characterization is not correct.

THE COURT:  Come up here, Mr. VanOstran, and tell me what's wrong about it.  What they said is you called them two hours before you filed the motion, talked about whether you didn't have any meet and confer, you said, "Yeah, let's talk, we'll meet," and then you filed the motion.

MR. VAN OSTRAN:  Your Honor, well, right, that's not correct.

THE COURT:  Okay.  So, what did happen?

MR. VAN OSTRAN:  We exchanged a number of communications up to that point and it was fairly clear that we were at an impasse.

THE COURT:  I want to know what happened -- This is the only telephone call you had with them, right?  The only time you actually spoke with your voice to the other side, when any lawyers on either side actually spoke to one another is two hours before this motion was filed, right?

MR. VAN OSTRAN:  I don't know if it was two hours.

THE COURT:  Three hours before.

MR. VAN OSTRAN:  It was early in the day.  I did not promise another phone call.  In fact, Mr. Sentenac specifically asked, "Can we continue to talk about this," but he was not willing to make any sort of concession or to work with us.  So, I said, "I'm not going to guarantee you another call, we need to move forward with this, because time is of

the essence."

Respectfully, Judge, we have tried to work with the other side collaboratively. We coordinate with them, speak to them regularly. There have been many moving parts in this case, as you know. With all due respect, they have weaponized in some ways the meet-and-confer process to try to drag this out, which is one of their strategies, and, you know, the conversation was not productive. We spoke for ten minutes, it was very cordial. But, in sort of filing after filing -- I've been on this case a relatively short amount of time, Judge, but I have just never really seen anything like this. There is just sort of incessant back and forth that seems designed to delay and isn't in good faith.

So, I think, again, we have exchanged multiple letters at that point, we reached out, we had a cordial conversation, but it was very clear that we were at an impasse that after -- And I know you are well aware of the history, Your Honor, but after eight years of motion practice on this subject and we have never gotten an answer to what Mr. Rennert's net worth is, it was very clear that there was not going to be continued progress on that point.

THE COURT: Okay, thank you.

So, Mr. Stump, when did you take his deposition before? When was this?

MR. STUMP: Your Honor, I believe the most recent one

would have been in 2018.

THE COURT:  I knew it was a long time ago.

MR. STUMP:  It's been a while, yes.

THE COURT:  Yeah.  So, at that time did you ask him what his net worth was?

MR. STUMP:  My -- I don't recall that being a topic of the conversation.  I am not prepared to answer that, Your Honor, I'm sorry.  I didn't review the deposition transcript before I came today.

THE COURT:  Okay.  You're obviously not the one that's going to take his deposition, or are you?

MR. STUMP:  I am, Your Honor.  I'm taking both his deposition and the younger Rennert's deposition in December.

THE COURT:  Okay.  And you were too busy doing other things to get prepared for this sooner in order to meet and confer with them like a month ago, right?  I mean, there was some letters -- I saw two letters and a couple of e-mails.  I mean --

MR. STUMP:  I think if I could, Your Honor, I understand where you are coming from, I think, but the history of this, that you said you understood, it goes back to 2017.  We have been trying to get the same information for eight years.  We filed a Motion to Compel on this already before, we filed a Motion for Sanctions on this issue before, so I think you should consider that history when you consider whether or

not any additional conferral would have been productive.  We don't think it would have been, we still don't think it is.  If they would stipulate, Your Honor, if they would just say, "Look, Forbes says he's worth 3.8 billion, we will stipulate he's worth 3.8 billion," boy, that would short-circuit a lot of this.

THE COURT:  And you didn't ask him that in the earlier deposition.  Actually, you don't know what you asked him in the earlier deposition.

MR. STUMP:  I couldn't answer that, Your Honor.

THE COURT:  So, I mean, how does Forbes decide that he's worth that much?

MR. STUMP:  I don't know, I don't know.  I mean, he has certain things about his wealth that are public, you know; the house that he lives in, there's public sort of estimates of how much it's worth and that sort of thing.  I have no idea how they come up with those figures.

THE COURT:  And you don't know if you asked him in the prior deposition, "What's your house worth?  Is it worth 400-million-plus or whatever they say it is?"

MR. STUMP:  I really don't want to speculate.  It's certainly the kind of question I think we would have asked, but I don't want to speculate.

THE COURT:  You would be in better position standing here talking to me about it today if you had asked that before

and you were just updating, you know, and that's all you needed to do, right?

MR. STUMP:  Yes, I agree with you, Your Honor, that would have been nice to have that information.  But this is, again, your order.  You ordered him to produce these documents and to sit for a deposition on that subject, so, you know, we are here partly defending your order.

THE COURT:  I understand that.  Okay, go ahead.

So, let me see what else, if I had any other questions in mind.

Okay.  Let me hear, then, from the Defense, Mr. Sentenac.

MR. SENTENAC:  Good morning, again.  It's Mark Sentenac on behalf of Defendants.

THE COURT:  Let me make sure I am understanding.  Mr. Rennert has -- possesses no financial statement that would show his assets and liabilities?

MR. SENTENAC:  He does not maintain a consolidated updated list of --

THE COURT:  Yeah, so when was the last time he had one?

MR. SENTENAC:  I don't -- I don't know that, Your Honor, and I'm not -- I'm not surprised by that.  In fact, I was thinking about this as I was preparing for today and how I would prove my net worth if someone came and asked the same

thing of me.  I think a lot of the case is -- and a lot of the assumptions you are hearing from the other side is that he's somehow a business entity that's keeping annual audited financial statements, but that's not the case.  He's an individual like you and me.  I don't -- Maybe I'm wrong, but -- and others do this, but I don't keep a running list of the artwork in my home or the vehicles, the furniture in my house or all of my other assets.  It's not a thing.  I'm a little surprised why this seems shocking to others.

THE COURT:  When was the last time -- I mean, he must have to produce statements of what his art and his physical possessions are worth for insurance purposes for people, right?  The art museum he has must have some insurance on it, or his home, doesn't it?

MR. SENTENAC:  I don't know the answer to that question.  It wasn't asked, part of the request, insurance information, so I don't know for sure.  But, it's -- to your point, Your Honor, this is supplemental discovery they took. They have now decades of his financial information, they took his deposition.  Surely they would have something more to say than, "Surely he has other information."  What your order says is this is supplemental discovery, updated information from what was produced previously in response to this particular request, correct, for the eight-year period of time.

THE COURT:  What did you produce before in terms of

his net worth?

MR. SENTENAC: Well, what I was -- So, I don't believe they have identified that a net worth statement or a consolidated list of assets or liabilities was previously produced, because he didn't have it then. And the same thing was said to them five years ago in the Motion to Compel under sanctions that they were referencing. This isn't a surprise, this wasn't something new that they didn't know about.

And since they brought it up, Your Honor, you, of course, denied that motion, determining that you couldn't grant their Motion to Compel and for sanctions on the record. Obviously we are here on an expedited motion with zero evidence submitted in support of it, so I find it hard to believe that they could have a Motion to Compel on this record granted, either.

But, I do think it's important to understand what they are asking for. I have not heard a specific item of evidence that they say we failed to supplement. They mentioned an appraisal for a mortgage, for example. Mr. Rennert doesn't go to regular creditors or a bank to get a loan like you and me, and an appraisal on a home is something that doesn't happen -- I don't get a appraisal on my home every year just to find out how much it's worth. You may do that when you get a mortgage, but it's not like there's something -- if they are having all these expert evaluators

coming in to decide what his personal possessions are worth on a regular basis.  It just -- I don't do that and I find it hard to believe they think someone else, another individual does.

THE COURT:  Not even for estate planning or insurance purposes?

MR. SENTENAC:  I don't know.  My understanding is there are not.  The company conducted and Mr. Rennert conducted a reasonable search for the documents they asked for, and we produced a substantial amount of financial materials.

You asked, for example, Your Honor, how does Forbes calculate financial -- estimate Mr. Rennert's net worth.  They have far more detailed financial information with respect to Mr. Rennert, his personal tax returns.  They do have his investment brokerage accounts, his personal checking accounts. They have his tax returns, they have his business interests, the Renco Group's detailed consolidated financial statement. They have a far greater amount of information than the Forbes Company does to be able to reasonably assess Mr. Rennert's financial condition.

And I hope this is -- screams off the page in the meet-and-confer correspondence, but we have been very diligent in trying to work with them and I think Your Honor pointed this out that there were a couple of letters, and we were very

willing to work with them and offered to meet and confer additional times. They've never come back to us and asked for anything specific. So, I just heard my colleague say, "Well, they could stipulate to a number." On the ten-minute phone call that is how it was written in our papers, I made that exact point, was the call was introduced as, "Oh, hi, Mark, I'm just calling to confirm that we have an impasse." And I asked, "Well, you know, Mr. VanOstran, it sounds like you are ready to file a motion, but we haven't heard from you on any of our letters." And I even threw out, "Well, you could have come prepared to this phone call to offer -- to offer something, a stipulation, some specific documents, you could have identified some compromise or at least responded to our letters," the information about the account they're claiming, or something else they wanted. And, of course, they got nothing. He did say he would take that request back and discuss it with his folks, and that's what I was -- that's what the papers refer to as agreeing to talk about it more, and then they filed their motion.

So, I think it has been -- I think it's clear from the meet-and-confer correspondence that there's been a complete lack of a good-faith confer to try and resolve this before having to come here today before Your Honor. And certainly they have been dilatory, which is an independent reason why the Court should just deny this motion. The

documents were produced two and a half months ago, and it's -- you know, the fact that it was two weeks before the deposition sort of jagging up this sense of urgency is, I think, unfair and should be denied for that reason, as well.

THE COURT:  When -- Is -- Did you offer Ari Rennert as someone who could speak to Ira Rennert's net worth?

MR. SENTENAC:  We did offer that and they rejected that.  It was because they had refused to agree to a time limit on Mr. Rennert's deposition.  He's now 91 years old and we thought it would be potentially an agreeable way to accommodate Mr. Rennert, and they rejected the proposal.  And I -- You know, I heard them suggest that somehow there's some other documents that we would prepare Ari Rennert with for -- to talk about Mr. Rennert's financial documents.  We would use the documents that we produced to Plaintiffs, of course.  And if that's not clear -- And we have represented to them now multiple times over a half a decade that the documents they're asking for, the net worth statement, the lists don't exist, and I don't see -- the case law is very clear that you don't have to produce documents that don't exist.

THE COURT:  Let me ask you this.  Well, actually, no, what you just said gave me the opportunity to remind you that your credibility has some issues on this subject with me, some limitations with me, because you all were the ones who told me that Mr. Rennert, last time his deposition was taken, was so

frail and old that he couldn't possibly sit for seven hours of deposition or even do two days in a row, he needed a day in between, and then he testified at his deposition that he was working 80 hours a week.

So, credibility is still an issue of the lawyers in this case.  I don't know if you were here back then, but I hope you've read his deposition and I hope everybody has from what -- from before since this is, you know, the same thing.

MR. SENTENAC:  That is a remarkable admission, I think, from the opposing side.  They're asking here to produce documents that -- a supplemental discovery and they haven't read the discovery in the first instance, I think, Your Honor.

THE COURT:  Well, he didn't say they hadn't looked at the documents; he said hadn't looked at the deposition.

MR. SENTENAC:  The deposition, yeah.

THE COURT:  That's different.  So, he'll read it before he gets -- takes the deposition.

Does he own a plane?

MR. SENTENAC:  I don't know the answer to that, Your Honor.

THE COURT:  If they ask him does he own a plane, what will he say?

MR. SENTENAC:  He'll be prepared to testify truthfully.

THE COURT:  He won't say, "You have to ask my

accountants"?

MR. SENTENAC:  No, I think he would understand that.

THE COURT:  Okay.  And, so, to the extent -- Well, if they ask him, "How much is your house worth," will he say, "I have no idea," and then they'll say, "Is it bigger than a bread box," and go on that line of questioning, or what?

MR. SENTENAC:  Well, I don't know that that's an unfair response.  We are talking about liquid assets --

THE COURT:  Right.

MR. SENTENAC:  -- that have to be specially evaluated.  I don't -- They have the address to his -- Or, again, this is supplemental to discovery.  They know where he lives, right?  They know the address.  They can go -- come up with their own valuation of it.  It's not -- You know, if he knows, then he can testify to it.  If he doesn't, then I don't find that to be an unfair response.

THE COURT:  Well, we are not going to postpone this deposition.  I want these depositions to go forward as scheduled and I want them to be meaningful.  I don't want this to be a deposition where the Plaintiffs ask a lot of questions and the deponent says, "Oh, I don't know, I don't keep track of that.  People at my level don't need to keep track of how much money they have.  We know how much -- you know, it's enough," or other things to -- or "I can't possibly know, you'll have to ask, you know, my accountants or someone else."

11/20/2025 - Page 22

Although, if he says you have to ask someone else, then I will expect the Plaintiffs to notice up those depositions and ask those other people the questions.  So, he needs to understand if that's what he says it's not -- you know, it's not a way to get out of getting the information out.  But, also the -- I mean, it depends on what it is, but, you know, in general terms he has a general idea what his net worth is, I'm sure, and he has a general idea of what some of his assets are.

I am going to -- I am going to supplement.  This may not have exactly been covered, but I am very concerned that the -- that they are not going to get what they need for the purpose of punitive damages.  And, because of that, I believe it's appropriate to tell you to at least, to this extent, before the deposition -- so by December 2nd -- Defendants are required to produce a -- any appraisals or statements of value --

Let me try to write this down so I will say this correctly.

-- of any of the physical assets that he owns.  And by that I mean any real estate, home, artwork, any of the things that have a valuation placed on them for insurance purposes or any other purpose.

I think that he must have at some point had a valuation of things for insurance purposes, whether they're appraisals or otherwise, of the physical assets that he owns.

And I don't know what all those are, but if he has had any -- I'm not telling him he has to create new ones, I'm not saying send an appraiser out to his house.  But, if he had to make statements or his people made statements to someone to insure the art that he owns or to insure any other personal property that he owns or to insure any real estate that he owns, that would -- that would be sufficient.  It doesn't mean it had to be this year, if it was the most recent one.  It may be that once an insurer looks at the artwork and says, "This is what you've got, that's" -- they say, "Okay, we are going to cover it for this value," or something to that effect.  I think that is the kind of information that I think he can come up with, because I think he has it.  I don't expect him to go to his bottom drawer and pull it out.  I'm sure he has people who do that for him, and he needs to go to those people and get a statement of those physical assets.

And I recognize that in the supplemental -- the supplementation that we were talking about this may have been excluded and I recognize that it's not a statement of net worth, because he says he has no idea -- If he says he has no idea what he's worth in his deposition, I think that's information that is -- You know, I think you can ask those questions.  You can ask him if he doesn't know what his net worth is, if he doesn't know what anything he owns is valued at that could be admissible evidence, partly because it's not

credible, even if he is 91 years old.  And, so, but I think that's as far as I can go on this because of where we are. I'm not going to order additional things.

Let me just ask, Mr. Stump, the statement -- One of the things you listed was investments is something you didn't know about.  But if you have his brokerage reports, don't you know what he owns, stocks and bonds?

MR. STUMP:  It's not clear to us, Your Honor.  You know, we have our expert accountant, so we asked her for some help on this, as well.  She actually submitted an affidavit earlier, it's 1077-2 on this issue.  But it looks to us that he probably has more investments than what he produced, because what he produced shows just basically like one -- things like one money market account or something.  So, if he's got a hedge fund or something like that that they didn't produce statements for, that's the kind of thing we want to know about.

THE COURT:  Well, that was covered by the Order. There's no doubt about that.

MR. STUMP:  Yeah.

THE COURT:  Okay.  Well, so I am just going to limit this to the personal appraisals or statements of value of the personal property.  And by that I am including house, houses, apartments, other places of abode; personal things like, you know, furnishings and jewelry, to the extent they exist, and

the artwork, certainly; airplanes, cars, those sorts of things.  Personal property.

And he had -- I do not believe -- And if he testifies, "No, no, my insurance companies know I'm worth -- I'm good for it, they never asked to see anything proving how much art I have in the garage or how much, you know, my home is worth, they can look at it and know -- you know, they're going to insure me for whatever I ask," if that's what he says, that's fine, but if -- and we'll have that and that will be admissible.

You know, it may be that in punitive damages that's the kind of testimony you'll have to give a jury.  "This is a man who doesn't know what his net worth is, this is a man who says his insurance company just insures his personal property for whatever he tells them to because everybody knows he's richer than God."  I don't think you can say that to a jury, but he can say whatever he says.  You know, it's not an *everybody knows*.  But, if he is unable to state any of those things, it may be -- I'm not telling you right now it is, I don't need a 50-page Motion in Limine on this -- but that may be admissible.  That's the kind of thing we will have to see about.

So, all I'm doing is ordering -- I'm granting the Motion to Compel to the extent that no later than December -- Did I say 2 or 3?

-- December 2, which is the Tuesday before your deposition, which is on Friday, that no later than December 2 you produce -- you supplement the discovery by producing any kind of appraisals or valuation statements that have been made for him at any time in the past eight years on any personal property.  And I am using *insurance* as simply one way that that could be done, because I know that most people -- although most people are not these people we are talking about -- but most people at least do have some statements for insurance purposes, there are appraisals made.  If he's never had a loan or needed to, you know, guarantee -- I mean, I don't expect that he went down to the Savings & Loan on the corner and got a mortgage.  I mean, I agree with that.  But, to the extent he's got appraisals for loans or insurance purposes or anything else.  And, if -- And we need to know -- When I said any that were made over the last eight years, that's because that's when we have had discovery from previously in this case and also because I understand that things can come and go.  And in the year 2019, he may have had a statement that he did for some purpose, as I am speculating it could be for insurance or other.  You know, he knows what he's got, you all should be able to find it.

And then, you know, and so it's artwork.  This is all hypothetical.  So, in 2019, he got insurance and he updated or he gave an affidavit saying, "Yeah, it's still worth what it

was before," whatever he did, something to give -- put a value on his artwork, and that was valued at -- I know it's more than this -- but $10,000,000.00, and then in 2023 he's got a statement that says, I only have $10,000 worth of artwork now," that's something they're entitled to know, because they're entitled to know, "Well, what happened to it?  "Well, I gave it to my kids; oh, it's in a trust, it's somewhere," whatever it is, or, "I don't have it anymore, we had a fire." You know, you tell me.  I don't know what happened in his life, but I know these are things that according to most people are valuable.  I also know that they may be things that are very small parts of his net worth, so they may not be that important to him, but I think there is a way to find out what he owns and what he -- you know, so they can come up with some amount.

The Plaintiffs don't actually have to know his exact worth to submit a punitive damages case.  They can tell a jury, "You know, Forbes said" -- Well, they can't say, "Forbes says," unless you get Forbes to come in and testify as to how they do it.  That's an expert witness.  I don't think he can do that.  It's too late to disclose that.

But, you know, I think they can say, "We don't know exactly, but we have got all this evidence he's worth at least 500 million dollars."  You don't have to say it's however many billions Forbes says.  You know, there ought to be enough that

they can do that, and that's what we are looking for and I think they're entitled to it. And you have got the Renco stuff, and who knows what that shows. You've got investments, you've got the checking account that says 68 cents in it, and you can -- You know, let's get the physical assets. There has to be some -- I am not going to find it credible that there is no statement of value or appraisal or some estimate of what the real estate and personal property are worth that he has access to, even though it's not going to be at home in his home office, I'm sure.

Yes, sir? Why don't you step up to the lectern so we can make sure we get you on the record.

MR. SENTENAC: Thank you, Your Honor. Mark Sentenac on behalf of Defendants again. I just want to be clear, because I already stated that it's not credible. But, we did a reasonable search already, and they did not identify a statement of net worth or these types of assets. We will certainly ask to identify appraisals of the items you said, but I don't -- You know, and I don't know the answer, so we will have to investigate it, but I don't know that it's not a credible answer that he has not obtained a valuation of his artwork in the last eight years, for example. You know, like I said, I don't go and do that.

THE COURT: Yeah, so, and it may be -- You know, he may say he doesn't own anything, he may tell you that it's all

owned by trusts and he doesn't know where they are and he doesn't know when he got them set up, and those will be issues that we can -- You know, if that's the case we will have to deal with it. But, assuming he owns something, as opposed to not anything, I believe there are statements. And, so, perhaps there aren't any in the last eight years. In that case, if he owns -- I don't know. I have no idea what this man owns, okay? And certainly, you know, the business gossip pages, what Forbes says is not something that's -- you know, tells me anything that's actually evidence, but if he -- you know, if he bought a Matisse 15 years ago, but he hasn't had it appraised in the last eight years, it's legitimate for them to say, "What did you pay for it when you bought it?" And, you know, those are things that I think he would know, I do believe that.

Go ahead.

MR. SENTENAC: They should have asked him that in the last deposition.

THE COURT: Well, they can ask him this time.

MR. SENTENAC: Okay. And I understand, Your Honor. My concern is we are now going way beyond what you said in the past is a very narrow scope of supplemental discovery and not a second here -- you know, Your Honor's ruling, not a second bite of the apple, which is what that sounds like. And, so, I do want to make sure that we are not -- I don't want to

venture into the area of speculation.  I certainly understand the Court's ruling to find valuations during the supplemental period, but -- and we will certainly investigate that.

THE COURT:  Okay.  And that's -- Your objection is noted for the record and is overruled.  And the reason is we are now at the point where we are getting ready for trial.

And, I want to talk to you all about that.  We need to have some trials.  We are going to have some trials starting very soon, and so it's time to stop messing around or dragging our feet on anything.  We are not going to drag this out anymore and we are going to move forward, and so that's what everybody needs to be thinking about.  And, so, if it turns out that there is essential information that the Plaintiffs believe they need that they have not received, you know, once all this is done, once everything is finished with the schedule you all are marching forward on now, then, you know, I will want to hear about that.  I know there's not essential information that the Defendants need, because they keep getting more and more stuff about the Plaintiffs.  And these Plaintiffs are not people who have, you know, so many millions that they couldn't possibly know how much they're worth.  So, but if it turns out we have to do more, I may give them leave to ask for more.

And, Plaintiffs, that is not a blank check by any means.  I expect you to stick to what you've done so far and

see what you can find out.  But if, in fact -- And partly -- I will have to say that part of this is the Defendants have made so much -- Defendants' counsel throughout this case have done so much to protect Mr. Rennert, to make sure that he does not have to disclose and that the companies don't have to disclose any more than absolutely necessary, and they've -- you've, you know, kept a very narrow interpretation of this.  And, you know, we are going to get to trial and I want this case to be decided -- these cases to be decided on the merits of the case, not on, "Well, we couldn't find this out in discovery because we" -- you know, "because we asked for X and we should have been asking for Y, and he just kept telling us he didn't have any idea, because, after all, he is 91 years old and he has people who do these things."  So, you know, if that's where we are when we finish all this discovery, perhaps we will have to do more, I do not know.  But, we are going to go to trial and it's going to be quickly.

And, so, here's what I want to talk to you all about.  This is a different topic.  The topic on which we are here today is done.  You understand what my ruling is, correct?

And you will have to get a transcript from the Court Reporter.  I'm not going to -- I'm going to do an order, we'll do a minute entry.  The Clerk will do a minute entry from today saying the motion is granted in part and denied in part.  And then what exactly it is is your -- if you don't have the

notes or remember exactly what I said.

But, the next topic is what's coming up next.  You all are moving forward on this schedule and you have gotten things almost done, correct, Mr. Stump?

MR. STUMP:  That's correct, Your Honor.

THE COURT:  And, so, let me just ask this:  In the -- In terms of travel documents and all of that stuff, as I recall there were just two that were outstanding.  Are they still outstanding?  You've got them all.  And Mr. VanOstran is just shaking his head.  So, you are good on that?

MR. STUMP:  We're good on that.

THE COURT:  Most of them last for months.

MR. STUMP:  I believe that most of them will go through the end of next year.

MR. VAN OSTRAN:  Supposedly all of them -- There are some sort of different notations on some of them.  We are not exactly sure whether that's a formal limitation or just a recognition that they were to travel for this purpose.  I believe that it's likely that they are all good for a decade.

THE COURT:  Okay.  Well, I don't need them for a decade.  I need them for 2026 right now.  And, so, 2026 we are going to have some trials.  And exactly how they are going to work, I don't know.  We are going to have a status conference, and I want you all to -- This you do need to write down.

I want you to meet and confer, actually speak to one

another, because you are going to give me a joint report on next Wednesday, the 26th of November, and that is going to be on a date or dates that you all can agree we can have a status conference here in court, and that is going to be some time between -- starting with Tuesday, January 20th, through Friday, February 6th.  There are two days when -- The afternoon of January 29th and the morning of January 30th are exclusionary times.  So, except for that January 29th afternoon, going over into January 30th morning.  Other than that, any date -- I'll move anything I need to any date between Tuesday, January 20th, and Friday, February 6th.  I want to have a conference.  It's going to be a status conference.  We are going to talk about the schedules, status and scheduling conference, and I'll want you all to report to me on the status of everything you have been doing.

And some of it I recognize will not have been completed, but -- because you have got some depositions that were supposed to be done by the end of February, correct?  And so I recognize that, but I'll -- you know, I'll expect a report on everything you have done.

And then also we are going to pick a trial date, we are going to look at some trial dates, we are going to talk about the structure of a trial.  And before -- Once I get your notice of when the -- of when you're available for this -- And, if it's more than one date, give me more than one date.

But, once I get your notice of when you're available for this status conference, I will send you out an Order -- I can't tell you it will come out the next day, but it will come out certainly before the end of the year.  But, it will tell you the topics to be discussed and also give you some outlines of what I expect in the trial structure.

Obviously once you see that, I will then expect you all to be prepared to tell me how long you think the trial will take, the first trial, and how long you think we would need in between the first trial and the second trial.  So, we will map out a schedule on that.

So, I hope you all have kept your calendars open for 2026 and are ready to go, because that's where we are.  We are ready to get this underway.  We've got to have a trial, at least one.  Actually, I would like to have two in 2026.  And, so, we will see where we are.  But, I will give you all those details.

But, right now what I need from you is for you to go forward with your discovery, produce the things that I have indicated from the Defendant need to be produced by December 2nd, and then on the -- by November 26th, next Wednesday, the day before Thanksgiving, give me a joint statement of, "Here's the dates we would be available for an in-person conference in court to talk about scheduling and the status of the case," okay?

MR. STUMP:  Yes, Your Honor.  And I'll just say, too, we have already spoken cooperatively about some of those issues in terms of the length of the trial and potential trial dates, so we are already started.

THE COURT:  Great.  That will be great.  Do you know -- Do you have answers on that, or you are still talking?  It could give me some guidelines and, you know, it will help me when I come up with the Order.

Mr. Berra, any general ideas of what you are thinking about?

MR. STUMP:  Any issue with --

THE COURT:  You may not have agreed yet.

MR. BERRA:  We were still waiting to hear back from them, Your Honor.  Tom Berra, Your Honor.

We have had some preliminary discussions.  I think they were talking more internally, so I think maybe we do need to just talk some more.  We will be prepared to report, I think it sounds like, in due course.

THE COURT:  Yeah, and so do that, and we'll try to get this -- get a schedule for the rest of -- you know, schedule through at least one trial, I hope two trials, maybe. Okay?

MR. STUMP:  Very good.  Thank you, Your Honor.

MR. SENTENAC:  Thank you, Judge.

THE COURT:  Court's in recess.

(Proceedings adjourned at 11:51 a.m.)

REPORTER'S CERTIFICATE

* * * * * * *

I, Stephanie K. Rennegarbe, RDR, CRC, Official Court Reporter for the U.S. District Court, Southern District of Illinois, do hereby certify that I reported with mechanical stenography the proceedings contained in pages 1-37; and that the same is a full, true, correct and complete transcript from the record of proceedings in the above-entitled matter.

*/S/ Stephanie K. Rennegarbe,*                11/21/2025
IL CSR, RDR, CRC