IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| A.O.A., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. 4:11-cv-00044-CDP |
| | ) (CONSOLIDATED) |
| THE DOE RUN RESOURCES | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL RECONSIDERATION**

Plaintiffs urge the Court to reconsider its recent order granting summary judgment as to "the five DC plaintiffs without measured [BLLs.]" *See* Order at 62.[1] In opposition (Doc. 1561), Defendants argue that (1) reconsideration is unwarranted, (2) the Court's decision not to credit Plaintiffs' evidence of lead exposure is supported by case law, and (3) Plaintiffs cannot support causation without measured BLLs. Plaintiffs now respond to these arguments in turn.

**I.      Reconsideration is warranted.**

Defendants devote much of their Opposition not to any deficiency in Plaintiffs' arguments on the merits, but instead to the "heavy burden" for reconsideration under Federal Rule of Civil Procedure 60(b). Opp. at 2, 3. That argument is legally confused. Defendants concede that Plaintiffs are moving the Court to reconsider an "interlocutory" order (Opp. at 2) and acknowledge that the Court's summary judgment ruling is a "non-final order[.]" Opp. at 3, n. 1. Plaintiffs agree,

---

[1] All defined terms have the same meaning as set forth in Plaintiffs' Motion in Support (Doc. 1547). Plaintiffs' Motion in Support is hereinafter cited as "Mot." Defendants' opposition is referred to as "Opp."

which is why Plaintiffs' motion invokes Rule 54(b), the rule that governs reconsideration of interlocutory orders. Because Plaintiffs' motion seeks reconsideration of an interlocutory order and must therefore be considered pursuant to Rule 54(b), Defendants' arguments pertaining to Rule 60(b) are wholly misplaced. *See Brice v. Bethany Ret. Living*, No. 1:24-cv-00033, 2025 U.S. Dist. LEXIS 1292, at *3 (D.N.D. Jan. 3, 2025) ("The standard under Rule 54(b) is unclear but is considered less exacting than a motion under Federal Rule of Civil Procedure 59(e), which is in turn less exacting than a motion under Federal Rule of Civil Procedure 60(b).").

"Under Federal Rule of Civil Procedure 54(b), an interlocutory order "may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and responsibilities." *Westinghouse Elec. Co. v. United States*, No. 03-861 (CDP), 2009 U.S. Dist. LEXIS 27369, at *13 (E.D. Mo. Mar. 30, 2009) (citing Rule 54(b)). "Rule 54(b) governs reconsideration of orders that do not constitute final judgments in a case. . . . Summary judgment motions are interlocutory in nature, and may be reconsidered and revised up until the time a final judgment is entered." *Id.* at *13–14 (internal citations and quotation marks omitted).

"District courts have considerable discretion in deciding whether to reconsider an interlocutory order under 54(b)." *Id.* (citing *Wells' Dairy, Inc. v. Travelers Indem. Co.*, 336 F. Supp. 2d 906, 909 (N.D. Iowa 2004); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 640, 647 (N.D. Iowa 2006)). "A court may reconsider an interlocutory order to "correct any clearly or manifestly erroneous findings of fact or conclusions of law." *Id.* at *14 (citing *Jones v. Casey's Gen. Stores*, 551 F. Supp. 2d 848, 854 (S.D. Iowa 2008)). "[R]econsideration may be granted as justice requires. . . . The decision to reconsider a judgment or interlocutory order is one grounded in equity, and should be used to prevent a judgment from becoming a vehicle of injustice." *Id.* at *15 (internal citations and quotation marks omitted).

Under Rule 54(b), the Court should exercise its considerable discretion and correct its order granting summary judgment as to the Selected Cohort Plaintiffs. The Court's order rests on incorrect findings of law—specifically, that a measured blood lead level is *required* to prove exposure notwithstanding myriad and incontrovertible circumstantial evidence of exposure. Plaintiffs are unaware of any court ruling in the wide range of personal injury cases from lead exposure explicitly requiring a showing of blood lead levels as the *only* way of proving exposure. The Court's judgment, if allowed to stand, will become a vehicle of injustice, as it will surely be wielded to deny a day in court to hundreds of plaintiffs who have put forth a wealth of evidence demonstrating their exposure but who lack contemporaneous quantified measurements of lead in their blood. In addition, the Court's judgement will be used to prevent hundreds of plaintiffs from demonstrating through scientifically proven measures the actual presence of lead in their bodies. Specifically, and as an example, bone lead measurements are a well-accepted methodology for demonstrating lead exposure years after lead is no longer present in blood. *See* Sec. IV, *infra.*

Even if the Court were to look for guidance to the Rule 60(b) standard for reconsideration (*see, e.g.*, *Ideal Instruments*, 434 F. Supp. 2d 640), there are firm grounds for reconsideration. In their own earlier papers,[2] Defendants reminded the Court that "[r]econsideration motions are warranted for any . . . reason that justifies relief (Rule 60(b)(6)) and to *correct manifest errors of law* or fact." Doc. 1402 at 1 (internal quotation marks and citation omitted, emphasis added). Respectfully, the Court's decision to dismiss claims of Plaintiffs lacking a specific *type* of evidence was a manifest error of law. The Court incorrectly determined that individual blood lead levels—

---

[2] Apart from being legally wrong, Defendants' implication that reconsideration is radical or disfavored is disingenuous, given Defendants' previous motions for reconsideration in this case. *See* Docs. 291, 662, 914, and 1402. Most recently, Defendants sought reconsideration of this Court's order on supplemental financial discovery, though their request was styled as a motion for protective order. *See* Docs. 1504, 1505.

either actually measured or reliably modeled by an expert—are necessary for a reasonable jury to infer exposure to lead and determine causation of injury. This was error. The Selected Cohort Plaintiffs have offered a plethora of evidence from which a jury can reasonably infer exposure and, in turn, causation, even without measured blood lead levels.

## II. Plaintiffs' evidence of causation is sufficient.

Defendants are wrong to claim that "Plaintiffs chose to build their case . . . on the backbone of quantified BLLs." Opp. at 11. Plaintiffs offered Dr. MacIntosh's predictive modeling as yet one more piece of scientific evidence. But even without his testimony, there exists a trove of other evidence from which a reasonable jury can reliably determine causation. Defendants do not dispute that under Missouri law, plaintiffs in negligence actions can use circumstantial evidence to prove their case. A "causal connection can be proven by reasonable inferences from proven fact or by circumstantial evidence—direct proof is not required." *Hollis v. Poplar Bluff Reg'l Med. Ctr., LLC*, 674 S.W.3d 76, 96–97 (Mo. Ct. App. 2023) (citing *inter alia Marion v. Marcus*, 199 S.W.3d 887, 894 (Mo. App. W.D. 2006)) (internal citations and quotation marks omitted). This is not only true in Missouri, but is widely the case in other jurisdictions. *See, e.g., Powell-Murphy v. Revitalizing Auto Cmtys. Envtl. Response Tr.*, 333 Mich. App. 234, 247 (2020) (in Michigan, a "plaintiff is permitted to prove his case through circumstantial evidence and reasonable inferences") (internal citation omitted).

As discussed in Plaintiffs' Motion, there is substantial evidence in the summary judgment record to support a finding of causation, even as to plaintiffs without measured blood lead levels. *See* Mot. at 2–3, 9–11. Contemporaneous reports from DIGESA and Integral Consulting showed a pathway of exposure and modeled predictions that ***virtually all children*** in La Oroya experienced exposure to lead from Defendants' operations. Contemporaneous study results from St. Louis University and predictions from Gradient corroborated those findings.

4

Furthermore, as this Court has already observed, Plaintiffs' "experts proffer ***more than enough evidence*** demonstrating that during the period DRP operated the Complex the DC plaintiffs were exposed to lead emitted from the smelter at sufficient levels to cause their claimed injuries." Doc. 1506 at 66 (emphasis added); *see id.* at 4 (defining "DC plaintiffs" to include all 16 plaintiffs in the Discovery Cohort). Like their co-plaintiffs with blood lead measurements, each of the Selected Cohort Plaintiffs was examined by Dr. Clemente Vega, who found that their individual "neuropsychological sequelae and resultant impairments in cognitive, academic, behavioral, and emotional functioning" were "consistent with the known consequences of children exposed to lead." *See, e.g.*, Doc. 1279-1 at 15. Dr. Vega relied not only on the predictive measurements calculated by Dr. MacIntosh but also on the "modeling done by Integral Consulting" and "testing done by Saint Louis University," which showed that each of the Selected Cohort Plaintiffs was "exposed to extremely high levels of lead . . . sufficient to cause" their impairments. *See, e.g., id.*

The Selected Cohort Plaintiffs were also examined by Dr. Karen Hopkins. Like Dr. Vega, Dr. Hopkins did not rely exclusively on Dr. MacIntosh's calculations to conclude that the Selected Cohort Plaintiffs were exposed to lead at levels sufficient to cause injury. Instead, she similarly diagnosed lead-related injuries based on exposure to lead "as documented in . . . the Human Health Risk Assessment report prepared for the Defendants in 2005," *i.e.*, the Integral report. *See, e.g.*, Doc. 1229-2 at 108–109. Her conclusions were "further supported by the additional publications cited in [her] report pertaining to lead exposure to residents of the La Oroya region." *See id.* That is evidence from which a reasonable jury can infer causation. *See* Doc. 1506 at 63 (allowing Dr. Hopkins to offer her specific causation opinions based in part on "the nature and consistency of [the DC plaintiffs'] symptoms and presentation" and "the duration of [their] exposure to toxic levels of lead"); *cf. Boyer v. Weyerhaeuser Co.*, No. 14-286, 2016 U.S. Dist. LEXIS 20207, at *56

(W.D. Wis. Feb. 19, 2016) (finding that similar circumstantial evidence of exposure to asbestos "is evidence and science based, which is appropriately considered by the trier of fact").

**III.     Case law clearly supports reconsideration and reversal.**

Defendants claim Plaintiffs failed to distinguish the cases cited in their motion for summary judgment and in the Court's order granting summary judgment. Opp. at 9. But Plaintiffs have responded to those cases, both by offering more apposite cases in their original briefing (*see* Doc. 1276 at 146) and by presenting additional facts distinguishing those adverse authorities in their principal motion for reconsideration. For instance, Plaintiffs distinguished *Mascarenas v. Miles, Inc.*, 986 F. Supp. 582 (W.D. Mo. 1997), and *Latimer v. Smithkline & French Labs., a Div. of Smithkline Beckman Corp.*, 919 F.2d 301 (5th Cir. 1990), by noting there was *no* reliable evidence that the plaintiff in those cases was actually exposed to the chemicals in question. *See* Mot. at 12–13. Plaintiffs distinguished *Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013), on the basis that the plaintiffs' medical expert "admitted that he did not determine what exposure level to what chemical caused an increased risk of what disease in each plaintiff." *See id.* Those adverse authorities are wholly inapposite, and Defendants' opposition fails to rehabilitate their utility.

Legal precedent simply does not compel the result reached by the Court. In its Order, this Court relied principally on *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006 (8th Cir. 1992), for its unremarkable conclusion that "to withstand summary judgment, plaintiffs must present probative evidence . . . such that a reasonable jury could return a favorable verdict based on more than mere speculation[.]" Order at 63 (citing *id.*). Of course, Plaintiffs agree that is an accurate statement of law. But far from compelling the instant result, *Gregory* addressed a Section 1983 action in which plaintiffs attempted to blame law enforcement for two intoxicated individuals leaving a police station in a car that later crashed. The Eighth Circuit concluded, perhaps in part because of a record lacking key testimony, that there was no evidence the officer in question knew the intoxicated

6

individuals were drunk. *See Gregory*, 974 F.2d at 1010.[3] Here, by contrast, Plaintiffs have presented overwhelmingly substantial evidence that the Selected Cohort Plaintiffs were exposed to lead at high levels, and that they suffered injuries caused by lead. Hundreds of children in the same very small town had some of the highest blood lead levels ever recorded in the world. Selected Cohort Plaintiffs' lack of a *specific piece* of evidence (measured BLLs) should not condemn their claims.

As discussed in the principal brief, *Gates v. Rohom & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), is inapposite because it concerned the adequacy of evidence for class certification purposes. Mot. at 13. Defendants insist that *Gates* is relevant. Opp. at 9–10. But even setting aside the postural differences, *Gates* is inapplicable because it affirmed denial of class certification where the plaintiffs' expert "disclaimed that his report was conclusive as to individual cases" and acknowledged his risk calculations were "'*not meant to predict risk for a single individual* under any specific scenario' because of 'individual or personal variability—susceptibility.'" *Gates*, 655 F.3d at 261 (emphasis added). Plaintiffs have offered infinitely more evidence of causation— *including expert testimony specific to individual claims*—than putative class members in *Gates. Cf. id.* Here, unlike in *Gates*, the statistical evidence proffered by Selected Cohort Plaintiffs— because of its overwhelming nature (depending on the study in question, either **98, 99.1, or 100**

---

[3] It is also notable that *Gregory* resulted in a 6-5 decision from the *en banc* Court of Appeals, and a vigorous dissent from Judge Heaney, which Judges Lay, McMillian, Arnold, and Gibson joined, arguing that the majority had "neither viewed that evidence in the light most favorable to the plaintiffs nor drawn all justifiable inferences in the plaintiffs' favor." *Id.* at 1013 (Heaney, J., dissenting). In *Gregory*, then, whether or not plaintiffs had presented more than mere speculation narrowly divided the full Eighth Circuit Court of Appeals—and here, the Selected Cohort Plaintiffs have presented *scads* more evidence, including directly relevant expert testimony following individual examinations. Far from compelling the instant outcome, *Gregory* militates *against* summary judgment.

percent of the relevant population evidenced injurious blood lead levels)—leaves no question that even the minimum possible exposure is sufficient to support causation. In tandem with other evidence, including individualized expert testimony, this overwhelming statistical evidence of exposure must defeat summary judgment.

Defendants again cite *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990), offering a sound bite to support their position that community-wide estimates cannot speak to the probability of causation in any one case. Opp. at 10. But that case addressed the district court's plan to resolve roughly 3,000 asbestos cases in a common trial, with liability to be determined based on how the jury determined "certain representative cases." *In re Fibreboard Corp.*, 893 F.2d at 707. That situation has no bearing and no real application to the instant facts, where a jury would still have to decide the individual claims of each Selected Cohort Plaintiff. Defendants also previously cited *In re Agent Orange Prod. Liab. Litig. MDL 381*, 818 F.2d 145, 165 (2d Cir. 1987), for ordinary propositions that are highly attenuated in their application here and do not compel the result reached by the Court. *See* Doc. 1301 at PDF 50.

In contrast, Defendants have no convincing response to Plaintiffs' authorities. They attempt to distinguish the Eighth Circuit's analysis in *Bednar v. Bassett Furniture Manufacturing Co.* because in *Bednar*, there was no other possible source of the victim's contamination. Opp. at 8. They insist that there were other potential sources of lead to which Plaintiffs might have been exposed. But in 2005, a CDC study found that "the smelting facility in La Oroya is the main source of lead contamination in the zone." Doc. 871-70 at PDF 21. Defendants' own consultants assumed the same. *See* Doc. 1277-14 at PDF 21 ("[M]etals in air, outdoor dust, indoor dust and food are assumed to be principally due to current smelter operations."). These and other similar findings were presented in Plaintiffs' summary judgment response. *See* Doc. 1276 at PDF 159–164.

All of this shows that the source and extent of the Selected Cohort Plaintiffs' exposure—just like all the other plaintiffs—is a *factual question* that must be submitted to a jury, not decided on summary judgment, and that any inferences must be drawn in *plaintiffs'* favor. *E.g.*, *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 802 (8th Cir. 2001).

The "individualized evidence of exposure to lead from Doe Run Peru's operation of the Complex" that Defendants demand (Opp. at 9) is exactly what Plaintiffs have provided in the form of (1) uncontroverted community data and (2) permitted expert evaluation and analysis as to individual plaintiffs. It is evidence of the same kind and caliber as was offered in *Bednar*. *Bednar* is controlling authority and demands reversal; Defendants' response to it only underlines that a factual question has been presented that simply cannot be answered at summary judgment.

**IV.  Even apart from proof of exposure via community data, the Selected Cohort Plaintiffs, as well as the other plaintiffs without blood lead tests, should be permitted to prove injury by other means, such as bone lead tests.**

The Court should correct its error of law and afford the Selected Cohort Plaintiffs the opportunity to present their claims to a Missouri jury. However, even if the Court were to stand on its holding, the Court should allow the five Plaintiffs and the other Plaintiffs without blood lead tests to prove their exposure through bone lead tests. In particular, the Court should reconsider its ruling in light of the Flint, Michigan litigation pertaining to lead in drinking water and the scientific foundation on which it is based. *See In re Flint Water Cases*, 752 F. Supp. 3d 832 (E.D. Mich. 2024).

In *Flint*, the court denied summary judgment. The defendant argued that causation could not be shown because the plaintiffs had no evidence of "how much lead they were exposed to from Flint water after February 2015" and were "unable to show they were exposed to lead at a level that could have injured them during the time relevant to [their claims against] VNA." 752 F. Supp. 3d at 858–62 (internal citation and quotation marks omitted). But the court correctly observed that

9

"Plaintiffs may survive summary judgment if a reasonable jury could find that it is more likely than not that Defendants caused Plaintiffs to be exposed to a sufficient quantity of a hazardous substance capable of causing their injuries." *Id.* at 859 (citing *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 431 (6th Cir. 2009)).[4]

The *Flint* plaintiffs were able to demonstrate that the water they drank contained lead by pointing to "elevated lead levels in the community as a whole, citing a study of high lead levels in significant numbers of Flint homes." *Id.* at 861. Critically, the community data offered there suggested that some 40% of homes had water with elevated lead content, *see* 752 F. Supp. 3d at 861, while here, **100%** of dust samples taken from homes in La Oroya Antigua contained elevated concentrations of lead (*see* Doc. 1277-71 at 12) and nearly 100% of the population tested had injurious blood lead levels. Compared to the circumstances in Flint, the community data here is infinitely more compelling, comprehensive, and reliable.

Furthermore, while there were not measured blood lead levels for every *Flint* plaintiff, causation was still sufficiently supported by "testimony about where [the plaintiffs] were exposed to lead in their drinking water, the 'substantial amounts of lead' detected in their bones, the fact they were living in a city experiencing a lead pollution crisis in its water, and . . . expert testimony that 'Flint water was the most likely source for [the plaintiffs'] exposure to lead.'" *Id.* at 860 (internal citation omitted). Plaintiffs "were not required to prove their precise level of lead exposure but instead that their lead consumption during the relevant time-period could have caused or contributed to their claimed injuries." *Id.* at 859 (internal citation omitted).

---

[4] Michigan law regarding causation is comparable, in relevant part, to Missouri law; while causation cannot rely on "mere speculation," Michigan law permits "reasonable inferences of causation" based on "circumstantial evidence." *Powell-Murphy*, 333 Mich. App. at 246, 964 N.W.2d 50 (citing *Skinner*, 445 Mich. at 162-63, 516 N.W.2d 475); *accord Hollis,* 674 S.W.3d at 96–97.

Importantly, *Flint* is also notable because the court found that bone lead scans taken by the plaintiffs' expert captured cumulative lead exposure and provided "direct evidence that Plaintiffs were exposed to lead." *Id.* at 860–61. Such bone lead measurements provide a reliable methodology, even many years after exposure to lead, to evaluate lead exposure in plaintiffs for whom contemporaneous blood lead levels were never measured. *See In re Flint Water Cases*, No. 5:16-CV-10444-JEL-EAS, 2024 U.S. Dist. LEXIS 162023, at *77 (E.D. Mich. Sep. 9, 2024) (denying a *Daubert* motion to exclude expert testimony regarding bone scans). The court in *Flint* concluded that the plaintiffs' bone lead levels provided additional "support for a reasonable jury's conclusion that they were exposed to lead at a level sufficient to cause injury." 752 F. Supp. 3d at 860. Such a holding is consistent with, and supported by, scientific evidence from bone lead testing years after exposure.[5]

Ultimately, the *Flint* litigation resulted in a historic multi-million dollar settlement.[6] If this Court's ruling had been applied in *Flint*, those plaintiffs without blood lead test results might have had no redress for their injuries; their claims could have been dismissed. The law did not compel such an unjust result in those cases, and summary judgment should have been denied here as well. At a minimum, Plaintiffs outside the cohort should have the opportunity to present their own

---

[5] *See, e.g.*, Aaron J. Specht et al., *Portable x-ray fluorescence for bone lead measurement: Current approaches and future directions*, 11 CURR ENVIRON HEALTH REP. 443 (2024); Aaron J. Specht et al.,*XRF-measured bone lead (Pb) as a biomarker for Pb exposure and toxicity among children diagnosed with Pb poisoning*, 21 BIOMARKERS 347 (2016).

[6] *See Veolia North America Reaches $25 Million Settlement with Flint Water Litigation Class,* Veolia North America, https://www.veolianorthamerica.com/media/press-releases/veolia-north-america-reaches-25-million-settlement-agreement-flint-water (Feb. 1, 2024); *see also* Julie Bosman, *Michigan to Pay $600 Million to Victims of Flint Water Crisis*, N.Y. Times (Aug. 19, 2020), https://www.nytimes.com/2020/08/19/us/flint-water-crisis-settlement.html.

individualized evidence of exposure, including bone lead measurements or other testing procedures that could still be undertaken. The Court should clarify its order and ensure that it has no precedential or preclusive effect beyond the five Selected Cohort Plaintiffs. Such an expansive ruling—that a plaintiff without contemporaneous blood lead measurements can *never* prove exposure to lead—would fly in the face of established law and have far-reaching and unwarranted ramifications.

## V.      Conclusion

The Court's decision to deny a day in court to plaintiffs who have substantial evidence of exposure, including individualized expert testimony and uncommonly compelling circumstantial evidence, is an extreme one. Plaintiffs with measured blood lead levels have one additional piece of evidence than do those without such contemporaneous measurements (a fact that is no fault of the Selected Cohort Plaintiffs). But disparate consideration of these cases does violence to the summary judgment standard and should not be grounds for the Selected Cohort Plaintiffs to be left without redress. All cohort plaintiffs have made a submissible case on causation when the facts are construed in their favor (as they must be). Summary judgment was improper.

Alternatively, if the Court stands on its grant of summary judgment as to the five Plaintiffs without blood lead testing, the Court should allow bone lead testing for them because of its proven utility in determining lead exposure. Selected Cohort Plaintiffs could not have anticipated that their cases were subject to dismissal, because no court has held that blood lead testing is the *sole* method of demonstrating lead exposure.

Plaintiffs request the Court reconsider its grant of summary judgment as to the five cohort plaintiffs without measured blood lead levels, and allow them to proceed, or at least limit the reach of its holding only to those against whom summary judgment was granted; and, make clear that its holding does not apply to other Plaintiffs without blood lead tests.

Respectfully submitted,

**SCHLICHTER BOGARD LLC**

Dated: November 26, 2025

By:   */s/ Jerry Schlichter*
JEROME J. SCHLICHTER #32225 (MO)
KRISTINE K. KRAFT #37971 (MO)
NATHAN D. STUMP #71641 (MO)
CORT A. VANOSTRAN #67276 (MO)
100 South 4th Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-7151 (fax)
jschlichter@uselaws.com
nstump@uselaws.com
kkraft@uselaws.com
cvanostran@uselaws.com

13