**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION AND MEMORANDUM OF LAW**
**SEEKING CLARIFICATION OF LEGAL ISSUES RELATED TO APPLICATION**
**OF THE SAFE HARBOR IMMUNITY PROVIDED BY ARTICLE 1971**
**<u>WITH ACCOMPANYING EXPERT DECLARATION</u>**

**INTRODUCTION**

This Court held in its January 2023 Order "that the law of Peru, and specifically Article 1971 of its Civil Code, applies" as a defense to Plaintiffs' claims. ECF #1322 ("Order") at 25. Specifically, the Court determined that Article 1971 provides a "safe harbor" under Peruvian law against liability for those who act "in the regular exercise of a right," *id.* at 17 (quoting Article 1971), and further found that the "Environmental Adaptation and Management Program" adopted for the facility (the "PAMA") specifically provided such a right, *id.* at 26.

This foundational ruling, while critical, left unanswered at least three significant legal questions essential to the application of immunity. *First*, under controlling Peruvian law, **what evidence** can the jury consider in determining whether a facility has defaulted on a PAMA and lost its 1971 immunity? *Second*, in the event there is a finding of default at some specific point in **time**, will a finding of default be applied retroactively, eliminating existing immunity for earlier operations, or only prospectively? *Third*, in private party litigation such as this, must the injuries for which recovery is sought have been **caused** by the actions that resulted in default?

The Government of Peru has spoken directly to the first and second questions. As the Court will recall, Peru's first attempt to privatize its mining and smelting industry in 1994 attracted no bidders. Potential investors shied away from the La Oroya Complex because of its significant environmental history and the potential liabilities stemming therefrom. To ameliorate those concerns in the second round of bidding, Peru promised to protect any buyer from third-party environmental claims in all but very limited and prescribed circumstances, even for matters arising from the buyer's own operations.

Significantly, in responding to questions from prospective buyers, Peru expressly acknowledged that it would "accept responsibility for all the contaminated land, water and air until

the end of the period covered by the PAMA," and that the buyer would assume such responsibility *only* upon a finding by Peru's Ministry of Energy and Mines ("MEM") of PAMA non-compliance "***from the date of non-compliance*** of the obligation, according to the ***competent authority's*** opinion." CEPRI-Centromin Peru S.A., Consultations and Answers – 2nd Round, RENCOGRP-004694 (Answer to Question No. 41) (attached as Ex. A). Thus, the Government of Peru made clear, at least as early as March 26, 1997, that non-compliance is determined solely by the "competent authority" and that responsibility for such non-compliance only attaches "from the date of non-compliance." Hence, the only evidence relevant to the jury's consideration of PAMA compliance is whether MEM found Doe Run Peru ("DRP") in violation of the PAMA. And then liability can only arise for activity occurring after the date of non-compliance.

While the Government did not purport to answer the third question—whether a private party's injuries must stem from the non-compliance to overcome the Article 1971 safe harbor—it is black-letter law in both Peru and Missouri that a plaintiff can only recover where there is an adequate causal link between the default and the harm.

This motion seeks an order resolving these important legal questions so the parties will know in advance of trial how the Article 1971 safe harbor immunity will be applied and what, in particular, must be proven to successfully invoke this immunity.

## BACKGROUND

On May 1, 1993, more than four years before DRP's acquisition of the La Oroya smelter, Peru approved the country's first body of environmental mining regulations and the genesis of the PAMA program. *See* Supreme Decree No. 016-93-EM (May 1, 1993) (Peru) (attached as Ex. B), as amended by Supreme Decree No. 046-2004-EM (Dec. 29, 2004) (attached as Ex. C), and Peru Law No. 28964 (attached as Ex. D). As detailed in the Expert Declaration of Ángel Chávez

2

Mendoza ("Mendoza Decl.") (attached as Ex. E)—a Peruvian environmental law expert and former Legal Director of Environmental Mining Affairs for the Ministry of Energy and Mines—mining and metallurgical companies operated with virtually no pre-established limits on facility emissions before the adoption of Supreme Decree No. 016-93-EM. *Id.* ¶ 12. With its adoption, facilities were required to prepare and submit a plan—referred to as a PAMA—for bringing their operations into compliance with new environmental regulations. *Id.* The PAMA was intended as a transition tool to allow companies to continue operations while modernizing their facilities. *Id.* These site-specific PAMAs identified the improvements necessary to comply with new environmental regulations and established a schedule for each facility to implement those improvements. *Id.* ¶ 14. During the PAMA period (typically ten years, unless extended), the PAMA functioned as a liability shield because the operator of a facility was not required to comply with new environmental emissions limits. *Id.* ¶¶ 9(i), 15. Those limits would instead *only* take effect at the conclusion of the PAMA period. *Id.* ¶ 15.

As required by the new law, Centromin—the Peruvian government entity that owned and operated the facility at the time—prepared a site-specific PAMA detailing numerous modernization projects for the La Oroya smelter in accordance with Supreme Decree No. 016-93-EM. MEM approved the La Oroya PAMA in January 1997. *Id.* ¶¶ 17, 32. After DRP acquired the smelter in October 1997, the required PAMA projects were divided between DRP and Centromin.

### **ARGUMENT**

A.   **Question One: What Evidence Can the Jury Consider in Determining Whether a Facility Has Defaulted on Its PAMA?**

It is against this backdrop that the first question arises: under Peruvian law, what evidence can the jury consider in determining whether the La Oroya Complex was in default of its PAMA obligations? As noted above, the Government of Peru answered this question directly in response

3

to questions from potential investors in the La Oroya smelter, explaining that non-compliance is determined "according to the ***competent authority***'s opinion." Ex. A at 41 (emphasis added). Peru assigned MEM (and later its enforcement branch, OSINERGMIN) to serve as the "***competent authority***" to oversee and enforce the PAMA program. Mendoza Decl. ¶ 16 (quoting Supreme Decree No. 016-93-EM, art. 4. In that role, MEM was given "sole government agency responsib[ility]" to implement, supervise, and enforce the PAMA. *Id.* That exclusive authority includes the power to, among other things, "determin[e] the liability of the operator, in the event of a violation of the provisions of this Regulation," and also to "impos[e] the penalties provided therein." *Id.*

This authority was not unfettered. Rather, Supreme Decree No. 016-93-EM created detailed legal procedures, set out in Article 48, for MEM to follow in carrying out and enforcing the PAMA program—procedures that "regulate how, when, and why a PAMA 'default' (otherwise known as a 'non-compliance' in Peru)" could be found. *Id.* ¶ 18.  Under that process:

- MEM was required to audit facilities for PAMA compliance, notify operators of any alleged deficiencies, and provide an opportunity to cure within a designated time period;

- If the deficiencies persisted, MEM was authorized to issue an escalating series of fines;

- Finally, MEM was required to order the facility to submit a closure plan and cease operations, resulting in the formal issuance of a default finding.[1]

*Id*. ¶¶ 18-22.  Only at that final step would the facility be in default, such that continued operation would no longer be in the "regular exercise of a right." Absent an order from MEM requiring closure, the facility would continue to operate, by right, under the governing PAMA.

---

[1] Peruvian law ensures due process protections for these administrative determinations. Mendoza Decl. ¶¶ 23-28. Indeed, "[a]ll administrative sanctioning proceedings, including those initiated by any 'competent authority', must comply with the principles of administrative sanctioning proceedings, such as the 'due process' and 'presumption of lawfulness', which are recognized in the [Peruvian] Constitution" and other Peruvian laws. *Id.* ¶ 24 (footnotes omitted).

As Mr. Mendoza explains, there is no other method or procedure under Peruvian law for finding a party to be in "default" of a PAMA: "The Peruvian State, through different entities over time, supervised the progress on the PAMA and held *sole responsibility*, *through the competent legal authority, to declare facility operators to be in non-compliance with the PAMA,* either during the term of the PAMA or at its expiration." *Id.* ¶ 9(ii) (emphasis added). This is fully consistent with what the Government of Peru itself told investors looking to acquire the smelter.

Given the numerous requirements set out in the PAMA and the complexities of implementing the PAMA projects while continuing plant operations, determining whether a facility was in default of its PAMA would be, as the Court has previously noted, a "factually dense question." Order at 27. This determination, however, under Peruvian law, which this Court has stated controls, was solely within the authority of MEM / OSINGERMIN as the entity authorized to make this determination as the "competent authority." Thus, the only evidence that will be relevant to the jury's determination of whether DRP defaulted on the PAMA is evidence of whether MEM / OSINGERMIN found DRP to have done so. All other evidence Plaintiffs may offer at trial is wholly irrelevant to this question.

**B.**     <u>**Question Two**</u>**: What Is the Significance of the Timing of Default?**

This naturally leads to the second question: if at some point during the PAMA period, a facility is found by the "competent authority" to be in default of the PAMA, what effect does that have on the existing safe harbor immunity? In other words, will a finding of default be applied retroactively, eliminating existing immunity for earlier operations, or is immunity only lost going forward? Once again, the Government of Peru's answer to prospective buyers of the La Oroya smelter is directly on point. In such a circumstance, the operator would only assume responsibility "*from the date of non-compliance* of the obligation, according to the competent authority's

5

opinion." Ex. A at RENCOGRP-004694. This point as to timing and retroactivity is consistent with Peruvian law more broadly. Both the Peruvian Constitution and Civil Code provide that there is no retroactive application of laws except in limited circumstances inapplicable here. *See* Peru Const. Title IV Ch. II Art. 103 (attached as Ex. F) & Peru Civil Code Preliminary Title Art. III (attached as Ex. G). Thus, as a matter of Peruvian law generally, and confirmed by the Government of Peru addressing the circumstances of La Oroya specifically, any finding of default with the PAMA in the future would not strip Defendants of Article 1971 immunity for past smelting operations, as those operations would have been conducted, at the time, "in the regular exercise of a right."[2]

In other words, Defendants can only be liable for conduct that occurred after the "date of non-compliance," as determined by the "competent authority."

**C.    Question Three:  Must the Default Cause Plaintiffs' Injuries for Liability to Attach?**

While the Peruvian Government has not spoken directly on the question, fundamental tort principles—consistent across both Peruvian and Missouri law—confirm that, to the extent a default is found, any damages resulting from the non-compliance must bear a causal relationship to the default. As both parties' Peruvian law experts have previously noted, Article 1985 of Peru's Civil Code provides that "[a]n adequate causal relation must exist between the act and the resulting damage." ECF #756-16 at 31 (Defendants' expert quoting Article 1985); *see also* ECF #640-97 at 14 (Plaintiffs' expert opining that Article 1985 "refer[s] to causality as a constituent element of

---

[2] As the Court is aware, DRP was unable to complete one portion of one PAMA project—the sulfuric acid plant for the copper circuit—though it did complete sulfuric acid plants for the lead and zinc circuits. The critical point, however, is that the deadline for completing that last project did not expire until *after* the La Oroya smelter ceased operations. As a result, even if the controlling authority had issued a finding of default once the deadline passed, that would be irrelevant as to the application of safe harbor immunity for prior plant operations.

the civil liability premise").[3] Thus, if civil liability requires a causal connection between the alleged misconduct and the resulting injuries, Defendants cannot be found to lose Article 1971 immunity based on conduct that did not give rise to Plaintiffs' injuries.

In other words, Defendants can only be liable for conduct that occurred after the "date of non-compliance," as determined by the "competent authority," and the conduct that breached the PAMA must be causally related to Plaintiffs' injuries. A default, for instance, that is unrelated to air lead emissions cannot serve as the basis for liability in these cases in which Plaintiffs allege injuries from exposure to air lead emissions.

## **CONCLUSION**

Defendants respectfully request that the Court issue an order setting forth the following answers to the legal questions outlined above to provide the parties with the direction needed to craft jury instructions and properly prepare for trial: (1) in determining whether DRP violated the PAMA, the only relevant evidence is whether the "competent authority" in Peru (*i.e.*, MEM / OSINGERMIN) concluded that the La Oroya Complex defaulted on the PAMA; (2) any finding of default cannot be applied retroactively, meaning that Defendants can only be liable for conduct starting "from the date of non-compliance, according to the competent authority's opinion"; and (3) any damages resulting from the non-compliance must bear a causal relationship to the default.

Defendants stand willing to submit additional briefing on any issue the Court believes would be helpful to address in further depth.

---

[3] Missouri law is in accord on this point. *See* MSJ Order, ECF #1524 at 59 ("To establish a claim of negligence under Missouri law, a plaintiff must prove that their injury was proximately caused by a defendant's breach of its duty to protect them."); *id*. at 74 ("Causation requires proving 'a reasonable connection between the defendant's tortious conduct and the plaintiff's injury.'") (quoting *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 390 (8th Cir. 2018)); *id*. ("Simply put, plaintiffs must establish a causal connection between the charged negligent conduct and the loss or injury sustained.").

Date: February 23, 2026

Respectfully submitted,

**KING & SPALDING LLP**

By: */s/ Geoffrey M. Drake*
Andrew T. Bayman, #043342GA
abayman@kslaw.com
Geoffrey M. Drake, #229229GA
gdrake@kslaw.com
Mark Sentenac, #987346GA
msentenac@kslaw.com
1180 Peachtree Street, N.E., Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Tracie J. Renfroe, #16777000T
trenfroe@kslaw.com
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

*Attorneys for Defendants The Renco Group, Inc.,*
*D.R. Acquisition Corp., Doe Run Cayman Holdings,*
*LLC, Doe Run Resources Corporation, Ira L.*
*Rennert, Marvin M. Kaiser, and Albert Bruce Neil*

**SIDLEY AUSTIN LLP**

Jennifer L. Saulino
Jennifer.saulino@sidley.com
Richard W. Smith
rwsmith@sidley.com
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736-8649
Facsimile: (202) 736-8711

*Attorneys for Defendants The Renco Group, Inc.*
*and Ira L. Rennert*

**LEWIS RICE LLC**

Thomas P. Berra, Jr., #43399MO
tberra@lewisrice.com
Michael J. Hickey, #47136MO

mhickey@lewisrice.com
600 Washington Ave., Suite 2500
St. Louis, Missouri 63102-2147
Telephone: (314) 444-7600
Facsimile: (314) 241-6056

*Attorneys for Defendants Doe Run Resources Corporation, Marvin K. Kaiser, and Albert Bruce Neil*

**DOWD BENNETT LLP**

Edward L. Dowd, Jr., #28785MO
edowd@dowdbennett.com
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111

*Attorneys for Defendants The Renco Group, Inc., D.R. Acquisition Corp., Doe Run Cayman Holdings, LLC, and Ira L. Rennert*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 23rd day of February, 2026, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Geoffrey M. Drake*