IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| IRA L. RENNERT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE (DOC. 1655)**

Defendants have not shown that Plaintiffs violated any discovery rules or Court orders. Their motion to strike (Doc. 1655) boils down to one complaint: three non-party witnesses—Dr. B. Hunter Farrell, Reverend Elinor Stock, and Leslie Warden—when approached by Plaintiffs' counsel regarding their testimony at trial, turned over additional records that Plaintiffs promptly produced. These witnesses have never been represented by Plaintiffs' counsel and are not under Plaintiffs' control. Defendants have not shown that these witnesses committed any discovery violations, let alone that such violations should be attributed to Plaintiffs and counted for sanctions.

While Defendants complain about the volume of the production, nearly all of it—five boxes of documents, photographs, and videos—were only just received by Dr. Farrell in February 2026. *See* Ex. 1, Farrell Aff. Upon learning of their existence in early March, Plaintiffs' counsel promptly made arrangements to have the records shipped to St. Louis and processed by an outside vendor. Within ***five days*** of receiving the records back from the vendor, Plaintiffs forwarded the entire production to Defendants. Defendants' claim (Doc. 1655 at 4) that counsel "waited 20 days to select which of Farrell's voluminous documents to produce" is doubly incorrect: Plaintiffs' counsel had the digitized records for ***five days*** before producing ***all of them*** to the defense.

Case No.:  4:11-cv-00044-CDP
(Consolidated

Defendants have also failed to show prejudice resulting from the recent production. Plaintiffs conservatively estimate that at least 25% of the records consist of newspaper clippings, printouts from websites, and other publicly available media reports. There are also government pamphlets about the dangers of lead; a copy of Renco's claim in arbitration; copies of correspondence with Doe Run and Renco officials; internal emails among various private individuals expressing concern for children in Herculaneum and La Oroya; information related to a candlelight vigil held in St. Louis for the people of La Oroya; and so on. Some of the documents were already produced in discovery, and their nature and tenor fall directly in line with prior productions of these witnesses. In other words, there is nothing remotely surprising here.

Because no discovery violation occurred, Plaintiffs acted in good faith and produced the records in a timely manner, and no party has been prejudiced, Defendants' motion to strike should be denied.

### BACKGROUND

**Rev. Dr. B. Hunter Farrell** is an ordained Presbyterian minister and missionary long affiliated with the World Mission Initiative of the Pittsburgh Theological Seminary. He worked for over 30 years in the Department of International Mission of the Presbyterian Church (U.S.A.). He spent 15 years as a missionary in the Congo and Peru, including significant time in La Oroya, Peru, during the Defendants' ownership of the Complex. Dr. Farrell was an important organizer for the grassroots movement to improve children's health in La Oroya.

**Rev. Elinor Stock** is also a Presbyterian minister who spent time in La Oroya with the Joining Hands network of religious groups and NGOs. She personally witnessed the air pollution in La Oroya during Defendants' ownership of the Complex, corresponded with officials at Doe Run about the related health crisis, and played a role in connecting Peruvian leaders with organizations and volunteers in the United States. **Leslie Warden** and her family were personally

impacted by the lead emissions from Doe Run's Herculaneum smelter. She witnessed Doe Run's response to the Herculaneum lead crisis and later traveled to La Oroya, where she found the air quality and lead pollution even worse than what she had experienced in her hometown.

All three of these witnesses are well known to Defendants. Each was listed in Plaintiffs' Rule 26 disclosures in July 2020. *See* Doc. 1123 at 3. The parties' joint status report of August 3, 2020, described the scope and knowledge of each witness. *See id.* at 3–4. Each of them has previously produced records in response to a subpoena from Defendants. *See* Doc. 1655 at 2. Defendants deposed Rev. Stock and Ms. Warden in September 2020. *See id.* Despite a clear record and an earlier admonition from Plaintiffs, Defendants "elected not to depose" Dr. Farrell. *Id.* While they acknowledge that this was a "strategic decision[]" on their part, *id.*, they now claim "trial by surprise," *id.* at 1. It is no such thing.

Plaintiffs offer the following timeline of recent events to facilitate the Court's review:

| Late January 2026 | Plaintiffs' counsel began reaching out to third-party fact witnesses to determine whether they might appear at trial. No subpoenas were served. |
|---|---|
| February 11, 2026 | Dr. Farrell received five boxes of records from the Presbyterian Church. *See* Ex. 1, Farrell Aff. at ¶¶ 5–6. |
| March 5, 2026 | Plaintiffs' counsel spoke with Dr. Farrell by phone and first learned of the existence of the five boxes of records. *See id.* at ¶ 7. |
| March 12, 2026 | Plaintiffs received four documents and 64 photographs from Rev. Stock. |
| March 20, 2026 | Plaintiffs received three documents, 47 photographs, and a 2002 book entitled, "La Oroya Cannot Wait," from Ms. Warden. |
| March 20, 2026 | Plaintiffs received four of the five boxes from Dr. Farrell.[1] |
| March 25, 2026 | Plaintiffs received the fifth box from Dr. Farrell and promptly sent all five boxes to an outside vendor for processing. |
| March 25, 2026 | Plaintiffs disclosed the existence of additional documents received from Dr. Farrell, Rev. Stock, and Ms. Warden on Plaintiffs' initial exhibit list. *See* Doc. 1655 at 3. |

---

[1] In a prior communication with defense counsel, Plaintiffs' counsel mistakenly believed the boxes were received on Friday, March 27. *See* Doc. 1655-7 at 2. Four of them were actually received a week earlier, on Friday, March 20.

Case No.:  4:11-cv-00044-CDP
                                                            (Consolidated

| April 7, 2026 | Plaintiffs produced 18 of the 20 new Farrell exhibits and both of the new Stock exhibits that remain on Plaintiffs' exhibit list. |
| --- | --- |
| April 10, 2026 | Plaintiffs received a digitized production of the five boxes from the vendor. |
| April 15, 2026 | With minimal exceptions noted below, Plaintiffs produced the entire digitized production of Dr. Farrell's boxes, as well as the additional records received from Rev. Stock and Ms. Warden. |
| April 17, 2026 | Plaintiffs produced photos of each page of the book, "La Oroya Cannot Wait," even though Defendants already had a copy of the publication and had included it in their own production (e.g., DRPE-0002025493). |
| April 20, 2026 | Plaintiffs produced an additional cassette from Dr. Farrell, which had been challenging to digitize. |
| April 20, 2026 | Defendants sent a letter demanding to know who produced the documents, whether they were subpoenaed, and when they were received. Defendants separately requested Bates numbers for any recently produced documents from Dr. Farrell on Plaintiffs' exhibit list. *See* Ex. 2. |
| April 21, 2026 | Plaintiffs' counsel responded to Defendants' letter at 9:25 a.m. *See* Doc. 1655-7 at 2. Counsel also responded to Defendants' request for Bates numbers at 10:07 a.m. and provided the same. *See* Ex. 2. |

From April 24 to May 5, Plaintiffs produced two identical letters from Rev. Stock and an AI-translated document from Dr. Farrell that had been inadvertently omitted from the production. After careful review, Plaintiffs believe in good faith that they have now produced to Defendants all documents and materials received from Dr. Farrell, Rev. Stock, and Ms. Warden.

On the morning of May 8, 2026, Plaintiffs' counsel met and conferred by videoconference with counsel for Defendants and shared what Plaintiffs had learned about the origins of the five boxes and the timeline set forth above. Plaintiffs' counsel further outlined the arguments that would be presented in this response and invited Defendants to reconsider their motion, particularly as to Dr. Farrell. Defendants' counsel understood that if they were inclined to change their position, Plaintiffs would include their current position in this response if received by the close of business. As of the time of this filing, Plaintiffs have not heard back from Defendants.

Case No.:  4:11-cv-00044-CDP
(Consolidated

## LEGAL STANDARD

Rule 37 of the Federal Rules of Civil Procedure authorizes courts to sanction parties for failure to comply with discovery orders. *Phyllis Schlafly Revocable Tr. v. Cori*, No. 16-1631 (RWS), 2026 U.S. Dist. LEXIS 71784, at *9 (E.D. Mo. Mar. 31, 2026). "In order to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir. 1999). A "Rule 37(b) sanction should not be imposed by the trial court unless a Rule 37(a) order is in effect[.]" *Holmes v. Trinity Health*, 729 F.3d 817, 821 (8th Cir. 2013) (citation omitted). "[T]he exclusion of evidence is a harsh penalty and should be used sparingly[.]" *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). "When fashioning a remedy, the district court should consider, *inter alia*, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.*

## ARGUMENT

### I.   Defendants have failed to establish that Plaintiffs violated a discovery order.

Defendants have not shown that Plaintiffs did anything wrong here. They complain that "***Plaintiffs*** failed to timely discover and produce these documents," Doc. 1655 at 5 (emphasis added), but Plaintiffs' counsel does not represent these three non-party witnesses, has never represented them, and is not responsible for any late-produced discovery from them. The Court has never ordered Plaintiffs to turn over records on their behalf. All three witnesses were directly subpoenaed by the defense in 2020. Plaintiffs were under no obligation to discover and produce records in their possession, especially considering that all of them were represented by separate counsel in connection with those subpoenas.

In fact, it is only through Plaintiffs' diligent efforts that the documents have been identified, received, and promptly produced to the other side. Counsel turned over the entirety of the Farrell production within five days of receiving it back from the vendor. The few materials received from Ms. Warden and Rev. Stock that Plaintiffs intend to use at trial were produced within a month of their receipt. The rest were turned over shortly thereafter. In sum, Plaintiffs complied with their Rule 26 discovery obligations "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A); *see LifeScience Techs., LLC v. Mercy Health*, No. 21-1279 (SEP), 2024 U.S. Dist. LEXIS 177167, at \*17 (E.D. Mo. Sep. 30, 2024) (observing that, under Rule 26, "timeliness means without undue delay upon discovering the information that is to be provided") (citation and marks omitted).

Defendants attempt to pin the witnesses' recent productions on Plaintiffs simply because Plaintiffs' counsel (a) intends to call them as witnesses at trial; (b) "corresponded with them without notifying Defendants"; and (c) "received their documents weeks before producing them." Doc. 1655 at 6. Defendants' "cry" for sanctions on these grounds is legally unsupported. Rule 37 does not apply to discovery sought from non-parties. *See Fisher v. Marubeni Cotton Corp.*, 526 F.2d 1338, 1341 (8th Cir. 1975). There is no discovery violation, and sanctions are unwarranted, where "the documents in question were not in the possession, custody, or control of Plaintiffs' Counsel." *Hawkeye-Security Ins. Co. v. Bunch*, No. 08-1071 (ERW), 2009 U.S. Dist. LEXIS 110401, at \*10 (E.D. Mo. Nov. 25, 2009).

The out-of-district *Weiss* case relied on by Defendants is readily distinguished. There, the plaintiffs had "retained" the witness at issue, they were previously warned by the court that he would not be permitted to testify if he failed to comply with a subpoena, and he nevertheless "failed to produce any documents." *See Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 293 F. Supp. 2d 397, 411 (S.D.N.Y. 2003). The court found that preclusion was warranted because the plaintiffs

had been "duly warned and still fail[ed] to provide the information subpoenaed[.]" *Id.* No such circumstances exist here. To the contrary, the three witnesses were represented by separate counsel; each produced documents in response to subpoenas and were available for deposition; two were deposed. That they dutifully turned over more records in their possession in the run-up to trial is not grounds for their exclusion, especially as Defendants have not shown bad faith or prejudice.

The other out-of-district cases Defendants cite (Doc. 1655 at 5) are similarly off point. In the *Voyager* case, the court found that the defendant "was entirely at fault for the failure to discover and produce [a particular document] when required to do so" in response to valid discovery requests, and late production of the document, which had been in the defendant's possession the entire time, was not substantially justified or harmless. *See Voyager Indem. Ins. Co. v. Zalman N., Inc.*, 668 F. Supp. 3d 990, 998-99 (C.D. Cal. 2023). Likewise, in *Forbes*, the plaintiffs admitted they violated their disclosure obligations as to five photographs and "neither offer[ed] a justification for the late disclosure" nor "attempt[ed] to meet their burden of showing that late disclosure [was] harmless[.]" *Forbes v. 21st Century Ins. Co.*, 258 F.R.D. 335, 338 (D. Ariz. 2009).

Those cases are inapposite to the present situation, where the documents were in the possession of non-party witnesses, Plaintiffs had no reason to know of their existence, and the documents were promptly and proactively produced upon their discovery. This is especially true for the five boxes of records produced by Dr. Farrell, which comprise nearly all the contested documents targeted in Defendants' motion. The undisputed timeline for those materials establishes that they were not in the possession of any party or non-party witness when Dr. Farrell was subpoenaed in this case in 2020; he had disposed of them six years earlier, in 2014, and only got them back six years later, in February 2026. Defendants have not shown ***any*** fault by Dr. Farrell, Rev. Stock, the Plaintiffs, or anyone else in connection with those records.

## II.      Exclusion is unwarranted.

As demonstrated above, Plaintiffs acted appropriately, and sanctions of any kind are wholly unwarranted. Defendants have especially failed to show why the "harsh penalty" of exclusion should be ordered. While they would no doubt like to keep these three non-party witnesses from testifying at trial,[2] they offer no valid justification for such an extreme punishment.

### A.      The testimony of Rev. Stock and Ms. Warden should not be barred.

Defendants' complaints about the Warden and Stock productions are overblown. First, they confuse the issue by referring to past productions in terms of "documents" (*see* Doc. 1655 at 2) but recent supplementations in terms of "pages" (*id.* at 1). This has the effect of implying that the recent supplementations were significant when, in fact, they were not. Depending on how the individual photographs are considered, the recent production from Rev. Stock constitutes a mere six documents, and the production from Ms. Warden constitutes three documents and a video file. Such meager supplemental productions months in advance of trial are neither surprising nor overly burdensome to Defendants.

Defendants complain of "10,000 pages of new documents and dozens of media files from three non-party witnesses (Ellie Stock, Hunter Farrell, and Leslie Warden)" but later acknowledge that only a tiny portion of that production (some 300 pages) was from Rev. Stock and Ms. Warden. Most of those pages are comprised of individual photographs and a publication that Defendants already possessed. The "177-page document that appears to be ... a report on the health impacts of ... operations in La Oroya" is Ms. Warden's soft-bound copy of "La Oroya Cannot Wait," a 2002 book that has been a central piece of evidence in this lawsuit since its inception. It has already been

---

[2] Defendants have also objected to the testimony of these three witnesses for reasons that have nothing to do with late-produced discovery. *See* Doc. 1636.

produced in discovery in multiple forms *by the defense*: *e.g.*, DRPE-0002025493 (in English); DRP-STUDY-000178 (in Spanish); DRRCE-00582666 (in English); DRPE-0001989127 (in Spanish); DRRCE-00835988 (in English); DRPE-0002006667 (in Spanish). The notion that Defendants are somehow disadvantaged by receiving yet another copy of a book they have long possessed is absurd.

Plaintiffs have performed their trial preparations in a diligent, conventional fashion and timely produced these documents to Defendants in good faith when discovered. Plaintiffs did not "curate" the productions but promptly produced *all* materials received from Rev. Stock and Ms. Warden, without regard to their relevance or responsiveness, out of an abundance of caution. Just *eight* of these records (or nine, counting "La Oroya Cannot Wait") appear on Plaintiffs' exhibit list. The newly produced items on Plaintiffs' exhibit list constitute the following (*see* Ex. 3):

a. a jar of lead dust collected by Ms. Warden in Herculaneum, which she will testify is indistinguishable from the lead dust she observed in La Oroya in 2003;

b. a 2002 video news report ("NOW, with Bill Moyers") about lead contamination in Herculaneum, which profiles Ms. Warden and her family;

c. a 2002 video news report (in Spanish) about the Complex titled "Children of Lead";

d. two short letters between Rev. Stock and the U.S. Embassy regarding an incident that occurred during her visit to La Oroya in 2002;

e. a photograph of a framed poster Ms. Warden observed in Peru in 2003;

f. a photograph of another framed poster Ms. Warden observed in Peru in 2003;

g. 15 photographs of the Complex and La Oroya from Ms. Warden, dated 2003; and

h. 17 photographs of the Complex and La Oroya from Rev. Stock, dated 2002 to 2006.

These materials are not surprising. The jar of lead dust was not requested in the subpoena served on Ms. Warden, which demanded only "documents." *See* Ex. 4. It is, however, referenced in publicly available news articles about Ms. Warden. *See, e.g.*, https://www.kbia.org/science-and-technology/2012-08-08/the-end-of-a-lead-laced-era-polluting-smelter-to-close-after-120-years

Case No.:  4:11-cv-00044-CDP
(Consolidated

(last accessed on May 6, 2026) ("Back at their new home a few miles south of Herculaneum, [Jack] Warden unscrews a small glass jar. 'This is what the contamination on the streets was,' he says, spilling a bit on the kitchen table.").

The two videotaped news reports were publicly broadcast in 2002. They contain interviews with Doe Run officials and show contemporaneous video of the smelter pollution in Herculaneum and La Oroya. They were both referenced in Ms. Warden's deposition, *see* Ex. 5 at 3 (29:6-14):

> Q. Tell me what you remember about – tell me what you remember about that initial communication with Ellie Stock?
>
> **A. The initial? She came down to our residence in Herculaneum and she had a tape, a videotape, Telemundo, I believe, that documented what was going on in Peru. And Jack and I had a 60 Minutes, or a Bill Moyers, or whatever, so we just watched each tape to watch the similarities.**

Plaintiffs will offer these videos not for the truth of the matters asserted but for non-hearsay purposes, including Defendants' knowledge that children were at serious risk from lead emissions from the Complex; video footage of the two smelters, their emissions, and the surrounding neighborhoods; and admissions of a party opponent.

The 2002 correspondence between Rev. Stock and the U.S. Embassy records her memory of an incident that occurred when she and others were visiting La Oroya that year. It involved a meeting with the mayor of La Oroya and a subsequent traffic stop she experienced. Rev. Stock testified about the incident at her 2020 deposition, *see* Ex. 6 at 3 (81:1–82:25), and her deposition testimony comports with the substance of the correspondence.

Finally, many of the photographs at issue were previously produced. For instance, the photographs of the framed posters (e and f above) were marked as exhibits 2 and 3 in Ms. Warden's 2020 deposition. *See* Ex. 5 at 2 (5:13-16). Most of Rev. Stock's photos of the Complex were also produced back in 2020, as shown in this example:



**Produced by Rev. Stock in 2020**          **Produced by Rev. Stock in 2026**

These and the other photographs produced by Rev. Stock and Ms. Warden are consistent with the many photographs of La Oroya and the smelter that are already familiar to the parties in discovery. Defendants have not shown any prejudice by the use of these particular photographs at trial, or by the timing of any of the other materials received from Rev. Stock and Ms. Warden, let alone the severe degree of prejudice required to preclude these two witnesses from testifying at trial. Defendants' motion to strike should be denied as to Rev. Stock and Ms. Warden.

**B.      Dr. Farrell's testimony should not be barred.**

Nor should the Court strike the testimony of Dr. Farrell. While he is the one who provided the five boxes of documents that prompted Defendants' motion, he only just received those records himself from the Presbyterian Church on February 11, 2026. *See* Ex. 1 at ¶¶ 5–6. Defendants protest that they would have deposed Dr. Farrell if they had known the "scale" of his involvement in La Oroya, as the "new production reveals far more involvement in La Oroya than his 2020 production suggested." Doc. 1655 at 3–4. But the "9,000-plus pages and dozens of media files" they reference are not his records; they belonged to Rev. Stock. *See* Ex. 1 at ¶ 6. Accordingly, the sheer size of the production and the nature of the records themselves say nothing about Dr. Farrell's involvement in the case. The pertinent witness for these records is Rev. Stock, who was already

deposed by the Defendants in this case and whose role as a long-time advocate for children and families in Herculaneum and La Oroya is anything but a mystery.[3]

Dr. Farrell's work in La Oroya has been well known to Defendants for years. In August 2020, Plaintiffs explained his role in the parties' joint status report: "Hunter Farrell, a Presbyterian missionary from Texas who visited La Oroya in the early 2000's and served as an initial link between La Oroya and St. Louis University School of Public Health." Doc. 1123 at 3. He "put religious leaders from Peru in contact with individuals from St. Louis in order to investigate the health impact on the La Oroya community due to the lead emissions from the La Oroya Complex." *Id.* The documents Dr. Farrell produced in 2020 further elucidated his work in La Oroya. Here are just a few examples:

- A March 2013 academic/theological article by Dr. Farrell detailing the history and timeline of the missionary work in La Oroya, framing it as a case study in how short-term missions can transform into long-term involvement "in a way that contribute[s] to the transformation of the host community…." *See* BHF 00089–BHF 000106.[4]

- A September 2006 article detailing that Dr. Farrell visited La Oroya for the first time in September of 2001 and within a year invited interested residents of La Oroya to become part of the Joining Hands Network. *See* BHF 000329–BHF 000334.

- A May 30, 2006 letter from Dr. Farrell to the "Friends of La Oroya Network" in which he goes into great detail regarding the situation in La Oroya, including details regarding PAMA compliance and the impact of the 2005 St. Louis University study on the local population. *See* BHF 000337–BHF 000339.

- A February 10, 2006 joint letter from Dr. Farrell and Cardinal Barreto to the U.S Ambassador to Peru, Dr. J. Curtis Struble, regarding Doe Run's request to postpone PAMA compliance. *See* BHF 000347–BHF 000348.

---

[3] In her 2020 deposition, Rev. Stock was asked, "why do you not have any of your earlier documents?" In her answer, she explained that "when I retired, we ... got rid of a lot of stuff that I couldn't deal with anymore. We weren't dealing – besides, it was post the closure of the smelter and I just got rid of the stuff." Ex. 6 at 4 (139:17-140:2). Plaintiffs suspect this was a reference to the five boxes she sent to Dr. Farrell in 2014 that wound up in the custody of the Presbyterian Church.

[4] Plaintiffs will provide any Bates-stamped documents to the Court upon request.

Case No.:  4:11-cv-00044-CDP
                                                                     (Consolidated



A 2004 St. Louis Post-Dispatch article produced by Defendants quotes "American Presbyterian missionary Hunter Farrell of Lima, Peru." Ex. 8 at 1 (DRRC-00066886). "'Everyone wants the company to stay and do business and continue to employ people," said Farrell, who works with a group called the Movement for Health in La Oroya. 'But there is an element of human dignity and the right to the health and life of the people.'" *Id.* Barb Shepard is quoted extensively in the same article. *See id.* at 2. In 2005, an article written by Dr. Farrell was forwarded to Barb Shepard, Bruce Neil, and others at Doe Run. *See* Ex. 9 (DRRC-00056826). He writes, "As you know, there are powerful economic interests working against the SLU Environmental Health Test, but a multitude of families, churches, indigenous communities, grass-roots organizations and people have been enabled, by God's grace, to come together and dream of a healthier region with reduced contamination." *Id.* at 3. Shepard forwarded the article to others. *See id.* at 1.

These are just a few examples. Defendants have long been on notice of this witness and cannot credibly claim to be surprised by his role in the case. The scale and scope of his involvement was evident and yet, Defendants passed on the opportunity to depose him. There is no reason to

Case No.:  4:11-cv-00044-CDP
                                                                    (Consolidated

reopen discovery now to allow them a do-over of that "strategic decision." Indeed, this Court has looked askance at parties who belatedly seek discovery that could have been completed on time. *Cf., e.g.*, *Iridex Corp. v. Synergetics, Inc.*, No. 05-1916 (CDP), 2007 U.S. Dist. LEXIS 22070, at *21 (E.D. Mo. Mar. 12, 2007). A late, unnecessary deposition of Dr. Farrell would also disrupt and distract from the other work Plaintiffs are doing to prepare for multiple trials in 2026 and 2027.

To the extent that reviewing the recent production imposes a burden, the parties share it equally. Surely, among the four premier law firms representing them at trial, Defendants have the resources to quickly review and assess the records. It does not take long. A large chunk consists of publicly available newspaper clippings and printouts of various news stories. There are roughly 1,400 photographs showing members of the Joining Hands network engaged in various social activities (e.g., enjoying a potluck dinner). A number of the video files are home movies with no apparent relevance whatsoever to the case.

Plaintiffs have added 20 records from the Farrell production to their exhibit list. *See* Ex. 3. These include various news articles about Herculaneum and La Oroya from 2001-2003; a 1994 editorial authored by Jeff Zelms titled, "*Blood Lead Levels Sharply Reduced*"; correspondence between Rev. Stock and Barb Shepard in 2003; and photos and videos documenting emissions from the Complex (2002–2006). The records were produced over two months before trial. Several of them were already produced in this litigation and are not "new" at all. *See id.*

If Defendants want to designate other recently produced documents for their own exhibit list, Plaintiffs have no objection. But more is not required. Defendants' proposals—re-opening discovery, striking testimony, or barring use of materials—are draconian and reserved for actual discovery offenses, not the mere inconveniences of trial preparation. Quickly rectified errors by non-parties, even if attributable to a party, are not typically the basis of Rule 37 sanctions. *See,*

Case No.:  4:11-cv-00044-CDP
(Consolidated

*e.g.*, *Fluor Fed. Sols., LLC v. BAE Sys. Ordnance Sys.*, No. 19-698, 2023 U.S. Dist. LEXIS 20434, *9 (W.D. Va. Feb. 7, 2023) (declining to impose sanctions against party for third-party vendor's error where the mistake was timely disclosed and the documents promptly produced).

## CONCLUSION

Defendants have not identified any rule or discovery order that Plaintiffs violated. Nor have they demonstrated any meaningful prejudice resulting from the production of these non-party witness records. The extreme relief they seek—barring the witnesses from testifying at trial—is unjustified. Defendants should be permitted a reasonable time in which to amend their exhibit list to include other recently produced records, if they choose. They should also be permitted to lodge additional objections to any of the new documents on Plaintiffs' exhibit list, now that the parties have a better understanding of their origins. Otherwise, and in all material respects, the motion to strike should be denied.

May 8, 2026

Respectfully submitted,

**SCHLICHTER BOGARD LLC**

 /s/ *Cort A. VanOstran*
Cort A. VanOstran, #67276 (MO)
Jerome J. Schlichter, #32225 (MO)
Nathan D. Stump, #71641 (MO)
Kristine K. Kraft, #37971 (MO)
Rachel Berger, #77248 (MO)
100 South 4th St., Suite 1200
St. Louis, Missouri 63102
(314) 621-6115
cvanostran@uselaws.com
jschlichter@uselaws.com
nstump@uselaws.com
kkraft@uselaws.com
rberger@uselaws.com

*Attorneys for Plaintiffs*

Case No.:  4:11-cv-00044-CDP
(Consolidated