IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| IRA L. RENNERT, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSES IN OPPOSITION TO
DEFENDANTS' OMNIBUS MOTIONS IN LIMINE (DOC. 1645)**

Pursuant to the Court's Order (Doc. 1590), Plaintiffs file this memorandum in opposition to Defendants' omnibus motions *in limine* (Doc. 1645).

**I.     Opposition to MIL #1: Evidence and Argument Concerning Herculaneum**

Defendants' experience in Herculaneum is highly probative of their knowledge and motive and should not be excluded. The probative value readily outweighs any undue prejudice. Evidence of other acts may be admitted if it is "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the event at issue." *White Communs., LLC v. Synergies3 Tec Servs., LLC*, 4 F.4th 606, 612 (8th Cir. 2021) (quoting *Batiste-Davis v. Lincare, Inc.*, 526 F.3d 377, 380 (8th Cir. 2008)); *see* Fed. R. Evid. 404(b). Knowledge and motive are permissible purposes. Fed. R. Evid. 404(b); *United States v. Simon*, 767 F.2d 524, 526 (8th Cir. 1985) ("Rule 404(b) ... admits evidence of other crimes or acts relevant to any issue in the trial....") (citation omitted).

Defendants' knowledge—regarding, *inter alia*, the dangers of fugitive emissions from lead smelters and the steps necessary to protect neighboring communities from harm—is an essential component of this action. *See, e.g.*, Doc. 474 (Am. Compl.) at ¶¶ 107, 190, 206, 207, 227 (alleging

Defendants' knowledge); Doc. 949 at 32 (crediting knowledge allegations in upholding negligence claims). Before purchasing the Complex, Defendants owned and operated a primary lead smelter in Herculaneum, Missouri. The Herculaneum smelter was *the* principal source of Defendants' knowledge as to the risks of primary lead smelting and the steps necessary to avoid harm to children. Their experience in Herculaneum involved many of the same decisionmakers, occurred in the same general timeframe, and covered the same general issues.

The subject of Defendants' Herculaneum experience is inexorably woven into the fabric of the case. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Just before he became the president of Doe Run Peru (DRP), Ken Buckley oversaw the operations at Herculaneum.[2] ██████████████████████████



████████████████████ When the MEM approved the 2005 PAMA modification request to address fugitive emissions, it noted that Defendants' process for addressing fugitive emissions would be "based on the experience applied in smelters, namely Herculaneum...."[5]

---

[1] ███████████████████████████.

[2] Ex. 2, 2021 Buckley Dep. at pp. 24–25.



[5] Ex. 5, DRRC-00075367, DRRC-00075435.

Case No.: 4:11-cv-00044-CDP
(Consolidated

Herculaneum also recurs in critical documents, including joint trial exhibits. ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████ █ █████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ █

In the 2002 publication, "La Oroya Cannot Wait," the authors wrote: "Doe Run has implemented several programs to protect public health in Herculaneum. These programs could easily be replicated in La Oroya."[8] ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ █ █████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████ █ These are just some of the many examples showing why the jury will necessarily hear about Herculaneum.[11]

---

█ ████████████████████████████████

█ ████████████████████████████████

[8] Ex. 8, "La Oroya Cannot Wait," at 57–58.

█ █████████████████████████

[10] *Id.*

[11] The following witnesses on Defendants' witness list were also deposed in the Herculaneum litigation: Banner, Binko, Bowers, Chalhub, Hoffnagle, Kaiser, Mard, Marucheau, Rennert, and Sadlowsi. Doc. 1638. Putting aside the practical question of how Plaintiffs could use the depositions for impeachment without mentioning that lawsuit, the extent of the overlap reinforces that Defendants' knowledge of these matters is informed by Herculaneum. Additional witnesses on Plaintiffs' witness list also deposed in the Herculaneum litigation include Ryer-Powder, Shepard, Warden, and Zelms.

Case No.:  4:11-cv-00044-CDP
                                                                        (Consolidated

Defendants urge that their Herculaneum experience was not "substantially similar" to La Oroya.[12] Doc. 1645 at 7–8. But Defendants fail to identify a single meaningful difference between Herculaneum and La Oroya. The relevant environmental regulations are immaterial, because this is not a regulatory enforcement proceeding. The complexity of the La Oroya facility is irrelevant to Defendants' knowledge that the facility was releasing lead emissions, including fugitive emissions, and that those emissions were harmful to children in the surrounding communities. La Oroya was a multi-metallurgical complex, but this case is about lead. Likewise, the location of the Complex is irrelevant to Defendants' knowledge of fugitive lead emissions and their impact on surrounding communities, especially children. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ Last, the notion that Herculaneum had an isolated environmental team is simply untrue.[14]

---

[12] The "substantially similar" standard Defendants cite is specific to "prior incident" evidence in products liability cases. *See* Doc. 1645 at 8 (citing *Lovett ex rel. Lovett v. Union Pac. R.R.*, 201 F.3d 1074 (8th Cir. 2000); *J.B. Hunt Transp., Inc. v. GMC*, 243 F.3d 441 (8th Cir. 2001). [All citations to Defendants' Motions in Limine refer to ECF pagination.] Plaintiffs satisfy this standard in any case; where prior experience supports knowledge or notice, "the incidents need only be sufficiently similar to make the defendant aware of the dangerous situation." *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1386 (4th Cir. 1995).

[13] Ex. 5. Despite Defendants' attempts to recast his deposition, Mr. Marucheau's testimony, in context, ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Each of the categories of evidence Defendants identify as specific to Herculaneum is directly relevant to—and probative of—Defendants' knowledge and intent in this action. Leslie Warden will testify about her visit to La Oroya, her personal observations of the lead contamination there, and how she came to be involved in La Oroya through her experience in Herculaneum, where she first learned about the dangers that lead smelters pose to children and witnessed Defendants' response to those concerns. The personal injury lawsuits, government investigations, and regulatory actions relating to lead emissions in Herculaneum all show Defendants' knowledge of the impact those emissions would have in La Oroya. Press releases and news articles concerning Herculaneum are likewise probative of the fact that Defendants understood the damage being caused by their lead smelting operations. Negative press coverage of Herculaneum is also relevant to show the reason Defendants opted to acquire the Complex in 1997.

Internal documents relating to emissions controls at Herculaneum show that Defendants knew how to effectively control lead emissions and the steps they could have implemented at the Complex. Public relations campaigns and political lobbying evince Defendants' knowledge of the health effects of lead, particularly of exposure to lead dust from primary lead smelting and the reasons that Defendants chose to focus on developing their Peru operations in the mid-90s and early 2000s. The jar of lead dust collected by Ms. Warden will be helpful to the jury's understanding of what lead dust is and how it settles. She will testify that she and her husband collected the dust in Herculaneum and that the dust she saw in La Oroya was identical but present in far larger quantities throughout the area.

The Court's summary order (Doc. 283) regarding certain discovery requests does not affect the analysis. *Contra* Doc. 1645 at 9. "[D]iscovery evolves over time as theories of liability, defense, and relief begin to take shape and may not come into focus until the end of discovery." *Hill v.*

Case No.:  4:11-cv-00044-CDP
                                                                    (Consolidated

*Briggs & Stratton LLC*, No. 2-2243, 2026 U.S. Dist. LEXIS 70103, at *7 (S.D. Ohio Mar. 27, 2026) (citation omitted). The examples above show that Defendants' own documents contain myriad references to Herculaneum and La Oroya such that the issues are not practically separable. Far from being "context-free and fragmentary" (Doc. 1645 at 9), the evidence relating to Herculaneum comes largely from Defendants' own productions and goes directly to knowledge.

Defendants' prejudice arguments fail. They protest that Ms. Warden's testimony about her son will confuse the issues, but she will testify about her separate experiences in Herculaneum and La Oroya, and the jury will not be confused. Defendants claim that Herculaneum's changes in ownership raise questions as to who gained knowledge from Herculaneum. But Plaintiffs will show that it was Defendants and their own officers and employees; any knowledge that other owners of Herculaneum may or may not have garnered is not at issue. Last, testimony from Dr. Matson about lead emission control projects at Herculaneum is directly relevant to show what Defendants could have implemented at La Oroya. It is difficult to see how this would confuse the jury. Nor will this testimony require Defendants to introduce rebuttal evidence that has not been produced. Defendants' experts submitted rebuttal reports addressing Dr. Matson's testimony years ago.

In sum, evidence relating to Defendants' Herculaneum smelter is exceptionally probative to Plaintiffs' allegations and Defendants' Rule 403 objection fails.

## II.    Opposition to MIL #2: Evidence and Argument Concerning Lawsuits, Regulatory Compliance, or Financial Practices and Difficulties of Other Renco Businesses

In their second motion in limine, Defendants broadly seek to exclude all evidence of "environmental and/or regulatory compliance issues or financial difficulties relating to Defendants' other businesses or facilities," arguing that they "involve activities wholly separate from those alleged here." Doc. 1645 at 14. They identify (at 13) two matters by name: Magnesium Corporation of America (MagCorp) and WCI Steel, Inc., both of which were owned by Renco

when they were sued by U.S. regulators for environmental violations. Defendants argue that any such evidence is inadmissible unless it "involves 'virtually identical' circumstances." *Id.* (quoting *Moses.com Sec., Inc. v. Comprehensive Software Sys.*, 406 F.3d 1052, 1059 (8th Cir. 2005)). But there is no "virtually identical" requirement in the Rules of Evidence, and the case they rely on is readily distinguished.

In *Moses.com*, the plaintiff sued a software developer for negligent misrepresentation about the functionality of its stock trading program. *See Moses.com*, 406 F.3d at 1057-58. On appeal, the Eighth Circuit found it was not an abuse of discretion for the district court to bar evidence of how the defendant's systems were performing at other companies, as the plaintiff had no factual basis to assume that "the other companies' systems were virtually identical" to the software at issue. *See id.* at 1059. Without that factual connection, evidence of how the defendant's systems were faring at other companies was "not clearly relevant." *Id.*

The *Moses.com* decision makes no reference to Rule 404(b), which is the rule that governs "other acts" evidence. Fed. R. Evid. 404(b). Under the Rule, such evidence is not admissible to prove propensity, but it may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* The other acts need not be "virtually identical"; it is enough if they are "similar in kind and close in time to the event at issue." *White Communs., LLC*, 4 F.4th at 612 (internal marks and citation omitted). The Herculaneum situation addressed above is one example of how other acts evidence can be directly relevant to the claims at issue. So, too, are other Renco subsidiaries like MagCorp and WCI Steel, which are relevant to show knowledge, intent, and control.

At trial, Plaintiffs will show that Renco and Rennert undercapitalized DRP, saddled it with enormous debt, and siphoned its profits, eventually running it into bankruptcy. The jury should be

allowed to hear that this was no accident; ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████ This has long been Rennert's modus operandi, as reported by various

news outlets over the years.[16] ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Evidence involving other Renco companies is also relevant to the issue of control, because

the evidence will show that Rennert and Renco controlled DRP in a manner similar to how they

controlled their other subsidiaries. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████ (see WCI Steel, Lodestar Energy,
Magnesium Corporation of America)"); *see also generally* Ex. 16, *Ira Rennert's House of Cards*,
Bloomberg (Sept. 2004); Ex. 17, *Devastating Luxury*, Vanity Fair (July 2003).

[17] Ex. 18, Excerpts of MagCorp Trial Tr. at 432:21–433:16.

Case No.: 4:11-cv-00044-CDP
                                                                              (Consolidated

jury should be able to consider this and other evidence like it in determining whether Rennert controlled Renco, and whether they both controlled their subsidiaries, including Doe Run and DRP.

To the extent Defendants seek to preclude any mention of other lawsuits against other Renco entities, the motion should also be denied. Plaintiffs have no intention of delving into the merits of those other cases, but Plaintiffs should be permitted to question Mr. Rennert about his testimony in the MagCorp case, and the jury should have some basic context to understand the circumstances in which that testimony was offered. The fact of the lawsuits is not simply "a generic pattern ... meant to show bad character." *Cf. Van Deelen v. Johnson*, No. 05-4039, 2008 U.S. Dist. LEXIS 85519, at *7 (D. Kan. Oct. 22, 2008). Rather, it shows the same Renco policies and practices at issue here leading to a very similar result. Defendants have not established any serious risk of confusion or waste of time that would substantially outweigh the probative value of the evidence. *See* Doc. 1645 at 14. Defendants' hearsay arguments are non-specific, and, in any event, best addressed on a case-by-case basis at trial. *See Nakagaki v. Surgical Care Affiliates LLC*, No. 23-00617, 2025 U.S. Dist. LEXIS 46463, at *7–8 (C.D. Cal. Jan. 29, 2025).

### III.    Opposition to MIL #3: Evidence and Argument Regarding Non-Peru Regulations

Evidence of international environmental regulations, especially U.S. regulations, is highly probative in this action. A critical question for the jury will be whether Defendants failed to use "ordinary care," meaning the degree of care that "an ordinarily careful person would use under the circumstances."[18] This case involves decisions made by American businessmen in the United States.[19] U.S. regulations are relevant to determine whether these U.S. defendants used ordinary

---

[18] MAI 11.07.

[19] Doc. 474 (Amended Complaint) at ¶¶71, 99, 103, 109, 188, 225. *State Farm Mut. Auto. Ins. Co. v. Campbell*, which concerns behavior that was "lawful where it occurred" is, accordingly, inapposite. 538 U.S. 408 (2003); Doc. 1645 at 15.

Case No.:  4:11-cv-00044-CDP
(Consolidated

care. *See In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1024 (E.D. Mo. 2009) ("The regulatory scheme is also relevant to the standard of care issue[.]").

This is so regardless of whether Defendants' Peru operations were themselves subject to U.S. regulations. *Cf. St. Germain v. United States*, No. 20-105, 2022 U.S. Dist. LEXIS 37400, *10 (D. Conn. Mar. 3, 2022) (codes that are not binding on defendants "may still inform the factfinder's conclusions regarding what constituted reasonable care"); *McNaught v. United States*, No. 07-10713, 2009 U.S. Dist. LEXIS 143587, *12 (D. Mass. Dec. 22, 2009) (regulations are relevant to determining whether defendant took reasonable precautions "regardless of whether the codes explicitly apply" to the defendant). The jury should be free to find that U.S. regulations, with which Defendants were intimately familiar from their Missouri operations, inform Defendants' standard of care.[20] And *even if* the Court were to determine that U.S. regulations are inadmissible as evidence of the relevant standard of care, such regulations would nonetheless be admissible because their existence put Defendants on notice that lead emissions beyond such standards could pose a threat to human health, and specifically, to the communities (including the children) living near the smelter. *See In re Davol, Inc.*, No. 18-2846, 2021 U.S. Dist. LEXIS 237370, *56 (S.D. Ohio Dec. 13, 2021) ("[W]hen the evidence is put forward to demonstrate mere notice, no such contextualization is necessary.").

Defendants claim that evidence of U.S. regulations "poses a high risk of prejudice to Defendants because the jury may well hold them liable for DRP's violating a U.S. regulation." Doc. 1645 at 15. But this is not a strict liability action, and the jury will not be assessing liability

---

[20] *See also Mazzocchio v. Cotter Corp.*, 120 F.4th 565, 569 n.2 (8th Cir. 2024) (citing dissent in *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 345 (2008) ("Most States do not treat regulatory compliance as dispositive, but regard it as one factor to be taken into account by the jury.") (Ginsburg, J., dissenting)).

based on Defendants' compliance (or lack thereof) with any regulatory scheme, U.S. or Peruvian. *See In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d at 1022 (while regulations are relevant to standard of care, "performance standards do not provide a standard of care"); *cf. Bayes v. Biomet, Inc.*, No. 13-800 (SRC), 2021 U.S. Dist. LEXIS 143810, *16 (E.D. Mo. Aug. 2, 2021) (industry standards "have relevance to whether [defendant] breached the standard of care but do not establish the applicable standard of care").[21] Thus, evidence of U.S. regulations is no more prejudicial than evidence of Peruvian regulations, which Defendants do not seek to exclude. Moreover, introducing only Peruvian regulations would generate significant prejudice by falsely implying that Peru's regulations alone set the standard of care. *See, e.g.*, Doc. 1322 at 51 (acknowledging Dr. Matson's testimony that "Doe Run Peru could satisfy Peruvian environmental standards for air quality and yet not satisfy the standard of care."). Defendants have not shown prejudice that substantially outweighs the significant probative value as necessary to warrant exclusion under Rule 403.

## IV.    Opposition to MIL #4: Argument that Defendants Acquired the Complex to Escape U.S. Environmental Regulations

In its January 22, 2026 status conference, the Court made clear that motions in limine should be limited to requests to exclude evidence, not argument. Doc. 1589 at 17 ("[I]t should be things that are evidence-based, not me to tell somebody they can't argue something or argue about the law. So please remember that."). This motion to exclude argument thus readily fails.

---

[21] Defendants' cited authorities involved the introduction of *foreign* regulatory action to prove claims of *domestic* law violations. *See* Doc. 1645 at 15 (*citing In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007) (excluding testimony about foreign regulatory actions, which, "in a case that is governed by domestic law, would likely cause jury confusion"); *In re Seroquel Prods. Liab. Litig.*, No. 06-1769, 2009 U.S. Dist. LEXIS 124798, *289 (M.D. Fla. Jan. 30, 2009) ("the foreign regulatory actions have no relevance to Plaintiffs' main case")). These are irrelevant to whether U.S. regulations are admissible in a case involving U.S. defendants.

Moreover, as Plaintiffs will show at trial, the evidence supports a reasonable inference that Defendants acquired the Complex in part because of the relatively lax regulatory scheme in Peru.



Similarly, Zelms' deposition testimony (which Defendants cherry pick and distort, Doc. 1645 at 16–17)

Evidence is not "inflammatory" simply because it is damning. *See, e.g.*, *United States v. Jongewaard*, 567 F.3d 336, 342 (8th Cir. 2009) ("Virtually all evidence is prejudicial—if the truth be told, that is almost always why the proponent seeks to introduce it—but it is only unfair prejudice against which the law protects.") (citation and marks omitted). The jury should be allowed to draw all reasonable inferences from the evidence presented. Defendants' request for the Court to determine now what inferences the evidence may support at trial is inappropriate. *See Doe v. Bd. of Trs. of the Neb. State Colls.*, No. 17-265, 2021 U.S. Dist. LEXIS 98351, *10–11 (D.

Neb. May 25, 2021) (denying motion in limine because "the jury will be instructed that attorney argument is not evidence" and "the jury can draw reasonable inferences from the evidence").

**V.      Opposition to MIL #5: Evidence and Argument Concerning the Personal Financial Status, Wealth, or Assets of Defendants During the Liability Phase**

Plaintiffs will separately oppose Defendants' Motion to Bifurcate, because, as Plaintiffs will explain in their opposition brief, bifurcation is unnecessary and inefficient. Doc. 1646. In response to Defendants' parallel motion in limine, Plaintiffs make the following brief points:

First, Defendants Renco's and Rennert's financial information from the period the smelter operated is directly relevant to Plaintiffs' liability allegations.  This financial information is critical to show the flow of payments between Doe Run and Renco, Defendants' undercapitalization of Doe Run, and Defendants' control, all of which are relevant to Plaintiffs' veil-piercing allegations.

Second, Defendant Rennert and Renco's net worth at the time DRP operated the Complex is directly relevant to a jury determination as to the amount of capital that would have been reasonable for Defendants to expend on controlling lead emissions. For example, Defendants renegotiated their PAMA multiple times because they purportedly did not have sufficient capital to complete the PAMA projects.[26] Evidence of Defendants' net worth will support that Defendants had the ability to spend far more but chose not to.

Third, to the extent Defendants are allowed to tout "charitable" or environmental spending in Peru that was not directly related to reducing lead emissions or addressing the effects thereof, Plaintiffs should be allowed to demonstrate the value of that spending relative to Defendants' total assets. Without that context, evidence of such spending would be even more unfairly prejudicial.

---

[26] *See e.g.*, Ex. 21, DRRC-00046949 *et seq.*, at PDF 14–15 (Doe Run Resources Company 10-K for fiscal year ending October 31, 2004) (explaining Doe Run did not expect to be able to comply with the investment requirements of the PAMA for 2005 and 2006 and would therefore request an extension from the MEM).

Fourth, Plaintiffs will introduce evidence that Defendants considered but ultimately chose not to relocate the residents of La Oroya to protect them from the smelter's emissions.[27] Renco's simultaneous purchase of a grand estate in the Hamptons for Rennert's personal use is highly probative of the reasonableness of that decision, which could have protected Plaintiffs.[28]

Fifth, the purportedly "extraneous details" to which Defendants claim counsel devoted "inordinate time" regarding Rennert's personal car, jet, and fur were elicited, per the Court's instruction, simply because Defendants refused to provide Plaintiffs with an accurate assessment of Rennert's net worth.[29] Defendants can still minimize the need for such questioning by providing full and accurate financial information for Mr. Rennert and Renco, but they have not.

Sixth, the idea that evidence of Defendants' assets should be excluded from arguments regarding punitive damages ignores the very purpose of punitive damages—to punish and deter individuals situated like Defendants. *See* Doc. 1624 at 4 (punitive damages are "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence") (citation omitted). Indeed, "the Supreme Court has explicitly recognized that juries have 'broad discretion ... in assessing the amount of punitive damages ... [and] evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded.'" *Graham v. Bristol Hospice Holdings Inc.*, No. 21-754, 2026 U.S. Dist. LEXIS 13090, *5 (D. Utah Jan. 23, 2026) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981)).[30]

---

[27] *See, e.g.*, Ex. 22, RENCOGRP-037494, at PDF 8 (La Oroya Complex Business Plan noting that "much of La Oroya city should be moved to a new community").

[28] *See generally* Ex. 17.

[29] *See* Doc. 1572 at 25:21–26:2 (Transcript of Expedited Hearing).

[30] Defendants cite no contrary authority. In *Campbell*, the Supreme Court said nothing about evidence of a defendant's personal assets. *Campbell*, 538 U.S. at 424. In *McKiver*, evidence of a parent company's assets was deemed irrelevant because the parent itself was not a defendant. *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 976 (4th Cir. 2020).

Case No.:  4:11-cv-00044-CDP
                                                                    (Consolidated

Evidence of Defendant Rennert's assets is directly relevant to assessing the sum necessary to serve as a deterrent for him and others so situated.

## VI.     Opposition to MIL #6: Evidence or Argument Regarding Defendants' Arbitrations

Defendants' sixth motion should be denied in its entirety. References to, evidence of, and arguments regarding Defendants' arbitration proceedings in Peru should be permitted for a limited purpose. Namely, statements made by Defendants and defense witnesses in those proceedings are admissible as non-hearsay statements of a party opponent. Fed. R. Evid. 801(d). For example,

███████████████████████████████████ ; ██████████████████████

█████████████████████████████████████████████████

██████████████████████ The jury should be permitted to consider these and other statements attributable to Defendants. The context in which the statements were made has no bearing on their relevance to the trial and is not grounds for exclusion. Nor would their introduction force Defendants to "litigate their claims against Peru in this forum" or "defend their decision to seek redress from Peru." *Contra* Doc. 1645 at 22.

Evidence pertaining to the arbitration proceedings may also be relevant for additional purposes, depending on how the Court rules on other motions. For instance, Plaintiffs moved *in limine* to exclude evidence of potential indemnification for Defendants' liability. *See* Doc. 1654 at 15–16. If that motion is denied and Defendants introduce the idea of indemnification, the jury should be allowed to know that Peru and Activos Mineros deny that they are obligated to indemnify Defendants and that such indemnification is therefore highly speculative. Similarly, if Defendants



are allowed to introduce arguments on Article 1971 and other aspects of Peruvian law, Peru's own position as to the proper interpretation of those provisions should also be permitted. *See* Doc. 1654 at 2–11. In particular, the jury should know that Peru has taken the position in arbitration that DRP failed to meet its PAMA obligations and adopted practices that increased the environment harm caused by the Complex.[33] Defendants disparage that fact as "a sideshow" and suggest it should not be considered the official position of the Peruvian government. Doc. 1645 at 22–23. The jury should be permitted to reach a different conclusion.

## VII.    Opposition to MIL#7: Deposition Testimony of Dr. Cheremisinoff

Defendants argue—without offering a single citation of law except general references to Rules 26 and 37—that Plaintiffs must exclude the deposition testimony of their late expert. They do not dispute the probative value of Dr. Cheremisinoff's testimony, nor can they. He compiled a 170-page report, including a historical reconstruction of emissions inventories from the Complex and personal investigation of the air pollution management practices in La Oroya.[34] At his deposition, Dr. Cheremisinoff expanded on his expert opinions, including the process he used for creating the reconstructions.[35] Dr. Matson expressly relied on Dr. Cheremisinoff's deposition testimony in forming his opinions.[36] The Court already found that such reliance was proper.[37]

---

[33] *See e.g.*, Respondents' Counter-Memorial, PCA Case Nos. 2019-46 & 2019-47, at 45–46, 63–113 (Perm. Ct. Arb. Apr. 1, 2022), available at https://pcacases.com/web/sendAttach/35805.

[34] *See* Ex. 25, Expert Report of Dr. Nicholas Cheremisinoff.

[35] *See* Ex. 26, Transcript of Deposition of Dr. Nicholas Cheremisinoff, at 193–204.

[36] Doc. 1225–1 at 1 ("(Upon reviewing Dr. Cheremisinoff s Expert Report (Cheremisinoff, 2/18/2019) and the materials cited in his expert report, *the deposition transcripts and exhibits* (Cheremisinoff Deposition, 5/22/2019; 5/23/2019) and his expert rebuttal reports (6/22/2020), I have determined…")") (emphasis added).

[37] Doc. 1524 at 48–52. Accordingly, the deposition testimony is separately admissible as an expert reliance material under Rule 703. Fed. R. Evid. 703 (the proponent of expert reliance materials that are not otherwise admissible may disclose them to the jury if their probative value outweighs their prejudicial effect); *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 908 (E.D. Ark. 2020)

Defendants' claims of prejudice are hollow. The Federal Rules are clear that "[a] party may use for any purpose the deposition of a witness, whether or not a party" if the court finds that "the witness is dead." Fed. R. Civ. P. 32(a)(4)(A). Dr. Cheremisinoff passed away on August 9, 2020. His testimony is thus admissible. Probative expert deposition testimony may be presented by video where the expert is unavailable. *Cf. Long v. Fairbank Reconstruction Corp.*, 701 F.3d 1, 5 (1st Cir. 2012) (where plaintiff offered deposition video of defendants' former expert, "the district court did not err—let alone plainly err—in admitting the video"); *see also Fletcher v. Tomlinson*, 895 F.3d 1010, 1020–21 (8th Cir. 2018) ("We hold that Rule 32(a)(4)(B) gave the district court discretion to admit Dr. Berns's deposition testimony because he was more than 100 miles away from the trial, and Fletcher did not procure his absence.").

Plaintiffs' use of Dr. Cheremisinoff's deposition testimony poses no risk of unfair prejudice because Defendants deposed Dr. Cheremisinoff in May 2019. Defendants thus had full opportunity to question Dr. Cheremisinoff and test his opinions through cross examination. Their claims of "surprise and strategic gamesmanship" are unfounded. Plaintiffs previewed their continued reliance on Dr. Cheremisinoff's testimony in their opposition to Defendants' summary judgment motion.[38] Plaintiffs also accurately and timely conveyed to Defendants that they were securing "substitute" or "replacement" experts who could "step in the shoes of Dr. Cheremisinoff," which Dr. Matson and Mr. Sullivan did by handling supplemental reports and being available for direct examination by Plaintiffs at trial. Plaintiffs certainly never represented to Defendants that they

---

("Pursuant to Rule 703, even if inadmissible, the proponent of the opinion may disclose the otherwise inadmissible facts or data to the jury if probative in helping the jury evaluate the opinion and if the probative value substantially outweighs the prejudicial effect.").

[38] Doc. 1276 at 142–43 ("Defendants also ignore the substantial work of the late Dr. Cheremisinoff, Plaintiffs' original standard of care expert, whose opinions Dr. Matson adopted and ***whose deposition testimony is also admissible***.").

would not introduce Dr. Cheremisinoff's deposition testimony at trial. Accordingly, designations from Defendants' deposition of Dr. Cheremisinoff are admissible under Rule 403's balancing test.

### VIII.   Opposition to MIL #8: Plaintiffs' Authentication Witness, Christopher Brown

Plaintiffs will rely on Mr. Brown for business records authentication in connection with Dr. Cheremisinoff's expert reliance materials. Plaintiffs anticipate that this testimony will be extremely brief. Such authentication testimony raises no risk of prejudice to Defendants.

### IX.   Opposition to MIL #9: References to the Absence of Witnesses at Trial

Plaintiffs agree that references to a witness's absence from the courtroom should generally be precluded.[39] However, if a Defendant or a Defendant's representative fails to appear entirely, Plaintiffs should be allowed to comment on that wholesale absence in closing arguments. *See In re Yasmin & Yaz (Drospirenone) Mktg.*, No. 9-2100, 2011 U.S. Dist. LEXIS 147935, at *28 (S.D. Ill. Dec. 22, 2011) ("[I]f no corporate representative is present at counsel table, said absence is fodder for comment by plaintiff since it is customary for such a person to be present.").[40]

### X.   Opposition to MIL #10: References to Other Plaintiffs

Plaintiffs should be permitted to tell the jury that they are not the only ones who have brought claims against Defendants for lead exposure from the Complex. Plaintiffs would not seek to introduce the *number* of other plaintiffs or lawsuits filed against Defendants, only that there are others. Defendants contend that mentioning other lawsuits would be unduly prejudicial because it could lead a jury to "incorrectly assume that Plaintiffs' case must be meritorious based on the

---

[39] Doc. 1654 (Plaintiffs' Omnibus Motions in Limine) at 19.

[40] If the trial is bifurcated (it should not be), Plaintiffs should certainly be allowed to comment on a Defendants' total absence from the punitive damages phase. Defendants' *own authority* supports that such absence would be relevant at such stage. *See C.C. v. Suzuki Mfg. of Am. Corp.*, No. 16-01271, 2018 U.S. Dist. LEXIS 160788 (E.D. Mo. Sep. 20, 2018) (denying motion to preclude mention of corporate representative's absence for punitive damages phase).

number of others who have sued." Doc. 1645 at 25–26. But the reverse is also true and more compelling. Excluding all mention of other lawsuits would be highly prejudicial to Plaintiffs, as it could lead the jury to wrongly assume their case is ***not*** meritorious because only five of the many thousands of affected children have sued. There is no reason the jury should be so misled.

The fact of other plaintiffs has probative value. The initial actions in this matter were filed in October 2007, while Defendants were still operating the Complex. Afterward, Defendants dramatically increased their PAMA spending. ███████████████████████████ ███████████████████████████ █ ███████████████████ ███████████████████ █ In assessing the Defendants' conduct, the jury should be permitted to know when the first lawsuits were filed against them. If the Court is inclined to preclude all mention of other plaintiffs, the jurors should at least be told when the litigation was filed and instructed not to consider the number of plaintiffs in reaching their verdict. Such an instruction would be necessary to prevent unfair prejudice to Plaintiffs.

█ ██████████████████████████████████████████ ████████████████████████████ ███████████████████ █ ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

█ ██████████████████████ █ ██████████████████████ █ ████████████████████████████████

Case No.:  4:11-cv-00044-CDP
(Consolidated

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

May 11, 2026                          Respectfully submitted,

                                     SCHLICHTER BOGARD LLC

                                      /s/ *Nathan D. Stump*
                                     Nathan D. Stump, #71641 (MO)
                                     Jerome J. Schlichter, #32225 (MO)
                                     Kristine K. Kraft, #37971 (MO)
                                     Cort A. VanOstran, #67276 (MO)
                                     Rachel Berger, #77248 (MO)
                                     100 South 4th St., Suite 1200
                                     St. Louis, Missouri 63102
                                     (314) 621-6115
                                     nstump@uselaws.com
                                     jschlichter@uselaws.com
                                     kkraft@uselaws.com
                                     cvanostran@uselaws.com
                                     rberger@uselaws.com

                                     *Attorneys for Plaintiffs*