IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-cv-00044-CDP |
| | ) | (CONSOLIDATED) |
| IRA L. RENNERT, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' TRIAL BRIEF

In accordance with the Court's order (Doc. 1590), Plaintiffs file this trial brief to state the legal and factual issues and authorities relied on and to discuss anticipated substantive and procedural problems that may arise at trial.

### I.      The Parties

This trial will adjudicate the claims of the following five plaintiffs only:

> Geanfranco Sergio Agui Yupanqui
> Jhonatan Raul Espinoza Laureano
> Roberto Luis Espinoza Yantas
> D'Alessandro Farith Godoy Cuadrado
> Medaly Xiomara Ortega Rodrigo

Plaintiffs anticipate that the trial will be against the following five defendants only:

> Ira L. Rennert
> The Renco Group, Inc.
> The Doe Run Resources Corporation
> Marvin K. Kaiser
> Albert Bruce Neil

Before trial begins, Plaintiffs will seek voluntary dismissal of the following defendants:

> Defendants D.R. Acquisition Corp.
> Doe Run Cayman Holdings LLC

These defendants are corporate holding companies with no separate mind or will of their own. Dismissing them from the case will not prejudice any party but only narrow the trial presentation and help simplify the verdict form. *Cf., e.g.*, *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 09-1252 (ERW), 2015 U.S. Dist. LEXIS 7762, at *8–10 (E.D. Mo. Jan. 23, 2015) (granting voluntary dismissal of two defendants before trial); *see generally Halle v. BNSF Ry. Co.*, No. 23-213, 2025 U.S. Dist. LEXIS 256389 (D. Neb. Dec. 11, 2025) (granting voluntary dismissal of two defendants to "streamline the issues for trial"). The dismissal of these two defendants should not affect the admissibility of any evidence or the viability of any remaining claims.

## II.    Claims to Be Tried

Plaintiffs will try the following five claims to the jury:

| | | |
|---|---|---|
| Count I: | **Negligence – Veil Piercing** | (DRRC, Renco & Rennert) |
| Count II: | **Negligence** | (Kaiser, Neil & Rennert) |
| Count VIII: | **Breach of Assumed Duties** | (DRRC, Kaiser & Neil) |
| Count IX: | **Breach of Assumed Duties** | (Renco & Rennert) |
| Count XII: | **Direct Participation Liability** | (Renco & Rennert) |

Before trial begins, Plaintiffs will seek to voluntarily dismiss the following claims:

| | | |
|---|---|---|
| Count X: | **Negligent Performance of a Contract** | (DRRC, Kaiser & Neil) |
| Count XI: | **Negligent Performance of a Contract** | (Renco & Rennert) |

The legal theory underlying counts X and XI substantially overlaps the breach of assumed duties claims in counts VIII and IX. The Court itself has observed the "confusing and overlapping nature of these counts" and expressed skepticism "that plaintiffs will be able to sort them out to present them to a jury in any reasonable manner when the cases go to trial." Doc. 949 at 45. Plaintiffs will accordingly seek to reduce that confusion by voluntarily dismissing counts X and XI. Allowing these claims to be dismissed will not prejudice any party. Rather, "all parties will benefit from the clarification and narrowing of issues for trial." *Envtl. Dynamics v. Robert Tyer & Assocs.*, 929 F. Supp. 1212, 1227 (N.D. Iowa 1996).

Case No.: 4:11-cv-00044-CDP
(Consolidated)

### III.    Pending Motions

For the convenience of the Court and the parties, Plaintiffs provide this list of motions impacting trial that remain outstanding:

#### A.  *Filed by Plaintiffs:*

| ECF | Description of Motion | Date Filed |
|---|---|---|
| 1651-1 | Plaintiffs' Omnibus Motion in Limine | April 28, 2026 |
| | *#1: Article 1971 of Peru's civil code* | |
| | *#2: Testimony of Angel Chavez Mendoza* | |
| | *#3: Charitable acts / environmental projects unrelated to lead* | |
| | *#4: Whether Defendants may or should be indemnified* | |
| | *#5: Plaintiffs' client recruitment efforts* | |
| | *#6: Peruvian criminal investigation* | |
| | *#7: Plaintiffs' compliance with expert recommendations* | |
| | *#8: Plaintiffs' periodic absence from the courtroom* | |
| 1580 | Plaintiffs' Motion for Sanctions | Jan. 20, 2026 |

#### B.  *Filed by Defendants:*

| ECF | Description of Motion | Date Filed |
|---|---|---|
| 1645 | Defendants' Omnibus Motion in Limine | April 28, 2026 |
| | *#1: Herculaneum-related evidence and argument* | |
| | *#2: Other acts evidence (Defendants' other businesses or facilities)* | |
| | *#3: Non-Peru regulations* | |
| | *#4: Argument that Defendants acquired the Complex to escape U.S. environmental regulations* | |
| | *#5: Defendants' personal financial status, wealth, or assets during the liability phase of trial* | |
| | *#6: Arbitrations involving Defendants* | |
| | *#7: Plaintiffs' deceased expert, Dr. Cheremisinoff* | |
| | *#8: Plaintiffs' undisclosed witness, Christopher Brown* | |
| | *#9: References to absence of witnesses at trial* | |
| | *#10: References to other plaintiffs* | |
| | *#11: Criminal proceedings against any Defendant in Peru* | |
| 1646 | Motion for Bifurcation of Trial | April 28, 2026 |
| 1655 | Motion to Strike Farrell, Warden, and Stock or, Alternatively, to Bar Use of Late-Produced Material and Reopen Discovery | May 1, 2026 |
| 1680 | Supplemental Brief in Support of Omnibus Motion in Limine | May 13, 2026 |
| | *#12: Vornberg Deposition Testimony* | |

### IV.     Witnesses

#### A.  *Plaintiffs' Witness List*

Plaintiffs' initial witness list was filed on April 23, 2026. Doc. 1636. Plaintiffs may seek leave of Court to file an amended witness list before the final pretrial conference on June 9. A revised witness list may be necessary (a) to remove a few witnesses Plaintiffs no longer intend to call; (b) to add Daniel Vornberg (whose name was inadvertently omitted); and (c) to add a Peruvian law expert to testify in Plaintiffs' case-in-chief or in rebuttal to Defendants' late-disclosed expert, Angel Chavez Mendoza, regarding the operation of Article 1971. Plaintiffs have objected to Mr. Mendoza's testimony. *See* Doc. 1638 at 2; Doc. 1651-1 at 11–12.

#### B.  *Defendants' Cumulative Objections*

Defendants have objected on cumulative grounds to Plaintiffs' decision to publish deposition excerpts of their deceased standard of care expert, **Dr. Cheremisinoff**, while also calling their substitute expert, **Dr. Matson**. *See* Doc. 1636. Whether Dr. Cheremisinoff's deposition video may be used at trial is addressed in the parties' prior briefing. *See* Doc. 1645 at 23–24 (Defts' motion); Doc. 1669-1 at 16–18 (Pltfs' response). Whether Dr. Matson's testimony is needlessly cumulative on any point can be dealt with at trial, as the testimony is presented. *E.g.*, *Hoover v. Bayer Healthcare Pharms., Inc.*, 14-5090, 2016 U.S. Dist. LEXIS 189840, at *4–5 (W.D. Mo. Dec. 8, 2016). "Other courts have likewise deferred these concerns to trial." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 18-6825, 2020 U.S. Dist. LEXIS 250736, at *9 (C.D. Cal. July 27, 2020) (collecting cases); *see also, e.g.*, *Wolff v. Tomahawk Mfg.*, No. 21-880, 2025 U.S. Dist. LEXIS 100869, at *18 (D. Or. May 28, 2025) (reserving until trial any ruling on whether expert testimony would be cumulative); *Marquette Transp. Co. Gulf-Inland, LLC v.*

*Navigation Mar. Bulgarea*, No. 19-10927, 2022 U.S. Dist. LEXIS 8327, at *11 (E.D. La. Jan. 17, 2022) (refusing to limit plaintiff "to just one expert" and deferring cumulative objection until trial).

Defendants also objected to the following four witnesses based in part on an argument that their testimony would be unnecessarily cumulative:

> Cardinal Pedro Jimeno Barreto
> Rev. Dr. B. Hunter Farrell
> Rev. Elinor Stock
> Leslie Warden

Plaintiffs have no intention of "needlessly presenting cumulative evidence." Fed. R. Evid. 403. Although there is the potential for some overlap in the testimony of these four witnesses, each witness has something to offer that the others cannot, and all of them should be permitted to testify. Any concerns about needless repetition are better addressed at trial.

**Cardinal Barreto** served as the Catholic archbishop in the archdiocese of Huancayo, where the Complex is located, beginning in 2004. He made multiple visits to La Oroya, where he witnessed the air pollution from the smelter, interacted with children and families living nearby, and experienced the tensions there between economic interests and community health. He also wrote to Defendants about what he witnessed and his concerns for human dignity. The jury will hear how those concerns led Cardinal Barreto to invite St. Louis University to conduct a health study in La Oroya, and how he traveled to the United States and testified before the U.S. Congress, even after he received death threats and hostilities in Peru for speaking out. Certain exhibits will also be admitted through Cardinal Barreto, including letters he exchanged with Renco and DRRC.

**Hunter Farrell** was an American missionary stationed in Peru who witnessed pollution from the Complex first-hand and drew international attention to the children's health issue in La Oroya. He will describe what the air in La Oroya was like during his many visits there, beginning in 2001. He witnessed children in La Oroya being tested for blood lead and will explain the origins

of "La Oroya Cannot Wait." The jury will also benefit from hearing about Dr. Farrell's interactions with Doe Run personnel about the lead crisis in La Oroya. Plaintiffs will seek to publish certain exhibits through Dr. Farrell, including video footage of emissions from the Complex and footage showing how certain blood lead tests were administered to La Oroya children.

**Elinor Stock** was a Presbyterian minister in north St. Louis County who traveled to La Oroya in 2002 and personally witnessed the air quality and smelter emissions in La Oroya. She also witnessed DRRC's response to the lead crisis in Peru and corresponded in several letters with Barb Shepard, DRRC's VP of Human Resources. Through Rev. Stock, Plaintiffs will seek to admit certain exhibits, including photos and videos of the Complex and her letters with Shepard.

**Leslie Warden** will provide unique testimony as a Missouri mother who witnessed the air pollution in La Oroya after her own son was permanently impacted by lead emissions from Defendants' Herculaneum smelter. She will describe what the pollution was like in La Oroya in April 2003, the emissions she witnessed from the Complex, and how it compared to what she had experienced in Herculaneum (showing both the magnitude of the contamination in La Oroya and knowledge). She will also relate how Defendants responded to the concerns of the Herculaneum community after the problem of air lead emissions became widely known—a "playbook" they also followed in Peru. Her testimony will help establish Defendants' knowledge of fugitive lead emissions and the dangers they posed to young children, as well as Defendants' conscious disregard for the safety of children in La Oroya. Finally, Ms. Warden will authenticate and admit certain exhibits, including the jar of lead dust she and her husband collected in Herculaneum, the bound copy of "La Oroya Cannot Wait," videotaped news footage depicting emissions from the Herculaneum smelter and Defendants' response, and photos of her visit to La Oroya.

These four witnesses provide four different perspectives on some of the most important facts of the case. Their testimony will be relevant, helpful, and not needlessly cumulative.

### C.  *Defendants' New Subpoenas to Farrell, Stock, and Warden*

On May 13, 2026, Defendants issued new subpoenas to Dr. Farrell, Rev. Stock, and Ms. Warden to produce documents and appear at a deposition in the first week of June. The subpoenas should not have been issued without leave of Court. Fact discovery closed in 2020. *See* Doc. 1102 at 2. Plaintiffs did not stipulate to these depositions. *See* Fed. R. Civ. P. 30(a)(2)(A). The subpoenas to Dr. Farrell and Rev. Stock are invalid, as they live more than 100 miles from the place of compliance. *See* Fed. R. Civ. P. 45(c). Nor did Plaintiffs stipulate to have these depositions proceed remotely. *See* Fed. R. Civ. P. 30(b)(4). Ms. Warden and Rev. Stock were previously deposed in this matter, so they cannot be compelled to testify at a second deposition without leave of Court. Fed. R. Civ. P. 30(2)(A)(ii). Most importantly, these last-minute depositions are harassing and unnecessary. Defendants have not established good cause for reopening discovery to take them. *See generally* Doc. 1662-1. Defendants verbally agreed on May 26, 2026, to hold these subpoenas in abeyance pending the Court's ruling on their motion to strike (Doc. 1655).

### D.  *Defendants' Objection to Christopher Brown*

Plaintiffs' witness list includes Christopher Brown. *See* Doc. 1636 at 1. He supported Dr. Cheremisinoff's expert work in this case, and his testimony at trial may be necessary solely to authenticate and admit Plaintiffs' Trial Exhibit 186—a spreadsheet created by Dr. Cheremisinoff. Defendants have objected to Mr. Brown's testimony on the grounds that he was not previously disclosed. The parties have briefed this issue already in connection with Defendants' omnibus motion *in limine*. *See* Doc. 1645 at 24–25; Doc. 1669-1 at 18.

Exhibit 186 is a large Excel file containing a detailed emissions inventory reconstruction Dr. Cheremisinoff assembled for the Complex. Considerable effort went into reconstructing the various air emissions from the Complex from 1997 to 2009, and the spreadsheet contains numerous summaries of data collected from far flung sources, including (a) location of stacks; (b) stack heights; (c) stack exit velocities; (d) stack temperatures; (e) stack diameters; (f) information about particle size, distribution, and density; (f) annual hours of operation; and (g) the dates various point sources of emissions were in use. Most of the data came directly from Defendants' own records. *See* Doc. 1669-27 at 5 (Tr. 195:9–19) ("All of the point sources come from DRP records.").

The emissions inventory reconstruction forms the basis for many of Dr. Cheremisinoff's opinions in this case. He was questioned at length about it in his 2019 deposition. *See, e.g.*, Ex. 1 at 9–10 (Tr. 282:14–288:11). Several of Plaintiffs' experts, including David Sullivan, David MacIntosh, and Jack Matson, rely on the same data in forming their own opinions. Mr. Brown will simply identify, authenticate, and admit the spreadsheet, essentially as a records custodian. *See id.* at 4 (Tr. 22:18–25:11) (testifying that "Brown did maintain my spreadsheets").

Plaintiffs' late disclosure of Mr. Brown is substantially justified by the death of Dr. Cheremisinoff and is harmless. *See* Fed. R. Civ. P. 37(c)(1); *see, e.g.*, *Mozingo v. Oil States Energy Servs., L.L.C.*, No. 15-529, 2017 U.S. Dist. LEXIS 185016, at \*7 (W.D. Pa. Nov. 8, 2017) (finding no prejudice in late-disclosed records custodian). Through Plaintiffs' Rule 26(a) disclosures, Defendants were on notice that this document would be introduced at trial. "Plaintiffs anticipate using the following categories of documents to support their claims and defenses: \* \* \* d. All documents identified by each of the Plaintiffs' Experts in their reference materials and individual files, all of which have been produced to Defendants." Doc. 1645-11 at 10–11. Mr. Brown's name appears over 20 times in Dr. Cheremisinoff's deposition. *See* Ex. 1 at 5–6, 11. His testimony will

be limited to establishing the necessary foundation to admit Exhibit 186 into evidence. Defendants will not be prejudiced by such limited testimony. *Cf., e.g.*, *Montera v. Premier Nutrition Corp.*, No. 16-6980, 2022 U.S. Dist. LEXIS 83676, at \*7 (N.D. Cal. May 9, 2022) (declining to exclude testimony of undisclosed records custodian); *OpenMethods, LLC v. Mediu, LLC*, 10-76, 2012 U.S. Dist. LEXIS 43826, at \*9–10 (W.D. Mo. Mar. 29, 2012) (same).

### E.  *Witnesses Under Subpoena*

The following witnesses have been duly served with subpoenas to appear at trial:

| Witness | Date Served | Manner of Service |
| --- | --- | --- |
| Chaput, David | April 20, 2026 | Via email to defense counsel |
| Gietl, Sharon | March 31, 2026 | Via email to defense counsel |
| Grubbs, James | March 31, 2026 | Via email to defense counsel |
| Rennert, Ari | March 31, 2026 | Via email to defense counsel |
| Rennert, Ira | March 31, 2026 | Via email to defense counsel |
| Shepard, Barbara | March 31, 2026 | Via email to defense counsel |

Defense counsel agreed to accept service of trial subpoenas for these witnesses, all of whom Plaintiffs believe to be within the subpoena power of the Court. *See* Fed. R. Civ. P. 45(c).

While these witnesses are aligned with Defendants, Plaintiffs intend to call them live in Plaintiffs' case-in-chief. Leading questions of these witnesses should be permitted during Plaintiffs' direct examinations. *See* Fed. R. Evid. 611(c)(2). For efficiency, and to avoid confusion, all witnesses should be called to testify only once. Therefore, Defendants should be permitted to go beyond the scope of direct in their questioning of David Chaput, Ari Rennert, and Ira Rennert, as these witnesses also appear on Defendants' witness list (the other three do not). *See* Doc. 1638. However, Defendants should not be permitted to ask these witnesses leading questions, as their "cross examination" in each instance will function as a direct exam.

## F.  *Witness Sequestration*

Plaintiffs will seek to sequester all witnesses, as provided in Rule 615(a) of the Federal Rules of Evidence, except for parties, party representatives, and expert witnesses. Plaintiffs will also ask the Court to prohibit disclosure of trial testimony to witnesses who are sequestered, as provided in Rule 615(b).

## G.  *Witnesses Who Require an Interpreter*

Plaintiffs' case-in-chief will require Spanish-to-English consecutive interpretation for the following ten witnesses:

> Cardinal Pedro Jimeno Barreto
>
> Five Plaintiffs
> Geanfranco Sergio Agui Yupanqui
> Jhonatan Raul Espinoza Laureano
> Roberto Luis Espinoza Yantas
> D'Alessandro Farith Godoy Cuadrado
> Medaly Xiomara Ortega Rodrigo
>
> Four Plaintiffs' Parents
> Ofelia Consuelo Yupanqui (Geanfranco)
> Viviana Natalia Cuadrado Guere (D'Alessandro)
> Maria Antonio Laureano Vilca (Jhonatan)
> Silvia Yovana Yantas Magallanes (Roberto)

The parties have agreed to hire AAA Translation to provide qualified interpreters for the trial, and to split the cost of their services. Plaintiffs propose to have designated "Spanish days," where witnesses who speak Spanish will be scheduled in advance and prioritized over other witnesses. This will allow the Court, the parties, the jury, the courtroom staff, and the interpreters to have some predictability about when Spanish will be spoken in the courtroom. The Peruvian witnesses will also benefit from knowing with more certainty the dates for their international travel. Spanish days would also be spaced apart, to avoid overworking the interpreters and the jury. Some witness testimony may need to be interrupted to make this work, though Plaintiffs will try

their best to minimize disruptions. If the Court is amenable to this plan, Plaintiffs would propose that the following trial days would be Spanish days: July 2, July 6, July 9, and July 14. Plaintiffs believe that all eleven witnesses can be completed in those four days.

Defendants have indicated their intent to call several other Spanish-speaking witnesses in their own case-in-chief. *See* Doc. 1638 (Dfts' Witness List). Plaintiffs would agree to a similar arrangement, including pausing certain examinations (if necessary), in Defendants' case.

When the five plaintiffs, their family members, and other native Spanish speakers aligned with Plaintiffs are in the courtroom merely to observe the proceedings, Plaintiffs will provide them with a technological interpreting solution known as Enersound. *See* Ex. 2. The Enersound system involves wireless earphones that connect to a secure, cloud-based, interpreting software program via an internet-connected computer. *See id.* at 3. To work properly, a transmitter must be connected to the courtroom audio system. Audio from the courtroom is then transmitted through the computer to the cloud-based program, which instantly translates the audio from English to Spanish using artificial intelligence. No audio is recorded, stored, or shared outside this closed system. Plaintiffs will test the Enersound equipment in the courtroom during their technology session on June 9.

### H.  *Witnesses Appearing via Deposition Video*

Many of the witnesses in this case are unavailable to testify live, and so Plaintiffs anticipate calling the following eleven witnesses[1] by playing portions of their deposition videos:

> Dr. David Bellinger (*ailing health*)
> John Binko (*outside subpoena power*)
> Kenneth Buckley (*ailing health*)
> Dr. Nicholas Cheremisinoff (*deceased*)
> Kelly Flanigan (*outside subpoena power*)
> John Grimaldi (*outside subpoena power*)

---

[1] The following six witnesses may also be presented by video deposition if they fail to appear live: Marvin Kaiser, Thomas Krasner, Louis Marucheau, A. Bruce Neil, Eric Peitz, and Michael Ryan.

Case No.: 4:11-cv-00044-CDP
(Consolidated)

> Jose Hansen (*outside subpoena power*)
> Gary Mard (*outside subpoena power*)
> Dennis Sadlowski (*outside subpoena power*)
> Daniel Vornberg (*deceased*)
> Jeffrey Zelms (*deceased*)

The parties have agreed that for witnesses to be called in Plaintiffs' case-in-chief, Plaintiffs will prepare and present the video deposition clips designated by both sides, with all clips treated the same way (for example, with exhibits called out and highlighted as necessary) and played in chronological sequence. The jury will not be told which clips were designated by which party. With the Court's permission, Plaintiffs also propose to read a short, neutral, introductory paragraph before each witness is called, identifying the witness by name, position, and general topics of testimony. Plaintiffs will provide drafts of these statements to Defendants sufficiently in advance of trial so that the parties can attempt to reach an agreement as to their content. Such statements will help orient the jury to the testimony they are about to hear and help reduce, in some cases, the background portion of the designations.

## I. *Defense Witnesses Called in Plaintiffs' Case*

Witnesses should be called only once. And "as between live or deposition testimony, live testimony is preferable." *CGC Holding Co., Ltd. Liab. Co. v. Hutchens*, No. 11-1012, 2016 U.S. Dist. LEXIS 160290, at *8 (D. Colo. Nov. 16, 2016). Therefore, except for impeachment, witness deposition testimony should not be played if the witness is expected to appear live.

Defendants have indicated their position that certain witnesses, such as Ira and Ari Rennert, should not be called in Plaintiffs' case but only in Defendants' case. Plaintiffs oppose that stance, as it would deprive Plaintiffs of the ability to present relevant, admissible evidence elicited through these witnesses in Plaintiffs' case-in-chief. "[I]t is neither unusual nor improper for a plaintiff to wish to call the opposing party during the plaintiff's case in chief." *Id.* "Absent some irreconcilable

scheduling conflict, there generally is no compelling reason to let a defendant call witnesses in the middle of a plaintiff's case or to leave a plaintiff's case open until after the defendant has called the witnesses." *Id.*

The Court should rule that, where the parties have designated the same witnesses, "any Defendant who wishes to present [a] witness live during its own case-in-chief must voluntarily make that witness available for live testimony during Plaintiffs' case." *In re Polyurethane Foam Antitrust Litig.*, No. 10-2196, 2015 U.S. Dist. LEXIS 183457, at *5–6 (N.D. Ohio Mar. 6, 2015). Or put another way, "if Plaintiffs are forced to show the videotaped depositions or read the transcript into the record of any [witnesses] in this action because Defendants have failed to produce them, Defendants will thereafter be precluded from producing the same witnesses in person." *Iorio v. Allianz Life Ins. Co.*, No. 05-633, 2009 U.S. Dist. LEXIS 97617, at *19 (S.D. Cal. Oct. 21, 2009). Other courts have similarly used their discretion under Rule 611(a) of the Federal Rules of Evidence "to preclude parties who refuse to honor a reasonable request for production of a key witness subject to their control, and thereby force an opponent to use a deposition, from calling the witness to testify personally during their presentation of evidence." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 776 F. Supp. 838, 839 (S.D.N.Y. 1991) (citation omitted); *accord, e.g.*, *Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 806 (N.D. Ill. 2002).

## V. Exhibits

### A. *Plaintiffs' Exhibit List*

Plaintiffs' initial exhibit list was filed on April 23, 2026. Doc. 1637. Plaintiffs anticipate filing an amended exhibit list before the final pretrial conference on June 9. Revisions are needed to address various mistakes, including duplicate exhibits, wrong or missing Bates numbers, dates, and descriptions, and to include certain exhibits that were inadvertently omitted, such as English

translations of various Spanish-language documents. Documents authenticated as business records by declaration (e.g., Plaintiffs' Trial Exhibits 175, 202, 207, and 213) will also be clearly indicated, as the Court directed. *See* Doc. 1590 at 2. Plaintiffs will make clear all changes that are made and work cooperatively with Defendants to ensure any new or revised objections they have to any exhibits are accurately included.

### B.  *English Translations*

The parties' exhibit lists include hundreds of Spanish documents. Rather than obtain certified translations of these, the parties have agreed to rely on machine-assisted translations generated by a mutually agreed upon software program to be determined. Plaintiffs anticipate that, in advance of trial, the parties will file a stipulation that such translations are accurate and may be admitted into evidence if the original Spanish document is also admitted. To avoid confusion, these translations will be marked on Plaintiffs' exhibit list with a unique exhibit number that associates them with the original Spanish exhibit. For example, if the Spanish document is "Pltf-1104," the English translation will be marked "Pltf-1104-E."

### C.  *Illustrative Aids*

At trial, Plaintiffs intend to use illustrative aids—including tables, charts, diagrams, animations, photographs, and videos—to assist the jury in understanding the evidence. *See* Fed. R. Evid. 107(a). Some of these have already been provided to the defense in discovery or in the production of trial exhibits; others are still being created. On March 12, 2026, the parties reached an agreement that illustrative aids (as defined in Rule 107) need not be included on the parties' respective exhibit lists. The parties further agreed that "[i]f either side seeks to offer such a visual or illustrative aid into evidence under FRE 107(b), the other side will not object on the grounds that the document wasn't included on the March 25 exhibit list exchange." *See generally* Fed. R.

Case No.: 4:11-cv-00044-CDP
(Consolidated)

Evid. 107(b). Plaintiffs will work with Defendants in good faith to agree on a mutually agreeable deadline for the disclosure of illustrative aids before they are used in trial and will notify the Court of any such agreement before trial begins.

## VI.    Anticipated Issues

### A.  *Case Belongs in Peru*

Plaintiffs anticipate that Defendants may suggest or argue to the jury, in opening statement, closing argument, or in witness questioning, that this case should have been brought in Peru rather than the United States. The Court should not allow this to happen, as such an argument has no relevance to any issue in the case and would only serve to improperly bias the jury against Plaintiffs based on their nationality. *See* Fed. R. Evid. 403. Furthermore, this Court has already determined the question and found that the case may be properly tried here in the Eastern District of Missouri, *see* Doc. 1322, a ruling that the Eighth Circuit Court of Appeals later upheld. *See Reid v. Doe Run Res. Corp.*, 110 F.4th 1049 (8th Cir. 2024). This issue was not addressed in Plaintiffs' omnibus motion *in limine*, as the Court instructed the parties not to file any motion seeking to limit purely argument. *See* Doc. 1589 at 17:8–11 (explaining that motions in limine "should be things that are evidence-based, not me to tell somebody they can't argue something....").

### B.  *Contaminants Other Than Lead*

One issue that may arise at trial is whether and to what extent the jury should hear about contaminants emitted from the Complex other than lead. Last year, the Court ruled that "there is no evidence sufficient to show that 'the injuries Plaintiffs experienced' were caused by their exposure to non-lead substances emitted from the Complex" and granted Defendants summary judgment "to the extent plaintiffs seek recovery for injuries based on their claimed exposure to sulfur dioxide, arsenic, or cadmium." Doc. 1524 at 61–62. As a result, this case is about lead only.

Plaintiffs will not stray beyond the bounds of the Court's summary judgment order and will not seek damages for injuries caused by any pollutant other than lead. Plaintiffs' experts will also stay within the lines drawn by the Court's Daubert rulings.

At the same time, the existence of these other toxic substances in the air pollution of La Oroya is an unavoidable fact. Sulfur dioxide, for instance, was the primary focus of air pollution control in the original PAMA (JEX058). The 2004 Gradient report (Pltf-79) and the 2005 Integral Consulting report (Pltf-113)—key documents prepared for Doe Run Peru—detail health effects associated with both arsenic and cadmium, in addition to lead and sulfur dioxide. *See* Doc. 871-82 (Gradient report) at 2; Doc. 1233-70 (Integral report) at 5. Internal Doe Run documents, including some marked as joint trial exhibits (*e.g.*, JEX002), track emissions of lead, cadmium, arsenic, sulfur dioxide, and other toxins. It would be practically impossible to conduct this trial without exposing the jury to the existence of these other contaminants, and the Court should allow the jury to hear that these other contaminants were in the air, even if there are no compensable injuries associated with them.

### C. *Corporate Veil Piercing of Every Layer*

In their draft jury instructions, Defendants have previewed their position that Rennert and Renco cannot be held liable under Count I (negligence under a veil piercing theory of liability) unless Plaintiffs first pierce, in succession, the veil of each corporate layer below them. The law, however, does not require this step-by-step approach to veil piercing. "[P]iercing 'every layer of the corporate structure' is not required when the relevant companies within the structure are alter egos of each other." *See Burnett v. Conseco Life Ins. Co.*, No. 18-200, 2020 U.S. Dist. LEXIS 148283, at *17 (S.D. Ind. Aug. 17, 2020) (quoting with approval this statement by plaintiffs) (citing *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt., L.P.* (*In re Moll*

*Indus.*), 454 B.R. 574, 587 (Bankr. D. Del. 2011)). That is the case here. "Like a Russian nesting doll, there is no separation of ownership among these entities." Doc. 1524 at 17. "Each is wholly owned and encompassed by its immediate upstream parent, with Rennert encircling them all as the ultimate patriarch of the family of dolls." *Id.*

The key to veil piercing is the element of control. *See generally Weitz Co. v. MH Wash.*, 631 F.3d 510, 520–21 (8th Cir. 2011) (citing *Collet v. Am. Nat'l Stores, Inc.*, 708 S.W.2d 273, 283–84 (Mo.App. 1986)). "The rationale behind piercing the corporate veil is that when a controlling entity or individual misuses the controlled corporation for the controlling entity's own purposes, rather than the purposes of the controlled corporation, it loses the limited liability privilege and the debts of the controlled corporation become the obligations of the controlling entity or individual." *Fleming Cos., Inc. v. Rich*, 978 F. Supp. 1281, 1303 (E.D. Mo. 1997) (quoting *Dwyer v. ING Investment Co., Inc.*, 889 S.W.2d 902, 904 (Mo.App. 1994)).

To pierce the veil, the controlling entity or individual need not be a direct shareholder of the controlled corporation, as long as they "act in a way which demonstrates that they were functionally the owner of the dominated corporation." *John Wiley & Sons, Inc. v. NICE Glob. LLC*, No. 25-2662, 2026 U.S. Dist. LEXIS 70719, at *16 (S.D.N.Y. Mar. 31, 2026) (discussing the doctrine of equitable ownership) (citing *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997)). "While alter ego liability may be most common in an ordinary parent-subsidiary context, 'the equitable doctrine of piercing the corporate veil is not limited to the parent-subsidiary relationship.'" *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 29 (1st Cir. 2000) (quoting *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 538 (7th Cir. 1980)). Otherwise, "alter ego claims [could] be defeated and defendants [could] insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby

Case No.: 4:11-cv-00044-CDP
                                                                                                (Consolidated)

indirectly doing that which lawfully cannot be accomplished directly." *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 975 (D. Del. 1994).

Accordingly, sequential veil piercing is not required and should not be the rule imposed at trial. "[A]lthough sequential veil piercing has appealing logic in some respects (walking up the corporate entity ladder, so to speak)," the purpose of veil piercing is to hold accountable 'the *party actually responsible for the inequitable conduct.*'" *Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 557 (Bankr. D. Del. 2022) (emphasis in original, quoting *Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 57 (Bankr. D. Del. 2015)). Where corporate entities "have acted in concert without regard to their own corporate separateness to achieve the unjust results that veil piercing protects against, any insistence on sequential piercing necessarily falls on deaf ears." *Michael W. Dickinson, Inc. v. Keeneland Ass'n*, No. 15-326, 2017 U.S. Dist. LEXIS 45011, at *14 (E.D. Ky. Mar. 28, 2017) (quoting *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 166 (Ky. 2012)).

## VII. Offensive Collateral Estoppel

On May 12, 2026, Plaintiffs filed a notice of intent to seek offensive non-mutual collateral estoppel. Doc. 1673. The purpose of this filing was to notify the Court and Defendants that, if Plaintiffs prevail at trial, Plaintiffs will seek to preclude the re-litigation of certain material issues in subsequent trials. Such issues include (but are not limited to): Defendants' knowledge of the hazards posed by lead emissions from the Complex; Defendants' duties of care owed to Plaintiffs in connection with the operations of the Complex; Defendants' breach of such duties; Defendants' control over Doe Run Peru; corporate veil piercing; and the predicate conduct supporting any punitive damages award. *See id.*

"'The doctrine of collateral estoppel, or issue preclusion, provides that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in another lawsuit.'" *Robb v. Hungerbeeler*, 281 F. Supp. 2d 989, 995 (E.D. Mo. 2003) (quoting *United States v. Brekke*, 97 F.3d 1043, 1049 (8th Cir. 1996)). Collateral estoppel is appropriate when four conditions are present: (1) the issue sought to be precluded is identical to the issue previously decided by the court; (2) the prior action resulted in a final adjudication on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issues in the prior action. *Id.* (citing *Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1016 (8th Cir. 2002)); *accord Est. of Smith v. Primerica Life Ins. Co.*, 54 F.4th 550, 556 (8th Cir. 2022) (applying Missouri law).

Offensive or "non-mutual" collateral estoppel occurs "when a plaintiff is attempting to prevent a defendant from pursuing an issue that the defendant previously litigated and lost to a different plaintiff." *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1022 (8th Cir. 2019) (quoting *Kent v. United of Omaha Life Ins. Co.*, 484 F.3d 988, 994 (8th Cir. 2007)). In that case, the fourth factor takes on greater importance, as the party against whom estoppel is asserted must have had "a full and fair opportunity to litigate the issue." *See Doe Run Res. Corp. v. St. Paul Fire & Marine Ins. Co.*, 48 F.4th 574, 579 (8th Cir. 2022) (observing that this factor "was developed to analyze cases where the parties in the first action are not the same as those in the second") (citation omitted).

While advanced notice of the potential preclusive effect of the trial is not required—*Abbott v. E. I. Du Pont De Nemours & Co.*, 54 F.4th 912, 928 (6th Cir. 2022)—Plaintiffs have nevertheless provided it, to avert any unfairness argument that might be subsequently advanced by Defendants. As the party potentially asserting collateral estoppel, Plaintiffs will bear the burden of proving the

four required elements. *Berger Transfer & Storage v. Cent. States Pension Fund*, 85 F.3d 1374, 1377 (8th Cir. 1996) (citing *Farmland Indus. v. Morrison-Quirk Grain Corp.*, 987 F.2d 1335, 1339 (8th Cir. 1993)). Ultimately, whether "to allow offensive collateral estoppel is left to the broad discretion of the district court, because issues of fairness may arise in the offensive situation that are not present where the parties are identical." *Robb*, 281 F. Supp. 2d at 995 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330–31 (1979) and *Aetna Cas. and Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707, 711(8th Cir. 1992)).

## VIII.  Estimated Length of Trial

Plaintiffs continue to believe that trial can be completed in eight-to-ten weeks. For judicial economy, and in fairness to the jury, the Court should impose reasonable time limits on the parties, with time split evenly between Plaintiffs and Defendants. Plaintiffs believe that a reasonable time limit for witness questioning (including deposition designations) would be **120 hours per side**. Assuming roughly six hours of testimony per trial day, that would result in around eight weeks of testimony between the two sides. Voir dire, side bar discussions, hearings, opening statements, and closing arguments should not count toward the time limit. The Court should also be willing to entertain motions for some proportional additional time if the opposing party exhibits a pattern of making unduly long or frivolous objections, or if Plaintiffs are granted a rebuttal case.

## IX.   Plaintiffs' Motion for Sanctions (Doc. 1580)

In January 2026, Plaintiffs filed a motion seeking sanctions against Defendants for violating this Court's prior orders and for discovery abuses they committed in connection with the two collateral actions they initiated in Florida. *See* Docs. 1580, 1582-1. Previously, in 2020, this Court sanctioned Defendants and awarded $429,260 in attorneys fees for willful violations of

discovery orders. *See* Doc. 1107. Since the January 2026 sanctions motion was filed, this Court again awarded sanctions against Defendants in an amount still to be determined. *See* Doc. 1679.

The sanctions sought in Plaintiffs' January 2026 motion are remedies that would impact the trial: (a) entering judgment on liability for each Plaintiff, with trial only on the amount of compensatory and punitive damages; (b) ordering Defendants to pay all costs incurred by Plaintiffs in the litigation to date, plus $429,260; (c) giving a special instruction to the jury concerning Defendants' repeated abuse of the judicial process; and (d) ordering Ira Rennert to attend each day of trial in 2026. *See* Doc. 1582-1 at 14–15; Doc. 1609-1 at 12. Plaintiffs respectfully ask the Court to rule on Plaintiffs' motion in advance of trial and impose these or other appropriate sanctions— a third round of sanctions—for Defendants' outrageous conduct, so that the parties can prepare for the impact of any sanctions on the trial and on jury instructions.

Respectfully submitted,

**SCHLICHTER BOGARD LLC**

May 26, 2026

 /s/ *Nathan D. Stump*
Nathan D. Stump, #71641 (MO)
Jerome J. Schlichter, #32225 (MO)
Kristine K. Kraft, #37971 (MO)
Cort A. VanOstran, #67276 (MO)
Rachel Berger, #77248 (MO)
100 South 4th St., Suite 1200
St. Louis, Missouri 63102
(314) 621-6115
nstump@uselaws.com
jschlichter@uselaws.com
kkraft@uselaws.com
cvanostran@uselaws.com
rberger@uselaws.com

*Attorneys for Plaintiffs*