**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| A.O.A., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:11-cv-00044-CDP |
| ) | (CONSOLIDATED) |
| THE DOE RUN RESOURCES ) | |
| CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS THE DOE RUN RESOURCES CORPORATION, ALBERT BRUCE NEIL, AND MARVIN KAISER'S TRIAL BRIEF**

**TABLE OF CONTENTS**

**Page**

I.    Defendants' Position on Two Substantive Open Items ........................................................... 1

    A.    The Court Should Require Plaintiffs to Dismiss Redundant, Overlapping, and Confusing Causes of Action .................................................................................................... 1

    B.    Collateral Estoppel Is Improper. ...................................................................................... 2

        i.    Introduction......................................................................................................... 2

        ii.    Argument .......................................................................................................... 4

II.    Trial Procedure Matters ...................................................................................................... 11

    A.    The Court Should Require Plaintiffs to Cull Their Unwieldy and Cumulative Witness List.. .............................................................................................................................. 11

    B.    The Court Should Require Plaintiffs to Provide Rough Witness Time Estimates and Anticipated Dates When They Will Seek to Call Certain Witnesses. ............................... 13

    C.    Trial Time Limits Per Side and for Opening Statements.................................................. 14

    D.    The Court Should Carefully Police Plaintiffs' Trial Side Shows. .................................... 15

    E.    Remote Trial Testimony of Defendant Bruce Neil............................................................ 17

    F.    Scope and Presentation of Evidence by Deposition. ........................................................ 17

    G.    Advance Disclosure of Witnesses and Deposition Testimony to Be Offered. ................. 19

    H.    Admission of and Objections to Exhibits. ....................................................................... 20

    I.    Procedures for Voir Dire.................................................................................................. 20

    J.    Procedures Applicable to Media Access to Courtroom..................................................... 22

    K.    Anticipated Interpreter Arrangements. ............................................................................ 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.O.A. v. Rennert*,
 2025 WL 2606548 (E.D. Mo. Sept. 9, 2025)................................................................1

*A.O.A. v. Rennert*,
 350 F. Supp. 3d 818 (E.D. Mo. 2018)........................................................................1

*Coop. Home Care, Inc. v. City of St. Louis*,
 514 S.W.3d 571 (Mo. 2017) ...............................................................................3, 5

*E.I. du Pont de Nemours & Co. v. Abbott*,
 144 S. Ct. 16 (Thomas, J., dissenting from denial of cert.) ............................3, 6, 10

*Fed. Ins. Co. v. Great Am. Ins. Co.*,
 893 F.3d 1098 (8th Cir. 2018) ..................................................................................5

*Goodson v. McDonough Power Equip., Inc.*,
 443 N.E.2d 978 (Ohio 1983) ....................................................................................6

*Hardy v. Johns-Manville Sales Corp.*,
 681 F.2d 334 (5th Cir. 1982) ....................................................................................5

*Harrison v. Celotex Corp.*,
 583 F. Supp. 1497 (E.D. Tenn. 1984)........................................................................6

*Haynes v. Edgerson*,
 240 S.W.3d 189 (Mo. Ct. App. 2007)........................................................................8

*James v. Paul*,
 49 S.W.3d 678 (Mo. 2001) ...............................................................................3, 5, 10

*Kincaid Enters., Inc. v. Porter*,
 812 S.W.2d 892 (Mo. App. Ct. 1991)........................................................................1

*Liberty Mut. Ins. Co. v. FAG Bearings Corp.*,
 335 F.3d 752 (8th Cir. 2003) ....................................................................................3

*MCI Commc'ns Corp. v. AT&T Co.*,
 708 F.2d 1081 (7th Cir. 1983) .................................................................................15

*Parklane Hosiery Co. v. Shore*,
 439 U.S. 322 (1979)............................................................................... *passim*

ii

*Pennington v. Fluor Corp.*,
    19 F.4th 589 (4th Cir. 2021) ...................................................................................2

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
    531 U.S. 497 (2001)..................................................................................................3

*Setter v. A.H. Robins Co., Inc.*,
    748 F.2d 1328 (8th Cir. 1984) ............................................................................6, 9

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)..................................................................................................9

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)................................................................................................11

*Tretter v. Johns-Manville Corp.*,
    88 F.R.D. 329 (E.D. Mo. 1980) ..............................................................................7

*United States v. Huyser*,
    697 F. Supp. 3d 873 (S.D. Iowa 2023) ...................................................................3

*Xiaoyan Gu v. Da Hua Hu*,
    447 S.W.3d 680 (Mo. Ct. App. 2014)..................................................................3, 5

**Statutes**

28 U.S.C. § 1870..........................................................................................................21

**Other Authorities**

Wright & Miller, 18A Fed. Prac. & Proc. (3d ed. 2026) .........................................3, 10

Seventh Amendment, United States Constitution........................................................21

Fed. R. Civ. P. 43........................................................................................................17

Fed. R. Civ. P. 48........................................................................................................20

Fed. R. Evid. 106 ........................................................................................................18

Fed. R. Evid. 403 ...................................................................................................12, 16

Fed. R. Evid. 611 ...................................................................................................12, 16

Restatement (Second) of Judgments......................................................................10, 11

iii

Defendants The Doe Run Resources Corporation, Albert Bruce Neil, and Marvin Kaiser hereby submit their trial brief pursuant to the Court's January 22, 2026 Pre-Trial Order.  This brief proceeds in two parts.  The first discusses Defendants' position on two substantive items that would benefit from the Court's attention before trial.  The second discusses key procedural issues for the Court to address for the trial to proceed efficiently, within the projected schedule, and with due safeguards for Defendants' rights.

## I. Defendants' Position on Two Substantive Open Items

### A. The Court Should Require Plaintiffs to Dismiss Redundant, Overlapping, and Confusing Causes of Action.

As the Court noted in its September 9, 2025 Order, "Plaintiffs have admitted that the claims raised in Counts VIII-XII overlap."  2025 WL 2606548, at *15, n.21.  Nor was that Order the first time the Court has drawn attention to "the confusing and overlapping nature of these counts."  350 F. Supp. 3d 818, 846 (E.D. Mo. 2018) ("I am somewhat skeptical that plaintiffs will be able to sort them out to present them to a jury in any reasonable manner[.]").  Those claims—"direct liability for breach of assumed duties pertaining to foreseeable harm," "negligent performance of an undertaking," and "direct participation liability," *id.* at *3-4—are not merely overlapping; they are redundant of each other and of Plaintiffs' simple negligence claims.  Presenting these claims as independent bases for liability, as Plaintiffs' proposed jury instructions do, would allow the jury to hold certain Defendants liable more than once and award overlapping or duplicative damages for the same conduct.  This is improper.  *See, e.g.*, *Kincaid Enters., Inc. v. Porter*, 812 S.W.2d 892, 901 (Mo. App. Ct. 1991) ("[I]nstructions that allow a jury to return damages that overlap or duplicate are error.").

In substance, Plaintiffs have merely two claims: veil-piercing derivative negligence against certain Defendants and direct negligence against all Defendants.  Plaintiffs' claim for "direct

participation liability" is a theory of direct negligence that applies to corporate actors for their own (rather than derivative) conduct. *See Pennington v. Fluor Corp.*, 19 F.4th 589, 598 (4th Cir. 2021) (explaining that direct liability "remains a narrow test, one that is designed to apply in the unusual case where a company commits a wrongful act through the legal form of a distinct entity"). And Plaintiffs' claim for "breach of assumed duties" is not a separately cognizable cause of action, only a theory of direct negligence based on an obligation derived from contract. But here, Plaintiffs do not assert and the Court has never found a duty not to harm Plaintiffs that exists separate from Plaintiffs' negligence claims related to the operation of the CMLO. The Court should require Plaintiffs to elect theories such that only their claim for derivative negligence liability based on veil piercing and one of their direct-negligence-based claims proceed to trial. It should dismiss the others as duplicative, confusing to the jury, and creating an intolerable risk of double recovery.

### B.      Collateral Estoppel Is Improper.

#### i.      *Introduction*

On May 12, 2026, Plaintiffs filed a Notice of Intent to Seek Offensive Non-Mutual Collateral Estoppel concerning "common-conduct issues determined by the first-cohort jury and Court." Dkt. 1673 at 1. Plaintiffs stated that the Notice was "provided in advance of trial so that no party may later claim lack of notice of the foreseeable preclusive consequences of that trial," and further indicated that the Notice was "not a motion and seeks no relief at this time." While the Court need not determine whether to apply non-mutual collateral estoppel as to any hypothetical issues not even yet adjudicated by a jury, Defendants nonetheless submit this statement to provide their position opposing Plaintiffs' contention that non-mutual offensive collateral estoppel could apply following entry of judgment on the verdict in the first-cohort trial.

Application of nonmutual collateral estoppel as requested by Plaintiffs would likely violate Defendants' constitutional rights. *See E.I. du Pont de Nemours & Co. v. Abbott*, 144 S. Ct. 16 (mem.) (Thomas, J., dissenting from denial of cert.). Even if the Constitution permitted use of the doctrine as Plaintiffs ask, "[o]ffensive collateral estoppel is disfavored by courts" and inappropriate here. *Coop. Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 581 (Mo. 2017).

The doctrine of collateral estoppel "precludes the same parties from relitigating issues previously adjudicated between the same parties or those in privity with them." *Xiaoyan Gu v. Da Hua Hu*, 447 S.W.3d 680, 686 (Mo. Ct. App. 2014) (citation omitted). Missouri law recognizes an exception to the traditional "mutuality" requirement such that a prior judgment may, in narrow circumstances, "preclude relitigation of an issue even though the party asserting collateral estoppel was not a party to the prior case." *James v. Paul*, 49 S.W.3d 678, 684 (Mo. 2001).[1] But nonmutual offensive collateral estoppel "is not available as a matter of right." Wright & Miller, 18A Fed. Prac. & Proc. § 4465 (3d ed. 2026). Rather, as the Supreme Court has made clear, a trial court should not allow the use of nonmutual offensive collateral estoppel when its application "would be unfair to a defendant." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979); *see also Coop. Home Care*, 514 S.W.3d at 581 (refusing to apply offensive collateral estoppel when "it would not be fair" to do so).

Fairness dictates that nonmutual offensive collateral estoppel is improper here. *First*, the risk of unfairness to a party against whom estoppel is invoked is exponentially magnified in

---

[1] Federal courts sitting in diversity look to state law when determining whether to apply issue preclusion. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003). Regardless, as courts within the Eighth Circuit have recognized, there are no material differences between state and federal applications of the doctrine. *United States v. Huyser*, 697 F. Supp. 3d 873, 879 (S.D. Iowa 2023).

multiple-claimant tort cases like this one.  The bellwether trial process is meant to test the relative strength of the parties' positions, not resolve large swaths of claims or issues in one fell swoop. And given the risk that an isolated jury verdict may be inconsistent with verdicts rendered by other juries in separate bellwether trials, courts often decline to afford preclusive effect to verdicts after multiple bellwether trials.  There is even less reason to give preclusive effect to the very first.

*Second*, Plaintiffs cannot point to any gains in judicial economy meriting application of this doctrine here.  The issues on which Plaintiffs seek preclusion are bound up in plaintiff-specific inquiries, so preclusion will not streamline future proceedings.  If anything, applying collateral estoppel effect after the first-cohort trial would create a substantial risk of judicial inefficiencies, as the second and third cohort juries are scheduled to convene in short order—before any appellate rulings are likely to be rendered. Thus, an adverse appellate ruling on *any* of the issues identified in Plaintiffs' Notice would necessitate retrial of multiple cases.

*Third*, if the Court is inclined to apply some form of preclusion, it should not allow Plaintiffs to wield the doctrine as both a sword and a shield.  At minimum, to avoid compounding unfairness through uneven application, if the Court will apply issue preclusion, Plaintiffs should be bound to any adverse rulings.

## ii.  *Argument*

### 1. *Nonmutual Offensive Collateral Estoppel Raises Serious Constitutional Concerns and Is, at a Minimum, Highly Disfavored in Multi-Claimant Tort Cases.*

Preclusion may be appropriate only if: "(1) the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel

4

is asserted had a full and fair opportunity to litigate the issue in the prior suit." *Xiaoyan Gu*, 447 S.W.3d at 686. But "the overriding consideration is fairness." *Id.* Thus, "[t]he doctrine of collateral estoppel will not be applied where to do so would be inequitable." *James*, 49 S.W.3d at 683; *see also Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1103 (8th Cir. 2018) (same).

"Offensive use" of collateral estoppel occurs when a "plaintiff . . . seek[s] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff," *Parklane*, 439 U.S. at 329, while defensive use involves a "defendant invoking the doctrine to prevent a plaintiff from relitigating a fact decided against the plaintiff." *James*, 49 S.W. 3d at 685. "Generally speaking, courts have been less inclined to allow offensive use of the doctrine rather than defensive when mutuality of parties is lacking." *Id.*; *Coop. Home Care*, 514 S.W.3d at 581 ("Offensive collateral estoppel is disfavored by courts, and it will not be applied when doing so would be inequitable[.]"). This reluctance makes good sense. Although collateral estoppel is meant to promote judicial economy, nonmutual offensive use of the doctrine has the opposite effect—plaintiffs have every incentive to "adopt a 'wait and see' attitude in the hope that the first action by another plaintiff will result in a favorable judgment." *Parklane*, 439 U.S. at 330. "Thus, offensive use of collateral estoppel will likely increase . . . the total amount of litigation, since potential plaintiffs will have everything to gain . . . by not intervening in the first action." *Id.* This *decreases* efficiency, and its application increases the risk of unfairness to a defendant. *Id.* at 330–31.

Nonmutual offensive collateral estoppel is uniquely inappropriate in multiple claimant tort cases like this one. The stakes in the first trial may not reflect the broader litigation, posing due process concerns. *See, e.g.*, *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 346 (5th Cir. 1982). Further, because multiple claimant tort cases typically involve technical, complex issues

requiring expert testimony, "the determination made by a jury in any particular case will ofttimes not be free from doubt." *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 987 (Ohio 1983).  Permitting an entire tranche of cases to rise and fall on one bellwether would only "unfairly broaden[]" the "potential impact of such a decision." *Id*.

Perhaps most critically, multiple trials of individual plaintiffs' claims in a consolidated action often produce different verdicts—one of the situations the Supreme Court identified in *Parklane* as working an unfairness to a defendant.  *Parklane*, 439 U.S. at 330.  In the ordinary course, a jury in an initial trial may find a defendant liable while a future jury finds in favor of the defendant.  And, as Justice Thomas recently explained in discussing multi-district litigation, "expansive use of nonmutual offensive collateral estoppel . . . raises serious due process concerns" because defendants ultimately "ha[ve] all of the downside without any potential for upside." *E.I. du Pont de Nemours*, 144 S. Ct. at 17–18 (mem) (Thomas, J., dissenting from denial of cert.).  This is particularly unfair in the context of a mass action involving many plaintiffs.  Under Plaintiffs' proposal, if a defendant loses one bellwether trial, every other plaintiff in the consolidated actions could invoke the loss to preclude the defendant from relitigating key issues of liability even in cases presenting markedly different factual circumstances.  That would be fundamentally unfair. It would also be incompatible with the "information gathering" purpose of bellwether trials. *Id.* at 16–17.  And it may vitiate Defendants' rights to a jury trial. *See id.*

Lower courts have recognized that it is "most inappropriate" for a court "to pick out one case upon which the jury reached a verdict for the plaintiff, and accord it preclusive effect," especially since other juries may reasonably reach different (and often inconsistent) conclusions. *Harrison v. Celotex Corp.*, 583 F. Supp. 1497, 1503 (E.D. Tenn. 1984); *see also Setter v. A.H. Robins Co., Inc.*, 748 F.2d 1328, 1330–31 (8th Cir. 1984) (affirming district court's refusal to

6

apply collateral estoppel to products liability cases); *Tretter v. Johns-Manville Corp.*, 88 F.R.D. 329, 333 (E.D. Mo. 1980) (refusing to apply nonmutual offensive collateral estoppel to mass asbestos case). Simply put, courts recognize nonmutual collateral estoppel is generally inappropriate in multi-claimant tort cases, particularly based on a single bellwether trial. The same is true here.

### 2. Nonmutual Offensive Collateral Estoppel Should Not Apply to the Issues Plaintiffs Have Identified as Candidates for Preclusion.

Even if nonmutual offensive collateral estoppel could somehow apply upon entry of judgment in the first-cohort trial, none of the issues Plaintiffs have identified would be appropriate candidates for such preclusion. Specifically, Plaintiffs have articulated the following issues upon which they anticipate seeking collateral estoppel: "Defendants' knowledge of the hazards posed by lead emissions from the La Oroya smelter; Defendants' duties of care in connection with smelter operations and breaches thereof; control by each Defendant over Doe Run Peru; corporate veil piercing; and the predicate conduct supporting any award of punitive damages." None of them warrants preclusive effect.

First, although Plaintiffs insist that they do not "seek preclusion on issues individual to any plaintiff, such as individual exposure," Dkt. 1673 at 1, they ignore that Defendants' knowledge of the alleged hazards posed by the La Oroya facility and purported duties of care in connection with smelter operations are inherently bound up in a host of plaintiff-specific inquiries. For example, Plaintiffs seek to hold Defendants liable for conduct that allegedly took place *over a decade*. So, when each plaintiff was born and manifested his or her purported injuries cannot be divorced from what knowledge Defendants possessed at that particular time. Additionally, Defendants' duties of care and purported breaches thereof are inextricably intertwined with plaintiff-specific questions of timing, causation, proximity to the facility, exposure, injuries, etc. For instance, a jury's

7

assessment of duty of care and breach may hinge significantly upon the timing of project completion pursuant to the PAMA. And a jury's determination that Defendants "breached" a duty as to a plaintiff purportedly injured in 2007 says nothing about whether Defendants breached a duty to plaintiffs allegedly injured, for example, in 1998.

Second, Plaintiffs' veil-piercing theory and the issue of "control by each Defendant over Doe Run Peru" ultimately hinge, in part, on plaintiff-specific inquiries too. Indeed, as this Court emphasized at both the motion to dismiss and summary judgment stages, Plaintiffs' veil-piercing theory requires a showing that "the control and breach of duty proximately caused *their* injury." MTD Order, Dkt. 949 at 26 (emphasis added); *see also* MSJ Order, Dkt. 1524 at 15–16. Each plaintiff has their own unique constellation of alleged injuries and their own history of exposure, life experiences, and potential alternative causes of their injuries. Moreover, other factors to be assessed in the veil-piercing analysis will also depend on plaintiff-specific evidence. For instance, the Court has previously held that the adequacy of Doe Run Peru's capitalization is not assessed at a static moment in time. *See* MSJ Order, Dkt. 1524, at 19 ("There is a genuine dispute as to whether capitalization of DRP was 'grossly inadequate' *and, if so, when*.") (emphasis added).[2] Thus, the jury's assessment of whether a specific plaintiff's injuries were proximately caused by undercapitalization will necessarily hinge on fact-specific issues such as the timing of when those injuries supposedly occurred. *See id.* at 19–20 (noting that "evidence shows that DRP paid its bills and kept capital projects afloat early on," but "financial strife" occurred years later). Additionally, the timing of payments under intercompany agreements (which ceased altogether in 2004),

---

[2] Defendants respectfully disagree with the Court's conclusion on this issue, *see Haynes v. Edgerson*, 240 S.W.3d 189, 197 (Mo. Ct. App. 2007) ("Inadequate capitalization is generally measured at the time of incorporation."), but address this issue using the framework set forth in the Court's summary judgment order.

Authorizations for Expenditure, and other corporate decision-making will play a role in this analysis—and, consequently, a jury's determination of whether a Defendant's purported "control" over downstream entities caused a particular plaintiff's injuries.

Third, the "predicate conduct supporting any award of punitive damages" cannot give rise to preclusive effects either. For starters, even purportedly common punitive-damages-related issues are likely to vary across individual plaintiffs in a multitude of ways. Indeed, entitlement to punitive damages necessarily turns on a defendant's specific conduct at a particular time that affected the plaintiff. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422–23 (2003) (punitive-eligible "conduct must have a nexus to the specific harm suffered by the plaintiff," and punishment must be "for the conduct that harmed the plaintiff"). For example, a subsequent plaintiff may have been exposed to lead in La Oroya in 1998 or in 1999—years before much of the "predicate conduct" Plaintiffs urge in support of punitive damages here. And any verdict here will not indicate what specific "predicate conduct" supported a finding of punitive damages—or when it occurred. In any event, as the Eighth Circuit has previously held in the mass torts context, it makes little sense and yields few efficiencies to apply collateral estoppel on issues of liability where subsequent plaintiffs will seek punitive damages because "the same facts, or most of them" underlying proof of liability "would still have to come in and be considered by the court or jury on the issue of exemplary damages." *Setter*, 748 F.2d at 1331. So too here, as the same "predicate conduct" underlying a hypothetical punitive damages finding would form the basis of a subsequent plaintiff's proof of liability. At minimum, these individual liability issues overlap with any common punitive-damages-related issues on which Plaintiffs seek preclusion, thus undercutting any efficiency gains because the jury will need to consider the same evidence.

9

Compounding matters, a jury "may be confused or improperly influenced" if directed to evaluate evidence with a directive to begin with a certain premise. Wright & Miller, § 4465.3.

Further, and perhaps most significantly, Plaintiffs' intent to seek preclusion ignores that Defendants will likely appeal any adverse verdict in the first-cohort trial. While the pendency of an appeal does not necessarily prevent the application of collateral estoppel, the Restatement of Judgments counsels that "[i]t may be appropriate to postpone decision of [preclusion] until the proceedings addressed to the judgment are concluded." Restatement (Second) of Judgments § 13. Such is the case here. Because the cohort trials are scheduled to proceed consecutively, an adverse ruling on appeal would disrupt the finality of multiple judgments. Redoing multiple trials is antithetical to "promoting judicial economy by preventing needless litigation." *Parklane*, 349 U.S. at 326. Because applying collateral estoppel here would actively undermine the purpose of the doctrine by risking inefficiency—on top of the certain unfairness to Defendants—the Court should not permit Plaintiffs to seek preclusion on any issue.

### 3. Alternatively, Any Preclusion Should Apply Equally to Both Sides.

If the Court decides to permit preclusion, all parties should be bound by adverse rulings on any of the enumerated issues on which the Court determines estoppel is potentially applicable. As discussed, the primary concern when it comes to offensive use of nonmutual collateral estoppel in both state and federal courts is fairness. *See Parklane,* 439 U.S. at 330; *James*, 49 S.W. 3d at 783. And yet Plaintiffs propose that Defendants carry "all of the downside without any potential for upside." *E.I. du Pont de Nemours & Co.*, 144 S. Ct. at 18 (Thomas, J., dissenting from denial of cert.). This "lopsidedness adds to the potential for unfairness." *Id*. Eliminating the asymmetry would avoid the disproportionate risk. *See* Wright & Miller, § 4465 (questioning whether there are circumstances "in which a nonparty should be allowed to invoke nonmutual preclusion only

10

on condition that it be bound by unfavorable determinations of other issues in the same prior action").

If there is any such case, this is it: all Plaintiffs in this consolidated action were at one point represented by the same next friends who brought this action and are and have been represented by the same counsel for over a decade.  Moreover, counsel is intimately familiar with the issues and have every incentive to litigate this first case to the very best of their abilities.  Indeed, while non-first-cohort plaintiffs are not "parties" in the initial trial, the Supreme Court has observed that "the rule against nonparty preclusion is subject to exceptions," including in circumstances where a nonparty (i) "agrees to be bound by the determination of issues in an action between others" or (ii) "was adequately represented by someone with the same interests who was a party to the suit." *Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008) (noting that "[r]epresentative suits with preclusive effect on nonparties include properly conducted class actions, *and suits brought by trustees, guardians, and other fiduciaries*") (emphasis added) (citations omitted); *see also* Restatement (Second) of Judgments, § 39–41.

Accordingly, to the extent non-mutual offensive collateral estoppel could ever apply in this case—and Defendants submit it cannot—at a minimum, any risk of collateral estoppel application should be borne equally by Defendants and Plaintiffs alike.

## II. Trial Procedure Matters

### A. The Court Should Require Plaintiffs to Cull Their Unwieldy and Cumulative Witness List.

Plaintiffs have indicated that they will call *48 witnesses*—a number that cannot be reconciled with an 8-to-10-week trial or Plaintiffs' proposed 120 hours of *total* trial time (inclusive of their questioning of Defendants' witnesses).  This unwieldy and cumulative witness list must be narrowed significantly or Plaintiffs must identify the distinct, non-duplicative testimony each

11

witness will offer.   Although Defendants have moved *in limine* to exclude certain of these witnesses and moved to strike two others based on Plaintiffs' unjustified and prejudicial discovery violations, additional reasons to limit or exclude these and other witnesses' testimony warrant the Court's attention.   For example, Plaintiffs' witness list includes the following individuals:

- Three religious leaders—Cardinal Pedro Barreto, Reverend Hunter Farrell, and Reverend Elinor Stock—who were all disclosed on the following substantially overlapping topics not relevant to the five trial plaintiffs:
  - Missionary and/or religious and charitable organizational work related to La Oroya; and
  - The alleged health effects of pollution from the Complex on community residents; and
  - Living conditions in La Oroya as they relate to emissions from the Complex.

- Two experts—Dr. Jack Matson and David Sullivan—whose testimony will substantially overlap with deposition testimony Plaintiffs have designated from the deceased expert these two witnesses replaced, Dr. Nicholas Cheremisinoff.

- Corporate witnesses from the same departments with substantially overlapping roles and subjects of testimony—namely, James Grubbs and Jose (Pepe) Hansen:
  - Mr. Hansen reported to Mr. Grubbs when Mr. Hansen joined the St. Louis consolidated DRRC-DRP sales function in 2005, and then took Mr. Grubbs's job in 2009.
  - Both have personal knowledge of and testified at their depositions to the decision to consolidate DRRC's and DRP's marketing and sales functions in 2005.
  - Both were involved in the sale of metals produced at the Complex—Grubbs overseeing the function and Hansen executing contracts and sales.
  - Both provided sales and marketing advice to Doe Run Peru from the St. Louis offices of DRRC.

The Court should not permit these witnesses to provide duplicative testimony on the same topics and, instead, should require Plaintiffs to cull their witness list and elect among those cumulative witnesses.   *See* Fed. R. Evid. 403; Fed. R. Evid. 611(a) (vesting the Court with authority to exercise reasonable control over the mode and order of presentation so as to avoid

12

wasting time). Permitting Plaintiffs to present the same testimony through multiple witnesses would prejudice Defendants by consuming disproportionate trial time and unfairly reinforcing certain themes through sheer repetition rather than quality of proof. In a trial projected to last 8-10 weeks, the Court should not tolerate such waste.

The three clergy witnesses illustrate the problem. Permitting Cardinal Barreto, Reverend Farrell, *and* Reverend Stock to testify about the same missionary work, the same alleged generalized pollution they observed, and the same living conditions in La Oroya they observed would be cumulative, waste the jury's time, and unduly prejudice Defendants. Worse, presenting this redundant testimony through three ordained members of the church would improperly engender sympathy and solicitude for as well as impermissibly bolster Plaintiffs' claims. And their testimony about generalized pollution and living conditions not specific to any of the five plaintiffs is doubly cumulative and unnecessary, because Plaintiffs will surely elicit similar but more pertinent testimony from the individual Plaintiffs and their family members. At minimum, the Court should require Plaintiffs to elect which one of these witnesses—and the others identified above—will testify on which topics.

**B.      The Court Should Require Plaintiffs to Provide Rough Witness Time Estimates and Anticipated Dates When They Will Seek to Call Certain Witnesses**.

Defendants respectfully request that the Court require Plaintiffs to provide (a) detailed, witness-by-witness time estimates for all testimony they intend to present and (b) anticipated call dates (or windows of no more than three business days) for witnesses under Defendants' control.

Time estimates are not merely a matter of convenience—they are a prerequisite to efficient trial administration in a case where Plaintiffs seek to call nearly 50 witnesses. Such trial presentation projections are the only practicable means to ensure that, in fact, this trial can be

completed within the allotted 8–10 weeks and consistent with the Court's intention to set trial time limits for the parties. *See* Jan. 20, 2026 Status Conf. Hr'g Tr. at 8:2–6, 8:21–10:8, attached as Ex. A. Without witness time estimates, neither the Court nor Defendants can plan for cross-examination, coordinate the appearances of defense witnesses, or ensure that the jury's time is used effectively. Defendants request that the Court order Plaintiffs to submit witness-by-witness time estimates no later than seven days before trial.

Similarly, Plaintiffs have listed *ten* current or former employees of Defendants whom they intend to call live. Defendants must coordinate these witnesses' trial appearances, which in turn requires Plaintiffs to provide anticipated call dates—or, at minimum, call windows. This coordination is especially critical given the age of several witnesses: for example, Mr. Kaiser is 85 years old; Mr. Rennert will be 92 years old. Both, along with witnesses such as Ari Rennert, live far from St. Louis and must travel to appear. Defendants must also coordinate their expert witnesses—many of whom are practicing physicians with demanding schedules. To accomplish this coordination, Defendants need to know when Plaintiffs' case will conclude. A trial of this length and complexity—with so many live corporate witnesses Plaintiffs seek to call as well as a number of defense experts—demands extensive and transparent coordination between counsel. Defendants respectfully ask that the Court impose a structured coordination protocol that includes anticipated call dates or call windows for Plaintiffs' witnesses and a target date for conclusion of Plaintiffs' case.

## C.    Trial Time Limits Per Side and for Opening Statements.

Defendants request that the Court impose equal time limits on both sides' presentation of evidence. A trial clock—allocating equal hours to each side for all aspects of their case, including direct and cross-examination and deposition testimony—is the most effective means to ensure

14

parity and bring this complex matter to resolution within the projected trial timeline.  Courts routinely impose time limits in complex civil litigation. *See, e.g.*, *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983) (affirming trial court's imposition of equal time limits). Defendants understand that Plaintiffs have proposed 120 hours of trial time per side, excluding opening statements, closing arguments, and any rebuttal case they may seek to present.  Defendants believe that 120 hours per side is the absolute maximum in trial time that the 8-to-10-week schedule affords but agree to this allocation, provided that any rebuttal case Plaintiffs wish to present counts towards their 120 hours.

The Court's Standing Order does not address opening statement time limits.  Given this trial's length and complexity—multiple defendants, international operations, technical scientific evidence—Defendants respectfully request two hours and thirty minutes, combined, for the entirety of their opening statements.  This allocation reflects that Defendants must address claims spanning decades of alleged conduct across multiple corporate entities.  The jury will benefit from a comprehensive roadmap of the defense case at the outset.  Defendants will coordinate to ensure their combined opening is non-duplicative and efficient.

### D.    The Court Should Carefully Police Plaintiffs' Trial Side Shows.

This case is about Peruvian residents allegedly injured by lead emissions from a Peruvian smelter operated by a Peruvian company under Peru's environmental compliance program (the PAMA).  Yet Plaintiffs seek to transform this trial into something else entirely—a sprawling inquiry into regulations, community activism, and events in Defendants' past that have nothing to do with Peru, the Complex, or Plaintiffs' injuries.

The examples are numerous: Plaintiffs insist on presenting evidence of United States regulations concerning lead emissions—not just for the point that lead can cause injury, but as

15

evidence of liability despite these regulations' complete irrelevance to the CMLO's operation under Peruvian law.  They will attempt to introduce evidence that some of Defendants' other U.S.-based subsidiaries, such as MagCorp and WCI Steel, had financial and regulatory troubles over the years, despite the complete absence of any connection whatsoever to Doe Run Peru.  They seek to introduce days of evidence about Defendants' Herculaneum, Missouri lead smelter— relevant only to the uncontested point that Defendants understood lead's potential hazards at the time when Doe Run Peru operated the CMLO in Peru.  And, as discussed above, they intend to call community activists and religious leaders to testify about La Oroya pollution, community sentiment, and their awareness-raising efforts—topics that open the door to how Plaintiffs' counsel, working with these activists, recruited La Oroya residents for this litigation.[3]

Defendants have addressed these topics in their Omnibus Motion *in Limine* and do not repeat those arguments here.  But to the extent the Court denies that Motion in relevant part, Defendants request prophylactic measures to keep this trial focused on the issues that will be submitted to the jury for decision.  *See* Fed. R. Evid. 403; Fed. R. Evid. 611(a)(2) (court shall avoid needless consumption of time).  Specifically, the Court should require Plaintiffs to proffer in advance the specific points they seek to establish through witnesses testifying about U.S. regulations, Herculaneum, La Oroya activism, or Defendants' other companies.  This measure will enable the Court to evaluate the relevance and admissibility of the evidence, help prevent the trial from devolving into a series of side shows, protect the jury from confusing detours, minimize prejudice to Defendants from defending against allegations that were barely developed in discovery, and ensure orderly and efficient proceedings.

---

[3] Despite seeking to parade witness after witness in front of the jury to testify on these topics, Plaintiffs have moved *in limine* to exclude all evidence of litigation recruitment or their counsel's involvement in Plaintiffs' bringing these lawsuits.

16

E.      **Remote Trial Testimony of Defendant Bruce Neil**.

Defendants respectfully request advance resolution of one witness-appearance issue: Defendant Bruce Neil's testimony.  Mr. Neil resides in Toronto, Canada, and Defendants intend to make him available voluntarily, notwithstanding his residing outside the Court's subpoena power.  Mr. Neil, however, serves as the primary caregiver for his wife, who requires full-time assistance.  These circumstances necessitated his video testimony in the arbitration between certain Defendants and the Peruvian Government.  The Court should permit Mr. Neil to testify remotely, subject to real time direct- and cross-examination before the jury.  Remote testimony has become commonplace, and permitting it will not prejudice Plaintiffs or impair the jury's ability to assess his credibility.  This is precisely the "good cause in compelling circumstances" for which Federal Rule of Civil Procedure 43(a) permits contemporaneous electronic testimony.

F.      **Scope and Presentation of Evidence by Deposition.**

Given the substantial volume of deposition testimony both sides intend to offer—and both sides' extensive objections to the same—Defendants propose that the Court set at least one pre-trial day for oral argument on deposition designation objections.  While rulings on motions *in limine* may dispose of many objections and the Court may rule on other objections based only on the parties' paper submissions, a significant number of objections are likely to remain.  A pre-trial hearing addressing overarching or recurring objections will guide the parties in preparing and conferring on the final deposition runs to present to the jury.

As for the logistics of presenting deposition testimony to the jury, the parties have generally agreed to present each deposition witness's testimony only once, thereby avoiding the inefficiency and potential confusion of having the jury hear from the same witness first in Plaintiffs' and then in Defendants' cases in chief.  The effect of this agreement is that in presenting a witness to the

17

jury by deposition, Plaintiffs will play all the testimony of that witness and not object to the testimony that Defendants offer from the same witness on the grounds that it exceeds the scope of Plaintiffs' designations.  That said, a different approach is warranted for witnesses whom Defendants alone have listed on their witness list and for whom Defendants alone have prepared "affirmative designations" of testimony.  While Plaintiffs should be allowed to offer counter-designations consistent with Federal Rule of Evidence 106, Defendants reserve the right to object to any attempt by Plaintiffs to designate testimony from such witnesses beyond the scope of Defendants' own designations (i.e., "affirmative designations").  In other words, if Plaintiffs seek to designate out-of-scope deposition testimony from a witness not on their witness list, the Court should only permit those designations to be offered in a rebuttal case (should the Court grant Plaintiffs leave to present one).

With respect to the introduction of witnesses who will testify via deposition, Plaintiffs have proposed that the party calling a witness by deposition read to the jury brief, agreed-upon introductions for the witness.  Defendants do not object in principle to this proposal, provided that such introductions are limited to a single, non-argumentative sentence identifying the witness by name, party affiliation, and their general connection to this case. The introductions should be neutral in tone and should not characterize the substance or significance of the witness's testimony. Defendants propose that the parties exchange proposed introductions no later than seven days before the witness's deposition is to be played, and that in the event of a dispute regarding the witness's introduction, either (a) the Court resolves the dispute on the morning when the witness's testimony is to be presented or (b) no introduction will be read to the jury for that witness.

18

**G.**     **Advance Disclosure of Witnesses and Deposition Testimony to Be Offered.**

To ensure fairness and adequate preparation time for both parties, Defendants propose the following advance-disclosure protocol to govern both sides' presentation of witnesses and designated deposition testimony at trial.

First, the calling party shall disclose a witness it intends to call live by 7:00 p.m. on the third business day preceding the day on which the witness will testify—whether live or by deposition video.  For the avoidance of doubt, and by way of example, a party wishing to call a witness on Monday would disclose that witness by 7:00 p.m. on the preceding Wednesday, a party wishing to call a witness on Tuesday would disclose that witness by 7:00 p.m. on the preceding Thursday, and so on.

Second, Defendants propose that the final video or designated deposition transcript that the offering party intends to introduce at trial must be exchanged with the opposing party before 12:00 p.m. on the day preceding the trial day on which the deposition testimony will be presented to the jury.[4]  No deposition shall be played at trial or read to the jury until the non-offering party has had an opportunity to review the final deposition video or, as the case may be, designated transcript as edited to reflect the parties' final designations and the Court's rulings.

---

[4] The parties have agreed that the party in whose case designated deposition testimony will be offered to the jury will provide to the other side a copy of the edited video deposition—or, as the case may be, highlighted deposition transcript—containing both sides' designations as soon as final rulings on deposition designations are obtained from the Court and video editing is completed.  The party preparing the video deposition shall not afford the opposing party's designations less favorable treatment than its own by, for example, highlighting or calling out its own quotations from documents but not highlighting or calling out in like manner the opposing party's designations.

**H.      Admission of and Objections to Exhibits.**

Defendants propose that the Court adopt a streamlined procedure for the admission of exhibits at trial.  Specifically, Defendants request that on each morning of trial, the Court hear argument and rule on any substantive objections to the admission of exhibits to be used that day. This procedure will minimize sidebars during live testimony, reduce disruptions to the jury's consideration of the evidence, and allow the parties to present their cases without unnecessary interruption.  For exhibits accompanying deposition video testimony, Defendants propose that offers of admission be made at the conclusion of each trial day, after the Court has had the opportunity to view the video testimony and rule on any outstanding objections.

With respect to Spanish-language documents, the parties have reserved substantive objections pending receipt of translations, which the parties anticipate exchanging pre-trial. Defendants request that the Court establish a deadline following the exchange of translations by which any objections to the accuracy of the translations or the substance of the underlying documents must be filed, so that such objections may be resolved before trial or, at minimum, constrained to the parties' exchange in order to facilitate the Court's resolution of any objections on the trial day when such documents will be offered to the jury.

**I.      Procedures for Voir Dire.**

Defendants also request that the Court address procedural matters relating to voir dire and jury selection, including the following.

First, given the anticipated trial length, the Court should seat 12 jurors rather than the seven or eight indicated in the Court's Standing Order.  *See* Fed. R. Civ. P. 48(a).  In a trial of up to 10 weeks, the Court should expect to excuse several jurors for family or medical emergencies,

20

unforeseen work obligations, or attendance issues.  Seating 12 jurors provides a cushion against substantial attrition and reduces the risk of mistrial.

Second, the Court should afford Defendants a total of six peremptory challenges, consistent with 28 U.S.C. § 1870.  *See id.* (in multi-party litigation, "[s]everal defendants . . . may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly").  The five Defendants fall into two groups represented by separate counsel—undersigned counsel represent Doe Run Resources Corporation, Albert Bruce Neil, and Marvin Kaiser, and separate counsel represent Defendants Ira L. Rennert and The Renco Group, Inc.  Affording these five differently situated Defendants just three peremptory challenges would not protect their statutory and Seventh Amendment rights.  Instead, the Court should grant Defendants a total of six peremptory challenges to account for their separate representation, heterogeneous interests, and the different claims they face premised on different theories of liability.

Third, Defendants are concerned about Plaintiffs' attempts to try this case in the local media and, accordingly, request that the Court allow individualized voir dire questioning outside the presence of the *venire* on recent publicity surrounding the trial, including a May 1, 2026 story in St. Louis Magazine and a May 25, 2026 story in the St. Louis Post-Dispatch.[5]  These reports, which provide flattering coverage (and even a press portrait) only of Plaintiffs' counsel, discuss contested facts, evidence subject to motions *in limine*, and inadmissible discovery disputes in presenting a highly plaintiff-slanted view of the litigation that many prospective jurors—who are

---

[5] J. Suntrup, "St. Louis legal fight pits New York billionaire against hundreds of Peruvian youths," St. Louis Post-Dispatch Online (May 25, 2026), *available at* rb.gy/5yfr5a (last visited May 25, 2026); R. Krull, "Doe Run Peru cases finally gear up for trial this June after nearly two decades," St. Louis Magazine (May 1, 2026), *available at* https://tinyurl.com/4cv89sjj (last visited May 25, 2026).

currently responding to questionnaires—will have seen.[6]   Among the topics reported are the imposition of discovery-based sanctions against Defendants, regulatory violations involving the Herculaneum smelter, net worth information regarding Mr. Rennert, the existence of hundreds of additional plaintiffs in the litigation, Defendants' supposed punitive damages exposure of over a billion dollars, and Plaintiffs' dismissed claims involving cadmium, arsenic, and sulfur dioxide exposure.   Defendants should be allowed to question every prospective juror on this recent publicity individually and privately to ensure that he or she has not prejudged the case or otherwise been tainted by it.

**J.      Procedures Applicable to Media Access to Courtroom.**

Any media representatives present during trial should be subject to the same restrictions as all members of the public under the Court's Standing Order: no photographs, audio or video recording, or broadcasting from the courtroom, and advance judicial approval for laptops.   The Court should strictly enforce these restrictions to prevent dissemination of any audio or visual record that could taint the jury pool for related pending cases involving many of the same parties and claims.   Defendants further request that the Court admonish media representatives that violations may result in courtroom exclusion and other appropriate sanctions.

**K.      Anticipated Interpreter Arrangements.**

The parties have agreed on interpreter arrangements: they will utilize AAA and interpreters previously used for depositions and other proceedings, splitting costs 50/50.   Defendants request that the Court address logistical matters in advance, including seating arrangements, the protocol

---

[6] In addition to a portrait of Plaintiffs' lead counsel Jerry Schlichter taken by a St. Louis Magazine photographer, the St. Louis Magazine article includes a picture of the CMLO provided "Courtesy of Jerry Schlichter."   Krull, *supra* note 5.   The Post-Dispatch article includes a picture of Herculaneum and covers much of the evidence on which Defendants have filed motions *in limine* but never mentions any of the evidence that Plaintiffs "want[] barred."   Suntrup, *supra* note 5.

22

for interpretation-accuracy objections, and whether interpreters will provide simultaneous or consecutive interpretation during live testimony.  Resolving these details before trial will ensure interpretation does not disrupt testimony or confuse the jury.

*    *    *

Defendants will be prepared to discuss the topics in this brief at the pre-trial conference.

Dated: May 26, 2026

Respectfully submitted,

**KING & SPALDING LLP**

By: */s/ Geoffrey M. Drake*
Andrew T. Bayman, #043342GA
abayman@kslaw.com
Geoffrey M. Drake, #229229GA
gdrake@kslaw.com
Mark Sentenac, #987346GA
msentenac@kslaw.com
1180 Peachtree Street, N.E., Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Tracie J. Renfroe, #16777000T
trenfroe@kslaw.com
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

*Attorneys for Defendants Doe Run Resources Corporation, Marvin K. Kaiser, and Albert Bruce Neil*

**LEWIS RICE LLC**

Thomas P. Berra, Jr., #43399MO
tberra@lewisrice.com
Michael J. Hickey, #47136MO
mhickey@lewisrice.com
600 Washington Ave., Suite 2500
St. Louis, Missouri 63102-2147

23

Telephone: (314) 444-7600
Facsimile: (314) 241-6056

*Attorneys for Defendants Doe Run Resources Corporation, Marvin K. Kaiser, and Albert Bruce Neil*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 26th day of May, 2026, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.


*/s/ Geoffrey M. Drake*

25