UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.O.A., *et al.*, | ) | |
| | ) | Case No. 4:11-cv-00044-CDP |
| Plaintiffs, | ) | (CONSOLIDATED) |
| | ) | |
| vs. | ) | |
| | ) | |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF EMERGENCY
MOTION TO STRIKE DR. NICHOLAS CHEREMISINOFF FROM
<u>PLAINTIFFS' WITNESS LIST</u>**

## I.    INTRODUCTION

Plaintiffs cannot substitute their standard of care expert three weeks before trial, much less

with an expert who died and was replaced six years ago.  At that time, Plaintiffs substituted Dr.

Jack Matson as their standard of care expert after the unexpected death of their previously retained

expert, Dr. Nicholas Cheremisinoff.  Now, three weeks before jury selection, Plaintiffs seek to

substitute the deceased Dr. Cheremisinoff for Dr. Matson.  Because this is legally impermissible

and immensely prejudicial to Defendants, the court should exclude Dr. Cheremisinoff's testimony.

In a filing made at 5:00 P.M. the evening before several pretrial filings were due, Plaintiffs

quietly withdrew Dr. Matson and stated their intent to instead show the jury the deposition

testimony of their deceased and long-replaced standard of care expert Dr. Cheremisinoff.

(Plaintiffs' Amended Witness List [ECF 1705].)  Buried in a footnote on the eve of a trial five years

in the making, Plaintiffs' move is gamesmanship of the highest degree.  Plaintiffs erroneously

characterize this gambit as designed to "obviate" Defendants' concerns regarding cumulative

testimony on the basis that Defendants had previously objected to the admissibility of Dr. Cheremisinoff's testimony on various grounds, including that it would be duplicative of Dr. Matson's.  But this is not an issue of merely "cumulative testimony."  Rather, allowing Dr. Cheremisinoff to now be substituted for Dr. Matson improperly allows Plaintiffs a third bite at the apple for putting forward a standard of care expert.  First Dr. Cheremisinoff, second Dr. Matson, and now back to Dr. Cheremisinoff.  Moreover, doing so would fundamentally change the nature of the trial—now only three weeks away—and severely prejudices the Defendants in a multitude of ways.

This case has proceeded over the last six years with Dr. Matson as Plaintiffs' standard of care expert—with his opinions as the focus of Plaintiffs' negligence case.  When Dr. Matson substituted for Dr. Cheremisinoff, Dr. Matson first adopted all of Dr. Cheremisinoff's opinions, only later to disclaim many of them.  As the Court put it in addressing Defendants' Rule 702 motion to exclude Dr. Matson, Dr. Matson did not "adopt[] wholesale and merely parrot Dr. Cheremisinoff's opinion," but "disagreed with Dr. Cheremisinoff." Dkt. 1524 at 49.  Defendants have invested thousands of attorney and expert witness hours responding to Dr. Matson's opinions, and those opinions have fundamentally shaped this litigation.  Defendants' experts have proceeded on the reasonable assumption that Dr. Matson's opinions controlled in terms of what Plaintiffs would present at trial—and Defendants' strategy in preparing for trial has been focused on responding to the theory of the case that Dr. Maston, as Plaintiffs' sole standard of care expert, put forth.  Plaintiffs may now realize that they prefer the opinions of the late Dr. Cheremisinoff and prefer to present those opinions to the jury free of cross-examination.  But preparing to respond to the opinions of Dr. Cheremisinoff, when previously discarded by Dr. Matson, is a substantial undertaking that requires more time than the three weeks left before a jury is picked.

2

Even more fundamentally, Plaintiffs' gambit vitiates Defendants' right to test unreliable expert testimony under Federal Rule of Evidence 702 and undermines the Court's gatekeeping obligation under *Daubert*. Given that Plaintiffs told this Court and Defendants that Dr. Matson was substituted for and replaced Dr. Cheremisinoff, Defendants never filed a Rule 702 motion to preclude Dr. Cheremisinoff's opinions. This Court then spent substantial time carefully reviewing Dr. Matson's opinions—not Dr. Cheremisinoff's—in the context of Rule 702 and summary judgment motions. Plaintiffs relied extensively on Dr. Matson's opinions to oppose Defendants' summary judgment motions, naming him *more than 100 times* in their briefing and telling the Court that they would rely on him at trial. Plaintiffs' attempted about-face would unravel the years of careful work Defendants and this Court have invested in preparing for trial, requiring additional, repetitive motions practice and delay. Defendants cannot be required to start over and develop a strategy responsive to the opinions of the long-deceased and replaced Dr. Cheremisinoff, without even the opportunity for trial cross-examination—especially not now, on the eve of trial. Nor is there sufficient time for this Court to review the new Rule 702 and summary judgment briefing likely required to test what Plaintiffs now want to claim is the standard of care.

Equally prejudicial is that Plaintiffs' eleventh-hour gambit seems intended to hide from the jury some of the strongest evidence Defendants have developed. Indeed, Dr. Matson gutted some of the central theories of Plaintiffs' case. Dr. Matson flatly rejected the image of Doe Run Peru as an inveterate polluter. He testified that Doe Run Peru successfully reduced lead emissions by 74%, and lead in ambient air by 48% between 1999 and 2000. (Matson Dep. (1/26/21), attached as Exhibit A, at 243:23-244:11; Matson Dep. (1/27/21), attached as Exhibit B, at 166:5-11; Matson Dep. (1/27/21), Ex. B, at 154:6-9). He further testified that this is "definitely not a case in which an American operator went down to South America and polluted, in an uncontrolled manner, a

3

pristine community." (Matson Dep. (1/26/21), Ex. A, at 239:10-15).  With respect to corporate separateness, Dr. Matson flatly rejected the notion that Ira Rennert dominated and controlled DRP such that it had no mind, will, or existence of its own.  He testified that he "doubt[ed] that [Ira Rennert] was involved in day-to-day operations," and that the people at Doe Run Peru "were in charge of the operations."  (Matson Dep. (1/26/21), Ex. A, at 235:6-22; 237:18-21).  He further testified that Ira Rennert was not responsible for DRP's supposed failure to meet his standard of care by not completing four fugitive emissions projects earlier.  (*See* Matson Dep. (1/26/21), Ex. A, at 208:9-16 (Ira Rennert "didn't make a decision [regarding the fugitive emissions projects] because [Doe Run Peru] didn't issue an AFE to do anything about it.")).  If Plaintiffs no longer wish to call Dr. Matson in light of these admissions, they must live with the consequences of a potential failure of proof.  They do not get to rewind the clock six years to a time before Dr. Matson became their only standard-of-care expert, before *Daubert* motions were filed and adjudicated, and before the entire case had developed around Dr. Matson's opinions.

At a minimum, if the Court allows Plaintiffs to call Dr. Cheremisinoff to testify by deposition at trial in lieu of Dr. Matson, the Court should vacate the June 29, 2026 trial date and issue a schedule for Rule 702 briefing on Dr. Cheremisinoff's opinions as such briefing would require substantial time given the hundreds of pages of reports issued by Dr. Cheremisinoff and the extent of the errors within them.  Defendants' trial teams have been working tirelessly to prepare for the upcoming trial and are prepared to proceed to a trial involving the opinions of Plaintiffs' current expert: Dr. Matson.  But a trial involving Dr. Cheremisinoff's standard of care opinions would look materially different such that Defendants would be severely prejudiced by not having the opportunity to formulate a trial plan and strategy.  There are serious, irreparably harmful consequences to going forward with this trial on the schedule planned and allowing Dr.

4

Cheremisinoff's deposition testimony in lieu of Dr. Matson's live trial appearance.  This is not a simple matter of swapping one expert for another, even if the timing and the procedural impropriety were not independent barriers.

Finally, the Court should sanction Plaintiffs for their handling of this situation.  Plaintiffs should be required to pay for Defendants' costs and fees associated with all of the responsive discovery and other trial preparation associated with responding to Dr. Matson, as laid out in detail below.  And if trial does proceed in June, Defendants should also be permitted the option of playing portions of Dr. Matson's deposition testimony at trial in their case in chief so that Plaintiffs cannot hide from the jury the opinions of their own expert that they adopted and forced Defendants to respond to for nearly six years.

## II.    ARGUMENT

Plaintiffs filed an Amended Witness List on June 1, 2026, listing 43 witnesses.  (Plaintiffs' Amended Witness List [ECF 1705].)  Their ninth witness is Dr. Cheremisinoff (via deposition), and their twenty-fifth is Dr. Matson.  But beside Dr. Cheremisinoff's name is footnote 2, which states:

> This amended witness list still includes Dr. Jack Matson and Dr. Nicholas Cheremisinoff. As the Court is aware, Defendants object to Dr. Matson pursuant to Federal Rule of Evidence 403 as "Cumulative of Cheremisinoff," and further object to Dr. Cheremisinoff pursuant to Federal Rules of Evidence 26 and 37 (*see* Doc. 1636). Defendants have moved *in limine* to keep out Dr. Cheremisinoff's testimony (Doc. 1645, MIL No. 7).
>
> Based on continued trial preparation, and in an attempt to avoid duplicative testimony, ***Plaintiffs presently anticipate calling only the late Dr. Cheremisinoff***. This will obviate Defendants' concern regarding the cumulative nature of designating both witnesses. Counsel will be prepared to discuss this matter at the final pretrial conference on June 9, 2026.

(ECF 1705 at 4 n.2 (emphasis added)).  In addition, Plaintiffs still list Dr. Cheremisinoff's research assistant, Christopher Brown (a previously undisclosed witness).

Plaintiffs' discarding of Dr. Matson at the last minute in favor of the deceased Dr. Cheremisinoff is improper and should not be permitted.

**A.     Plaintiffs Should Not Be Allowed to Present Dr. Cheremisinoff's Deposition Testimony at Trial.**

**1.     Plaintiffs Substituted Dr. Matson for Dr. Cheremisinoff Upon His Death in 2020, and the Parties Have Proceeded Accordingly for Six Years.**

There is no dispute that Dr. Matson was disclosed as a substitute expert for Dr. Cheremisinoff. (*See also* Defs.' Omnibus Mot. *in Limine*, at 17-18). The parties met and conferred extensively on the subject in August 2020 after Dr. Cheremisinoff passed away. The Court heard argument on this subject at the status conference on September 3, 2020, at which Plaintiffs' counsel explained that Dr. Cheremisinoff had passed away and that "in light of that change of circumstance, we have been in the process of retaining ***replacement*** experts for him." (Telephonic Status Conference (9/3/20) at 5:2-24 (emphasis added) (attached as Exhibit C)). This Court recognized that "Plaintiffs secured Dr. Matson as a ***substitute standard-of-care expert*** upon the unexpected death of their initial expert, Dr. Nicholas P. Cheremisinoff, in August 2020." (MSJ Order (9/9/25) [ECF 1524] at 48 (emphasis added)). Plaintiffs told the Court, at the time, that Dr. Matson would be the standard of care expert who would testify at trial. (Pls.' Opp. to MSJ (3/24/22) ("[T]he jury will undoubtedly be assisted by the expert opinion of Dr. Matson . . . .")).

Since then, the parties engaged in six years of discovery and trial preparation with the understanding that Dr. Matson was the standard of care expert in this case (even if he may rely in part on Dr. Cheremisinoff's prior work). Among other things, Defendants engaged in the following Matson-specific activities:

- **Initial Deposition of Dr. Matson**. Defendants took Dr. Matson's deposition over the course of two days—January 26 and 27, 2021. During that deposition, Dr. Matson

6

expressed opinions that drastically limited what he contended were the supposed standard-of-care failures by Doe Run Peru.  While the Court did not confine his opinions in ruling on Defendants' Rule 702 motion, the Court did note that Defendants would have the opportunity to cross-examine him at trial.  (MSJ Order (9/9/25) [ECF 1524] at 53-54).

- **Supplemental Expert Reports**.  To respond to Dr. Matson, Defendants served supplemental expert reports from several of their experts on March 19, 2021, including Corby Anderson, John Connor, Gale Hoffnagle, Shari Libicki (since substituted with Ranjit Machado—who has never responded to Dr. Cheremisinoff as he was disclosed long after Dr. Cheremisinoff's passing), Chip Pitts, and Shahrokh Rouhani.

- **Supplemental Matson Report**. Dr. Matson issued supplemental reports in May 2021, responding to certain opinions from John Connor, Corby Anderson, and Chip Pitts. Again, these reports required analysis and review by Defendants' various expert teams.

- **Supplemental Matson Deposition**. Defendants deposed Dr. Matson regarding his supplemental opinions for a third day of deposition in July 2021, at which time he offered opinions that in many cases contradicted those of Dr. Cheremisinoff.

- **Rule 702 Motions**.  After discovery was complete, Defendants moved to exclude Dr. Matson on multiple reliability grounds via motion in November 2021.  Notably, and as explained in Defendants Motion *in Limine* No. 7, Defendants did not move to exclude Dr. Cheremisinoff for similar reasons because he had been substituted for Dr. Matson at that point, and there was no reason to seek to exclude a prior substituted expert who had passed away.

7

- **Motions for Summary Judgment**.  Defendants moved for summary judgment in November 2021, and much of the summary judgment briefing with respect to the liability arguments revolved around Dr. Matson's testimony and theory of negligence as well as veil piercing issues in this case.  Dr. Matson's name appears 100 times in Defendants' Motion for Summary Judgment Under Missouri Law, reflecting the reality that his opinions defined the scope of this case since he replaced Dr. Cheremisinoff in 2020.

- **Summary Judgment and Daubert Reply Briefing**.  Defendants submitted reply briefs in support of their motions for summary judgment as well as their motion to exclude Dr. Matson in May 2022.  Again, Dr. Matson featured prominently in this briefing.

The time, effort, energy, and expense that has gone into responding to Dr. Matson's opinions over the past six years is enormous.  And the case is proceeding to trial on the theories that Dr. Matson identified in his deposition.  Defendants have crafted key elements of their trial strategy around Dr. Matson's testimony.  Indeed, as mentioned above, Defendants' expert Dr. Machado has never even had the opportunity to prepare opinions rebutting Dr. Cheremisinoff, as he was disclosed long after Dr. Cheremisinoff's death.

Plaintiffs should not be allowed to go back on their prior representations to the Court and to Defendants by pretending that the last six years never happened.  That is profoundly unfair to Defendants, not to mention a waste of the Court's and the parties' time and resources.  There have been many junctures in the past six years at which Plaintiffs could have sought to replace Dr. Matson should they have so desired or needed; the eve of trial is not the appropriate time.

> ### 2. Defendants Had No Opportunity to File a Motion to Exclude Dr. Cheremisinoff's Opinions Under Rule 702, Which Prejudices Defendants.

Defendants are also substantially prejudiced by the fact that they had no opportunity to challenge Dr. Cheremisinoff's expert opinions through a Rule 702 motion. As explained above, Plaintiffs represented that they would, and in fact did, replace Dr. Cheremisinoff with new experts—Dr. Matson for the standard of care and David Sullivan for the emissions inventory. Because Dr. Cheremisinoff would no longer be testifying at trial, there was no occasion or need for Defendants to file a Rule 702 motion to exclude his testimony.

Had Plaintiffs disclosed that Dr. Cheremisinoff would still be offered as a testifying expert at trial, Defendants would have moved to exclude him on numerous grounds. For example, Defendants would have moved to exclude Dr. Cheremisinoff's methodology as unreliable because the bases for many of his opinions are his own say-so, based solely on his speculation. (*Compare*, *e.g.*, Cheremisinoff Dep. (5/23/19), attached as Exhibit D, at 321:9-17 (claiming there was no information regarding the locations of stacks and release points and that a reasonable company would have prepared an inventory of this information), *with* the La Oroya PAMA (Jan. 13, 1997) [JEX058], attached as Exhibit E, at RENCOGRP-003022-028 (which includes such an inventory); *see* Cheremisinoff Dep. (5/22/19), attached as Exhibit F, at 125:8-127:12 (claiming no one was monitoring the CCTV footage of various emission points, but only supporting this belief by pointing to some unrelated files from employee computers that were produced alongside the CCTV footage)). Defendants would have also moved to exclude Dr. Cheremisinoff's opinions regarding his interpretations of Peruvian laws, regulations, and policy as outside the scope of his expertise and qualifications. (*See* Cheremisinoff Dep. (5/22/19), Ex. F, at 33:20-23 (explaining he is not an expert in Peruvian law or regulations)). Similarly, his opinions regarding corporate structure and separateness are beyond the scope of his expertise, and he admitted to doing no analysis to support

his opinions regarding corporate separateness, making these opinions inadmissible. (*See id.* at 66:23-25). Indeed, these are only a handful of the many potential Rule 702 challenges Defendants could have brought had they known Dr. Cheremisinoff would be Plaintiffs' standard of care expert at trial.

### 3.    Dr. Cheremisinoff Cannot Be Cross-Examined at Trial, Which Prejudices Defendants.

It is also improper to substitute a live expert witness for one who is deceased and cannot be cross-examined at trial.  Defendants are not aware of any instance in which a court has permitted substitution of a live expert for one who has passed away. Such a reverse substitution would prevent the jury from benefiting from robust cross-examination.  Indeed, as this Court noted, "[a]ny limitations of the information on which Dr. Matson relied in reaching his opinion may be presented to the jury and tested 'through the traditional means of cross examination and presentation of contrary evidence.'"  (MSJ Order (9/9/25) [ECF 1524] at 53 (quoting *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 632 (8th Cir. 2012))).  Of course, that cannot be the case for Dr. Cheremisinoff.

While Plaintiffs may argue that Defendants had the opportunity to examine Dr. Cheremisinoff during his deposition, that deposition was not adequate to preserve Defendants' rights.  Defendants conducted a deposition of Dr. Cheremisinoff that was obviously intended for discovery purposes rather than trial preservation.  When conducting depositions for discovery purposes, an opposing party seeks to ascertain the witness' knowledge of relevant evidence and to challenge that knowledge—or, in the case of experts, to discover the scope and bases for the experts' opinions.  By contrast, trial depositions are generally taken to preserve testimony if a witness is not available to testify in person at trial.  *See generally Lenius v. Deere & Co.*, Nos. C12–2063, C12–2072, 2014 WL 6879311 (N.D. Iowa Dec. 4, 2014); *Lofgren v. BNSF Ry. Co.*, 231

F. Supp. 3d 322, 324 (D.N.D. 2017).  At the time of his deposition, Dr. Cheremisinoff was not in extremis or otherwise expected to die imminently; his death has been referred to countless times as unexpected and untimely.  And it cannot be the law that every expert witness deposition must be conducted as if it would be used as primary testimony at trial.  That is simply not the way expert discovery proceeds.  In fact, in contrast to fact witnesses, expert opinions can be and are routinely substituted.  A fact witness possesses unique personal knowledge or percipient observations, whereas an expert brings his or her education and/or experience to bear on a set of facts that he or she likely did not live through.

### 4.   Plaintiffs' Attempt to Withdraw Dr. Matson and Replace Him with His Deceased Predecessor Prevents Defendants from Demonstrating to the Jury Flaws in Plaintiffs' Case, Which Prejudices Defendants.

Plaintiffs are attempting to benefit from relying on testimony from Dr. Cheremisinoff that was never subject to the Court's gatekeeping, while hiding that Dr. Matson's subsequent testimony is riddled with holes and admissions exposing the flaws in their case.  As a few examples, Dr. Matson admitted that:

- The La Oroya Complex was in "very poor condition" when it was acquired by Doe Run Peru and that the smelting technology was "extremely outdated."  (Matson Dep. (1/27/21), Ex. B, at 100:9-25).

- "[W]ell before Doe Run Peru acquired the complex in 1997, La Oroya was significantly contaminated with lead and other metals."  (Matson Dep. (1/26/21), Ex. A, at 152:5-9).

- This is "definitely not a case in which an American operator went down to South America and polluted, in an uncontrolled manner, a pristine community."  (Matson Dep. (1/26/21), Ex. A, at 239:10-15).

11

- The Government of Peru did not prioritize fugitive emissions at the time of the PAMA. (Matson Dep. (7/2/21), attached as Exhibit G, at 59:21-60:3).

- Doe Run Peru reduced lead emissions by 74%. (Matson Dep. (1/26/21), Ex. A, at 243:23-244:11; Matson Dep. (1/27/21), Ex. B, at 166:5-11).

- Doe Run Peru reduced lead in the ambient air by 48% between 1999 and 2000. (Matson Dep. (1/27/21), Ex. B, at 154:6-9).

These admissions chip away at Plaintiffs' negligence theory. So, they have chosen to discard Dr. Matson altogether in an eleventh-hour maneuver, hoping to curate for the jury their preferred narrative. That is not valid trial strategy; it is improper gamesmanship. More importantly, it undermines the crucial truth-finding function of the jury.

**B.      Without a Standard of Care Expert, Plaintiffs' Claims Should Be Dismissed.**

During summary judgment briefing, Plaintiffs took the position that they did not need a standard of care expert to proceed to trial. Plaintiffs argued at the time, again recognizing Dr. Matson's role in the case, that "[a]lthough the jury will undoubtedly be assisted by the expert opinion of Dr. Matson, his testimony is not legally necessary to establish the standard of care." (Pls.' Opp. to MSJ (3/24/22)). But the Court disagreed and found that expert testimony would be necessary to the jury. (MSJ Order (9/9/25) [ECF 1524] at 46 ("I agree with defendants that the relevant facts at issue in this case are so technical or complex that expert testimony on the standard of care is necessary to assist the factfinder in resolving the issues.")).

As such, if Plaintiffs have jettisoned Dr. Matson and Dr. Cheremisinoff is excluded as he must be, Plaintiffs do not have sufficient evidence to present a negligence case to the jury. Rather than proceeding with trial for which Defendants would then be entitled to judgment as a matter of

12

law at the close of Plaintiffs' case, the Court should permit Defendants to file a renewed motion for summary judgment.

If the Court were to permit a substitution at this late stage, which Defendants oppose, the trial should be vacated and a new discovery schedule should be negotiated, with costs assessed to Plaintiffs for the work associated with that effort.

**C.     If Dr. Cheremisinoff Is Permitted to Testify, The Trial Date Should Be Continued.**

If the Court allows Dr. Cheremisinoff's testimony, this case will be a fundamentally different case.  Defendants have been working with their expert witnesses, several of whom respond to Dr. Matson's opinions, for years in anticipation of the upcoming trial.  And the past few months have been particularly focused and work intensive as preparations for trial have intensified.  There is no way for Defendants to have a fair and adequate opportunity to present a defense if they are forced to prepare to face an entirely different theory of the case in three weeks.

There are numerous complexities and contradictions as between Dr. Matson's and Dr. Cheremisinoff's opinions that would need to be addressed and fleshed out by defense experts (including Dr. Machado, as discussed above) were they to be responding only to Dr. Cheremisinoff rather than to Dr. Matson's partial adoption of Dr. Cheremisinoff in addition to Dr. Matson's own supplemental opinions.  For example, Dr. Cheremisinoff relied on pre-2000 ambient air lead concentration data from a monitoring station near the facility (the Sindicato station) as a basis for multiple opinions.  (*See* Cheremisinoff Dep. (5/22/19), Ex. F, at 230:8-232:2 (discussing Exhibit 7 from Cheremisinoff's Expert Report)).  The data from the pre-2000 years shows a significant spike in air lead:



Exhibit 7. Ambient average annual lead concentrations reported for the Sindicato air monitoring station.

Source: See DRP - Sindicato PM Analysis.xlsx for original bates stamped records of data values.

(Cheremisinoff Rept. (2/18/19), attached as Exhibit H, at pdf p. 217 (Ex. 7)).  But Dr. Matson asserts that all pre-2000 Sindicato data is unreliable and "would not meet any kind of veracity test."  (Matson Dep. (7/2/21), Ex. G, at 25:5-15).  Indeed, Dr. Matson testified that "Dr. Cheremisinoff was wrong to have relied on pre-2000 data from the Sindicato station." (*Id.* at 25:1-4).  This contradiction is particularly damaging for Plaintiffs because Dr. Cheremisinoff used the pre-2000 data to support his opinion that air quality "significantly worsened" when Doe Run Peru began operating the facility.

But Defendants cannot cross-examine Dr. Cheremisinoff on his opinion regarding the Sindicato data. Nor can Defendants present to the jury how Plaintiffs' substitute expert Dr. Matson blatantly disagreed with Dr. Cheremisinoff's reliance on the Sindicato air data.

14

Similarly, Dr. Cheremisinoff testified that increased production when Doe Run Peru took over the facility led to increased emissions.  (Cheremisinoff Dep. (5/22/19), Ex. F, at 238:3-12 ("What I'm saying is that the plant production levels increased after Doe Run took possession of the facility, but I'm not aware of any changes that were made to air pollution controls.")).  ***But Dr. Matson specifically disclaimed Dr. Cheremisinoff's opinion on increased production*** because, given the unreliable Sindicato data, Dr. Cheremisinoff's conclusion that lead in the air had increased due to production increases was also unreliable. (Matson Dep. (7/2/21), Ex. G, at 315:17-316:2 (not adopting Cheremisinoff's opinion "that the data for 2000 or 1998 to 1999 on the particulate concentrations at Sindicato station represented to him that they had increased production and so that was the relationship.")).

These are just examples of the material contradictions between the two experts that would require a brand-new approach to trial and could not be accomplished within the coming three weeks, layered atop the numerous other pretrial deadlines and workstreams.  And, as discussed above, Defendants would need time to present their Rule 702 briefing to the Court.

**D.**     **The Court Should Impose Monetary Sanctions for Defendants' Fees and Costs Associated with Responding to Dr. Matson's Opinions.**

District courts have broad discretion in the choice of sanctions.  *Indep. Contractors of Maverick Transp., LLC v. Great W. Cas. Co.*, 2025 WL 871635, at *6 (E.D. Mo. Mar. 20, 2025). The United States Supreme Court has explained that a district court's "fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110 (2017).  The court, in its discretion, may thus decide "that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct." *Id.*  "And such judgments, in light of the trial

15

court's 'superior understanding of the litigation,' are entitled substantial deference on appeal." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

The Court should award Defendants their fees and costs associated with the work described above in Section A.I.  That work was entirely unnecessary and wasteful if Plaintiffs are no longer using Dr. Matson.  Defendants can submit an accounting for the amount of time spent by their counsel and experts responding to Dr. Matson's opinions at a later date.

**E.      Defendants Should Be Permitted to Present Dr. Matson's Deposition Testimony in Their Case.**

Finally, Defendants should be allowed to present Dr. Matson's deposition testimony in their case, with Plaintiffs not being permitted any counter-designations other than for completeness (in the strictest sense).  Where an expert is designated to testify at trial, "the expert is recognized as presenting part of the common body of discoverable, and generally admissible information and testimony available to all parties." *House v. Combined Ins. Co. of America*, 168 F.R.D. 236, 245 (N.D. Iowa 1996).  In *House*, the court balanced the potential prejudice to the plaintiff in allowing the defendant to call a withdrawn testifying expert as a witness against the court's interest in receiving expert testimony necessary to achieve "an informed resolution of plaintiff's claim." *Id.* at 247.  The court also considered a party's reliance on the other party's designation of expert trial witnesses and the expectation that designated experts will testify at trial.  Balancing those factors, the court concluded that, once a party designates an expert, "the party will have to live with the consequence that the opposing party will likely be given the opportunity to depose the expert or even to call the expert at trial on their own behalf." *Id.*; *see also Guinn v. CRST Van Expedited, Inc.*, No. CIV-09-1198-D, 2011 WL 2414393, at *2 (W.D. Okla. June 10, 2011) (allowing one party to call other party's withdrawn expert by deposition given circumstances where trial would be delayed by not allowing it; distinguishing testifying from consulting experts); *Peterson v. Willie*,

16

81 F.3d 1033, 1037 (11th Cir. 1996) (upholding trial court's decision to allow opposing party to call expert who had been designated as a testifying expert).  Dr. Matson's depositions are part of the record in this case and, in the circumstances wrought by Plaintiffs' gamesmanship, are fair game for Defendants to play in their case in chief.

## III.  CONCLUSION

In sum, Defendants submit that the Court should proceed as follows:

- Dr. Cheremisinoff's testimony should be excluded, as admitting it at this juncture would severely prejudice Defendants.

- Without expert testimony on standard of care, the Court should vacate the trial date and allow Defendants to file a renewed motion for summary judgment.

- Alternatively, if the Court does permit Dr. Cheremisinoff to testify in lieu of Dr. Matson, the Court should continue the trial date so that Defendants may have an adequate opportunity to re-calibrate their trial strategy and presentation in light of Plaintiffs' eleventh-hour tactics, and submit Rule 702 briefing on Dr. Cheremisinoff for the first time, a supplemental report from Dr. Machado, and new summary judgment briefing.

- The Court should issue sanctions against Plaintiffs for their unsupportable, belated, and inappropriate attempt to substitute and the costs and fees associated with developing the record with Dr. Matson as the testifying expert.

- The Court should permit Defendants to affirmatively designate Dr. Matson's deposition testimony.

17

Date: June 3, 2026

Respectfully submitted,

**KING & SPALDING LLP**

By: */s/ Geoffrey M. Drake*
Andrew T. Bayman, #043342GA
abayman@kslaw.com
Geoffrey M. Drake, #229229GA
gdrake@kslaw.com
Mark Sentenac, #987346GA
msentenac@kslaw.com
1180 Peachtree Street, N.E., Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Tracie J. Renfroe, #16777000T
trenfroe@kslaw.com
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

*Attorneys for Defendants The Renco Group, Inc., D.R. Acquisition Corp., Doe Run Cayman Holdings, LLC, Doe Run Resources Corporation, Ira L. Rennert, Marvin M. Kaiser, and Albert Bruce Neil*

**SIDLEY AUSTIN LLP**

Jennifer L. Saulino
Jennifer.saulino@sidley.com
Richard W. Smith
rwsmith@sidley.com
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736-8649
Facsimile: (202) 736-8711

*Attorneys for Defendants The Renco Group, Inc. and Ira L. Rennert*

**LEWIS RICE LLC**

Thomas P. Berra, Jr., #43399MO
tberra@lewisrice.com

18

Michael J. Hickey, #47136MO
mhickey@lewisrice.com
600 Washington Ave., Suite 2500
St. Louis, Missouri 63102-2147
Telephone: (314) 444-7600
Facsimile: (314) 241-6056

*Attorneys for Defendants Doe Run Resources
Corporation, Marvin K. Kaiser, and Albert Bruce
Neil*

**DOWD BENNETT LLP**

Edward L. Dowd, Jr., #28785MO
edowd@dowdbennett.com
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111

*Attorneys for Defendants The Renco Group, Inc.,
D.R. Acquisition Corp., Doe Run Cayman Holdings,
LLC, and Ira L. Rennert*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 3rd day of June, 2026, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.


*/s/ Geoffrey M. Drake*